**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KENNETH GORDON, Individually and on Behalf of All Others Similarly Situated,<br><br>   Plaintiff,<br><br>   v.<br><br>VANDA PHARMACEUTICALS INC., MIHAEL H. POLYMEROPOULOS, JAMES P. KELLY, GIAN PIERO REVERBERI, and THOMAS E. GIBBS,<br><br><br>   Defendants. | Case No. 1:19-cv-01108-FB-LB<br><br>**ORAL ARGUMENT<br>REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000

*Counsel for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF RELEVANT FACTS .................................................................................. 4

    A.    The Parties ........................................................................................... 4

    B.    Plaintiff's Allegations ......................................................................... 5

        1.    Purported "Off-Label" Marketing ......................................... 5

        2.    Unsealing of the Qui Tam Action ......................................... 8

        3.    Tradipitant and the FDA Action ........................................... 9

        4.    The Challenged Statements ................................................... 11

LEGAL STANDARD ............................................................................................................ 12

ARGUMENT .......................................................................................................................... 12

I.    Plaintiff Fails to Plead a Strong Inference of Scienter ...................................... 12

    A.    Plaintiff Fails to Plead That Any Defendant Intended to Deceive Investors About Purported Off-Label Marketing ......................................................... 14

    B.    Plaintiff Fails to Plead Scienter by Any Defendant to Deceive Investors About Tradipitant and the FDA Action ......................................................... 18

    C.    Plaintiff Impermissibly Employs Group Pleading, Which Cannot Support a Finding of Scienter ......................................................................... 20

II.    Plaintiff Fails to Plead Fraud with Particularity .............................................. 20

    A.    Plaintiff Fails to Plead Securities Fraud with Particularity in Connection with Purported Off-Label Marketing ......................................................... 21

    B.    Plaintiff Fails to Plead Securities Fraud with Particularity in Connection with Tradipitant and the FDA Action ......................................................... 23

III.    Plaintiff Fails Adequately to Plead an Actionable Material Misstatement or Omission .. 23

    A.    The Complaint Does Not Plead False or Misleading Statements About Fanapt® and Hetlioz® ......................................................................... 25

    B.    The Complaint Does Not Plead False or Misleading Statements About Tradipitant and the FDA Action ......................................................... 31

    C.    Items 303 and 305 of SEC Regulation S-K Do Not Provide Alternative Sources of Liability for Plaintiff ......................................................................... 35

        1.    Item 303 Does Not Create Any Duty to Disclose ................................ 35

        2.    Item 503 Does Not Create Any Duty to Disclose ................................ 38

IV.    Plaintiff Fails to Plead Loss Causation .......................................................... 39

    A.    Loss Causation is Not Pleaded for Alleged Off-Label Marketing Fraud ............ 40

|   | B. | Loss Causation is Not Pleaded for Tradipitant Allegations | 41 |
| V. | | The Fraud Claims Against the Individual Defendants Are Also Defective Because They Did Not "Make" the Challenged Statements During the Putative Class Period | 42 |
| VI. | | The Complaint Fails to State a Claim for Violation of Section 20(a) | 42 |
| CONCLUSION | | | 43 |

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abiuso* v. *Donahoe*,
No. 12–CV–1713 (JFB)(AKT), 2015 WL 3487130 (E.D.N.Y. June 3, 2015)....................4, 40

*In re Advanced Battery Techs., Inc.*,
781 F.3d 638 (2d Cir. 2015).......................................................................................13

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)........................................................................43

*In re Amarin Corp. PLC Sec. Litig.*,
689 F. App'x 124 (3d. Cir. 2017) ..............................................................................34

*Anschutz Corp.* v. *Merrill Lynch & Co., Inc.*,
690 F.3d 98 (2d Cir. 2012).........................................................................................12

*Apotex Inc.* v. *Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016)...........................................................................................8

*In re AstraZeneca Sec. Litig.*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008)........................................................................20

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...........................................................................13, 42, 43

*Avon Pension Fund* v. *GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) ...............................................................................14

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)........................................................................36

*Bartesch* v. *Cook*,
941 F. Supp. 2d 501 (D. Del. 2013)...........................................................................14

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)..............................................................................................24, 36

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)..........................................................................35

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
506 F. App'x 32 (2d Cir. 2012) ........................................................................ passim

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)..................................................................14, 22

iii

*C.D.T.S.* v. *UBS AG*,
  No. 12 Civ. 4924 (KBF), 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ...............................20

*In re Canandaigua Sec. Litig.*,
  944 F. Supp. 1202 (S.D.N.Y. 1996)......................................................................................36

*United States* v. *Caronia*,
  703 F.3d 149 (2d Cir. 2012)....................................................................................................5

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004)............................................................................ passim

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014)........................................................................................26, 38, 42

*Constr. Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*,
  No. 18-CV-7796 (VEC), 2020 WL 248729 (S.D.N.Y. Jan. 15, 2020).......................... passim

*In re CRM Holdings, Ltd. Sec. Litig.*,
  No. 10 Civ. 975 (RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...............................20

*Das* v. *Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018).....................................................................................14

*In re Deutsche Bank AG Sec. Litig.*,
  No. 09-cv-1714, 2016 WL 4083429 (S.D.N.Y. July 25, 2016)...............................................36

*Diehl* v. *Omega Protein Corp.*,
  339 F. Supp. 3d 153 (S.D.N.Y. 2018).....................................................................................38

*Dura Pharm., Inc.* v. *Broudo*,
  544 U.S. 336 (2005)..........................................................................................................12, 39

*ECA & Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)......................................................................................... passim

*In re Elan Corp. Sec. Litig.*,
  543 F. Supp. 2d 187 (S.D.N.Y. 2008)....................................................................................18

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  922 F. Supp. 2d 445 (S.D.N.Y. 2013).......................................................................................4

*Fan* v. *US Zhimingde Int'l Grp., LLC*,
  No. 19 CIV 1647 (NRB), 2020 WL 43352 (S.D.N.Y. Jan. 28, 2020)...................................16

*Fila* v. *Pingtan Marine Enter.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016).....................................................................................40

iv

*Fire & Police Pension Ass'n of Colo.*v. *Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015)....................................................................19, 26, 27, 34

*SEC* v. *First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)...................................................................................43

*Fort Worth Emp'rs' Ret. Fund* v. *Biovail Corp.*,
    615 F. Supp. 2d 218 (S.D.N.Y. 2009)......................................................................19

*Gallagher* v. *Abbott Labs.*,
    269 F.3d 806 (7th Cir. 2001) ...................................................................................34

*In re Genzyme Corp. Sec. Litig.*,
    754 F.3d 31 (1st Cir. 2014)................................................................................19, 34

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).......................................................................14

*Harris* v. *AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015)......................................................................26

*Holbrook* v. *Trivago N.V.*,
    No. 17 Civ. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) ..................24

*Hussain* v. *Alltran Fin., LP*,
    No. 17-cv-3571-ARR-CP, 2018 WL 1640584 (E.D.N.Y. Apr. 4, 2018) ................43

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)......................................................................41

*Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016).................................................................................36, 37

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012)..........................................................25, 27, 35

*Janus Capital Grp., Inc.* v. *First Derivative Traders*,
    564 U.S. 135 (2011).............................................................................................12, 42

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001).......................................................................13, 14, 17, 22

*Kinra* v. *Chi. Bridge & Iron Co.*,
    No. 17 Civ. 4251 (LGS), 2018 WL 2371030 (S.D.N.Y. May 24, 2018).................20

*Kleinman* v. *Elan Corp.*,
    706 F.3d 145 (2d Cir. 2013).....................................................................................24

*Lattanzio* v. *Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007)...................................................................................23

*Leemon* v. *Burns*,
175 F. Supp. 2d 551 (S.D.N.Y. 2001).....................................................................21

*Lefebvre* v. *Morgan*,
No. 14 Civ. 5322 (KMK), 2016 WL 1274584 (S.D.N.Y. Mar. 31, 2016) ...............8

*Lentell* v. *Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)..............................................................................40, 42

*In re Lions Gate Entm't Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016).........................................................19, 24, 34

*Local No. 38 IBEW Pension Fund* v. *Am. Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010).....................................................................17

*In re Manulife Fin. Corp. Sec. Litig.*,
276 F.R.D. 87 (S.D.N.Y. 2011) ...............................................................................39

*In re MELA Sciences, Inc. Sec. Litig.*,
No. 10 CV 8774(VB), 2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012)....................19

*Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016)......................................................................25

*In re Merrill Lynch Auction Rate Sec. Litig.*,
704 F. Supp. 2d 378 (S.D.N.Y. 2010)......................................................................41

*Mylan Pharm., Inc.* v. *Proctor & Gamble Co.*,
443 F. Supp. 2d 453 (S.D.N.Y. 2006)......................................................................16

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)..............................................................................39, 40

*Ong* v. *Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018)......................................................................24

*Ong* v. *Chipotle Mexican Grill, Inc.*,
No. 16 Civ. 141 (KPF), 2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) ......................24

*Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)........................................................31, 32, 35

*PDK Labs, Inc.* v. *Friedlander*,
103 F.3d 1105 (2d Cir. 1997)...................................................................................16

*Pearlstein* v. *BlackBerry Ltd.*,
   93 F. Supp. 3d 233 (S.D.N.Y. 2015)................................................................36

*Perez* v. *Higher One Holdings, Inc.*,
   No. 3:14-CV-755(AWT), 2016 WL 6997160 (D. Conn. Sept. 13, 2016).........................25, 28

*Reisner* v. *Stoller*,
   51 F. Supp. 2d 430 (S.D.N.Y. 1999)................................................................40

*Rombach* v. *Chang*,
   355 F.3d 164 (2d Cir. 2004)..............................................................12, 24, 28, 42

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016)..........................................................20, 25, 35

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)..............................................................14, 19

*Schaffer* v. *Horizon Pharma LLC*,
   No. 16 Civ. 1763 (JMF), 2018 WL 481883 (S.D.N.Y. Jan. 18, 2018)..................................39

*Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*,
   729 F. App'x 55 (2d Cir. 2018) ....................................................................23

*Simon* v. *Abiomed, Inc.*,
   37 F. Supp. 3d 499 (D. Mass. Apr. 10, 2014)........................................................16

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d. Cir. 2019)........................................................................31

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012)................................................................42

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)..................................43

*Steamfitters' Indus. Pension Fund* v. *Endo Int'l PLC*,
   771 F. App'x 494 (2d. Cir. 2019) ..................................................................34

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta Inc.*,
   552 U.S. 148 (2008)................................................................................12

*Stratte-McClure* v. *Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015).....................................................................24, 25

*In re Supercom Inc. Sec. Litig.*,
   No. 15 Civ. 9650 (PGG), 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018)..................................20

*In re Symbol Techs. Class Action Litig.*,
   950 F. Supp. 1237 (E.D.N.Y. 1997) ...............................................................32, 35

*Teamsters Local 456 Pension Fund* v. *Universal Health Servs.*,
   396 F. Supp. 3d 413 (E.D. Pa. 2019) ...................................................................15

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...............................................................................................12

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) ......................................................................................24

*Tongue* v. *Sanofi*,
   816 F.3d 199 (2d Cir. 2016)...................................................................................34

*In re UBS AG Sec. Litig.*,
   No. 07 Civ. 11225 (RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..............42

*Wilson* v. *Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011)...................................................................................26

*Zhong Zheng* v. *Pingtan Marine Enters.*,
   379 F. Supp. 3d 164 ...............................................................................................40

STATUTES

Private Securities Litigation Reform Act of 1995,
   15 U.S.C. § 78u–4...................................................................................1, 2, 12, 23

Securities Exchange Act of 1934 § 10(b),
   15 U.S.C. § 78j.............................................................................................. passim

Securities Exchange Act of 1934 § 20(a),
   15 U.S.C. § 78t....................................................................................................2, 42

OTHER AUTHORITIES

17 C.F.R. § 229.303 ...............................................................................................35, 37

17 C.F.R. § 229.503 ...............................................................................................35, 38

17 C.F.R. § 240.10b-5...........................................................................................12, 23, 42

21 C.F.R. § 312.2 ........................................................................................................5

52 Fed. Reg. 8798-01 (Mar. 19 1987) .........................................................................5

59 Fed. Reg. 52723 (Oct. 19, 1994)............................................................................35

68 Fed. Reg. 75056 (Dec. 29, 2003) ................................................................................35

Fed. R. Civ. P. 9(b) ................................................................................1, 2, 12, 23

Fed. R. Civ. P. 12(b)(6)................................................................................1

Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4, *et seq.* (the "PSLRA"), defendants Vanda Pharmaceuticals Inc. ("Vanda" or the "Company"), Dr. Mihael H. Polymeropoulos, James P. Kelly, Gian Piero Reverberi, and Thomas E. Gibbs (collectively, the "Individual Defendants" and, together with Vanda, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Lead Plaintiff Teamsters Local Union No. 727 Pension Fund's ("Plaintiff's") Amended Complaint for Violations of the Federal Securities Laws, dated July 23, 2019 (ECF No. 29) (the "Complaint"), in its entirety and with prejudice.

## PRELIMINARY STATEMENT

Vanda is a pharmaceutical company that develops and sells innovative therapies to improve the lives of patients with unmet medical needs. To develop these therapies, Vanda engages in long-term clinical studies that are laden with uncertainty, risk, and complexity—requiring regular interaction with Vanda's primary regulator, the U.S. Food and Drug Administration ("FDA"), regarding the Company's development pipeline. Vanda is also subject to various regulations, including those concerning the content of its communications with healthcare providers who prescribe Vanda's drugs. As described in greater detail below, Vanda provides robust disclosures to its shareholders of the ongoing risks that the Company faces by virtue of its business.

Yet, in this case, Plaintiff ignores this backdrop, attempting to hold Vanda and certain of its executives liable based on an untenable securities fraud theory cobbled together from disparate events at issue in two other litigations. First, the Complaint relies on allegations in a *qui tam* action currently pending against Vanda that the government declined to join (the "Qui Tam Action"), in which a disgruntled former sales employee alleges that Vanda engaged in improper, off-label marketing of drugs Fanapt® and Hetlioz®. Separately, the Complaint relies on entirely unrelated events that prompted Vanda to bring an action against the FDA, in which Vanda challenged the FDA-imposed partial clinical hold on extended clinical trials of tradipitant, a drug in Vanda's

1

development pipeline, after the FDA requested that Vanda conduct an additional study on dogs before proceeding with further clinical testing (the "FDA Action").  But to state viable claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Plaintiff must satisfy the heightened requirements imposed by the PSLRA and Federal Rule of Civil Procedure 9(b).  Plaintiff's amalgam of unconnected allegations fails to meet these standards for multiple, independent reasons, each of which requires dismissal of the Complaint:

*First*, Plaintiff fails to plead the required strong inference of fraudulent intent.  As courts have held, unproven, untested allegations from a *qui tam* action cannot be credited to establish securities fraud.  And, even if credited, at most the allegations relate to Vanda's purported intent to induce off-label prescribing by health care providers—*not* Vanda's intent to deceive its own shareholders.  Under controlling Second Circuit law, this is fatal to Plaintiff's claim.  As regards the FDA Action, far from pleading a strong inference of fraudulent intent regarding tradipitant, Plaintiff's allegations show that Vanda made a careful, strategic decision to pursue litigation challenging the FDA's position, after first attempting to convince the FDA to explain its position or consider alternative data collection methods.  Plaintiff makes no attempt to explain why Vanda would initiate a public lawsuit—disclosing its dispute with the FDA to the world—if it intended to conceal that dispute to defraud investors.  Nor does Plaintiff allege that Defendants had any motive to defraud investors.  This is not surprising, as the only Individual Defendants owning Vanda common stock *increased* their holdings during the relevant period—a fact that undercuts any inference of fraudulent intent.

*Second*, Plaintiff fails to plead fraud with particularity as to each Defendant.  For nearly all Defendants, the Complaint makes **zero** attempt to plead **any** involvement in disseminating allegedly false SEC filings.  And, with respect to Dr. Polymeropoulos and Vanda, the allegations are insufficient, relying almost exclusively on snippets of discussion from a single training session in November 2015 that had nothing to do with disclosures to the public.  Such allegations do not

2

come close to pleading facts showing knowledge of, and participation in, fraudulent disclosures to investors. The Complaint also contains *no* factual allegations about any Defendant's participation in a purported fraud regarding tradipitant, impermissibly relying on group pleading.

*Third*, Plaintiff fails to allege any false or misleading statement by any Defendant. With respect to purported off-label marketing, Plaintiff lists dozens of statements, covering a host of topics over a 39-month period, and contends that they were somehow rendered misleading because they did not admit to the purported off-label marketing alleged in the Qui Tam Action. But the law is crystal clear that companies are not obligated to disclose unadjudicated, unproven allegations of wrongdoing, like the allegations in the Qui Tam Action. And, with respect to the FDA Action, Plaintiff contends that Vanda *should have known* that it would be unable to resolve its dispute with the FDA, and made an earlier disclosure, before the partial clinical hold was actually imposed. But this is nothing more than an attempt to plead "fraud by hindsight," which cannot support a claim for securities fraud. Vanda had no duty to disclose the events prompting the FDA Action in advance of initiating that lawsuit, and, in any event, Vanda *did* disclose the relevant risks of its clinical trials.

*Fourth*, the Complaint fails adequately to plead loss causation. Plaintiff seeks damages for stock drops that followed two purported corrective disclosures: (1) a negative report from short seller Aurelius Value, issued on February 11, 2018 (the "Aurelius Report"), which—consistent with Aurelius Value's own financial incentives—pejoratively characterized allegations that had already been made public a week earlier; and (2) the announcement of the FDA Action, which revealed only that Vanda was challenging the scientific underpinnings of an FDA decision. Neither of these events qualifies as a "corrective disclosure" under the law: the Aurelius Report is nothing more than a negative characterization of information already available to the public, which the Second Circuit has held does not suffice; and the announcement of the FDA Action did not reveal any prior misstatement, and thus Plaintiff also cannot plead loss causation here.

3

For these reasons, and the others below, the Complaint should be dismissed.

## STATEMENT OF RELEVANT FACTS[1]

### A.    The Parties

Vanda is a biopharmaceutical company headquartered in Washington, DC that develops and commercializes innovative therapies to address unmet medical needs.  (¶ 34, 81.)[2]  Its common stock is traded on the NASDAQ securities exchange.  (¶ 15.)

The Individual Defendants are each current or former Vanda employees.  Dr. Mihael H. Polymeropoulos co-founded Vanda and, since May 2003, has served as Vanda's President and CEO.  (¶ 16.)  James P. Kelly served as Vanda's CFO from December 2010 to March 15, 2020.[3]  (*See* ¶ 17.)   Gian Piero Reverberi served as Vanda's Senior Vice President and CCO from December 2015 to March 16, 2020.[4]  (¶ 18.)  Prior to assuming these roles, Mr. Reverberi served as Vanda's Senior Vice President and European General Manager from September 2015 to December 2015.  (*Id.*)  For a period of only eight months, from April to December 2015, Thomas E. Gibbs served as Vanda's Senior Vice President and CCO.  (¶ 19.)

Plaintiff is a Vanda shareholder suing on behalf of a putative class of persons and entities who acquired Vanda common stock during a lengthy, 39-month period from November 4, 2015 until February 11, 2019 (the "Putative Class Period").  (¶¶ 1, 14.)  Plaintiff purports to have made its only purchase of Vanda shares on January 22, 2019, and to have held those shares for a few

---

[1]    The facts outlined herein are accepted as true solely for purposes of Defendants' motion to dismiss.  The relevant facts are drawn from the Complaint and from other sources that the Court is permitted to review.  To the extent that the Complaint quotes, cites, or references a document, that document is deemed incorporated in or integral to the Complaint.  *E.g.*, *Abiuso* v. *Donahoe*, No. 12–CV–1713 (JFB)(AKT), 2015 WL 3487130, at *3 (E.D.N.Y. June 3, 2015).  In addition, the Court may take judicial notice of SEC filings in considering Defendants' motion. *E.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 922 F. Supp. 2d 445, 460 n.13 (S.D.N.Y. 2013).

[2]    "¶" refers to a paragraph from the Complaint.  "Ex." refers to an exhibit to the Declaration of Brad D. Feldman, dated March 23, 2020 (the "Feldman Declaration").

[3]    On February 20, 2020, Vanda announced Mr. Kelly's resignation from Vanda, effective March 15, 2020.  (Ex. 9 at 2, Vanda Form 8-K (Feb. 20, 2020).)

[4]    On January 21, 2020, Vanda announced Mr. Reverberi's resignation from Vanda, effective March 16, 2020. (Ex. 8 at 2, Vanda Form 8-K (Jan. 21, 2020).)

weeks, through the end of the Putative Class Period.  (*See* Decl. of David A. Rosenfeld,  Ex. 3 at 2

(Apr. 26, 2019), ECF No. 9-3.)

> B.        **Plaintiff's Allegations**

> 1.        **Purported "Off-Label" Marketing**

As alleged in the Complaint (which is based heavily on the unproven and contested

allegations in the Qui Tam Action), during the Putative Class Period, Vanda engaged in purported

"off-label" promotion of its two commercially available drugs: (1) Fanapt®, which is FDA-

approved to treat schizophrenia in adults, and (2) Hetlioz®, which is FDA-approved to treat Non-

24-Hour Sleep-Wake Disorder ("Non-24"), a circadian rhythm disorder. (¶¶ 2–5, 49–186.)  The

allegations in the Qui Tam Action, cited liberally in the Complaint, come from former Vanda

employees—Richard Gardner and Jeff Bourgeois—who each worked as a Regional Business

Leader ("RBL") (¶¶ 29, 32–33) and had responsibility for overseeing Vanda sales representatives

in a designated region of the United States (¶¶ 29, 31–32).  As sales representatives, neither is

alleged to have ***any*** knowledge of Vanda's finance or accounting functions, or to have had

responsibilities for SEC filings or other Company disclosures.

Although the allegations from the Qui Tam Action focus entirely on purported "off-label"

promotion, prescribing drugs for "off-label" uses is an accepted medical practice; doctors are

permitted to use their medical judgment to prescribe medications for uses that go beyond the

indications listed on the FDA-approved label of the drug.  *United States* v. *Caronia*, 703 F.3d 149,

153 (2d Cir. 2012).  In fact, the Second Circuit has held that "prescription drugs can be prescribed

by doctors for both FDA-approved and -unapproved uses," noting that "courts and the FDA have

recognize the propriety and potential public value of unapproved or off-label drug use."  *Id.*

(collecting cases).[5]

---

[5]     *See also* 21 C.F.R. § 312.2(d) ("[t]his part does not apply to the use in the practice of medicine for an unlabeled
indication"); New Drug, Antibiotic, & Biologic Drug Product Regulations, 52 Fed. Reg. 8798-01, 8803 (Mar. 19

**Fanapt® Allegations**.  Plaintiff alleges that, beginning in early 2015, Vanda employed a team of twelve sales representatives (the "Fanapt 12") who purportedly promoted Fanapt® for off-label uses.  (¶¶ 74–76.)  Plaintiff asserts, without any factual support, that this purported off-label promotion began because Fanapt® was "a difficult antipsychotic to sell due to its limited indication (adults with schizophrenia), its status as a second-line treatment, its risk of [side effects (namely, a heart rhythm disorder called QT prolongation)], and its requirement to be administered twice-daily, as opposed to once-a-day." (¶ 74.)  Plaintiff alleges that, in November 2015, Vanda decided to expand the existing Fanapt® sales force, hiring additional RBLs (including Gardner and Bourgeois) and sales representatives, and bringing the total number of Fanapt® sales representatives to 50 (the "Fanapt 50").  (¶¶ 77–78.)

The Complaint focuses heavily on a single sales training session in November 2015.  In particular, Plaintiff alleges that the Fanapt 50, the RBLs, and members of Vanda senior management (including Dr. Polymeropoulos and Messrs. Kelly, Gibbs, and Reverberi) attended a five-day Fanapt® sales training in Washington, DC (the "November 2015 Meeting").  (¶¶ 82–84.)  The Complaint does not contain *any* specific factual allegations regarding Messrs. Kelly's, Gibbs's, or Reverberi's purported participation in the November 2015 Meeting.  Rather, relying primarily on snippets of purported statements by Dr. Polymeropoulos—statements that are incomplete and out of context—the Complaint alleges that Vanda trained its sales force to promote "off-label" use.

Not only are the snippets on which Plaintiff relies insufficient to demonstrate wrongful "off-label" marketing, but they also are internally inconsistent and/or innocuous.  For example, the Complaint faults Vanda for purportedly training its Fanapt® sales force to highlight the drug's low

---

1987) (stating that "[the] FDA [does] not regulate the practice of medicine" and "a physician may, in treating patients, prescribe the drug for uses not included in the drug's approved labeling").

6

risk of akathisia (a side effect common with other antipsychotics), but Plaintiff concedes that akathisia is, in fact, not prevalent with Fanapt®. (¶¶ 96–101.) And, with respect to QT prolongation (another side effect), Plaintiff points to Dr. Polymeropoulos's purported suggestion that certain Fanapt®'s competitors, unlike Fanapt®, lacked QT prolongation warnings "because those drugs were approved years after Fanapt and the FDA no longer considers QT prolongation a serious issue" (¶¶ 132–33), but this observation merely highlights a change in the FDA's priorities and does not improperly mis-market the drug for "off-label" use.

Plaintiff also alleges that, in the years following the November 2015 Meeting, the Fanapt 50 and RBLs were urged by members of Vanda's management to grow prescriptions of Fanapt® at a rate that Gardner and Bourgeois felt was faster than could be achieved via on-label prescriptions. (¶¶ 108–10, 113.) Plaintiff also criticizes Vanda for purportedly incentivizing off-label promotion by compensating salespeople based on "total dirt" rather than solely "on-label" sales. (¶ 114.) But these allegations merely suggest that two salespeople were critical of the Company's sales target practices. Finally, Plaintiff complains that Vanda provided salespeople with target lists of prescribers that included psychiatrists who treat children as well as adults—speculating that this *may have* caused doctors to prescribe Fanapt® "off label" to children. (¶¶ 120–27.) Yet, despite Plaintiff's characterization of these doctors as "child psychiatrists" (*see, e.g.*, ¶¶ 122–26), Plaintiff provides no factual basis for its ultimate conclusion, and, in any event, several of the named providers' public internet profiles show that they treat children and adults.[6]

---

[6]  For example, Dr. Teresita C. Briones-Ramilo is employed by the Franciscan Physician Network, which states in Dr. Briones-Ramilo's biography on its website that its specialists "are dedicated to providing quality care to children, *teens, and adults*." *Terisita C. Briones-Ramilo,* MD, Franciscan Health, https://www.franciscanhealth.org/find-a-doctor/physician/teresita-briones-ramilo-1144216060 (last visited Feb. 3, 2020) (emphasis added). Similarly, Dr. Paras Harshawat owns Harsha Behavioral Center, *Paras Harshawat*, LinkedIn, https://www.linkedin.com/in/paras-harshawat-5a978332 (last visited Feb. 3, 2020), which publicly identifies itself as an "Acute Psychiatric Hospital for Children, *Adolescents, Adults & Geriatrics*," Harsha Behavioral Center, Facebook, https://www.facebook.com/pg/harshacenter/about/?ref=page_internal (last visited Feb. 3, 2020) (emphasis added). Online listings for Dr. Rick Robertson and Dr. Syed Kahn indicate that they treat patients of various age groups, including adults. *Syed J.A. Kahn, MD, MBA*, Community Health Network, https://fad.ecommunity.com/provider/Syed+J.A.+Khan/185936 (last visited Feb. 4, 2020); Rick Robertson, MD, Hendricks Therapy, https://hendrickstherapy.com/rick-robertson (last visited Feb. 4, 2020). And online directory

**Hetlioz**®.  With respect to Hetlioz®, the thrust of Plaintiff's theory is that Vanda trained its sales force to promote the drug to psychiatrists for "off-label" use in sighted patients, as part of the "Hetlioz® to Psychiatrists Initiative" ("HPI").  (*See* ¶¶ 162–64, 171, 173, 178.)  But, as Plaintiff admits, the FDA had approved Hetlioz® to treat Non-24 "regardless of whether or not the patient is blind" (¶ 155).  Plaintiff's core theory thus makes no sense:  it cannot possibly be "off-label" to market Hetlioz® to both blind and sighted patients when the drug is approved for both categories.

Plaintiff also alleges that in marketing Hetlioz® to psychiatrists, sales representatives were trained to promote the drug for sleep disorders other than Non-24.  (¶¶ 167–68, 171–74, 177–78, 181.)  As purported evidence of this practice, Plaintiff alleges that Mr. Reverberi attended a national sales meeting in 2018 (¶ 180), during which a single Hetlioz® sales representative demonstrated his sales pitch, and purportedly did not specifically mention Non-24.  (¶ 181.) Plaintiff makes the tenuous leap that this single presentation must mean that Vanda marketed Hetlioz® for sleep disorders other than Non-24.  Inconsistent with that allegation, moreover, the Complaint acknowledges that former employee Bourgeois—one of the RBLs upon whose allegations the Complaint is based—was asked by Vanda's Head of Compliance to remove the word "sleep" from his sales reports, and instead to refer specifically to Non-24.  (¶ 175.)

### 2.    Unsealing of the Qui Tam Action

On February 4, 2019, the Qui Tam Action was unsealed, revealing to the public allegations of Vanda's purported off-label marketing practices—as well as the United States' and 27 states'

---

listings for Emma Engel and Dr. David Hilton lack any indication that they treat only children. *David Kent Hilton, MD*, WebMD https://doctor.webmd.com/doctor/david-hilton-e03e2dcf-a4a9-40c3-8bf8-4a90d9923af1-overview (last visited Feb. 4, 2020; *Emma Engel, PCNS*, Good Samaritan, https://www.gshvin.org/find-a-provider/e/emma-r-engel-pcns/ (last visited Mar. 2, 2020).  The Court may take judicial notice of these documents. *E.g.*, *Apotex Inc.* v. *Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016) (noting that, in deciding a motion to dismiss, the court may take judicial notice of a document that is "publicly available and [whose] accuracy cannot reasonably be questioned"); *Lefebvre* v. *Morgan*, No. 14 Civ. 5322 (KMK), 2016 WL 1274584, at *13 n.17 (S.D.N.Y. Mar. 31, 2016) (taking judicial notice of publicly available information on website, and collecting cases).

8

(and the District of Columbia's) decisions **not** to intervene in that action.[7]  (Ex. 21 at 3, Docket, *U.S. ex rel. Gardner* v. *Vanda Pharm. Inc.*, 1:17-cv-00464-APM (D.D.C. Feb. 4, 2019) (unsealing complaint and declination); Ex. 22 at 1, Notice of Election to Decline Intervention, *Gardner*, 1:17-cv-00464 (Jan. 29, 2019), ECF No. 16.)

Plaintiff does *not* allege that Vanda's stock price dropped as a result of the unsealing.  (*See* ¶¶ 429–35.)   Rather, Plaintiff wrongly contends that the Qui Tam Action allegations were "publicly revealed for the first time" a week later, on February 11, 2019, when short seller Aurelius Value issued a self-serving report (the "Aurelius Report") that quotes extensively from, and pejoratively characterizes, the complaint in the Qui Tam Action.  (Ex. 26 at 1, 2–4, 7–8, 11, Aurelius Report; *see* ¶¶ 185, 433.)  Plaintiff alleges that, on that same day as the Aurelius Report's publication, Vanda's stock price fell 5.51%.  (¶¶ 185, 434.)

### 3.    Tradipitant and the FDA Action

Plaintiff's second and unrelated fraud theory is that Vanda knew and fraudulently concealed that the FDA would impose a partial clinical hold on the Company's clinical trials for tradipitant, before the FDA formally imposed this hold (the "Tradipitant Allegations").  (¶¶ 211–12.)

By way of background, early in the Putative Class Period, Vanda was in the midst of conducting clinical tests of tradipitant's potential for treating gastroparesis, a debilitating digestive disorder.  (¶¶ 189–91.)  Plaintiff alleges that, in November 2016, Vanda initiated a Phase II trial of tradipitant for the treatment of gastroparesis ("Study 2301").  (¶¶ 201–02.) Regardless of Study 2301's outcome, however, "Vanda still needed to conduct a Phase III trial on gastroparesis for the

---

[7]    On February 14, 2019, the United States filed a Supplemental Notice stating that, in fact, all twenty-eight plaintiff states had declined to intervene as of the original declination notice.  (Ex. 23 at 1, Suppl. Notice, *Gardner*, 1:17-cv-00464-APM (Feb. 14, 2019), ECF No. 18.)  Then, on May 17, 2019, after reviewing the *amended* complaint in the Qui Tam Action, the United States declined to intervene a second time.  (Ex. 25 at 1, United States' Resp. to the Court's May 17, 2019 Minute Order, *Gardner*, 1:17-cv-00464-APM (May 28, 2019), ECF No. 30.)

FDA to approve tradipitant to treat gastroparesis." (¶ 202.) Put simply, clinical testing—with all of its attendant risks—would continue for some time.

Vanda submitted several requests to extend the duration of Study 2301. (¶ 203.) In particular, Vanda requested a protocol amendment in April 2018 seeking to "extend Study 2301 to add a 52-week, open-label extension period." (¶ 205.) Plaintiff alleges that, in response to the April 2018 protocol amendment, the FDA informed Vanda on a May 15, 2018 teleconference (the "May 2018 Call") that Vanda could not extend Study 2301 to 52 weeks until Vanda completed a separate nine-month non-rodent toxicity study (hereinafter, the "dog study"). (¶ 206.) Absent this additional study, the FDA would place a clinical hold on Study 2301 to prevent its expansion to 52 weeks. (¶¶ 211–13.)[8] To avoid the risk of a clinical hold being placed on Study 2301, Vanda submitted an amended protocol to the FDA in late May 2018, extending the study to three months, which the FDA approved. (¶¶ 214–15.) Plaintiff concedes that, in December 2018, after this study was completed, Vanda disclosed to investors that the Phase II study, Study 2301, was successful but that further study was needed with respect to treating patients with gastroparesis. (¶ 219.)[9]

Meanwhile, in August 2018, Vanda took steps through the FDA's internal process to challenge the FDA's position requiring a dog study. (¶ 216.) The FDA later rejected these efforts on a date not alleged in the Complaint. (*Id.*) Then, in September 2018, Vanda submitted a new clinical study protocol for tradipitant ("Study 2302"), which proposed a 52-week open-label extension study. (¶ 217.) Vanda contemporaneously engaged in dialogue with the FDA, both providing detailed scientific data supporting the safety profile of tradipitant and attempting to have

---

[8]     Plaintiff does not allege that the FDA's position was due to any particular concern regarding the safety of tradipitant but rather that the FDA took the position that "chronic toxicology studies in 2 species is a requirement, not a recommendation, prior to proceeding to long-term studies in humans." (¶ 211.)

[9]     (*See also* Ex. 7 at 2, Form 8-K (Dec. 3, 2018) ("Vanda believes that if these robust efficacy results with a well-tolerated chronic treatment safety profile are further confirmed in future studies, tradipitant has the potential to become a first line pharmacological option in the treatment of patients with gastroparesis.").)

the FDA explain its purported scientific justification for the requested dog study.[10]  A few months later, in December 2018, Vanda "again requested to add a 12-month open-label extension." (¶ 220.)  Notwithstanding the additional materials provided by Vanda, on December 19, 2018, the FDA informed Vanda by telephone that the FDA had placed a partial clinical hold on Studies 2301 and 2302 because Vanda had not conducted the dog study, and issued a written explanation to the Company three days later, on December 21, 2018.  (¶¶ 221–22.)  Vanda immediately asked the FDA to reconsider the partial clinical hold; but, on January 4, 2019, the FDA informed Vanda that it had denied its request for reconsideration.  (¶¶ 224–25.)

Unable to reach agreement with the FDA, on February 5, 2019, Vanda filed a lawsuit against the FDA seeking to challenge the FDA's dog study requirement and to lift the partial clinical hold on the tradipitant studies.  (¶ 226.)  As alleged, with the announcement of this filing, investors first "learn[ed] about the threat to Vanda's clinical testing regime for tradipitant caused by the Company's refusal to conduct a routine safety test on tradipitant."  (*Id.*)  Plaintiff contends that, on this news, the trading price of Vanda's common stock fell 19.95%.  (*Id.*)

### 4.    The Challenged Statements

Plaintiff alleges that dozens of Vanda's statements over a three-year-plus period were materially false and misleading (the "Challenged Statements").  A chart detailing the contents of the Challenged Statements, and categorizing them, is attached as Exhibit 1 to the Feldman Declaration.    None of these statements addresses—much less misrepresents—either the Company's marketing practices with respect to off-label use, or the dispute with the FDA regarding the dog study.  Rather, the Challenged Statements speak generally to six topics:  (1) the commercialization of Fanapt® and Hetlioz®; (2) the Fanapt® sales team expansion; (3) the uses and marketing of Fanapt®; (4) the uses and marketing of Hetlioz®; (5) risk factors; and (6) the

---

[10]    (Ex. 27 ¶ 105, Am. Compl., *Vanda Pharm. Inc.* v. *FDA*, 1:19-cv-00301 (D.D.C. May 29, 2019), ECF No. 18; Ex. 28 at 9, Defs.' Mem. Supp. Cross-mot. Summ. J., *Vanda*, 1:19-cv-00301 (Oct. 8, 2019), ECF No. 40.)

tradipitant gastroparesis study.  Plaintiff contends that these statements were somehow rendered false or misleading by the omission of information about off-label marketing and the FDA dispute.

## LEGAL STANDARD

Where, as here, section 10(b) fraud claims are asserted, a plaintiff must satisfy the heightened pleading standards under the PSLRA and Federal Rule of Civil Procedure 9(b). *See Anschutz Corp.* v. *Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012).  The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (citing *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005)).  To comply with Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  A complaint failing to satisfy these exacting pleading standards must be dismissed. *See, e.g.*, *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012).

To state an actionable claim under section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the Complaint must allege, among other things, (1) "a material misrepresentation or omission by the defendant," (2) "scienter," and (3) "loss causation." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta Inc.*, 552 U.S. 148, 157 (2008) (citation omitted).  A defendant can be liable only if he also is the "maker" of the challenged statement. *Janus Capital Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142 (2011).  The Complaint here must be dismissed on multiple, independent grounds for failure to meet these requirements.

## ARGUMENT

### I.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

The Complaint does not state a claim for securities fraud because it does not plead particularized facts that give rise to a strong inference of fraudulent intent by Defendants. *Tellabs,*

12

*Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007); *accord In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015).  It is "not enough" to allege a theory that "*could*" be true; the Court must weigh the competing inferences, and, to survive dismissal, Plaintiff's theory must be "at least as compelling as any opposing inference" of non-fraudulent intent.  *In re Advanced Battery Techs., Inc.*, 781 F.3d at 644 (quoting *Tellabs*, 551 U.S. at 324).

Under the law of this Circuit, scienter may be sufficiently alleged in one of two ways: (1) by pleading particularized facts sufficient to show a defendant's "motive and opportunity" to commit fraud; or (2) by pleading particularized facts demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *accord ECA & Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

This Complaint does not purport to plead a strong inference of scienter through "motive and opportunity" to defraud.  Indeed, there are no allegations that any Defendant benefitted personally from the purported fraud, or otherwise had any specific motive to deceive shareholders.[11]  Indeed, three of the four Individual Defendants *increased* their overall holdings of Vanda common stock during the Putative Class Period, and the fourth (Mr. Gibbs) held no Vanda common stock at all.[12]  Courts have held consistently that where defendants increase their holdings of the securities at issue during the relevant period, the increased holdings undercut an inference

---

[11]    *ECA*, 553 F.3d at 198 (citation omitted); *see also Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most corporate directors and officers do not suffice . . . plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." (citation omitted)).

[12]    As demonstrated in SEC filings, the four Individual Defendants acquired additional shares, and sold only a small number of shares, if any, to cover options exercises or pay taxes.  From the start of the Putative Class Period to the end, Dr. Polymeropoulos increased his shares of Vanda common stock from 816,781 to 1,163,636 (Ex. 14, Form 4 (Sept. 10, 2015); Ex. 17, Form 4 (Jan. 4, 2019)), and Mr. Kelly increased his shares from 53,304 to 193,473 (Ex. 10, Form 4 (Mar. 11, 2015); Ex. 15, Form 4 (Jan. 4, 2019)).  Mr. Reverberi held no Vanda common stock at the start of the Putative Class Period and increased his holdings to 138,870 shares by the end of the Putative Class Period.  (Ex. 13, Form 4 (Sept. 9, 2015); Ex. 16, Form 4 (Jan. 4, 2019).)  Mr. Gibbs held only derivative securities, not Vanda common stock, during a portion of the Putative Class Period.  (*See* Ex. 12, Form 4 (Apr. 21, 2015); Ex. 11, Form 3 (Apr. 20, 2015).)  The lack of significant stock sales in advance of negative disclosures dramatically undercuts any motive to engage in fraud.

of scienter.  *E.g.*, *Avon Pension Fund* v. *GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (where three of four defendants increased holdings during relevant period and fourth had no trading activity, plaintiffs failed to plead a "cogent and compelling" inference of fraudulent intent; rather, purchases signaled "only confidence in the future of their company and, by extension, in the commercial success of [its product]" (citation omitted)); *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (individual defendant's increase in holdings "raise[d] precisely the contrary inference from the one suggested by plaintiffs"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (fact that individual defendants increased their holdings was "wholly inconsistent with fraudulent intent").

Absent "motive and opportunity," Plaintiff must allege strong circumstantial evidence of conscious misbehavior or recklessness, for which "the strength of the circumstantial allegations must be correspondingly greater."  *ECA*, 553 F.3d at 198 (citation omitted); *accord Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018) (citing *Kalnit*, 264 F.3d at 142).  Plaintiff must demonstrate that the defendant understood that the public statements were inaccurate, or that the defendant was "'highly unreasonable' in failing to appreciate that possibility." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015), *aff'd sub nom. Tongue* v. *Sanofi*, 816 F.3d 199 (2d Cir. 2016).

Plaintiff fails to allege such strong circumstantial evidence here, either with respect to the allegations in the Qui Tam Action or the FDA Action.

A.      **Plaintiff Fails to Plead That Any Defendant Intended to Deceive Investors About Purported Off-Label Marketing**

Plaintiff's allegations about purported off-label marketing cannot establish a strong inference of scienter for at least five reasons—each of which is dispositive of this claim.

*First*, "unproven and contested" allegations in a qui tam action "do not amount to 'facts' sufficient to establish a strong inference of scienter." *Bartesch* v. *Cook*, 941 F. Supp. 2d 501, 507

14

(D. Del. 2013) (citations omitted); *accord Teamsters Local 456 Pension Fund* v. *Universal Health Servs.*, 396 F. Supp. 3d 413, 468 (E.D. Pa. 2019). *Universal Health* is directly on point. 396 F. Supp. 3d at 467–68. There, the plaintiffs pointed to allegations of misconduct from six separate *qui tam* actions against the company to show that executives must have known about alleged misconduct. *Id.* a 467. While noting that those *qui tam* allegations were specific, detailed, and numerous, the court nonetheless held that scienter had not been pleaded based on those allegations. The court explained that it could not "ignore the fact that the allegations raised in the qui tam cases [were] just that—allegations. None of the qui tam lawsuits resulted in findings against [the defendant]. Liability was not admitted, and thus, the allegations made in those suits remain unsubstantiated." *Id.* at 468. The same principles apply here.

*Second*, the liability allegations asserted in the Qui Tam Action are far too attenuated to establish a strong inference of fraudulent intent in this action. In order to prevail in the Qui Tam Action, the plaintiff there must overcome numerous hurdles: *first*, that Vanda trained its sales representatives improperly to promote Vanda's commercial drugs off-label; *second*, that the sales representatives, in fact, improperly promoted these drugs for off-label uses; *third*, that this conduct caused doctors to prescribe Fanapt® and Hetlioz® for off-label uses (which, as Plaintiff acknowledges, doctors are legally permitted to do (¶ 52)); *fourth*, that these off-label prescriptions were presented to government payors; *fifth*, that the government payors would have deemed these particular claims non-payable based on their specific reimbursement policies; and *sixth*, that, had the government payor known the truth, it would not have paid the claims. Such an attenuated chain of liability in the Qui Tam Action cannot possibly also support an inference of fraudulent intent here. In addition to pleading facts necessary to support each step of this chain (which Plaintiff has not done), Plaintiff would need to show that (1) Defendants *knew* that they were encouraging salespeople to promote drugs in a manner that would result in liability to the Company under the False Claims Act and (2) when then making statements to investors, Defendants

15

knowingly concealed that the sales activity somehow rendered their statements false or misleading. Plaintiff fails to do so. Allowing Plaintiff to convert alleged off-label marketing practices into securities fraud without any specific allegations of intent to deceive would improperly create a private right of action for shareholders to sue companies that engage in off-label marketing. The law is clear that no such private right of action exists. *See, e.g.*, *Mylan Pharm., Inc.* v. *Proctor & Gamble Co.*, 443 F. Supp. 2d 453, 460 (S.D.N.Y. 2006) ("[C]ourts have rejected attempts . . . to create a private cause of action to challenge a manufacturer['s] . . . sale of an FDA approved drug for off-label use." (citations omitted)).[13]

*Third*, even assuming allegations in the Qui Tam Action could be credited—and they cannot—alleged off-label marketing does not itself support an inference of intent because such practices can easily be attributed to corporate negligence, not fraud. In *Simon* v. *Abiomed, Inc.*, for instance, the plaintiff alleged scienter based on a series of inferences drawn from purported off-label marketing, similar to the inferential chain alleged here. 37 F. Supp. 3d 499, 502 (D. Mass. Apr. 10, 2014). The court rejected that scienter theory, explaining that "[i]mproper off-label marketing practices may . . . be the result of deliberate actions, or they may be the product of corporate mismanagement or negligence," including "negligence on the part of senior management in training and supervising" sales personnel. *Id.* at 523. Holding that scienter was not pleaded, the court cautioned that "inferring intent merely from the existence of the practice, even in a small company, is problematic." *Id.* at 522–23; *see also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[A]llegations of mismanagement . . . are insufficient to support a

---

[13]    *See also PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1113 (2d Cir. 1997) (dismissing Lanham Act claim where plaintiff's "true goal [was] to privately enforce alleged violations of the FDCA" and noting that "no such private right of action exists"); *Fan* v. *US Zhimingde Int'l Grp., LLC*, No. 19 CIV. 1647 (NRB), 2020 WL 43352, at *5 (S.D.N.Y. Jan. 28, 2020) (dismissing claim for violations of the FDCA and stating that "plaintiff has failed to cite, and the [c]ourt is not aware of, any provision in the FDCA or a legal authority that provides for a private right of action for violations of FDCA's provisions").

16

securities fraud claim under section 10(b).")), *aff'd sub. nom. Albert Fadem Tr.* v. *Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

*Fourth*, even assuming that the allegations in the Complaint demonstrate improper marketing practices, they fail to plead that Defendants intended to deceive **shareholders**, as opposed to some other group. The Second Circuit has specifically held that, to plead scienter under section 10(b), a plaintiff must plead that the fraudulent intent is specifically directed at **shareholders**. *ECA*, 553 F.3d at 202–03. In *ECA*, the defendant bank was alleged to have created entities "to facilitate disguised loan transactions with Enron Corporation." *Id.* at 193–94. Attempting to plead scienter, the bank's shareholders alleged that the defendants knew the disguised loan transactions were related-party transactions, but failed to disclose them as such. *Id.* at 201–02. The court held that this was insufficient because plaintiffs failed to show an intent to defraud *the defendant's own shareholders*, rather than Enron's shareholders, concluding that "[e]ven if [the defendant] was actively engaged in duping other institutions for the purposes of gaining at the expense of those institutions, it would not constitute a motive for [the defendants] to defraud its own investors." *Id.* at 203; *see also Kalnit*, 264 F.3d at 141 ("any intent to defraud [a potential acquiring company] cannot be conflated with an intent to defraud the shareholders" in order to establish scienter). The same is true here. Plaintiff's allegations, at most, would show an intent to deceive healthcare providers *or*, perhaps, government payors, but they do not show an intent to deceive **Vanda's shareholders**, as Second Circuit law requires.

*Finally*, scienter is not pleaded because the individuals upon whose allegations the Complaint relies—namely, Gardner and Bourgeois—were employed only as members of Vanda's *sales* team. (*See* ¶¶ 29–33.) As such, they are not alleged to have had any knowledge regarding the Company's issuance of SEC filings and other public statements, much less Defendants' state of mind when making those statements (as would be required to plead a strong inference of Defendants' scienter). *See, e.g., Local No. 38 IBEW Pension Fund* v. *Am. Express Co.*, 724

17

F. Supp. 2d 447, 460–61 (S.D.N.Y. 2010) (allegations insufficient where complaint was premised on witnesses "employed in rank-and-file positions or by outside contractors" or unable to provide facts that defendants "had specific information contradicting [those defendants'] public statements"); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (finding allegation insufficient where witness was not "in a position to have knowledge regarding communications with [the company's] senior management or the conclusions reached by [] senior management upon receipt of [the relevant] information").

> ### B.    Plaintiff Fails to Plead Scienter by Any Defendant to Deceive Investors About Tradipitant and the FDA Action

Nor does the Complaint allege factual allegations establishing a strong inference of intent to defraud shareholders concerning the Tradipitant Allegations.  To the contrary, Plaintiff's allegations show just the opposite:  a measured, strategic decision by Vanda to engage in dialogue with the FDA concerning what studies would be necessary during the clinical testing of tradipitant, followed by a decision to litigate once the internal process concluded.  Such allegations are inconsistent with any intent to deceive shareholders.

The Complaint does not contain *any* factual allegations showing that any person affiliated with Vanda took any steps to deceive shareholders about the tradipitant clinical trial.

Instead, Plaintiff theorizes—with no factual support—that Vanda's intent can be inferred from the delay between the FDA's request for a dog study in May 2018 and the partial clinical hold imposed in December 2018, speculating that Vanda *knew* as early as May 2018 that a partial clinical hold would later be imposed.  This speculation offers no factual basis to infer that any Defendant intended to deceive shareholders.  To the contrary, the allegations in the Complaint show that Vanda acted reasonably.  When Vanda received word in May 2018 of the FDA's then-current position regarding a dog study, it promptly took steps to address it—including, at first, successfully extending Study 2301 by a month while it considered the FDA's dog study position.

18

(¶¶ 214–17, 220–22, 225.)  After much back and forth, it was not until December 2018—following Vanda's unsuccessful efforts to convince the FDA to reverse its position—when the FDA imposed the partial clinical hold.  (¶¶ 211–21.)  Far from hiding this development from shareholders, only weeks later (in early February 2019), Vanda initiated the FDA Action, accompanied by a public announcement that very same day.  (¶ 226.)  Plaintiff offers *no* explanation for why Vanda would initiate a public lawsuit—making its dispute with the FDA known to the world—if it intended to conceal that dispute from investors.  The filing of the FDA Action, if anything, demonstrates that the Individual Defendants *lacked* intent to defraud investors.

Finally, Plaintiff cannot plead scienter simply by complaining that the FDA dispute should have been disclosed earlier.  Courts have routinely rejected the argument that non-final communications with the FDA, let alone a Company's nonpublic litigation strategy, must be disclosed in real time to investors.  *See Fire & Police Pension Ass'n of Colo.* v. *Abiomed, Inc.*, 778 F.3d 228, 243 n.9 (1st Cir. 2015) ("there is no per se rule that a company immediately disclose receipt of any correspondence with the FDA" (citation omitted)); *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014) (non-disclosure of negative FDA communication, which was not "final word," did not breach any duty to disclose); *In re Sanofi*, 87 F. Supp. 3d at 541–42 (noting that multiple courts have "rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review"); *In re MELA Sciences, Inc. Sec. Litig.*, No. 10 CV 8774(VB), 2012 WL 4466604, at *13–14 (S.D.N.Y. Sept. 19, 2012) (finding no duty to disclose FDA correspondence raising issues with ongoing clinical trials); *Fort Worth Emp'rs' Ret. Fund* v. *Biovail Corp.*, 615 F. Supp. 2d 218, 231 (S.D.N.Y. 2009) (finding no duty to disclose FDA feedback critical of ongoing study design).  Nor was Vanda required to disclose the FDA Action before it was filed.  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) ("no duty to disclose litigation that is not substantially certain to occur" (citations omitted)).

19

C.      **Plaintiff Impermissibly Employs Group Pleading, Which Cannot Support a Finding of Scienter**

Unable to plead strong circumstantial evidence of any Defendant's misconduct, Plaintiff falls back on impermissible group pleading, relying on conclusory allegations about Defendants' access to information and positions of authority.  (¶¶ 118, 206, 211, 221–22, 225, 422.)  But allegations lumping Defendants together *en masse* run counter to the foundational requirement that "[s]cienter must be separately pled and individually supportable as to each defendant." *C.D.T.S.* v. *UBS AG*, No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013) ("[S]cienter is not amenable to group pleading."), *aff'd sub nom. Westchester Teamsters Pension Fund* v. *UBS AG*, 604 F. App'x 5 (2d Cir. 2015); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 472 (S.D.N.Y. 2008) (same); *see also In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) ("Scienter . . . cannot be inferred solely from the fact that, due to the defendants' . . . executive managerial position, they had access to the company's internal documentation as well as any adverse information.").  Where, as here, a plaintiff fails to plead scienter individually as to any defendant, dismissal is warranted.  *See, e.g.*, *In re Supercom Inc. Sec. Litig.*, No. 15 Civ. 9650 (PGG), 2018 WL 4926442, at *28 (S.D.N.Y. Oct. 10, 2018) (dismissing section 10(b) claims "for failure to plead scienter individually"); *Kinra* v. *Chi. Bridge & Iron Co.*, No. 17 Civ. 4251 (LGS), 2018 WL 2371030, at *6–7 (S.D.N.Y. May 24, 2018) (same); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (same).

## II.      PLAINTIFF FAILS TO PLEAD FRAUD WITH PARTICULARITY

In addition to failing to plead an overarching theory of liability that could support a strong inference of scienter, the Complaint fails to plead fraud with particularity as to each Defendant.

### A.    Plaintiff Fails to Plead Securities Fraud with Particularity in Connection with Purported Off-Label Marketing

Focusing on the specific allegations by Defendant—as required, *Leemon* v. *Burns*, 175 F. Supp. 2d 551, 556 (S.D.N.Y. 2001)—it is clear that Plaintiff fails to plead fraud with particularity:

Dr. Polymeropoulos.    At their core, Plaintiff's allegations—taken from the Qui Tam Action—speak only to the first in a long chain of inferences necessary to establish liability under the False Claims Act, not the securities laws. (*Supra* 15–16.)  But, even assuming that these allegations could support an inference that Dr. Polymeropoulos improperly trained sales representatives to promote drugs off-label (he did not), the Complaint is devoid of well-pleaded factual allegations showing any intent to defraud Vanda's *shareholders*.  (*Supra* 17.)

Further, the out-of-context snippets that Plaintiff cites from the November 2015 Meeting do not plead fraud with particularity regarding Dr. Polymeropoulos.  In short, Plaintiff contends that he improperly trained sales representatives regarding Fanapt® promotion at a single meeting where Dr. Polymeropoulos, a psychiatrist, opined as to inferences that psychiatrists might draw from the drug's sole indication for schizophrenia, the value of the drug's low instance of akathisia, the reason why certain of the drug's competitors do not have Fanapt®'s QT prolongation warning, and the feasibility of employing a once-daily dosing schedule due to the drug's long half-life. (¶¶ 88, 101, 133, 139–40, 165.)  None of these allegations—many of which conflict with other allegations in the Complaint (*see supra* 6–7)—gives rise to a strong inference of intent to defraud *shareholders*.

And with respect to the alleged off-label marketing of Hetlioz®, Plaintiff alleges that Dr. Polymeropoulos acted improperly by instructing the sales team to educate doctors about Hetlioz® irrespective of whether the particular doctor did or did not treat blind patients.  (¶ 164.) Since the FDA has approved Hetlioz® to treat Non-24 *in both blind and sighted patients,*

21

Dr. Polymeropoulos's instruction was perfectly appropriate.    Plaintiff also alleges that Dr. Polymeropoulos observed that psychiatrists "would understand that[,] if Hetlioz treats circadian rhythm disruption in Non-24[,] . . . it could also treat . . . other sleep disorders caused by circadian rhythm disruption[.]" (¶ 165.)  But this observation about *psychiatrists'* understanding of the drug does not demonstrate that Dr. Polymeropoulos improperly told the sales team to recommend off-label use to providers. And, even more fundamentally, this allegation—like the others discussed above—does not show any intent to defraud *shareholders*. *E.g.*, *ECA*, 553 F.3d at 203; *Kalnit*, 264 F.3d at 141.

Mr. Kelly.  Plaintiff alleges that Mr. Kelly attended the November 2015 Meeting, at which the Fanapt 50 were trained regarding the promotion and sale of Fanapt®.  (¶¶ 82–83, 163–65.) There are no allegations in the Complaint, however, as to how—if at all—Mr. Kelly actually participated in this meeting, let alone any pleaded facts that show intent to defraud shareholders.

Mr. Reverberi.  The Complaint's allegations regarding Mr. Reverberi are similarly anemic. Like Mr. Kelly, Mr. Reverberi is alleged to have attended the November 2015 Meeting, but the Complaint offers no allegations as to how—*or even whether*—Mr. Reverberi participated in that meeting.  The Complaint alleges only that Mr. Reverberi encouraged RBLs to increase sales of Fanapt® throughout the Putative Class Period (*see, e.g.*, ¶¶ 108, 109, 113), but does not allege that Mr. Reverberi instructed anyone to accomplish this goal by marketing Fanapt® off-label or that he knew anyone in Vanda's sales force would engage in off-label marketing.  And, as numerous courts have held, management does not commit securities fraud merely by encouraging sales representatives to meet sales targets.  *In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 566 (noting that "[o]ffering incentives to meet sales or earnings goals is a common practice" and is insufficient to support a finding of conscious misbehavior or recklessness).

Mr. Gibbs.  The only Challenged Statement that Mr. Gibbs is alleged to have made *predates* the Putative Class Period, and thus cannot form the basis of any liability.  *Lattanzio* v.

22

*Deloitte & Touche LLP*, 476 F.3d 147, 154 (2d Cir. 2007) (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)) ("A defendant . . . is liable only for those statements made during the class period."). Regardless, the Complaint cannot plead scienter as to Mr. Gibbs because the only allegation as to him—*i.e.*, his mere attendance at the November 2015 Meeting (¶¶ 82–83, 163–165)—lacks *any* specificity as to his participation, if any, in that meeting.[14] Nor does the Complaint offer any theory for why Mr. Gibbs—who departed Vanda one month after the Putative Class Period commenced, and never held or sold Vanda common stock—would have intended to deceive shareholders. (¶ 19.)

### B. Plaintiff Fails to Plead Securities Fraud with Particularity in Connection with Tradipitant and the FDA Action

With respect to the Tradipitant Allegations, Plaintiff offers no well-pleaded factual allegations specific to *any* Individual Defendant's (or any other individual's) participation in the purported fraud. The Complaint is silent as to the "who, what, when, where and how" of the purported fraud, even going so far as to assert claims against one Defendant—Mr. Gibbs—who was not employed at Vanda during the time period relevant to the Tradipitant Allegations. (*See* ¶ 19.) Rather, the Complaint attributes the fraud only to *Vanda* generally, with no factual allegations for how the fraud was conducted. Plaintiff, therefore, fails to plead the Tradipitant Allegations with the particularity required by Rule 9(b) and the PSLRA.

### III. PLAINTIFF FAILS ADEQUATELY TO PLEAD AN ACTIONABLE MATERIAL MISSTATEMENT OR OMISSION

The Complaint also fails to plead that the Challenged Statements were false or misleading. Section 10(b) and Rule 10b-5 prohibit Defendants from making an "untrue statement of material fact" or "omit[ting] . . . a material fact necessary in order to make the statements made, in the light

---

[14] Because the allegations of scienter with respect to the Individual Defendants fail, these same allegations cannot support a finding of scienter as to Vanda. *See Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*, 729 F. App'x, 55, 58 (2d Cir. 2018) ("[T]he pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." (citation omitted)).

of the circumstances under which they were made, not misleading[.]"  17 C.F.R. § 240.10b–5.

"A statement is misleading if a reasonable investor would have received a false impression from

the statement."  *Ong* v. *Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 226 (S.D.N.Y. 2018)

(citation omitted).  To establish this element, Plaintiff "must do more than say that the statements

. . . were false and misleading; [Plaintiff] must demonstrate with specificity why and how that is

so." *Rombach*, 355 F.3d at 174; *accord Kleinman* v. *Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

Plaintiff also must plead that the alleged misstatement is material, *i.e.*, that a reasonable

shareholder would consider it important in deciding how to act.  *ECA*, 553 F.3d at 197 (quoting

*Basic Inc.* v. *Levinson*, 485 U.S. 224, 240 (1988)).[15]

This action is premised principally on purported omissions.  Omissions are not "actionable

under the securities laws" absent "a duty to disclose" the omitted information.  *Stratte-McClure* v.

*Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (citation omitted); *accord Basic*, 485 U.S. at 239

n.17; *Ong* v. *Chipotle Mexican Grill, Inc.*, No. 16 Civ. 141 (KPF), 2017 WL 933108, at *8

(S.D.N.Y. Mar. 8, 2017).  The relevant question is *not* whether "a reasonable investor would very

much like to [have] know[n]" about the alleged misconduct at an earlier point in time.  *In re Time*

*Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *see also Holbrook* v. *Trivago N.V.*, No. 17

Civ. 8348 (NRB), 2019 WL 948809, at *16 (S.D.N.Y. Feb. 26, 2019) ("[A] duty to disclose does

not spring solely from plaintiffs' interest in that omitted fact."), *aff'd sub nom. Shetty* v. *Trivago*,

No. 19-0766, 2019 WL 6834250 (2d Cir. Dec. 16, 2019).

To make out a duty to disclose, Plaintiff must either (1) show that an omission rendered a

statement "inaccurate, incomplete, or misleading" or (2) identify "a statute or regulation [that]

---

[15]   Plaintiff has pleaded no facts to show that the information purportedly misrepresented in any of the Challenged Statements was material.  For a misstatement to be material "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *ECA*, 553 F.3d at 197.  Where, as here, a plaintiff fails to plead that the purportedly omitted information was material, the complaint should be dismissed. *See In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d at 13–14.

requir[ed] disclosure" of the omission.  *Stratte-McClure*, 776 F.3d at 101 (citation omitted).  To render a disclosure "inaccurate, incomplete, or misleading," *id.* (citation omitted), an alleged omission must be "sufficiently connected" to the disclosure.  *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (citation omitted); *see also Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581–82 (S.D.N.Y. 2016) (noting that "there must be a connection between the illegal conduct and the misleading statements" beyond the mere "adverse impact upon the corporation's operations in general" and finding a stated connection "too tenuous to give rise to a duty to disclose" (citation omitted)).

Where, as here, Plaintiff complains that improper activity by the Company was not disclosed, a claim cannot be stated unless the existing disclosure "suggest[s] that the undisclosed improper activity alleged by [p]laintiff was not occurring."  *In re ITT Educ. Servs.*, 859 F. Supp. 2d at 579; *see also In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 403 ("The critical consideration . . . in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading." (citation omitted)); *Perez* v. *Higher One Holdings, Inc.*, No. 3:14-CV-755(AWT), 2016 WL 6997160, at *16 (D. Conn. Sept. 13, 2016) (finding no duty to disclose absent statement that company "was not engaging in the conduct" challenged).  As demonstrated below, in this case, Defendants did not make any statements that the purported improper activity was not occurring, and the Challenged Statements are not sufficiently connected to the alleged omissions to be rendered false.

### A.    The Complaint Does Not Plead False or Misleading Statements About Fanapt® and Hetlioz®

Plaintiff's principal theory is that dozens of Vanda's statements were rendered misleading simply because Vanda failed simultaneously to admit the alleged misconduct at issue in the Qui Tam Action.  This is manifestly incorrect.  There was no wrongdoing, and, even if there was,

25

Defendants have no duty voluntarily to "accuse [themselves] of wrongdoing," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 377, or otherwise engage in the "rite of confession," *Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 131 (2d Cir. 2011) (citation omitted). A corporation has no affirmative duty to disclose "uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citation omitted); *see also Fire & Police Pension Ass'n of Colo.*, 778 F.3d at 244 (holding that company was not required to affirmatively admit that it was engaged in off-label marketing after the FDA initiated inquiries regarding its marketing practices, and stating that "such an admission would have been misleading, since the off-label marketing issues had the potential to be resolved with no adverse action from the FDA"); *Bahash*, 506 F. App'x at 36 ("Section 10(b) . . . does not reach mere instances of corporate mismanagement." (citation omitted)); *Harris* v. *AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) (similar). For this reason alone, the Challenged Statements cannot be false merely because they did not admit the unproven, purported off-label marketing.

In addition, each category of Challenged Statements fails to identify a material, false statement of fact that is capable of supporting a fraud claim:

Successful Commercialization of Fanapt® and Hetlioz®. This category includes a single statement, repeated on multiple occasions in Vanda's Quarterly and Annual Reports, that "[o]ur ability to generate meaningful product sales and achieve profitability largely depends on our ability to successfully commercialize [HETLIOZ® and Fanapt®]." (¶¶ 236, 243, 249, 261, 268, 274, 282, 288, 294, 298, 304, 310, 314, 318, 320, 324, 328, 332, 338, 344, 350, 356, 362, 368, 374, 382.) Plaintiff contends that Defendants had a duty to speak "fully and truthfully" and that by "fail[ing] to disclose that Vanda was using an off label promotion scheme" to sell these drugs, this statement was rendered false and misleading. (¶¶ 237, 319.) Plaintiff's argument fails, for multiple reasons.

26

*First*, these Challenged Statements—which merely warn that Vanda's profitability depends on its ability to commercialize Fanapt® and Hetlioz®—are plainly true. Vanda's profitability *does* depend on its ability to sell products. This statement says nothing about Vanda's marketing strategies or whether Vanda was or was not promoting Fanapt® and Hetlioz® off-label. *In re ITT Educ. Servs.*, 859 F. Supp. 2d at 579; *see also Constr. Laborers Pension Tr. for S. Cal.* v. *CBS Corp.*, No. 18-CV-7796 (VEC), 2020 WL 248729, at *12 (S.D.N.Y. Jan. 15, 2020) (statements that executive was "important" to the company "neither stated nor implied anything that was untrue" regarding allegations of misconduct by that executive).

*Second*, the Challenged Statements in this category are just the types of general statements that cannot form the basis for a securities fraud violation. *ECA*, 553 F.3d at 206 (holding that "mere[] generalizations regarding [the defendant's] business practices" were "too general to cause a reasonable investor to rely upon them" and were therefore "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." (citations omitted)). No reasonable investor would rely on a single sentence that simply communicates, in the most general terms, the truism that profitability depends on sales.

*Third*, as noted above, the purported omission pertains to allegations of unadjudicated wrongdoing and corporate mismanagement, which Vanda had no duty to disclose. *In re Citigroup*, 330 F. Supp. 2d at 377; *Bahash*, 506 F. App'x at 36. Indeed, had Vanda affirmatively disclosed that it was engaged in purported off-label marketing, that itself would have been misleading, as the allegations in the Qui Tam Action could very well be resolved without any liability. *Fire & Police Pension Ass'n of Colo.*, 778 F.3d at 244.

Fanapt® Sales Team Expansion. Plaintiff next challenges statements—made on Vanda's earning calls and in presentations at investor conferences from 2015 to 2017—regarding the expansion of the Fanapt® sales team, from 12 to 50, to increase sales of Fanapt®. (¶¶ 233, 238, 241, 247, 253, 256, 259, 272, 280, 286, 292.) Plaintiff alleges that these statements were materially

27

false or misleading, on the unsupported theory that the expansion was designed to further the "scope and extent" of Vanda's off-label marketing of Fanapt®.  (¶¶ 234–35.)

But these statements are not, in fact, false or misleading because they truthfully convey that Vanda *did*, in fact, expand the sales force as described.  (*See* ¶ 78.)  A truthful announcement that Vanda expanded its sales force is not rendered false because Vanda declined to accuse itself of purportedly engaging in unlawful marketing practices with respect to this expansion.  *In re Citigroup*, 330 F. Supp. 2d at 377; *Bahash*, 506 F. App'x at 36.

Further, these alleged misstatements say nothing about whether any off-label promotion was or was not occurring.  *See, e.g.*, *Perez*, 2016 WL 6997160, at *16; *CBS Corp.*, 2020 WL 248729, at *12.  Plaintiff fails to allege how mere information regarding the size of Vanda's sales force has anything to do with the aims of the sales force, the methods that it used, or the type of marketing that it performed.  Thus, these allegations are insufficient.  *Rombach*, 355 F.3d at 174 (noting that a plaintiff "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so").

Uses and Marketing of Fanapt®.  Plaintiff challenges true statements—made on the Company's earnings calls and in presentations at investor conferences during 2015, 2016, 2017, and 2018—regarding the uses and marketing of Fanapt®.  (¶¶ 238, 253, 256, 265, 278, 302.)  These include statements that Vanda was (1) "recommending Fanapt as a second-line treatment" (¶ 253), (2) "working on differentiation [based on akathisia] with [its] sales force" (¶ 256), and (3) "interested in pediatric applications" (¶ 265).  Plaintiff alleges that these statements were false and misleading because the Company purportedly "failed to disclose" that (1) it "was promoting and marketing Fanapt as a first line treatment, meaning off-label" (¶ 254), (2) the Company "was using Fanapt's potential in reducing akathisia as a central part of its off-label promotion scheme for Fanapt" (¶ 239), and/or (3) "the Company's off-label promotion scheme for Fanapt involved marketing it to pediatric patients" (¶ 267).  In other words, Plaintiff's theory is that Vanda's

28

*truthful* statements to shareholders somehow became false because Vanda made inconsistent or otherwise improper statements to healthcare providers.

This theory is not viable. Regardless of what representations the Company allegedly made to providers, those representations to providers did not render untruthful the accurate statements made to Vanda's shareholders. As Plaintiff concedes, the Challenged Statements truthfully disclosed the limitations of Fanapt®'s approved uses to investors. For example, Plaintiff admits that "Fanapt's FDA label [] explains that Fanapt was approved as a second line treatment" (¶ 66; *see also* ¶¶ 74, 128, 131), and that this fact was publicly disclosed to investors on multiple occasions (¶¶ 66, 253, 278). Likewise, Plaintiff *concedes* that it is true that "Fanapt has a relatively low incidence of akathisia compared to other antipsychotics." (¶ 96.) Therefore, the alleged misstatements regarding akathisia were not misstatements at all because, as alleged, Vanda was in fact using Fanapt®'s low risk of akathisia to differentiate it in the market. Vanda had no obligation to categorize this truthful marketing as part of an alleged off-label promotion "scheme." *In re Citigroup*, 330 F. Supp. 2d at 377; *Bahash*, 506 F. App'x at 36. And disclosing to investors that the company was "interested in pediatric applications" in no way suggests that Fanapt® is currently approved by the FDA for such applications (and, therefore, cannot be misleading).

Uses and Marketing of Hetlioz®. Plaintiff challenges statements concerning the uses and marketing of Hetlioz® made on the Company's earnings calls and in the Company's presentations at investor conferences during 2017 and 2018. (¶¶ 308, 336, 342, 348, 354, 360, 366, 372, 378, 380.) These statements largely highlight that the initiative involved marketing to sighted patients with Non-24, as well as blind patients. (*E.g.*, ¶¶ 348 ("[I]n July, the Fanapt US field force team began promoting HETLIOZ to psychiatrists."), 360 ("[I]n the past, some of the scripts were coming from sighted people as well. The difference is that in the HPI initiative, most of the patients are sighted."), 366 ("[HPI] continues to drive an acceleration in new patient demand . . . . The positive response from the psychiatric community is a confirmation of the significant unmet

29

medical need for patients with Non-24."). Plaintiff alleges these statements were somehow false and misleading (¶ 349) even though the Complaint concedes that the FDA approved Hetlioz® to treat Non-24 in both sighted and blind patients (¶ 155).

Plaintiff's theory is nonsensical. Consistent with its public disclosures and FDA approvals, Vanda was promoting Hetlioz® to psychiatrists to treat Non-24—the drug's *approved* use. Allegations that Vanda marketed the drug to sighted patients cannot help Plaintiff because, as the Complaint concedes, Hetlioz® is approved by the FDA for the treatment of Non-24 in *both* blind and sighted patients. (¶ 155 ("[O]n January 31, 2014, the FDA sent Vanda a letter clarifying that Hetlioz had been approved for sale in the United States to treat Non-24 regardless of whether or not the patient was blind.").) If anything, that Defendants publicly disclosed the HPI initiative— and Vanda's goal of targeting sighted individuals with Non-24—undercuts Plaintiff's theory that Defendants secretly marketed Hetlioz® to sighted patients as part of some illicit "scheme."[16]

Risk Factors. Plaintiff challenges certain risk disclosures in Vanda's Annual and Quarterly Reports for 2016, 2017, and 2018. (¶¶ 245, 251, 263, 270, 276, 284, 290, 296, 300, 306, 312, 316, 322, 326, 330, 334, 340, 346, 352, 358, 364, 370, 376, 384.) These Challenged Statements include disclosures that there have been "no material changes in our risk factors subsequent to the filing of [the] annual report" for fiscal years 2015, 2016, and 2017 (*e.g.*, ¶¶ 251, 284, 296, 316, 326, 358, 384), and that "failure to comply with government regulations regarding the sale and marketing of our products could harm our business" (*e.g.*, ¶¶ 245, 276, 300, 322, 340, 364). Plaintiff alleges these statements were false and misleading because "it was not merely possible" that Vanda would not comply; this risk purportedly had "already materialized because Vanda was actively and

---

[16]  Vanda repeatedly disclosed that the rationale for the HPI initiative was to reach a greater number of patients with Non-24. (*See, e.g.*, Ex. 18 at 4–5, November 7, 2017 Earnings Call ("The positive response from the psychiatric community underscores the significant unmet need of patients with Non-24 . . . recent literature suggests that this disorder is mainly prevalent among patients with mood disorders."); Ex. 20 at 5, Vanda Presentation at Morgan Stanley Healthcare Conference on September 12, 2018 ("And what changed was a new initiative where we began targeting sighted individuals with psychiatric comorbidities who had Non-24.").)

knowingly engaged in an off-label promotion scheme for [Fanapt® and Hetlioz®]." (¶¶ 246, 323.) This theory falls flat.

These Challenged Statements accurately disclosed the risk of "fail[ing] to comply with government regulations" (*e.g.*, ¶¶ 245, 276, 300, 322, 340, 364) because the risk was just that— only a risk. Vanda had not been charged with, much less found liable of, the conduct Plaintiff alleges, and thus was not required to make any additional disclosure to render this statement not false or misleading. A disclosure that "covers the exact risk later realized" does not become false or misleading simply because that risk later materialized, *Panther Partners, Inc.* v. *Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) ("An accurate statement coupled with the precise disclosure of a risk later realized cannot adequately form the basis for a securities claim."), *aff'd*, 347 F. App'x 617 (2d Cir. 2009). Nor does it become false or misleading if that risk simply increased. *CBS Corp.*, 2020 WL 248729, at \*12 ("It cannot be the case that every time a risk increases or decreases, a company must precisely quantify the increase or decrease in its disclosures identifying that risk.").

Moreover, as the Second Circuit has held, a statement such as "[f]ailure to comply with government regulations regarding the sale and marketing of our products could harm our business" (*e.g.*, ¶¶ 245, 276, 300, 322, 340, 364) is a "general declaration" that cannot give rise to securities fraud liability. *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63 (2d. Cir. 2019) (describing "general declarations about the importance of acting lawfully and with integrity" as a "textbook example" of inactionable "'puffery'").

### B. The Complaint Does Not Plead False or Misleading Statements About Tradipitant and the FDA Action

The Challenged Statements with respect to tradipitant and the FDA Action are similarly non-actionable because they are not false or misleading:

31

Risk Factors.  Plaintiff alleges that Defendants spoke falsely on two occasions by stating "[t]here have been no material changes in our risk factors subsequent to the filing of our annual report on Form 10-K for the fiscal year ended December 31, 2017." (¶¶ 393, 401; *see also* ¶ 392.) Specifically, Plaintiff contends that representing there had been "no material changes" to Vanda's risk factors after the May 2018 Call with the FDA "was materially false and misleading to investors because Vanda knew all along that it would not conduct the required non-rodent study and that this refusal would trigger a clinical trial hold." (¶ 394.)

On the May 2018 Call, however, the FDA review staff gave its then-current position on the necessity of a dog study; it did not officially impose the partial clinical hold until December 19, 2018.  (¶¶ 221–22.)   Plaintiff concedes—as it must—that in the interim Vanda engaged in a dialogue with the FDA to attempt to modify the FDA's view.  (¶¶ 214–17, 220.)  Further, despite Plaintiff's assertion that Vanda "knew all along" that it would not conduct the requested dog study (¶ 394), the Complaint contains no factual allegations to support the contention that Vanda knew it would be unsuccessful in resolving its dispute with the FDA.  Plaintiff's impermissible attempt to plead "fraud by hindsight" thus fails because there are no factually supported allegations that the statement was false when made.  *In re Symbol Techs. Class Action Litig.*, 950 F. Supp. 1237, 1242 (E.D.N.Y. 1997) ("Defendants cannot be held liable for statements that were true when made; there is no 'fraud by hindsight.'" (citing *Denny* v. *Barber*, 576 F.2d 465, 470 (2d Cir. 1978))); *see also Panther Partners*, 538 F. Supp. 2d at 672 ("An earlier statement is not somehow made misleading simply because it failed to foretell a . . . problem which later materialized.").

In any event, the risk that the FDA could impose a partial clinical hold *was* adequately disclosed by Vanda.  Among other disclosures, Vanda warned investors that "[t]he FDA . . . may suspend or terminate clinical trials at any time for various reasons" and that "[a]ny failure or delay

in completing clinical trials for our products could severely harm our business."[17]   Vanda's statement that there had been no change to its risk disclosures was, therefore, accurate, because Vanda had ***already warned*** of the very risk that materialized when the FDA raised the dog study issue and imposed the partial clinical hold.  Even if the chance of that risk had increased, additional disclosure was not required.  *CBS Corp.*, 2020 WL 248729, at *12 ("An increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading.").

Tradipitant Gastroparesis Study.  Plaintiff challenges statements regarding the tradipitant gastroparesis study—made on the Company's earnings calls and in the Company's Current Reports, between August 1, 2018 and December 3, 2018—as containing false and misleading omissions.  (¶¶ 388, 386, 390, 395, 397, 399, 403, 405.)  These statements concern the ongoing nature of the clinical trial, the timing of certain results, and anticipated discussions with regulators regarding a path to approval.  (*E.g.*, ¶¶ 386 ("A tradipitant clinical study for the treatment of gastroparesis is ongoing.  Results are expected by the end of 2018."), 397 ("Our Phase II study, of which we'll report the results next month, is a 150- patient, 2-arm, double-blind tradipitant versus placebo 85-milligram twice a day of tradipitant to evaluate the ability of the drug to improve symptoms of gastroparesis over a period of 4 weeks."), 403 ("Vanda expects to meet with regulatory authorities in the near future to further define and confirm the path towards registration of tradipitant in the treatment of patients with gastroparesis.").  Plaintiff's theory is that these true statements were somehow rendered misleading because Vanda failed to disclose its intent to contest the proposed dog study, and instead sued the FDA to appeal the FDA's position.  (¶¶ 387, 407.)

---

[17]   (*See* Ex. 5 at 10, 27, Form 10-K for Fiscal Year 2017; *see also id.* at 10 ("The FDA closely monitors the progress of each of the three phases of clinical trials that are conducted in the U.S. and may, at its discretion, reevaluate, alter, suspend or terminate the testing based upon . . . the FDA's assessment of the risk/benefit ratio to the patient"); *id.* ("The FDA . . . may suspend or terminate clinical trials at any time for various reasons").)

As the Complaint acknowledges, the FDA and Vanda engaged in a dialogue between May and December 2018 concerning the need for a dog study. (¶¶ 214–17, 220.) When that dialogue failed, on February 5, 2019, Vanda filed the FDA Action challenging the FDA's decision. (¶ 225.) Vanda had no affirmative obligation to disclose its internal business strategy or the possibility that it eventually could initiate litigation against the FDA should alternative strategies ultimately prove unsuccessful. *Steamfitters' Indus. Pension Fund* v. *Endo Int'l PLC*, 771 F. App'x 494, 498 (2d. Cir. 2019) (a company has no obligation to "announce its internal business strategies" (citation omitted)); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d at 12 (holding no duty to "disclose litigation that is not substantially certain to occur" (citation omitted)); *see also Tongue*, 816 F.3d at 199 (not disclosing ongoing dialogue with the FDA, including the FDA's expressed concerns regarding the company's testing methodology, did not render false or misleading optimistic statements regarding the likelihood of drug approval).[18] Moreover, "there is no per se rule that a company immediately disclose receipt of any correspondence with the FDA." *Fire & Police Pension Ass'n of Colo.*, 778 F.3d at 243 n.9 (citing *In re Genzyme Corp. Sec. Litig.*, 754 F.3d at 41).

Additionally, the Challenged Statements do not even speak to the topic of the purportedly omitted information. They state only that clinical studies were ongoing, with results expected by year-end 2018. Those statements were true: Vanda was in fact engaged in three-month-long tradipitant studies in 2018 and did expect results at the end of the year. (*E.g.*, ¶ 390 ("A tradipitant clinical study for the treatment of gastroparesis is ongoing. Results are expected by the end of

---

[18] *See also In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 130–31 (3d. Cir. 2017) (holding that company was not required to disclose communications with the FDA regarding study design requirements at a time when the FDA had not "*conclusively* reformulate[d]" its position with respect to the agreed upon study design (emphasis in original)); *Gallagher* v. *Abbott Labs.*, 269 F.3d 806, 810 (7th Cir. 2001) (holding that non-disclosure of letter from FDA demanding compliance with regulatory requirements did not render false or misleading statements made prior to the issuance of the letter, and company had no duty to correct the prior statements that were correct when made).

2018." (emphasis omitted)), 399 ("Enrollment in the clinical study of tradipitant in gastroparesis is complete.  Results are expected by the end of 2018." (emphasis omitted)).)  These statements make no representation regarding the likelihood that the FDA would ultimately approve or disapprove tradipitant at the end of a long, multi-phased, and unpredictable regulatory process. Nor do they—or could they possibly—make any representation about a decision that Vanda supposedly made regarding an FDA action that had not yet come to pass.  *See In re ITT Educ. Servs.*, 859 F. Supp. 2d at 579; *see also In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 403.  Thus, Plaintiff's theory is no more than impermissible "fraud by hindsight."  *In re Symbol Techs. Class Action Litig.*, 950 F. Supp. at 1242; *see also Panther Partners*, 538 F. Supp. 2d at 672.

### C.    Items 303 and 305 of SEC Regulation S-K Do Not Provide Alternative Sources of Liability for Plaintiff

In an effort to find a statute or regulation that creates a duty to disclose, Plaintiff points to Items 303 and 503 of SEC Regulation S-K, 17 C.F.R. § 229.303, 229.503 (2019) (¶¶ 408–17), which govern the requirements for specific sections of a registrant's Form 10-K and Form 10-Q.[19] But neither applies here to render any Challenged Statement false or misleading.

#### 1.    Item 303 Does Not Create Any Duty to Disclose

Item 303 has a limited scope:  it requires a registrant to, among other things, "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on *net sales or revenues or income from continuing operations*."  § 229.303(a)(3)(ii)  (emphasis added); *see* Commission Guidance Regarding Management's Discussion & Analysis of Financial Condition & Results of Operations, 68 Fed.

---

[19]    As the Complaint implicitly concedes, Items 303 and 503 have no application to any of the Challenged Statements not contained in a Form 10-K or Form 10-Q.  (*See* ¶¶ 411, 417 (listing alleged failures to disclose in *only* such SEC filings)); *cf. also* Safe Harbor for Forward-Looking Statements, 59 Fed. Reg. 52723 (Oct. 19, 1994) ("[MD&A] requirements [are] applicable to the Form 10-K and other required filings[.]").  In addition, at least one court has found that Item 503 applies "*only* to registration statements and prospectuses," *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 89 (S.D.N.Y. 2017) (emphasis added), and thus would be inapplicable here.

Reg. 75056 (Dec. 29, 2003). Courts in this Circuit have confirmed Item 303's limited scope, consistently declining to apply Item 303 where, as here, the omitted information does not concern "events, trends, and uncertainties" that are likely to have a "material effect on the 'financial condition' or 'results of operations' of a registrant," *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1211 (S.D.N.Y. 1996) (holding disclosure of marketing strategies and plans not required under Item 303); *see, e.g.*, *CBS Corp.*, 2020 WL 248729, at *14–15, and that are also "presently known" to management, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 583–84 (S.D.N.Y. 2013); *accord Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016).

Contrary to Plaintiff's allegations, Item 303 has no application to the purported omission of off-label marketing practices, which relates only to Vanda's "competitive marketing strategies and plans . . . [which] are competitive business judgments that management makes to improve the business, and need not be disclosed." *In re Canandaigua*, 944 F. Supp. at 1210–11. Fatal to its claim, Plaintiff makes no allegation that Vanda had any basis to assess what impact—if any— alleged off-label marketing practices would have on its operations and revenues. While Plaintiff falls back on the utterly conclusory allegation that these practices "were having, and were reasonably likely to have, a negative impact on the Company's continuing operations" (¶ 411), this is insufficient. *Pearlstein* v. *BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015) (holding conclusory allegations that defendant had knowledge of purported trend were insufficient to support a violation of Item 303 that would make alleged omissions actionable); *see also CBS Corp.*, 2020 WL 248729, at *15 (noting that "Item 303 only requires disclosure of uncertainties that are more than foreseeable or possible" and that a contrary rule would "'bury the shareholders in an avalanche of trivial information'" (quoting *Basic*, 485 U.S. at 231)); *In re Deutsche Bank AG Sec. Litig.*, No. 09-cv-1714, 2016 WL 4083429, at *26 (S.D.N.Y. July 25, 2016) ("It is not enough that [the company] should have known of the existing trend, event, or uncertainty." (citation

36

omitted)).  Thus, Defendants were under no obligation to disclose purported off-label marketing pursuant to Item 303.

Plaintiff is also wrong that Item 303 required Vanda to disclose its unwillingness to conduct the requested dog study and the risk of a partial clinical hold on tradipitant.  (¶ 412.)  Plaintiff's theory fails for at least three independent reasons:

*First*, Vanda did not have "actual knowledge" that it would be unable to resolve its dispute with the FDA concerning the dog study until *after* the filing of the documents in which Plaintiff contends this information should have been disclosed.[20]  Item 303 does not require disclosure absent **actual**, present knowledge of the trend, event, or uncertainty.  *Ind. Pub. Ret. Sys.*, 818 F.3d at 95 ("Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC.  It is not enough that it should have known of the existing trend, event, or uncertainty.").

*Second*, because tradipitant is a drug in Vanda's development pipeline that never has been available commercially—and therefore had no proven sales or revenues—developments with respect to the drug, by definition, could not have affected "*known* trends or uncertainties that . . . will have a material favorable or unfavorable impact on *net sales or revenues*."  *See* 17 C.F.R. § 229.303(a)(3)(ii) (emphasis added).

*Third*, in the allegedly deficient SEC filings, Vanda *repeatedly disclosed*, in an abundance of caution, the uncertainty of completing clinical trials in a timely manner, and the risk that the FDA could suspend clinical trials for a variety of reasons.[21]  These risk disclosures were robust

---

[20]    These documents were filed between August 1 and December 3, 2018.  (*See* Ex. 1 at 6–7, Challenged Statements Chart.)  Even when the FDA informed Vanda of its decision to impose the partial clinical hold on December 19, 2018, the FDA's decision was not final.  Indeed, as alleged in the Complaint, the FDA did not inform Vanda that it was denying the Company's request for reconsideration until January 4, 2019.  (¶ 225.)

[21]    (*See, e.g.*, Ex. 3 at 11, FY 2015 Form 10-K ("The FDA closely monitors the progress of each of the three phases of clinical trials that are conducted in the U.S. and may, at its discretion, reevaluate, alter, suspend or terminate the testing based upon . . . the FDA's assessment of the risk/benefit ratio to the patient"); Ex. 4 at 8, FY 2016 Form 10-K (same); Ex. 5 at 10, FY 2017 Form 10-K (same); Ex. 4 at 8, FY 2016 Form 10-K ("The FDA . . . may suspend or terminate clinical trials at any time for various reasons"); Ex. 5 at 10, FY 2017 Form 10-K (same);

and transparent.  Even if Item 303 applied (it does not), these risk disclosures were adequate to satisfy Item 303.

### 2.      Item 503 Does Not Create Any Duty to Disclose

Item 503 also has very limited application, and creates no duty here.  Item 503 requires a registrant to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. § 229.503(c) (2018), *amended by* 17 C.F.R. § 229.503 (2019); *see also City of Pontiac*, 752 F.3d at 183–84.  It is inapplicable to the purported fraud in this case.

With respect to alleged off-label marketing allegations, the Second Circuit has held that Item 503 does *not* require disclosure of "uncharged, unadjudicated wrongdoing."  *City of Pontiac*, 752 F.3d at 183–84 (holding that failure to disclose purported tax evasion scheme was not a violation of Item 503); *accord Diehl* v. *Omega Protein Corp.*, 339 F. Supp. 3d 153, 168–69 (S.D.N.Y. 2018).  The purported omissions at issue with respect to the commercialization of Fanapt® and Hetlioz® concern alleged wrongdoing with which Vanda had not been charged, much less found liable.  Thus, Item 503 did not require Vanda to disclose such allegations.  *City of Pontiac*, 752 F.3d at 183–84.

There also can be no duty created under Item 503 with respect to the tradipitant clinical trial.  Investors were well aware that tradipitant cannot possibly be produced, marketed, and sold to patients until clinical trial research has been completed to the FDA's satisfaction, safety and efficacy have been proven, and all necessary approvals have been obtained.  Because investors were on notice that tradipitant may never be commercially viable, the risk of imposition of a

---

Ex. 6 at 47, Q3 2015 Form 10-Q ("Clinical trials for our products are expensive and their outcomes are uncertain. Any failure or delay in completing clinical trials for our products could severely harm our business"); Ex. 3 at 29, FY 2015 Form 10-K (same); Ex. 4 at 24, FY2016 Form 10-K (same); Ex. 5 at 27, FY 2017 Form 10-K (same).)

temporary partial clinical hold on the tradipitant studies does not render the sale of Vanda securities any more "speculative or risky" than already disclosed in Vanda's SEC filings.

In any event, Vanda's risk disclosures satisfied Item 503. Vanda repeatedly disclosed in its SEC filings the most significant risk factors relevant *both* to the sale of Fanapt® and Hetlioz®[22] and to the uncertainty of FDA approvals and clinical trial outcomes.[23] Vanda was not required to disclose anything further. *See Schaffer* v. *Horizon Pharma LLC*, No. 16 Civ. 1763 (JMF), 2018 WL 481883, at \*14 (S.D.N.Y. Jan. 18, 2018) (dismissing Item 503 claim where defendant repeatedly disclosed relevant risk factors).

## IV.   PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

The Complaint also fails to plead loss causation. Plaintiff is required to plead that the Challenged Statements "proximately cause[d its] economic loss." *Dura*, 544 U.S. at 346. This requirement means that the "alleged disclosure must reveal the falsity of an alleged misstatement." *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) (no loss causation when disclosures did not "reveal any new information that relate[d] to the alleged fraud"). For this additional reason, the Complaint should be dismissed. *In re Omnicom Grp., Inc. Sec. Litig.*, 597

---

[22]   (*See, e.g.*, Ex. 6 at 40, Q3 2015 Form 10-Q ("For the commercialization of HETLIOZ®, Fanapt® or our other products, we may not be able to establish additional sales, marketing and distribution capabilities or partnerships on acceptable terms or at all."; "As a company, we have minimal experience selling, marketing or distributing products, which may make commercializing our products difficult."); Ex. 3 at 21–22, FY 2015 Form 10-K (same); Ex. 4 at 15–16, FY 2016 Form 10-K ("We are dependent on the commercial success of HETLIOZ® and Fanapt®."; "Our ability to generate significant product revenue from sales of HETLIOZ® and Fanapt®, both in the U.S. and abroad, in the near term will depend on, among other things, our ability to: . . . continue to maintain and grow a wide variety of internal sales, distribution and marketing capabilities sufficient to sustain growth in sales of our products; . . . obtain approval from the FDA to expand the labeling of our approved products for additional indications . . . ."); Ex. 5 at 17–18, FY 2017 Form 10-K (same).)

[23]   (*See, e.g.*, Ex. 6 at 46–47, Q3 2015 Form 10-Q ("FDA and foreign regulatory approval of our products is uncertain."; "Clinical trials for our products are expensive and their outcomes are uncertain. Any failure or delay in completing clinical trials for our products could severely harm our business."; "The process of obtaining FDA and other required regulatory approvals and clearances can take many years and will require us and our partners, as applicable, to expend substantial time and capital. Despite the time and expense expended, regulatory approval is never guaranteed."); Ex. 3 at 28–29, FY 2015 Form 10-K (same); Ex. 4 at 23–24, FY 2016 Form 10-K (same); Ex. 5 at 26–27, FY 2017 Form 10-K (same); Ex. 5 at 20, FY 2017 Form 10-K ("Pharmaceutical companies are subject to extensive government regulation and oversight by government authorities in countries in which they do business. As a result, we may become subject to governmental actions which could materially and adversely affect our business, results of operations and financial condition, certain of which are described below.").)

F.3d 501, 514 (2d Cir. 2010) (affirming dismissal on loss causation grounds); *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 177–78 (2d Cir. 2005) (same); *Fila* v. *Pingtan Marine Enter.*, 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016) (stating that failure to plausibly allege loss causation is an independent reason for dismissal).

### A.    Loss Causation is Not Pleaded for Alleged Off-Label Marketing Fraud

The Complaint alleges that the Aurelius Report issued on February 11, 2019 "publicly revealed for the first time" Defendants' purported off-label marketing scheme, and seeks to recover stock drop losses for a decline the same day.  (¶ 185.)  To the contrary, the Aurelius Report described the *same* allegations of off-label marketing that had been publicly disclosed *a week earlier*, upon the unsealing of the complaint in the Qui Tam Action on February 4, 2019—a filing the Aurelius Report quotes and characterizes extensively.[24]  (*Compare* Ex. 26 at 3–4, 7–8, 11, Aurelius Report, *with* Ex. 24, ¶¶ 79, 90, 98, 152, 158, 165, Qui Tam Action Compl.)  As the Second Circuit held in *In re Omnicom*, "[a] negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."  597 F.3d at 512; *Zhong Zheng* v. *Pingtan Marine Enters.*, 379 F. Supp. 3d 164, 178–79 (report based on publicly available information did not constitute corrective disclosure).  That reasoning applies with even greater force here:  because the Aurelius Report merely reported on previously public information—with a pejorative characterization to benefit its author's short position (*see* Ex. 26 at 1, 2–4, 7–8, 11, Aurelius Report)—loss causation is not pleaded.

Plaintiff cannot avoid this conclusion, particularly given its invocation of the "fraud on the market" doctrine to establish reliance.  (¶ 443.)  As alleged, "[a]t all relevant times, the market for Vanda common stock was efficient" (¶ 445), meaning it "promptly digested current information regarding Vanda from *all publicly available sources and* reflected such information in the price of

---

[24]    The unsealing of the Qui Tam Action is a fact properly considered in adjudicating a motion to dismiss.  *See Abiuso*, 2015 WL 3487130, at *3; *Reisner* v. *Stoller*, 51 F. Supp. 2d 430, 440 (S.D.N.Y. 1999).

the stock" (¶ 446 (emphasis added)).  Therefore, based on Plaintiff's own allegations, the market for Vanda securities "promptly digested" the information and allegations in the Qui Tam Action at the moment it was publicly unsealed, *i.e.*, on February 4, 2019.  *See In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 401 (S.D.N.Y. 2010) ("[I]gnorance of [a] document's availability . . . do[es] not exempt [a plaintiff] from the expectation that the average investor of ordinary intelligence can acquire materials that are a matter of public record." (citation omitted)), *aff'd sub nom. Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011).  Plaintiff cannot rely on the efficient market theory for the purpose of pleading reliance, while simultaneously disavowing it in the context of pleading loss causation.  *See In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007) (in deciding a motion to dismiss, the court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint" (citing *Madonna* v. *United States*, 878 F.2d 62, 65–66 (2d Cir. 1989))).

## B.    Loss Causation is Not Pleaded for Tradipitant Allegations

Plaintiff alleges that Vanda's press release announcing the initiation of the FDA Action was a corrective disclosure with respect to the Tradipitant Allegations.  (*See* ¶ 226.)  It was not.  Neither that press release nor the filing of the FDA Action revealed any prior alleged misstatement or omission about the tradipitant clinical trials because Vanda had not made any predictions whatsoever about whether its proposed 52-week study proposal would be approved by the FDA.  (*See supra* 33–35.)  To the contrary, the filing of the FDA Action revealed only that Vanda had determined to litigate with the FDA concerning a recent adverse position requiring a dog study.  (¶¶ 221–25.)  The filing of the litigation certainly did not render false any statements that the Company had previously made about the ongoing clinical trials of tradipitant.  Further, given the sequence of events, the purported corrective disclosures could not have "revealed to the market" the falsity of any other tradipitant-related Challenged Statements, because the FDA had not yet issued its formal decision to impose a partial clinical hold on longer-term studies pending

a dog study. *See Lentell*, 396 F.3d at 175 & 175 n.4 (to qualify as a corrective disclosure, the new information must "reveal to the market the falsity of" the prior statements).

## V.    THE FRAUD CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE ALSO DEFECTIVE BECAUSE THEY DID NOT "MAKE" THE CHALLENGED STATEMENTS DURING THE PUTATIVE CLASS PERIOD

It is well-settled that only the "maker" of a false or misleading statement—*i.e.*, "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it"—can be liable under Rule 10b-5(b). *Janus*, 564 U.S. at 142. Ignoring *Janus*, Plaintiff broadly alleges that "Defendants" are responsible for numerous of the Challenged Statements (*e.g.*, ¶¶ 235, 319, 387), even though the Individual Defendants did not make most of the Challenged Statements. Defendants respectfully request that the Court dismiss all claims against each Individual Defendant that are premised on Challenged Statements he did not "make" as set forth in Exhibit 2 to the Feldman Declaration. *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *10 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac*, 752 F.3d 173.

With respect to Mr. Gibbs, he did not make **any** false statement during the Class Period. His dismissal from the case is thus required for this additional reason as well. (*See supra* 22–23.)

## VI.    THE COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 20(a)

A claim for control person liability under section 20(a) is "necessarily predicated on a primary violation of securities law." *Rombach*, 355 F.3d at 177–78; *accord ECA*, 553 F.3d at 206–07. No claim is stated unless a plaintiff pleads (1) control of the primary violator by each individual defendant and (2) that each individual defendant was, "in some meaningful sense, a culpable participant" in the alleged fraud. *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

Because the Complaint fails to state a claim for a primary violation of section 10(b), as discussed above, Plaintiff necessarily fails to state a claim for breach of section 20(a).

The section 20(a) claims also should be dismissed because Plaintiff does not allege, as shown *supra* Part II, facts showing that any of the Individual Defendants culpably participated in the alleged securities fraud—as the Second Circuit requires. *See ATSI Commc'ns, Inc.*, 493 F.3d at 108; *SEC* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Therefore, the section 20(a) claim cannot survive. *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) (plaintiff failed to plead required state of mind under section 20(a) by failing to plead the same under section 10(b)).

The section 20(a) claims against Messrs. Reverberi and Gibbs should be dismissed for the additional reason that Plaintiff pleads no facts showing that they were control persons.[25]

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court dismiss the Complaint in its entirety. Defendants further request dismissal with prejudice, given that Plaintiff declined the opportunity to amend after the deficiencies in the Complaint were identified.[26]

---

[25] To face control person liability, a defendant must have "actual control" not only over the primary violator but also "over the *transaction* in question." *In re Alstom SA*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (emphasis in original and citations omitted). A defendant's status as an officer, absent additional facts showing actual control, does not constitute "control" for purposes of section 20(a). *Id.*; *In re Sotheby's*, 2000 WL 1234601, at *8. Yet, with respect to Messrs. Reverberi and Gibbs, Plaintiff alleges control *only* by virtue of "their positions . . . as officers and/or directors of the Company" (¶ 26; *see also* ¶¶ 24, 454), ignoring that each was (at various points in time) the Chief Commercial Officer—a position that Plaintiff does not contend had responsibility for the Company's disclosures to investors.

[26] The Court afforded Plaintiff an opportunity to further amend its already amended Complaint after Plaintiff was informed—both in Defendants' pre-motion letter (ECF No. 39) and at the January 14, 2020 pre-motion conference—of the bases for Defendants' motion to dismiss. Plaintiff expressly declined this opportunity. (ECF No. 43); *see, e.g.*, *Hussain* v. *Alltran Fin., LP*, No. 17-cv-3571-ARR-CP, 2018 WL 1640584, at *3 (E.D.N.Y. Apr. 4, 2018) (dismissing complaint with prejudice where "plaintiff ha[d] already declined an opportunity to amend his complaint with regard to the noted deficiency").

Dated:  March 23, 2020
        New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP

By:  /s/ Audra J. Soloway

Daniel J. Kramer
Audra J. Soloway
Brad D. Feldman
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Email:  dkramer@paulweiss.com
Email:  asoloway@paulweiss.com
Email:  bfeldman@paulweiss.com

*Counsel for Defendants*

44