# Exhibit 4

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission File No. 001-34186**

# VANDA PHARMACEUTICALS INC.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **03-0491827** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**2200 Pennsylvania Avenue NW, Suite 300 E**
**Washington D.C. 20037**
**(202) 734-3400**
**(Address and telephone number, including area code, of registrant's principal executive offices)**

**Securities registered pursuant to Section 12(b) of the Exchange Act:**

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| Common Stock, par value $0.001 | The Nasdaq Stock Market LLC (NASDAQ Global Market) |
| Rights to Purchase Series A Junior Participating Preferred Stock | The Nasdaq Stock Market LLC (NASDAQ Global Market) |

**Securities registered pursuant to Section 12(g) of the Exchange Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

**Table of Contents**

chemical entity (NCE) patent for Fanapt® in the U.S. on November 15, 2016. Under the amended agreement, we will pay directly to Sanofi a fixed royalty of 3% of net sales from November 16, 2016 through December 31, 2019 related to manufacturing know-how. We made a $2.0 million payment during the year ended December 31, 2016 that applied to this 3% manufacturing know-how royalty and will make additional royalty payments only to the extent that our cumulative royalty obligations during this period exceed the amount of the pre-payment. No further royalties on manufacturing know-how are payable by us after December 31, 2019. This amended agreement does not alter Titan's obligation under the License Agreement to make royalty payments to Sanofi prior to November 16, 2016 or our obligations under the Sublicense Agreement to pay Sanofi a fixed royalty on Fanapt net sales equal up to 6% on Sanofi know-how not related to manufacturing under certain conditions for a period of up to 10 years in markets where the NCE patent has expired or was not issued.

### Tradipitant (VLY-686)

In April 2012, we entered into a license agreement with Lilly pursuant to which we acquired an exclusive worldwide license under certain patents and patent applications, and other licenses to intellectual property, to develop and commercialize an NK-1R antagonist, tradipitant, for all human indications.

Pursuant to the agreement, we paid Lilly an initial license fee of $1.0 million and we will be responsible for all development costs for tradipitant. Lilly is also eligible to receive additional payments based upon achievement of specified development and commercialization milestones as well as tiered-royalties on net sales at percentage rates up to the low double digits. These milestones include $4.0 million for pre-NDA approval milestones and up to $95.0 million for future regulatory approval and sales milestones. We have agreed to use commercially reasonable efforts to develop and commercialize tradipitant.

Either party may terminate the agreement under certain circumstances, including a material breach of the agreement by the other. In the event that we terminate the agreement, or if Lilly terminates the agreement due to our breach or for certain other reasons set forth in the agreement, all rights licensed and developed by us under the agreement will revert or otherwise be licensed back to Lilly on an exclusive basis, subject to payment by Lilly to us of a royalty on net sales of products that contain tradipitant.

### AQW051

In December 2014, we entered into a license agreement with Novartis pursuant to which we acquired an exclusive worldwide license under certain patents and patent applications, and other licenses to intellectual property, to develop and commercialize an alpha-7 nicotinic acetylcholine receptor partial agonist, AQW051, for all human indications.

Pursuant to the agreement, we will be responsible for all development costs for AQW051. Novartis is eligible to receive tiered royalties on net sales at percentage rates up to the low double digits. We have agreed to use commercially reasonable efforts to develop and commercialize AQW051.

Either party may terminate the agreement under certain circumstances, including a material breach of the agreement by the other. In the event that we terminate the agreement, or if Novartis terminates the agreement due to our breach or for certain other reasons set forth in the agreement, all rights licensed and developed by us under the agreement will revert or otherwise be licensed back to Novartis on an exclusive basis, subject to payment by Novartis to us of a royalty on net sales of products that contain AQW051.

## Government Regulation

Government authorities in the U.S., at the federal, state and local level, as well as foreign countries and local foreign governments, regulate the research, development, testing, manufacture, labeling, promotion, advertising, distribution, sampling, marketing, import and export of our products. Other than HETLIOZ® in the U.S. and the European Union and Fanapt® in the U.S., Israel and Mexico, all of our products will require regulatory approval by government agencies prior to commercialization. In particular, human pharmaceutical products are subject to rigorous pre-clinical and clinical trials and other approval procedures of the FDA and similar regulatory authorities in foreign countries. The process of obtaining these approvals and the subsequent compliance with appropriate domestic and foreign laws, rules and regulations require the expenditure of significant time and human and financial resources.

### United States government regulation

#### FDA approval process

In the U.S., the FDA regulates drugs under the Federal Food, Drug and Cosmetic Act, as amended, and implements regulations. If we fail to comply with the applicable requirements at any time during the product development process, approval process, or after approval, we may become subject to administrative or judicial sanctions. These sanctions could include the FDA's refusal to approve pending applications, withdrawals of approvals, clinical holds, warning letters, product recalls, product seizures, total or partial suspension of our operations, injunctions, fines, civil penalties or criminal prosecution. Any such sanction could have a material adverse effect on our business.

Table of Contents

The steps required before a drug may be marketed in the U.S. include:

- pre-clinical laboratory tests, animal studies and formulation studies under Current Good Laboratory Practices (cGLP);

- submission to the FDA of an investigational new drug application (IND), which must become effective before human clinical trials may begin;

- execution of adequate and well-controlled clinical trials to establish the safety and efficacy of the drug for each indication for which approval is sought;

- submission to the FDA of an NDA;

- satisfactory completion of an FDA inspection of the manufacturing facility or facilities at which the drug is produced to assess compliance with Current Good Manufacturing Practices (cGMP); and

- FDA review and approval of the NDA.

Pre-clinical studies generally are conducted in laboratory animals to evaluate the potential safety and activity of a drug. Violation of the FDA's cGLP regulations can, in some cases, lead to invalidation of the studies, requiring these studies to be replicated. In the U.S., drug developers submit the results of pre-clinical trials, together with manufacturing information and analytical and stability data, to the FDA as part of the IND, which must become effective before clinical trials can begin in the U.S. An IND becomes effective 30 days after receipt by the FDA unless before that time the FDA raises concerns or questions about issues such as the proposed clinical trials outlined in the IND. In that case, the IND sponsor and the FDA must resolve any outstanding FDA concerns or questions before clinical trials can proceed. If these concerns or questions are unresolved, the FDA may not allow the clinical trials to commence.

Pilot studies generally are conducted in a limited patient population, approximately three to 25 subjects, to determine whether the drug warrants further clinical trials based on preliminary indications of efficacy. These pilot studies may be performed in the U.S. after an IND has become effective or outside of the U.S. prior to the filing of an IND in the U.S. in accordance with applicable government regulations and institutional procedures.

Clinical trials involve the administration of the investigational new drug to human subjects under the supervision of qualified investigators. Clinical trials are conducted under protocols detailing, among other things, the objectives of the study, the parameters to be used in assessing the safety and the effectiveness of the drug. Each protocol must be submitted to the FDA as part of the IND prior to beginning the trial.

Typically, clinical evaluation involves a time-consuming and costly three-Phase sequential process, but the phases may overlap. Each trial must be reviewed, approved and conducted under the auspices of an independent Institutional Review Board, and each trial must include the patient's informed consent.

- Phase I: refers typically to closely-monitored clinical trials and includes the initial introduction of an investigational new drug into human patients or healthy volunteer subjects. Phase I trials are designed to determine the safety, metabolism and pharmacologic actions of a drug in humans, the potential side effects associated with increasing drug doses and, if possible, to gain early evidence of the drug's effectiveness. Phase I trials also include the study of structure-activity relationships and mechanism of action in humans, as well as studies in which investigational new drugs are used as research tools to explore biological phenomena or disease processes. During Phase I trials, sufficient information about a drug's pharmacokinetics and pharmacological effects should be obtained to permit the design of well-controlled, scientifically valid Phase II studies. The total number of subjects and patients included in Phase I trials varies, but is generally in the range of 20 to 80 people.

- Phase II: refers to controlled clinical trials conducted to evaluate appropriate dosage and the effectiveness of a drug for a particular indication or indications in patients with a disease or condition under study and to determine the common short-term side effects and risks associated with the drug. These trials are typically well-controlled, closely monitored and conducted in a relatively small number of patients, usually involving no more than several hundred subjects.

- Phase III: refers to expanded controlled and uncontrolled clinical trials. These trials are performed after preliminary evidence suggesting effectiveness of a drug has been obtained. Phase III trials are intended to gather additional information about the effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling. Phase III trials usually include several hundred to several thousand subjects.

Phase I, II and III testing may not be completed successfully within any specified time period, if at all. The FDA closely monitors the progress of each of the three phases of clinical trials that are conducted in the U.S. and may, at its discretion, reevaluate, alter, suspend or terminate the testing based upon the data accumulated to that point and the FDA's assessment of the risk/benefit ratio to the patient. A clinical program is designed after assessing the causes of the disease, the mechanism of action of the active pharmaceutical ingredient of the drug and all clinical and pre-clinical data of previous trials performed. Typically, the trial design protocols and efficacy endpoints are established in consultation with the FDA. Upon request through a special protocol assessment, the FDA can also provide specific guidance on the acceptability of protocol design for clinical trials. The FDA, we or our partners may suspend or terminate clinical trials at any time for various reasons, including a finding that the subjects or patients are being exposed to an unacceptable health risk. The FDA can also request additional clinical trials be conducted as a condition to drug approval. During all clinical trials, physicians monitor the patients to determine effectiveness and to observe and report any reactions or other safety risks that may result from use of the drug.

8

Table of Contents

Assuming successful completion of the required clinical trials, drug developers submit the results of pre-clinical studies and clinical trials, together with other detailed information including information on the manufacture and composition of the drug, to the FDA, in the form of an NDA, requesting approval to market the drug for one or more indications. In most cases, the NDA must be accompanied by a substantial user fee. The FDA reviews an NDA to determine, among other things, whether a drug is safe and effective for its intended use.

Before approving an NDA, the FDA will inspect the facility or facilities where the drug is manufactured. The FDA will not approve the application unless cGMP compliance is satisfactory. The FDA will issue an approval letter if it determines that the application, manufacturing process and manufacturing facilities are acceptable. If the FDA determines that the NDA, manufacturing process or manufacturing facilities are not acceptable, it will issue a complete response letter (CRL), in which it will outline the deficiencies in the submission and will often request additional testing or information. Notwithstanding the submission of any requested additional information, the FDA may ultimately decide that the NDA does not satisfy the regulatory criteria for approval and refuse to approve the NDA.

The testing and approval process requires substantial time, effort and financial resources, and each may take several years to complete. The FDA may not grant approval on a timely basis, or at all. We or our partners may encounter difficulties or unanticipated costs in our efforts to secure necessary governmental approvals, which could delay or preclude us or our partners from marketing our products. Furthermore, the FDA may prevent a drug developer from marketing a drug under a label for its desired indications or place other conditions on distribution as a condition of any approvals, which may impair commercialization of the drug. After approval, some types of changes to the approved drug, such as adding new indications, manufacturing changes and additional labeling claims, are subject to further FDA review and approval. Similar regulatory procedures must also be complied within countries outside the U.S.

If the FDA approves the NDA, the drug becomes available for physicians to prescribe in the U.S. After approval of our products, we have to comply with a number of post-approval requirements, including delivering periodic reports to the FDA, submitting descriptions of any adverse reactions reported, and complying with drug sampling and distribution requirements. We and our partners also are required to provide updated safety and efficacy information and to comply with requirements concerning advertising and promotional labeling. Also, our quality control and manufacturing procedures must continue to conform to cGMP after approval. Drug manufacturers and their subcontractors are required to register their facilities and are subject to periodic unannounced inspections by the FDA to assess compliance with cGMP which imposes certain procedural and documentation requirements relating to quality assurance and quality control. Accordingly, manufacturers must continue to expend time, money and effort in the area of production and quality control to maintain compliance with cGMP and other aspects of regulatory compliance. The FDA may require post market testing and surveillance to monitor the drug's safety or efficacy, including additional studies, known as Phase IV trials, to evaluate long-term effects.

In addition to studies requested by the FDA after approval, we or our partners may have to conduct other trials and studies to explore use of the approved product for treatment of new indications, which require FDA approval. The purpose of these trials and studies is to broaden the application and use of the product and its acceptance in the medical community.

We use, and will continue to use, third-party manufacturers to produce our products in clinical and commercial quantities. Future FDA inspections may identify compliance issues at our facilities or at the facilities of our contract manufacturers that may disrupt production or distribution, or require substantial resources to correct. In addition, discovery of problems with a product or the failure to comply with requirements may result in restrictions on a product, manufacturer or holder of an approved NDA, including withdrawal or recall of the product from the market or other voluntary or FDA-initiated action that could delay further marketing. Newly discovered or developed safety or effectiveness data may require changes to a product's approved labeling, including the addition of new warnings and contraindications.

In September 2007, the Food and Drug Administration Amendments Act (FDAAA), was enacted into law, amending the U.S. Federal Food, Drug, and Cosmetic Act and the Public Health Service Act. The FDAAA made a number of substantive and incremental changes to the review and approval processes in ways that could make it more difficult or costly to obtain approval for new pharmaceutical products, or to produce, market and distribute existing pharmaceutical products. Most significantly, the law changed the FDA's handling of postmarked drug product safety issues by giving the FDA authority to require post approval studies or clinical trials, to request that safety information be provided in labeling, or to require an NDA applicant to submit and execute a Risk Evaluation and Mitigation Strategy (REMS).

The FDAAA made certain changes to the user fee provisions to permit the use of user fee revenue to fund the FDA's drug product safety activities and the review of Direct-to-Consumer advertisements. The Food and Drug Administration Safety and Innovation Act of 2012, which became effective in October 2012, reauthorized the authority of the FDA to collect user fees to fund the FDA's review activities.

In addition, new government requirements may be established that could delay or prevent regulatory approval of our products under development.

9

Table of Contents

## Employees

We had 142 full-time employees as of December 31, 2016, compared with 118 employees as of December 31, 2015. None of our employees are represented by a labor union. We have not experienced any work stoppages and consider our employee relations to be good.

## Corporate Information

We were incorporated in Delaware in 2002. Our principal executive offices are located at 2200 Pennsylvania Avenue NW, Suite 300E, Washington D.C. 20037, and our telephone number is (202) 734-3400. Our website address is www.vandapharma.com and the information contained in, or that can be accessed through, our website is not part of this annual report and should not be considered part of this annual report.

## Available Information

We file annual, quarterly, and current reports, proxy statements, and other documents with the Securities and Exchange Commission (SEC) under the Securities Exchange Act of 1934 (the Exchange Act). The public may read and copy any materials that we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Also, the SEC maintains an internet website at www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers, including us, that file electronically with the SEC.

We also make available free of charge on our Internet website at www.vandapharma.com our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and, if applicable, amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC.

Our code of ethics, other corporate policies and procedures, and the charters of our Audit Committee, Compensation Committee and Nominating/Corporate Governance Committee are available through our Internet website at www.vandapharma.com.

## ITEM 1A.    RISK FACTORS

*Our business, financial condition and operating results can be affected by a number of factors, whether current known or unknown, including but not limited to those described below, any one or more of which could, directly or indirectly, cause our actual operating results and financial condition to vary materially from past, or anticipated future, operating results and financial condition. Any of these factors, in whole or in part, could materially and adversely affect our business, financial condition, operating results and the price of our common stock.*

*The following discussion of risk factors contains forward-looking statements. These risk factors may be important to understanding any statement in this annual report on Form 10-K or elsewhere. The following information should be read in conjunction with the consolidated financial statements and related notes in Part I, Item 1, Financial Statements and Part I, Item 2, Management's, Discussion and Analysis of Financial Condition and Results of Operations.*

*Because of the following factors, as well as other factors affecting our financial condition and operating results, past financial performance should not be considered to be a reliable indicator of future performance, and investors should not use historical trends to anticipate results or trends in future periods.*

### Risks related to our business and industry

#### *We are dependent on the commercial success of HETLIOZ® and Fanapt®.*

Our future success is currently substantially dependent upon the commercial success of HETLIOZ® for the treatment of Non-24-Hour Sleep-Wake Disorder (Non-24) and Fanapt® for the treatment of schizophrenia.

In January 2014, the FDA approved our New Drug Application (NDA) for HETLIOZ® for the treatment of Non-24 and in April 2014, we commenced the U.S. commercial launch of HETLIOZ®. In July 2015, the European Commission (EC) granted centralized marketing authorization with unified labeling for HETLIOZ® for the treatment of Non-24 in blind adults, and in August 2016 we commenced the commercial launch of HETLIOZ® in Germany. This authorization is valid in the 28 countries that are members of the European Union, as well as European Economic Area members Iceland, Liechtenstein and Norway.

In the first quarter of 2015, we acquired the U.S. commercial rights to Fanapt®, and began selling, marketing and distributing Fanapt® in the U.S.

Our ability to generate significant product revenue from sales of HETLIOZ® and Fanapt®, both in the U.S. and abroad, in the near term will depend on, among other things, our ability to:

- defend our patents and intellectual property from generic competition;

- maintain commercial manufacturing arrangements with third-party manufacturers;

15

Table of Contents

- produce, through a validated process, sufficiently large quantities of inventory of our products to meet demand;

- continue to maintain and grow a wide variety of internal sales, distribution and marketing capabilities sufficient to sustain growth in sales of our products;

- gain broad acceptance of our products from physicians, health care payors, patients, pharmacists and the medical community;

- properly price and obtain adequate coverage and reimbursement of these products by governmental authorities, private health insurers, managed care organizations and other third-party payors;

- maintain compliance with ongoing FDA labeling, packaging, storage, advertising, promotion, recordkeeping, safety and other post-market requirements;

- obtain approval from the FDA to expand the labeling of our approved products for additional indications;

- obtain regulatory approval for HETLIOZ® or Fanapt® in additional countries;

- adequately protect against and effectively respond to any claims by holders of patents and other intellectual property rights that our products infringe their rights; and

- adequately protect against and effectively respond to any unanticipated adverse effects or unfavorable publicity that develops in respect to our products, as well as the emergence of new or existing competitive products, which may be proven to be more clinically effective and cost-effective.

We expect to continue to incur significant expenses and to utilize a substantial portion of our cash resources as we continue the commercialization of HETLIOZ® and Fanapt®, evaluate foreign market opportunities for HETLIOZ® and Fanapt® and continue to grow our operational capabilities, both domestically and abroad. This activity represents a significant investment in the commercial success of HETLIOZ® and Fanapt®, which is uncertain.

If our continued commercial efforts are not successful with respect to HETLIOZ® and Fanapt® in the U.S., Europe or other jurisdictions in which these products may be approved for sale, our ability to generate increased product sales revenue may be jeopardized and, consequently, our business may be seriously harmed.

The cost of growing and maintaining a sales, marketing and distribution organization may exceed its cost effectiveness. If we fail to continue to develop sales, marketing and distribution capabilities, if sales efforts are not effective or if costs of developing sales, marketing and distribution capabilities exceed their cost effectiveness, our business, results of operations and financial condition could be materially adversely affected.

*Continued growth of HETLIOZ® and Fanapt® may be slow or limited for a variety of reasons including competing products or unanticipated safety issues. If either HETLIOZ® or Fanapt® is not successful in gaining broad commercial acceptance, our business would be harmed.*

Any increase in sales of HETLIOZ® and Fanapt® will be dependent on several factors, including our ability to educate physicians and to increase physician awareness of the benefits and cost-effectiveness of our products relative to competing products. The degree of further market acceptance of any of our products or market acceptance of approved product candidates among physicians, patients, health care payors and the medical community will depend on a number of factors, including:

- acceptable evidence of safety and efficacy;

- relative convenience and ease of administration;

- the prevalence and severity of any adverse side effects;

- availability of alternative treatments; and

- pricing and cost effectiveness.

In addition, HETLIOZ® and Fanapt® are subject to continual review by the FDA, and we cannot assure that newly discovered or reported safety issues will not arise. With the use of any newly marketed drug by a wider patient population, serious adverse events may occur from time to time that initially do not appear to relate to the drug itself. Any safety issues could cause us to suspend or cease marketing of our approved products, cause us to modify how we market our approved products, subject us to substantial liabilities and adversely affect our revenues and financial condition. In the event of a withdrawal of either HETLIOZ® or Fanapt® from the market, our revenues would decline significantly and our business would be seriously harmed.

*We may enter into third party collaborations from time to time in order to commercialize our products. If we are unable to identify or enter into an agreement with any material third-party collaborator, if our collaborations with any such third-party are not commercially successful or if our agreement with any such third-party is terminated or allowed to expire, we could be adversely affected financially or our business reputation could be harmed.*

16

Table of Contents

and noninfringement of the '610 Patent and the '432 Patent. A trial on these matters was scheduled to begin on May 15, 2017. On December 15, 2016, following a submission by the parties that it may be appropriate to remove the May 15, 2017 trial from the Delaware District Court's calendar pending the Federal Circuit's decision in Roxane's appeal of the Delaware District Court's August 25, 2016 ruling finding that Roxane's proposed products infringed the asserted claims of the '610 Patent, the Delaware District Court removed the May 15, 2017 trial from the calendar and adopted a new schedule for discovery. The parties agreed that within 14 days after any decision on the merits in the Roxane appeal, the parties will submit to the Delaware District Court a status report and request a schedule for trial. We entered into a confidential stipulation with Inventia regarding any potential launch of Inventia's generic ANDA product. We also entered into a confidential stipulation with Lupin regarding any potential launch of Lupin's generic ANDA product.

Lupin filed counter claims for declaratory judgment of invalidity and noninfringement of seven of our method of treatment patents that are listed in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book) related to Fanapt® (such seven patents, the Method of Treatment Patents). We have not sued Lupin for infringing the Method of Treatment Patents. On October 13, 2016, we, along with Lupin, filed a Stipulation of Dismissal in the Delaware District Court pursuant to which Lupin's counterclaims relating to the Method of Treatment Patents were dismissed without prejudice in recognition of an agreement reached between Lupin and us by which we would not assert those patents against Lupin absent certain changes in Lupin's proposed prescribing information for its iloperidone tablets.

On October 24, 2016, we entered into a License Agreement with Taro to resolve our patent litigation against Taro regarding Taro's ANDA seeking approval of its generic version of Fanapt® (the Taro License Agreement). Under the Taro License Agreement, we granted Taro a non-exclusive license to manufacture and commercialize Taro's version of Fanapt® in the U.S. effective November 2, 2027, unless prior to that date we obtain pediatric exclusivity for Fanapt®, in which case, the license will be effective May 2, 2028. Taro may enter the market earlier under certain limited circumstances. The Taro License Agreement, which is subject to review by the U.S. Federal Trade Commission (FTC) and the U.S. Department of Justice (DOJ), provides for a full settlement and release by us and Taro of all claims that are the subject of the litigation.

On December 7, 2016, we entered into a License Agreement with Apotex to resolve our patent litigation against Apotex regarding Apotex's ANDA seeking approval of its generic version of Fanapt® (the Apotex License Agreement). Under the Apotex License Agreement, we granted Apotex a non-exclusive license to manufacture and commercialize Apotex's version of Fanapt® in the U.S. effective November 2, 2027, unless prior to that date we obtain pediatric exclusivity for Fanapt®, in which case, the license will be effective May 2, 2028. Apotex may enter the market earlier under certain limited circumstances. The Apotex License Agreement, which is subject to review by the FTC and the DOJ, provides for a full settlement and release by us and Apotex of all claims that are the subject of the litigation.

On February 26, 2016, Roxane filed suit against us in the U.S. District Court for the Southern District of Ohio (Ohio District Court). The suit seeks a declaratory judgment of invalidity and noninfringement of the Method of Treatment Patents. We have not sued Roxane for infringing the Method of Treatment Patents. We filed a motion to dismiss this lawsuit for lack of personal jurisdiction or to transfer the lawsuit to the Delaware District Court. On December 20, 2016, the Ohio District Court ruled in our favor, dismissing Roxane's suit without prejudice for lack of personal jurisdiction.

On February 26, 2016, Roxane filed a Petition for *Inter Partes* Review (IPR) of the '432 Patent with the Patent Trials and Appeals Board (PTAB) of the U.S. Patent and Trademark Office. We filed a Preliminary Response on June 7, 2016, and on August 30, 2016, the PTAB denied the request by Roxane to institute an IPR of the '432 Patent. On September 29, 2016, Roxane filed a Petition for Rehearing with the PTAB, and on October 13, 2016, we filed a Response to Roxane's Petition. On November 4, 2016, the PTAB denied Roxane's Petition for Rehearing.

### *FDA and foreign regulatory approval of our products is uncertain.*

The research, testing, manufacturing and marketing of products such as those that we have developed or that we or our partners are developing are subject to extensive regulation by federal, state and local government authorities, including the FDA, as well as foreign regulatory authorities in jurisdictions in which we seek approval. To obtain regulatory approval of such products, we or our partners must demonstrate to the satisfaction of the applicable regulatory agency that, among other things, the product is safe and effective for its intended use. In addition, we or our partners must show that the manufacturing facilities used to produce such products are in compliance with current Good Manufacturing Practices regulations (cGMP).

The process of obtaining FDA and other required regulatory approvals and clearances can take many years and will require us and our partners, as applicable, to expend substantial time and capital. Despite the time and expense expended, regulatory approval is never guaranteed. The number of pre-clinical and clinical trials that will be required for FDA or foreign regulatory approval varies depending on the product, the disease or condition that the product is in development for, and the requirements applicable to that particular product. The FDA or applicable foreign regulatory agency can delay, limit or deny approval of a product for many reasons, including that:

- a product may not be shown to be safe or effective;

23

**Table of Contents**

- the FDA or foreign agency may interpret data from pre-clinical and clinical trials in different ways than we or our partners do;

- the FDA or foreign agency may not approve our or our partners' manufacturing processes or facilities;

- a product may not be approved for all the indications we or our partners request;

- the FDA or foreign agency may change its approval policies or adopt new regulations;

- the FDA or foreign agency may not meet, or may extend, the Prescription Drug User Fee Act (PDUFA-V) date or its foreign equivalent with respect to a particular NDA or foreign application; and

- the FDA or foreign agency may not agree with our or our partners' regulatory approval strategies or components of the regulatory filings, such as clinical trial designs.

For example, if certain of our or our partners' methods for analyzing trial data are not accepted by the FDA or the applicable foreign agency, we or our partners may fail to obtain regulatory approval for our products.

Any delay or failure to obtain regulatory approvals for our products will result in increased costs, could diminish competitive advantages that we may attain and would adversely affect the marketing and sale of our products. Other than HETLIOZ® in the U.S. and the 31 countries in Europe covered by the centralized marketing authorization by the EC, and Fanapt® in the U.S., Mexico and Israel, we have not received regulatory approval to market any of our products in any jurisdiction.

Even following regulatory approval of our products, the FDA or the applicable foreign agency may impose limitations on the indicated uses for which such products may be marketed, subsequently withdraw approval or take other actions against us, our partners or such products that are adverse to our business. The FDA and foreign agencies generally approve drugs for particular indications. An approval for a more limited indication reduces the size of the potential market for the product. Product approvals, once granted, may be withdrawn or modified if problems occur after initial marketing.

We and our partners also are subject to numerous federal, state, local and foreign laws, regulations and recommendations relating to safe working conditions, laboratory and manufacturing practices, the environment and the use and disposal of hazardous substances used in connection with discovery, research and development work. In addition, we cannot predict the extent to which new governmental regulations might significantly impede the discovery, development, production and marketing of our products. We or our partners may be required to incur significant costs to comply with current or future laws or regulations, and we may be adversely affected by the cost of such compliance or the inability to comply with such laws or regulations.

**If our products are determined to be unsafe or ineffective in humans, whether commercially or in clinical trials, our business will be materially harmed.**

Despite the FDA's approval of the NDA for HETLIOZ® in January 2014 and the NDA for Fanapt® in May 2009, the EC's grant of the centralized marketing authorization for HETLIOZ® in July 2015, and the positive results of our completed trials for HETLIOZ® and Fanapt®, we are uncertain whether either of these products will ultimately prove to be effective and safe in humans long term and in all uses. Frequently, products that have shown promising results in clinical trials have suffered significant setbacks in later clinical trials or even after they are approved for commercial sale. Future uses of our products, whether in clinical trials or commercially, may reveal that the product is ineffective, unacceptably toxic, has other undesirable side effects, is difficult to manufacture on a large scale, is uneconomical, infringes on proprietary rights of another party or is otherwise not fit for further use. If our products are determined to be unsafe or ineffective in humans, our business will be materially harmed.

**Clinical trials for our products are expensive and their outcomes are uncertain. Any failure or delay in completing clinical trials for our products could severely harm our business.**

Pre-clinical studies and clinical trials required to demonstrate the safety and efficacy of our products are time-consuming and expensive and together take several years to complete. Before obtaining regulatory approvals for the commercial sale of any of our products, we or our partners must demonstrate through preclinical testing and clinical trials that such product is safe and effective for use in humans. We have incurred, and we will continue to incur, substantial expense for, and devote a significant amount of time to, preclinical testing and clinical trials.

Historically, the results from preclinical testing and early clinical trials often have not predicted results of later clinical trials. A number of new drugs have shown promising results in clinical trials, but subsequently failed to establish sufficient safety and efficacy data to obtain necessary regulatory approvals. Clinical trials conducted by us, by our partners or by third parties on our or our partners' behalf may not demonstrate sufficient safety and efficacy to obtain the requisite regulatory approvals for our products. Regulatory authorities may not permit us or our partners to undertake any additional clinical trials for our products, may force us to stop any ongoing clinical trials and it may be difficult to design efficacy studies for our products in new indications.

Clinical development efforts performed by us or our partners may not be successfully completed. Completion of clinical trials may take several years or more. The length of time can vary substantially with the type, complexity, novelty and intended use of the products and the size of the prospective patient population. The commencement and rate of completion of clinical trials for our products may be delayed by many factors, including:

- the inability to manufacture or obtain from third parties materials sufficient for use in pre-clinical studies and clinical trials;

- delays in beginning a clinical trial;

24

Table of Contents

- delays in patient enrollment and variability in the number and types of patients available for clinical trials;

- difficulty in maintaining contact with patients after treatment, resulting in incomplete data;

- poor effectiveness of our products during clinical trials;

- unforeseen safety issues or side effects; and

- governmental or regulatory delays and changes in regulatory requirements and guidelines.

If we or our partners fail to complete successfully one or more clinical trials for our products, we or they may not receive the regulatory approvals needed to market that product. Therefore, any failure or delay in commencing or completing these clinical trials would harm our business materially.

*Our products may cause undesirable side effects or have other properties that could delay, prevent or result in the revocation of their regulatory approval or limit their marketability.*

Undesirable side effects caused by our products could interrupt, delay or halt clinical trials and could result in the denial of regulatory approval by the FDA or other regulatory authorities for any or all targeted indications, and in turn prevent us or our partners from commercializing or continuing the commercialization of such products and generating revenues from their sale. We will continue to assess the side effect profile of our products in ongoing clinical development programs. However, we cannot predict whether the commercial use of our approved products (or our products in development, if and when they are approved for commercial use) will produce undesirable or unintended side effects that have not been evident in the use of, or in clinical trials conducted for, such products to date. Additionally, incidents of product misuse may occur. These events, among others, could result in product recalls, product liability actions or withdrawals or additional regulatory controls, all of which could have a material adverse effect on our business, results of operations and financial condition.

In addition, if after receiving marketing approval of a product, we, our partners or others identify undesirable side effects caused by such product, we or our partners could face one or more of the following:

- regulatory authorities may require the addition of labeling statements, such as a "black box" warning or a contraindication;

- regulatory authorities may withdraw their approval of the product;

- we or our partners may be required to change the way the product is administered, conduct additional clinical trials or change the labeling of the product; and

- our, our partner's or the product's reputation may suffer.

Any of these events could prevent us or our partners from achieving or maintaining market acceptance of the affected product or could substantially increase the costs and expenses of commercializing the product, which in turn could delay or prevent us from generating significant revenues from its sale.

*We have a history of operating losses, anticipate future losses and may never become profitable on a sustained basis.*

We have been engaged in identifying and developing products since March 2003, which has required, and will continue to require, significant research and development expenditures. The continued commercialization of HETLIOZ® and Fanapt® will require substantial additional expenditures.

As of December 31, 2016, we had an accumulated deficit of $345.9 million and we cannot estimate with precision the extent of our future losses. In April 2014, we commercially launched HETLIOZ® in the U.S. for the treatment of Non-24 and in August 2016 we commercially launched HETLIOZ® in Germany for the treatment of Non-24. We are currently evaluating the commercial opportunity for HETLIOZ® in the rest of Europe. In the fourth quarter of 2014, we acquired all further rights to Fanapt® from Novartis. The continued commercialization of HETLIOZ® and Fanapt® will require substantial additional expenditures. In addition, we may not succeed in commercializing HETLIOZ®, Fanapt® or any other products. Novartis launched Fanapt® in the U.S. in the first quarter of 2010 and we began selling Fanapt® on our own in the first quarter of 2015. We may not succeed in gaining additional market acceptance of Fanapt® in the U.S. and we may not succeed in commercializing HETLIOZ® or Fanapt® outside of the U.S. We may not be profitable even if our products are successfully commercialized. We may be unable to fully develop, obtain regulatory approval for, commercialize, manufacture, market, sell and derive revenue from our products in the timeframes we project, if at all, and our inability to do so would materially and adversely impact the market price of our common stock and our ability to raise capital and continue operations.

25

**Table of Contents**

**Signatures**

Pursuant to the requirements of Section 13 and 15(d) of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this annual report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

Vanda Pharmaceuticals Inc.

February 17, 2017

By:      /s/ Mihael H. Polymeropoulos, M.D.

Mihael H. Polymeropoulos, M.D.
**President and Chief Executive Officer**

Pursuant to the requirements of the Securities Act of 1934, this annual report on Form 10-K has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| <u>Name</u> | <u>Title</u> | <u>Date</u> |
|---|---|---|
| /s/ Mihael H. Polymeropoulos, M.D.<br>Mihael H. Polymeropoulos, M.D. | President and Chief Executive Officer and Director (principal executive officer) | February 17, 2017 |
| /s/ James P. Kelly<br>James P. Kelly | Senior Vice President, Chief Financial Officer and Treasurer (principal financial officer and principal accounting officer) | February 17, 2017 |
| /s/ H. Thomas Watkins<br>H. Thomas Watkins | Chairman of the Board and Director | February 17, 2017 |
| /s/ Kenneth M. Bate<br>Kenneth M. Bate | Director | February 17, 2017 |
| /s/ Michael Cola<br>Michael Cola | Director | February 17, 2017 |
| /s/ Richard W. Dugan<br>Richard W. Dugan | Director | February 17, 2017 |
| /s/ Vincent J. Milano<br>Vincent J. Milano | Director | February 17, 2017 |

55