UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————————— x

KENNETH GORDON, Individually and on
Behalf of All Others Similarly Situated,

                              Plaintiff,

      vs.

VANDA PHARMACEUTICALS, INC.,
MIHAEL H. POLYMEROPOULOS, JAMES
P. KELLY, GIAN PIERO REVERBERI, and
THOMAS E. GIBBS,

                         Defendants.

—————————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:19-cv-01108-FB-LB

<u>CLASS ACTION</u>

Hon. Frederic Block

PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED
COMPLAINT

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS ...................................................................................4

       A.    Vanda Derived Its Class Period Revenues from Fanapt and Hetlioz .....................4

       B.    Promoting and Marketing Drugs Off-Label Is Illegal ............................................4

       C.    Vanda Acquired the Rights to Sell Fanapt Years After It Was Approved .............4

       D.    The Off-Label Promotion Scheme for Fanapt .........................................................5

       E.    The FDA Approves Hetlioz to Treat Non-24, Not Generic Sleep Disorders .........8

       F.    The Off-Label Promotion Scheme for Hetlioz ........................................................9

       G.    Tradipitant Was Vanda's Most Important Class Period Developmental
             Drug ......................................................................................................................10

       H.    Vanda Knew by May 2018 that the FDA Would Issue a Clinical Trial
             Hold Because the Required Safety Test for Tradipitant Was Not Being
             Conducted ..............................................................................................................11

       I.    Defendants' Fraud Is Revealed in Early February 2019........................................12

III.   ARGUMENT .....................................................................................................13

       A.    The Standards Applicable to Defendants' Motion.................................................13

       B.    Defendants' False and Misleading Statements and Omissions..............................14

             1.    The Materially False and Misleading Fanapt Misstatements and
                   Omissions.....................................................................................................14

             2.    The Materially False and Misleading Hetlioz Misstatements and
                   Omissions.....................................................................................................21

             3.    The Materially False and Misleading Tradipitant Misstatements
                   and Omissions...............................................................................................23

             4.    The Materially False and Misleading Items 303 and 503 Omissions........26

                   a.    Item 303 ............................................................................................26

**Page**

b.      Item 503 ...................................................................................28

C.      Defendants' False Statements and Omissions Were Made with Scienter .............29

1.      The AC Adequately Alleges Scienter for the Fanapt and Hetlioz
        Statements and Omissions ..........................................................................29

2.      The AC Adequately Alleges Scienter for the Tradipitant
        Statements and Omissions ..........................................................................36

D.      The AC Adequately Alleges Loss Causation.........................................................39

1.      The Fanapt and Hetlioz Decline ................................................................39

2.      The Tradipitant Decline ..............................................................................41

E.      The Extrinsic Materials Submitted by Defendants Should Be Stricken ...............41

F.      Defendants' Group Pleading Argument Fails.........................................................43

G.      The Individual Defendants Are Liable as Control Persons ...................................44

H.      Should Defendants' Motion Be Granted, Leave to Amend Is Warranted .............45

IV.     CONCLUSION...................................................................................................................45

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Acticon AG v. China N.E. Petroleum Holdings, Ltd.*,
  692 F.3d 34 (2d Cir. 2012)...............................................................................33

*Akerman v. Arotech Corp.*,
  608 F. Supp. 2d 372 (E.D.N.Y. 2009) ........................................................29, 35

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)...........................................................................13

*Avon Pension Fund v. GlaxoSmithKline plc*,
  343 F. App'x 671 (2d Cir. 2009) ....................................................................36

*Bartesch v. Cook*,
  941 F. Supp. 2d 501 (D. Del. 2013).................................................................33

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) .....................................................................40

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014).................................................................39, 41, 44

*Christine Asia Co. Ltd. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ......................................................................37

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013)..............................................................43

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)...............................................30, 36, 37, 44

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)......................................................................19, 28

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)..............................................................28

*City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*,
  2015 WL 1478565
  (E.D. Wis. Mar. 31, 2015) ...........................................................................42

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)..............................................................18

**Page**

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)..................................................................................................39

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
   551 F. Supp. 2d 210 (S.D.N.Y. 2008).......................................................................26

*Emergent Capital Inv. Mgmt, LLC v. Stonepath Grp., Inc.*,
   343 F.3d 189 (2d Cir. 2003).....................................................................................39

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015).........................................................................13, 30, 32

*Fire & Police Pension Association of Colorado v. Abiomed, Inc.*,
   778 F.3d 228 (1st Cir. 2015).....................................................................................19

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)...........................................................15, 17, 22

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)...........................................................21, 24, 30, 35

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000).........................................................................14, 25

*Gauquie v. Albany Molecular Research, Inc.*,
   2016 U.S. Dist. LEXIS 97295
   (E.D.N.Y. July 26, 2016) ............................................................15, 18, 30, 31

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011).......................................................................36

*Hirsch v. Complex Media, Inc.*,
   2018 U.S. Dist. LEXIS 209701
   (S.D.N.Y. Dec. 10, 2018).........................................................................................33

*In re Altaba Inc., f/d/b/a Yahoo! Inc.*,
   2018 WL 1919547
   (Apr. 24, 2018)........................................................................................................28

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010).......................................................................17

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004).......................................................................31

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017).............................................................19, 23, 28

**Page**

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)........................................................36

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).......................................................20

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010).......................................................31

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014)...........................................22, 25, 37

*In re Deutsche Bank AG Sec. Litig.*,
2016 U.S. Dist. LEXIS 96741
(S.D.N.Y. July 25, 2016) .....................................................................27, 28

*In re Eletrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017).......................................................17

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................18, 24

*In re GE Sec. Litig.*,
856 F. Supp. 2d 645 (S.D.N.Y. 2012).......................................................37

*In re Genzyme Corp. Sec. Litig.*,
754 F.3d 31 (1st Cir. 2014).......................................................................38

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019)..................................................15, 23

*In re Initial Pub. Offering Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004) ................................................................41

*In re Intercept Pharms., Inc. Sec. Litig.*,
2015 U.S. Dist. LEXIS 26442
(S.D.N.Y. Mar. 4, 2015) ...........................................................................37

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017).......................................................16

*In re Lions Gate Entm't Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ..........................................................25

*In re Merrill Lynch Auction Rate Sec. Litig.*,
704 F. Supp. 2d 378 (S.D.N.Y. 2010).......................................................40

**Page**

*In re MF Global Holdings Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................. 36

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) ........................................................... 30, 36

*In re Mylan N.V. Sec. Litig.*,
  379 F. Supp. 3d 198 (S.D.N.Y. 2019) ................................................................. 33

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014) ............................................................. 32, 33

*In re Pall Corp.*,
  2009 U.S. Dist. LEXIS 88240
  (E.D.N.Y. Sept. 21, 2009) .............................................................................. 31, 35

*In re Pfizer Inc. Sec. Litig.*,
  584 F. Supp. 2d 621 (S.D.N.Y. 2008) ................................................................. 43

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................................. 45

*In re Salix Pharms., Ltd. Sec. Litig.*,
  2016 U.S. Dist. LEXIS 54202
  (S.D.N.Y. Apr. 22, 2016) ................................................................................... 31

*In re Sequans Communs. S.A. Sec. Litig.*,
  2019 U.S. Dist. LEXIS 170335
  (E.D.N.Y. Sept. 30, 2019) .................................................................................. 40

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 U.S. Dist. LEXIS 110779
  (S.D.N.Y. June 19, 2019) ................................................................................... 19

*In re Signet Jewelers Ltd. Sec. Litig.*,
  389 F. Supp. 3d 221 (S.D.N.Y. 2019) ................................................................. 21

*In re SuperCom Inc. Sec. Litig.*,
  2018 U.S. Dist. LEXIS 175467
  (S.D.N.Y. Oct. 10, 2018) ................................................................................... 35

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  2009 WL 5851089
  (D.N.M. Dec. 21, 2009) ..................................................................................... 42

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ................................................................. 20

**Page**

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
195 F. Supp. 3d 528 (S.D.N.Y. 2016)..................................................................44

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).......................................................................... *passim*

*In re Winstar Communs.*,
2006 U.S. Dist. LEXIS 7618
(S.D.N.Y. Feb. 27, 2006)...............................................................................39

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016)........................................................................26, 27

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
146 F.3d 66 (2d Cir. 1998)...........................................................................42

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010)..........................................................................25

*Katz v. Image Innovations Holdings, Inc.*,
542 F. Supp. 2d 269 (S.D.N.Y. 2008).................................................................45

*Lenco Diagnostic Labs. v. McKinley Scientific, Inc.*,
2016 U.S. Dist. LEXIS 137700
(E.D.N.Y. Sept. 30, 2016).............................................................................44

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706, 716 (2d Cir. 2011)....................................................................26

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)..........................................................................45

*Manavazian v. ATEC Grp., Inc.*,
160 F. Supp. 2d 468 (E.D.N.Y. 2001) ......................................................... *passim*

*Martinez v. LVNV Funding LLC*,
2016 U.S. Dist. LEXIS 136613
(E.D.N.Y. Oct. 2, 2016) ...............................................................................33

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)...............................................................................13, 14

*Mayo v. Fed. Gov't*,
558 Fed. App'x 55 (2d Cir. 2014).....................................................................42

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
900 F.2d 576 (2d Cir. 1990)...........................................................................14

**Page**

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)..................................................................14, 15, 19

*Micholle v. Ophthotech Corp.*,
    2019 U.S. Dist. LEXIS 160131
    (S.D.N.Y. Sept. 18, 2019) ...............................................................................38

*Mingbo Cai v. Switch, Inc.*,
    2019 U.S. Dist. LEXIS 116702
    (D. Nev. July 12, 2019) ...................................................................................28

*Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*,
    326 F. Supp. 3d 26 (S.D.N.Y. 2018)...............................................................42

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................14, 29

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)...........................................16, 18, 23, 38

*Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*,
    2019 U.S. Dist. LEXIS 164126
    (D. Conn. Sept. 25, 2019) ...............................................................................39

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012).............................................................31

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)........................................................20, 31

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)........................................................................13, 42

*Schering Corp. v. Pfizer Inc.*,
    189 F.3d 218 (2d Cir. 1999)........................................................................24, 25

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F. Supp. 3d 313 (S.D.N.Y. 2018).............................................................23

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013)........................................................................27, 28

*Simon v. Abiomed, Inc.*,
    37 F. Supp. 3d 499 (D. Mass. 2014) ...............................................................34

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)...............................................................................21

**Page**

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004)...............................................................................42

*Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*,
    771 F. App'x 494 (2d. Cir. 2019) ....................................................................25

*Straker v. Metro. Transit Auth.*,
    333 F. Supp. 2d 91 (E.D.N.Y. 2004) ...............................................................45

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015)...............................................................33

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)..............................................................................30

*Teamsters Local 456 Pension Fund v. Universal Health Services*,
    396 F. Supp. 3d 413 (E.D. Pa. 2019) ...........................................................32, 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................13, 29, 36, 38

*Tomasino v. Estee Lauder Cos., Inc.*,
    2015 U.S. Dist. LEXIS 38918
    (E.D.N.Y. Mar. 26, 2015) .................................................................................43

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016).............................................................................25

*United States v. EMD Serono, Inc.*,
    370 F. Supp. 3d 483 (E.D. Pa. 2019) ...............................................................34

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)...................................................22, 32, 36

*Vanda Pharm., Inc. v. FDA*,
    2020 U.S. Dist. LEXIS 16623
    (D.D.C. Jan. 31, 2020) .....................................................................12, 23, 36, 37

*Vanleeuwen v. Keyuan Petrochemicals Inc.*,
    2014 U.S. Dist. LEXIS 110255
    (S.D.N.Y. Aug. 8, 2014) ...................................................................................33

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016)...............................................................33

**Page**

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b)............................................................................................................1, 14
    §78t(a) ..........................................................................................................1, 44
    §78u-4(b)(1).....................................................................................................14
    §78u-4(b)(2)(A) ................................................................................................13

Federal Rule of Evidence
    Rule 201(b) .......................................................................................................42
    Rule 801(d)(2)...................................................................................................25

Federal Rules of Civil Procedure
    Rule 8 ..........................................................................................................39, 44
    Rule 12(b)(6)............................................................................................ *passim*
    Rule 15(a)(2) .....................................................................................................45

17 C.F.R.
    §229.105.....................................................................................................26, 28
    §229.303.....................................................................................................26, 27
    §229.503.....................................................................................................26, 28

Lead Plaintiff Teamsters Local Union No. 727 Pension Fund ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss the Amended Complaint ("AC") (ECF No. 29).[1]

## I.    INTRODUCTION

This lawsuit is about Vanda and its senior executives misrepresenting to investors material information about the Company's three most important drugs.  Specifically, Defendants failed to disclose that Fanapt and Hetlioz, the only two drugs sold by Vanda during the Class Period, were promoted through an off-label marketing scheme, and that tradipitant, Vanda's most important developmental drug, could not advance in clinical trials because Vanda refused to conduct the required safety test mandated by the Food and Drug Administration ("FDA").  The AC provides an *unprecedented* level of detail, sourced from, *inter alia*: (i) interviews conducted by Plaintiff's counsel with Gardner (defined below) and Bourgeois (defined below), former Vanda managers who interacted with the Individual Defendants regarding the marketing of Fanapt and Hetlioz; and (ii) factual admissions made by Vanda in its failed lawsuit against the FDA regarding tradipitant.

Gardner and Bourgeois, who oversaw approximately 40% of the Fanapt sales force, were instructed by the Individual Defendants to market Fanapt off-label in numerous ways, including by promoting it: (i) as a primary treatment (even though it was FDA-approved only as a secondary treatment); (ii) to children (even though it was FDA-approved only for adults because it can cause a lethal side effect); and (iii) for any mental disorder (even though it was FDA-approved only for schizophrenia).  The Individual Defendants repeatedly discussed Vanda's marketing practices for

---

[1] The AC alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of all purchasers of Vanda Pharmaceuticals, Inc. ("Vanda" or the "Company") common stock between November 4, 2015 and February 11, 2019, inclusive (the "Class Period").  "Defendants" refers to Vanda and Mihael H. Polymeropoulos ("Polymeropoulos"), James P. Kelly ("Kelly"), Gian Piero Reverberi ("Reverberi"), and Thomas E. Gibbs ("Gibbs") (together, the "Individual Defendants").  "¶_" refers to paragraphs in the AC.  "Def. Mem." refers to Defendants' memorandum of law, dated March 23, 2020.  "Def. Ex. _" refers to the exhibits to the Declaration of Brad D. Feldman, dated March 23, 2020.  "Pl. Ex. _" refers to the exhibits to the Declaration of Michael G. Capeci, dated May 7, 2020.  Unless otherwise noted, all emphasis in quotations is added and all internal citations and quotation marks are omitted.

Fanapt with investors, but failed to accurately describe these efforts or the risks they posed.

Gardner and Bourgeois were also instructed by the Individual Defendants to market Hetlioz – which is FDA-approved to treat Non-24, a rare sleeping disorder that occurs mostly in blind individuals and afflicts fewer than 100 sighted individuals worldwide – off-label. Vanda was marketing Hetlioz to sighted people with *sleeping problems*, instead of persons with *Non-24*. Indeed, Non-24 requires a formal diagnosis, which Defendants never told Gardner or Bourgeois (or, by extension, their sales teams). These off-label efforts led to Hetlioz, which retails for over $200,000 per year, being primarily sold to patients who did not have Non-24. Defendants, however, misrepresented to investors that Hetlioz's marketing was limited to individuals with Non-24.

Finally, in May 2018, the FDA informed Vanda that it was required to conduct a routine safety test to ensure that tradipitant is safe to use on humans before the drug could proceed to the next step in the clinical trial process, or else the FDA would impose a clinical trial hold. Vanda repeatedly admitted this fact in its pleadings in the FDA Litigation (defined below), Vanda's unsuccessful lawsuit against the FDA to undo the clinical trial hold. Defendants (except defendant Gibbs) repeatedly discussed tradipitant's clinical trial progress starting in August 2018 – even misrepresenting that the next step was imminent – but failed to disclose that Vanda's unilateral decision to not conduct the safety test – a test the FDA specifically told Vanda it was *required* to complete – meant that tradipitant would not advance to the next phase of clinical trial testing.

Faced with these well-pled allegations, Defendants resort to mischaracterizing Plaintiff's allegations and raising factual disputes that cannot be resolved on their dismissal motion. Defendants argue, for example, that Plaintiff alleges mismanagement, not fraud, ignoring that the AC's allegations are about misstatements and omissions to investors, not the underlying misconduct. Likewise, Defendants argue that qui tam allegations can never support securities fraud claims,

- 2 -

neglecting Plaintiff's allegations that its counsel independently confirmed the statements ascribed to Gardner and Bourgeois by interviewing them, meaning they are no different from other former employees who courts routinely rely upon in sustaining securities fraud claims. Defendants also misstate the law because Second Circuit courts routinely allow securities fraud plaintiffs to rely on untested allegations from other lawsuits on Rule 12(b)(6) motions. Equally deficient are the numerous factual arguments Defendants make regarding Gardner and Bourgeois, including an effort to downplay the importance of the 5-day meeting that served as the national rollout for Fanapt – where the Individual Defendants trained Vanda's sales representatives to market Fanapt and Hetlioz off-label – and trying to recast Vanda's factual admissions in the FDA Litigation as "speculation."

Likewise, Defendants argue that they provided "robust disclosures" to investors regarding Vanda's marketing and clinical trials, ignoring that these disclosures do not remotely address the then-ongoing off-label marketing schemes or Vanda's decision to jeopardize tradipitant by choosing to not conduct the required safety test. Defendants further overlook that such disclosures can only immunize *forward-looking* statements, which Defendants concede the AC does not challenge. Defendants also incorrectly argue that Plaintiff must allege why Vanda would sue the FDA, ignoring that Plaintiff need not plead motive and can rely solely on allegations of recklessness, as the AC does. For the same reason, Defendants' argument that certain Individual Defendants purportedly increased their Vanda shareholdings during the Class Period – improperly relying on extrinsic documents that cannot be considered on a Rule 12(b)(6) motion and do not state what Defendants claim they do – is deficient. Finally, Defendants raise flawed loss causation arguments that run contrary to binding Second Circuit authority and rely upon a misreading of the AC.

Accordingly, Plaintiff respectfully submits that Defendants' motion to dismiss lacks merit and that this case should proceed to discovery.

## II.    STATEMENT OF FACTS

### A.    Vanda Derived Its Class Period Revenues from Fanapt and Hetlioz

Vanda derived its over $613 million in Class Period revenues from two drugs: (i) Fanapt, which is FDA-approved to treat adults with schizophrenia as a secondary treatment in a twice-daily formulation; and (ii) Hetlioz, which is FDA-approved to treat Non-24, a rare circadian rhythm disorder that occurs mostly, if not fully, in blind individuals. ¶¶35-36.  Fanapt and Hetlioz each generated between approximately 40% and 60% of Vanda's Class Period revenue.  ¶¶43-48.

### B.    Promoting and Marketing Drugs Off-Label Is Illegal

Off-label promotion means marketing or promoting a drug for a disease or symptom that the drug has not received FDA approval to treat. ¶49.  Because the FDA only approves drugs if they have been shown to be safe and effective for the specific indications they are approved to treat, the Federal Food, Drug, and Cosmetics Act, and related FDA regulations, prohibit pharmaceutical companies from introducing: (i) drugs into interstate commerce for any intended use the FDA has not determined to be safe and effective; or (ii) drugs that are misbranded.  ¶¶51-54.

Notwithstanding the restrictions on how pharmaceutical companies market drugs, physicians can choose to prescribe drugs off-label.  ¶52.  But because off-label marketing is illegal, FDA guidance requires that when physicians inquire about potential off-label uses for a drug, the company's sales representative should refer such questions to a separate department that consists of a medical or scientific professional.  ¶55.  Vanda failed to comply with this guidance.  ¶56.

### C.    Vanda Acquired the Rights to Sell Fanapt Years After It Was Approved

In April 2006, Vanda sought to obtain FDA approval for Fanapt to treat both schizophrenia and bipolar disorder for all ages because most antipsychotics, *i.e.* Fanapt's competitors, are indicated for treating multiple related mental illnesses to reach the largest possible pool of patients.  ¶¶60-63.  In 2009, however, the FDA approved Fanapt only to treat schizophrenia in adults.  ¶¶64-65.

Further, Fanapt was approved as a second line treatment, meaning it should only be

- 4 -

prescribed after a patient first tries a different antipsychotic. ¶66. The FDA did this because Fanapt presents a serious risk of developing QT prolongation, a side effect that can cause sudden death. ¶67. For this reason, Fanapt carries a black box warning (the most severe level) that is added to drug labels to alert patients and doctors about life-threatening risks for dangerous drugs. ¶¶67-68. The FDA also approved Fanapt to be taken twice-daily. ¶69. This made Fanapt less attractive compared to most other antipsychotics, which are taken once-a-day because patients with mental disorders typically struggle to take medicine on a routine schedule. *Id.* After Fanapt was approved in 2009, Vanda lost the right to sell it. ¶70. Vanda regained the rights to sell Fanapt in early 2015. ¶¶71-72. Shortly thereafter, Defendants began an off-label promotion scheme to market Fanapt because it was a legacy drug that was difficult to sell given its limited on-label approved uses. ¶¶73-74, 86.

> **D.      The Off-Label Promotion Scheme for Fanapt**

Vanda's off-label promotion scheme began in 2015 with 12 sales representatives in New York City and St. Louis that defendant Polymeropoulos termed the "Fanapt 12," who were overseen by one Regional Business Leader ("RBL"). ¶¶75-76. Defendants expanded the Fanapt sales force in November 2015 to 50 sales representatives (the "Fanapt 50") and six RBLs. ¶¶77-78. The new RBLs included Richard Gardner ("Gardner"), who worked as an RBL from November 2015 until August 5, 2016 in the Mid-West region and oversaw approximately 10 sales representatives (¶¶29-31), and Jeff Bourgeois ("Bourgeois"), who worked as an RBL from November 2015 until June 2018 in the South-West region and oversaw approximately 9 sales representatives. ¶¶32-33.

The RBLs reported directly to Vanda's head of sales, who was David James ("James") from January 2014 until July 2016 (¶31) and then Tom Griffin ("Griffin") starting in 2017. ¶¶110-11. James (and then Griffin) reported directly to Vanda's Chief Commercial Officer ("CCO"), meaning first defendant Gibbs until December 21, 2015, and then defendant Reverberi beginning by late December 2015. ¶¶18-19, 31, 79. Defendants Gibbs and Reverberi reported directly to defendant

- 5 -

Polymeropoulos, Vanda's Chief Executive Officer ("CEO"). ¶¶18-19, 31. Also reporting directly to defendant Polymeropoulos during the Class Period was Paul Ramirez ("Ramirez"), a consultant who maintained an office at Vanda's headquarters and frequently interacted with the RBLs. ¶¶31, 80-81.

Gardner is the relator in an ongoing qui tam lawsuit filed on March 10, 2017 against Vanda regarding the off-label promotion schemes for Fanapt and Hetlioz. ¶30.[2] In the Qui Tam Litigation, Bourgeois corroborated many of Gardner's allegations. ¶33. Both individuals were interviewed by Lead Plaintiff's counsel for the AC to independently verify their allegations. ¶28.

Gardner and Bourgeois state that the Fanapt 50, the RBLs, James, Ramirez, and each of the Individual Defendants were in attendance at Vanda's five-day national Fanapt launch meeting from November 30, 2015 to December 4, 2015, at the Fairmount Hotel in Washington, D.C. (the "November 2015 Meeting"). ¶¶82-85. At the November 2015 Meeting, the Fanapt 50 were trained to promote and sell Fanapt regardless of the underlying condition it was being prescribed to treat, *i.e.*, off-label. ¶¶87-95. For example, during the November 2015 Meeting, Gardner declined to certify a Fanapt sales representative because he determined that the representative was engaging in off-label promotion, but James and Ramirez overruled him and certified the representative. ¶¶93-95.

Among other things, Vanda's off-label promotion scheme for Fanapt involved having representatives push Fanapt's relatively low incidence of akathisia, a side effect of many antipsychotics, to get Fanapt prescribed for any mental disorder, not just schizophrenia. ¶¶96-100, 106. In fact, Bourgeois was informed by defendant Polymeropoulos at the November 2015 Meeting that every patient exhibiting akathisia should be on Fanapt. ¶101. Vanda's focus on akathisia, and related efforts to deemphasize schizophrenia, caused Kate Holland ("Holland"), Vanda's Vice President of Sales and Marketing from May 2012 to January 2016, to resign from Vanda. ¶¶102-03. Also departing Vanda around the same time as Holland was defendant Gibbs, who left Vanda only

---

[2] *U.S. ex rel. Gardner v. Vanda Pharm., Inc.*, No. 1:17-cv-00464 (APM) (D.D.C.) (the "Qui Tam Litigation").

eight months after being hired and forfeited his right to any severance benefits.  ¶¶104-05.

In addition, Defendants encouraged the RBLs to market Fanapt off-label during telephonic meetings.  ¶¶31, 119.  For example, during a June 2016 conference call, defendant Reverberi stated "doctors can use Fanapt anywhere they want" after the RBLs raised concerns about the difficulty of selling Fanapt on-label.  ¶108.  Likewise, in June 2018, defendant Reverberi was told by Bourgeois that insurers were not approving Fanapt prescriptions because they were being made off-label.  ¶109.  Further, in early 2018, defendant Reverberi asked Bourgeois to get more Fanapt prescriptions from a doctor in Houston even though Bourgeois informed him that the doctor was already prescribing Fanapt to all of his schizophrenia patients.  ¶113.  Further, Bourgeois was instructed by Kate Arnold ("Arnold"), Vanda's Head of Compliance since February 2017, to not state in his reports that sales representatives needed to "push" Fanapt, which Bourgeois was instructed to do by Griffin, because defendant Polymeropoulos was concerned about legal liabilities.  ¶¶110-12.

Likewise, Vanda fostered off-label promotion of Fanapt by setting sales goals based on the total market for antipsychotics, which were impossible to meet by marketing Fanapt on-label because schizophrenia is a small portion of that market.  ¶107.  Vanda also compensated the Fanapt 50 on "total dirt," Vanda's term for all prescriptions written for Fanapt in a sales representatives' territory regardless if it was prescribed on-label or off-label.  ¶114.  On several occasions, Gardner expressed his concerns to Vanda's senior management that compensation should be for on-label sales only, but Ramirez warned him to drop the subject.  ¶¶115-16.  Likewise, in an April 2018 meeting with Griffin, the RBLs were told that Vanda's senior management decided to pay based on total dirt and it was not changing.  ¶117.  At all times, Defendants had access to ICD-9 data for each prescription written for Fanapt, which showed the number of off-label prescriptions written.  ¶118.

Another aspect of Vanda's off-label promotion scheme was to focus on children instead of

the adults that Fanapt was FDA-approved to treat, notwithstanding that Fanapt carried a black box warning. ¶120.  To that end, Vanda's senior management required the Fanapt 50 to target the top 25 prescribers of antipsychotics in their territories, who were compiled into charts by Vanda.  ¶121. These charts often included child psychiatrists who could not, by definition, prescribe Fanapt on-label. ¶¶122-23.  Vanda also had a competition called "10 to win," which paid an additional bonus every few weeks to the sales representative who had the most new prescription growth from any prescriber in their territory, including from child psychiatrists.  ¶¶124-26.  The top 25 and 10 to win charts were available to Vanda's senior management, including defendant Polymeropoulos.  ¶127.

Furthermore, defendant Polymeropoulos instructed Vanda's sales representatives at the November 2015 Meeting to promote Fanapt as a first line treatment, including discouraging sales representatives from inquiring into whether Fanapt would be prescribed to a previous user of antipsychotics.  ¶¶128-30.  Gardner and Bourgeois also observed that Vanda was downplaying the risk of QT prolongation in order to promote Fanapt as a first line treatment, even though this risk is precisely why the FDA approved Fanapt as a secondary treatment.  ¶¶131-36.

Finally, Vanda trained its sales representatives to market Fanapt as a once-daily drug even though it was only FDA-approved for a twice-daily regimen.  ¶¶137-38.  During the November 2015 Meeting, defendant Polymeropoulos told the RBLs and Fanapt 50 that Fanapt should have been approved for once-daily dosing by the FDA, meaning sales representatives should promote Fanapt as being able to be taken once-daily, not twice-a-day as required by Fanapt's FDA label.  ¶¶139-41.

### E.    The FDA Approves Hetlioz to Treat Non-24, Not Generic Sleep Disorders

Non-24 is a rare disease that occurs mostly, if not fully, in totally blind individuals and requires a formal diagnosis by a doctor.  ¶¶145-46.  Specifically, "blood, saliva, or urine should be collected [by a doctor] over several weeks to look for circadian biochemical chemical rhythms *that can determine for sure* whether the clock is exhibiting a non-24-hour rhythm" because Non-24 "has

- 8 -

been *misdiagnosed* for other sleep deprivation or non-related psychiatric disorders . . . ." ¶147.

Non-24 rarely occurs in sighted individuals, as "there have been fewer than 100 cases of sighted people with Non-24 . . . reported in the scientific literature." ¶148. Defendants recognized as much before (¶¶149, 151-53) and during the Class Period. ¶¶156-57. Thus, when Vanda submitted Hetlioz for FDA approval in May 2013, it was "for the treatment of Non-24 . . . in totally blind patients." ¶144. Nonetheless, Hetlioz received FDA approval in January 2014 to treat Non-24 regardless of whether the patient is blind. ¶¶154-55. Once Hetlioz received FDA approval, Vanda sold it for $79,600 per year. ¶158. During the Class Period, Defendants rapidly raised the price of Hetlioz to $148,000 per year by May 2016 (¶159), and $223,200 per year by February 2019. ¶160.

**F.      The Off-Label Promotion Scheme for Hetlioz**

Despite Non-24 requiring a formal diagnosis and there being fewer than 100 sighted Non-24 cases worldwide, Defendants promoted Hetlioz during the Class Period to sighted patients of psychiatrists who had sleep problems, not Non-24. ¶¶161-62. This was off-label marketing. ¶166.

Specifically, during the November 2015 Meeting, the Fanapt 50 and RBLs were instructed to introduce Hetlioz to the psychiatrists being targeted for Fanapt. ¶¶163-64, 169-70.[3] Defendant Polymeropoulos told the RBLs that psychiatrists would understand that if Hetlioz treats Non-24 that it could also treat sighted patients with other sleep disorders, such as jet lag. ¶165. Vanda never informed the RBLs that Non-24 could be diagnosed, instead telling them that it was impossible to diagnose a patient with Non-24, which is why Hetlioz could easily be prescribed off-label. ¶167.

In addition, Vanda trained its representatives to not provide a direct answer if doctors asked whether Non-24 could be formally diagnosed. ¶168. Instead, representatives were instructed to state that Hetlioz can treat sleeping problems in individuals with mental disorders. *Id.* Likewise,

---

[3]      Even though Vanda forced Fanapt sales representatives to pitch Hetlioz to psychiatrists beginning at the November 2015 Meeting, Vanda announced the Hetlioz to Psychiatrists Initiative ("HPI") to investors in July 2017, falsely claiming that Fanapt sales representatives would first begin marketing Hetlioz to psychiatrists at this time. ¶¶182-83.

Vanda trained its representatives to respond to a question from doctors asking if Hetlioz is only for blind patients by stating that if a patient does not have normal sleep habits they should use Hetlioz. ¶¶171-73.  Similarly, Vanda's promotional materials for Hetlioz did not focus solely on patients with Non-24.  ¶174.  Moreover, the Aurelius Report (defined below), confirmed that Vanda was promoting Hetlioz off-label by marketing it as a general sleep disorder treatment.  ¶184.

As with his reports for Fanapt, Bourgeois was contacted by Arnold in early 2018 to remove the word "sleep" from his Hetlioz reports and replace it with "Non-24" because defendant Polymeropoulos was concerned about legal liability.  ¶¶175-76.  Defendants further understood that Hetlioz was being promoted off-label because certain sales representatives were able to obtain an out-sized number of prescriptions for Hetlioz to sighted patients without Non-24.  ¶177.  For example, Scott Grontkowski ("Grontkowski"), a Vanda sales representative from Illinois since January 2017, obtained over 50 prescriptions for Hetlioz in a single quarter – all for sighted patients. ¶178.  This would have meant that Grontkowski had identified nearly all of the "fewer than 100 cases of sighted people with Non-24" world-wide in Illinois in just three months. *Id.*  Grontkowski alone accounted for at least 8.2% of Hetlioz prescriptions written in *fiscal year* 2017.  ¶179.  Vanda had Grontkowski present at the Company's 2018 national sales meeting in Washington, D.C., to demonstrate his pitch for selling Hetlioz, which was attended by Griffin, Ramirez, and defendant Reverberi.  ¶180.  Grontkowski stated that his pitch involved telling doctors that if they have patients who cannot sleep that they should prescribe them Hetlioz to get them sleeping right now.  ¶181.

**G.    Tradipitant Was Vanda's Most Important Class Period Developmental Drug**

Vanda's most promising developmental drug during the Class Period was tradipitant, a drug that was being tested for treating gastroparesis (a stomach disorder) and eczema.  ¶¶41-42, 187-89. Tradipitant's potential for treating gastroparesis presented a significant economic opportunity for Vanda.  ¶¶190-91.  For this reason, by early 2018, Vanda dedicated to tradipitant between 62.9% and

73.2% of the Company's budget for direct project costs for clinical trials.  ¶¶192-97.

**H.    Vanda Knew by May 2018 that the FDA Would Issue a Clinical Trial Hold Because the Required Safety Test for Tradipitant Was Not Being Conducted**

According to Vanda's lawsuit against the FDA,[4] in November 2016, Vanda began an eight week Phase II study ("Study 2301") to test tradipitant for gastroparesis.  ¶¶198-204.  In April 2018, Vanda submitted a protocol amendment to the FDA to extend Study 2301 because the FDA typically requires positive results from studies of over three months for a drug to be approved.  ¶¶205, 229.

On May 15, 2018, the FDA informed Vanda on a conference call to discuss the proposed amendment that the Company could not extend Study 2301 beyond three months unless Vanda conducted a routine 9-month non-rodent toxicity study on tradipitant to ensure it is safe for use in humans.  ¶¶206-10.  The FDA unequivocally stated that if Vanda did not conduct the required safety study, then the FDA would place a clinical trial hold on Study 2301 to prevent a longer study from being conducted.  ¶¶211-13.  Vanda proceeded with Study 2301, but refused to conduct the required safety test, even as the Company continued discussing this issue with the FDA.  ¶¶214-19.

Vanda announced positive results from Study 2301 on December 3, 2018.  ¶219.  Shortly thereafter, on December 19, 2018, the FDA privately informed Vanda that Study 2301 had been placed on a clinical hold because Vanda had not complied with the requirement – communicated in May 2018 and repeatedly invoked thereafter – that the safety test first be conducted.  ¶¶221-22.

Vanda repeatedly admitted in the FDA Litigation that "[t]hroughout 2018 . . . FDA made clear that, one way or another, Vanda would be obligated to conduct the [safety] study."  ¶223; *see also* ¶211 (admitting that the FDA informed Vanda in May 2018 that the safety study "'is a requirement, ***not a recommendation***, prior to proceeding to long-term studies in humans'").[5]

---

[4]    *Vanda Pharm., Inc. v. Food & Drug Admin., et al.*, No. 1:19-cv-301 (JDB) (D.D.C.) (the "FDA Litigation").

[5]    The brief filed by the FDA in the FDA Litigation that Defendants submit (*see* Def. Mem. at 10-11 n.10) unequivocally supports Plaintiff's allegations by stating that "[i]n May 2018, FDA told Vanda that it lacked 'adequate nonclinical safety data to support clinical trials beyond 3 months duration.' AR 10192, see AR 11110."  Def. Ex. 28 at 8.

Recently, Judge Bates granted the FDA's motion for summary judgment in the FDA Litigation, fully rejecting Vanda's claim that the FDA illegitimately placed a clinical trial hold on tradipitant because Vanda would not conduct the required safety study. *See Vanda Pharm., Inc. v. FDA*, 2020 U.S. Dist. LEXIS 16623 (D.D.C. Jan. 31, 2020). In describing the facts drawn from the evidentiary record, Judge Bates wrote that the "FDA informed Vanda [on May 22, 2018] that that three-month trial (4 weeks plus the 8-week extension) was acceptable but *reiterated that anything over three months could not move forward without long-term nonrodent studies*." *Id.* at *4-*5. Vanda has not timely appealed from this decision. *See* Pl. Ex. A.

### I.     Defendants' Fraud Is Revealed in Early February 2019

In just one week, Vanda's investors learned about the long-running off-label marketing schemes and that Vanda's refusal to conduct the required safety test jeopardized tradipitant.

First, after the market closed on February 5, 2019, Vanda issued a press release announcing the FDA Litigation, which, among other things, informed investors for the first time that Vanda refused to perform the routine safety study needed for tradipitant to advance through the FDA's clinical testing program. ¶226. Analysts were deeply concerned with the Company's decision to sue the FDA and not conduct the required safety study, stating, for example, that it "comes as a surprise to us," "the FDA's request for nine-month tox data from non-human mammals is not unusual given gastroparesis . . . [is a] chronic condition," and "this will certainly raise questions among investors about . . . whether or not management is really focused on creating value for its shareholders." ¶¶227-28, 230. In response to Vanda's disclosures, the Company's common stock declined $5.00 per share and closed at $20.06 per share, a 19.95% decline. ¶¶431-32.

Then, during the trading day on February 11, 2019, Aurelius Value publishing a report entitled "Vanda: In the Land of the Blind, The One-Eyed Man is King," (the "Aurelius Report") that publicly disclosed for the first time Vanda's off-label promotion scheme for Fanapt and Hetlioz.

- 12 -

¶433; Def. Ex. 26.  In response to these disclosures, Vanda's common stock declined $1.05 per share and closed at $18.00 per share, a 5.51% decline.  ¶434.

## III.    ARGUMENT

### A.    The Standards Applicable to Defendants' Motion

On a Rule 12(b)(6) motion, "the Court's task is 'necessarily a limited one.'"  *Manavazian v. ATEC Grp., Inc.*, 160 F. Supp. 2d 468, 476 (E.D.N.Y. 2001) (Block, J.).  "'[Courts] must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally.'"  *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must "accept all factual allegations in the complaint as true" on Rule 12(b)(6) motions).  "[F]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (alterations in original).

To state a Section 10(b) claim for securities fraud, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).  The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]."  15 U.S.C. §78u-4(b)(2)(A). However, "this pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage." *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

### B. Defendants' False and Misleading Statements and Omissions

The PSLRA requires a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). Specifically, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). Thus, Defendants had "'a duty to be both accurate and complete'" in making their Class Period statements. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("'[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic.") (alteration in original).

An omission is actionable under Section 10(b) if it is "material." *Manavazian*, 160 F. Supp. 2d at 478. Omissions are material if there is a "substantial likelihood" that their disclosure "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives*, 563 U.S. at 38. "'[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

#### 1. The Materially False and Misleading Fanapt Misstatements and Omissions

During the Class Period, defendant Kelly falsely stated that Vanda is "recommending Fanapt as a second-line treatment." ¶¶253-54. According to Gardner and Bourgeois, however, at the November 2015 Meeting, Vanda's senior management – including defendant Kelly (¶¶83-84) –

- 14 -

trained the Fanapt 50 to market Fanapt off-label as a first-line treatment. ¶¶128-36. As this Court has recognized, a statement is adequately alleged to be false where an executive's statements are contradicted by an employee's observations. *See Gauquie v. Albany Molecular Research, Inc.*, 2016 U.S. Dist. LEXIS 97295, at \*4 (E.D.N.Y. July 26, 2016) (Block, J.); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 182-84 (S.D.N.Y. 2010) (a statement that the company had "zero" subprime loans was false because such loans were a substantial portion of its portfolio).

Defendants also made six sets of omissions regarding Fanapt. "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250-51 (statements about regulatory compliance efforts omitted material information because, even if "technically true," they failed to disclose that such efforts were insufficient). "The law is well settled . . . that so-called half-truths – literally true statements that create a materially misleading impression – will support claims for securities fraud." *Vivendi*, 838 F.3d at 240. Particularly relevant here, "[i]f a company . . . 'puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'" *Freudenberg*, 712 F. Supp. 2d at 180.

First, defendant Polymeropoulos stated that "Fanapt . . . will be a drug that will be used once patients switch from another medication" (¶265), "Fanapt is considered in the US a second line treatment" (¶278), and "[o]ur sales team continues making progress in introducing Fanapt as an additional option in treating adult patients with schizophrenia." ¶302. These statements failed to disclose that Vanda was promoting and marketing Fanapt as a first-line treatment, *i.e.*, off-label. ¶¶128-36, 254. *See In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) ("Even if Televisa was not otherwise obligated to disclose that it or its subsidiary participated in

- 15 -

bribing FIFA officials, speaking about the issue imposed a duty to do so.").

Second, defendant Polymeropoulos misleadingly informed investors that Vanda is "always interested in pediatric applications" for Fanapt and that this was "part of [Fanapt's] long-term planning." ¶265. Likewise, defendants Polymeropoulos and Reverberi stated that Vanda's sales representatives were marketing Fanapt only to "adult patients with schizophrenia." ¶¶280, 86, 302. These statements failed to disclose that Vanda was already – and improperly – marketing Fanapt off-label to pediatric patients. ¶267. According to Gardner and Bourgeois, Vanda's senior management understood that Fanapt was being marketed to child psychiatrists who could only prescribe Fanapt off-label to pediatric patients. ¶¶120-27. By failing to disclose that Vanda was currently marketing Fanapt off-label to children, defendant Polymeropoulos "could have given a reasonable investor a false impression about [the company's] historical business operations and potential regulatory exposure." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 613 (S.D.N.Y. 2017).

Third, Defendants repeatedly informed investors that Vanda had hired the Fanapt 50 to promote Fanapt throughout the United States without disclosing that such promotion would improperly include off-label marketing. ¶¶233, 38, 41, 47, 53, 56, 59, 72, 80, 86, 92. According to Gardner and Bourgeois, the off-label promotion scheme was dictated to the Fanapt 50 at the November 2015 Meeting, which was overseen by the Individual Defendants and James and Ramirez. ¶¶234-35, 39, 54, 67, 83-84. The RBLs and the Fanapt 50 were instructed by Defendants to, *inter alia*, market Fanapt to treat disorders other than schizophrenia (¶¶87-113), promote Fanapt as a first-line treatment (¶¶128-36), sell Fanapt to adolescents (¶¶120-27), and portray Fanapt as a once-daily drug. ¶¶137-41. Thus, Defendants' statements, while "literally true," were "misleading by what they failed to mention." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) (finding falsity where statements "presented an incomplete picture").

- 16 -

Fourth, in every Class Period Form 10-K and 10-Q, Defendants stated that Vanda's "ability to generate meaningful product sales and achieve profitability largely depends on our ability to successfully commercialize . . . Fanapt® . . . ." ¶¶236, 243, 248, 261, 268, 274, 282, 288, 294, 298, 304, 310, 314.  Like the Fanapt 50 statements, the repeated statements about Vanda's efforts to successfully commercialize Fanapt failed to disclose that Vanda was utilizing an off-label promotion scheme to market and sell Fanapt. ¶237.  By speaking about Vanda's commercialization efforts for Fanapt, Defendants were obligated to speak accurately.  *See Freudenberg*, 712 F. Supp. 2d at 185-86 (finding that statements about a company's efforts to generate revenue were misleading because they were "related to the fundamental nature of E*TRADE's most important business sector"); *see also In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (statements were actionable for failing to disclose that the company's success was due to a fraudulent scheme).

Fifth, defendants Polymeropoulos and Kelly informed investors that Fanapt's relatively low incidence of akathisia provided a competitive advantage for Fanapt.  ¶¶238, 53, 56.  These statements failed to disclose that Fanapt's akathisia benefit, while legitimate, was a key part of the Company's broader effort to market Fanapt off-label as a treatment for all mental disorders, not just schizophrenia. ¶¶96-113, 239.  "By addressing the quality of a particular management practice," *i.e.*, using akathisia to promote Fanapt, "a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully."  *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010).

Finally, each Class Period Form 10-K made the materially incomplete representation that Vanda could fail to comply with applicable regulations in selling Fanapt.  ¶¶245, 276, 300.  Defendants reaffirmed these statements in each Class Period Form 10-Q. ¶¶251, 263, 270, 284, 290, 296, 306, 312, 316.  "[R]isk disclosures are misleading where the company warns only that a risk

- 17 -

*may* impact its business when that risk has already materialized." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013). These statements failed to disclose that this risk had manifested due to the off-label promotion scheme for Fanapt. ¶246. Because these statements "contained affirmative representations regarding the risks of investing," Defendants "had a duty to ensure that those statements were accurate and complete." *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646-47 (S.D.N.Y. 2012); *see also Lexmark*, 367 F. Supp. 3d at 34 ("the general disclosure of a phenomenon's existence" was materially misleading for failing to "describ[e] its outsize rate of occurrence or the potential impact on an important source of revenue").

In response to the numerous false and misleading statements challenged in the AC, Defendants make insufficient arguments that, at best, mischaracterize the AC. *See Lexmark*, 367 F. Supp. 3d at 33 (rejecting defense effort to distort plaintiff's allegations on a dismissal motion).

First, while acknowledging that materiality is critical in assessing falsity (Def. Mem. at 24), Defendants argue in a perfunctory footnote that "no facts" have been alleged to demonstrate Fanapt's materiality. *Id.* at 24 n.15. Not so. Fanapt accounted for between 40% and 60% of Class Period revenues, amounting to hundreds of millions of dollars. ¶¶43-48. Defendants frequently spoke to investors about Vanda's efforts to market and sell Fanapt during the Class Period. ¶¶233-317. When investors first learned that Vanda was engaged in an off-label promotion scheme for Fanapt, Vanda's stock price materially declined. ¶¶433-34. This adequately alleges Fanapt's materiality on a motion to dismiss. *See Manavazian*, 160 F. Supp. 2d at 483-84 (rejecting materiality argument on a motion to dismiss as premature and holding that repeated statements portraying the company "in an unrealistically favorable light" allege materiality); *Gauquie*, 2016 U.S. Dist. LEXIS 97295, at *4-*5 (stock decline shows materiality).

Second, Defendants mischaracterize the AC by arguing it alleges mismanagement and that it

- 18 -

asks Vanda to accuse itself of wrongdoing. Def. Mem. at 25-26. But Plaintiff does not seek recovery for Defendants' poor management of Vanda or for failing to admit to a crime. Rather, Plaintiff seeks damages under the federal securities laws for the many misstatements and omissions challenged in the AC whose accurate disclosure would have revealed the true risks associated with investing in Vanda's stock during the Class Period. *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 82 n.6 (S.D.N.Y. 2017) (rejecting argument that a securities fraud complaint alleged mismanagement because it contravened "a fair reading" of the allegations); *see also In re Signet Jewelers Ltd. Sec. Litig.*, 2019 U.S. Dist. LEXIS 110779, at *7 (S.D.N.Y. June 19, 2019) ("From this time forth and forevermore, the Court rejects Defendants' suggestion that this is a [mismanagement] lawsuit masquerading as securities fraud. It is not.").

Defendants' cases do not advance their argument because they involved situations where the relevant information was ***already disclosed*** to investors. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (holding that no additional disclosure was required because the company had previously disclosed to investors "multiple legal proceedings and government investigations" relating to the allegedly undisclosed conduct). Even less compelling is Defendants' out-of-Circuit citation to *Fire & Police Pension Association of Colorado v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015), where the company "promptly disclosed receipt of the June 2011 Warning Letter." *Id.* at 243. *Abiomed* also found the unnamed confidential sources to be unreliable because they did not work at the company during the class period or interact with its executives. *Id.* at 245. Neither deficiency applies to Gardner or Bourgeois.

Third, Defendants summarily conclude that no challenged statement can be actionable because they are all true. Def. Mem. at 28-29. This argument entirely ignores the Second Circuit's mandate that "literal[ly] true" statements can be actionable. *See Meyer*, 761 F.3d at 250-51; *Vivendi*,

- 19 -

838 F.3d at 240.   For example, Defendants fail to explain how stating that Vanda was "recommending Fanapt as a second-line treatment" is not materially misleading when Vanda's sales force was instructed to do otherwise.  *See supra* 8, 14-16.  Defendants' cases are similarly unavailing.  *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (dismissing claim because the alleged fraud involved other company's securities, not Citigroup's).

Fourth, Defendants argue that the Fanapt 50 statements are disconnected from Fanapt's marketing (Def. Mem. at 28), but ignore that: (i) Defendants effectuated their off-label marketing scheme through the Fanapt 50; (ii) the Individual Defendants personally participated at the November 2015 Meeting where the Fanapt 50 were trained; and (iii) the Fanapt 50 were responsible for generating approximately half of Vanda's Class Period revenues.  ¶¶43-48, 82-143.  Once again, Defendants' argument fails because when a company "puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success . . . .'" *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005).

Fifth, Defendants argue that the Fanapt commercialization statements are puffery.  Def. Mem. at 26-27.  But Defendants ignore that material statements cannot be puffery.  *See Vivendi*, 838 F.3d at 245.  As explained above, Vanda's efforts to commercialize Fanapt were highly material to investors (*see supra* 18), meaning they cannot be puffery.  *See Manavazian*, 160 F. Supp. 2d at 480-81 (rejecting puffery argument for statement that the company had a "strategic position in the technology industry" because it "allegedly knew the contrary was true"); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 279-80 (S.D.N.Y. 2012) (upholding complaint because defendant "must not be allowed to pass off its repeated assertions that it complies with the letter and spirit of the law, [and] values its reputation" as "mere puffery or statements of opinion").

Finally, Defendants argue that the risk factor statements cannot be actionable because Vanda

has not been charged with a crime.  Def. Mem. at 30-31.  Again, Defendants misread the AC, which alleges that the risk of failing to legally market Fanapt had already materialized by November 2015 because Defendants were actively engaged in an off-label promotion scheme.  ¶246.  Courts routinely find similar risk factors actionable.  *See, e.g.*, *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 291, 303-04 (S.D.N.Y. 2018) (finding risk factor actionable because plaintiff alleged "the risk . . . had already materialized.").  Further, Defendants incorrectly portray the Second Circuit's decision in *Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019), as holding that all statements about compliance with regulations are inactionable.  Def. Mem. at 31.  But these type of statements were found lacking in *Singh* because the company made numerous other disclosures that demonstrated it was "actively working to improve its compliance efforts" (918 F.3d at 64), which Defendants do not argue was stated in Vanda's SEC filings.  Moreover, at least one court has recognized that *Singh* is limited to the facts of that case.  *See In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229-30 (S.D.N.Y. 2019) ("Significantly, *Cigna* did not rule (as Defendants imply) that all statements in codes of conduct qualify as 'puffery.'").

> ### 2.    The Materially False and Misleading Hetlioz Misstatements and Omissions

Defendants also made numerous false and misleading statements and omissions regarding Hetlioz, the other source of Vanda's Class Period revenues.  ¶¶318-85.[6]  Instead of accurately disclosing Vanda's marketing efforts for Hetlioz, defendant Polymeropoulos falsely and repeatedly informed investors that Hetlioz was being marketed to patients ***with Non-24***, stating, for example,

---

[6]    The Hetlioz commercialization statements (¶¶318, 20, 24, 28, 31, 38, 44, 50, 56, 62, 68, 74, 82) are actionable for the same reasons as the Fanapt commercialization statements.  *See supra* 17.  Likewise, the risk factor statements (¶¶322, 26, 30, 34, 40, 46, 52, 58, 64, 70, 76, 84) are also actionable for failing to disclose the off-label promotion scheme for Hetlioz.  *See supra* 17-18.  As with Fanapt, information about Hetlioz was highly material to investors during the Class Period because, *inter alia*: (i) Hetlioz was one of two drugs that generated revenue for Vanda and accounted for between 40% and 60% of Class Period revenues (¶¶43-48); (ii) Defendants frequently spoke to investors about Vanda's efforts to market and sell Hetlioz during the Class Period (¶¶318-85); and (iii) when investors first learned that Vanda's commercialization efforts were driven by an off-label promotion scheme for Hetlioz, the Company's stock materially declined.  ¶¶433-34.  These allegations establish Hetlioz's materiality.  *See supra* 18.

that "[o]ur HETLIOZ team is focused on driving growth by creating awareness about non-24" (¶336), "[t]he positive response from the psychiatric community is a confirmation of the significant unmet medical need for patients with Non-24" (¶366), and "we did have experience before with sighted patients with Non-24[.]" ¶354; *see also* ¶342 (defendant Reverberi speaking). These statements failed to disclose that Vanda was promoting Hetlioz off-label by focusing on individuals *without Non-24*. *See supra* 9-10. Because Hetlioz was being marketed off-label, these statements are actionable. *See, e.g.*, *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 332 (S.D.N.Y. 2014) ("[W]hen a pharmaceutical company makes statements about its product, the company is required to disclose information that would render those statements not misleading.").

Defendants Polymeropoulos and Kelly also failed to disclose material information when discussing the HPI (¶¶348, 60, 66, 72, 78, 80), specifically that Vanda began using Fanapt sales representatives to market Hetlioz to psychiatrists in November 2015, not July 2017. ¶¶182-83. These statements also failed to disclose that the HPI facilitated the off-label marketing scheme for Hetlioz. ¶349. Thus, falsity is adequately alleged. *See Freudenberg*, 712 F. Supp. 2d at 185-86.

Entirely overlooking the AC's allegations, Defendants mischaracterize Plaintiff's claim by arguing that "Plaintiff's core theory thus makes no sense: it cannot possibly be 'off-label' to market Hetlioz® to both blind and sighted patients when the drug is approved for both categories." Def. Mem. at 8, 29-30. This sidesteps that Hetlioz was purposely marketed to individuals *who did not have Non-24*. *See, e.g.*, ¶¶166-68. Whether the person is sighted is irrelevant – marketing Hetlioz to treat anything other than Non-24 is off-label, and that is precisely what Defendants did.[7]

---

[7] Despite submitting numerous extraneous materials (much of which is improper, *infra* 41-43), Defendants do not dispute that less than 100 sighted individuals worldwide have Non-24 and that Non-24 can be diagnosed with a test. ¶¶146-48. And, tellingly, Defendants fail to cite even a single case in support of their deficient falsity argument for the Hetlioz statements. *See* Def. Mem. at 29-30. At best, Defendants' argument raises factual issues about the focus of Vanda's marketing for Hetlioz that cannot be resolved on their dismissal motion. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013) ("[A]rguments regarding the truthfulness of [the company's] statements . . . amount to fact-based disputes that the Court will not credit on a motion to dismiss.").

- 22 -

### 3. The Materially False and Misleading Tradipitant Misstatements and Omissions

Beginning on August 1, 2018, Defendants repeatedly discussed Study 2301 with investors in the context of Vanda's efforts to obtain FDA approval for tradipitant. ¶¶386-407. Specifically, Defendants repeatedly informed investors that the results of Study 2301 were forthcoming. ¶¶386, 88, 90, 95, 97, 99. These statements failed to disclose that Vanda knew the FDA would impose a clinical trial hold on future studies of tradipitant even if Study 2301 was successful because Vanda refused to conduct the required safety test. ¶387. Vanda admitted in the FDA Litigation that on May 15, 2018, the FDA informed Vanda that it could not extend Study 2301 unless Vanda completed the required safety test for tradipitant. ¶¶206, 10-13, 23; *see also Vanda Pharm.*, 2020 U.S. Dist. LEXIS 16623, at *4-*5. Thus, these statements are actionable. *See, e.g.*, *Grupo Televisa*, 368 F. Supp. 3d at 721; *Lexmark*, 367 F. Supp. 3d at 31-34; *Manavazian*, 160 F. Supp. 2d at 484.[8]

Further, contrary to Vanda's admissions (¶407), on December 3, 2018, defendant Polymeropoulos falsely stated that Vanda had "a 12-month protocol" for tradipitant "which we'll be implementing shortly." ¶405. This statement was materially false. *See BHP Billiton*, 276 F. Supp. 3d at 86 (statement that a river had no toxic waste was false because testing confirmed otherwise).

That same day, Defendants informed investors that Vanda would be "meeting with regulatory authorities in the near future" including "the [FDA]" to "confirm the path towards registration of tradipitant[.]" ¶¶403, 05. These statements failed to disclose that tradipitant's "path towards registration" had been derailed since May 2018 because Vanda refused to do the required safety test. ¶404; *see also Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 324-25 (S.D.N.Y. 2018) (statement was false because company had information that "directly contradicted" it).

In addition, Defendants misleadingly stated in Form 10-Q filings in August and November

---

[8] Contrary to Defendants' accusation (Def. Mem. at 23), defendant Gibbs is not alleged to be liable for any tradipitant statement (all of which were made in 2018) because the AC acknowledges that he left Vanda in December 2015. ¶19.

2018 that "[t]here have been no material changes in our risk factors subsequent to the filing of our annual report on Form 10-K for the fiscal year ended December 31, 2017." ¶¶393, 401. In that Form 10-K, filed in February 2018 (¶298), Vanda warned investors that "[i]f we fail to comply with the applicable requirements at any time during the product development process . . . we may become subject to administrative or judicial sanctions . . . [including] clinical holds[.]" ¶392. This is precisely the risk that materialized in May 2018 following the meeting between Vanda and the FDA. ¶394. At the very least, Defendants failed to disclose that the risk profile for tradipitant had materially changed since February 2018. *Id.* Thus, these statements are actionable. *See Galestan*, 348 F. Supp. 3d at 292, 303-04 (finding actionable statement in Form 10-Q that "'there have been no material changes to our risk factors previously disclosed'" because the risk had materialized); *Facebook*, 986 F. Supp. 2d at 516 (finding "risk warnings" actionable because they "represented that this revenue cut was merely possible when, in fact, it had already materialized.").

Unable to plausibly contest falsity, Defendants once again invoke their legally deficient argument that these are "true" statements and, therefore, they cannot be actionable. Def. Mem. at 34-35. As explained above, this misstates the law. *See supra* 15, 19-20. It also ignores defendant Polymeropoulos' affirmatively false statement in December 2018 that Vanda had "a 12-month protocol" for tradipitant that Vanda would be "implementing shortly. ¶405.

Even less compelling is Defendants' attempt to recast the admissions Vanda made in the FDA Litigation by mischaracterizing the FDA's position during the May 2018 meeting as being "interim" and subject to interpretation. Def. Mem. at 31-32. But Vanda cannot take back their own factual admissions. ¶¶206, 10-13, 23. Not only does this argument contravene the pleading standard on a motion to dismiss (*see supra* 13), Vanda's statements are admissible even on a motion for summary judgment or at trial. *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 238-39 (2d Cir.

- 24 -

1999) (Sotomayor, J.) (holding that prior statements made by a corporation's agent qualified as party admissions under Federal Rule of Evidence 801(d)(2)).  The subsequent conversations with the FDA that Vanda relies upon are only relevant insofar as they demonstrate that the FDA never wavered from its position in May 2018 that Vanda had to conduct the required safety test or else tradipitant clinical trials would be halted.  ¶¶216-22.  Thus, there is no "fraud by hindsight," as Defendants inaccurately posit (Def. Mem. at 32, 35), because the FDA's position in May 2018 was final and remained consistent thereafter.  Moreover, this argument presents factual issues, and ignores that falsity must be assessed at the time the statement is made.  *See Ganino*, 228 F.3d at 165.

Next, Defendants again argue that Vanda had no obligation to disclose its internal business strategy.  Def. Mem. at 33-34.  But by specifically discussing Study 2301 and the path to obtaining FDA approval for tradipitant, Defendants had a duty to disclose that Vanda's refusal to conduct the required safety test meant the FDA would impose a clinical trial hold on future clinical testing.  *See, e.g.*, *Delcath*, 36 F. Supp. 3d at 333 ("Defendants made statements about their Phase III trial results, which given the allegations in the Complaint, were misleading without the disclosure of additional facts that would cast those results in a more negative light.").[9]

Finally, Defendants argue that they adequately warned of the risk that a clinical trial hold would be implemented for tradipitant.  Def. Mem. at 32-33 & n.17.  Defendants effectively invoke the bespeaks caution doctrine (*id.*), but ignore that "[i]t is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking" and courts "have consistently observed that limitation."  *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142-44 (2d Cir. 2010)

---

[9]    Defendants' cases are easily distinguishable.  *See, e.g.*, *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 496-97 (2d. Cir. 2019) (holding there was no duty to disclose anticipated changes to an acquired business because "Defendants signaled all along that they planned significant changes at Qualitest"); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 20 (S.D.N.Y. 2016) (stating that an SEC investigation was not required to be disclosed because it was unrelated to Lions Gate's financial condition); *Tongue v. Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) (finding statements inactionable because plaintiff failed to allege that the company's "interpretation of the data was irrational or unreasonable," thus rendering the statements immaterial).

- 25 -

(reversing and remanding because the trial court applied the bespeaks caution doctrine to present and historical statements).  But Defendants concede that the tradipitant statements are not forward-looking.  Def. Mem. at 31-35.  Even if they were, the cautionary language cited by Defendants, which is vague and hypothetical, is woefully inadequate.  *See Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("The bespeaks caution doctrine does not apply where the specific risk is apparent and not disclosed. If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.").

### 4.    The Materially False and Misleading Items 303 and 503 Omissions

Even if the Court were to conclude that the challenged statements are inactionable, Defendants still had affirmative obligations of disclosure under Items 303 and 503 of SEC Regulation S-K in Vanda's Class Period Forms 10-K and 10-Q filings.[10]  ¶¶409, 414-15.

### a.    Item 303

Item 303 requires disclosure "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016).  Defendants violated Item 303 by failing to disclose that Vanda knew by at least November 2015 that the Company was marketing and selling Fanapt and Hetlioz off-label, which was reasonably likely to negatively impact Vanda's financial condition.  ¶411.  Likewise, Defendants violated Item 303 by failing to disclose that Vanda knew its unwillingness to conduct the required safety test would halt the approval process for tradipitant, jeopardizing the Company's future profits.  ¶412.  These events and uncertainties are actionable.  *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (Item 303 liability attached when "Plaintiffs allege that the

---

[10]    In April 2019, Item 503(c) was replaced with Item 105 of Regulation S-K.  17 C.F.R. §229.105.  The analysis of liability for Item 503 remains the same under Item 105.

downward trend in the real estate market was already known and existing at the time" of the SEC filing); *see also Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 105 (1st Cir. 2013) (finding undisclosed "adverse events" concerning the company's main drug violated Item 303).

With respect to the Fanapt and Hetlioz Item 303 claims, Defendants only attack the second prong of Item 303, arguing that the impact of the off-label marketing schemes on Vanda's financial condition could not be estimated. Def. Mem. at 36-37. Beyond ignoring the AC's allegations that this impact could be estimated (¶¶410-13), the Second Circuit flatly rejected this argument in *SAIC*, holding that Item 303 requires the disclosure of the uncertainty created by an undisclosed risk. *See* 818 F.3d at 95-96 (requiring disclosure where "SAIC was aware of the [overbilling] fraud by late March 2011 but was uncertain about its likely effect on SAIC's current and future revenues."). Defendants' case agrees with *SAIC*. *See In re Deutsche Bank AG Sec. Litig.*, 2016 U.S. Dist. LEXIS 96741, at *98-*99 (S.D.N.Y. July 25, 2016) (finding Item 303 liability for uncertainty that "'might reasonably be expected to materially impact [the] company's overall financial position.'").

For tradipitant, Defendants make three challenges, all without merit. First, again contradicting their admissions in the FDA Litigation, Defendants argue that they had no actual knowledge by August 2018 of what they admit the FDA told them in May 2018. Def. Mem. at 37 & n.20. This argument is both inaccurate and contravenes the pleading standard. *See supra* 11-13. Second, Defendants argue that there can be no Item 303 liability because tradipitant was not yet approved for sale (Def. Mem. at 37), ignoring that Item 303 requires disclosure of uncertainties that "'might reasonably be expected to materially impact' . . . *future* revenues." *SAIC*, 818 F.3d at 96 (citing Item 303 instructions). Finally, Defendants argue that the risk of a clinical trial hold was adequately disclosed (Def. Mem. at 37-38 & n.21), again overlooking the insufficiency of these disclosures. *See supra* 25-26.

- 27 -

### b.    Item 503

Item 503 requires an accurate and candid discussion of the most significant risk factors in a company's SEC filings.[11]    17 C.F.R. §229.105.    Defendants violated Item 503 by failing to adequately disclose that Vanda's efforts to commercialize Fanapt and Hetlioz, the only two sources of Vanda's Class Period revenues, were centered on an off-label promotion scheme.    ¶417. Likewise, Defendants violated Item 503 by failing to disclose that Vanda's unwillingness to conduct the required safety test meant that the Company's most promising clinical trial drug would not move forward in the FDA approval process.    ¶418.    These are actionable Item 503 violations.    *See City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 427 (S.D.N.Y. 2011) (finding a violation of Item 503 where significant risks were not sufficiently described in the company's risk factors); *see also Silverstrand*, 707 F.3d at 104 (holding that where a company's "profits entirely depended on [a drug's] commercial success," defendants violated Item 503 by failing to disclose adverse events related to the drug); *Mingbo Cai v. Switch, Inc.*, 2019 U.S. Dist. LEXIS 116702, at *16 (D. Nev. July 12, 2019) (stating that Item 503 was violated where the registration statement did not "explain the risks of its new sales strategy" and instead included "over thirty pages" of "boilerplate risk factors"); *Deutsche Bank*, 2016 U.S. Dist. LEXIS 96741, at *99.

In response, Defendants again argue that the Fanapt and Hetlioz off-label marketing schemes did not require disclosure.  Def. Mem. at 38.  Not only does this misstate the law (*see supra* 14-22), Defendants' cited authority contemplates that Item 503 requires disclosure of the risks related to illegal conduct.  *See UBS*, 752 F.3d at 183-84 & n.45 (finding that Item 503 was satisfied where the company disclosed that the government was investigating the company for an alleged tax fraud).

---

[11]    Defendants incorrectly argue that Item 503 does not apply to Forms 10-K and 10-Q (Def. Mem. at 35 n.19), citing to *BHP*, 276 F. Supp. 3d at 89, a case that involved filings by a foreign corporation on Form 20-F (*id.* at 81-82) and declined to reach the issue of Item 503's application.  *Id.* at 89.  Defendants ignore that Form 10-K and Form 10-Q affirmatively *require* companies to comply with Item 503.  ¶¶414-15.  Moreover, Defendants' own cases recognize that Item 503 applies to Forms 10-K and 10-Q (Def. Mem. at 38-39), as does the SEC.  *See, e.g.*, *In re Altaba Inc., f/d/b/a Yahoo! Inc.*, 2018 WL 1919547, at *3 n.2 (Apr. 24, 2018).

- 28 -

Defendants also argue that the risks for Fanapt, Hetlioz, and tradipitant were adequately disclosed (Def. Mem. at 38-39), again ignoring that these disclosures are woefully deficient.

### C. Defendants' False Statements and Omissions Were Made with Scienter

In assessing scienter, a court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "[T]he 'tie . . . goes to the plaintiff'" in assessing whether scienter is adequately alleged. *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009).

"[T]he absence of a motive allegation is not fatal," as scienter may be independently based on conscious disregard or recklessness. *Tellabs*, 551 U.S. at 325. Allegations: of "defendants' knowledge of facts"; of "access to information contradicting their public statements"; that Defendants "failed to check information they had a duty to monitor"; *or* that Defendants "ignored obvious signs of fraud," sufficiently allege scienter. *Novak*, 216 F.3d at 308, 311.

### 1. The AC Adequately Alleges Scienter for the Fanapt and Hetlioz Statements and Omissions

The Individual Defendants each participated in the off-label marketing schemes for Fanapt and Hetlioz, meaning they knew about, or recklessly disregarded, them. *See supra* 5-10. Unlike typical securities fraud cases, which rely on unnamed sources, Gardner and Bourgeois directly provide highly detailed accounts of these off-label marketing schemes. *Id.* Indeed, Gardner and Bourgeois were hired by Vanda to oversee approximately 40% of the Fanapt 50 and were trained by the Individual Defendants to – and in fact did – market Fanapt and Hetlioz off-label. *Id.*

Gardner defined "Vanda's senior management" as comprising each of the Individual

Defendants, plus James, Ramirez, and Griffin (after James left).  ¶84.  Thus, every allegation discussing Vanda's senior management implicates each of these Vanda executives.  *See* ¶¶87, 92, 107, 109, 115, 117-19, 121-27, 173.  These allegations particularize the direct involvement of defendants Polymeropoulos (¶¶85-88, 92, 101, 103, 107-09, 112, 115, 117-19, 121 127, 129, 133, 139-40, 164-65, 173, 175), Kelly (¶¶83-87, 92, 107-09, 115, 117-19, 121, 127, 173), Reverberi (¶¶83-87, 92, 107-09, 113, 115, 117-19, 121 127, 173, 180), and Gibbs (¶¶83-87, 92, 104, 107-09, 115, 117-19, 121, 127, 173), which more than adequately alleges their conscious disregard or recklessness.  *See Blanford*, 794 F.3d at 308 (finding scienter where executives participated in efforts to conceal inventory from auditors); *Galestan*, 348 F. Supp. 3d at 300-01 (holding that scienter was adequately alleged where confidential witnesses recounted interactions with executives); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 370-72 (S.D.N.Y. 2012) (relying on confidential witnesses to find that scienter allegations were sufficiently specific to demonstrate that the executive "was actively involved in the misconduct"); *Gauquie*, 2016 U.S. Dist. LEXIS 97295, at *6 (sustaining scienter allegations based on lone low-level confidential witness).

The Individual Defendants' scienter is imputed to Vanda.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Even if the Individual Defendants lacked scienter, Plaintiff may "raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.* at 195-96.  "There is no formulaic method or seniority prerequisite . . . scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants."  *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009).  "The individual making an alleged misstatement and the one with scienter do not have to be one and the same." *Id.* at 516.

James (and later Griffin) and Ramirez also consciously or recklessly disregarded the off-label

- 30 -

promotion schemes for Fanapt and Hetlioz. *See* ¶¶83-84, 95, 108, 110, 116-17, 119-20, 131, 170, 180; *see supra* 5-10. All three can impute their scienter to Vanda, as can Arnold (¶¶110-12, 175-76), and Holland (¶¶102-03). *See, e.g.*, *Richman*, 868 F. Supp. 2d at 281 n.10 ("the scienter reflected in Goldman's Mortgage Department Head's statements can be attributed to Goldman."). Likewise, Gardner and Bourgeois can impute their scienter – which they concede – to Vanda because they were only two reporting levels from defendants Gibbs and Reverberi, and three from defendant Polymeropoulos. ¶31. *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (imputing knowledge of "assistant vice president" to company); *see also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (finding corporate scienter based upon the knowledge of "a Citigroup credit strategist").

Further supporting scienter for all Defendants is the core operations doctrine, which applies because Fanapt and Hetlioz were the only two revenue-generating drugs sold by Vanda during the Class Period. ¶422. Accordingly, Defendants are presumed to be knowledgeable about these drugs. *See In re Salix Pharms., Ltd. Sec. Litig.*, 2016 U.S. Dist. LEXIS 54202, at *51 (S.D.N.Y. Apr. 22, 2016) (core operations applies to a pharmaceutical company's key products); *see also Gauquie*, 2016 U.S. Dist. LEXIS 97295, at *5 (core operations can support a finding of scienter against executives); *In re Pall Corp.*, 2009 U.S. Dist. LEXIS 88240, at *21 (E.D.N.Y. Sept. 21, 2009) (same).

Likewise, Defendants repeatedly discussed Fanapt's use as a second line treatment, the Fanapt 50, Hetlioz's use in patients with Non-24, the HPI, and Vanda's commercialization efforts for both drugs. *See supra* 14-22. That the Individual Defendants frequently spoke about these topics supports an inference that they (and Vanda) "had intimate knowledge of those facts or should have known of them." *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *see also Gauquie*, 2016 U.S. Dist. LEXIS 97295, at *5-*6 ("Actively

- 31 -

communicating with the public about this issue demonstrates defendants' sensitivity to it").

Finally, the resignations of defendant Gibbs and Holland (¶¶102-04) support an inference of scienter. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (resignations of senior executives supports recklessness). In particular, defendant Gibbs' resignation is suspicious because it came only eight months after starting with Vanda (¶19), only two months into his oversight of the national rollout of Vanda's marketing efforts for Fanapt (¶¶82-84), and resulted in him forfeiting his right to any severance or other post-termination benefits. ¶104; *see, e.g.*, *Van Dongen*, 951 F. Supp. 2d at 474 ("[T]he resignation and retirement of company insiders alleged to have been involved in the scheme . . . all contribute to the inference of scienter.").

Defendants respond to the well-pled allegations of scienter in the AC by raising a host of insufficient arguments that rely on ignoring Plaintiff's allegations. Def. Mem. at 14-18, 20-23.

First, and most egregiously, Defendants omit the numerous instances where Gardner and Bourgeois state that Defendants knew about, or recklessly disregarded, the off-label marketing schemes. *See supra* 5-10. These allegations were confirmed by Plaintiff's counsel in interviews with Gardner and Bourgeois (¶28), which resulted in obtaining new information not included in the Qui Tam Litigation. *Compare* Def. Ex. 24 at ¶¶57-163 *with* ¶¶74-143, 161-86. Gardner and Bourgeois are, therefore, no different from other percipient witnesses that courts routinely rely upon in finding scienter. *See, e.g.*, *Blanford*, 794 F.3d at 307-08. For this reason, *Teamsters Local 456 Pension Fund v. Universal Health Services*, 396 F. Supp. 3d 413 (E.D. Pa. 2019), the out-of-Circuit case Defendants principally rely upon (Def. Mem. at 14-15), is inapposite. Specifically, *Universal Health* rejected qui tam allegations because they did not demonstrate that the executives had knowledge, or reckless disregard, of the alleged fraud. 396 F. Supp. 3d at 468.[12] Gardner and

---

[12] Defendants fail to mention that *Universal Health* found the challenged statements were adequately alleged to be false based upon the qui tam allegations (396 F. Supp. 3d at 462), undermining Defendants' falsity arguments.

Bourgeois do precisely that. *See supra* 5-10. Thus, *Universal Health* is **not** "directly on point," as Defendants incorrectly argue (Def. Mem. at 15), nor is *Bartesch v. Cook*, 941 F. Supp. 2d 501 (D. Del. 2013), which criticized qui tam allegations that did not explain the relator's relationship to the defendant. 941 F. Supp. 2d at 507. And the qui tam allegations from *Universal Health* and *Bartesch* were merely copied by the securities plaintiffs, not independently verified, as was done here.

Moreover, *Universal Health* conflicts with Second Circuit law, which permits securities fraud plaintiffs to rely on untested allegations from other lawsuits at the pleadings stage, especially where, as here, such allegations have been independently verified. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214-15 (S.D.N.Y. 2019); *Hirsch v. Complex Media, Inc.*, 2018 U.S. Dist. LEXIS 209701, at *28-*29 (S.D.N.Y. Dec. 10, 2018); *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 516 n.10 (S.D.N.Y. 2016); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015); *OSG*, 12 F. Supp. 3d at 622; *Vanleeuwen v. Keyuan Petrochemicals Inc.*, 2014 U.S. Dist. LEXIS 110255, at *12-*13 (S.D.N.Y. Aug. 8, 2014); *Martinez v. LVNV Funding LLC*, 2016 U.S. Dist. LEXIS 136613, at *11 (E.D.N.Y. Oct. 2, 2016).

Second, reciting the legal elements of the False Claims Act ("FCA"), Defendants argue that the off-label marketing scheme can only support scienter if Gardner is successful in the Qui Tam Litigation. Def. Mem. at 15-16. Again, Defendants ignore that the AC challenges Defendants' statements for being materially false and misleading under the ***federal securities laws***. *See supra* 19. More fundamentally, however, Defendants overlook that "'[f]raud depends on the state of events when a statement is made, not on what happens later.'" *Vivendi*, 838 F.3d at 262. Plaintiff is no less, or more, damaged by Defendants' fraudulent statements if the Qui Tam Litigation is successful **or** dismissed. *See Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) ("[A] share of stock that has regained its value after a period of decline is not functionally

- 33 -

equivalent to an inflated share that has never lost value."). Thus, the relevant inquiry is whether Vanda's investors were able to accurately assess the risks of their investment in the Company when the challenged statement were made, not whether Vanda is found liable for violating the FCA.[13]

Third, Defendants argue that the off-label marketing scheme constituted mismanagement, meaning it cannot demonstrate scienter. Def. Mem. at 15-16. Beyond again misstating the nature of Plaintiff's claims (*see supra* 19), the lone out-of-Circuit case Defendants cite actually supports a finding of scienter against Defendants. *See Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499 (D. Mass. 2014). *Simon* found that allegations of off-label marketing from several low-level confidential witnesses who never interacted with the company's executives plausibly alleged the existence of an off-label promotion scheme and the falsity of the challenged statements. *Id.* at 514-19. In so holding, *Simon* specifically rejected Defendants' main argument here – "this case is not about whether or not defendants violated the FDCA or FDA regulations. It concerns alleged violations of securities law, and that is where the Court will direct its focus." *Id.* at 516.[14] *Simon* was dismissed only because none of the confidential witnesses "were present at any meetings at which critical statements or admissions were made by senior management." *Id.* at 522. Thus, if there were such allegations – and there are many here (*see supra* 5-10) – scienter would have been found in *Simon*.

Fourth, Defendants weakly argue that Gardner and Bourgeois were too low-level to support scienter. Def. Mem. at 17-18. Again, this contravenes the allegations in the AC, and further ignores that courts, including this Court, routinely rely upon confidential witnesses with far less

---

[13]    Defendants make much of the government's decision not to intervene in the Qui Tam Litigation. *See* Def. Mem. at 1, 8-9 & n.7; Def. Exs. 21-23, 25. It is hardly unusual, however, because the government intervenes in "[f]ewer than 25% of filed qui tam actions . . . on *any* count[.]" Pl. Ex. B at 2. Moreover, pursuant to the Department of Justice's 2018 Granston Memo, which sought to "curb[] meritless qui tams," the government has been instructed to move to dismiss qui tam lawsuits where "the relator's factual allegations are frivolous." Pl. Ex. C at 3. Although many Granston motions have successfully been made (*see. e.g.*, *United States v. EMD Serono, Inc.*, 370 F. Supp. 3d 483 (E.D. Pa. 2019)), none was filed in the Qui Tam Litigation. *See* Def. Ex. 21. Defendants also overlook that nothing prohibits the government from reconsidering its intervention decision in the Qui Tam Litigation as that case proceeds.

[14]    It is clear, therefore, that the AC alleges that Defendants intended to deceive Vanda's shareholders, not "healthcare providers" or "government payors," as Defendants wrongly suggest. Def. Mem. at 17.

- 34 -

particularized detail than Gardner and Bourgeois provided to find scienter adequately alleged on a motion to dismiss. *See supra* 30; *see also Pall*, 2009 U.S. Dist. LEXIS 88240, at *18-*23 (finding scienter based on low-level confidential witnesses); *Akerman*, 608 F. Supp. 2d at 376, 387 (same).

Fifth, Defendants accuse Plaintiff of failing to distinguish among the Individual Defendants in alleging scienter. Def. Mem. at 20. But as Defendants demonstrate in their particularity argument (addressed below), the AC specifies the nature of each Individual Defendants' involvement. *Id.* at 20-23; *see also* ¶¶83-84. Even Defendants' cases are in accord. *See, e.g.*, *In re SuperCom Inc. Sec. Litig.*, 2018 U.S. Dist. LEXIS 175467, at *81-*82 (S.D.N.Y. Oct. 10, 2018) (rejecting group pleading argument where confidential witnesses detailed information for two executives, but finding it precluded scienter against two other executives that were not specifically mentioned).

Sixth, Defendants argue that the AC does not particularize scienter against the Individual Defendants for the off-label marketing schemes. Def. Mem. at 20-23. But Defendants then proceed to detail some of the particularized allegations in the AC over three pages and make factual arguments regarding their plausibility (*id.*), while ignoring many others. *See supra* 5-10. Overlooking particularized allegations does not mean they were not alleged, as this Court has recognized. *See Manavazian*, 160 F. Supp. 2d at 479-80 (finding that "Defendants' general attack" on particularity "can be resolved with dispatch" because the complaint contained "specific allegations"); *see also Akerman*, 608 F. Supp. 2d at 387-88 (rejecting particularity defense where the complaint explained "'why the statements were fraudulent'"); *Galestan*, 348 F. Supp. 2d at 298-300 (finding that confidential witness allegations pled fraud with particularity).

Finally, Defendants incorrectly argue that Plaintiff ***must*** plead motive to establish scienter. Def. Mem. at 12-13 & nn.11-12. "That plaintiff has not pled motive does not make the fraud illogical; indeed, if that were the case, motive and opportunity would be the sole test for pleading

- 35 -

scienter, not just an alternative test [to recklessness]." *Lockheed Martin*, 875 F. Supp. 2d at 371; *see also Tellabs*, 551 U.S. at 325. Even worse, relying on improperly submitted extrinsic materials (*see infra* 41-43), Defendants argue that there is no recklessness because defendants Polymeropoulos, Kelly, and Reverberi purportedly increased their Vanda shareholdings during the Class Period.[15] Def. Mem. at 12-13. But the cases Defendants cite find that increasing an executives' stockholdings in the company undercut motive, ***not recklessness***. *See Avon Pension Fund v. GlaxoSmithKline plc*, 343 F. App'x 671, 673 (2d Cir. 2009) (finding allegations of stock sales to be insufficient to allege motive because of class period purchases and then separately considering recklessness); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592-98 (S.D.N.Y. 2011) (same); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561-64 (S.D.N.Y. 2004) (same).

By contrast, *In re MF Global Holdings Securities Litigation*, 982 F. Supp. 2d 277 (S.D.N.Y. 2013), firmly rejected that executive stock purchases were relevant to allegations of recklessness. *Id.* at 320 (finding that class period stock purchases by certain individual defendants did not "counteract the circumstantial evidence of fraudulent intent," *i.e.*, recklessness, reasoning that "such a rule would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud."). *MF Global* applies with equal force here.

### 2. The AC Adequately Alleges Scienter for the Tradipitant Statements and Omissions

Vanda admitted in the FDA Litigation that the Company was informed in May 2018 by the FDA that it had to conduct the required safety test or else a clinical trial hold would be placed on tradipitant. ¶¶206, 210-13, 223; *see also Vanda Pharm.*, 2020 U.S. Dist. LEXIS 16623, at *4-*5. These admissible facts sufficiently plead scienter. *See Van Dongen*, 951 F. Supp. 2d at 473 ("find[ing] a strong inference of scienter" where plaintiffs "adequately alleged that defendants were aware of information that contradicted their statements"); *Moody's*, 599 F. Supp. 2d at 515

---

[15]    As explained below, Def. Exs. 10-17 do not support Defendants' interpretation of these documents. *See infra* 42.

(allegations that defendant "had access to 'information suggesting that [his] public statements were not accurate'" were "sufficient to allege . . . scienter"); *In re Intercept Pharms., Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 26442, at \*19 (S.D.N.Y. Mar. 4, 2015) (finding scienter where defendant "engag[ed] in the sort of selective disclosure that creates a real possibility of misleading investors").

Defendants Polymeropoulos, Kelly, and Reverberi, the most senior executive officers of Vanda, were undoubtedly aware of, or recklessly disregarded, the perilous threat to obtaining regulatory approval of tradipitant caused by Vanda's refusal to conduct the required safety test. Not only did Defendants repeatedly communicate with investors regarding Study 2301 (¶¶386-407), but the decision to not conduct the required safety test was necessarily made by, or approved by, Vanda's senior executives. Thus, at the very least, these Individual Defendants recklessly disregarded the FDA's communications with Vanda in May 2018. *See Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (finding scienter when it was "virtually inconceivable" that executives were not given information about key business segments); *In re GE Sec. Litig.*, 856 F. Supp. 2d 645, 660 (S.D.N.Y. 2012) (holding that "[i]t is highly implausible that GE's CFO would be ignorant of basic facts contained in these reports about the quality of roughly one-third of GE Capital's assets"); *Delcath*, 36 F. Supp. 3d at 335 (finding scienter where the executive frequently spoke about the clinical trial at issue); *Lockheed Martin*, 875 F. Supp. 2d at 372-73 (finding scienter for the CEO and CFO because they made specific statements about the subject of the fraud).[16]

Defendants' principal response to Plaintiff's particularized scienter allegations is to recast the May 2018 meeting with the FDA as constituting "speculation." Def. Mem. at 18-19. As explained above, this is an inappropriate factual argument on a motion to dismiss (*see supra* 25), but it is also factually incorrect and contravenes Judge Bates' findings – made from evidence submitted by ***Vanda's own lawyers***. ¶¶198-99; *see Vanda Pharm.*, 2020 U.S. Dist. LEXIS 16623, at \*4-\*5.

---

[16]   Further contributing to scienter for the tradipitant statements is the core operations doctrine. *See supra* 31; ¶422.

- 37 -

Unsurprisingly, Defendants offer no legal authority to support their tortured and unbelievable retelling of Vanda's communications with the FDA regarding Study 2301. Def. Mem. at 18-19. Defendants' disavowal of its own factual admissions hardly constitutes a plausible competing inference sufficient to warrant dismissal at this stage. *See Tellabs*, 551 U.S. at 326.

Further, Defendants misstate the AC by characterizing the FDA's communication in May 2018 as being "non-final" (Def. Mem. at 19), which directly contradicts Vanda's clear-cut admission that the FDA stated in May 2018 that the safety test was a "requirement, not a recommendation[.]" ¶211; *see also* ¶¶206, 210, 213, 223. Defendants' cited authority is therefore inapposite. *See, e.g.*, *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 (1st Cir. 2014) (finding no scienter because "the advisory language that accompanies all Forms 483" means "that the circumstances noted therein are merely observational in nature, and do not represent the FDA's final word.").

Defendants also rehash their improper motive argument by arguing that the AC does not explain why Defendants would hide the FDA's directives to Vanda in May 2018 and then later disclose them by suing the FDA. Def. Mem. at 19. Again, this argument is irrelevant because Plaintiff is not alleging motive. *See supra* 35-36; *see also Micholle v. Ophthotech Corp.*, 2019 U.S. Dist. LEXIS 160131, at *47-*49 (S.D.N.Y. Sept. 18, 2019) (holding that plaintiff was not required to explain why defendants engaged in a fraud that hurt a clinical trial's chance of success because "the proper scienter inquiry" was recklessness); *Lexmark*, 367 F. Supp. 3d at 38-39 (rejecting argument that recklessness allegations were implausible because no motive was alleged).[17] And Defendants ignore that Vanda had no choice but to sue the FDA because the clinical trial hold meant investors would eventually learn that tradipitant was not advancing towards FDA approval.

---

[17]    Defendants make two additional scienter arguments that are easily disposed of. First, Defendants argue there was no duty to disclose for the tradipitant statements. Def. Mem. at 19. Because this has nothing to do with scienter, and instead pertains to falsity, Plaintiff incorporates its argument above. *See supra* 23-26. Second, Defendants perfunctorily argue that the AC lacks particularized allegations of scienter for the tradipitant statements, citing no case law in support. Def. Mem. at 23. Defendants ignore that the May 2018 meeting with the FDA provides precisely the "'who, what, when, where and how'" they wrongly claim is lacking. *See, e.g.*, *Manavazian*, 160 F. Supp. 2d at 479.

- 38 -

### D.    The AC Adequately Alleges Loss Causation

Unlike falsity and scienter, loss causation is governed by Rule 8, requiring only "'a short and plain statement of the claim showing that the pleader is entitled to relief[.]'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This standard is "not meant to impose a great burden upon a plaintiff," and a securities fraud complaint is sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be." *Id.* at 347. If there is a question of whether the "loss was caused by an intervening event . . . the chain of causation . . . is a matter of proof at trial and [should not be] decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt, LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price" – because this presents a quintessential factual issue. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (emphasis in original).

### 1.    The Fanapt and Hetlioz Decline

Defendants cannot plausibly dispute that the Aurelius Report publicly disclosed for the first time that Vanda was engaged in an off-label promotion scheme for Fanapt and Hetlioz, which caused a substantial decline in Vanda's stock price. ¶¶433-34. Media accounts like the Aurelius Report are routinely found to suffice for loss causation. *See, e.g.*, *Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*, 2019 U.S. Dist. LEXIS 164126, at *91-*94 (D. Conn. Sept. 25, 2019) (finding that media reports of a previously concealed fraud that were accompanied by stock price declines adequately alleged loss causation); *In re Winstar Communs.*, 2006 U.S. Dist. LEXIS 7618, at *46-*48 (S.D.N.Y. Feb. 27, 2006) (holding that a short seller's report that the company would likely file for bankruptcy sufficed for loss causation).

Recognizing as much, Defendants make a factual argument that because the Qui Tam Litigation was unsealed on February 4, 2019, after being sealed since March 2017 (Def. Ex. 21),

- 39 -

investors actually learned about Vanda's off-label marketing scheme one week before the Aurelius Report was issued. Def. Mem. at 40-41. This argument fails for four reasons.

First, despite submitting numerous extraneous materials (much of which is improper, *see infra* 41-43), Defendants cannot establish that any investor knew about the existence of the Qui Tam Litigation before the Aurelius Report was issued. Def. Mem. at 40-41. Nor do Defendants explain why the analyst reports reporting on the FDA Litigation on February 6, just two days after the Qui Tam Litigation was unsealed, do not mention off-label marketing. ¶¶227-28. But even if Defendants could make this showing, this Court has held that the "effect of [an] intervening event on plaintiff's theory of loss causation 'is a matter of proof at trial and [is] not to be decided on a Rule 12(b)(6) motion to dismiss.'" *In re Sequans Communs. S.A. Sec. Litig.*, 2019 U.S. Dist. LEXIS 170335, at \*9 (E.D.N.Y. Sept. 30, 2019) (Block, J.). Defendants overlook *Sequans*, which found loss causation adequately alleged where Sequans issued a public report that was accompanied by a share price ***increase*** and Sequans' stock only declined after a second public report was made. *Id.*

Second, the mere placement of the Qui Tam Litigation on a court docket without any notice to investors does not defeat loss causation and is consistent with the fraud on the market doctrine. *See Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) (applying the fraud on the market doctrine where clinical trial results were publicly posted on the internet, but did not cause a stock price decline until an analyst first reported on them ten days later). Defendants' lone authority, *In re Merrill Lynch Auction Rate Securities Litigation*, 704 F. Supp. 2d 378 (S.D.N.Y. 2010), is inapposite because the alleged undisclosed information was contained in the very prospectuses filed with the SEC for the securities at issue. *Id.* at 396-97. That hardly compares to a secret whistleblower lawsuit that was publicized a week after it was unsealed with no fanfare.

Third, the Aurelius Report was based, in part, on information from interviews with former

Vanda employees and a sleep doctor (¶184), none of which comes from the Qui Tam Litigation. Defendants concede that these sources were first publicly revealed on February 11. Def. Mem. at 40-41. Because these uncontested new sources contributed to Vanda's stock price decline on February 11, loss causation is adequately alleged even if the Qui Tam Litigation was already public knowledge. *See Carpenters*, 750 F.3d at 234 (finding dismissal was premature where defendants' fact-based loss causation arguments were "inconsistent with the complaint's allegations.").

Finally, Vanda's stock declined on February 4, 2019 by $0.66, or 2.5% (Pl. Ex. D), meaning there is still loss causation even if investors first learned about the Qui Tam Litigation on February 4. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 115 (S.D.N.Y. 2004) ("loss causation only requires that plaintiffs establish some inflation and dissipation, not the precise size of the inflation or amount of the loss. That inquiry relates to damages, not loss causation[.]").

### 2. The Tradipitant Decline

Defendants weakly argue that Vanda's announcement of the FDA Litigation after market close on February 5, 2019 does not suffice for loss causation. Def. Mem. at 41-42. Defendants concede, as they must, that the FDA Litigation disclosed for the first time that Vanda knew since May 2018 that its refusal to conduct the required safety study would result in a clinical trial hold for tradipitant. ¶¶431-32. This ends the inquiry because courts have repeatedly found loss causation when a company suffers financial losses relating to the disclosure of the fraud. *See, e.g.*, *Vivendi*, 838 F.3d at 262 ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus."). Recognizing as much, Defendants unsuccessfully rehash their deficient falsity arguments (Def. Mem. at 41). *See supra* 23-26.

### E. The Extrinsic Materials Submitted by Defendants Should Be Stricken

Ignoring that "[a] court normally may not look beyond the four corners of the complaint in

- 41 -

considering a motion to dismiss," *Mayo v. Fed. Gov't*, 558 Fed. App'x 55, 56 (2d Cir. 2014), Defendants improperly submit numerous documents. *See* Def. Exs. 10-17 *and* Def. Mem. at 7 n.6. Neither of the two narrow exceptions to this rule – incorporation by reference nor judicial notice – permit consideration of Defendants' extrinsic materials at this stage. *See Roth*, 489 F.3d at 509.

First, because the AC does not allege motive (*see supra* 35-36) or mention executive stock sales, Def. Exs. 10-17 – Forms 4 that purport to detail Vanda stock transactions by the Individual Defendants – are not incorporated by reference. *See, e.g.*, *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("[l]imited quotation from or reference to documents . . . is not enough to incorporate those documents, wholesale, into the complaint."). Likewise, the websites in footnote six do not appear in the AC and, as this Court has recognized, cannot be considered as they are "neither attached to the complaint nor appear[] to be incorporated by reference." *Manavazian*, 160 F. Supp. 2d at 482; *see also Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 33 (S.D.N.Y. 2018).

Second, Def. Exs. 10-17 cannot be judicially noticed. These materials contain information not generally known by the Court nor capable of accurate determination based on reliable sources. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (citing F.R.E. 201(b)). Indeed, Forms 4 cannot be judicially noticed where the circumstances of their preparation are not established. *See City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*, 2015 WL 1478565, at *5 (E.D. Wis. Mar. 31, 2015) (striking Forms 4); *In re Thornburg Mortg., Inc. Sec. Litig.*, 2009 WL 5851089, at *3-*4 (D.N.M. Dec. 21, 2009) (same).

Nor may Defendants rely on Def. Exs. 10-17 for their truth. *See Roth*, 489 F.3d at 511 (court "improperly considered" the truth of SEC filings because "they raised issues of fact that should not have been determined at the pleading stage"). Def. Exs. 10-13 are pre-Class Period SEC filings that cannot, by definition, speak to Class Period purchases or sales. Def. Exs. 15-17 disclose sales of

- 42 -

over $590,000 worth of Vanda stock, and no open market purchases. Thus, contrary to Defendants'

argument (Def. Mem. at 13 & n.12), no Individual Defendant increased his Vanda stockholdings

through open market purchases during the Class Period. *See City of Austin Police Ret. Sys. v.*

*Kinross Gold Corp.*, 957 F. Supp. 2d 277, 288 (S.D.N.Y. 2013) (judicial notice is inappropriate

where "the causal connection that defendants posit is plausibly subject to dispute").

Even less reliable are the six URLs that Defendants curiously fail to include as exhibits.[18]

*See* Def. Mem. at 7 n.6. It is unsurprising why – none of them establish that the doctor in question

does not treat children, let alone that they did not treat children during the Class Period. *See* Pl. Ex.

E (Dr. Hilton "specializes in Child & Adolescent Psychiatry"); Pl. Ex. F (Dr. Briones-Ramilo

specializes in "Child and Adolescent Psychiatry"); Pl. Ex. G (Dr. Robertson "completed his

fellowship in Child and Adolescent Psychiatry"); Pl. Ex. H (containing no information for Dr.

Harshawat); Pl. Ex. I (same for Dr. Engel); Pl. Ex. J (showing a dead link for Dr. Khan).[19]

Defendants' argument sharply contrasts with how Gardner and Bourgeois – who marketed Fanapt

and Hetlioz to these doctors – understood these doctors' practices during the Class Period. ¶122.

The factual issues raised by Pl. Exs. E-J precludes judicially noticing them. *See, e.g.*, *Tomasino v.*

*Estee Lauder Cos., Inc.*, 2015 U.S. Dist. LEXIS 38918, at *15-*16 (E.D.N.Y. Mar. 26, 2015)

(declining to notice documents that "could only create a point of factual dispute that is not properly

decided on a motion to dismiss"); *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 634 (S.D.N.Y.

2008) (rejecting using judicial notice to establish factual matters through extraneous documents).

### F.    Defendants' Group Pleading Argument Fails

Defendants wrongly argue that the AC fails to particularize the speakers of the challenged

---

[18]    For the Court's convenience, Plaintiff submits the webpages for these URLs as they appear on May 7, 2020. *See* Pl. Exs. E-J. Plaintiff has no knowledge, however, as to whether these webpages are or were legitimate, or were actually created by the cited doctors, and only submits them to illustrate why they are unreliable and should not be considered.

[19]    Defendants concede that Dr. Hinshaw treated children. *See* ¶123. Defendants further overlook that the charts in ¶¶123-25 were only for Indiana, just one of the many territories covered by Gardner's and Bourgeois' teams. ¶¶29, 32.

statements. Def. Mem. at 42. As Defendants' own chart acknowledges, the speakers being challenged for each statement are readily identifiable. *See* Def. Ex. 2.[20]

Contrary to Defendants' argument (Def. Mem. at 42), most courts in this Circuit, including this Court, recognize the group pleading doctrine and allow written statements to be attributed to all officers, like the Individual Defendants, who are involved in the direct day-to-day business of a company. *See Lockheed Martin*, 875 F. Supp. 2d at 373-74 (collecting cases); *see also Lenco Diagnostic Labs. v. McKinley Scientific, Inc.*, 2016 U.S. Dist. LEXIS 137700, at *11 (E.D.N.Y. Sept. 30, 2016) (Block, J.). Thus, Defendants' group pleading argument should be rejected for the written statements (*i.e.*, those in Vanda's SEC filings and press releases) challenged in the AC.[21]

Defendants also wrongly assert that one of defendant Gibbs' statements (¶233) is outside the Class Period. As the AC alleges, this statement was made "after the market closed" on November 3, the day before the Class Period began. *Id.* But Plaintiff could not have started the Class Period on November 3 because this statement did not impact Vanda's stock price until the next trading day.[22]

### G.    The Individual Defendants Are Liable as Control Persons

For control person liability under Section 20(a), "'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters*, 750 F.3d at 236. Allegations of control are not fraud claims and, therefore, are subject only to Rule 8. *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 543 (S.D.N.Y. 2016) (control adequately alleged where executive frequently spoke for the company and signed SEC filings). Because the AC states primary claims, Section 20(a) liability is alleged.

---

[20]    Def. Ex. 2 overlooks that every statement challenged in the AC was also made by Vanda, the corporate defendant.

[21]    Plaintiff acknowledges that the challenged oral statements can only impose liability against the Individual Defendant who made the specific statement and Vanda, the corporate defendant.

[22]    Even if Defendants are correct, defendant Gibbs is still liable for the Form 10-Q statements regarding Fanapt and Hetlioz made on November 4. ¶¶236, 318.

Defendants Gibbs and Reverberi argue that they were not control persons. Def. Mem. at 43 n.25. Both, however, were in charge of Vanda's sales teams for Fanapt and Hetlioz (¶¶31, 79, 83-84) and Defendants concede they were executive officers of Vanda who spoke on behalf of the Company at investor conferences during the Class Period. *See* Def. Mem. at 4; ¶¶18-19. Where an officer is "'charged with the day-to-day operations of a public corporation, it is reasonable to presume that [the person or entity] had the power to control or influence the particular transactions giving rise to the securities violations.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 639 (S.D.N.Y. 2007); *see also Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) ("Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss.").

**H.     Should Defendants' Motion Be Granted, Leave to Amend Is Warranted**

If the Court dismisses the AC, Plaintiff respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2). "Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). Because: (i) the AC is the first pleading tested on a Rule 12(b)(6) motion in this case; (ii) Plaintiff's counsel has a Freedom of Information Act request to the FDA outstanding; and (iii) Plaintiff's counsel's fact investigation is ongoing, leave to amend is not futile. *See Straker v. Metro. Transit Auth.*, 333 F. Supp. 2d 91, 102 (E.D.N.Y. 2004) (Block, J). Defendants' focus on the Court's invitation at the pre-motion conference to amend the AC as being dispositive (Def. Mem. at 43 n.26) contravenes the Second Circuit's mandate in *Loreley*.

**IV.   CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' motion be denied.

- 45 -

DATED: May 7, 2020                    Respectfully submitted,

                                      ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                      SAMUEL H. RUDMAN
                                      DAVID A. ROSENFELD
                                      MICHAEL G. CAPECI


                                                */s/ Michael G. Capeci*
                                      ────────────────────────────
                                      MICHAEL G. CAPECI

                                      58 South Service Road, Suite 200
                                      Melville, NY  11747
                                      Telephone:  631/367-7100
                                      631/367-1173 (fax)
                                      srudman@rgrdlaw.com
                                      drosenfeld@rgrdlaw.com
                                      mcapeci@rgrdlaw.com

                                      *Lead Counsel for Lead Plaintiff*

CERTIFICATE OF SERVICE

I, Michael G. Capeci, hereby certify that on May 7, 2020, I authorized a true and correct copy

of the foregoing document to be served on defense counsel via electronic mail.

*/s/ Michael G. Capeci*
MICHAEL G. CAPECI