# Exhibit 3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Vanda Pharmaceuticals, Inc., et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> Food and Drug Administration, et al., <br><br> *Defendants*. | Civil Action No. 1:19-cv-00301 (JDB) <br><br> Hon. John D. Bates |

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Paul W. Hughes (D.C. Bar No. 997235)
  phughes@mwe.com
Michael B. Kimberly (D.C. Bar No. 991549)
Andrew A. Lyons-Berg (D.C. Bar No. 230182)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, D.C. 20001
(202) 756-8000 (office)
(202) 756-8087 (facsimile)

## ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................ iii

Glossary ........................................................................................................... viii

Introduction ........................................................................................................ 1

Summary ............................................................................................................. 1

Background .......................................................................................................... 5

    A.    Statutory and Regulatory Framework. .................................................... 5

        1.    The Investigational New Drug application (IND) process. ........... 5

        2.    Clinical holds. ............................................................................. 5

        3.    The ICH Guidance. ...................................................................... 6

    B.    Gastroparesis ........................................................................................ 8

    C.    Procedural History. ............................................................................... 9

Argument .......................................................................................................... 13

I.    FDA's Application of the ICH Guidance as binding law violates the APA's notice-and-comment requirement. ............................................................................ 14

    A.    The partial clinical hold stems from FDA's treatment of the ICH Guidance as binding law. ............................................................................... 14

    B.    The ICH Guidance is a legislative rule. ............................................. 17

        1.    The ICH Guidance is not an interpretive rule. ........................... 17

        2.    The ICH Guidance is not a general statement of policy. ............. 22

        3.    The Guidance is not a rule of agency organization, procedure, or practice. ...................................................................................... 25

    C.    FDA did not use notice-and-comment rulemaking. ............................. 25

II.    As a procedural matter, FDA's Remand Response cannot rehabilitate the partial clinical hold. ................................................................................................. 26

    A.    The Remand Response is post hoc and pretextual. ............................. 27

    B.    FDA has failed to consider and respond to adverse evidence. ............ 32

    C.    FDA's tradipitant-specific reasoning is procedurally arbitrary and capricious. ............................................................................................ 36

III.    As a substantive matter, the Remand Response cannot rehabilitate the partial clinical hold. ................................................................................................. 37

    A.    FDA's evaluation of the probative value of 9-month dog studies is arbitrary and capricious. .................................................................... 38

        1.    FDA has failed to analyze the predictive power of nonrodent studies. ............ 38

        2.    The Remand Response misinterprets the evidence. ................... 40

    B.    FDA's newfound analysis of safety signals is arbitrary and capricious. ........... 42

        1.    The Remand Response is impermissibly standardless. ............. 42

Case 1:19-cv-00301-JDB    Document 23-1    Filed 07/10/19    Page 3 of 55

**TABLE OF CONTENTS**
**(continued)**

2.    The Remand Response misinterprets the evidence...........................................43

IV.    The Court should vacate the partial clinical hold. ...............................................................45

Conclusion .................................................................................................................................45

Case 1:19-cv-01108-LB Document 48-47 Filed 06/09/20 Page 5 of 56 PageID #: 1269

# TABLE OF AUTHORITIES

**Cases**

*ACA Int'l v. FCC*,
  885 F.3d 687 (D.C. Cir. 2018) .................................................................................42

*Alpharma, Inc. v. Leavitt*,
  460 F.3d 1 (D.C. Cir. 2006) .........................................................................27, 28, 31

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ..............................................................................45

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ..............................................................................24

*Azar v. Allina Health Servs.*,
  139 S. Ct. 1804 (2019) .............................................................................................24

*Batterton v. Marshall*,
  648 F.2d 694 (D.C. Cir. 1980) ................................................................................17

*Bechtel v. FCC*,
  10 F.3d 875 (D.C. Cir. 1999) ............................................................................23, 24

*Butte Cty. v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010) ................................................................................32

*California v. U.S. Dep't of Labor*,
  306 F. Supp. 3d 1180 (E.D. Cal. 2018).....................................................................31

*\*Catholic Health Initiatives v. Sebelius*,
  617 F.3d 490 (D.C. Cir. 2010) .......................................................................... passim

*Chamber of Commerce of U.S. v. SEC*,
  443 F.3d 890 (D.C. Cir. 2006) ................................................................................37

*Chamber of Commerce of U.S. v. U.S. Dep't of Labor*,
  174 F.3d 206 (D.C. Cir. 1999).....................................................................23, 24, 25

*Crooks v. Mabus*,
  845 F.3d 412 (D.C. Cir. 2016) ................................................................................36

*CropLife Am. v. EPA*,
  329 F.3d 876 (D.C. Cir. 2003) ................................................................................24

*\*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019)........................................................................................32, 38

*Dist. Hosp. Partners, L.P. v. Burwell*,
  786 F.3d 46 (D.C. Cir. 2015) ..................................................................................41

*Dithiocarbamate Task Force v. EPA*,
  98 F.3d 1394 (D.C. Cir. 1996) ................................................................................42

*\*Elec. Privacy Info. Ctr. v. DHS*,
  653 F.3d 1 (D.C. Cir. 2011) .......................................................................14, 22, 25

*Envtl. Def. Fund v. EPA*,
  922 F.3d 446 (D.C. Cir. 2019)......................................................................37, 40, 42

## TABLE OF AUTHORITIES
### (continued)

*Exelon Generation Co. v. Local 15, Int'l Bhd. of Elec. Workers,*
   676 F.3d 566 (7th Cir. 2012) ...................................................................................26

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009)..................................................................................................44

*Food Mktg. Inst. v. ICC,*
   587 F.2d 1285 (D.C. Cir. 1978).................................................................................27

*Gen. Elec. Co. v. EPA,*
   290 F.3d 377 (D.C. Cir. 2002)......................................................................22, 23, 24

*\*Genuine Parts Co. v. EPA,*
   890 F.3d 304 (D.C. Cir. 2018)..........................................................32, 34, 36, 44

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.,*
   589 F.2d 658 (D.C. Cir. 1978).............................................................................24, 25

*\*Hoctor v. USDA,*
   82 F.3d 165 (7th Cir. 1996) .............................................................................19, 20, 21

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
   571 F.3d 69 (D.C. Cir. 2009)....................................................................................37

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019)....................................................................................26, 27, 28

*La. Ass'n of Indep. Producers & Royalty Owners v. FERC,*
   958 F.2d 1101 (D.C. Cir. 1992).................................................................................37

*Level the Playing Field v. FCC,*
   __ F. Supp. 3d __, 2019 WL 1440883 (D.D.C. Mar. 31, 2019) ..............................38

*McLouth Steel Prods. Corp. v. Thomas,*
   838 F.2d 1317 (D.C. Cir. 1988)......................................................................22, 24, 25

*\*Mendoza v. Perez,*
   754 F.3d 1002 (D.C. Cir. 2014).........................................................14, 17, 18, 25

*Michigan v. EPA,*
   135 S. Ct. 2699 (2015)........................................................................................27, 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)..............................................................................................27, 37

*Muwekma Ohlone Tribe v. Salazar,*
   708 F.3d 209 (D.C. Cir. 2013)...................................................................................28

*\*NAACP v. Trump,*
   315 F. Supp. 3d 457 (D.D.C. 2018) .................................................................27, 28, 31

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
   417 F.3d 1272 (D.C. Cir. 2005).................................................................................22

*Nat'l Lifeline Ass'n v. FCC,*
   921 F.3d 1102 (D.C. Cir. 2019) .......................................................................... *passim*

**TABLE OF AUTHORITIES**
(continued)

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ................................................................................................23

*Neb. Dep't of Health & Human Servs. v. HHS*,
   340 F. Supp. 2d 1 (D.D.C. 2004) .......................................................................................22, 24

*New Life Evangelistic Ctr., Inc. v. Sebelius*,
   672 F. Supp. 2d 61 (D.D.C. 2009) .....................................................................................33, 36

*Oceana, Inc. v. Ross*,
   920 F.3d 855 (D.C. Cir. 2019) ..............................................................................................38

*Paralyzed Veterans of Am. v. D.C. Arena L.P.*,
   117 F.3d 579 (D.C. Cir. 1997) ..............................................................................................18

*Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   940 F.2d 679 (D.C. Cir. 1991) ..............................................................................................24

*Shands Jacksonville Med. Ctr., Inc. v. Azar*,
   366 F. Supp. 3d 32 (D.D.C. 2018) ..............................................................................38, 41, 43

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997) ................................................................................................17

*Tesoro Alaska Petroleum Co. v. FERC*,
   234 F.3d 1286 (D.C. Cir. 2000) .......................................................................................32, 36

*U.S. Postal Serv. v. Postal Regulatory Comm'n*,
   785 F.3d 740 (D.C. Cir. 2015) .........................................................................................42, 43

*U.S. Sugar Corp. v. EPA*,
   830 F.3d 579 (D.C. Cir. 2016) ..............................................................................................27

*U.S. Telecom Ass'n v. FCC*,
   400 F.3d 29 (D.C. Cir. 2005) .....................................................................................17, 21, 22

*United States v. Picciotto*,
   875 F.2d 345 (D.C. Cir. 1989) ..............................................................................................17

*United Steel Workers Int'l Union v. Fed. Highway Admin.*,
   151 F. Supp. 3d 76 (D.D.C. 2015) ........................................................................................19

**Statutes and Regulations**

5 U.S.C.
   § 551(4) ..............................................................................................................................17
   § 553 ..................................................................................................................................14
   § 553(b)(A) ..........................................................................................................................17
   § 706 ..................................................................................................................................14
   § 706(2)(D) ..........................................................................................................................14

21 U.S.C.
   § 355(a) ................................................................................................................................5
   § 355(i)(1) .............................................................................................................................5

21 U.S.C.

**TABLE OF AUTHORITIES**
**(continued)**

§ 355(i)(1)(A) .......................................................................................................... 5

§ 355(i)(2) ............................................................................................................... 5

§ 355(i)(3)(A) .......................................................................................................... 6

§ 355(i)(3)(B) ...................................................................................................... 4, 6

§ 355(i)(3)(B)(i) ..................................................................................................... 12

9 C.F.R. § 3.125(a) .................................................................................................... 19

21 C.F.R.

§ 10.115(d)(1) .......................................................................................................... 8

§ 10.115(d)(2) .......................................................................................................... 8

§ 312.20 .................................................................................................................... 5

§ 312.23 .................................................................................................................... 5

§ 312.23(a) ................................................................................................................ 5

§ 312.23(a)(8) .................................................................................................. *passim*

§ 312.23(a)(8)(ii)(A) ................................................................................................ 6

§ 312.40(b) ............................................................................................................... 5

§ 312.42(b)(1)(i) ............................................................................................ 4, 6, 12

§ 312.42(b)(1)(iv) ................................................................................................ 6, 38

§ 312.42(b)(2)(i) .................................................................................................. 6, 12

40 C.F.R. § 158.500 ................................................................................................... 14

**Other Authorities**

A.P. Hall *et al.*, *Liver Hypertrophy: A Review of Adaptive (Adverse and Non-adverse) Changes*, 40 Toxicologic Pathology 971 (2012) ........................................... 44, 45

Ctr. for Drug Evaluation and Research, *Program Description* (effective Sept. 6, 2017) .............. 28

David Smith *et al.*, *Preclinical Safety Evaluation Using Nonrodent Species: An Industry/Welfare Project to Minimize Dog Use*, 43 ILAR J. S39 (2002) ............................... 33

FDA, *Gastroparesis: Clinical Evaluation of Drugs for Treatment: Guidance for Industry* (July 2015) ................................................................................. 8, 9

FDA, *Guidance for Industry and FDA Staff: Statistical Guidance on Reporting Results from Studies Evaluating Diagnostic Tests* (Mar. 13, 2017) ..................................... 38, 39

FDA, *Prescribing Information for Reglan* (Aug. 2017) ............................................... 9

Harry Olson *et al.*, *Concordance of the Toxicity of Pharmaceuticals in Humans and in Animals*, 32 Regulatory Toxicology 56 (2000) .................................................. 39

Houman Savoji *et al.*, *Cardiovascular Disease Models: A Game Changing Paradigm in Drug Discovery and Screening*, Biomaterials (2018) ...................................... 34

ICH, *History* (visited June 6, 2019) ...................................................................... 7

ICH, *Mission: Harmonisation for Better Health* (last visited June 24, 2019) ............. 20

ICH, *Overview of ICH* (June 2019) ..................................................................... 20

**TABLE OF AUTHORITIES**
**(continued)**

*International Conference on Harmonisation; Draft Guidance on the Duration of Chronic Toxicity Testing in Animals (Rodent and Nonrodent Toxicity Testing); Availability*, 62 Fed. Reg. 61,513 (Nov. 18, 1997) .......................................................41

*International Conference on Harmonisation; Draft Guideline on the Timing of Nonclinical Studies for the Conduct of Human Clinical Trials for Pharmaceuticals*, 62 Fed. Reg. 24,320 (May 2, 1997) .......................................................7, 8

*International Conference on Harmonisation; Guidance on M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals; Availability*, 75 Fed. Reg. 3,471 (Jan. 21, 2010) .................................*passim*

*International Conference on Harmonisation; Guidance on Nonclinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals*, 62 Fed. Reg. 62,922 (Nov. 25, 1997) .......................................................7, 8

Jarrod Bailey *et al.*, *An Analysis of the Use of Animal Models in Predicting Human Toxicology and Drug Safety*, 42 ATLA 181 (2014) .......................................................34

Jarrod Bailey *et al.*, *An Analysis of the Use of Dogs in Predicting Human Toxicology and Drug Safety*, 41 ALTA 335 (2013) .......................................................33, 34, 39, 40

Jarrod Bailey *et al.*, *Predicting Human Drug Toxicity and Safety via Animal Tests: Can* Any *One Species Predict Drug Toxicity in Any Other, and Do Monkeys Help?*, 43 ATLA 393 (2015) .......................................................33

Jarrod Bailey & Michael Balls, *Recent Efforts to Elucidate the Scientific Validity of Animal-Based Drug Tests by the Pharmaceutical Industry, Pro-Testing Lobby Groups, and Animal Welfare Organisations*, 20 BMC Med. Ethics 16 (2019).......................................................34

Joseph J. DeGeorge *et al.*, *The Duration of Non-Rodent Toxicity Studies for Pharmaceuticals*, 49 Toxicological Sci. 143 (1999) .......................................................31, 40

*New Drug, Antibiotic, and Biologic Drug Product Regulations*, 52 Fed. Reg. 8,798 (Mar. 19, 1987) .......................................................21

Niall Shanks *et al.*, *Are Animal Models Predictive for Humans?*, 4 Philosophy, Ethics, & Human. in Med. 2 (2009).......................................................39

NIH, *Dr. Joseph Contrera Oral History Interview* (Dec. 18, 2003) .......................................................21

Nina Hasiwa, *Critical Evaluation of the Use of Dogs in Biomedical Research and Testing in Europe*, 28 ALTEX 326 (2011) .......................................................33

Robert A.J. Matthews, *Medical Progress Depends on Animal Models—Doesn't It?*, 101 J. Royal Soc'y Med. 95 (2008) .......................................................34, 39

Thomas M. Monticello *et al.*, *Current Nonclinical Testing Paradigm Enables Safe Entry to First-In-Human Clinical Trials: The IQ Consortium Nonclinical to Clinical Translational Database*, 334 Toxicology & Applied Pharmacology 100 (2017).......................................................39

Werner Kobel *et al.*, *A 1-Year Toxicity Study in Dogs Is No Longer a Scientifically Justifiable Core Data Requirement for the Safety Assessment of Pesticides*, 40 Critical Reviews in Toxicology 1 (2010).......................................................34, 35

# GLOSSARY

CDER .............Center for Drug Evaluation and Research (within FDA)

FDA................U.S. Food and Drug Administration

FDCA .............Food, Drug, and Cosmetic Act

FDRR .............Formal Dispute Resolution Request

IND ................Investigational New Drug

MPPRC ..........Medical Policy and Program Review Council (within CDER)

Case 1:19-cv-01108-bB Document 48-47  2 Filed 06/09/20  Page 11 of 56 PageID #:
Case 1:19-cv-00301-JDB  Document 23-1  Filed 07/10/19  Page 10 of 55
1275

**INTRODUCTION**

Plaintiff Vanda Pharmaceuticals is a biopharmaceutical company, based in Washington D.C., that develops innovative therapies for patients with unmet needs. Vanda is studying tradipitant to alleviate the debilitating symptoms of nausea and vomiting associated with gastroparesis, a disorder that prevents the stomach from emptying normally. For many individuals with gastroparesis, food remains rotting in one's stomach for days until violently vomited. Plaintiffs Cathy Hartwig, Louisa Jenness, and December Guzman all live with this devastating disease. All three participated in Vanda's 3-month trial of tradipitant, each experienced substantial relief from their symptoms, and all three wish to participate in a 12-month clinical trial.

The Food and Drug Administration (FDA), however, has barred Vanda from conducting any human trials longer than 3 months. FDA has not determined that such tests would be unsafe. Rather, FDA prevents this clinical testing because it says that Vanda must comply with a "guidance" document that the agency unlawfully applies as a binding rule. In FDA's view, a 9-month toxicology study in nonrodents (usually young beagle dogs) must be conducted for *every* pharmaceutical, regardless of whether the study has the potential for providing any scientifically useful data, and despite the massive killing of dogs that such studies necessarily entail.

Congress enacted the Administrative Procedure Act (APA) to prevent such lawless behavior. Most fundamentally, the APA requires agencies to engage in notice-and-comment rulemaking to bind regulated entities. FDA's failure to do so renders its conduct unlawful. To be clear, Vanda does not suggest that the Court can or should substitute its judgment for that of FDA. This lawsuit trains exclusively on whether FDA has used lawful procedures, and whether the agency has supplied sufficient reasons for its decision. It has not.

**SUMMARY**

This case stems from FDA's unlawful application of an international guidance document— the "ICH Guidance"—as binding law.

Vanda seeks to conduct a 12-month clinical trial of tradipitant to treat symptoms associated with gastroparesis. Tradipitant has been extensively studied—it has been tested on 3,669 animals

1

Case 1:19-cv-01108-JDB Document 48-47 Filed 06/09/20 Page 12 of 56 PageID #:
Case 1:19-cv-00301-JDB Document 23-1 Filed 07/10/19 Page 11 of 55
1276

(each of which was killed to facilitate the testing), and in 622 humans. Despite an extensive, favorable safety record, FDA placed a partial clinical hold on the proposed trial, freezing development until Vanda conducts a 9-month toxicology study in nonrodents. This animal testing would require the killing of dozens—if not a hundred or more—dogs, likely young beagles. FDA ultimately made this decision via its Medical Policy and Program Review Council (MPPRC), the policymaking body within FDA's Center for Drug Evaluation and Research (CDER). More than a dozen FDA documents, including external communications and internal analyses, make clear that FDA's decision was based on one reason, and one reason only: The ICH Guidance asserts that a 9-month dog study is required, and FDA applies the ICH Guidance as binding law. Indeed, prior to litigation, FDA communicated to Vanda that its decision was *not* specific to tradipitant.

Vanda subsequently filed this lawsuit, and FDA requested a voluntary remand to the agency. There is no evidence that, during the remand, FDA resubmitted this issue to the MPPRC. Instead, FDA simply issued a new document—the Remand Response (FDA-11106 to FDA-11127)—designed to supply additional reasons for the decision that FDA had already made.

The Court should declare the partial clinical hold unlawful and vacate it.

*First*, FDA's treatment of the ICH Guidance as binding law violates the APA's notice-and-comment requirement. FDA has effectively amended its clinical-trial regulations to require adherence to the ICH Guidance, but has not subjected this obligation to notice-and-comment rulemaking as required by Section 553 of the APA. Although FDA published notice of the guidance, the agency specifically stated that it was *not* a binding requirement. If FDA had used the APA's procedures, members of the public—including Vanda and the Humane Society of the United States—would have had an opportunity to present the robust scientific research adverse to FDA's approach.

*Second*, FDA's Remand Response—which attempts to supply entirely new reasons justifying the partial clinical hold—is procedurally arbitrary and capricious. To begin with, the Remand Response reflects impermissible post hoc rationalization and pretext. In a candid letter, FDA informed Vanda that, on remand, it did not reopen the record or reconsider the issue. That is why, FDA asserts, the Remand Response disregards the significant amount of evidence and argument

Case 1:19-cv-01108-hB-301 Document 48-47 2 Filed 06/09/20 0/ Page 12 of 56 PageID #:
1277
Case 1:19-cv-00301-JDB Document 23-1 Filed 07/10/19 Page 12 of 55

that Vanda and the Humane Society provided FDA following the partial clinical hold. The procedural history confirms FDA's account, as there is no evidence that the agency resubmitted the issue to the policymaking body within FDA responsible for the original decision, the MPPRC. Thus, on remand, FDA *could not* have come to a different conclusion. Yet the reasons and evidence identified in the Remand Response are entirely distinct from those supplied by the actual decision-maker. As a result, the Court must disregard all of FDA's new evidence and argument.

FDA has additionally erred by failing to address evidence that cuts against its preferred result—even evidence that the agency acknowledges is in the record. What is more, FDA has acted in spectacularly arbitrary and capricious fashion by treating the remand period as a one-way ratchet: It larded the record with material and argument allegedly favorable to its position, but it refused to consider the contrary evidence that Vanda and the Humane Society submitted. That is not lawful agency action.

Separately, the agency has erred by failing to provide Vanda any opportunity to respond. FDA now says, for example, that its experience with another pharmaceutical, casopitant, provides some support for the partial clinical hold. But FDA had never once mentioned this issue to Vanda, much less supplied Vanda an opportunity to rebut the claim with evidence.

*Third*, FDA's proffered reasons for the partial clinical hold are also substantively arbitrary and capricious. The Remand Response identified evidence that, in FDA's view, supports 9-month nonrodent studies. But FDA has never addressed a central aspect of the question: whether those nonrodent studies provide any added predictive power for human populations, beyond that already obtained by other tests. As for FDA's invocation of supposed safety signals regarding tradipitant, FDA fails to identify any standard governing its conduct; it certainly does not demonstrate *how* it has connected the alleged evidence to its conclusion. And, in any event, FDA selectively presents the evidence in a one-sided and arbitrary manner.

\* \* \*

Before proceeding, we must address two preliminary issues. The first is patient safety. Vanda is unequivocally, religiously committed to patient safety. It would never sponsor a test that

3

Case 1:19-cv-00301-JDB Document 23-1 Filed 07/10/19 Page 13 of 55

it believed might put patients at undue risk. Critically, FDA's actions in this case do *not* suggest that the agency has any concerns about tradipitant's safety in clinical trials.

Lest there be any doubt, FDA has broad authority to impose a clinical hold in the event of "an unreasonable risk" to trial participants. 21 U.S.C. § 355(i)(3)(B); *see also* 21 C.F.R. § 312.42(b)(1)(i). *This* case does not involve that authority, because FDA has never invoked this provision (either pre-remand or post-remand) against the proposed clinical trials. Whatever the outcome of this lawsuit, FDA will *always* have authority to issue a clinical hold (on tradipitant and any other drug) if it finds that particular trials would present an "unreasonable risk" to patients.

Not only has FDA declined to use its safety-based authority to issue the hold, the agency has also repeatedly acknowledged that tradipitant was sufficiently "safe to proceed" in shorter-duration human trials. FDA-10902; *see also* FDA-10196 to FDA-10199 (safe to proceed letter). When FDA made this determination, the agency had evaluated all of the evidence to which it now points. If FDA believed that tradipitant posed a safety risk to humans, surely it would have said so then. It was not until after this litigation began that FDA even hinted at a patient safety rationale. FDA's new justifications are pretext. As every pre-litigation action by FDA illustrates, this case stems solely from bureaucratic entrenchment.

This case, moreover, is not about approving tradipitant for widespread public use. It is about continuing highly controlled studies in volunteer patients, including Plaintiffs, who wish to participate—all in order to *determine* whether the drug is safe and effective enough to be marketed.

The other issue is *why* Vanda has brought this lawsuit. A 9-month dog study is not especially expensive; this case is not about cost. Rather, patients are central to Vanda's mission; Vanda is committed to patient safety alongside the development of novel treatments for unmet patient needs. FDA's reflexive reliance on the ICH Guidance discourages productive research, making it less likely that researchers will achieve important new breakthroughs for those patients. If FDA believes that an across-the-board requirement is appropriate, it must submit that policy to notice-and-comment rulemaking, and the ensuing vigorous public debate about its costs and benefits.

Finally, animal testing requires killing the animal subjects. While Vanda does not oppose

4

all animal testing, it believes that mass destruction of animal life must be legally and scientifically justified. Thousands of animals have already been killed to demonstrate tradipitant's safety. There is no scientific or legal basis for killing scores more.

## BACKGROUND

### A. Statutory and Regulatory Framework.

#### 1. The Investigational New Drug application (IND) process.

The Food, Drug, and Cosmetic Act (FDCA) sets out a comprehensive scheme for federal government approval of newly developed drugs, and it prohibits the introduction into interstate commerce of any new drug absent approval. *See* 21 U.S.C. § 355(a). The statute requires FDA to create, by regulation, an exemption from this prohibition for new drugs "intended solely for investigational use . . . to investigate th[eir] safety and effectiveness." *Id.* § 355(i)(1).

The FDCA permits the agency to promulgate regulations that "condition[] such exemption upon" the submission of "reports, by the manufacturer or the sponsor of the investigation of such drug, of preclinical tests (including tests on animals) of such drug adequate to justify the proposed clinical testing." 21 U.S.C. § 355(i)(1)(A). In turn, FDA's regulations require the sponsor of a new drug to submit an Investigational New Drug application (IND) before clinical (that is, human) trials in the United States may begin. *See* 21 C.F.R. § 312.20. Among other things, an IND must contain information on the drug's chemistry and manufacturing, information on the pharmacological and toxicological effects of the drug from animal studies and in vitro testing, information on any previous human experience, and a protocol for each planned study. *See id.* § 312.23(a).

By statute, an IND takes effect automatically—and clinical trials may therefore proceed—30 days after it is received by FDA. 21 U.S.C. § 355(i)(2); *see also* 21 C.F.R. § 312.40(b). That is, the statute allows clinical trials to go forward absent a compelling reason to stop them.

#### 2. Clinical holds.

During the 30-day period before an IND becomes effective, or at any point thereafter, FDA may stop a clinical trial from proceeding by issuing a clinical hold. The FDCA authorizes clinical

5

holds under two distinct circumstances: first, if "the drug involved represents an unreasonable risk to the safety of the persons who are the subjects of the clinical investigation"; or second, if "the clinical hold should be issued for such other reasons as [FDA] may by regulation establish." 21 U.S.C. § 355(i)(3)(B). In either case, the statute requires FDA to "specify the basis for the clinical hold, including the specific information available to [FDA] which served as the basis for such clinical hold, and confirm such determination in writing." *Id.* § 355(i)(3)(A).

As relevant here, FDA has used its delegated rulemaking power both to repeat the statute's unreasonable-risk-to-safety grounds for a clinical hold (*see* 21 C.F.R. § 312.42(b)(1)(i)), and to separately provide for a hold if "[t]he IND does not contain sufficient information required under [Section] 312.23 to assess the risks to subjects of the proposed studies" (*id.* § 312.42(b)(1)(iv)). *See also id.* § 312.42(b)(2)(i).

And, as mentioned above, Section 312.23 of the regulations requires INDs to contain toxicological information: specifically, "[a]dequate information about pharmacological and toxicological studies of the drug involving laboratory animals or in vitro, on the basis of which the sponsor has concluded that it is reasonably safe to conduct the proposed clinical investigations." 21 C.F.R. § 312.23(a)(8); *see also id.* § 312.23(a)(8)(ii)(a)) (requiring "[a]n integrated summary of the toxicological effects of the drug in animals and in vitro. Depending on the nature of the drug and the phase of the investigation, the description is to include the results of acute, subacute, and chronic toxicity tests."). The regulations do not further define just what "information about . . . toxicological studies" the agency will consider "[a]dequate"; rather, they state that "[t]he kind, duration, and scope of animal and other tests required varies with the duration and nature of the proposed clinical investigations," and that "[g]uidance documents are available from FDA that describe ways in which these requirements may be met." 21 C.F.R. § 312.23(a)(8).

### 3.    *The ICH Guidance.*

One such guidance document is the M3(R2) guidance (ICH Guidance), developed by the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH), and adopted by FDA in 2010. *See International Conference on*

6

*Harmonisation; Guidance on M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals; Availability*, 75 Fed. Reg. 3,471 (Jan. 21, 2010) (*2010 Notice*); FDA-10906 to FDA-10934. The ICH is a private nonprofit international association, organized under Swiss law, that works to harmonize the requirements for drug approval across different countries; its membership is comprised of representatives from the pharmaceutical regulators and the main pharmaceutical industry trade groups of the United States, the European Union, and Japan. *E.g.,* 75 Fed. Reg. at 3,471-72; *see also, e.g.*, FDA-10510; ICH, *History* (visited June 6, 2019), www.ich.org/about/history.html.

The M3(R2) guidance came about as a result of an effort, begun in the 1990s, to harmonize the technical requirements for nonclinical studies intended to support clinical trials of new drugs. As relevant here, the current version of the guidance provides that the "recommended duration" of the "animal toxicity studies conducted in two mammalian species (one nonrodent) should be equal to or exceed the duration of the human clinical trials up to the maximum recommended duration," which is 6 months for rodent studies and 9 months for nonrodent studies. ICH Guidance, FDA-10916 to FDA-10917 & tbl. 1. That is, to support a 12-month human clinical study, the ICH Guidance "recommend[s]" a 6-month trial in rodents and a 9-month study in nonrodents. *Id.* In Europe, however, the guidance recommends a 6-month study in nonrodents. *Id*.

The 2010 ICH guidance and its 1997 predecessor were each submitted to the Federal Register and held out for public comment by FDA, in both draft and final form.[1] But none of these notices purported to establish a binding requirement; to the contrary, they "announc[ed] the avail-

---

[1]    *See International Conference on Harmonisation; Draft Guideline on the Timing of Nonclinical Studies for the Conduct of Human Clinical Trials for Pharmaceuticals*, 62 Fed. Reg. 24,320 (May 2, 1997) (draft guidance); *International Conference on Harmonisation; Guidance on Nonclinical Safety Studies for the Conduct of Human Clinical Trials for Pharmaceuticals*, 62 Fed. Reg. 62,922 (Nov. 25, 1997) (final guidance); *International Conference on Harmonisation; Draft Guidance on M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals; Availability*, 73 Fed. Reg. 51,491 (Sept. 3, 2008) (draft guidance) (*2008 Notice*); *2010 Notice*, 75 Fed. Reg. 3,471 (final guidance).

7

ability of a guidance," and explicitly stated—in keeping with the proper role of guidance documents in administrative law—that "[a]n alternative approach may be used if such approach satisfies the requirements of the applicable statutes and regulations." 75 Fed. Reg. at 3,471-72; *accord* 73 Fed. Reg. at 51,491; 62 Fed. Reg. at 62,922; 62 Fed. Reg. at 24,320; *see generally* 21 C.F.R. § 10.115(d)(1)-(2) (FDA's "good guidance practices" regulation, stating: "Are you or FDA required to follow a guidance document? No. Guidance documents . . . do not legally bind the public or FDA. You may choose to use an approach other than the one set forth in the guidance document.").

## B.    Gastroparesis

Gastroparesis is a serious and chronic medical condition in which the stomach cannot adequately empty itself of food, causing nausea, vomiting, upper abdominal pain, and other related symptoms. *See, e.g.*, FDA-10481; FDA, *Gastroparesis: Clinical Evaluation of Drugs for Treatment: Guidance for Industry* 2 (July 2015) (*Gastroparesis Guidance*), tinyurl.com/y3r432c6. The disease seriously affects patients' quality of life, and the symptoms are sometimes debilitating and can even lead to death. *See, e.g.*, *id.* at 2 ("[T]he burden of this disease on the individual (morbidity and mortality) and society (health care costs) is considerable."). For example, Plaintiff Cathy Hartwig can do nothing but sit still when her symptoms flare up; gastroparesis prevents her from traveling to see her grandchildren. Ex. U ¶¶ 2-3.[2] Plaintiff Louisa Jenness had to quit her job because her severe vomiting and other symptoms would not allow her to work; she is currently back in school studying electrical engineering, but is unable to take a full course load for fear that gastroparesis will cause her to fall behind academically. Ex. W ¶¶ 2, 7. Plaintiff December Guzman is ineligible for promotion at work because her employer never knows when she will have to stay home with debilitating nausea and vomiting. Ex. V ¶ 3. Other patients tell similar stories:

- 17-year-old Cathryn: "[I]t's . . . hard to face the fact that I will have this forever. . . . [E]very day I wake up worried about what to eat, drink, or if I should even bother to try. It doesn't only affect me, it does to all my loved ones." Breakthrough Therapy Appl. (Ex. N) at 31.

---

[2]    The exhibits cited in this brief are attached to Plaintiffs' contemporaneously filed motion to complete and supplement the administrative record.

- Hollie: "I have gone from a strong, independent nurse, wife and mother to a shell of a person barely able to get up and go each day. . . . I wake up every day after dreaming of eating, feeling good, and being healthy. And then I take my anti-nausea medication and head off to shower, hoping it kicks in soon." *Id.* at 31-32.

- Name withheld: "I am extremely desperate . . . I am missing out on so much of my life let alone my 9 year old daughter['s] life, since I am always sick throwing up which causes much exhaustion not to mention all the pain that goes along with it all. I am not able to participate in many family activities. Thank you for reading my story." *Id.* at 31.

The available treatment options for gastroparesis are bleak. The only FDA-approved medication, metoclopramide, is restricted to 12 weeks of treatment because of its serious side-effects. *See* FDA-10487. Indeed, FDA has imposed a black-box warning—the agency's strictest label warning—cautioning doctors and patients that metoclopramide "can cause tardive dyskinesia (TD), a serious movement disorder that is often irreversible. There is no known treatment for TD." FDA, *Prescribing Information for Reglan* 1 (Aug. 2017), tinyurl.com/y662hagw. Moreover, metoclopramide is approved only for diabetic, not idiopathic, gastroparesis, and idiopathic gastroparesis is the disorder's most common form. *Id.*; FDA-10482. Another similar drug, domperidone, has less serious side effects but is not FDA-approved, and is thus available in the United States only through special programs. *E.g.*, FDA-10487. Off-label use of erythromycin may initially control the symptoms of gastroparesis, but it generally loses its effectiveness after about 4 weeks of treatment. *E.g.* FDA-10487 to 10488.

Per FDA itself, "[t]here is an urgent medical need for development of drugs with a favorable risk-benefit profile to treat patients with gastroparesis." *Gastroparesis Guidance* at 3; *see also* FDA-10480 ("Current approved treatment options . . . do not adequately address clinical need.").

### C. Procedural History.

Vanda is studying tradipitant as a promising treatment for relieving the debilitating nausea and vomiting associated with gastroparesis. In September 2016, Vanda submitted its Investigational New Drug Application (IND) for tradipitant, which was assigned the IND number 13,1545. *See* FDA-09923. The IND included a proposal to conduct Study 2301, originally a 4-week clinical study of tradipitant in human subjects diagnosed with gastroparesis. FDA-10084 to FDA-10154.

9

A month later, FDA notified Vanda that it had completed a safety review and determined that Study 2301 was safe to proceed. FDA-10196 to FDA-10199.

Separately, Vanda had been investigating tradipitant for a different indication, pruritus associated with atopic dermatitis, under IND number 12,2741. *See* FDA-09923. In December 2016, Vanda submitted a proposal to waive the requirement of a 9-month dog study for that IND, arguing that under the circumstances such a study would add little value. FDA-00001 to FDA-00014. FDA summarily denied the waiver request in January of 2017, explaining only that "[i]t has been determined that the waiver is not justified." FDA-10180.

In April 2018, Vanda submitted a proposal to add a 52-week open-label extension to Study 2301, the study regarding gastroparesis. Vanda sought to study the same participants who had taken tradipitant in the 4-week trial as they continued on the medication for an additional year. *See* FDA-09706 to FDA-09922. Vanda explained that gastroparesis is a serious condition with inadequate treatment options, and that subjects had experienced significant improvement in their symptoms during the trial. As one participant put it, "[t]radipitant *gave me my life back*. Please, please, *please* allow Vanda Pharmaceuticals to continue giving me this medication!" FDA-09709.

In response, FDA initiated a series of communications in which it made clear that continued human trials beyond 3 months would not be allowed to proceed without a 9-month study in dogs, as required by the ICH Guidance. A call was held between the agency and Vanda on May 15, 2018, during which Vanda argued that a 9-month nonrodent study "would [not] add value," given the existing nonclinical data and clinical experience. FDA-10990 to FDA-10991. FDA responded that "chronic toxicology studies in 2 species"—as prescribed by the ICH Guidance—"is a requirement, not a recommendation, prior to proceeding to long-term studies in humans." FDA-10990.

Three days later, an FDA memorandum concluded that, because there was no 9-month dog study, "per ICH M3(R2), the available nonclinical data . . . does not support the 52-week open label extension." FDA-10998. "[P]er ICH M3(R2), a chronic toxicology study of 9 months duration will be needed." *Id*. FDA determined that trials beyond 3 months "should be put on clinical hold until the chronic toxicity study in a non-rodent species is submitted for our review." *Id*.

10

Case 1:19-cv-01108-LPS Document 48-47 Filed 06/09/20 Page 21 of 56 PageID #:
1285
Case 1:19-cv-00301-JDB Document 23-1 Filed 07/10/19 Page 20 of 55

That same day, Vanda gave notice to FDA that it would be reducing the 52-week open-label extension to an 8-week extension—for a total duration of three months—to avoid a clinical hold by complying with the ICH Guidance. FDA-09340. In this email, Vanda explained its understanding of what had happened on the May 15 call:

> We understand that the position of the Division is that a 9 month dog toxicology study as per ICH M3/R2 guidance, will be a prerequisite before a 6 month or a 1 year open label extension is initiated. We also understand that ***this position is not due to a specific scientific rational[e] from the already conducted studies*** but rather the Division's policy based on the referenced guidance.

*Id.* (emphasis added). FDA agreed, reiterating that a 9-month nonrodent study would be required, "per ICH M3(R2), prior to conducting a clinical trial exceeding 3 months in duration. The chronic toxicology study can be conducted in dogs, monkeys or minipigs." FDA-10192.

On August 1, 2018, Vanda filed a Formal Dispute Resolution Request (FDRR), contesting the agency's decision to require a 9-month dog study. *See* FDA-08753 to FDA-09130. In particular, Vanda noted that "[t]he Division has provided no basis from the scientific review of the tradipitant program to require a 9-month non-rodent study in tradipitant other than to follow, as if it were a requirement, a recommendation in the Guidance for Industry: M3(R2)." FDA-08754. As Vanda explained, on the May 15 teleconference, "[t]he Division cited the [ICH] guidance for industry on nonclinical safety studies as the basis for th[e] requirement." FDA-08758.

Rather than respond to the substance of Vanda's dispute resolution request, FDA sent a one-page letter stating that the FDRR was "not accepted." FDA-10189. "Because a protocol for a clinical trial exceeding three months in duration has not yet been submitted to your application . . . your request for formal dispute resolution is not appropriate at this time." *Id*. That is, FDA would not allow Vanda to press its objections to FDA's threats of a clinical hold, precisely because Vanda had obeyed FDA and withdrawn its application for a 52-week extension.

Seeking to have its claim heard without endangering the ongoing 3-month version of Study 2301, in September 2018 Vanda proposed Study 2302, an identical 52-week extension. *See* FDA-08647. The idea was that FDA would place *that* study on clinical hold, and the formal dispute

resolution process could then proceed while the 3-month study went ahead. But two months passed without FDA taking action; assuming that FDA had relaxed its stance, Vanda submitted another proposal for a 12-month extension of Study 2301. *See* FDA-08407 to FDA-08644.

In response, FDA convened the Medical Policy and Program Review Council (MPPRC)—the policymaking body within FDA's Center for Drug Evaluation and Research (CDER)—to address Vanda's request. The MPPRC ultimately imposed a partial clinical hold. FDA-10867 to FDA-10868 (memorandum explaining the reasons for the hold). In a teleconference to notify Vanda that both studies had been put on partial clinical hold, FDA informed Vanda that "[t]he Division's determination that non-rodent toxicity studies of 9-months duration *are required per the ICH M3(R2)* was endorsed by a unanimous Medical Policy and Program Review Council (MPPRC) discussion on December 19, 2018." FDA-10878 (emphasis added). When Vanda reiterated its argument that the requirement is unnecessary with respect to tradipitant, "FDA restated that the requirement for 9-month non-rodent studies, as outlined in the ICH M3(R2) guidelines, is . . . not specific to a class of drugs or a single development program." *Id.*

FDA followed up with a formal letter, explaining that "[t]he MPPRC agreed with the Division's determination that non-rodent toxicity studies of 9 months duration are required for the conduct of your proposed clinical investigations of 52 weeks (12 months) duration, per the ICH *Guidance for Industry: M3(R2)*," and that therefore, "[u]ntil you have submitted the required information . . . you may not legally conduct the identified clinical studies." FDA-10185. FDA identified the "specific deficiencies" in Vanda's IND as "21 CFR 312.42(b)(2)(i): Insufficient information to assess risks to human subjects." FDA-10185. That is, the partial clinical hold was not imposed because of any finding that "[h]uman subjects are or would be exposed to an unreasonable and significant risk of illness or injury," a separate grounds for a hold under the statute and regulations. 21 C.F.R. § 312.42(b)(1)(i); *see* 21 U.S.C. § 355(i)(3)(B)(i).

After requesting reconsideration from the agency, Vanda filed suit in this Court, arguing in part that FDA's imposition of the partial clinical hold is unlawful because it relied on the ICH Guidance as a binding, legislative rule, despite the guidance's failure to abide by the APA's notice-

12

and-comment procedures. *See generally* Dkt. 1. Ten days later, FDA requested—and this Court granted—voluntary remand without vacatur, so that FDA could "address certain procedural issues Vanda noted in its Complaint." Dkt. 6-1, at 2; *see also* Dkt. 11 (granting FDA's motion).

During the remand, the Humane Society of the United States submitted a letter to FDA containing substantial information disputing the scientific justification for long-term dog studies. *See* Mot. to Correct the Administrative R. (A.R. Mot.) at 6-7. Vanda also filed an application for Breakthrough Therapy designation, which it informed FDA is related to the clinical hold. *Id.* at 7.

There is no evidence in the record that, during the remand period, FDA reconvened its policymaking entity, the MPPRC. In a subsequent letter to Vanda, FDA stated that, despite the remand, it did not "reopen the evidentiary record" and did not reconsider its "*original agency decision.*" Harlow Ltr. (Ex. B) at 1. On April 26, 2019, FDA issued a new document, titled a "Remand Response," in which it provides new reasons for its original decision. *See* FDA-11106 to FDA-11127. Along with some background information, that document makes essentially two arguments: (1) that information related to tradipitant and related compounds indicates a need for additional testing; and (2) that a general requirement of 9-month nonrodent studies is supported by scientific literature.

On May 29, 2019, Vanda—along with three individual participants in Study 2301 whose lives had been changed by tradipitant—filed an amended complaint. Dkt. 18.

## ARGUMENT

FDA's imposition of a partial clinical hold is unlawful agency action. *First*, FDA applies the ICH Guidance as a substantive rule, but the agency never adopted this requirement via notice-and-comment rulemaking. *Second*, the agency's conduct is procedurally arbitrary and capricious: It reflects impermissible post hoc rationalization and pretext; it fails to address material adverse to the agency's preferred conclusion; and it denied Vanda an opportunity to respond to the agency's new arguments. *Third*, the partial clinical hold is substantively arbitrary and capricious: it fails to address critical aspects of the problem; it is standardless; and it selectively presents the evidence.

13

## I.   FDA'S APPLICATION OF THE ICH GUIDANCE AS BINDING LAW VIOLATES THE APA'S NOTICE-AND-COMMENT REQUIREMENT.

Under the APA, agency "rules" are generally void if not promulgated through the notice-and-comment procedures prescribed by the Act, and agency action based on such an invalid rule must be set aside. 5 U.S.C. §§ 553, 706; *see Mendoza v. Perez*, 754 F.3d 1002, 1020-1021 (D.C. Cir. 2014). Here, that principle requires the vacatur of the partial clinical hold: The clinical hold was imposed in reliance on the ICH Guidance, which is a legislative rule that was not promulgated through notice-and-comment rulemaking.

If FDA wanted to replace the "[a]dequate information" standard for toxicity studies embodied in the IND regulations (*see* 21 C.F.R. § 312.23(a)(8)) with a rigid numerical rule, it could have done so—through notice and comment rulemaking.[3] The notice-and-comment process would have allowed scientists, the regulated industry, and members of the general public to present their concerns—and supporting evidence—to the agency. *Cf. Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 6 (D.C. Cir. 2011) (notice and comment "serv[es] 'the need for public participation in agency decisionmaking'" and "ensur[es] the agency has all pertinent information before it when making a decision"). As detailed below, much of that evidence would have demonstrated that extended-duration toxicity studies in dogs provide little additional information, and the information they do provide is of dubious significance to humans. *See infra* pp. 33-36, 38-40. But the point for present purposes is only that the agency may not hide behind an ostensible guidance document to avoid having a debate at all. The ICH Guidance, as applied by FDA, is unenforceable for failure to follow the APA's notice and comment procedures and must be "set aside." 5 U.S.C. § 706(2)(D).

### A.   The partial clinical hold stems from FDA's treatment of the ICH Guidance as binding law.

FDA imposed the partial clinical hold because it deems the ICH Guidance a binding requirement. At every opportunity, FDA decisionmakers made clear—both internally and in communications to Vanda—that the sole basis for the clinical hold was the ICH Guidance.

---

[3]   EPA has promulgated detailed toxicology testing requirements for pesticides through notice and comment, and published them in the Code of Federal Regulations. *See* 40 C.F.R. § 158.500.

14

Case 1:19-cv-01108-JDB Document 48-47 Filed 06/09/20 Page 25 of 56 PageID #: 1289

- During the May 15, 2018 call in which Vanda argued that it should not have to follow the ICH Guidance, FDA replied "that chronic toxicology studies in 2 species *is a requirement, not a recommendation*, prior to proceeding to long-term studies in humans." FDA-10990 (emphasis added); *see also id.* ("*[P]er ICH M3(R2)*, a chronic toxicology study of 9 months duration in a non-rodent species *will be needed*.") (emphases added).

- In a medical officer memorandum describing the teleconference, FDA noted that Vanda "was informed that chronic toxicology studies are *required* in two species *as per ICH M3(R2)*." FDA-10993 (emphases added).

- In a May 18, 2018 internal evaluation of Vanda's proposed extension to Study 2301, the FDA reviewer stated that because only a 3-month dog study had been conducted, "*per ICH M3(R2)*, the available nonclinical data . . . does not support the 52-week open label extension phase." FDA-10998 (emphasis added).

- On May 22, 2018, FDA drafted an "[a]ddendum" to its May 18, 2018 review. FDA-10995. Once more, FDA concluded that "*per ICH M3(R2)*, the available nonclinical data supports clinical trials up to 3 months in duration, but does not support the 52-week open label extension phase submitted in clinical protocol amendment 6." *Id.*

- On May 24, 2018, FDA sent Vanda a letter reiterating that "FDA advised you to submit the study report from a chronic toxicology study of 9 months duration in a non-rodent species, *per ICH M3(R2)*, prior to conducting a clinical trial exceeding 3 months in duration." FDA-10192 (emphasis added).

- FDA's notes from an April 23, 2018 meeting with Vanda identify that the request to dispense with a 9-month nonrodent test would require a "waiver" from FDA policy, which FDA declined to grant. FDA-10157; *see also* FDA-10170 (same); FDA-10180 (same).

- On December 3, 2018, FDA's Office of New Drugs sent a memorandum to the Members of the Medical Policy Council regarding "the adequacy of the nonclinical program to support a 52-week clinical trial with tradipitant." FDA-10900. The Division concluded that, "*[p]er ICH M3(R2)*, clinical trials longer than 6 months in duration, such as the proposed 12-month clinical trial, should be supported by 6-month and 9-month toxicity studies in rodents and non-rodents." FDA-10904. The Division continued that allowing a 52-week study "would not be aligned with the FDA/ICH M3 (R2) guidance." *Id.*

- The MPPRC held a meeting on December 19, 2018. The meeting Powerpoint slides state in bold, red font that "*[p]er International Council for Harmonization (ICH) Guidance M3(R2)*, the conduct of this proposed 12-month clinical trial is <u>not</u> supported by the currently available nonclinical studies." FDA-10890 (first emphasis added). The next slide presented the "ICH M3(R2) Guidance for Toxicity Studies." FDA-10891.

- The MPPRC meeting minutes reference "FDA's adoption of the ICH guidance recommendations," which establishes FDA's policy "that nonrodent studies of 9 months duration are needed" for clinical trials extending beyond 3 months in duration. FDA-10871.

15

- That same day, December 19, 2018, FDA communicated its decision to Vanda. In a memorandum summarizing the call, FDA noted that "[t]he Division's determination that non-rodent toxicity studies of 9-months duration *are required per the ICH M3(R2)* was endorsed by a unanimous Medical Policy and Program Review Council (MPPRC)." FDA-10878 (emphasis added).

- In response to Vanda's arguments during that teleconference that "a chronic non-rodent toxicology study was not necessary," "FDA restated that *the requirement* for 9-month non-rodent toxicology studies, as outlined *in the ICH M3(R2) guidelines*, is evidence-based and not specific to a class of drugs or a single development program"—in other words, no exceptions. FDA-10878 (emphases added).

The record is clear: *every* internal analysis and external communication by FDA leading up to the partial clinical hold articulated one reason—and one reason only—for the agency's action: The ICH Guidance, FDA concluded, created a binding obligation on Vanda. It is no surprise, then, that FDA's partial clinical hold document identified a single reason why the agency imposed the hold on Vanda's further clinical trials of tradipitant—according to the hold letter, 9-month nonrodent studies "*are required* for the conduct of your proposed clinical investigations . . . *per the ICH Guidance.*" FDA-10185 (emphasis added).

An FDA memorandum written the next day, December 20, 2018, summarized the basis for the partial clinical hold: Vanda was told "that clinical studies longer than 3 months . . . are not supported by the sponsor's nonclinical toxicology program, *based on the ICH M3(R2) Guidance*." FDA-10882. Citing FDA's broad regulations, FDA "advised the sponsor . . . to submit satisfactory results from a chronic toxicology study of 9-months duration in a non-rodent species, *per ICH M3(R2) guidance*." FDA-10885. That same decision memorandum, under the heading "The Division Recommendation," states: "*Per ICH M3(R2)*, clinical trials longer than 6 months in duration, such as the proposed 12-month clinical trial, should be supported by 6-month and 9-month toxicity studies in rodents and non-rodents, respectively." FDA-10885 (emphasis added). What is more, this memorandum underscored the "focus[]" of the MPPRC discussion regarding the issue: "the FDA regulatory support of the ICH M3(R2) guidance." FDA-10885.

Nothing in FDA's letter to Vanda imposing a partial clinical hold—or in FDA's internal memorandum memorializing the reason for the hold—identified *any* alleged safety signal with

16

respect to tradipitant. FDA imposed the clinical hold because it treats the ICH Guidance as binding.

### B. The ICH Guidance is a legislative rule.

The ICH Guidance, as announced and applied by FDA, is a legislative rule requiring notice and comment. Because the APA "broadly defines an agency rule to include nearly every statement an agency may make" (*Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980); *see* 5 U.S.C. § 551(4)), the ICH Guidance is undoubtedly a "rule" within the meaning of the statute. The only question is whether it falls into one of the narrow exceptions to notice-and-comment rulemaking set out in Section 553—"interpretative rules, general statements of policy, [and] rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). In all circumstances, "the APA's notice and comment exemptions must be narrowly construed." *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989). Here, no exceptions apply, and the ICH Guidance is a "legislative" or "substantive" rule. *Mendoza*, 754 F.3d at 1020-1021.

#### 1. *The ICH Guidance is not an interpretive rule.*

"To fall within the category of interpretive, the rule must derive a proposition from an existing document whose meaning compels or logically justifies the proposition. The substance of the derived proposition must flow fairly from the substance of the existing document." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010). By contrast, a rule that "effectively amends a prior legislative rule" is itself legislative. *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34-35 (D.C. Cir. 2005). The ICH Guidance falls on the legislative side of this spectrum.

To begin, neither the guidance itself nor the Federal Register notice adopting it purported to interpret anything. *See generally* ICH Guidance, FDA-10905 to FDA-10934; *2010 Notice*, 75 Fed. Reg. at 3,471-3,472. That alone cuts strongly against finding the guidance an interpretive rule. *See Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (finding FDA "notice" was a legislative rule in part because it "does not purport to construe any language in a relevant statute or regulation; it does not interpret anything"). To the extent that FDA argues the guidance is an interpretation of the regulatory requirement for "[a]dequate information about . . . toxicological

17

studies" (21 C.F.R. § 312.23(a)(8)), such a contention would run contrary to both general principles of administrative law and the history of the specific IND regulations at issue.

As the D.C. Circuit has explained, the critical question is whether the supposed interpretive rule "derive[s] a proposition from an existing document whose meaning compels or logically justifies the proposition." *Catholic Health Initiatives*, 617 F.3d at 494. But "if the relevant statute or regulation consists of vague or vacuous terms . . . the process of announcing propositions that specify applications of those terms is not ordinarily one of interpretation, because *those terms in themselves do not supply substance from which the propositions can be derived.*" *Id.* (emphasis added; quotation marks omitted); *see also id.* (listing "fair and equitable," "just and reasonable," and "in the public interest" as such content-less statutory standards); *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 588 (D.C. Cir. 1997) ("If the statute or rule to be interpreted is itself very general, using terms like 'equitable' or 'fair,' and the 'interpretation' really provides all the guidance, then the latter will more likely be a substantive regulation."), *abrogated on other grounds*, 135 S. Ct. 1199 (2015).

That is precisely the case here: There is no way to derive a 9-month nonrodent-study requirement from the general statutory directive to supply "[a]dequate information about . . . toxicological studies" (21 C.F.R. § 312.23(a)(8)) through a process that can fairly be called interpretation. The general word "adequate" supplies no substance that can be distilled down to an uncompromising 9-month nonrodent-study mandate. *See Catholic Health Initiatives*, 617 F.3d at 496 ("[T]here is no way an interpretation of 'reasonable costs' can produce the sort of detailed—and rigid—investment code set forth in [the supposed interpretive rule]."). Instead, the ICH Guidance "supplements [the] statute" and "effects a substantive change in existing law or policy," and is therefore a legislative rule. *Mendoza*, 754 F.3d at 1021; *see also id.* at 1023 ("Rather than *interpreting* an existing statute or regulation, the [rules in question] endeavor to *implement* the statute, the effect of a legislative rule.") (emphasis added; quotation marks and alteration omitted).

That is especially so because the ICH Guidance attempts to substitute a strict numerical threshold for the general "adequa[cy]" standard actually present in the regulations. And "when an

18

agency wants to state a principle in numerical terms, terms that cannot be derived from a particular record, the agency is legislating and should act through rulemaking." *Catholic Health Initiatives*, 617 F.3d at 495 (quotation marks omitted). The leading case of *Hoctor v. USDA*, 82 F.3d 165 (7th Cir. 1996)—relied on by the D.C. Circuit in *Catholic Health Initiatives*—illustrates why.

In *Hoctor*, the USDA had promulgated legislative regulations providing that various wild animals had to be kept in enclosures "of such material and of such strength as appropriate for the animals involved." 82 F.3d at 167-168 (quoting 9 C.F.R. § 3.125(a)). The agency later issued a memorandum supposedly interpreting that regulation, requiring all "dangerous animals" to be kept within "a perimeter fence at least eight feet high." *Id.* at 168. Patrick Hoctor kept his lions and tigers in a facility whose perimeter fence was only six feet high, and the agency cited him. *Id.*

Writing for the Seventh Circuit, Judge Posner held that the eight-foot fence requirement could not be an interpretive rule, because that number, while perfectly reasonable, "represent[ed] an arbitrary choice among methods of implementation" of the regulation's general security requirement. *Hoctor*, 82 F.3d at 170. The problem was not that the eight-foot value was arbitrary "in the 'arbitrary or capricious' sense," but rather that a different number could just as easily have been chosen: "There is no way to reason to an eight-foot perimeter-fence rule as opposed to a seven-and-a-half foot fence or a nine-foot fence or a ten-foot fence. None of these candidates for a rule is uniquely appropriate to, and in that sense derivable from, the duty of secure containment." *Id.* at 170. And "[w]hen agencies base rules on arbitrary choices they are legislating, and so these rules are legislative or substantive and require notice and comment rulemaking." *Id.* at 170-171; *accord Catholic Health Initiatives*, 617 F.3d at 495-96 (relying on *Hoctor* to hold that a numerical threshold was not an interpretive rule, because "it is impossible to give a reasoned distinction between numbers just a hair on the OK side of the line and ones just a hair on the not-OK side"); *United Steel Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 88 (D.D.C. 2015) ("[N]umerical-based rules are susceptible to arbitrary selection and, when an agency arbitrarily selects a number, the agency engages in a legislative function.").

The same holds true here: "There is no way to reason to" a 9-month dog-study "rule as

opposed to" an 8-month or 10-month rule. *Hoctor*, 82 F.3d at 170. As in *Hoctor* and *Catholic Health Initiatives*, the 9-month nonrodent-study requirement is not "uniquely appropriate to, and in that sense derivable from," the requirement that toxicology studies be "[a]dequate" (21 C.F.R. § 312.23(a)(8)), and therefore cannot be an interpretive rule. FDA's own analysis here indicates its view that "chronic nonrodent toxicity studies of 9-12 months duration" are "important." FDA-10871. FDA's selection of a 9-month duration is a legislative rule.[4]

The nature of the ICH Guidance underscores this conclusion. The ICH has never sought to interpret the meaning of a U.S. domestic regulation. From the beginning, the purpose of the ICH has been to render a policy judgment that brings international consistency. The organization aims "to achieve greater harmonisation"—international standardization of requirements—"to ensure that safe, effective, and high quality medicines are developed and registered *in the most resource-efficient manner*." ICH, *Mission: Harmonisation for Better Health* (last visited June 24, 2019) (emphasis added), perma.cc/DVA8-FGVY. In other words, as relevant here, the "[p]urpose of ICH" is to "[p]revent[] . . . unnecessary duplication of clinical trials" by consolidating the previously disparate testing requirements of the American, European, and Japanese regulatory agencies so that pharmaceutical manufacturers can conduct a single set of trials that will be valid in all three jurisdictions. ICH, *Overview of ICH* 4 (June 2019), perma.cc/Y3Y2-5MZF.

The ICH's task, then, was to choose a unified standard from a range of reasonable options represented by the member countries' prior practices—precisely the kind of "reasonable but arbitrary" policy choice that is legislative in nature and therefore requires notice and comment to legitimately bind the public. *Catholic Health Initiatives*, 617 F.3d at 495 (quoting *Hoctor*, 82 F.3d at 170). Indeed, the FDA representative who participated in the ICH meetings that led to the original guidance described the process as more political than scientific: "Science is only 30 percent

---

[4]   Neither *Hoctor* nor *Catholic Health Initiatives* held that "an interpretive rule can *never* have a numerical component." *Catholic Health Initiatives*, 617 F.3d at 495 (emphasis added) (quoting *Hoctor*, 82 F.3d at 171). Instead, the teaching of those cases is that when an agency substitutes a bright-line numerical value for an undefined statutory or regulatory standard, it is much more likely to be making the sort of "reasonable but arbitrary" policy judgment that requires public notice and an opportunity for comment. *Hoctor*, 82 F.3d at 170. That is exactly what happened here.

20

or 40 percent. The political power—there were agreements, and then there were quid pro quos and then there were all kinds of things that I didn't realize." NIH, *Dr. Joseph Contrera Oral History Interview*, 27 (Dec. 18, 2003), tinyurl.com/yxrddbj6. Political "quid pro quos" do not form part of a process that may be "reasonably described as interpretation." *Hoctor*, 82 F.3d at 170.

The arbitrary nature of the 9-month requirement—in the sense that it just as easily could have been some other duration—is made even plainer by the fact that *one of the ICH's signatories has chosen to require a different number of months*. By the terms of the ICH Guidance, 9-month dog studies are required generally, but "[i]n the EU, studies of 6 months' duration in nonrodents are considered acceptable." ICH Guidance, FDA-10917 & tbl. 1, n.d. That the world's second-largest economy has gone with a different standard demonstrates that the specification of 9 months in the ICH Guidance is not an objective scientific requirement but a choice between at least two different alternatives, neither of which is uniquely appropriate. This choice is an exercise of legislative, not interpretive, authority. *E.g.*, *Catholic Health Initiatives*, 617 F.3d at 494-496.

Moreover, the history of the only regulatory text the guidance could be interpreting—the requirement of "[a]dequate . . . toxicological studies" in 21 C.F.R. § 312.23(a)(8)—confirms that the 9-month dog-study requirement "effectively amend[ed]" that "prior legislative rule" and is therefore legislative. *U.S. Telecom Ass'n*, 400 F.3d at 34-35. When FDA adopted its IND regulations in 1987, it specifically declined to impose "specific . . . toxicological testing requirements" in the face of comments "urg[ing] the adoption" of such standards:

> As noted above, the regulation is intended to describe in general terms an appropriate format and content for the initial IND submission. Because of the dynamism and complexity of the scientific issues involved, *the agency does not believe that it would be either feasible or wise to specify in the regulation detailed, substantive pharmacology and toxicology testing requirements*.

*New Drug, Antibiotic, and Biologic Drug Product Regulations*, 52 Fed. Reg. 8,798, 8,812 (Mar. 19, 1987) (emphasis added). By imposing a specific and inflexible 9-month nonrodent-study requirement when the actual regulation explicitly declined to do so, FDA's adoption of the ICH Guidance "effects a substantive change" in those regulations, and is therefore a legislative rule.

21

*U.S. Telecom Ass'n*, 400 F.3d at 35; *see also, e.g.*, *Neb. Dep't of Health & Human Servs. v. HHS*, 340 F. Supp. 2d 1, 18 (D.D.C. 2004) ("A policy that adds a requirement not found in the relevant statute and regulation is a substantive rule.").

As the D.C. Circuit put it, "the purpose of the APA would be disserved if an agency with a broad statutory command . . . could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation . . . and then invoking its power to interpret that statute [or] regulation in binding the public to a strict and specific set of obligations." *Elec. Privacy Info. Ctr.*, 653 F.3d at 7. But that is just what FDA has done here. The ICH Guidance is a legislative rule.

### 2. The ICH Guidance is not a general statement of policy.

"The question raised by the policy exception 'is whether a statement is . . . of present binding effect'; if it is, then the APA calls for notice and comment." *Elec. Privacy Info. Ctr.*, 653 F.3d at 7 (quoting *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988)). The D.C. Circuit's cases "make clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding or is applied by the agency in a way that indicates it is binding." *Id.* (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)). In other words, "[i]f a document expresses a change in substantive law or policy (that is not an interpretation) which the agency . . . administers with binding effect, the agency may not rely upon the statutory exemption for policy statements, but must observe the APA's legislative rulemaking procedures." *Gen. Elec. Co.*, 290 F.3d at 382-383 (quotation marks omitted).

The ICH Guidance certainly "expresses a change in substantive law or policy." *Gen. Elec. Co.*, 290 F.3d at 382. As described above, by adopting the guidance, FDA has substituted a strict numerical threshold for the intentionally flexible approach embodied in the actual text of the governing regulation. *See supra* pp. 18-22. And it has done so in a way that substantively affects the rights and duties of the regulated public, requiring pharmaceutical manufacturers like Vanda to pay the costs (both economic and ethical) of 9-month dog studies without regard to whether such tests are scientifically justified in any individual case. *Cf., e.g.*, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) ("Legislative rules . . . grant

Case 1:19-cv-01108-LB Document 48-47 Filed 06/09/20 Page 33 of 56 PageID #:
Case 1:19-cv-00301-JDB Document 23-1 Filed 07/10/19 Page 32 of 55
1297

rights, impose obligations, or produce other significant effects on private interests.").

Moreover, as FDA's actions in this case confirm, the ICH Guidance "is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co.*, 290 F.3d at 383. When an agency relies on a document as if it were the law, that document cannot be a general statement of policy. *See Chamber of Commerce of U.S. v. U.S. Dep't of Labor*, 174 F.3d 206, 212 (D.C. Cir. 1999) ("The agency cannot apply or rely upon [a general statement of] policy as law because a general statement of policy only announces what the agency seeks to establish as policy."). Instead, "[w]hen the agency applies a general statement of policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (alteration incorporated). That is, "the agency must always stand ready to hear new argument and to reexamine the basic propositions undergirding the policy." *Bechtel v. FCC*, 10 F.3d 875, 878 (D.C. Cir. 1999).

Here, FDA has relied on the ICH Guidance as if it were law—repeatedly. As discussed above (at 14-17), FDA has continually made clear that its decision to impose the clinical hold was based on the ICH Guidance, and would not give credence to any of Vanda's arguments that the guidance's 9-month dog-study requirement should be relaxed in this individual case. *See, e.g.*, FDA-10185 (original partial clinical hold letter, reporting "the Division's determination that non-rodent toxicity studies of 9 months duration *are required* for the conduct of your proposed clinical investigations of 52 weeks (12 months) duration, *per the ICH Guidance*") (emphases added); FDA-10878 (minutes of December 19, 2018 teleconference with Vanda, recording that "FDA re-stated that *the requirement* for 9-month non-rodent studies, as outlined in the ICH M3(R2) guide-lines, is . . . *not specific to a class of drugs or a single development program*") (emphases added).

Especially telling is the FDA document memorializing a May 15, 2018 teleconference with Vanda, in which FDA informed the company of the "deficiencies" in its proposal for a 12-month trial of tradipitant in humans. *See* FDA-10990 to FDA-10991. With respect to the ICH Guidance, the document reflects that Vanda "stated that the 3-month dog study showed no adverse effects," and that "[t]herefore, given the totality of the results from the current non-clinical program,

23

[Vanda] did not believe that the 9-month dog study would add value." FDA-10990. In other words, Vanda "acknowledged the guidelines set forth in ICH M3 (R2)," but argued that the 9-month dog-study requirement logically should not apply to tradipitant. *Id.* But rather than responding to Vanda's arguments on the merits, "FDA advised that chronic toxicology studies in 2 species ***is a requirement, not a recommendation,*** prior to proceeding to long-term studies in humans." *Id.* (emphasis added). Instead of "stand[ing] ready to hear new argument and to reexamine the basic propositions undergirding" the policy embodied in the ICH Guidance (*Bechtel*, 10 F.3d at 878), FDA "rel[ied] upon [it] as law" (*Chamber of Commerce*, 174 F.3d at 212), "claim[ing] that the matter [was] foreclosed by" the guidance (*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978)). As this exchange demonstrates, the ICH Guidance "is applied by the agency in a way that indicates it is binding," and is thus a legislative rule. *Gen. Elec. Co.*, 290 F.3d at 383; *see also Neb. Dep't of Health*, 340 F. Supp. 2d at 18 (agency policy was a legislative rule because "the [agency] applied the policy . . . improperly as if it were law").

With this context, it is not especially probative that the ICH Guidance *says* it is nonbinding. *E.g.*, FDA-10911. As the Supreme Court recently reiterated, "[a]gencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019).[5] Instead, the D.C. Circuit has explained that "the agency's *application* of a disputed rule is crucial" to applying "the policy statement/substantive rule distinction." *Pub. Citizen, Inc. v. U.S. Nuclear Regulatory Comm'n*, 940 F.2d 679, 682-683 (D.C. Cir. 1991) (emphasis added) (collecting cases); *see also McLouth*, 838 F.2d at 1321 ("*More critically* than EPA's language adopting the model, its later conduct applying it confirms its binding character.") (emphasis added). And as just described, FDA's application of the ICH Guidance strongly "indicates it is binding." *Gen. Elec. Co.*, 290 F.3d at 383.

---

[5] *See also CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) ("[T]he agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the 'force of law,' but the record indicates otherwise."); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (declining to give legal effect to agency document's "boilerplate" statement that the document was "intended solely as guidance . . . and cannot be relied upon to create any rights enforceable by any party").

24

Case 1:19-cv-01108-JDB Document 48-47 Filed 06/09/20 Page 35 of 56 PageID #: 1299

Nor does the tiny bit of discretion built into the document render the ICH Guidance non-binding for purposes of the policy exception. *See* ICH Guidance, FDA-10916 ("In circumstances where significant therapeutic gain has been shown, trials can be extended . . . on a case-by-case basis."). Per the D.C. Circuit, "stringent substantive commands are not removed from section 553 because they have some provision for discretionary waiver." *Guardian Fed.*, 589 F.2d at 667; *see also id.* at 667 n.33 ("In general, a discretionary waiver provision is not sufficient to qualify an otherwise nondiscretionary regulation as a 'general statement of policy.'"); *McLouth*, 838 F.2d at 1321. As this case illustrates, the ICH Guidance in practice binds the conduct of the regulated industry in all but the exceptional case. It is not a general statement of policy.

### 3. The Guidance is not a rule of agency organization, procedure, or practice.

This category includes rules that do not "alter the rights or interests of parties," but merely "alter the manner in which the parties present themselves or their viewpoints to the agency." *Elec. Privacy Info. Ctr.*, 653 F.3d at 5 (quoting *Chamber of Commerce*, 174 F.3d at 211); *see also id.* (procedural rules do not "impose new substantive burdens"). Moreover, this exception in particular "is narrowly construed, and cannot be applied where the agency action trenches on substantial private rights and interests." *Mendoza*, 754 F.3d at 1023 (citation and quotation marks omitted). FDA's adoption of the ICH Guidance "alter[s] the rights" and "trenches on [the] . . . interests" of pharmaceutical manufacturers like Vanda by requiring a 9-month dog study whether or not it is justified by the facts of the individual case. *See id.* at 1024 (Department of Labor guidance that "set the bar for what employers must do to obtain approval" was a legislative rule). The ICH "Guidance" is in fact a substantive, legislative rule.

### C. FDA did not use notice-and-comment rulemaking.

Because it is a legislative rule, the ICH Guidance is void because FDA did not use the notice and comment procedures required by the APA. *See Mendoza*, 754 F.3d at 1020-1021.

"To meet the rulemaking requirements of section 553 of the APA, an agency must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaning-fully." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019). As noted above, FDA

25

published a notice "announcing the availability" of the draft ICH Guidance and soliciting public comments, but that notice explicitly stated that the guidance "does not operate to bind FDA or the public," and that "[a]n alternative approach may be used if such approach satisfies the requirements of the applicable statutes and regulations." *2008 Notice*, 73 Fed. Reg. at 51,491. The notice "announcing the availability" of the final ICH Guidance contained the same proviso. *2010 Notice*, 75 Fed. Reg. at 3,471-3,472.[6] A notice announcing the availability of a non-binding guidance document certainly does not provide an opportunity for "interested parties to comment meaningfully" (*Nat'l Lifeline*, 921 F.3d at 1115) on the possibility that the agency will apply the policies embedded in that document as if they were binding law—but this record reveals that that is exactly what FDA has done. *See supra* pp. 14-17. The notices disseminating the ICH Guidance as a nonbinding recommendation cannot save the guidance—applied as a binding rule—from invalidation.

## II.    AS A PROCEDURAL MATTER, FDA'S REMAND RESPONSE CANNOT REHABILITATE THE PARTIAL CLINICAL HOLD.

After Vanda's lawsuit identified FDA's unlawful reliance on the ICH Guidance, FDA asked for—and this Court granted—a second bite at the apple. *See* Dkt. 11. Whereas FDA's partial clinical hold letter contained barely a page of reasoning (FDA-10184 to FDA-10185), the Remand Response spans 22 pages. *See* FDA-11106 to FDA-11127. It is filled with material and argument that never previously appeared in the agency's extensive evaluation of the clinical hold. The Court should disregard these arguments for three, independent reasons. *First*, they reflect improper post hoc rationalizations and pretext. *Second*, FDA failed to consider substantial evidence that cuts against its preferred conclusion. *Third*, Vanda has had no meaningful opportunity to respond.

One particular aspect of FDA's remand conduct deserves special attention. During the remand, Vanda and the Humane Society supplied FDA with additional evidence demonstrating that the dog testing FDA seeks to compel would not have any scientific value. FDA refused to include

---

[6]    Because FDA has said, expressly, that the ICH Guidance is not binding, it does not warrant any deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2416-2417 (2019) (citing *Exelon Generation Co. v. Local 15, Int'l Bhd. of Elec. Workers*, 676 F.3d 566, 577-578 (7th Cir. 2012)). When an agency has "disclaimed the use of regulatory guides as authoritative or binding interpretations of its own rules," no deference is proper. *Exelon*, 676 F.3d at 577.

26

Case 1:19-cv-01108-JDB Document 48-47 2 Filed 06/09/20 0 Page 37 of 56 PageID #:
Case 1:19-cv-00301-JDB Document 23-1 Filed 07/10/19 Page 36 of 55
1301

this material in the administrative record, taking the position that, on remand, it did not reopen the record or reconsider its original decision. Yet, during the remand, FDA itself identified voluminous new evidence and entirely new rationales, all of which it relies on in the Remand Response.

FDA has boxed itself into an irrational corner. If it did not reopen the record, virtually all of the new argument and evidence contained in the Remand Response is impermissible post hoc rationalization and pretext. It must therefore be disregarded. If the agency did reopen the record and reconsider the issue, its failure to address the substantial evidence adverse to its conclusion renders the agency's conduct arbitrary and capricious.

In truth, during the remand, FDA did not reopen the record or reconsider its decision. In a letter, FDA said so directly. And that is confirmed by the procedures used on remand.

### A.     The Remand Response is post hoc and pretextual.

1.   It is axiomatic that "[a] court may not accept an agency's '*post hoc* rationalizations' for its decisionmaking." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 647 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)); *accord, e.g.*, *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015) (noting "the foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action"); *Kisor*, 139 S. Ct. at 2417 ("[A] court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack.'"). The same holds true even when a court remands to an agency for further proceedings: "Post-hoc rationalizations by the agency on remand are no more permissible than are such arguments when raised by appellate counsel during judicial review." *Food Mktg. Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C. Cir. 1978).

This Court recently explained the proper inquiry in such a situation: "[W]hen faced with an explanation offered for the first time on remand, a court must determine whether it is an 'amplified articulation' of the agency's prior reasoning (which must be considered), or instead 'a new reason for why the agency *could* have' taken the action (which must be disregarded)." *NAACP v. Trump*, 315 F. Supp. 3d 457, 466 (D.D.C. 2018) (Bates, J.) (quoting *Alpharma, Inc. v. Leavitt*, 460

27

F.3d 1, 6 (D.C. Cir. 2006)). To be valid, "an agency's further explanation on remand 'must be more than a barren exercise of supplying reasons to support a pre-ordained result.'" *Id.* (quoting *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 217 n.8 (D.C. Cir. 2013)).

Applying this test in *NAACP*, the Court held that one of the agency's rationales on remand was an impermissible post-hoc rationalization, since "[n]othing in the [original agency memoranda] even remotely parallels" the new argument. 315 F. Supp. 3d at 466-67; *see also id.* at 467 ("[T]he Court will decline to consider the Nielsen Memo's 'messaging' rationale, which appears for the first time on remand and is therefore impermissibly *post hoc*.").

2.  During the remand in this case, FDA neither reopened the record nor reconsidered its original decision. In a letter to Vanda, FDA said so directly: "Through the voluntary remand motion, FDA sought 'to take further action with respect to the *original agency decision on review*.'" Harlow Ltr. (Ex. B) at 1. As the agency explained, "FDA did *not* indicate that it would reopen the evidentiary record; rather, FDA stated it would more fully respond to Vanda's previous submissions related to the partial clinical hold." *Id.* FDA thus refused to include in the record submissions that, according to the agency, fall "outside the temporal scope of the record." *Id.* at 2-3.

This is confirmed by the procedural history. FDA issued the partial clinical hold in December 2018 only after putting the issue to its policymaking body, the MPPRC. *See*, *e.g.*, FDA-10864 to FDA-10868; FDA-10870 to FDA-10872; FDA-11111.[7] Through the MPPRC, the decision to impose the partial clinical hold was made by CDER's most senior leadership. This included, among several others, Janet Woodcock (CDER's Director), Peter Stein (Director, Office of New Drugs), and Jacqueline Corrigan-Curay (Director, Office of Medical Policy). *See* FDA-10872. The reasons the MPPRC gave for the clinical hold thus constitute "the agency's 'authoritative' or 'official position,'" as it "emanate[d] from those actors, using those vehicles, understood to make authoritative policy in the relevant context." *Kisor*, 139 S. Ct. at 2416.

---

[7]  The MPPRC "provides a senior-level forum to establish medical policy in CDER." *See* Ctr. for Drug Evaluation and Research, *Program Description* 1 (effective Sept. 6, 2017), tinyurl.com/yyg2k7pz. "[T]he policy established by the Council will be applied to all similar products." *Id.* at 2; *see also* FDA-11111 (similar).

Following the remand, the record does not indicate that the MPPRC ever met to reevaluate its earlier decision. *See* FDA-11106. Rather, on remand, lower-level FDA officials tried to justify the decision that senior leadership had already made. *See* FDA-11127.

3. As a result, the Court should disregard virtually everything contained within the Remand Response. Nothing in FDA's partial clinical hold letter "even remotely parallels" the arguments proffered by the agency in its Remand Response; those arguments are, at best, "new reason[s] for why the agency *could* have" issued the hold, and must therefore be "disregarded." *NAACP*, 315 F.3d at 466-47. What is more, the pretextual nature of the Remand Response is apparent: it is "a barren exercise of supplying reasons to support a pre-ordained result." *Id*.

As we described in detail (at 14-17), the underlying record shows beyond dispute that the sole reason FDA supplied to justify the hold prior to litigation was the ICH Guidance. In particular, this was the reasoning adopted by the MPPRC: the memorandum memorializing the reason for the partial clinical hold identifies that "[t]he Division's regulatory action follows meeting with and receiving advice from the Agency's Medical Policy and Program Review Council (MPPRC), ***whose members unanimously confirmed the ICH M3(R2) Guidance requirement for a non-clinical, non-rodent chronic toxicity study of 9 months*** to support clinical trials with tradipitant beyond 3 months of duration." FDA-10864 (emphasis added). Additionally, MPPRC's "discuss[ion] focused on the FDA regulatory support of the ICH M3(R2) guidance." FDA-10867.

FDA's documents, drafted prior to this lawsuit, make clear that the clinical hold was not based on the other rationales supplied in the Remand Response. Neither the alleged safety signals nor scientific evidence regarding dog studies ever factored into FDA's decision.

*Alleged safety signals*. The Remand Response's invocation of alleged safety signals with respect to tradipitant (FDA-11116 to FDA-11120) is naked post hoc rationalization.

The Remand Response asserts that there were safety concerns with casopitant, another "NK-1 receptor antagonist." FDA-11119 to FDA-11120. It cites various casopitant-related documents, which FDA has inserted into the administrative record. *See* FDA-10752 to FDA-10782; FDA-11048 to FDA-11640. But nothing in the partial clinical hold letter—nor the memorandum

29

justifying it—said anything about casopitant whatsoever. We have searched the whole of the administrative record, and, prior to the Remand Response, not a single document addressed casopitant. This reason was invented for litigation.

Likewise, the Remand Response asserts that safety signals were identified in a 3-month tradipitant dog study (FDA-11117) and a 13-week study in Han Wistar rats (FDA-11118). But FDA's partial clinical hold letter did not address either issue (FDO-10185), nor was either concern identified in FDA's memorandum explaining why FDA imposed the partial clinical hold (FDA-10864 to FDA-10868).

To be sure, the meeting notes from the MPPRC identify that "*the nonclinical staff*" suggested that "drug-related toxicities were observed in the 6-month rat (liver, thyroid, kidney) and 3-month dog (liver, thyroid) studies." FDA-10871. (This is a different rat study.) *But see* FDA-10900 to FDA-10904 (briefing memorandum provided to MPPRC members for that meeting, stating nothing about adverse toxicity findings but repeatedly invoking the ICH Guidance). A single sentence on one slide presented to the MPPRC identified weight changes in dogs. FDA-10875. But the MPPRC did not adopt this as a basis for its partial clinical hold; the "Discussion" section of this memorandum never mentions these alleged safety signals. FDA-10871 to FDA-10872. The memorandum memorializing the clinical hold explained that the MPPRC based its decision on the ICH Guidance, not (in whole or part) on any safety signal. FDA-10867.

In fact, when FDA conveyed the clinical hold to Vanda, FDA said it was *not* based on tradipitant-specific factors. In response to Vanda's renewed contention that a lengthy nonrodent study was inappropriate in the context of tradipitant, "FDA restated that the requirement for 9-month non-rodent studies, as outlined in the ICH M3(R2) guidelines, is evidence-based and ***not specific to a class of drugs or a single development program***." FDA-10878 (emphasis added). Indeed, it would have been surprising if the MPPRC had believed there to be a safety issue: FDA previously and repeatedly approved human trials of tradipitant, while evaluating this very same evidence. *See* FDA-10902; FDA-10196 to FDA-10199 (safe to proceed letter).

The alleged safety signals do not, therefore, qualify as "amplified articulation" of FDA's

decisionmaking. *NAACP*, 315 F. Supp. 3d at 466 (quoting *Alpharma*, 460 F.3d at 6). They are wholly new arguments, never endorsed by the MPPRC. This reasoning and accompanying evidence must be disregarded as impermissible post-hoc rationalizations. *Id.* at 466-67; *see also, e.g.*, *California v. U.S. Dep't of Labor*, 306 F. Supp. 3d 1180, 1189 (E.D. Cal. 2018) ("The [agency] must support its decision based on reasons articulated at the time of the first denial order."). FDA "cannot rely on new reasons that it now articulates for the first time." *NAACP*, 315 F. Supp. 3d at 461; *see also Michigan*, 135 S. Ct. at 2710; *California*, 306 F. Supp. 3d at 1189.

*Scientific literature.* The same result is proper for the citations to scientific literature that comprise the other half of the Remand Response. *See* FDA-11120 to FDA-11124. All but one of the studies upon which the Remand Response relies (*see* FDA-11121 to FDA-11123 & nn.47-58) are cited nowhere else in FDA decisional documents. The sole exception—the 1999 DeGeoge *et al.* study—is cited in the original clinical hold letter, but not as the basis for the clinical hold. Rather, FDA cites the study as "summariz[ing]" "[t]he rationale to support *the ICH requirement* for the 9-month duration." FDA-10185 (emphasis added) (citing Joseph J. DeGeorge *et al.*, *The Duration of Non-Rodent Toxicity Studies for Pharmaceuticals*, 49 Toxicological Sci. 143 (1999)); *see also* FDA-10708 to FDA-10720 (reproducing the DeGeorge study). The clinical hold was based on "the ICH requirement," not on the science that FDA now cites.

In other words, the rationale that FDA actually supplied for the hold (that the ICH Guidance requires 9-month dog studies) is different entirely than the rationale advanced in the remand response (the assertion that 9-month dog studies reflect sound science). The Remand Response presses the latter argument while attempting to minimize the former, but only the ICH Guidance-based reasoning actually appears in the record of FDA's decisionmaking. And the "good science" rationale is not an amplified articulation of FDA's earlier rationale—it is a different argument altogether. Like FDA's newfound tradipitant-specific reasoning, the Remand Response's scientific literature argument "appears for the first time on remand and is therefore impermissibly *post hoc*." *NAACP*, 315 F. Supp. 3d at 467.

To put the same point in a slightly different vernacular, both rationales appearing in the

Case 1:19-cv-01108-JDB Document 48-47   Filed 06/09/20   Page 42 of 56 PageID #:
Case 1:19-cv-00301-JDB   Document 23-1   Filed 07/10/19   Page 41 of 55
1306

Remand Response are pretextual, and for that reason are insufficient to support the partial clinical hold. As the Supreme Court recently held, agency action cannot be sustained when "the evidence tells a story that does not match the explanation the [agency] gave for [its] decision." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019); *see also id.* (noting "a significant mismatch between the decision the Secretary made and the rationale he provided"); *id.* ("We are presented . . . with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process."). The "story" that the evidence tells here is that FDA issued the partial clinical hold because it treated the ICH Guidance as binding law—which is exactly what the agency explained to Vanda the first time around. *See* FDA-10185 (original partial clinical hold letter). In the Remand Response, FDA has replaced that rationale with arguments about scientific evidence and tradipitant-specific toxicity results, but the "significant mismatch" between those arguments and the decisionmaking process revealed by the administrative record renders them pretextual. *Dep't of Commerce*, 139 S. Ct. at 2575.

Whether construed as pretext or as post-hoc rationalization, the arguments advanced in the Remand Response cannot support the partial clinical hold. Contrary to what FDA says now, the hold was imposed because—in the agency's own words—FDA believes that the 9-month nonodent-study mandate of the ICH Guidance "is a requirement, not a recommendation." FDA-10990. And *that* rationale, as we have explained (*see supra* pp. 14-26), violates the APA.

**B.     FDA has failed to consider and respond to adverse evidence.**

The Remand Response is independently arbitrary and capricious because FDA has failed to address the significant scientific evidence cutting against its preferred conclusion.

1.   To survive arbitrary-and-capricious review, "an agency cannot ignore evidence contradicting its position." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (quoting *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)); *see also, e.g.*, *id.* ("[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation."); *Tesoro Alaska Petroleum Co. v. FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("The Commission's failure to respond meaningfully to the evidence renders its decisions arbitrary

Case 1:19-cv-01108-JDB Document 48-47  Filed 06/09/20  Page 43 of 56 PageID #:
Case 1:19-cv-00301-JDB  Document 23-1  Filed 07/10/19  Page 42 of 55
1307

and capricious."); *New Life Evangelistic Ctr., Inc. v. Sebelius*, 672 F. Supp. 2d 61, 74 (D.D.C. 2009) ("An agency errs when it ignores contradictory relevant evidence regarding a critical factor in its decision.").

2.  As we have said (*see* pages 14-17, *supra*), the Remand Response rests almost entirely on the submission of evidence and argument that never previously appeared in the record. As we have explained, that is reason enough to declare FDA's action unlawfully arbitrary and capricious. If, however, FDA *did* reopen the record to lodge that evidence, the additional material supplied by Vanda and the Humane Society must also be part of the reopened record. *See* A.R. Mot. 5-9.

The Humane Society of the United States sent FDA a letter attaching several scientific studies. *See* Ex. G. CDER Director, Janet Woodcock, responded, "[w]e will take your comments into account and evaluate the studies you reference." Woodock Email (Ex. M) at 1. Each study undercuts the Remand Response's assertion that 9-month nonrodent studies "are the accepted scientific minimum." FDA-11120.

- Jarrod Bailey *et al.*, *An Analysis of the Use of Dogs in Predicting Human Toxicology and Drug Safety*, 41 ALTA 335, 340 (2013) ("This analysis of the most comprehensive quantitative database of publicly-available animal toxicity studies yet compiled, suggests that dogs are highly inconsistent predictors of toxic responses in humans, and that the predictions they can provide ***are little better than those that could be obtained by chance***—or tossing a coin—when considering whether or not a compound should proceed to testing in humans.") (emphasis added) (Ex. C);

- Nina Hasiwa, *Critical Evaluation of the Use of Dogs in Biomedical Research and Testing in Europe*, 28 ALTEX 326, 332 (2011) ("[W]hen the correct definitions of sensitivity, specificity and likelihood ratio are used, the data provide no statistically credible evidence that these animal models [dogs and monkeys] contribute any predictive value.") (Ex. H);

- David Smith *et al.*, *Preclinical Safety Evaluation Using Nonrodent Species: An Industry/Welfare Project to Minimize Dog Use*, 43 ILAR J. S39 (2002) (discussing "scientifically valid and feasible approaches to minimize dog use" without "compromis[ing]" "human safety") (Ex. I);

- Jarrod Bailey *et al.*, *Predicting Human Drug Toxicity and Safety via Animal Tests: Can Any One Species Predict Drug Toxicity in Any Other, and Do Monkeys Help?*, 43 ATLA 393, 400 (2015) ("[T]hese data, and our analyses, suggest strongly that a lack of toxicity in any species cannot be reliably used to imply a probable lack of toxicity in any other species.") (Ex. J);

33

- Jarrod Bailey & Michael Balls, *Recent Efforts to Elucidate the Scientific Validity of Animal-Based Drug Tests by the Pharmaceutical Industry, Pro-Testing Lobby Groups, and Animal Welfare Organisations*, 20 BMC Med. Ethics 16 (2019) (summarizing prior research concluding that "animal tests provide essentially no additional confidence in the outcome for humans, but at a great ethical, and financial, cost") (Ex. K);

- Houman Savoji *et al.*, *Cardiovascular Disease Models: A Game Changing Paradigm in Drug Discovery and Screening*, Biomaterials, 2, 56 (2018) (proposing "a roadmap for employing . . . non-animal platforms in assessing drug cardiotoxicity and safety," since "[c]urrent animal models . . . are incapable of fully recapitulating human physiology and pathophysiology, and thus imprecisely predict the biology and mechanisms involved in human cardiac dysfunctions") (Ex. L).

FDA does not address—or even so much as mention—this evidence in the Remand Response.

Similarly, Vanda's original complaint in this action brought some of the same scientific literature to FDA's attention, along with additional studies making similar points. *See* Dkt. 1 ¶ 105 & nn.28-29 (citing Bailey *et al.* (2013), *supra* (Ex. C); Robert A.J. Matthews, *Medical Progress Depends on Animal Models—Doesn't It?*, 101 J. Royal Soc'y Med. 95, 96-97 (2008) (describing the "serious difficulties for those seeking to show that the value of animal models is supported by quantitative evidence rather than anecdote") (Ex. E); Jarrod Bailey *et al.*, *An Analysis of the Use of Animal Models in Predicting Human Toxicology and Drug Safety*, 42 ATLA 181, 196 (2014) (Ex. D) ("These results suggest that testing in the dog or the rabbit contribute essentially no additional confidence in the outcome, but at considerable extra cost, both in monetary terms and in terms of animal welfare.")). But despite obtaining a remand "to address certain procedural issues Vanda noted in its Complaint, including the allegations about the agency's response to scientific arguments submitted by Vanda" (Dkt. 6-1, at 2), FDA does not mention these studies, either.

3.  FDA also "ignore[s] evidence contradicting its position" (*Genuine Parts Co.*, 890 F.3d at 312) that is undisputedly part of the *pre-remand* administrative record.

Vanda has repeatedly cited to FDA (*see* FDA-10956 & n.58; FDA-10974 & n.54) a paper surveying several evaluations of dog testing, showing overwhelming evidence that long-term dog tests do not yield probative results. *See* Werner Kobel *et al.*, *A 1-Year Toxicity Study in Dogs Is No Longer a Scientifically Justifiable Core Data Requirement for the Safety Assessment of Pesticides*, 40 Critical Reviews in Toxicology 1, 11 (2010) (Ex. X). That study concluded that "the

34

weight of evidence based on all of the reviews together . . . allows the clear conclusion that a 12-month dog study in addition to a 3-month study is of little value." *Id*. It continued that, "[i]n the entire databases . . . there are at most 3-4% of compounds in which the results of at 12-month dog study may have influenced a reference dose." *Id*. The agency has never once responded.

What is more, several of the articles that FDA itself provides in the record *refute* FDA's position—but FDA does not evaluate any of the relevant material. The Parkinson *et al.* study (*see* FDA-10721 to FDA-10729) is directly contrary to the agency's discussion of "the accepted scientific minimum" in the Remand Response. FDA-11120. The authors analyzed 117 compounds "to determine what new toxicological information was provided by the dog in chronic (6 months or longer) toxicity testing." FDA-10721. They found that "only 11% of the compounds in the analysis . . . showed salient effects in the dog later than 3 months which were not identified in the short-term dog study or in the rat studies," and that "[i]n *no cases* did this additional toxicological information result in termination of the compound's development." FDA-10728 (emphasis added). The authors therefore concluded that the study "has shown that the majority of information provided by long-term studies in the dog does little more than confirm effects seen in shorter-term studies in the dog or in studies in the rat," and that "*these results question the scientific basis of the routine requirement for chronic toxicity studies* in this valuable nonrodent species." *Id.* (emphasis added). The Remand Response cites this article, but only for the anodyne (and unforthcoming) proposition that "studies conducted in [the] early to mid-1990s compared 6- versus 12-month studies and reached different conclusions regarding the durations of nonrodent toxicity studies." FDA-11122.

Next, another study in the record, this one by Broadhead *et al.* (*see* FDA-10700 to FDA-10707), reports the results of a different survey of 174 new pharmaceutical compounds. Of those 174 drugs, for only 5—that is, less than three percent—did a dog study longer than 3 months reveal some toxicity signal that neither a shorter dog study nor a rat study had turned up. FDA-10701 at tbl. 2. Moreover, a panel of experts found that "an approach that would use two species in short-term studies and a single species (that is deemed to be the most appropriate) in longer-term studies" would be "worth exploring," in contrast to the ICH's two-species chronic study requirement. FDA-

10704. Finally, one of the study's "main conclusions" was that "*there [is] not sufficient convincing evidence* in the published literature to support or refute regulatory requirements for the routine use of the dog" (FDA-10700 (emphasis added))—in stark contrast to FDA's assertion that 9-month nonrodent studies are "the accepted scientific minimum" (FDA-11120). Yet the Remand Response cites Broadhead only to support its claim that "nonrodents frequently reveal toxicity that is not seen in rodents (and vice versa)." FDA-11114.[8]

In short, FDA in its Remand Response has simply "ignore[d] contradictory relevant evidence regarding a critical factor in its decision" (*New Life Evangelistic Ctr*, 672 F. Supp. 2d at 74)—and that is so even apart from Vanda's and the Humane Society's submissions to the agency on remand. The Remand Response is therefore arbitrary and capricious, and cannot support the partial clinical hold. *Id.*; *Genuine Parts Co.*, 890 F.3d at 312; *Tesoro Alaska*, 234 F.3d at 1294.

### C. FDA's tradipitant-specific reasoning is procedurally arbitrary and capricious.

Finally, FDA's inclusion in the Remand Response of reasoning specific to tradipitant, including the discussion of casopitant (FDA-11119 to FDA-11120), the 3-month dog study (FDA-11117), and the 13-week Han Wistar rat study (FDA-11118), is arbitrary and capricious because Vanda has had no opportunity to contest those assertions before the agency. In order for agency action to satisfy the APA's substantial evidence and arbitrary-and-capricious standards—which are substantively identical (*see, e.g.*, *Crooks v. Mabus*, 845 F.3d 412, 423 (D.C. Cir. 2016))—

---

[8] The Dellarco *et al.* study in the record (*see* FDA-10515 to FDA-10523) similarly found that for pesticides, "[l]onger-duration studies (e.g., 1 year) in the dog do not result in appreciably lower NOAELs or identify new toxic effects for the majority of chemicals when compared to the shorter-duration 13-week study in this species." FDA-10521. FDA responds with an attempt at slight-of-hand, stating that "the fact that EPA takes a different approach to regulating pesticides is neither relevant nor persuasive here." FDA-11125. But Vanda's point in submitting the pesticide studies was not simply that EPA has eliminated long-term dog studies from its pesticide testing regimen; it was that the pesticide studies demonstrate that long-term dog studies do not routinely result in different NOAELs from 3-month dog studies—and the setting of a NOAEL is a shared purpose of toxicology testing across *both* regulatory domains. *See, e.g.* FDA-11115 (Remand Response, explaining that "[t]oxicity studies of subchronic and chronic duration are . . . used to establish a drug's no-observed-adverse-effect-level (NOAEL), the highest level of drug exposure that is not associated with an adverse effect (toxicity) of the drug").

"interested parties must have an opportunity 'to introduce adverse evidence and criticize evidence introduced by others.'" *La. Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1115 (D.C. Cir. 1992); *cf. Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 571 F.3d 69, 87 (D.C. Cir. 2009) ("[Petitioners] could hardly challenge a theory first presented in the [agency's] determination and not advanced by any participant.").

Here, every communication Vanda received from FDA prior to the Remand Response indicated that the partial clinical hold was imposed solely on the basis of the ICH Guidance. *See supra* pp. 14-17. Vanda therefore had neither an "opportunity" nor any reason "to introduce adverse evidence" before the agency as to the clinical relevance of the supposed safety signals identified in the Remand Response, or to "criticize [the] evidence" proffered by FDA. *La. Ass'n*, 958 F.2d at 1115. This too requires vacatur of the partial clinical hold.

Additionally, FDA has relied on studies about casopitant that were not in the public record, and that Vanda therefore *could not have even accessed*, much less predicted, prior to the Remand Response. *See* FDA-11119 to FDA-11120. It is unlawful for FDA to base its adverse agency action against Vanda on information that Vanda could not obtain, and thus could not have its own experts critique for the record. *See Chamber of Commerce of U.S. v. SEC*, 443 F.3d 890, 904-05 (D.C. Cir. 2006) (holding that agency acted improperly in relying on material public could not predict).

## III.  AS A SUBSTANTIVE MATTER, THE REMAND RESPONSE CANNOT REHABILITATE THE PARTIAL CLINICAL HOLD.

Finally—and independently—the arguments in the Remand Response are substantively arbitrary and capricious. "Agency action is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Nat'l Lifeline*, 921 F.3d at 1110 (quoting *State Farm*, 463 U.S. at 43). An agency also "acts arbitrarily and capriciously when it offers inaccurate or unreasoned justifications for a decision." *Envtl. Def. Fund v. EPA*, 922 F.3d 446, 454 (D.C. Cir. 2019). While this standard

37

is narrow, the reviewing court is "not a 'rubber stamp'" and "must ensure that the agency considered all of the relevant factors." *Oceana, Inc. v. Ross*, 920 F.3d 855, 863 (D.C. Cir. 2019); *cf. Dep't of Commerce*, 139 S. Ct. at 2575 ("Our review is deferential, but we are not required to exhibit a naiveté from which ordinary citizens are free.") (quotation marks omitted).

Arbitrary-and-capricious review is more searching than normal here, where the agency has "'arrive[d] at substantially the same conclusion' on remand as it did in the prior proceeding." *Shands Jacksonville Med. Ctr., Inc. v. Azar*, 366 F. Supp. 3d 32, 48 (D.D.C. 2018); *see also id.* ("[T]he reviewing court 'will accord a somewhat greater degree of scrutiny . . . recogniz[ing] the danger that an agency, having reached a particular result, may become so committed to that result as to resist engaging in any genuine reconsideration of the issues.'"); *accord Level the Playing Field v. FCC*, __ F. Supp. 3d __, 2019 WL 1440883, at *2 (D.D.C. Mar. 31, 2019) (similar).

### A. FDA's evaluation of the probative value of 9-month dog studies is arbitrary and capricious.

The Remand Response's discussion of the science supposedly supporting a 9-month dog-study requirement reveals decisionmaking that is arbitrary and capricious on multiple levels.

#### 1. FDA has failed to analyze the predictive power of nonrodent studies.

First, the agency has "entirely failed to consider an important aspect of the problem." *Nat'l Lifeline*, 921 F.3d at 1110. Specifically, FDA's assertion that a 9-month dog study is always necessary "to assess the risks to [human] subjects of [] proposed studies" (21 C.F.R. § 312.42(b)(1)(iv)) proceeds on an unexamined premise: that long-term toxicity studies in animals are sufficiently predictive of human toxicity that such studies are indispensable. *Cf.* FDA-11112 (Remand Response, stating that "[c]hanges that are detrimental to the animal . . . serve as an indication that the drug has the potential to induce adverse effects (i.e., toxicities) in humans"). As FDA is well aware, sound science requires assessing the predictive power of diagnostic or other tests—like the chronic nonrodent toxicity tests at issue here—using statistical tools such as "sensitivity and specificity pairs," "likelihood ratio," and "[p]ositive and negative predictive value." *See* FDA, *Guidance for Industry and FDA Staff: Statistical Guidance on Reporting Results from*

Case 1:19-cv-01108-bB301 Document 48-47 Filed 06/09/20 Page 49 of 56 PageID #:
Case 1:19-cv-00301-JDB Document 23-1 Filed 07/10/19 Page 48 of 55
1313

*Studies Evaluating Diagnostic Tests* (Mar. 13, 2017), tinyurl.com/y56vgb3h. These measures describe how good a test is at predicting what it is supposed to predict—here, whether a new chemical compound will be toxic in humans at the relevant dose. *Id.*

There is a robust scientific literature explaining how these measures apply to—and what they reveal about—the predictive value of animal toxicology testing. *See, e.g.*, Bailey *et al.* (2013), *supra*, at 335-340 (Ex. C) (discussing the proper statistical tools to measure predictive value of toxicity studies, applying likelihood-ratio analysis to toxicology tests in dogs, and concluding that "the fact that a compound shows no toxic effects in dogs provides essentially no insight into whether the compound will also show no toxic effects in humans").[9]

FDA's Remand Response fails entirely to apply these accepted scientific tools to demonstrate the predictive value of chronic nonrodent toxicity studies. Indeed, it provides no discussion of predictive power at all, instead simply taking for granted that "changes that are detrimental to the animal . . . serve as an indication" that the compound is toxic in humans as well. FDA-11112. But the question whether animal studies effectively predict toxicities in humans is "an important aspect of the problem" the Remand Response was supposed to consider. *Nat'l Lifeline*, 921 F.3d at 1110. Rather than marshalling scientific and statistical evidence to make a case for such a proposition, the Remand Response elides that discussion entirely.

And because it does not even bother to address the quantitative predictive value of animal

---

[9] *See also* Thomas M. Monticello *et al.*, *Current Nonclinical Testing Paradigm Enables Safe Entry to First-In-Human Clinical Trials: The IQ Consortium Nonclinical to Clinical Translational Database*, 334 Toxicology & Applied Pharmacology 100, 102-103 (2017) (Ex. Q) (discussing statistical measures relevant to determine the impact of animal toxicology testing in predicting human clinical outcomes); Niall Shanks *et al.*, *Are Animal Models Predictive for Humans?*, 4 Philosophy, Ethics, & Human. in Med. 2, 5-8 (2009) (Ex. R) (explaining the application of predictive-power statistics to animal models and concluding that "animals are not predictive" of results in humans); Matthews, *supra*, at 96-97 (Ex. E) (explaining application of likelihood-ratio analysis to the "[p]redictive value of animal models"); Harry Olson *et al.*, *Concordance of the Toxicity of Pharmaceuticals in Humans and in Animals*, 32 Regulatory Toxicology 56, 58-59, 61-62 & fig. 7 (2000) (Ex. S) (laying out approach to evaluating concordance between animal and human toxicity, and concluding that "94% of animal target organ toxicities correlated with [human toxicities] were first observed in studies less than or equal to 1 month in duration"); A.R. Mot. 6-10 (explaining why these studies are properly part of the record).

39

studies, the Remand Response also "entirely fail[s] to consider" the further question of whether whatever predictive value they *do* provide is enough to justify the costs of the studies—not just costs in dollars and in ethically questionable animal sacrifice, but in the increased *human* suffering caused by delayed and abandoned therapies for conditions, like gastroparesis, that pose an unmet medical need. For example, one study found that for a hypothetical drug that is 70% likely to be free from human toxicities, a negative dog test may only increase the probability that the drug is nontoxic to 72%. Bailey *et al.* (2013), *supra*, at 340 (Ex. C). Is this 2% increase in confidence worth requiring time-consuming and destructive 9-month dog studies in every case? We do not know, because FDA has "entirely failed to consider" this "important aspect of the problem." *Nat'l Lifeline*, 921 F.3d at 1110. Once more, the Remand Response is arbitrary and capricious.

### 2. *The Remand Response misinterprets the evidence.*

Additionally, the Remand Response misunderstands or misinterprets the evidence that it does cite to support its claim that 9-month nonrodent studies are "the accepted scientific mini-mum." FDA-11120; *see, e.g.*, *Envtl. Def. Fund*, 922 F.3d at 454 ("An agency acts arbitrarily and capriciously when it offers inaccurate or unreasoned justifications for a decision.").[10]

FDA begins with the 1990s investigation by DeGeorge *et al.* that led to the creation of the ICH Guidance, stating without context "[i]n 83% of the case studies" the researchers "identified toxicities in 12-month studies that were not observed in 6-month studies" or that "increased in severity or occurred at a lower dose in the 12-month studies." FDA-11121. But FDA declines to mention that the pool of studies DeGeorge and his colleagues analyzed was cherry-picked; in fact "*[o]nly those cases were included* that were judged, by FDA assessors, to demonstrate significant toxicological differences in 6- and 12-month studies." DeGeorge *et al.*, *supra*, at 144, FDA-10709 (emphasis added). That 83% of a non-representative sample displayed a trait proves nothing, es-pecially when the sample was selected on the basis of that very trait. And in any event, an ICH

---

[10]    As explained above (at 20-21), the ICH Guidance's 9-month requirement is in fact not a "sci-entific" standard at all, but a regulatory compromise among reasonable options—necessitated pre-cisely by the fact that there *is no* single accepted scientific standard.

Case 1:19-cv-01108-JDB Document 48-47 Filed 06/09/20 Page 51 of 56 PageID #:
Case 1:19-cv-00301-JDB Document 23-1 Filed 07/10/19 Page 50 of 55 PageID #:
1315

document describing this study warns that "[a]n agreement on the clinical relevance"—that is, the relevance to humans—"of these findings could not be reached." *See International Conference on Harmonisation; Draft Guidance on the Duration of Chronic Toxicity Testing in Animals (Rodent and Nonrodent Toxicity Testing); Availability*, 62 Fed. Reg. 61,513, 61,515 (Nov. 18, 1997).

The Remand Response next turns to a study apparently undertaken by "a multidisciplinary expert working group under ICH" between 2006 and 2009—but the agency's citation for this study's conclusions is a four-sentence summary in an unrelated article, which contains no specific results and makes clear that the ICH study was "unpublished." *See* FDA-11122 & nn.53-54; FDA-10506. FDA cannot "articulate . . . a rational connection between the facts found and the choice made"—as required to survive arbitrary-and-capricious review, (*e.g.*, *Shands Jacksonville Med. Ctr.*, 366 F. Supp. 3d at 48)—if it discloses nothing about the study on which it relies. *Cf. Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015) ("[A]n agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data is arbitrary."). And in any event, according to the ICH presentation cited by the Remand Response (*see* FDA-11122 & nn.53-54), this study found that "6 months in non-rodents (primarily dogs) is usually but not always sufficient." FDA-10532. If the study found that 6-month studies are "usually . . . sufficient," it is hard to see how FDA can rationally cite it as evidence that 9-month studies are "the accepted scientific minimum" (FDA-11120).

Finally, the Remand Response cites a 2015 study by the pharmaceutical company Merck. *See* FDA-11122. But that analysis does not demonstrate clinical relevance, because the findings in the few chronic dog studies that showed additional toxicities were never confirmed in humans. *See generally* FDA-10475 to FDA-10479. Moreover, even this study's authors noted that "the vast majority of toxicity findings are observed in subchronic studies." FDA-10478.

When viewed in light of the clear evidence that the ICH Guidance's 9-month requirement is a regulatory compromise rather than a number derived through science (*see supra* pp. 20-21); and the affirmative evidence that chronic nonrodent studies are of dubious utility both in uncovering new toxicities and in predicting human outcomes (*see supra* pp. 33-36, 38-40); these scattered

41

Case 1:19-cv-01108-JDB Document 48-47 Filed 06/09/20 Page 52 of 56 PageID #: 1316

and self-contradictory pieces of support add up to nothing more than an "inaccurate or unreasoned justification[]" for the Remand Response's assertion that 9-month nonrodent studies are the "accepted scientific minimum." *Envtl. Def. Fund*, 922 F.3d at 454; FDA-11120. That assertion is thus substantively arbitrary and capricious in addition to its procedural failings.

## B.    FDA's newfound analysis of safety signals is arbitrary and capricious.

FDA's analysis of alleged safety signals fails for two reasons—it lacks any standard, and it is arbitrary and capricious with respect to its reading of the underlying evidence.

### 1.    *The Remand Response is impermissibly standardless.*

FDA's conclusion that the prior toxicity studies of tradipitant show signs that render existing evidence not "[a]dequate" to evaluate the risks of clinical trials (21 C.F.R. § 312.23(a)(8)) is utterly standardless. The only standard FDA has ever asserted is the ICH Guidance, which was the basis of the decision here. Once the ICH Guidance is set aside, FDA cannot demonstrate how it reached the conclusion that, "[b]ased on Vanda's own data, the risks of long-term tradipitant use in humans cannot be predicted by the studies conducted to date." FDA-11119. FDA fails to articulate *when* a toxicity study requires follow-up testing, as well as *why* that follow-up should be a 9-month study in dogs. FDA has no standards governing what renders a prior test result noteworthy, what that means with respect to *human* safety, and when that triggers more study.

That is a problem for FDA, because "[a]dministrative action is 'arbitrary and capricious [if] it fails to articulate a comprehensible standard' for assessing the applicability of a statutory category." *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 753 (D.C. Cir. 2015) ("[T]he Commission's Order is arbitrary and capricious because it fails to articulate a comprehensible standard for the circumstances in which a change to mail preparation requirements such as the one in this case will be considered a 'change in rates.'"); *Dithiocarbamate Task Force v. EPA*, 98 F.3d 1394, 1402 (D.C. Cir. 1996) (vacating "as arbitrary and capricious" agency action that "tends to turn [the agency's] application of [a regulatory standard] into an exercise in totally standardless discretion"). Here, FDA has "fail[ed] to articulate a comprehensible standard for the circumstances in which" toxicity

findings in three-month animal trials render those results "[in]adequate" to assess the safety of a longer-term clinical study. *U.S. Postal Serv.*, 785 F.3d at 753-54; 21 C.F.R. § 312.23(a)(8).

Put slightly differently, FDA has not "articulate[d] . . . a rational connection between the facts found and the choice made." *Shands Jacksonville Med. Ctr.*, 366 F. Supp. 3d at 48. The agency has found the facts (the supposed safety signals in the tradipitant data) but has jumped straight to the decision (the existing toxicity studies are inadequate), without supplying the "rational connection" between the two—*i.e.*, what does it *mean* for toxicity studies to not be "adequate"? *Why is it* that the minor toxicity findings set out in the Remand Response mean that "the risks of long-term tradipitant use in humans cannot be predicted"? FDA-11119. Without that missing link, FDA's decision is arbitrary and capricious.

### 2.       *The Remand Response misinterprets the evidence.*

Second, and independently, the Remand Response misreads the underlying data—as confirmed by FDA's prior finding, based on the same evidence, that earlier clinical trials were "safe to proceed." FDA-11109 (Remand Response); *see also* FDA-11045 (non-clinical review).

The centerpiece of the Remand Response's analysis in this respect is the weight loss observed in dogs taking large quantities of tradipitant in a 3-month toxicity study. *See* FDA-11117. The FDA reviewer determined based on this weight loss that the no-observed-adverse-event-level (or NOAEL) should be set at the medium dose administered to the dogs in the study, rather than the high dose that was associated with the weight loss. *Id.* What the Remand Response does not disclose, however, is that a previous FDA reviewer had looked at the exact same 3-month dog-study results, and had "agreed with the sponsor that ***no significant adverse effects were noted in this study*** and the NOAEL was identified as the [high dose]." FDA-10839 (emphasis added). We do not yet know that previous reviewer's reasoning, because FDA has excluded the prior review from the administrative record. A.R. Mot. 3-5.[11] But the very fact that FDA failed to consider its

---

[11]    We asked FDA to include the earlier review within the administrative record. FDA responded: "Although Dr. Wang's review in turn acknowledged a September 2, 2005 review by Dr. Chalecka-Franaszek, Dr. Chalecka-Franaszek's review was not considered by the agency for purposes of the

43

Case 1:19-cv-01108-LB Document 48-47 Filed 06/09/20 Page 54 of 56 PageID #: 1318

own reviewer's adverse conclusion—as to the central piece of evidence supposedly demonstrating tradipitant's lack of safety, no less—renders the Remand Response arbitrary and capricious. *Genuine Parts Co.*, 890 F.3d at 312 ("[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation"); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009) (agency must "display awareness that it *is* changing position. An agency may not . . . depart from a prior policy *sub silentio*.").

In any event, FDA has failed to explain how setting an NOAEL at the medium dose provides evidence of a potential safety issue at the human therapeutic dose, or why a 9-month canine study is the appropriate means to clarify this finding.[12] Regardless of which of the conflicting FDA review opinions is correct, FDA has still provided no reasoning to support its conclusion that a decrease in weight gain demonstrates the need for a chronic toxicity study in non-rodents.

The Remand Response moves next to a passing discussion of a study in Han Wistar rats, in which liver toxicities were observed. FDA-11118. But, as the FDA reviewer faced with the very same data concluded, "[t]he adverse effects in the thyroid and liver of the rat may be species-specific and may not be relevant to humans. Therefore, based on the safety margin of the mouse and dog and previous human experience, from a nonclinical standpoint, the proposed [one-month] clinical trial ***appears to be safe to proceed***." FDA-11045 (emphasis added); *see also* A.P. Hall *et al.*, *Liver Hypertrophy: A Review of Adaptive (Adverse and Non-adverse) Changes*, 40 Toxicologic

---

partial clinical hold decision." Harlow Ltr. (Ex. B) at 2. In FDA's apparent view, it may selectively "consider[]" just the evidence it believes favorable to its preferred outcome.

[12] Even the medium dose in this study, which FDA agrees showed no adverse effects, was orders of magnitude larger than the proposed human dose. *Compare* FDA-10838 (medium dose was 275 mg/kg/day (*i.e.*, 275 milligrams, per kilogram of body weight, per day)), *with* FDA-08413 (proposing human dose of 85 milligrams, twice per day—equal to about 3 mg/kg/day for an 80-kilogram man). The purpose of toxicology testing is to establish margins of safety, not to demonstrate that a compound is safe at *any* dose—an impossible task. *See, e.g.*, FDA-10259 ("Virtually every known chemical has the potential to produce injury or death if it is present in a sufficient quantity.").

FDA's assertion that the 3-month dog study revealed weight loss that had not been seen in shorter studies (*see* FDA-11117) cannot fill this gap, since the 3-month study began showing statistically significant weight findings from the very first week. FDA-05148.

Pathology 971, 988 (2012) ("The consensus of opinion" on rat studies is that "hepatomegaly as a consequence of hepatocellular hypertrophy without histologic or clinical pathology alterations indicative of liver toxicity [is] considered to be an adaptive non-adverse change.") (Ex. T). This study—at most—suggests the need for more *rat* testing; FDA fails to connect it to a study in dogs. Indeed, testing proceeded in another strain of rats, Fischer rats, without adverse toxicity results. *See* FDA-10860 (FDA review of 6-month rat study). The evidence, at best, shows that one rat species does not predict another. This data provides no rational basis for the partial clinical hold.

FDA's discussion of casopitant (FDA-11119 to FDA-11120) is likewise arbitrary and capricious. FDA asserts that, "[b]ecause of safety concerns from toxicities observed in 39- and 52-week dog studies, drug development for casopitant was discontinued." FDA-11120. What FDA neglects to mention is that FDA itself *recommended* approval of casopitant for postoperative nausea and vomiting. FDA-11055. FDA did not recommend its discontinuation. And, to the extent that later dog studies showed alleged toxicity results, it was not a longer duration that revealed the results. Rather, FDA itself explains that the shorter-duration studies did not use the "[h]ighly sensitive measures of myocardial injury" (FDA-11615) that were used in the longer-term studies. Indeed, the alleged sign of toxicity was observed "as early as 15 days of treatment." FDA-11621.

## IV. THE COURT SHOULD VACATE THE PARTIAL CLINICAL HOLD.

The "normal[]" remedy for a violation of the APA is "a vacatur of the agency's order." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001). Vacatur is especially warranted where, as here, FDA has already had a first remand without vacatur. And that is doubly so given that the individual Plaintiffs are out of treatment options for this debilitating disease. *See supra* p. 9; Hartwig decl. (Ex. U). Time is of the essence for testing to continue and for these patients—and others like them—to regain access to the medicine that has already helped change their lives.

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Plaintiffs, vacate the partial clinical hold, and remand this matter to the agency.

45

Dated: July 10, 2019

Respectfully submitted,

*/s/ Paul W. Hughes*

Paul W. Hughes (D.C. Bar No. 997235)
  phughes@mwe.com
Michael B. Kimberly (D.C. Bar No. 991549)
Andrew A. Lyons-Berg (D.C. Bar No. 230182)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, D.C. 20001
(202) 756-8000 (office)
(202) 756-8087 (facsimile)