1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X
                                  :
TEAMSTERS LOCAL UNION NO. 727     : 19-CV-01108 (FB)
PENSION FUND, et al.,             :
                                  :
          Plaintiffs,             :
                                  : United States Courthouse
                                  : Brooklyn, New York
    -against-                     :
                                  :
                                  : Tuesday, January 14, 2020
                                  : 11:00 a.m.
VANDA PHARMACEUTICALS INC.,       :
 et al.,                          :
                                  :
          Defendants.             :
                                  :
- - - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE


A P P E A R A N C E S:

For the Plaintiffs:   ROBBINS GELLER RUDMAN & DOWD, LLP
                         58 South Service Road
                         Suite 200
                         Melville, New York 11747
                      BY: MICHAEL G. CAPECI, ESQ.
                          DAVID A. ROSENFELD, ESQ.


For the Defendants:   PAUL, WEISS, RIFKIND, WHARTON &
                         GARRISON, LLP
                         1285 Avenue of the Americas
                         New York, New York 10019-6064
                      BY: AUDRA J. SOLOWAY, ESQ.
                          BRAD D. FELDMAN, ESQ.
                          EMILY M. MILLER, ESQ.


Court Reporter:   Stacy A. Mace, RMR, CRR
                  Official Court Reporter
                  E-mail:  SMaceRPR@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
SAMUEL WILLIAMS,                    :19-CV-04293 (FB)
                                    :
          Plaintiff,                :
                                    :
                                    :United States Courthouse
     -against,                      :Brooklyn, New York
                                    :
                                    :
                                    :Tuesday, January 14, 2020
MIHAEL H. POLYMEROPOULOS,           :11:00 a.m.
et al.,                             :
                                    :
          Defendants.               :
                                    :
- - - - - - - - - - - - - - - X

     TRANSCRIPT OF CIVIL CAUSE FOR PRE-MOTION CONFERENCE
            BEFORE THE HONORABLE FREDERIC BLOCK
            UNITED STATES SENIOR DISTRICT JUDGE


                    A P P E A R A N C E S:

For the Plaintiff:    LEVI & KORSINSKY, LLP
                           55 Broadway
                           10th Floor
                           New York, New York 10006
                      BY:GREGORY M. NESPOLE, ESQ.
                           WILLIAM J. FIELDS, ESQ.


For the Defendants:   PAUL, WEISS, RIFKIND, WHARTON &
                      GARRISON, LLP
                           1285 Avenue of the Americas
                           New York, New York 10019-6064
                      BY:AUDRA J. SOLOWAY, ESQ.
                           BRAD D. FELDMAN, ESQ.


Court Reporter:  Stacy A. Mace, RMR, CRR
                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.


                 SAM    OCR    RMR    CRR    RPR

Proceedings                                     3

(In open court.)

THE COURTROOM DEPUTY:  All rise.

(Judge FREDERIC BLOCK entered the courtroom.)

THE COURTROOM DEPUTY:  Civil cause for a pre-motion conference, Gordon versus Vanda and Williams versus Polymeropoulos.

I ask the parties if you can state your appearances.

THE COURT:  You are going to speak mostly for the plaintiff?

MR. CAPECI:  The plaintiff in Gordon, yes, Your Honor.

THE COURT:  And you are going to be the main speaker?

MR. CAPECI:  Yes, Your Honor.  Michael Capeci.

THE COURT:  Are you sure you're up to it?

MR. CAPECI:  Yes, Your Honor.

THE COURT:  You didn't have coffee?

MR. CAPECI:  I didn't.  I didn't.

From Robbins Geller on behalf of the plaintiffs in the Gordon matter.

THE COURT:  Any other folks going to want to speak here?

MR. NESPOLE:  We have a different case.

THE COURT:  You are the other case, right.

MR. NESPOLE:  Greg Nespole from Levi & Korsinsky, on

Proceedings                                      4

the derivative case.

THE COURT:  Yes.

MR. ROSENFELD:  I would have said David Rosenfeld, also from Robbins Geller, on behalf of the plaintiff.

THE COURT:  And do you want to also log in your appearance, as well?

MR. FIELDS:  Will Fields on behalf of the plaintiff.

THE COURT:  It will be memorialized for the rest of your lives.

And the other side, the people who think that you should not be suing them, we have?

MS. SOLOWAY:  Audra Soloway from Paul Weiss.  And with area my colleagues Brad Feldman and Emily Miller.

MS. MILLER:  I'm Emily Miller.

THE COURT:  Now is Brad -- what is Brad's last name, the former general manager of Paul Weiss?

MS. SOLOWAY:  Karp, Brad Karp.

THE COURT:  Brad Karp.

MS. SOLOWAY:  He is still works there.

THE COURT:  He still works there.  He sent me a Christmas card, send him my best.

MS. SOLOWAY:  I will, Your Honor.

THE COURT:  I think I should disclose that, right?

I didn't get a Christmas card from you guys.  I have law clerks there.  I don't remember which ones are there right

Proceedings                    5

now, but I am sure there are a couple.

Who am I thinking of?

Anyway aside from that, I don't know if I have any law clerks with your law firm, do I?

MR. CAPECI:  I don't believe so, Your Honor.

THE COURT:  This is a big problem.

MR. ROSENFELD:  Your Honor, in full disclosure I did intern for Your Honor about 20 years ago.

THE COURT:  You did?

MR. ROSENFELD:  I did, during law school.

THE COURT:  I don't remember.  A summer internship?

MR. ROSENFELD:  No, actually during the year.

THE COURT:  You were here for a whole year?

MR. ROSENFELD:  No, no, one semester during law school like in the spring of 20 -- sorry of 2000 probably -- no, 1998.

THE COURT:  So my apologies because it was 20 years ago?

MR. ROSENFELD:  1998, a little longer.

THE COURT:  Obviously, it was very helpful to you, otherwise you wouldn't be here today.

MR. ROSENFELD:  Exactly, gave me great insight.

THE COURT:  So we are going to get a little serious now.

I think I am going to give you folks a little

Proceedings                                   6

opportunity to tell me a little bit about the case, and you can tell me a little bit about why you think that we should dismiss the case. I know there is two lawsuits here. And we will have a little bit of a record here. We will stake out your positions today so we will have something productive to do here.

MS. SOLOWAY: Sure.

THE COURT: And then when I get your papers, we are going to have to look at them, obviously. We get these cases all the time, no causation, no scienter.

It is not unusual when we have these big types of litigations to have the defendant's lawyer want to challenge the pleading. Sometimes they're successful. But I can't really, obviously, make any substantive decisions today, but you can tell me a little bit about your case and then when I get your papers, if I have any other concerns, I will call you back.

I like to just focus effectively on not using lawyer's times inappropriately. So I thought that this way we could make a little bit of a record, which I normally don't do on these informal conferences, but I thought this would be helpful to me when I get your papers. We will have a chance to see what your argument is. So, in effect, we are having oral argument in advance of the motion.

You're up. What is your case about?

You've got a big drug here.

MR. CAPECI:  Well, we have three, actually, Your Honor.  So we have a company who during the class period sold only two drugs.  The first is called Fanapt, and that's a drug that is FDA approved to treat schizophrenia in adults.

THE COURT:  What does it do for you?

MR. CAPECI:  To be perfectly honest, Your Honor, I've never taken it, so I don't know.

THE COURT:  What is it there for?  Maybe I should use it.

MR. CAPECI:  It's to treat schizophrenia.  It is to treat the symptoms of the disease schizophrenia.

THE COURT:  Interesting.

MS. SOLOWAY:  It's an anti-psychotic.

THE COURT:  It's an anti-psychotic drug.

MR. CAPECI:  So -- and then there are a couple of other things that are important on the FDA label.  It's approved as an only once -- sorry, as a twice daily drug and it's approved as a second line treatment.  And what that means is you are supposed to try another anti-psychotic first before using Fanapt, and the reason for that is because Fanapt has a black box label warning, which means that the FDA has determined that there is a serious side-effect associated with it.

THE COURT:  Well, the black box is the mandated FDA

warning that is required on the label.

MR. CAPECI:  Right.

And Fanapt has it because there is a serious risk of developing a side-effect known as QT prolongation.

THE COURT:  Let me stop you for one second.

I am working on the assumption, tell me if I'm wrong, that this case cannot be settled and it is not the type of case we can use mediation or some of our settlement mechanisms to try and see whether we can resolve the case, but I may be wrong.

MR. CAPECI:  Well, Your Honor, you know, in our client's interest we are always open and willing to hear the other side out.  You know, I certainly would never foreclose something like that.

THE COURT:  Well, that's speaking like a good lawyer, but I want to know realistically.  Because we have a lot of strings in our arrow here.  I can mandate mediation on every case.  I don't do that unless I feel that it is really warranted.  Some cases, even big cases, benefit by mediation or appointing a receiver.  It depends on the case, of course, but I want to explore here, since we are here informally, whether there is anything about that that we should talk about.

MR. CAPECI:  Well, look, Your Honor, the allegations in this case are of a higher quality than, I think, in most

SAM      OCR      RMR      CRR      RPR

Proceedings                                    9

securities fraud cases.  There's a qui tam case against the company and the relators in that case were actually two of the six managers of a large percentage of the sales representatives --

THE COURT:  What's the status of that case?

MR. CAPECI:  There's a fully briefed motion to dismiss in that case.

THE COURT:  Is that before me, too?

MR. CAPECI:  It is not before Your Honor.  It's in the District Court of Washington, D.C.

MS. SOLOWAY:  And I think it's important to point out, Your Honor, that the Government decided not to intervene in that case.

THE COURT:  Okay.  So you gals and guys have been pretty busy working on the orders, right?

Do you have time to go to the movies once in a while?

MS. SOLOWAY:  Yes, Your Honor.

THE COURT:  Are you able to work on any other cases or does this preoccupy all of this?

MS. SOLOWAY:  No, right now I would say I am busy on other matters, Your Honor.

THE COURT:  How about you folks here, do you have time to do other matters?

MR. CAPECI:  Yes, we do.  I state, in fairness, that

Paul Weiss is not representing Vanda in a lot of the other litigation that is going on.  I think that's accurate.

THE COURT:  They have other lawyers handling it?

MR. CAPECI:  Yes.

MS. SOLOWAY:  Correct.

THE COURT:  So you are looking for what type of relief?  Obviously, lots of money, I guess?

MR. CAPECI:  Well, yes, Your Honor.  We are looking for the damages that are provided under the federal securities laws.

THE COURT:  What do you think that would be in this case?

MR. ROSENFELD:  If I could just comment, Your Honor.  At this point it's premature.

THE COURT:  You just don't know enough.

MR. ROSENFELD:  It involves experts, but it's tens of millions of dollars, if not more.

THE COURT:  So I take it that there is really nothing to do today by mandating mediation and getting you folks to sit down collectively to see whether this could be resolved.  If I'm wrong, let me know.  Because we can do things here.

MR. ROSENFELD:  Your Honor, we are always happy to talk, as Mr. Capeci said.  I believe this is a particularly strong case on the merits, and --

Proceedings                                      11

THE COURT:  No, I don't mandate mediation unless there is a real practical reason to do it.  Okay?

I know you have a strong case.  They think you have a terrible case.  I get that.  I am just asking whether there's any value in getting a real professional mediator to sit down with you folks to see if you can resolve it.  The answer may be no.

MR. CAPECI:  Perhaps --

MR. ROSENFELD:  We're happy to talk.  We're always happy to talk.

These cases, ultimately, get resolved through mediation.  We believe, you know, these securities-type actions get resolved usually with the help of a private mediator that the parties engage.  We're happy to go down that road.  Whether it's now later on, we are always happy to talk.

THE COURT:  What do you folks think?

MS. SOLOWAY:  My take on that, Your Honor, is that at this stage of the case --

THE COURT:  It's premature?

MS. SOLOWAY:  -- it's premature.  And I could explain why.  I think there's a couple of critical issues.

You've dealt with these cases before and you know how high the pleading standards are.  Obviously, our view is this case doesn't meet those standards, but it's, I think, quite important that even if we turn out to be wrong, and I

SAM      OCR      RMR      CRR      RPR

don't think we will be, the case may well also get narrowed significantly on a motion to dismiss.  They effectively have multiple theories, and so I think after the motion to dismiss is decided --

THE COURT:  It will shake things out --

MS. SOLOWAY:  -- it will shake things out, I agree.

THE COURT:  -- and then you could come back again to talk.

All right, so anyway, go ahead.  Your theory here is that they did some terrible things that depleted the value of the stock, right?

MR. CAPECI:  That's right, Your Honor.  There are three drugs at issue.

The first drug, Fanapt, basically, the relators in the qui tam case have alleged that the company had trained its sales representatives to market the drug off-label.

And if Your Honor is familiar with off-label marketing, I won't belabor you with what that means.

THE COURT:  This may come as a surprise to you, but next week at about this time I will be sitting as a designated judge on the Ninth Circuit Court of Appeals.  We have a case called -- is it a patent case?

Exactly the same type of thing complaining about off marketing, you know, activity.

MR. CAPECI:  It is a securities case.

Proceedings                                13

THE COURT:  Big black box, yes, and it is just interesting how sometimes these things resonate now.

MR. CAPECI:  Sure.

So, the allegations that they have provided in their case, and that we verified with them personally, are quite strong.  They were the ones who -- they were two of the six managers for this drug.  They were -- they recount that the CEO was specifically involved, along with other senior executives, directing people to market this drug off-label in a variety of manners.

So one of the ways --

THE COURT:  Give me your primary reasons how they marketed it off-label.

MR. CAPECI:  Sure.

So, for one example the FDA said that it's only approved for adults.  The company was ensuring that the drug was marketed to child psychiatrists so that it would be prescribed to children.

THE COURT:  All right.

MR. CAPECI:  The second way --

THE COURT:  But they have the label, though; doesn't the label really cover all of that?

MR. CAPECI:  No, the label is limited to adults only.

THE COURT:  What do you say about that?

SAM     OCR     RMR     CRR     RPR

MS. SOLOWAY:  Your Honor --

THE COURT:  So their theory is that the black box label only addresses usage by adults and your bad people marketed it for children to pediatricians and to doctors, I guess, right?

MS. SOLOWAY:  So, first of all, there's an important difference between what companies are allowed to do and what doctors are allowed to do that this complaint ignores.

Doctors are allowed to prescribe medications off-label.  So if you are treating children, you may treat children and adults and you've tried other medications and you determine as a doctor in your judgment that you want to use a drug that's predominantly used for adults with children, doctors can do that.  So the mere fact that a doctor hears about a drug and is educated about a drug and can make their own choices does not, in and of itself, mean that the company has engaged in wrongdoing.

But I think there's a really important step that the plaintiffs are missing here -- actually, two important steps. One is the qui tam action is not actually an actionable claim on the basis of off-label marketing.  In order to prevail in the qui tam act, the relator has to prove both that the company off-label marketed and that the Government reimbursed prescriptions that were off-label prescriptions.  So there is multiple elements before you even get to a violation of law in

the qui tam action.  We have one further step.

THE COURT:  We're not dealing with the qui tam action here.

MS. SOLOWAY:  Well, that's actually where I was going, Your Honor.

The qui tam action is, in and of itself, a disputed allegation.  It's a disputed case.  It's at the early stages of a motion to dismiss.  The company denies liability.  The plaintiffs in that case are asserting claims, but none of that turns into securities fraud, Your Honor.

Securities fraud, as you know, is when a company or its management lie to their investors.  And here there are no allegations that demonstrate that management and the company acted with intent when they were speaking to their shareholders.  And so, even if, and I don't think they will be able to prove it, but even if there was an allegation, a properly pleaded allegation of off-label marketing that could then arise to Medicare or Medicaid fraud, which is what's at issue in the qui tam action, that does not mean that securities fraud happened.

THE COURT:  They could amend the complaint.

MS. SOLOWAY:  They have not.  And maybe they want to before we do a motion to dismiss.

THE COURT:  So, what we are going to do here for sure is that before I have to really roll up my sleeves and

dig into the case, I want to give you the opportunity to amend if you want to do it. Because what I want to do is I don't want to have to have an application to amend, if we can avoid it, after we write a 75-page opinion.

MS. SOLOWAY: Okay.

THE COURT: So if you want the right to amend, I will give it to you. We can do it right now. It is up to you. You know what their arguments are. You just heard her articulate it again. If you feel a little shaky and you want to amend the complaint to deal with that alleged missing allegation, I will give you the opportunity to do that. That's one of the things we can accomplish today. The call is yours.

MR. CAPECI: Sure, Your Honor. We're not shaky. I will tell you that we have some ongoing FOIA efforts that we're undergoing that are hard from a timing perspective to -- to corral. I can't -- you know, if we take the amendment now, it would be on a thirty or maybe a sixty-day basis.

THE COURT: Slow down.

MR. CAPECI: Sure.

THE COURT: If you want to amend, I will give you a chance to amend it. If this is the complaint you are comfortable with, you heard what she said just now, let me know one way or the other. But we are making a record here that I will give you the opportunity to amend, if you want to.

SAM        OCR        RMR        CRR        RPR

Proceedings                                      17

But if you don't and you try to amend later, you are going to have problems.

MR. CAPECI:  Understood.

THE COURT:  I can't say a hundred percent I will deny it, but you are going to be swimming uphill big time because I am giving you the chance now.

MR. CAPECI:  Would it be possible to have a few days to think about it?

THE COURT:  Yes, that is one of the things we can accomplish at these so-called informal discussions.

MR. CAPECI:  Thank you.

THE COURT:  So let me know by, do you want Friday?

MR. CAPECI:  Sure, that's fine.

THE COURT:  If you want to amend, you let me know and I will give you leave to amend.  I have the power to do that, right?

MR. CAPECI:  Right.

MS. SOLOWAY:  And I would be happy to confer that schedule, depending on whatever decision you make.

THE COURT:  We'll work that out.

MS. SOLOWAY:  Okay.

THE COURT:  Let's not get ahead of ourselves.

You are going to let us know by Friday.  And if you want to amend, I will give you the opportunity to amend.  And then you will have to re-evaluate whether or not you can

Proceedings                                         18

dismiss on the pleading, if there is a proper allegation, whether true or not.

We are not here to talk about that, right?

MS. SOLOWAY:  Understood.

THE COURT:  Because on 12(b)(6), most of the times we deny 12(b)(6)'s because it doesn't take much to plead.

MR. CAPECI:  Right.

THE COURT:  In securities fraud cases, the Second Circuit does take a closer look at it, on scienter mostly. So, you know, I am not going to be as concerned about discouraging you from bringing your 12(b)(6), mostly because it is a common type of thing in these types of case.  But I want to give you the opportunity to give me your best complaint.

MR. CAPECI:  Okay.

THE COURT:  You let me know by Friday.

MR. CAPECI:  Okay.

THE COURT:  What else?

MR. CAPECI:  Could I -- could I just say just a couple things in response to what counsel said?

THE COURT:  Yes.

MR. CAPECI:  It's, I don't think, accurate to say that we overlooked the distinction of what off-label marketing means in our complaint.  If you look at paragraphs 49 to 58 it says actually exactly what counsel just said to you.

Proceedings                                              19

The success or lack thereof of the qui tam complaint really has no bearing on the securities fraud allegations in our case.

THE COURT:  They're separate litigations here.

MR. CAPECI:  Yes, absolutely.

THE COURT:  I am concerned about this litigation.

MR. CAPECI:  But I just wanted to make that point clear.  And we do have significantly -- we have very strong scienter allegations in this case.  You know, the relators were managers of the company who directly interacted with the individual defendants and were told to market this drug off-label.  And there is also a second drug.

THE COURT:  Well, she may not be denying that.

I mean you agree that they were told to market it off-label?

MS. SOLOWAY:  Well, I think when you read the allegations of what purportedly constitutes off-label marketing, I think we could have a different view on that, but I don't think you are ever going to need to get there because the problem the plaintiffs have is that they have not pleaded that management that was actually responsible for speaking to investors and doing SEC filings acted with intent to defraud in their public statements.

The risk that there could be regulatory actions relating to things like qui-tam-type issues was disclosed, and

Proceedings                                    20

we believe those disclosures, to the extent they exist, were accurate and that they haven't identified a false statement that was made with intent to deceive investors.

THE COURT:  Okay, so we are shaping up the different arguments here.

MS. SOLOWAY:  Right.

THE COURT:  So this will be helpful for me to get a sense of things when I see your papers, right?

MS. SOLOWAY:  Got it, Your Honor.

THE COURT:  Now, anything else you want to say now in support of your case?

And then we will hear more from your opposition, and then I will have a little bit of a feel what this is all about.  You can get a copy of the record.  I am sure you will want to do that.  And at least we will be able to frame the issues today, deal with the pleading aspects of it, and whatever else you want to talk about I am hear to help you. Okay?

MR. CAPECI:  Sure.

So I just want to talk very quickly about the other two drugs.  The first other -- the other -- the second of the three drugs is called Hetlioz, H-E-T-L-I-O-Z.

And that is a drug that retails for over $200,000 a year and it is designed to treat Non-24.  That's what the FDA label says.  Non-24 is a condition that can be diagnosed by a

SAM        OCR        RMR        CRR        RPR

doctor.  It's a sleep disorder.  It occurs mostly, if not fully, in blind individuals.  The scientific literature says there is fewer than a hundred known individuals of -- sighted individuals with Non-24.  And so the off-label marketing for that drug, the company was pushing it onto anyone who had a sleeping problem, whether or not they had Non-24.

THE COURT:  What revenues did they derive from that drug?

MR. CAPECI:  So, they derived approximately in the beginning of the class period, the class period is four years, in the beginning of the class period about 50 percent Fanapt, 40 percent Hetlioz.  And by the end of the class period it had flipped to about 60 percent Hetlioz, 40 percent Fanapt.

THE COURT:  Is there a big market for these?  I'm sorry, for a total of?

MR. CAPECI:  Sure.  The company has been able, through their off-label marketing scheme, to develop a tremendous market for Hetlioz.  Most of the prescriptions they're writing, around 600 a year, are to sighted individuals.  Even though the scientific literature says that there are less than a hundred of them with Non-24.

THE COURT:  So we are not talking about multi millions of dollars here?

MR. CAPECI:  Multi, yes, Your Honor, yes, hundreds of millions.

THE COURT:  Hundreds of millions?

MR. CAPECI:  Yes, combined between the two drugs.

THE COURT:  There are a lot of uses for that?

MR. CAPECI:  Well, the company is trying to -- had instructed its sales representatives actually instead of marketing the drug to sleep doctors, they were marketing it to psychiatrists who wouldn't treat people with Non-24.  And the goal of that marketing effort was to get people, the doctors to prescribe Hetlioz for people who just simply had trouble sleeping, not for people who had Non-24.

THE COURT:  Okay.

What else, the other drug?

MR. CAPECI:  The other drug has nothing to do with off-label marketing.  The other drug is called Tradipitant, T-R-A-D-I-P-I-T-A-N-T.

THE COURT:  Why they can't find simple names for drugs?

MR. CAPECI:  Trust me, Your Honor --

MS. SOLOWAY:  I'll take that up with my client, Your Honor.

MR. CAPECI:  -- the later it gets at night, the more I keep misspelling all these names on my word processing.

So with Tradipitant, it's a drug that was in clinical trial testing and in May of 2018 the company was told that if they wanted to extend the current trial for this drug,

they had to do a safety test.  The drug had never been proven safe for use in humans.  So they said you have to do a nine-month safety test on animals before we allow you to extend the drug.  And if you don't do it, we're going to put a hold on the drug.

And the company said:  Okay; and they proceeded to not tell their investors that.  And then go back and forth with the FDA as to whether or not they would actually do the study.  The smaller study comes out as successful and the company says:  Hey, we're going to expand to a twelve-month study.  We're meeting with the FDA to talk about the fastest way to get to market.  And the FDA is telling them all along: We're going to put a hold on you if you don't do the study.

THE COURT:  Talk slower.

MR. CAPECI:  Sorry.

The company winds up not doing the study and the FDA slaps the hold on them.  And then the company sues the FDA. And the announcement of the disclosures of the lawsuit caused the stock to decline stub substantially by 20 percent.

THE COURT:  So you think that there is inappropriate pleadings with respect to that aspect?

MS. SOLOWAY:  Absolutely, Your Honor.

THE COURT:  Why?

MR. CAPECI:  I just want to say, Your Honor, that those allegations come from Vanda's own complaint against the

Proceedings                                    24

FDA in a pleading signed by their own lawyers.

THE COURT:  You have a very capable adversary here, so she is going to tell me why you are not correct.

MS. SOLOWAY:  So, Your Honor, over the course of the time period when the FDA and Vanda were going back and forth about Tradipitant, there was a back-and-forth dialogue between the FDA and Vanda about what types of clinical trials would be required to get to the next stage.

There was never an announcement that the FDA declined to approve the drug.  There was never an announcement that the drug wasn't effective.  This was all about -- the question was how many people do we need to test it on before we get to move to the next stage.  Vanda, and you'll see this in the pleadings, Your Honor, had a back-and-forth with the FDA about this.  Ultimately, they were unable to reach an agreement that Vanda agreed with and Vanda elected to bring a lawsuit against the FDA arguing that the FDA was not abiding by its own regulations.

THE COURT:  How about this lawsuit?

MS. SOLOWAY:  Yes.  Well, that's the question.  Why is that securities fraud?

Vanda had a back-and-forth with its regulator. Ultimately, they weren't able to agree.  Vanda initiated litigation.  That litigation is ongoing.  None of that is securities fraud, Your Honor.

Proceedings                          25

THE COURT:  Doesn't sound like it to me.

MR. CAPECI:  Well, so, Your Honor, if you could, in May of 2018 Vanda admits in their summary judgment brief that they were told that the safety study was a requirement not a recommendation, the FDA told them this, prior to proceeding in long-term studies in humans.

THE COURT:  That is the fraud?

MR. CAPECI:  Right.  And then in December they're telling investors:  Well, in fact, we have a twelve-month protocol, which we'll be implementing shortly.

Well, they never did the safety test, so how could -- how could that be a true statement if the company --

THE COURT:  Okay, it is in your pleading.

MR. CAPECI:  Right; sorry.

THE COURT:  You don't have to amend that.

MR. CAPECI:  Right.

THE COURT:  Anything else?  I don't have to keep you here a long time because I am not going to be deciding the case today.

MR. CAPECI:  Sure.

Your Honor, at the end of their letter they do talk a little bit about loss causation.  And very quickly, loss causation, you just ruled on this in the Sequans case.  And if I'm butchering that, Your Honor, I'm sorry.  S-E-Q-U-A-N-S.

They raised a whole host of factual issues of loss

SAM      OCR      RMR      CRR      RPR

causation.  It's not appropriate at a motion-to-dismiss stage.

THE COURT:  Most of the time you don't dismiss on loss causation allegations.

MS. SOLOWAY:  Your Honor, I appreciate that.  I think here they have a real problem, and I'm happy to explain why.

THE COURT:  We are trying to flesh out the issues, so everybody understands what the duty is.

Why is there a issue on loss causation?

MS. SOLOWAY:  So, on the first set of allegations, which have to do with the purported off-label marketing, the qui tam action, which is the basis for the plaintiff's claims, was publicly disclosed when it was unsealed.  The stock didn't drop.  It's not until more than, I think, about a week later when an analyst writes a pejorative report, a short seller analyst writes a pejorative report characterizing the qui tam allegation that there is any -- that the plaintiffs claim there is a stock price reaction.

As Your Honor knows, you know, if you're going to proceed as a plaintiff in a securities case, you're operating on the assumption that the markets are efficient and that they absorb information when that information becomes available. As long as the qui tam allegations were public a week before the stock price, that can't be the basis for a lawsuit.

And there are plenty of cases at the motion-to-

SAM      OCR      RMR      CRR      RPR

Proceedings                                    27

dismiss stage that say that.

THE COURT:  So, educate me again.

MS. SOLOWAY:  Yes.

THE COURT:  This qui tam lawsuit is pending in Washington?

MS. SOLOWAY:  It is, Your Honor, in the District of D.C.

THE COURT:  D.C. district?

MS. SOLOWAY:  Correct.

THE COURT:  So if we have that lawsuit, why do we need this one also?

MR. CAPECI:  Well, Your Honor, that lawsuit has nothing to do with the losses that the investors suffered.

I mean this happened -- I just handled the BHP matter before Judge Buchwald, and the defendants came forward and said the same thing.  They said:  No, this is a case about mismanagement, it's not a case about securities fraud.  And what that does is it's a dishonest reading of the complaint because our cases have the statements that they made to the investors.  The underlying factual predicate of what caused the decline is an off-label marketing scheme and whether or not the company actually defrauded Medicare is a question for the qui tam complaint.

But the question here is was the statements to the investors accurate, and the answer is no, not for Fanapt, not

for Hetlioz, and not for Tradipitant.

And just to respond to counsel, the complaint -- it's very disingenuous to describe the qui tam complaint as being publicly available. It was filed in March of 2017 under seal, as most qui tam complaints are. The United States government declines to pick it up. The judge unseals it. It gets placed on the docket. It's not in Vanda's SEC filing that they were ever served with a qui tam complaint. It was not anywhere in the public record.

THE COURT: So what is the relevancy of the qui tam litigation to your litigation?

MR. CAPECI: Well, the qui tam litigation, when it's published in that analyst report, that's the first time investors are finding out --

THE COURT: It's when the investors find out.

MR. CAPECI: -- about off-label marketing.

So, they have two problems. First, they can't point you to a single fact showing that it was in the public domain sooner.

MS. SOLOWAY: Other than the docket.

MR. CAPECI: That no one knew about.

THE COURT: Anyway, we are talking about allegations now.

MR. CAPECI: Right. And the second point is it's a factual dispute, you can't resolve it on a motion to dismiss.

Proceedings                              29

So in that -- with that regard, their loss causation arguments are -- you know, don't hold much weight.

THE COURT:  They may well be.

Okay, so let's see, does anybody else want to add anything to the excellent presentation of counsel here?

MR. ROSENFELD:  I have nothing further to add.

THE COURT:  Okay.  Anybody else?

MR. NESPOLE:  Unless you want to hear about the derivative case.

THE COURT:  We are just shaping the debate here.  We are just shaping the issues.

Anybody else?

MS. SOLOWAY:  I'll just add, Your Honor, on loss causation, there is actually a Second Circuit case that is directly on point, the Omnicom case.

THE COURT:  What does that say?

MS. SOLOWAY:  Omnicom says that when you have allegations that are public, known publically, even if the stock price doesn't react, right, and then later a reporter writes an article and characterizes those allegations in a way that's pejorative, it does not mean that new information has come out and that cannot be a corrective disclosure.

So we will be relying on that case because as long as the facts are public, it doesn't matter whether someone looked at the docket or didn't look at the docket , they're

SAM      OCR      RMR      CRR      RPR

relying on an efficient market theory. They're stuck with --
if it's on the public docket, it's public, Your Honor. That's
what Omnicom says.

THE COURT: So I think my former law clerk, who is a
partner with Paul Weiss, his name Jonah Knobler.

THE LAW CLERK: No, Patterson.

THE COURT: Oh, he is with Patterson.

Who do we have in Paul Weiss?

MS. SOLOWAY: We'll have to look, Your Honor.

THE COURT: There has to be someone.

MS. SOLOWAY: There has to be someone.

THE COURT: Anyway, I think that's enough for today.

MS. SOLOWAY: That's fine, Your Honor.

THE COURT: What we are going to do by Friday, you
will let me know if you are going to go with the existing
complaint or you want to amend it. If you want to amend it, I
will give you whatever you want reasonably, two weeks or
whatever, and then the opportunity to reflect upon whether you
still want to bring the motions.

MS. SOLOWAY: Yes, Your Honor.

THE COURT: And we will be able to draw some issues
here. So you let me know by Friday.

Now, you don't have to come back here again unless
you need you after I look at your papers.

MR. CAPECI: Okay.

THE COURT:  We have a record here.  I don't know whether Holly, who drew the black bean here, is going to still be here by the time all the briefing is done and everything else; maybe yes, maybe no, we'll see.

But you work out your own briefing schedule.  I don't micromanage it.  I cannot possibly imagine that distinguished counsel cannot agree amongst themselves on a briefing schedule.

And yet, most of my colleagues do the silly thing by making schedules for people.  I don't understand why they do it.  I just don't understand that.  Lawyers are professional people, they should be able to do that.  Right?

MS. SOLOWAY:  Yes, Your Honor.

THE COURT:  I never had a problem in a hundred years with people not being able to agree on a briefing schedule.  I tell all my colleagues:  Why do you do these silly things? Don't do that.

Just send me a little note as to what you've come upon in terms of your briefing schedules so I have a record of it.  And then when you get your papers all together, you will put them together in a blue or pink bow, depending upon your sexual preference, and send them to me.  And then we will try to get you a response within six months, if not sooner, but there is no guarantee.  It depends on what else is happening, right?

What else can I do for you today?

Does this help, at least, get us going a little bit? Made it a value to come here, hopefully, of some value?

MR. CAPECI:  Always.

MS. SOLOWAY:  Yes, Your Honor.

MR. ROSENFELD:  Yes, Your Honor.

THE COURT:  Off the record.

(Off the record.)

THE COURT:  Anything else you want to add?

MR. NESPOLE:  No, I am assuming you want the derivative plaintiffs to do the same thing, decide if we want to amend?

THE COURT:  Yes, you might as well.  All right.

MS. SOLOWAY:  Your Honor, in the derivative case there is one issue that we did not agree on, unfortunately.

As Your Honor is no doubt aware, in a derivative case the plaintiffs can only bring a lawsuit if they first meet a demand on the company.

THE COURT:  Well, they say it was futile to do that.

MS. SOLOWAY:  Exactly, or they --

THE COURT:  So the issue of futility, I guess, cannot be resolved on legal papers?

MS. SOLOWAY:  It's almost always resolved on legal papers.

THE COURT:  Really, you have a Southern District

case that tells you that?

MS. SOLOWAY: Yes. In fact, there's a rule Rule 23.1, that says that --

MR. NESPOLE: Goes both ways.

MS. SOLOWAY: -- it's a very high standard and it does get resolved all the time on the papers.

THE COURT: All the times, without exception?

MS. SOLOWAY: All the time.

MR. NESPOLE: Disagree. Many of the issues, it's decided on the papers, but in certain instances you need some semblance of discovery to see if directors are interested to see --

THE COURT: Well, if there is no factual issue, there is no demand. The issue is whether or not Rule 23 will apply.

MS. SOLOWAY: Correct, Your Honor.

MR. NESPOLE: We've alleged --

THE COURT: But this is a pleading.

MS. SOLOWAY: Your Honor, it's very hard to plead demand futility. You either have to plead that the directors are interested in the outcome, the independent directors are interested in the outcome, or you have to plead that they face a substantial risk of liability.

THE COURT: Do you want a chance to amend your complaint also?

Proceedings                                    34

MR. NESPOLE:  Sure, unless you -- sure, unless you want me to explain why she's wrong.

THE COURT:  Are you happy with it the way it is?

MR. NESPOLE:  No, I'll amend it, but she's wrong.

THE COURT:  I am going to give you the same opportunity, if you want to amend.

MR. NESPOLE:  No, we'll amend.  We'll make it even better.

THE COURT:  So you are going to amend it by Friday, okay.  Is that all right?

MR. NESPOLE:  That's correct, sir.

THE COURT:  It's not going to be hard to do that.

MR. NESPOLE:  Amend by Friday or let you know by Friday?

THE COURT:  By what?

MR. NESPOLE:  I'm sorry, let you know by Friday or amend by Friday?

THE COURT:  Whatever you want, as long as it's within reason.

MR. NESPOLE:  Okay.

THE COURT:  How much time do you have want?

MR. NESPOLE:  We'll let you know -- I'd like to be on the same schedule as the security plaintiffs.

THE COURT:  Okay, so you will let me know by Friday if you want to amend it.

Proceedings                                    35

MR. NESPOLE:  Correct.

THE COURT:  And if you do, I will give you the opportunity to do that.  And then you'll let me know how much time you want to amend?

MR. NESPOLE:  We'll work out a schedule.

THE COURT:  Work it out amongst yourselves, if you can.

MS. SOLOWAY:  Yes.

THE COURT:  I have confidence you will be label to do that.  I think that handles things.

Anything else we need to talk about today?

MS. SOLOWAY:  So, Your Honor, the issue in the derivatives case was that what we had proposed was putting in a narrow targeted motion just on the demand futility issue and waiting until some subsequent time, because it may never be necessary, to address whether --

THE COURT:  He wants to do it all in one shot?

MS. SOLOWAY:  He does, he does.

MR. NESPOLE:  It's judicial efficiency.

Why should you receive two motions when I'm quite confident we're going to survive the demand issue, which then they're going to make the same motion again on the 12(b) and charge their client --

THE COURT:  Do it all at once.  It's my call.

MS. SOLOWAY:  Yes.

THE COURT:  This gentleman has probably never lost a case in his life, right?

MR. NESPOLE:  I've lost plenty.

THE COURT:  You don't have to answer that question.

Do it all together.

MS. SOLOWAY:  Okay.

THE COURT:  There are arguments on both sides, but let me have it all.

What else can I do for you?

Now, you are here in a particular capacity, right?

MS. MILLER:  Yes.

THE COURT:  You were told to take notes.  Now, don't take this the wrong way, but why do we need you?

I'm glad you're here, and I understand there is a notetaker, but we have whole record here.

MS. MILLER:  I just like to get the experience of being before Your Honor.

THE COURT:  Maybe I am missing something here.

MS. SOLOWAY:  Candidly, Your Honor, I thought since Emily has been working on this case she deserves to come to court --

THE COURT:  Absolutely deserves to come.

MS. SOLOWAY:  -- and experience court.  Yes.

THE COURT:  But I don't know if it was necessary for you to take notes here, unless you want to write down

Judge Block is a wonderful judge, good looking guy, that's okay.  But we have a whole record here, that's one of the reasons I did it.

MR. NESPOLE:  There is one thing, Your Honor.

The derivative plaintiffs are in a different position with respect to potentially an earlier mediation.  We don't represent stockholders seeking monetary damages.  There is a way potentially to resolve a derivative litigation through corporate governance reform.

So I would be willing to speak with these folks sooner than later, if it's possible.

THE COURT:  Well, by all means I encourage these types of communications.  No question about it.

Many times we have lawyers who come here, they never spoke to each other before.  I don't think that's this case.

MS. SOLOWAY:  It's not.

THE COURT:  But you would be surprised how many times we have less talented, less professional lawyers come in here who never spoke to each other.  And the only real requirement or rule -- I'm not a big rule person, right -- I require is for people to talk to each other.  Talk about settlement.  That is the only thing I require.  That is why we speak about whether this case is one that can be settled at an early stage.  Right?

Because how many cases actually wind up over there?

(Indicating.)  Not too many.

So they are going to be disposed of one way or another.  So I think that settlement discussions are so important since we know that it is very highly unlikely you are going to have eight people, six people, nine people, sit in that box deciding this case.

So whatever I can do to help you folks, I am here to do that.  I believe that that is part of my responsibility. If you think at a certain point in time mediation might be of value, you can come back and we can talk about it.  We will try to find a very competent mediator who you all respect, who would be of value, perhaps.  We've had some great success with that.  And the mediation office we have I think is as good as the Southern District.  They require mediation on every discrimination case.  We don't do that here.  I am more selective.  I talk to the lawyers and if I feel that it is a case that can be resolved in mediation, I think by talking to the lawyers in advance it is helpful.  And the cases that are sent to mediation, 75 percent, 80 percent get resolved.  So it is a very, very effective tool.

A skilled mediator can resolve all of your disputes, even if you have matrimonial problems.  There is no limitation to what a mediator can do to get parties to resolve their disputes.  Right?

MR. CAPECI:  Your Honor, if we do mediate, would you

Proceedings                                      39

like us to let you know that?

      THE COURT:  Well, I am inviting you.  This is very important for me to hear, that in the derivative action there is a greater potential that mediation can be of value than what I'm hearing from you right now.

      MR. CAPECI:  That's right.

      THE COURT:  Okay.  So you let me know.  We are here to help.  Okay?

      MS. SOLOWAY:  Thank you, Your Honor.

      MR. ROSENFELD:  Thank you, Your Honor.

      THE COURT:  Anything else?

      MS. SOLOWAY:  Not from defendants, Your Honor.

      (Off the record.)

      THE COURT:  Anything else?

      MR. NESPOLE:  No.

      THE COURT:  Okay, good to see you all.  And Sorry I made it difficult for you to take notes.

      MS. MILLER:  Oh, no problem.

      THE COURT:  I going to work on the assumption that they are each going to want a copy of the transcript.  Correct?

      MS. SOLOWAY:  Yes.  Thank you, Your Honor.

      (Matter adjourned.)

ooo0ooo

SAM    OCR    CRR    RMR    RPR
I certify the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.
/s/ Stacy A. Mace    January 21, 2020