UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

KENNETH GORDON, Individually and on
Behalf of All Others Similarly Situated,

       Plaintiff,

  vs.

VANDA PHARMACEUTICALS, INC. and
MIHAEL H. POLYMEROPOULOS,

       Defendants.

———————————————————— x

: Civil Action No. 1:19-cv-01108-FB-LB
:
: <u>CLASS ACTION</u>
:
: Hon. Frederic Block
:
: MEMORANDUM OF LAW IN SUPPORT
: OF LEAD PLAINTIFF'S MOTION FOR
: CLASS CERTIFICATION
:
:
:
:
:

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................1

II.   FACTUAL BACKGROUND .............................................................................4

    A.    Defendants' Misstatements and Omissions Regarding Vanda's Alleged
        Off-Label Promotion of Fanapt and Hetlioz .............................................4

    B.    Defendants' Misstatements and Omissions Regarding Vanda's Refusal to
        Conduct the FDA-Required Safety Study for Tradipitant ........................5

    C.    Current Procedural Posture ......................................................................6

III.  ARGUMENT ......................................................................................................8

    A.    Applicable Legal Standards for Class Certification .................................8

    B.    The Proposed Class Satisfies the Requirements of Rule 23(a) ...............9

        1.    The Proposed Class Is so Numerous that Joinder is Impracticable ............9

        2.    Common Questions of Law and Fact Exist ................................................10

        3.    Lead Plaintiff's Claims Are Typical of Those of the Proposed
            Class .........................................................................................................11

        4.    Lead Plaintiff Will Fairly and Adequately Represent the Proposed
            Class .........................................................................................................11

    C.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3) .........13

        1.    Common Questions of Law and Fact Predominate ...................................14

            a.    Lead Plaintiff Is Entitled to the Fraud-on-the-Market
                Presumption of Reliance .................................................................15

                (1)    *Cammer* Factor 1: Vanda Stock Experienced High
                      Weekly Trading Volume .....................................................16

                (2)    *Cammer* Factor 2: There Was Substantial Analyst
                      Coverage of Vanda .............................................................17

                (3)    *Cammer* Factor 3: The Number of Liquidity
                      Providers and Institutional Investors In Vanda Stock ........18

**Page**

(4)    *Cammer* Factor 4: Vanda Was Eligible to File a Form S-3 Registration Statement ......................................18

(5)    *Cammer* Factor 5: Vanda's Common Stock Reacted to Unexpected Company-Specific Information, Demonstrating a Cause-and-Effect Relationship ...............19

(6)    The *Krogman* Factors Also Support a Finding of Market Efficiency .............................................................20

b.    Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology ..............................................22

2.    A Class Action Is Superior to Other Methods of Adjudication .................23

D.    The Court Should Appoint Robbins Geller as Class Counsel ..............................24

IV.    CONCLUSION...........................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)................................................................................. *passim*

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  955 F.3d 254 (2d Cir. 2020), *rev'd on other grounds*
  141 S.Ct. 1951 (2021)...................................................................................9, 16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)......................................................................................15, 22

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ....................................................9, 10, 16, 17

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .................................................................. *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ..................................................................... *passim*

*City of Westland Police and Fire Ret. Sys. v. MetLife Inc.*,
  2017 WL 3608298
  (S.D.N.Y. Aug. 22, 2017) ....................................................................................8

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)........................................................................................22, 23

*Eisen v. Carlisle & Jacquelin*,
  391 F.2d 555 (2d Cir. 1968).................................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)......................................................................................14, 15

*Glauser v. EVCI Career Colleges Holding Corp.*,
  236 F.R.D. 184 (S.D.N.Y. 2006) ......................................................................12

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968)..................................................................................8

*Gruber v. Gilbertson*,
  2019 WL 4439415
  (S.D.N.Y. Sept. 17, 2019) .............................................................................. *passim*

**Page**

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)...........................................................................................15

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
338 F.R.D. 205 (S.D.N.Y. 2021) ....................................................................9, 14

*In re Allergan PLC Sec. Litig.*,
2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)...............................................3, 9, 19

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ......................................................................18

*In re Bank of Am. Corp. Sec., Deriv., and Emp. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ......................................................................11

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................................12

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354
(S.D.N.Y. Mar. 23, 2020) ......................................................................... *passim*

*In re Drexel Burnham Lambert Grp., Inc.*
960 F.2d 285 (2d Cir. 1992)..............................................................................12

*In re Facebook, Inc., IPO Sec. and Deriv. Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ......................................................................10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009).........................................................................11, 13

*In re Global Brokerage, Inc.*,
2021 WL 1160056
(S.D.N.Y. Mar. 18, 2021) .......................................................................10, 11, 18

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
2017 WL 1273963
(S.D.N.Y. Mar. 31, 2017) ............................................................................12, 14

*In re Perrigo Co. PLC Sec. Litig.*,
493 F. Supp. 3d 291 (S.D.N.Y. 2020).................................................................12

**Page**

*In re Petrobras Sec. Litig.*,
862 F.3d 250 (2d Cir. 2017)...............................................................................16, 20

*In re Pfizer Inc. Sec. Litig.*,
282 F.R.D. 38 (S.D.N.Y. 2012) ...................................................................................24

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084
(S.D.N.Y. July 10, 2019) ...............................................................................10, 23

*In re SunEdison, Inc. Sec. Litig.*,
329 F.R.D. 124 (S.D.N.Y. 2019) ...............................................................................9, 15

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
2017 WL 2062985
(S.D.N.Y. May 15, 2017)...............................................................................23

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)...............................................................................20

*In re Winstar Commc'ns Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013) ...............................................................................17, 18

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
311 F.R.D. 373 (S.D.N.Y. 2015) ...............................................................................24

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ...............................................................................16, 19, 22

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014)...............................................................................17

*Pearlstein v. BlackBerry Ltd.*,
2021 WL 253453
(S.D.N.Y. Jan. 26, 2021)...............................................................................9, 13, 21

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015)...............................................................................22, 23

*Scheufele v. Tableau Software, Inc.*,
2020 WL 2553100
(S.D.N.Y. Feb. 13, 2020)...............................................................................9, 22

**Page**

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) .................................................................16, 21

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)..............................................................................22

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016).......................................................................................10

*Vanda Pharms., Inc. v. FDA*,
    436 F. Supp. 3d 256 (D.D.C. 2020) .................................................................6

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ......................................................................21

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)...........................................................14, 15, 16, 19

Lead Plaintiff Teamsters Local Union No. 727 Pension Fund ("Lead Plaintiff" or "Teamsters") respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rule of Civil Procedure ("Rule") 23(a), (b)(3), and (g), for an Order: (i) certifying this case as a class action; (ii) certifying Lead Plaintiff as Class Representative; and (iii) appointing Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

## I.    INTRODUCTION

This is a federal securities class action asserting claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Vanda Pharmaceuticals, Inc. ("Vanda" or the "Company") and its Chief Executive Officer, Dr. Mihael H. Polymeropoulous (together, "Defendants") for allegedly making materially false and misleading misstatements and omissions to investors between November 4, 2015 and February 11, 2019, inclusive ("Class Period") regarding: (i) Vanda's multifaceted off-label promotion scheme for Fanapt and Hetlioz, the Company's only two approved drugs for sale during the Class Period (¶¶3-5);[1] and (ii) Vanda's refusal to conduct a safety study mandated by the U.S. Food & Drug Administration ("FDA") for the continued clinical development of its most important pipeline drug, Tradipitant (¶¶6-8).

Defendants' alleged fraud was disclosed to the market on February 5, 2019 and February 11, 2019. ¶9. First, post-market close on February 5, 2019, Vanda announced that it had initiated a lawsuit against the FDA and informed investors that the Company refused to perform the safety study required to advance Tradipitant through the FDA's clinical testing program. ¶431. Vanda's common stock declined 19.95% on February 6 in response. ¶432. Second, during the trading day

---

[1]    Unless otherwise noted, all references to "¶_" or "¶¶_" are to the Amended Complaint for Violations of the Federal Securities Laws (ECF No. 29) (the "Complaint"). The allegations of the Complaint are accepted as true for purposes of this motion. *See Gruber v. Gilbertson*, 2019 WL 4439415, at *1 (S.D.N.Y. Sept. 17, 2019) ("When considering a class certification motion, courts accept the allegations in the complaint as true.").

on February 11, 2019, a short seller, Aurelius Value, published a report that publicly disclosed for the first time the qui tam allegations of Vanda's off-label marketing scheme for Fanapt and Hetlioz. ¶433.  Vanda's common stock declined 5.51% in response.  ¶434.

Lead Plaintiff now seeks to certify a class of purchasers of Vanda common stock during the Class Period and propose itself as the Class Representative and its counsel, Robbins Geller, as Class Counsel.  As set forth in the Complaint (¶436), the Proposed Class is defined as follows:

> [A]ll purchasers of the common stock of Vanda during the Class Period, inclusive, and who were damaged thereby (the "Proposed Class").  Excluded from the Proposed Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

As explained below, class certification in this securities action is consistent with precedent from the U.S. Supreme Court and this Circuit, which have expressed a clear preference for certifying such actions.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020) ("Courts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification.").[2]

Here, all of the prerequisites for class certification under Rule 23(a) – numerosity, commonality, typicality, and adequacy – are readily met.  *First*, because there were over 52 million outstanding shares of Vanda common stock traded during the Class Period (¶15), the Proposed Class easily consists of more than 40 members, satisfying numerosity.  *Second*, because the Proposed Class' claims arise from the same misstatements and omissions and rely on the same theories of liability, questions of law and fact are common to the Proposed Class.  ¶440.  *Third*,

---

[2]    Unless otherwise noted, internal citations and quotation marks are omitted and all emphasis in quotations is added.

Lead Plaintiff's claims are typical of those of the Proposed Class because they share the same factual and legal underpinnings. ¶438. *Fourth*, the adequacy requirement is met because Teamsters, an institutional investor, is committed to prosecuting this action vigorously and in the best interests of the Proposed Class, and has retained one of the most successful and experienced class action law firms in the country. ¶439.

Additionally, this action satisfies the predominance and superiority requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual ones, and class treatment is superior to individual adjudication. Issues of materiality, loss causation and reliance all present common questions, with reliance presumed because Vanda common stock traded in an efficient market during the Class Period, as Lead Plaintiff's expert, Bjorn I. Steinholt, CFA ("Steinholt"),[3] has demonstrated. Steinholt has also proposed a model of calculating damages on a class-wide basis that uses a common methodology – the same type of model courts routinely accept from Steinholt and other experts.[4]

---

[3]    References to the "Steinholt Rept." are to the Expert Report of Bjorn I. Steinholt, CFA, dated July 30, 2021, attached as Exhibit ("Ex.") A to the Declaration of Michael G. Capeci ("Capeci Decl."), filed concurrently herewith.

[4]    On October 22, 2021, Lead Plaintiff, through Lead Counsel, deposed Vanda's rebuttal expert, Dr. René M. Stulz, who submitted a rebuttal report on September 17, 2021, in response to Steinholt's opening report. *See* Capeci Decl., ¶9. Concurrently with this motion, Steinholt is submitting a reply report confirming that his opinions on market efficiency and his proposed damages model remain unchanged, notwithstanding Dr. Stulz's report and testimony. *Id.* Because Defendants bear the burden of rebutting the fraud-on-the-market presumption of reliance for securities, like Vanda common stock, that trade in efficient markets (*see, e.g.*, *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *10-*13 (S.D.N.Y. Sept. 8, 2021) ("[I]t is Defendants' burden to show the absence of price impact – not merely to challenge Plaintiff on the persuasiveness of its own price impact claim – once *Basic*'s presumption of reliance attaches")), and because Defendants have not yet opposed this motion or deposed Steinholt, Lead Plaintiff reserves the right to address Dr. Stulz's positions on price impact and Steinholt's proposed damages model on reply should Defendants raise these issues in their opposition.

- 3 -

Accordingly, class certification is appropriate in this case, and Lead Plaintiff respectfully requests that the Court grant this motion in its entirety.

## II.    FACTUAL BACKGROUND

Vanda is a biopharmaceutical company that markets and sells only two drugs: (i) Fanapt, which is FDA-approved to treat schizophrenia in adults as a secondary treatment with a twice-daily administration; and (ii) Hetlioz, which is FDA-approved to treat Non-24, a rare circadian rhythm disorder that occurs mostly, if not exclusively, in blind individuals.  ¶¶35-36.  Vanda derived all of its Class Period revenue from sales of Fanapt and Hetlioz.  ¶¶43-48.  During the Class Period, Vanda's most important clinical trial drug was Tradipitant, which was being tested for the potential indication of gastroparesis (a stomach disorder).  ¶¶187-89.

### A.    Defendants' Misstatements and Omissions Regarding Vanda's Alleged Off-Label Promotion of Fanapt and Hetlioz

Off-label marketing, which is illegal, means marketing or promoting a drug for a disease or condition that the drug has not received FDA approval to treat.  ¶¶49-58.  With respect to Fanapt, during the Class Period, Lead Plaintiff alleges that Vanda trained its sales representatives to illegally promote the drug off-label in numerous ways, including: (i) as a primary treatment (even though it was FDA-approved only as a secondary treatment); (ii) to pediatric patients (even though it was FDA-approved only for adults); and (iii) for any mental disorder (even though it was FDA-approved only for the treatment of schizophrenia).  ¶4.

Defendants repeatedly made false and misleading statements regarding Vanda's Fanapt marketing practices during the Class Period.  For example, Defendants falsely represented that Vanda was promoting Fanapt on-label as a second-line treatment, when in fact, the Company trained its sales representatives to promote Fanapt as a first-line treatment.  *See, e.g.*, ¶¶253-254 ([Vanda is] "recommending Fanapt as a second-line treatment"); ¶¶265-66 ("Fanapt . . . will be a

- 4 -

drug that will be used once patients switch from another medication"); and ¶¶278-79 ("Fanapt is considered in the US a second line treatment").

Vanda also allegedly illegally marketed Hetlioz off-label during the Class Period by focusing on sighted patients without Non-24. ¶¶5, 161-186. In Defendants' public statements about Hetlioz, Defendants failed to disclose that Vanda was marketing Hetlioz off-label to patients that had not been diagnosed with Non-24. *See, e.g.*, ¶¶336-37 ("focused on driving growth by creating awareness about non-24."); ¶¶366-67 ("[t]he positive response from the psychiatric community is a confirmation of the significant unmet medical need for patients with Non-24"); ¶¶354-55 ("we did have experience before with sighted patients with Non-24").

During the trading day on February 11, 2019, Aurelius Value published a report entitled "Vanda: In the Land of the Blind, The One-Eyed Man is King" (the "Aurelius Report"), which publicly disclosed for the first time the qui tam relator's[5] allegations regarding Vanda's off-label promotion scheme for Fanapt and Hetlioz. ¶433. In response, Vanda's common stock declined $1.05 per share and closed at $18.00 per share on February 11, a 5.51% decline. ¶434.

**B.     Defendants' Misstatements and Omissions Regarding Vanda's Refusal to Conduct the FDA-Required Safety Study for Tradipitant**

In April 2018, Vanda sought permission from the FDA to extend the duration of its Phase II clinical trial of Tradipitant for treating gastroparesis ("Study 2301"). ¶¶198-204. On May 15, 2018, the FDA informed Vanda that it would not extend Study 2301 unless the Company conducted a routine 9-month non-rodent toxicity study to verify Tradipitant's safety for human

---

[5]   Richard Gardner (who worked at Vanda from November 2015 to August 5, 2016 (¶¶29-31)) is the relator in the ongoing qui tam lawsuit filed on March 10, 2017, against Vanda pertaining to the alleged off-label promotion schemes for Fanapt and Hetlioz. *See U.S. ex rel. Gardner v. Vanda Pharm., Inc.*, No. 1:17-cv-00464 (APM) (D.D.C.) (the "Qui Tam Litigation"). Judge Mehta denied Vanda's motion to dismiss in the Qui Tam Litigation on March 25, 2021, shortly after this Court mostly sustained the Complaint. *See* Capeci Decl., Ex. B.

use. ¶¶206-210.  The FDA unequivocally stated in May 2018 that if Vanda failed to conduct the required safety study, it would place a clinical trial hold on Study 2301 to prevent a longer study from being conducted.  ¶¶211-213.  Thereafter, Vanda consistently refused to conduct the required safety test.  ¶¶214-219.  On December 19, 2018, the FDA privately informed Vanda that Study 2301 had been placed on a clinical hold because of the Company's refusal.  ¶¶221-222.

Investors were unaware of these material facts.[6]  Indeed, during the Class Period, Defendants repeatedly reported on the progress of the Tradipitant studies but failed to disclose to the market that the drug's clinical development was at a standstill due to Vanda's refusal to conduct the FDA-mandated safety study.  ¶¶386-407.  After the market closed on February 5, 2019, Vanda issued a press release announcing that it had sued the FDA over the clinical hold, which, among other things, informed investors for the first time about Vanda's refusal to conduct the routine safety study and the consequence of that decision – Tradipitant's clinical trial progress was halted. ¶226.  In response to this announcement, Vanda's common stock declined $5.00 per share and closed on February 6 at $20.06 per share, a 19.95% decline.  ¶¶431-432.

### C.    Current Procedural Posture

This lawsuit, initiated on February 25, 2019 by an individual investor in Vanda common stock who was not represented by Robbins Geller, shortly followed the February 5 and February 11, 2019 disclosures.  On May 24, 2019, the Court appointed Teamsters as Lead Plaintiff and designated its counsel, Robbins Geller, as Lead Counsel.  *See* ECF No. 26.  As set forth in its

---

[6]   Vanda cannot plausibly dispute these material facts because they are sourced from the Company's own allegations in legal filings – allegations that Judge Bates found to be admissible and accurate when granting summary judgment to the FDA in January 2020 in Vanda's lawsuit against its regulator.  *See Vanda Pharms., Inc. v. FDA*, 436 F. Supp. 3d 256, 262-63 (D.D.C. 2020). Vanda never appealed this ruling.

Certification, Lead Plaintiff purchased Vanda common stock on January 22, 2019, suffering losses of over $88,000. ECF Nos. 9-2, 9-3, *see also* Capeci Decl., ¶11 & Ex. C.

Lead Plaintiff filed the Complaint on July 23, 2019 (ECF No. 29), which Defendants moved to dismiss. *See* ECF No. 48. On March 10, 2021, the Court denied, in substantial part, Defendants' motion to dismiss. *See* ECF No. 55.

The Court sustained all of the alleged misstatements and omissions made by defendants Vanda and Polymeropoulos regarding Fanapt, Hetlioz and Tradipitant, but dismissed three other individual defendants. *Id.* Among other things, the Court held that: (i) the Complaint "sufficiently alleges that Polymeropoulos actively participated in trainings where Vanda's salesforce was directed to market Hetlioz and Fanapt to individuals who did not suffer from diseases those drugs were approved to treat" (*id.* at *5); (ii) the Complaint "alleges Polymeropoulos made affirmative statements regarding the company's marketing practices which failed to convey the company's suspect drug promotion activities" (*id.* at *7); and (iii) "the fact that the qui tam action was unsealed a few days before the Aurelius Report does not defeat the plaintiffs' claims [on loss causation.]" *Id.* at *9.

Since then, Lead Plaintiff has served and responded to discovery requests, producing over 7,500 pages in response to Defendants' requests and providing Defendants with redaction and privilege logs; assembled a team of lawyers to prosecute this case; consulted with an expert in the pharmaceutical industry; pursued third-party discovery, including with the FDA; successfully opposed Defendants' attempt to coordinate discovery with the Qui Tam Litigation; and engaged Steinholt to evaluate the elements of class certification and provide an expert opinion on market efficiency. Capeci Decl., ¶¶6-7.

- 7 -

The parties are currently engaged in fact discovery, and Defendants are scheduled to substantially complete their document productions by January 28, 2022, and the parties are scheduled to complete fact discovery by May 20, 2022. *See* ECF Nos. 70-71. Defendants are currently scheduled to depose Steinholt on November 5, 2021, a representative of Lead Plaintiff's money manager, Rothschild & Co., on November 11, 2021, and a representative of Teamsters on November 17, 2021. Capeci Decl., ¶10.

## III.   ARGUMENT

### A.   Applicable Legal Standards for Class Certification

For decades, "[t]he Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions[,]" and to err "'in favor'" of granting class certification. *Chicago Bridge*, 2020 WL 1329354, at *2 (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 (2d Cir. 1968); *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968)); *see also City of Westland Police and Fire Ret. Sys. v. MetLife Inc.*, 2017 WL 3608298, at *3 (S.D.N.Y. Aug. 22, 2017) ("Doubts about whether Rule 23 has been satisfied should be resolved in favor of certification."). This is particularly true with respect to "claims alleging violations of Section[s] 10(b) and 20(a) of the Exchange Act[,] [which] are especially amenable to class certification." *Gruber*, 2019 WL 4439415, at *2.

To obtain class certification, a plaintiff need only show by a preponderance of the evidence that the proposed class meets all of the prerequisites of Rule 23(a) and satisfies one subsection of Rule 23(b). *See, e.g.*, *Chicago Bridge*, 2020 WL 1329354, at *1. Rule 23(a)'s prerequisites are "numerosity, commonality, typicality, and adequacy of representation," while Rule 23(b)(3) – the subsection under which certification is sought here – requires that common issues predominate over individual ones "'and that a class action is superior to other available methods'" of adjudication. *Amgen*, 568 U.S. at 460.

In evaluating this motion, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 465-66; *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 268 (2d Cir. 2020), *rev'd on other grounds*, 141 S.Ct. 1951 (2021) (same). "[T]he question before the Court is whether [a] [p]laintiff meet[s] Rule 23's requirements, not whether [the] [p]laintiff will prevail on the merits." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *6 (S.D.N.Y. Jan. 26, 2021).  Here, the Proposed Class easily meets these requirements.

### B.       The Proposed Class Satisfies the Requirements of Rule 23(a)

#### 1.       The Proposed Class Is so Numerous that Joinder is Impracticable

Numerosity requires that the proposed class be "so numerous that joinder of all members is impracticable[.]"  Fed. R. Civ. P. 23(a)(1).  "[A] class consisting of 40 or more members is presumed to be numerous in this Circuit."  *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 211 (S.D.N.Y. 2021).  "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Allergan*, 2021 WL 4077942, at *6; *see also Scheufele v. Tableau Software, Inc.*, 2020 WL 2553100, at *3 (S.D.N.Y. Feb. 13, 2020) (same).  Evidence of the exact class size is not required.  *See In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 138 (S.D.N.Y. 2019).

The Proposed Class in this case easily exceeds 40 members.  Vanda had more than 52 million shares of common stock outstanding during the Class Period (¶15), with an average reported daily trading volume that exceeded 640,000 shares and an average daily dollar volume of more than $10.3 million.  Steinholt Rpt., ¶24.  Further, during the Class Period, Vanda had over 420 institutional shareholders.  *Id.*, ¶34.  Under these circumstances, joinder of all Class members would be difficult and inconvenient.  Thus, numerosity is established.  *See, e.g., Billhofer v. Flamel*

*Techs., S.A.*, 281 F.R.D. 150, 156 (S.D.N.Y. 2012) (finding numerosity where the company had 23 million ADRs outstanding and between 71 and 82 institutional investors).

### 2. Common Questions of Law and Fact Exist

Commonality requires the existence of "questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). "[A] common question is one where 'the same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016). "[M]inor variations in the class members' positions will not suffice to defeat certification." *In re Facebook, Inc., IPO Sec. and Deriv. Litig.*, 312 F.R.D. 332, 341 (S.D.N.Y. 2015). "In most cases, the test for commonality 'is not demanding' and is met so long as there is at least one issue common to the class." *In re Global Brokerage, Inc.*, 2021 WL 1160056, at *9 (S.D.N.Y. Mar. 18, 2021).

The common questions of law and fact here include whether Defendants misrepresented or omitted material facts about Vanda's business, whether Defendants acted with scienter, whether the price of Vanda common stock was artificially inflated during the Class Period, to what extent the members of the Proposed Class have sustained damages, and the proper measure of damages. ¶440. The answers to these questions are susceptible to generalized class-wide proof. *See, e.g.*, *Chicago Bridge*, 2020 WL 1329354, at *11 (finding commonality satisfied where plaintiffs "allege[d] the same injury and claims resulting [from] common misrepresentations and omissions" and were "impacted by disclosures affecting equally all market participants who transacted [in defendant's] stock"). Thus, the commonality requirement is satisfied in this case, "as is typical of most securities fraud putative class actions[.]" *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019).

### 3. Lead Plaintiff's Claims Are Typical of Those of the Proposed Class

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). "This requirement is satisfied 'when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendants' liability. . . irrespective of minor variations in the fact patterns underlying the individual claims." *Global Brokerage*, 2021 WL 1160056, at *9; *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (same). "This standard is 'not demanding' as 'the claims only need to share the same essential characteristics, and need not be identical.'" *Chicago Bridge*, 2020 WL 1329354, at *11.

Here, Lead Plaintiff alleges (for itself and on behalf of the Class) that Defendants violated §§10(b) and 20(a) of the Exchange Act by making materially false and misleading statements and omissions that artificially inflated the price of Vanda's common stock. *See* ¶438; *see also In re Bank of Am. Corp. Sec., Deriv., and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012) ("In a securities class action, when 'plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims,' the claims and nature of evidence 'are generally considered sufficient to satisfy the typicality requirement.'"). Accordingly, because the same course of conduct injured Lead Plaintiff and the Proposed Class, and the evidence required to prove such claims will not differ, Lead Plaintiff's claims are typical of those of the Proposed Class.

### 4. Lead Plaintiff Will Fairly and Adequately Represent the Proposed Class

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied where, as here: (1) the class representative's interest is to vigorously pursue the claims of the class and is not "antagonistic

- 11 -

to the interests of other class members"; and (2) the proposed class counsel is "qualified, experienced and able to conduct the litigation." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016). "The purpose of the adequacy inquiry is to uncover conflicts of interest between named parties and the class they seek to represent." *In re Perrigo Co. PLC Sec. Litig.*, 493 F. Supp. 3d 291, 294 (S.D.N.Y. 2020). "To preclude certification[,]" any "conflict must be 'fundamental.'" *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2017 WL 1273963, at *9 (S.D.N.Y. Mar. 31, 2017).

Here, "there is no indication of any antagonism or conflict of interest between the Lead Plaintiff and the absent class members." *Perrigo*, 493 F. Supp. 3d at 294. Indeed, Lead Plaintiff and other Class members "share a common interest in showing that [Defendants] violated . . . [the] securities laws" and "wish to obtain the highest possible recovery" for the claims alleged. *In re Drexel Burnham Lambert Grp., Inc.* 960 F.2d 285, 291 (2d Cir. 1992).

Additionally, Teamsters, an institutional investor, is ideally suited to act as the Class Representative, especially because the "[t]he PSLRA was designed to increase the likelihood that institutional investors" such as Teamsters, "will serve as lead plaintiffs." *Perrigo,* 493 F. Supp. 3d at 294; *see also Glauser v. EVCI Career Colleges Holding Corp.*, 236 F.R.D. 184, 188 (S.D.N.Y. 2006) (courts in this District "have recognized [institutional investors] as being ideally suited to control this type of securities class action litigation").

Since Teamsters' appointment as Lead Plaintiff, it has demonstrated its willingness and ability to serve as an adequate Class Representative. Among other things, Teamsters has: (i) supervised and monitored the progress of the litigation; (ii) participated in discussions with Lead Counsel concerning case developments; (iii) reviewed Court filings; and (iv) searched for, collected, and produced documents responsive to Defendants' discovery requests. *See* Capeci

- 12 -

Decl., ¶¶12-13.  Teamsters understands its duty to the Proposed Class, has made itself available for a deposition and will be available for future hearings and trial, and is committed to vigorously prosecuting this action to maximize recovery for all Proposed Class members.  *See id.*

Lead Plaintiff has also ensured that the interests of the Class will be protected by retaining counsel that is "qualified, experienced and able to conduct the litigation."  *Flag Telecom*, 574 F.3d at 35.  "Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2015).  Robbins Geller has diligently prosecuted this case by, among other things, drafting a detailed amended complaint, opposing Defendants' motion to dismiss, and pursuing comprehensive discovery from Defendants and third parties.  Robbins Geller is committed to continue zealously advocating on behalf of the Proposed Class for as long as it takes to secure a successful outcome.

Lead Plaintiff is well-suited to represent the Class, and was injured by Defendants' alleged fraud like the rest of the Proposed Class members.  Lead Plaintiff and Lead Counsel are willing and able to prosecute this action on behalf of absent Class members and "will fairly and adequately protect" their interests.  Fed. R. Civ. P. 23(a)(4).  Therefore, adequacy is established.[7]

### C.      The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

In addition to meeting the requirements of Rule 23(a), this case also satisfies Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over

---

[7]     The implied Rule 23 requirement of ascertainability is satisfied here because "[t]he proposed class definition clearly delineates the class's boundaries by the dates of investors' transactions" in Vanda common stock, and, as a result, "[a]scertaining the members of the Class will be easily administrable by references to investor records."  *Pearlstein*, 2021 WL 253453, at *13.

- 13 -

any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1.     Common Questions of Law and Fact Predominate

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Hawaii Structural Ironworkers*, 338 F.R.D. at 213-14; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017).   The "Supreme Court has noted that the predominance requirement 'is a test readily met in certain cases alleging . . . securities fraud.'" *Hawaii Structural Ironworkers*, 338 F.R.D. at 214.  Importantly, "predominance does not require a plaintiff to show that there are <u>no</u> individual issues." *Gruber*, 2019 WL 4439415, at *5 (emphasis in original).

The analysis of whether common questions predominate "'begins . . . with the elements of the underlying cause of action.'" *J.P. Morgan*, 2017 WL 1273963, at *13 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*")).[8]  In securities fraud cases such as this, "materiality, falsity, and loss causation are considered 'common question[s].'" *Gruber*, 2019 WL 4439415, at *6; *see also Amgen*, 568 U.S. at 467, 475 (falsity and materiality present common questions).  Indeed, the Supreme Court has held that a plaintiff is not required to "show loss causation as a condition of obtaining class certification" because it is a common question. *Halliburton I*, 563 U.S. at 813.   Scienter is likewise a common question because

---

[8]    The elements of Lead Plaintiff's claims under §10(b) and Rule 10b-5 of the Exchange Act are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton I*, 563 U.S. at 810.

Defendants' state of mind did not differ with respect to individual class members. *See, e.g.*, *SunEdison*, 329 F.R.D. at 146-47 (scienter presented a common question). Therefore, the predominance inquiry "often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.

Here, Lead Plaintiff and the Proposed Class are entitled to a presumption of class-wide reliance under the fraud-on-the-market theory set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*") (reaffirming *Basic*). Damages will also be determined on a Class-wide basis using the same formula and measure of artificial inflation attributable to Defendants' conduct for all members of the Proposed Class.[9] Accordingly, the predominance requirement is satisfied.

### a. Lead Plaintiff Is Entitled to the Fraud-on-the-Market Presumption of Reliance

To invoke the fraud-on-the market reliance presumption, a security must trade in an efficient market. *Amgen*, 568 U.S. at 462 ("In *Basic*, we held that if a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities."). While the Second Circuit has "declined to adopt a particular test for market efficiency," it has recognized that "district courts in this and other Circuits regularly consider" the *Cammer* factors: (1) the average weekly trading volume of the stock; (2) the number of securities analysts following and reporting on it; (3) the extent to which market makers traded in the stock; (4) the issuer's eligibility to file an SEC registration Form S-3; and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price. *Waggoner*, 875 F.3d at 94-95 (reciting factors from *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).

---

[9] Because the elements of a §20(a) claim turn on the individual defendants' liability as control persons, those questions are also common to the Proposed Class.

The Second Circuit further recognized that courts in this District "often consider" the following additional factors: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ("the float")." *Waggoner*, 875 F.3d at 94-95 (quoting *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)). The *Cammer* and *Krogman* factors are tools, not a checklist, and should be analyzed "holistic[ally]" "based on the totality of the evidence presented." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 277 (2d Cir. 2017). "[T]he burden required to establish market efficiency 'is not an onerous one.'" *Waggoner*, 875 F.3d at 97.

Here, an analysis of the *Cammer* and *Krogman* factors is arguably unnecessary because Vanda common stock trades on the NASDAQ, which "is presumed to be efficient." *Billhofer*, 281 F.R.D. at 159 (finding market efficiency where company's ADRs traded on the NASDAQ); *see also Goldman Sachs*, 955 F.3d at 261 (describing the NASDAQ as a "theoretically efficient market[]"); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) ("most courts in this Circuit agree that [a] listing" on the NYSE or NASDAQ "is a good indicator of efficiency"). Nonetheless, a holistic evaluation of the *Cammer* and *Krogman* factors overwhelmingly supports a finding that the market for Vanda common stock was efficient during the Class Period, entitling Lead Plaintiff and the Proposed Class to rely on the fraud-on-the-market presumption of reliance.

### (1)    *Cammer* Factor 1: Vanda Stock Experienced High Weekly Trading Volume

High trading volume "suggests efficiency because it implies significant investor interest in the company . . . [which], in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Strougo*, 312 F.R.D. at 316. "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify

a substantial presumption."  *Cammer*, 711 F. Supp. at 1293; *see also In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013).

Here, the average weekly trading volume of Vanda common stock during the Class Period was 7% of outstanding shares – well above this threshold – which supports a strong presumption of market efficiency.  Steinholt Rept., ¶¶24-25.

**(2)      *Cammer* Factor 2: There Was Substantial<br>Analyst Coverage of Vanda**

Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market."  *Winstar*, 290 F.R.D. at 446.  "This factor is commonly met where multiple large brokerage firms produce . . . reports on the financial condition of a company . . . ."  *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014).  Vanda had at least 12 analyst firms that followed the Company during the Class Period.  Steinholt Rpt., ¶27.  The extensive analyst coverage of Vanda easily satisfies *Cammer* factor two and supports a finding of market efficiency.  *See Winstar*, 290 F.R.D. at 446 (finding market efficiency with three analysts).

Courts also recognize that widespread media coverage is indicative of market efficiency.  *See Carpenters*, 310 F.R.D. at 92 ("regular press coverage throughout the Class Period" weighed in favor of finding market efficiency); *Billhofer*, 281 F.R.D. at 153-54 (publication of over two dozen press releases and articles supported finding of market efficiency).  During the Class Period, Vanda's press releases, earnings announcements, conference calls and other media commentaries were available on *Bloomberg*, a major news source to the investment industry.  Steinholt Rept., ¶28.  This further supports the efficiency of the market for Vanda common stock.

**(3)** ***Cammer* Factor 3: The Number of Liquidity Providers and Institutional Investors in Vanda Stock**

The third *Cammer* factor relates to the number of arbitrageurs, market makers and/or other sophisticated investors, such as institutional investors, who traded Vanda common stock during the Class Period. Steinholt Rept., ¶30. "Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level." *Global Brokerage*, 2021 WL 1160056, at *15. "Courts in this Circuit have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency." *Carpenters*, 310 F.R.D. at 92. During the Class Period, out of more than 140 market makers or supplemental liquidity providers for Vanda stock, there were 20 with volume of at least one million shares. Steinholt Rept., ¶32.

Additionally, there were more than 420 institutional investors that reportedly owned a total of at least 37.5 million Vanda shares during the Class Period, making up more than 80% of the Company's shares outstanding plus short interest. *Id.*, ¶34. Such high institutional ownership is indicative of market efficiency. *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (finding that institutional investors could "easily buy and sell" a security and "likely acted as arbitrageurs and facilitated the efficiency of the market").

**(4)** ***Cammer* Factor 4: Vanda Was Eligible to File a Form S-3 Registration Statement**

"The ability to file this form" [Form S-3] is evidence of market efficiency because it "indicates that the company is easily able to issue new securities." *Winstar*, 290 F.R.D. at 447. To be eligible to file a Form S-3 registration statement, a company has to be an SEC reporting company for at least 12 months and have $75 million in voting stock held by non-affiliates (average

during 60-day period prior to filing).  *See* 17 C.F.R. §239.13; *see also* Steinholt Rept., ¶36. Vanda's eligibility to file a Form S-3 further supports market efficiency.

**(5)    *Cammer* Factor 5: Vanda's Common Stock Reacted to Unexpected Company-Specific Information, Demonstrating a Cause-and-Effect Relationship**

The fifth *Cammer* factor allows, but does not require, a plaintiff to submit "direct evidence" demonstrating a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Waggoner*, 875 F.3d at 94.  The Second Circuit has held that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies" – particularly where the other, "indirect" *Cammer* and *Krogman* factors provide compelling evidence of market efficiency.  *Id.* at 96-98. Here, the first four *Cammer* factors and all of the *Krogman* factors discussed below, support market efficiency, obviating the need to analyze the fifth *Cammer* factor.  *See Allergan*, 2021 WL 4077942, at *10 ("All together, these factors so strongly support a presumption of market efficiency, that it obviates the need to examine the empirical evidence necessary to evaluate the fifth *Cammer* factor."); *see also Carpenters*, 310 F.R.D. at 86 ("In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it.").

Nonetheless, Steinholt's event study analysis provides compelling supplemental evidence of a cause-and-effect relationship between the dissemination of unexpected Vanda-related news and the movement in the Company's stock price.  *See* Steinholt Rept., ¶¶38-48.  An event study measures how much a security price rises or falls in response to new, material company-specific information.  *Id.*, ¶38.  "[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima*

*facie* evidence of the existence of such a causal relationship." *Petrobras*, 862 F.3d at 278. The Second Circuit has recognized that event studies are "standard operating procedure in federal securities litigation[.]" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016); *see also Gruber*, 2021 WL 2482109, at *8.

Steinholt's event study identified and analyzed whether the information disclosed in Vanda's "financial releases" impacted the Company's stock price. Steinholt Rept., ¶42. Specifically, Steinholt examined the price reaction (or absence thereof) following each of Vanda's financial releases from thirteen quarters (totaling sixteen releases) during the Class Period, and found that the price movements associated with ten out of the sixteen financial releases were statistically significant at the 5% level. *Id.* The cumulative probability of this occurring simply by chance is one in more than 1 billion (far exceeding the 1 out of 20, or the 5% benchmark). *Id.*

Steinholt also examined Vanda's price reactions following the two corrective disclosures alleged in the Complaint. *Id.*, ¶43. Following the February 5, 2019 post-market close disclosure, the decline in Vanda's common stock on February 6 comprised a residual decline that was statistically significant at the 1% level. *Id.*, ¶45. Following the intra-day disclosure on February 11, 2019, Vanda's common stock experienced a residual decline that was statistically significant at the 5% level. *Id.*, ¶47.

Steinholt's event study demonstrates that investors quickly analyzed and traded on new, material company-specific information during the Class Period. *Id.*, ¶48. Thus, the fifth *Cammer* factor provides additional evidence of market efficiency. *Id.*

### (6) The *Krogman* Factors Also Support a Finding of Market Efficiency

All three *Krogman* factors – market capitalization, bid-ask spread, and public float – also support a finding of market efficiency. Steinholt Rpt., ¶¶49-54.

- 20 -

*First*, Vanda's large market capitalization – *i.e.*, the total value of all outstanding shares – supports market efficiency because "investors tend to be more interested in companies with higher market capitalizations, thus leading to more efficiency." *Strougo*, 312 F.R.D. at 315. Vanda's market capitalization ranged from $312 million to $1.65 billion during the Class Period. Steinholt Rpt., ¶50. This market capitalization is significantly greater than the $75 million benchmark in *Cammer* factor four, and provides a sufficient economic incentive for the Company's common stock purchasers to invest in and monitor Vanda. *Id.* Vanda's sizeable market capitalization exceeds the market capitalizations of companies whose securities have been found to be trading in efficient markets. *See, e.g.*, *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (market capitalization of $1 billion).

*Second*, the bid-ask spread for Vanda common stock – *i.e.*, the difference between the price at which market makers are offering to buy a security and the price at which they are offering it for sale – was exceedingly narrow. Steinholt Rpt., ¶52. "[A] small bid-ask spread indicate[s] that trading in the stock [is] inexpensive, suggesting efficiency." *Strougo*, 312 F.R.D. at 316; *see also Pearlstein*, 2021 WL 253453, at *16 ("comparatively small bid-ask spread strongly indicates that the stock traded in an efficient market"). During the Class Period, the average bid-ask spread for Vanda's common stock was very small – approximately $0.03 per share, or roughly 0.2% of the closing price. Steinholt Rpt., ¶52.

*Third*, Vanda's public float – the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities – ranged from 35.9 million to 50.6 million shares with a market value ranging from $261 million to $1.6 billion during the Class Period. *Id.*, ¶54. The large size and high percentage of Vanda's float is indicative of market efficiency. *See Strougo*, 312 F.R.D. at 316 ("[t]he percentage of shares available to the public generally bears a direct

relationship to efficiency" because when insiders with private information hold large portions of the security, "the price is less likely to reflect only the total of all public information").

*       *       *

In sum, all of the "indirect" *Cammer* and *Krogman* factors overwhelmingly weigh in favor of a finding that the market for Vanda common stock was efficient during the Class Period. Steinholt Rept., ¶55. And although not required, Lead Plaintiff has also satisfied the fifth *Cammer* factor by providing "direct evidence" of market efficiency. *Id.*, ¶¶37-48. Accordingly, Lead Plaintiff is entitled to the *Basic* presumption of reliance, and common questions predominate.

> **b.      Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology**

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class'[] asserted theory of injury[.]" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015). The Second Circuit has made clear that *Comcast* does not require "a finding that damages are capable of measurement on a classwide basis." *Id*. at 402. "All that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015); *see also Tableau Software*, 2020 WL 2553100, at *4 ("*Comcast* did not rewrite the standards governing individualized damages consideration.").

Here, Lead Plaintiff has demonstrated that damages in this case can be calculated using a common methodology. As Steinholt explains, valuation tools, including an event study, would be used to assess whether the alleged misrepresentations and omissions caused Vanda's stock price to be artificially inflated, and whether corrective disclosures caused the inflation to dissipate.

Steinholt Rept., ¶¶58-61. Under this model, damages per share would be the difference between inflation on the share purchase date and inflation on the share sale date. *Id.*, ¶60.

Courts have consistently found that this approach satisfies the requirements of *Comcast*. *See, e.g.*, *Signet*, 2019 WL 3001084, at *20 (event study satisfied *Comcast* by "provid[ing] a class-wide model for calculating damages arising from [plaintiff's] theory of liability"); *Carpenters*, 310 F.R.D. at 99 ("Plaintiffs' model survives the minimal scrutiny required under *Comcast* and Rule 23(b)(3) – their theory of liability matches their theory of damages and individualized damages issues will not predominate."). And although the specific amount of damages may vary among Proposed Class members, it is well established that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)." *Roach*, 778 F.3d at 405; *see also Gruber*, 2019 WL 4439415, at * 8 (rejecting the argument "that different plaintiffs would have relied on different omissions before making purchases"; noting that "the damages <u>model</u> is generally the same – inflated price minus actual price") (emphasis in original).

### 2. A Class Action Is Superior to Other Methods of Adjudication

"The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *6 (S.D.N.Y. May 15, 2017). In assessing Rule 23(b)(3)'s superiority requirement, courts consider: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). "Securities cases 'easily satisfy' [the superiority] requirement, as the alternatives

are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Chicago Bridge*, 2020 WL 1329354, at *11. This case is no different.

*First*, the Proposed Class consists of a large number of geographically dispersed purchasers of Vanda common stock whose individual damages likely are too small to make individual litigation economically worthwhile. *See Kaplan v. S.A.C. Cap. Advisors, L.P.*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015) (the superiority requirement is met where there is a "risk that, absent class action, certain . . . investors would be unable to adjudicate their claims"). *Second*, Lead Plaintiff is not aware of any other securities litigation commenced by Class members regarding the alleged fraud. *Third*, "concentrating the litigation in this forum would promote judicial economy" in light of the Court's familiarity with the subject matter of this action. *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 53 (S.D.N.Y. 2012). *Finally*, Lead Plaintiff does not foresee any management difficulties that will preclude this action from being maintained as a class action. Thus, a class action is clearly superior to a multiplicity of individual suits alleging identical claims.

**D.    The Court Should Appoint Robbins Geller as Class Counsel**

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." In appointing class counsel, the Court considers counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class[.]" Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). As discussed above, Robbins Geller has ably identified, investigated, and diligently pursued the Proposed Class's claims in this action and will continue to do so. *See supra* 6-8. In detailed briefing opposing Defendants' motion to dismiss, Robbins Geller demonstrated its knowledge of the applicable law. *See* ECF No. 48-31. And Robbins Geller's firm resumé confirms its extensive experience litigating class actions and that

- 24 -

the firm has proven its willingness to devote substantial time and resources to representing the Proposed Class.  *See* Capeci Decl., Ex. D.  Accordingly, Lead Plaintiff respectfully requests that the Court appoint Robbins Geller as Class Counsel pursuant to Rule 23(g).

## IV.    CONCLUSION

Lead Plaintiff has affirmatively demonstrated compliance with all of the requirements for class certification.  Accordingly, Lead Plaintiff respectfully requests that the Court enter an Order: (i) certifying this action as a class action pursuant to Rule 23(a) and Rule 23(b)(3); (ii) certifying Lead Plaintiff as Class Representative; and (iii) appointing Robbins Geller as Class Counsel pursuant to Rule 23(g).[10]

DATED:  October 29, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID A. ROSENFELD
MICHAEL G. CAPECI
AVITAL O. MALINA

*/s/ Michael G. Capeci*
MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
drosenfeld@rgrdlaw.com
mcapeci@rgrdlaw.com
amalina@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

---

[10]    In connection with this motion, earlier today Lead Plaintiff filed a request for a pre-motion conference regarding its anticipated motion to exclude the report and opinions of Defendants' rebuttal expert, Dr. Stulz, for failing to comport with *Daubert* and its progeny.

<u>CERTIFICATE OF SERVICE</u>

I, Michael G. Capeci, hereby certify that on October 29, 2021, I authorized a true and correct copy of the foregoing document to be served on counsel for Defendants via electronic mail.

*/s/ Michael G. Capeci*
MICHAEL G. CAPECI