**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KENNETH GORDON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> VANDA PHARMACEUTICALS INC. and MIHAEL H. POLYMEROPOULOS, <br><br><br> Defendants. | Case No. 1:19-cv-01108-FB-LB |

**MEMORANDUM OF LAW IN OPPOSITION TO
<u>LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000

*Counsel for Defendants*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD................................................................................................................. 8

ARGUMENT .............................................................................................................................. 9

I.  Plaintiff's Proposed Class Definition Must Be Delimited to Appropriately Address the Two Different Theories By Shortening the Class Period for the Tradipitant Claim. ......... 9

    A.  Under Rule 23, the Court Must Evaluate the Appropriate Length of the Tradipitant Claim Class Period.............................................................................. 10

    B.  The Factual Allegations Related to the Tradipitant Claim Can, at Most, Only Support a Class Period That Begins on December 3, 2018. ................................. 13

II.  Plaintiff's Proposed Class Should Not Be Certified with Respect to the Off-Label Claim because Defendants Have Rebutted the *Basic* Presumption of Reliance. ....................... 17

    A.  The Court Must Weigh All of the Evidence and May Not Certify a Class as to the Off-Label Claim if Defendants Have Demonstrated That the Alleged Misstatements Did Not Impact the Price of Vanda's Stock. ............................... 17

    B.  The Public Disclosure of the Qui Tam Action Complaint Did Not Cause a Statistically Significant Stock Price Drop............................................................. 20

    C.  Plaintiff's Articulated Theory of Price Impact Is Inconsistent with the Efficient Market Hypothesis and the Evidence. ............................................................... 22

    D.  Information in the Aurelius Report Was Previously Disclosed on Public Websites Without a Statistically Significant Stock Price Drop............................................. 27

    E.  No Analysts Modified Their Recommendations or Valuation Models Based on the Allegations of Vanda's Off-Label Marketing......................................................... 29

    F.  Under *Goldman*, the Generic Nature of the Alleged Misstatements Also Demonstrates Lack of Price Impact. ..................................................................... 30

    G.  Non-Fraud-Related New Information Became Public on February 11, 2019, Explaining the Stock Price Decline on Which Plaintiff Relies............................... 32

III.  The Proposed Class Cannot Be Certified Because Plaintiff Has Failed to Propose a Workable Class-Wide Damages Methodology.................................................................. 33

    A.  Plaintiff's Damages Methodology Is Not Tailored to Plaintiff's Theory of Liability With Respect to the Tradipitant Claim.................................................... 34

    B.  Plaintiff's Damages Methodology Is Not Tailored to Plaintiff's Theory of Liability With Respect to the Off-Label Claim. .................................................... 39

CONCLUSION......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerman* v. *Coca-Cola Co.*,
    No. 09 CV 395 DLI RML, 2013 WL 7044866 (E.D.N.Y. July 18, 2013) ..............................34

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................................................12

*Altayyar* v. *Etsy, Inc.*,
    731 F. App'x 35 (2d Cir. 2018) ..........................................................................................31

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020) .......................................................................................34, 38

*Amgen Inc.* v. *Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ...........................................................................................................22

*Asay* v. *Pinduoduo Inc.*,
    ___ F. App'x ___, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) ..............................................31

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988) .............................................................................................................8

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
    506 F. App'x 32 (2d Cir. 2012) ..........................................................................................31

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................10, 11, 31

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    No. 17 CIV. 01580 (LGS), 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ..............................21

*United States* v. *City of New York*,
    No. 07-CN-2067(NGG)(RLM), 2011 WL 3174084 (E.D.N.Y. July 8, 2011) ........................11

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ................................................................................................31

*Comcast Corp.* v. *Behrend*,
    569 U.S. 27 (2013) ........................................................................................................ *passim*

*Decastro* v. *City of New York*,
    No. 16-CV-3850 (RA), 2019 WL 4509027 (S.D.N.Y. Sept. 19, 2019) ..................................13

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ...........................................................................................31

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015) .............................................................................18, 29

*In re Finisar Corp. Sec. Litig.*,
    No. 5:11-cv-01252-EJD, 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ..................................18

*Fishon* v. *Peloton Interactive, Inc.*,
    336 F.R.D. 67 (S.D.N.Y. 2020) .................................................................................8, 13

*Fogel* v. *Vega*,
    759 F. App'x 18 (2d Cir. 2018) ....................................................................................31

*Fort Worth Emp'rs' Ret. Fund* v. *Biovail Corp.*,
    615 F. Supp. 2d 218 (S.D.N.Y. 2009).............................................................................16

*George* v. *China Auto. Sys., Inc.*,
    No. 11 CIV. 7533 KBF, 2013 WL 3357170 (S.D.N.Y. July 3, 2013)...............................8, 13

*Goldman Sachs Grp., Inc.* v. *Arkansas Tchr. Ret. Sys.*,
    141 S. Ct. 1951 (2021)...................................................................................... *passim*

*Greenberg* v. *Crossroads Sys., Inc.*,
    364 F.3d 657 (5th Cir. 2004) .......................................................................................29

*Gross* v. *GFI Grp., Inc.*,
    784 F. App'x 27 (2d Cir. 2019) ....................................................................................31

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014).............................................................................5, 8, 18, 21

*IBEW Loc. 90 Pension Fund* v. *Deutsche Bank AG*,
    No. 11 CIV. 4209 KBF, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ....................................8

*IBEW Loc. 98 Pension Fund* v. *Best Buy Co.*,
    818 F.3d 775 (8th Cir. 2016) .......................................................................................18

*Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016)...........................................................................................31

*In re ITT Educ. Servs.*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012)............................................................................16

*Jermyn* v. *Best Buy Stores, L.P.*,
    256 F.R.D. 418 (S.D.N.Y. 2009) ..................................................................................12

*Kurtz* v. *Costco Wholesale Corp.*,
   818 F. App'x 57 (2d Cir. 2020) ...................................................................................35

*Lanqing Lin* v. *Everyday Beauty Amore Inc.*,
   No. 18-CV-729 (BMC), 2019 WL 3037072 (E.D.N.Y. July 11, 2019) ...................................8

*In re Lehman Bros. Sec. & ERISA Litig.*,
   113 F. Supp. 3d 745 (S.D.N.Y. 2015)..............................................................................12

*Levitt* v. *J.P. Morgan Sec. Inc.*,
   270 F.R.D. 127 (E.D.N.Y. 2010) ...................................................................................11

*In re Liberty Tax, Inc. Sec. Litig.*,
   828 F. App'x 747 (2d Cir. 2020) ...................................................................................31

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018)..............................................................................10

*Ludlow* v. *BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) ...............................................................................39, 40

*Luna* v. *Marvell Tech. Grp., Ltd.*,
   No. C 15-05447 WHA, 2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) .............................11, 13

*Marisol* v. *Giuliani*,
   126 F.3d 372 (2d Cir. 1997)..........................................................................................11

*In re MELA Sciences, Inc. Sec. Litig.*,
   No. 10 CV 8774(VB), 2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012)...................................16

*Meyer* v. *Greene*,
   710 F.3d 1189 (11th Cir. 2013) ....................................................................................22

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ...................................................................................18

*Morangelli* v. *Chemed Corp.*,
   275 F.R.D. 99 (E.D.N.Y. 2011)......................................................................................10

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   338 F.R.D. 527 (S.D.N.Y. 2021) .................................................................9, 11, 34, 38

*Ohio Public Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*,
   No. 4:08CV0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) .......................................18

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008)..............................................................................35

*Ong* v. *Chipotle Mexican Grill*,
    294 F. Supp. 3d 199, 233 (S.D.N.Y. 2018)..................................................................16

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) .......................................................................16, 26, 31

*Reese* v. *Bahash*,
    574 F. App'x 21 (2d Cir. 2014) ...............................................................................31

*Rivera* v. *Harvest Bakery Inc.*,
    312 F.R.D. 254 (E.D.N.Y. 2016) ..............................................................................10

*Roach* v. *T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)..............................................................................33, 35

*Robinson* v. *Metro-N. Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001).....................................................................................10

*Royal Park Invs. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*,
    No. 14-CV-4394 (AJN), 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) ....................10

*Ruzhinskaya* v. *Healthport Techs., LLC*,
    311 F.R.D. 87 (S.D.N.Y. 2015) ................................................................................10

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015).........................................................................16

*Scott* v. *Gen. Motors Co.*,
    605 F. App'x 52 (2d Cir. 2015) ...............................................................................31

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y 2010)........................................................................22

*In re Smart Techs., Inc. S'holder Litig.*,
    295 F.R.D. 50 (S.D.N.Y. 2013) ................................................................................12

*Stevelman* v. *Alias Rsch., Inc.*,
    No. 91 Civ. 682 (EBB), 2000 WL 888385 (D. Conn. June 22, 2000).....................11

*In re Sumitomo Copper Litig.* v. *Credit Lyonnais Rouse, Ltd.*,
    262 F.3d 134 (2d Cir. 2001)......................................................................................12

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019) ...............................................................................10

*Sykes* v. *Mel S. Harris & Associates LLC*,
    780 F.3d 70 (2d Cir. 2015)..................................................................................35, 38

*In re Synchrony Fin. Sec. Litig.*,
   988 F.3d 157 (2d Cir. 2021)..................................................................................31

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008)....................................................................................8

*In re U.S. Foodservice Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013)..................................................................................35

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ..............................................................11, 12, 13

*Waggoner* v. *Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)..............................................................................22, 35

*Wai Hoe Liew* v. *Cohen & Slamowitz, LLP*,
   265 F. Supp. 3d 260 (E.D.N.Y. 2017) ...................................................................22

**Statutes**

21 U.S.C. § 355(i)(2) .............................................................................................15

**Other Authorities**

21 C.F.R. § 312.40(b) .............................................................................................15

Brealey, et al., *Principles of Corporate Finance* (10th ed. 2011) ...............................22

Fed. R. Civ. P. 23 ............................................................................................ *passim*

Defendants respectfully submit this memorandum of law in opposition to Plaintiff's motion for class certification.

## PRELIMINARY STATEMENT

Lead Plaintiff Teamsters Local Union No. 727 Pension Fund ("Plaintiff") seeks certification of a class of stockholders of Vanda Pharmaceuticals, Inc. ("Vanda" or the "Company") who purchased Vanda stock from November 4, 2015, to February 11, 2019, to pursue two distinct and unrelated theories of fraud:

- *First*, Plaintiff claims that Defendants made misstatements concerning the FDA's decision to impose a partial clinical hold on long-term human testing of a pipeline drug called tradipitant unless Vanda conducted an animal safety study that required the sacrifice of dozens of dogs (the "Tradipitant Claim"); and

- *Second*, Plaintiff claims that Defendants made misstatements concerning alleged off-label marketing of two already-approved drugs, Fanapt® and Hetlioz®, premised upon unproven allegations by several former Vanda employees that Vanda unlawfully promoted those drugs for off-label use (the "Off-Label Claim").

Plaintiff fashions its motion and proposed class definition as if both the Tradipitant Claim and Off-Label Claim support a single, expansive 39-month class period. But that is not so. Each of these theories concerns different drugs, different theories of liability, different alleged misstatements, and different stock drops (with different damages). Indeed, the Tradipitant Claim concerns a far shorter time period, but the alleged damages are significantly higher, reflecting a purported 20% stock drop, compared to five percent for the Off-Label Claim.

Given these two disparate theories, each must be analyzed separately. When the Court undertakes that analysis, it will find that class certification should be denied because each theory suffers from separate, but equally fatal, problems at class certification. Moreover, Plaintiff's

sweeping, 39-month proposed class period is vastly overbroad, and insupportably designed to impose hydraulic class-wide pressure on Defendants.[1]

**The Tradipitant Claim**. On February 5, 2019, Vanda announced that it had sued the FDA to challenge the FDA's decision to impose a partial clinical hold on trials for tradipitant, a drug in Vanda's development pipeline. The FDA had asked that Vanda perform an additional "non-rodent toxicity study"—*i.e.*, a study in dogs to test the safety of the drug—before conducting long-term clinical trials on humans. (¶ 206.) Vanda requested in August 2018 that the FDA reconsider its demand on the grounds that Vanda's prior safety testing for tradipitant was adequate and that the unnecessary sacrifice of dogs was inhumane; alternatively, Vanda asked that it be permitted to conduct a more humane, modified dog study. (Ex. 11.) Vanda engaged in a months-long dialogue with the FDA, during which it provided scientific evidence in support of its position and proposed alterative study designs. (*Id.*; ¶¶ 206–225.) Ultimately, the FDA insisted that Vanda conduct the safety study as originally demanded and, on December 19, 2018, imposed a partial clinical hold preventing clinical trials of tradipitant lasting more than three months absent the completion of the dog study. (¶ 221.)

According to Plaintiff, when Vanda announced its lawsuit seeking judicial review of the FDA's decision, the announcement caused Vanda's stock price to drop by almost 20%. (¶ 226.) The record shows, however, that the drop was not caused by news of the FDA's clinical hold; rather, investors and analysts reacted negatively to the fact that Vanda had sued the FDA (its primary U.S. regulator), worrying that it would antagonize the FDA and lead to problems for Vanda related to its *other* drugs. For example, Plaintiff's own money manager, Rothschild & Co.

---

[1] "¶" refers to a paragraph from the Amended Complaint for Violations of the Federal Securities Laws, dated July 23, 2019 (ECF No. 29) (the "Complaint"); "Ex. __" refers to an exhibit attached to the Declaration of Audra J. Soloway being filed with this Opposition; and "Pl. Ex. __" refers to an exhibit attached to Plaintiff's motion. "Steinholt Report" refers to the Expert Report of Bjorn I. Steinholt, CFA, dated July 30, 2021; "Stulz Report" refers to the Rebuttal Report of René M. Stulz, Ph.D., dated September 17, 2021; and "Reply Report" refers to the Expert Report of Bjorn I Steinholt, CFA, dated October 29, 2021.

("Rothschild"), wrote that "[t]his provocation raises concerns that the FDA could potentially take a hostile stance towards the company's filing for label expansion for its flagship Hetlioz commercial drug." (Ex. 12 at 6.) In other words, Rothschild was concerned that the hostile posture of Vanda's lawsuit against the FDA would impact interactions regarding another drug—not tradipitant—that was unrelated to the dog study issue.

Plaintiff's proposed class period for the Tradipitant Claim unjustifiably extends *years* before the alleged corrective disclosure on February 5, 2019, even though (a) the Complaint identifies the earliest Tradipitant Claim misstatement as occurring on August 1, 2018, and (b) Plaintiff's own expert admits that the Tradipitant Claim could not have caused damages before May 2018. Accordingly, the proposed class period beginning in November 2015 includes numerous investors who suffered no alleged losses on this claim. (*See infra* p. 1.) If a class is certified as to the Tradipitant Claim at all, that class period cannot start until December 3, 2018, which is the earliest date on which any misstatement could possibly have been made. While the Complaint identifies certain pre-December 3 statements by Defendants, none relate in any way to the FDA's clinical hold, which only affected clinical trials of tradipitant *longer than three months*. Instead, the pre-December 3 alleged misstatements concerned a short-term Phase II study that Vanda successfully completed while its dialogue with the FDA about the dog study was ongoing (the "Short-Term Study"). (¶¶ 386–402.) Vanda announced results for this Short-Term Study on December 3, 2018. (¶ 219.) As Plaintiff's own investment manager admitted at his deposition, the Short-Term Study had nothing to do with the longer-term study that was the subject of the clinical hold, and that there was nothing factually inaccurate about the Company's statements about the successfully completed Short-Term Study. (Ex. 5 at 123:13–124:3; 128:8–136:8.) As a result, if certified, the Tradipitant Claim class period cannot commence prior to December 3, 2018—when Vanda made the first alleged misstatements about further long-term testing—and any class definition must be limited accordingly. While the Court declined to address the

3

misstatements underlying the Tradipitant Claim at the motion-to-dismiss stage, the Court must do so now, because they are critical to determining the proper length of the proposed class period, an issue the Court must assess as part of class certification.  Any other result would allow Plaintiff to include in the class for the Tradipitant Claim investors who were not possibly defrauded and who cannot possibly have suffered any compensable damages, and courts routinely tailor class definitions to prevent such an outcome. (*See infra* Part I.)

In addition, class certification for the Tradipitant Claim should be denied entirely because Plaintiff has failed to advance a viable damages methodology for these claims, as required by the Supreme Court's decision in *Comcast Corp.* v. *Behrend*, 569 U.S. 27 (2013).  The damages methodology advanced by Plaintiff's expert, Bjorn Steinholt ("Steinholt"), suffers from multiple, fatal flaws, including:  (1) Steinholt offers no way to disentangle any price impact associated with the purported fraud from other, non-fraud-related information that was released simultaneously (namely, Vanda's decision to sue the FDA); (2) Steinholt's methodology cannot possibly generate class-wide damages because it incorrectly assumes that all information available on February 5, 2019, was available on every day of the 39-month proposed class period, which is plainly incorrect; and (3) Steinholt's methodology ignores Vanda's disclosure of the risk of adverse decisions from the FDA, including clinical holds, even though any viable damages methodology must account for the fact that the alleged corrective disclosure represented the materialization of a disclosed risk. Thus, in this case, Plaintiff's proposed damages methodology does not pass the "rigorous" analysis required by Supreme Court precedent at the certification stage.  (*See infra* Part III.A.)

**The Off-Label Claim**.  Plaintiff's allegations about purported misstatements about Fanapt® and Hetlioz® rest on an underlying claim that Vanda engaged in "off-label marketing" of those two drugs.  While doctors are free to prescribe FDA-approved drugs to treat any condition, companies may only market drugs for uses approved by the FDA.  Plaintiff claims that Vanda ran afoul of this rule by marketing Fanapt® and Hetlioz® for unapproved uses.  These allegations are

4

derivative of claims advanced in a *qui tam* action filed against Vanda in 2017 and unsealed on February 4, 2019, *United States ex rel. Gardner* v. *Vanda Pharmaceuticals*, No. 1:17-cv-00464 (APM) (D.D.C.) (the "Qui Tam Action").  Plaintiff's fraud claim is that the off-label marketing practices alleged in the Qui Tam Action rendered misleading statements Vanda made on other topics.  Plaintiff alleges the disclosure of these purported off-label marketing practices caused a five percent stock price decline when a Vanda investor summarized and pejoratively characterized the Qui Tam Action allegations in a report entitled "Vanda: In the Land of The Blind, The One-Eyed Man is King" (the "Aurelius Report") on February 11, 2019.

Class certification should be denied for the Off-Label Claim because the record shows by a preponderance of the evidence that the alleged misstatements did not have a price impact.  As the Supreme Court recently instructed, at class certification, the Court must "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact."  *Goldman Sachs Grp., Inc.* v. *Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021); *see also Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 269, 283 (2014) ("*Halliburton II*") (A showing "for whatever reason" that an alleged misrepresentation "did not . . . actually affect the market price of defendants' stock" eliminates contention that investor relied on the misrepresentation in relying on integrity of the market price, "completely collaps[ing]" the fraud-on-the-market theory underlying the *Basic* presumption (*see infra* p. 8).)  Although a defendant bears the burden to rebut price impact, that burden "will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise." *Goldman*, 141 S. Ct. at 1963.

In this case, the Off-Label Claim allegations were made public when the Qui Tam Action was unsealed on February 4, 2019.  (Ex. 13 at 1.)[2]  In an efficient market, public information about

---

[2]    Plaintiff's counsel conceded as much during Prof. Stulz's deposition: "[W]e're in agreement, right, that the qui tam lawsuit is not in the public domain before February 4, 2019…" (Ex. 3 at 247:14–15.)

a company is absorbed into its stock price almost immediately, typically within 24 hours (as Plaintiff's expert admits). But the unrefuted evidence—generated by Plaintiff's own expert's analysis—demonstrates that there was no statistically significant decline in Vanda's stock price on February 4 or February 5, 2019, after the Qui Tam complaint became publicly available. (Pl. Ex. A at Exhibit B, p. 15; Ex. 1 ¶ 27.)

Plaintiff's theory of price impact boils down to an unsupportable assertion that new and value-relevant information went unnoticed by investors for a week, then had a price impact when reiterated in the Aurelius Report by an investor who had already traded on that information. This theory of a delayed price impact is not viable in an efficient market, where, by definition, new and value-relevant information is immediately incorporated into the stock price. Plaintiff cannot have its cake and eat it, too: it cannot rely on the efficient market theory to invoke the fraud-on-the-market presumption to establish class-wide reliance, but simultaneously reject the efficient market theory by contending that publicly available information was ignored by the market for a week. The absence of any statistically significant price movement when the Qui Tam Action complaint was unsealed demonstrates that, if Vanda stock traded in an efficient market (a prerequisite to class certification), the alleged misstatements relating to the Off-Label Claim had no price impact.

Copious additional fact and expert evidence disproves price impact in this case. Hundreds of institutional investors actively traded in Vanda stock during the class period, and these investors have strong incentives to locate and trade on publicly available information. (Pl. Ex. A, ¶ 33 & Exhibit C; Ex. 1, ¶ 42; Ex. 4 at 226:16–227:7.) We know for certain that one investor, Aurelius Value, did just that. In addition, as the Aurelius Report itself demonstrates, Vanda's alleged off-label marketing practices were discussed on public industry message boards and websites months earlier in 2018, with no price impact. (Ex. 1, ¶¶ 23, 25–26.) Further undermining any inference that the market viewed the off-label marketing allegations as relevant to Vanda's stock price, industry analysts that covered Vanda made no mention of the off-label marketing allegations,

6

much less adjusted their valuations of Vanda based on those allegations, either before or after the Aurelius Report was issued. (*Id.* ¶ 33.) Moreover, the stock price movement on February 11, 2019, after the Aurelius Report was issued can be explained by non-fraud-related new information, including the public announcement that an investor had taken a substantial short position in Vanda as well as other new, negative information about Vanda. Finally, the alleged misstatements concerning Fanapt® and Hetlioz® were highly generic, and, as the Supreme Court has held, such misstatements are less likely to induce reliance and impact a security's price. *See Goldman*, 141 S. Ct. at 1960 ("as a rule of thumb, a more-general statement will affect a security's price less than a more-specific statement on the same question"). Where, as here, the alleged misstatements are highly general and the alleged correction is specific, this "mismatch" further undermines claims of a price impact. *Id.* at 1961.

In the face of this evidence disproving price impact, Plaintiff relies on its expert, Steinholt, who offers a novel theory under which only "obviously" public information is absorbed by an efficient market. But Steinholt admits that he is not a financial economist, has no advanced degree in economics, and has published zero books or articles concerning the core principles of market efficiency. (Ex. 4 at 31:18–32:24.) The Court should afford no weight to Steinholt's novel and unsupported theories of the efficient market (which are also contrary to Supreme Court case law), and instead rely upon the report and testimony of Defendants' expert: renowned financial economist Prof. René M. Stulz, who, unlike Steinholt, holds a Ph.D. in economics from MIT and has published more than 25 books and dozens of articles on efficient market theories and securities price movements.

Given this evidence, and applying the standard set out in *Goldman,* the Court should find by a preponderance of the evidence that there was no price impact from the alleged Off-Label Claim misstatements. This finding is fatal to Plaintiff's motion on the Off-Label Claim, because

7

it means that Defendants have rebutted the presumption of reliance in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). *See Halliburton II*, 573 U.S. at 269, 283; *infra* Part II.

Moreover, Plaintiff's damages theory for the Off-Label Claim is flawed under *Comcast*. A viable damages model must be able to disentangle the price impact from the alleged corrective disclosure from other negative information released at the same time. The model proffered by Plaintiff's expert Steinholt fails to do so, offering another reason to deny class certification. *See Comcast*, 569 U.S. 27; *infra* Part III.B.

\*    \*    \*

At the class certification stage, a plaintiff cannot rely on mere assertions, but must establish by a preponderance of the evidence that certification is appropriate. Here, the evidence is not in equipoise; rather, the facts in the record tip decisively in Defendants' favor, showing that Plaintiff has not met the requirements of Rule 23.

## LEGAL STANDARD

"The Supreme Court has explained that a plaintiff seeking class certification must 'satisfy through evidentiary proof' that the provisions of Rule 23 have been met." *Lanqing Lin* v. *Everyday Beauty Amore Inc.*, No. 18-CV-729 (BMC), 2019 WL 3037072, at \*2 (E.D.N.Y. July 11, 2019) (quoting *Comcast*, 569 U.S. at 33). Plaintiff must make this showing by a preponderance of the evidence. *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

The Court must undertake a careful and rigorous analysis of the plaintiff's claims, because class certification is a "crucial inflection point" of the litigation that can "turn[] potential losses from relatively small amounts into potentially massive exposure." *George* v. *China Auto. Sys., Inc.*, No. 11 CIV. 7533 KBF, 2013 WL 3357170, at \*1 (S.D.N.Y. July 3, 2013); *IBEW Loc. 90 Pension Fund* v. *Deutsche Bank AG*, No. 11 CIV. 4209 KBF, 2013 WL 5815472, at \*22 (S.D.N.Y. Oct. 29, 2013) (same); *see also Fishon* v. *Peloton Interactive, Inc.*, 336 F.R.D. 67, 70 (S.D.N.Y.

8

2020) ("The Second Circuit has recognized that 'class certification places inordinate or hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability'") (quoting *Hevesi* v. *Citigroup Inc.*, 366 F.3d 70, 80 (2d Cir. 2004)).

In addition, in this case, because Plaintiff asserts two unrelated theories of fraud, each of Plaintiff's theories must be analyzed separately for class certification purposes. *See In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 553 (S.D.N.Y. 2021) ("[w]here, as here, a plaintiff alleges more than one theory of liability, the theories must be analyzed separately to ensure that common issues predominate as to each theory").

## ARGUMENT

### I.   PLAINTIFF'S PROPOSED CLASS DEFINITION MUST BE DELIMITED TO APPROPRIATELY ADDRESS THE TWO DIFFERENT THEORIES BY SHORTENING THE CLASS PERIOD FOR THE TRADIPITANT CLAIM.

Plaintiff seeks to certify a sweeping 39-month Class Period that runs from November 4, 2015, to February 11, 2019, without any delimitation to address the two entirely separate theories of liability, which occur on vastly different timelines. *See* Pls. Brief at 1.[3]  The proposed class period starts in 2015, even though (a) Plaintiff's Tradipitant Claim relies on alleged misstatements that began on August 1, 2018, 34 months ***after*** the proposed start date; (b) Plaintiff's class certification expert, Steinholt, concedes that the alleged artificial inflation caused by the alleged Tradipitant Claim misstatements could not possibly have entered the stock price until May 2018, 31 months after the proposed start date (Ex. 4 at 258:24–259:6; 268:7–269:5, Steinholt Dep.) (conceding no artificial inflation before May 2018); and (c) Plaintiff does not identify any actionable disclosure related to the Tradipitant Claim before December 3, 2018.  By Plaintiff's own allegations and expert evidence, then, the proposed class definition seeks to certify a class on

---

[3]   Plaintiff acknowledges in the same sentence that the proposed class action encompasses two completely different sets of allegations: "Vanda's multifaceted off-label promotion scheme for Fanapt and Hetlioz, the Company's only two approved drugs for sale during the Class Period (¶¶3–5); and (ii) Vanda's refusal to conduct a safety study mandated by the U.S. Food & Drug Administration ("FDA") for the continued clinical development of its most important pipeline drug, Tradipitant." (Pls. Br. at 1.)

the Tradipitant Claim—the much larger of the two alleged stock price drops—that includes investors who purchased *before* the alleged Tradipitant-related fraud, *before* the stock was allegedly inflated, and *before* any damages could possibly be incurred.  The class definition must be appropriately delimited to address this fundamental defect.

### A.    Under Rule 23, the Court Must Evaluate the Appropriate Length of the Tradipitant Claim Class Period.

A court may "modify the definition of the proposed class to provide the necessary precision or to correct other deficiencies." *Rivera* v. *Harvest Bakery Inc.*, 312 F.R.D. 254, 267 (E.D.N.Y. 2016).  "[T]he court has a duty to ensure that the class is properly constituted and has broad discretion to modify the class definition as appropriate to provide the necessary precision[.]" *Id.* (quoting *Morangelli* v. *Chemed Corp.*, 275 F.R.D. 99, 114 (E.D.N.Y. 2011)); *see also In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 134 (S.D.N.Y. 2019) (explaining that "a court is not bound by the class definition proposed in the complaint" and that "the class period may be shortened" (internal citations omitted)).  Courts within this Circuit frequently limit the class period to exclude putative class members who could not have been harmed.  *See Royal Park Invs. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2017 WL 1331288, at *9 (S.D.N.Y. Apr. 4, 2017) ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23 or it may allow plaintiff to amend in order to limit the class" (internal citation omitted)); *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 310 F.R.D. 69, 96–97 (S.D.N.Y. 2015) (explaining that the class period must be "delimited in order to identify . . . the activity that can give rise to liability").[4]

---

[4]  *See also, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 464 (S.D.N.Y. 2018) (noting that the Second Circuit has instructed district courts to take "full advantage" of certifying only some claims where an action includes multiple claims, not all of which meet Rule 23 requirements) (citing *Robinson* v. *Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 167 (2d Cir. 2001), *abrogated on other grounds*, *Wal-Mart Stores* v. *Dukes*, 564 U.S. 338 (2011)); *Ruzhinskaya* v. *Healthport Techs., LLC*, 311 F.R.D. 87 (S.D.N.Y. 2015) (finding that a proposed class required several "modifications" because it was temporally overbroad, contained an overbroad definition of "qualified persons," and for other reasons).

Moreover, in cases such as this, where the same class action concerns two entirely separate theories of liability, courts must accordingly analyze those theories separately.  *See Namenda*, 338 F.R.D. 527 (analyzing two theories of liability separately, and ultimately only certifying a class definition based on one theory); *Levitt* v. *J.P. Morgan Sec. Inc.*, 270 F.R.D. 127, 132 (E.D.N.Y. 2010) (noting that "[a]s these causes of action present different issues, the Court will analyze them separately" for purposes of class certification), *rev'd and remanded on alt. grounds*, 710 F.3d 454 (2d Cir. 2013)).  This is necessary because "[c]onflating differing theories risks applying a theory of injury applicable only to certain class members to others who may not have been injured by that specific theory."  *Namenda*, 338 F.R.D. 527 at 553; *see also United States* v. *City of New York*, No. 07-CN-2067(NGG)(RLM), 2011 WL 3174084 (E.D.N.Y. July 8, 2011) (certifying two subclasses in discrimination suit against the City of New York, each with respect to only those issues common to the subclass).  Conducting this rigorous analysis at class certification allows the district court to "identify[] the specific issues to be tried . . . [and] focus discovery on those issues, sparing the parties from directionless and haphazard discovery."  *Marisol* v. *Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997).

In securities fraud actions, courts are required to end the class period once the truth has reached the market, and to start the period on the date of the statement or event that triggers the potential liability.  *Carpenters Pension Tr. Fund*, 10 F.R.D. at 97; *see also, e.g.*, *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 241 (S.D.N.Y. 2006) (finding certain alleged misstatements "not actionable under the securities laws" and certifying the class "pursuant to defendants' proposed definition"); *Stevelman* v. *Alias Rsch., Inc.*, No. 91 Civ. 682 (EBB), 2000 WL 888385, at *5 (D. Conn. June 22, 2000) ("[N]o class period may commence prior to the earliest date on which plaintiff can properly allege all the elements of his prima facie case").[5]

---

[5]   *See also Luna* v. *Marvell Tech. Grp., Ltd.*, No. C 15-05447 WHA, 2017 WL 4865559, at *2 (N.D. Cal. Oct. 27, 2017) (shortening proposed class period because transactions in the first three financial quarters were not

11

Where the proposed Class Period does not align with the facts alleged, courts have broad discretion to adjust the time period, create subclasses, or exclude certain class members in order to certify an otherwise viable class action. *See, e.g.*, *In re Sumitomo Copper Litig.* v. *Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001) (noting that trial courts are provided broad discretion to determine whether or not to grant class certification because "the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted"); *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 60 (S.D.N.Y. 2013) (excluding certain traders from certified class); *Jermyn* v. *Best Buy Stores, L.P.*, 256 F.R.D. 418, 430–31 (S.D.N.Y. 2009) (exercising discretion to create shorter subclass to exclude time-barred claims); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 292 (S.D.N.Y. 2008) (shortening class period so that the class period ended on the date when plaintiffs had sufficient notice of the facts giving rise to the alleged fraud). In securities fraud cases, courts will also often limit a class period to exclude particular statements that are not adequately alleged to be misleading or fraudulent. *See, e.g.*, *Veeco*, 235 F.R.D. at 241.

Often the facial adequacy of the plaintiff's allegations is addressed at the motion to dismiss stage. But when ruling on Defendants' motion to dismiss in this case, the Court chose to address only Plaintiff's claims related to the off-label marketing allegations for Fanapt® and Hetlioz®, reasoning that, "[b]ecause the defendant's motion to dismiss fails . . . under the off-label drug promotion theory, as a practical matter the Court will not analyze [the tradipitant] claim." (Memorandum and Order at 3 n.2, ECF No. 55) (the "MTD Op."). Since the motion to dismiss was decided, Plaintiff has confirmed that the Tradipitant Claim gives rise to most of the potential damages in this action. (*See* Pl. Ex. A, ¶¶ 45, 47, 59, Steinholt Report; Ex. 1, ¶ 16, Stulz Report.)

---

adequately alleged to be misleading or fraudulent); *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 749 (S.D.N.Y. 2015) (allowing plaintiffs to replead complaint so as to narrow their claims and shorten the class period, based on substantive deficiencies in earlier complaint), *aff'd sub nom. Rinehart* v. *Lehman Bros. Holdings Inc.*, 817 F.3d 56 (2d Cir. 2016).

12

Thus, while the Court did not evaluate the viability of these allegations at the Rule 12(b)(6) stage, such analysis must be undertaken now; as another court in this Circuit has noted, "[g]iven the enormous ramifications of certifying a class—turning potential losses from relatively small amounts into potentially massive exposure—careful analysis of the factors under Rule 23 is required." *China Auto. Sys.*, 2013 WL 3357170, at *1. Courts must carefully evaluate the viability of each of a plaintiff's securities fraud claims in deciding class certification, because the certified class definition and applicable time period can have significant implications for the scope of liability, as well as discovery.[6] *See, e.g.*, *Luna*, 2017 WL 4865559, at *6–7 (finding certain claims insufficient and amending class period accordingly); *Veeco*, 235 F.R.D. at 224 (evaluating motion to dismiss and motion for class certification together); *see also Decastro* v. *City of New York*, No. 16-CV-3850 (RA), 2019 WL 4509027, at *8 (S.D.N.Y. Sept. 19, 2019) (shortening class period because of statute of limitations, then analyzing Rule 23). Here, an analysis of the tradipitant-related misstatements is necessary to determine the appropriate start and end date of Plaintiff's proposed class, and shows that the proposed class period is far too long.

> **B.** **The Factual Allegations Related to the Tradipitant Claim Can, at Most, Only Support a Class Period That Begins on December 3, 2018.**

The thrust of Plaintiff's Tradipitant Claim is that Vanda made misleading statements concerning the threat that the FDA would impose a partial clinical hold on long-term testing of tradipitant on humans unless and until Vanda completed the dog study. In particular, the FDA is alleged to have advised Vanda that "chronic toxicology studies in 2 species is a requirement . . . ***prior to proceeding to long-term studies in humans***." (¶ 211) (emphasis added). This led to a series of discussions between the FDA and Vanda. In August of 2018, Vanda submitted a formal dispute resolution request to the FDA, providing additional data concerning

---

[6]  *See also Fishon*, 336 F.R.D. at 70 ("The Second Circuit has recognized that 'class certification places inordinate or hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability.'") (quoting *Hevesi*, 366 F.3d at 80).

the safety of tradipitant and asking the FDA either to reconsider the need for the dog study, or allow Vanda to perform an alternative dog study that would not require as many dogs to be killed. (*See* Ex. 11, Formal Dispute Resolution Request (Aug. 1, 2018).)

At the same time that Vanda sought an internal FDA review of the dog study requirement in 2018, Vanda was able to successfully complete the Short-Term Study, a three-month Phase II clinical trial of tradipitant. The Short-Term Study was unaffected by the FDA's position on the dog study, which only concerned longer studies. (¶ 215.) Indeed, Vanda completed the Short-Term Study, and announced positive results on December 3, 2018. (¶ 219.) Later that month, on December 19, 2018, Vanda learned that the FDA would not reconsider its position on the dog study, at which time the FDA imposed the partial clinical trial preventing long-term testing of tradipitant on humans until the dog study was completed. (¶ 221.) Plaintiff alleges that on February 4, 2019, when Vanda filed suit against the FDA to seek judicial review of the FDA's decision to require the dog study,[7] its stock price fell 19.95%. (¶ 226.)[8]

Any class for the Tradipitant Claim cannot possibly begin prior to December 3, 2018, because, until that date, Vanda could not have made any misstatement concerning the dog study. While Defendants vigorously dispute that *any* alleged misstatement was *ever* made about tradipitant, it was not until December 3, 2018, that Vanda made alleged misstatements about long-term testing of tradipitant that potentially implicated the FDA's request for a long-term dog study. Specifically, in its 8-K filed on December 3, 2018, Vanda announced that it "expects to meet with

---

[7]   In Vanda's press release from February 5, 2019—Plaintiff's alleged corrective disclosure—the Company stated "that there is no scientific justification for the requirement that tradipitant be tested in a nine-month dog study," and that the FDA's position was based on "on old, outdated science and requires the killing of too many dogs without any scientifically justified purpose." (Ex. 14 at 6, Vanda Form 8-K (Feb. 5, 2019).)

[8]   Plaintiff concedes that investors were aware—because Vanda disclosed in December 2018—that a longer clinical trial for tradipitant would be needed to obtain FDA approval. (¶ 219.) Plaintiff also admits that Vanda informed its investors of the risk of adverse regulatory action, including the risk of clinical holds if Vanda did not comply with regulatory requirements. (¶ 392.) Plaintiff nonetheless alleges that Vanda's disclosures were misleading because Vanda had raised ethical concerns about the unnecessary killing of dogs, and the FDA had indicated that, absent the dog study, it would impose the partial clinical hold.

14

regulatory authorities in the near future to further define and confirm the path towards registration of tradipitant in the treatment of patients with gastroparesis." (¶ 403.) This message was reiterated by defendant Polymeropoulos in an earnings call on the same day, and he also mentioned that the company had a "12-month protocol, which we [would] be implementing shortly." (¶ 405.) These alleged misstatements are the first to mention the next phase of the tradipitant clinical trials, which would involve long-term testing on humans, and thus would implicate the need for a dog study.[9]

Plaintiff's Complaint identifies only six tradipitant-related statements from before December 2018. (¶¶ 386, 388, 390, 395, 397, 399, 403, 405.) Each of these statements, however, simply provided basic information about the Short-Term Study that was completed successfully in December 2018. For example, one stated that "enrollment in the clinical study of tradipitant in gastroparesis is complete," and that the study is "a 150-patient, 2-arm, double-blind tradipitant versus placebo 85-milligram twice a day . . . to evaluate the ability of the drug to improve symptoms of gastroparesis over a period of 4 weeks." (¶¶ 397, 399.) Defendants also stated that "[r]esults are expected by the end of 2018" (¶¶ 386, 390, 395, 399), an accurate prediction (the Short-Term Study results were released on December 3, 2018). These statements did not include any statements or predictions about what further studies the FDA might require. Plaintiff's own money manager, Rothschild—which made the decision to purchase Vanda on Plaintiff's behalf—testified that the alleged misstatements before December 3 said nothing about the FDA's decision to impose a clinical hold on longer-term studies, and identified nothing inaccurate in these statements. (Ex. 5 at 123:13–124:3; 128:8–136:8, Kehoe Dep.)

---

[9]  As Defendants will demonstrate at summary judgment, these statements were not false or misleading because, among other things, Defendants' proposal to proceed with a longer-term study had been permitted by the FDA at the time these statements were made. By statute, an Investigational New Drug Application ("INDA") takes effect automatically—and clinical trials may therefore proceed—30 days after the INDA is received by the FDA. 21 U.S.C. § 355(i)(2); *see also* 21 C.F.R. § 312.40(b). Vanda submitted a protocol for a long-term human study on September 26, 2018, but the FDA did not impose the partial clinical hold preventing this study from proceeding until December 19, 2018—more than 80 days later. When Defendants made the alleged misstatements about the long-term study on December 3, 2018, the 30-day deadline for the FDA to object to the proposed study had passed.

Thus, Plaintiff's allegations concerning misstatements that pre-dated December 3, 2018, are not actionable. Each simply described the Short-Term Study that was ongoing in 2018, and stated that the results from the study were expected by the end of 2018. (*See* Ex. 6 at 8, Challenged Statements Chart.) These statements were indisputably true; they are also irrelevant to Vanda's dispute with the FDA regarding the dog study, or the FDA's related decision to impose a partial clinical hold, which did not have any impact on the successfully completed Short-Term Study. *See Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 103 n.4 (2d Cir. 2021) (noting that there must be a close relationship between an alleged misstatement and any omitted facts; an "attenuated" relationship is insufficient); *Ong* v. *Chipotle Mexican Grill*, 294 F. Supp. 3d 199, 233 (S.D.N.Y. 2018) (statement that Chipotle used multiple produce suppliers was "far too attenuated" from alleged "nondisclosure of Chipotle's ability to trace ingredients" to "trigger a corresponding duty to disclose"); *In re ITT Educ. Servs.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (finding that defendants' "statements are not misleading because they do not suggest that the undisclosed improper activity alleged by [p]laintiff was not occurring").[10]

Accordingly, if a class is certified as to the Tradipitant Claim, the definition proposed by Plaintiff should be limited to class members who purchased between December 3, 2018, and February 5, 2019. Even if the Court declines to address the pre-December 3, 2018, statements at this time, certainly, the class period for the Tradipitant Claim can begin no earlier than August 1, 2018, the date on which Plaintiff alleges the first misstatement.

---

[10]   Nor can Plaintiff proceed on the theory that Defendants had some *sua sponte* duty to disclose the dispute with the FDA about the dog study before it had been resolved. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 541–42 (S.D.N.Y. 2015) (noting that courts have "rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary, or other interim status reports, received from the FDA as to drugs under review"), *aff'd sub nom. Tongue* v. *Sanofi*, 816 F.3d 199 (2d Cir. 2016); *In re MELA Sciences, Inc. Sec. Litig.*, No. 10 CV 8774(VB), 2012 WL 4466604, at *13–14 (S.D.N.Y. Sept. 19, 2012) (no duty to disclose FDA correspondence raising issues with clinical trials); *Fort Worth Emp'rs' Ret. Fund* v. *Biovail Corp.*, 615 F. Supp. 2d 218, 231 (S.D.N.Y. 2009) (no duty to disclose FDA criticism of ongoing study design).

**II.     PLAINTIFF'S PROPOSED CLASS SHOULD NOT BE CERTIFIED WITH RESPECT TO THE OFF-LABEL CLAIM BECAUSE DEFENDANTS HAVE REBUTTED THE *BASIC* PRESUMPTION OF RELIANCE.**

Plaintiff's Off-Label Claim is derived from the allegations of "off-label" marketing in the Qui Tam Action.  The gravamen of Plaintiff's theory is that Vanda's stock price dropped by 5.51% after the allegations in the Qui Tam Action were published on February 11, 2019, in the Aurelius Report.[11]  But the Aurelius Report merely ***repeated*** already-public allegations about off-label marketing; it did ***not*** disclose any new allegations of off-label marketing.[12]  Moreover, the evidence adduced during class certification discovery—including admissions from Plaintiff's own expert—demonstrates unequivocally that Vanda's stock price did not experience a statistically significant decline on the day the Qui Tam Action was unsealed, or the following day.  (Ex. 1, ¶ 27, Stulz Report.)  Additional evidence, discussed in detail below, demonstrates that the purported off-label marketing misstatements did not impact the price of Vanda's stock, meaning that Plaintiff cannot rely on the fraud-on-the-market presumption to establish reliance and Rule 23's predominance requirement is not satisfied.

**A.     The Court Must Weigh All of the Evidence and May Not Certify a Class as to the Off-Label Claim if Defendants Have Demonstrated That the Alleged Misstatements Did Not Impact the Price of Vanda's Stock.**

Under Rule 23(b)(3), Plaintiff must show that common questions of law or fact will predominate at trial.  *See* Fed. R. Civ. P. 23(b)(3).  To meet this predominance requirement,

---

[11]  In evaluating Plaintiff's Off-Label Claim against the Company and Dr. Polymeropoulos at the motion to dismiss stage, the Court found it necessary to address only three out of the dozens of Challenged Statements alleged to be false or misleading.  (MTD Op. at 8.)  These three statements all concerned the uses and marketing of Fanapt®.  More specifically, the Court held that Dr. Polymeropoulos's statements that "Fanapt . . . will be a drug that will be used once patients switch from another medication," "Fanapt is considered in the US a second line treatment," and "[o]ur sales team continues making progress in introducing Fanapt as an additional option in treating adult patients with schizophrenia" could be found materially misleading because they "did not communicate that Vanda appears to have been actively promoting and marketing Fanapt off-label, as a first-line treatment."  (*Id.*)

[12]  Plaintiff contends that the Court already addressed this argument at the motion to dismiss stage.  Not so.  The Court only addressed loss causation—not price impact or rebuttal of the presumption of reliance—and simply held that at the pleading stage the revelations in the Aurelius Report, as a species of "[m]edia reports and other similar public disclosures[,]" were adequate to establish loss causation.  (MTD Op. at 9.)  While the Court recognized that the unsealing of the Qui Tam complaint was an "intervening event[,]" it declined to consider the matter further at the motion to dismiss stage.  (*Id.* (internal citation omitted).)

17

Plaintiff invokes the *Basic* presumption of reliance; absent that presumption, individual questions of reliance will predominate, making class certification inappropriate. *Halliburton II*, 573 U.S. at 267–68. The *Basic* presumption is premised on the "fraud on the market" theory, which teaches that, in an efficient market, the market price of securities reflects "all publicly available information, and, hence, any material misrepresentations." *Id.* at 268. If a plaintiff can make a threshold showing that the securities at issue traded in an efficient market, then other investors trading at the market price are presumed to rely on any public material misrepresentation. *Id.*

Even if a plaintiff can establish an efficient market, however, a defendant can rebut the *Basic* presumption in several ways. One such way is to show that "the alleged misrepresentation did not, for whatever reason, actually affect the market price" of the defendant's stock. *See id.* at 269; *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 490 (S.D.N.Y. 2011) ("A showing that the misrepresentations did not lead to a distortion in price is sufficient to rebut the presumption" (citing *Basic*, 485 U.S. at 248)); *see also IBEW Loc. 98 Pension Fund* v. *Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (defendant successfully rebutted the presumption at class certification by showing that the alleged misstatements did not have any impact on the company's stock price at the time they were made); *Ohio Public Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *18–20 (N.D. Ohio Aug. 14, 2018) (finding defendants rebutted presumption of reliance by showing the absence of price impact on the dates of the alleged misrepresentations); *In re Finisar Corp. Sec. Litig.*, No. 5:11-cv-01252-EJD, 2017 WL 6026244, at *6–9 (N.D. Cal. Dec. 5, 2017) (defendants rebutted *Basic* presumption by demonstrating lack of price impact at the time the alleged misstatement was made). "[A]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff" is sufficient to rebut the presumption. *Goldman*, 141 S. Ct. at 1958 (internal quotation marks omitted). For example, a defendant may show that the alleged fraud had already been corrected in a prior disclosure that did not cause a statistically significant change in price. *See Erica P. John*

18

*Fund, Inc.* v. *Halliburton Co.*, 309 F.R.D. 251, 273 (N.D. Tex. 2015) ("*Halliburton I*") (the *Basic* presumption was rebutted where "the information alleged by the [plaintiff] to be corrective was *both* already disclosed *and* caused no statistically significant price reaction").

Even for issues where the defendant bears the burden—here, price impact—the Supreme Court has emphasized that courts cannot merely credit the plaintiff's unproven assertions (as on a motion to dismiss) or evidence (as on summary judgment); instead, courts, sitting as finders of fact, must rigorously evaluate and weigh the evidence presented by both sides. "Although the defendant bears the burden of persuasion, the allocation of the burden is unlikely to make much difference" when there is "competing expert evidence on price impact." *Goldman*, 141 S. Ct. at 1963. "The defendant's burden of persuasion will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise." *Id.* "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* In addition, as the Supreme Court recently held in *Goldman*, highly generic statements are less likely to have induced reliance than specific misstatements. *See Goldman,* 141 S. Ct. at 1960 ("as a rule of thumb, a more-general statement will affect a security's price less than a more-specific statement on the same question").

Here, Defendants have successfully demonstrated lack of price impact, because (a) the alleged off-label marketing practices were indisputably made public no later than February 4, 2019 (when the Qui Tam complaint was unsealed), and (b) Plaintiff's own expert concedes that the stock price did not drop upon the public disclosure of the alleged fraud on February 4. (Ex. 1, ¶ 27, Stulz Report.)  As demonstrated by the Stulz Report, Plaintiff's motion rests on two irreconcilable assertions: that Vanda securities traded in an efficient market (*i.e.*, a market in which all value-relevant publicly available information is promptly incorporated into the value of the stock); and that the market waited a week before absorbing the publicly available information about the alleged off-label marketing revealed on February 4, 2019. (*Id.* ¶ 41.)  Either the market is efficient and

19

there was no price impact, or the market was not efficient—but in either event, the Off-Label Claim cannot be certified for class-wide treatment. (Ex. 3 at 182:13–18, Stulz Dep. ("[T]he allegation-related information did not have a price impact because if the market for Vanda is efficient as proposed by Mr. Steinholt, then repeating old information can't have a price impact.").)

Beyond the lack of price movement when the Qui Tam complaint was unsealed, there is also powerful additional evidence rebutting price impact in this case. Not only did the alleged off-label marketing allegations become public in the Qui Tam complaint, but they were also posted on numerous well-known and public websites months earlier—with no contemporaneous price impact. (Ex. 1, ¶¶ 23–30, Stulz Report.) In addition, securities analysts who provided research reports on Vanda's stock did not adjust their valuation of the Company's securities after the off-label marketing allegations became public—indeed, they did not even comment on the purported off-label marketing practices in their reports—demonstrating that analysts did not view that information as value-relevant. (Ex. 1, ¶¶ 34–37, Stulz Report.) Moreover, the alleged misrepresentations that purportedly inflated the stock price are highly generic and "mismatched" from the purported corrective disclosure, which the Supreme Court recently held is also relevant evidence of lack of price impact. Finally, the Aurelius Report itself contained new, non-fraud-related information that explains the movement in Vanda's stock price following its release. (Ex. 1, ¶¶ 38–39, Stulz Report.) Each of these issues is addressed in detail below.

**B.      The Public Disclosure of the Qui Tam Action Complaint Did Not Cause a Statistically Significant Stock Price Drop.**

There is no dispute that, when the information about alleged off-label marketing was publicly disclosed by the unsealing of the Qui Tam Action, it did not impact Vanda's share price. (Ex. 1, ¶ 57, Stulz Report ("the whistleblower lawsuit was unsealed and publicly available on February 4, 2019 . . . and Vanda's stock price did not experience any statistically significant movement on that date *based on Mr. Steinholt's own analysis*.") (emphasis added).) The

whistleblower lawsuit alleging off-label promotion of Fanapt® and Hetlioz®, which was quoted and cited in the later Aurelius Report, was unsealed and available on the PACER database on February 4, 2019—one week before the Aurelius Value Report was published.  (Ex. 13 at 3, Docket, Qui Tam Action (Feb. 4, 2019) (unsealing complaint).)   The regression analysis in Plaintiff's *own* expert's event study demonstrates unequivocally that Vanda's stock price did not experience a statistically significant price movement immediately following the unsealing of the Qui Tam Action complaint. (Pl. Ex. A at Ex. D, p. 20, Steinholt Report; Ex. 1, ¶ 27, Stulz Report; *see also* Ex. 4 at 129:6–13, Steinholt Dep.)[13]

Thus, as Prof. Stulz explains, assuming Vanda's common stock trades in an efficient market, the lack of any stock price movement on February 4 or 5, 2019, shows that the whistleblower lawsuit was not considered new or value relevant by the market.[14]   This alone demonstrates that the alleged misrepresentations did not affect the stock price.  *See Halliburton II*, 573 U.S. at 279 (holding that the *Basic* fraud-on-the-market presumption is rebuttable at the class certification stage with a showing that "the particular misrepresentation at issue did not affect the stock's market price"); *cf. In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 CIV. 01580 (LGS), 2019 WL 5287980, at *41 (S.D.N.Y. Oct. 18, 2019) (rejecting an alleged corrective disclosure that contained no new information).[15]

---

[13]   While the records on PACER do not specify a time of day when the whistleblower lawsuit became publicly accessible (*i.e.*, during trading hours on February 4 or after market close), Vanda's stock price did not have a statistically significant price reaction on either February 4 or February 5, 2019.  (Ex. 1, ¶ 27, Stulz Report.) Indeed, using Steinholt's own regression model and event study methodology, Vanda's stock experienced abnormal returns of -3.60% on February 4, 2019 (the day on which the whistleblower lawsuit was unsealed and available) and -0.97% on February 5, 2019 (the next trading day)—neither of which was statistically significant. (*Id.* ¶ 27.)   These results do not meet Steinholt's threshold for statistical significance (five percent).  (*Id.* ¶ 27 n.59.)

[14]   Steinholt used the term "material information" to refer to information "that impacts the future cash flows, or the timing or riskiness of the future cash flows." (*See* Pl. Ex. A, ¶ 7 n.7, Steinholt Report.)  Prof. Stulz uses the term "value relevant" to convey that principle.  (Ex. 1,  ¶¶ 18, 35, Stulz Report.)  Consistent with these definitions, Plaintiff's investment manager also testified that allegations of off-label marketing would not necessarily alter his investment thesis, and would impact his investment decision only "[i]f [he] knew it was rampant and . . . it could impact [the company's] financials."  (Ex. 5 at 175:5–6, Kehoe Dep.)

[15]   There can be no question that documents available on PACER, like the Qui Tam complaint, are "publicly available." (Ex. 4 at 159:7–23, Steinholt Dep. (conceding that whether information on PACER is subject to a fee

**C.    Plaintiff's Articulated Theory of Price Impact Is Inconsistent with the Efficient Market Hypothesis and the Evidence.**

Plaintiff's theory of delayed price impact with respect to the Off-Label Claim is inconsistent with the efficient market hypothesis. (Ex. 1, ¶ 22, Stulz Report.) The efficient market hypothesis, which underlies the *Basic* presumption of reliance, holds that share prices react quickly—typically within one day—to the presence of new publicly available information. Plaintiff's own allegations and its expert's testimony acknowledge and accept these basic principles. (¶¶ 443–46; *see also* Pl. Ex. A, ¶¶ 9, 12 n.8, Steinholt Report ("new and material information is incorporated into a stock price within one day").) The Supreme Court has also adopted this understanding, explaining that "[the fraud-on-the-market theory] is premised on the understanding that in an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price." *Amgen Inc.* v. *Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also Waggoner* v. *Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017) (describing an efficient market as "one in which the prices of the [stock] incorporate[s] most public information rapidly" (first alteration in original) (internal citation omitted)); *Meyer* v. *Greene*, 710 F.3d 1189, 1197–98, 1199 n.11 (11th Cir. 2013) (under the efficient market theory, "any information released to the public is immediately digested and incorporated into the price of a security[,]" and corrective disclosures therefore "must present facts to the market that are . . . publicly revealed for the first time"); *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 600 n.5 (S.D.N.Y 2010) (similar); Brealey, et al., *Principles of*

---

does not affect whether it is publicly available).) The federal court website is accessible to any users (*Register for an Account*, Public Access to Electronic Records ("PACER"), https://pacer.uscourts.gov/register-account (last visited Nov. 30, 2021) ("[a]nyone can access PACER to view federal court records")), and courts routinely refer to court filings as "publicly available[.]" *See, e.g.*, *Wai Hoe Liew* v. *Cohen & Slamowitz, LLP*, 265 F. Supp. 3d 260, 285 (E.D.N.Y. 2017) (finding that document was "publicly available on PACER" and could have been discovered by plaintiffs). In addition, there are a number of services, such as Docket Bird and PACERPro, that provide monitoring services that allow customers—including investors—to receive docket updates for cases or parties meeting pre-specified criteria. (Ex. 3 at 159:10–17, Stulz Dep.; *see also* DocketBird, https://www.docketbird.com/ (last visited Nov. 30, 2021) ("DocketBird sends you daily updates of new cases"); *How We Help: Case Teams*, PACERPro, https://www.pacerpro.com/how-we-help/case-teams/ (last visited Nov. 30, 2021) ("[o]ur software automates delivery of PDFs of federal court filings in real time").)

*Corporate Finance*, 317–18 (10th ed. 2011) ("If markets are semistrong efficient, then prices will adjust immediately to public information[.]").

In this case, however, Plaintiff asserts a theory of delayed price impact that is inconsistent with the efficient market hypothesis on which Plaintiff relies. Plaintiff claims that the alleged Off-Label Claim corrective disclosure occurred on February 11, 2019, when the Aurelius Report supposedly revealed allegations concerning "off-label" marketing by Vanda employees. (¶¶ 185, 433.) But those same allegations were in fact publicly revealed, at the latest, on February 4, 2019, when the 150-page, 485-paragraph complaint in the Qui Tam Action was unsealed. (Ex. 13 at 3, Docket, Qui Tam Action (Feb. 4, 2019) (unsealing complaint); Ex. 1, ¶ 21, Stulz Report.) Plaintiff's expert, Steinholt, does not contend otherwise; indeed, he admitted having conducted no analysis whatsoever as to whether the Aurelius Report revealed any new, fraud-related allegations. (Ex. 4 at 204:22–205:1, Steinholt Dep. ("the qualification of how much of that price decline was caused by alleged fraud is . . . not an analysis that I have performed"); *see also id.* at 205:15–20 ("If there are -- are any material [confounding] factors that need[] to be disaggregated, then that is something that would be incorporated into a damage analysis. But I have not performed such damage analysis at this time.").) Defendants' expert, decorated economist and Ohio State finance professor René Stulz, pointed out these flaws in his report. (Ex. 1, ¶¶ 18(a), 19–22, Stulz Report.)

In response to this criticism, Plaintiff's expert submitted a second report (the "Reply Report") that put forward an entirely new explanation of market efficiency. While Steinholt initially opined that "it was reasonable for investors to rely on the integrity of the market prices of Vanda's common stock during the Class Period as reflecting *all publicly available* information about the Company" (Pl. Ex. A, ¶ 9, Steinholt Report (emphasis added)), Steinholt contends in his Reply Report that, in an efficient market, only information that is "***obviously*** publicly available" is reflected in a company's share price. (Ex. 2, ¶ 9, Reply Report (emphasis added).) Not only does this new explanation of market efficiency conflict with his initial report, but Steinholt

23

mischaracterizes the academic source upon which he relies for this proposition.[16]    At his deposition, Steinholt was unable to support this definition with any citations to academic literature. (*See* Ex. 4 at 75:18–98:7, Steinholt Dep.)  He also admitted that he has never used the "obviously publicly available" standard in any other case, despite submitting numerous reports opining on market efficiency citing the exact same academic source.  (Ex. 4 at 79:9–14, Steinholt Dep. ("Q: can you identify any other situation in which you've quoted the 1970 Dr. Fama article for the language . . . 'obviously publicly available'? . . . A: I -- no."); *id.* at 150:3–19; *see also* Ex. 15, ¶ 7, Steinholt *Dendreon* Expert Report (opining in prior case that "in an efficient market, investors rely on the market price of a security to reflect ***all the available public information*** regarding that security" and citing the same 1970 article by Dr. Fama (emphasis added)).)  But Steinholt nonetheless insisted (citing no support) that—notwithstanding the dictionary definition of "available" as meaning "accessible" or "obtainable"—the word "available" in the context of market efficiency must be defined to include only information that "the market is aware of."  (*See* Ex. 4 at 54:14–19, 153:6–154:17, Steinholt Dep.)[17]

Unsurprisingly, having proffered a third definition of "publicly available" on the fly at his deposition, Steinholt was unable to identify any methodology to distinguish information that "the market is aware of" from information that is "available" according to the plain language meaning of the word.  (*Id.* at 125:3–23.)  While Steinholt contends that information on Bloomberg and in

---

[16]    Steinholt cites a 1970 article by Dr. Eugene Fama, but the language he quotes is simply a summary of the types of information discussed in prior studies of market efficiency.  (*See* Ex. 2, ¶ 4, Reply Report; Ex. 4, 89:14–18 ("Q. So he's talking about tests that have been done on the semi-strong form of the efficient market theory in the past; correct? . . . A. That's Correct".)  The article nowhere discusses a requirement that information be "obviously publicly available" to be incorporated in an efficient market.  In his Reply Report, Steinholt additionally contends that an efficient market incorporates information that is "published" (*Id.*), but at his deposition he could not identify any reliable methodology for distinguishing "published" information from information that is "publicly available[.]"  (Ex. 4 at 135:18–136:5, Steinholt Dep.)  Nor could Steinholt identify any prior case in which he used "published" as a criterion for applying the efficient market hypothesis.  (*Id.* at 138:6–20.)  Ultimately, Steinholt fell back on the explanation that "the important thing is whether or not the market became aware of" the information, which he also has no reliable methodology for determining.  (*Id.* at 128:6–11; 139:12–20.)

[17]    Steinholt concedes that one definition of "available" is "accessible" or "obtainable" but opines that that dictionary definition does not apply in the context of market efficiency. (Ex. 4 at 59:6–14, 60:10–20, Steinholt Dep.)

analyst reports can provide a "pretty good understanding" of what information is available, he concedes that information can be available from other public sources.[18]  (*Id.* at 53:19–54:13.) Steinholt also concedes that information is publicly available despite the fact that a fee might be required to obtain it, as is the case with documents on PACER and numerous other public sources. (*Id.* at 159:2–25.)  And he also concedes that institutional investors are financially incentivized to monitor publicly available sources in order to obtain information quickly, and that at least 423 institutional investors invested in Vanda during the Putative Class Period.  (Ex. 4 at 42:24–43:11, 226:16–227:7, Steinholt Dep.; Pl. Ex. A at Ex. C, Steinholt Report.)

Steinholt is entirely unqualified to offer his novel opinion that efficient markets absorb only *some* publicly available information.  Unlike Prof. Stulz—who has a Ph.D. in economics from MIT, is the Everett D. Reese Chair of Banking and Monetary Economics and the Director of the Dice Center for Research in Financial Economics at The Ohio State University, and has published more than 25 books and dozens of articles on markets and securities price movements (Ex. 1, ¶¶ 1–6 & App. A, Stulz Report)—Steinholt has no advanced degree in economics (only coursework as part of an MBA program), has no academic experience, and has published no scholarly articles.  (*See* Ex. 4 at 32:6–24, Steinholt Dep..)  Instead, Steinholt is an accountant who claims to have expertise as a "securities analyst."  (*Id.* at 31:22.)  Asked to describe his own expertise, he stated that it lay in conducting "an analysis of the Cammer and Krogman Factors"— that is, factors considered by courts in connection with class certification—and admitted that he could not offer a "theoretical academic view in terms of analyzing market efficiency."  (*Id.* at 34:16–25.)  In effect, Steinholt is a professional class-certification expert for plaintiffs' lawyers,

---

[18]    Steinholt placed weight on the fact that Bloomberg distributed notice of the Aurelius Report after the report's publication, but the Bloomberg blurb sent to Plaintiff's own investment manager did not describe the alleged wrongdoing Vanda was accused of, as Plaintiff's own money manager  conceded. (Ex. 16, Bloomberg News Alert (Feb. 11, 2019); Ex. 5 at 91:12–92:5, Kehoe Dep. ("Q:  Do you know what activities are being referred to [in the Bloomberg alert]?  A:  I don't.  Q:  You can't tell that from this e-mail.  Correct? . . . A:  No.").)  Kehoe would have needed to review the Aurelius Report itself to know its content, which he testified he did not do.  *Id.* at 89:16–24.

having worked for the Robbins Geller firm in approximately 100 cases over the last five years. (*Id.* at 40:2–10.) Even if this experience somehow makes Steinholt qualified to opine on how to apply the efficient market hypothesis in a run-of-the-mill securities case—itself a questionable proposition—Steinholt has no expertise that qualifies him to offer his novel, unsupported opinion that only "obviously publicly available information" is absorbed by an efficient market.

For all these reasons, the Court should afford no weight to Steinholt's opinion that only "***obviously*** publicly available information" is incorporated into stock prices in an efficient market. This opinion is methodologically unsound and rests on an understanding of the efficient market that is inconsistent with Supreme Court precedent. Moreover, Steinholt is unqualified to give such an opinion. Instead, the Court should rely on the opinion of Prof. Stulz, a decorated economist who persuasively explains that Steinholt's theory of a delayed price impact simply cannot be reconciled with the definition of an efficient market. (Ex. 1, ¶¶ 19–22, Stulz Rep..)

Even if, as Steinholt wrongly contends, new information is incorporated into the market price only if "obviously publicly available" or "the market is aware" of it, the facts of this case still refute price impact. The Aurelius Report itself was written ***by a Vanda investor***, Aurelius Value, who expressly relied on (and copied and pasted) portions of the Qui Tam complaint and other public sources in the report and who had shorted Vanda stock on that basis. The report says so on its face. (Ex. 17 at 1–2, Aurelius Report.) There is no allegation that Aurelius Value became aware of this information from some secret source; rather, Aurelius Value obtained it from a review of public websites. Thus, the Aurelius Report itself shows that investors already had access to this information before February 11, 2019, and traded on it, meaning that the "the market is aware" by that date—satisfying even Steinholt's defective and unsupported standard.[19] (Ex. 3 at 200:13–18,

---

[19] Even assuming Plaintiff is correct that, somehow, the market price was inefficient as to the publicly available Qui Tam complaint and website postings, but otherwise efficient, it would nonetheless be true that some investors— like Aurelius Value—were exposed to the "truth" but nonetheless invested. Under Second Circuit law, any class member who purchased after public disclosure of the alleged fraud cannot pursue a claim. *See Danske Bank*, 11

Stulz Dep. ("Q: My question for you, Professor Stulz, is: What proof do you have that investors had any -- were aware of the public information you're describing in paragraph 41 [of your report]? A: At the very least, Marcus Aurelius was aware of it.").)

For these reasons, the evidence adduced by Plaintiff fails to provide any plausible explanation as to why, in an efficient market (which is a pre-requisite to Plaintiff's motion), the purported Off-Label Claim has a price impact when "revealed by" the Aurelius Report but the earlier unsealing of the Qui Tam complaint does not—assuming those allegations provided new, value relevant information about the Company. Plaintiff cannot have it both ways. Plaintiff cannot rely on the efficient market hypothesis to support its invocation of the *Basic* presumption, while simultaneously ignoring its other implications. Nor can Plaintiff rely on an unsupported definition of market efficiency that its expert formulated (and largely abandoned on cross-examination) to support its paradoxical theory of liability in this case.

**D.    Information in the Aurelius Report Was Previously Disclosed on Public Websites Without a Statistically Significant Stock Price Drop.**

Lack of price impact is also demonstrated by numerous earlier disclosures of Vanda's alleged off-label marketing practices on public websites without any statistically significant price movement. (Ex. 1, ¶¶ 23–27, Stulz Report.) The Aurelius Report relied on and quoted information from the online forum Cafepharma, a website widely read by individuals in the pharmaceutical/ medical industry, including investors. (*Id.* ¶ 25.) Cafepharma users posted questions regarding the "off-label" use of Fanapt® and Hetlioz® as early as September 2018, months before publication of the Aurelius Report. (*Id.*) In addition, on Glassdoor, a website on which current and former employees post anonymous reviews of their employers, a user posted in September

---

F.4th at 102 (holding that disclosures reporting on fraud that occurred in 2018, which were published from 2016–2018, were "too remote in time to have 'assumed actual significance in the deliberations' of a purchaser in 2018" (internal citation omitted)). As Prof. Stulz explains, this would raise individualized issues because whether any given investor was aware of this public information could only be assessed on an investor-by-investor basis. (Ex. 1, ¶¶ 40, 42, Stulz Report.)

2018 about Vanda: "Very unethical, sales goals are based upon demanded off label sales." (Ex. *Id.* ¶ 26.)  A post from August 2018 stated:  "Ethical and compliant behavior is punished. Sales depends on targeting off label business." (*Id.*)  None of these disclosure dates for Cafepharma and Glassdoor corresponds with a statistically significant drop in Vanda's share price.  (*Id.* ¶ 25 nn.50–54.)  As further evidence of off-label usage of Hetlioz®, the Aurelius Report cited drug effectiveness complaint statistics from 2013 and 2014 from publicly accessible sources such as the "FDA Adverse Event Reporting System ('FAERS'), which contains information on medication error reports submitted to the FDA."  (Ex. 17 at 5, Aurelius Report.)

Although Steinholt concedes that these website posts were publicly available after they were posted,[20] he opines that "posts of unverified information by anonymous sources would generally be viewed by investors as unreliable. Consequently, unless independently verified by a credible investigation such as in the Aurelius Report, . . . these posts would have no impact on the stock price." (Ex. 2, ¶¶ 17–18, Reply Report.)  This opinion—which seeks to import a reliability standard into market-efficiency theory—is unsupported by citation to any credible source on market efficiency, and even Steinholt admits that speculation and rumors can move stock prices. (Ex. 4 at 183:20–24, Steinholt Dep.)  It also makes no sense to conclude that the posts were too "unreliable" to impact Vanda's share price when they were originally made public, yet somehow became more credible when they were repeated in the Aurelius Report (which simply cut and pasted them into its body).  As Steinholt admitted, Aurelius Value is itself an anonymous source, and he could not opine that Aurelius Value's investigation was "credible."  (*Id.* at 161:12–20, 192:7–23.)[21]  Steinholt's dismissal of the public website postings thus does not hold water.

---

[20]   (Ex. 4 at 169:19–22, Steinholt Dep. ("I think that any investor who wanted to access that website [Cafepharma] could have done so and could have read those posts after they were posted.").)

[21]   Moreover, even if Plaintiff's explanation for the lack of price movement at the time of the website postings could be credited (and it cannot be), the repetition of this information in the Aurelius Report is not an actionable corrective disclosure.  Courts have repeatedly explained that an event can only serve the role of a corrective disclosure if it "reveal[ed] some [previously]-undisclosed fact with regard to the specific misrepresentations

**E.      No Analysts Modified Their Recommendations or Valuation Models Based on the Allegations of Vanda's Off-Label Marketing.**

The record also presents other powerful evidence that the purported corrective disclosures concerning off-label marketing did not have an impact:  the lack of any reaction from securities analysts covering Vanda either before or after the Aurelius Report.  As Steinholt admits, at least 12 securities analysts provided research coverage of Vanda during the class period. (Pl. Ex. A, ¶ 27, Steinholt Report.)  Even after the publication of the Aurelius Report, by which time Plaintiff concedes the market was aware that Vanda had been accused of off-label marketing, not a single analyst expressed concern about Vanda's marketing practices.  (Ex. 1, ¶ 34, Stulz Report.)  Indeed, despite a thorough search, Prof. Stulz "could not identify a single analyst who expressed concern or commented negatively on Vanda's alleged marketing practices that are the focus of Plaintiff's claims here with respect to Fanapt and Hetlioz." (*Id.* ¶ 33.)  Plaintiff's expert, Steinholt, also could not identify any analyst who changed his or her recommendation to buy, sell, or hold Vanda stock due to the revelation of these allegations.  (Ex. 4 at 213:16–25, Steinholt Dep.)  And Steinholt further conceded that he is aware of no analysts who reported that they changed their valuation model based on these allegations against Vanda.  (*Id.* at 215:17–20.)  The lack of analyst interest in the alleged fraud following the alleged corrective disclosure supports the proposition that the alleged misstatements by Vanda did not impact the market price of its securities, as analysts simply did not see that information as value relevant.[22]  (Ex. 3 at 97:20–25, Stulz Dep. ("Now, if the

---

alleged in the complaint[.]" *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010); *see also Halliburton I*, 309 F.R.D. at 273 (holding that "[the defendant] has rebutted the *Basic* presumption" because the defendant "has shown that the information alleged by the [plaintiff] to be corrective was *both* already disclosed *and* caused no statistically significant price reaction").  Similarly, courts recognize that it is "a market reality that a stock's price will not change upon the release of confirmatory information" but rather "when the 'truth' is revealed 'the share price will fall' . . . [and] [i]t is this *actual movement* of stock price which must be shown by fraud-on-the-market plaintiffs[.]"  *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004).

[22]   Further, certain of the practices that Plaintiff challenges in this lawsuit as purportedly reflecting off-label marketing of Hetlioz® were openly discussed in the analyst reports, evidence that aspects of Vanda's challenged marketing efforts were fully known to investors.  For example, while Plaintiff challenges the sales of Hetlioz® to sighted individuals with Non-24 (a sleep disorder) (¶¶ 5, 161), the label included blind and sighted people with Non-24.  Moreover, contrary to Plaintiff's contention that very few sighted individuals have Non-24 (¶ 148),

29

allegation-related statements in the Aurelius Value report were value relevant, what you would expect is the analysts to discuss those statements. As I say in my report, I haven't seen an analyst discuss those statements.").)

F.    **Under *Goldman*, the Generic Nature of the Alleged Misstatements Also Demonstrates Lack of Price Impact.**

As the Supreme Court recently held, the specificity of an alleged misstatement is important to evaluating price impact. *See Goldman*, 141 S. Ct. at 1960. That is because "as a rule of thumb, a more-general statement will affect a security's price less than a more-specific statement on the same question." *Id.* (internal citation omitted). This question is properly considered at the class certification stage, even where the generic nature of such a statement may also be relevant to materiality at the merits stage of the proceedings. *Id.* at 1961.

In this case, the alleged misrepresentations concerning Fanapt® and Hetlioz® were highly generic, supporting the proposition that investors did not ascribe value to Vanda shares based on these representations. (Ex. 1, ¶ 34, Stulz Report.) In its prior ruling, the Court addressed only three of the Challenged Statements, all of which are exceedingly general in nature. (MTD Op. at 8; *see* ¶¶ 265, 278, 302) These statements merely convey basic information about Fanapt®, and do not contain any specific information about Vanda's marketing practices, much less any misinformation about the purported off-label marketing scheme. The other alleged misstatements (which the Court did not address in its motion to dismiss ruling) are even more generic, such as:

- "[o]ur ability to generate meaningful product sales and achieve profitability largely depends on our ability to successfully commercialize [Hetlioz® and Fanapt®]."

---

market data reported on by analysts demonstrated significant numbers of sighted Non-24 patients who would benefit from treatment. (*See* Ex. 7 at 60, Oppenheimer Report (Oct. 3, 2018) (analyst report on a survey of psychiatrists concerning use of Hetlioz® in sighted patients and noting "likely future uptake trends within this cohort"); Ex. 8, Oppenheimer Report (Oct. 29, 2017) (analyst report on the expanded Fanapt® sales force, its detailing to Hetlioz® and educating of psychiatrists on Non-24 diagnoses, and predicting that "Hetlioz sales will accelerate"); Ex. 9, JMP Securities Report (Feb. 15, 2018) (analyst report discussing Vanda sales and marketing efforts, to include the prospect of revenue growth from sighted Non-24 patients); Ex. 10, Jefferies Report (Aug. 2, 2018) (analyst report making same observations).) No analysts correlated these trends in Hetlioz® sales with purported off-label marketing. (Ex. 1, ¶ 34, Stulz Report.)

(¶¶ 236, 243, 249, 261, 268, 274, 282, 288, 294, 298, 304, 310, 314, 318, 320, 324, 328, 332, 338, 344, 350, 356, 362, 368, 374, 382.)[23]

- "[f]ailure to comply with government regulations regarding the sale and marketing of our products could harm our business" and "[t]here have been no material changes in our risk factors subsequent to" the prior risk factor disclosures. (¶¶ 245, 251, 263, 270, 276, 284, 290, 296, 300, 306, 312, 316, 322, 326, 330, 334, 340, 346, 352, 358, 364, 370, 376, 384, 393, 401.)[24]

(*See* Ex. 6, Challenged Statements Chart.)

Such generic statements are "too general [for] a reasonable investor to rely upon," because they offered no "specific, factual," or "concrete" information about "the state of [the Firm's] business." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168, 170 (2d Cir. 2021) (internal citation omitted). *See generally City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 177, 183, 185 (2d Cir. 2014) (explaining that "representations regarding [] risk management policies" and "compliance, reputation, and integrity" provide no "guarantee of some concrete fact or outcome" and are "too general to cause a reasonable investor to rely upon them").[25]   Under *Goldman,* the generic nature of the statements is relevant to price impact, and must be considered among all other evidence.  141 S. Ct. at 1961.  As the Supreme Court explained, the "inference— that the back-end price drop equals front-end inflation—starts to break down when there is a

---

[23]   Moreover, Vanda first made this statement on March 13, 2015, as part of its 2014 Form 10-K, before the start of the putative class period.  (Ex. X Stulz Report ¶ 35.)  As Prof. Stulz opines, "in an efficient market, these statements, which repeated the same information that Vanda already disclosed in the 2014 Form 10-K, would not be expected to have affected Vanda's stock price during the Putative Class Period, as only *new*, value-relevant information should have affected Vanda's stock price."  (*Id.*)

[24]   This statement also was made as early as March 10, 2011 in Vanda's 2010 Form 10-K, and was repeated verbatim in each of Vanda's 10-Ks for the years 2015, 2016, and 2017 during the Putative Class Period.  Prof. Stulz opines that he "would not expect these alleged misstatements regarding the risk of government regulations—which were generic in nature and repeated the same disclosure that Vanda had routinely made since 2011—to have affected Vanda's stock price during the Putative Class Period, assuming Vanda's common stock traded in an efficient market."  (Ex. X Stulz Report ¶ 36.)

[25]   *See also Asay* v. *Pinduoduo Inc.*, ___ F. App'x ___, 2021 WL 3871269, at *2-3 (2d Cir. Aug. 31, 2021); *Danske Bank*, 11 F.4th at 103-04; *In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 750-51 (2d Cir. 2020); *Gross* v. *GFI Grp., Inc.*, 784 F. App'x 27, 30 (2d Cir. 2019); *Fogel* v. *Vega*, 759 F. App'x 18, 21, 24 (2d Cir. 2018); *Altayyar* v. *Etsy, Inc.*, 731 F. App'x 35, 37-38 (2d Cir. 2018); *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016); *Scott* v. *Gen. Motors Co.*, 605 F. App'x 52, 54 (2d Cir. 2015); *Reese* v. *Bahash*, 574 F. App'x 21, 23 (2d Cir. 2014); *Carpenters Pension Tr. Fund*, 750 F.3d at 235; *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009).

mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* Thus, the generic nature of a misrepresentation is "important" evidence of price impact because a more general statement is less likely to affect a security's price than a more specific one. That is precisely the situation here: Plaintiff contends that inflation entered Vanda's stock price from highly generic statements, which are less likely to affect Vanda's stock than specific statements.

### G.    Non-Fraud-Related New Information Became Public on February 11, 2019, Explaining the Stock Price Decline on Which Plaintiff Relies.

Finally, new, non-fraud-related information was revealed on February 11, 2019, providing a credible explanation for the price movement on which Plaintiff relies. The Aurelius Report contained other negative information about Vanda: the report did not merely summarize the allegations in the Qui Tam Action, but also publicly announced that an investor was taking a short position against Vanda's stock, and made numerous unrelated negative comments about Vanda, including that Vanda's CEO supposedly engaged in nepotistic behavior and price gouging. (Ex. 17 at 6, 9–10, Aurelius Report; Ex. 3 at 190:24–191:1, Stulz Dep. ("there is new information in the mere fact that there is a short seller that is engaged in a campaign").) As Prof. Stulz found, this information was new and could plausibly have moved the market. (Ex. 1, ¶¶ 38–39, Stulz Report.) At his deposition, Steinholt conceded that he had performed no analysis of whether the price movement on February 11, 2019, resulted from non-fraud-related information. (Ex. 4 at 250:16–20, 255:4–15, 206:15–207:3, Steinholt Dep.) In light of the strong evidence that the market did not react to numerous prior public disclosures of alleged off-label marketing, the new information contained in the Aurelius Report credibly and persuasively explains the stock price drop on February 11.

*       *       *

As the Supreme Court recently observed, "[t]he district court's task [on class certification] is simply to assess all the evidence of price impact—direct and indirect—and determine whether

32

it is more likely than not that the alleged misrepresentations had a price impact." *Goldman*, 141 S. Ct. at 1963. For the reasons above, the record evidence strongly supports a finding that the alleged misrepresentations did not impact Vanda's share price. Thus, the Court should deny class certification as to the Off-Label Claim.

### III. THE PROPOSED CLASS CANNOT BE CERTIFIED BECAUSE PLAINTIFF HAS FAILED TO PROPOSE A WORKABLE CLASS-WIDE DAMAGES METHODOLOGY.

As the Supreme Court has held, a class cannot be certified unless the damages model used by the class is capable of calculating damages attributable *only* to the asserted and surviving theories of injury. *Comcast*, 569 U.S. at 34–35 (holding no class can be certified unless plaintiff puts forward a viable "damages model" tied to a calculation of damages that measures "only those damages attributable to that theory"). Without this check on damages methodology at the certification stage, "any method of measurement [would be] acceptable so long as it [could] be applied classwide, no matter how arbitrary the measurements . . . . Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 36.

Accordingly, the Second Circuit has recognized that courts must examine the plaintiff's proposed damages methodology with rigor, even if that means grappling with some aspects of the underlying merits. *Roach* v. *T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015) ("[A] model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury[.]"). Indeed, as one court within this Circuit has recently noted:

> [A]s a review of *Comcast* and its progeny reflect, where an expert's model is the basis for a plaintiff's claim of classwide impact and causation, a court is obliged to rigorously examine the soundness of that model at the class certification stage. A court may certify a class under these circumstances only where the Court finds the model methodologically sound. That is so notwithstanding that, if the class is certified, the finder of fact, too, would be called upon at trial to evaluate the soundness and persuasiveness of the expert's model.

*In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 46–47 (S.D.N.Y. 2020).[26]   For

multiple reasons, and as explained by Prof. Stulz, Plaintiff's model falls well short of this standard.

### A.      Plaintiff's Damages Methodology Is Not Tailored to Plaintiff's Theory of Liability With Respect to the Tradipitant Claim.

Not only is Plaintiff's proposed class definition overbroad as to the Tradipitant Claim (*see*

*supra* Part I), but Plaintiff fails to propose a workable class-wide damages methodology.

*First*, Plaintiff does not explain how it will disentangle any fraud-related price impact on

February 5, 2019, from other, confounding information (*i.e.*, "incremental information beyond

what allegedly was previously misrepresented or omitted[,]" Ex. 1, ¶ 54, Stulz Report).   Several

pieces of information were released simultaneously on February 5, including, most significantly,

the fact that Vanda had filed a lawsuit against its primary regulator, the FDA.  (*Id.* ¶ 54.)  Notably,

Plaintiff does not contend that the February 5 corrective disclosure revealed some months-long

undisclosed plan to sue the FDA—nor would such an allegation even make sense, since Vanda

could not have decided with certainty to sue until the FDA ultimately imposed the partial clinical

hold in late December 2018.  (¶¶ 226, 231.)

Despite this, Steinholt fails to present a class-wide damages model that accounts for the

price impact attributable to Vanda's lawsuit against the FDA (or any other non-fraud-related new

information).  (Ex. 1, ¶¶ 45, 54, Stulz Report.)  When confronted with this issue, both at his

deposition and in his Reply Report, Steinholt said that he had not yet decided if it would be

necessary, and alluded to unspecified "fundamental valuation" tools that he could apply.  (Ex. 2,

¶ 24, Reply Report; *see also id.* ¶ 28 ("if needed, in the case of (b) the fundamental value approach,

---

[26]      *See also Ackerman* v. *Coca-Cola Co.*, No. 09 CV 395 DLI RML, 2013 WL 7044866, at *20 (E.D.N.Y. July 18, 2013) (stating that a plaintiff fails to satisfy Rule 23(b)(3) in the absence of "a suitable methodology or formula for establishing causation and injury on a class-wide basis"); *Namenda*, 338 F.R.D. at 551 ("[A] damages estimate proffered by a plaintiff's expert must actually correspond to the specific theory of liability that plaintiffs advance. 'If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).'" (quoting *Comcast*, 569 U.S. at 35)). *Comcast* also requires that a district court's analysis of plaintiff's proposed model be "rigorous." 569 U.S. at 35.

it can be applied to determine the value of other specific information, including confounding information"); Ex. 4 at 252:6–253:5, Steinholt Dep. ("I'm not aware of any [confounding] factors, as I sit here today . . . [but] I haven't conclusively excluded the possibility").)   Without a methodology that can separate any fraud-related stock price decline from the non-fraud-related disclosure that Vanda had sued the FDA, class members would obtain a windfall, compensating them not only for any harm from Vanda's supposed tradipitant-related fraud, but also for the new and confounding impact of the filing of the lawsuit.  (Ex. 1, ¶ 56, Stulz Report.)   This is impermissible under *Comcast*, as Plaintiff is not permitted to seek recovery for "damages that are not the result of the wrong."  *Sykes* v. *Mel S. Harris & Associates LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (internal citation omitted).  Rather, "confounding factors" must be "disaggregat[ed]" when calculating damages.  *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010).[27]

Steinholt's failure to grapple with the record evidence is fatal to his damages model for the Tradipitant Claim, because the evidence is overwhelming that the market's reaction on February 5 was spurred by news that Vanda had sued the FDA, its primary regulator, and not the FDA's

---

[27] Plaintiff apparently contends that *Comcast* is applicable only in antitrust class actions, and not securities class actions.  There is nothing in the *Comcast* decision that limits its application so narrowly, however, and courts do apply *Comcast* in securities cases.  *Comcast*, 569 U.S. at 34 ("[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class . . . [t]his case thus turns on the straightforward application of class-certification principles; it provides no occasion for the dissent's extended discussion . . . of substantive antitrust law").  *See generally Waggoner*, 875 F.3d at 106 (2d Cir. 2017) (applying *Comcast* to theory of liability advanced by plaintiff in securities class action, but rejecting *Comcast* challenge on particular facts presented).  Here, the stock drop that followed the filing of the FDA action was driven by the market reaction to Vanda's lawsuit against its regulator, and so *Comcast* must be applied stringently.  The Second Circuit's holding in *Waggoner* is not to the contrary:  there, the Court emphasized that the regulatory action revealed on the corrective disclosure date was "directly linked" to the plaintiff's theory of liability.  *Id.*  Here, there is no one-to-one relationship between Plaintiff's theory of falsity (*i.e.*, that Vanda misrepresented the status of the development of tradipitant) and the alleged corrective disclosure (*i.e.*, Vanda's announcement it was suing the FDA), because the latter contained additional confounding information.  Moreover, the Second Circuit's prior cases applying *Comcast* did not have to grapple with the novel application of the efficient market hypothesis advanced by Plaintiff in this case.  *See, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 (2d Cir. 2013) (holding that damages from overcharging customers could be determined on a class-wide basis); *Sykes* v. *Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (holding that damages related to individualized service of process could be determined on a class-wide basis); *Roach*, 778 F.3d at 407 (holding that damages under the Fair Labor Standards Act could be determined on a class-wide basis; *Kurtz* v. *Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020) (holding that damages in a products liability case were determinable on a class-wide basis).

underlying decision to impose a dog study.  Plaintiff's own investment manager testified that investors attached great significance to the fact of the lawsuit itself, separate and apart from whether Vanda would ultimately have to perform the dog study.  The investment manager testified that he personally was worried that Vanda's suit against the FDA would sour Vanda's overall relationship with its regulator and negatively impact future interactions concerning another drug (Hetlioz®), because the FDA might react to Vanda's "provocation" in a retributive way.  (Ex. 5 at 102:20–104:3, 107:12–108:20, Kehoe Dep.)[28]  Plaintiff's investment manager also testified—contrary to Plaintiff's contention that the stock dropped because of the partial hold on tradipitant testing—that his real concern was about the impact the lawsuit would have on Vanda's ability to expand the Hetlioz® label for other uses.  (Ex. 5 at 105:14–106:4, Kehoe Dep.)  Likewise, as the Complaint itself points out, analysts were "deeply concerned by Defendants' decision to sue the FDA"  (¶¶ 227–29) (quoting Oppenheimer & Co. ("VNDA's announcement that it is pursuing legal action against the FDA due to a partial clinical hold restricting tradipitant dosing to 3 months comes as a surprise to us . . . we view a lawsuit as a non-optimal strategy") and Stifel Nicolaus ("this will certainly raise questions . . . whether or not management is really focused on creating value for its shareholders")).

Given the overwhelming evidence, including from Plaintiff's own investment advisor, that the stock dropped because of the lawsuit and not the partial clinical hold, Plaintiff should not be permitted to proceed under *Comcast* without articulating a damages model that is capable of identifying class-wide damages that is reconcilable with the facts at issue in this litigation.

*Second*, Steinholt proposes to measure damages using a constant inflation ribbon that does not—and cannot—account for how Vanda's interactions with the FDA developed over time.  (Ex.

---

[28]  (*See also* Ex. 12 at ROTHSHILD_0127437, Teamsters 727 Pension Fund Quarterly Report (March 2019) ("This provocation [*i.e.*, Vanda's lawsuit against the FDA] raises concerns that the FDA could potentially take a hostile stance towards the company's filing for label expansion for its flagship Hetlioz commercial drug.").)

1, ¶¶ 60–62, Stulz Report.)   Plaintiff's Tradipitant Claim is based on an on-going disagreement between Vanda and the FDA that developed over time, culminating in the imposition of the partial clinical hold in December 2018 and Vanda's filing of a lawsuit against the FDA in February 2019.[29]   At any given point in these discussions, any "corrective disclosures" would have been different and necessarily would have altered the "total mix of information" available to investors in different ways, resulting in a different impact on the price of Vanda's stock (if any impact at all).   But Plaintiff's damages model illogically assumes that Vanda could have disclosed **all** of the information ultimately revealed in February 2019 at **any** time during the putative class period.   Put differently, Plaintiff's expert treats the **entire** price decline as the measure of price inflation caused by the alleged misrepresentations **throughout** the class period.   (*See* Ex. 1, ¶¶ 63, 66, Stulz Report.) This analysis assumes that a class member who purchased on Day 1 of the class period was damaged in the same amount as one who purchased on Day 1,189 (and every day in between)— even though the factual allegations show that this cannot be true.   (Ex. 3 at 243:17–24, Stulz Dep. ("[Steinholt] has absolutely nothing to say about what [an inflation ribbon] would look like . . . so I don't really know how you can say that there is a method to compute damages class-wide when he's not even saying when that inflation band would actually start.").)

As a consequence, Plaintiff has failed to present a methodology that could possibly be presented to a jury for a claim of class-wide liability.   As demonstrated by a verdict form in a recent securities class action, the jury will be asked to identify the amount of artificial inflation in Vanda's stock on every day of the 1,195-day class period.   (*See* Ex. 18 at 58–68, *Vivendi* Jury Form ("Please identify the daily inflation amount . . ., if any, that you find was caused by the

---

[29]   (*See* ¶ 201 (Phase II trial begins on November 22, 2016);  ¶ 205 (Vanda requests extension of Phase II study on April 10, 2018); ¶ 206 (FDA suggests nine-month non-rodent toxicity study required before requested extension on May 15, 2018); ¶ 215 (FDA approves modified extension for no longer than three months on May 24, 2018); ¶ 216 (Vanda formally contests requested nine-month non-rodent toxicity study on August 1, 2019, and FDA denies request); ¶217 (Vanda submits a new proposal for a 52-week study on September 26, 2018); ¶ 220 (Vanda renews same request on December 11, 2018); ¶ 221 (FDA informs Vanda by telephone of clinical holds on December 19, 2018).)

Section 10(b) violation(s) you identified . . .").)  Plaintiff here has proposed no way to determine such damages, making it impossible for a jury to actually assess damages for each date of the class period.  In other words, Plaintiff's proposed methodology treats every date of the class period (and every class member) the same, even though the theory of liability makes it impossible that every class member suffered the same loss. (Ex. 1, ¶¶ 63–68, Stulz Report).)  This damages model does not fit the facts underlying Plaintiff's Tradipitant Claim and thus cannot adequately measure damages of the putative class.  *Sykes*, 780 F.3d at 82 (2d Cir. 2015) (noting that a damages methodology must be tied to the theory of liability in the case); *cf. Namenda*, 338 F.R.D. at 551 ("[A] damages estimate proffered by a plaintiff's expert must actually correspond to the specific theory of liability that plaintiffs advance.").

*Third*, Steinholt does not account for the fact that the FDA partial clinical hold represented the "realization of the risks" that were at least partially disclosed to Vanda investors well before December 2018.  (Ex. 3 at 125:16, Stulz Dep.; Ex. 1, ¶¶ 71, 79, Stulz Report.)  For example, Vanda's annual report for 2017, published in February 2018, disclosed that:

> If we fail to comply with the applicable requirements at any time during the product development process, approval process, or after approval, we may become subject to administrative or judicial sanctions. These sanctions could include the FDA's refusal to approve pending applications, withdrawals of approvals, *clinical holds*, warning letters, product recalls, product seizures, total or partial suspension of our operations, injunctions, fines, civil penalties or criminal prosecution. Any such sanction could have a material adverse effect on our business.[30]

While Plaintiff might argue that the full extent of this regulatory risk was not disclosed, at least some degree of risk clearly was.  Plaintiff's damages model fails to account for this reality and erroneously attributes the entire amount of the stock price drop to the alleged misrepresentations, even though, in an efficient market, Vanda's previous risk disclosures would already have been absorbed into the price of its stock.  *See Aluminum Warehousing*, 336 F.R.D. at 49 (noting that

---

[30]    (Ex. 19 at 9, Vanda 2017 10-K (emphasis added).)

38

"[a] flawed model may result in denial of class certification . . . [where] the model measures harm not attributable to the [alleged misconduct]").  As Prof. Stulz explains, Plaintiff's damages model cannot work in a case where the risk at issue was partially disclosed to the market, because in such a case, some of the price drop will be attributable to the realization of the risk and not the defendant's misleading statements—meaning the proper measure of damages is the incremental risk that was concealed and not the entire stock drop.[31]  (Ex. 1, ¶¶ 71–79, Stulz Report.)  Other courts have rejected methodologies that do not show if or how they would account for this problem. *Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015) (rejecting damages methodology because it did not distinguish between plaintiffs who were willing to take on some amount of risk lower than the true, concealed risk, and plaintiffs who would not take the true risk at all).

Thus, and as further explained in Prof. Stulz's Report (Ex. 1, ¶¶ 43–79, Stulz Report), Plaintiff's class-wide damages methodology cannot survive the "rigorous" analysis required, and the Court should decline to certify Plaintiff's proposed class with respect to the Tradipitant Claim.

B.     **Plaintiff's Damages Methodology Is Not Tailored to Plaintiff's Theory of Liability With Respect to the Off-Label Claim.**

Plaintiff has also failed to provide a workable damages methodology for its Off-Label Claim, providing yet reason to deny class certification.  For this claim, a workable damages methodology must be able to disentangle the price impact (if any) associated with disclosure of the alleged fraud from other new information revealed on February 11, 2019, in the Aurelius Report.  As discussed above (*supra* Part II.G.), the Aurelius Report contained other negative information about Vanda:  namely, news that an investor was publicly shorting Vanda's stock, and

---

[31]    Consider an example in a which a company would be worth $100/share if no partial clinical hold was imposed and $90/share if a partial clinical hold was imposed.  In the example, the company disclosed a 10% risk of a hold being issued, when the real risk was 30%.  An accurate valuation of the company's stock price pre-hold would be $97, while the inflated value assigned by an efficient market would be $99.  Thus, the amount of an appropriate inflation ribbon would be $2, even though the announcement of a partial clinical hold would cause the price to drop from $99 to $90—a decline of $9.  Plaintiff's methodology, by contrast, incorrectly treats the entire $9 as the measure of damages.  (*See* Ex. 1, ¶¶ 75–76, Stulz Report.)

other accusations against Vanda that are unrelated from the alleged off-label marketing. (Ex. 1, ¶ 39, Stulz Report.) Plaintiff's expert has offered no way to disentangle the price impact of these confounding revelations from any price impact attributable to the alleged corrective disclosures. *Comcast*, 569 U.S. at 28, 35 (no class can be certified unless plaintiff puts forward a viable "damages model" tied to a calculation of damages that measures "only those damages attributable to that theory"). Those other revelations have nothing to do with Plaintiff's theory of Vanda's purported fraud; therefore, to be workable, Plaintiff's expert must provide a methodology that can separate the price decline attributable to these pieces of confounding information from that associated with the alleged corrective disclosures. Instead, as noted above, Plaintiff's expert has offered no methodology that can disentangle this confounding news. (Pl. Ex. A, ¶¶ 38–39, Steinholt Report; Ex. 4 at 207:5–16, Steinholt Dep.)

Plaintiff's proposed damages methodology also fails to distinguish between the stock price impact from the disclosure of the allegedly concealed risk versus the impact from the materialization of disclosed risk. As discussed above in Section II.D, the allegations of Vanda's off-label marketing were discussed publicly well before February 11, 2019. To the extent the market was aware of these allegations and the associated risks to Vanda, such as a potential whistleblower lawsuit, the February 11 stock drop reflects the materialization of disclosed risk, which has no bearing in measuring inflation. (Ex. 1, ¶ 78, Stulz Report.) Thus, any damages model in this case must be able to identify the price impact attributable to the incremental concealed risk, which Plaintiff has failed to offer. *See BP*, 800 F.3d at 690. The absence of a workable class-wide damages methodology provides yet another reason why individual issues will predominate, and why class certification of the Fanapt® and Hetlioz® claims should be denied.

### CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court deny Plaintiff's motion for class certification.

Dated:  December 1, 2021
      New York, New York

                         PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

                         By:  */s/ Audra J. Soloway*
                              Daniel J. Kramer
                              Audra J. Soloway
                              1285 Avenue of the Americas
                              New York, New York 10019-6064
                              Telephone:  (212) 373-3000
                              Email:  dkramer@paulweiss.com
                              Email:  asoloway@paulweiss.com

                              *Counsel for Defendants*

41