# Exhibit 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

KENNETH GORDON, Individually and on
Behalf of All Others Similarly Situated,

    Plaintiff,

v.

VANDA PHARMACEUTICALS INC.,
MIHAEL H. POLYMEROPOULOS, JAMES
P. KELLY, GIAN PIERO REVERBERI, and
THOMAS E. GIBBS,

    Defendants.

---------------------------------------------------------------------x

Civil Action No. 1:19-cv-01108-FB-LB

REBUTTAL REPORT OF

**RENÉ M. STULZ, PH.D.**

**EVERETT D. REESE CHAIR OF**

**BANKING AND MONETARY ECONOMICS**

**THE OHIO STATE UNIVERSITY, FISHER COLLEGE OF BUSINESS**

September 17, 2021

# Table of Contents

I.     Qualifications ................................................................................................. 1

II.    Assignment .................................................................................................... 2

III.   Background .................................................................................................... 3

       A.    Company Overview ............................................................................ 3

       B.    Summary of Allegations .................................................................... 5

IV.    Summary of Opinions .................................................................................... 8

V.     The Alleged Corrective Information on February 11, 2019, Which Merely Repeated
       Already-Available Information, Could Not Have Impacted Vanda's Stock Price If the
       Stock Traded in an Efficient Market ............................................................ 12

       A.    Mr. Steinholt's Analysis Ignores That Numerous Public Statements Concerning
             Vanda's Purported Off-Label Marketing Practices before February 11, 2019,
             Were Not Accompanied by Statistically Significant Stock Price Changes .......... 14

       B.    In an Efficient Market, the Reiteration of Previously Disclosed Information on
             February 11, 2019 Would Not Be Expected to Impact Vanda's Stock Price ....... 19

       C.    Mr. Steinholt Fails to Take into Account That There Is No Evidence of Negative
             Analyst Commentary Regarding Vanda's Alleged Marketing Practices for Hetlioz
             and Fanapt ...................................................................................... 21

       D.    Other Information Not Related to Vanda's Alleged Off-Label Marketing Practices
             Became Available on February 11, 2019 That Affected Vanda's Stock Price ..... 24

VI.    The Steinholt Report Fails to Consider That Differences in Putative Class Members'
       Knowledge of Allegations of Vanda's Off-Label Marketing Practices Would Require
       Individualized Inquiry .................................................................................. 26

VII.   Mr. Steinholt Has Not Articulated a Reliable Class-Wide Damages Methodology That Is
       Consistent with Plaintiff's Theories of Liability ............................................ 27

       A.    Mr. Steinholt Has Offered a Generic, "Off the Shelf" Methodology That Is Not
             Properly Tailored to Plaintiff's Liability Theories in *This* Matter ......... 27

       B.    Mr. Steinholt Fails to Provide a Reliable Methodology to Analyze Vanda's Stock
             Price Declines on the Alleged Corrective Disclosure or Information Dates That
             Can Reliably Measure the Alleged Inflation during the Putative Class Period.... 29

             1.    Mr. Steinholt Fails to Provide a Reliable Methodology to Determine the
                   Fraud-Related Price Decline Due to the February 5, 2019, Alleged
                   Corrective Disclosure ............................................................. 31

             2.    Mr. Steinholt Fails to Provide a Reliable Methodology to Determine the
                   Fraud-Related Price Decline Due to the February 11, 2019, Alleged
                   Corrective Information ............................................................ 34

C.      Mr. Steinholt Has Not Proposed a Reliable Methodology for Measuring Time-Varying Inflation throughout the Putative Class Period ...................................... 34

        1.      Mr. Steinholt Has Not Provided a Reliable Methodology to Measure Inflation Attributable to Alleged Misrepresentations Regarding Tradipitant ................................................................................................................ 36

        2.      Mr. Steinholt Has Not Provided a Reliable Methodology to Measure Inflation Attributable to Alleged Misrepresentations Regarding Off-Label Marketing Practices for Fanapt and Hetlioz ........................................... 39

D.      Mr. Steinholt Has Not Proposed a Reliable Methodology to Account for the Fact That Vanda's Stock Price Decline Following the Alleged Corrective Disclosures or Information Reflected Realizations of Risks Described prior to and throughout the Putative Class Period ...................................................................................... 40

## I.    Qualifications

1.    I hold the Everett D. Reese Chair of Banking and Monetary Economics at The Ohio State University.  I am also Director of the Dice Center for Research in Financial Economics at The Ohio State University and a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts.  Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and The Ohio State University.  I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2.    I am a past president of the American Finance Association; a fellow of the American Finance Association, the Financial Management Association, the European Corporate Governance Institute, and the Wharton Financial Institutions Center; and a past president of the Western Finance Association.  I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland.  I have also been recognized by a number of organizations for my contributions to financial economics by awards or by invitations to be a keynote speaker.

3.    I belong to the editorial boards of many academic and practitioner publications.  Further, I am a member of the Asset Pricing and Corporate Finance Programs and the director of the Risks of Financial Institutions Group of the National Bureau of Economic Research.  I was editor of the *Journal of Finance* for 12 years and co-editor of the *Journal of Financial Economics* for five years (these are two of the top three journals in the field of financial economics).  Thomson Reuters has included me in its list of the world's most influential scientific minds, which identifies top researchers based on the number of authored publications that are highly cited by peers.[1]

4.    I have published more than 100 studies in finance and economics journals, including the *Journal of Political Economy*, the *Journal of Financial Economics*, the *Journal of Finance*, and the *Review of Financial Studies*.  I am a co-author of *The Squam Lake Report: Fixing the Financial System*, and author of *Risk Management and Derivatives*.  I have edited several books, including the *Handbook of the Economics of Finance* and *International Capital Markets*.

---

[1] *See, e.g.*, "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015, p. 46.

5.      I have taught in executive development programs in North America, Europe, and Asia. I have consulted for major corporations, law firms, the New York Stock Exchange, the International Monetary Fund, and the World Bank.  I also served as a member of an advisory board of the U.S. Treasury and as a director of several bank holding companies and of an asset management firm.  I also held the function of vice-chairman of the Board of Trustees of the Global Association of Risk Professionals and of chair of the governance committee of that Board.

6.      A copy of my curriculum vitae is attached as **Appendix A**, which includes a list of my publications over the last 10 years.  **Appendix B** contains a list of my testimony over the last four years.

## II.      Assignment

7.      I have been retained by counsel for Defendants to review and assess certain opinions expressed and analyses proposed or presented in the Expert Report of Bjorn I. Steinholt, CFA, dated July 30, 2021 ("Steinholt Report"), submitted on behalf of Plaintiff Teamsters Local Union No. 727 Pension Fund who moves to certify a class comprising "all purchasers of the common stock of [Vanda Pharmaceuticals Inc. ("Vanda" or "the Company")] between November 4, 2015 and February 11, 2019, inclusive" (the "Putative Class" and "Putative Class Period").[2] Specifically, I have been asked to assess the implications of Mr. Steinholt's market efficiency conclusions for determining whether certain alleged misrepresentations[3] and corrective disclosures impacted the stock price of Vanda during the Putative Class Period.  I have also been asked to determine whether Mr. Steinholt has put forth a damages methodology that is capable of reliably measuring class-wide damages attributable to Plaintiff's theories of liability in this matter, and only damages attributable to those liability theories.

8.      The analyses and opinions expressed in this report are my own.  I am compensated for my time and services on this case at my regular hourly rate of $1,100.  I am assisted in this matter by staff of Cornerstone Research, who work under my direction.  I receive compensation from

---

[2] Amended Complaint for Violations of the Federal Securities Laws, *Kenneth Gordon, Individually and on Behalf of All Others Similarly Situated v. Vanda Pharmaceuticals, Inc., et al.*, filed on July 23, 2019 ("Amended Complaint"), ¶ 1.

[3] Here and throughout the remainder of this report, I use the term "misrepresentation" to refer to both statements Plaintiff alleges were false and statements Plaintiff alleges were misleading by omission.

Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

9.      A list of the materials I relied upon in preparing this report is attached as **Appendix C**. My work in this matter is ongoing, and I reserve the right to supplement my opinions in the event that Plaintiff or its experts submit additional analyses or information.

### III.    Background

#### A.      Company Overview

10.      Headquartered in Washington, D.C., Vanda is a global biopharmaceutical company focused on developing and commercializing innovative therapies addressing high unmet medical needs.[4]  Since commencing operations in March 2003, Vanda had "devoted substantially all of [its] resources to the in-licensing, clinical development and commercialization of [its] products."[5] In April 2006, Vanda completed an initial public offering and was subsequently listed on the NASDAQ stock exchange under the symbol "VNDA."[6]  During the Putative Class Period, Vanda marketed and sold two drugs:

---

[4] Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2018, filed on February 19, 2019 ("2018 Vanda 10-K"), pp. 3, 21.

[5] 2018 Vanda 10-K, p. 3.

[6] "Vanda Pharmaceuticals, Inc. Announces Initial Public Offering of 5,750,000 Shares of Common Stock at $10.00 per Share," *BioSpace*, April 12, 2006, https://www.biospace.com/article/releases/vanda-pharmaceuticals-inc-announces-initial-public-offering-of-5-750-000-shares-of-common-stock-at-10-00-per-share-/, accessed September 14, 2021.

    a. HETLIOZ® (tasimelteon), a drug approved by the Federal Drug Administration ("FDA") in January 2014 and launched commercially in the U.S. in April 2014 to treat Non-24-Hour Sleep-Wake Disorder ("Non-24"),[7] a rare circadian rhythm disorder;[8] and

    b. Fanapt® (iloperidone), a drug approved by the FDA in May 2009 and launched commercially by Novartis Pharma AG ("Novartis") in January 2010 to treat schizophrenia, a mental disorder.[9] On December 31, 2014, Novartis transferred all the U.S. and Canadian commercial rights to the Fanapt franchise to Vanda.[10]

11. As relevant to this lawsuit, during the Putative Class Period, Vanda was also developing a third drug, tradipitant (VLY-686), "a small molecule neurokinin-1 receptor (NK-1R) antagonist, which [was] in clinical development for the treatment of chronic pruritus in atopic dermatitis and the treatment of gastroparesis."[11] Vanda had licensed the drug from Eli Lilly in April 2012 and had evaluated it "in a number of indications including chemotherapy-induced nausea and vomiting, post-operative nausea and vomiting, alcohol dependence, anxiety, depression, [and] gastroparesis…."[12]

---

[7] During the Putative Class Period, Hetlioz was solely approved for the treatment of Non-24. However, in December 2020, the FDA approved Hetlioz for the treatment of nighttime sleep disturbances in Smith-Magenis Syndrome, adding an additional indication to the drug's label. *See* "Highlights of Prescribing Information: Hetlioz," *U.S. Food and Drug Administration*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/214517s000lbl.pdf.

[8] 2018 Vanda 10-K, p. 3.

[9] 2018 Vanda 10-K, p. 6. According to Vanda, "Schizophrenia is a chronic, debilitating mental disorder characterized by hallucinations, delusions, racing thoughts and other psychotic symptoms (collectively referred to as 'positive symptoms'), as well as moodiness, anhedonia (inability to feel pleasure), loss of interest, eating disturbances and withdrawal (collectively referred to as 'negative symptoms'), and attention and memory deficits (collectively referred to as 'cognitive symptoms')" (2018 Vanda 10-K, p. 12).

[10] 2018 Vanda 10-K, p. 3.

[11] 2018 Vanda 10-K, p. 3. According to Vanda, "[a]tropic dermatitis is a chronic, relapsing inflammatory skin disorder characterized by the symptom of intense and persistent pruritus or itch. Other clinical features include erythema, excoriation, edema, lichenification, oozing and xerosis" (2018 Vanda 10-K, p. 7). "Gastroparesis is a serious medical condition characterized by delayed gastric emptying associated with the symptoms of nausea, vomiting, bloating, fullness after meals and abdominal pain, along with significant impairment of social and occupational functioning" (2018 Vanda 10-K, p. 8).

[12] 2018 Vanda 10-K, p. 7.

### B.      Summary of Allegations

12.      I understand Plaintiff alleges that Defendants made "materially false and misleading statements and omissions concerning a long-running and multifaceted off-label promotion scheme that Defendants undertook to sell Fanapt and Hetlioz during the [Putative] Class Period."[13]  According to the Amended Complaint, "the term 'off-label marketing' or 'off-label promotion' refers to marketing or promoting a drug for an indication (e.g., a disease or symptom) that it has never received FDA approval to treat."[14]

13.      With respect to Fanapt, Plaintiff alleges that Vanda trained its sales representatives to engage in off-label promotion of the drug by:

> (i) marketing Fanapt to treat mental disorders other than schizophrenia;
> (ii) focusing on akathisia, a side effect of antipsychotics, in an effort to obtain sales to non-schizophrenia patients; (iii) providing unrealistic sales targets that required off-label promotion in order to be met; (iv) compensating sales representatives for off-label sales; (v) targeting pediatric patients as part of the marketing efforts for Fanapt even though the drug is only FDA-approved for use by adults; (vi) presenting Fanapt as a first line treatment even though it is only FDA-approved as a second line treatment, meaning it should not be used unless a patient has tried another antipsychotic first; (vii) downplaying the extent and severity of QT prolongation, a serious and sometimes fatal side effect of Fanapt; and (viii) promoting that Fanapt can be administered once-daily even though it is only FDA-approved to be taken twice-daily.[15]

14.      With respect to Hetlioz, Plaintiff alleges that despite acknowledging "that Non-24 rarely, if ever, occurs in sighted individuals, the Company focused its promotional efforts for Hetlioz during the [Putative] Class Period in sighted individuals regardless of whether they had Non-24."[16]  However, I understand that nowhere on the FDA label for Hetlioz does it indicate

---

[13] Amended Complaint, ¶ 3.

[14] Amended Complaint, ¶ 49.  The Amended Complaint also asserts that "[b]y contrast, 'on-label marketing' refers to marketing or promoting a drug for the indication or indications that the drug has received FDA approval to treat. In the case of Fanapt, that means schizophrenia in adults.  In the case of Hetlioz, that means Non-24" (Amended Complaint, ¶ 50).

[15] Amended Complaint, ¶ 4.

[16] Amended Complaint, ¶ 161.

that the drug is limited to use exclusively by blind individuals.[17]  In other words, notwithstanding that the FDA label does not limit use of Hetlioz to only blind patients,[18] Plaintiff alleges that the sale of Hetlioz to sighted patients signals that Vanda was marketing the drug for uses beyond Non-24.[19]  Plaintiff further alleges that Vanda's promotional efforts for Hetlioz "demonstrated an intent to promote Hetlioz off-label because they did not focus on patients with Non-24"[20] and that efforts were instead focused on Hetlioz's efficacy "in treating circadian rhythm disruption[,]" which Plaintiff alleges was intended to signal to prescribers that Hetlioz "could also treat non-blind patients with other sleep disorders caused by circadian rhythm disruption, such as shift work disorder, jet lag, and insomnia."[21]  Plaintiff additionally alleges that Vanda's sales representatives were instructed to tell psychiatrists that "Non-24 occurs in blind patients [and] also those with mental conditions, so if a psychiatrist has patients who have trouble sleeping, and have tried Ambien and it did not work, that they should prescribe Hetlioz."[22]  According to the Amended Complaint, off-label promotion of Hetlioz was evidenced by "certain sales representatives [being] able to obtain an out-sized number of prescriptions written for Hetlioz."[23]

15.    In addition to off-label marketing allegations pertaining to Fanapt and Hetlioz, Plaintiff asserts that Defendants made "materially false and misleading statements and omissions concerning tradipitant," which Plaintiff alleges "was Vanda's most important drug in the clinical trial stage during the [Putative] Class Period."[24]  Specifically, Plaintiff asserts that in May 2018,

---

[17] The "Indications and Usage" on the label note only that "HETLIOZ capsules are indicated for the treatment of Non-24 in adults."  *See* Hetlioz website, https://hetlioz.com/; "Highlights of Prescribing Information: Hetlioz," *U.S. Food and Drug Administration*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/214517s000lbl.pdf.

[18] The Amended Complaint explains that "on-label marketing" for Hetlioz simply "means Non-24" and acknowledges that Hetlioz is FDA-approved to treat Non-24 in *both* blind and non-blind individuals (Amended Complaint, ¶¶ 50, 155).  An analyst report by Jefferies on February 14, 2019, noted that "Hetlioz has been approved for the overall non-24 population, not just for blind patients.  In some cases, [Vanda] has gone to an administrative judge to resolve the reimbursement issue, with rulings in VNDA's favor" ("4Ql8: Pipeline Dev[elopment] Continues to Be The [Long Term] Value Creator," *Jefferies*, February 14, 2019, STEINHOLT_0000620–630 at 620).

[19] Amended Complaint, ¶ 5.

[20] Amended Complaint, ¶ 174.

[21] Amended Complaint, ¶¶ 164–65.

[22] Amended Complaint, ¶ 173.

[23] Amended Complaint, ¶ 177.

[24] Amended Complaint, ¶ 6.

the FDA informed Vanda that if "the Company wanted to do a study of tradipitant in humans for longer than three months – which was necessary for tradipitant to ultimately receive FDA approval – Vanda needed to conduct a nine-month non-rodent study to ensure that tradipitant is safe for humans."[25]  Subsequently, in December 2018, the FDA issued a partial clinical hold for tradipitant studies.[26]

16.    Plaintiff alleges two corrective disclosure dates, that is, dates when the "truth" was allegedly "revealed":

> a. **February 5, 2019**:  After market close on February 5, Vanda issued a press release announcing that the Company had initiated litigation against the FDA over the FDA's decision to issue a partial clinical hold to delay or suspend drug trials for tradipitant studies.  Vanda's common stock price declined from $25.06 per share as of market close on February 5, to a closing price of $20.06 per share on February 6—a decline of $5.00 per share, or 19.95%.[27]
>
> b. **February 11, 2019**:  During the trading day (at approximately 10:00 AM Eastern Time ("ET")), short seller[28] Marcus Aurelius Value published a report ("Aurelius Value Report") titled "Vanda: In the Land of the Blind, The One-Eyed Man is King," which summarized the allegations in a *qui tam* whistleblower lawsuit alleging that Vanda had engaged in an off-label promotion scheme for Fanapt and Hetlioz.[29]  By the end of the day, Vanda's common stock price

---

[25] Amended Complaint, ¶ 6.

[26] Amended Complaint, ¶ 7.

[27] Amended Complaint, ¶ 432.  According to the Steinholt Report, the abnormal return (i.e., return after controlling for market and/or industry factors) on February 6, 2019 was -19.83%.  *See* Steinholt Report, Exhibit D, p. 21.

[28] A "short seller" is an investor who seeks to profit from a decline in a company's stock price.  According to Brealey *et al.* (2011), "[t]o sell a stock short, you borrow shares from another investor's portfolio, sell them, and then wait hopefully until the price falls and you can buy the stock back for less than you sold it for" (Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (McGraw-Hill/Irwin, 2011), p. 327).

[29] "Vanda: In the Land of the Blind, The One-Eyed Man is King," *Marcus Aurelius Value*, February 11, 2019 ("Aurelius Value Report").

declined by $0.95 (from $18.95 to $18.00), or 5.01% as compared to the closing price on the prior trading day, February 8, 2019.[30]

17.    According to Plaintiff, "the timing and magnitude of the price declines in Vanda's common stock negate any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud."[31]

## IV.    Summary of Opinions

18.    Below is a summary of my opinions in this matter.  The bases for these opinions are detailed in the sections that follow.

   a.    *First*, Plaintiff's claim that the alleged corrective information on February 11, 2019, caused Vanda's stock price to decline[32] is inconsistent with Mr. Steinholt's finding of market efficiency.

      i.    Mr. Steinholt asserts that Vanda's common stock traded in an efficient market throughout the Putative Class Period.  In an efficient market, stock prices reflect the most up-to-date information that is publicly available, as they rapidly incorporate *new*, value-relevant information.  A finding that the reiteration of old information impacted the price of a stock would be inconsistent with a finding of market efficiency.

      ii.    Plaintiff's assertion that Vanda's stock price was impacted by "revelations" of the Company's alleged off-label marketing practices detailed in the Aurelius Value Report on February 11, 2019 (the second of Plaintiff's two alleged corrective disclosure days) is inconsistent with

---

[30] Amended Complaint, ¶ 434.  According to the Steinholt Report, the abnormal return (i.e., return after controlling for market and/or industry factors) on February 11, 2019 was -5.57%.  *See* Steinholt Report, Exhibit D, p. 21.

[31] Amended Complaint, ¶ 435.

[32] Amended Complaint, ¶ 434 ("In response to the revelations on February 11, 2019, the trading price of Vanda's common stock declined from an opening price of $19.05 per share on February 11 to a closing price of $18.00 per share on February 11 – a decline of $1.05 per share, or 5.51%.").

Mr. Steinholt's market efficiency claims.  The Aurelius Value Report merely summarized and repeated claims of the Company's purported off-label marketing practices that were made in various public fora and media months before February 11, 2019 (*see* **Exhibit 1**).  For example, the Aurelius Value Report repeated claims made in a whistleblower lawsuit that was unsealed and became publicly available on February 4, 2019, and repeated allegations previously made in months prior on public websites. Mr. Steinholt fails to explain how, in an efficient market, the alleged corrective information that became publicly available as of February 4, 2019 (or earlier) was not reflected in Vanda's stock price until a week later, on February 11, 2019.  Accordingly, if Vanda's common stock traded in an efficient market during the Putative Class Period, the alleged corrective information on February 11, 2019—which was previously available—could not have impacted the stock price of Vanda that day.  Conversely, if the corrective information, which allegedly revealed the truth concealed by the "materially false and misleading" misrepresentations, was not quickly absorbed into Vanda's stock price when it became publicly available, then it is inconsistent with Mr. Steinholt's opinion that Vanda's common stock traded in an efficient market.

b.  *Second*, to the extent that Mr. Steinholt asserts that allegations of Vanda's purported off-label practices were not publicly disclosed (and thus not incorporated into Vanda's stock price) prior to the publication of the Aurelius Value Report, such an assertion would raise the question of what information individual members of the Putative Class had access to—and when they learned it and how they relied upon it—regarding the allegations.  Ascertaining the disparate knowledge among the Putative Class could only be achieved through individualized inquiry of each Putative Class member.

c. ***Third***, Mr. Steinholt does not offer a reliable methodology for calculating damages on a class-wide basis.

    i. Mr. Steinholt provides only a generic, boilerplate overview of a damages approach that he claims is "well-accepted." The overview he provides amounts only to high-level references to certain tools and techniques (such as an event study) an economist could potentially apply in measuring the value impact of information in general, without accounting for the theories of liability or the fact pattern of this case.

    ii. Mr. Steinholt does not consider or analyze whether there was confounding information (i.e., information unrelated to the alleged misrepresentations) on either February 6[33] or February 11, 2019—the two alleged corrective disclosure dates when the stock price could incorporate the "truth" that was allegedly "revealed"—and fails to articulate a reliable damages methodology that can disentangle the stock price effects of allegedly corrective information from that of other confounding information. The event study methodology described in the Steinholt Report can measure the stock price impact of all new, value-relevant information that became publicly available on a given trading day, but it cannot differentiate between the price impact of the allegedly corrective information and that of any confounding information released concurrently. While Mr. Steinholt alludes to some "fundamental valuation tools" that could potentially refine his event study methodology to calculate damages, he fails to explain which tool he would use or how it could be used in the context of the specific fact pattern of this matter to quantify "the fraud-related portion of the price decline caused by the disclosure of the alleged truth" that is "key to quantifying class-wide damages."[34]

---

[33] The "corrective disclosure" regarding tradipitant was announced by Vanda on February 5, 2019, after market close. Therefore, the relevant stock price impact date to consider is the following trading day, February 6, 2019.

[34] Steinholt Report, ¶ 57.

iii.  Mr. Steinholt also fails to provide a reliable methodology for measuring time-varying inflation throughout the Putative Class Period.  For example, with respect to Vanda's alleged misrepresentations regarding tradipitant, despite acknowledging the need to estimate inflation *throughout* the Putative Class Period, Mr. Steinholt fails to describe a reliable methodology that could be used to account for the facts that (1) events occurred over time such that certain information (e.g., various developments in communications between Vanda and the FDA) could not have been disclosed earlier, and, as a result, inflation would not have been constant; and (2) the circumstances facing Vanda may have changed during the Putative Class Period, which could have affected the total mix of information, and, therefore, any potential "but for" price impact.  With respect to the alleged "revelations" of Vanda's purported off-label marketing practices in the Aurelius Value Report, Mr. Steinholt fails to explain how his damages methodology could accommodate different findings on what information Vanda could or should have disclosed at an earlier point in time and how that information might have affected Vanda's stock price, considering that the alleged "truth" revealed in the report was merely a summary and repetition of allegations against the Company.  This is particularly important as there had already been public allegations of off-label marketing practices against Vanda before the start of the Putative Class Period.

iv.  Finally, Mr. Steinholt has not provided a damages methodology that could distinguish the stock price impact from allegedly concealed risks being disclosed versus the impact from the materialization of known risks (which would have no bearing in measuring inflation).  For example, with respect to alleged misrepresentations regarding tradipitant, Vanda's disclosures in multiple public financial filings throughout the years leading up to February 5, 2019 highlighted the risk that the FDA could impose clinical holds.  To the extent that Vanda allegedly understated the

true probability of risks related to the FDA imposing a clinical hold, inflation would result from the portion of the risk (if any) that was concealed or understated.  Yet Mr. Steinholt does not explain how his generic damages approach could separate the impact of the allegedly concealed or understated risk (if any) from the impact of the realization of a known risk.

## V.    The Alleged Corrective Information on February 11, 2019, Which Merely Repeated Already-Available Information, Could Not Have Impacted Vanda's Stock Price If the Stock Traded in an Efficient Market

19.    As Mr. Steinholt explains in his report, "[a]n efficient market is one that efficiently processes *new* and material information.  In an efficient market, *new* and material information is *quickly* incorporated into the stock price as different investors buy and sell based on their respective evaluations of the *new* information disclosed."[35]  He further explains that the "driving force that causes markets to be efficient is the competition amongst investors to *quickly* analyze and trade on *new* information as it becomes publicly available," and that "[g]enerally, it is reasonable to assume that *new* and material information is incorporated into a stock price within one day."[36]  In other words, according to Mr. Steinholt, in an efficient market, if information is new and material, it generally should be incorporated into the stock price within a day.

20.    Mr. Steinholt states that evidence based on "Vanda's price reactions following the two alleged corrective disclosures on February 5, 2019 (after market close) and February 11, 2019 (during trading)" are "on [their] own, sometimes viewed as the only evidence needed to prove market efficiency in a reliance context."[37]  Citing to the Amended Complaint, Mr. Steinholt claims that the Aurelius Value Report published on February 11, 2019, "revealed the alleged truth, i.e., Vanda's off-label promotion scheme for Fanapt and Hetlioz."[38]  He further asserts that

---

[35] Steinholt Report, ¶ 12 (emphasis added).

[36] Steinholt Report, ¶ 12, footnote 8 (emphasis added).  Mr. Steinholt further notes that "[w]hile financial economists may hold different views regarding various aspects of market efficiency, they generally agree that securities traded in open and developed markets quickly incorporate and reflect new information as it becomes available" (Steinholt Report, ¶ 14).

[37] Steinholt Report, ¶ 43.

[38] Steinholt Report, ¶ 46.

the "negative Aurelius Value research report, in an efficient market, would be expected to cause Vanda's stock price to decline."[39]  Mr. Steinholt states that the residual decline in Vanda's stock price on February 11, 2019, was statistically significant and concludes that "the market in which Vanda's common stock traded throughout the [Putative] Class Period was impersonal, open, well developed, and efficient in that the prices reflected new, material information as it became publicly available."[40]

21.     Notwithstanding his explication of market efficiency and that the price of Vanda's common stock "reflected new, material information as it became publicly available,"[41] Mr. Steinholt fails to consider that allegations of "Vanda's off-label promotion scheme for Fanapt and Hetlioz"[42] purportedly "revealed" by the Aurelius Value Report were publicly available before February 11, 2019 (e.g., in a whistleblower lawsuit that was unsealed on February 4, 2019, and in other sources that were publicly available earlier, as discussed below).[43]

22.     As I discuss in detail in the subsequent sections, given that such allegations were not "new" and had been discussed in various public fora and media before February 11, 2019, information about the allegations should have already been *quickly* incorporated into Vanda's stock price prior to the publication of the Aurelius Value Report.  In an efficient market—as Mr. Steinholt asserts existed for Vanda's common stock during the Putative Class Period—the reiteration or repetition of information on February 11, 2019, would not be expected to impact Vanda's stock price.  In fact, Plaintiff's claim that the alleged corrective information on February 11, 2019 caused Vanda's stock price to decline[44] is inconsistent with Mr. Steinholt's finding of market efficiency.  In other words, either (1) the market for Vanda's stock is efficient,

---

[39] Steinholt Report, ¶ 47.  Mr. Steinholt states that "to assess 'cause and effect' relating to Company-specific information, [he] also examined Vanda's price reactions following the two alleged corrective disclosures on February 5, 2019 (after market close) and February 11, 2019 (during trading)" (Steinholt Report, ¶ 43).

[40] Steinholt Report, ¶ 63.

[41] Steinholt Report, ¶ 63.

[42] Steinholt Report, ¶ 46.

[43] The Aurelius Value Report notes that the whistleblower lawsuit was unsealed on January 31, 2019.  As I understand, the court in that matter issued an order to unseal the complaint on January 31, 2019, but the complaint was not unsealed and publicly available until February 4, 2019.

[44] Amended Complaint, ¶ 424 ("In response to the revelations on February 11, 2019, the trading price of Vanda's common stock declined from an opening price of $19.05 per share on February 11 to a closing price of $18.00 per share on February 11 – a decline of $1.05 per share, or 5.51%.").

and thus the alleged corrective information on February 11, 2019—which was already publicly available—could not have impacted Vanda's stock price that day; or (2) Vanda's stock price did not promptly incorporate new information, contrary to Mr. Steinholt's espoused notion that in an efficient market, "[g]enerally, it is reasonable to assume that new and material information is incorporated into the stock price within one day."[45]

### A. Mr. Steinholt's Analysis Ignores That Numerous Public Statements Concerning Vanda's Purported Off-Label Marketing Practices before February 11, 2019, Were Not Accompanied by Statistically Significant Stock Price Changes

23.     The Aurelius Value Report did not purport to report information that was previously unavailable to the public; instead, as discussed further below, it relied on information gathered from various sources that were already publicly available.  Despite this fact, the Steinholt Report ignores the many public statements on Vanda's purported off-label marketing practices that predate February 11, 2019.  Based on my analysis of these public statements and Mr. Steinholt's event study, Vanda's stock price did not experience a statistically significant change when the statements were publicly disseminated.

24.     The "truth" that Plaintiff and Mr. Steinholt contend was revealed by the Aurelius Value Report on February 11, 2019—"i.e., Vanda's off-label promotion scheme for Fanapt and Hetlioz"[46]—was not a legal finding that Vanda engaged in illicit activity, but rather allegations brought by a former employee in a whistleblower lawsuit.  This whistleblower lawsuit was not even the first instance in the public record in which such allegations about Vanda's marketing practices were made.  Similar claims or suggestions that Vanda sales representatives had been purportedly engaging in off-label marketing practices had been in the public discourse well before February 11, 2019, as the Aurelius Value Report itself recognized.[47]  Indeed, the Aurelius

---

[45] Steinholt Report, ¶ 12, fn. 8.

[46] Steinholt Report, ¶ 46.

[47] Aurelius Value Report, p. 2.  The Aurelius Value Report also cited a "Warning Letter from the FDA instructing the company to immediately cease misbranding its drug with 'false and misleading marketing materials' that failed to warn about the safety risks of Fanapt and Hetlioz" (Aurelius Value Report, p. 3).  This warning letter was publicly accessible on the FDA's website as of October 22, 2018.  *See* "Warning Letter: Vanda Pharmaceuticals," *U.S. Food and Drug Administration*, October 22, 2018, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/vanda-pharmaceuticals-576442-10222018, accessed September 14, 2021.

Value Report expressly stated that, in recent months, "detailed but anonymous allegations of illegal sales practices and outright criminality quietly gathered steam" on a publicly available website.[48]

25.     First, the Aurelius Value Report relied on information from the online forum Cafepharma, a widely read website for the pharmaceutical/medical industry,[49] where users posted questions regarding the "off-label" use of Fanapt and Hetlioz as early as September 2018, months before the alleged "corrective disclosure."  As just some examples:

- "Why are high volume PC [(primary care)] doc[tor]s on my Fanapt list (no psych licensure) when they aren't treating schiz[ophrenia]?  How do I explain and support treating a non-blind patient with Hetlioz?";[50]

- "[W]hy are my Fanapt goals and sales incentives directly tied to dirt data and every off label Rx whether the [healthcare professionals] are actually a target or not?  Isn't this telling me to ignore the indication and sell however and wherever necessary?";[51]

- "FDA interest in incentives based on dirt 'off label' business with Fanapt is another matter though.  Hetlioz use in sighted patients is being shut down by payors and may

---

[48] Aurelius Value Report, p. 2.

[49] "Dear Associate Reps," *Cafepharma.com*, http://www.cafepharma.com/boards/threads/dear-associate-reps.627505/, accessed September 14, 2021.  According to an article in the *New York Times* detailing growing online communities for drug and medical device makers, readers of *Cafepharma* "include investors, plaintiffs' lawyers, health care bloggers, journalists and recruiters."  As of the date of the article, June 12, 2007, *Cafepharma* had "more than 18,000 individual visitors on an average weekday."  *See* Barnaby J. Feder, "A TheirSpace for Drug Sales Reps," *New York Times*, June 11, 2007.

[50] The timestamp of this user post was September 7, 2018 at 12:35 PM ET.  Vanda's stock price return on this day was -2.12%—a residual return of -1.73%, which is not statistically significant according to Mr. Steinholt's event study methodology.  Notwithstanding this post's question about "treating a non-blind patient with Hetlioz," as noted above in Section III.B., I understand that nowhere on the FDA label for Hetlioz is it indicated that the drug is exclusively limited to use by blind individuals.  *See* Steinholt Report, Exhibit D, p. 18.  *See also* "Dear Associate Reps," *Cafepharma.com*, September 7, 2018, available at http://www.cafepharma.com/boards/threads/dear-associate-reps.627505/, accessed September 14, 2021.

[51] The timestamp of this user post was September 8, 2018 at 2:53 PM ET.  September 8, 2018 was a Saturday.  Vanda's stock price return on the next trading day (Monday, September 10) was -1.08%—a residual return of -1.26%, which is not statistically significant according to Mr. Steinholt's event study methodology.  *See* Steinholt Report, Exhibit D, p. 18.  *See also* "Dear Associate Reps," *Cafepharma.com*, September 8, 2018, available at http://www.cafepharma.com/boards/threads/dear-associate-reps.627505/, accessed September 14, 2021.

become a non issue.  Greedy Vanda needs to stop trying to convince [healthcare professionals] that insomnia is really non 24 when it is NOT.";[52]

- "My manager and his boss and her boss, Tommy have made it very clear just to tell prescribers that they are ignorant and any Ambien failure is the perfect Hetlioz patient. Criteria for non 24 is really not that important?";[53] and

- "Vanda had a driving study comparing Ambien to Hetlioz when the indications for the products are completely different?  That is a very strong 'wink wink' from leadership that Ambien is the competitor and to go get those insomnia patients.  Off label promotion is alive and well at Vanda with the blessing of HQ (although they will deny it but still demand it!!)."[54]

26.    On Glassdoor, a website through which current and former employees post reviews of companies,[55] a user posted in September 2018 about Vanda:  "Very unethical, sales goals are based upon demanded off label sales."[56]  Another post from August 2018 made similar claims:

---

[52] The timestamp of this user post was September 11, 2018 at 3:24 PM ET.  Vanda's stock price return on this day was 0.00%—a residual return of 0.52%, which is not statistically significant according to Mr. Steinholt's event study methodology.  *See* Steinholt Report, Exhibit D, p. 18.  *See also* "Dear Associate Reps," *Cafepharma.com*, September 11, 2018, available at http://www.cafepharma.com/boards/threads/dear-associate-reps.627505/page-2, accessed September 14, 2021.

[53] The timestamp of this user post was September 11, 2018 at 9:07 PM ET.  Vanda's stock price return on the following trading day (September 12) was 1.10%—a residual return of 0.97%, which is not statistically significant according to Mr. Steinholt's event study methodology.  *See* Steinholt Report, Exhibit D, p. 18.  *See also* "Dear Associate Reps," *Cafepharma.com*, September 11, 2018, available at http://www.cafepharma.com/boards/threads/dear-associate-reps.627505/page-2, accessed September 14, 2021.

[54] The timestamp of this user post was September 13, 2018 at 11:14 AM ET.  Vanda's stock price return on this day was 0.27%—a residual return of -0.28%, which is not statistically significant according to Mr. Steinholt's event study methodology.  *See* Steinholt Report, Exhibit D, p. 18.  *See also* "Dear Associate Reps," *Cafepharma.com*, September 13, 2018, available at http://www.cafepharma.com/boards/threads/dear-associate-reps.627505/page-2, accessed September 14, 2021.

[55] According to an article in Yahoo! Finance published on February 26, 2018, "[w]ith 50 million unique users and growing, Glassdoor [had become] the second-most popular jobs listing site in the U.S, after Indeed.com."  Additionally, "Glassdoor's reviews have also proven crucial for holding companies more accountable for their behavior."  *See* "How Glassdoor became the No. 2 jobs site in the US," *Yahoo! Finance*, February 26, 2018, https://www.yahoo.com/news/glassdoor-became-no-2-jobs-site-us-222246364.html, accessed September 14, 2021.

[56] "Vanda Pharmaceuticals Reviews," *Glassdoor*, September 6, 2018, available at glassdoor.com/Reviews/Vanda-Pharmaceuticals-Reviews-E40474_P3.htm, accessed September 14, 2021.  This user post is dated September 6, 2018.  Vanda did not experience a statistically significant return, according to Mr. Steinholt's event study methodology, on either September 6 or September 7, 2018.  *See* Steinholt Report, Exhibit D, p. 18.

"Ethical and compliant behavior is punished.  Sales depends on targeting off label business."[57] As purported indicia of off-label usage of Hetlioz, the Aurelius Value Report further cited to drug effectiveness complaint statistics from 2013 and 2014 that were posted on publicly accessible sources such as the "FDA Adverse Event Reporting System ('FAERS'), which contains information on medication error reports submitted to the FDA."[58]

27.    Next, the whistleblower lawsuit alleging off-label promotion of Fanapt and Hetlioz, which was the focus of the Aurelius Value Report, was unsealed and available on the Public Access to Court Electronic Records ("PACER") database on February 4, 2019—one week before the Aurelius Value Report was published.  While the records on PACER do not specify a time of day when the whistleblower lawsuit became publicly accessible (i.e., during trading hours on February 4 or after market close), Vanda's stock price did not have a statistically significant price reaction on either February 4 or February 5, 2019.[59]  Indeed, using Mr. Steinholt's own regression model and event study methodology, Vanda's stock experienced abnormal returns of -3.60% on February 4, 2019 (the day on which the whistleblower lawsuit was unsealed and available) and -0.97% on February 5, 2019 (the next trading day)—neither of which was statistically significant.[60]  This indicates that, to the extent Vanda's common stock traded in an efficient market as Mr. Steinholt claims, the information alleged in the whistleblower lawsuit was not considered new or material by the market on February 4 or February 5, 2019.[61]

---

[57] "Vanda Pharmaceuticals Reviews," *Glassdoor*, August 16, 2018, available at https://www.glassdoor.com/Reviews/Vanda-Pharmaceuticals-Reviews-E40474_P3.htm , accessed September 14, 2021.  This user post is dated August 16, 2018.  Vanda did not experience a statistically significant return, according to Mr. Steinholt's event study methodology, on either August 16 or August 17, 2018.  *See* Steinholt Report, Exhibit D, p. 18.

[58] Aurelius Value Report, p. 5.  *See also* "FDA Adverse Event Reporting System (FAERS) Public Dashboard," *U.S. Food and Drug Administration*, available at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard, accessed September 14, 2021.

[59] Steinholt Report, Exhibit D, p. 20.  I note further that based on Mr. Steinholt's own regression model and event study methodology, the two-day joint return (on February 4 and 5, 2019) of Vanda's stock is not statistically significant at the 5% level.

[60] Steinholt Report, Exhibit D, p. 20.

[61] Mr. Steinholt uses the term "material information" to refer to information "that impacts the future cash flows, or the timing or riskiness of the future cash flows."  *See* Steinholt Report, ¶ 7, footnote 7.

28.    In addition, contrary to any suggestion that use of Hetlioz by sighted patients was unknown to investors, analyst reports published before February 11, 2019, show that analysts were aware of such uses.[62]  For example, an Oppenheimer report dated October 3, 2018, presented the results of a survey of psychiatrists conducted "to assess current use of Hetlioz among sighted psychiatric patients, and likely future uptake trends within this cohort."[63]  The survey "data indicate[d] [that] psychiatrists who prescribe Hetlioz treated more sighted patients than blind with the medication."[64]  Additionally, the Oppenheimer report stated that only 13% of patients being treated with Hetlioz had been diagnosed with "Circadian Rhythm Sleep-Wake Disorders" such as Non-24, while 87% were diagnosed for other sleep disorders including insomnia, narcolepsy, obstructive sleep apnea, and parasomnias.[65]

29.    An earlier Oppenheimer report dated October 29, 2017, reported on the Company's "strategy to leverage the Fanapt sales force to detail Hetlioz [to sleep specialists] for sighted patients."[66]  Based on its interviews with two psychiatrists—each of whom reported having treated approximately 100 or more sighted patients with Non-24—Oppenheimer opined that the "market opportunity for Hetlioz in sighted Non-24 patients could expand its [Total Addressable

---

[62] *See, e.g.*, Amended Complaint, ¶ 349.

[63] "Survey Implies Healthy Hetlioz Use in Sighted Psychiatric Patients," *Oppenheimer*, October 3, 2018, STEINHOLT_0000860–72 at 60.

[64] "Survey Implies Healthy Hetlioz Use in Sighted Psychiatric Patients," *Oppenheimer*, October 3, 2018, STEINHOLT_0000860–72 at 60.

[65] "Survey Implies Healthy Hetlioz Use in Sighted Psychiatric Patients," *Oppenheimer*, October 3, 2018, STEINHOLT_0000860–72 at 64.

[66] "Raising [Price Target] to $26 on Bullish View of Sighted Non-24 Opportunity for Hetlioz," *Oppenheimer*, October 29, 2017, STEINHOLT_0001156–70 at 56.  Oppenheimer reported that "[a]s of October, the ~115-person Fanapt sales force is now also detailing Hetlioz and educating roughly ~10,000 psychiatrists on how to screen/diagnose Non-24 in their sighted patients.  This field force is much larger than the original ~20 reps detailing Hetlioz to sleep specialists and is the reason we believe Hetlioz sales will accelerate over the next 12-18 months" ("Raising [Price Target] to $26 on Bullish View of Sighted Non-24 Opportunity for Hetlioz," *Oppenheimer*, October 29, 2017, STEINHOLT_0001156–70 at 58).  The Aurelius Value Report asserted, "[i]n order to meet growth targets, we believe Vanda's 'secret sauce' is a product of [Vanda CEO] Polymeropoulos harnessing the Fanapt sales force to begin selling Hetlioz to psychiatrists as a sleep aide alternative to Ambien and Lunesta for <u>sighted patients</u>" (Aurelius Value Report, p. 5 (emphasis in original)).

Market] three-fold."[67]  The report also observed that Vanda "sales reps do have leave-behind marketing material regarding sighted Non-24 and reference certain screening questions around sleep timing, cyclicality of sleep and day-time functioning."[68]  Similarly, reports from analysts at Jefferies and JMP Securities discussed Vanda's sales and marketing efforts and prospects for revenue growth from sighted (non-blind) Non-24 patients.[69]  Analysts thus acknowledged and discussed in their reports that, during the Putative Class Period, Hetlioz was being prescribed by doctors for both blind and sighted patients, and for sleep disorders other than Non-24.

30.     Similarly, with respect to Fanapt, a Jefferies report dated March 9, 2015—months before the Putative Class Period—acknowledged that Vanda "has talked about finalizing its strategy for Fanapt which could include repositioning of the drug due to its low akathisia rate[.]"[70]  Thus, despite Plaintiff's allegation that Vanda failed to disclose that it "was using Fanapt's potential in reducing akathisia as a central part of its off-label promotion scheme for Fanapt,"[71] analysts were discussing Vanda's strategy to highlight the drug's "low rates of akathisia" well before the publication of the Aurelius Value Report in February 2019.

### B.     In an Efficient Market, the Reiteration of Previously Disclosed Information on February 11, 2019 Would Not Be Expected to Impact Vanda's Stock Price

31.     The Steinholt Report provides a lengthy exposition of market efficiency, which according to Mr. Steinholt, indicates that any new, material public information should rapidly be

---

[67] "Raising [Price Target] to $26 on Bullish View of Sighted Non-24 Opportunity for Hetlioz," *Oppenheimer*, October 29, 2017, STEINHOLT_0001156–70 at 56.  In the same report, Oppenheimer further noted that "[w]hile the physicians [it] spoke with are ahead of the curve relative to their psychiatrist colleagues in using Hetlioz in sighted patients, [Oppenheimer] believe[d] continued education/screening [would] expand usage over time" ("Raising [Price Target] to $26 on Bullish View of Sighted Non-24 Opportunity for Hetlioz," *Oppenheimer*, October 29, 2017, STEINHOLT_0001156–70 at 56).

[68] "Raising [Price Target] to $26 on Bullish View of Sighted Non-24 Opportunity for Hetlioz," *Oppenheimer*, October 29, 2017, STEINHOLT_0001156–70 at 58.

[69] *See, e.g.*, "Financials and Guidance In Line with Preannouncement as Pipeline Progress Continues," *JMP Securities*, February 15, 2018, STEINHOLT 0001079–84; "Q2: Hetlioz Does Not Disappoint; Fanapt Steady; Two Ph. II Read-outs Late 2018," *Jefferies*, August 2, 2018, STEINHOLT_0000928–37.

[70] "Vanda Pharmaceuticals (VNDA) Keeping the Rhythm to Maximize Hetlioz Commercial Potential; Initiate at BUY," *Jefferies*, Mar. 9, 2015, STEINHOLT 0002135–68 at 39.

[71] Amended Complaint, ¶ 239.

impounded into Vanda's common stock price.[72]  Yet Mr. Steinholt fails to explain how, in an efficient market for Vanda's common stock, the alleged corrective information that became publicly available as of February 4, 2019, or earlier (as detailed above), was not reflected in Vanda's stock price until a week later, on February 11, 2019.[73]  Given that the information Plaintiff characterizes as "corrective" was publicly available before February 11, the decline in Vanda's stock price on February 11 cannot be attributed to the disclosure of such alleged corrective information in an efficient market.  Accordingly, if, as Mr. Steinholt concludes, Vanda's common stock traded in an efficient market during the Putative Class Period, the alleged corrective information on February 11, 2019, could not impact Vanda's stock price.

32.    Indeed, Mr. Steinholt fails to explain what, if any, *new* or incremental information about those alleged practices was provided by the report.  **Exhibit 1** provides a table identifying earlier dates (prior to February 11, 2019) when publicly accessible sources described allegations and information contained in the Aurelius Value Report.  As the exhibit demonstrates, claims of Vanda's alleged off-label marketing practices in the Aurelius Value Report were previously detailed in both the whistleblower lawsuit (unsealed on February 4, 2019) as well as other sources published months or even years before February 11, 2019.  In an efficient market, the disclosure of information that was already known could not be expected to have a price impact.

33.    Consistent with that principle, I have seen no mention, much less discussion, of the whistleblower lawsuit or the Aurelius Value Report in any analyst report that Mr. Steinholt has produced as evidence of "substantial analyst coverage" supporting his conclusion that Vanda traded in an efficient market—including the analyst reports in Mr. Steinholt's production issued after February 4, 2019 (when the whistleblower lawsuit was unsealed) or February 11, 2019

---

[72] Steinholt Report, ¶ 12 ("An efficient market is one that efficiently processes *new* and material information.  In an efficient market, *new* and material information is *quickly* incorporated into the stock price as different investors buy and sell based on their respective evaluations of the *new* information disclosed."(emphasis added)).

[73] The whistleblower lawsuit was unsealed and became publicly available on February 4, 2019.  Based on Mr. Steinholt's own regression model and event study methodology, the two-day joint return (on February 4 and 5, 2019) of Vanda's stock is not statistically significant at the 5% level.

(when the Aurelius Value Report was published).[74]  Indeed, based on my own review of analyst reports, I could not identify a single analyst who expressed concern or commented negatively on Vanda's alleged marketing practices that are the focus of Plaintiff's claims here with respect to Fanapt and Hetlioz.  This is notwithstanding Mr. Steinholt's observations that, during the Putative Class Period (1) news about the Company was "widely available and discussed in the media," which "facilitates market efficiency;" and (2) a "significant number" of sophisticated investors who "quickly evaluate new information and understand its potential impact on the value of a security" invested in Vanda stock.[75]  In an efficient market—as Mr. Steinholt contends existed for Vanda's common stock during the Putative Class Period—it would be expected that there would be some discussion of the lawsuit, Vanda's alleged illegal off-label marketing practices, or the Aurelius Value Report if such information was considered "new and material,"[76] or was expected to cause a statistically significant stock price movement.  Instead, this lack of analyst attention is consistent with a finding, in an efficient market, that the alleged corrective information was not considered new or material information and was not expected to have a price impact on Vanda's stock.

C.    **Mr. Steinholt Fails to Take into Account That There Is No Evidence of Negative Analyst Commentary Regarding Vanda's Alleged Marketing Practices for Hetlioz and Fanapt**

34.    Mr. Steinholt analyzes the price reaction following the alleged corrective disclosure on February 11, 2019, but fails to assess how his finding of a statistically significant price decline is consistent with the lack of analyst commentary on the alleged corrective disclosure regarding Vanda's purported off-label marketing practices.  In fact, he fails to take into account that there

---

[74] *See, e.g.*, Steinholt Report compilation of analyst reports (STEINHOLT_0000515–2233).  On February 11, 2019, an article posted on the website *TheFlyontheWall.com* made reference to the Aurelius Value Report.  The article merely quoted excerpts from the Aurelius Value Report, which, as discussed above, had repeated allegations in the whistleblower lawsuit "describ[ing] illegal off-label promotion of both of Vanda's drugs, Vanda's participation in a fraud involving doctors writing hundreds of 'fake prescriptions' and pocketing cash using Vanda-issued copay cards, falsified documents in internal systems, and resignations of senior executives who refused to participate in illegal activity." ("VNDA: Vanda Pharmaceuticals under Pressure as Aurelius Value Discloses Short Position," *TheFlyontheWall.com*, February 11, 2019, STEINHOLT_0002234–35 at 34).

[75] Steinholt Report, ¶¶ 28, 33.  *See also* Section VI below.

[76] Steinholt Report, ¶ 45.

is no evidence of negative analyst commentary regarding Vanda's alleged illegal off-label marketing practices throughout the Putative Class Period. Further, some of the alleged misstatements on which Plaintiff relies in the Amended Complaint are generic in nature and had been included in Vanda's financial filings well before the start of the Putative Class Period, when Plaintiff alleges inflation occurred.[77]

35.     For example, Plaintiff claims that Vanda's repeated statement that "[its] ability to generate meaningful product sales and achieve profitability largely depends on [its] ability to successfully commercialize HETLIOZ®…and Fanapt®…" is "materially false and missing."[78] I understand that this statement is factually accurate, as Fanapt and Hetlioz were the only FDA-approved, commercialized drugs that Vanda had at the time and hence the only products that could generate revenues or profits for Vanda during the Putative Class Period.[79] Based on my review, Vanda first made this statement on March 13, 2015, as part of its 2014 Form 10-K, *before* the start of the Putative Class Period (which is the first Form 10-K that Vanda filed following the commercial launch of Hetlioz and the transfer of all the U.S. and Canadian commercial rights to Fanapt from Novartis to Vanda).[80] During the Putative Class Period, Vanda repeated this statement verbatim in every Form 10-Q and Form 10-K it filed, and Plaintiff claims all these repeated statements are "materially false and missing."[81] These statements are generic in nature (i.e., if a company does not successfully commercialize its products it cannot generate any revenues, let alone profits) and they are not expected to change the total mix of information available about Vanda. Furthermore, in an efficient market, these statements, which repeated the same information that Vanda already disclosed in the 2014 Form 10-K, would not be expected to

---

[77] Amended Complaint, ¶ 425 ("By concealing these material facts from investors, Vanda maintained and/or increased its artificially inflated common stock price throughout the [Putative] Class Period.").

[78] Amended Complaint, ¶¶ 236–237, 243–244, 249–250, 261–262, 268–269, 274–275, 282–283, 288–289, 294–295, 298–299, 304–305, 310–311, 314–315, 318–321, 324–325, 328–329, 332–333, 338–339, 344–345, 350–351, 356–357, 362–363, 368–369, 374–375, 382–383.

[79] Amended Complaint, ¶ 2 ("Vanda is a biopharmaceutical company that markets and sells only two drugs. […] During the [Putative] Class Period, Vanda derived all of its revenue from sales of Fanapt and Hetlioz.").

[80] Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2014, filed on March 13, 2015 ("2014 Vanda 10-K"), pp. 4, 6.

[81] *See* footnote 78 above.

have affected Vanda's stock price during the Putative Class Period, as only *new*, value-relevant information should have affected Vanda's stock price.

36.    Vanda's statement that "[f]ailure to comply with government regulations regarding the sale and marketing of our products could harm our business" was also generic in nature.[82]  This statement was made as early as March 10, 2011, in Vanda's 2010 Form 10-K, and was repeated verbatim in Vanda's Form 10-Ks for the years 2015, 2016, and 2017 during the Putative Class Period.[83]  As with the alleged misstatements regarding the importance of commercializing Hetlioz and Fanapt discussed above, I would not expect these alleged misstatements regarding the risk of government regulations—which were generic in nature and repeated the same disclosure that Vanda had routinely made since 2011—to have affected Vanda's stock price during the Putative Class Period, assuming Vanda's common stock traded in an efficient market.

37.    Plaintiff also alleges that Vanda made various other statements about the sales and marketing of Fanapt and Hetlioz (e.g., statements about the expansion of Vanda's Fanapt sales force or Vanda's implementation of the Hetlioz to Psychiatry Initiative ("HPI"))[84] that were "materially false and misleading."[85]  I understand that Plaintiff claims that these statements are misleading—not because Vanda did not actually expand its Fanapt sales team or did not actually implement the HPI—but rather, because the statements purportedly concealed that Vanda was using an illegal "off-label promotion scheme" to commercialize and drive the growth of Fanapt

---

[82] I note that other pharmaceutical companies identified as competitors by Vanda provided similar risk disclosures in their financial filings regarding regulatory risk, including delay or denial in commercializing drugs. *See, e.g.*, Medicine Co. ("The research, testing, manufacturing, labeling, approval, sale, marketing and distribution of drug products are and will remain subject to extensive regulation by the FDA and other regulatory authorities in the United States and other countries that each have differing regulations. […] [T]he FDA may delay, limit or deny approval of a drug candidate for many reasons" (The Medicines Company Form10-K for the year ending 2018, filed on February 27, 2019, p. 34)); Retrophin, Inc. ("We are required to report to the FDA events associated with our products relating to death or injury.  Adverse events could result in additional regulatory controls, such as a requirement for costly post-approval clinical studies or revisions to our approved labeling which could limit the indications or patient population for a product or could even lead to the withdrawal of a product from the market" (Retrophin, Inc. Form 10-K for the year ending 2018, filed on February 26, 2019, p. 43)).

[83] Amended Complaint, ¶¶ 245, 276, 300, 322, 340, 364.

[84] The HPI was launched in August 2017 with the objective of leveraging sales representatives for Fanapt to target psychiatrists who treat sighted Non-24 patients. *See, e.g.*, "Q3 2017 Earnings Call" transcript, STEINHOLT_0002318–30 at 19; "Hetlioz HPI Program a Bright Spot in a Quarter with Slight QonQ Sales Decline," *Jefferies*, November 8, 2017, STEINHOLT_0001148; "Raising [Price Target] to $26 on Bullish View of Sighted Non-24 Opportunity for Hetlioz," *Oppenheimer*, October 29, 2017, STEINHOLT 0001156–70 at 58.

[85] Amended Complaint, ¶¶ 253–254.

and Hetlioz.[86]  Based on my review of analyst reports obtained from Mr. Steinholt's production, while analysts did comment on the expansion of Vanda's sales force and did comment on the use of the HPI, I was unable to identify any analysts who referenced the alleged misstatements as assurances that Vanda did not engage in any illegal off-label marketing practices for Fanapt and Hetlioz.[87]  In making this observation, I am not commenting on what sales practices Vanda deployed (nor am I an expert in off-label sales practice regulations), but rather confirming that analyst reports did not expressly correlate discussion of these sales initiatives with any assurance about compliance with FDA regulations.  Rather, the analyst reports are silent, as noted above, about the issue of whether Vanda was engaging in any unlawful marketing practices, both before and after the complaint in the whistleblower lawsuit was unsealed.

### D.    Other Information Not Related to Vanda's Alleged Off-Label Marketing Practices Became Available on February 11, 2019 That Affected Vanda's Stock Price

38.    Mr. Steinholt claims that there was a statistically significant stock price decline on February 11, 2019, for Vanda's common stock.  As explained above, this decline cannot be explained by reiteration of prior disclosures concerning Vanda's purported off-label marketing practices.  However, other information became available that day.  That other information included, for example, news that Vanda had attracted the attention of a short seller who initiated a short position against the Company.[88]

39.    The Aurelius Value Report was not just a summary of existing allegations concerning Vanda's purported off-label marketing practices.  It was also a short seller's announcement that

---

[86] Amended Complaint, ¶ 411 ("The following were known trends, events, or uncertainties that…were required to be disclosed by Defendants pursuant to Item 303 in the 3Q15 Form 10-Q, the 2015 Form 10-K, the 1Q16 Form 10-Q, the 2Q16 Form 10-Q, the 3Q16 Form 10-Q, the 2016 Form 10-K, the 1Q17 Form 10-Q, the 2Q17 Form 10-Q, the 3Q17 Form 10-Q, the 2017 Form 10-K, the 1Q18 Form 10-Q, the 2Q18 Form 10-Q, and the 3Q18 Form 10-Q:  (a) that Vanda's efforts to commercialize Fanapt were centered on an off-label promotion scheme; and (b) that Vanda's efforts to commercialize Hetlioz were centered on an off-label promotion scheme.").

[87] I have reviewed the "approximately 190 analyst reports covering Vanda from the relevant time period of November 2015 through February 2019" included in Mr. Steinholt's production (STEINHOLT_0000515–2233). *See also* Steinholt Report, ¶ 27.

[88] As noted above, a short seller's objective is to profit from the decline in a company's stock price.  *See* Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (McGraw-Hill/Irwin, 2011), p. 327.

disclosed its short position in the Company based on a number of negative opinions and predications about Vanda that rested, in turn, on various unproven claims of impropriety or misconduct, some of which were unrelated to off-label marketing.[89]  More specifically, the Aurelius Value Report contained numerous opinions, predictions, and speculative statements about allegations against Vanda pertaining to:

a. **Alleged nepotism and biased hiring practices**:  "Former employees also explain that [Vanda CEO] Polymeropoulos has turned Vanda into an increasingly nepotistic organization by transferring authority of key departments to his children.  Former employees we spoke to described how seasoned professionals were jettisoned in favor of newly hired reps lacking experience.";

b. **Allegedly excessive employee turnover**:  "Vanda appears to have experienced a mass employee exodus since Polymeropoulos' announcement of the so-called HPI initiative.  Our review of Linked[I]n found that 87 people have left Vanda since the beginning of 2017[…], which amounts to 31% of the 273 total employees Vanda had as of December 2017.";

c. **Accusation of "price gouging"**:  "With Hetlioz costing more than many life-saving cancer drugs, one former sales manager observed that Polymeropoulos 'was so proud he was gouging people for this product.'";

d. **Certain legal and other risks the Company allegedly faced**:  "A former sales rep stated that most Vanda patients do not pay any money because the co-pays are covered by a foundation, although no former employee we spoke to was able to recall the name of the foundation used by Vanda.  We believe this relationship introduces another risk for investors.  We note that in 2017, [Patient Services Incorporated, a non-profit organization] was referenced by the Department of

---

[89] As explained in the preface of the Aurelius Value Report, Marcus Aurelius Value "ha[d] a short position in the stock…and bonds" of Vanda and "therefore st[ood] [to] realize significant gains in the event that the prices of either equity or debt securities of Vanda Pharmaceuticals decline[d]" (Aurelius Value Report, p. 1).

Justice in criminal and civil charges brought against Aegerion Pharmaceuticals that resulted in a guilty plea."[90, 91]

## VI.    The Steinholt Report Fails to Consider That Differences in Putative Class Members' Knowledge of Allegations of Vanda's Off-Label Marketing Practices Would Require Individualized Inquiry

40.    As discussed above, claims of off-label marketing practices at Vanda had been discussed in various public fora and media well before the alleged corrective information on February 11, 2019.  To the extent that Mr. Steinholt asserts that such claims, including the whistleblower lawsuit, contain value-relevant information but were not disseminated to the public (and thus not incorporated into Vanda's stock price prior to publication of the Aurelius Value Report), such an assertion would raise the question of what information individual members of the Putative Class had access to—and when they learned it and how they relied upon it—regarding the claims.  Ascertaining the disparate knowledge among the Putative Class could only be achieved through individualized inquiry of each Putative Class member.

41.    Moreover, in discussing *Cammer* Factor 3, Mr. Steinholt highlights that a significant number of sophisticated investors, such as institutional investors, traded Vanda's common stock during the Putative Class Period.[92]  According to the Steinholt Report and its Exhibit C, institutional investors owned at least 37.5 million common shares of Vanda during the Putative Class Period, "making up more than 80% of the Company's shares outstanding plus short interest."[93]  As Mr. Steinholt acknowledges, such sophisticated investors "are able to quickly evaluate new information and understand its potential impact on the value of a security, and []

---

[90] Aurelius Value Report, pp.6, 8–10, 12.

[91] An article published on the website *TheFlyontheWall.com* also on February 11, 2019, summarized and quoted excerpts from the Aurelius Value Report regarding several of these allegations.  *See* "VNDA: Vanda Pharmaceuticals under Pressure as Aurelius Value Discloses Short Position," *TheFlyontheWall.com*, February 11, 2019, STEINHOLT_0002234–35.

[92] As explained by Mr. Steinholt, the "third *Cammer* factor relates to the number of arbitrageurs, market makers and/or other sophisticated investors, such as institutional investors, who traded Vanda common stock during the Class Period" (Steinholt Report, ¶ 30).

[93] Steinholt Report, ¶ 34 and Exhibit C.  According to the Steinholt Report, some of the largest holders of Vanda's common stock during the Putative Class Period were "actively managed" funds that closely monitor their investments, including Armistice Capital LLC, Avoro Capital Advisors, Glenmede Investment Management LP, and Rothschild & Co Asset Management US INC (Steinholt Report Exhibit C).

then take appropriate investment actions causing the new information to become reflected in the price of the security" in an efficient market.[94]  If information regarding the purported off-label marketing practices were material, a one-week delay for institutional investors to become aware of the information and react to it would be inconsistent with the efficient market hypothesis on which Mr. Steinholt relies.  At a minimum, it raises the question of which investors were aware of the public information, and which were not, and whether any such investors deemed that information relevant to their investment decisions.

42.      Again, according to Exhibit C of the Steinholt Report, some of the largest positions in Vanda's common stock were held by actively managed funds such as hedge funds.  Such investors closely monitor the companies they invest in, conducting comprehensive due diligence into myriad aspects of a company's business and keeping apprised of the latest news and developments affecting the company.  To the extent that such sophisticated investors were better informed than other investors, including on litigation developments and allegations published in online fora and other media, this further demonstrates a need for individualized inquiry into Putative Class members' disparate knowledge of off-label marketing allegations against Vanda.

## VII.    Mr. Steinholt Has Not Articulated a Reliable Class-Wide Damages Methodology That Is Consistent with Plaintiff's Theories of Liability

43.      I understand that at the class certification stage, securities class action plaintiffs must establish the existence of a methodology for calculating class-wide damages that is consistent with their theory of liability, and the methodology must be able to isolate reliably damages attributable only to the allegedly misrepresented or omitted information given the specific facts and circumstances of the case.  Here, however, Mr. Steinholt makes no attempt to address case-specific facts and circumstances that a damages methodology for this matter must account for to be consistent with Plaintiff's liability theories in this matter.

### A.      Mr. Steinholt Has Offered a Generic, "Off the Shelf" Methodology That Is Not Properly Tailored to Plaintiff's Liability Theories in *This* Matter

44.      To calculate damages in a matter like the current one, I understand that Plaintiff must put forth an appropriate model to measure inflation caused by the alleged misrepresentations on each

---

[94] Steinholt Report, ¶ 33.

day of the Putative Class Period, which represents the difference between the actual stock price at that time and the hypothetical price that would have prevailed at that time absent the alleged misrepresentations (i.e., the "but for" stock price). For example, in a certified securities class action, plaintiffs must present a damages model that is capable of calculating the amount of artificial inflation in the stock price for an investor who purchased on the first day of the class period, the last day of the class period, and every day in between.

45. A damages methodology should also measure artificial price inflation attributable *only* to the alleged misrepresentations and/or omissions for which defendants are found liable. When inflation can be reliably measured using price drops following the alleged corrective disclosures—which is not always the case and, as discussed below, Mr. Steinholt has not shown to be the case in this matter—any price drops attributable to other causes (i.e., confounding factors unrelated to the alleged misrepresentations or price drops that do not represent removal of early price inflation) should be excluded.

46. Mr. Steinholt does not examine Plaintiff's theory of liability and the fact pattern of this case in order to demonstrate that a damages methodology that is economically sound can be used to estimate damages on a class-wide basis consistent with that theory. Indeed, the section in his report discussing his proposed damages methodology does not include a single reference to Vanda or the facts in this matter.[95]

47. Instead, Mr. Steinholt provides only a generic, boilerplate overview of a damages approach that he claims is "well-accepted."[96] Mr. Steinholt proposes the following general steps:

    a. First, he proposes to use his event study methodology to quantify "the impact of the disclosure of the alleged truth (the event) on the stock price."[97] This methodology can "sometimes also [be] refined using fundamental valuation tools" such as a "discounted cash flow approach" and "market approach (market multiples on various financial metrics)."[98]

---

[95] Steinholt Report, ¶¶ 56–62.

[96] Steinholt Report, ¶ 58.

[97] Steinholt Report, ¶ 58.

[98] Steinholt Report, ¶ 58.

    b.   Second, he claims that the "fraud-related impact is then used as the inflation from the misrepresentations concealing the alleged truth until its disclosure, known as an inflation ribbon. If there are multiple disclosures of the alleged truth, then multiple inflation ribbons are used."[99]

    c.   Third, he claims that "because each class member purchased and/or sold their shares at market prices, each class member's individual damages can now be calculated based on the inflation (quantified the same for all the class members) at the time of their respective purchases and sales."[100]

48.    This amounts only to high-level references to certain tools and techniques (such as an event study) that an economist could potentially apply to measure the value impact of information in general, without accounting for the theories of liability or the fact pattern of this case.

49.    Importantly, I am not faulting Mr. Steinholt for failing to actually measure or calculate damages at this point, nor am I faulting him for not conducting a loss causation analysis. Instead, I am highlighting that the generic approach that Mr. Steinholt proposes to employ to measure damages at a later phase of the case does not address case-specific circumstances, and therefore cannot purport to measure the damages that are attributable to Plaintiff's theories of liability.

    **B.    Mr. Steinholt Fails to Provide a Reliable Methodology to Analyze Vanda's Stock Price Declines on the Alleged Corrective Disclosure or Information Dates That Can Reliably Measure the Alleged Inflation during the Putative Class Period**

50.    As noted above, in describing his damages calculation, Mr. Steinholt states, "[f]irst, the impact of the disclosure of the alleged truth (the event) on the stock price is quantified using an event study, sometimes also refined using fundamental valuation tools."[101] Mr. Steinholt analyzes the declines in Vanda's common stock on two such dates: (1) February 6, 2019

---

[99] Steinholt Report, ¶ 59.

[100] Steinholt Report, ¶ 60.

[101] Steinholt Report, ¶ 58.

(Vanda announced that it would be pursuing litigation against the FDA after market close on February 5, 2019); and (2) February 11, 2019 (the Aurelius Value Report was published at 10:00 AM ET that day).

51.    A reliable damages methodology must be able to disentangle the stock price effects of allegedly corrective information from the effects of other information unrelated to the alleged misrepresentations.  Given that Mr. Steinholt proposes using the "fraud-related portion of the price decline caused by the disclosure of the alleged truth" as the estimate of the alleged inflation throughout the Putative Class Period until the alleged truth was revealed,[102] it is essential for him to present a reliable methodology capable of measuring such "fraud-related portion of price decline" on the two alleged corrective disclosure or information dates.[103]  That is, Mr. Steinholt must articulate what methodology he intends to use to determine the stock price effects of only the alleged corrective disclosures or information, and not of other information released on those respective dates (February 6 and February 11, 2019).  Mr. Steinholt fails to offer any such methodology.  While he has provided an event study model to analyze Vanda's stock price movement on the two above-referenced dates, his event study can only measure the stock price reaction to the *totality* of information released on a day.[104]  Mr. Steinholt's event study cannot, by itself, separate the impact of the alleged corrective information from that of non-allegation-related information disclosed simultaneously.

52.    As I now discuss, there was information unrelated to the alleged misrepresentations on both alleged corrective disclosure or information days.  Mr. Steinholt fails to explain how he would use, in addition to the event study methodology discussed in his report, any "fundamental valuation tools" that he references briefly in his report to "quantify[] the fraud-related portion of the price decline caused by the disclosure of the alleged truth" that is "key to quantifying class-wide damages."[105]  More specifically, when claiming that an event study analysis may be refined using "fundamental valuation tools" to estimate the "fraud-related impact," Mr. Steinholt merely

---

[102] Steinholt Report, ¶¶ 57–59.

[103] The stock price of a company can be impacted by any number of factors or circumstances, some or all of which may be unrelated to any alleged fraud.

[104] I note also that an event study analysis cannot assess the market reaction to information *withheld* from the market; it can only assess the market reaction to information *disclosed* to the market.

[105] Steinholt Report, ¶¶ 57–58.

alludes to "the income approach (discounted cash flow approach) and the market approach (market multiples on various financial metrics)."[106]  However, Mr. Steinholt ignores the fact that these valuation tools are not part of the event study methodology he has outlined in his report, nor does he explain which tools he would use or how he would actually use any of these valuation tools.  Such tools require considerable judgment, especially when used to disentangle the stock price effect of distinct economic factors, such as the impact of a short seller targeting a company or a litigation against the FDA as explained below.[107]  Thus, merely suggesting the potential use of these valuation models does not provide a methodology to resolve the challenges of actually measuring damages consistent with Plaintiff's disparate theories of liability.

**1.      Mr. Steinholt Fails to Provide a Reliable Methodology to Determine the Fraud-Related Price Decline Due to the February 5, 2019, Alleged Corrective Disclosure**

53.      I understand that Plaintiff claims that it was revealed on February 5, 2019, for the first time that the FDA would require a nine-month non-rodent toxicity study before tradipitant was to be studied in humans for longer than three months.  Mr. Steinholt states that according to the Amended Complaint, the alleged truth revealed on this day was "Vanda's refusal to conduct a safety trial for tradipitant that was needed for this drug to receive FDA approval."[108]  Mr. Steinholt finds that the subsequent decline in Vanda's stock price was statistically significant.[109]

54.      Notably, Vanda's news release on February 5, 2019, was titled "Company pursuing legal action against the FDA for requiring unnecessary studies that would result in the death of dozens of dogs without legal authority."[110]  The Amended Complaint also states that on this day, "to the

---

[106] Steinholt Report, ¶ 58.

[107] Aswath Damodaran, *Damodaran on Valuation*, 2nd ed. (John Wiley and Sons, 2006), pp. 4–7 ("Barring a very small subset of assets, there will always be uncertainty associated with valuations, and even the best valuations come with a substantial margin for error. […]  Even at the end of the most careful and detailed valuation, there will be uncertainty about the final numbers. […]  It is unrealistic to expect or demand absolute certainty in valuation, since the inputs are only estimates.").

[108] Steinholt Report, ¶ 44.

[109] Steinholt Report, ¶ 45.

[110] Vanda Pharmaceuticals, Inc. Form 8-K, Exhibit 99.1, filed on February 6, 2019, p. 3.

surprise of investors and analysts, Vanda issued a press release announcing that it had initiated the FDA litigation, which sought, among other things, to lift the partial clinical hold."[111]  I understand that Plaintiff claims that Defendants' alleged misrepresentations regarding tradipitant concern "Vanda's decision to forgo a routine safety study that the Company knew would result in a clinical trial hold for tradipitant"[112]—not that Vanda had made misrepresentations regarding its decision to litigate against the FDA, Vanda's primary regulator.  To the extent that news about Vanda's litigation against the FDA is confounding (i.e., it reveals incremental information beyond what allegedly was previously misrepresented or omitted), Mr. Steinholt fails to provide a damages methodology that could determine the portion of Vanda's price movement on February 6, 2019, attributable specifically to Plaintiff's liability theory regarding tradipitant— that is, only the portion of the price movement that reflects the value of the information about the partial clinical hold, but not the litigation.

55.     Indeed, Vanda's decision to sue the FDA was a focus of contemporaneous analyst report commentary.  For example, in the days following the Company's announcement on February 5, 2019, analysts at Oppenheimer noted that "[it] is not unusual" for the FDA to request non-rodent toxicity studies, while expressing "surprise" at Vanda's "announcement that it is pursuing legal action against the FDA," viewing "[the] lawsuit as a non-optimal strategy for a company with near-term regulatory catalysts on its key value driver Hetlioz."[113]  Similarly, in a report published on February 6, 2019, analysts at Cantor Fitzgerald commented:  "Our new view is the result of yesterday's disclosure of FDA interactions that appear 'challenged.'  We think this news reduces our visibility on development timelines for tradipitant in gastroparesis, perhaps even pruritus,

---

[111] Amended Complaint, ¶ 226.

[112] Amended Complaint, ¶ 232.

[113] "A Dog Fight in the Year of the Pig," *Oppenheimer*, February 7, 2019, STEINHOLT 0000662–67 at 62.  As Oppenheimer further explained in its report, Vanda was seeking FDA approval to use Hetlioz in patients with Smith-Magenis Syndrome, "a complex developmental disorder that affects multiple organ systems of the body." ("Rare Disease Database: Smith Magenis Syndrome," *NORD website*, available at https://rarediseases.org/rare-diseases/smith-magenis-syndrome/, accessed September 14, 2021.).

and may also affect Hetlioz label expansion efforts."[114]  The analysts further expressed that Vanda's interactions with the FDA "could have been managed more effectively."[115]

56.      In light of the foregoing, a reliable damages methodology in this case must be able to disentangle the price impact of Vanda's decision to sue from the other disclosures on the day. However, Mr. Steinholt fails to provide a damages methodology that could determine the portion of Vanda's stock price movement on February 6, 2019, attributable specifically to Plaintiff's liability theory regarding tradipitant—that is, only the portion of the price movement that reflects the value of the information allegedly "misrepresent[ed] or omi[tted]," but not the announcement of the litigation against the FDA.[116]  If the price decline on February 6, 2019, reflected the impact of Vanda's confrontation with the FDA, that decline would not provide a reliable basis to measure the alleged inflation throughout the Putative Class Period.[117]  Given that Mr. Steinholt has provided no such methodology in his report to isolate only the "fraud-related impact," his proposed damages methodology is rendered unreliable.

---

[114] "Between Scylla and Charybdis; Bold Statement with Tradi', but Reduced Visibility; Downgrading," *Cantor Fitzgerald*, February 6, 2019, STEINHOLT_0000668–73 at 68.

[115] "Between Scylla and Charybdis; Bold Statement with Tradi', but Reduced Visibility; Downgrading," *Cantor Fitzgerald*, February 6, 2019, STEINHOLT_0000668–73 at 68.

[116] Plaintiff alleges that Defendants failed to disclose that "Vanda knew its unwillingness to conduct a routine non-rodent study to ensure tradipitant's safety for humans meant that the FDA would impose a clinical hold on a necessary extension of the 2301 study" (Amended Complaint, ¶ 387).  It is my understanding that Plaintiff does not allege that Vanda should have disclosed the litigation against the FDA earlier.

[117] I note further that on February 14, 2019, the FDA filed a motion to remand for reevaluating its decision to impose a partial clinical hold on tradipitant.  Analysts at Jefferies commented that the decision to request a remand was made "to avoid a formal litigation" after the FDA identified "substantial and legitimate" concerns in Vanda's complaint.  Jefferies stated that the FDA "appear[ed] to agree that it should have done a better job of explaining how it reached its decision on the [partial clinical hold]," acknowledging that "it did not adequately analyze or respond to VNDA's scientific evidence on necessity of conducting an additional [long-term] non-rodent safety study" and that "it needs to review the regulatory vs. scientific basis for the [partial clinical hold] decision." ("FDA Requested Remand for Re-evaluation; Resolution Could Come within 75 Days;" *Jefferies*, February 15, 2019, STEINHOLT_0000607–13 at 07).  On the day of this announcement, February 14, 2019, Vanda's stock price increased by 9.23%, or an abnormal return (controlling for market and industry factors) of 8.83%—a statistically significant positive return according to Mr. Steinholt.  *See* Steinholt Report, Exhibit D, p. 21.

> **2.    Mr. Steinholt Fails to Provide a Reliable Methodology to Determine the Fraud-Related Price Decline Due to the February 11, 2019, Alleged Corrective Information**

57.    Plaintiff and Mr. Steinholt have not justified why February 11, 2019, is the appropriate date to measure damages attributable to Vanda's alleged off-label marketing practices for Fanapt and Hetlioz.  As detailed above, the whistleblower lawsuit was unsealed and publicly available on February 4, 2019—a week prior to publication of the Aurelius Value Report—and Vanda's stock price did not experience any statistically significant movement on that date based on Mr. Steinholt's own analysis.  Mr. Steinholt fails to explain how this lack of price reaction can be reconciled with Plaintiff's liability theories, assuming, as the Steinholt Report concludes, that the market was efficient for Vanda's common stock during the Putative Class Period.

58.    Moreover, and as already explained above, even assuming that February 11, 2019, was the first time that the "truth" regarding Vanda's purported off-label marketing practices was revealed, it is notable that Mr. Steinholt also fails to take into account the disclosure of other value-relevant information on February 11, 2019, that could have impacted Vanda's stock price that day.  In particular, the very first line of the Aurelius Value Report proclaimed, "We are short Vanda Pharmaceuticals," as did Marcus Aurelius's accompanying Tweet.[118]  The statistically significant price decline that Mr. Steinholt claims occurred on this day may reflect investors reacting to Marcus Aurelius Value's public criticisms of Vanda and the announcement of its short position,[119] rather than to allegations in the already-disclosed whistleblower lawsuit.

59.    Here too, Mr. Steinholt fails to provide any methodology that can disentangle the price impact of this other news from the alleged corrective information concerning Vanda's purported off-label marketing practices.

> **C.    Mr. Steinholt Has Not Proposed a Reliable Methodology for Measuring Time-Varying Inflation throughout the Putative Class Period**

60.    In addition, Mr. Steinholt has not provided a reliable methodology for measuring inflation on each and every day throughout the Putative Class Period.  Instead, he only proposes

---

[118] Aurelius Value Report, p. 1.  *See also* Marcus Aurelius on Twitter: "We Are Short $VNDA," February 11, 2019.

[119] Aurelius Value Report, p. 14.

using some unspecified "inflation ribbon" based on the "fraud-related portion of [Vanda's stock] price decline[s]"[120] on the two alleged corrective disclosure or information dates (which, as discussed in Section VII.B above, he has not provided a methodology to do), and applying such ribbons from some unspecified "starting points depending on when it is determined that defendants had a legal obligation to disclose the omitted information" until the disclosure of the alleged truth.[121]  This approach is inadequate, particularly in this case.

61.    The methodology adopted by Mr. Steinholt is particularly problematic in cases where the information revealed on the alleged corrective disclosure or information dates could not or need not all have been disclosed at an earlier point in time during the Putative Class Period.[122]  For example, consider a case where an issuer allegedly reported revenues that were 5% too high in 2017 and 10% too high in 2018, and that the issuer's stock price declined when the accurate (lower) results were disclosed all at once in 2019.  The issuer could not have disclosed its 2018 revenues in 2017, and so it would not be appropriate to use the full size of the 2019 price decline to measure the issuer's stock price inflation in 2017.  A constant inflation ribbon would not reliably measure damages in such a case; instead, one would have to use a different methodology that reflected how the omitted information changed over time.  Mr. Steinholt has not proposed any such methodology in this case.

62.    In this case, the amount of inflation at any particular point in time depends on how a hypothetical corrective disclosure at that point in time would have changed investors' expectations regarding Vanda's future cash flows and risks.  This impact depends on what specific information could and should have been disclosed earlier and how it would have changed the total mix of available information at the time regarding the alleged misrepresentations.  Determining the level of inflation at a specific point within the Putative Class Period thus requires careful evaluation of the incremental information regarding the alleged misrepresentations that could and should have been revealed.  Mr. Steinholt has not

---

[120] Steinholt Report, ¶¶ 57–59.  As discussed above in Section VII.B, the stock price of a company can be impacted by any number of factors or circumstances, some of which may be unrelated to any alleged fraud.  An event study can only measure the stock price reaction to the totality of information released on a day, and cannot, by itself, separate the impact of the alleged corrective information from that of non-allegation-related information disclosed simultaneously.

[121] Steinholt Report, ¶ 59.

[122] While Mr. Steinholt alludes to this problem when he refers to "different starting points", he offers no way to address it (Steinholt Report, ¶ 59).

articulated how he would account for changes in what could and should have been disclosed by Vanda over time nor how his proposed damages methodology would accommodate alternative factual or liability findings.

**1.    Mr. Steinholt Has Not Provided a Reliable Methodology to Measure Inflation Attributable to Alleged Misrepresentations Regarding Tradipitant**

63.    Mr. Steinholt's analysis fails to take into account that the allegedly omitted information about tradipitant changed over the course of the Putative Class Period.  Instead, he proposes to use a model with a constant inflation ribbon "from the [alleged] misrepresentations concealing the alleged truth until its disclosure,"[123] which necessarily cannot reliably account for this changing information.  Thus, Mr. Steinholt fails to establish that the "fraud-related impact" he has calculated—that is, Vanda's price decline following the alleged corrective disclosure date, February 5, 2019—can reliably measure "the inflation from the misrepresentations concealing the alleged truth until its disclosure."[124]

64.    There were at least four discrete pieces of information concurrently disclosed on February 5, 2019:  (1) per the FDA, Vanda could not extend its Phase II study of tradipitant until after completing a nine-month non-rodent toxicity study; (2) the Company refused to conduct "unnecessary and unethical animal studies" and disputed the FDA's demand to conduct the study; (3) the FDA had imposed a partial clinical hold on Vanda's studies of tradipitant; and (4) the Company was pursuing litigation against the FDA over the dispute.[125]  As summarized below, I understand that the information allegedly available to Vanda evolved over time as its clinical trials progressed and its communication with the FDA evolved:

       a.    November 22, 2016:  Vanda initiates a Phase II trial of tradipitant for the treatment of gastroparesis ("Study 2301").[126]

---

[123] Steinholt Report, ¶ 59.

[124] Steinholt Report, ¶ 59.

[125] "Vanda Pharmaceuticals Takes a Stand against Unnecessary Animal Research," *PR Newswire*, February 5, 2019, STEINHOLT_0002509-512.

[126] Amended Complaint, ¶ 201.

b.  April 10, 2018:  Vanda requests to extend Study 2301 for 52 weeks.[127]

c.  May 15, 2018:  The FDA and Vanda participate in a teleconference, during which the FDA suggests that Vanda could not extend Study 2301 until after completion of a nine-month non-rodent toxicity study.[128]

d.  May 22, 2018:  Vanda submits an amended protocol for a three-month extension of Study 2301.[129]

e.  May 24, 2018:  The FDA approves the amended protocol and allows Study 2301 to proceed for no longer than three months in duration.[130]

f.  August 1, 2018:  Vanda files a formal dispute resolution request contesting the FDA's determination that the nine-month non-rodent toxicity study was necessary in order to conduct a clinical trial of tradipitant for gastroparesis in excess of three months.[131]

g.  August 16, 2018:  The FDA rejects Vanda's formal dispute resolution request.[132]

h.  September 26, 2018:  Vanda submits a new clinical study protocol for tradipitant for a 52-week study ("Study 2302").[133]

i.  December 3, 2018:  After Study 2301 concludes, Vanda publicly reports successful results in a Form 8-K and press release, but notes that further study is needed for FDA approval.[134]

j.  December 11, 2018:  Vanda again requests a 52-week extension for Study 2301.[135]

k.  December 19, 2018:  The FDA informs Vanda by telephone that it was placing partial holds on Study 2301 and Study 2302 because Vanda had not completed a nine-month dog study.[136]

---

[127] Amended Complaint, ¶ 205.

[128] Amended Complaint, ¶ 206.

[129] Amended Complaint, ¶ 214.

[130] Amended Complaint, ¶ 215.

[131] Amended Complaint, ¶ 216.

[132] Statement of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment, *Vanda Pharmaceuticals, Inc., et al. v. Food and Drug Administration, et al.,* July 10, 2019.

[133] Amended Complaint, ¶ 217.

[134] Amended Complaint, ¶ 219.

[135] Amended Complaint, ¶ 220.

[136] Amended Complaint, ¶ 221.

l.  December 21, 2018:  The FDA sends Vanda a written explanation for partial clinical holds.  Vanda requests a reconsideration of the partial clinical holds.[137]

m.  January 4, 2019:  The FDA denies Vanda's request for reconsideration.[138]

n.  February 5, 2019:  Vanda issues a press release announcing a lawsuit against the FDA over the non-rodent toxicity study requirement and seeking an order lifting the partial clinical hold.[139]

65.    At any point along this timeline, Vanda could only have disclosed information it had at the time.  For example, Plaintiff appears to contend that on May 15, 2018, the FDA advised Vanda that it would not allow the extension of the study absent completion of the dog study.  Accordingly, I understand that had Vanda made a disclosure immediately following May 15, 2018, Vanda potentially could have announced that the FDA had requested the additional study, that the Company disagreed, and that it was in discussions with the FDA to resolve the issue, but it could not have disclosed subsequent events (e.g., the FDA's imposition of a partial clinical hold) that had not yet occurred.

66.    Given these facts, it is unreasonable to assume that information revealed after the market closed on February 5, 2019, could *all* have been disclosed at the same time earlier in the Putative Class Period.  It is likewise unreasonable to simply assume, as Mr. Steinholt does, that the amount of the tradipitant-related inflation would have remained constant starting from some unspecified dates until February 5, 2019.  In reality, any contemporaneous information that Vanda could and should have disclosed prior to February 5, 2019, would necessarily have been more limited (than what was *actually* disclosed on February 5) because such information (e.g., that Vanda was suing the FDA) had not yet become available.

---

[137] Amended Complaint, ¶¶ 222–224.

[138] Amended Complaint, ¶ 225.

[139] "Vanda Pharmaceuticals Takes a Stand against Unnecessary Animal Research," *PR Newswire*, February 5, 2019, STEINHOLT_0002513.

67.    Should a finder of fact determine that different information related to tradipitant could and should have been disclosed at different earlier points in time (prior to February 5, 2019),[140] Mr. Steinholt has provided no methodology that could measure inflation on such different earlier dates during the Putative Class Period.  For example, if it is determined that the alleged inflation started to affect Vanda's stock price at different points in time, then the generic "inflation ribbon" referred to in the Steinholt Report cannot reliably measure tradipitant-related inflation throughout the Putative Class Period.

68.    In summary, Mr. Steinholt has provided no reliable methodology to measure the alleged inflation and the potential day-to-day variation in the alleged inflation as the tradipitant-related information evolved over time.  There is no reason to believe that, absent the tradipitant-related misrepresentations, Vanda's stock would have had the same stock price decline[141] that occurred immediately after February 5, 2019, when Vanda's litigation against the FDA was first announced.

### 2.    Mr. Steinholt Has Not Provided a Reliable Methodology to Measure Inflation Attributable to Alleged Misrepresentations Regarding Off-Label Marketing Practices for Fanapt and Hetlioz

69.    As discussed above, considering that the "truth" purportedly "revealed" by the Aurelius Value Report on February 11, 2019, was merely a summary and repetition of allegations of Vanda's purported off-label marketing (and not a court finding of illicit activity), it is unclear—and neither Plaintiff nor Mr. Steinholt has explained—what information Vanda could and should have disclosed at an earlier point in time.  Mr. Steinholt fails to explain how his damages methodology can accommodate different factual findings regarding what information Vanda could and should have disclosed earlier.

---

[140] Alternative definitions of inflation (assuming there is any) could include, among other possibilities:  (1) inflation due to the alleged omission regarding the FDA requirement of toxicity studies (of which the FDA allegedly informed Vanda during a May 15, 2018 teleconference call); (2) inflation due to the alleged misrepresentation of Vanda's "unwillingness to conduct a routine non-rodent study" that led to the partial clinical hold; (3) inflation due to the alleged misrepresentation of the partial clinical hold that the FDA issued (which Vanda did not receive until December 19, 2018); or (4) inflation due to the alleged misrepresentation about the pursuit of litigation against the FDA.

[141] Steinholt Report, Exhibit D, p. 21.

70.    For example, the Amended Complaint alleges that Defendants "failed to disclose that Vanda was using an off-label promotion scheme to commercialize" its products.[142]  To the extent that the alleged corrective information (which I understand is based on unproven *allegations* of Vanda's off-label marketing practice) is not the same information that Vanda allegedly could and should have disclosed from the beginning of the Putative Class Period, Vanda's price decline on the alleged corrective information date (February 11, 2019) would not measure this alleged inflation given the mismatch.  For example, the whistleblower lawsuit that was filed under seal was not filed until March 10, 2017, more than one year after the start of the Putative Class Period.[143]  Mr. Steinholt does not offer any methodology to calculate what inflation, if any, was present in Vanda's stock price during the days before the whistleblower lawsuit was filed versus what inflation, if any, was present in the stock during the days after.  Likewise, Mr. Steinholt provides no evidence to support the underlying assumption of his inflation ribbon approach that the price impact of Vanda disclosing the whistleblower lawsuit (or even the unproved allegations underlying that lawsuit) would have been the same if a short seller had not discussed the whistleblower lawsuit, raised accusations unrelated to Plaintiff's theory of liability, and simultaneously revealed a short position in Vanda.  Mr. Steinholt simply has not articulated a damages methodology that could accommodate different findings regarding what information about the alleged off-label marketing practices Vanda could and should have disclosed earlier.

**D.    Mr. Steinholt Has Not Proposed a Reliable Methodology to Account for the Fact That Vanda's Stock Price Decline Following the Alleged Corrective Disclosures or Information Reflected Realizations of Risks Described prior to and throughout the Putative Class Period**

71.    Mr. Steinholt proposes an inflation ribbon based on the "fraud-related portion of the price decline caused by the disclosure of the alleged truth."[144]  Under this approach, Vanda's "fraud-related" residual return on February 6, 2019, would represent the purported "inflation" arising from Defendants' alleged failure to disclose that "Vanda knew its unwillingness to

---

[142] Amended Complaint, ¶ 237.

[143] Civil Docket for Case #: 1:17-cv-00464-APM, *Gardner v. Vanda Pharmaceuticals, Inc.*

[144] Steinholt Report, ¶¶ 57–59.

conduct a routine non-rodent study to ensure tradipitant's safety for humans meant that the FDA would impose a clinical hold on a necessary extension of the 2301 study."[145]  However, as discussed below, Mr. Steinholt fails to take into account the extent to which the tradipitant-related information revealed in the alleged corrective disclosure on February 5, 2019, reflects the realization of regulatory risks that were previously disclosed by the Company.  The realization of such risks would be expected to lead to stock price declines even absent any alleged misrepresentations.  If the "but for" disclosures that Vanda allegedly could and should have made earlier in the Putative Class Period would have affected the market's assessment of the likelihood of certain negative events (i.e., the FDA requiring a non-rodent study or imposing a clinical hold) occurring, but not a disclosure of those events actually occurring as revealed on February 5, 2019, Mr. Steinholt has not provided a reliable methodology to measure inflation in this scenario.

72.     Vanda's disclosures in multiple public financial filings through the years leading up to February 5, 2019, indicated that the potential for the FDA to impose clinical holds was a known risk.  Specifically, in its discussion of risks facing the Company, Vanda disclosed that:

> If we fail to comply with the applicable requirements at any time during the product development process, approval process, or after approval, we may become subject to administrative or judicial sanctions.  These sanctions could include the FDA's refusal to approve pending applications, withdrawals of approvals, *clinical holds*, warning letters, product recalls, product seizures, total or partial suspension of our operations, injunctions, fines, civil penalties or criminal prosecution.  Any such sanction could have a material adverse effect on our business.[146]

---

[145] Amended Complaint, ¶ 387.

[146] Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2017, filed on February 15, 2018 ("2017 Vanda 10-K"), p. 9 (emphasis added).

73.     This exact risk disclosure had been made since 2010—five years before the Putative Class Period began—and was reiterated each year throughout the Putative Class Period.[147] Indeed, analyst reports published prior to February 5, 2019, similarly highlighted regulatory risk in discussions of "Investment Risks" associated with Vanda, including that the FDA or other regulators could "require additional studies prior to granting approval."[148]  If, as Mr. Steinholt claims, Vanda's common stock traded in an efficient market during the Putative Class Period, disclosed risks (including the risks associated with a clinical hold) would have been quickly incorporated into the stock price, and subsequent price declines due to the materialization of such known or disclosed risks should not be considered a basis for damages.[149]

74.     As discussed in the prior section, the FDA did not place any clinical holds on Study 2301 and Study 2302 until December 19, 2018.[150]  If it is determined that, before December 19, 2018, Vanda could have disclosed information conveying that the "true" risk of a clinical hold was

---

[147] For example, based on my review of Vanda's annual financial filings, this exact statement was first made in the Company's Form 10-K for the year ending 2009, filed on March 15, 2010.  It was subsequently made in the Form 10-K of Vanda for every year from at least 2010 to 2018.  *See* 2018 Vanda 10-K, p. 15; 2017 Vanda 10-K, p. 9; Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2016, filed February 17, 2017, p. 7; Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2015, filed February 12, 2016, p. 10; 2014 Vanda 10-K, p. 11; Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2013, filed on February 25, 2014, pp. 9–10; Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2012, filed on February 26, 2013, p. 11; Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2011, filed on March 9, 2012, p. 12; Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2010, filed on March 10, 2011, p. 12; Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2009, filed on March 15, 2010, p. 11.  Other similar disclosures of regulatory (FDA-related) risk were also made in these annual filings such as:  "The FDA closely monitors the progress of each of the three phases of clinical trials that are conducted in the U.S. and may, at its discretion, reevaluate, alter, suspend or terminate the testing based upon the data accumulated to that point and the FDA's assessment of the risk/benefit ratio to the patient. […]  The FDA, we or our partners may suspend or terminate clinical trials at any time for various reasons, including a finding that the subjects or patients are being exposed to an unacceptable health risk. The FDA can also request additional clinical trials be conducted as a condition to drug approval."

[148] *See, e.g.*, "HNY'19 Celebration, but Not Nauseous on Gastro' P3 Plan & Unmet Need," *Cantor Fitzgerald*, January 2, 2019, STEINHOLT_0000712–20 at 17 ("Risks associated with investment are broadly clinical, regulatory, and commercial. […]  Clinical failure of tradipitant.  Clinical studies are in indications where it may be difficult to separate clinical signal from noise."); "FDA Accepts sNDA Filing for HETLIOZ for Jet Lag," *JMP Securities*, December 20, 2018, STEINHOLT_0000721–5 at 22 ("Regulatory risk. The FDA and/or other ex-U.S. regulatory agencies could reject any of the firms' or its partners' future regulatory filings or require additional studies prior to granting approval.").

[149] Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, no. 2 (1970), pp. 383–417 at 413–416.  *See also* Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (McGraw-Hill/Irwin, 2011), pp. 317-318 ("The second level of efficiency requires that prices reflect not just past prices but all other public information, for example, from the Internet or the financial press.  This is known as semistrong market efficiency.  If markets are semistrong efficient, then prices will adjust immediately to public information such as the announcement of the last quarter's earnings, a new issue of stock, or a proposal to merge two companies.").

[150] Amended Complaint, ¶ 221.

greater than that previously implied by the Company's public statements,[151] only the price impact of that *incremental* risk that was purportedly concealed (or understated) by the alleged misrepresentations should be included in a measure of any inflation, and "Vanda's price reactions following the two alleged corrective disclosures"[152] may not be informative of determining the alleged inflation.

75.    To illustrate, consider a hypothetical example involving a fictitious pharmaceutical company, Drug Co., the common stock of which would be $100 per share absent any risk of a regulatory clinical hold.  In the event of a clinical hold, Drug Co.'s stock price would decline to $90 per share.  Because FDA clinical holds are rare events,[153] assume now that investors believe the probability of the FDA making such a decision is 10%.  In an efficient market, the value of Drug Co.'s stock would be $99 [(90% x $100) + (10% x $90)], which incorporates the probability of the clinical hold.  However, assume Drug Co. knows that the true probability of a regulatory clinical hold is actually 30%, not the 10% that investors assume.  Thus, had Drug Co. disclosed the true probability earlier, its stock price, in an efficient market, would or should have been $97 [(70% x $100 + (30% x $90)], following the original example above.

76.    Assume Drug Co. could and should have disclosed the 30% probability of a clinical hold but did not.  In this example, inflation should be equal to the actual price less the price "but for" the alleged concealment or understatement of risk—that is, the per-share inflation in this example is $2 (the difference between $99 and $97) rather than the full $9 decline (from $99 to $90) that would be observed if or when a regulatory clinical hold is imposed and disclosed by Drug Co.  Importantly, this example highlights that the full decline when the regulatory clinical hold is imposed (i.e., $9) does not provide any information about the true probability of such an event occurring that Drug Co. could and should have disclosed, and does not measure the amount of inflation (if any) in the stock price.

77.    As with the foregoing hypothetical example, to the extent that Vanda's alleged misrepresentations understated the true probability of risks related to the FDA imposing a clinical hold, inflation would result from the degree of risk (if any) that was concealed or

---

[151] Plaintiff claims that "[i]nvestors did not learn about the threat to Vanda's clinical testing regime for tradipitant caused by the Company's refusal to conduct a routine safety test on tradipitant until after the market closed on February 5, 2019" (Amended Complaint, ¶ 226).

[152] Steinholt Report, ¶ 43.

[153] Amended Complaint, ¶ 7.

understated.  Thus, a reliable damages methodology must evaluate (1) the risk or the probability of a clinical hold that Vanda disclosed versus what it allegedly could and should have disclosed regarding the risk of the clinical hold, and (2) the difference in the impact of such differential risk disclosures on Vanda's stock price.  Yet Mr. Steinholt does not explain how his proposed generic damages approach could measure the impact of the allegedly concealed or understated risk (if any), which is different from the price impact of the realization of a known risk observed on the alleged corrective disclosure date when such risk materialized, i.e., when the probability of the clinical hold became 100%.  His report alludes to "valuation tools" that he could bring to bear for certain complications that may come up, but he does not specify which tools or how he will parameterize them (or, indeed, opine that there are tools capable of parsing out the effect of the understated risk as a specific complication in this matter).  Notwithstanding Mr. Steinholt's claim that his proposed damages framework is "flexible,"[154] he fails to explain how he would measure the difference between "true" and disclosed risk, and consequently any inflation due to concealed or understated risks.  In short, Mr. Steinholt has not established that he actually has a concrete methodology to disentangle effects of the materialization of known risks.

78.    Similarly, with respect to the allegations of off-label marketing practices regarding Fanapt and Hetlioz, I described in detail above in Section V that such allegations were in the public discourse well before February 11, 2019—that is, the date of publication of the Aurelius Value Report, which purportedly "revealed the alleged truth" about Vanda's off-label marketing practices by citing to the whistleblower lawsuit.  To the extent that the market was aware of such allegations and the associated risks that Vanda could have faced (e.g., a whistleblower lawsuit), the alleged corrective information on February 11, 2019, reflects the materialization of risks that would have been known at an earlier point in time.  Again, Mr. Steinholt has not described a methodology that could distinguish the stock price impact from the allegedly concealed risk being disclosed versus the impact from the materialization of disclosed risk, which would have no bearing in measuring inflation.

79.    I understand Plaintiff acknowledges that Vanda made various risk disclosures in its Form 10-Qs and Form 10-Ks filed during the Putative Class Period, but claims that those

---

[154] Steinholt Report, ¶ 62.

statements were "materially false and misleading."[155]  Specifically, for Vanda's statements that "[f]ailure to comply with government regulations regarding the sale and marketing of [its] products could harm [its] business"[156] and that "[t]here have been no material changes in [the Company's] risk factors subsequent to the filing of [its] annual report on Form 10-K"[157] in the previous fiscal year, Plaintiff claims that the risk regarding the potential harm to Vanda's business and financial performance from failure to comply with applicable laws and regulators "had already materialized because Vanda was actively and knowingly engaged in an off-label promotion scheme" for Fanapt and Hetlioz.[158]  In addition, for tradipitant, Plaintiff asserts that Vanda "knew all along that it would not conduct the required non-rodent study and that this refusal would trigger a clinical trial hold."[159]  However, to the extent that Plaintiff claims that there was a risk that materialized during the Putative Class Period—notwithstanding that, as discussed above in Section V.C, such risk had been disclosed by Vanda before the start of the Putative Class Period—Mr. Steinholt fails to provide a methodology that can differentiate between the price impact resulting from the materialization of a known versus unknown or understated risk, and his inflation ribbon approach would overstate damages when it includes the price impact resulting from the materialization of known or previously disclosed risks.  In addition, to the extent that Plaintiff claims that there had been "material changes" in Vanda's risk factors that were allegedly concealed or understated during the Putative Class Period, Mr. Steinholt has not proposed a reliable methodology that can measure the changes in inflation over time due to those alleged "material changes" in Vanda's risk factors.  In other words, Mr. Steinholt fails to provide a reliable damages methodology that is consistent with Plaintiff's liability theories that are based on the materializations or the purported "material changes" of known risks.

---

[155] Amended Complaint, ¶ 232 ("During the [Putative] Class Period, Defendants made materially false and misleading statements, and otherwise violated an obligation to disclose material information, concerning…known uncertainties, events, trends and material risks associated with Vanda's operations.").

[156] Plaintiff includes this statement in two sections of the Amended Complaint, titled "The False and Misleading Fanapt Misstatements and Omissions" and "The False and Misleading Hetlioz Misstatements and Omissions."

[157] Plaintiff includes this statement in three sections of the Amended Complaint, titled "The False and Misleading Fanapt Misstatements and Omissions," "The False and Misleading Hetlioz Misstatements and Omissions," and "The False and Misleading Tradipitant Misstatements and Omissions."

[158] *See, e.g.*, Amended Complaint, ¶¶ 246, 252, 323.

[159] *See, e.g.*, Amended Complaint, ¶ 394.

Executed this 17th of September, 2021

_____

René M. Stulz, Ph.D.

# Exhibit 1
## Purported Off-Label Marketing Claims Repeated by Marcus Aurelius Value

| Aurelius Value Report (Published 02/11/2019) | Earlier Reference from Qui Tam Whistleblower Lawsuit (Unsealed 02/04/2019) | Earlier Reference from Other Public Sources |
|---|---|---|
| "To increase sales of Fanapt, the whistleblower states that [Vanda CEO] Polymeropoulos crafted off-label messaging himself and trained sales reps to promote the drug for other indications using a variety of false claims regarding Fanapt's efficacy, dosing, and safety." (Aurelius Report, p. 4) | "Even when sales representatives were promoting Fanapt's safety profile, Vanda trained sales representatives to avoid discussing Fanapt's sole indication, and steer the conversation back to a discussion of Fanapt's safety profile. For example, the overcoming objections sales aide also contains the objection 'Fanapt has only one indication.' The canned response prepared by Vanda states: 'I understand that other antipsychotics have more than one indication. Can you think of any of your adult schizophrenia patients who are experiencing inner restlessness, agitation or other treatment-induced movement disorders on their current medication? The Fanapt efficacy and tolerability profile, including its placebo-like rate of akathisia make it an option for patients who need to switch from one antipsychotic to another.'" (Whistleblower Complaint, ¶ 74) | "With only a schizophrenia indication, I am concerned as I do not want pushed to be unethical and sell off label to make my numbers. After meeting Vanda management, some of which were brand new, I do not feel good about the company. It smells like big pharma disguised as small pharma." (Cafepharma Post, 1/30/2017)<br><br>"Promoting a medicine indicated for adult schizophrenia to a physician that does not treat schizophrenia is unethical. Being measured against medicines that HAVE other indications looks highly questionable. The on-label promotion with the hint of 'use it how you know best, doctor' is easier than getting a new indication but shows the lack of integrity of management." (Cafepharma Post, 2/1/2017)<br><br>"[W]hy are my Fanapt goals and sales incentives directly tied to dirt data and every off label Rx whether the [healthcare professionals] are actually a target or not? Isn't this telling me to ignore the indication and sell however and wherever necessary?" (Cafepharma Post, 9/8/2018)<br><br>"Vanda Pharmaceutical's (Vanda) webpage titled, 'Products' for FANAPT® (iloperidone) tablets, for oral use (Fanapt), and HETLIOZ® (tasimelteon) capsules, for oral use (Hetlioz) […] is false or misleading in that it presents information about the benefits of Fanapt and Hetlioz, but fails to include any risk information about either drug. […] This violation is concerning from a public health perspective because it creates a misleading impression about the safety of Fanapt and Hetlioz." (FDA Warning Letter, 10/22/2018, p. 1) |
| "In order to meet growth targets, we believe Vanda's 'secret sauce' is a product of Polymeropoulos harnessing the Fanapt sales force to begin selling Hetlioz to psychiatrists as a sleep aide alternative to Ambien and Lunesta for sighted patients. [...] Our discussion with former employees and a sleep doctor support the whistleblower's assertion that Vanda is engaging in off-label marketing of Hetlioz as a sleep aid. A former sales rep we spoke to explained that 'We were [internally] saying 'give it to everyone who doesn't sleep well''. The sleep doctor opined that 'they are prescribing this off label and calling it's something it's not. I'll tell you that, Absolutely.' A former sales manager explained 'basically the training was creating the story or creating the plausible idea that this could be happening really commonly in our psychiatry office'. The whistleblower lawsuit alleges that Vanda's off-label marketing pitch was premised, in part, on Hetlioz not being classified as a schedule drug by the FDA." (Aurelius Report, pp. 6, 8) | "Further, by promoting Hetlioz as a sleep aide that was not classified as a schedule drug by the FDA, Vanda intended to convince physicians to use Hetlioz instead of other sleep aides. As a significant majority of scheduled sleep aides are prescribed for conditions other than Non-24, and sales representatives were required to promote Hetlioz regardless of whether the provider had blind patients, it is obvious that Vanda intended its sales representatives to promote Hetlioz as an effective substitute for all sleep aides to treat conditions outside of its indicated use (i.e., Non-24)." (Whistleblower Complaint, ¶ 162) | "My manager and his boss and her boss, Tommy have made it very clear just to tell prescribers that they are ignorant and any Ambien failure is the perfect Hetlioz patient. Criteria for non 24 is really not that important." (Cafepharma Post, 9/11/2018)<br><br>"Vanda had a driving study comparing Ambien to Hetlioz when the indications for the products are completely different? That is a very strong 'wink wink' from leadership that Ambien is the competitor and to go get those insomnia patients. Off label promotion is alive and well at Vanda with the blessing of HQ (although they will deny it but still demand it!!)" (Cafepharma Post, 9/13/2018)<br><br>"It's MELATONIN. It should not cost nearly $200K per year. And there is no reason for an issuer to pay for it in a sighted patient. Greedy Poly[meropoulos] had a drug for blind patients with non 24 but has exposed himself for the fraud he is by pushing it for insomnia. Crooked Vanda" (Cafepharma Post, 10/3/2018) |

1

| Aurelius Value Report (Published 02/11/2019) | Earlier Reference from Qui Tam Whistleblower Lawsuit (Unsealed 02/04/2019) | Earlier Reference from Other Public Sources |
|---|---|---|
| "We believe that Vanda eventually began running out of enough blind patients to replace the ones churning off Hetlioz. Vanda pivoted to begin targeting sighted patients through the 'HETLIOZ to Psychiatrists initiative' ('HPI') formally announced by Vanda in 2017, whereby the Fanapt sales force would begin selling Hetlioz. Vanda stated last year that at least 2 out of every 3 prescriptions now come from Psychiatrists for sighted patients. [...]<br><br>Since there were only around 700 patients on Hetlioz at the end of 2017, each incremental patient is extremely valuable for Vanda. Former sales reps told us that Vanda began offering them $1k for each Hetlioz prescription they were able to get a Psychiatrist to write (regardless if it was eventually filled). One former rep informed us that some Vanda employees were able get friendly doctors in certain regions to fax a highly abnormal number of prescriptions. We also reviewed a sell side research report that suggests a select number of psychiatrists are responsible for an outsized number of prescriptions." (Aurelius Report, pp. 7, 9)[1] | "Hetlioz, which based on its indicated use has a very small potential patient population, was promoted on every Fanapt sales call. The only reason to do so, given its very small patient population and without regard to if the provider treats blind patients, was to market the drug for all sleep disorders caused by circadian rhythm disruption. Therefore, Vanda's marketing scheme was aimed at promoting Hetlioz off-label." (Whistleblower Complaint, ¶ 163) | "You nailed it. There aren't enough patients within indication to stay ethical." (Cafepharma Post, 1/31/2017)<br><br>"The [H]etlioz numbers don't add up. [C]onsidering all the commentary about lag time between Rx and patient starts, patients stopping therapy, inability for patients to get medication, etc. [S]omething doesn't make sense. [M]y guess is the reported numbers. [U]nless Vanda is simply churning and burning through patients. [W]hich seems unsustainable." (Cafepharma Post, 10/1/2018) |
| "The whistleblower suit also states that employees were threatened with termination unless they engaged in the illegal activity. Vanda's Director of Marketing and the Chief Compliance Officer resigned after 'CEO Polymeropoulos refused to alter the marketing strategy' [...]." (Aurelius Report, p. 9) | "This [Fanapt] marketing piece caused internal disputes among Vanda senior management. According to Relator, Kate Holland, Vanda's Vice President and Director of Marketing, vehemently protested this marketing piece because it marketed a side effect, Akathisia, and that the marketing strategy as a whole falsely presented Fanapt as a cure for Akathisia because that side effect was the main focus of the marketing strategy. However, despite Holland's protests, CEO Polymeropoulos refused to alter the marketing strategy, and as a result Holland resigned in January 2016 along with Thomas Gibbs, Vanda Senior Vice President and Chief Compliance Officer." (Whistleblower Complaint, ¶ 79) | "Ethical and compliant behavior is punished.  Sale[] depends on targeting off label business." (Glassdoor Post, 8/16/2018) |

2

| Aurelius Value Report (Published 02/11/2019) | Earlier Reference from Qui Tam Whistleblower Lawsuit (Unsealed 02/04/2019) | Earlier Reference from Other Public Sources |
|---|---|---|
| "The lawsuit depicts Vanda as having a sell-at-all costs culture that relied on **illegal sales tactics and even outright fraud out of concern for the company's stock price.**" (emphasis in original) (Aurelius Report, p. 3) | "Relator believes that Vanda's unwillingness to adjust its internal sales estimates was because Vanda feared such action would cause its stock price to drop. According to Relator, in discussing the Indiana coverage change, he requested that these prescriptions be removed from the sales goal. Ramirez stated that no change would be made because Vanda 'already gave the sales expectation number to the Street, and it is not changing.' Relator took this to mean that the sales expectation figures had already been provided to analysts on Wall Street, and if Vanda was to lower that number it would cause a drop in stock price." (Whistleblower Complaint, ¶ 98) | "With only a schizophrenia indication, I am concerned as I do not want pushed to be unethical and sell off label to make my numbers. After meeting Vanda management, some of which were brand new, I do not feel good about the company. It smells like big pharma disguised as small pharma." (Cafepharma Post, 1/30/2017)<br><br>"[W]hy are my Fanapt goals and sales incentives directly tied to dirt data and every off label Rx whether the [healthcare professionals] are actually a target or not? Isn't this telling me to ignore the indication and sell however and wherever necessary?" (Cafepharma Post, 9/8/2018) |
| "The lawsuit states that Vanda <u>falsified documents</u> relating to physician target lists in company systems that 'were a joke and were designed solely to shield Vanda from liability'. Instead, according to the complaint, sales reps were directed to target physicians prescribing drugs for other mental disorders as well as child psychologists, <u>even though Fanapt has no FDA approval for children</u>, according to the complaint." (emphasis in original) (Aurelius Report, p. 4) | "According to Relator, the target lists were a joke and were designed solely to shield Vanda from liability. Specifically, every provider on the target list had at least two or three schizophrenia patients. In fact, in November 2015, Head of Sales, Ramirez, told the RBLs, including Relator, that the target lists Vanda provided were just 'for show' and in place just in case Vanda was ever questioned about off-label promotion. Ramirez further stated that if the Company was ever questioned about off-label promotion, it could just show the target lists as proof that the Company only encouraged sales representatives to target physicians treating schizophrenia patients." (Whistleblower Complaint, ¶ 90) | "This was a very bad decision. It was clear at the meeting that CP was correct and GP and Poly[meropoulos] are dictators that have zero ability to guide a company or a sales team. Who will I sample dump tomorrow? Maybe some child doc[tor] that is dumped into my call deck and I cant delete because only treating kids isnt a good enough excuse to not call on him or her..." (Cafepharma Post, 3/20/2017)<br><br>"I am measured by sales THREE weeks in the field with a completely worthless call plan. I dont even get to spend time selling, I am always called out of the field to fill out another emergency spreadsheet about call activity or sampling or time off territory. How can we sell when management wont give us the opportunity or the tools??" (Cafepharma Post, 4/10/2017) |
| "We also examined data from the FDA Adverse Event Reporting System ("FAERS"), which contains information on medication error reports submitted to the FDA. The single most frequently reported adverse event is the complaint of 'drug ineffective' which, when combined with similar complaints about efficacy, totals 888 complaints since 2014, an amount which exceeds the number of patients currently on Hetlioz. In fact, questions about Hetlioz's efficacy date back to 2013, when Health Care columnist Adam Feuerstein identified 'a disturbingly large number of irregularities and red flags' related to Vanda's clinical trials of Hetlioz. One former employee suggested that **elevated reports of the drug being ineffective reflect the increased off-label usage** [...]" (emphasis added) (Aurelius Report, pp. 6–7) | | "Vanda Pharmaceuticals tells a pretty compelling story about the development of tasimelteon for the treatment of a rare sleep-pattern disorder that affects blind people. Dig into the company's clinical work on tasimelteon, however, and you'll find a disturbingly large number of irregularities and red flags which should ring alarm bells for any investor betting on the drug's approval." ("Vanda's Sleep Disorder Drug Is A Nightmare" article by Adam Feuerstein, 6/19/2013)<br><br>"The timing of the changes to the tasimelteon study in the middle of 2012 were pushed through at the same time Vanda already had data in hand from the study suggesting the original primary endpoint -- improvement in night time total sleep -- was likely to fail." ("Vanda's Sleep Disorder Drug Is A Nightmare" article by Adam Feuerstein, 6/19/2013) |

Source: Aurelius Value Report dated February 11, 2019; Complaint Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2), *USA, et al. v. Vanda Pharmaceuticals, Inc.*, filed on March 10, 2017 ("Whistleblower Complaint"); *Cafepharma.com*; *Glassdoor*; "Warning Letter: Vanda Pharmaceuticals," *U.S. Food and Drug Administration*, October 22, 2018, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/vanda-pharmaceuticals-576442-10222018, ("FDA Warning Letter"); Public Press; Vanda Earnings Transcripts

[1] In its 2017 Q2 earnings call on August 2, 2017, Vanda disclosed that as of July 2017, members of the U.S. Fanapt sales force began promoting Hetlioz to psychiatrists. In early 2018, Vanda described prescription fill rates amongst sighted patients as "lower than that of blind [patients]," and that despite seeing increases in the number of sighted patients, "the blind Non-24 patients continue to be the majority of patients on treatment". (*See* Vanda Q2 2017 Earnings Transcript, August 2, 2017; Vanda Q4 2017 Earnings Transcript, Vanda Q2 2018 Earnings Transcript)

3



**René M. Stulz**

Fisher College of Business                                    Home Address:
806 Fisher Hall                                                      3419 River Seine Street
2100 Neil Avenue                                               Columbus, OH 43221
Columbus, OH 43210-1144                              Phone: (614) 771-1110
Phone:  (614) 292-1970                                    Cell:    (614) 206-0265
Fax:     (614) 292-2359
E-mail: stulz.1@osu.edu
Homepage
Google Scholar

## UNDERGRADUATE STUDIES

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

## GRADUATE STUDIES

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

## ACADEMIC APPOINTMENTS

Ohio State University, Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University, Business School, August 1996 to July 1997, Bower Fellow.

Ohio State University, Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University, Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University, Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University, Professor of Finance, 1985 to present.

1

**Appendix A**

University of Chicago, Visiting Professor of Finance, 1986-1987.

Massachusetts Institute of Technology, Visiting Associate Professor of Finance, Fall 1985.

Ohio State University, Associate Professor of Finance, 1983-1985.

University of Rochester, Assistant Professor of Finance and Economics, 1980-1983.


## OTHER POSITIONS

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Group on the Risks of Financial Institutions, 2005 to present.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to 2019.

Finance Research Advisory Committee, Office of Financial Research, U.S. Treasury, 2016 to 2019.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Expert testimony in federal courts, state courts, and domestic and international arbitrations.

Taught executives in Europe, Asia and North America (open enrollment as well as for corporations, courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to present.

Director, Wegelin Fund Management, 1999 to 2010.

President, Gamma Foundation, 2002 to 2013.

Director, Community First Financial Group, Inc., 2001 to 2010.

Director, Peninsula Banking Group, Inc., 2001 to 2010.

Trustee, Global Association of Risk Professionals, 2002-2020; executive committee, 2004-2011; chair of governance committee, 2011-2020 to present; vice-chair, 2017-2019.


**Appendix A**

Vice-Chairman, Board of Trustees, Global Association of Risk Professionals, 2019-2020.  to present.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to 2020.

Chairman, New York Federal Reserve Bank/GARP Global Risk Forum (2011, 2013, 2016, 2019), Bank of England/GARP Global Risk Forum (2012, 2014, 2017, 2020), Hong Kong Monetary Authority/GARP Global Risk Forum (2013, 2015).

International Advisory Committee, NCCR, 2002 to 2011.

External Reviewer, London Business School Finance Department, 2005.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

Senior Academic Fellow, Asia Bureau of Finance and Economic Research, 2012 to present.

Fellow, Wharton Center for Financial Institutions, 2013 to present.

Nominating Committee, American Finance Association, 2016, 2018.


**HONORS, SCHOLARSHIPS AND FELLOWSHIPS**

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: ABFER, Asia-Pacific Finance Association, Bank of the Netherlands Governance Conference, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, Financial Management Association, European Financial Management Association, Financial Management Association European Conference, FDIC Annual

**Appendix A**

Conference, Rising Stars Conference, Fourth Annual Conference on Asia-Pacific Financial Markets of the Korean Securities Association, French Finance Association, German Finance Association, Infiniti Conference, Notre Dame/SEC Conference, Northern Finance Association, Swiss Banking Association 100th Anniversary Conference, Western Finance Association, World Finance Conference, China International Conference in Finance, South Carolina Conference on Banking and Fixed Income, Asian Finance Association Conference, Seoul Asian Financial Forum, Oklahoma University Energy and Commodities Finance Research Conference, ECGI Roundtable Riga, Institutional Investor Private Markets Summit, 7th HEC Paris Workshop.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2002), President-elect (2003), President (2004), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008, 2017; runner-up, 2011.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

4

**Appendix A**

Risk Manager of the year award, Global Association of Risk Professionals, 2009.

Swiss Finance Institute/Banque Privée Espirito Santo Prize 2010.

Trailblazer in Finance Award, 2014.

Reuters, Highly-Cited Researchers, first time in 2014.

Ohio State University, Distinguished Scholar Award, 2016.


**CONGRESSIONAL TESTIMONY**

"Over-the-Counter Derivatives Markets Act of 2009," testimony to the House of Representatives Committee on Financial Services, 2009.

"Oversight of the Mutual Fund Industry: Ensuring Market Stability and Investor Confidence," Subcommittee on Capital Markets and Government Sponsored Enterprises, House of Representatives Committee on Financial Services, 2011.


**BOOKS**

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, volume 1, edited with George Constantinides and Milton Harris, North-Holland, 2003.

Handbook of the Economics of Finance, volume 2, edited with George Constantinides and Milton Harris, Elsevier, 2013.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group, Princeton University Press, 2010.

**Appendix A**

## PUBLISHED PAPERS

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, v36(4), 923-934; reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, v9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, v12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, v10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, v38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, v15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, v19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, v16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting: An Introduction," Journal of International Business Studies (Winter 1984), 55-73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, v14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, v20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw Hill, 1993, and in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds., Risk Publications, London, 1999.

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, v41(1), 209-224.



**Appendix A**

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, v6, 217-232.

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, v17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, v3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, v42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, v95(5), 1024-1040.

"Managerial Control of Voting Rights: Financing Policies and the Market for Corporate Control," Journal of Financial Economics, 1988, v20(1/2), 25-54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance, McGraw-Hill, 1989 (second edition).

"Risk and the Economy: A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk: Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, v7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, v22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, v8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, v24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, v24(1), 137-154.

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company, 1989, v3, 247-262.

**Appendix A**

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets: Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, v9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, v45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, v26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, v16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A.Walkling and Larry H. Lang, Journal of Financial Economics, 1991, v29(2), 315-335.

"Is There a Global Market for Convertible Bonds?" with Yong-Cheol Kim, Journal of Business, 1992, v65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, v32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, v32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, v6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, v3(2), 97-114.

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, v25(3), Part 2, 585-601.



**Appendix A**

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, v102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael Brennan, ed., Edward Elgar, 2001.

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, v37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, v30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, v8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies, 1995, v8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, v40(1), 3-29.

"How Different is Japanese Corporate Finance?", with Jun-Koo Kang, Review of Financial Studies, 1996, v9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, v20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, v42(2), 159-185,reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"Why Do Markets Move Together? An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, v51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in



**Appendix A**

Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, v46(1), 3-28.

"Are Internal Capital Market Efficient?" with Hyun-Han Shin, Quarterly Journal of Economics, 1998, v113(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, v52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001 v14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, v54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, v12(3), 519-534.

"International Portfolio Flows and Security Markets," in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293, reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, v12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, v73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, v8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, v90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, v1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, v29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, v14(1), 215-241.



**Appendix A**

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, v64(1), 117-144, reprinted in Corporate Restructuring, vol. 2, John Campbell and David J. Denis, ed., Edward Elgar Publishing, 2005.

"Should we Fear Capital Flows?" in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

"Corporate Governance, Investor Protection, and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, v38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, v93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, v70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, v16, 717-763. Pre-publication Working Paper

"Are Assets Priced Locally or Globally?" with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms that List in the U.S. Worth More?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, v71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?" with Federico Nardari and John Griffin, Review of Economics and Statistics, 2004, v86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Financial Economics, 2004, v73, 201-228.

"Should we Fear Derivatives?" Journal of Economic Perspectives, 2004, v18(3), 173-192; reprinted in The ICFAI Journal of Derivatives Markets, 2005, v2(1), 42-53.

"Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Finance, 2005, v60(2), 757-782 (Reprinted in Mergers and Acquisitions, J. Harold Mulherin, ed., Edward Elgar Publishing, 2012).

"Do Domestic Investors have an Edge? The Trading Experience of Foreign Investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, v18(3),795-829.

11

**Appendix A**

"The Limits of Financial Globalization," Journal of Finance, 2005, v60(4), 1595-1638; reprinted in Journal of Applied Corporate Finance, 2007, v19(1), 8-15.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A Cross-Country Analysis," with Lee Pinkowitz and Rohan Williamson, Journal of Finance, 2006, v61(6) 2725-2751; reprinted in Journal of Applied Corporate Finance, 2007, v19(1), 81-87.

"Dividend Policy and the Earned/Contributed Capital Mix: A Test of the Life-cycle Theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, v81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, v18(8), 8-20.

"Do Investors Trade more when Stocks have Performed Well? Evidence from 46 Countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, v20(3), 905-951.

"Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, v21(2), 175-194.

"The Economics of Conflicts of Interests in Financial Institutions," with Hamid Mehran, Journal of Financial Economics, 2007, v85(2), 267-296.

"Why Do Countries Matter so much for Corporate Governance?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, v86, 1-39.

"How do Diversity of Opinion and Information Asymmetry Affect Acquirer Returns?" with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, v20(6), 2047-2078.

"Do Local Analysts know more? A Cross-Country Study of Performance of Local Analysts and Foreign Analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008 v88(3), 581-606.

"Why Do Private Acquirer Pay so Little Compared to Public Acquirers?" with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, v89(3), 375-390

"Risk Management Failures: What Are They and When Do They Happen?" Journal of Applied Corporate Finance, 2008, v20, No. 4, 39-48.


**Appendix A**

"Private Benefits of Control, Ownership, and the Cross-Listing Decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, v64(1), 425-466.

"Has New York Become Less Competitive than London in Global Markets?  Evaluating Foreign Listing Choices Over Time," with Craig Doidge, and G. Andrew Karolyi, Journal of Financial Economics, 2009, v91(3), 253-277.

"Differences in Governance Practices between U.S. and Foreign Firms: Measurement, Causes, and Consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, v22(8), 3171-3209.

"Managerial Ownership Dynamics and Firm Value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, v92(3), 342-361.

"How Much Do Banks Use Credit Derivatives to Hedge Loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, v35(1), 1-31.

"Securities Laws, Disclosure, and National Capital Markets in the Age of Financial Globalization," Journal of Accounting Research, 2009, v47(2), 349-390.

"Why Do U.S. Firms Hold so Much More Cash than they Used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, v64(5), 1985-2021.

"Financial Globalization, Governance, and the Evolution of the Home Bias," with Bong-Chan Kho and Francis E. Warnock, Journal of Accounting Research, 2009, v47(2), 597-635.

"Seasoned Equity Offerings, Market Timing and the Corporate Lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2010, v95(3), 275-295.

"Why do Firms Appoint CEOs as Outside Directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, 2010, v97(1), 12-32.

"Credit Default Swaps and the Credit Crisis," Journal of Economic Perspectives, 2010, v24(1), 73-92.

"Why Do Foreign Firms Leave U.S. Equity Markets?" with Craig Doidge and G. Andrew Karolyi, Journal of Finance, 2010, v.65(4), 1507-1553.

"Hedge Fund Contagion and Liquidity Shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, 2010, v65(5), 1789-1816.

"Bank CEO Incentives and the Credit Crisis," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2011, v99, 11-26 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

13



**Appendix A**

"When Are Analyst Recommendation Changes Influential?" with Roger K. Loh, Review of Financial Studies, 2011, v24(2), 593-627.

"The Credit Crisis Around the Globe: Why Did Some Banks Perform Better?" with Andrea Beltratti, Journal of Financial Economics, 2012, v105(1), 1-17 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Why Are U.S. Stocks More Volatile?" with Söhnke M. Bartram and Gregory Brown, Journal of Finance, 2012, v67(4), 1329-1370.

"Market Institutions, Financial Market Risks, and The Financial Crisis," with Mark Carey, Anil K. Kashyap, and Raghuram Rajan, Journal of Financial Economics, 2012, v104(3),421-424.

"This Time Is the Same: Using Bank Performance in 1998 to Explain Bank Performance during the Recent Financial Crisis," with Rüdiger Fahlenbrach and Robert Prilmeier, Journal of Finance, 2012, v67(6), 2139-2185 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Access to Capital, Investment, and the Financial Crisis," with Kathleen Kahle, Journal of Financial Economics, 2013, v110(2), 280-299.

"The U.S. Left Behind? Financial Globalization and the Rise of IPOs Outside the U.S.," with Craig Doidge and G. Andrew Karolyi, Journal of Financial Economics, 2013, v110(3), 546-573.

"Why Did Holdings of Highly-Rated Securitization Tranches Differ So Much Across Banks?" with Isil Erel and Taylor Nadauld, The Review of Financial Studies, 2014, v27(2), 404-453.

"Liquid-Claim Production, Risk Management, and Bank Capital Structure: Why High Leverage is Optimal for Banks," with Harry DeAngelo, Journal of Financial Economics, 2015, v116, 219-236.

"Corporate Acquisitions, Diversification, and the Firm's Lifecycle" with Asli M. Arikan, Journal of Finance, 2016, v71(1), 139-194.

"Do U.S. Firms Hold More Cash than Foreign Firms?" with Lee Pinkowitz and Rohan Williamson, The Review of Financial Studies, 2016, v29(2), 309-348.

"Why Don't All Banks Practice Regulatory Arbitrage? Evidence from the Usage of Trust Preferred Securities," with Nicole Boyson and Rüdiger Fahlenbrach, The Review of Financial Studies, 2016, v29(7), 1821-1859.

"Risk Management, Governance, Culture and Risk-Taking in Banks," Economic Policy Review, Federal Reserve Bank of New York, 2016, v22(1), 43-59 (A shorter version was published as "Risk-Taking and Risk Management by Banks," Journal of Applied Corporate Finance, 2015, v.27(1), 8-18).

14



**Appendix A**

"Firm Rigidities and the Decline of Growth Opportunities," with Claudio Loderer and Urs Wälchli, 2016, Management Science 63(9), 3000-3020.

"Portable Country Governance and Cross-Border Acquisitions," with Jesse A. Ellis, Sara B. Moeller, and Frederik P. Schlingemann, Journal of International Business Studies, 2017, 48(2), 148-173.

"The U.S. Listing Gap," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2017, 123, 464-487.

"Is the US Public Corporation in Trouble?" with Kathleen Kahle, Journal of Economic Perspectives, 2017, 31(3), 67-88.

"Do Independent Director Departures Predict Future Bad Events?" with Rüdiger Fahlenbrach and Angie Low, 2017, The Review of Financial Studies, 30(7), 2131-2358.

"What Is the Shareholder Wealth Impact of Target CEO Retention in Private Equity Deals?" with Leonce Bargeron, Fred Schlingemann, and Chad Zutter, Journal of Corporate Finance, 2017, v46, 186-206.

"Why Does Fast Loan Growth Predict Poor Performance for Banks?" with Rüdiger Fahlenbrach and Robert Prilmeier, 2017, The Review of Financial Studies, 31(3), 1014-1063.

"Corporate Deleveraging and Financial Flexibility," with Harry DeAngelo and Andrei Gonçalves, 2018, The Review of Financial Studies, 31(8), 3122-3174.

"Eclipse of the Public Corporation or Eclipse of the Public Markets?" with Craig Doidge, Kathleen Kahle, and Andrew Karolyi, 2018, Journal of Applied Corporate Finance, 30(1), 8-16.

"Is Sell-Side Research More Valuable in Bad Times?" with Roger K. Loh, 2018, Journal of Finance, 73(3), 959-1013.

"Do Firms Issue More Liquidity When Markets Become More Liquid?" with Rogier M. Hanselaar and Mathijs A. van Dijk, 2019, Journal of Financial Economics, 133(1), 64-82.

"Are the Largest Banks Valued More Highly?" with Bernadette Minton and Alvaro Taboada, 2019, Review of Financial Studies, 32(12), 4604-4652.

"FinTech, BigTech, and the Future of Banks," 2019, Journal of Applied Corporate Finance, 31(4), 86-97.

"Does the Stock Market Make Firms More Productive?" with Ben Bennett and Zexi Wang, Journal of Financial Economics, 2020, 136(2), 281-306.



"Risk Management, Firm Reputation, and the Impact of Successful Cyberattacks on Target Firms," with Shinichi Kamiya, Jun-Koo Kang, Jungmin Kim, and Andreas Milidonis, 2020, Journal of Financial Economics, forthcoming.

"Public Versus Private Equity," 2020, Oxford Economic Policy Review, 36(2), 275-290.

"Why Is Contagion Asymmetric During the European Sovereign Crisis?" Journal of International Money and Finance, forthcoming.

"Why Does Equity Capital Flow Out of High Tobin's q Industries," with Dong Lee and Han Shin, Review of Financial Studies, forthcoming.

"Why Are Firms with More Managerial Ownership Worth Less?" with Kornelia Fabisik, Rüdiger Fahlenbrach, and Jérôme Taillard, Journal of Financial Economics, forthcoming.

"How Valuable is Financial Flexibility when Revenue Stops? Evidence from the COVID-19 Crisis" with Rüdiger Fahlenbrach and Kevin Rageth, Review of Financial Studies, forthcoming.

"Why Are Payouts So High in the 2000s?" with Kathleen Kahle, Journal of Financial Economics, forthcoming.

"Where there Fire Sales in the RMBS Market?" with Craig B. Merrill, Taylor D. Nadauld, and Shane M. Sherlund, Journal of Monetary Economics, forthcoming.


## PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio Management (1, 1988), 11-22.

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (4, 1989), 288-300.

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

16



"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (2, 1990), 99-115.

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the Corporate Treasury: New Developments in Strategy and Control, Robert Jameson, ed., Risk Publications, London, 1997, 33-51 (Reprinted in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999). Pre-publication Working Paper

"What's Wrong with Modern Capital Budgeting?" Financial Practice and Education, Fall/Winter 1999, p.5-9.

"Diminishing the Threats to Shareholder Wealth," Financial Times, Mastering Risk Series, April 25, 2000.

"Why Risk Management is not Rocket Science," Financial Times, Mastering Risk Series, June 27, 2000.

"An Emotional High for Stocks?" a review of "Irrational Exuberance" by Robert J. Shiller, Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, v87(3), 86-94.

"In Defense of Derivatives and How to Regulate Them," Wall Street Journal, April 7, 2009.

**SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS**

"Has the Bond Market Really Become Less Liquid?" with Mike Anderson.

"Why Has there Been a Secular Decline in Idiosyncratic Risk since 2000?" with Söhnke Bartram and Greg Brown.

"Are Analyst Trade Ideas Valuable?" with Justin Birru, Sinan Gokkaya, and Xi Liu.

17

**Appendix A**

"Who Benefits from Analyst 'Top Picks?'" with Justin Birru, Sinan Gokkayaa, and Xi Liu.

"Has the Stock Market Become Less Representative of the Economy," with Fred Schlingemann.

"Is Financial Globalization in Reverse After the 2008 Global Financial Crisis? Evidence from Corporate Valuations," with Craig Doidge and Andrew Karolyi.

"Does Joining the S&P 500 Index Hurt Firms?" with Benjamin Bennett and Zexi Wang.


**EDITORIAL AND REFEREEING ACTIVITIES**

Advisory Board, Journal of Risk and Financial Management, 2018 to present.

Editorial Board, Journal of Financial Intermediation, 2013 to present.

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to present.

Advisory Editor, Journal of Financial Services, 1999 to present.

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

**Appendix A**

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to 2015.

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983-1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.



**Appendix B**

# Deposition and Trial Testimony of René M. Stulz During the Past Four Years

| | |
|---|---|
| **Case Name:** | Dennis Wilson et al. v. LSB Industries, Inc. et al. |
| **Case No.:** | No. 1:15-cv-7614, United States District Court, Southern District of New York |
| **Date of Testimony:** | September 2017 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re Eletrobras Securities Litigation |
| **Case No.:** | No. 1:15-cv-05754-JGK, United States District Court, Southern District of New York |
| **Date of Testimony:** | November 2017 (Deposition) |

| | |
|---|---|
| **Case Name:** | Australian Securities and Investment Commission v. Westpac Banking Corporation |
| **Case No.:** | No. VID282/2016, Federal Court of Australian Proceedings |
| **Date of Testimony:** | December 2017 (Trial) |

| | |
|---|---|
| **Case Name:** | William Sponn et al. v. Emergent Biosolutions, Inc. et al. |
| **Case No.:** | No. 8:16-cv-02625-RWT, United States District Court, Southern District of Maryland |
| **Date of Testimony:** | February 2018 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re BHP Billiton Limited Securities Litigation |
| **Case No.:** | No. 1:16-cv-01445-NRB, United States District Court, Southern District of New York |
| **Date of Testimony:** | June 2018 (Deposition) |

| | |
|---|---|
| **Case Name:** | Loreley Financing (Jersey) No. 28, Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al. |
| **Case No.:** | No. 652732/2011, Supreme Court of the State of New York |
| **Date of Testimony:** | November 2018 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re Flowers Foods, Inc. Securities Litigation |
| **Case No.:** | No. 7:16-CV-00222-WLS, United States District Court, Middle District of Georgia |
| **Date of Testimony:** | November 2018 (Deposition) |

**Appendix B**

**Case Name:**          SSA Bonds
**Case No.:**           A.T.40346, European Commission
**Date of Testimony:**  July 2019 (Oral Hearing)


**Case Name:**          In Re Equifax, Inc. Securities Litigation
**Case No.:**           No. 17-CV-3463-TWT
**Date of Testimony:**  September 2019 (Deposition)


**Case Name:**          Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corporation et al.
**Case No.:**           No. 16-112-MN
**Date of Testimony:**  December 2019 (Deposition)


**Case Name:**          Joseph Prause v. TechnipFMC PLC et al.
**Case No.:**           No. 4:17-cv-02368
**Date of Testimony:**  February 2020 (Depositions)


**Case Name:**          In Re Volkswagen "Clean Diesel" Marketing Sales Practices, and Products Liability Litigation; BRS v. Volkswagen AG, et al., Case No. 16-cv-3435 ("Bondholders Securities Action")
**Case No.:**           MDL No. 2672-CRB (JSC), United States District Court, Northern District of California
**Date of Testimony:**  February 2020 (Deposition)


**Case Name:**          Mayagüez S.A. v. Citigroup, Inc., Citibank, N.A.
**Case No.:**           No. 1:16-cv-06788-PGG-JLC, United States District Court, Southern District of New York
**Date of Testimony:**  May 2020 (Deposition)

**Case Name:**          In re WeWork Litigation
**Case No.:**           No. 2020-0258-AGB, Court of Chancery, Delaware
**Date of Testimony:**  February 2021 (Deposition)


**Case Name:**          In re Envision Healthcare Corporation Securities Litigation
**Case No.:**           No. 3:17-cv-01112, United States District Court, Middle District of Tennessee, Nashville Division
**Date of Testimony:**  May 2021 (Deposition)

**Appendix B**

**Case Name:** Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corporation et al.
**Case No.:** No. 16-112-MN
**Date of Testimony:** June 2021 (Deposition)


**Case Name:** In Re Navient Corporation Securities Litigation
**Case No.:** No. 17-cv-08373-RBK-AMD, United States District Court, District of New Jersey
**Date of Testimony:** June 2021 (Deposition)


**Case Name:** Evanston Police Pension Fund v. McKesson Corporation et al
**Case No.:** No. 3:18-cv-06525-CRB, United States District Court, Northern District of California
**Date of Testimony:** July 2021 (Deposition)

3

**Appendix C**

# Documents Relied upon by René M. Stulz

| Document Title | Document Date |
|---|---|
| **Academic Literature, Books and Chapters** | |
| Aswath Damodaran, *Damodaran on Valuation*, 2nd ed. (John Wiley and Sons) | 2006 |
| Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, no. 2, pp. 383–417 | 1970 |
| Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (McGraw-Hill/Irwin) | 2011 |
| **Expert Reports and Documents Cited Therein** | |
| Expert Report of Bjorn I. Steinholt, CFA and exhibits | July 30, 2021 |
| Documents Relied upon by Bjorn I. Steinholt: STEINHOLT_0000001–STEINHOLT_0002736 | |
| **Analyst Reports** | |
| STEINHOLT_0000515–966 | June 4, 2018 to May 6, 2019 |
| STEINHOLT_0000967–1379 | May 2, 2017 to May 24, 2018 |
| STEINHOLT_0001380–1778 | April 19, 2016 to April 11, 2017 |
| STEINHOLT_0001779–2201 | February 19, 2015 to March 14, 2016 |
| STEINHOLT_0002202–2233 | January 9, 2015 to February 2, 2015 |

*These reports are included in the production of documents relied upon by Bjorn I. Steinholt (STEINHOLT_0000001–STEINHOLT_0002736)

| Document Title | Document Date |
|---|---|
| **Legal Documents** | |
| Amended Complaint for Violations of the Federal Securities Laws, *Kenneth Gordon, Individually and on Behalf of All Others Similarly Situated v. Vanda Pharmaceuticals, Inc., et al.* | July 23, 2019 |
| Civil Docket for Case #: 1:17-cv-00464-APM, *Gardner v. Vanda Pharmaceuticals, Inc.* | |
| Complaint Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2), *USA, et al. v. Vanda Pharmaceuticals, Inc.* | March 10, 2017 |
| Statement of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment, *Vanda Pharmaceuticals, Inc., et al. v. Food and Drug Administration, et al.* | July 10, 2019 |
| **Publicly Available Documents and Websites** | |
| Adam Feuerstein, "Vanda's Sleep Disorder Drug Is A Nightmare," *TheStreet* | June 19, 2013 |
| Barnaby J. Feder, "A Their Space for Drug Sales Reps," *New York Times* | June 11, 2007 |
| "Dear Associate Reps," *Cafepharma.com*, http://www.cafepharma.com/boards/threads/dear-associate-reps.627505/ | |

| Document Title | Document Date |
|---|---|
| "FDA Adverse Event Reporting System (FAERS) Public Dashboard," *U.S. Food and Drug Administration*, https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard | |
| Hetlioz website, https://hetlioz.com/ | |
| "Highlights of Prescribing Information: Hetlioz," *U.S. Food and Drug Administration*, https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/214517s000lbl.pdf | |
| "How Glassdoor Became the No. 2 Jobs Site in the US," *Yahoo! Finance*, https://www.yahoo.com/news/glassdoor-became-no-2-jobs-site-us-222246364.html | February 26, 2018 |
| "Rare Disease Database: Smith Magenis Syndrome," *NORD website*, https://rarediseases.org/rare-diseases/smith-magenis-syndrome/ | |
| "The World's Most Influential Scientific Minds," *Thomson Reuters* | December 2015 |
| "Vanda Pharmaceuticals Reviews," *Glassdoor*, https://www.glassdoor.com/Reviews/Vanda-Pharmaceuticals-Reviews-E40474_P4.htm?filter.iso3Language=eng | |
| "Vanda Pharmaceuticals, Inc. Announces Initial Public Offering of 5,750,000 Shares of Common Stock at $10.00 per Share," *BioSpace*, https://www.biospace.com/article/releases/vanda-pharmaceuticals-inc-announces-initial-public-offering-of-5-750-000-shares-of-common-stock-at-10-00-per-share-/ | April 12, 2006 |
| "Warning Letter: Vanda Pharmaceuticals," *U.S. Food and Drug Administration*, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/vanda-pharmaceuticals-576442-10222018 | October 22, 2018 |
| "Vanda: In the Land of the Blind, The One-Eyed Man is King," *Marcus Aurelius Value* | February 11, 2019 |
| "We Are Short $VNDA," Marcus Aurelius on Twitter | February 11, 2019 |

## Data Sources

Refinitiv

Standard & Poor's Capital IQ

## SEC Filings

| | |
|---|---|
| The Medicines Company Form 10-K for the year ending 2018 | February 27, 2019 |
| Retrophin, Inc. Form 10-K for the year ending 2018 | February 26, 2019 |
| Vanda Pharmaceuticals, Inc. Form 8-K | February 6, 2019 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2009 | March 15, 2010 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2010 | March 10, 2011 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2011 | March 9, 2012 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2012 | February 26, 2013 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2013 | February 25, 2014 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2014 | March 13, 2015 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2015 | February 12, 2016 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2016 | February 17, 2017 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2017 | February 15, 2018 |
| Vanda Pharmaceuticals, Inc. Form 10-K for the year ending 2018 | February 19, 2019 |

**Note: In addition to the documents on this list, I considered all documents cited in my report and my exhibits to form my opinions.**