# Exhibit 3

**Page 1**

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - -

Kenneth Gordon, Individually )
and on behalf of all others )
similarly situated, )
) Civil Action
Plaintiff, ) No.
) 1:19-CV-01108-
vs. ) FB-LB
)
Vanda Pharmaceuticals, Inc. )
and Mihael H. )
Polymeropoulos, )
)
Defendants. )

- - - - -

Videotaped Deposition of:
RENÉ M. STULZ, Ph.D.
Appearing Remotely from
Franklin County, Ohio

October 22, 2021
9:30 a.m.

Reporter:  Kristin Wegryn, RMR, CRR
Appearing Remotely from
Cuyahoga County, Ohio

Page 2

REMOTE APPEARANCES:

On behalf of the Plaintiff:
MICHAEL G. CAPECI, ESQ.
BRENT MITCHELL, ESQ.
AVITAL MALINA, ESQ.
Robbins Geller Rudman & Dowd LLP
58 South Service Road
Suite 200
Melville, New York 11747
631.367.7100
mcapeci@rgrdlaw.com
bmitchell@rgrdlaw.com
amalina@rgrdlaw.com

On behalf of the Defendants:
AUDRA J. SOLOWAY, ESQ.
ALLISON PEARL, ESQ.
EMILY M. MILLER, ESQ.
Paul Weiss Rifkind
Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, New York 10019
212.373.3289
asoloway@paulweiss.com
apearl@paulweiss.com
emiller@paulweiss.com

- - - - -

ALSO PRESENT:
Clint Thomas, Concierge
Peter Cooper, Videographer

- - - - -

Page 3

I N D E X

EXAMINATION OF RENÉ M. STULZ, Ph.D.

Page  Line
BY MR. CAPECI....................8    21

AFTERNOON PROCEEDINGS
AFTERNOON SESSION.................141    10

EXHIBITS MARKED
Deposition Exhibit 1, ............11    18
Plaintiff's Notice of Deposition
to René M. Stulz
Deposition Exhibit 2, Reuters ....29    15
Special Report:  For Some
Professors, Disclosure is
Academic article
Deposition Exhibit 3, Rebuttal ...39    17
Report of René M. Stulz, Ph.D.
Deposition Exhibit 4, Marcus .....109    18
Aurelius article - Vanda:  In
the Land of the Blind, The
One-Eyed Man is King,
Bates-labeled Stulz_00000137 -
154
Deposition Exhibit 5, New York ...114    16
Times article - A Their Space
for Drug Sales Reps,
Bates-labeled Stulz_00003037 -
3039
Deposition Exhibit 6, Cafepharma .120    8
posts, Bates-labeled
Stulz_00000001 - 18
Deposition Exhibit 7, Glassdoor ..134    8
Help Center printout
Deposition Exhibit 8, Warning ....142    7
letter from Vanda
Pharmaceuticals

Page 4

Deposition Exhibit 9, Expert .....218    8
Report of Bjorn I. Steinholt,
CFA
Deposition Exhibit 10, Amended ...229    13
Complaint for Violations of the
Federal Securities Laws,
Bates-labeled Stulz_00000255 -
352
Deposition Exhibit 11, First .....231    16
Amended Complaint

        OBJECTIONS
MS. SOLOWAY......................12    18
MS. SOLOWAY......................14    24
MS. SOLOWAY......................18    3
MS. SOLOWAY......................30    15
MS. SOLOWAY......................30    18
MS. SOLOWAY......................31    25
MS. SOLOWAY......................32    21
MS. SOLOWAY......................33    7
MS. SOLOWAY......................34    9
MS. SOLOWAY......................34    22
MS. SOLOWAY......................36    10
MS. SOLOWAY......................50    13
MS. SOLOWAY......................51    25
MS. SOLOWAY......................52    24
MS. SOLOWAY......................53    22
MS. SOLOWAY......................54    19
MS. SOLOWAY......................56    16
MS. SOLOWAY......................57    5
MS. SOLOWAY......................58    8
MS. SOLOWAY......................61    24
MS. SOLOWAY......................63    8
MS. SOLOWAY......................63    19
MS. SOLOWAY......................64    9
MS. SOLOWAY......................67    1
MS. SOLOWAY......................67    3
MS. SOLOWAY......................67    20
MS. SOLOWAY......................69    1
MS. SOLOWAY......................80    21
MS. SOLOWAY......................86    1
MS. SOLOWAY......................89    13
MS. SOLOWAY......................89    18
MS. SOLOWAY......................90    18
MS. SOLOWAY......................97    17
MS. SOLOWAY......................105    10
MS. SOLOWAY......................106    11

Page 5

MS. SOLOWAY......................108    14
MS. SOLOWAY......................111    1
MS. SOLOWAY......................112    3
MS. SOLOWAY......................117    23
MS. SOLOWAY......................119    11
MS. SOLOWAY......................123    1
MS. SOLOWAY......................123    23
MS. SOLOWAY......................123    25
MS. SOLOWAY......................125    7
MS. SOLOWAY......................130    1
MS. SOLOWAY......................131    4
MS. SOLOWAY......................132    6
MS. SOLOWAY......................132    9
MS. SOLOWAY......................133    1
MS. SOLOWAY......................136    5
MS. SOLOWAY......................136    15
MS. SOLOWAY......................139    7
MS. SOLOWAY......................144    22
MS. SOLOWAY......................145    11
MS. SOLOWAY......................154    15
MS. SOLOWAY......................155    12
MS. SOLOWAY......................158    14
MS. SOLOWAY......................159    6
MS. SOLOWAY......................159    13
MS. SOLOWAY......................161    10
MS. SOLOWAY......................161    25
MS. SOLOWAY......................163    2
MS. SOLOWAY......................163    17
MS. SOLOWAY......................164    22
MS. SOLOWAY......................165    17
MS. SOLOWAY......................166    11
MS. SOLOWAY......................167    10
MS. SOLOWAY......................167    18
MS. SOLOWAY......................168    18
MS. SOLOWAY......................170    13
MS. SOLOWAY......................172    16
MS. SOLOWAY......................172    25
MS. SOLOWAY......................177    11
MS. SOLOWAY......................178    1
MS. SOLOWAY......................179    5
MS. SOLOWAY......................180    8
MS. SOLOWAY......................181    13
MS. SOLOWAY......................183    20
MS. SOLOWAY......................186    6
MS. SOLOWAY......................187    11
MS. SOLOWAY......................190    13
MS. SOLOWAY......................196    19
MS. SOLOWAY......................197    7
MS. SOLOWAY......................197    21

2 (Pages 2 - 5)

Page 6

MS. SOLOWAY.......................198  20
MS. SOLOWAY.......................199  5
MS. SOLOWAY.......................199  17
MS. SOLOWAY.......................201  11
MS. SOLOWAY.......................202  2
MS. SOLOWAY.......................203  20
MS. SOLOWAY.......................204  1
MS. SOLOWAY.......................207  21
MS. SOLOWAY.......................209  17
MS. SOLOWAY.......................210  9
MS. SOLOWAY.......................210  11
MS. SOLOWAY.......................212  25
MS. SOLOWAY.......................214  11
MS. SOLOWAY.......................215  9
MS. SOLOWAY.......................215  23
MS. SOLOWAY.......................217  7
MS. SOLOWAY.......................219  19
MS. SOLOWAY.......................223  7
MS. SOLOWAY.......................225  1
MS. SOLOWAY.......................225  6
MS. SOLOWAY.......................225  12
MS. SOLOWAY.......................237  18
MS. SOLOWAY.......................238  10
MS. SOLOWAY.......................238  14
MS. SOLOWAY.......................239  14
MS. SOLOWAY.......................240  9
MS. SOLOWAY.......................240  18
MS. SOLOWAY.......................241  18
MS. SOLOWAY.......................241  21
MS. SOLOWAY.......................242  8
MS. SOLOWAY.......................242  14
MS. SOLOWAY.......................242  24
MS. SOLOWAY.......................244  10
MS. SOLOWAY.......................244  21
MS. SOLOWAY.......................246  13
MS. SOLOWAY.......................247  19
MS. SOLOWAY.......................248  2
MS. SOLOWAY.......................248  5

- - - - -

Page 7

REPORTING REMOTELY FROM CUYAHOGA COUNTY, OHIO

Friday, October 22, 2021, 9:30 a.m.

- - - - -

VIDEOGRAPHER: Good morning. We are going on the record at approximately 9:30 a.m. on Friday, October 22nd, 2021. The audio and video recording will continue to take place unless all parties agree to go off the record. This is media unit one of the video-recorded deposition of René Stulz taken in the matter of Kenneth Gordon, et al., versus Vanda Pharmaceuticals, Inc., et al., filed in the United States District Court for the Eastern District of New York, Civil Action Number 1:19-CV-01108-FB-LB.

This deposition is being held via remote video conference. My name is Peter Cooper from the firm of Veritext and I'm the videographer. The court reporter is Kristin Wegryn from the firm Veritext.

All counsel consent to this remote video arrangement and waive any objections to this manner of reporting. If there are any objections to the court reporter swearing in the witness remotely and this remote video arrangement, please state them now.

Page 8

Not hearing any objections, counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. CAPECI: Good morning. My name is Michael Capeci. I'm with the firm of Robbins Geller Rudman & Dowd. I represent the plaintiff in this action, Teamsters Local Union Number 727 Pension Fund.

MS. SOLOWAY: Good morning. Audra Soloway from Paul Weiss Rifkind Wharton & Garrison, LLP. I represent the defendants in this action, as well as the expert witness being deposed today.

RENÉ M. STULZ, Ph.D., of lawful age, called for examination, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

COURT REPORTER: Thank you. You may proceed.

EXAMINATION OF RENÉ M. STULZ, Ph.D. BY MR. CAPECI:

Q.   Okay. Good morning. Sir, would you please state your full name and address for the record.

A.   My full name is René, R-E-N-E with an

Page 9

accent on the E, on the second E, M. Stulz, S-T-U-L-Z.

Q.   And your address, please.

A.   The address is 3419 River -- and I separate word -- Seine, S-E-I-N-E, Street, Columbus, Ohio 43221.

Q.   Thank you.

Is it okay if I refer to you as Dr. Stulz?

A.   That's, that's fine. Usually I use professor.

Q.   Okay. So Professor Stulz, can you please confirm that there's no intent by you or your counsel to communicate via Instant Messenger, text message, or any other electronic means while you're on the record today?

A.   I do.

Q.   Thank you.

Can you please confirm that the package of documents that we mailed to you has remained in its original shipping material?

A.   You can look at it.

Q.   Okay. All right. So thank you for that.

It's one of the many unique

3 (Pages 6 - 9)

Page 10

circumstances that we're all dealing with here, is that we're providing you with these exhibits in that manner. We may not use all the exhibits. You'll hear me say that some of them have some printing problems and stuff, so please just bear with us as we go throughout the day here. We did do our best to get you everything that you were going to need for today.

Sir, you understand that you've been placed under oath here and that your testimony is the same as if it were before a judge and jury?

A.   Yes, I do.

Q.   And you understand that just because we're doing this deposition by video, that that doesn't change the force of the oath?

A.   I do.

Q.   Okay. And, Dr. Stulz, I presume you're familiar with -- I'm sorry.

Professor Stulz, I assume you're familiar with the rules of depositions?

A.   Yes.

Q.   Do you have any questions about those rules before we get started?

A.   No, I do not.

Q.   Great.

Page 11

MR. CAPECI:  Brent, could you please mark the notice of deposition.

MS. SOLOWAY:  Mike, do you want -- I also have the unopened box. Do you want the two of us to open the boxes?

MR. CAPECI:  Yes, if you could. I'll preview that by saying the notice of deposition is not in there.

MS. SOLOWAY:  Okay.

MR. CAPECI:  So -- but I have a feeling it's not going to be -- I'm hoping it's not going to be controversial.

MS. SOLOWAY:  All right. Well, while you're talking, I'll open the box.

MR. MITCHELL:  I've marked the first exhibit. It should be marked on Exhibit Share.

MR. CAPECI:  Great. Thank you, Brent.

(Deposition Exhibit 1, Plaintiff's Notice of Deposition to René M. Stulz, was marked for purposes of identification.)

Q.   Dr. Stulz, just let me know when you're ready.

A.   I'm ready.

Q.   Okay. Dr. -- Professor Stulz, have you

Page 12

seen this notice of deposition before?

A.   I'm not sure that I've seen it. I certainly have been told about it.

Q.   Okay. And, Professor Stulz, you understand that you're testifying today in response to this notice?

A.   That's correct.

Q.   Thank you.

I just want to go over a couple of terms that I'm going to use throughout this deposition, and I just want to make sure that we're both comfortable that when I use those terms, we all understand what I'm saying.

The first term is the class period of November 4, 2015, to February 11, 2019. Is that your understanding of the class period?

A.   That's my --

MS. SOLOWAY:  Objection to form.

A.   That's my understanding of the class period, the putative class period.

Q.   Thank you.

COURT REPORTER:  I'm sorry. Say that again.

Q.   When I refer to --

COURT REPORTER:  The what class period?

Page 13

THE WITNESS:  Putative.

COURT REPORTER:  Putative. Thank you.

Q.   When I refer to defendants, I'm referring to Vanda Pharmaceuticals, Inc., and their -- its CEO, Dr. Polymeropoulos.

Is that your understanding, sir?

A.   It is my understanding.

Q.   When I refer to the Aurelius report, that's the report that was issued during the trading day on February 11th, 2019.

Are we in agreement on that?

A.   When you refer to the Aurelius report, I will know what you're talking about. I may refer to it as Aurelius Value report, but I understand what you're saying.

Q.   Okay. Thank you, sir.

F -- the FDA litigation, that being the lawsuit that Vanda filed against the FDA, if I use that term, "FDA litigation," do you understand what that means?

A.   I understand what it means.

Q.   Okay. And the term "off-label marketing," what's your understanding of the term "off-label marketing"?

A.   My understanding of off-label marketing

4 (Pages 10 - 13)

Page 14

is an attempt to market a drug for a use that is not prescribed on the label of the drug.

Q. Okay. Thank you. I think that's a definition that we can live with.

Professor Stulz, could you please estimate the previous number of depositions that you've had in -- as a -- serving as an expert in securities fraud class action lawsuits?

A. So I'm not sure about securities fraud. I mean, I've had more than 50 depositions, but that includes other depositions in other matters besides securities litigation.

Q. Could you -- do you feel like you could estimate for me? Have you served as a class certification defense expert more or less than ten times?

A. More than ten times, definitely.

Q. Thank you.

Professor Stulz, did you testify truthfully in your previous depositions?

A. Yes, I did.

Q. And do you wish to change any testimony you've given in any of your previous depositions?

MS. SOLOWAY: Objection to form.

A. No, I do not.

Page 15

Q. Thank you.

Professor Stulz, what did you do to prepare for today's deposition?

A. I re-read my report a few times. I re-read -- re-read values documents that I had, including the complaint, the report of Mr. Steinholt on some of the materials. I also met with Cornerstone and met with attorneys.

Q. Which attorneys did you meet with?

A. With the attorneys who are present here from the defense.

Q. And can you estimate how many hours you prepared in total?

A. I don't know.

Q. Are you able to estimate how many hours you prepared with counsel for the defendants?

A. So I think meetings with counsel were less than four hours in total.

Q. When you met with Vanda's attorneys, was anyone else present?

A. Some staff from Cornerstone.

Q. And who from Cornerstone was present?

A. Iris Jiang, Frank Schneider, Marcelo Han.

Q. Thank you.

Page 16

Q. Do you have any -- was there any documents or information provided to you by Vanda or its attorneys or Cornerstone that you considered in forming your opinions that you offered in this case?

A. I have a list of materials that I rely on in my report. Some of those materials were provided by attorneys and some were provided by Cornerstone. I believe that some I may have gotten myself.

Q. Other than those three sources, did anyone else contribute to the documents you relied upon?

A. I don't believe so.

Q. Have you had any communications with anyone other than Vanda or its attorneys or Cornerstone about the contents of your report?

A. No.

Q. Professor Stulz, when were you retained to serve as the rebuttal expert in this matter?

A. I think the first contact was sometime in July. I think I may have been formally retained early in August.

Q. Okay. And who has retained you in this lawsuit?

Page 17

A. The attorneys for Vanda.

Q. And have they retained you in your personal capacity or do they retain Cornerstone? Are you able to explain a little how that works?

A. They retain me in my personal capacity.

Q. So how does -- how does Cornerstone relate to all of this, then?

A. Cornerstone supports me in the work that I'm doing in this litigation.

Q. Does Cornerstone have a retention agreement with Vanda's counsel?

A. I don't know what they have.

Q. All right. Is it your view that Cornerstone's participation in any communications with you and Vanda's counsel -- well, strike that.

When you met with Vanda's attorneys, was anyone from Cornerstone present?

A. I just answered that question.

Q. Okay. So the people you prepared with from Cornerstone were also present at that time?

A. That's correct.

Q. Is it your view, Professor Stulz, that Cornerstone's participation during that preparation session would not have waived any

5 (Pages 14 - 17)

Page 18

privilege that might apply if they don't have an agreement with Vanda's counsel?

MS. SOLOWAY: Objection to form. I think you're asking him to draw a legal conclusion here. Do you want to talk to me about this off the record, or...

MR. CAPECI: Yeah, sure. I mean, I'm assuming there is an agreement, Audra, you know. But what --

MS. SOLOWAY: I'm happy to give you information right now or if you prefer without Professor Stulz on the record. Whatever you prefer, but...

MR. CAPECI: I'm happy to take your statement on the record, Audra.

MS. SOLOWAY: Okay. So we -- the client Vanda and Dr. Polymeropoulos have engaged Cornerstone. They're obviously an expert consulting firm and they have supported Professor Stulz in this matter.

MR. CAPECI: Okay. Thank you. Thank you. I appreciate the clarification.

MS. SOLOWAY: No problem.

MR. CAPECI: I will move on.

BY MR. CAPECI:

Page 19

Q. Professor Stulz --

MR. CAPECI: Well, you never know, right?

Q. Professor Stulz, could you tell us where this lawsuit's pending?

A. I believe in New York.

Q. Okay. And are you able to tell me who the judge is?

A. I hope I get it correctly. Mister -- Judge Block. I'm not sure about the spelling.

Q. Yes. It's B-L-O-C-K.

Okay, Professor Stulz. Did you draft the report that you submitted on September 17th, 2021, entirely on your own?

A. It is my report. I received help from Cornerstone in the drafting.

Q. Anyone from Cornerstone other than the three individuals you've already identified?

A. Those individual ones are the ones that I communicated with. Obviously, other people were involved in the project.

Q. What about Amir Rozen? Was he involved from Cornerstone?

A. You asked me that question once before. I haven't seen Amir for many years.

Page 20

Q. What about a Kristin Feitzinger?

A. You asked me that question, as well. She was not involved in this project, I mean, that I know of. I mean...

Q. Professor Stulz, I'm honored that you remember me. I know you take a lot of depositions, so I must -- I must have stood out the last time.

Can you estimate, please, how much time you spent on this engagement?

A. I'd say it's a rough estimate. I would think between 40 and 60 hours.

Q. And would you say, in your experience, that's more or less than your typical engagement as a defense class certification expert?

A. I don't know what the average is. I would suspect that this is at the lower end of the time spent because it's, it's a short report.

Q. Okay. And when -- and when you have -- have you submitted, so far, any bills for this engagement?

A. I believe so.

Q. And when you submit your bills, who do you submit those to?

A. At this point, Cornerstone collects the

Page 21

bills and then sends them on to the clients.

Q. And your hourly rate of $1,100, are you able to explain how you set that rate?

A. It was $1,000 for a number of years and I thought it was time to reflect inflation that took place before I set the $1,000 rate.

Q. Okay. Are you able to estimate how many hours Cornerstone has spent assisting you on this engagement?

A. No.

Q. Why is that?

A. I have no idea.

Q. Does Corner- -- do you receive a portion of Cornerstone's billing on this engagement as additional compensation above your hourly rate?

A. I describe this in my report as part of the discussion of compensation. I receive a portion of the billings by nonofficers. That's correct.

Q. At some point, are you provided with a summary document of how many hours that entails? I mean, are you able to explain just a little bit how that operates?

A. I receive payments that correspond to all my engagement. It's just one payment. I

6 (Pages 18 - 21)

Page 22

don't look at the details.

Q. So it doesn't differentiate between other engagements that you may have with Cornerstone that are not related to this case; is that correct?

A. That's correct.

Q. Professor Stulz, do you currently own any Vanda common stock?

A. Except for one infrequently traded bank stock that came from directorship, I don't own any individual stocks. I own stocks through mutual funds on -- it's possible that it's in one of the mutual funds that I own, but I have no idea.

Q. Okay. Have you -- have you ever owned any individual stocks?

A. Not, not for a long time.
I have to add one thing, which is that we have somebody managing a portion of our assets and I have no discretion on that and I don't look at what he does.

Q. So that's an independent financial adviser or consultant?

A. Adviser, yes. This question was the -- how to invest.

Page 23

Q. Can you estimate for me the last time you personally owned an individual common stock, roughly? 1990? 2000?

A. Besides the one that I -- besides the ones that I mentioned on the bank stock, I would think it would be at least ten years back. I mean, I rarely held individual stocks.

Q. Okay. And have you ever -- well, you say you have never owned any individual stocks. What about shorting individual stocks?

A. I'm --

MS. SOLOWAY: I think you misheard him. Sorry.

A. Sorry. No, I have owned individual stocks. I haven't owned individual stocks besides the bank stocks that I mentioned for at least ten years, I think. I might be wrong by a couple of years, but...

Q. Just that one stock, correct?

A. That's correct.

Q. Have you ever shorted any common stock in the previous ten years?

A. No, I've never shorted a stock.

Q. You never shorted a stock ever?

A. That's correct.

Page 24

Q. Professor Stulz, amongst your many, many activities, you serve as a consultant to corporations; is that right?

A. At times, yes.

Q. And what about for Vanda? Have you ever served as a consultant for Vanda?

A. No.

Q. Have you ever served for a consultant to any pharmaceutical company?

A. Not outside of the context of litigation, as far as I can remember.

Q. And Dr. Polymeropoulos, do you have any previous relationship with him prior to your engagement in this litigation?

A. I have not met him. I've never talked to him.

Q. Professor Stulz, can you please explain to us what you are an expert in.

A. In financial economics, as I explain in my report.

Q. Are you an expert in anything else?

A. My expertise is in financial economics and that's the expertise I'm here for.

Q. And how -- and what qualifies you to be an expert in financial economics?

Page 25

A. Well, I am one of the most highly cited financial economists in the world. I have been president of the American Finance Association, which is a top owner in the US for financial economists. I have been editor of the top journal in my field. I don't know what else you want.

Q. Who certified you as one of the most highly cited financial economists in the world? Who quantifies that?

A. Well, so you can see by your studies that are done about citations, some things that academics engage in.

COURT REPORTER: I'm sorry. Some things...

THE WITNESS: Some things that academics engage in.
So if you look at those studies, you will see that I am very highly ranked.

Q. Is one of those the Thomson Reuters cite that you put in your Appendix A that we referred to?

A. Thompson Reuters doesn't exactly look at citations. No. Their ranking is not completely transparent. There are studies that look at

7 (Pages 22 - 25)

Page 26

Google sites. There are studies that look at sites in the social sciences index. When -- if you look at studies that are using those, you will see that I am highly ranked.

Q. Okay. Are you able to estimate the percentage of your income this year that you've derived from serving as an expert in -- as a class certification expert for -- in defense class certification expert?

A. No, I don't know. I don't keep track of this journal here.

COURT REPORTER: I'm sorry. I don't keep track of...

THE WITNESS: Of this journal year. Or I actually never have kept track of that -- of that.

Q. Do you think it's more or less than your compensation as an academic?

A. I know that -- so this is income from assignments that concern class certification? I mean, certainly, on average, it's less, probably substantially less than my academic salary.

Q. I'm sorry.

A. I mean -- I'm sorry. My academic --

Q. [Overtalking.]

Page 27

A. -- salary, I already made my 12 months' compensation from Ohio State.

Q. Has this year -- have you been busier as a class certification defense expert this year versus previous years?

A. I'm not sure that I've been more busy in class certification. I might be less. I don't know.

Q. Okay. Professor Stulz, have you ever been retained to serve as an expert for a plaintiff in the class certification context?

A. I have not. I have been called only once and I was not able to do it because of the commitments at the time.

Q. That was to serve as a market efficiency expert in a class certification motion?

A. No. It was on merit issues.

Q. Okay. So fair to say that all of your previous engagements as a class certification expert has been for the defense?

A. I have been retained by the defense, yes.

Q. Thank you.

Professor Stulz, one of the things that you talk about in your report of your many

Page 28

credentials is the fact that you've testified before Congress.

Q. Do you recall doing that?

A. Yeah. We had an extensive discussion of this in -- [unintelligible]

COURT REPORTER: Of this what?

Q. Yes, we did. Yes, we did, Professor Stulz. For better or for worse, we can't transport what happened there to here, so if you'll bear with me, we'll revisit some of these topics.

So you do recall testifying before Congress, Professor Stulz?

A. Yes, I do.

Q. Okay.

A. It's a long time ago, though.

Q. Right.

That was in 2009, correct?

A. I think that there was one time -- in 2009 I think is the second time. It might have been later, but I don't remember exactly.

Q. And were you an independent expert at that hearing?

A. I'm not quite sure what you mean by "independent expert." I was asked to testify and

Page 29

I went and testified.

Q. Did you -- as part of that testimony, did you present yourself as an independent expert?

A. I mean, I wasn't there to put forward the agenda of any particular group. I was giving my expertise as a financial economist.

Q. Did you disclose all relevant conflicts you may have had in connection with your testimony at this hearing?

A. I did. We are going to have again this discussion?

MR. CAPECI: Okay. Brent, if you could mark the Reuters article as an exhibit, please.

(Deposition Exhibit 2, Reuters Special Report: For Some Professors, Disclosure is Academic article, was marked for purposes of identification.)

Q. This would be Exhibit 4 in the package that you and Audra received. I'm going to apologize, the printing on it, we realized after sending it out, is not -- is not the best. So I -- you know, the correct version's on the Exhibit Share.

MR. MITCHELL: And that should have been

8 (Pages 26 - 29)

Page 30

introduced. I marked it.

MR. CAPECI: Great.

Q. So, for the record, Exhibit 2 is a Reuters article dated December 20, 2010. The title is Special Report: For Some Professors, Disclosure is Academic.

Professor Stulz, are you familiar with this Reuters article?

A. I am, and it is wrong.

Q. Okay. Well, let's, let's get to that.

You understand, sir, that this article is criticizing you for failing to, in its opinion, disclose some professional connections that you had in connection with your testimony?

MS. SOLOWAY: Objection to form.

Q. Is that a fair summary of what the article states?

MS. SOLOWAY: Objection to form.

A. The view of the journalist is that I had not disclosed two relationships. This is not correct for two reasons: The first reason is I had disclosed exactly what I was asked to disclose on the forms that were sent to me.

The second reason is that those relationships were on my resume that they asked

Page 31

me to give them, as well. So that information was available. And it obviously was available to the journalist since she went to my home page and saw those relationships.

Q. Is Reuters -- is Reuters a reliable source of information, Professor Stulz?

A. Well, as you know, journalists make mistakes.

Q. Have you ever spoken to Emily Flitter or Kristina Cooke or Pedro da Costa, the authors of this article?

A. Not that I remember. I may have. It's a really long time ago.

Q. After this article came out, did you do anything to correct your belief that the information in here was false, as you state?

A. I did not. I didn't see any point of doing so. I mean, anybody could go to my home page and see everything is transparent. Everything was transparent to the committee.

Q. So the fact that journalists might make mistakes, does that mean that when people read Reuters, they shouldn't trust the information in the article they're reading?

MS. SOLOWAY: Objection to form.

Page 32

A. I'm not saying that. I'm saying, in this case, an obvious mistake was made. The forms that I was asked -- where I was asked to disclose relationships was very precise. It asked about institutions or parties that would have an interest in the legislation, and I disclosed various parties that had an interest in the legislation that I was associated with.

Q. Professor Stulz, if I could direct you a little earlier in the article, I hope it's on the one you have. It states: Reuters review of 96 testimonies given by 82 academics to the Senate Banking Committee and the House Financial Services Committee between late 2008 and early 2010, as well as, to make, you know, et cetera, et cetera.

Do you know why this article is focused on you as opposed -- you know, why did they -- why did they -- do you know why they chose you out of the 82 academics that they identified?

MS. SOLOWAY: Objection to form.

A. I think because the information was so easily accessible on my website, they wanted a picture and it's easy to get a picture on my website. I mean, I have no other explanations.

Page 33

May be another one, but I don't have it.

Q. So, in your view, what should Judge Block think about this, that we should just set this to the side? It's not a reliable piece of information even though it's from Reuters because it's false, in your view?

MS. SOLOWAY: Objection to form.

COURT REPORTER: I don't know why there's an echo now.

CONCIERGE: Yes. Everyone, there is an echo going on. Michael, I think it's actually --

COURT REPORTER: Can we go off the record.

CONCIERGE: Yeah. Let's go off the record.

Michael, I think the echo is coming from --

VIDEOGRAPHER: Sorry. Stand by. The time is approximately 10:07 a.m. and we are going off the record.

(A recess was taken.)

VIDEOGRAPHER: The time is approximately 10:10 a.m. and we are back on the record.

BY MR. CAPECI:

Q. All right. Professor Stulz, my

9 (Pages 30 - 33)

Page 34

apologies for the technical difficulties there.

I will restate the question that was pending at the time the difficulties manifested.

Professor Stulz, what should Judge Block think about this Reuters article? Should we tell him it's not a reliable piece of information because even though it was issued by Reuters, the reporters in this instance got it wrong?

MS. SOLOWAY: Objection to form.

A.   I think the first thing I would tell to Judge Block is that I would be very happy to answer any questions he has about this.

The second thing I would say is that I was completely transparent and did exactly what I was asked to do.

And the third thing I would say is that this question is one that doesn't usually come up in depositions, but I'm perfectly happy to answer any questions about it.

Q.   Professor Stulz, are special reports from Reuters reliable pieces of information?

MS. SOLOWAY: Objection.

A.   Well, I'm an academic. When I look at something, I think about whether it's right. I -- in this case, it so happens that I know that

Page 35

it's wrong.

You said earlier that somehow I was a centerpiece of that. I would point out that it's -- the article starts with a long discussion of Professor Hal Scott from the Harvard Law School instead of starting with me. I would point out that the costs that I pay here is that everything about me is fully transparent, so that made it easier -- easy on the reporter. I think, at that time, some reporters had an agenda on these issues and they fit in that agenda.

COURT REPORTER: I'm sorry. On what that agenda.

THE WITNESS: "Fit in that agenda."

But I'm perfectly happy to talk with Judge Block at any time about this.

Q.   Okay. So, Professor Stulz, in your view, even though this special report came through Reuters, one has to look at the content and the quality of the information in the report to assess its reliability, correct?

A.   Well, in this case, I know for a fact that there is a mistake.

Q.   And that would make this report unreliable; isn't that right?

Page 36

A.   It certainly is unreliable as far as I am concerned.

Q.   Thank you.

A.   As far as -- I'm sorry. As far as it discusses me.

Q.   We can set that to the side.

So today, and with your report, are you presenting yourself as an independent expert to Judge Block?

MS. SOLOWAY: Objection to form.

A.   I was retained to give my expertise as a financial economist. That's what I'm doing. So I'm using my skill, training, knowledge as a financial economist to answer the questions that I was asked, and I am doing that in a professional manner, which means independent of other considerations.

Q.   Independent of whether or not the defendants are ultimately successful in imposing this motion; is that right?

A.   I don't understand the question. Can you phrase it maybe differently? I just don't understand it.

Q.   In serving as the financial economics expert for the defense, your opinions are not --

Page 37

your opinions are not contingent on the ultimate outcome of plaintiff's class certification motion, correct?

A.   I'm sorry. I still don't understand.

My opinions are in my report and, at this point, I have no idea what will happen to the motion.

Q.   Is it your practice, Professor Stulz, in other cases where you served as the class certification expert for the defense, to review any opinion that the Court issues in a case where you provide an opinion?

A.   It depends.

Q.   What does it depend on?

A.   Sometimes the opinion is summarized to me, sometimes I want to read it. It depends on what the bases for the opinion are.

Q.   What about Emergent BioSolutions back in 2018? Have you ever reviewed that opinion that was issued by the District of Maryland judge?

A.   My recollection is that I looked at parts of it. I must say that, at this point, I don't remember it.

Q.   Do you think it's important to review the decisions issued in the cases where you've

10 (Pages 34 - 37)

Page 38

served as a class certification expert for the defense?

A. It is important for me to pay careful attentions -- attention to the issues that concern what I was opining on. If a decision deals with legal issues that are unrelated to my report, then I'm not in a position to assess what is being said because I'm not a lawyer. So I will pay careful attention whenever the issues involve what I was asked to opine on.

Q. And why do you do that? Why do you pay careful attention to the issues that you were asked to opine on?

A. I mean, for many reasons. I want to see how it was assessed by the Court on what role it played in the decision on -- now, was -- I wasn't clear in my report, it could be -- I mean, could do things differently in terms of how I explain my opinions.

Q. Do you care what judges think of the expert testimony that you provide in their cases?

A. As I just said, my practice is to look at it carefully.

Q. How do you feel when judges decline to follow the expertise that you've offered them?

Page 39

A. Well, judges may fail to follow my opinions for many, many different reasons, some having nothing to do with the content of the opinions, some having -- I mean, a legal basis. All I can do is give my best answer to the questions that are asked of me using my professional training. I'm not a lawyer.

Q. Okay.

MR. CAPECI: All right. I think at this time, Brent, if you could, please, mark Professor Stulz's report as Exhibit Number 3. And that would be the September 17th, 2021, rebuttal report.

And for Audra and Professor Stulz, that is number 21 in your set. And this one has no printing problems, I hope.

(Deposition Exhibit 3, Rebuttal Report of René M. Stulz, Ph.D., was marked for purposes of identification.)

MR. MITCHELL: That is marked and uploaded.

MR. CAPECI: Thank you.

Q. Counsel and Professor Stulz, when you're ready, let me know.

A. Did you say 3? Did you say 3?

Page 40

Q. Yes. This would be Exhibit 3, Professor Stulz.

No. I'm sorry. I know this is going to get confusing. I apologize. We should have listed them as folders, not exhibits.

A. Okay.

Q. It's being marked as Exhibit 3 for purposes of this deposition. It's in folder 21. It would be the last folder that you have.

A. Yes. I'm good.

Q. Okay. I really do apologize. I'm sorry. Usually we have a more fluid presentation when these things -- when these things are happening in person. So bear with us.

Professor Stulz, does this appear to be the report you submitted in this matter?

A. Yes, it does.

Q. Professor Stulz, could you please turn to page 46.

A. Yes.

Q. Is that your signature, sir?

A. Yes.

Q. And by signing your report, what are you intending to convey to Judge Block?

A. That it is my report.

Page 41

Q. And that you stand by its contents?

A. That's correct.

Q. Does this report contain all the opinions that you intend to provide in connection with my client's class certification motion in this case?

A. It does as of now.

Q. Okay. Is there anything that you wish to add to this report today?

A. That's three typos that I saw as I went through it. The first one is on page 25 in line 2.

Q. Okay.

A. Instead of "predictions," it says "predications."

The second is on page 22. I mistyped part of the complaint. I have "materially false, missing" when it should be "materially false, misleading."

Q. Okay. That's page 35, correct, sir?

A. Correct.

The last one is in paragraph 28. It shouldn't have in the last sentence "being treated with Hetlioz."

Q. Okay. Could you clarify that? So how

11 (Pages 38 - 41)

Page 42

should it read?

A. It should -- it should read everything else the same except for those three words, or four words.

Q. Additionally, the Oppenheimer report stated that only 13 percent of patients have been diagnosed with, et cetera, et cetera?

A. That's correct.

Q. Okay. Other than those three edits, anything else that you want to amend or change at this time?

A. That's all I'm aware of at this time.

Q. Has the Court ever declined to follow the opinions you've offered in a class certification -- in serving as a class certification expert?

A. Well, the cases that I'm -- I've been involved with have one of three outcomes. One outcome is that there is a settlement before the Court decides; the second outcome is the Court grants class certification; and the third outcome is that it doesn't.

Q. In any of your previous experiences as an expert on class certification for the defense, has the Court granted class certification?

Page 43

A. Yes.

Q. Do you discuss those cases in your report in this case?

A. I list in my reports the cases that I was involved where I testified over the last four years.

Q. Regardless of outcome, correct?

A. That's correct.

MR. CAPECI: Okay. Audra, I'm about to, you know, head into a fairly substantive topic. I know we've been going for about an hour. Do you want to take a break now or do you want to forge ahead here?

I'm happy to go however you'd like -- you know, however you'd like to proceed. I leave it to you and the witness. I know usually about an hour is when we typically take breaks.

MS. SOLOWAY: Yeah.

René, would you like maybe a five-minute bathroom break and then we'll come back?

THE WITNESS: That would be good.

MS. SOLOWAY: Okay.

VIDEOGRAPHER: The time is approximately 10:25 a.m. This is the end of media number one and we're going off the record.

Page 44

(A recess was taken.)

VIDEOGRAPHER: The time is approximately 10:33 a.m. This is the beginning of media number two and we are on the record.

BY MR. CAPECI:

Q. Welcome back, Professor Stulz. Do you understand that you're still under oath?

A. Yes, I do.

Q. Did you speak with anyone about your testimony during our brief break?

A. No.

Q. Wonderful.

Professor Stulz, what is your understanding of the term "market efficiency"?

A. My understanding of market efficiency is one that one can find in the study by Professor Fama. It is the proposition that prices of securities reflects the information that is available about those securities so quickly. There usually is a distinction between various types of efficiency.

My understanding is that, in litigations, a relevant concept of efficiency is a semi-strong form of efficiency. With that semi-strong form, public information is

Page 45

incorporated in stock prices and the securities of stock within very rapidly and fully if the market is semi-strong form efficient.

I believe that Mr. Steinholt also has this definition of efficiency. In this case, he says that the information is incorporated within one day, typically.

COURT REPORTER: One day?

THE WITNESS: One day, yes.

Q. Thank you.

All right. Professor Stulz, do you have an understanding of what the Cammer factors are?

A. Yes, I do.

Q. And do you have an understanding of what the Krogman factors are?

A. Yes, I do.

Q. Are you offering opinions regarding market efficiency in this case?

A. The only opinion I have about market efficiency in this case is that if the Aurelius Value report and a stock price impact because of disclosures related to the allegations, then that would be inconsistent with market efficiency because these disclosures had already been made before.

12 (Pages 42 - 45)

Page 46

In an efficient market, repeating information should not affect the price of securities.

COURT REPORTER: "Inconsistent," did you say?

Q. Okay.

THE WITNESS: "Inconsistent with market efficiencies," that's correct.

COURT REPORTER: Thank you.

Q. Okay. We'll get to your -- to your -- the price impact portion of your report in a moment.

I just want to confirm, Professor Stulz, that in the first instance, you're not challenging -- your report's not challenging Mr. Steinholt's Cammer factor findings, correct?

A. As I have said, I described for you the only opinion I have concerning market efficiency in my report. I have no other opinion about market efficiency.

Q. Thank you for that.

What's your understanding of the term "price impact," Professor Stulz?

A. I am not an attorney. I have no legal expertise, so the definition I'm giving is one

Page 47

that a financial economist would give. So I'm only speaking from the perspective of my profession. But price impact would mean that disclosure of a piece of information moves the price in a way that can be observed.

Q. Have you ever published any articles on the topic of price impact?

A. If by that you mean articles where I assess whether disclosure of a type of information affects stock prices, I suspect I have dozens of articles that do that.

Q. For a single stock or for a basket of stocks?

A. I would think that most of those articles do that mostly for averages across stocks to be able to better capture the price impact of a specific type of announcement. I have papers where I discuss individual stocks, but I would say most of them do not focus on individual stocks.

Q. Professor Stulz, are you an expert on how to analyze the price impact of misrepresentations in securities fraud class action lawsuits?

A. As I have already said and will keep

Page 48

repeating, I'm not an attorney. I have no legal expertise, so I would not have any expertise concerning such analysis from a legal standpoint.

I'm a financial economist. As a financial economist, I have considerable experience in analyzing the price impact of various disclosures and announcements and so, in that sense, yes, I do have experience.

Q. Your considerable experience, is that in the price impact of various disclosures and announcements on the price of a single stock?

A. We were discussing my research, and through that research, I obviously have a lot of experience in analyzing the impact of announcements. The technique that I used in that context are similar to the techniques that I used in the context of single stocks.

I said that I had academic research that also looked at single stocks. I have taught how to assess the impact of announcements on -- in my classes, Ph.D. classes, but I also have considerable experience in the context of litigation and conducting analysis for single stocks.

Q. Great.

Page 49

So can you point me to anything in Appendix A where you analyze the price impact of a misrepresentation or a corrective disclosure on a single stock?

A. I was discussing announcements. The -- and disclosures. I am not quite sure what you mean by your question in terms of going beyond what I was discussing.

Q. My question simply, sir, is whether or not you can point me to any of the materials in Appendix A that discuss analyzing the price impact on an individual stock.

A. So in terms of price impact of -- on an individual stock of an announcement -- now, some of the studies that look at multiple stocks will discuss results for some individual stocks. I'm not sure that I could get a list of that.

I have two papers that are related to announcements made by the firm Nestle which look at individual stocks on -- I may have other ones, but those are the ones that come to mind.

Q. And those look like -- those articles deal with the price impact of information on Nestle's stock?

A. Of an announcement on Nestle's stock

13 (Pages 46 - 49)

Page 50

indeed.

Q.   Those are listed in Appendix A?

A.   I believe so.

Q.   If you could please turn to paragraph 7 of your report.  And that's on page 2, for the record.

A.   Yes.

Q.   Sir, do you have an understanding of -- strike that.

Why are you only offering an opinion on price impact for the Aurelius Value report and no other part of Mr. Steinholt's report?

MS. SOLOWAY:  Objection to form.

A.   I'm not sure that what you're saying is strictly correct in the following sense.

When I discuss the marketing allegations -- no.  I have the opinion that the disclosures in the Aurelius report doesn't disclose new information concerning the allegations and, therefore, in an efficient market, the allegation could not cause change in the price of the stock on February 11.  That's for --

COURT REPORTER:  I'm sorry.  The allegation could not...

Page 51

THE WITNESS:  "Cause a change in the stock."

COURT REPORTER:  Cause.

THE WITNESS:  "Cause" -- on February 11.

COURT REPORTER:  Thank you.

A.   Concerning February 5, I do have the opinion that there are multiple pieces of information disclosed on that day, and some related to the allegations and some possibly not, are related in different ways.  And, therefore, the abnormal stock return estimated by Mr. Steinholt is not a measure of price impact of the allegations.

Q.   Really.

Professor Stulz, what you just said about the February 5 report, where is that in your -- in the report that's in front of us?  Because I read it really closely and I haven't seen anything like that in there.

I mean, you limit your report -- the February 5 portion of your report is limited to a discussion of damages under Comcast.  Where do you offer in this report an opinion that there's no price impact for the February 5th report?

MS. SOLOWAY:  Objection to form.

Page 52

Mischaracterizes a number of things.

A.   I did not say that there was no price impact.  I was saying that the abnormal return from an event study is not a measure of price impact for February -- for the disclosure of February 5.

COURT REPORTER:  Did you say "event study"?

THE WITNESS:  That's correct.

Q.   And where in this report does it state that?

A.   That's a discussion of confounding events for February 5.

Q.   What pages would those appear on, sir?

A.   It would be page 31 to 33, I believe.  I hope I'm correct.

But I just want to make sure that you understood what I said correctly.  I'm not saying there is no price impact.  I'm saying the abnormal return is not a measure of price impact.

Q.   Right.

So that -- but that's a criticism of Professor Steinholt's damages model, correct?

MS. SOLOWAY:  Objection to form.

Q.   Mr. Steinholt.  Sorry.

Page 53

A.   It's an analysis of issues with his proposed model, if we want to call it that; whereas concerning February 11, it is an explicit opinion that there is no price impact.

Q.   Okay.  So there's no explicit opinion of no price impact for the February 5th announcement, correct?

A.   That's correct.

Q.   You agree that the price decline in Vanda common stock on February 6th was caused, at least in part, by the postmarket close press release on February 5?

A.   I discuss in my report that on February 5, there is the release of four different pieces of information and that Mr. Steinholt has not proposed any method to assess the impact of these different pieces of information.

Q.   The four pieces of information you identify, though, you agree that those all, in your view, at least in part, are responsible for the price decline?

MS. SOLOWAY:  Objection to form.

A.   I agree that the new information released on the 5th explains, at least in part, the drop in the stock price on February 6th, but

14 (Pages 50 - 53)

Page 54

the method of event study that Mr. Steinholt proposes does not allow us -- or does not allow anybody to attribute part of the drop to any one of those four pieces of information. It only --

Q. Professor Stulz --

A. It only gives a result for the total impact.

Q. Yeah.

Professor Steinholt [sic], we understand that you have concerns with --

A. I'm sorry. I'm not -- I want to remain --

Q. I'm sorry. I apologize.

Professor Stulz, we understand your concerns with Mr. Steinholt's damages model. I'm just trying to simply confirm that you do not take any position on price impact for the February 5th postmarket close disclosure.

MS. SOLOWAY: Objection to form.

A. I just want to make clear that I do have a position, which is the one that I summarized, which is that's the abnormal --

Q. [Overtalking.]

A. -- on February 6th is not a measure of the price impact of the allegations.

Page 55

Q. Do you agree that the decline on February 6th was statistically significant in Mr. Steinholt's event study?

COURT REPORTER: I'm sorry. Do you agree that the what?

MR. CAPECI: That the decline on February 6th was statistically significant in Mr. Steinholt's event study.

A. I agree that in the event studies that Mr. Steinholt reports on in his report and in his exhibit that the abnormal return on February 6th is statistically significant.

Q. And do you offer your own event study to rebut Mr. Steinholt's findings for purposes of the February 6th decline?

A. I am not rebutting his finding of a statistically significant decline. The opinions I have on February 6th hold the respective of the magnitude of the abnormal return and, therefore, there was no reason for me to have my own event study for this.

Q. Professor Stulz, I want to jump ahead. We're going to revisit the issue of what you say in the damages portion of your report. Perhaps, perhaps we misunderstand what it was you were

Page 56

saying there, but we'll turn back to that.

For now, if you could please turn to -- well, sorry. If you would please turn again to paragraph 7 on page 2.

A. Yes.

Q. It says, in the middle of the paragraph: I've been asked to assess the implications of Mr. Steinholt's market efficiency conclusions for determining whether certain alleged misrepresentation and corrective disclosures impacted the stock price of Vanda during the class -- through the class period.

What portion of your rebuttal report relates to price impact for any of the misrepresentations alleged in the complaint?

MS. SOLOWAY: Objection to form.

A. The opinion on no price impact is an opinion for February 11. That is the one that states that inefficient market.

What the Value report says about issues related to the allegations cannot have had a price impact because it was repeating information that was already in the market at the time.

Q. Understood, Professor Stulz. We do understand what you're saying in that regard.

Page 57

I'm simply trying to confirm. Your report doesn't make a front-end price impact argument for any of the misrepresentations alleged in the complaint; isn't that right?

MS. SOLOWAY: Objection to form.

A. If by front-end argument you mean me assessing abnormal returns on dates of alleged misrepresentations, I do not do so in my report.

Q. Thank you very much.

Could we please turn to Appendix C of your report, sir.

A. Yes.

Q. Okay. The header says documents relied upon by yourself.

Are there -- is there a broader universe of documents that you considered above and beyond what's listed here?

A. At this point, I don't -- I don't remember documents that I considered that wouldn't, wouldn't be listed in my report or in this list. I mean, obviously, as I was preparing the report, I was carrying with me in my knowledge as a financial economist and the experience that I have in these matters. I -- no, I'm not -- I'm not sure that I looked at -- I

15 (Pages 54 - 57)

Page 58

mean at documents explicitly that are not listed here when I was working on the report, but I may have.

Q. Okay. Do you understand, Professor Stulz, that you're obligated by the federal rules to put everything that you looked at in your report or in this appendix?

MS. SOLOWAY: Objection.

A. I was asked to create a documents-relied-upon list, and that's what I did.

Q. Is there anything that comes to mind now that's not on this list that ought to be on it?

A. Nothing comes to mind right now.

MR. CAPECI: I'll just note for the record that the witness paused for about 45 seconds before providing that last answer.

Q. If you could look at page 2, Professor Stulz. In the middle, it says: Data Sources, Refinitiv, and Standard & Poors Capital IQ.

In what regard -- [connection interruption] -- your report?

COURT REPORTER: I didn't hear that whole question. In what regard --

MR. CAPECI: -- "did you rely on the

Page 59

sources for purposes of your report."

A. For Refinitiv, it may go to the question that you asked before in the sense that we did do a broader search for analyst reports to see whether there were any additional analyst reports that we should be using, and that came from Refinitiv, if I remember correctly. We might have looked at Standard Capital IQ, as well.

Q. Okay. That was going to be my next question, was -- I just wanted to confirm that you didn't find or rely on any analysts' reports other than the ones that were included in Mr. Steinholt's production?

A. My understanding -- my understanding is that there are other analyst reports, but as a type of report produced by coin shops as opposed to brokers, and so they just exploit kind of the financial data on the firm's report on the financial data without analysis.

Q. Understood.

And then for the legal documents on page 1, who provided those? How did you -- who compiled those documents? Was that you or was that Cornerstone.

A. Those are the legal documents concerning

Page 60

the qui tam lawsuit. I asked for documents related to that lawsuit.

Q. From Cornerstone or from counsel?

A. I asked from Cornerstone.

Q. So the materials that appear in legal documents, those all came from Cornerstone?

A. Yes. So I was -- I was inexact in my answer because the fourth one concerns the FDA litigation. The first three concerns the qui tam lawsuit.

COURT REPORTER: I'm sorry. The first three concerns...

THE WITNESS: The qui tam, Q-U-I, and then separately T-A-M.

Q. I believe the first one is the amended complaint in this case; isn't that right, Professor Stulz?

A. Yeah, right. Sorry.

Q. I know. Gordon and Gardner are very similar. I'm sure -- I'm sure Audra's email is frustrating to read for that reason.

But, certainly, the middle two relate to the Gardner, the qui tam lawsuit; isn't that right?

A. That's correct.

Page 61

Q. Okay. If you look on page 2, one of the -- for the publicly available documents and websites is the World's Most Influential Scientific Minds from Thompson Reuters.

What did you rely on that for for your report?

A. I'm sorry. Page 2 of the report as opposed to...

Before I go there, I just want to point out a note at the bottom of page 2 of Appendix C. In addition to the documents on this list, I considered all documents cited in my report on my exhibits to form my opinions.

And so going to page 2 of my report, I cite the document from Thompson Reuters of December 2015.

Q. That's paragraph 3?

A. That's right.

Q. So, Professor Stulz, would you agree that Thompson Reuters is reliable when they're saying you're one of the most influential scientific minds in the world but not when it's criticizing the disclosures you made to Congress?

MS. SOLOWAY: Objection to form.

A. What I would say is the following: That

16 (Pages 58 - 61)

Page 62

a number of rankings besides this one, that put me among the top financial economists in the world, so they are certainly not unique here.

And what I would say is that in the article we discussed, I know exactly why it's wrong. I don't think anybody would dispute that it's wrong based on the information I have provided.

Q. So would you say that it's a quality of the information in the various Reuters articles matters in terms of its reliability?

A. What I would say that this here is produced by a completely different part of Reuters that is specialized in assessing the impact of academic work.

And what we talked about before is journalist that obviously was concerned about an issue and was trying to find arguments for that -- for our views.

Q. The Scientific Minds Thompson Reuters article, is it your belief that that's a reliable source of information?

A. I think it correctly characterizes my position in the profession. I'm aware of other people believing that, so I will leave it at

Page 63

that. If you need other evidence of my stature in the financial economics position -- profession, I'm happy to give them to you.

Q. By including it on Appendix C, what you're telling Judge Block is the Thompson Reuters article here is a reliable piece of information; isn't that right?

MS. SOLOWAY: Objection to form.

A. Well, this is one example of somebody saying that I have a prominent position in the financial economics profession. There are lots of examples, and if you don't like this one, I'm happy to provide another one.

Q. Professor Stulz, I'm not trying to dispute your academic credentials. I'm simply trying to ascertain whether or not it's your belief that this Thompson Reuters article contains reliable information.

MS. SOLOWAY: I think we've already been over this. I think he's done the best he can to answer this question.

Asked and answered.

A. Thompson Reuters, which is different from the Reuters news organization, Thompson Reuters has a process to evaluate academics,

Page 64

assuming that they followed that process, that process seems sensible. It's not completely transparent. I have discussed the fact that other people have rankings that are more transparent. I fare as well, if not better, in those rankings.

Q. Is that the same thing as saying you view the article as being reliable?

MS. SOLOWAY: Objection. Asked and answered.

A. I view -- I view the article as being a piece of evidence on my position within my profession and I will leave it at that.

Q. Okay. Professor Stulz, do you have an understanding of the term "the basic presumption of reliance"?

A. Yes, I do.

Q. What's that understanding, sir?

A. I want to say that I'm not an attorney and, therefore, what I'm going to say has no legal implications. Throughout my report, at no point do I offer any legal interpretations.

My lay understanding of basic is that if the market for security is efficient, there is a presumption that the investors, shareholders in

Page 65

the case of a stock, traded and relied on the information that was made available and, hence, the misinformation if there was misinformation by trading in the efficient market because the information would be incorporated in the price. It's a presumption and so it can be refuted.

Q. Okay. So is it your understanding, Professor Stulz, that if plaintiffs are entitled to the basic presumption of reliance, that the defendants are able to rebut that presumption?

A. It is my understanding. But, again, I'm not an attorney. I don't -- I'm not a legal expert. It is my understanding that defendants can show that the market is not efficient. That's an option that defendants have. Or defendants can show that a specific piece of information did not impact the stock price.

Q. And so, Professor Stulz, if the defendants are only focusing on the price impact portion, that means that the market efficiency piece has been established and the focus would be on showing -- it would be on rebutting the basic presumption, correct?

A. That is not correct. It is perfectly possible for an expert to make the assumption

17 (Pages 62 - 65)

Page 66

that under the conclusions of the plaintiff expert's report, there is no price impact without having an opinion on efficiency.

Q.   And what is your basis for that understanding?

A.   I would say that this is what I'm doing in this report in the sense that I have -- the only opinion I have on efficiency in this report is if the Aurelius Value report had a price impact because of the alleged misstatements and omissions, then the market is not efficient. But I don't have an opinion on efficiency, per se, outside of that opinion.

Q.   Professor Stulz, I'm going to -- I'm going to read you a few statements and I'd like you to tell me if you agree with those statements or not, okay?

A.   Okay.

Q.   The first is: To rebut the basic presumption of reliance, defendants must do more than merely produce evidence that might result in a favorable outcome. They must demonstrate that the misrepresentations did not affect the company's stock price by a preponderance of the evidence.

Page 67

MS. SOLOWAY:  Objection to form.

Q.   Are you familiar with that standard?

MS. SOLOWAY:  I object to the form of this question.

A.   I'm happy to answer your question, but I need the context.

Q.   Well, Professor Stulz, I'm, I'm sorry, but I'm the one asking the questions today.

The question is: Are you familiar with that phrasing or terminology?

A.   I would say that the sentence is one that I may have read before, but for me to understand the sentence, I need the context of the sentence.

Q.   Okay. Well, how about this. Is it your understanding, Professor Stulz, that the defendant bears the burden of persuasion to prove a lack of price impact on a class certification motion?

MS. SOLOWAY:  Objection to form. And to the extent that this question seeks to delve into communications between counsel and the expert about legal opinions or legal issues, I would instruct Professor Stulz not to answer giving any information about communications with counsel.

Page 68

Q.   To be clear, Professor Stulz, we're not -- the point of this question is not to ascertain any communications you may have had with Vanda's lawyers about these issues. I'm just trying to understand the -- where you source your understanding of the relevant legal standards on this motion. Perhaps maybe you could explain that for us.

A.   So I want to repeat what I have said before, which is I am not a lawyer. I'm not offering any legal opinions and I'm not claiming any legal expertise.

What you just read about the burden of persuasion might be language out of the Goldman decision.

Q.   That's very good, Professor Stulz. You are correct. That is a quote from the Supreme Court's decision in Goldman Sachs.

So have you read that opinion, sir?

A.   Yes, I have.

Q.   Why did you read it?

A.   I read it in the context of a different case and I can't really say more than that.

Q.   Is that the McKesson case, Professor Stulz?

Page 69

MS. SOLOWAY:  Objection. I think this is getting into privilege that isn't Vanda's privilege, Michael.

MR. CAPECI:  The McKesson materials are discussed at length on the public docket of that case, so I don't see what privilege would --

MS. SOLOWAY:  Yeah. I mean, I'm concerned that he may have been asked to read the decision by counsel for another client.

Again, if you want to probe this, just do it carefully so we can make sure we don't -- I don't want him to be, you know, inadvertently giving away some privileged information in another case.

MR. CAPECI:  Under- -- and understood.

Q.   And, certainly, we don't want you to do that, either, Professor Stulz.

Do you recall in the McKesson case discussing the Goldman Sachs Supreme Court opinion in your reports that are publicly available on the docket?

A.   Five -- maybe five reports or four reports in the McKesson litigation. I don't recall whether I cited the Goldman Sachs decision. It is not my practice usually to cite

18 (Pages 66 - 69)

Page 70

legal decisions because I'm not a legal expert on -- I am not -- that's not -- my reports are not about legal standards and expounding on legal standards.

Q. Okay. Do you think it's important to understand the relevant legal standard that Judge Block will be using to decide this class certification motion as it relates to price impact?

A. Again, I'm not a legal expert. And I am asked questions about -- as a financial economist, I answered them as a financial economist.

That being said, I would hope to have information that is helpful to the Judge. And if the legal standards makes that information not helpful, then I would hope I don't have it in my reports. But my reports are my -- I mean, give my opinions as a financial economist. If I'm asked a question, I will answer it as a financial economist, not as an attorney or not as somebody trying to explain how something fits in the legal standards in the sense that I don't have the expertise to interpret those legal standards.

Q. Okay. That's precisely what I'm trying

Page 71

to get at here, Professor Stulz, which is what did you do to make sure that your financial economics opinion does not contradict the legal standard that Judge Block will be using in this motion?

MS. SOLOWAY: Again, I would just say without describing any communications with counsel.

Q. And, yes, please, don't reveal the communications that you've had with Vanda's lawyers in responding to this question.

A. I was asked to develop opinions on two topics using my expertise as a financial economist. I answered those opinions from the perspective of a legal -- of a financial economist, not from the perspective of somebody with legal expertise because I don't have that expertise.

If my opinions were such that they would not be useful to the Court because of legal standards, I would expect the attorneys to let me know that those opinions will not be useful and, therefore, not to file my report.

Q. So other than any -- other than communications you may have had with Vanda's

Page 72

attorneys, did you take any other steps to ascertain the relevant legal standards for price impact for purposes of this motion?

A. I am familiar with some of the decisions that have been made with respect to price impact at various levels of the judicial system. I am obviously leery of reaching conclusions about those decisions because of my lack of legal expertise, but I have general familiarity with those decisions.

Q. And did that general familiarity come from anywhere other than communications with lawyers for the companies who have retained you?

A. As I said, I've read a number of those decisions.

Q. And did you read any of those decisions in connection with this report?

A. Not that I remember.

Q. Why not?

A. I was not aware of new decisions that I should read for the purpose of that -- of this report.

Q. Do you have an understanding when the Supreme Court rendered its decision in Goldman Sachs?

Page 73

A. I don't remember exactly when, but I thought it was in late spring.

Q. Of which year?

A. This year.

Q. Is that not sufficiently new to warrant a review for purposes of this report?

A. I would say two things: First, I had read it. Second, I'm not an attorney. I don't claim legal expertise and I don't claim the ability to interpret decisions by the Supreme Court. I have a lay understanding of that decision. That was enough to me -- for me. That's all I could do.

Q. Professor Stulz, analyzing whether an alleged misrepresentation or a corrective disclosure impacted the price of an individual stock, what are the tools that an economist would use to make that assessment?

A. As a financial economist, you would want to know what information the market already had because you know that in an efficient market, repeating existing information should not affect the stock price. So that's one inquiry that you would pursue.

You would want to know whether there is

19 (Pages 70 - 73)

Page 74

a significant abnormal return on the day that information reaches the market. You would want to have a thorough understanding of whether there is confounding information on that day and whether it is possible to unbundle the abnormal return to attribute part of it to specific information in a way that is reliable.

Q. That process you just described, what would you call that?

A. I would call that an analysis a financial economist would conduct to assess whether that piece of information had an impact on the stock price.

One more piece that you would look at, in addition to the three that I mentioned, is kind of the economic implications of that information. Formation --

Q. Sir --

COURT REPORTER: I'm sorry.

A. Using --

COURT REPORTER: I didn't hear the question.

Q. Professor Stulz, I apologize. I didn't mean to cut you off. If you're not finished with your answer, please finish.

Page 75

A. Maybe it would make more sense for you to repeat the question for the court reporter and then me providing an answer.

Q. I mean, I'm simply just trying to ascertain what are the tools available.

You described a process where you would review information, but are there any specific financial economic tools that you would employ to assess price impact?

A. So the first -- the first tool was that I wanted to add before the interruption is now that you would want to know the economic implications of the piece of information. For that, you would use the tools that financial economists have to assess the value implications of various pieces of information, assuming that those tools can be employed successfully, which they may not.

Q. Okay. And that's precisely what I would like to know, Professor Stulz. What are those tools? Can you list them for me?

A. Well, I mean, what I describes -- describe covers a broad range of tools, covers a good part of the field of investments in financial economics. So I'm not quite sure what

Page 76

you want me to do here. Though I cite the textbook of Brealey and Myers and they cover a number of those tools, but when it comes to assessing what information is in the market, you have lots of different tools that you can use.

But the obvious starting point is to look at what the analysts are saying. For that, you use your expertise as a financial economist, your knowledge of the works that analysts do to understand what's a view is important for company and what they don't, what they know about a company, what they have talked about, and so on.

Q. Okay. So just so I'm clear, so to rebut price impact, you look at what the analysts say, correct?

A. I mean, you are phrasing the question in a way that forces me to say that that's not correct in the sense that looking at what analysts say and looking at the determinants of value for the corporations that they use in their models is just one part of the analysis you would conduct.

Now, I pointed to four different areas that you would investigate. Each one of those areas would use tools that financial economists

Page 77

use, would use the expertise that a financial economist has.

Q. Okay. Yes, but you keep referencing these tools, Professor Stulz, but I'm simply asking you to explain or list for us what those are. I mean, is a regression analysis one of those tools?

A. So I talked about one of the investigations being an event study to estimate the abnormal returns, and so that would involve a regression analysis. You may -- you may use regression analysis when you pursue the other investigations that I talked about, as well. That depends on the context.

In this report, I don't use regression analysis for the other investigations, but in other reports, I have done so. It all depends.

Q. And what about volatility tests? Is that another tool a financial economist could use?

A. It is a tool that they would use under some circumstances. You use the tools that, as an expert and financial economist, you believe is the most appropriate for the investigation that you are conducting.

20 (Pages 74 - 77)

Page 78

Q. And you've used volatility tests in other cases where you've served as a class certification expert; isn't that right?

A. I have used them in a number of different contexts.

Q. Including the class certification context of the defense expert, correct?

A. But even within the class certification context, I've used them for different purposes.

Q. Have you ever used it for the purposes of disproving price impact on the class certification context?

A. In conducting an event study, if you are doing so, then you want to use the model that is the most appropriate to estimate the abnormal return and to estimate the significance of the abnormal return.

In that case, it is routine for you to look at your event study and make sure that if you are using the appropriate regression model. Volatility test may inform you about whether you are using the correct regression model.

Q. Okay. So other than event studies, regression analyses, volatility tests, are there any other economic tests that a financial

Page 79

economist would employ in assessing price impact?

A. Well, there are many other -- I mean, ways that you could be using the event study method in this context. You might be using it for other pieces of information or you might use it for other dates besides the dates that you are looking at to evaluate price impact. So there's a wide range of approaches that you could use involving the event study method to assess price impact.

The difficulty with event study method is that it gives you only one abnormal return for the days that you are looking at, and that abnormal return incorporates all the new and unexpected information that is disclosed.

And so if you are after only one piece of information and its impact, the event study cannot answer that question. That, as I discuss in my report, is a big issue with the report of Mr. Steinholt.

MS. SOLOWAY: Michael, is now --

Q. Your crit- --

MS. SOLOWAY: I'm sorry.

MR. CAPECI: I'm sorry.

MS. SOLOWAY: I was just going to ask,

Page 80

if we're winding up a line of questioning, it might be a good time to take a five-minute break, but please finish with this. I'm not interrupting this line.

MR. CAPECI: Just a few more, hopefully.

BY MR. CAPECI:

Q. Okay. What you just stated, Professor Stulz, that's part of your criticism of Mr. Steinholt's damages model, correct?

A. The issues with the abnormal return incorporates all new information, new unexpected information, not only the information that is allegation related. Yes, that's, that's accurate criticisms I make in my discussion of the damages model.

Q. Okay. So I just want to understand. Any other tools other than event studies, regression analyses, volatility tests, are there any other financial economic tools that an economist would employ in assessing price impact?

MS. SOLOWAY: Objection to form. Misstates the prior testimony.

A. As I discussed in answer to your earlier questions, now, as a financial economist, you will use all the tools that are helpful in

Page 81

assessing price impact. You seem to think that investigating prior information does not use the tools of financial economists. It obviously does. Knowing that you are concerned about the content of that information, about its economic significance, and so, in that process, you will -- you will use those tools.

You might also use an event study, in essence, in past disclosures of information. You might look at what analysts have to say about it, so you might want to map the information that is disclosed to the reactions of the analysts and to the assessment by the analysts of whether that information is material to them. You might want to look at whether the valuation models used by the analysts are affected by that information.

So there's a lot of -- a lot of things that go into that investigation and the number of tools that you are going to use and affirm financial economics will depend on what is the best approach, what is necessary.

Q. Professor Steinholt, would you agree that you don't do an event study or regression analysis in your report in this case?

A. You asked the question before, and my

21 (Pages 78 - 81)

Page 82

answer was that the issues that I raise in my report are such that I can use the significance of abnormal returns from the Steinholt report to discuss those issues, and so there was no need for me to do my own event study to raise the issues that I do. There was no need for my own event study for the price impact arguments that we are discussing because that price impact argument does not depend on the significance or the size of the abnormal return. It depends on the conclusion of Mr. Steinholt that the market is efficient.

If the market is efficient, then what was in the Aurelius Value report concerning the allegations could not have a price impact. It could not have a price impact because precisely what Mr. Steinholt says in his report, which is that new --

MS. SOLOWAY: Come in. I apologize.

A.    -- new information affects the stock price within a day. On an efficient market, repeating information does not affect the stock price.

MS. SOLOWAY: Sorry about the interruption.

Page 83

MR. CAPECI: Okay.

MS. SOLOWAY: Someone was knocking on my office door. I apologize.

MR. CAPECI: No worries. No worries at all.

I think, Professor Stulz, your counsel asked for a break. We're happy to do so at this time if you would like one.

THE WITNESS: That's good.

VIDEOGRAPHER: The time is approximately 11:40 a.m. This is the end of media unit two and we're going off the record.

(A recess was taken.)

VIDEOGRAPHER: The time is approximately 11:48 a.m. This is the beginning of media unit number three and we are on the record.

BY MR. CAPECI:

Q.    All right. Welcome back, Professor Stulz. Do you remember that you're still under oath?

A.    Yes, I do.

Q.    And did you discuss your testimony with anyone during the break?

A.    No.

Q.    Okay. Great.

Page 84

Professor Stulz, if we could please turn to paragraph 18 on page 8 of your report. It's the paragraph lowercase Roman numeral one.

A.    I am there.

I just wanted to add to my testimony before the break that, obviously, one crucially important tool that one uses as a financial economist in evaluating price impact is a theory of market efficiency on the empirical evidence that we know about market efficiency.

Q.    And how is that used in analyzing price impact?

A.    In the report that I have in this case, it's a crucial tool that is used. Because with an efficient market, in the way that is defined as strong form efficient market, repeating existing information should not have an impact.

Q.    Do you need to be a financial economist to reach that conclusion?

A.    If you are saying that the theory of efficient markets and understanding of the empirical evidence and how that empirical evidence is formed, all of that doesn't require expertise of a financial economist, then no.

Q.    What I'm asking, Professor Stulz, is:

Page 85

If what your report is doing and, in our view, what your report is doing is saying that there was previously available information, meaning that the Aurelius report didn't contain anything new, what makes you more qualified to make that decision than -- that determination than a member of the jury?

A.    First, you mischaracterized my report. I'm not saying that there's nothing new coming to the market on February 11. I am saying that there is nothing new related to the allegations.

The analysis I conduct -- I was asked to conduct an analysis of whether given Mr. Steinholt's conclusions about market efficiency, I was asked to find out what one could say about price impact and, therefore, I used all the tools of my field that were relevant for that inquiry to answer the question and then form the opinions that is in my report.

Q.    Is it your testimony -- is it your testimony that one needs to be a financial economist to determine whether information relating to the allegations in our complaint was previously in the market before the Aurelius report was issued?

22 (Pages 82 - 85)

Page 86

MS. SOLOWAY: Objection.

A. My answer to that is that one has to be a financial economist to conduct the analysis that I conducted linking market efficiency to price impact.

Q. Can you just -- for the record, just tell us, what's the name of the analysis that you conducted? Does it have a name?

A. I'm not quite sure what you mean by asking whether it has a name. It's, it's an analysis of the implications of market efficiency as conducted by a financial economist.

Q. Is a layperson able to analyze the implications of market efficiency?

A. Given that a Nobel Prize was given for the work on market efficiency, and I would think that this is required specialized knowledge to conduct the analysis properly.

Q. Was that the Nobel Prize for Professor Fama or for Professor Engle that you're referencing there?

A. Professor Engle had nothing to do with market efficiency. So it is Professor Fama.

Q. Okay. So Professor Fama --

COURT REPORTER: Wait, wait, wait. So

Page 87

it is who?

MR. CAPECI: Professor Engle. E-N- -- I believe E-N-G-L-E.

COURT REPORTER: No. He said Professor Engle had nothing to do with market efficiency, so it is Professor -- and that's what I missed.

THE WITNESS: So I said Professor Engle has nothing to do with -- I mean, his award had nothing to do with market efficiency. It is the award to Professor Fama that was given for the work on market efficiency.

BY MR. CAPECI:

Q. And when Professor Fama received this Nobel Prize, the work that he did included an event study; isn't that right?

A. Well, so, I mean, I don't -- you could show me the citation. I mean, Professor Fama is credited as an originator of the event study method. The event studies that is not usually viewed as the first event study would be one that is very different from what we do know and wouldn't be very helpful to what we do know because it used monthly returns, and so it looked at a different aspect of market efficiency than what we are focusing here.

Page 88

Q. So it's your view, Professor Stulz, that only a financial economist can provide the type of price impact opinion that you've offered in this case; is that right?

A. I am not saying that. Now, whether expert knowledge is required for an opinion is obviously not a decision for me to make. What I'm saying is that, in writing my report, I used my knowledge and expertise as a financial economist.

Q. Okay. If we can look at page 8, paragraph 18. It's the second sentence in little I. It reads: In an efficient market, stock prices reflect the most up-to-date information that is publicly available. They rapidly incorporate new value-relevant information.

What do you intend to convey by the phrase "value-relevant information" in that sentence, Professor Stulz?

A. Information that doesn't affect the value of a security shouldn't be incorporated in an efficient market.

Q. What makes information value relevant?

A. Information that changes the expectations about future cash flows or changes

Page 89

about discount rate is value relevant.

COURT REPORTER: I'm sorry. About future cash flows or changes...

THE WITNESS: The discount rate applied to future cash flows, future expected cash flows is value relevant. I think I agree with Mr. Steinholt on that.

Q. And does value-relevant information, does the reliability of that information implicate whether it's value relevant?

A. I'm sorry. I did not understand the question.

MS. SOLOWAY: I actually objected to form but I was muted. So...

Q. In determining whether information is value relevant, would a financial economist look at the reliability of that information?

MS. SOLOWAY: Objection to form.

A. You would want to look at all aspects of what is being done by the market. If your goal was to assess by how much that information would move the market, alternatively, you can look at whether the information moves the market.

I'm sorry. Let me change what I said. I mean, you would look at all aspects of the

23 (Pages 86 - 89)

Page 90

information, including what was known before, and you would focus on whether the change in the information set of the investors is such that it would change the assessment of the value of the firm.

COURT REPORTER: That was the value of the what?

THE WITNESS: "Of the firm."

Q. Would it matter the source of the information?

A. The answer is that it depends.

Q. What does it depend on?

A. It would depend on a range of factors and it would depend on the type of information.

Q. And so what do you -- how do you rely on your training as a financial economist to figure out what is and is not reliable information?

MS. SOLOWAY: Objection to form.

A. I didn't use the term "reliable" in my answer. The question is whether that information changes the information set of investors. You could have information that investors are not sure that it is correct, but it would still change the information set.

Q. How would you do that?

Page 91

A. It would be a new piece of information and they would want to take into account -- it into account if that information being correct would affect the value of the firm.

Q. So is it your testimony, sir, that you do not take into account the source of the information in determining whether it's value relevant?

A. Two different issues here, which is the extent to which information is value relevant, whether it is value relevant at all.

And what I am saying is that you would have to look at each, each of those two carefully and to assess the value implications of the information. And what I'm saying is that a piece of information where investors are not 100 percent sure that it is correct can still have a very big impact on the value of the firm.

Q. What's the process that you used to carefully assess the value implications of the information? Can you describe for us how you do that?

A. I mean, it would depend on the nature of the information and it would depend on the context. It would depend on a lot of factors,

Page 92

the types of information where it's relatively straightforward to assess the value implications, on that type of information where you can't reliably assess the value information because there's too much uncertainty.

Q. And do you need to be a financial economist to determine whether information is value relevant?

A. Well, the field of financial economics provides theories, empirical results, tools to assess value relevance that a financial economist who is trained in that body of knowledge can apply.

Q. Right.

So what are the tools you apply to determining whether information is value relevant?

A. Well, it's your overall understanding of the determinants of the value of firms. That body of knowledge is enormous. Even beginning textbooks on those issues run 600 or 700 pages.

Q. So you need to read a 600-page textbook to figure out if information would be valuable to investors? Is that your testimony?

A. What I'm saying is there is a vast body

Page 93

of knowledge in financial economics about how information affects security prices, about how information affects the value of firms. I'm using that body of knowledge.

Q. But I'm asking -- this is a predicate step, Professor Stulz. How do you ascertain whether the information is value relevant in the first instance?

You're talking about the application once you decided already that it is value relevant, but how does a financial economist decide that information is, in the first instance, value relevant?

A. Now your question -- your question was incorrect about what I said.

You use that body of knowledge to figure out whether it's value relevant in the first place.

Q. Okay. So is it your testimony that you are an expert in ascertaining what information is value relevant?

A. My testimony is I am an expert in financial economics. As an expert in financial economics, I have done work on understandings and determinants of the value of firms and I have

24 (Pages 90 - 93)

Page 94

done theoretical work and I have done empirical work. I have consulted with corporations on those issues, and, therefore, I am using that understanding of the determinants of value of firms in my work as an expert when that understanding is called for.

Q. Professor Stulz, is it possible for a layperson, a member of the jury, to determine whether or not information is value relevant?

A. That is not a determination for me to make. What I can say is that, in my analysis of price impact, as a financial economics expert, I use the body of knowledge of the field of financial economics. The lay expert is not going to have that body of knowledge, but it's not for me to determine what a lay expert can conclude or not conclude.

What I'm saying is, as a financial economist, I use a body of knowledge in my expert reports that address the issues of price impact.

Q. And is that body of knowledge absolutely necessary to determine whether or not information is value relevant?

A. If what you are saying is that there are situations where it's obvious that the value of a

Page 95

corporation was affected by something, that a layperson could figure it out, I mean, obviously, there are cases like this.

Q. Okay. Could you please turn to paragraph 23 on page 14 of your report.

A. Yes.

Q. And in paragraph 23, would you agree that you're criticizing Mr. Steinholt for ignoring public statements on Vanda's purported off-label marketing practices that predated the February 11 Aurelius Value report?

A. Mr. Steinholt in his report makes statements about the effect of the Aurelius Value report that are not the result of an analysis of the types that I discussed and, therefore, he makes a statement that is speculative concerning the impact of that report.

Q. Do you believe there are previous public reports of Vanda's off-label marketing practices that Mr. Steinholt ignored?

A. My report provides a long list of such statements, yes.

Q. I'm merely confirming that, Professor Stulz. Not every question's -- not every question's meant to be a -- you know, I'm just

Page 96

trying to confirm what's in paragraph 23.

So it says here that you conducted an analysis of those public statements that you detail at length in your report; is that right?

A. I do a number of things in relation to -- I mean, February 11, this is one of those things, yes.

Q. Okay. I'm merely trying to ascertain that you state you do an analysis of those public statements. Correct?

A. What I do is to show that the statements in the Aurelius reports that are related to the allegations are statements that were public before.

Q. Okay. And, as part of your analysis, did you ascertain whether this information was value relevant?

A. My focus for this part of the investigation was whether the information was new, and the answer is that it's not. This is -- concerns only the allegation-related information.

Q. Yes, but Professor Stein- -- Professor Stulz, wouldn't the information have to be value relevant in the first instance to have an impact on the stock price in order for the, in your

Page 97

view, Aurelius report to be not reporting anything new concerning the allegations in this case?

A. I'm sorry. I don't understand the question. It took a turn in the middle that left me confused.

Q. Okay. I'll rephrase it.

The -- whether or not the information that you say came out before the Aurelius report that, in your view, disclosed the off-label marketing practices of the company, the alleged off-label marketing practices of the company, are those -- in order for those to have included the Aurelius report from having any price impact, wouldn't they, in and of themselves, have to have been value-relevant information?

MS. SOLOWAY: Objection to form.

A. Your question is making critical assumptions that is problematic.

Now, if the allegation-related statements in the Aurelius Value report were value relevant, what you would expect is the analysts to discuss those statements. As I say in my report, I haven't seen an analyst discuss those statements.

25 (Pages 94 - 97)

Page 98

Q. Okay. Yeah. Well, that's wrong and we'll get to it.

But for right now, what I'm simply trying to ascertain, Professor Stulz, is: Did you -- did you -- in your analysis of these public statements that you state you conducted in paragraph 23, did that analysis contain -- consist of thinking about whether the information from Cafepharma or from the qui tam lawsuit was value relevant?

A. I'm confused by the question in the following way: Which is that the information in the qui tam lawsuit is actually more extensive than the information in the Aurelius Value report. So I'm, I'm just not understanding your question.

Q. Okay. Did you do an analysis of the Cafepharma information to see if it was value-relevant information?

A. So we just discussed the fact that there is no evidence that any -- that the value reports led analysts to change their assessment of Vanda. As a result, as -- they use that information or it was new and was not value relevant.

What I show in my report is that that

Page 99

information was in the market before, starting with the qui tam lawsuit but also based on a number of other considerations.

So there was a lot -- there was a lot of information in the market. The information in Cafepharma need not have been value relevant if investors at that point already knew that Vanda was marketing its and was selling its drugs more broadly than according to the label and was pursuing marketing plans that made it possible to do so.

Q. Okay. So, sir, is it your testimony that you're saying that even before the Cafepharma posts were made, that it's your view that there was public information about Vanda's alleged off-label marketing practices? Is that your testimony?

A. I point in my report to an analyst report that dates from before the class period that discusses how Vanda is considering marketing Fanapt and that it is considering developing a marketing plan that would focus more on the benefit of the lack of akathisia.

I'm not quite sure about the spelling, but it could be A-K-I-T-H-I-S-I-A [sic].

Page 100

Q. You're talking about paragraph 30 of your report?

A. Yes.

Q. So it's your testimony, sir, that that analyst report from March of 2015 disclosed to investors that Vanda was engaged in an off-label marketing promotion scheme for Fanapt?

COURT REPORTER: For who?

A. Well, and --

COURT REPORTER: For who?

THE WITNESS: For Fanapt. F-A-N-A-P-T.

What I'm saying is that throughout the class period and before the start of the class period, there were discussions and disclosures of instances where the broader marketing or broader sale of the drug was an implication.

Q. Okay. So you've identified what you think is one instance for Fanapt.

Anything else for Fanapt?

A. With Fanapt, there are a number of discussions on Cafepharma, as well as I have in my report.

Q. Okay. So other than Cafepharma and the March 2015 analyst report, anything else for Fanapt?

Page 101

A. The qui tam lawsuit. The FDA -- the FDA letter of October 2018.

Q. Okay. Anything else?

A. I don't want to forget anything, but those are the things that come to mind.

Q. And it's your testimony, sir, that those pieces of information were value relevant and communicated to investors that Vanda was engaged in an off-label marketing scheme for Fanapt?

A. No. It's my opinion that that information ends up being the information that Aurelius value publishes in its report. So the information that Aurelius publishes is information that was already public before.

I'm not making a statement that that information is value relevant at the times that Aurelius publishes it or that it is relevant -- value relevant at the times that it shows up in Cafepharma.

For information to be value relevant, it has to be new, it has to be unexpected, and it has to change the market's expectations about future cash flows or discount rates.

As I said, the analysts did not react to the disclosures in Aurelius or to the information

26 (Pages 98 - 101)

Page 102

published in Aurelius in ways that would be consistent with them thinking that that information was value relevant.

Q. All right. You keep going to that point, Professor Stulz.

What if I were to show you some information today showing that the analysts did care about what was in the Aurelius report? Would that change the testimony and the opinions that you've offered in this case?

A. If you show me analyst reports that I have not seen or missed that has different information, I would need to read it carefully to assess it and to see whether it has any implications for my opinions.

What I would say is that I looked at analyst reports in Mr. Steinholt's materials, and when I did so, I did not find discussions of the Aurelius report or analysts changing their assessment of Vanda based on that report.

In contrast, there are many changes and many discussions following the disclosures of February 5. So it's not like analysts don't react to new information, they just did not react to the information in the Aurelius report.

Page 103

Q. Okay. Yeah. Like I said, we'll, we'll turn back to that later.

So, sir, am I correct in saying that your testimony is that if the Cafepharma posts -- if the Cafepharma posts were not value relevant when they were made, that's not relevant to your price impact analysis?

A. I discuss in my reports that there are no abnormal returns associated with the Cafepharma posts, but that doesn't have -- that doesn't -- I'm sorry. So that's what I do in my report.

The issue of value relevance now is often addressed by either using one's own valuation model to see whether some information has value implications in that model or by looking at how analysts assess the information.

The advantage of looking at analysts is that they are third parties and they follow the company as part of their job. What I show in my report is that the analyst reports that I have looked at do not change their assessment of the company as a result of the Aurelius Value report when it comes to the allegation in the complaint.

It's important here to distinguish

Page 104

between the allegations of misstatements and omissions in the complaint and whether those have a price impact as opposed to whether the Aurelius Value report itself has a value impact. My opinion is that the allegation-related information in the Aurelius Value report did not have a price impact. It does not go beyond that.

Q. Well, but based on the market efficiency definition you provide in paragraph 18, in order for the Cafepharma posts to have been incorporated into the stock price, they would have had to have been value relevant, correct?

A. For the posts to have an impact on the stock price, it would have had to be that there was new information to the market, then that information was unexpected and that information was value relevant.

Q. Did you -- as part of your analysis, did you undertake an analysis of whether those Cafepharma posts constituted value-relevant information?

A. I did not have to do that in the context of my report because you are approaching the issue presuming that the information itself was value relevant.

Page 105

What I am showing in my report is that the information in the Aurelius Value report was already in the market, and that's not just Cafepharma. That's the qui tam lawsuit. That's the FDA letter. That's analyst reports. That's Cafepharma. That's Glassdoor.

Q. Okay. So just to confirm, Professor Stulz, you didn't analyze whether the Cafepharma posts were value-relevant information, correct?

MS. SOLOWAY: Objection. Asked and answered.

A. I walked backwards from the Aurelius report. I saw that the report was that the allegation-related information in the report was not discussed by analysts, did not lead analysts to change their assessment of the value of Vanda's stock.

And so that information was not viewed as value relevant by investors as looked through the lens of the analyst reports. They did not change expected earnings. They did not change price targets. They did not discuss it.

And so the next step was whether that information was new irrespective of whether it was value relevant or not. When I did that, I

27 (Pages 102 - 105)

Page 106

found that the information wasn't new. Then I looked at whether there was evidence that it affected the stock price and I did not find that kind of evidence for the Cafepharma posts or the qui tam lawsuit.

Q.   But you're -- isn't it your testimony, sir, that the Cafepharma post had no price impact because it constituted previous value-relevant information that had already been incorporated into Vanda's stock price; isn't that right?

MS. SOLOWAY:  Objection.  Misstates the testimony.

A.   So I go back to the starting point of this, which is that when Aurelius value published its report, the allegation-related information in that report did not affect what analysts were saying about the firm and did not cause them to publish information related to that report.

Then going backwards, I see that the qui tam lawsuit or the Cafepharma posts did not -- were not associated with abnormal returns.  One possibility for that is that the information was already in the market.  And I have pointed out that there was information about broader sales of Fanapt and Hetlioz before 2000 -- before some of

Page 107

those Cafepharma posts.

There was, as well, a letter from the FDA that was discussed by some analysts but viewed it as a nonevent.  And so there was a lot of information out there.

Q.   Okay.  I just would like to direct you to paragraph 22 on page 13 of your report.  The first sentence says:  As I discuss in detail in the subsequent section, given that such allegations were not, quote, new and had been discussed in various public forum and media before February 11, 2019, information about the allegations should have already been quickly incorporated into Vanda's stock price prior to the publication of the Aurelius Value report.

And my question for you, sir, is:  In order for that information to be incorporated into Vanda's stock price, it had to be value relevant; is that right?

A.   So given the nature of the information and given that the Aurelius report explicitly says that it got some of its information from Cafepharma, now, for it to have an impact on value, it had to be -- I mean, it would have had to be value-relevant information, but it has not

Page 108

been established that that type of information was value relevant as of the fall of 2018.  And it certainly has not been established that as of the time of the Aurelius reports that information was value relevant.

In fact, the contrary is the case as of February 11 because of the lack of impact of the information on analysts.

Q.   Okay.  Let's turn to -- okay.

So, sir, is it your testimony that the Aurelius report is merely republishing the posts from Cafepharma that you list in paragraph 25 of your report?

MS. SOLOWAY:  Objection to form.

A.   That's not my testimony.

My testimony is that the Aurelius report uses public information.  But the mere fact that Aurelius is saying that it is short of the company and advises investors to go short is by itself information, as well.

Q.   Professor Stulz, my question is about paragraph 25.  Are these examples of the Cafepharma posts that are referenced in the Aurelius report?

A.   Paragraph 25 says that the Aurelius

Page 109

Value report explicitly relied on information from Cafepharma.  Now, this says so in the report.  They obviously looked at that.

Then I show a number of examples of the type of information that was on Cafepharma.  I do not claim that every one of those posts was discussed in the Aurelius Value report and I do not claim that everything that was discussed in the Aurelius Value report is listed here.

I have an exhibit in my report where I match the statement in the Aurelius Value report to existing public information.  So for that matching, that's where one has to look.

MR. CAPECI:  Okay.  Brent, can we mark the Aurelius report, please.  And for Audra and Professor Stulz, that would be number 10 in your folders.

(Deposition Exhibit 4, Marcus Aurelius article - Vanda:  In the Land of the Blind, The One-Eyed Man is King, Bates-labeled Stulz_00000137 - 154, was marked for purposes of identification.)

Q.   Marking as Exhibit 4, for the record, is a report from Marcus Aurelius, Value, called Vanda:  In the Land of the Blind, The One-Eyed

28 (Pages 106 - 109)

Page 110

Man is King, dated February 11th, 2019.

A.   I have it.

Q.   Professor Stulz, do you recognize this report to be the Aurelius Value report that we've been discussing so far today?

A.   Yes, it is.

Q.   Great.

Can you point me to all the references to Cafepharma in this report, please.

A.   Sorry.  I mean, it's -- for me to read it, I'm to look at the footnotes and so on, it would take some time.

They mentioned Cafepharma on page 15. If you look at the actual text, a number of things matching what is said in Cafepharma, as well.

Q.   So on page 15, it states that the allegations on Cafepharma are unverified; isn't that right?

A.   So as are the acquisitions in the qui tam lawsuit.  It's the same.

Q.   I'm sorry, sir.  Is it your testimony that allegations in the qui tam lawsuit are as unverified as the posts on Cafepharma?

A.   No.  I'm saying --

Page 111

MS. SOLOWAY:  Object to form.

A.   I'm saying that in both cases, they're allegations.  There is obviously a difference with the qui tam lawsuit in the sense that it is submitted to a court.

Q.   Let me ask you this:  Is there a difference in the reliability of the information between what's in Cafepharma and what's in the qui tam lawsuit?

A.   I mean, it could be that the people speaking in Cafepharma have exactly the same type as the personal files of the qui tam lawsuit.  We don't know.

Q.   Okay.

A.   But -- I'm sorry.  I wasn't done.

Now, one important consideration in this we have to focus on is that the qui tam lawsuit was public information on a week before February 11, so that in an efficient market, that information would have been the price.

Q.   Yeah, that's -- we'll get to that, Professor Stulz.

I'm simply asking for right now whether -- if your -- it's your opinion that the information in the qui tam lawsuit is equally

Page 112

reliable to the information that was on Cafepharma.

MS. SOLOWAY:  Objection to form.

A.   I said that there is a difference between the two, which is that the qui tam lawsuit is submitted to a court and is, is a signed lawsuit, whereas the stuff on Cafepharma is unsigned.  But the stuff on Cafepharma has very specific facts about what people are doing and asked to do.  Those facts can be verified.

COURT REPORTER:  Can be very fine?

THE WITNESS:  Verified.

COURT REPORTER:  Verified.

Q.   And how -- do you know how investors were able to verify the information on Cafepharma during the class period?

A.   If the issues raised were important issues for investors, there was a way for them to ask questions about that at various analyst conferences.  They have not done so.

Q.   Professor Stulz, is it your opinion that investors definitively read Cafepharma?

A.   Well, it's my opinion that Cafepharma is widely followed.  That says they are followed by investors; that the -- that if the market is

Page 113

efficient, public information is going to be incorporated in the price rapidly that now cite -- I mean, Mr. Steinholt says that information would be incorporated rapidly if it's public information.  So...

Q.   Public value-relevant information.

A.   I'm sorry.  I wasn't done.

Now, he says -- I mean, that's an important part of his report.  He says that lots of investors that are incentivized to go and seek out information about companies on which they can trade and can make profits, and he cites hedge funds as being sophisticated investors that will engage in those practices.

So if there is material information out there that is valuable to investors, they will go and seek, seek it out.  Ultimately, that's what Aurelius did.

Now, Aurelius didn't do anything that the other investors, sophisticated investors that Mr. Steinholt talks about couldn't do on their own if it was worthwhile for them to do it.

Q.   Professor Stulz, what is your basis for opining that Cafepharma was read by investors? What do you specifically rely on for that belief?

29 (Pages 110 - 113)

Page 114

A.   Well, the Cafepharma site itself says -- describes the people who follow the site.  The New York Times discusses who follows the site.  One of those two at the very least would say that.

I mean, if you are -- if you are an investor in that industry and you are concerned about a firm, that's where -- I mean, it would make sense to turn there.  It's easier to actually get to Cafepharma than it is to get to Marcus Aurelius.

MR. CAPECI:  Brent, could you mark the New York Times article, please, as Exhibit 5.  And for Professor Stulz and Audra, that's number 8 in your set.

(Deposition Exhibit 5, New York Times article - A Their Space for Drug Sales Reps, Bates-labeled Stulz_00003037 - 3039, was marked for purposes of identification.)

Q.   Professor Stulz, is this the New York Times article that you just referenced in your testimony?

A.   Yes.

Q.   Would you please turn -- although,

Page 115

first, there is some highlighting on the first page and also on the third page.

Do you know whose highlighting that is?

A.   I have no idea.

Q.   So if you look on the second-to-last paragraph on the first page, it says:  The problem is that only industry insiders can figure out which postings are accurate.

Do you recall reviewing that portion of the New York Times article in drafting your report?

A.   I, I recall reading the whole article and I know that it says that investors read it, plaintiffs' lawyers read it, healthcare bloggers read it, journalists and recruiters.

Now, in terms of assessing signal to noise, I mean, obviously, that depends on the nature of the information.  There is information that is more in the nature of opinion or guesses and there is information that is more factual, and so that would be quite different, depending on what we are talking about.

Q.   Would you agree, Professor Stulz, that the New York Times article criticizes the reliability of the information on Cafepharma?

Page 116

A.   What the New York Times article is saying is there's all sorts of information on that site.  There's no question about that.  But the question is -- there's no question about that.

The issue is that the information that I cite to is more a factual type of information.  Now, when this says that I'm being compensated on total dirt, I don't see any reason --

COURT REPORTER:  I'm sorry.  When it says...

THE WITNESS:  That I'm compensated on total dirt, D-I-R-T, that would be information to investors if that would be relevant and if they think that information is material and is information they would want to pursue.

Q.   Professor Stulz, did you read the last sentence in this article?

A.   As I said, I read -- I read the whole article and -- now, it gives a range of opinions and -- with any website, including the Marcus Aurelius website.  You have to be cautious.

Q.   I'm sorry.  It doesn't talk about the Marcus Aurelius website, right?  Can we agree with that, at least, in 2007?

Page 117

A.   We agree that the New York Times did not talk about the Marcus Aurelius report.  So, for them, it wasn't -- it wasn't something to discuss.

They -- there's no reason for me to disagree with anything they say in the sense that there is a lot of information on that website that if you were a sophisticated investor working for a hedge fund that is looking for positions in Vanda and some things that would be useful information for you, you would have to evaluate it.  But that information would be in the public domain.

Q.   Professor Stulz, the last sentence of the New York Times article says:  The latest advice, posted May 21, might serve as a verdict on the whole website as a source of reliable information:  Quote, don't count on it.

Professor Stulz, is there any reason why you didn't include that portion of the New York Times article in your report?

A.   As far as I know --

MS. SOLOWAY:  Objection to form.

A.   As far as I know -- sorry.

COURT REPORTER:  I'm sorry.  Was there

30 (Pages 114 - 117)

Page 118

an objection?

MS. SOLOWAY: I just said "objection to form."

A. As far as I know, I don't quote any of the article directly. The...

Q. Professor Stulz, could I direct you to --

A. I'm sorry.

Q. [Overtalking.]

COURT REPORTER: I can't hear you both.

MS. SOLOWAY: I don't think he was finished -- I don't think the witness was finished with his answer. Why don't we let him finish.

MR. CAPECI: Sure.

A. My concern was whether information was in the public domain, and the answer is yes, it is, and it is for all the reasons that I discussed.

Now, in a site like Cafepharma, if you look at the whole site, you will see a lot of things, but the information concerning Vanda that I cite is very specific and is information that is similar or is the same as the one that ultimately is published by the Value report.

Page 119

And what I'm saying here is that Cafepharma is a source for the Value report. So if you think that value pharma is problematic -- I'm sorry -- Cafepharma is problematic, then you are saying the Value report is problematic, as well.

Q. Well, sir, we certainly -- we certainly disagree with that and we think that you're having some trouble understanding what our client's actual allegation in this case is.

MS. SOLOWAY: Objection to form.

Q. Be that as it may --

MS. SOLOWAY: Is there a question?

Q. Be that as it may --

MR. CAPECI: Yes.

Q. The question is -- the question is whether or not you believe -- you know what? Strike that. We'll --

MR. CAPECI: Brent, can you mark as the next exhibit, please. Am I wrong on the exhibit number? Was it -- am I off by one? Would this be Exhibit 5 or Exhibit 6 that we're going to enter?

MS. SOLOWAY: I think you're up to 6.

MR. CAPECI: Yeah.

Page 120

MS. SOLOWAY: The Times article was 5.

MR. CAPECI: Right.

Q. We're going to mark as Exhibit 6 one that did not make the mail-in to you. It's the compilation of the Cafepharma posts that were produced to us, Professor Stulz, by Vanda's counsel.

(Deposition Exhibit 6, Cafepharma posts, Bates-labeled Stulz_00000001 - 18, was marked for purposes of identification.)

Q. You received a PDF. The Cafepharma posts were part of that PDF. We extrapolated the ones that related to Cafepharma. They are Bates-stamped Stulz_1, 2, 3, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 18.

MS. SOLOWAY: So this is not --

MR. CAPECI: This should be on Exhibit Share.

COURT REPORTER: I can't hear.

MS. SOLOWAY: I was just going to say -- okay. The document just appeared, so, René, you should be able to open it now online.

THE WITNESS: I have it.

MS. SOLOWAY: Why don't we just take a minute.

Page 121

BY MR. CAPECI:

Q. I apologize. Yeah. Please take your time. And I apologize for it not being sequential, but we compiled it in the form that it was produced to us.

Professor Stulz, are you ready?

A. Yes. I looked at the posts.

Q. Did you go on Cafepharma and collect these posts, or were they provided to you?

A. So I've gone on Cafepharma. I've looked at it. I did not download the posts. Cornerstone did that.

Q. Do you know approximately how many posts there are about Vanda on Cafepharma?

A. No, I don't. The intent wasn't to reproduce every post. The intent was to show posts that contained information that is similar to or the same as the information that Aurelius value has in its report.

Q. Would it -- would it matter to you, Professor Stulz, if I were to tell you that there were approximately 2,000 posts about Vanda and that these are only a subset of those posts?

A. I know it's a subset. I mean, I explained very clearly in my report why I cite

31 (Pages 118 - 121)

Page 122

the posts that I do, which are posts that have the information that subsequently shows up in Value Aurelius. There was no reason for me to look at posts in general in the sense that my focus was what is it that was public information that is related to the allegations.

And the information that I cite from Cafepharma is information related to the allegations in the same way as the qui tam lawsuit has information correlated to the allegations that is public before the value -- the Aurelius Value report.

The whole issues that I had rest here is simply is there evidence of information being public before February 11 related to the allegations that shows up in the Aurelius Value report, and the answer is yes. The answer is yes because that information is in the qui tam report. It's in Cafepharma. It's in Glassdoor. It's in analyst reports. It's in the FDA letter and so on.

Q.   So your only criteria is whether the information is public, not whether it would have been material or value relevant to investors at the time; is that right?

Page 123

MS. SOLOWAY: Objection to form.

A.   We discussed repeatedly the issue of value relevance. As I say, when the information was published in the Aurelius Value report, it did not lead analysts to make changes in their assessment of the corporation based on information related to allegations. As a result, as of that time, analysts did not find it value relevant.

So the relevant question for me is, is that information in the market before. As I say in my report, the Aurelius Value report uses information that they could collect on their own from public materials. They collected it from Cafepharma; they collected it from Glassdoor; they collected it from the qui tam lawsuit and other materials.

Q.   So it's your testimony that the information was not value relevant when it was posted on Cafepharma and was also not value relevant when it was included in the Aurelius Value report; is that right?

MS. SOLOWAY: Objection.

A.   No. I --

MS. SOLOWAY: Misstates the testimony.

Page 124

A.   I don't have an opinion on value relevance when that information came to the market first. I have an opinion that when that information was published in the Aurelius report, it did not lead analysts to change their assessment of the corporation. And so, as of that time, the analysts did not find it value relevant.

Could it have been value relevant when it was first published? It could be. I don't know. What I know is that by the time it was in Cafepharma, there's no evidence of abnormal returns. When that information is published and when it's published with a qui tam lawsuit, there is no evidence of abnormal returns.

Q.   So is it your opinion, sir, that during the entirety of the class period, investors were apprised of alleged off-label marketing at Vanda?

A.   I am not an expert in off-label marketing and I'm not an expert in disclosure.

What I am saying is even before the start of the class period, there were indications that Vanda was considering a more extensive marketing approach than the narrow approach that seems to be suggested it should have pursued

Page 125

according to the complaint.

Q.   Do you agree, Professor Stulz, that there's a difference between considering an off-label marketing approach and actually being credibly accused of engaging in an off-label marketing campaign?

MS. SOLOWAY: Objection to form.

A.   In terms of the investors and in terms of the stock price, the -- when that is being considering -- considered, it creates a risk for the investors that it's actually going to be done. So it opens a risk for investors, that if it's material, that will affect the stock price that investors will base their decisions on. So if it subsequently happens, then it becomes a realization of the risks that they were aware of.

Q.   All right. Let's turn to what we've marked as Exhibit 6. And please turn to the third page, which is Stulz_3. It's a Cafepharma post from September 8th, 2018, at 2:53 p.m.

A.   Yes.

Q.   Dr. Stulz, are you able to tell me who from -- who from Vanda wrote this post?

A.   I'm sorry. Can you repeat. I seem to be looking at the wrong one.

32 (Pages 122 - 125)

Page 126

Q. It's Stulz_3, if you look at the Bates stamp on the bottom.

A. Okay. Oh, so that's September 8, 2018?

Q. Yeah. Who wrote this post?

A. As we have already discussed, the posts on Cafepharma are unsigned. Unsigned.

Q. Are you certain that someone from Vanda posted that?

A. Well, as you know, the second bullet points in that post is something that shows up in other -- in other documents. It shows up in this issue of Incentive. It shows up in the Aurelius report and shows up in the qui tam lawsuit.

So, at the very least, it's somebody who knows how incentives are set. This issue of being paid on total dirt is one that shows up repeatedly. And so it's information that as -- is available elsewhere.

Q. Professor Stulz, the question was: Are you certain that someone from Vanda made this post?

A. My answer was that the information that is Vanda specific here is information that has been -- is available elsewhere, as well.

And concerns details of the incentive

Page 127

pay of salespeople, you are suggesting that somehow somebody knew all the details of incentive pay wasn't at Vanda and would send posts -- a post on Vanda, about Vanda. I can't exclude that, but it seems awfully far-fetched.

Q. Did you take any steps to verify the author of this post?

A. What I was concerned about is, is that information that subsequently finds its way in Marcus Aurelius Value report. I did not try to verify the Aurelius report itself either. Now, when it makes allegations that come straight from Cafepharma, I did not try to verify that either.

So what I am saying is that information that comes from Cafepharma and shows its way into the Aurelius report or comes from the qui tam lawsuit and shows in the Aurelius report, I haven't verified any of that information because that's not my job here.

My job here is to say that my investigation -- my job is to investigate whether in an efficient market the information -- as described by...

The efficient market, that information as published by Aurelius would not affect the

Page 128

stock price. I'm sorry. This was kind of wobbled.

Now, I was asked to investigate whether an efficient market as described in the Steinholt report one could make statement about the price impact of the alleged misstatements and omissions.

And my answer is: If what is published in the Aurelius report is information that was in the market, then the allegation-related information in the Aurelius report should not have a price impact in an efficient market. And I show that that information was available before the Aurelius report through a number of outlets, including Cafepharma.

Q. Where, where on this post, Professor -- well, strike that.

Okay. Professor Steinholt [sic], can we agree that the author of this post is anonymous?

A. I'm sure that -- I mean, I'm sure that Mr. Steinholt -- is not a professor -- would agree, but I am -- I also agree that the posts on Cafepharma were not signed, as I said earlier.

Q. Okay. When you say "unsigned," you mean we don't know who the author of the post is?

Page 129

That's what you intend to convey by "unsigned"?

A. There is no name attached to it.

Q. Thank you.

Okay. On Stulz_3, where in this text does it say that Vanda's engaged currently in an off-label marketing promotion scheme for Hetlioz or Fanapt?

COURT REPORTER: I'm sorry. An off-label marketing promotion for...

MR. CAPECI: That Vanda is currently engaged in an off-label marketing scheme for Fanapt or Hetlioz.

Where does it say that in this post?

A. I'm sure that you know the complaint much better than I do or you have a better memory than I do, but my recollection is that the incentives of salespeople is one of the issues brought up in the qui tam lawsuit and brought up in the complaint about the marketing practices of Vanda.

Q. So it's your belief, Professor Stulz, that my client's alleging that the misrepresentations were false because they failed to disclose how these salespeople were being compensated?

33 (Pages 126 - 129)

Page 130

MS. SOLOWAY: Objection.

A.   I'm not saying that. I'm saying that in the complaint, there is a list of the practices that are indicative of off-label marketing, and that among those practices, the incentives of salespeople that compensates them for off-label use of the drugs, this is precisely what this post is saying.

Q.   How are investors -- when they -- if -- assuming any investor actually looked at this, how is an investor supposed to know that this was, in fact, taking place if the author of this post is anonymous?

A.   What an investor would get from this is that somebody talking about the goals on sales incentives for that person at Vanda states that the compensation is tied to off-label prescriptions.

Now, that would be an indication that these are for off-label prescriptions. If you were an investor in Vanda or considering to be an investor in Vanda or were a sophisticated investor and thought that this is a material issue, then you would be alerted to it and you would be looking at it.

Page 131

Q.   Is it your understanding that it's legal for sales representatives to be compensated for off-label sales of the drug?

MS. SOLOWAY: Objection.

A.   I have no legal expertise, as I keep repeating, and I'm not going to change.

As I said, the complaint looks at off-label compensation as one of the elements of this marketing practice, and this is exactly what it says.

Q.   Okay. Let's look at the next page, which is Stulz_9. This is from September 11th, 2018.

And, again, just to confirm, do you agree that the author of this post is anonymous and unknown?

A.   As we have discussed before, the posts on Cafepharma are not signed, but what is discussed here is precisely the set of issues that are raised in the complaint and are raised in the qui tam lawsuit.

Q.   So, Professor Stulz, can you explain to me what in this Cafepharma post on September 11th, 2018, states that the company was engaged in an ongoing off-label promotion scheme for

Page 132

Hetlioz?

A.   Absolutely. Any Ambien failure is a perfect Hetlioz patient.

Q.   So but who wrote this post? Who is saying that?

MS. SOLOWAY: Objection. Objection.

Q.   Which -- can you tell me which Vanda sales representative wrote that?

MS. SOLOWAY: Objection to form.

A.   I can't tell you that because we have already agreed that the posts are not signed.

What I'm saying is that this post raises an issue that is an important issue in the complaint and does so a number of months before the Aurelius report and were first to issue that subsequently discussed in the Aurelius report.

The whole point here is that the issues discussed in the Aurelius report are discussed on Cafepharma many months before the Aurelius report and that the Aurelius report uses that information as part of its report.

Q.   Just to be clear, Professor Stulz, we agree that at the time this post was made, there was nothing to indicate that anyone from Vanda actually made the post; is that right?

Page 133

MS. SOLOWAY: Objection. Misstates the testimony.

A.   I have nothing to change to what I said before.

Q.   So, Professor Stulz, looking at paragraph 26 of your report. You state that Glassdoor is a website through which current and former employees post reviews of companies.

You --

MS. SOLOWAY: Michael, just give me a second. We're switching, switching exhibits. Sorry.

Paragraph 26?

MR. CAPECI: Yeah, paragraph 26.

MS. SOLOWAY: Okay.

A.   Yes.

Q.   What did you -- did you -- did you take any steps to verify whether the Glassdoor posts you cite were, in fact, written by a current or former employee of Glassdoor? Of Vanda?

A.   So Glassdoor works differently from Cafepharma, or at least I think they do. Now, I don't think Cafepharma verifies whether somebody's an employee or ex-employee. My understanding of the practices of Glassdoor is

34 (Pages 130 - 133)

Page 134

that there is a checking mechanism.

Q. Okay.

MR. CAPECI: Brent, could you please mark as 15 -- the number 15, the Glassdoor piece.

And this would be number 15 in your set, Audra and Professor Stulz. We'll mark this as, I believe, Exhibit 7.

(Deposition Exhibit 7, Glassdoor Help Center printout, was marked for purposes of identification.)

A. I'm sorry. Where do I find it?

Q. Number -- it's number 15 in your set, sir.

A. Oh, okay.

Q. For the record, it is a printout from Glassdoor's website dated October 20th, 2021: How can we help you today? And it states: Does Glassdoor verify employees? At Glassdoor, we aim to verify our data as much as possible. Considering the reality of our digital age, however, we're unable to fully confirm our users' identities, the truthfulness of their contributions, or their employment status.

Did you look at this provision on Glassdoor in providing your opinions today in

Page 135

your report, Professor Stulz?

A. Well, I mean, so -- now, based on my understanding and knowledge of Glassdoor and use, it is an attempt to make sure that people are employees -- aware employees, but everybody who knows anything about the Internet would know that those attempts have limits.

Now, the one thing that I know is that now you can use information on Glassdoor to predict expected returns on stocks, so that information can be quite useful.

Q. And how do you -- how do you know that? What, what makes you believe you can use information on Glassdoor to make predicted returns on stocks?

A. I have a student that actually is working using Glassdoor and he keeps showing me the results as things evolve for his dissertation.

Q. Okay. Is that a published paper, sir?

A. No. I understand that there are some published papers on this, as well.

Q. You relied and considered them in connection with your report here?

A. No. I didn't have to rely on them.

Page 136

Q. So let me ask you this, Professor Stulz:

The Glassdoor post that you reference in your report, are you certain that those came from current or former Vanda employees?

MS. SOLOWAY: Objection to form.

A. I think we are going in circle here. I mean, what I know is that this information is information that was used by Aurelius value. And I show that this information was public before and so that it being an Aurelius value was not new information.

Q. But you didn't take any steps to verify the identity of the users of the Glassdoor posts; isn't that right?

MS. SOLOWAY: Objection to form.

A. I have nothing to add to my testimony.

Q. Is it your understanding that investors look at Glassdoor for value-relevant information on companies, Professor Stulz?

A. My understanding is that it is a source of information that is used, but it's an informal understanding. I don't...

Q. Are you done?

A. Yes.

I would add that there are hedge fund

Page 137

strategies that essentially try to siphon as much information as they possibly can, and so that would be information that you would expect them to siphon.

Q. Anonymous reviews on Glassdoor is the type of information you'd expect hedge funds to look at as being value-relevant information?

A. It is information that can have value-relevant implications, so it is information that you would want to look at because it might tell you something useful about a firm or it might not. You would have to assess it. You would have to look at what type of facts are being discussed.

The point here is, now, that the Marcus Aurelius Value report used that type of information, and so that by itself is proof that investors look at Cafepharma and look at Glassdoor for information.

Q. So turning back to Exhibit 4. Can you show me where in the Aurelius report it mentions Glassdoor?

A. So they may not -- they may not mention Glassdoor. We know they mention Cafepharma, but it's the same type of information. So if you are

35 (Pages 134 - 137)

Page 138

a hedge fund that is trying to collect information about a firm, that's the type of information you'd be looking at.

Q. Did you undertake any analyses to ascertain whether the two Glassdoor posts you cite in your report contain value-relevant information?

A. We discussed this issue repeatedly already, and the answer is that I looked at the post to see whether they had information that -- of the type that showed up in the Aurelius Value report, and the answer is yes.

So the aim of this exercise is to show what information is public. It is not to show what information is both public and value relevant.

MR. CAPECI: Audra, I just want to touch on one other topic real quickly, and then does it perhaps make sense to break for lunch?

MS. SOLOWAY: Sure.

René, are you doing okay? Can you go for another five minutes?

THE WITNESS: I'm okay.

MS. SOLOWAY: Okay.

Q. Professor Stulz, I just want to talk to

Page 139

you about the FDA Adverse Event Reporting System.

Is it your opinion that the FDA Adverse Event Reporting System conveyed to investors in 2013 and 2014 that Vanda was engaged in an off-label promotion scheme for Fanapt and Hetlioz?

MS. SOLOWAY: Objection. Form.

A. What I say in my report is that the adverse event reports concerning Vanda have frequently -- raised frequently the issue of ineffectiveness, and that could be an indication that -- of their off-label use, given that their effectiveness was demonstrated for on-label use.

Q. Well, just to be clear, you understand that Fanapt was not marketed and sold by the company until 2015; is that right?

A. That's correct.

Q. So this -- your opinion as it relates to the FDA Adverse Event Reporting System is limited to Hetlioz?

A. I mean, the Adverse Event Reporting System is still in effect throughout the class period.

Q. Did you see anything on the FDA Adverse Event Reporting System during the class period

Page 140

that led you to believe it was disclosing off-label marketing for Fanapt or Hetlioz?

A. The only thing I refer to with respect to the adverse event reporting is the frequency of ineffectiveness statements.

Q. Are you aware of when my client alleges that the off-label promotion schemes for Fanapt and Hetlioz began?

A. My understanding is that the first misstatement in the class period would have to do with why Vanda was expanding the sales force for Fanapt. And that was on November 4, 2015. I did not understand that to mean that this was the start of off-label marketing.

Q. Do you know if the complaint alleges that there was off-label marketing before 2015?

A. My recollection is that's the first misstatement is November 4, 2015, associated with the expansion of the sales force. That's all I remember.

MR. CAPECI: Okay. I think we can -- I think we can break here. We're going to pick up on paragraph 27.

Audra, how long would you like to allocate for lunch?

Page 141

MS. SOLOWAY: René, what do you think, 30 minutes?

COURT REPORTER: Off the record?

VIDEOGRAPHER: The time is --

THE WITNESS: I'm fine with that.

VIDEOGRAPHER: The time is approximately 1:29 p.m. This is the end of media number three and we are going off the record.

(A luncheon recess was taken.)

AFTERNOON SESSION

VIDEOGRAPHER: The time is approximately 2:21 p.m. This is the beginning of media number four and we are on the record.

BY MR. CAPECI:

Q. All right. Welcome back, Dr. Stulz. Do you understand that you're still under oath?

A. Yes, I do.

Q. Wonderful.

And did you discuss your testimony at all during our lunch break?

A. I had a brief phone call with Ms. Soloway, partly to see how I was doing and partly to see -- for me to see when we would be done because I have to go out of town. I just wanted to have a sense of when.

36 (Pages 138 - 141)

Page 142

Q. Okay. Well, you know, that all depends on how quickly we get the answers to our questions.

MR. CAPECI: So without further ado, Brent, could you mark the FDA warning letter as an exhibit, please.

(Deposition Exhibit 8, Warning letter from Vanda Pharmaceuticals, was marked for purposes of identification.)

Q. This would be number 7 in the set that you were provided, Professor Stulz and Audra.

MR. MITCHELL: It should be marked and uploaded.

MR. CAPECI: Okay. And, Brent, are we at 8? Is that right?

MR. MITCHELL: That's correct.

MR. CAPECI: Okay. Great.

BY MR. CAPECI:

Q. So marking as Exhibit Number 8, for the record, is a warning letter from the FDA to Dr. Polymeropoulos. It's dated October 22, 2018. Professor Stulz, is this the FDA warning letter that you cite in footnote 47 on page 14 of your report?

A. I have this. Yes.

Page 143

Q. Okay. Professor Stulz, is it your opinion that this warning letter, letter informed investors that there was off-label marketing in Fanapt and Hetlioz?

A. It informs them that there was misbranding. Misbranding would be a form of off-label marketing, or at least could be seen as a form of off-label marketing.

Q. And what's your basis for that view?

A. Well, if you misrepresent what the drug is about, your doing so might lead to uses of the drugs that are not label -- that are not on the label.

Q. What's your understanding, sir, of what this warning letter is about?

A. It is about Vanda being accused by the FDA of having a web page that misbrands Fanapt and Hetlioz.

Q. Misbranded how?

A. My recollection is -- I mean, I would have to read the whole letter to refresh my recollection, but the -- one of the issues is that risks were improperly reported on the web page.

Q. Are you an expert --

Page 144

COURT REPORTER: What were improperly reported?

THE WITNESS: Improperly reported on the web page.

COURT REPORTER: What was? What was?

THE WITNESS: The risks.

COURT REPORTER: The risks. Thank you.

BY MR. CAPECI:

Q. And, Professor Stulz, are you an expert in what constitutes off-label marketing?

A. We already discussed that issue, and I said very explicitly that I'm not an expert.

The point of this letter is that Vanda wasn't following, according to the FDA, the proper approach to sell its drugs across interstate borders, and so that's part of the whole set of information that the investors had.

Q. So it's your view that this FDA warning letter disclosed that there was -- that sales representatives were marketing Fanapt and Hetlioz off-label?

MS. SOLOWAY: Objection. Form.

A. Well, I mean, so I'm not -- I mean, as I said, I'm not an expert in off-label marketing. What this discussion in my report is

Page 145

about is that the Aurelius report -- the Aurelius Value report discusses this letter. And the point of citing the letter is that it was in the public domain. Anybody could get it and anybody could get it for months. So that's not new information.

Q. Professor Stulz, do you understand my client to be alleging that Vanda failed to disclose that -- the safety risks of Fanapt and Hetlioz in marketing those drugs?

MS. SOLOWAY: Objection to form.

A. Actually, aims at discussion of the various ways that Vanda was mismarketing Fanapt, if I remember correctly, is a complaint raises the issue that Vanda wasn't properly focusing on -- I mean properly telling people about the risk of QT prolongation. And so that would be Vanda not discussing the risks properly.

Q. Okay. And that was -- the sales representatives were using the company's website to do that? Is that your understanding?

A. I'm confused by the question in the sense that here we have the company not mentioning the risks properly, which I would think within the contours of the complaint would

37 (Pages 142 - 145)

Page 146

be an instance of mismarketing, is the complaint.

Q. Professor Stulz --

A. I'm sorry. So --

Q. Is the FDA warning letter --

Is the FDA warning letter mentioned in the complaint?

A. I actually don't remember. I would have -- I would have to look.

The point of mentioning the complaint letter is that the Aurelius -- I mean, the FDA letter is, as the Aurelius report mentions it on -- my report focuses on what was available publicly that ended up finding its way in the Aurelius report.

The FDA letter was available publicly. You then said, well, that has nothing to do with the complaint. I pointed out that the complaint raises the issue of not properly disclosing the risk of QT prolongation. Or I'm not quite sure whether I am getting the language right here, which is a risk.

Q. Does the -- is it your understanding that the complaint alleges the company did that through its website for Fanapt and Hetlioz?

A. I would have to go back to the

Page 147

paragraphs that I keep mentioning in the complaint that lists all the ways that this multifaceted marketing scheme was operating.

COURT REPORTER: I'm sorry. Multifaceted what?

THE WITNESS: Marketing scheme alleged in the complaint was operating.

COURT REPORTER: Thank you.

Q. Is it your understanding, Professor Stulz, that -- strike that.

Is it your understanding, Professor Stulz, that plaintiff alleges anything about the safety risks of Hetlioz in connection with off-label marketing?

A. I remember the statement I mentioned about Fanapt. I don't remember about Hetlioz.

Q. Isn't it right that my client's allegations with Hetlioz revolve around whether or not the drug was marketed for Non-24?

COURT REPORTER: Non-24?

MR. CAPECI: Non, dash, two four.

A. You obviously can say what the complaint is about. I can only read it. Obviously, the complaint focuses a lot on sighted individuals that -- to whom Hetlioz is marketed.

Page 148

Q. Does that have anything to do with the safety of Hetlioz, the use of it?

A. I'm, I'm not -- I'm not a doctor. I'm not a specialist in those medications. My understanding -- I mean, my recollection -- and I may be wrong -- is that's a discussion doesn't have to do with safety.

Q. Thank you.

Okay. If we could please turn to paragraph 27 on page 17 of your report.

A. Yes.

Q. Professor Stulz, do you have an understanding of how the PACER website works?

A. I have an understanding, yes.

Q. Have you ever used PACER?

A. Well, I've been on the website and I have looked at it. I wouldn't say that I've used it, but I know how the website is structured.

Q. Do you know if you need a -- you need to have a username and password to access the PACER website?

A. You need a username and password to access the website like you do for a lot of websites, yes.

Q. Do you know if you have to pay money to

Page 149

access documents that are on the docket on PACER?

A. You wouldn't have to pay anything to find out that something got unsealed. You wouldn't have to pay anything to find out that there is a new lawsuit. If you wanted to download the lawsuit, you would have to pay something.

Q. Do you have an understanding as to whether or not there's one PACER website that encompasses all the federal district courts in the United States, or does each District Court have its own PACER website?

A. So my recollection is that when you look at the PACER website, you have an option to obtain information from all the courts, the federal courts.

Q. So it's your understanding that on PACER, you can search for dockets on every single federal court in one space?

A. That's my understanding. I hope that I am not wrong in that or that I don't misremember. My recollection is that you can type in Vanda and have all the courts searched.

Q. So you wouldn't need to know, for example, that the qui tam lawsuit was in the

38 (Pages 146 - 149)

Page 150

District of Washington, D.C., specifically look at that PACER website. You could go to a general website and just type in Vanda and come up with a lawsuit?

A. The way I remember the PACER website -- I mean, we can look at it. You can show it to me -- is that on the left you have a choice of courts, and on the right you have a choice -- I mean, you have an option to search more broadly.

COURT REPORTER: More broadly?

THE WITNESS: Yes.

Q. Okay. Mr. Stulz, do you have an understanding of how qui tam lawsuits are -- or what happens when a qui tam lawsuit is filed, initially?

A. I am not a lawyer, as I keep repeating. I have no legal opinions whatsoever. I have an understanding of qui tam lawsuits, which is that they get filed by individuals who file it under seal and then the lawsuit is being examined by various government entities who have the option to join the lawsuit, as those lawsuits are filed under what I believe is a False Claims Act and the individuals filing the lawsuit hope to share in the recovery.

Page 151

Q. From the time that the lawsuit is filed until the time that the government either agrees to intervene or declines to intervene, do you understand that the qui tam lawsuit's existence is unknown to anyone other than the court and the government?

A. So when you say "unknown to anyone," obviously, it's known from the lawsuits the file date and the individual who filed the lawsuit, in addition.

I understand that it's sealed and it's not public. In this case, I understand that it was unsealed and then became available on PACER. My understanding is that it became available on PACER on February 4.

Q. Do you have an understanding as to whether a company that is the target of a qui tam lawsuit while it is under seal knows about the existence of the lawsuit until it is sealed? Until it is unsealed?

A. I don't want to speculate on this, but I'm not aware of Vanda having known about the lawsuit, but maybe they did, but I'm not aware of it.

Q. Is it your understanding that there

Page 152

would have been no way for any investor to know about the existence of the qui tam lawsuit before February 4, 2019?

A. I don't know that that is true in the sense that I don't know how we can be sure that nobody mentioned it to some investors.

What I would agree with you is that it was sealed and wasn't available publicly until February 4 or until around February 4, 2019, but it's impossible for me to say that nobody blabs anywhere.

COURT REPORTER: Say that again. Impossible for me to say...

THE WITNESS: That nobody mentioned it. I mean, that's -- I mean, I don't see how anybody can know that.

COURT REPORTER: Did you say the word "blab"?

THE WITNESS: Yes.

COURT REPORTER: Thank you.

THE WITNESS: Which is not a technical word.

BY MR. CAPECI:

Q. Let me ask you this, Professor Stulz. Prior to the issuance of the Aurelius

Page 153

Value report, did you see anything in your careful review of the materials in this case that indicated that the qui tam lawsuit was public?

A. No, and I don't say that in my report. I say in my report that it became public when it was unsealed.

Q. So is it your testimony, sir, that the unsealing of the qui tam lawsuit automatically meant that the minute it hit the docket, it became -- it should have been publicly incorporated into the stock price of Vanda?

A. I haven't said the minutes, that it reached the docket.

As we have discussed previously, Mr. Steinholt says that public information gets incorporated in the stock price within a day. With that definition of market efficiency, it would have gotten incorporated in the stock price on February 5.

Q. Does that premise hold true even if no investor would have any knowledge of the fact that the lawsuit got unsealed?

A. Mr. Steinholt repeats in his reports that we have market efficiency in part because investors have tremendous incentives to find

39 (Pages 150 - 153)

Page 154

information that is material and trade on it.

So if that qui tam lawsuit is material information or if lawsuits against Vanda in general are material information or could be material information, you would expect sophisticated investors to go and look for that information, especially when it's so cheap to be looking for it and where the payoffs can be large.

Q.   So if investors had no idea this lawsuit was filed, it's your testimony that investors are constantly searching PACER to find unsealed whistleblower lawsuits every single day of the week?

MS. SOLOWAY:  Objection to form.

A.   You are misrepresenting what I said.

I said the sophisticated investors that think that there might be material information are going to be looking for it.  They are going to be looking at places where such information could be showing up.

Evidence of that -- evidence of that is Marcus Aurelius.  Now, they went looking for it, and it can't be that they are the only ones that ever went looking for that.

Page 155

Q.   Do you have an understanding of how Marcus Aurelius received possession of the whistleblower complaint?

A.   I don't have an understanding of that.

Q.   Is it possible that the whistleblower sent it to Marcus Aurelius?

A.   If he did that, how do we know that he didn't send it to other investors?

Q.   How do we know that Marcus Aurelius found it on PACER?

A.   Well, Marcus --

MS. SOLOWAY:  Objection to form.

A.   Marcus Aurelius had been fishing for information.  Had he been looking --

Q.   How do you know that, sir?  Did you speak to someone at Marcus Aurelius in connection with forming your opinions?

A.   No.  It says so in the report.

Q.   Had they been fishing for information in their report?

A.   No.  They say in their reports they had been looking for information for a period of time.  They had been looking at public information.  They didn't start looking at Vanda that week.

Page 156

Q.   Is it your view, Professor Stulz, that the qui tam complaint did not provide Marcus Aurelius Value with any information they didn't previously know about?

A.   I don't know about that.

What I show in my report is that information in the Marcus Aurelius report that is allegation-related is information that was public before the Marcus Aurelius report.  And I show that using the qui tam complaint.  I show that using Cafepharma, Glassdoor.  I show that using analyst reports and so on.

Q.   Well, do you agree that Marcus Aurelius characterizes the qui tam complaint as containing previously unreported information and new information?

COURT REPORTER:  And what information?

MR. CAPECI:  "New."

A.   First, information that is new to the qui tam complaint is public information as of the time of the Marcus Aurelius report.

Second, for concerning information related to the acquisition -- to the litigation I show in any reports, that information was public in a number of ways before the Marcus Aurelius

Page 157

report.

But I'm not saying that there's nothing new in the qui tam complaint.  I am saying that there's nothing new allegation related in the Marcus Aurelius report.

Q.   Before the issuance of the Marcus Aurelius report, did you see anything in the public record that disclosed that Richard Gardner, the former regional business leader at Vanda, was -- alleges that he was instructed by Vanda's CEO to engage in illegal off-label marketing?

A.   As I have said before today and I say in my report, the analysts that followed Vanda did not discuss those issues after the Aurelius report or before the Aurelius report, and so that's the information that I have.

If they were not going to discuss it afterwards and if it was new in the qui tam reports, they would not discuss it between the time of the qui tam report and the Marcus Aurelius report unless --

Q.   Well, Dr. --

A.   -- there were circumstances that justified it.

40 (Pages 154 - 157)

Page 158

Q.   Okay, Professor Stulz.  Do you have an understanding as to why Marcus Aurelius would characterize the qui tam lawsuit as new and previously unreported?

A.   We just discussed this.  I'm not saying there's nothing new in the qui tam lawsuit.  I'm saying the qui tam lawsuit was public.

Q.   So it's your testimony that plaintiffs placed on the docket without any notice of that complaint's existence being given to investors means that within one day, the complaint -- the contents of the complaint should be reflected in the company stock price?

MS. SOLOWAY:  Objection to form.

COURT REPORTER:  What of the complaint should be reflected?

MR. CAPECI:  The contents of the complaint --

COURT REPORTER:  Thank you.

MR. CAPECI:  -- should be reflected in the company stock price.

A.   If it takes one week for it to be reflected in the stock price, then this would be inconsistent with Mr. Steinholt's, Steinholt's definition of market efficiency.

Page 159

Q.   What academic literature are you relying on for the notion that information placed on a website without any notice to investors would be considered value-relevant information for purposes of price impact?

MS. SOLOWAY:  Objection.

A.   I am not sure what you mean by a notice to investor.  You will have to explain to me what you mean.

Q.   How would investors know to go to the PACER website to find the qui tam lawsuit on February 4?

MS. SOLOWAY:  Objection.

A.   My understanding is that there are services that will provide you with information about lawsuits concerning companies that you are interested in.  So it's not clear that they would even have needed to go there.

Q.   Do you have any understanding if any investors retained services like that for Vanda as of February of 2019?

A.   All I am saying is that investors who believe that that's material information that could come from lawsuits on -- have enough of an investment stake can easily get that information

Page 160

to them at what would seem to be a small cost compared to the potential payoff.

Q.   But you have no evidence that that, in fact, took place here?

A.   The Steinholt report shows that Vanda had hundreds of very sophisticated and very aggressive investors.  Now, it had some index investors.  Wouldn't do that, but you had many hedge funds that are always on the lookout for an investment hedge.  Edge.  That's obviously one way to get an investment edge.

Now, if it's totally the case that the information on that report decreases stock price by 5 percent, then any investor who is first there could position himself for that benefit.

Q.   Okay.  But the question is:  Do you have any evidence that that, in fact, took place?

A.   Well, if Mr. Steinholt is correct in his -- in his description of market efficiency, you would believe that it's those -- that this would happen.  Now, that's the investors who have all those incentives would go looking for information with information.

Q.   Do you have any evidence at all that any investor had the qui tam complaint in their

Page 161

possession before the Aurelius report was issued on February 11th?

A.   I think the way to establish that would be through individualized inquiry, as I discuss in my report.

Q.   Well, we'll get -- we'll get to the topic of individualized inquiries.  Can you please just confirm that you don't have any evidence?

MS. SOLOWAY:  Objection to form.

A.   As I have said repeatedly, none of the analysts following Vanda raised the issue of that complaint or changed their view of the company as a result of either that complaint or the Marcus Aurelius report.

And so the analysts, as far as I can tell, they didn't find that information to be important enough to be discussed with investors or to change their perception of the company.  That's what I know about investors.

Q.   So the fact that analysts, in your view, didn't respond at all to the qui tam lawsuit, that's your evidence that investors had the qui tam lawsuit for February 11th, 2019?

MS. SOLOWAY:  Objection.  Misstates the

41 (Pages 158 - 161)

Page 162

testimony.

A.    What I am saying is that because they didn't react to it as of before the Marcus Aurelius report or afterwards makes it difficult to get the type of evidence that you are wanting. If the investors and if the analysts had found the information to be valuable in their assessment of the company, we would no more have a reaction of investors.

Q.    If we could please turn to paragraph 28 on the top of page 18.

A.    Yes.

MR. CAPECI:  Am I the only one who can't see Professor Stulz?

MS. SOLOWAY:  No.  I can't see him either.  Oh, there he is.

A.    Sorry.  I removed the -- sorry.

Q.    No need to apologize, professor.

If I could just read that first sentence, part of it:  In addition, contrary to any suggestion that use of Hetlioz by sighted patients was unknown to investors.

Professor Stulz, do you understand that our allegation is that it's not that the use of Hetlioz by sighted patients is impermissible?

Page 163

Do you understand that?

MS. SOLOWAY:  Objection.

A.    I will -- I will let you be the one who knows what's a -- I mean what the allegation is about.  I mean, I don't want to interpret the allegations or anything like that.  I'm not a lawyer.

My understanding is that selling to sighted patients is an important issue.  And that the way I read the complaint, which may be wrong, is that it is an entry point into the marketings that you allege was illegal.

Q.    But would you -- would you agree that marketing Non-24 -- I'm sorry.  Marketing Hetlioz to a sighted person with Non-24, if that's permissible marketing?

MS. SOLOWAY:  Objection to form.

A.    As I have said several times, I am not an expert in what is permissible and what is not permissible.

In my lay understanding, marketing Hetlioz to sighted patients that do not have Non-24 at the time was not permissible in the sense that it would be off-label.  Subsequently, indication was added so that subsequently that

Page 164

would -- my answer would have to be modified.

But I repeat that I'm not an expert on what is legal or not legal.  But that's my lay understanding.  That's a label said explicitly as it was for Non-24.  It did not discuss non -- I mean that it was only for nonsighted, I mean, patients.

Q.    Dr. Stulz -- I'm sorry.

Professor Stulz, do you understand that doctors can prescribe drugs off-label permissibly?

A.    Yes, I do.  Doctors can prescribe drugs at their own discretion if they think it's in the interest of the patient.

Q.    And, and, and I think we agree that you're not an expert in off-label marketing.

So given those two things, why is it that your report is talking about the use of Hetlioz by -- in other words, the way that Hetlioz is being prescribed by doctors, what's the relevance of that to the price impact?

MS. SOLOWAY:  Objection.

A.    It has to do with an understanding of where the demand for Hetlioz was coming from and how it was going to evolve.  And analysts viewed

Page 165

the marketing of Hetlioz to sighted patients as being an important opportunity and that they valued Vanda more highly because of being more optimistic about that opportunity.

Q.    Well, let's read the last sentence of paragraph 29 together, which is on page 19:

Analysts thus acknowledged and discussed in their reports that, during the putative class period, Hetlioz was being prescribed by doctors for both blind and sighted patients and for sleep disorders other than Non-24.

MS. SOLOWAY:  Is there a question?

MR. CAPECI:  What -- yeah.

Q.    What does the prescription of Hetlioz by doctors have to do with price impact in this lawsuit?

MS. SOLOWAY:  Objection.

A.    The issue focused on here is what is it that was known -- was publicly known about the marketing practices of Vanda before the publication of the Marcus Aurelius report.

And the point here is that marketing to sighted patients was an important issue for analysts because it described a valuable opportunity for, for Vanda.  And so this issue of

42 (Pages 162 - 165)

Page 166

marketing to sighted patients was one that was discussed by analysts.

Q.   Well, but, sir, that's precisely what your report doesn't say.

Your report in paragraph -- the sentence I just read to you is about the fact that Hetlioz was being prescribed by doctors, okay, not marketed by Vanda.

Do you agree that there's a very important difference between those two things?

MS. SOLOWAY:  Objection.

A.   Okay.  I think that there's more to the paragraphs, just that sentence, in the sense that I discuss the facts that Oppenheimer actually increased its target price for Vanda as a result of this marketing -- I mean, as a result of the efforts of Vanda to market to sighted patients and that analysts viewed favorably the use of the Fanapt sales force to market Hetlioz to psychiatrists for sighted patients.

Q.   Besides patients with Non-24 or without Non-24?

A.   I mean, this goes to the subtle issue of what marketing for off-label uses represents. Now, subtly we're talking to psychiatrics who had

Page 167

sighted patients with sleep disorders about the benefits of Hetlioz.

Q.   Right.

So, Professor Stulz, I'm just simply trying to understand, your, your reading of these Oppenheimer reports is that they're disclosing that Vanda was marketing Hetlioz off-label to sighted individuals who wouldn't have Non-24; is that right?

MS. SOLOWAY:  Objection.  Misstates the report and the testimony.

A.   Yeah.  I did not say that.

Q.   How did -- how does saying that -- how does analysts commenting on the fact that Hetlioz was being prescribed for off-label purposes disclose anything that has any bearing on price impact?

MS. SOLOWAY:  Objection to form.

A.   I already addressed that issue.  I'm not sure that I have anything to add to it.

The point of this discussion is to summarize information that was in the market before the Value report on this information in this case being that sighted patients was an important source of revenue growth for Vanda.

Page 168

Q.   Sighted patients regardless of whether they have Non-24?

A.   I don't have that statement in my report.

What is clear from the analyst reports and from the surveys they conducted was that Hetlioz was being prescribed to patients that had Non-24.  And it's also clear, from what we discussed earlier, that there was public information that the sales force -- that some salespeople felt that they had to market Hetlioz as a substitute for Ambien when Ambien wasn't working, which would be off-label.

Q.   Other than Cafepharma, do you have any other source for what you just said, or is that the entirety of the source you relied on for that previous statement?

MS. SOLOWAY:  Objection.

A.   Well, it's also in the qui tam lawsuit.

Q.   Okay.  Moving on to paragraph 30.  And you referenced this earlier in your testimony, Professor Stulz, that there's a Jefferies report that states, quote:  Vanda has talked about finalizing its strategy for Fanapt which could include repositioning of the drug due to its low

Page 169

akathisia rate.

What's the significance of this to price impact?

A.   So it goes back to the same issue, which is what is the new information in the Aurelius report.  For the allegation-related information in the Aurelius report to have price impact, it has to be new and it has to be unexpected; otherwise, it can't have a price impact.

Q.   But what's the -- what's new and unexpected about Vanda considering -- right? Because it says "could include."  It doesn't say they would.  What's the price impact of them considering a marketing strategy?

A.   Well, it means two things:  It means that Vanda was considering positioning, which is precisely the one that the complaint objects to. Another complaint is a statement about Fanapt on mismarketing because of this akathisia rate.  And second, it means that investors were on notice at that time that Fanapt -- that Vanda might be considering that, which also meant that there are incentives if they believe that that was important to pursue the issue and to ask the company about it and so on.

43 (Pages 166 - 169)

Page 170

Q. So is it your view that this Jefferies report communicated to investors that Vanda was off-label marketing Fanapt?

A. It says that Vanda was considering a marketing strategy where the focus would be the low akathisia rate. And the complaint views emphasis of that low akathisia rate as being an indicator of market -- off-label marketing.

Q. So it's your view that the opinion complaint is alleging that the low rate of akathisia, in and of itself, constituted off-label marketing?

MS. SOLOWAY: Objection. Misstates the testimony.

A. The complaint has a long list of ways that this multifaceted marketing strategy was working. One of the ways that the complaint mentions is this attempt to sell based on the facts that contrast compared to other drugs. Fanapt had a low akathisia rate or akathisia rates that was not distinguishable from placebo.

Q. But does the Jefferies report say that Vanda was going to do that in order to obtain off-label prescriptions for conditions other than schizophrenia in adults?

Page 171

A. What the Jefferies report says is exactly what I quote, which is that Vanda was working on a strategy, that that strategy might include repositioning the branding of the drug to emphasize the akathisia rate. That is something that the complaint subsequently says was a way to market the drug off-label.

Q. Okay. Can we please, Professor Stulz, turn to your Exhibit 1.

A. I'm sorry. My Exhibit 1?

Q. Yes. Yes, your Exhibit 1 in your report. Yes. I know it does get confusing.

A. Okay.

Q. Who created this exhibit, Professor Stulz?

A. Cornerstone created it under my instructions.

Q. So you're the one who selected the references from the qui tam lawsuit in this exhibit; is that right?

A. Together with the staff of Cornerstone helping me, yes.

Q. What about the Cafepharma -- you know, the right-hand column, the earlier reference from other public sources. Those were your -- those

Page 172

were your selection, as well?

A. I'm sorry. I thought you were talking about that.

Q. I apologize, sir. My question -- the first question was the middle column for the qui tam lawsuit clips.

A. The way we proceeded with this was to look at the Aurelius Value report, look at statements that were allegation related, and then went looking to the qui tam lawsuit to earlier references. Not just Cafepharma, but anything that we could look at for the issues raised in the Aurelius Value report.

Q. Do you agree that there's a difference between behaving unethically and illegally?

MS. SOLOWAY: Objection to form.

A. I think it's an issue that can be specific to the circumstances one is looking at. I mean, I think, in general, ethical considerations can be different from legal considerations.

Q. This chart that Cornerstone compiled at your direction, do you need to be a financial economist to put a chart like this together?

MS. SOLOWAY: Objection. Misstates the

Page 173

testimony.

A. Just to be clear, I put this chart together with the help of the staff of Cornerstone.

Q. Professor Stulz, that's -- hold on. That's fair. That's fair, so let me restate the question in a way that's not objectionable to your counsel.

With respect to Exhibit 1, does one need to be a financial economist to put a chart like this together?

A. This chart is an outgrowth or a summary of the efforts I went through and the analysis I conducted to assess whether there was new information in the Aurelius Value report. That was allegation related to understand the -- whether the allegations or the alleged misstatements and omissions caused the price of Vanda to move on February 11.

To conduct an analysis, as I discussed before, but I have to add again, I used my skills and my training on the body of knowledge of financial economics. This chart is an outgrowth of that, so I could not have gotten to that chart without the analysis that I did --

44 (Pages 170 - 173)

Page 174

[unintelligible] -- my trainings --

COURT REPORTER: I'm sorry. I was coughing.

THE WITNESS: I'm sorry?

COURT REPORTER: So I could not have gotten to that chart without the analysis that I...

THE WITNESS: That I performed using my skills as a financial economist.

COURT REPORTER: Could we go off the record, please.

MS. SOLOWAY: Of course.

Q. And did you use a --

VIDEOGRAPHER: The time is approximately --

MS. SOLOWAY: Michael, hang on one second. Kristin needs a minute.

MR. CAPECI: I'm sorry. She asked to go off. I apologize.

VIDEOGRAPHER: The time is approximately 3:19. We're going off the record.

(A brief recess was taken.)

VIDEOGRAPHER: The time is approximately 3:20 p.m. and we are back on the record.

BY MR. CAPECI:

Page 175

Q. So, Professor Stulz, look at Exhibit 1 to your report. Did you employ a scientifically replicable methodology in creating this exhibit?

A. This exhibit answers a very simple question, which is, looking at the statements in the Aurelius Value report, can I find instances of that information being public before the publication of the Aurelius report. So that's an analysis that is replicable, and the answer is yes, I did find that information.

Q. And what's your source for conducting an analysis like this? Is there a specific piece of literature or a textbook that states that this is how financial economists were to look at price impact?

A. I'm sorry. I think I don't quite understand your question.

Q. Let me rephrase it.

Is Exhibit 1 one of the financial economic tools you referenced earlier in your testimony that you would rely on to demonstrate a lack of price impact?

A. The way to understand Exhibit 1 is the following: Now, we know from the definition of market efficiency -- and that's the definition

Page 176

that both I have and Mr. Steinholt has -- that for there to be a price impact, the information has to be new and unexpected. That's financial economics 101. It's market efficiency theory 101. Therefore, for there to be a price impact from the Aurelius Value report of information concerning the allegations, there has to be new and unexpected information concerning the allegations that is value relevant.

So we need new information, we need unexpected information, and we need it to be value relevant. We need those three things. That, again, is the theory of market efficiency. This means that one way to investigate whether there is market impact is to look at whether the information that is allegation related in the Aurelius Value report was in the public domain before that report.

And so to deal with that, you need to go and look whether that information is in the public domain. That's what I did, and I found that it was.

Q. And understood, Professor Stulz; however, my question was a little different. It was: Is Exhibit 1 a tool of a financial

Page 177

economist?

A. What Exhibit 1 does is provide a summary of evidence that I found showing that information was in the public domain.

Q. And what would we call this, just the results of your analysis? Is there like a scientific name that would be associated with this? Like a term of art like regression or event study? Does Exhibit 1 have something like that that goes with it?

MS. SOLOWAY: Objection.

A. Well, I mean, it is a summary of the evidence I collected of the facts that's allegation-related information in the Aurelius Value report was in the public domain before publication of the Aurelius Value report.

Q. Okay. Professor Stulz, you -- we're now on -- we're now on to paragraph 33. And it's on page 20, going on to page 21 in your report. You've alluded to it several times already in your testimony today.

Sir, why do you -- why do you believe it's necessary for an analyst to have expressed concern or commented negatively on the qui tam lawsuit? What's the importance of that to you?

45 (Pages 174 - 177)

Page 178

MS. SOLOWAY: Objection to form.

A. So I said nothing like what you just said I said. Sorry about the sentence. Too many "saids."

What I -- I didn't mean that it was important that they commented negatively. What I am saying is when information about a company changes in important ways, you expect an analyst to reflect that change in their report and in their models.

So if the company is not what they thought it was in a way that is material for them, meaning that its value should be different from what they thought it was, they will write about that in their reports. They will change their price targets. They might change their expected earnings. They might change their recommendation.

That's the ways that analysts work, and I don't see that at all in this case.

Q. Okay. So I'm just going to read the last sentence in paragraph 33: This lack of analyst attention is consistent with the finding in an efficient market that the alleged corrective information was not considered newer

Page 179

material information and was not expected to have a price impact on Vanda stock.

Is that the sum and substance of what you're saying in paragraph 33?

MS. SOLOWAY: Objection to form.

A. I would have to re-read the paragraph to make sure that that's the case. It's the last sentence of the paragraph. It's not necessarily meant as a summary of the paragraph.

Q. Okay. Well, please take a moment to re-read paragraph 33 and let me know if you agree with that.

A. Okay. I read the paragraph. The paragraph is really about the fact that there was no reaction by analysts on -- Mr. Steinholt is very explicit about there being a large number -- a significant number of analysts first looking at Vanda and very active and sophisticated investors.

And so those analysts did not discuss the Aurelius report or did not discuss the qui tam lawsuit. Or at least I have not found any evidence that they did. Now, I looked at all the reports in Mr. Steinholt's backup. I found -- I found nothing.

Page 180

And so, in order for that to be the case, it has to be that the information did not change their view of the company.

Q. Well, Professor Stulz, would you agree that you cite an article from flyonthewall.com that discusses the existence of the qui tam complaint and its allegations?

MS. SOLOWAY: Objection to form.

A. That's correct. In footnote 74, the article essentially is a bunch of extracts from the report.

Q. Okay. So my question is: Why isn't evidence of media attention enough? What is it about needing analysts' attention, too, that's necessary for purposes of price impact?

A. I'm sorry. I think you misunderstood what I was talking about.

The analysts are in the business of producing valuations of companies. They use those valuations to make recommendations. They use those valuations to have price targets. And so if -- one way to look at whether something changes the value of a company is to look at whether analysts change their assessment of the value of the company.

Page 181

And one way to see whether information is material is to see whether that information added to the information that analysts already had changes the way they look at the company.

The bottom line here is that the information in the Aurelius Value report and the qui tam lawsuit did not change the ways that analysts looked at the company.

Q. Would you agree, Professor Stulz, that it's enough that the information in the Aurelius Value report caused the stock to decline? Isn't that the inquiry on price impact?

MS. SOLOWAY: Objection.

A. The answer is no. The answer is that it's not enough to show price impact. The answer is that it's nowhere close enough to show price impact.

Let me be clear here. When I say it's not enough to show price impact, it's not in a legal sense. I'm not making any legal statements. I'm not an attorney. I'm speaking as a financial economist. As a financial economist, this is not in the same ZIP code as showing price impact.

Q. Okay. So why did you include it in your

46 (Pages 178 - 181)

Page 182

report if it's not in the same ZIP code as price impact?

A.   I'm sorry.  You have me confused.  Maybe your question wasn't what I thought it was.

I thought your question was isn't it enough to show that the price changed.  And I'm saying evidence that the price changed is not in the same ZIP code as showing price impact.  The reason for that is the price can change for many reasons, and here's the only price impact that I understand to be relevant is the price impact of -- due to the allegation-related information.

What I show in my report is that the allegation-related information did not have a price impact because if the market for Vanda is efficient as proposed by Mr. Steinholt, then repeating old information can't have a price impact.

COURT REPORTER:  Can or can't?

THE WITNESS:  Can't.  Cannot.

COURT REPORTER:  Thank you.

Q.   Professor Stulz, if there had been an analyst that came out with a report and ascribed the price decline to the existence of the unsealed whistleblower lawsuit, would that change

Page 183

your view?

A.   There is a fundamental issue with using exposed information in this way.  Now, because it's, it's the same problem as using the abnormal return for curative disclosure as evidence of price impact.  The curative disclosure dates were chosen in part because the market moved.  If the market had not moved, there would not be a lawsuit.

Q.   That's not my question, Professor Stulz.  My question is --

A.   Well --

Q.   -- you talked about the fact that there's no analyst attention to the qui tam lawsuit.  And my, my question to you is:  Hypothetically speaking, if an analyst had said the stock price declined in light of the qui tam lawsuit, would that change -- would that change your view as stated in paragraph 33?

MS. SOLOWAY:  Objection to form.

A.   The first thing I want to say is that what is relevant here is not that the stock price fell.  This is not the price impact analysis.  The price impact analysis is whether information that is allegation-related affected the stock

Page 184

price.

So if an analyst said, gee, the stock price fell because of either the qui tam lawsuit or the Aurelius report, that would not be evidence of price impact of the allegation-related information.  That's the first point.

The second point:  If an analyst said that the allegation-related information caused the price to fall, this would be inconsistent with market efficiency.

Q.   Professor Stulz, what you're saying is that in no scenario could...

A.   We have to be extremely precise about what we are talking about.  Now, when I look at February 11, there's also some new information to the market.

COURT REPORTER:  Excuse me.  Did I miss part of your question?  My computer just said that my internet was insufficient.  I just wanted to make sure I didn't miss anything.

MR. CAPECI:  Yeah.  The question was: What you're saying is that in no scenario could there be any price impact here.

A.   I'm not sure I completely understand

Page 185

your question.  When I --

Q.   [Overtalking.]

A.   I'm sorry.  When I set out in my investigation, I did not know what information I would uncover.  So before I started the investigation, there could be a price impact or there might not be.  I have no idea.  Okay?

After I have concluded my investigation, my conclusion is that the allegation-related information in the Aurelius report was already public.  In that case, if the market is efficient, then there cannot be a price impact.

Now, if the market is not efficient, then there can be a price impact, but not if the market is efficient.

Q.   What about, Professor Stulz, if analysts had questioned Vanda on the investor conference call about the allegations in the qui tam lawsuit, would that demonstrate that it was something that analysts were paying attention to?

A.   It would demonstrate that analysts wanted to know more.  That's not the same as analysts changing their view of the company as a result of the alleged lawsuit.  I mean the lawsuit, I'm sorry, not alleged.

47 (Pages 182 - 185)

Page 186

Q.   And what if Vanda disclosed the existence of the lawsuit in its SEC filings? Would that, in your view, demonstrate the materiality of the existence of that lawsuit in its allegations to Vanda's investors?

MS. SOLOWAY:  Objection.

A.   I think there's some confusion here.

My price impact opinion is that the Marcus Aurelius Value report did not have a price impact because the information that it had about the allegations was already public.  Part of the evidence that it was public is that the qui tam lawsuit was public.

So I'm not -- I'm not making statements generally about materiality or anything like that.  I'm saying that there is no price impact in an efficient market when information that is published on a given day is information that is already public.

Q.   So what, what part of the literature that you included in Appendix A provides support for your position that an analyst has to change its recommendation in response to a piece of news in order for that news to have price impact?

A.   So you misinterpreted my answers.  I'm

Page 187

really sorry if I wasn't clear here.

I am not saying that a condition for price impact is that analysts change their view. I am saying that here, further evidence to what I'm saying is that analysts did not change their views.

Q.   In your view, Professor Stulz, is it possible to have price impact for a piece of information even if that information doesn't cause analysts to change their views?

MS. SOLOWAY:  Objection to form.

A.   In general, I can't exclude the possibilities.  The analysis of price impact is very specific to the days that you are looking at and to the information that is revealed on that day.

Q.   Mr. Stulz, are you familiar with the Supreme Court case called Halliburton II?

A.   Yes, I am.

Q.   Do you recall approximately --

A.   I'm --

Q.   [Overtalking.]

COURT REPORTER:  I can't hear both.

A.   Yeah.  Sorry.  I just wanted to add to my answer.

Page 188

No, I did reach a decision, but I am not an attorney and I am not making any legal statements here.

Q.   Do you have a recollection, generally, when that decision came out?

A.   I would think it's more than five years ago, but I don't remember the exact year.

Q.   If I said 2014, would that refresh your recollection?

A.   So I was pretty close.

Q.   Prior to Halliburton II in your time serving as an expert for class certification motions, did you ever put forth an opinion that there was a lack of price impact?

A.   I believe so.

Q.   Can you recall what cases you did that in?

A.   I would have to look at the cases.  Now, when I say lack of price impact, it's not an opinion formulated like the one that I am discussing today, now, which is in the context of -- let me withdraw the question.  The answer. I remember a Credit Suisse-AOL litigation --

COURT REPORTER:  I'm sorry.  Say it again.  I remember...

Page 189

THE WITNESS:  Credit Suisse-AOL litigation where there was a discussion of price impact of analyst report, if I remember correctly.

There was a Moody's litigation where there was a price impact of a piece of information.  There are other cases, but I just don't remember them.

Q.   Professor Stulz, what -- did you conduct any mathematical calculations to try to -- withdrawn.

Professor Stulz, do you have an opinion as to whether the Aurelius report constituted price impact for nonallegation-related information?

A.   As I have said, the Aurelius -- I mean, on February 11, there was new information to the market that led the price to move.  One piece of information is that there was an investor that explained why he was shorting -- or she was shorting.  I don't know -- Vanda, and so in very negative terms, that by itself is information.

I did not view it as part of my tasks in this report to look at price impact of other pieces of information that came out on that day.

48 (Pages 186 - 189)

Page 190

I viewed my assignment to be what I describe, I believe, in paragraph 7, which is to look at what the market efficiency implies for the price impact of allegation-related information in the Aurelius report.

Q.   Professor Stulz, you didn't do anything in your report to explain why the price declined on February 11th, 2019.  Your report is simply focused on the fact that, in your view, the price decline on February 11, 2019, couldn't have had anything to do with allegation-related information; is that right?

MS. SOLOWAY:  Objection.  Objection.

A.   I would not state my opinions the way that you did.  I would say is that if the market for Vanda is an efficient market, as Mr. Steinholt proposes, then repetition of old information cannot move the price of Vanda stock.

I then show that allegation-related information was public before the Aurelius report and, hence, that information couldn't move the price on February 11.

There's other information on that day and, as I just said, there is new information in the mere fact that there is a short seller that

Page 191

is engaged in a campaign.

And that's the extent of what I looked at.  I did not view it as my task to explain how the various other pieces of information affected the stock price on that day.  Because, based on the theory of efficient markets, which is one that Mr. Steinholt and I seem to agree to, based on that theory, allegation-related information could not affect the stock price.

MR. CAPECI:  Okay.  I think I'm going to move on to another topic.  Audra, is this a sensible spot for a break?

MS. SOLOWAY:  Yeah.  I could use a five-minute break.  René, is that okay with you?

THE WITNESS:  It's good, yeah.

MS. SOLOWAY:  Good.

VIDEOGRAPHER:  Stand by.  The time is approximately 3:53 p.m.  This is the end of media number four and we're going off the record.

(A recess was taken.)

VIDEOGRAPHER:  The time is approximately 4:03 p.m.  This is the beginning of media number five and we are on the record.

BY MR. CAPECI:

Q.   Welcome back, Professor Stulz.  Do you

Page 192

understand you're still under oath?

A.   Yes, I do.

Q.   Did you discuss your testimony with anyone during our brief break?

A.   No.

Q.   Thank you.

Okay.  I'd like to turn to paragraphs 40 to 42 that are in your report, which are pages 26 to 27, for the record.

Professor Stulz, what do you mean by the term "individualized inquiry"?

A.   That you would need to inquire from individual investors to know what they were aware of.  For instance, whether those investors were aware of the qui tam lawsuit before the Aurelius report or were aware of the existence of practice -- of the practices that the complaint discusses.

Q.   Is that a term that's -- is that a term of art in the world of financial economics?

A.   It's not a term of art in financial economics.  The -- where to frame this using -- I guess I'm not sure I'm using terms of art.  But given that there is public information that subsequently is incorporated in the Aurelius

Page 193

report, it is likely that some investors know that information ahead of the Aurelius report and, therefore, these investors would not be damaged by the subsequent disclosure of that information because they already had it.

So to -- with that, now, to compute class-wide damages is not possible with -- is not possible because different investors could be damaged differently.

Q.   Your understanding of the term "individualized inquiry," what part of the financial economics literature do you draw upon for that understanding?

A.   I just want to make it absolutely clear when it says "require individualized inquiry," I do not mean to say in any way that the Judge should require individualized inquiry.

What I mean by that is to assess damages for individual investors, you would need to have the information arising from individualized inquiry.  I want to be absolutely clear on that and that I'm not make -- giving any -- making any legal statement here or any legal interpretation.

I'm just saying given that information is public if it's not incorporated in the prices,

49 (Pages 190 - 193)

Page 194

you would need to know what investors know to compute damages.

Q.   Are you an expert in what constitutes an individualized inquiry?

A.   I'm not sure I understand the question.

What I'm saying I think is very clear, is that if there is information that investors are -- that is public information and that information is not incorporated in the stock price for some reason, investors who have that information are not going to be damaged by the subsequent revelation of that information because they already have it.

Q.   So assuming you're right, Professor Stulz, that investors already had that information, it's your opinion that there is, quote, a need for individualized inquiry into punitive class members' disparate knowledge of off-label marketing allegations against Vanda; isn't that accurate?

A.   Again, I want to be absolutely clear here.  When I say "a need," I am not saying anything that the Court should be doing.  I am saying that, to compute damages, those damages are going -- can be different for individuals who

Page 195

buy at the same price on the same day because those individuals might have different knowledge related to the allegations.

Q.   And so what in your training as a financial economist qualifies you to make that determination?

A.   This goes to the claim by Mr. Steinholt that damages can be computed on a class-wide basis.  Damages can be computed on a class-wide basis if information is incorporated in the stock price.

If you are in a situation where some investors are knowledgeable about the allegation -- the practices alleged by the plaintiff and others are not, then those who are knowledgeable would not be damaged in the same way as those that are not knowledgeable as a matter of economics.

I mean, the law is a different issue.  I'm not a lawyer, as I've said.  But if you know about a practice and you're willing to invest despite knowing about that practice, at the current market prices, then you are not going to be damaged in the same way as somebody who doesn't know about the practice and then it

Page 196

causes a loss when the practice is disclosed.

Q.   Which of the materials in Appendix A address the issue of individualized inquiry?

A.   As I said, I come here with my experience and training as a financial economist, as well as my experience with class certification.

Q.   Have you ever previously opined on the issue of individualized inquiry when you've served as a class certification expert for the defense?

A.   Yes, I have.

Q.   And how many -- in how many instances have you done that?

A.   That I don't remember.

Q.   Are you aware of the Court ever agreeing with your view on whether individualized inquiries are necessary?

MS. SOLOWAY:  Objection to form.

A.   I'm not going to speak for the Courts.  Some reports have opinions about how some information was diffused, unknown by a lot of investors, and I know that those opinions played a role in the decision.

But for me to go beyond that, I would

Page 197

need to re-read some decisions.  I would want to re-read the body's decision where class certification was denied.

Q.   Do you think it's appropriate for you to be opining on the issue of individualized inquiries in your report?

MS. SOLOWAY:  Objection to form.

A.   I think it is appropriate for me to have the opinion as a financial economist that if information is -- concerning the allegations is available to some investors, that that's an obstacle to constructing a damages model that does not account for that.  And that one way to account for that would be to have individualized inquiry.  All of this is a matter of economics, not a legal matter.

Q.   So, sir, can you please just point me to the materials in Appendix A that discuss the concept of individualized inquiry in the financial economics context?

MS. SOLOWAY:  Objection.

A.   I gave you the answers that I can give, which is the second part of my assignment was to investigate whether Mr. Steinholt has proposed an approach to damages that is class-wide and

50 (Pages 194 - 197)

Page 198

addresses the theories of -- the liability theories of the plaintiff and produces damages only for those -- arising from those theories.

What I am saying in this section is if there is public information about the allegations and if it is claimed that that public information is not in the stock price of Vanda, and at the same time that Vanda trades in an efficient market, then the investors who have that information would be receiving a windfall if there is a class-wide allocation of damages that depends on the price at which an investor invested and the inflation at that time.

Q.   So if you could just, sir, please answer the question.

What in Appendix A talks about individualized inquiries in a financial economics context? Can you please point me to the articles.

MS. SOLOWAY:  Same objection.

A.   I am confused about the question in the sense that what I am addressing is the ability to have a class-wide damages model, given the evidence I put forth concerning February 11.

So what I'm doing there is drawing the

Page 199

implications of that evidence for the existence of a class-wide approach.

Q.   Where does the word "damage" appear in all of Section 6 or in paragraphs 40, 41, or 42?

MS. SOLOWAY:  Objection.

A.   I'm sorry.  I thought it was kind of obvious.

If there is a class-wide damages approach, then you don't need to ask any questions from investors about what's new.  You just need to know the price at which they pay -- the price they paid and what inflation is on that day.

Q.   Why do you -- why do you believe that your views on individualized inquiry are useful to Judge Block?

MS. SOLOWAY:  Objection.

A.   The reason I thought that this discussion was relevant in this report is that I have uncovered much public information about the allegations.  Given the existence of that information, you would expect that there are investors who have that information and, as a result, would be situated differently.

Now, there's, obviously, the issues that

Page 200

if that information was in the price, then investors would trade it and the price would not be situated differently.  But this section addresses the alternative where one concludes that the information is not in the price, but some investors had it.

Q.   And so the last sentence of paragraph 41, you say:  At a minimum, it raises the question of which investors were aware of the public information and which were not and whether any such investors deemed that information relevant to their investment decisions.

My question for you, Professor Stulz, is:  What proof do you have that investors had any -- were aware of the public information you're describing in paragraph 41?

A.   At the very least, Marcus Aurelius was aware of it.

Q.   Anyone else other than Marcus Aurelius?

A.   The whole point of having individualized inquiry would be to find out.

Now, as we have discussed extensively, the information that we have discussed throughout the day is invest- -- information that investors could access.  Anybody who wanted to could access

Page 201

the qui tam lawsuit.  Anybody --

Q.   But you have no proof, sir --

MS. SOLOWAY:  Let him --

Q.   You have no proof, sir --

MS. SOLOWAY:  Wait a minute.  Let's let him finish his answer.

A.   Anybody could access Cafepharma.  People could access Glassdoor.

Q.   Of course, you have no proof that anyone, in fact, did, correct?

MS. SOLOWAY:  Objection.

A.   Well, as I said, we have -- the one case where we have the proof is Marcus Aurelius.

Q.   Other than Marcus Aurelius, you can't identify any investor -- you don't in your report and you're not able to on the record today identify any investor that conclusively had access to the public information you discuss in paragraph 41?

A.   What I can say is, as we have discussed extensively, that Marcus Aurelius used public information.  That public information was available to other investors.

Q.   Professor Stulz, what you can't say is that for sure any investor other than Marcus

51 (Pages 198 - 201)

Page 202

Aurelius had that information; is that right?

MS. SOLOWAY: Objection. Asked and answered.

A. I have nothing to add to my previous testimony. I just want to reiterate that I am speaking to this from the perspective of a financial economist looking at damages models and that in no way am I drawing any legal conclusion in what I am saying. That's -- I want to be absolutely sure about that.

Q. And so my question to you, again, Professor Stulz, is: You've not substantiated for us that the phrase "individualized inquiry" is a matter of financial economics.

Where, where -- what can you point me to in the academic literature that talks about individualized inquiry in the financial economics context?

A. I answered this question before. I think I must not have been clear in my answer.

The financial economics here comes in in the demonstrations that there is public information about the allegation that information could be accessed by investors. The bal- -- if that information was in the price, as we would

Page 203

expect in an efficient market, there is no price impact of allegation-related information on February 11.

If that information wasn't in the price but was available to some individuals, it is the case that these individuals would receive a windfall with a damages model that is the traditional out-of-pocket model where the damages would be the difference between the price at which an investor bought on the -- but for price on that day.

To avoid that windfall, knowing -- inquiring investors about what they knew would be the way to avoid that windfall. All of that is straightforward application of economics principle if you want to have a damages model that avoids windfalls to investors.

Q. Thank you for confirming that nothing in Exhibit A discusses individualized inquiry --

MS. SOLOWAY: Objection.

Q. -- in the financial economics context.

Do you agree, Professor Stulz, that the right person to making -- to be making decisions on individualized inquiries is Judge Block, not you?

Page 204

MS. SOLOWAY: Objection.

A. I just want to make clear that Exhibit A cites the Brealey and Myers textbook on the principles that I apply in that textbook.

Concerning your second question --

Q. Hold on. Hold on.

A. I'm sorry. I want to answer the question fully here.

Now, concerning your second question, if you listened to me, I said repeatedly that I am not telling Judge Block what to do. That's not what I'm here for. In no way would I want to do that.

What I am saying is, in my analysis, as an economist, given that there is information related to the allegations that is public, those individuals who had that information between February 11 would be receiving a windfall with an out-of-pocket model that suggested by -- or recommended by the plaintiff's expert.

I am then saying that to avoid that, individualized inquiry could be used. I'm not saying it should be used. I am not having any legal opinion here and I am not telling Judge Block what to do. I'm raising the issue and I'm

Page 205

showing that there is a solution to it. That's all I'm doing.

Q. What is the name of the textbook you referenced earlier in your testimony just now?

A. The corporation finance textbook of Brealey and Myers.

Q. Principles of Corporate Finance?

A. Absolutely.

Q. If we look at the Principles of Corporate Finance, we're going to see a discussion in there of the issue of individualized inquiries in the context of financial economics?

A. I am not saying that. I am saying that if you look at that textbook, you will see the tools for the analysis that I undertake to evaluate Mr. Steinholt pro- -- I mean, proposed damages model in a context where some investors have information related to the allegations.

Q. Well, to the extent that this textbook or the portions of this textbook that you're relying on haven't been produced to us, we're going to ask that it be produced to us in a timely fashion.

And, Professor Stulz, we're going to

52 (Pages 202 - 205)

Page 206

reserve the right to bring you back to depose you on that textbook if it, in fact, does not show that there is any discussion or individualized inquiry in the context of financial economics.

A.   So you did not --

MS. SOLOWAY:  I'm going to -- I'm sorry. I'm just going to respond to that by saying that you can reserve all rights.  We disagree with the interpretation, the request, the demand, and the characterization of the testimony, but why don't we just move on from this.

Q.   All right.  Professor Stulz, turning to the portion of your report that appeared to us to deal with Mr. Steinholt's damages methodology, being Section 7, and including the word "damages" in the title, I direct your attention to paragraph 43 of your report on page 27.

You have a lengthy first sentence to paragraph 43 talking about your understanding of what the plaintiff must establish in terms of a class-wide damages model.

You say:  The methodology must be able to isolate reliably the damages attributable only to the allegedly misrepresented or omitted information, given the specific facts and

Page 207

circumstances of the case.

There's no footnote associated with this sentence, so my question, sir, is:  What did you rely upon for that understanding?

A.   I rely on what has been communicated to me by attorneys about what the standard is.

Q.   Anything else other than what you've been told by an attorney?

A.   I'm not an attorney.  I've read the relevant decisions, but I'm not an attorney, so I wouldn't rely on myself for the interpretation of those decisions.

Q.   Well, sir, you include over 155 footnotes in your report.  You don't seem shy about wanting to let Judge Block know when you're sourcing a piece of information.

Here you don't do that.  So if you're not relying on a source and you're not relying on yourself, where did you get this from?  Just from Vanda's attorneys and nowhere else?

MS. SOLOWAY:  Objection.

A.   It's a sentence that I have used in other reports, and so it's a sentence that precedes this litigation.

If the sentence were incorrect, I'm sure

Page 208

that I would be told by the attorneys.  And that's all I can say.  I don't think Judge Block wants me -- well, I don't know it.  I mean, but I'm a financial economist.  I'm comfortable citing articles in my field and I'm comfortable making sure that everything I say in my report is appropriately sourced.

But when it comes to legal matters, I am not a legal expert and I can only proceed from my understanding.  And if my understanding is wrong, then it needs to be corrected.  But I'm not -- I'm not an attorney.  I'm not a legal expert. And I am telling you what I understand and where my understanding comes from.

Q.   Okay.  Professor Stulz, are you an expert on how to calculate damages in a securities fraud class action lawsuit?

A.   As I keep saying, I'm an expert in financial economics.  I have been involved in many litigations -- in many securities litigations at the merit stage --

COURT REPORTER:  At what stage?

A.   -- where --

THE WITNESS:  The merit stage, where I did loss causation analysis on where I did

Page 209

damages analysis.

Q.   Have you ever been retained by plaintiffs at the merit stage to calculate damages in a securities fraud class action lawsuit?

A.   We discussed that early this morning, and I said at the time that I only received one phone call from plaintiffs.  It involved a merits phase and was unable to do it.

Q.   My apologies.  I thought we were only talking the class certification context earlier.

In your time serving as an expert in class certification, as an expert for defense, for the defense in class certification motions, has the Court ever rejected a proposed damages model under Comcast?

MS. SOLOWAY:  Objection to form.

A.   As I have said repeatedly, I'm not an attorney.  I have no legal expertise, and so all I can say in this context is that I know of at least one case where the Court agreed with me concerning opinions in the Comcast section of my report.

Q.   Which court was that?

A.   That was the BP case.

53 (Pages 206 - 209)

Page 210

COURT REPORTER: BP?

THE WITNESS: BP, yes.

Q. And that was at the class certification stage?

A. That's correct.

Q. And so that Court found that there was not a satisfactory damages model for purposes of Comcast, that class certification.

MS. SOLOWAY: Object.

Q. Is that your understanding?

MS. SOLOWAY: Objection.

A. I am not a lawyer, as I said. I think that, from my lay perspective, that's reasonable characterization. But I could also see where an attorney might look at things in a more subtle and complicated way.

Q. When I say the Comcast decision, Professor Stulz, do you understand I'm referring to a decision from the United States Supreme Court that has the word "Comcast" in its -- in its title?

A. Yes.

Q. What's your understanding of the Comcast decision?

A. Well, my understanding in practice for

Page 211

class certification would correspond to the first sentence that we discussed of paragraph 43.

Q. Do you understand that the Comcast decision involved a lawsuit involving -- alleging antitrust claims and not securities fraud claims?

A. I understand that.

Q. Have you ever served as an expert before for a plaintiff or a defendant in an antitrust case?

A. I'm sorry. Can you repeat.

Q. Sure.

Have you ever served as an expert before either for plaintiff or defendant in an antitrust case?

A. I have been involved in antitrust litigation. The most recent one I remember did not involve a settlement a few days before my report.

COURT REPORTER: Did not involve a what?

THE WITNESS: "A settlement a few days before my report."

COURT REPORTER: Thank you.

Q. Have you ever -- have you ever looked at how to calculate damages in an antitrust case?

A. I did in that case, yes.

Page 212

Q. Is it your understanding that there are differences between how an expert would calculate damages in a securities fraud case versus in an antitrust case?

A. At this point, you're taxing my memory. I don't think I want to try to remember this. I remember that there are differences. I don't remember enough about the details to be discussing this.

Q. Do you have any understanding as to the success rate that defendants have in raising Comcast challenges at class certification and securities fraud class action lawsuits?

A. I'm not sure what is a correct measure of success rate in the sense that, as you know, many lawsuits settle before the class certification decision. I don't know how to count that towards a success rate.

Q. Well, for those cases that you've been involved in where a decision's been rendered, other than in the BP case, can you think of a case where, in your view, a judge has found that a damages model didn't satisfy Comcast in the securities fraud class action?

MS. SOLOWAY: Objection to form.

Page 213

A. I understand that that was the cases where class certification was denied because of Comcast, but I'm not aware of many of them.

Q. So, Professor Stulz, in paragraph 44, paragraph 45 of your report -- and those are pages 27 and 28 -- it contains a string of sentences, again, none of which have any citation, and so I'll ask you: What sources did you rely upon for the information in paragraphs 44 and 45?

A. Well, I mean, in paragraph 42, I used -- I understand the source -- the source is similar. It's my understanding of how damages have to be computed.

COURT REPORTER: I'm sorry. I cannot understand. "Well, I mean, in paragraph 42, I used -- I understand..."

Could you please repeat.

A. Right. So the start of the first sentence of paragraph 44 uses the statements that I understand that plaintiff must put forth an appropriate model. That is the understanding conveyed to me by attorneys. And paragraph 43 to 45 gave my understanding of how damages are to be computed in the context of Comcast.

54 (Pages 210 - 213)

Page 214

By saying this, I'm not giving any legal opinion, as I keep repeating. I'm not an attorney and I'm not a legal expert. I am simply summarizing the roles as I understand them to then assess from paragraph 46 on what Mr. Steinholt is doing.

Q. Okay. So I'm just trying to understand, Professor Stulz. Paragraphs 44 and 45, that information comes from you, but you're not able to explain precisely where it comes from?

MS. SOLOWAY: Objection to form.

A. It comes from, as I told you, from my understanding of the law as conveyed to me by attorneys.

Q. So is your understanding --

A. I'm sorry.

Q. I'm sorry.

A. This understanding --

Q. [Overtalking.]

A. -- is consistent with everything else I've seen. But I'm not a legal expert and I have no opinion as to interpret court decisions. That's not what I'm here for. I'm here as a financial economist and given my understanding of how damages are computed. I then can go forth

Page 215

with my expertise to assess what Mr. Steinholt did.

Q. The relevant question here isn't how damages are computed, right, Professor Stulz? The relevant inquiry is: What type of damages model is sufficient for purposes of class certification?

Do you agree with that?

MS. SOLOWAY: Objection.

A. I guess I, I think it's good that you force me to be more precise.

The key issue here is whether Mr. Steinholt proposes a damages model that can be applied class-wide and that attributes damages according to the liability theories of the plaintiffs and gives damages only arising out of those theories.

Q. If it's the case that your understanding of the legal standard differs from the one that Judge Block is required to use by law, would you agree that your damages opinions would not be useful to the Court?

MS. SOLOWAY: Objection.

A. I don't know that, in the sense that the 20 pages of my report we are talking about raise

Page 216

a number of issues that might be important even if it were concluded that I am applying the wrong standard.

Now, to give you an example, the fact that there is confounding information on February 6th and the nature of the confounding information could be valuable information to Judge Block even if he considers that I am not applying the correct standard.

Similarly, my discussion of the fact that Mr. Steinholt doesn't show how inflation could be computed over time for the allegations concerning tradipitant --

COURT REPORTER: Concerning?

THE WITNESS: Tradipitant. T-R-A-D-I-P-I-D-A-N-T.

-- the allegation concerning tradipitant could be valuable information for him.

I am -- as I keep saying, I am saying nothing about what the legal standard should be. That's not something I have any expertise or training. I am saying that given my understanding of the law, Mr. Steinholt has not shown that the damages can be computed class-wide over the class period.

Page 217

Q. Would you agree, Dr. Stulz, that Mr. Steinholt represents in his report that his damages model in this case is the same damages model that he's used in other cases and that that model has been accepted at class certification by the courts?

MS. SOLOWAY: Objection. Form.

A. Mr. Steinholt does not propose a model that is specific to this case. Mr. Steinholt discusses in generalities how a model could look like and does not show that this model can actually be applied in this case.

Q. Well, that -- well, we'll get to your views on Mr. Steinholt's model.

The question simply, Professor Stulz, was: Did you see the decision that Mr. Steinholt listed in his report where he says the same damages model had been accepted in other cases?

Did you see that?

MS. SOLOWAY: Is there a citation you can point us to, Michael?

MR. CAPECI: Sure. You know, I'll do you one better.

Brent, could you please mark the Steinholt report, which is number 1 in the

55 (Pages 214 - 217)

Page 218

materials you folks were sent.

MS. SOLOWAY: René, it's your first folder.

MR. CAPECI: What are we at? Is this Exhibit 10, Brent?

MR. MITCHELL: I believe it's 9.

MR. CAPECI: 9. Sorry.

(Deposition Exhibit 9, Expert Report of Bjorn I. Steinholt, CFA, was marked for purposes of identification.)

BY MR. CAPECI:

Q. So marking for the record as Exhibit 9 is the expert report of Bjorn I. Steinholt dated July 30, 2021, that was submitted in this matter.

And I'll direct you, Professor Stulz, to paragraphs 2 to 4 and footnotes 2 to 6 of that report.

A. So paragraph 2 is only about market efficiency, and so it's kind of irrelevant to our discussion. That paragraph has a lot of reports where Mr. Steinholt opined on efficiency.

Paragraph 3 is about the Comcast section in class certification reports. He interestingly has four cases on -- he doesn't really tell us much about this. It is interesting that in one

Page 219

case, he actually seems to explain that he didn't choose the event study approach. Maybe he misspoke. He says: The Court also accepted my class-wide damages methodology based on a fundamental evaluation approach.

So here we just have four examples that seem to involve different proposed models. And it seems that at least in Grober, he must have said something that was specific to the case if he said that he was going to use a fundamental model. The point here is, in this case, he has done nothing that is specific to the case.

Q. Professor Stulz, we'll -- we've read your report, so the question simply is: Were you aware of these paragraphs?

So does reading these paragraphs refresh your recollection? You previously saw them in reviewing Mr. Steinholt's report; is that right?

MS. SOLOWAY: Objection to form.

A. I can say that I have read the report of Mr. Steinholt completely. What I was reacting to is the way you characterized his experience on the Comcast section by saying that there was a long list of reports, if I understood you correctly. I don't see a long list of reports.

Page 220

Q. You see a couple of cases he cites; is that right?

A. I, I see a few cases that he cites.

Q. Okay. So did you look at those cases to compare the damages model he proposed in those cases versus the one he proposed in this case for purposes of class certification?

A. I, I actually did not go and read those decisions. As I keep telling you, I'm here as a financial economist and I give my opinion as a financial economist. I want to point out that the only New York case is one, actually, where he says he didn't use the event study approach.

COURT REPORTER: I'm sorry. The only New York case is one, actually, where he says it...

THE WITNESS: "He did not use the event study approach."

Q. Do you have an objection to the use of the fundamental value approach?

A. I have no objection to that, but I want to point out that the title of the section regarding damages has "event study" in the title. And so it must be that in some cases, he tailors his opinion to the case, but he did not do so

Page 221

here.

Q. Why didn't you review these decisions?

A. I'm not an attorney. I don't want to play the attorney. I focused on the financial economics issues, given the assignment that I had, and that's what I did.

Q. Okay. Well, let's look at paragraph 47 of your report on page 28. It states: Instead, Mr. Steinholt provides only --

A. Just a minute. Where do you want me to look?

Q. I'm sorry, sir. Paragraph 47 of page 28. I apologize. I'll go when you're ready.

A. Okay.

Q. Okay. So that sentence, it says -- the first sentence of paragraph 47: Instead, Mr. Steinholt provides only a generic boilerplate overview of the damages -- of the damages approach that he claims is -- and then put in parentheses -- in quotes, I'm sorry, "well accepted."

Why did you place quotes around the term "well accepted"?

A. He obviously has issue with what he does. He talks about the issue at 50,000 feet.

56 (Pages 218 - 221)

Page 222

We really don't know what it implies for the case at hand. There is nothing in that section that is case specific. There are unique issues in this case that he doesn't address and doesn't explain how he would address.

We spent a lot of time talking about a unique issue in this case, which is the extent to which there was allegation-related information that was public. He doesn't address at all. That creates issues with using event studies. It creates issues with using the fundamental approach and so on.

As I explained in my report, there's a lot of information changing with tradipitant. He -- there's a distinct distance between the information disclosed on February 5 and what could be disclosed earlier in the class period. He doesn't address that issue and so on.

Q. Have you -- in all the time that you've served as a class certification expert since Comcast was issued, did you ever issue a report that doesn't criticize the damages model proposed by an expert for the plaintiff?

A. Yes.

Q. And how many -- can you estimate the

Page 223

percentage of times that's occurred?

A. I don't know. I don't know. I can't -- I mean, I can think of some, but I don't know.

Q. More or less than 50 percent of the time?

A. I don't know.

MS. SOLOWAY: Objection. Asked and answered.

Q. What would you need to do to figure that out, go back through your old reports?

A. I'm not sure I even could do that. I don't have access to all of my old reports.

Q. Who does, Cornerstone?

A. In some cases, I was asked to destroy everything related to a case, so I don't know.

MR. CAPECI: Well, to the extent it's possible, we'll request the production of all Professor Stulz's reports post Comcast so we can get an accurate answer to that question.

MS. SOLOWAY: Well, we're going to reserve all rights on that. I don't think that's, that's -- we'll just reserve rights on that.

Q. Okay. So if you could please, Professor Stulz, turn to page 33 and footnote 117.

Page 224

A. Yes.

Q. What's the significance of the events of February 14th, 2019, to a damages model for the class period?

A. As I explained in my report, on February 5, the market learns at least four things about tradipitant. Or it learns that the FDA required a nonrodent study.

COURT REPORTER: A non what study?

THE WITNESS: Nonrodent. N-O-N, hyphen, R-O-D-E-N-T. Nonrodent study. It learns that Vanda eventually wasn't willing to conduct that study. It learned that there was a hold on two of the studies of Vanda when it finally learned that Vanda was suing the FDA.

Now, the issue is how to assess the different pieces of information on that day. And the fact that there is a large positive abnormal return on a day when there is new news about this FDA litigation is potentially instructive about the importance of the FDA-related litigation for the stock price reaction on February 6th.

Q. Is it appropriate to rely on post-class period data in calculating a damages model during the class period?

Page 225

MS. SOLOWAY: Objection.

COURT REPORTER: I'm sorry. What the class period?

MR. CAPECI: A damages model -- a model assessing damages during the class period.

MS. SOLOWAY: Same objection.

Q. I'll say it differently, Professor Stulz.

Other than the PS 90-day lookback, what relevance does post-class period events have on a damages model for a class period?

MS. SOLOWAY: Objection. Although it's a better question, Michael, it's still objectionable.

MR. CAPECI: It's getting better every day. I try.

MS. SOLOWAY: You're improving.

A. The only point here is that there's confounding information on February 6th. Information about the importance of the FDA litigation is relevant in assessing what happened on February 6th.

Q. Okay. If we can please move to paragraph 58 on page 34.

MS. SOLOWAY: René, you still doing

57 (Pages 222 - 225)

Page 226

okay?

THE WITNESS: I'm fine, yes.

MS. SOLOWAY: Okay.

A. Yes.

Q. So the last sentence reads: The statistically significant price decline that Mr. Steinholt claims occurred on this day may reflect investors reacting to Marcus Aurelius Value's public criticisms of Vanda and the announcement of its short position rather than to allegations in the already-disclosed whistleblower lawsuit.

Why did you use the words "may reflect"?

A. Remember that my price impact argument is based on market efficiency and it's based on the theory of market efficiency, where repeating known information doesn't affect the stock price. And so once I had reached that conclusion, I had completed my assignment with respect to the implications of market efficiency for analysis of price impact.

The stock price on February 11 decreased, and I don't question that it decreased significantly. It was not my task to explain why it decreased to try to decompose the abnormal

Page 227

return in different -- in a variety of factors that affected the stock price on that day.

I point out that on that day came out an announcement by a short seller that he was or she was short in Vanda and accompanied by extremely negative opinions, not facts, opinions about Vanda. That by itself may have moved the price. And so it can be understood why the price moved without new information about the allegations.

Q. But you didn't undertake your own study to ascertain whether the announcement of Marcus Aurelius having a short position impacted the price of Vanda stock on February 11th; isn't that right?

A. Having a short position and having an extremely negative opinion about Vanda, the answer is that I did not do such a study. It is not immediately obvious to me how one would do such a study, but if I asked to do it, I would try to see whether it can be done.

The point is that, for my price impact opinion, such a study is not required or is not needed or is not useful. What is important for my price impact opinion is that an efficient market, known information doesn't move the price.

Page 228

Now, I point out that on February -- before 10:00 on February 6th, it was not known that there was a short seller, short in the stock, having a short position in the stock, so that having an interest in the stock price falling with an extremely negative opinion of Vanda.

Q. Well, Professor Stulz, isn't 10:00 in the morning on February 11th when the Aurelius Value report was publicly posted?

A. That's what I said, before 10:00.

Q. Thank you.

Could we please move on to pages 36 to 37, paragraph 64.

A. Yes.

Q. Okay. Professor Stulz, you, you provide a series of events that run -- I'm sorry. It goes, actually, to page 38 -- that run from A through N. And you appear to source those events primarily from the amended complaint in our case.

Is that the source you relied on, sir?

A. Yes. I mean, unless, unless there is a typo, the complaint has that information.

Q. Can I direct your attention to the top of page 37, small C. It recites the -- your view

Page 229

of what took place on May 15th, 2018. You write: The FDA and Vanda participated in a teleconference during which the FDA suggests that Vanda cannot extend study 2301 until after completion of a nine-month nonrodent toxicity study. You cite paragraph 206 of the amended complaint.

MR. CAPECI: So I'm going to pause there and I'm going to ask, Brent, if you could please mark the amended complaint as Exhibit 10. And, Professor Stulz and Audra, that's number 2 in your set.

(Deposition Exhibit 10, Amended Complaint for Violations of the Federal Securities Laws, Bates-labeled Stulz_00000255 - 352, was marked for purposes of identification.)

Q. For the record, marking the Exhibit 10 the Amended Complaint for Violations of the Federal Securities Laws filed in this litigation on July 23, 2019.

Professor Stulz, are you familiar with the amended complaint? Did you review it in connection with your report?

A. I reviewed it before being retained and

58 (Pages 226 - 229)

Page 230

I reviewed it since.

Q. Sir, why did you review it before you were retained?

A. To have an understanding of the case.

Q. Did you review it in contemplation of accepting the engagement or independently on your own?

A. No. After being contacted by Cornerstone, I was -- [unintelligible.]

COURT REPORTER: I'm sorry. "After being contacted by Cornerstone, I was"...

THE WITNESS: After being contacted by Cornerstone, I looked at the complaint.

Q. You're very busy, Professor Stulz. It was going to worry me if you were just reading the complaint in my cases for the fun of it.

A. Right.

Q. Okay. So if we could -- if we could look at number C, and that would be footnote 128. And you're citing paragraph 206.

So I'd like to direct your attention to Exhibit 10, which is the amended complaint, in paragraph 206, which is on page 44. And I'd like you to review paragraph 206 and please tell me where you see the word "suggest."

Page 231

A. The complaint uses the language "could not extend."

Q. Okay. Do you have an idea or an understanding where the complaint gets the information in paragraph 206 from?

A. I would have to go back to refresh my memory. I don't.

Oh, so footnote 132 has a lot of those dates and maybe all of them, as well. On the document in footnote 132 is also mentioned in the complaint, so that might be the source, as well.

MR. CAPECI: Okay. So, Brent, if you could please mark for Dr. Stulz -- we're going to do the FDA litigation complaint.

I'm sorry. It is folder 5 in your set.

(Deposition Exhibit 11, First Amended Complaint, was marked for purposes of identification.)

Q. What I'm marking for the record as Exhibit 11 is the first amended complaint filed in the FDA litigation dated May 29, 2019.

Professor Stulz, this document does not appear in Appendix C, but -- so is my understanding correct that you have never seen this document before?

Page 232

A. No, that's not correct. I remember that when we looked at Appendix C, I directed you to the note at the end of it saying that the documents that are cited in my report are also documents I relied on. Given that I cite this document in my report, I relied on it.

Q. Well, sir, you don't actually cite the first amended complaint from the FDA litigation in your report, as I was able to tell it.

A. Oh, I'm sorry. Okay. So there is confusion. The document I cite is a statement of points and authorities.

Q. Right. You cited -- you cite the summary judgment brief. This is the complaint in that lawsuit. I'm simply just trying to ascertain whether you've seen this document or not before.

A. I don't -- I don't -- I don't remember. I don't rely on it.

Q. Okay. Sir, if you could please turn to page 4 of 57. If you see that header on the top of each page, it would be page 4 of 57.

A. Yes.

Q. Okay. Do you understand, if you read the very introductory line, it says: Plaintiff

Page 233

Vanda Pharmaceuticals, Inc.

Do you understand that that means that, in this lawsuit, your client in this case was the plaintiff?

A. In this case, I was retained by the attorneys for Vanda. I understand that here Vanda brings its complaint, yes.

Q. Okay. And if we can please go to the last page of this complaint, page 57 of 57.

Do you see that the complaint was signed by the attorneys for plaintiffs? Do you understand what that means, it was signed by Vanda's attorneys?

A. It is signed by attorneys for plaintiffs indeed.

Q. Sir, I'd like to direct your attention now to paragraphs 96 and 97 of this complaint. And that would be on page 27 of 57 in Exhibit 11.

A. Yes.

Q. I'd like to read it into the record.

During May -- hold on a second. Before I do that, you understand that the allegations that appear in Exhibit 11, the FDA complaint, are allegations that your client has made?

Do you understand that?

59 (Pages 230 - 233)

Page 234

A.   I understand that those are allegations that Vanda made.

Q.   And your client in this lawsuit, right? In this litigation, the Gordon litigation.

A.   As I said, I was retained by the attorneys for Vanda.

Q.   Okay.  I'm going to read paragraphs 96 and 97 into the record, and then I'll have a question.

During a May 2015 -- sorry.  During a May 15, 2018, teleconference, the FDA informed Vanda that, despite the extensive toxicity and other nonclinical data collected for tradipitant, the FDA would require Vanda to complete a nine-month repeated dose nonrodent toxicity study before the FDA would permit Vanda to conduct a human dosing study for longer than three months. The FDA cited the nine-month study as a, quote, requirement, end quote, under the ICH guidance.

Sir, in your client's allegations here, can you please point me to where it says the word "suggests"?

A.   Paragraphs 96 and 97 don't use the word "suggest."

Q.   Okay.  So, sir, why did you use the word

Page 235

"suggest" in paragraph 64 little C on page 37 in your report if your client doesn't use it when making that allegation against the FDA?

A.   So I don't remember why I use the word "suggest."  My understanding is that this was just one step in an evolution.  But an alternative way of saying this is that the FDA told Vanda that it could not extend the study.

COURT REPORTER:  I'm sorry.  You said a what way of saying this is the FDA --

THE WITNESS:  Vanda that it could not extend the study to 301 until after completion of a nine-month nonrodent toxicity study.

Q.   Sir, I'd like to also direct your attention to paragraph 98 in Exhibit 11, which is the Vanda FDA complaint.  And that's on the top of page 28 of 57.

A.   I'm sorry.  Can you repeat.

Q.   Yes, sir.

Page 28 of 57, paragraph 98.  And I'd like to read in a paragraph into the record, as well, and then I'll have a question.

Talking about the same May 15th, 2018, call, the paragraph reads:  The FDA stated that, if Vanda did not agree to conduct the nine-month

Page 236

study, the FDA would place a clinical hold on Vanda's proposed open-label extension.

Sir, my question for you is:  Where in that sentence that Vanda wrote in this lawsuit against the FDA does it state that the FDA, quote, suggests that Vanda could not extend study 2301 until after completion of the toxicity study?

MS. SOLOWAY:  Michael, I think the witness already said that you could substitute the word "states" for "suggests."

I mean, are we really going to spend 15 minutes of this deposition on use of the word "suggests"?  He already said put the word "states" in.  Ask him if he changed his opinion.

Q.   Professor Stulz, does your review of the FDA litigation complaint change your opinion about how 64 little C should be worded?

A.   It does not change my opinion that says a long period going on here with developments about tradipitant and where eventually a hold is put in place but with various intervening events.

So it doesn't change that opinion.  As I told you, I'm perfectly comfortable with different phrasing of little C that you would

Page 237

think is more consistent with the documents that you showed me.  I would be perfectly comfortable with that, but it would not change my opinions.

Q.   Okay.  So let's look at page 39, footnote 140 in your report, please.  It says here:  Alternative definitions of inflation, assuming there is any, could include, among other possibilities, one, inflation due to the alleged omission regarding the FDA requirement of toxicity studies, parentheses, of which the FDA allegedly informed Vanda during a May 15, 2018, teleconference call.

Professor Stulz, do you agree that the use of the word "allegedly" is inappropriate in light of the discussion we've just had about Vanda's statements in its complaint in Exhibit 11?

MS. SOLOWAY:  Objection.

A.   I would point out that we had this long discussion about "suggest," but here I use the word "requirement."  So it's probably a distinction without much of a difference.  I do use the word "requirement" here.

Q.   Well, so you stand by the use of the word "allegedly" in footnote 140?

60 (Pages 234 - 237)

Page 238

A.    I'm kind of confused about what you want me to say in this context.  No.  It's a context where plaintiff's alleging that that was what the FDA said.

Q.    Sir, that's -- your client is saying that that's, in fact, what they were told.  I mean, there's nothing -- there's no -- there's no allegedly about it.  Your client is saying it happened.  So I'm wondering why --

MS. SOLOWAY:  Michael, objection.

Q.    -- Vanda is saying it's an undisputed fact when you're presenting it as something that allegedly occurred.  That's all I'm trying to --

MS. SOLOWAY:  Objection.  He said -- I don't want to get into a long thing on the record here with speaking objections, but you also make allegations about this.  He's just telling you that he's making reference to the fact that you've made allegations.

You have made allegations.  I just don't -- can we move on from this?

MR. CAPECI:  Well, the premise of his -- of his damages argument on the safety study side seems to be that Vanda did not have enough information to disclose on May 15th, 2018, and

Page 239

the predicate for that is his belief that, well, the FDA merely suggested on that date that there was certain information that would have been perhaps material to investors.  And our point simply is, is that Professor Stulz has it wrong.

Professor Stulz even admitted now that 64 C is incorrectly worded.  And so I'll ask you, how is it that if the company now, as you acknowledge, admits that it was told that they would have a clinical trial hold slapped on their study if they didn't do the safety study, that the information that we allege was corrective couldn't have been disclosed on May 15, 2018.

MS. SOLOWAY:  Objection to form.

René, if you can answer, go ahead.

A.    It says that the partial hold was put in place on December 19, 2018.  So there's a lot of time between May 15, 2018, and December 19, 2018.  So in terms of what exactly could have been said on May 15, it would depend on things that I actually don't know.

BY MR. CAPECI:

Q.    Okay.

A.    That's a complaint to discuss.  It depends on kind of what options were open to

Page 240

Vanda at that point in time.  I don't know.

Q.    Professor Stulz, do you have an understanding of the current status of the FDA litigation?

A.    No, I don't.

Q.    Are you aware, Professor Stulz, that Vanda lost the FDA litigation on summary judgment?

MS. SOLOWAY:  Objection to form.

A.    I am not -- I mean, as I told you, I'm not aware of the status of the litigation.

Q.    Okay.  Are you aware, Professor Stulz, that there was an opinion written in connection with the summary judgment decision in the FDA litigation that sets out actual findings of what took place with respect to the safety study for tradipitant?

MS. SOLOWAY:  Objection.

A.    I mean, I don't know what to add to what I already said.  I'm not aware of the current status.

Q.    Yes or no?  Do you know about it?  Yes or no?

MS. SOLOWAY:  Can we let the witness finish his answer, please.

Page 241

A.    So, as I said, I'm not aware of the current status and, therefore, I have not read what you mentioned.

COURT REPORTER:  And therefore what?

Q.    Do you think it would be --

THE WITNESS:  Therefore, therefore, I have not read what you mentioned.

COURT REPORTER:  I have no -- sorry.

THE WITNESS:  I have not read what you mentioned.

COURT REPORTER:  Thank you.

Q.    Do you think it would be important to understand what a Court has found took place from a factual perspective if you're going to go through the exercise of reciting what purportedly took place with respect to a safety study for tradipitant?

MS. SOLOWAY:  Objection.

Q.    Is that important information for you to understand?

MS. SOLOWAY:  Objection.

A.    What I'm saying in my report, and you have not shown me that that's not correct --

COURT REPORTER:  I'm sorry.  What I'm saying in my report...

61 (Pages 238 - 241)

Page 242

THE WITNESS: And you have not shown me that it is incorrect is that there are a number of steps from May 15 to December 19, and so along those steps, disclosures could have changed.

Q. Okay. Did you review anything in the FDA litigation to ensure that what you were reciting here is accurate?

MS. SOLOWAY: Objection.

A. As we discussed, I'm referring to the complaint.

Q. Are you an expert in what information a company needs to disclose at a particular moment in time?

MS. SOLOWAY: Objection.

A. I mentioned several times today that I'm not an expert on disclosure and I have been pretty clear about that.

I also mentioned several times --

Q. Would you --

A. -- that I am not a legal expert.

Q. Would you agree that your commentary on what you have disclosed at a given point in time regarding a safety study is speculation?

MS. SOLOWAY: Objection. Mischaracterizes his testimony.

Page 243

A. I don't think you characterized my report correctly.

If in footnote 140 I discuss some possibilities about what could have been disclosed and that's all I do, given that we have this long period of time from May 15 to December 19 with events happening during that period of time, there could have been a number of possible disclosures. Which ones Vanda should have made and how it should have made it is something for a disclosure expert.

What I want -- what is relevant to my report is that Mr. Steinholt doesn't address any of those issues. Those issues are quite important in trying to figure out how inflation changes over that period of time and when inflation gets put into the stock price. He has absolutely nothing to say about what it would look like and when inflation actually got into the stock price with respect to the tradipitant allegations, so I don't really know how you can say that there is a method to compute damages class-wide when he's not even saying when that inflation band would actually start. We only know when it would end. But the date when it

Page 244

ends is a date with confounding information, so it doesn't address that.

Q. Would you agree, Professor Stulz, that if there were a finding in this case that Vanda has asked, as of May 15, 2018, all material information that it was required to disclose regarding tradipitant, that that would resolve the concerns you raise in your report with respect to Mr. Steinholt's damages model?

MS. SOLOWAY: Objection to form.

A. I'm sorry. Can you repeat the question.

Q. Would you agree that if there were a finding in this case that Vanda had --

Would you agree if there was a finding in this case that, as of May 15, 2018, Vanda possessed all of the material information that we allege it was required to disclose with respect to the safety study, would that resolve the concerns that you have with Mr. Steinholt's damages model?

MS. SOLOWAY: Objection.

A. What you're suggesting is that the inflation bands that he's talking about would start on May 15, but it doesn't tell us what this inflation -- or how one would reach a conclusion

Page 245

as to the size of that inflation band.

MS. SOLOWAY: Michael, how are we doing on time? We've just been going a long time.

MR. CAPECI: I think I've just got one -- I've got one final set that I want to get through and then just a quick break to make sure I didn't miss anything.

Is that fair?

MS. SOLOWAY: René, do you need a break? Are you okay?

THE WITNESS: It depends on how long the set is.

MR. CAPECI: I really feel -- I really feel like this -- it should be about five minutes or less.

THE WITNESS: Then I'm okay.

BY MR. CAPECI:

Q. Okay. If we can just please turn to paragraph 70. And that's on page 40 of your report. Please let me know when you're ready, Professor Stulz.

A. Okay.

Q. It states in the middle of the paragraph: For example, the whistleblower lawsuit that was filed under seal was not filed

62 (Pages 242 - 245)

Page 246

until March 10, 2017, more than one year after the start of the putative class period. Mr. Steinholt does not offer any methodology to calculate what inflation, if any, was present in Vanda stock price during the days before the whistle -- the whistleblower lawsuit was filed versus what inflation, if any, was present in the stock during the days after.

My question, sir, is: How could there be any inflation in this price of Vanda stock if the qui tam lawsuit was filed that was not reflected anywhere in the public domain?

MS. SOLOWAY: Objection.

A. So this goes to the question of how to compute the inflation band over time and what kind of disclosures should have been made and how they affected -- how it would affect the inflation band. Mr. Steinholt doesn't discuss that.

Now, as far as I understand what he's saying, he's talking about a constant inflation band. But, from the complaint itself, the practices of Vanda changed over time. So he's not saying how he would be able to adjust the inflation band for that, assuming that there is

Page 247

actually damages on the date of the alleged curative disclosure. Remember that if there is no price impact, then there are no damages from the alleged curative disclosure date.

But so he doesn't -- no, he doesn't say how the -- how if there is a finding, if there is an impact from the qui tam lawsuit, how that impact is attributed over time and whether that impact holds before that lawsuit is filed.

Q. Okay. But, Professor Stulz, I think I'm -- I hope I'm asking you something that I think is a little simpler.

Are we in agreement that -- I think we're in agreement, right, that the qui tam lawsuit is not in the public domain before February 4, 2019, right? That's your view? It's not in the public domain before February 4, 2019?

A. I agree with that.

MS. SOLOWAY: Objection to form.

Q. Okay. So how, how would one go about calculating inflation for a lawsuit that's not in the public domain?

I mean, the statement here is talking about calculating inflation in the days before it was filed on March 10th, 2017, and the days

Page 248

after.

MS. SOLOWAY: Objection.

Q. What calculation would there be to calculate if no one knows about it?

MS. SOLOWAY: Objection.

A. So it goes to the question that what is -- the qui tam lawsuit became public on February 5 -- I mean on February 4, as we have discussed, and so it should be in the price by February 11; however, Mr. Steinholt doesn't address the issue at all. So --

Q. I guess I understand --

A. -- the discussion here relates to how to compute the inflation band in the universe that Mr. Steinholt is. In that universe, what is disclosed on February 11 -- remember that I don't view that to be correct, but is the existence of this qui tam lawsuit.

And so the question is, when you go back with the inflation band, does that inflation band stop when the qui tam lawsuit is filed because that's information that exists at that point in time, or how does it go back and how does it go forward?

Does information in the qui tam lawsuit

Page 249

say what the state was in March 2017, which is more than a year after the start of the class period?

There are a whole set of issues around that lawsuit that he doesn't address at all.

Q. Okay. I just want to make sure I'm understanding.

When you use the word "was filed," are you talking about when it was initially filed on March 10, 2017, or when it was unsealed February 4, 2019?

COURT REPORTER: I'm sorry. Or when it was -- repeat that, please.

Q. When it was -- when it was first filed on March 10, 2017, or when it was unsealed on February 4, 2019?

A. Here I refer to when it was first filed.

Q. You're --

A. That's --

Q. You're -- you're asking Mr. Steinholt to estimate inflation from a lawsuit that wasn't in the public domain. I mean, I'm just trying to understand. That doesn't -- I don't understand --

A. That's --

63 (Pages 246 - 249)

Page 250

Q.   [Unintelligible.]

COURT REPORTER:  I can't hear you both. I can't hear you both.  Sorry.

A.   Yeah.  I'm sorry that I didn't express myself better.

What the lawsuit says, there is a set of information that is alleged as of March 2017, and that's, that's the time when that information exists.  Remember that it's alleged.  We discussed alleged before.  But there is that information.

And so does the fact that there is that information at that point have any impact on the inflation band -- you're obviously claiming that Vanda would have disclosed the information that is in the qui tam lawsuit, according to the complaint.  Those were acts of Vanda.

So it could have made a disclosure at that time of the facts that were in the lawsuit, that were alleged in the lawsuit, if I understand the complaint correctly.  You're saying that the information in the qui tam lawsuit is curative and that information was available in March 2017.

Q.   Who was that information available to? Are you saying it was available to investors?

Page 251

A.   No.  I'm not saying it was available to investors.  I'm saying if you are computing the "but-for" word --

COURT REPORTER:  Excuse me.  I'm sorry. If you're computing the what?

THE WITNESS:  "But-for."

COURT REPORTER:  Okay.

THE WITNESS:  B-U-T, hyphen, F-O-R.

If you're computing that, you know that an event happened in March of 2017, which is the lawsuit being filed.  The obvious issue is does it affect the inflation band or not.  Or does the inflation band look before or does it look after.

Q.   In your review -- in your review whether or not the filing of that lawsuit was public has nothing to do with whether it's affecting the inflation band?

A.   Well, if you are trying to understand the "but-for" word where Vanda would have disclosed the information you alleged it had about its practices, one date where there is information about the information it had would be March 2017.  So that date could be important in measuring inflation.

MR. CAPECI:  All right.  Why don't we go

Page 252

off the record for just a couple minutes and I'll see if I have anything else for you.  I think I'm done.

MS. SOLOWAY:  Thank you.

MR. CAPECI:  I want to take a couple minutes to double-check.

VIDEOGRAPHER:  The time is approximately 5:49 p.m.  We're going off the record.

(A recess was taken.)

VIDEOGRAPHER:  The time is approximately 5:55 p.m. and we are back on the record.

MR. CAPECI:  Professor Stulz, I just want to say thank you very much for your time today.  This concludes my questioning subject to any questions I may have in response to your counsel.  That's it.

MS. SOLOWAY:  And I have nothing today. Thank you.

VIDEOGRAPHER:  All right.  Thank you. We are off the record at 5:56 p.m.  And this concludes today's testimony given by René M. Stulz.  The total number of media used was five and will be retained by Veritext Legal Solutions.

(Signature is not waived.)

(Deposition concluded at 5:56 p.m.)

Page 253

CERTIFICATE

The State of Ohio,   )
                     )    SS:
County of Cuyahoga.  )

I, Kristin Wegryn, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named witness, RENÉ M. STULZ, Ph.D., was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotypy in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken remotely at the time and place in the foregoing caption specified and was completed without adjournment.  I do further certify that I am not a relative, counsel, or attorney for either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this 27th day of October 2021.

Kristin L. Wegryn, RMR, CRR
Notary Public State of Ohio
Commission expiration:  July 23, 2023

64 (Pages 250 - 253)

Page 254

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Gordon v. Vanda Pharmaceuticals, Inc.
DATE OF DEPOSITION: 10/22/2021
WITNESSES' NAME: Rene M. Stulz , Ph.D.

PAGE  LINE (S)    CHANGE        REASON
___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

___|_____|_____|_____

_____
      Rene M. Stulz , Ph.D.
SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.

_____     _____
(NOTARY PUBLIC)           MY COMMISSION EXPIRES:

65 (Page 254)

[& - 20]                                                                                              Page 1

**&**

**&**   2:4,11 8:6,10
  58:20

**0**

**00000001**   3:22
  120:9
**00000137**   3:17
  109:21
**00000255**   4:4
  229:16
**00003037**   3:20
  114:18
**01108**   1:7 7:14

**1**

**1**   3:11 4:19,21,22
  5:1,3,5,7,20 6:4,10
  11:18 59:22
  120:14 171:9,10
  171:11 173:9
  175:1,19,23
  176:25 177:2,9
  217:25
**1,000**   21:4,6
**1,100**   21:2
**10**   3:8 4:2,13,24
  5:13,16 6:12,17
  109:16 120:14
  218:5 229:10,13
  229:18 230:22
  246:1 249:10,15
**10/22/2021**   254:3
**100**   91:16
**10019**   2:12
**101**   176:4,5
**105**   4:24
**106**   4:25
**108**   5:1
**109**   3:15
**10:00**   228:2,8,11

**10:07**   33:19
**10:10**   33:23
**10:25**   43:24
**10:33**   44:3
**10th**   247:25
**11**   3:11 4:5,25 5:3
  5:10,16,19,23 6:2
  6:6,7 12:15 50:22
  51:4 53:3 56:18
  85:10 95:11 96:6
  107:12 108:7
  111:19 120:14
  122:15 173:19
  184:16 189:17
  190:10,22 198:24
  203:3 204:18
  226:22 231:16,20
  233:18,23 235:15
  237:17 248:10,16
**111**   5:1
**112**   5:2
**114**   3:18
**117**   5:2 223:25
**11747**   2:5
**119**   5:3
**11:40**   83:11
**11:48**   83:15
**11th**   13:10 110:1
  131:12,24 161:2
  161:24 190:8
  227:13 228:9
**12**   4:8 5:11 6:11
  27:1 120:14
**120**   3:21
**123**   5:3,4,4
**125**   5:5
**128**   230:19
**1285**   2:11
**13**   4:2,13,22 5:12
  5:18,21,23 6:18
  42:6 107:7 120:14

**130**   5:5
**131**   5:6
**132**   5:6,7 231:8,10
**133**   5:7
**134**   3:22
**136**   5:8,8
**139**   5:9
**14**   4:8 5:1,11 6:12
  6:13,16 95:5
  120:15 142:23
**140**   237:5,25 243:3
**141**   3:8
**142**   3:23
**144**   5:9
**145**   5:10
**14th**   224:3
**15**   3:12 4:9 5:8,10
  110:13,17 120:15
  134:4,4,5,12
  234:11 236:12
  237:11 239:13,18
  239:20 242:3
  243:6 244:5,15,24
**154**   3:18 5:10
  109:21
**155**   5:11 207:13
**158**   5:11
**159**   5:12,12
**15th**   229:1 235:23
  238:25
**16**   3:18 4:5,16
  5:18 120:15
**161**   5:13,13
**163**   5:14,14
**164**   5:15
**165**   5:15
**166**   5:16
**167**   5:16,17
**168**   5:17
**17**   3:14 4:24 5:14
  5:15 6:2,5 120:15

  148:10
**170**   5:18
**172**   5:18,19
**177**   5:19
**178**   5:20
**179**   5:20
**17th**   19:13 39:12
**18**   3:11,15,22 4:8,9
  4:10,23,23 5:17,17
  6:11,14,14 84:2
  88:12 104:9 120:9
  120:15 162:11
**180**   5:21
**181**   5:21
**183**   5:22
**186**   5:22
**187**   5:23
**19**   4:15,18 5:24
  6:9,18 165:6
  239:17,18 242:3
  243:7
**190**   5:23
**196**   5:24
**197**   5:24,25
**198**   6:1
**199**   6:1,2
**1990**   23:3
**1:19**   1:7 7:14
**1:29**   141:7

**2**

**2**   3:12 5:14 6:3,19
  29:15 30:3 41:12
  50:5 56:4 58:18
  61:1,7,10,14
  120:14 218:16,16
  218:18 229:11
**2,000**   121:22
**20**   4:20 5:22 6:1,3
  30:4 177:19
  215:25 254:22

[200 - 5]                                                                                          Page 2

**200**   2:5
**2000**   23:3 106:25
**2007**   116:25
**2008**   32:14
**2009**   28:18,20
**201**   6:2
**2010**   30:4 32:15
**2013**   139:4
**2014**   139:4 188:8
**2015**   12:15 61:16
   100:5,24 139:16
   140:12,16,18
   234:10
**2017**   246:1 247:25
   249:1,10,15 250:7
   250:23 251:10,23
**2018**   37:19 101:2
   108:2 125:20
   126:3 131:13,24
   142:21 229:1
   234:11 235:23
   237:11 238:25
   239:13,17,18,18
   244:5,15
**2019**   12:15 13:10
   107:12 110:1
   152:3,9 159:21
   161:24 190:8,10
   224:3 229:21
   231:21 247:16,17
   249:11,16
**202**   6:3
**2021**   1:17 7:2,6
   19:14 39:12
   134:16 218:14
   253:19
**2023**   253:25
**203**   6:3
**204**   6:4
**206**   229:6 230:20
   230:23,24 231:5

**207**   6:4
**209**   6:5
**20th**   134:16
**21**   3:5 4:11,21
   5:25 6:4,15,17
   39:15 40:8 117:16
   177:19
**210**   6:5,6
**212**   6:6
**212.373.3289**   2:12
**214**   6:7
**215**   6:7,8
**217**   6:8
**218**   4:1
**219**   6:9
**22**   1:17 4:12,15
   5:9,15 7:2 41:16
   107:7 142:21
**223**   6:9
**2232**   253:23
**225**   6:10,10,11
**229**   4:2
**22nd**   7:6
**23**   5:2,4 6:8 95:5,7
   96:1 98:7 229:21
   253:25
**2301**   229:4 236:7
**231**   4:5
**237**   6:11
**238**   6:12,12
**239**   6:13
**24**   4:8,14,17 6:16
   147:19,20 163:14
   163:15,23 164:5
   165:11 166:21,22
   167:8 168:2,8
**240**   6:13,14
**241**   6:14,15
**242**   6:15,16,16
**244**   6:17,17

**246**   6:18
**247**   6:18
**248**   6:19,19
**25**   4:10,14 5:4,13
   5:19 6:6 41:11
   108:12,22,25
**26**   133:6,13,14
   192:8
**27**   140:23 148:10
   192:9 206:17
   213:6 233:18
**27th**   253:19
**28**   41:22 162:10
   213:6 221:8,13
   235:17,20
**29**   3:12 165:6
   231:21
**2:21**   141:12
**2:53**   125:20

**3**

**3**   3:14 4:9,20 5:2
   39:11,17,25,25
   40:1,7 61:17
   120:14 125:19
   126:1 129:4
   218:22
**30**   4:9,10 100:1
   141:2 168:20
   218:14
**301**   235:12
**3039**   3:20 114:19
**31**   4:10 52:15
**32**   4:11
**33**   4:11 52:15
   177:18 178:22
   179:4,11 183:19
   223:25
**34**   4:12,12 225:24
**3419**   9:4
**35**   41:20

**352**   4:4 229:16
**36**   4:13 228:13
**37**   228:14,25 235:1
**38**   228:18
**39**   3:14 237:4
**3:19**   174:21
**3:20**   174:24
**3:53**   191:18

**4**

**4**   3:15 5:6 12:15
   29:19 109:18,23
   137:20 140:12,18
   151:15 152:3,9,9
   159:12 218:16
   232:21,22 247:16
   247:17 248:8
   249:11,16
**40**   20:12 192:7
   199:4 245:19
**41**   199:4 200:8,16
   201:19
**42**   192:8 199:4
   213:11,16
**43**   206:17,19 211:2
   213:23
**43221**   9:6
**44**   213:4,10,20
   214:8 230:23
**45**   58:16 213:5,10
   213:24 214:8
**46**   40:19 214:5
**47**   142:23 221:7,12
   221:16
**4:03**   191:22

**5**

**5**   3:18 4:16 5:8,20
   6:1,19 51:6,16,21
   52:6,13 53:12,14
   102:23 114:13,16
   119:22 120:1

**[5 - address]**

153:19 160:14 222:16 224:6 231:15 248:8

**50** 4:13 14:10 223:4

**50,000** 221:25

**51** 4:14

**52** 4:14

**53** 4:15

**54** 4:15

**56** 4:16

**57** 4:16 232:21,22 233:9,9,18 235:17 235:20

**58** 2:4 4:17 225:24

**5:49** 252:8

**5:55** 252:11

**5:56** 252:20,25

**5th** 51:24 53:6,24 54:18

**6**

**6** 3:21 5:6,12,22 6:10 119:22,24 120:3,8 125:18 199:4 218:16

**60** 20:12

**600** 92:21,22

**61** 4:17

**63** 4:18,18

**631.367.7100** 2:6

**64** 4:19 228:14 235:1 236:18 239:7

**67** 4:19,20,20

**69** 4:21

**6th** 53:10,25 54:24 55:2,7,11,15,18 216:6 224:22 225:19,22 228:2

**7**

**7** 3:22,23 4:11 5:5 5:9,24 6:8,9 50:4 56:4 134:7,8 142:10 190:2 206:15

**70** 245:19

**700** 92:21

**727** 8:7

**74** 180:9

**8**

**8** 3:5,21,22,23 4:1 4:17,18 5:21 6:15 84:2 88:11 114:15 126:3 142:7,15,19

**80** 4:21

**82** 32:12,20

**86** 4:22

**89** 4:22,23

**8th** 125:20

**9**

**9** 4:1,12,19 5:7 6:5 6:7,13 120:14 131:12 218:6,7,8 218:12

**90** 4:23 225:9

**96** 32:11 233:17 234:7,23

**97** 4:24 233:17 234:8,23

**98** 235:15,20

**9:30** 1:17 7:2,5

**a**

**a.m.** 1:17 7:2,5 33:19,23 43:24 44:3 83:11,15

**ability** 73:10 198:22

**able** 15:15 17:4 19:7 21:3,7,22

26:5 27:13 47:16 65:10 86:13 112:15 120:22 125:22 201:16 206:22 214:9 232:9 246:24

**abnormal** 51:11 52:3,20 54:22 55:11,19 57:7 74:1,5 77:10 78:15,17 79:12,14 80:10 82:3,10 103:9 106:21 124:12,15 183:4 224:18 226:25

**absolutely** 94:21 132:2 193:14,21 194:21 202:10 205:8 243:18

**academic** 3:14 26:18,22,24 29:17 30:6 34:23 48:18 62:15 63:15 159:1 202:16

**academics** 25:13 25:16 32:12,20 63:25

**accent** 9:1

**accepted** 217:5,18 219:3 221:21,23

**accepting** 230:6

**access** 148:20,23 149:1 200:25,25 201:7,8,18 223:12

**accessed** 202:24

**accessible** 32:23

**accompanied** 227:5

**account** 91:2,3,6 197:13,14

**accurate** 80:13 115:8 194:20 223:19 242:7

**accused** 125:5 143:16

**acknowledge** 239:9

**acknowledged** 165:7

**acquisition** 156:23

**acquisitions** 110:20

**act** 150:23

**action** 1:6 7:14 8:7 8:12 14:8 47:24 208:17 209:4 212:13,24 253:17

**active** 179:18

**activities** 24:2

**acts** 250:17

**actual** 110:14 119:10 240:15

**add** 22:18 41:9 75:11 84:5 136:16 136:25 167:20 173:21 187:24 202:4 240:19

**added** 163:25 181:3

**addition** 61:11 74:15 151:10 162:20

**additional** 21:15 59:5

**additionally** 42:5

**address** 8:23 9:3,4 94:20 196:3 222:4 222:5,9,18 243:13 244:2 248:11 249:5

**addressed** 103:14
167:19
**addresses** 198:1
200:4
**addressing** 198:22
**adjournment**
253:15
**adjust** 246:24
**admits** 239:9
**admitted** 239:6
**ado** 142:4
**adults** 170:25
**advantage** 103:18
**adverse** 139:1,2,9
139:19,21,24
140:4
**advice** 117:16
**adviser** 22:23,24
**advises** 108:19
**affect** 46:2 66:23
73:22 82:22 88:20
91:4 106:16
125:13 127:25
191:9 226:17
246:17 251:12
**affiliations** 8:2
**affirm** 81:19
**affixed** 253:18
**aforesaid** 253:10
**afternoon** 3:7,8
141:10
**age** 8:14 134:20
**agenda** 29:6 35:10
35:11,13,14
**aggressive** 160:7
**ago** 28:16 31:13
188:7
**agree** 7:8 53:9,19
53:23 55:1,5,9
61:19 66:16 81:22
89:6 95:7 115:23

116:24 117:1
125:2 128:19,22
128:22 131:15
132:23 152:7
156:13 163:13
164:15 166:9
172:14 179:11
180:4 181:9 191:7
203:22 215:8,21
217:1 235:25
237:13 242:21
244:3,12,14
247:18
**agreed** 132:11
209:21
**agreeing** 196:16
**agreement** 13:11
17:11 18:2,8
247:13,14
**agrees** 151:2
**ahead** 43:13 55:22
193:2 239:15
**aim** 134:18 138:13
**aims** 145:12
**akathisia** 99:23
169:1,19 170:6,7
170:11,20,20
171:5
**al** 7:11,12
**alerted** 130:24
**allegation** 50:21
50:25 80:13 96:21
97:20 103:24
104:5 105:14
106:15 119:10
128:10 156:8
157:4 162:24
163:4 169:6 172:9
173:16 176:16
177:14 182:12,14
183:25 184:6,9

185:9 190:4,11,19
191:8 195:14
202:23 203:2
216:17 222:8
235:3
**allegations** 45:22
50:17,20 51:9,13
54:25 56:21 82:15
85:11,23 96:13
97:2 104:1 107:10
107:13 110:18,23
111:3 122:6,9,11
122:16 123:7
127:12 147:18
163:6 173:17
176:7,9 180:7
185:18 186:5,11
194:19 195:3
197:10 198:5
199:21 204:16
205:19 216:12
226:11 227:9
233:22,24 234:1
234:20 238:17,19
238:20 243:21
**allege** 163:12
239:12 244:17
**alleged** 56:9,15
57:4,7 66:10
73:15 97:11 99:16
124:18 128:6
147:6 173:17
178:24 185:24,25
195:14 237:8
247:1,4 250:7,9,10
250:20 251:20
**allegedly** 206:24
237:11,14,25
238:8,13
**alleges** 140:6,15
146:23 147:12

157:10
**alleging** 129:22
145:8 170:10
211:4 238:3
**allison** 2:9
**allocate** 140:25
**allocation** 198:11
**allow** 54:2,2
**alluded** 177:20
**alternative** 200:4
235:7 237:6
**alternatively**
89:22
**amalina** 2:7
**ambien** 132:2
168:12,12
**amend** 42:10
**amended** 4:2,5
60:15 228:20
229:6,10,13,19,23
230:22 231:16,20
232:8
**american** 25:3
**americas** 2:11
**amir** 19:22,25
**analyses** 78:24
80:18 138:4
**analysis** 48:3,23
53:1 59:19 74:10
76:21 77:6,11,12
77:16 81:24 85:12
85:13 86:3,7,11,18
94:11 95:14 96:3
96:9,15 98:5,7,17
103:7 104:18,19
173:13,20,25
174:6 175:9,12
177:6 183:23,24
187:13 204:14
205:16 208:25
209:1 226:20

**analyst** 59:4,5,15 97:24 99:18 100:5 100:24 102:11,17 103:21 105:5,20 112:19 122:20 156:12 168:5 177:23 178:8,23 182:23 183:14,16 184:2,8 186:22 189:3

**analysts** 59:11 76:7,9,14,19 81:10 81:12,13,16 97:23 98:22 101:24 102:7,19,23 103:17,18 105:15 105:15 106:16 107:3 108:8 123:5 123:8 124:5,7 157:14 161:12,16 161:21 162:6 164:25 165:7,24 166:2,18 167:14 178:19 179:15,17 179:20 180:14,18 180:24 181:3,8 185:16,20,21,23 187:3,5,10

**analyze** 47:22 49:2 86:13 105:8

**analyzing** 48:6,14 49:11 73:14 84:11

**announcement** 47:17 49:14,25 53:7 226:10 227:4 227:11

**announcements** 48:7,11,15,20 49:5 49:19

**anonymous** 128:19 130:13

131:15 137:5

**answer** 34:12,18 36:14 39:5 58:17 60:8 63:21 67:5 67:24 70:20 74:25 75:3 79:18 80:23 82:1 85:18 86:2 90:11,20 96:20 118:13,17 122:17 122:17 126:22 128:8 138:9,12 164:1 175:9 181:14,14,15 187:25 188:22 198:14 201:6 202:20 204:7 223:19 227:17 239:15 240:25

**answered** 17:19 63:22 64:10 70:12 71:14 105:11 202:3,19 223:8

**answers** 142:2 175:4 186:25 197:22

**antitrust** 211:5,8 211:13,15,24 212:4

**anybody** 31:18 54:3 62:6 145:4,4 152:15 200:25 201:1,7

**aol** 188:23 189:1

**apearl** 2:13

**apologies** 34:1 209:10

**apologize** 29:21 40:4,11 54:13 74:23 82:19 83:3 121:2,3 162:18 172:4 174:19

221:13

**appear** 40:15 52:14 60:5 199:3 228:19 231:23 233:23

**appearances** 2:1 8:2

**appeared** 120:21 206:13

**appearing** 1:14,23

**appendix** 25:21 49:2,11 50:2 57:10 58:7 61:10 63:4 186:21 196:2 197:18 198:16 231:23 232:2

**application** 93:9 203:15

**applied** 89:4 215:14 217:12

**apply** 18:1 92:13 92:15 204:4

**applying** 216:2,8

**appreciate** 18:22

**apprised** 124:18

**approach** 81:21 124:24,24 125:4 144:15 197:25 199:2,9 219:2,5 220:13,18,20 221:19 222:12

**approaches** 79:8

**approaching** 104:23

**appropriate** 77:24 78:15,20 197:4,8 213:22 224:23

**appropriately** 208:7

**approximately** 7:5 33:19,22 43:23

44:2 83:10,14 121:13,22 141:6 141:11 174:15,20 174:23 187:20 191:18,21 252:7 252:10

**areas** 76:23,25

**argument** 57:3,6 82:9 226:14 238:23

**arguments** 62:18 82:7

**arising** 193:20 198:3 215:16

**arrangement** 7:21 7:24

**art** 177:8 192:20 192:21,23

**article** 3:14,16,19 29:14,17 30:4,8,11 30:17 31:11,14,24 32:10,17 34:5 35:4 62:5,21 63:6 63:17 64:8,11 109:19 114:13,17 114:22 115:10,12 115:24 116:1,18 116:20 117:15,21 118:5 120:1 180:5 180:10

**articles** 47:6,8,11 47:15 49:22 62:10 198:19 208:5

**ascertain** 63:16 68:3 72:2 75:5 93:6 96:8,16 98:4 138:5 227:11 232:16

**ascertaining** 93:20

**ascribed** 182:23

**asked** 19:24 20:2 28:25 30:22,25 32:3,3,5 34:15 36:15 38:10,13 39:6 56:7 58:9 59:3 60:1,4 63:22 64:9 69:8 70:11 70:20 71:12 81:25 83:7 85:12,15 105:10 112:10 128:3 174:18 202:2 223:7,14 227:19 244:5
**asking** 18:4 67:8 77:5 84:25 86:10 93:5 111:23 247:11 249:20
**asoloway** 2:13
**aspect** 87:24
**aspects** 89:19,25
**assess** 35:21 38:7 47:9 48:20 53:16 56:7 74:11 75:9 75:15 79:9 89:21 91:14,20 92:2,4,11 102:14 103:17 137:12 173:14 193:18 214:5 215:1 224:16
**assessed** 38:15
**assessing** 57:7 62:14 76:4 79:1 80:20 81:1 115:16 225:5,21
**assessment** 73:18 81:13 90:4 98:22 102:20 103:22 105:16 123:6 124:6 162:8 180:24

**assets** 22:19
**assignment** 190:1 197:23 221:5 226:19
**assignments** 26:20
**assisting** 21:8
**associated** 32:8 103:9 106:21 140:18 177:7 207:2
**association** 25:3
**assume** 10:19
**assuming** 18:8 64:1 75:16 130:10 194:14 237:7 246:25
**assumption** 65:25
**assumptions** 97:19
**attached** 129:2
**attempt** 14:1 135:4 170:18
**attempts** 135:7
**attention** 38:4,9 38:12 178:23 180:13,14 183:14 185:20 206:16 228:24 230:21 233:16 235:15
**attentions** 38:4
**attorney** 8:3 46:24 48:1 64:19 65:12 70:21 73:8 181:21 188:2 207:8,9,10 208:12 209:19 210:15 214:3 221:3,4 253:16
**attorneys** 15:8,9 15:10,19 16:3,8,16 17:1,17 71:21 72:1 207:6,20 208:1 213:23

214:14 233:6,11 233:13,14 234:6
**attributable** 206:23
**attribute** 54:3 74:6
**attributed** 247:8
**attributes** 215:14
**audio** 7:6
**audra** 2:9 8:9 18:8 18:15 29:20 39:14 43:9 109:15 114:14 134:6 138:17 140:24 142:11 191:11 229:11
**audra's** 60:20
**august** 16:23
**aurelius** 3:16 13:8 13:12,14 45:20 50:11,18 66:9 82:14 85:4,24 95:11,13 96:12 97:1,9,14,21 98:14 101:12,13,17,25 102:1,8,19,25 103:23 104:3,6 105:2,12 106:14 107:15,21 108:4 108:11,16,18,24 108:25 109:7,9,11 109:15,18,24 110:4 113:18,19 114:11 116:22,24 117:2 121:18 122:3,12,16 123:4 123:12,21 124:4 126:12 127:10,11 127:16,17,25 128:9,11,14 132:15,16,18,19

132:20 136:8,10 137:16,21 138:11 145:1,1 146:10,11 146:14 152:25 154:23 155:2,6,9 155:13,16 156:3,7 156:9,13,21,25 157:5,7,15,16,22 158:2 161:1,15 162:4 165:21 169:5,7 172:8,13 173:15 175:6,8 176:6,17 177:14 177:16 179:21 181:6,10 184:4 185:10 186:9 189:13,16 190:5 190:20 192:15,25 193:2 200:17,19 201:13,14,21 202:1 226:8 227:12 228:9
**author** 127:7 128:19,25 130:12 131:15
**authorities** 232:12
**authors** 31:10
**automatically** 153:8
**available** 31:2,2 44:19 61:2 65:2 69:21 75:5 85:3 88:15 126:18,24 128:13 146:12,15 151:13,14 152:8 197:11 201:23 203:5 250:23,24 250:25 251:1
**avenue** 2:11
**average** 20:16 26:21

**averages** 47:15
**avital** 2:3
**avoid** 203:12,14 204:21
**avoids** 203:17
**award** 87:8,10
**aware** 42:12 62:24 72:20 125:16 135:5 140:6 151:22,23 192:13 192:15,16 196:16 200:9,15,18 213:3 219:15 240:6,11 240:12,20 241:1
**awfully** 127:5

**b**

**b** 19:11 251:8
**back** 23:6 33:23 37:18 43:20 44:6 56:1 83:18 103:2 106:13 137:20 141:15 146:25 169:4 174:24 191:25 206:1 223:10 231:6 248:19,23 252:11
**backup** 179:24
**backwards** 105:12 106:19
**bal** 202:24
**band** 243:24 245:1 246:15,18,22,25 248:14,20,20 250:14 251:12,13 251:17
**bands** 244:23
**bank** 22:9 23:5,16
**banking** 32:13
**base** 125:14
**based** 62:7 99:2 102:20 104:8

123:6 135:2 170:18 191:5,7 219:4 226:15,15
**bases** 37:17
**basic** 64:15,23 65:9,22 66:19
**basis** 39:4 66:4 113:23 143:9 195:9,10
**basket** 47:12
**bates** 3:17,20,21 4:4 109:21 114:18 120:9,14 126:1 229:15
**bathroom** 43:20
**bear** 10:5 28:10 40:14
**bearing** 167:16
**bears** 67:17
**began** 140:8
**beginning** 8:3 44:3 83:15 92:20 141:12 191:22
**behalf** 1:5 2:2,8
**behaving** 172:15
**belief** 31:15 62:21 63:17 113:25 129:21 239:1
**believe** 16:9,14 19:6 20:22 45:4 50:3 52:15 60:15 77:23 87:3 95:18 119:17 134:7 135:13 140:1 150:23 159:23 160:20 169:23 177:22 188:15 190:2 199:14 218:6
**believing** 62:25

**benefit** 99:23 160:15
**benefits** 167:2
**best** 10:7 29:22 39:5 63:20 81:21
**better** 28:8 47:16 64:5 129:15,15 217:23 225:13,15 250:5
**beyond** 49:7 57:16 104:7 196:25
**big** 79:19 91:18
**billing** 21:14
**billings** 21:18
**bills** 20:20,23 21:1
**biosolutions** 37:18
**bit** 21:22
**bjorn** 4:1 218:9,13
**blab** 152:18
**blabs** 152:10
**blind** 3:16 109:20 109:25 165:10
**block** 19:10 33:3 34:4,11 35:16 36:9 40:24 63:5 70:7 71:4 199:16 203:24 204:11,25 207:15 208:2 215:20 216:7
**bloggers** 115:14
**bmitchell** 2:7
**body** 92:12,20,25 93:4,16 94:13,15 94:19,21 173:22
**body's** 197:2
**boilerplate** 221:17
**borders** 144:16
**bottom** 61:10 126:2 181:5
**bought** 203:10

**box** 11:4,14
**boxes** 11:5
**bp** 209:25 210:1,2 212:21
**branding** 171:4
**break** 43:12,20 44:10 80:2 83:7 83:23 84:6 138:19 140:22 141:20 191:12,14 192:4 245:6,9
**breaks** 43:17
**brealey** 76:2 204:3 205:6
**brent** 2:3 11:1,17 29:13 39:10 109:14 114:12 119:19 134:3 142:5,14 217:24 218:5 229:9 231:12
**brief** 44:10 141:21 174:22 192:4 232:14
**bring** 206:1
**brings** 233:7
**broad** 75:23
**broader** 57:15 59:4 100:15,15 106:24
**broadly** 99:9 150:9,10
**brokers** 59:17
**brought** 129:18,18
**bullet** 126:9
**bunch** 180:10
**burden** 67:17 68:13
**busier** 27:3
**business** 157:9 180:18

**[busy - certify]**                                                                Page 8

**busy** 27:6 230:14
**buy** 195:1

**c**

**c** 19:11 57:10
61:10 63:4 228:25
230:19 231:23
232:2 235:1
236:18,25 239:7
**cafepharma** 3:21
98:9,18 99:6,14
100:21,23 101:19
103:4,5,10 104:10
104:20 105:4,6,8
106:4,7,20 107:1
107:23 108:12,23
109:2,5 110:9,13
110:15,18,24
111:8,11 112:2,7,8
112:15,22,23
113:24 114:1,10
115:25 118:20
119:2,4 120:5,8,11
120:13 121:8,10
121:14 122:8,19
123:15,20 124:12
125:19 126:6
127:13,15 128:15
128:23 131:18,23
132:19 133:22,23
137:18,24 156:11
168:14 171:23
172:11 201:7
**calculate** 208:16
209:3 211:24
212:2 246:4 248:4
**calculating** 224:24
247:21,24
**calculation** 248:3
**calculations**
189:10

**call** 53:2 74:9,10
141:21 177:5
185:18 209:8
235:24 237:12
**called** 8:15 27:12
94:6 109:24
187:18
**cammer** 45:12
46:16
**campaign** 125:6
191:1
**capacity** 17:3,5
**capeci** 2:2 3:5 8:4
8:5,21 11:1,6,10
11:17 18:7,14,21
18:24,25 19:2
29:13 30:2 33:24
39:9,22 43:9 44:5
55:6 58:15,25
69:4,15 79:24
80:5,6 83:1,4,17
87:2,12 109:14
114:12 118:15
119:15,19,25
120:2,17 121:1
129:10 133:14
134:3 138:17
140:21 141:14
142:4,14,17,18
144:8 147:21
152:23 156:18
158:17,20 162:13
165:13 174:18,25
184:22 191:10,24
217:22 218:4,7,11
223:16 225:4,15
229:8 231:12
238:22 239:22
245:4,13,17
251:25 252:5,12

**capital** 58:20 59:8
**caption** 253:15
**capture** 47:16
**care** 38:20 102:8
**careful** 38:3,9,12
153:2
**carefully** 38:23
69:11 91:13,20
102:13
**carrying** 57:22
**case** 16:5 22:4
32:2 34:25 35:22
37:11 41:6 43:3
45:5,18,20 60:16
65:1 68:23,24
69:6,14,18 78:18
81:24 84:13 88:4
97:3 102:10 108:6
119:10 151:12
153:2 160:12
167:24 178:20
179:7 180:2
185:11 187:18
201:12 203:6
207:1 209:21,25
211:9,14,24,25
212:3,4,21,22
215:18 217:3,9,12
219:1,9,11,12
220:6,12,15,25
222:1,3,4,7 223:15
228:20 230:4
233:3,5 244:4,13
244:15 254:2
**cases** 37:9,25
38:21 42:17 43:2
43:4 78:2 95:3
111:2 188:16,18
189:7 212:19
213:1 217:4,18
218:24 220:1,3,4,6

220:24 223:14
230:16
**cash** 88:25 89:3,5
89:5 101:23
**causation** 208:25
**cause** 50:21 51:1,3
51:4 106:17
187:10 253:10
**caused** 53:10
173:18 181:11
184:9
**causes** 196:1
**cautious** 116:22
**center** 3:23 134:9
**centerpiece** 35:3
**ceo** 13:5 157:11
**certain** 56:9 126:7
126:20 136:3
239:3
**certainly** 12:3
26:21 36:1 60:22
62:3 69:16 108:3
119:7,7
**certificate** 253:1
**certification** 14:15
20:15 26:8,9,20
27:4,7,11,16,19
37:2,10 38:1 41:5
42:15,16,21,24,25
67:18 70:8 78:3,6
78:8,12 188:12
196:7,10 197:3
209:11,13,14
210:3,8 211:1
212:12,17 213:2
215:7 217:5
218:23 220:7
222:20
**certified** 8:16 25:8
**certify** 253:8,14
253:16

cetera  32:15,16
  42:7,7
cfa  4:2 218:9
challenges  212:12
challenging  46:15
  46:15
change  10:15
  14:22 42:10 50:21
  51:1 89:24 90:2,4
  90:24 98:22
  101:22 102:9
  103:22 105:16,21
  105:21 124:5
  131:6 133:3
  161:19 178:9,15
  178:16,17 180:3
  180:24 181:7
  182:9,25 183:18
  183:18 186:22
  187:3,5,10 236:17
  236:19,23 237:3
  254:5
changed  161:13
  182:6,7 236:15
  242:4 246:23
changes  88:24,25
  89:3 90:21 102:21
  123:5 178:8
  180:23 181:4
  243:16
changing  102:19
  185:23 222:14
characterization
  206:10 210:14
characterize  158:3
characterized
  219:22 243:1
characterizes
  62:23 156:14
chart  172:22,24
  173:2,10,12,23,24

174:6
cheap  154:7
check  252:6
checking  134:1
choice  150:7,8
choose  219:2
chose  32:19
chosen  183:7
circle  136:6
circumstances
  10:1 77:22 157:24
  172:18 207:1
citation  87:17
  213:8 217:20
citations  25:12,24
cite  25:20 61:15
  69:25 76:1 113:3
  116:7 118:23
  121:25 122:7
  133:19 138:6
  142:23 180:5
  229:6 232:5,7,11
  232:13
cited  25:1,9 61:12
  69:24 232:4,13
  234:18
cites  113:12 204:3
  220:1,3
citing  145:3 208:5
  230:20
civil  1:6 7:13
claim  73:9,9 109:6
  109:8 195:7
claimed  198:6
claiming  68:11
  250:14
claims  150:23
  211:5,5 221:19
  226:7
clarification  18:22

clarify  41:25
class  12:14,16,19
  12:20,25 14:8,14
  20:15 26:8,9,20
  27:4,7,11,16,19
  37:2,9 38:1 41:5
  42:14,15,21,24,25
  47:23 56:12,12
  67:18 70:7 78:2,6
  78:8,11 99:19
  100:13,13 112:16
  124:17,22 139:22
  139:25 140:10
  165:8 188:12
  193:7 194:18
  195:8,9 196:6,10
  197:2,25 198:11
  198:23 199:2,8
  206:21 208:17
  209:4,11,13,14
  210:3,8 211:1
  212:12,13,16,24
  213:2 215:6,14
  216:24,25 217:5
  218:23 219:4
  220:7 222:17,20
  224:4,23,25 225:3
  225:5,10,11
  243:23 246:2
  249:2
classes  48:21,21
clear  38:17 54:20
  68:1 76:13 132:22
  139:14 159:17
  168:5,8 173:2
  181:18 187:1
  193:14,21 194:6
  194:21 202:20
  204:2 242:17
clearly  121:25

cleveland  253:19
client  18:16 69:9
  140:6 145:8 233:3
  233:24 234:3
  235:2 238:5,8
client's  41:5
  119:10 129:22
  147:17 234:20
clients  21:1
clinical  236:1
  239:10
clint  2:19
clips  172:6
close  53:11 54:18
  181:16 188:10
closely  51:18
code  181:23 182:1
  182:8
coin  59:16
collect  121:8
  123:13 138:1
collected  123:14
  123:15,16 177:13
  234:13
collects  20:25
columbus  9:6
column  171:24
  172:5
comcast  51:22
  209:16,22 210:8
  210:17,20,23
  211:3 212:12,23
  213:3,25 218:22
  219:23 222:21
  223:18
come  34:17 43:20
  49:21 72:11 82:19
  101:5 127:12
  150:3 159:24
  196:4

**comes** 58:12,14
  76:3 103:24
  127:15,16 202:21
  208:8,14 214:9,10
  214:12
**comfortable** 12:12
  208:4,5 236:24
  237:2
**coming** 33:16 85:9
  164:24
**commentary**
  242:21
**commented**
  177:24 178:6
**commenting**
  167:14
**commission**
  253:25 254:25
**commissioned**
  253:8
**commitments**
  27:14
**committee** 31:20
  32:13,14
**common** 22:8 23:2
  23:21 53:10
**communicate** 9:14
**communicated**
  19:20 101:8 170:2
  207:5
**communications**
  16:15 17:14 67:22
  67:25 68:3 71:7
  71:10,25 72:12
**companies** 72:13
  113:11 133:8
  136:19 159:16
  180:19
**company** 24:9
  76:10,12 97:11,12
  103:20,23 108:19

131:24 139:16
  145:23 146:23
  151:17 158:13,21
  161:13,19 162:8
  169:25 178:7,11
  180:3,23,25 181:4
  181:8 185:23
  239:8 242:12
**company's** 66:24
  145:20
**compare** 220:5
**compared** 160:2
  170:19
**compensated**
  116:8,12 129:25
  131:2
**compensates**
  130:6
**compensation**
  21:15,17 26:18
  27:2 130:17 131:8
**compilation** 120:5
**compiled** 59:23
  121:4 172:22
**complaint** 4:3,5
  15:6 41:17 56:15
  57:4 60:16 85:23
  103:24 104:2
  125:1 129:14,19
  130:3 131:7,20
  132:14 140:15
  145:14,25 146:1,6
  146:9,17,17,23
  147:2,7,22,24
  155:3 156:2,10,14
  156:20 157:3
  158:11,12,15,18
  160:25 161:13,14
  163:10 169:17,18
  170:6,10,15,17
  171:6 180:7

192:17 228:20,23
  229:7,10,14,19,23
  230:13,16,22
  231:1,4,11,14,17
  231:20 232:8,14
  233:7,9,10,17,23
  235:16 236:17
  237:16 239:24
  242:10 246:22
  250:17,21
**complaint's**
  158:10
**complete** 234:14
**completed** 226:19
  253:15
**completely** 25:24
  34:14 62:13 64:2
  184:25 219:21
**completion** 229:5
  235:12 236:7
**complicated**
  210:16
**compute** 193:6
  194:2,24 243:22
  246:15 248:14
**computed** 195:8,9
  213:14,25 214:25
  215:4 216:12,24
**computer** 184:19
**computing** 251:2
  251:5,9
**concept** 44:23
  197:19
**concern** 26:20
  38:5 118:16
  177:24
**concerned** 36:2
  62:17 69:8 81:4
  114:7 127:8
**concerning** 46:18
  48:3 50:19 51:6

53:3 59:25 82:14
  95:16 97:2 118:22
  139:9 156:22
  159:16 176:7,8
  197:10 198:24
  204:5,9 209:22
  216:13,14,17
**concerns** 54:10,15
  60:8,9,12 96:21
  126:25 244:8,19
**concierge** 2:19
  33:10,14
**conclude** 94:16,17
**concluded** 185:8
  216:2 252:25
**concludes** 200:4
  252:14,21
**conclusion** 18:5
  82:11 84:19 185:9
  202:8 226:18
  244:25
**conclusions** 56:8
  66:1 72:7 85:14
**conclusively**
  201:17
**condition** 187:2
**conditions** 170:24
**conduct** 74:11
  76:22 85:12,13
  86:3,18 173:20
  189:9 224:12
  234:16 235:25
**conducted** 86:4,8
  86:12 96:2 98:6
  168:6 173:14
**conducting** 48:23
  77:25 78:13
  175:11
**conference** 7:16
  185:17

**conferences** 112:20

**confirm** 9:13,19 46:13 54:16 57:1 59:10 96:1 105:7 131:14 134:21 161:8

**confirming** 95:23 203:18

**conflicts** 29:8

**confounding** 52:12 74:4 216:5 216:6 225:19 244:1

**confused** 97:6 98:11 145:22 182:3 198:21 238:1

**confusing** 40:4 171:12

**confusion** 186:7 232:11

**congress** 28:2,13 61:23

**connection** 29:9 30:14 41:4 58:21 72:17 135:24 147:13 155:16 229:24 240:13

**connections** 30:13

**consent** 7:20

**considerable** 48:5 48:9,22

**consideration** 111:16

**considerations** 36:17 99:3 172:20 172:21

**considered** 16:4 57:16,19 61:12 125:10 135:23

159:4 178:25

**considering** 99:20 99:21 124:23 125:3,10 130:21 134:20 169:11,14 169:16,22 170:4

**considers** 216:8

**consist** 98:8

**consistent** 102:2 178:23 214:20 237:1

**constant** 246:21

**constantly** 154:12

**constituted** 104:20 106:8 170:11 189:13

**constitutes** 144:10 194:3

**constructing** 197:12

**consultant** 22:23 24:2,6,8

**consulted** 94:2

**consulting** 18:19

**contact** 16:21

**contacted** 230:8 230:11,12

**contain** 41:3 85:4 98:7 138:6

**contained** 121:17

**containing** 156:14

**contains** 63:18 213:6

**contemplation** 230:5

**content** 35:19 39:3 81:5

**contents** 16:17 41:1 158:12,17

**context** 24:10 27:11 48:16,17,22

67:6,13 68:22 77:14 78:7,9,12 79:4 91:25 104:22 188:21 197:20 198:18 202:18 203:21 205:12,18 206:4 209:11,20 213:25 238:2,2

**contexts** 78:5

**contingent** 37:1

**continue** 7:7

**contours** 145:25

**contradict** 71:3

**contrary** 108:6 162:20

**contrast** 102:21 170:19

**contribute** 16:12

**contributions** 134:23

**controversial** 11:12

**convey** 40:24 88:17 129:1

**conveyed** 139:3 213:23 214:13

**cooke** 31:10

**cooper** 2:19 7:16

**corner** 21:13

**cornerstone** 15:8 15:21,22 16:3,9,17 17:3,6,8,10,18,21 18:18 19:16,17,23 20:25 21:8 22:4 59:24 60:3,4,6 121:12 171:16,21 172:22 173:4 223:13 230:9,11 230:13

**cornerstone's** 17:14,24 21:14

**corporate** 205:7 205:10

**corporation** 95:1 123:6 124:6 205:5

**corporations** 24:3 76:20 94:2

**correct** 12:7 17:22 21:19 22:5,6 23:19,20,25 28:18 29:23 30:21 31:15 35:21 37:3 41:2 41:20,21 42:8 43:7,8 46:8,16 50:15 52:9,16,23 53:7,8 60:25 65:23,24 68:17 76:15,18 78:7,22 80:9 90:23 91:3 91:17 96:10 103:3 104:12 105:9 139:17 142:16 160:18 180:9 201:10 210:5 212:14 216:9 231:24 232:1 241:23 248:17 253:12

**corrected** 208:11

**corrective** 49:3 56:10 73:15 178:25 239:12

**correctly** 19:9 52:18 59:7 62:23 145:14 189:4 219:25 243:2 250:21

**correlated** 122:10

**correspond** 21:24 211:1

**cost** 160:1

costa   31:10
costs   35:7
coughing   174:3
counsel   7:20 8:1
  9:14 15:16,17
  17:11,15 18:2
  39:23 60:3 67:22
  67:25 69:9 71:8
  83:6 120:7 173:8
  252:16 253:16
count   117:18
  212:18
county   1:14,24 7:1
  253:5
couple   12:9 23:18
  220:1 252:1,5
course   174:12
  201:9
court   1:1 7:13,18
  7:23 8:18 12:22
  12:25 13:2 25:14
  26:12 28:6 33:8
  33:12 35:12 37:11
  38:15 42:13,20,20
  42:25 45:8 46:4,9
  50:24 51:3,5 52:7
  55:4 58:23 60:11
  69:19 71:20 72:24
  73:11 74:19,21
  75:2 86:25 87:4
  89:2 90:6 100:8
  100:10 111:5
  112:6,11,13
  116:10 117:25
  118:10 120:19
  129:8 141:3 144:1
  144:5,7 147:4,8,20
  149:11,19 150:10
  151:5 152:12,17
  152:20 156:17
  158:15,19 174:2,5

174:10 182:19,21
  184:18 187:18,23
  188:24 194:23
  196:16 208:22
  209:15,21,24
  210:1,6,20 211:19
  211:22 213:15
  214:22 215:22
  216:14 219:3
  220:14 224:9
  225:2 230:10
  235:9 241:4,8,11
  241:13,24 249:12
  250:2 251:4,7
court's   68:18
courts   149:10,15
  149:16,23 150:8
  196:20 217:6
cover   76:2
covers   75:23,23
create   58:9
created   171:14,16
creates   125:10
  222:10,11
creating   175:3
credentials   28:1
  63:15
credibly   125:5
credit   188:23
  189:1
credited   87:18
crit   79:22
criteria   122:22
critical   97:18
criticism   52:22
  80:8
criticisms   80:14
  226:9
criticize   222:22
criticizes   115:24

criticizing   30:12
  61:23 95:8
crr   1:23 253:24
crucial   84:14
crucially   84:6
curative   183:5,6
  247:2,4 250:22
current   133:7,19
  136:4 195:23
  240:3,20 241:2
currently   22:7
  129:5,10
cut   74:24
cuyahoga   1:24 7:1
  253:5
cv   1:7 7:14

**d**

d   3:1 116:13
  216:16,16 224:11
d.c.   150:1
da   31:10
damage   199:3
damaged   193:4,9
  194:11 195:16,24
damages   51:22
  52:23 54:15 55:24
  80:9,14 193:7,18
  194:2,24,24 195:8
  195:9 197:12,25
  198:2,11,23 199:8
  202:7 203:7,8,16
  205:18 206:14,15
  206:21,23 208:16
  209:1,4,15 210:7
  211:24 212:3,23
  213:13,24 214:25
  215:4,5,13,14,16
  215:21 216:24
  217:3,3,18 219:4
  220:5,23 221:18
  221:18 222:22

224:3,24 225:4,5
  225:11 238:23
  243:22 244:9,20
  247:1,3
dash   147:21
data   58:19 59:18
  59:19 134:19
  224:24 234:13
date   88:14 151:9
  239:2 243:25
  244:1 247:1,4
  251:21,23 254:3
dated   30:4 110:1
  134:16 142:21
  218:13 231:21
dates   57:7 79:6,6
  99:19 183:6 231:9
day   10:6 13:10
  45:7,8,9 51:8 74:1
  74:4 82:21 153:16
  154:13 158:11
  186:18 187:16
  189:25 190:23
  191:5 195:1
  199:13 200:24
  203:11 224:17,19
  225:9,16 226:7
  227:2,3 253:19
  254:22
days   79:13 187:14
  211:17,20 246:5,8
  247:24,25
deal   49:23 176:19
  206:14
dealing   10:1
deals   38:6
december   30:4
  61:16 239:17,18
  242:3 243:6
decide   70:7 93:12

**decided** 93:10
**decides** 42:20
**decision** 38:5,16
68:15,18 69:9,25
72:24 73:12 85:6
88:7 188:1,5
196:24 197:2
210:17,19,24
211:4 212:17
217:16 240:14
**decision's** 212:20
**decisions** 37:25
70:1 72:4,8,10,15
72:16,20 73:10
125:14 197:1
200:12 203:23
207:10,12 214:22
220:9 221:2
**decline** 38:24 53:9
53:21 55:1,6,15,17
181:11 182:24
190:10 226:6
**declined** 42:13
183:17 190:7
**declines** 151:3
**decompose** 226:25
**decreased** 226:23
226:23,25
**decreases** 160:13
**deemed** 200:11
**defendant** 67:17
211:8,13
**defendants** 1:10
2:8 8:11 13:3
15:16 36:19 65:10
65:13,15,16,19
66:20 212:11
**defense** 14:15
15:11 20:15 26:8
27:4,20,21 36:25
37:10 38:2 42:24

78:7 196:11
209:13,14
**defined** 84:15
**definitely** 14:17
**definition** 14:4
45:5 46:25 104:9
153:17 158:25
175:24,25
**definitions** 237:6
**definitively**
112:22
**delve** 67:21
**demand** 164:24
206:9
**demonstrate**
66:22 175:21
185:19,21 186:3
**demonstrated**
139:13
**demonstrations**
202:22
**denied** 197:3
213:2
**depend** 37:14
81:20 82:9 90:12
90:13,14 91:23,24
91:25 239:20
**depending** 115:21
**depends** 37:13,16
77:14,17 82:10
90:11 115:17
142:1 198:12
239:25 245:11
**depose** 206:1
**deposed** 8:13,16
**deposition** 1:13
3:11,11,12,14,15
3:18,21,22,23 4:1
4:2,5 7:9,15 10:14
11:2,7,18,19 12:1
12:10 15:3 29:15

39:17 40:8 109:18
114:16 120:8
134:8 142:7 218:8
229:13 231:16
236:13 252:25
253:14 254:3
**depositions** 10:20
14:6,10,11,20,23
20:7 34:18
**derived** 26:7
**describe** 21:16
75:23 91:21 190:1
**described** 46:17
74:8 75:6 127:23
128:4 165:24
**describes** 75:22
114:2
**describing** 71:7
200:16
**description** 160:19
**despite** 195:22
234:12
**destroy** 223:14
**detail** 96:4 107:8
**details** 22:1
126:25 127:2
212:8
**determinants**
76:19 92:19 93:25
94:4
**determination**
85:6 94:10 195:6
**determine** 85:22
92:7 94:8,16,22
**determining** 56:9
89:15 91:7 92:16
**develop** 71:12
**developing** 99:21
**developments**
236:20

**diagnosed** 42:7
**difference** 111:3,7
112:4 125:3
166:10 172:14
203:9 237:22
**differences** 212:2
212:7
**different** 39:2
51:10 53:14,17
62:13 63:23 68:22
76:5,23 78:5,9
87:21,24 91:9
102:12 115:21
172:20 176:24
178:13 193:8
194:25 195:2,19
219:7 224:17
227:1 236:25
**differentiate** 22:2
**differently** 36:22
38:18 133:21
193:9 199:24
200:3 225:7
**differs** 215:19
**difficult** 162:4
**difficulties** 34:1,3
**difficulty** 79:11
**diffused** 196:22
**digital** 134:20
**direct** 32:9 107:6
118:6 206:16
218:15 228:24
230:21 233:16
235:14
**directed** 232:2
**direction** 172:23
**directly** 118:5
**directorship** 22:10
**dirt** 116:9,13
126:16

**[disagree - drugs]**                                                      Page 14

**disagree**  117:6
  119:8 206:8
**disclose**  29:8
  30:13,23 32:4
  50:19 129:24
  145:9 167:16
  238:25 242:12
  244:6,17
**disclosed**  30:20,22
  32:7 51:8 79:15
  81:12 97:10 100:5
  144:19 157:8
  186:1 196:1
  222:16,17 226:11
  239:13 242:22
  243:5 248:16
  250:15 251:20
**disclosing**  140:1
  146:18 167:6
**disclosure**  3:13
  29:16 30:6 47:4,9
  49:3 52:5 54:18
  73:16 124:20
  183:5,6 193:4
  242:16 243:11
  247:2,4 250:18
**disclosures**  45:22
  45:24 48:7,10
  49:6 50:18 56:10
  61:23 81:9 100:14
  101:25 102:22
  242:4 243:9
  246:16
**discount**  89:1,4
  101:23
**discretion**  22:20
  164:13
**discuss**  43:2 47:18
  49:11,16 50:16
  53:13 79:18 82:4
  83:22 97:23,24

  103:8 105:22
  107:8 117:4
  141:19 157:15,18
  157:20 161:4
  164:5 166:14
  179:20,21 192:3
  197:18 201:18
  239:24 243:3
  246:18
**discussed**  62:5
  64:3 69:5 80:23
  95:15 98:20
  105:15 107:3,11
  109:7,8 118:19
  123:2 126:5
  131:17,19 132:16
  132:18,18 137:14
  138:8 144:11
  153:14 158:5
  161:18 165:7
  166:2 168:9
  173:20 200:22,23
  201:20 209:6
  211:2 242:9 248:9
  250:10
**discusses**  36:5
  99:20 114:3 145:2
  180:6 192:18
  203:19 217:10
**discussing**  48:12
  49:5,8 69:19 82:8
  110:5 145:18
  188:21 212:9
**discussion**  21:17
  28:4 29:12 35:4
  51:22 52:12 80:14
  144:25 145:12
  148:6 167:21
  189:2 199:19
  205:11 206:3
  216:10 218:20

  237:15,20 248:13
**discussions**  100:14
  100:21 102:18,22
**disorders**  165:11
  167:1
**disparate**  194:18
**disproving**  78:11
**dispute**  62:6 63:15
**dissertation**
  135:19
**distance**  222:15
**distinct**  222:15
**distinction**  44:20
  237:22
**distinguish**  103:25
**distinguishable**
  170:21
**district**  1:1,2 7:12
  7:13 37:20 149:10
  149:11 150:1
**docket**  69:5,21
  149:1 153:9,13
  158:9
**dockets**  149:18
**doctor**  148:3
**doctors**  164:10,12
  164:20 165:9,15
  166:7
**document**  21:21
  61:15 120:21
  231:10,22,25
  232:6,11,16
**documents**  9:20
  15:5 16:2,12
  57:13,16,19 58:1
  58:10 59:21,23,25
  60:1,6 61:2,11,12
  126:11 149:1
  232:4,5 237:1
**doing**  10:14 17:9
  28:3 31:18 36:12

  36:15 66:6 78:14
  85:1,2 112:9
  138:21 141:22
  143:11 194:23
  198:25 205:2
  214:6 225:25
  245:2
**domain**  117:13
  118:17 145:4
  176:17,21 177:4
  177:15 246:12
  247:15,17,22
  249:22
**door**  83:3
**dose**  234:15
**dosing**  234:17
**double**  252:6
**dowd**  2:4 8:6
**download**  121:11
  149:6
**dozens**  47:11
**dr**  9:9 10:17 11:22
  11:25 13:5 18:17
  24:12 125:22
  141:15 142:21
  157:23 164:8
  217:1 231:13
**draft**  19:12
**drafting**  19:16
  115:10
**draw**  18:4 193:12
**drawing**  198:25
  202:8
**drop**  53:25 54:3
**drug**  3:19 14:1,2
  100:16 114:17
  131:3 143:10
  147:19 168:25
  171:4,7
**drugs**  99:8 130:7
  143:12 144:15

**[drugs - estimate]**                                                                 Page 15

145:10 164:10,12 170:19

**due** 168:25 182:12 237:8

**duly** 8:15 253:7,9

**e**

**e** 3:1 8:25,25 9:1,1 9:5,5 87:2,3,3 224:11

**earlier** 32:10 35:2 80:23 128:23 168:9,21 171:24 172:10 175:20 205:4 209:11 222:17

**early** 16:23 32:14 209:6

**earnings** 105:21 178:17

**easier** 35:9 114:9

**easily** 32:23 159:25

**eastern** 1:2 7:13

**easy** 32:24 35:9

**echo** 33:9,11,16

**economic** 74:16 75:8,12 78:25 80:19 81:5 175:20

**economics** 24:19 24:22,25 36:24 63:2,11 71:3 75:25 81:20 92:9 93:1,23,24 94:12 94:14 173:23 176:4 192:20,22 193:12 195:18 197:15,20 198:17 202:14,17,21 203:15,21 205:13 206:4 208:19 221:5

**economist** 29:7 36:12,14 47:1 48:4,5 57:23 70:12,13,19,21 71:14,16 73:17,19 74:11 76:8 77:2 77:19,23 79:1 80:20,24 84:8,18 84:24 85:22 86:3 86:12 88:2,10 89:16 90:16 92:7 92:11 93:11 94:19 172:24 173:10 174:9 177:1 181:22,23 195:5 196:5 197:9 202:7 204:15 208:4 214:24 220:10,11

**economists** 25:2,5 25:9 62:2 75:15 76:25 81:3 175:14

**edge** 160:10,11

**editor** 25:5

**edits** 42:9

**effect** 95:13 139:22

**effectiveness** 139:13

**efficiencies** 46:8

**efficiency** 27:15 44:14,15,21,23,24 45:5,18,20,23 46:18,20 56:8 65:20 66:3,8,12 84:9,10 85:15 86:4,11,14,16,23 87:5,9,11,24 104:8 153:17,24 158:25 160:19 175:25 176:4,13 184:11 190:3 218:19,21

226:15,16,20

**efficient** 45:3 46:1 50:20 64:24 65:4 65:14 66:11 73:21 82:12,13,21 84:15 84:16,21 88:13,22 111:19 113:1 127:22,24 128:4 128:12 178:24 182:16 185:12,13 185:15 186:17 190:16 191:6 198:8 203:1 227:24

**efforts** 166:17 173:13

**either** 69:17 103:14 127:11,13 151:2 161:14 162:16 184:3 211:13 253:16

**electronic** 9:15

**elements** 131:8

**email** 60:20

**emergent** 37:18

**emiller** 2:14

**emily** 2:10 31:9

**emphasis** 170:7

**emphasize** 171:5

**empirical** 84:9,22 84:22 92:10 94:1

**employ** 75:8 79:1 80:20 175:2

**employed** 75:17

**employee** 133:20 133:24,24

**employees** 133:8 134:18 135:5,5 136:4

**employment** 134:23

**encompasses** 149:10

**ended** 146:13

**ends** 101:11 244:1

**engage** 25:13,17 113:14 157:11

**engaged** 18:17 100:6 101:8 129:5 129:11 131:24 139:4 191:1

**engagement** 20:10 20:14,21 21:9,14 21:25 24:14 230:6

**engagements** 22:3 27:19

**engaging** 125:5

**engle** 86:20,22 87:2,5,7

**enormous** 92:20

**ensure** 242:6

**entails** 21:21

**enter** 119:23

**entirely** 19:14

**entirety** 124:17 168:16

**entities** 150:21

**entitled** 65:8

**entry** 163:11

**equally** 111:25

**errata** 254:1

**especially** 154:7

**esq** 2:2,3,3,9,9,10

**essence** 81:9

**essentially** 137:1 180:10

**establish** 161:3 206:20

**established** 65:21 108:1,3

**estimate** 14:6,14 15:12,15 20:9,11

21:7 23:1 26:5
77:9 78:15,16
222:25 249:21
**estimated** 51:11
**et** 7:11,12 32:15
32:16 42:7,7
**ethical** 172:19
**evaluate** 63:25
79:7 117:11
205:17
**evaluating** 84:8
**evaluation** 219:5
**event** 52:4,7 54:1
55:3,8,9,13,20
77:9 78:13,19,23
79:3,9,11,17 80:17
81:8,23 82:5,7
87:15,18,19,20
139:1,3,9,19,21,25
140:4 177:9 219:2
220:13,17,23
222:10 251:10
253:17
**events** 52:13 224:2
225:10 228:17,19
236:22 243:7
**eventually** 224:12
236:21
**everybody** 135:5
**evidence** 63:1
64:12 66:21,25
84:9,22,23 98:21
106:2,4 122:14
124:12,15 154:22
154:22 160:3,17
160:24 161:9,23
162:5 177:3,13
179:23 180:13
182:7 183:5 184:5
186:12 187:4
198:24 199:1

**evolution** 235:6
**evolve** 135:18
164:25
**ex** 133:24
**exact** 188:7
**exactly** 25:23
28:21 30:22 34:14
62:5 73:1 111:11
131:9 171:2
239:19
**examination** 3:3
8:15,20
**examined** 150:20
**example** 63:9
149:25 216:4
245:24
**examples** 63:12
108:22 109:4
219:6
**exclude** 127:5
187:12
**excuse** 184:18
251:4
**exercise** 138:13
241:15
**exhibit** 3:11,12,14
3:15,18,21,22,23
4:1,2,5 11:16,16
11:18 29:14,15,19
29:24 30:3 39:11
39:17 40:1,7
55:11 109:10,18
109:23 114:13,16
119:20,20,22,22
120:3,8,17 125:18
134:7,8 137:20
142:6,7,19 171:9
171:10,11,14,20
173:9 175:1,3,4,19
175:23 176:25
177:2,9 203:19

204:2 218:5,8,12
229:10,13,18
230:22 231:16,20
233:18,23 235:15
237:16
**exhibits** 3:10 10:2
10:3 40:5 61:13
133:11
**existence** 151:4,19
152:2 158:10
180:6 182:24
186:2,4 192:16
199:1,21 248:17
**existing** 73:22
84:17 109:12
**exists** 248:22
250:9
**expanding** 140:11
**expansion** 140:19
**expect** 71:21 97:22
137:3,6 154:5
178:8 199:22
203:1
**expectations**
88:25 101:22
**expected** 89:5
105:21 135:10
178:17 179:1
**experience** 20:13
48:6,8,9,14,22
57:24 196:5,6
219:22
**experiences** 42:23
**expert** 4:1 8:12
14:7,15 16:20
18:18 20:15 24:18
24:21,25 26:7,8,9
27:4,10,16,20
28:22,25 29:4
36:8,25 37:10
38:1,21 42:16,24

47:21 65:13,25
67:22 70:1,10
77:23 78:3,7 88:6
93:20,22,23 94:5
94:12,14,16,19
124:19,20 143:25
144:9,12,24
163:19 164:2,16
188:12 194:3
196:10 204:20
208:9,12,16,18
209:12,13 211:7
211:12 212:2
214:3,21 218:8,13
222:20,23 242:11
242:16,20 243:11
**expert's** 66:2
**expertise** 24:22,23
29:7 36:11 38:25
46:25 48:2,2
68:12 70:24 71:13
71:17,18 72:9
73:9 76:8 77:1
84:24 88:9 131:5
209:19 215:1
216:21
**expiration** 253:25
**expires** 254:25
**explain** 17:4 21:3
21:22 24:17,19
38:18 68:8 70:22
77:5 131:22 159:8
190:7 191:3
214:10 219:1
222:5 226:24
**explained** 121:25
189:20 222:13
224:5
**explains** 53:24
**explanations**
32:25

**explicit** 53:3,5
  179:16
**explicitly** 58:1
  107:21 109:1
  144:12 164:4
**exploit** 59:17
**exposed** 183:3
**expounding** 70:3
**express** 250:4
**expressed** 177:23
**extend** 229:4
  231:2 235:8,12
  236:6
**extension** 236:2
**extensive** 28:4
  98:13 124:23
  234:12
**extensively** 200:22
  201:21
**extent** 67:21 91:10
  191:2 205:20
  222:7 223:16
**extracts** 180:10
**extrapolated**
  120:12
**extremely** 184:14
  227:5,16 228:6
**eyed** 3:17 109:20
  109:25

**f**

**f** 13:17 100:11
  251:8
**fact** 28:1 31:21
  35:22 64:3 98:20
  108:6,17 130:12
  133:19 153:21
  160:4,17 161:21
  166:6 167:14
  179:14 183:13
  190:9,25 201:10
  206:2 216:4,10

224:18 238:6,12
  238:18 250:12
**factor** 46:16
**factors** 45:12,15
  90:13 91:25 227:1
**facts** 112:9,10
  137:13 166:14
  170:19 177:13
  206:25 227:6
  250:19
**factual** 115:20
  116:7 241:14
**fail** 39:1
**failed** 129:23
  145:8
**failing** 30:12
**failure** 132:2
**fair** 27:18 30:16
  173:6,6 245:8
**fairly** 43:10
**fall** 108:2 184:10
**falling** 228:6
**false** 31:16 33:6
  41:17,18 129:23
  150:23
**fama** 44:17 86:20
  86:23,24 87:10,13
  87:17
**familiar** 10:18,20
  30:7 67:2,9 72:4
  187:17 229:22
**familiarity** 72:9
  72:11
**fanapt** 99:21
  100:7,11,18,19,20
  100:25 101:9
  106:25 129:7,12
  139:5,15 140:2,7
  140:12 143:4,17
  144:20 145:9,13
  146:24 147:16

166:19 168:24
  169:18,21 170:3
  170:20
**far** 20:20 24:11
  36:1,4,4 110:5
  117:22,24 118:4
  127:5 161:16
  246:20
**fare** 64:5
**fashion** 205:24
**favorable** 66:22
**favorably** 166:18
**fb** 1:7 7:14
**fda** 13:17,18,19
  60:8 101:1,1
  105:5 107:3
  122:20 139:1,2,19
  139:24 142:5,20
  142:22 143:17
  144:14,18 146:4,5
  146:10,15 224:7
  224:15,20,21
  225:20 229:2,3
  231:14,21 232:8
  233:23 234:11,14
  234:16,18 235:3,7
  235:10,16,24
  236:1,5,5,17 237:9
  237:10 238:4
  239:2 240:3,7,14
  242:6
**february** 12:15
  13:10 50:22 51:4
  51:6,16,21,24 52:5
  52:6,13 53:3,6,10
  53:12,13,25 54:18
  54:24 55:2,7,11,15
  55:18 56:18 85:10
  95:11 96:6 102:23
  107:12 108:7
  110:1 111:18

122:15 151:15
  152:3,9,9 153:19
  159:12,21 161:2
  161:24 173:19
  184:16 189:17
  190:8,10,22
  198:24 203:3
  204:18 216:5
  222:16 224:3,5,22
  225:19,22 226:22
  227:13 228:1,2,9
  247:16,17 248:8,8
  248:10,16 249:10
  249:16
**federal** 4:3 58:5
  149:10,16,19
  229:14,20
**feel** 14:13 38:24
  245:13,14
**feeling** 11:10
**feet** 221:25
**feitzinger** 20:1
**fell** 183:23 184:3
**felt** 168:11
**fetched** 127:5
**field** 25:6 75:24
  85:17 92:9 94:13
  208:5
**figure** 90:16 92:23
  93:16 95:2 115:7
  223:9 243:15
**file** 71:23 150:19
  151:8
**filed** 7:12 13:18
  150:14,19,22
  151:1,9 154:11
  229:20 231:20
  245:25,25 246:6
  246:11 247:9,25
  248:21 249:8,9,14
  249:17 251:11

**[files - form]**                                                                 Page 18

**files**  111:12
**filing**  150:24
  251:15
**filings**  186:2
**final**  245:5
**finalizing**  168:24
**finally**  224:14
**finance**  25:3 205:5
  205:7,10
**financial**  22:22
  24:19,22,25 25:2,4
  25:9 29:7 32:13
  36:12,14,24 47:1
  48:4,5 57:23
  59:18,19 62:2
  63:2,11 70:11,12
  70:19,20 71:2,13
  71:15 73:19 74:11
  75:8,14,25 76:8,25
  77:1,19,23 78:25
  80:19,24 81:3,20
  84:7,18,24 85:21
  86:3,12 88:2,9
  89:16 90:16 92:6
  92:9,11 93:1,11,23
  93:23 94:12,14,18
  172:23 173:10,23
  174:9 175:14,19
  176:3,25 181:22
  181:22 192:20,21
  193:12 195:5
  196:5 197:9,20
  198:17 202:7,14
  202:17,21 203:21
  205:13 206:4
  208:4,19 214:24
  220:10,11 221:4
**find**  44:16 59:11
  62:18 85:15
  102:18 106:3
  123:8 124:7

134:11 149:3,4
153:25 154:12
159:11 161:17
175:6,10 200:21
**finding**  55:16
  146:13 178:23
  244:4,13,14 247:6
**findings**  46:16
  55:14 240:15
**finds**  127:9
**fine**  9:10 112:11
  141:5 226:2
**finish**  74:25 80:3
  118:14 201:6
  240:25
**finished**  74:24
  118:12,13
**firm**  7:17,19 8:5
  18:19 49:19 90:5
  90:8 91:4,18
  106:17 114:8
  137:11 138:2
**firm's**  59:18
**firms**  92:19 93:3
  93:25 94:5
**first**  4:5 8:15
  11:15 12:14 16:21
  30:21 34:10 41:11
  46:14 60:9,11,15
  66:19 73:7 75:10
  75:10 85:8 87:20
  93:8,12,17 96:24
  107:8 115:1,1,6
  124:3,10 132:15
  140:9,17 156:19
  160:14 162:19
  172:5 179:17
  183:21 184:6
  206:18 211:1
  213:19 218:2
  221:16 231:16,20

232:8 249:14,17
253:9
**fishing**  155:13,19
**fit**  35:11,14
**fits**  70:22
**five**  43:19 69:22
  69:22 80:2 138:22
  188:6 191:14,23
  245:14 252:22
**flitter**  31:9
**flows**  88:25 89:3,5
  89:5 101:23
**fluid**  40:12
**flyonthewall.com**
  180:5
**focus**  47:19 65:21
  90:2 96:18 99:22
  111:17 122:5
  170:5
**focused**  32:17
  165:18 190:9
  221:4
**focuses**  146:12
  147:24
**focusing**  65:19
  87:25 145:15
**folder**  40:8,9
  218:3 231:15
**folders**  40:5
  109:17
**folks**  218:1
**follow**  38:25 39:1
  42:13 103:19
  114:2
**followed**  64:1
  112:24,24 157:14
**following**  50:15
  61:25 98:12
  102:22 144:14
  161:12 175:24

**follows**  8:17 114:3
**footnote**  142:23
  180:9 207:2
  223:25 230:19
  231:8,10 237:5,25
  243:3
**footnotes**  110:11
  207:14 218:16
**force**  10:15 140:11
  140:19 166:19
  168:10 215:11
**forces**  76:17
**foregoing**  253:12
  253:15
**forge**  43:13
**forget**  101:4
**form**  12:18 14:24
  18:3 30:15,18
  31:25 32:21 33:7
  34:9 36:10 44:24
  44:25 45:3 50:13
  51:25 52:24 53:22
  54:19 56:16 57:5
  61:13,24 63:8
  67:1,3,20 80:21
  84:16 85:19 89:14
  89:18 90:18 97:17
  108:14 111:1
  112:3 117:23
  118:3 119:11
  121:4 123:1 125:7
  132:9 136:5,15
  139:7 143:6,8
  144:22 145:11
  154:15 155:12
  158:14 161:10
  163:17 167:18
  172:16 178:1
  179:5 180:8
  183:20 187:11
  196:19 197:7

[form - good]                                                                    Page 19

209:17 212:25
214:11 217:7
219:19 239:14
240:9 244:10
247:19
**formally** 16:22
**formation** 74:17
**formed** 84:23
**former** 133:8,20
136:4 157:9
**forming** 16:4
155:17
**forms** 30:23 32:3
**formulated** 188:20
**forth** 188:13
198:24 213:21
214:25
**forum** 107:11
**forward** 29:5
248:24
**found** 106:1
155:10 162:6
176:21 177:3
179:22,24,25
210:6 212:22
241:13
**four** 15:18 42:4
43:5 53:14,18
54:4 69:22 76:23
141:13 147:21
191:19 218:24
219:6 224:6
**fourth** 60:8
**frame** 192:22
**frank** 15:23
**franklin** 1:14
**fraud** 14:8,9 47:23
208:17 209:4
211:5 212:3,13,24
**frequency** 140:4

**frequently** 139:10
139:10
**friday** 7:2,6
**front** 51:17 57:2,6
**frustrating** 60:21
**full** 8:23,25
**fully** 35:8 45:2
134:21 204:8
**fun** 230:16
**fund** 8:8 117:9
136:25 138:1
**fundamental**
183:2 219:5,10
220:20 222:11
**funds** 22:12,13
113:13 137:6
160:9
**further** 142:4
187:4 253:14,15
**future** 88:25 89:3
89:5,5 101:23

**g**

**g** 2:2 87:3
**gardner** 60:19,23
157:9
**garrison** 2:11 8:11
**gee** 184:2
**geller** 2:4 8:6
**general** 72:9,11
122:4 150:2 154:4
172:19 187:12
**generalities**
217:10
**generally** 186:15
188:4
**generic** 221:17
**getting** 69:2
146:20 225:15
**give** 18:10 31:1
36:11 39:5 47:1
63:3 70:18 133:10

197:22 216:4
220:10
**given** 14:23 32:12
85:13 86:15,15
87:10 107:9,20,21
139:12 158:10
164:17 186:18
192:24 193:24
198:23 199:21
204:15 206:25
214:24 216:22
221:5 232:5
242:22 243:5
252:21 253:10,12
**gives** 54:6 79:12
116:20 215:16
**giving** 29:6 46:25
67:24 69:13
193:22 214:1
**glassdoor** 3:22
105:6 122:19
123:15 133:7,18
133:20,21,25
134:4,8,18,18,25
135:3,9,14,17
136:2,13,18 137:5
137:19,22,24
138:5 156:11
201:8
**glassdoor's** 134:16
**go** 7:8 10:6 12:9
31:18 33:12,14
43:14 59:2 61:9
81:18 104:7
106:13 108:19
113:10,16 121:8
138:21 141:24
146:25 150:2
154:6 159:10,18
160:22 174:10,18
176:19 196:25

214:25 220:8
221:13 223:10
231:6 233:8
239:15 241:14
247:20 248:19,23
248:23 251:25
**goal** 89:20
**goals** 130:15
**goes** 166:23 169:4
177:10 195:7
228:18 246:14
248:6
**going** 7:5 10:8
11:11,11 12:10
29:11,20 33:11,19
40:3 43:11,25
49:7 55:23 59:9
61:14 64:20 66:14
66:15 79:25 81:19
83:12 94:14 102:4
106:19 113:1
119:22 120:3,20
125:11 131:6
136:6 140:22
141:8 154:19,19
157:18 164:25
170:23 174:21
177:19 178:21
191:10,19 194:11
194:25 195:23
196:20 205:10,23
205:25 206:6,7
219:10 223:20
229:8,9 230:15
231:13 234:7
236:12,20 241:14
245:3 252:8
**goldman** 68:14,18
69:19,24 72:24
**good** 7:4 8:4,9,22
40:10 43:21 68:16

**[good - impact]** Page 20

75:24 80:2 83:9 191:15,16 215:10
**google** 26:1
**gordon** 1:4 7:11 60:19 234:4 254:2
**gotten** 16:10 153:18 173:24 174:6
**government** 150:21 151:2,6
**granted** 42:25
**grants** 42:21
**great** 10:25 11:17 30:2 48:25 83:25 110:7 142:17
**grober** 219:8
**group** 29:6
**growth** 167:25
**guess** 192:23 215:10 248:12
**guesses** 115:19
**guidance** 234:19

**h**

**h** 1:9 99:25
**hal** 35:5
**halliburton** 187:18 188:11
**han** 15:24
**hand** 171:24 222:2 253:18
**hang** 174:16
**happen** 37:6 160:21
**happened** 28:9 225:21 238:9 251:10
**happening** 40:14 243:7
**happens** 34:25 125:15 150:14

**happy** 18:10,14 34:11,18 35:15 43:14 63:3,13 67:5 83:7
**harvard** 35:5
**head** 43:10
**header** 57:13 232:21
**healthcare** 115:14
**hear** 10:4 58:23 74:21 118:10 120:19 187:23 250:2,3
**hearing** 8:1 28:23 29:10
**hedge** 113:12 117:9 136:25 137:6 138:1 160:9 160:10
**held** 7:15 23:7
**help** 3:23 19:15 134:8,17 173:3
**helpful** 70:15,17 80:25 87:22
**helping** 171:22
**hereinafter** 8:16
**hereunto** 253:18
**hetlioz** 41:24 106:25 129:6,12 132:1,3 139:6,20 140:2,8 143:4,18 144:20 145:10 146:24 147:13,16 147:18,25 148:2 162:21,25 163:14 163:22 164:19,20 164:24 165:1,9,14 166:6,19 167:2,7 167:14 168:7,11
**highlighting** 115:1 115:3

**highly** 25:1,9,19 26:4 165:3
**hit** 153:9
**hold** 55:18 153:20 173:5 204:6,6 224:13 233:21 236:1,21 239:10 239:16
**holds** 247:9
**home** 31:3,18
**honored** 20:5
**hope** 19:9 32:10 39:16 52:16 70:14 70:17 149:20 150:24 247:11
**hopefully** 80:5
**hoping** 11:11
**hour** 43:11,17
**hourly** 21:2,15
**hours** 15:12,15,18 20:12 21:8,21
**house** 32:13
**human** 234:17
**hundreds** 160:6
**hyphen** 224:10 251:8
**hypothetically** 183:16

**i**

**ich** 234:19
**idea** 21:12 22:14 37:6 115:4 154:10 185:7 231:3
**identification** 11:21 29:18 39:19 109:22 114:20 120:10 134:10 142:9 218:10 229:17 231:18
**identified** 19:18 32:20 100:17

**identify** 53:19 201:15,17
**identities** 134:22
**identity** 136:13
**ignored** 95:20
**ignoring** 95:9
**ii** 187:18 188:11
**illegal** 157:11 163:12
**illegally** 172:15
**immediately** 227:18
**impact** 45:21 46:11,23 47:3,7,17 47:22 48:6,10,14 48:20 49:2,12,13 49:23 50:11 51:12 51:24 52:3,5,19,20 53:4,6,16 54:7,17 54:25 56:14,17,22 57:2 62:15 65:17 65:19 66:2,10 67:18 70:9 72:3,5 74:12 75:9 76:14 78:11 79:1,7,10,17 80:20 81:1 82:7,8 82:15,16 84:8,12 84:17 85:16 86:5 88:3 91:18 94:12 94:20 95:17 96:24 97:14 103:7 104:3 104:4,7,13 106:7 107:23 108:7 128:6,12 159:5 164:21 165:15 167:17 169:3,7,9 169:13 175:15,22 176:2,5,15 179:2 180:15 181:12,15 181:17,19,24 182:2,8,10,11,15

182:18 183:6,23
183:24 184:5,24
185:6,12,14 186:8
186:10,16,24
187:3,8,13 188:14
188:19 189:3,6,14
189:24 190:4
203:2 226:14,21
227:21,24 247:3,7
247:8,9 250:13
**impacted** 56:11
73:16 227:12
**impermissible**
162:25
**implicate** 89:10
**implication**
100:16
**implications** 56:7
64:21 74:16 75:13
75:15 86:11,14
91:14,20 92:2
102:15 103:16
137:9 199:1
226:20
**implies** 190:3
222:1
**importance**
177:25 224:21
225:20
**important** 37:24
38:3 70:5 76:10
84:7 103:25
111:16 112:17
113:9 132:13
161:18 163:9
165:2,23 166:10
167:25 169:24
178:6,8 216:1
227:23 241:12,19
243:15 251:23

**imposing** 36:19
**impossible** 152:10
152:13
**improperly**
143:23 144:1,3
**improving** 225:17
**inadvertently**
69:12
**inappropriate**
237:14
**incentive** 126:12
126:25 127:3
**incentives** 126:15
129:17 130:5,16
153:25 160:22
169:23
**incentivized**
113:10
**include** 117:20
168:25 169:12
171:4 181:25
207:13 237:7
**included** 59:12
87:14 97:13
123:21 186:21
**includes** 14:11
**including** 15:6
63:4 78:6 90:1
116:21 128:15
206:15
**income** 26:6,19
**inconsistent** 45:23
46:4,7 158:24
184:10
**incorporate** 88:16
**incorporated** 45:1
45:6 65:5 88:21
104:11 106:9
107:14,17 113:2,4
153:11,16,18
192:25 193:25

194:9 195:10
**incorporates**
79:14 80:11
**incorrect** 93:15
207:25 242:2
**incorrectly** 239:7
**increased** 166:15
**independent** 22:22
28:22,25 29:3
36:8,16,18
**independently**
230:6
**index** 26:2 160:7
**indicate** 132:24
**indicated** 153:3
**indication** 130:19
139:11 163:25
**indications** 124:22
**indicative** 130:4
**indicator** 170:8
**individual** 19:19
22:11,16 23:2,7,9
23:10,14,15 47:18
47:20 49:12,14,16
49:20 73:16 151:9
192:13 193:19
**individualized**
161:4,7 192:11
193:11,15,17,20
194:4,17 196:3,9
196:17 197:5,14
197:19 198:17
199:15 200:20
202:13,17 203:19
203:24 204:22
205:12 206:3
**individually** 1:4
**individuals** 19:18
147:24 150:19,24
167:8 194:25
195:2 203:5,6

204:17
**industry** 114:7
115:7
**ineffectiveness**
139:11 140:5
**inefficient** 56:19
**inexact** 60:7
**inflation** 21:5
198:13 199:12
216:11 237:6,8
243:15,17,19,24
244:23,25 245:1
246:4,7,10,15,18
246:21,25 247:21
247:24 248:14,20
248:20 249:21
250:14 251:12,13
251:17,24
**influential** 61:3,21
**inform** 78:21
**informal** 136:21
**information** 16:2
18:11 31:1,6,16,23
32:22 33:5 34:6
34:21 35:20 44:18
44:25 45:6 46:2
47:4,10 49:23
50:19 51:8 53:15
53:17,18,23 54:4
56:22 62:7,10,22
63:7,18 65:2,5,17
67:25 69:13 70:15
70:16 73:20,22
74:2,4,7,12,17
75:7,13,16 76:4
79:5,15,17 80:11
80:12,12 81:2,5,9
81:11,14,16 82:20
82:22 84:17 85:3
85:22 88:14,16,18
88:20,23,24 89:8,9

89:15,17,21,23
90:1,3,10,14,17,20
90:21,22,24 91:1,3
91:7,10,15,16,21
91:24 92:1,3,4,7
92:16,23 93:2,3,7
93:12,20 94:9,22
96:16,19,21,23
97:8,16 98:8,12,14
98:18,19,23 99:1,5
99:5,15 101:7,11
101:11,13,14,16
101:20,25 102:3,7
102:13,24,25
103:15,17 104:6
104:15,16,16,21
104:24 105:2,9,14
105:18,24 106:1,9
106:15,18,22,24
107:5,12,17,20,22
107:25 108:1,4,8
108:17,20 109:1,5
109:12 111:7,18
111:20,25 112:1
112:15 113:1,4,5,6
113:11,15 115:18
115:18,20,25
116:2,6,7,13,15,16
117:7,11,12,18
118:16,22,23
121:17,18 122:2,5
122:7,8,10,14,18
122:23 123:3,7,11
123:13,19 124:2,4
124:13 126:17,22
126:23 127:9,14
127:18,22,24
128:9,11,13
132:21 135:9,11
135:14 136:7,8,9
136:11,18,21

137:2,3,6,7,8,9,17
137:19,25 138:2,3
138:7,10,14,15
144:17 145:6
149:15 153:15
154:1,3,4,5,7,18
154:20 155:14,19
155:22,24 156:3,7
156:8,15,16,17,19
156:20,22,24
157:17 159:2,4,15
159:23,25 160:13
160:23,23 161:17
162:7 167:22,23
168:10 169:5,6
173:15 175:7,10
176:2,6,8,10,11,16
176:20 177:3,14
178:7,25 179:1
180:2 181:1,2,3,6
181:10 182:12,14
182:17 183:3,24
184:6,9,16 185:4
185:10 186:10,17
186:18 187:9,9,15
189:7,15,17,19,22
189:25 190:4,12
190:18,20,21,23
190:24 191:4,8
192:24 193:2,5,20
193:24 194:7,8,9
194:11,12,16
195:10 196:22
197:10 198:5,6,10
199:20,22,23
200:1,5,10,11,15
200:23,24 201:18
201:22,22 202:1
202:23,23,25
203:2,4 204:15,17
205:19 206:25

207:16 213:9
214:9 216:5,6,7,18
222:8,14,16
224:17 225:19,20
226:17 227:9,25
228:23 231:5
238:25 239:3,12
241:19 242:11
244:1,6,16 248:22
248:25 250:7,8,11
250:13,15,22,23
250:24 251:20,22
251:22
**informed** 143:2
234:11 237:11
**informs** 143:5
**infrequently** 22:9
**initially** 150:15
249:9
**inquire** 192:12
**inquiries** 161:7
196:18 197:6
198:17 203:24
205:12
**inquiring** 203:13
**inquiry** 73:23
85:18 161:4
181:12 192:11
193:11,15,17,21
194:4,17 196:3,9
197:15,19 199:15
200:21 202:13,17
203:19 204:22
206:4 215:5
**insiders** 115:7
**instance** 34:8
46:14 93:8,13
96:24 100:18
146:1 192:14
**instances** 100:15
175:6 196:13

**instant** 9:14
**institutions** 32:5
**instruct** 67:24
**instructed** 157:10
**instructions** 171:17
**instructive** 224:20
**insufficient** 184:20
**intend** 41:4 88:17
129:1
**intending** 40:24
**intent** 9:13 121:15
121:16
**interest** 32:6,7
164:14 228:5
**interested** 159:17
253:17
**interesting** 218:25
**interestingly** 218:23
**internet** 135:6
184:20
**interpret** 70:24
73:10 163:5
214:22
**interpretation** 193:23 206:9
207:11
**interpretations** 64:22
**interrupting** 80:4
**interruption** 58:22
75:11 82:25
**interstate** 144:16
**intervene** 151:3,3
**intervening** 236:22
**introduced** 30:1
**introductory** 232:25

invest  22:25
  195:21 200:24
invested  198:13
investigate  76:24
  127:21 128:3
  176:14 197:24
investigating  81:2
investigation
  77:24 81:18 96:19
  127:21 185:4,6,8
investigations
  77:9,13,16
investment  159:25
  160:10,11 200:12
investments  75:24
investor  114:7
  117:8 130:10,11
  130:14,21,22,23
  152:1 153:21
  159:8 160:14,25
  185:17 189:19
  198:12 201:15,17
  201:25 203:10
investors  64:25
  90:3,21,22 91:16
  92:24 99:7 100:6
  101:8 105:19
  108:19 112:14,18
  112:22,25 113:10
  113:13,16,20,20
  113:24 115:13
  116:14 122:24
  124:17 125:8,11
  125:12,14 130:9
  136:17 137:18
  139:3 143:3
  144:17 152:6
  153:25 154:6,10
  154:11,17 155:8
  158:10 159:3,10
  159:20,22 160:7,8

160:21 161:18,20
161:23 162:6,9,22
169:20 170:2
179:19 186:5
192:13,14 193:1,3
193:8,19 194:1,7
194:10,15 195:13
196:23 197:11
198:9 199:10,23
200:2,6,9,11,14,24
201:23 202:24
203:13,17 205:18
226:8 239:4
250:25 251:2
involve  38:10
  77:10 211:17,19
  219:7
involved  19:21,22
  20:3 42:18 43:5
  208:19 209:8
  211:4,15 212:20
involving  79:9
  211:4
iq  58:20 59:8
iris  15:23
irrelevant  218:19
irrespective
  105:24
isolate  206:23
issuance  152:25
  157:6
issue  55:23 62:18
  79:19 103:13
  104:24 116:6
  123:2 126:12,15
  130:24 132:13,13
  132:15 138:8
  139:10 144:11
  145:15 146:18
  161:12 163:9
  165:18,23,25

166:23 167:19
169:4,24 172:17
183:2 195:19
196:3,9 197:5
204:25 205:11
215:12 221:24,25
222:7,18,21
224:16 248:11
251:11
issued  13:9 34:7
  37:20,25 85:25
  161:1 222:21
issues  27:17 35:11
  37:11 38:4,6,9,12
  53:1 56:20 67:23
  68:4 80:10 82:1,4
  82:6 91:9 92:21
  94:3,20 112:17,18
  122:13 129:17
  131:19 132:17
  143:22 157:15
  172:12 199:25
  216:1 221:5 222:3
  222:10,11 243:14
  243:14 249:4

**j**

j  2:9
jefferies  168:22
  170:1,22 171:1
jiang  15:23
job  103:20 127:19
  127:20,21
join  150:22
journal  25:6 26:11
  26:14
journalist  30:19
  31:3 62:17
journalists  31:7
  31:21 115:15
judge  10:11 19:8
  19:10 33:2 34:4

34:11 35:16 36:9
37:20 40:24 63:5
70:6,15 71:4
193:16 199:16
203:24 204:11,24
207:15 208:2
212:22 215:20
216:7
judges  38:20,24
  39:1
judgment  232:14
  240:8,14
judicial  72:6
july  16:22 218:14
  229:21 253:25
jump  55:22
jury  10:11 85:7
  94:8
justified  157:25

**k**

k  19:11 99:25
keep  26:10,13
  47:25 77:3 102:4
  131:5 147:1
  150:16 208:18
  214:2 216:19
  220:9
keeps  135:17
kenneth  1:4 7:10
kept  26:15
key  215:12
kind  59:17 74:16
  106:4 128:1 199:6
  218:19 238:1
  239:25 246:16
king  3:17 109:20
  110:1
knew  99:7 127:2
  203:13
knocking  83:2

**know** 11:22 13:13 15:14 17:12 18:8 19:2 20:4,6,16 25:6 26:10,19 27:8 29:23 31:7 32:15,17,18,19 33:8 34:25 35:22 39:24 40:3 43:10 43:11,15,16 60:19 62:5 69:12 71:22 73:20,21,25 75:12 75:20 76:11 84:10 87:21,22 95:25 111:13 112:14 115:3,13 117:22 117:24 118:4 119:17 121:13,24 124:11,11 126:9 128:25 129:14 130:11 135:6,8,12 136:7 137:24 140:15 142:1 148:18,19,25 149:24 152:1,4,5 152:16 155:7,9,15 156:4,5 159:10 161:20 171:12,23 175:24 179:11 185:4,22 189:21 192:13 193:1 194:1,1 195:20,25 196:23 199:11 207:15 208:3 209:20 212:15,17 215:24 217:22 222:1 223:2,2,3,6 223:15 239:21 240:1,19,22 243:21,25 245:20 251:9

**knowing** 81:4 195:22 203:12
**knowledge** 36:13 57:23 76:9 86:17 88:6,9 92:12,20 93:1,4,16 94:13,15 94:19,21 135:3 153:21 173:22 194:18 195:2
**knowledgeable** 195:13,16,17
**known** 90:1 151:8 151:22 165:19,19 226:17 227:25 228:2
**knows** 126:15 135:6 151:18 163:4 248:4
**kristin** 1:23 7:18 20:1 174:17 253:7 253:24
**kristina** 31:10
**krogman** 45:15

**l**

**l** 9:2 19:11 87:3
**label** 13:22,24,25 14:2 95:10,19 97:10,12 99:9,16 100:6 101:9 124:18,19 125:4,5 129:6,9,11 130:4,6 130:17,20 131:3,8 131:25 139:5,12 139:13 140:2,7,14 140:16 143:3,7,8 143:12,13 144:10 144:21,24 147:14 157:11 163:24 164:4,10,16 166:24 167:7,15 168:13 170:3,8,12

170:24 171:7 194:19 236:2
**labeled** 3:17,20,21 4:4 109:21 114:18 120:9 229:15
**lack** 67:18 72:8 99:23 108:7 175:22 178:22 188:14,19
**land** 3:16 109:19 109:25
**language** 68:14 146:20 231:1
**large** 154:9 179:16 224:18
**late** 32:14 73:2
**latest** 117:15
**law** 35:5 195:19 214:13 215:20 216:23
**lawful** 8:14
**laws** 4:3 229:15,20
**lawsuit** 13:18 16:25 60:1,2,10,23 98:9,13 99:2 101:1 105:4 106:5 106:20 110:21,23 111:4,9,12,17,25 112:6,7 122:10 123:16 124:14 126:13 127:17 129:18 131:21 149:5,6,25 150:4 150:14,20,22,24 151:1,9,18,19,23 152:2 153:3,8,22 154:2,10 158:3,6,7 159:11 161:22,24 165:16 168:19 171:19 172:6,10 177:25 179:22

181:7 182:25 183:9,15,18 184:3 185:19,24,25 186:2,4,13 192:15 201:1 208:17 209:5 211:4 226:12 232:15 233:3 234:3 236:4 245:25 246:6,11 247:7,9,15,21 248:7,18,21,25 249:5,21 250:6,16 250:19,20,22 251:11,15
**lawsuit's** 19:5 151:4
**lawsuits** 14:8 47:24 150:13,18 150:22 151:8 154:3,13 159:16 159:24 212:13,16
**lawyer** 38:8 39:7 68:10 150:16 163:7 195:20 210:12
**lawyers** 68:4 71:11 72:13 115:14
**lay** 64:23 73:11 94:14,16 163:21 164:3 210:13
**layperson** 86:13 94:8 95:2
**lb** 1:7 7:14
**lead** 105:15 123:5 124:5 143:11
**leader** 157:9
**learned** 224:13,14
**learns** 224:6,7,11
**leave** 43:15 62:25 64:13

**[led - m]**                                                                                            Page 25

**led** 98:22 140:1 189:18
**leery** 72:7
**left** 97:5 150:7
**legal** 18:4 38:6 39:4 46:24 48:1,3 59:21,25 60:5 64:21,22 65:12 67:23,23 68:6,11 68:12 70:1,1,3,3,6 70:10,16,22,24 71:3,15,17,20 72:2 72:8 73:9 131:1,5 150:17 164:3,3 172:20 181:20,20 188:2 193:23,23 197:16 202:8 204:24 208:8,9,12 209:19 214:1,3,21 215:19 216:20 242:20 252:23
**legislation** 32:6,8
**length** 69:5 96:4
**lengthy** 206:18
**lens** 105:20
**letter** 3:24 101:2 105:5 107:2 122:20 142:5,7,20 142:23 143:2,2,15 143:21 144:13,19 145:2,3 146:4,5,10 146:11,15
**levels** 72:6
**liability** 198:1 215:15
**light** 183:17 237:15
**limit** 51:20
**limited** 51:21 139:19

**limits** 135:7
**line** 3:4 41:11 80:1 80:4 181:5 232:25 254:5
**linking** 86:4
**list** 16:6 43:4 49:17 57:21 58:10 58:13 61:11 75:21 77:5 95:21 108:12 130:3 170:15 219:24,25
**listed** 40:5 50:2 57:17,20 58:1 109:9 217:17
**listened** 204:10
**lists** 147:2
**literature** 159:1 175:13 186:20 193:12 202:16
**litigation** 13:17,19 14:12 17:9 24:11 24:14 48:23 60:9 69:23 156:23 188:23 189:2,5 207:24 211:16 224:20,21 225:21 229:20 231:14,21 232:8 234:4,4 236:17 240:4,7,11 240:15 242:6
**litigations** 44:23 208:20,21
**little** 17:4 21:22 32:10 88:12 176:24 235:1 236:18,25 247:12
**live** 14:4
**llc** 254:1
**llp** 2:4,11 8:11
**local** 8:7

**long** 22:17 28:16 31:13 35:4 95:21 140:24 170:15 219:24,25 236:20 237:19 238:15 243:6 245:3,11
**longer** 234:17
**look** 9:22 22:1,20 25:18,23,25 26:1,3 34:23 35:19 38:22 49:15,19,22 58:18 61:1 74:14 76:7 76:14 78:19 81:10 81:15 88:11 89:16 89:19,22,25 91:13 109:13 110:11,14 115:5 118:21 122:4 126:1 131:11 134:24 136:18 137:7,10 137:13,18,18 146:8 149:13 150:1,6 154:6 172:8,8,12 175:1 175:14 176:15,20 180:22,23 181:4 184:15 188:18 189:24 190:2 205:9,15 210:15 217:10 220:4 221:7,11 230:19 237:4 243:19 251:13,13
**lookback** 225:9
**looked** 37:21 48:19 57:25 58:6 59:8 87:23 102:16 103:22 105:19 106:2 109:3 121:7 121:10 130:10 138:9 148:17

179:23 181:8 191:2 211:23 230:13 232:2
**looking** 76:18,19 79:7,13 103:17,18 117:9 125:25 130:25 133:5 138:3 154:8,19,20 154:23,25 155:14 155:22,23,24 160:22 172:10,18 175:5 179:17 187:14 202:7
**lookout** 160:9
**looks** 131:7
**loss** 196:1 208:25
**lost** 240:7
**lot** 20:6 48:13 81:17,17 91:25 99:4,4 107:4 117:7 118:21 147:24 148:23 196:22 218:20 222:6,14 231:8 239:17
**lots** 63:11 76:5 113:9
**low** 168:25 170:6 170:7,10,20
**lower** 20:17
**lowercase** 84:3
**lunch** 138:19 140:25 141:20
**luncheon** 141:9

**m**

**m** 1:13 2:10 3:3,12 3:15 8:14,20 9:1 11:19 39:18 60:14 252:21 253:8 254:3,21

**[magnitude - mean]** Page 26

**magnitude** 55:19
**mail** 120:4
**mailed** 9:20
**making** 97:18
 101:15 181:20
 186:14 188:2
 193:22 203:23,23
 208:6 235:3
 238:18
**malina** 2:3
**man** 3:17 109:20
 110:1
**managing** 22:19
**manifested** 34:3
**manner** 7:22 10:3
 36:16
**map** 81:11
**marcelo** 15:23
**march** 100:5,24
 246:1 247:25
 249:1,10,15 250:7
 250:23 251:10,23
**marcus** 3:15
 109:18,24 114:11
 116:21,24 117:2
 127:10 137:15
 154:23 155:2,6,9
 155:11,13,16
 156:2,7,9,13,21,25
 157:5,6,21 158:2
 161:14 162:3
 165:21 186:9
 200:17,19 201:13
 201:14,21,25
 226:8 227:11
**mark** 11:2 29:14
 39:10 109:14
 114:12 119:19
 120:3 134:4,6
 142:5 217:24
 229:10 231:13

**marked** 3:10
 11:15,16,20 29:17
 30:1 39:18,20
 40:7 109:22
 114:19 120:10
 125:18 134:9
 142:8,12 218:9
 229:16 231:17
**market** 14:1 27:15
 44:14,15 45:3,18
 45:19,23 46:1,7,18
 46:20 50:21 56:8
 56:19,23 64:24
 65:4,14,20 66:11
 73:20,21 74:2
 76:4 82:11,13,21
 84:9,10,15,16
 85:10,14,24 86:4
 86:11,14,16,23
 87:5,9,11,24 88:13
 88:22 89:20,22,23
 99:1,5 104:8,15
 105:3 106:23
 111:19 112:25
 123:11 124:3
 127:22,24 128:4
 128:10,12 153:17
 153:24 158:25
 160:19 166:17,19
 167:22 168:11
 170:8 171:7
 175:25 176:4,13
 176:15 178:24
 182:15 183:7,8
 184:11,17 185:11
 185:13,15 186:17
 189:18 190:3,15
 190:16 195:23
 198:9 203:1
 218:18 224:6
 226:15,16,20

 227:25
**market's** 101:22
**marketed** 139:15
 147:19,25 166:8
**marketing** 13:23
 13:24,25 50:16
 95:10,19 97:11,12
 99:8,10,16,20,22
 100:7,15 101:9
 124:18,20,24
 125:4,6 129:6,9,11
 129:19 130:4
 131:9 140:2,14,16
 143:3,7,8 144:10
 144:20,24 145:10
 147:3,6,14 157:12
 163:14,14,16,21
 164:16 165:1,20
 165:22 166:1,16
 166:24 167:7
 169:14 170:3,5,8
 170:12,16 194:19
**marketings**
 163:11
**markets** 84:21
 191:6
**marking** 109:23
 142:19 218:12
 229:18 231:19
**maryland** 37:20
**match** 109:11
**matching** 109:13
 110:15
**material** 9:21
 81:14 113:15
 116:15 122:24
 125:13 130:23
 154:1,2,4,5,18
 159:23 178:12
 179:1 181:2 239:4
 244:5,16

**materiality** 186:4
 186:15
**materially** 41:17
 41:18
**materials** 15:7
 16:6,7 49:10 60:5
 69:4 102:17
 123:14,17 153:2
 196:2 197:18
 218:1
**mathematical**
 189:10
**matter** 7:10 16:20
 18:20 40:16 90:9
 121:20 195:18
 197:15,16 202:14
 218:14
**matters** 14:11
 57:24 62:11 208:8
**mcapeci** 2:6
**mckesson** 68:24
 69:4,18,23
**mean** 14:10 18:7
 20:3,4 21:22 23:7
 26:21,24 28:24
 29:5 31:18,22
 32:25 38:14,17
 39:4 47:3,8 49:7
 51:20 57:6,21
 58:1 69:7 70:18
 74:24 75:4,22
 76:16 77:6 79:2
 86:9 87:8,16,17
 89:25 91:23 95:2
 96:6 107:24
 110:10 111:10
 113:3,8 114:6,8
 115:17 121:24
 128:20,24 135:2
 136:7 139:21
 140:13 143:20

144:23,23 145:16 146:10 148:5 150:6,9 152:15,15 159:7,9 163:4,5 164:6,6 166:16,23 172:19 177:12 178:5 185:24 189:16 192:10 193:16,18 195:19 205:17 208:3 213:11,16 223:3 228:22 236:12 238:7 240:10,19 247:23 248:8 249:22

**meaning** 85:3 178:13

**means** 9:16 13:20 13:21 36:16 65:20 158:11 169:15,15 169:20 176:14 233:2,12

**meant** 95:25 153:9 169:22 179:9

**measure** 51:12 52:4,20 54:24 212:14

**measuring** 251:24

**mechanism** 134:1

**media** 7:9 43:24 44:3 83:11,15 107:11 141:7,12 180:13 191:18,22 252:22

**medications** 148:4

**meet** 15:9

**meetings** 15:17

**melville** 2:5

**member** 85:6 94:8

**members** 194:18

**memory** 129:15 212:5 231:7

**mention** 137:23,24

**mentioned** 23:5,16 74:15 110:13 146:5 147:15 152:6,14 231:10 241:3,7,10 242:15 242:18

**mentioning** 145:24 146:9 147:1

**mentions** 137:21 146:11 170:18

**mere** 108:17 190:25

**merely** 66:21 95:23 96:8 108:11 239:2

**merit** 27:17 208:21,24 209:3

**merits** 209:8

**message** 9:15

**messenger** 9:15

**met** 15:8,8,19 17:17 24:15

**method** 53:16 54:1 79:4,9,11 87:19 243:22

**methodology** 175:3 206:14,22 219:4 246:3

**michael** 2:2 8:5 33:11,16 69:3 79:21 133:10 174:16 217:21 225:13 236:9 238:10 245:2

**middle** 56:6 58:19 60:22 97:5 172:5 245:23

**mihael** 1:9

**mike** 11:3

**miller** 2:10

**mind** 49:21 58:12 58:14 101:5

**minds** 61:4,22 62:20

**minimum** 200:8

**minute** 43:19 80:2 120:25 153:9 174:17 191:14 201:5 221:10

**minutes** 138:22 141:2 153:12 236:13 245:14 252:1,6

**misbranded** 143:19

**misbranding** 143:6,6

**misbrands** 143:17

**mischaracterized** 85:8

**mischaracterizes** 52:1 242:25

**misheard** 23:12

**misinformation** 65:3,3

**misinterpreted** 186:25

**misleading** 41:19

**mismarketing** 145:13 146:1 169:19

**misremember** 149:21

**misrepresent** 143:10

**misrepresentation** 49:3 56:10 73:15

**misrepresentatio...** 47:23 56:15 57:3 57:8 66:23 129:23

**misrepresented** 206:24

**misrepresenting** 154:16

**missed** 87:6 102:12

**missing** 41:18

**misspoke** 219:3

**misstatement** 140:10,18

**misstatements** 66:10 104:1 128:6 173:18

**misstates** 80:22 106:11 123:25 133:1 161:25 167:10 170:13 172:25

**mistake** 32:2 35:23

**mistakes** 31:8,22

**mister** 19:9

**mistyped** 41:16

**misunderstand** 55:25

**misunderstood** 180:16

**mitchell** 2:3 11:15 29:25 39:20 142:12,16 218:6

**model** 52:23 53:2 54:15 78:14,20,22 80:9,15 103:15,16 197:12 198:23 203:7,8,16 204:19 205:18 206:21 209:16 210:7 212:23 213:22

**[model - number]**                                              Page 28

215:6,13 217:3,4,5 217:8,10,11,14,18 219:11 220:5 222:22 224:3,24 225:4,4,11 244:9 244:20

**models** 76:21 81:15 178:10 202:7 219:7

**modified** 164:1

**moment** 46:12 179:10 242:12

**money** 148:25

**month** 229:5 234:15,18 235:13 235:25

**monthly** 87:23

**months** 27:1 132:14,19 145:5 234:17

**moody's** 189:5

**morning** 7:4 8:4,9 8:22 209:6 228:9

**motion** 27:16 36:20 37:3,7 41:5 67:19 68:7 70:8 71:5 72:3

**motions** 188:13 209:14

**move** 18:24 89:22 173:19 189:18 190:18,21 191:11 206:11 225:23 227:25 228:13 238:21

**moved** 183:7,8 227:7,8

**moves** 47:4 89:23

**moving** 168:20

**multifaceted** 147:3,5 170:16

**multiple** 49:15 51:7

**muted** 89:14

**mutual** 22:12,13

**myers** 76:2 204:3 205:6

**n**

**n** 3:1 8:25 9:5 87:2 87:3 100:11 216:16 224:10,10 224:11 228:19

**name** 7:16 8:4,23 8:25 86:7,8,10 129:2 177:7 205:3 254:2,3

**named** 253:8

**narrow** 124:24

**nature** 91:23 107:20 115:18,19 216:6

**necessarily** 179:8

**necessary** 81:21 94:22 177:23 180:15 196:18

**need** 10:8 63:1 67:6,13 82:4,6 84:18 92:6,22 99:6 102:13 148:19,19,22 149:24 162:18 172:23 173:9 176:10,10,11,12 176:19 192:12 193:19 194:1,17 194:22 197:1 199:9,11 223:9 245:9

**needed** 159:18 227:23

**needing** 180:14

**needs** 85:21 174:17 208:11 242:12

**negative** 189:22 227:6,16 228:6

**negatively** 177:24 178:6

**nestle** 49:19

**nestle's** 49:24,25

**never** 19:2 23:9,23 23:24 24:15 26:15 231:24

**new** 1:2 2:5,12,12 3:18 7:13 19:6 50:19 53:23 72:20 73:5 79:14 80:11 80:11 82:18,20 85:5,9,11 88:16 91:1 96:20 97:2 98:24 101:21 102:24 104:15 105:24 106:1 107:10 114:3,13 114:16,21 115:10 115:24 116:1 117:1,15,20 136:11 145:5 149:5 156:15,18 156:19 157:3,4,19 158:3,6 169:5,8,10 173:14 176:3,7,10 184:16 189:17 190:24 199:10 220:12,15 224:19 227:9 254:1

**newer** 178:25

**news** 63:24 186:23 186:24 224:19

**nine** 229:5 234:15 234:18 235:13,25

**nobel** 86:15,19 87:14

**noise** 115:17

**non** 147:19,20,21 163:14,15,23 164:5,5 165:11 166:21,22 167:8 168:2,8 224:9

**nonallegation** 189:14

**nonclinical** 234:13

**nonevent** 107:4

**nonofficers** 21:18

**nonrodent** 224:8 224:10,11 229:5 234:15 235:13

**nonsighted** 164:6

**notary** 253:7,24 254:25

**note** 58:15 61:10 232:3

**notice** 3:11 11:2,7 11:19 12:1,6 158:9 159:3,7 169:20

**noticing** 8:3

**notion** 159:2

**november** 12:15 140:12,18

**number** 7:14 8:7 14:6 21:4 39:11 39:15 43:24 44:3 52:1 62:1 72:14 76:3 78:4 81:18 83:16 96:5 99:3 100:20 109:4,16 110:14 114:14 119:21 128:14 132:14 134:4,5,12 134:12 141:7,12 142:10,19 156:25

**[number - once]**

179:16,17 191:19
191:22 216:1
217:25 229:11
230:19 242:2
243:8 252:22
**numeral**  84:3

**o**

**o**  19:11 224:10,11
251:8
**oath**  10:10,15 44:7
83:20 141:16
192:1
**object**  67:3 111:1
210:9
**objected**  89:13
**objection**  12:18
14:24 18:3 30:15
30:18 31:25 32:21
33:7 34:9,22
36:10 50:13 51:25
52:24 53:22 54:19
56:16 57:5 58:8
61:24 63:8 64:9
67:1,20 69:1
80:21 86:1 89:18
90:18 97:17
105:10 106:11
108:14 112:3
117:23 118:1,2
119:11 123:1,23
125:7 130:1 131:4
132:6,6,9 133:1
136:5,15 139:7
144:22 145:11
154:15 155:12
158:14 159:6,13
161:10,25 163:2
163:17 164:22
165:17 166:11
167:10,18 168:18
170:13 172:16,25

177:11 178:1
179:5 180:8
181:13 183:20
186:6 187:11
190:13,13 196:19
197:7,21 198:20
199:5,17 201:11
202:2 203:20
204:1 207:21
209:17 210:11
212:25 214:11
215:9,23 217:7
219:19 220:19,21
223:7 225:1,6,12
237:18 238:10,14
239:14 240:9,18
241:18,21 242:8
242:14,24 244:10
244:21 246:13
247:19 248:2,5
**objectionable**
173:7 225:14
**objections**  4:7
7:21,22 8:1
238:16
**objects**  169:17
**obligated**  58:5
**observed**  47:5
**obstacle**  197:12
**obtain**  149:15
170:23
**obvious**  32:2 76:6
94:25 199:7
227:18 251:11
**obviously**  18:18
19:20 31:2 48:13
57:21 62:17 72:7
81:3 84:6 88:7
95:2 109:3 111:3
115:17 147:22,23
151:8 160:10

199:25 221:24
250:14
**occurred**  223:1
226:7 238:13
**october**  1:17 7:2,6
101:2 134:16
142:21 253:19
**offer**  51:23 55:13
64:22 246:3
**offered**  16:5 38:25
42:14 88:3 102:10
**offering**  45:17
50:10 68:11
**office**  83:3 253:18
**oh**  126:3 134:14
162:16 231:8
232:10
**ohio**  1:14,24 7:1
9:6 27:2 253:3,7
253:19,24
**okay**  8:22 9:8,12
9:23 10:17 11:9
11:25 12:4 13:16
13:22 14:3 16:24
17:20 18:16,21
19:7,12 20:19
21:7 22:15 23:8
26:5 27:9,18
28:15 29:13 30:10
35:17 39:8 40:6
40:11 41:8,13,20
41:25 42:9 43:9
43:22 46:6,10
53:5 57:13 58:4
59:9 61:1 64:14
65:7 66:17,18
67:15 70:5,25
75:19 76:13 77:3
78:23 80:7,16
83:1,25 86:24
88:11 93:19 95:4

96:8,15 97:7 98:1
98:17 99:12
100:17,23 101:3
103:1 105:7 107:6
108:9,9 109:14
111:14 120:21
126:3 128:18,24
129:4 131:11
133:15 134:2,14
135:20 138:21,23
138:24 140:21
142:1,14,17 143:1
145:19 148:9
150:12 158:1
160:16 166:7,12
168:20 171:8,13
177:17 178:21
179:10,13 180:12
181:25 185:7
191:10,14 192:7
208:15 214:7
220:4 221:7,14,15
223:24 225:23
226:1,3 228:16
230:18 231:3,12
232:10,20,24
233:8 234:7,25
237:4 239:23
240:12 242:5
245:10,16,18,22
247:10,20 249:6
251:7
**old**  182:17 190:17
223:10,12
**omission**  237:9
**omissions**  66:11
104:2 128:7
173:18
**omitted**  206:24
**once**  19:24 27:13
93:10 226:18

**one's**  103:14
**ones**  19:19,19 23:5
  49:20,21 59:12
  120:13 154:24
  243:9
**ongoing**  131:25
**online**  120:22
**open**  11:5,14
  120:22 236:2
  239:25
**opens**  125:12
**operates**  21:23
**operating**  147:3,7
**opine**  38:10,13
**opined**  196:8
  218:21
**opining**  38:5
  113:24 197:5
**opinion**  30:13
  37:11,12,15,17,19
  45:19 46:18,19
  50:10,17 51:7,23
  53:4,5 56:17,18
  66:3,8,12,13 68:19
  69:20 71:3 88:3,6
  101:10 104:5
  111:24 112:21,23
  115:19 124:1,3,16
  139:2,18 143:2
  170:9 186:8
  188:13,20 189:12
  194:16 197:9
  204:24 214:2,22
  220:10,25 227:16
  227:22,24 228:6
  236:15,17,19,23
  240:13
**opinions**  16:4
  36:25 37:1,5
  38:19 39:2,4 41:4
  42:14 45:17 55:17

61:13 67:23 68:11
70:19 71:12,14,19
71:22 85:19 102:9
102:15 116:20
134:25 150:17
155:17 190:14
196:21,23 209:22
215:21 227:6,6
237:3
**oppenheimer**  42:5
  166:14 167:6
**opportunity**  165:2
  165:4,25
**opposed**  32:18
  59:16 61:8 104:3
**optimistic**  165:4
**option**  65:15
  149:14 150:9,21
**options**  239:25
**order**  96:25 97:13
  104:9 107:17
  170:23 180:1
  186:24
**organization**
  63:24
**original**  9:21
**originator**  87:18
**ought**  58:13
**outcome**  37:2
  42:19,20,21 43:7
  66:22
**outcomes**  42:18
**outgrowth**  173:12
  173:23
**outlets**  128:14
**outside**  24:10
  66:13
**overall**  92:18
**overtalking**  26:25
  54:23 118:9 185:2
  187:22 214:19

**overview**  221:18
**owned**  22:15 23:2
  23:9,14,15
**owner**  25:4

## p

**p**  100:11 216:16
**p.m.**  125:20 141:7
  141:12 174:24
  191:18,22 252:8
  252:11,20,25
**pacer**  148:13,15
  148:20 149:1,9,12
  149:14,18 150:2,5
  151:13,15 154:12
  155:10 159:11
**package**  9:19
  29:19
**page**  3:4 31:3,19
  40:19 41:11,16,20
  50:5 52:15 56:4
  58:18 59:21 61:1
  61:7,10,14 84:2
  88:11 92:22 95:5
  107:7 110:13,17
  115:2,2,6 125:19
  131:11 142:23
  143:17,24 144:4
  148:10 162:11
  165:6 177:19,19
  206:17 221:8,12
  223:25 225:24
  228:18,25 230:23
  232:21,22,22
  233:9,9,18 235:1
  235:17,20 237:4
  245:19 254:5
**pages**  52:14 92:21
  192:8 213:6
  215:25 228:13
**paid**  126:16
  199:12

**paper**  135:20
**papers**  47:18
  49:18 135:22
**paragraph**  41:22
  50:4 56:4,6 61:17
  84:2,3 88:12 95:5
  95:7 96:1 98:7
  100:1 104:9 107:7
  108:12,22,25
  115:6 133:6,13,14
  140:23 148:10
  162:10 165:6
  166:5 168:20
  177:18 178:22
  179:4,6,8,9,11,13
  179:14 183:19
  190:2 200:7,16
  201:19 206:17,19
  211:2 213:4,5,11
  213:16,20,23
  214:5 218:18,20
  218:22 221:7,12
  221:16 225:24
  228:14 229:6
  230:20,23,24
  231:5 235:1,15,20
  235:21,24 245:19
  245:24
**paragraphs**  147:1
  166:13 192:7
  199:4 213:9 214:8
  218:16 219:15,16
  233:17 234:7,23
**parentheses**
  221:20 237:10
**part**  21:16 29:2
  41:17 50:12 53:11
  53:20,24 54:3
  62:13 74:6 75:24
  76:21 80:8 96:15
  96:18 103:20

104:18 113:9
120:12 132:21
144:16 153:24
162:20 183:7
184:19 186:11,20
189:23 193:11
197:23
**partial** 239:16
**participated** 229:2
**participation**
17:14,24
**particular** 29:6
242:12
**parties** 7:8 32:5,7
103:19
**partly** 141:22,23
**parts** 37:22
**party** 253:16
**password** 148:20
148:22
**patient** 132:3
164:14
**patients** 42:6
162:22,25 163:9
163:22 164:7
165:1,10,23 166:1
166:17,20,21
167:1,24 168:1,7
**paul** 2:10 8:10
**paulweiss.com**
2:13,13,14
**pause** 229:8
**paused** 58:16
**pay** 35:7 38:3,9,11
127:1,3 148:25
149:2,4,6 199:11
**paying** 185:20
**payment** 21:25
**payments** 21:24
**payoff** 160:2

**payoffs** 154:8
**pdf** 120:11,12
**pearl** 2:9
**pedro** 31:10
**pending** 19:5 34:3
**pension** 8:8
**people** 17:20
19:20 31:22 62:25
64:4 111:10 112:9
114:2 135:4
145:16 201:7
**percent** 42:6 91:17
160:14 223:4
**percentage** 26:6
223:1
**perception** 161:19
**perfect** 132:3
**perfectly** 34:18
35:15 65:24
236:24 237:2
**performed** 174:8
**period** 12:14,16,20
12:20,25 56:12
99:19 100:13,14
112:16 124:17,22
139:23,25 140:10
155:22 165:9
216:25 222:17
224:4,24,25 225:3
225:5,10,11
236:20 243:6,7,16
246:2 249:3
**permissible**
163:16,19,20,23
**permissibly**
164:11
**permit** 234:16
**person** 40:14
130:16 163:15
203:23

**personal** 17:3,5
111:12
**personally** 23:2
**perspective** 47:2
71:15,16 202:6
210:13 241:14
**persuasion** 67:17
68:14
**peter** 2:19 7:16
**ph.d.** 1:13 3:3,15
8:14,20 39:18
48:21 253:9 254:3
254:21
**pharma** 119:3
**pharmaceutical**
24:9
**pharmaceuticals**
1:8 3:24 7:11 13:4
142:8 233:1 254:2
**phase** 209:9
**phone** 141:21
209:8
**phrase** 36:22
88:18 202:13
**phrasing** 67:10
76:16 236:25
**pick** 140:22
**picture** 32:24,24
**piece** 33:4 34:6
47:4 63:6 64:12
65:16,21 74:12,14
75:13 79:16 91:1
91:15 134:4
175:12 186:23
187:8 189:6,18
207:16
**pieces** 34:21 51:7
53:14,17,18 54:4
75:16 79:5 101:7
189:25 191:4
224:17

**place** 7:7 21:6
93:18 130:12
160:4,17 221:22
229:1 236:1,22
239:17 240:16
241:13,16 253:15
**placebo** 170:21
**placed** 10:10
158:9 159:2
**places** 154:20
**plaintiff** 1:6 2:2
8:6 27:11 66:1
147:12 195:15
198:2 206:20
211:8,13 213:21
222:23 232:25
233:4
**plaintiff's** 3:11
11:18 37:2 204:20
238:3
**plaintiffs** 65:8
115:14 158:8
209:3,8 215:16
233:11,14
**plan** 99:22
**plans** 99:10
**play** 221:4
**played** 38:16
196:23
**please** 7:25 8:23
9:3,13,19 10:5
11:1 14:5 20:9
24:17 29:14 39:10
40:18 50:4 56:2,3
57:10 71:9 74:25
80:3 84:1 95:4
109:15 110:9
114:13,25 119:20
121:2 125:18
134:3 142:6 148:9
161:8 162:10

171:8 174:11
179:10 197:17
198:14,18 213:18
217:24 223:24
225:23 228:13
229:9 230:24
231:13 232:20
233:8 234:21
237:5 240:25
245:18,20 249:13
**pocket** 203:8
204:19
**point** 20:25 21:20
31:17 35:3,7 37:6
37:22 49:1,10
57:18 61:9 64:22
68:2 76:6 99:7,18
102:5 106:13
110:8 132:17
137:15 144:13
145:3 146:9
163:11 165:22
167:21 184:7,8
197:17 198:18
200:20 202:15
212:5 217:21
219:11 220:11,22
225:18 227:3,21
228:1 234:21
237:19 239:4
240:1 242:22
248:22 250:13
**pointed** 76:23
106:23 146:17
**points** 126:10
232:12
**polymeropoulos**
1:9 13:5 18:17
24:12 142:21
**poors** 58:20

**portion** 21:13,18
22:19 46:11 51:21
55:24 56:13 65:20
115:9 117:20
206:13
**portions** 205:21
**position** 38:7
54:17,21 62:24
63:2,10 64:12
160:15 186:22
226:10 227:12,15
228:4
**positioning** 169:16
**positions** 117:9
**positive** 224:18
**possessed** 244:16
**possession** 155:2
161:1
**possibilities**
187:13 237:8
243:4
**possibility** 106:22
**possible** 22:12
65:25 74:5 94:7
99:10 134:19
155:5 187:8 193:7
193:8 223:17
243:8
**possibly** 51:9
137:2
**post** 106:7 121:16
125:20,23 126:4
126:10,21 127:4,7
128:16,19,25
129:13 130:8,13
131:15,23 132:4
132:12,23,25
133:8 136:2
138:10 223:18
224:23 225:10

**posted** 117:16
123:20 126:8
228:10
**postings** 115:8
**postmarket** 53:11
54:18
**posts** 3:21 99:14
103:4,5,10 104:10
104:13,20 105:9
106:4,20 107:1
108:11,23 109:6
110:24 120:5,8,12
121:7,9,11,13,17
121:22,23 122:1,1
122:4 126:5 127:4
128:22 131:17
132:11 133:18
136:13 138:5
**potential** 160:2
**potentially** 224:20
**practice** 37:8
38:22 69:25 131:9
192:17 195:21,22
195:25 196:1
210:25
**practices** 95:10,19
97:11,12 99:16
113:14 129:19
130:3,5 133:25
165:20 192:17
195:14 246:23
251:21
**precedes** 207:24
**precise** 32:4
184:14 215:11
**precisely** 70:25
75:19 82:16 130:7
131:19 166:3
169:17 214:10
**predated** 95:10

**predicate** 93:5
239:1
**predications** 41:15
**predict** 135:10
**predicted** 135:14
**predictions** 41:14
**prefer** 18:11,13
**premise** 153:20
238:22
**preparation** 17:25
**prepare** 15:3
**prepared** 15:13,16
17:20
**preparing** 57:21
**preponderance**
66:24
**prescribe** 164:10
164:12
**prescribed** 14:2
164:20 165:9
166:7 167:15
168:7
**prescription**
165:14
**prescriptions**
130:18,20 170:24
**presence** 253:11
**present** 2:18 15:10
15:20,22 17:18,21
29:3 246:4,7
**presentation**
40:12
**presenting** 36:8
238:12
**president** 25:3
**press** 53:11
**presume** 10:17
**presuming** 104:24
**presumption**
64:15,25 65:6,9,10
65:23 66:20

**pretty** 188:10 242:17

**preview** 11:7

**previous** 14:6,20 14:23 23:22 24:13 27:5,19 42:23 95:18 106:8 168:17 202:4

**previously** 85:3,24 153:14 156:4,15 158:4 196:8 219:17

**price** 45:21 46:2 46:11,23 47:3,5,7 47:16,22 48:6,10 48:11 49:2,11,13 49:23 50:11,22 51:12,24 52:2,4,19 52:20 53:4,6,9,21 53:25 54:17,25 56:11,14,17,22 57:2 65:5,17,19 66:2,9,24 67:18 70:8 72:2,5 73:16 73:23 74:13 75:9 76:14 78:11 79:1 79:7,9 80:20 81:1 82:7,8,15,16,21,23 84:8,11 85:16 86:5 88:3 94:12 94:20 96:25 97:14 103:7 104:3,7,11 104:14 105:22 106:3,7,10 107:14 107:18 111:20 113:2 125:9,13 128:1,5,12 153:11 153:16,18 158:13 158:21,23 159:5 160:13 164:21 165:15 166:15

167:16 169:2,7,9 169:13 173:18 175:14,22 176:2,5 178:16 179:2 180:15,21 181:12 181:15,16,19,24 182:1,6,7,8,9,10 182:11,15,17,24 183:6,17,22,23,24 184:1,3,5,10,24 185:6,12,14 186:8 186:9,16,24 187:3 187:8,13 188:14 188:19 189:2,6,14 189:18,24 190:3,7 190:9,18,22 191:5 191:9 194:10 195:1,11 198:7,12 199:11,12 200:1,2 200:5 202:25 203:1,4,9,10 224:22 226:6,14 226:17,21,22 227:2,7,8,13,21,24 227:25 228:5 243:17,20 246:5 246:10 247:3 248:9

**prices** 44:17 45:1 47:10 88:14 93:2 193:25 195:23

**primarily** 228:20

**principle** 203:16

**principles** 204:4 205:7,9

**printing** 10:5 29:21 39:16

**printout** 3:23 134:9,15

**prior** 24:13 80:22 81:2 107:14

152:25 188:11

**privilege** 18:1 69:2 69:3,6

**privileged** 69:13

**prize** 86:15,19 87:14

**pro** 205:17

**probably** 26:21 237:21

**probe** 69:10

**problem** 18:23 115:7 183:4

**problematic** 97:19 119:3,4,5

**problems** 10:5 39:16

**proceed** 8:19 43:15 208:9

**proceeded** 172:7

**proceedings** 3:7

**process** 63:25 64:1 64:2 74:8 75:6 81:6 91:19

**produce** 66:21

**produced** 59:16 62:13 120:6 121:5 205:22,23

**produces** 198:2

**producing** 180:19

**production** 59:13 223:17

**profession** 47:3 62:24 63:3,11 64:13

**professional** 30:13 36:16 39:7

**professor** 9:11,12 10:19 11:25 12:4 14:5,19 15:2 16:19 17:23 18:12 18:19 19:1,4,12

20:5 22:7 24:1,17 27:9,24 28:7,13 30:7 31:6 32:9 33:25 34:4,20 35:5,17 37:8 39:10,14,23 40:1 40:15,18 44:6,13 44:16 45:11 46:13 46:23 47:21 51:15 52:23 54:5,9,14 55:22 56:24 58:4 58:18 60:17 61:19 63:14 64:14 65:8 65:18 66:14 67:7 67:16,24 68:1,16 68:24 69:17 71:1 73:14 74:23 75:20 77:4 80:7 81:22 83:6,18 84:1,25 86:19,20,22,23,24 87:2,4,6,7,10,13 87:17 88:1,19 93:6 94:7 95:23 96:22,22 98:4 102:5 105:7 108:21 109:16 110:3 111:22 112:21 113:23 114:14,21 115:23 116:17 117:14,19 118:6 120:6 121:6 121:21 125:2 126:19 128:16,18 128:21 129:21 131:22 132:22 133:5 134:6 135:1 136:1,19 138:25 142:11,22 143:1 144:9 145:7 146:2 147:9,11 148:12 152:24 156:1

158:1 162:14,18 162:23 164:9 167:4 168:22 171:8,14 173:5 175:1 176:23 177:17 180:4 181:9 182:22 183:10 184:12 185:16 187:7 189:9,12 190:6 191:25 192:10 194:14 200:13 201:24 202:12 203:22 205:25 206:12 208:15 210:18 213:4 214:8 215:4 217:15 218:15 219:13 223:18,24 225:7 228:8,16 229:11,22 230:14 231:22 236:16 237:13 239:5,6 240:2,6,12 244:3 245:21 247:10 252:12

**professors** 3:13 29:16 30:5

**profits** 113:12

**project** 19:21 20:3

**prolongation** 145:17 146:19

**prominent** 63:10

**promotion** 100:7 129:6,9 131:25 139:5 140:7

**proof** 137:17 200:14 201:2,4,9 201:13

**proper** 144:15

**properly** 86:18 145:15,16,18,24 146:18

**propose** 217:8

**proposed** 53:2,16 182:16 197:24 205:17 209:15 219:7 220:5,6 222:22 236:2

**proposes** 54:2 190:17 215:13

**proposition** 44:17

**prove** 67:17

**provide** 37:12 38:21 41:4 63:13 88:2 104:9 156:2 159:15 177:2 228:16

**provided** 16:2,8,8 21:20 59:22 62:8 121:9 142:11

**provides** 92:10 95:21 186:21 221:9,17

**providing** 10:2 58:17 75:3 134:25

**provision** 134:24

**ps** 225:9

**psychiatrics** 166:25

**psychiatrists** 166:20

**public** 44:25 69:5 95:9,18 96:3,9,13 98:6 99:15 101:14 107:11 108:17 109:12 111:18 113:1,5,6 117:12 118:17 122:5,11 122:15,23 123:14 136:9 138:14,15

145:4 151:12 153:3,5,15 155:23 156:8,20,24 157:8 158:7 168:9 171:25 175:7 176:17,21 177:4 177:15 185:11 186:11,12,13,19 190:20 192:24 193:25 194:8 198:5,6 199:20 200:10,15 201:18 201:21,22 202:22 204:16 222:9 226:9 246:12 247:15,17,22 248:7 249:22 251:15 253:7,24 254:25

**publication** 107:15 165:21 175:8 177:16

**publicly** 61:2 69:20 88:15 146:13,15 152:8 153:10 165:19 228:10

**publish** 106:18

**published** 47:6 102:1 106:14 118:25 123:4 124:4,10,13,14 127:25 128:8 135:20,22 186:18

**publishes** 101:12 101:13,17

**punitive** 194:18

**purported** 95:9

**purportedly** 241:15

**purpose** 72:21

**purposes** 11:20 29:18 39:19 40:8 55:14 59:1 72:3 73:6 78:9,10 109:22 114:19 120:10 134:9 142:9 159:5 167:15 180:15 210:7 215:6 218:10 220:7 229:17 231:17

**pursue** 73:24 77:12 116:16 169:24

**pursued** 124:25

**pursuing** 99:10

**put** 25:21 29:5 58:6 62:1 172:24 173:2,10 188:13 198:24 213:21 221:19 236:14,22 239:16 243:17

**putative** 12:20 13:1,2 165:8 246:2

---

**q**

**qt** 145:17 146:19

**qualified** 85:5 253:8

**qualifies** 24:24 195:5

**quality** 35:20 62:9

**quantifies** 25:10

**question** 17:19 19:24 20:2 22:24 34:2,17 36:21 49:7,9 58:24 59:2 59:10 63:21 67:4 67:5,9,21 68:2 70:20 71:11 74:22

**[question - reasonable]** Page 35

75:2 76:16 79:18
81:25 85:18 89:12
90:20 93:14,14
97:5,18 98:11,16
107:16 108:21
116:3,4,4 119:13
119:16,16 123:10
126:19 145:22
160:16 165:12
172:4,5 173:7
175:5,17 176:24
180:12 182:4,5
183:10,11,15
184:19,22 185:1
188:22 194:5
198:15,21 200:9
200:13 202:11,19
204:5,8,9 207:3
215:3 217:15
219:14 223:19
225:13 226:23
234:9 235:22
236:3 244:11
246:9,14 248:6,19
**question's** 95:24
95:25
**questioned** 185:17
**questioning** 80:1
252:14
**questions** 10:22
34:12,19 36:14
39:6 67:8 70:11
80:24 112:19
142:3 199:10
252:15
**qui** 60:1,9,13,23
98:9,13 99:2
101:1 105:4 106:5
106:19 110:20,23
111:4,9,12,17,25
112:5 122:9,18

123:16 124:14
126:13 127:16
129:18 131:21
149:25 150:13,14
150:18 151:4,17
152:2 153:3,8
154:2 156:2,10,14
156:20 157:3,19
157:21 158:3,6,7
159:11 160:25
161:22,23 168:19
171:19 172:5,10
177:24 179:21
180:6 181:7
183:14,17 184:3
185:18 186:12
192:15 201:1
246:11 247:7,14
248:7,18,21,25
250:16,22
**quick** 245:6
**quickly** 44:19
107:13 138:18
142:2
**quite** 28:24 49:6
75:25 86:9 99:24
115:21 135:11
146:19 175:16
243:14
**quote** 68:17
107:10 117:18
118:4 168:23
171:2 194:17
234:18,19 236:6
**quotes** 221:20,22

**r**

**r** 8:25 116:13
216:16 224:11
251:8
**raise** 82:1,5
215:25 244:8

**raised** 112:17
131:20,20 139:10
161:12 172:12
**raises** 132:12
145:14 146:18
200:8
**raising** 204:25
212:11
**range** 75:23 79:8
90:13 116:20
**ranked** 25:19 26:4
**ranking** 25:24
**rankings** 62:1
64:4,6
**rapidly** 45:2 88:15
113:2,4
**rarely** 23:7
**rate** 21:2,3,6,15
89:1,4 169:1,19
170:6,7,10,20
171:5 212:11,15
212:18
**rates** 101:23
170:21
**reach** 84:19 188:1
244:25
**reached** 153:13
226:18
**reaches** 74:2
**reaching** 72:7
**react** 101:24
102:24,24 162:3
**reacting** 219:21
226:8
**reaction** 162:9
179:15 224:22
**reactions** 81:12
**read** 15:4,5,5
31:22 37:16 42:1
42:2 51:18 60:21
66:15 67:12 68:13

68:19,21,22 69:8
72:14,16,21 73:8
92:22 102:13
110:10 112:22
113:24 115:13,14
115:15 116:17,19
116:19 143:21
147:23 162:19
163:10 165:5
166:6 178:21
179:6,11,13 197:1
197:2 207:9
219:13,20 220:8
232:24 233:20
234:7 235:21
241:2,7,9
**reading** 31:24
115:12 167:5
219:16 230:15
**reads** 88:13 226:5
235:24
**ready** 11:23,24
39:24 121:6
221:13 245:20
**real** 138:18
**reality** 134:20
**realization** 125:16
**realized** 29:21
**really** 31:13 40:11
51:14,18 68:23
179:14 187:1
218:24 222:1
236:12 243:21
245:13,13
**reason** 30:21,24
55:20 60:21 116:9
117:5,19 122:3
182:9 194:10
199:18 254:5
**reasonable** 210:13

**reasons**  30:21 38:14 39:2 118:18 182:10
**rebut**  55:14 65:10 66:19 76:13
**rebuttal**  3:14 16:20 39:12,17 56:13
**rebutting**  55:16 65:22
**recall**  28:3,12 69:18,24 115:9,12 187:20 188:16
**receive**  21:13,17 21:24 203:6
**received**  19:15 29:20 87:13 120:11 155:2 209:7
**receiving**  198:10 204:18
**recess**  33:21 44:1 83:13 141:9 174:22 191:20 252:9
**recites**  228:25
**reciting**  241:15 242:7
**recognize**  110:3
**recollection**  37:21 129:16 140:17 143:20,22 148:5 149:13,22 188:4,9 219:17
**recommendation**  178:18 186:23
**recommendations**  180:20
**recommended**  204:20

**record**  7:5,8 8:3 8:24 9:16 18:6,12 18:15 30:3 33:13 33:15,20,23 43:25 44:4 50:6 58:16 83:12,16 86:6 109:23 134:15 141:3,8,13 142:20 157:8 174:11,21 174:24 191:19,23 192:9 201:16 218:12 229:18 231:19 233:20 234:8 235:21 238:15 252:1,8,11 252:20
**recorded**  7:9
**recording**  7:7
**recovery**  150:25
**recruiters**  115:15
**reduced**  253:11
**refer**  9:8 12:24 13:3,8,12,13 140:3 249:17
**reference**  136:2 171:24 238:18
**referenced**  108:23 114:22 168:21 175:20 205:4 253:10,12
**references**  110:8 171:19 172:11
**referencing**  77:3 86:21
**referred**  25:21
**referring**  13:4 210:18 242:9
**refinitiv**  58:20 59:2,7
**reflect**  21:5 88:14 178:9 226:8,13

**reflected**  158:12 158:16,20,23 246:12
**reflects**  44:18
**refresh**  143:21 188:8 219:16 231:6
**refuted**  65:6
**regard**  56:25 58:21,24
**regarding**  45:17 220:23 237:9 242:23 244:7
**regardless**  43:7 168:1
**regional**  157:9
**regression**  77:6,11 77:12,15 78:20,22 78:24 80:18 81:23 177:8
**reiterate**  202:5
**rejected**  209:15
**relate**  17:7 60:22
**related**  22:4 45:22 49:18 51:9,10 56:21 60:2 80:13 85:11 96:12,21 97:20 104:5 105:14 106:15,18 120:13 122:6,8,15 123:7 128:10 156:8,23 157:4 169:6 172:9 173:16 176:16 177:14 182:12,14 183:25 184:6,9 185:9 189:14 190:4,11,19 191:8 195:3 203:2 204:16 205:19 222:8 223:15

224:21
**relates**  56:14 70:8 139:18 248:13
**relating**  85:23
**relation**  96:5
**relationship**  24:13
**relationships**  30:20,25 31:4 32:4
**relative**  253:16
**relatively**  92:1
**release**  53:12,14
**released**  53:24
**relevance**  92:11 103:13 123:3 124:2 164:21 225:10
**relevant**  29:8 44:23 68:6 70:6 72:2 85:17 88:16 88:18,23 89:1,6,8 89:10,16 91:8,10 91:11 92:8,17 93:7,11,13,17,21 94:9,23 96:17,24 97:16,22 98:10,19 98:24 99:6 101:7 101:16,17,18,20 102:3 103:5,6 104:12,17,20,25 105:9,19,25 106:8 107:19,25 108:2,5 113:6 116:14 122:24 123:9,10 123:19,21 124:8,9 136:18 137:7,9 138:6,16 159:4 176:9,12 182:11 183:22 199:19 200:12 207:10 215:3,5 225:21

243:12
**reliability** 35:21
  62:11 89:9,17
  111:7 115:25
**reliable** 31:5 33:4
  34:6,21 61:20
  62:21 63:6,18
  64:8 74:7 90:17
  90:19 112:1
  117:17
**reliably** 92:4
  206:23
**reliance** 64:16
  65:9 66:20
**relied** 16:13 57:13
  58:10 65:1 109:1
  135:23 168:16
  228:21 232:5,6
**rely** 16:6 58:25
  59:11 61:5 90:15
  113:25 135:25
  175:21 207:4,5,11
  213:9 224:23
  232:19
**relying** 159:1
  205:22 207:18,18
**remain** 54:12
**remained** 9:20
**remember** 20:6
  24:11 28:21 31:12
  37:23 57:19 59:7
  72:18 73:1 83:19
  140:20 145:14
  146:7 147:15,16
  150:5 188:7,23,25
  189:3,8 196:15
  211:16 212:6,7,8
  226:14 232:1,18
  235:4 247:2
  248:16 250:9

**remote** 2:1 7:15,20
  7:24
**remotely** 1:14,23
  7:1,24 253:14
**removed** 162:17
**rendered** 72:24
  212:20
**rene** 254:3,21
**rené** 1:13 3:3,12
  3:15 7:10 8:14,20
  8:25 11:19 39:18
  43:19 120:21
  138:21 141:1
  191:14 218:2
  225:25 239:15
  245:9 252:21
  253:8
**repeat** 68:9 75:2
  125:24 164:2
  211:10 213:18
  235:18 244:11
  249:13
**repeated** 234:15
**repeatedly** 123:2
  126:17 138:8
  161:11 204:10
  209:18
**repeating** 46:1
  48:1 56:22 73:22
  82:22 84:16 131:6
  150:16 182:17
  214:2 226:16
**repeats** 153:23
**repetition** 190:17
**rephrase** 97:7
  175:18
**replicable** 175:3,9
**report** 3:13,15 4:1
  13:8,9,12,14 15:4
  15:6 16:7,17
  19:13,15 20:18

21:16 24:20 27:25
29:16 30:5 35:18
35:20,24 36:7
37:5 38:7,17
39:11,13,17 40:16
40:23,25 41:3,9
42:5 43:3 45:21
46:11,19 50:5,11
50:12,18 51:16,17
51:20,21,23,24
52:10 53:13 55:10
55:24 56:13,20
57:2,8,11,20,22
58:2,7,22 59:1,16
59:18 61:6,7,12,14
64:21 66:2,7,8,9
71:23 72:17,22
73:6 77:15 79:19
79:19 81:24 82:2
82:3,14,17 84:2,13
85:1,2,4,8,19,25
88:8 95:5,11,12,14
95:17,21 96:4
97:1,9,14,21,24
98:15,25 99:18,19
100:2,5,22,24
101:12 102:8,19
102:20,25 103:12
103:21,23 104:4,6
104:23 105:1,2,13
105:13,14 106:15
106:16,18 107:7
107:15,21 108:11
108:13,16,24
109:1,3,7,9,10,11
109:15,24 110:4,4
110:9 113:9
115:11 117:2,21
118:25 119:2,5
121:19,25 122:12
122:17,19 123:4

123:12,12,22
124:4 126:13
127:10,11,16,17
128:5,9,11,14
132:15,16,18,19
132:20,21 133:6
135:1,24 136:3
137:16,21 138:6
138:12 139:8
142:24 144:25
145:1,2 146:11,12
146:14 148:10
153:1,4,5 155:18
155:20 156:6,7,9
156:21 157:1,5,7
157:14,16,16,21
157:22 160:5,13
161:1,5,15 162:4
164:18 165:21
166:4,5 167:11,23
168:4,22 169:6,7
170:2,22 171:1,12
172:8,13 173:15
175:2,6,8 176:6,17
176:18 177:15,16
177:19 178:9
179:21 180:11
181:6,11 182:1,13
182:23 184:4
185:10 186:9
189:3,13,24 190:5
190:7,8,20 192:8
192:16 193:1,2
197:6 199:19
201:15 206:13,17
207:14 208:6
209:23 211:18,21
213:5 215:25
217:2,17,25 218:8
218:13,17 219:14
219:18,20 221:8

222:13,21 224:5 228:10 229:24 232:4,6,9 235:2 237:5 241:22,25 243:2,13 244:8 245:20

**report's** 46:15

**reported** 143:23 144:2,3

**reporter** 1:23 7:18 7:23 8:18 12:22 12:25 13:2 25:14 26:12 28:6 33:8 33:12 35:9,12 45:8 46:4,9 50:24 51:3,5 52:7 55:4 58:23 60:11 74:19 74:21 75:2 86:25 87:4 89:2 90:6 100:8,10 112:11 112:13 116:10 117:25 118:10 120:19 129:8 141:3 144:1,5,7 147:4,8,20 150:10 152:12,17,20 156:17 158:15,19 174:2,5,10 182:19 182:21 184:18 187:23 188:24 208:22 210:1 211:19,22 213:15 216:14 220:14 224:9 225:2 230:10 235:9 241:4,8,11,24 249:12 250:2 251:4,7

**reporters** 34:8 35:10

**reporting** 7:1,22 97:1 139:1,3,19,21 139:25 140:4 254:1

**reports** 34:20 43:4 55:10 59:4,5,11,15 69:20,22,23 70:2 70:18,18 77:17 94:20 95:19 96:12 98:21 102:11,17 103:8,21 105:5,20 108:4 122:20 139:9 153:23 155:21 156:12,24 157:20 165:8 167:6 168:5 178:15 179:24 196:21 207:23 218:20,23 219:24 219:25 223:10,12 223:18

**repositioning** 168:25 171:4

**represent** 8:6,11

**representative** 132:8

**representatives** 131:2 144:20 145:20

**represents** 166:24 217:2

**reproduce** 121:16

**reps** 3:19 114:18

**republishing** 108:11

**request** 206:9 223:17

**require** 84:23 193:15,17 234:14

**required** 86:17 88:6 215:20 224:7

227:22 244:6,17

**requirement** 234:19 237:9,21 237:23

**research** 48:12,13 48:18

**reserve** 206:1,8 223:21,22

**resolve** 244:7,18

**respect** 72:5 140:3 173:9 226:19 240:16 241:16 243:20 244:9,17

**respective** 55:18

**respond** 161:22 206:7

**responding** 71:11

**response** 12:6 186:23 252:15

**responsible** 53:20

**rest** 122:13

**restate** 34:2 173:6

**result** 54:6 66:21 95:14 98:23 103:23 123:7 161:14 166:15,16 185:24 199:24

**results** 49:16 92:10 135:18 177:6

**resume** 30:25

**retain** 17:3,5

**retained** 16:19,23 16:24 17:2 27:10 27:21 36:11 72:13 159:20 209:2 229:25 230:3 233:5 234:5 252:23

**retention** 17:10

**return** 51:11 52:3 52:20 55:11,19 74:1,6 78:16,17 79:12,14 80:10 82:10 183:5 224:19 227:1

**returns** 57:7 77:10 82:3 87:23 103:9 106:21 124:13,15 135:10,15

**reuters** 3:12 25:20 25:23 29:14,15 30:4,8 31:5,5,23 32:11 33:5 34:5,7 34:21 35:19 61:4 61:15,20 62:10,14 62:20 63:6,17,23 63:24,25

**reveal** 71:9

**revealed** 187:15

**revelation** 194:12

**revenue** 167:25

**review** 32:11 37:10,24 73:6 75:7 153:2 221:2 229:23 230:2,5,24 236:16 242:5 251:14,14

**reviewed** 37:19 229:25 230:1

**reviewing** 115:9 219:18

**reviews** 133:8 137:5

**revisit** 28:10 55:23

**revolve** 147:18

**rgrdlaw.com** 2:6,7 2:7

**richard** 157:8

**rifkind** 2:10 8:10

**[right - section]**                                                    Page 39

**right**  9:23 11:13
  17:13 18:11 19:3
  24:3 28:17 33:25
  34:24 35:25 36:20
  39:9 45:11 52:21
  57:4 58:14 60:16
  60:18,24 61:18
  63:7 78:3 83:18
  87:15 88:4 92:14
  96:4 98:3 102:4
  106:10 107:19
  110:19 111:23
  116:24 120:2
  122:25 123:22
  125:17 132:25
  136:14 139:16
  141:15 142:15
  146:20 147:17
  150:8 167:3,9
  169:11 171:20,24
  190:12 194:14
  202:1 203:23
  206:1,12 213:19
  215:4 219:18
  220:2 227:14
  230:17 232:13
  234:3 247:14,16
  251:25 252:19
**rights**  206:8
  223:21,22
**risk**  125:10,12
  145:17 146:19,21
**risks**  125:16
  143:23 144:6,7
  145:9,18,24
  147:13
**river**  9:4
**rmr**  1:23 253:24
**road**  2:4
**robbins**  2:4 8:5

**role**  38:15 196:24
**roles**  214:4
**roman**  84:3
**rough**  20:11
**roughly**  23:3
**routine**  78:18
**rozen**  19:22
**rudman**  2:4 8:6
**rules**  10:20,23
  58:5
**run**  92:21 228:17
  228:18

s

**s**  9:2,5 99:25 254:5
**sachs**  68:18 69:19
  69:24 72:25
**safety**  145:9
  147:13 148:2,7
  238:23 239:11
  240:16 241:16
  242:23 244:18
**saids**  178:4
**salary**  26:22 27:1
**sale**  100:16
**sales**  3:19 106:24
  114:17 130:15
  131:2,3 132:8
  140:11,19 144:19
  145:19 166:19
  168:10
**salespeople**  127:1
  129:17,24 130:6
  168:11
**satisfactory**  210:7
**satisfy**  212:23
**saw**  31:4 41:10
  105:13 219:17
**saying**  11:7 12:13
  13:15 32:1,1
  50:14 52:3,18,19
  56:1,25 61:21

  63:10 64:7 76:7
  84:20 85:2,9,10
  88:5,8 91:12,15
  92:25 94:18,24
  99:13 100:12
  103:3 106:17
  108:18 110:25
  111:2 116:2 119:1
  119:5 124:21
  127:14 130:2,2,8
  132:5,12 157:2,3
  158:5,7 159:22
  162:2 167:13
  178:7 179:4 182:7
  184:12,23 186:16
  187:2,4,5 193:24
  194:6,22,24 198:4
  202:9 204:14,21
  204:23 205:14,14
  206:7 208:18
  214:1 216:19,19
  216:22 219:23
  232:3 235:7,10
  238:5,8,11 241:22
  241:25 243:23
  246:21,24 250:21
  250:25 251:1,2
**says**  41:14 45:6
  56:6,20 57:13
  58:19 82:17 96:2
  107:8,22 108:25
  109:2 112:24
  113:3,8,9 114:1
  115:6,13 116:8,11
  117:15 131:10
  153:15 155:18
  169:12 170:4
  171:1,6 193:15
  217:17 219:3
  220:13,15 221:15
  232:25 234:21

  236:19 237:5
  239:16 250:6
**scenario**  184:13
  184:23
**scheme**  100:7
  101:9 129:6,11
  131:25 139:5
  147:3,6
**schemes**  140:7
**schizophrenia**
  170:25
**schneider**  15:23
**school**  35:6
**sciences**  26:2
**scientific**  61:4,22
  62:20 177:7
**scientifically**
  175:2
**scott**  35:5
**se**  66:12
**seal**  150:20 151:18
  245:25 253:18
**sealed**  151:11,19
  152:8
**search**  59:4
  149:18 150:9
**searched**  149:23
**searching**  154:12
**sec**  186:2
**second**  9:1 28:20
  30:24 34:13 41:16
  42:20 73:8 88:12
  115:5 126:9
  133:11 156:22
  169:20 174:17
  184:8 197:23
  204:5,9 233:21
**seconds**  58:17
**section**  107:9
  198:4 199:4 200:3
  206:15 209:22

**[section - signed]**                                            Page 40

218:22 219:23
220:22 222:2
**securities**  4:3 14:8
  14:9,12 44:18,19
  45:1 46:3 47:23
  208:17,20 209:4
  211:5 212:3,13,24
  229:15,20
**security**  64:24
  88:21 93:2
**see**  25:11,19 26:4
  31:17,19 38:14
  59:4 69:6 98:18
  102:14 103:15
  106:19 116:9
  118:21 138:10
  139:24 141:22,23
  141:23 152:15
  153:1 157:7
  162:14,15 178:20
  181:1,2 205:10,15
  210:14 217:16,19
  219:25 220:1,3
  227:20 230:25
  232:21 233:10
  252:2
**seek**  113:10,17,17
**seeks**  67:21
**seen**  12:1,2 19:25
  51:19 97:24
  102:12 143:7
  214:21 231:24
  232:16
**seine**  9:5
**selected**  171:18
**selection**  172:1
**sell**  144:15 170:18
**seller**  190:25
  227:4 228:3
**selling**  99:8 163:8

**semi**  44:24,25 45:3
**senate**  32:12
**send**  127:3 155:8
**sending**  29:22
**sends**  21:1
**sense**  48:8 50:15
  59:3 66:7 70:23
  75:1 76:18 111:4
  114:9 117:6 122:4
  138:19 141:25
  145:23 152:5
  163:24 166:13
  181:20 198:22
  212:15 215:24
**sensible**  64:2
  191:12
**sent**  30:23 155:6
  218:1
**sentence**  41:23
  67:11,13,14 88:12
  88:19 107:8
  116:18 117:14
  162:20 165:5
  166:5,13 178:3,22
  179:8 200:7
  206:18 207:3,22
  207:23,25 211:2
  213:20 221:15,16
  226:5 236:4
**sentences**  213:7
**separate**  9:5
**separately**  60:14
**september**  19:13
  39:12 125:20
  126:3 131:12,23
**sequential**  121:4
**series**  228:17
**serve**  16:20 24:2
  27:10,15 117:16
**served**  14:14 24:6
  24:8 37:9 38:1

78:2 196:10 211:7
  211:12 222:20
**service**  2:4
**services**  32:14
  159:15,20
**serving**  14:7 26:7
  36:24 42:15
  188:12 209:12
**session**  3:8 17:25
  141:10
**set**  21:3,6 33:3
  36:6 39:15 90:3
  90:21,24 114:15
  126:15 131:19
  134:5,12 142:10
  144:17 185:3
  229:12 231:15
  245:5,12 249:4
  250:6 253:18
**sets**  240:15
**settle**  212:16
**settlement**  42:19
  211:17,20
**share**  11:16 29:24
  120:18 150:24
**shareholders**
  64:25
**sheet**  254:1
**shipping**  9:21
**shops**  59:16
**short**  20:18 108:18
  108:19 190:25
  226:10 227:4,5,12
  227:15 228:3,3,4
**shorted**  23:21,23
  23:24
**shorting**  23:10
  189:20,21
**show**  65:14,16
  87:17 96:11 98:25
  102:6,11 103:20

109:4 121:16
  128:13 136:9
  137:21 138:13,14
  150:6 156:6,9,10
  156:11,24 181:15
  181:16,19 182:6
  182:13 190:19
  206:2 216:11
  217:11
**showed**  138:11
  237:2
**showing**  65:22
  102:7 105:1
  135:17 154:21
  177:3 181:24
  182:8 205:1
**shown**  216:24
  241:23 242:1
**shows**  101:18
  122:2,16 126:10
  126:11,12,13,16
  127:15,17 160:5
**shy**  207:14
**sic**  54:9 99:25
  128:18
**side**  33:4 36:6
  238:23
**sighted**  147:24
  162:21,25 163:9
  163:15,22 165:1
  165:10,23 166:1
  166:17,20 167:1,8
  167:24 168:1
**signal**  115:16
**signature**  40:21
  252:24 253:23
**signed**  112:7
  128:23 131:18
  132:11 233:10,12
  233:14

**[significance - sorry]**                                                    Page 41

**significance** 78:16
81:6 82:2,9 169:2
224:2
**significant** 55:2,7
55:12,17 74:1
179:17 226:6
**significantly**
226:24
**signing** 40:23
**similar** 48:16
60:20 118:24
121:17 213:12
**similarly** 1:5
216:10
**simple** 175:4
**simpler** 247:12
**simply** 49:9 54:16
57:1 63:15 75:4
77:4 98:3 111:23
122:14 167:4
190:8 214:3
217:15 219:14
232:15 239:5
**single** 47:12 48:11
48:17,19,23 49:4
149:18 154:13
**siphon** 137:1,4
**sir** 8:22 10:9 13:6
13:16 30:11 40:21
41:20 49:9 50:8
52:14 57:11 64:18
68:19 74:18 91:5
99:12 100:4 101:6
103:3 106:7
107:16 108:10
110:22 119:7
124:16 134:13
135:20 143:14
153:7 155:15
166:3 172:4
177:22 197:17

198:14 201:2,4
207:3,13 221:12
228:21 230:2
232:7,20 233:16
234:20,25 235:14
235:19 236:3
238:5 246:9
**site** 114:1,2,3
116:3 118:20,21
**sites** 26:1,2
**situated** 1:5
199:24 200:3
**situation** 195:12
**situations** 94:25
**size** 82:10 245:1
**skill** 36:13
**skills** 173:21 174:9
**slapped** 239:10
**sleep** 165:10 167:1
**small** 160:1
228:25
**social** 26:2
**sold** 139:15
**soloway** 2:9 4:8,8
4:9,9,10,10,11,11
4:12,12,13,13,14
4:14,15,15,16,16
4:17,17,18,18,19
4:19,20,20,21,21
4:22,22,23,23,24
4:24,25 5:1,1,2,2,3
5:3,4,4,5,5,6,6,7,7
5:8,8,9,9,10,10,11
5:11,12,12,13,13
5:14,14,15,15,16
5:16,17,17,18,18
5:19,19,20,20,21
5:21,22,22,23,23
5:24,24,25 6:1,1,2
6:2,3,3,4,4,5,5,6,6
6:7,7,8,8,9,9,10,10

6:11,11,12,12,13
6:13,14,14,15,15
6:16,16,17,17,18
6:18,19,19 8:9,10
11:3,9,13 12:18
14:24 18:3,10,16
18:23 23:12 30:15
30:18 31:25 32:21
33:7 34:9,22
36:10 43:18,22
50:13 51:25 52:24
53:22 54:19 56:16
57:5 58:8 61:24
63:8,19 64:9 67:1
67:3,20 69:1,7
71:6 79:21,23,25
80:21 82:19,24
83:2 86:1 89:13
89:18 90:18 97:17
105:10 106:11
108:14 111:1
112:3 117:23
118:2,11 119:11
119:13,24 120:1
120:16,20,24
123:1,23,25 125:7
130:1 131:4 132:6
132:9 133:1,10,15
136:5,15 138:20
138:24 139:7
141:1,22 144:22
145:11 154:15
155:12 158:14
159:6,13 161:10
161:25 162:15
163:2,17 164:22
165:12,17 166:11
167:10,18 168:18
170:13 172:16,25
174:12,16 177:11
178:1 179:5 180:8

181:13 183:20
186:6 187:11
190:13 191:13,16
196:19 197:7,21
198:20 199:5,17
201:3,5,11 202:2
203:20 204:1
206:6 207:21
209:17 210:9,11
212:25 214:11
215:9,23 217:7,20
218:2 219:19
223:7,20 225:1,6
225:12,17,25
226:3 236:9
237:18 238:10,14
239:14 240:9,18
240:24 241:18,21
242:8,14,24
244:10,21 245:2,9
246:13 247:19
248:2,5 252:4,17
**solution** 205:1
**solutions** 252:23
**somebody** 22:19
63:9 70:21 71:16
126:14 127:2
130:15 195:24
**somebody's**
133:24
**sophisticated**
113:13,20 117:8
130:22 154:6,17
160:6 179:18
**sorry** 10:18 12:22
23:13,14 25:14
26:12,23,24 33:18
35:12 36:4 37:4
40:3,12 50:24
52:25 54:11,13
55:4 56:3 60:11

60:18 61:7 67:7
74:19 79:23,24
82:24 89:2,11,24
97:4 103:11
110:10,22 111:15
113:7 116:10,23
117:24,25 118:8
119:4 125:24
128:1 129:8
133:12 134:11
146:3 147:4
162:17,17 163:14
164:8 171:10
172:2 174:2,4,18
175:16 178:3
180:16 182:3
185:3,25 187:1,24
188:24 199:6
204:7 206:6
211:10 213:15
214:16,17 218:7
220:14 221:12,20
225:2 228:17
230:10 231:15
232:10 234:10
235:9,18 241:8,24
244:11 249:12
250:3,4 251:4
**sorts** 116:2
**source** 31:6 62:22
68:5 90:9 91:6
117:17 119:2
136:20 167:25
168:15,16 175:11
207:18 213:12,12
228:19,21 231:11
**sourced** 208:7
**sources** 16:11
58:19 59:1 171:25
213:8

**sourcing** 207:16
**south** 2:4
**space** 3:19 114:17
149:19
**speak** 44:9 155:16
196:20
**speaking** 47:2
111:11 181:21
183:16 202:6
238:16
**special** 3:13 29:15
30:5 34:20 35:18
**specialist** 148:4
**specialized** 62:14
86:17
**specific** 47:17
65:16 74:6 75:7
112:9 118:23
126:23 172:18
175:12 187:14
206:25 217:9
219:9,12 222:3
**specifically** 113:25
150:1
**specified** 253:15
**speculate** 151:21
**speculation**
242:23
**speculative** 95:16
**spelling** 19:10
99:24
**spend** 236:12
**spent** 20:10,18
21:8 222:6
**spoken** 31:9
**spot** 191:12
**spring** 73:2
**ss** 253:4
**staff** 15:21 171:21
173:3

**stage** 208:21,22,24
209:3 210:4
**stake** 159:25
**stamp** 126:2
**stamped** 120:14
**stand** 33:18 41:1
191:17 237:24
**standard** 58:20
59:8 67:2 70:6
71:4 207:6 215:19
216:3,9,20
**standards** 68:7
70:3,4,16,23,24
71:21 72:2
**standpoint** 48:3
**start** 100:13
124:22 140:14
155:24 213:19
243:24 244:24
246:2 249:2
**started** 10:23
185:5
**starting** 35:6 76:6
99:1 106:13
**starts** 35:4
**state** 7:25 8:2,23
27:2 31:16 52:10
96:9 98:6 133:6
190:14 236:5
249:1 253:3,7,24
**stated** 42:6 80:7
183:19 235:24
**statement** 18:15
95:16 101:15
109:11 128:5
147:15 168:3,17
169:18 193:23
232:11 247:23
**statements** 66:15
66:16 95:9,13,22
96:3,10,11,13

97:21,23,25 98:6
140:5 172:9 175:5
181:21 186:14
188:3 213:20
237:16
**states** 1:1 7:12
30:17 32:11 56:19
110:17 130:16
131:24 134:17
149:11 168:23
175:13 210:19
221:8 236:11,15
245:23
**statistically** 55:2,7
55:12,17 226:6
**stature** 63:1
**status** 134:23
240:3,11,21 241:2
**stein** 96:22
**steinholt** 4:1 15:7
45:4 51:12 52:25
53:15 54:1,9
55:10 79:20 81:22
82:3,11,17 89:7
95:8,12,20 113:3
113:21 128:4,18
128:21 153:15,23
160:5,18 176:1
179:15 182:16
190:17 191:7
195:7 197:24
205:17 214:6
215:1,13 216:11
216:23 217:2,8,9
217:16,25 218:9
218:13,21 219:21
221:9,17 226:7
243:13 246:3,18
248:10,15 249:20
**steinholt's** 46:16
50:12 52:23 54:15

55:3,8,14 56:8
59:13 80:9 85:14
102:17 158:24,24
179:24 206:14
217:14 219:18
244:9,19
**stenotypy** 253:11
**step** 93:6 105:23
235:6
**steps** 72:1 127:6
133:18 136:12
242:3,4
**stock** 22:8,10 23:2
23:5,19,21,23,24
45:1,2,21 47:10,12
48:11 49:4,12,14
49:24,25 50:22
51:2,11 53:10,25
56:11 65:1,17
66:24 73:17,23
74:13 82:20,22
88:13 96:25
104:11,14 105:17
106:3,10 107:14
107:18 125:9,13
128:1 153:11,16
153:18 158:13,21
158:23 160:13
179:2 181:11
183:17,22,25
184:2 190:18
191:5,9 194:9
195:10 198:7
224:22 226:17,22
227:2,13 228:4,4,5
243:17,20 246:5,8
246:10
**stocks** 22:11,11,16
23:7,9,10,15,15,16
47:13,16,18,20
48:17,19,24 49:15

49:16,20 135:10
135:15
**stood** 20:7
**stop** 248:21
**straight** 127:12
**straightforward**
92:2 203:15
**strategies** 137:1
**strategy** 168:24
169:14 170:5,16
171:3,3
**street** 9:5
**strictly** 50:15
**strike** 17:15 50:9
119:18 128:17
147:10
**string** 213:6
**strong** 44:24,25
45:3 84:16
**structured** 148:18
**student** 135:16
**studies** 25:11,18
25:25 26:1,3
49:15 55:9 78:23
80:17 87:19
222:10 224:14
237:10
**study** 44:16 52:4,8
54:1 55:3,8,13,21
77:9 78:13,19
79:3,9,11,17 81:8
81:23 82:5,7
87:15,18,20 177:9
219:2 220:13,18
220:23 224:8,9,11
224:13 227:10,17
227:19,22 229:4,6
234:15,17,18
235:8,12,13 236:1
236:6,8 238:23
239:11,11 240:16

241:16 242:23
244:18
**stuff** 10:5 112:7,8
**stulz** 1:13 3:3,12
3:15,17,20,22 4:4
7:10 8:14,20 9:1,9
9:12 10:17,19
11:19,22,25 12:4
14:5,19 15:2
16:19 17:23 18:12
18:20 19:1,4,12
20:5 22:7 24:1,17
27:9,24 28:8,13
30:7 31:6 32:9
33:25 34:4,20
35:17 37:8 39:14
39:18,23 40:2,15
40:18 44:6,13
45:11 46:13,23
47:21 51:15 54:5
54:14 55:22 56:24
58:5,19 60:17
61:19 63:14 64:14
65:8,18 66:14
67:7,16,24 68:1,16
68:25 69:17 71:1
73:14 74:23 75:20
77:4 80:8 83:6,19
84:1,25 88:1,19
93:6 94:7 95:24
96:23 98:4 102:5
105:8 108:21
109:16,21 110:3
111:22 112:21
113:23 114:14,18
114:21 115:23
116:17 117:14,19
118:6 120:6,9,14
121:6,21 125:2,19
125:22 126:1,19
129:4,21 131:12

131:22 132:22
133:5 134:6 135:1
136:1,19 138:25
141:15 142:11,22
143:1 144:9 145:7
146:2 147:10,12
148:12 150:12
152:24 156:1
158:1 162:14,23
164:8,9 167:4
168:22 171:8,15
173:5 175:1
176:23 177:17
180:4 181:9
182:22 183:10
184:12 185:16
187:7,17 189:9,12
190:6 191:25
192:10 194:15
200:13 201:24
202:12 203:22
205:25 206:12
208:15 210:18
213:4 214:8 215:4
217:1,15 218:15
219:13 223:25
225:8 228:8,16
229:11,16,22
230:14 231:13,22
236:16 237:13
239:5,6 240:2,6,12
244:3 245:21
247:10 252:12,22
253:8 254:3,21
**stulz's** 39:11
223:18
**subject** 252:14
**submit** 20:23,24
**submitted** 19:13
20:20 40:16 111:5
112:6 218:14

**[subscribed - technical]**                                                                                    Page 44

**subscribed** 254:22
**subsequent** 107:9
  193:4 194:12
**subsequently**
  122:2 125:15
  127:9 132:16
  163:24,25 171:6
  192:25
**subset** 121:23,24
**substance** 179:3
**substantially**
  26:22
**substantiated**
  202:12
**substantive** 43:10
**substitute** 168:12
  236:10
**subtle** 166:23
  210:15
**subtly** 166:25
**success** 212:11,15
  212:18
**successful** 36:19
**successfully** 75:17
**sufficient** 215:6
**sufficiently** 73:5
**suggest** 230:25
  234:24 235:1,5
  237:20
**suggested** 124:25
  204:19 239:2
**suggesting** 127:1
  244:22
**suggestion** 162:21
**suggests** 229:3
  234:22 236:6,11
  236:14
**suing** 224:15
**suisse** 188:23
  189:1

**suite** 2:5
**sum** 179:3
**summarize** 167:22
**summarized** 37:15
  54:21
**summarizing**
  214:4
**summary** 21:21
  30:16 173:12
  177:2,12 179:9
  232:14 240:7,14
**support** 186:21
**supported** 18:19
**supports** 17:8
**supposed** 130:11
**supreme** 68:17
  69:19 72:24 73:10
  187:18 210:19
**sure** 12:2,11 14:9
  18:7 19:10 27:6
  28:24 49:6,17
  50:14 52:17 57:25
  60:20,20 69:11
  71:2 75:25 78:19
  86:9 90:23 91:17
  99:24 118:15
  128:20,20 129:14
  135:4 138:20
  146:19 152:5
  159:7 167:20
  179:7 184:21,25
  192:23 194:5
  201:25 202:10
  207:25 208:6
  211:11 212:14
  217:22 223:11
  245:6 249:6
**surveys** 168:6
**suspect** 20:17
  47:10

**swearing** 7:23
**switching** 133:11
  133:11
**sworn** 8:16 253:9
  254:22
**system** 72:6 139:1
  139:3,19,22,25

**t**

**t** 9:2 60:14 99:25
  100:11 116:13
  216:16,16 224:11
  251:8
**tailors** 220:24
**take** 7:7 18:14
  20:6 43:12,17
  54:17 72:1 80:2
  91:2,6 110:12
  120:24 121:2
  127:6 133:17
  136:12 179:10
  252:5
**taken** 7:10 33:21
  44:1 83:13 141:9
  174:22 191:20
  252:9 253:14
**takes** 158:22
**talk** 18:5 27:25
  35:15 116:23
  117:2 138:25
**talked** 24:15 62:16
  76:12 77:8,13
  168:23 183:13
**talking** 11:14
  13:13 93:9 100:1
  115:22 130:15
  164:18 166:25
  172:2 180:17
  184:15 206:19
  209:11 215:25
  222:6 235:23
  244:23 246:21

  247:23 249:9
**talks** 113:21
  198:16 202:16
  221:25
**tam** 60:1,9,13,23
  98:9,13 99:2
  101:1 105:4 106:5
  106:20 110:21,23
  111:4,9,12,17,25
  112:5 122:9,18
  123:16 124:14
  126:13 127:16
  129:18 131:21
  149:25 150:13,14
  150:18 151:4,17
  152:2 153:3,8
  154:2 156:2,10,14
  156:20 157:3,19
  157:21 158:3,6,7
  159:11 160:25
  161:22,24 168:19
  171:19 172:6,10
  177:24 179:22
  180:6 181:7
  183:14,17 184:3
  185:18 186:12
  192:15 201:1
  246:11 247:7,14
  248:7,18,21,25
  250:16,22
**target** 151:17
  166:15
**targets** 105:22
  178:16 180:21
**task** 191:3 226:24
**tasks** 189:23
**taught** 48:19
**taxing** 212:5
**teamsters** 8:7
**technical** 34:1
  152:21

**technique**  48:15
**techniques**  48:16
**teleconference**
 229:3 234:11
 237:12
**tell**  19:4,7 34:5,10
 66:16 86:7 121:21
 125:22 132:7,10
 137:11 161:17
 218:24 230:24
 232:9 244:24
**telling**  63:5 145:16
 204:11,24 208:13
 220:9 238:17
**ten**  14:16,17 23:6
 23:17,22
**term**  12:14 13:19
 13:22,23 44:14
 46:22 64:15 90:19
 177:8 192:11,19
 192:19,21 193:10
 221:22
**terminology**  67:10
**terms**  12:9,12
 38:18 49:7,13
 62:11 115:16
 125:8,8 189:22
 192:23 206:20
 239:19
**test**  78:21
**testified**  28:1 29:1
 43:5
**testify**  14:19 28:25
 253:9
**testifying**  12:5
 28:12
**testimonies**  32:12
**testimony**  10:10
 14:22 29:2,10
 30:14 38:21 44:10
 80:22 83:22 84:5

85:20,21 91:5
 92:24 93:19,22
 99:12,17 100:4
 101:6 102:9 103:4
 106:6,12 108:10
 108:15,16 110:22
 114:23 123:18,25
 133:2 136:16
 141:19 153:7
 154:11 158:8
 162:1 167:11
 168:21 170:14
 173:1 175:21
 177:21 192:3
 202:5 205:4
 206:10 242:25
 252:21 253:10,12
**tests**  77:18 78:1,24
 78:25 80:18
**text**  9:15 110:14
 129:4
**textbook**  76:2
 92:22 175:13
 204:3,4 205:3,5,15
 205:20,21 206:2
**textbooks**  92:21
**thank**  8:18 9:7,18
 9:23 11:17 12:8
 12:21 13:2,16
 14:3,18 15:1,25
 18:21,21 27:23
 36:3 39:22 45:10
 46:9,21 51:5 57:9
 129:3 144:7 147:8
 148:8 152:20
 158:19 182:21
 192:6 203:18
 211:22 228:12
 241:11 252:4,13
 252:18,19

**theoretical**  94:1
**theories**  92:10
 198:1,2,3 215:15
 215:17
**theory**  84:8,20
 176:4,13 191:6,8
 226:16
**thing**  22:18 34:10
 34:13,16 64:7
 135:8 140:3
 183:21 238:15
**things**  25:12,15,16
 27:24 38:18 40:13
 40:13 52:1 73:7
 81:17 96:5,7
 101:5 110:15
 117:10 118:22
 135:18 164:17
 166:10 169:15
 176:12 210:15
 224:6 239:20
**think**  14:3 15:17
 16:21,22 18:4
 20:12 23:6,12,17
 26:17 28:19,20
 32:22 33:3,11,16
 34:5,10,24 35:9
 37:24 38:20 39:9
 47:14 62:6,23
 63:19,20 69:1
 70:5 81:1 83:6
 86:16 89:6 100:18
 116:15 118:11,12
 119:3,8,24 133:22
 133:23 136:6
 140:21,22 141:1
 145:25 154:18
 161:3 164:13,15
 166:12 172:17,19
 175:16 180:16
 186:7 188:6

191:10 194:6
 197:4,8 202:20
 208:2 210:12
 212:6,21 215:10
 223:3,21 236:9
 237:1 241:5,12
 243:1 245:4
 247:10,12,13
 252:2
**thinking**  98:8
 102:2
**third**  34:16 42:21
 103:19 115:2
 125:19
**thomas**  2:19
**thompson**  25:23
 61:4,15,20 62:20
 63:5,17,23,24
**thomson**  25:20
**thorough**  74:3
**thought**  21:5 73:2
 130:23 172:2
 178:12,14 182:4,5
 199:6,18 209:10
**three**  16:11 19:18
 41:10 42:3,9,18
 60:9,12 74:15
 83:16 141:7
 176:12 234:17
**tied**  130:17
**time**  17:21 20:8,9
 20:18 21:5 22:17
 23:1 27:14 28:16
 28:19,20 31:13
 33:19,22 34:3
 35:10,16 39:10
 42:11,12 43:23
 44:2 56:23 80:2
 83:8,10,14 108:4
 110:12 121:3
 122:25 123:8

**[time - uncovered]**                                            Page 46

124:7,11 132:23
141:4,6,11 151:1,2
155:23 156:21
157:21 163:23
169:21 174:14,20
174:23 188:11
191:17,21 198:8
198:13 209:7,12
216:12 222:6,19
223:5 239:18
240:1 242:13,22
243:6,8,16 245:3,3
246:15,23 247:8
248:23 250:8,19
252:7,10,13
253:14
**timely** 205:24
**times** 3:19 14:16
14:17 15:4 24:4
101:16,18 114:3
114:13,16,22
115:10,24 116:1
117:1,15,21 120:1
163:18 177:20
223:1 242:15,18
**title** 30:5 206:16
210:21 220:22,23
**today** 8:13 9:16
10:8 12:5 36:7
41:9 67:8 102:7
110:5 134:17,25
157:13 177:21
188:21 201:16
242:15 252:14,17
**today's** 15:3
252:21
**told** 12:3 207:8
208:1 214:12
235:8 236:24
238:6 239:9
240:10

**tool** 75:10 77:19
77:21 84:7,14
176:25
**tools** 73:17 75:5,8
75:14,17,21,23
76:3,5,25 77:4,7
77:22 80:17,19,25
81:3,7,19 85:17
92:10,15 175:20
205:16
**top** 25:4,5 62:2
162:11 228:24
232:21 235:16
**topic** 43:10 47:7
138:18 161:7
191:11
**topics** 28:11 71:13
**total** 15:13,18 54:6
116:9,13 126:16
252:22
**totally** 160:12
**touch** 138:17
**town** 141:24
**toxicity** 229:5
234:12,15 235:13
236:7 237:10
**track** 26:10,13,15
**trade** 113:12
154:1 200:2
**traded** 22:9 65:1
**trades** 198:8
**trading** 13:10 65:4
**tradipitant** 216:13
216:15,17 222:14
224:7 234:13
236:21 240:17
241:17 243:20
244:7
**traditional** 203:8
**trained** 92:12

**training** 36:13
39:7 90:16 173:22
195:4 196:5
216:22
**trainings** 174:1
**transcribed**
253:11
**transcription**
253:12
**transparent** 25:25
31:19,20 34:14
35:8 64:3,5
**transport** 28:9
**treated** 41:24
**tremendous**
153:25
**trial** 239:10
**trouble** 119:9
**true** 152:4 153:20
253:12
**trust** 31:23
**truth** 253:9,9,9
**truthfully** 14:20
**truthfulness**
134:22
**try** 127:10,13
137:1 189:10
212:6 225:16
226:25 227:20
**trying** 54:16 57:1
62:18 63:14,16
68:5 70:22,25
75:4 96:1,8 98:4
138:1 167:5 214:7
232:15 238:13
243:15 249:22
251:18
**turn** 40:18 50:4
56:1,2,3 57:10
84:1 95:4 97:5
103:2 108:9 114:9

114:25 125:17,18
148:9 162:10
171:9 192:7
223:25 232:20
245:18
**turning** 137:20
206:12
**two** 11:4 30:20,21
44:4 49:18 60:22
71:12 73:7 83:11
91:9,13 112:5
114:4 138:5
147:21 164:17
166:10 169:15
224:13
**type** 47:9,17 59:16
88:2 90:14 92:3
108:1 109:5
111:11 116:7
137:6,13,16,25
138:2,11 149:22
150:3 162:5 215:5
**types** 44:21 92:1
95:15
**typical** 20:14
**typically** 43:17
45:7
**typo** 228:23
**typos** 41:10

**u**

**u** 9:2 60:13 251:8
**ultimate** 37:1
**ultimately** 36:19
113:17 118:25
**unable** 134:21
209:9
**unbundle** 74:5
**uncertainty** 92:5
**uncover** 185:5
**uncovered** 199:20

**[understand - value]**                                   Page 47

**understand** 10:9
10:13 12:5,13
13:14,20,21 30:11
36:21,23 37:4
44:7 54:9,14
56:25 58:4 67:13
68:5 70:6 76:10
80:16 89:11 97:4
135:21 139:14
140:13 141:16
145:7 151:4,11,12
162:23 163:1
164:9 167:5
173:16 175:17,23
182:11 184:25
192:1 194:5
208:13 210:18
211:3,6 213:1,12
213:16,17,21
214:4,7 232:24
233:2,6,12,22,25
234:1 241:13,20
246:20 248:12
249:23,24 250:20
251:18
**understanding**
12:16,19 13:6,7,23
13:25 44:14,15,22
45:12,14 46:22
50:8 59:14,14
64:15,18,23 65:7
65:11,13 66:5
67:16 68:6 72:23
73:11 74:3 84:21
92:18 94:4,6
98:15 119:9 131:1
133:25 135:3
136:17,20,22
140:9 143:14
145:21 146:22
147:9,11 148:5,13

148:14 149:8,17
149:20 150:13,18
151:14,16,25
155:1,4 158:2
159:14,19 163:8
163:21 164:4,23
193:10,13 206:19
207:4 208:10,10
208:14 210:10,23
210:25 212:1,10
213:13,22,24
214:13,15,18,24
215:18 216:23
230:4 231:4,24
235:5 240:3 249:7
**understandings**
93:24
**understood** 52:18
56:24 59:20 69:15
176:23 219:24
227:8
**undertake** 104:19
138:4 205:16
227:10
**undisputed** 238:11
**unethically** 172:15
**unexpected** 79:15
80:11 101:21
104:16 169:8,11
176:3,8,11
**unintelligible** 28:5
174:1 230:9 250:1
**union** 8:7
**unique** 9:25 62:3
222:3,7
**unit** 7:9 83:11,15
**united** 1:1 7:12
149:11 210:19
**universe** 57:15
248:14,15

**unknown** 131:16
151:5,7 162:22
196:22
**unopened** 11:4
**unrelated** 38:6
**unreliable** 35:25
36:1
**unreported**
156:15 158:4
**unsealed** 149:3
151:13,20 153:6
153:22 154:12
182:25 249:10,15
**unsealing** 153:8
**unsigned** 112:8
126:6,6 128:24
129:1
**unverified** 110:18
110:24
**uploaded** 39:21
142:13
**use** 9:10 10:3
12:10,12 13:19
14:1 73:18 75:14
76:5,8,20,25 77:1
77:1,11,15,20,21
77:22 78:14 79:5
79:8 80:25 81:2,7
81:8,19 82:2
90:19 93:16 94:13
94:19 98:23 130:7
135:3,9,13 139:12
139:13 148:2
162:21,24 164:18
166:18 174:13
180:19,21 191:13
215:20 219:10
220:13,17,19
226:13 234:23,25
235:2,4 236:13
237:14,20,23,24

249:8
**useful** 71:20,22
117:10 135:11
137:11 199:15
215:22 227:23
**username** 148:20
148:22
**users** 134:21
136:13
**uses** 84:7 108:17
123:12 132:20
143:11 166:24
213:20 231:1
**usually** 9:10 34:17
40:12 43:16 44:20
69:25 87:19

**v**

**v** 254:2
**valuable** 92:23
113:16 162:7
165:24 216:7,18
**valuation** 81:15
103:15
**valuations** 180:19
180:20,21
**value** 13:14 45:21
50:11 56:20 66:9
75:15 76:20 82:14
88:16,18,21,23
89:1,6,8,10,16
90:4,6 91:4,7,10
91:11,14,18,20
92:2,4,8,11,16,19
93:3,7,10,13,17,21
93:25 94:4,9,23,25
95:11,13 96:17,23
97:16,21,22 98:10
98:14,19,21,24
99:6 101:7,12,16
101:18,20 102:3
103:5,13,16,23

[value - want]                                                                 Page 48

104:4,4,6,12,17,20
104:25 105:2,9,16
105:19,25 106:8
106:14 107:15,18
107:24,25 108:2,5
109:1,7,9,11,24
110:4 113:6
118:25 119:2,3,5
121:19 122:3,11
122:12,16,24
123:3,4,8,12,19,20
123:22 124:1,7,9
127:10 136:8,10
136:18 137:7,9,16
138:6,11,15 145:2
153:1 156:3 159:4
167:23 172:8,13
173:15 175:6
176:6,9,12,17
177:15,16 178:13
180:23,25 181:6
181:11 186:9
220:20 228:10
value's  226:9
valued  165:3
values  15:5
vanda  1:8 3:16,24
  7:11 13:4,18 16:2
  16:16 17:1 18:17
  22:8 24:5,6 53:10
  56:11 98:22 99:7
  99:20 100:6 101:8
  102:20 109:19,25
  117:10 118:22
  121:14,22 124:18
  124:23 125:23
  126:7,20,23 127:3
  127:4,4 129:10,20
  130:16,21,22
  132:7,24 133:20
  136:4 139:4,9

140:11 142:8
143:16 144:13
145:8,13,15,18
149:22 150:3
151:22 153:11
154:3 155:24
157:10,14 159:20
160:5 161:12
165:3,20,25 166:8
166:15,17 167:7
167:25 168:23
169:11,16,21
170:2,4,23 171:2
173:19 179:2,18
182:15 185:17
186:1 189:21
190:16,18 194:19
198:7,8 224:12,14
224:15 226:9
227:5,7,13,16
228:7 229:2,4
233:1,6,7 234:2,6
234:12,14,16
235:8,11,16,25
236:4,6 237:11
238:11,24 240:1,7
243:9 244:4,13,15
246:5,10,23
250:15,17 251:19
254:2
vanda's  15:19
  17:11,15,17 18:2
  68:4 69:2 71:10
  71:25 95:9,19
  99:15 105:17
  106:10 107:14,18
  120:6 129:5
  157:11 186:5
  207:20 233:13
  236:2 237:16

variety  227:1
various  32:7 44:20
  48:7,10 62:10
  72:6 75:16 107:11
  112:19 145:13
  150:21 191:4
  236:22
vast  92:25
verdict  117:16
verified  112:10,12
  112:13 127:18
verifies  133:23
verify  112:15
  127:6,11,13
  133:18 134:18,19
  136:12
veritext  7:17,19
  252:23 254:1
version's  29:23
versus  7:11 27:5
  212:3 220:6 246:7
video  7:6,9,16,20
  7:24 10:14
videographer  2:19
  7:4,17 33:18,22
  43:23 44:2 83:10
  83:14 141:4,6,11
  174:14,20,23
  191:17,21 252:7
  252:10,19
videotaped  1:13
view  17:13,23
  30:19 33:2,6
  35:18 53:20 64:8
  64:11,11 76:10
  85:1 88:1 97:1,10
  99:14 143:9
  144:18 156:1
  161:13,21 170:1,9
  180:3 183:1,19
  185:23 186:3

187:3,7 189:23
190:9 191:3
196:17 212:22
228:25 247:16
248:17
viewed  87:20
  105:18 107:4
  164:25 166:18
  190:1
views  62:19 170:6
  187:6,10 199:15
  217:14
violations  4:3
  229:14,19
volatility  77:18
  78:1,21,24 80:18
vs  1:7

w

wait  86:25,25,25
  201:5
waive  7:21
waived  17:25
  252:24
walked  105:12
want  11:3,4 12:9
  12:11 18:5 25:7
  37:16 38:14 42:10
  43:12,12 46:13
  52:17 53:2 54:11
  54:20 55:22 61:9
  64:19 68:9 69:10
  69:12,16 73:19,25
  74:2 75:12 76:1
  78:14 80:16 81:11
  81:14 89:19 91:2
  101:4 116:16
  137:10 138:17,25
  151:21 163:5
  183:21 193:14,21
  194:21 197:1
  202:5,9 203:16

**[want - wrong]**                                                                 Page 49

204:2,7,12 212:6
220:11,21 221:3
221:10 238:1,15
243:12 245:5
249:6 252:5,13
**wanted** 32:23
59:10 75:11 84:5
141:25 149:5
184:20 185:22
187:24 200:25
**wanting** 162:5
207:15
**wants** 208:3
**warning** 3:23
142:5,7,20,22
143:2,15 144:18
146:4,5
**warrant** 73:5
**washington** 150:1
**way** 47:5 74:7
76:17 84:15 98:12
112:18 122:9
127:9,15 146:13
150:5 152:1
160:11 161:3
163:10 164:19
171:6 172:7 173:7
175:23 176:14
178:12 180:22
181:1,4 183:3
190:14 193:16
195:17,24 197:13
202:8 203:14
204:12 210:16
219:22 235:7,10
**ways** 51:10 79:3
102:1 145:13
147:2 156:25
170:15,17 178:8
178:19 181:7

**we've** 43:11 63:19
110:4 125:17
219:13 237:15
245:3
**web** 143:17,23
144:4
**website** 32:23,25
116:21,22,24
117:7,17 133:7
134:16 145:20
146:24 148:13,16
148:18,21,23
149:9,12,14 150:2
150:3,5 159:3,11
**websites** 61:3
148:24
**week** 111:18
154:14 155:25
158:22
**wegryn** 1:23 7:18
253:7,24
**weiss** 2:10 8:10
**welcome** 44:6
83:18 141:15
191:25
**went** 29:1 31:3
41:10 154:23,25
172:10 173:13
**wharton** 2:11 8:10
**whatsoever**
150:17
**whereof** 253:18
**whistle** 246:6
**whistleblower**
154:13 155:3,5
182:25 226:12
245:24 246:6
**wide** 79:8 193:7
195:8,9 197:25
198:11,23 199:2,8
206:21 215:14

216:24 219:4
243:23
**widely** 112:24
**willing** 195:21
224:12
**windfall** 198:10
203:7,12,14
204:18
**windfalls** 203:17
**winding** 80:1
**wish** 14:22 41:8
**withdraw** 188:22
**withdrawn** 189:11
**witness** 7:23 8:12
13:1 25:16 26:14
35:14 43:16,21
45:9 46:7 51:1,4
52:9 58:16 60:13
83:9 87:7 89:4
90:8 100:11
112:12 116:12
118:12 120:23
138:23 141:5
144:3,6 147:6
150:11 152:14,19
152:21 174:4,8
182:20 189:1
191:15 208:24
210:2 211:20
216:15 220:17
224:10 226:2
230:12 235:11
236:10 240:24
241:6,9 242:1
245:11,16 251:6,8
253:8,10,11,13,18
**witnesses'** 254:3
**wobbled** 128:2
**wonderful** 44:12
141:18

**wondering** 238:9
**word** 9:5 152:17
152:22 199:3
206:15 210:20
230:25 234:21,23
234:25 235:4
236:11,13,14
237:14,21,23,25
249:8 251:3,19
**worded** 236:18
239:7
**words** 42:3,4
164:19 226:13
**work** 17:8 62:15
86:16 87:11,14
93:24 94:1,2,5
178:19
**working** 58:2
117:8 135:17
168:13 170:17
171:3
**works** 17:4 76:9
133:21 148:13
**world** 25:2,9
61:22 62:3 192:20
**world's** 61:3
**worries** 83:4,4
**worry** 230:15
**worse** 28:8
**worthwhile**
113:22
**write** 178:14 229:1
**writing** 88:8
**written** 133:19
240:13
**wrong** 23:17 30:9
34:8 35:1 62:6,7
98:1 119:20
125:25 148:6
149:21 163:10
208:10 216:2

**[wrong - zip]**                                                                                            Page 50

239:5
**wrote**   125:23
  126:4 132:4,8
  236:4

| x |
|---|

**x**   3:1

| y |
|---|

**yeah**   18:7 28:4
  33:14 43:18 54:8
  60:18 69:7 98:1
  103:1 111:21
  119:25 121:2
  126:4 133:14
  165:13 167:12
  184:22 187:24
  191:13,15 250:4
**year**   26:6,14 27:3
  27:4 73:3,4 188:7
  246:1 249:2
**years**   19:25 21:4
  23:6,17,18,22 27:5
  43:6 188:6
**york**   1:2 2:5,12,12
  3:18 7:13 19:6
  114:3,13,16,21
  115:10,24 116:1
  117:1,15,20
  220:12,15 254:1

| z |
|---|

**z**   9:2
**zip**   181:23 182:1,8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.