# Exhibit 5

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK


C.A. NO:  1:19-CV-01108-FB-LB

----------------------------)

                            )

KENNETH GORDON, INDIVIDUALLY)

AND ON BEHALF OF ALL OTHERS )

SIMILARILY SITUATED         )

                            )

        Plaintiff(s),       )

                            )

VS.                         )

                            )

                            )

VANDA PHARMACEUTICALS, INC. )

AND MIHAEL H. POLYMEROPOULOS)

                            )

        Defendant(s).       )

                            )

----------------------------)

CONFIDENTIAL

ATTORNEYS EYES ONLY


VIDEO DEPOSITION OF: MICHAEL KEHOE


DATE:      November 11, 2021

TIME:      9:30 a.m.


HELD REMOTELY BY WEB CONFERENCE

              - - -




Reporter:  JENNY C. EBNER, RPR/CLR/LSR 00030

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 2

APPEARANCES:

REPRESENTING THE PLAINTIFF(S):

ROBBINS GELLER RDMAN & DOWD, LLP.
58 South Service Road
Melville, NY 11747
631.367.7100
amalina@rgrdlaw.com
bmitchell@rgrdlaw.com
mcapeci@rgrdlaw.com
By:  AVITAL MALINA, ESQ.
By:  BRENT MITCHELL, ESQ.
     MICHAEL CAPECI, ESQ.

REPRESENTING THE DEFENDANT(S):

PAUL WEISS RIFKIND WHARTON & GARRISON, LLP.
1285 Avenue of the Americas
New York, NY 10019
212.373.3289
asoloway@paulweiss.com
By:  AUDRA SOLOWAY, ESQ.
     JUSTIN WARD, ESQ.
     THOMAS BOUNDS, ESQ.

REPRESENTING THE WITNESS:

COHEN & GRESSLER, LLP.
800 Third Avenue
New York, NY 10022
212.957.7806
dtabak@cohengressler.com
By:  DANIEL TABAK, ESQ.

ALSO PRESENT:
  ROCCO MERCURIO, Videographer
  CLINT THOMAS, Technician

Page 4

READ IN

READ IN                          Page

By Court Reporter                 7

**Exhibits presented on screen by technician and retained by technician**

Page 3

INDEX
November 11, 2021

EXAMINATION

WITNESS NAME              Direct Cross

MICHAEL KEHOE
  By Ms. Soloway ................     8
  By Ms. Malina .................   164

EXHIBITS
Exhibit     Description   Marked
Exhibit 1    Tab 20 .......... 30
Exhibit 2    A document ...... 44
Exhibit 3    Teamsters' letter 46
Exhibit 4    Tab 7 ........... 47
Exhibit 5    Tab 9 ........... 52
Exhibit 6    Tab 8 .......... 70
Exhibit 7    Tab 19 ......... 80
Exhibit 8    Tab 11 ......... 82
Exhibit 9    2/11/2019 E-mail  88
Exhibit 10   2/12/2019 E-mail  92
Exhibit 11   4/25/19 E-mail   97
Exhibit 12   Tab 28 ......... 106
Exhibit 13   Tab 27 ......... 109
Exhibit 14   Tab 25 ......... 112
Exhibit 15   Tab 24 ......... 116
Exhibit 16   Tab 22 ......... 123
Exhibit 17   Tab 15 ......... 124
Exhibit 18   Tab 18 ......... 126
Exhibit 19   Tab 21 ......... 128
Exhibit 20   10/23/19 E-mail . 136
Exhibit 21   Tab 29 ......... 142
Exhibit 22   2/2/20 E-mail ... 152
Exhibit 23   Rothschild 1 .... 167

Recess
Recess                    Page
Recess 10:50 a.m. - 10:59 a.m.        70
Recess 11:28 a.m. - 11:36 a.m.        93
Recess 12:27 p.m. - 12:29 p.m.       135
Lunch 12:59 p.m. - 1:38 p.m.         163
Recess 1:53 p.m. - 1:58 p.m.         174

Page 5

COURT REPORTER:  Ms. Malina, do you know what you want for a transcript?

MS. MALINA:  I was actually going to request that we get an official transcript as soon as possible.  Friday if possible.

COURT REPORTER:  Ms. Soloway, can you tell me what you want for a transcript?

A VOICE:  I can get you the standing order after the deposition is concluded.

It's my understanding it's just going to be an electronic transcript is fine with a mini.

A VOICE:  Recording in progress.

VIDEOGRAPHER:  We are now going on the record.  Today is Thursday, November 11, 2021, the time is approximately 9:38.

This is the remote video deposition of Michael Kehoe, in the matter of Gordon versus Vanda Pharmaceuticals, Inc. filed in the Eastern District Court of New York, Case number 1:19-cv-01108-FB 6.

My name is Rocco Mercurio.  The court reporter is Jenny Ebner.

Will counsel please introduce yourselves and who you represent for the

2 (Pages 2 - 5)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 6

record?

MS. MALINA: This is Avital Malina representing the plaintiff, Teamsters Local Union No. 727 Pension Funds.

MS. SOLOWAY: Good morning. Audra Soloway, from Paul Weiss Rifkin Wharton & Garrison representing the defendants.

MR. TABAK: Good morning. Daniel Tabak, Cohen and Gresser representing the witness.

MS. SOLOWAY: I will just note for the record that there are some other attorneys from I think each Robbins Geller and Paul Weiss on the, on the, on the Zoom, as well.

I know this is considered representation, but I'm Dina (inaudible) Clements. I'm in-house counsel at (inaudible).

COURT REPORTER: I'm sorry. All these names are going to run together because I don't know who anybody is talking. "Zima Clements," did you say?"

MS CLEMENTS: Dina Clements, in-house counsel for (inaudible).

Page 7

MS. SOLOWAY: Good morning, Dina.

MS. CLEMENTS: Good morning.

VIDEOGRAPHER: That will do it? The court reporter will now swear in the witness and proceed.

COURT REPORTER: (Reading) Pursuant to Executive Order 7Q issued on March 30, 2020, by Governor Ned Lamont, this deposition is being reported remotely.

All counsel participating in this deposition proceeding acknowledge that I am not present in the deposition room and further acknowledge that in lieu of an in-person administration of the oath, it will be administered remotely.

The parties and all counsel consent to this arrangement and waive any objections to this method of reporting.

Counsel, kindly voice your agreement, stating your name and agreement on the record.

MS. SOLOWAY: On behalf of the defendants, we agree.

MS. MALINA: On behalf of plaintiff, we agree.

Page 8

MR. TABAK: I agree, as well.

(Deposition commenced at 9:35 a.m.)

MICHAEL KEHOE, called as a witness, being duly sworn or affirmed by Jenny C. Ebner, RPR, CSR, CLR, a Notary Public in and for the State of Connecticut, testified as follows:

DIRECT EXAMINATION
BY MS. SOLOWAY:

Q Good morning, Mr. Kehoe. How are you?

A Fine, thanks. Good morning.

Q Thank you so much for your patience this morning as we were getting going.

Could I ask you to please state your full name for the record?

A Michael Noel Kehoe.

Q What is your address?

A 18 Kensett Lane, Darien, Connecticut 06820.

Q You understand you are under oath today just as if we are sitting in a court room with a judge and a jury?

Page 9

A Yes.

Q You understand that your testimony here today could be played in front of a jury in a trial in this case?

A I do.

Q You understand that you have an obligation to testify truthfully?

A I do.

Q Is there any reason why you would not be able to testify truthfully here today?

A No.

Q You are feeling okay?

A Fine.

Q Okay. Good. If you don't understand one of my questions, please let me know. I am happy to rephrase it. So just let me know if there is any issue.

A Okay.

Q Okay. I will try very hard not to talk over you. It makes it very difficult for the court reporter. Sometimes it can be hard with the Zoom format to tell when people are done and know when to start. We will try to make her life easy that way.

You and I have never met before. Correct?

3 (Pages 6 - 9)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 10

A Correct.

Q In advance of this deposition, in preparation for this deposition, you have not spoken with anyone at Vanda. Correct?

A Correct.

Q Or with any other, any of the defendants in the case. Correct?

A Correct.

Q I am just going to start with some background information if you wouldn't mind. Would you mind giving me an overview of your educational background?

A Sure. I went to the University of Pennsylvania for undergraduate studies and then Yale University for an MBA.

Q What year did you graduate Penn?

A 2000.

Q You are younger than me. We did not overlap.

Did you attend -- I am sorry.

Where did you attend graduate school? I think you said.

A Yale.

Q Yale. Was that for an MBA or --

A It was.

Page 11

Q Are you currently employed?

A I am.

Q By Rothschild & Co.?

A That is right.

Q Since you graduated from -- or since you finished your formal education, have you worked anywhere other than Rothschild & Co.

A Yes.

Q Give me at a high level, an overview of your career since completing school.

A Outside -- after undergraduate I worked in the equity options industry for, I guess mainly for Knight Securities which was ultimately acquired by CitiGroup.

And then after business school, I worked for CIBC and Cowen and Co. before going to Roth.

Q Just at a high level, what types of jobs -- I mean we can start with your first job, but what responsibilities have you had? Have you always been an investment professional?

A Since business school, yes. Prior to that I was a trader, options trader activities.

Q Got it. Then since you finished your MBA, you have been an investment professional?

A Correct. In an oriented analytical

Page 12

capability or capacity I should say.

Q How long have you been at Rothschild?

A Just over 13 years.

Q Are you the managing director there?

A I am.

Q Since you have been at Rothschild, I assume you've had a number of positions; is that fair?

A Yes.

Q Can you walk me through since the time you have been at Rothschild what positions you have held there?

A So, my title has changed from vice president to director to managing director, so it's three different titles.

My job responsibilities have changed once. So my first job responsibility was an analyst. And then subsequently became a portfolio manager.

Q When did you become a portfolio manager?

A I have to answer that two ways. I was a, what we call a backup portfolio manager for the last five years, but I have been the sole lead portfolio manager for the small and mid cap portfolio for about two and a half years.

Q You have been working on the small and mid

Page 13

cap portfolios in some capacity now for how many years?

A Thirteen.

Q Got it. You have been with these two strategies the entire time you have been at Rothschild?

A That is correct.

Q During the time period or -- let's just start in 2017. Which of these jobs did you have? Is that a time when you were an analyst?

A Yes. I would characterize it as an analyst.

Q In 2018?

A Still an analyst. Yes.

Q Then 2019?

A That is when I became the portfolio manager. I believe it was in mid -- early '19 or mid '19. Mid '19.

Q Mid '19?

A Yes.

Q Okay. Fair enough. Turning to -- we can get back into the strategies in a minute. Just turning to the plaintiff in this case. The plaintiff in this case has a full name: Teamsters Local 727 Pension Fund. Is it okay with you if

4 (Pages 10 - 13)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 14

today I just refer to them as Teamsters to keep it short?

A  Yes.

Q  You will understand who I am talking about if I say Teamsters?

A  Yes.

Q  Okay.  Did you have any -- in connection with your role as an analyst or a leader in your role with some portfolio management responsibilities, did you interact with Teamsters in any way?

A  No.

Q  Is it one of your responsibilities to interact -- again, as an analyst working on these strategies, was it your responsibility to interact with clients of Rothschild who might invest in those strategies?

A  Not with any regularity.  Maybe if it was a new client and they came in to meet us before investing with us, there would be an introduction, but not after that, no.

Q  Okay.

A  Generally.

Q  Are you aware, sitting here today, that Teamsters is one of Rothschild's customer accounts?

Page 15

A  I believe it was.  Correct?

Q  Yes.

A  Yes.

Q  Are you familiar at all with Teamsters?

A  No.

Q  So, you are not familiar with what types of strategies they invest in, for example?

A  No, I wouldn't have that.

Q  You have never spoken with any representative of Teamsters?

A  No.

Q  Have you ever spoken to Teamsters in connection with any investment by Rothschild for Teamsters in Vanda Securities?

A  No.

Q  To your knowledge did Teamsters ever call anyone at Rothschild to ask about Rothschild's investment thesis in Vanda?

MS. MALINA:  Objection.

THE WITNESS:  Not to my knowledge.

BY MS. SOLOWAY:

Q  Did you do anything to prepare for today's deposition?

A  Nothing out of the ordinary, no.

Q  Let me just ask, other than speaking with

Page 16

your counsel, Mr. Tabak, who is here with us today, did you do anything to prepare for this deposition?

A  No.

Q  Did you go back, outside of with Mr. Tabak, and review any documents?

A  No.  Whatever he showed me, which was I think some --

Q  You don't have to tell me what he showed you.  I am just going --

(Talking on top of each other.)

A  I don't actually recall.  He just showed me what you shared with him.

Q  Putting aside what Mr. Tabak showed you, because I don't want to hear about anything that happened between you and your counsel, did you go and look at any documents?

A  No.

Q  Did you go talk to any of your colleagues, for example, to try to remember the events that surrounded the Rothschild investment in Vanda?

A  No.

Q  Have you talked to anyone other than Mr. Tabak about the testimony you would give today?

A  No.

Q  How many times did you meet with

Page 17

Mr. Tabak?

A  Once.

Q  For how long?

A  Couple hours.

Q  Have you spoken with anyone from the plaintiffs about this deposition?

A  No.

Q  Have you spoken to plaintiffs' counsel?

A  No.

Q  Are you aware that Rothschild has produced documents to the parties in this case in connection with this litigation?

A  Yes.

Q  Did you have anything to do with collecting those documents?

A  No.

Q  Are you aware of what was produced?

A  (Shaking head.)

Q  No.  Do you have any hard copy documents that relate to investments that Rothschild made in Vanda?

A  I believe those were filed away, and that is what they went through to produce for you.  But I wasn't part of that process.

Q  Understood.  I am just trying to

5 (Pages 14 - 17)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 18

understand what you might have in your personal possession.

A   Nothing.

Q   Okay.  Anything that you might have had that related to Rothschild's investment in Vanda would have been put in files?

A   That's right.

Q   Okay.  Then other than, other than those types of hard copy documents, it would have been retained electronically?

A   That is correct.

Q   Other than e-mail is there any other electronic location where those documents may have been located?

A   No, not that I am aware of.

Q   Do you create -- for example, if you look at analysts' reports in connection with an investment, do you create a file that memorialized what analyst reports you looked at?

A   That is possible.

Q   Do you know whether you did that in connection with your investment in Vanda?

A   (Silence.)

Q   I am sorry.  I didn't hear that.  I think you cut out.

Page 19

A   I don't recall.

Q   Okay.  Thanks.  I want to just cover -- actually, let me take a step back.  Is your expertise as an analyst focused on the Pharmaceutical industry?

MS. MALINA:  Objection.

(Reporter clarification.)

BY MS. SOLOWAY:

Q   Excuse me, healthcare.  Thank you.

The sound is not perfect today, we will keep going, but -- Mr. Kehoe, if you have any trouble hearing me, let me know, because it's not always perfect up here.

A   Audio is okay.

Q   It's okay.  Good.  Do you have educational background in health care at all?

A   No, not in sciences if that is what you are asking like a Master's or anything like that, no.

Q   When you came out of school and decided to focus on health care, is that the first time you got exposure to the health care industry?

MS. MALINA:  Objection.

THE WITNESS:  When I traded equity options it was in health care as well.

Page 20

BY MS. SOLOWAY:

Q   Got it.  Have you focused in health care for your career?

A   Yes.

Q   You continue to do that today?

A   Yes.

Q   I am just going to ask you some very general questions about investing in health care and particularly in investing in pharmaceutical companies.

Would you agree that investors in the pharmaceutical industry take on risks?

A   Yes.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q   Did you always --

(Talking on top of each other.)

Q   Can you identify the types of risks that investors in the pharmaceutical industry take on?

A   Basic investment risk, capital risk.  They are investing in companies that may or may not succeed.

Q   Specific to pharmaceutical companies in particular, what types of risks tend to, you know, tend to present in that particular industry?

Page 21

A   There is clinical risk, self-study risk.  There is regulatory risk from the FDA.  There is commercial risks from launching a product and building a commercial team and promoting it properly, educating physicians.  That can also be a risk.  And competitive risk.

Q   So, I think you just named five categories of risk.  I am going to ask you to take me through them just so every, just so -- a jury may not understand what all of those things mean.  You'll forgive me if I ask you to give me a little bit more granularity.

When you say clinical risk, I think you said clinical study risks, what do you mean?

A   A company in order to gain approval from the FDA needs to conduct a clinical study, which means in humans to satisfy the FDA's requirements with some statistical level of proof that the drug, in fact, does what they say it does.

Q   There are multiple phases of studies that have to be conducted, correct?

A   There's three.

Q   And there is studies that test safety as well as -- let's start with that.  There are safety studies.  Correct?

6 (Pages 18 - 21)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 86

psychiatrists on sighted non 24 will play a major role on whether Vanda will be able to materially penetrate this market.

"Based on our discussion with Vanda management, few sighted non 24 patients are on Hetlioz therapy, meaning there is significant room for growth."  Do you see that?

A  I see it.  Yes.

Q  Do you recall earlier we talked about the education efforts that you said sometimes companies need to undertake in order to sell an orphan drug?  Do you recall that?

A  I do, yes.

Q  Is it consistent with your understanding that at the time Vanda was engaged in such education efforts?

MS. MALINA:  Objection.

THE WITNESS:  My assumption is they are always engaging in those efforts.

BY MS. SOLOWAY:

Q  No specific details coming to mind for you?

MS. MALINA:  Objection.

THE WITNESS:  No.

BY MS. SOLOWAY:

Page 87

Q  Was that a no?

A  That is a no.

Q  All right.  Then we can skip the rest of this document.

(Pause.)

I am not going to ask you about documents that you don't have recollections about.  So we are skipping forward a little bit.

Let me ask you -- so, I want you -- in answering these questions, I want to exclude, I want you to exclude anything -- so I don't want you to tell me about privileged conversations with your counsel.  I want to know what you knew before you prep'd for this deposition.  Okay?

Don't tell me about your discussions with your counsel or anything you may have learned.

Excluding any preparation for this deposition with your counsel, have you heard of Aurelius Value?

A  No.

Q  You don't know who they are?

A  I don't.  I don't recall.

Q  I am going to -- You don't recall?

A  It's possible they came across my desk.  You ask me today?  I don't remember.

Page 88

Q  That is fine.  Let's take a look at -- let's take a look at -- this is one, I think.

MS. SOLOWAY:  Actually, Thomas, I am not sure if this is in the binder, but can we put up the February 11, 2019 e-mail from Richard Vasquez to Mr. Kehoe?

Can you see that, Mr. Kehoe?

TECHNICIAN:  I will get on it right now.

MS. SOLOWAY:  Thank you very much.  Mine hasn't refreshed yet.  Let's just give it a minute.  I think this is Exhibit 9, right?

TECHNICIAN:  That is correct.

(Exhibit 9:
Marked for identification.)

BY MS. SOLOWAY:

Q  All right.  Mine just came up.

So, I am going to start.  Mr. Kehoe, if it's okay, I am going to start in the middle of the page where it says, "News Alert, Subject, Vanda Pharma six to eight month low after Aurelius' short report."  Do you see that?

A  I do.

Q  To take you through the e-mail at the top,

Page 89

it looks like this is Exhibit 9 that we are looking at.  Mr. Vasquez forwards it to you and a couple of others -- or one other.  Excuse me.

A  Yes.  Yes.

Q  Who is Mr. Vasquez?

A  Our trader.

Q  Okay.  This is on February 11, 2019.  Correct?

A  Correct.

Q  Sitting here today do you recall receiving this e-mail?

A  I don't.

Q  Do you know what report this is that is forwarded in the e-mail below or -- let me withdraw.

Do you know what the report is, the Aurelius report that's referenced in the e-mail below?

A  I don't.

Q  Do you remember ever reading that report?

A  No.

Q  Is it fair to say you don't know what information that report contained?

A  That is fair.

Q  If you look at the e-mail below, do you

23 (Pages 86 - 89)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 90

see that it says -- and now I'm looking at the e-mail from Bloomberg below. It says, "Shares of Vanda Pharmaceuticals drop as much as 9.8 percent to the lowest intraday since May 29, 2018, as research firm Aurelius Value says it is short on the company." Do you see that?

A   Yes.

Q   What is a short seller?

A   It's someone who has a negative opinion of a stock but they take that short position. To do that they borrow stock from someone else and sell it into the market. So they are effectively betting that the stock will go down.

Q   If someone takes a short position before releasing a report taking a negative position on the company, what economic interest do they have?

A   Please be more specific.

MS. MALINA: Objection.

BY MS. SOLOWAY:

Q   Sure. If an investor takes a short position and then releases a negative report on a company, what economic interest does that investor have?

MS. MALINA: Objection.

THE WITNESS: Their interest is for

Page 91

the stock to go down so they can profit.

BY MS. SOLOWAY:

Q   Right. So they are betting that the stock is going to go down. Correct?

A   Correct.

Q   In your experience can news that an investor is short on a company cause a stock to decline?

MS. MALINA: Objection.

THE WITNESS: Yes. That can happen.

BY MS. SOLOWAY:

Q   If you look here at the Bloomberg e-mail, do you see that?

A   I do.

Q   It says, quote, "We believe investors fundamentally misunderstand the true nature of Vanda activities, and therefore, see significant downside activities of the shares." Do you see that?

A   I do.

Q   Do you know what activities are being referred to?

A   I don't.

Q   You can't tell that from this e-mail. Correct?

Page 92

A   (Shaking head.)

MS. MALINA: Objection.

BY MS. SOLOWAY:

Q   I didn't hear your answer.

A   No.

Q   Mr. Kehoe, I am going to ask you to flip now in your binder to tab -- sorry -- not tab. Hang on. A new document.

Thomas is going to put it up. This is a February 12, 2019 e-mail. Let's give it a minute to refresh but we'll mark this as Exhibit 10.

(Exhibit 10:
Marked for identification.)

BY MS. SOLOWAY:

Q   Let me know when it's up for you, sir?

A VOICE: I am having a technical issue. Give me a second.

MS. SOLOWAY: Sure.

BY MS. SOLOWAY:

Q   Mr. Kehoe, this was easier when I could just hand documents to witnesses.

A   I know, but I think virtual, net of all things, might be still better. But that is me as a witness.

Q   Hopefully for you, not wanting to sit in

Page 93

the room with a bunch of litigators?

(Pause.)

A   I still don't see it.

Q   Me either.

MS. SOLOWAY: Thomas, it is not uploading.

MR. BOUNDS: Give me one second.

MS. SOLOWAY: Yes.

(Pause.)

VIDEOGRAPHER: Go off the record briefly?

VIDEOGRAPHER: Going off the record. Time is 11:28.

(Whereupon a recess was held from 11:28 o'clock a.m. until 11:36 o'clock a.m.)

A VOICE: Recording stopped.

(Pause.)

TECHNICIAN: We are good.

A VOICE: Recording in progress.

VIDEOGRAPHER: Going back on the record. Time is 11:36.

BY MS. SOLOWAY:

Q   Before we took that brief break, Mr. Kehoe, we were, we were trying to get Exhibit

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 94

10 loaded.

You should be able to see Exhibit 10 now. This is a February 12, 2019 from MarketIntel@factset.com to you. Do you see that?

A   Yes.

Q   What is marketintel@factset.com?

A   Fact Set is a data provider. They also -- they were -- they were (inaudible) Bloomberg. They provide a lot of financial data and information.

Q   Do they send you periodic e-mails gathering a whole bunch of information?

A   Yes. They just send any news and reports.

Q   Okay. If you take a look at the page that's Bates stamped -- let me first ask you, you don't remember receiving this February 12, 2019 e-mail. Correct?

MS. MALINA:  Objection.

COURT REPORTER:  I didn't hear an answer.

THE WITNESS:  Correct.

BY MS. SOLOWAY:

Q   Let me ask it as a nonleading question, Mr. Kehoe. Do you remember receiving this February 12, 2019 e-mail?

A   No.

Page 95

Q   Take a look at the page that has Bates number 7778 in the bottom right corner.

A   Okay.

Q   7778?

A   Yes.

Q   Do you see near the top of the page, it mentions Vanda on the left side, V-n-d-a?

A   I see it.

Q   It says, "Vanda Pharmaceuticals trading lower"?

A   Yes, I see that.

Q   Then it says, "Circulation of negative Aurelius Value report cited." Do you see that?

A   I do.

Q   Do you remember whether you read this when you received it on February 12, 2019?

A   I don't.

Q   Do you remember --

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q   Do you remember, sitting here today, whether you ever read this document before?

A   I don't recall ever reading the document.

Q   Okay. You'll recall earlier I asked if you are familiar with the term off-label marketing.

Page 96

A   Yes.

Q   Do you know what a Qui Tam Action is?

A   No.

Q   Do you know what the False Claims Act is?

A   No.

Q   Again I am going to ask you to exclude everything you have discussed with your lawyer in preparation for this deposition.

So putting aside this lawsuit and your preparation for this deposition, do you recall ever learning whether Vanda was subject to False Claims Act claims in a lawsuit?

A   I don't recall.

Q   Do you recall ever hearing that Vanda had be been sued in a Qui Tam Action?

A   No.

Q   Sitting here today, again excluding any discussions with your lawyer, have you ever learned of any claim that Vanda was engaged in off-label marketing of its drugs?

A   Don't recall.

Q   You don't recall?

A   No.

Q   Okay. All right. Mr. Kehoe, did there come a time when you learned that Vanda had sued

Page 97

the FDA?

A   Yes.

Q   Do you recall --

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q   Do you recall approximately when you learned that information?

A   Approximately -- I don't know -- I don't recall.

Q   Let's see if we can help orient you in time. Let's take a look at Rothschild -- excuse me -- withdrawn.

I am going to show you a document. We are going to now work as Exhibit 11 where, unfortunately, one piece of the document is missing from your binder, so we will put it up on the screen, but if you need to look at the longer piece of it, it's available in the hard copy of your binder.

Let's start with online. Let's get this document marked -- this is Tab 27 marked as Exhibit 11.

(Exhibit 11:
Marked for identification.)

BY MS. SOLOWAY:

25 (Pages 94 - 97)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 98

Q   Let me know when it comes up for you on the Exhibit Share.

A   Okay.  I see it.

Q   It came up for me.  All right.  Looking at Exhibit Share, why don't we start with that.  This is an e-mail from Vivianne Bai, B-a-i, dated April 25, 2019.  Do you see that?

A   I do.

Q   It goes to Local -- it goes to several addresses that are at Local 727 HW Fund.  Do you see that?

Withdrawn.  I misstated that.

Do you see that the second e-mail address is to Bobby L at 727benefitfunds.com, do you see that?

A   Yes.

Q   Okay.  Then I just want to point out in the subject line it says, Rothschild and Co, March 2019 quarterly report Teamsters Local 727.

A   Yes.

Q   Teamsters is the plaintiff in this action.  Correct?

A   Yes.

Q   Rothschild would have provided them with periodic reporting on their portfolio.  Correct?

Page 99

A   Yes.

Q   Okay.  So this cover e-mail attaches a file which is also in your binder, which you are free to look at either in hard copy or in, you know, on the electronic platform.

I want to confirm is this document, says, at the top front page, Bates stamp 137434, Teamsters Local 727 Pension Fund, and underneath it says, Rothschild and Co U.S. Small Cap Core.  Do you see that?

A   I do.

Q   That says quarterly, March 25, 2019?

A   Yes.

Q   Do you understand this to be the first quarter report sent to Teamsters concerning their investment in the Small Cap Core portfolio?

A   I don't know that to be true.

Q   Are you familiar with this type of document that Teamsters -- excuse me -- the portfolio summary for the small cap fund?

A   Yes.  This looks like a presentation that we disseminate, yes.

Q   Okay.  These presentations go to investors who had asked you to invest them in one of your strategies.  Correct?

Page 100

A   Yes.

Q   Those are created in the ordinary course of Rothschild's regularly conducted business?

A   Yes.

Q   And do you provide content sometimes to go into those quarterly reports to investors?

A   Yes.

Q   You would do that if you were the analyst, for example, who was responsible for a particular stock?

A   Yes.

Q   All right.  So I want to ask you about something on page two of that report, which is Bates stamped 137437.

A   Yes.

Q   I said I would help -- this is a report from March of 2019, and you will see that it says, "On a stock specific basis our largest relative detractor has included Vanda Pharmaceuticals down 29.6 percent, a biotechnology company."  Do you see that?

A   I do.

Q   Then it goes on to say, "The company disclosed their intention to sue the FDA after the agency placed a partial hold on Vanda's phase three

Page 101

trial for its gastroparesis treatment after Vanda questioned the necessity to conduct animal safety studies."  Do you see that?

A   I do.

Q   Does this refresh your recollection that Vanda sued the FDA in the first quarter of 2019?

A   It does.

Q   Okay.  It goes on to say, "This provocation raised concerns that the FDA could potentially take a hostile stance towards the company's filing for label expansion for its flagship Hetlioz commercial drug.

"Vanda expects to hear a court decision over the next few months."  Do you see that?

A   I do.

Q   I just want to ask you a few questions about this summary.

When you say, "This provocation," what do you mean?

MS. MALINA:  Objection.

THE WITNESS:  With the FDA.

BY MS. SOLOWAY:

Q   Let me withdraw that.

Would you have provided that content for this report?

26 (Pages 98 - 101)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 102

A  Yes.

Q  Okay.  So you are the author of those words.  Correct?

A  Yes.  The context, yes.  The marketing team can tweak things, but yes, the context is mine.

Q  Okay.  So the words "this provocation"?

A  Yes.

Q  What does that mean?

MS. MALINA:  Objection.

THE WITNESS:  Suing the FDA.

(Pause.)

BY MS. SOLOWAY:

Q  So, why is suing the FDA provocative?

MS. MALINA:  Objection.

THE WITNESS:  Well, you are suing the same agency that you are asking for previously to approve your drug.

BY MS. SOLOWAY:

Q  You go on to say that "This provocation raised concerns that the FDA could potentially take a hostile stance towards the company's filing for label expansion for its flagship Hetlioz commercial drug."

What do you mean when you use the words

Page 103

flagship --

MS. MALINA:  Objection.

THE WITNESS:  It's the main revenue, main source of revenue for the company.

BY MS. SOLOWAY:

Q  What was your concern for Hetlioz as explained in this sentence?

A  That their lawsuit could impact the FDA's decision on label expansion indications for Hetlioz.

Q  Why would it impact the FDA's ultimate decision for label expansion for Hetlioz?

MS. MALINA:  Objection.

THE WITNESS:  Possibly the FDA doesn't like being sued.

BY MS. SOLOWAY:

Q  So you are worried that the FDA would essentially be -- I don't want to put words in your mouth -- but unhappy with Vanda for bringing a lawsuit?

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Q  And that would potentially implicate other drugs?

Page 104

A  It would implicate Vanda in the case that they have a filing for, on file with the FDA for Hetlioz.

Q  Why is it that you are focused on Hetlioz as opposed to any other product that Vanda sells or might sell?

MS. MALINA:  Objection.

THE WITNESS:  This stock was already reflecting the issues with Tradipitant with gastroparesis.  For the stock to work in this case, you want to get approval for another indication to be done before the stock and the stock would appreciate.

That's why it was relevant.

BY MS. SOLOWAY:

Q  You mean the stock -- when you said the stock was already reflecting the issue with Tradipitant, you mean the risk that Tradipitant might not get approved by the FDA?

A  Correct.

Q  The concern here, from your point of view, is that this new stock price decline that you are describing in this investor presentation reflects the market's concern that as to the flagship Hetlioz drug, the FDA might take retributive action

Page 105

against the company?

MS. MALINA:  Objection.

THE WITNESS:  To answer the question, I don't know what the market was really thinking or why the stock was doing what it was doing.

BY MS. SOLOWAY:

Q  I can only ask you about your opinion.

A  My opinion is that the stock sold off because of their reluctance to do an animal safety study.  From that point forward we own the stock and that price of the stock, based on its performance, which went down.

Going forward what could have helped the stock is if they were to get Hetlioz second indication approval.

Q  So the stock would have been positively impacted if the company was able to get an expansion for Hetlioz?

A  Right.

Q  Which is what you believed the market was worried about based on this FDA lawsuit?

MS. MALINA:  Objection.

THE WITNESS:  It could have been, yes.

27 (Pages 102 - 105)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 106

I would say it was my opinion. Yes.

BY MS. SOLOWAY:

Q   That was your concern?

A   Yes.

Q   I am going to show you another document. This is in your binder at tab 28.

A   I am there.

MS. SOLOWAY:  So we will mark this as Exhibit -- I guess we are up to 12 now.

TECHNICIAN:  That is correct.

(Exhibit 12:

Marked for identification.)

BY MS. SOLOWAY:

Q   This is an e-mail from you to someone named Lakenda Tesar.  Do you see that?

A   Yes.

Q   This is dated March 4, 2019?

A   Yes.

Q   Was this written around the time that you -- withdrawn.

Is it fair to say that as the author of this e-mail, you had knowledge of the subject matter of it?

A   Yes.

Q   Also fair to say that this e-mail was

Page 107

prepared by you in the course of your regularly conducted business activity?

A   Yes.

Q   You said earlier that you would often provide content for the reports that went out to investors?

A   Yes.

Q   Do you believe this e-mail reflects the content that you were providing for the investor report we just looked at?

A   Yes.

Q   When you -- again, just turning to this, to this description in the third paragraph where it says "Vanda," "this provocation raised unnecessary concerns the FDA would take retribution"?

A   Yes.

Q   "And hostile stance."  Do you see that?

A   I do.

Q   Again, what did you mean by retribution and hostile stance?

A   It was referencing their review of their filing for Hetlioz.

Q   You were concerned that the FDA would basically take revenge on Vanda because it had been filed?  Excuse me.

Page 108

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q   They had been sued.  Correct?

A   Yes.

Q   Did you understand the question?

A   Revenge, I don't know that I would use that strong a language.  Yes.

Q   I guess retribution and revenge to me seem like similar words.  But feel free to put it in your own words.

When you say "retribution," you mean they would react negatively to Vanda?

A   We could split hairs.  Revenge seems emotional.  I don't think it's an emotional thing. The FDA has a lot of things they can do.  They don't have to spend time on this.

Q   The concern was they would therefore take a negative act toward Vanda because Vanda had sued them?

THE WITNESS:  Yes.

MS. MALINA:  Objection.  Asked and answered.

BY MS. SOLOWAY:

Q   All right.  I just want to ask one other question -- I am sorry.  I am done with this

Page 109

document.

Why don't we flip to tab 27 of your binder which we can mark as Exhibit 13?

(Exhibit 13:

Marked for identification.)

MR. BOUNDS:  We are going to look at the complete version online, Audra.

MS. SOLOWAY:  Thank you.  Thanks for the reminder, Thomas.

BY MS. SOLOWAY:

Q   So, I believe we will have you pull up both docs so there is full context, but actually I am going to only show you a page of this.

I will tell you when it's up, Mr. Kehoe.

A   Just remind me which Exhibit Number is this?

Q   Up to Exhibit 13 now?

TECHNICIAN:  Should be up.

MS. SOLOWAY:  Great.

BY MS. SOLOWAY:

Q   Tell me once you've had a chance to flip through it, Mr. Kehoe.

A   I have it up.  It's the presentation we just looked at.  Is this a different date?  No. That's March 19.  This is the same one.  Correct?

28 (Pages 106 - 109)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 122

completing the FDA's request for a dog study?

MS. MALINA: Objection.

THE WITNESS: Yes. Because I believe before -- you only have to show long term -- I believe with regards to the FDA, you have to provide long-term safety data at the time you file your NDA.

So you could perform phase one and phase two studies, which in the case of phase two it was a short term.

Phase three would be a longer study, and that's why they would require with the filing long term.

Safety study in this case was the canine studies that they requested.

BY MS. SOLOWAY:

Q Got it. If you look at the last sentence of this -- well, not -- I'll just direct your attention, it's the top of the page right after the one we were just looking at that starts with, "In addition Vanda expects."

A Sorry. You are on -- the same --

Q Yes, the first -- So, there is the press release that says "Vanda announces positive phase two study results," and then carries over onto the

Page 123

next page. See that?

A Yes.

MR. TABAK: I don't know that we gave it an Exhibit Number to this.

MS. SOLOWAY: Sure. Justin, what Exhibit Number should this be?

TECHNICIAN: Currently up as Exhibit 16 in the --

MS. SOLOWAY: Okay. Tab 22 is up as Exhibit 16. Everyone following along?

(Exhibit 16:

Marked for identification.)

BY MS. SOLOWAY:

Q Okay. Good. Mr. Kehoe, did you find where I am directing you to, where it says. "In addition Vanda expects"?

A I did.

Q Okay. I will just read the complete sentence. "In addition Vanda expects to meet with regulatory authorities in the near future to further define and confirm the path forwards toward registration of Tradipitant in the treatment of patients with gastroparesis." Do you see that?

A I do.

Q Do you have any reason, sitting here

Page 124

today, to believe that this statement is inaccurate?

A No.

Q I am going to direct your attention to tab 15 in your binder which we will mark as Exhibit -- what are we up to?

MR. BOUNDS: Seventeen.

MS. SOLOWAY: Seventeen. Thank you.

(Exhibit 17:

Marked for identification.)

A VOICE: Could I have the tab again, please?

MS. SOLOWAY: Of course. Tab 15.

A VOICE: Thank you. It's going up.

BY MS. SOLOWAY:

Q By the way, Mr. Kehoe, with respect to the exhibit we were just looking at, the EK, sitting here today, do you know whether you read that EK at the time it came out?

A I don't recall.

Q Okay. Now, I am looking at tab 15, which we've marked as Exhibit 17.

This is a August 1st Vanda earnings call transcript. Do you see that?

A I do.

Page 125

Q Okay. And sitting here today do you recall whether you listened to this call at that time?

A I don't recall.

Q Do you know whether you ever read this transcript before?

A I don't recall.

Q I want you to flip to -- so now, just to orient you in time, sir, this is August 2018. We were just looking at the announcement of the phase two study in the December, and this is now going back in time to August. Right?

A Okay.

Q We are at page five of the transcript, roughly one-third of the way down. Do you see the paragraph that starts with, "I will now turn to Tradipitant?

A I see that.

Q Okay. Obviously take your time, but I am going to direct your attention to the middle of that paragraph. It says, "The recruitment efforts in Tradipitant gastroparesis clinical study are now working.

"We can now report that as of today 110 patients have been randomized in the study with a

32 (Pages 122 - 125)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 126

number of patients in screening.

"We are now on target to randomize approximately 150 patients and expect to report results by year end."  See that?

A  I do.

Q  In fact, Vanda did report results by year end.  Correct?

A  Yes.

Q  Do you have any reason, sitting here today, to believe that that statement that I just read aloud is inaccurate?

A  No.

Q  All right.  Let's flip to tab 18.  All right.  So this is a Vanda 10Q.  Correct?

A  It is.

Q  Dated November 7, 2018?

MR. BOUNDS:  For the record, this is Exhibit 18.

MS. SOLOWAY:  Thank you, Thomas.

(Exhibit 18:
Marked for identification.)

THE WITNESS:  Okay.

BY MS. SOLOWAY:

Q  Mr. Kehoe, this is the third quarter of 2018 Q.  Correct?

Page 127

A  Yes.

Q  Sitting here today, do you know whether you read this at the time?

A  Don't recall.

Q  I am going to direct your attention to page 24.  Let me know when you are there.

A  I am there.

Q  All right.  So now to orient you in time, we are now in November, right, of 2018.  Correct?

A  Yes.

Q  Page 24 under Operational Highlights, do you see where it says Tradipitant?

A  Yes.

Q  I am going to read a sentence to you.  It says, "Enrollment in the clinical study of Tradipitant and gastroparesis is complete, results are expected by the end of 2018."  Do you see that?

A  I do.

Q  Sitting here today do you have any reason to believe that statement is inaccurate?

A  No.

Q  All right.  Here I am going to have you look at tab 21 in your binder, which we will mark as Exhibit --

MR. BOUNDS:  Nineteen.

Page 128

MS. SOLOWAY:  Thank you.

(Exhibit 19:
Marked for identification.)

MR. BOUNDS:  Tab 21.  Correct?

MS. SOLOWAY:  Yes.

BY MS. SOLOWAY:

Q  Mr. Kehoe, if you are looking at tab 21, Exhibit 19, this is a Vanda Pharmaceutical's call.  I should say the cover says Vanda Pharmaceutical's call.  Correct?

A  Special call?

Q  Yes.

A  Yes.

Q  Okay.  This is dated December 3, 2018?

A  Yes.

Q  That's the date that the phase three gastroparesis results were released.  Correct?

A  Yes.

Q  We just looked at that EK a few moments ago.  Correct?

A  Correct.

Q  Did you -- sitting here today, do you recall whether you participated in a special call on December 3rd?

Page 129

A  Did I listen to it or did I participate in it?

Q  I assume you didn't post it.  Fair enough.  Do you know whether you listened to it?

A  I don't recall.

Q  Okay.  Do you recall whether you've ever read this transcript?

A  I don't recall.

Q  Do you know whether you have ever seen this document before?

A  I don't recall.

Q  I am going to just direct your attention to a couple of things in here.

Let's take a look at page six of the transcript.  So there's a description here of the improvement seen in most of the core gastroparesis symptoms.  Do you see that?  It's about in the middle of that.

A  Three days, is that what you are --

Q  I am going to make sure we are on the same page.  Do you see where that is?

A  Yes.

Q  Is that consistent with your understanding that the trial had demonstrated an improvement in symptoms for patients with gastroparesis?

33 (Pages 126 - 129)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 130

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Q  Okay.  See at the bottom it says, "Finally we believe that if these robust efficacy results with a well tolerated chronic treatment safety profile are further confirmed in future studies, Tradipitant has the potential to become a first line pharmacological option in the treatment of patients with gastroparesis and the first such agent in 40 years."  Do you see that?

A  I do.

Q  Any reason to question the accuracy of that statement?

A  No.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q  It goes on to say, "Detailed results of the study are expected to be presented in our cabin meetings and peer review publications."  Do you see that?

A  I do.

Q  Do you have any basis to question the accuracy of that statement?

A  No.

Page 131

MS. MALINA:  Objection.

MS. SOLOWAY:  What is the basis for your objection?

Actually, you know, forget I asked.  I don't want to invite a speaking objection.  We will just muddle through.

BY MS. SOLOWAY:

Q  Next it says, "We will also be meeting with regulatory authorities in the near future to further define and confirm the path toward registration of Tradipitant in the treatment of patients with gastroparesis."  Do you see that?

A  I do.

Q  Any reason to question the accuracy of that statement?

A  No.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q  In the question and answer on the next page -- let me just ask the question.  It was your understanding, Mr. Kehoe, at this point before Tradipitant could be marketed and sold to patients, it would need to undergo additional testing.  Correct?

A  Correct.

Page 132

Q  Okay.  If you look in the middle of the page, do you see that there is a response by Mihael H. Polymeropoulos?  Do you see that?

A  Yes.

Q  Do you know who Mr. Polymeropoulos is?

A  The CEO.

Q  I am going to read the paragraph, but please take your time, if you need to review the context around it.

It says, "Pete, certainly, we want to continue to evaluate the effectiveness of the drug in the broad population of gastroparetic patients; however, I would say while we have some very good ideas of potential designs and population of patients, we need to spend a little more time understanding these study results but also sit down with key opinion leaders, investigators, and certainly the Food and Drug Administration to find out the fastest to market."

Do you see that?

A  Actually I don't know which paragraph that is.

Q  I am sorry.  I lost you.  I am sorry.  I am on page 11.  I apologize.

A  Okay.  "Pete, certainly," yes I see this

Page 133

now.

Q  Why don't you just take a minute to read where it says, "Pete, certainly," that paragraph, and then I will ask you about it.

A  Okay.

(Pause.)

Q  Have you had a chance to read that paragraph?

A  I did.

Q  In your view is Mr. Polymeropoulos acknowledging that there are still steps that need to be taken before Tradipitant could go to the market?

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Q  What steps is Mr. Polymeropoulos acknowledging would need to happen?

A  He would have to speak to key leaders which are clinicians who generally, I don't, are institutions, investigators, people who conduct the study, clinicians and the FDA to understand the next steps into the design phase three to satisfy the FDA.

Q  You do not interpret Mr. -- well, let me

34 (Pages 130 - 133)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 134

ask you this: Do you interpret Mr. Polymeropoulos' statement to be a representation that the FDA is going to approve Tradipitant?

MS. MALINA: Objection.

THE WITNESS: No.

BY MS. SOLOWAY:

Q Is there anything in this paragraph that we just read together that sitting here today you believe is inaccurate?

MS. MALINA: Objection.

THE WITNESS: No.

BY MS. SOLOWAY:

Q Turn to page 12, please. There is a question here from Esther Rajavelu, R-a-j-a-v-e-l-u. Do you see that? From Oppenheimer?

A (Inaudible) Can you hear me?

Q You are breaking up a little bit. Speak again.

A Yes.

TECHNICIAN: I think we need to go off the record.

VIDEOGRAPHER: Off the record. It's 12:27.

A VOICE: Recording has stopped.

Page 135

(Whereupon, a brief recess was taken from 12:27 o'clock p.m. until 12:29 o'clock p.m.)

VIDEOGRAPHER: Going back on. Time is 12:29.

BY MS. SOLOWAY:

Q We just briefly went off the record to address a technical issue.

Mr. Kehoe, I am going to direct your attention to page 12 of the document that we have been looking at, which is Exhibit -- where are we up to -- 19. Are you on page 12?

A I am.

Q Okay. There is a second question from Esther Rajavelu of Oppenheimer. Do you see where it says, "Okay. Got it"?

A Yes.

Q It states, "Then my last question: Are you, do you anticipate having to do a long-term safety study on the gastroparesis population given the chronic nature of the condition and the treatment?" Do you see that?

A I do.

Q Then Mr. Polymeropoulos says, "Absolutely,

Page 136

it would be very appropriate to do so. And in fact we have a 12-month protocol which we will be implementing shortly." Do you see that?

A I do.

Q Do you have any reason to believe that this is inaccurate?

MS. MALINA: Objection.

THE WITNESS: No.

BY MS. SOLOWAY:

A I am going to have you turn to tab 30, but this is another one of the documents that doesn't have all the pieces, so we will put it up on Exhibit Share. We're up to Exhibit 20.

(Exhibit 20:

Marked for identification.)

BY MS. SOLOWAY:

Q It just came up for me, Mr. Kehoe.

Okay. Tab 30 which is Exhibit 20, just taking a look at this, this is an e-mail dated October 23, 2019, do you see that?

A It's not in the right, I don't see that in the binder under tab 30.

Q No? Okay. You know what, let's use the version -- I apologize. Let's use the version on the screen then.

Page 137

A Okay. I am opening the exhibit now.

Q Sure.

A I see it.

Q I think the problem is that the binder only has the attachment, but not the cover e-mail, sir. I apologize for that.

If you look in the cover e-mail, do you see that this is an e-mail from Ms. Bai?

A I do.

Q October 23, 2019. Correct?

A Yes.

Q Okay. This is another quarterly report for Teamsters. Correct?

A Yes.

Q And the subject line is Rothschild & Co., September 2019, Quarterly Report, Teamsters Local 727. Correct?

A Yes.

Q The attachment to this is the portfolio report for the fourth quarter ending September 30, 2019. Correct?

A Yes.

Q Again, is this a document that you are familiar with from your, performing your responsibilities as an analyst for the small cap

35 (Pages 134 - 137)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 174

reflect your investment thesis as of September 2017?

A   Yes.

Q   Is it fair to say that your investment thesis could have changed between that time and 2019?

A   Yes.

MS. MALINA:  Could we have two minutes off the record?  I want to see if I have anything else.

MS. SOLOWAY:  Give you two minutes.

MS. MALINA:  That is fine.

VIDEOGRAPHER:  Going off the record. The time is 1:53.

A VOICE:  Recording stopped.

(Whereupon, a recess was taken from 1:53 o'clock p.m. until 1:58 o'clock p.m.)

VIDEOGRAPHER:  Back on.  Time is 1:58.

BY MS. MALINA:

Q   Good afternoon, Mr. Kehoe.  Earlier you testified that off-label marketing of a company may have changed your investment thesis; is that right?

Page 175

MS. SOLOWAY:  Objection to form.

THE WITNESS:  Right.

BY MS. MALINA:

Q   Why is that?

A   If I knew it was rampant and it was, say, their main drug, it could impact their financials and their promotion.  Basically it would mean that their sales were overstated because they were generating sales off label, which would be curtailed under an investigation.

However, if it was in a drug that wasn't core to a thesis or core to its financial standing, it would be less relevant from a financial perspective.

And a lot of times these things could be one case so you don't know if it's rampant.  You know, it could be one sales rep or one physician stating that something that went awry.

So you have to understand the details of it.

Q   Is it your understanding that Fanapt and Hetlioz were core drugs of Vanda Pharmaceuticals?

MS. SOLOWAY:  Objection.

THE WITNESS:  They are two commercial drugs.

Page 176

My thesis Fanapt was not a, not a catalyst; was not a -- it was not a reason to own it.  It was about Hetlioz.

MS. MALINA:  I have nothing further.

MS. SOLOWAY:  I have nothing further, either.  Mr. Kehoe, thank you for your time today.  We really appreciate it.

MS. MALINA:  Thank you, Mr. Kehoe.  I wanted to request, and I know we discussed transcripts earlier, we are going to get an expedited transcript.

VIDEOGRAPHER:  Going off the record. This concludes today's deposition.  The time is 2:00 o'clock.

(Whereupon, the deposition was concluded at 2:00 o'clock p.m.)

Page 177

GORDON vs. VANDA PHARMACEUTICALS, et al.
11/11/2021 - MICHAEL KEHOE

ACKNOWLEDGEMENT OF DEPONENT

I, MICHAEL KEHOE, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

MICHAEL KEHOE                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

45 (Pages 174 - 177)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.