# Exhibit 17

# Vanda: In the Land of The Blind, The One-Eyed Man is King

----------------------------------------------------------------------------

aureliusvalue.com/research/vanda-in-the-land-of-the-blind-the-one-eyed-man-is-king/

*"I think they [the public] have a fundamental misunderstanding with how pharmaceutical companies operate".*

*– Martin Shkreli*

IMPORTANT – Please read this Disclaimer in its entirety before continuing to read our research opinion. The information set forth in this report does not constitute a recommendation to buy or sell any security. This report represents the opinion of the author as of the date of this report. This report contains certain "forward-looking statements," which may be identified by the use of such words as "believe," "expect," "anticipate," "should," "planned," "estimated," "potential," "outlook," "forecast," "plan" and other similar terms. All are subject to various factors, any or all of which could cause actual events to differ materially from projected events. This report is based upon information reasonably available to the author and obtained from sources the author believes to be reliable; however, such information and sources cannot be guaranteed as to their accuracy or completeness. The author makes no representation as to the accuracy or completeness of the information set forth in this report and undertakes no duty to update its contents. The author encourages all readers to do their own due diligence.

You should assume that as of the publication date of his reports and research, Aurelius and possibly any companies affiliated with him and their members, partners, employees, consultants, clients and/or investors (the "Aurelius Affiliates") have a short position in the stock (and/or options, swaps, and other derivatives related to the stock) and bonds of Vanda Pharmaceuticals. They therefore stand to realize significant gains in the event that the prices of either equity or debt securities of Vanda Pharmaceuticals decline. Aurelius and the Aurelius Affiliates intend to continue transactions in the securities of Vanda Pharmaceuticals for an indefinite period after his first report on a subject company at any time hereafter regardless of initial position and the views stated in Aurelius' research. Aurelius will not update any report or information on this website to reflect such positions or changes in such positions.

Please note that Aurelius, the author of this report, and the "Aurelius Affiliates" are not in any way associated with Aurelius Capital Management, LP, a private investment firm based in New York, and any affiliates of or funds managed by the latter company.

——-

We are short Vanda Pharmaceuticals (NASDAQ: VNDA).

In recent years, the public markets have witnessed a certain underclass of companies that have chosen to bilk the health care system at the expense of taxpayers and patients. Companies such as MiMedx, Insys, Valeant, and Turning have collectively deployed a playbook of various tactics including reimbursement shenanigans, billing schemes, off-label marketing, price gouging, bribing doctors, and retaliating against whistleblowers and short sellers. Although this playbook can be used to temporarily boost financial performance, inflate stock prices, and create windfall bonuses for

**Exhibit D 0009**
11/5/2021
Steinholt

executives, history demonstrates that companies resorting to this kind of chicanery often end in complete disaster for investors.  Vanda and its CEO, Mihael Polymeropolous, in our opinion, may prove to be the next corporation to have embraced this ethos.

While Vanda shares surged to all-time highs in recent months, detailed but anonymous allegations of illegal sales practices and outright criminality quietly gathered steam on an industry message board named CafePharma. Meanwhile, Vanda experienced a mass exodus of employees, with authority over key departments reportedly being transferred to the CEO's children and new hires lacking experience.

Now, a 150 page Qui Tam lawsuit (here) filed by a whistleblower was recently unsealed with detailed allegations that Vanda has engaged in a series of fraudulent schemes, some personally orchestrated by Polymeropoulos himself, to defraud government payors.  The allegations describe illegal off-label promotion of both of Vanda's drugs, Vanda's participation in a fraud involving doctors writing hundreds of "fake prescriptions" and pocketing cash using Vanda-issued copay cards, falsified documents in internal systems, and resignations of senior executives who refused to participate in illegal activity.

These new allegations amplify the findings from our own months-long investigation which yielded evidence of significant irregularities.  They also corroborate certain allegations made by multiple former employees in private calls who described off-label promotion, suspect business practices, and internal turmoil that continued well after the whistleblower's departure.

At a current valuation of around 5x trailing sales, Vanda investors are paying a significant "blue sky" premium for projected future growth.  We believe investors fundamentally misunderstand the true nature of Vanda's activities and therefore see significant downside potential in the shares.

**Recently Unsealed Qui Tam Suit Alleges Vanda Engaged in Fraudulent Schemes**

This undisclosed and previously unreported lawsuit is one of the most expansive and detailed whistleblower writings we have come across.  The whistleblower, Richard Gardner, has over 20 years of pharmaceutical experience and left Pfizer to become a Regional Business Leader at Vanda from November 2015 to August 2016.  The lawsuit depicts Vanda as having a sell-at-all costs culture that relied on **illegal sales tactics and even <u>outright fraud</u> out of concern for the company's stock price.**

sales expectations. Relator believes that Vanda's unwillingness to adjust its internal sales estimates was because Vanda feared such action would cause its stock price to drop. According to Relator, in discussing the Indiana coverage change, he requested that these prescriptions be removed from the sales goal. Ramirez stated that no change would be made because Vanda "already gave the sales expectation number to the Street, and it is not changing." Relator took this to mean that the sales expectation figures had already been provided to analysts on Wall Street, and if Vanda was to lower that number it would cause a drop in stock price.

Note: U.S.D.C., D.C. Case 1:17-cv-00464-APM, Unsealed January 31, 2019. Investors should assume that Vanda denies all allegations in the lawsuit.  We believe most investors are not aware of this lawsuit because the filing date is 2017, which disguises that it was recently unsealed. We also note that the government declined to intervene in the case. The government declines to intervene in the vast majority of cases and, in our experience, this does not necessarily reflect a judgement of the merits.

Vanda has grown by selling two drugs, Fanapt and Hetlioz, that had previously been cast off by larger companies. Both drugs have narrow FDA approved indications that severely limit their respective potential patient populations and therefore also limit Vanda's on-label revenue potential.  To juice sales, the whistleblower states that Vanda's senior management implemented a plan to illegally promote both drugs for off-label purposes and alleges that, as a result of fraudulent reimbursement claims, "the government has been defrauded and suffered a substantial loss".

One former top-performing sales employee we spoke to explained that Fanapt, which accounts for just over 40% of Vanda's sales, "was a dud" because it is a second line drug approved solely to treat adult schizophrenia as compared to competitive antipsychotics which have much broader indications. To increase sales of Fanapt, the whistleblower states that Polymeropoulos crafted off-label messaging himself and trained sales reps to promote the drug for other indications using a variety of false claims regarding Fanapt's efficacy, dosing, and safety. We note that several months ago, Vanda received a Warning Letter from the FDA instructing the company to immediately cease misbranding its drug with "false and misleading marketing materials" that failed to warn about the safety risks of Fanapt and Hetlioz.

The lawsuit states that Vanda falsified documents relating to physician target lists in company systems that "*were a joke and were designed solely to shield Vanda from liability*".  Instead, according to the complaint, sales reps were directed to target physicians prescribing drugs for other mental disorders as well as child psychologists, even though Fanapt has no FDA approval for children, according to the complaint.

90. According to Relator, the target lists were a joke and were designed solely to shield Vanda from liability. Specifically, every provider on the target list had at least two or three schizophrenia patients. In fact, in November 2015, Head of Sales, Ramirez, told the RBLs, including Relator, that the target lists Vanda provided were just "for show" and in place just in case Vanda was ever questioned about off-label promotion. *Ramirez further stated that if the Company was ever questioned about off-label promotion, it could just show the target lists as proof that the Company only encouraged sales representatives to target physicians treating schizophrenia patients.*

The complaint also states that Vanda even actively participated in and attempted to conceal a **fraudulent scheme involving doctors writing hundreds of "*fake prescriptions*" and then submitting Vanda-provided copay cards to pocket cash, which we interpret as a method of bribing doctors:**

152. Relator then followed up with Ramirez regarding this issue. Ramirez conceded that the increase in prescriptions was the result of a fraudulent scheme between the physicians and local pharmacists to submit hundreds of Fanapt copay cards and prescriptions, receive reimbursement from the insurance provider, and then pocket the money because the prescriptions were never dispensed. Ramirez instructed Relator not to discuss the matter with anyone and not to email him or anyone else about the issue. Further, in regards to Harris, Ramirez stated, "we are removing [Harris] from the account. The less she knows the better." Vanda was an active participant in this scheme. According to Relator, Fanapt copay cards can only be provided by a Fanapt sales representative or manager. Therefore, in order for these physicians to obtain such a large quantity of copay cards, Vanda must have supplied the copay cards and subsequently sought to cover it up after others took notice. And, as Fanapt's copay cards can be used by Medicare and Medicaid, which itself is a violation, the payments for these fake prescriptions were incurred by the Government.

Fanapt sales have since stagnated in favor of Hetlioz, a $188k/year orphan drug that treats Non-24, an extremely rare sleep disorder that primarily effects blind people who have no perception of light. Investors have pinned their hopes to the growth prospects of Hetlioz, with one sell side analyst projecting a "base case" of $470M in Hetlioz sales by 2033 with an Upside scenario of *$608 million* (as compared to just over $100 million in trailing sales today).

Our research indicates that Vanda has had an extremely difficult time attracting and keeping blind patients on Hetlioz, the population the drug was tested on and designed to treat. In order to meet growth targets, we believe Vanda's "secret sauce" is a product of Polymeropoulos harnessing the Fanapt sales force to begin selling Hetlioz to psychiatrists as a sleep aide alternative to Ambien and Lunesta for sighted patients.   The principal problem is that taxpayers appear to be on the hook for Polymeropoulos' alleged shenanigans.

Non-24 is so rare that Vanda had to cut patient enrollment of its FDA trials of Hetlioz in half because it could not identify enough patients with the condition.  This makes it exceedingly difficult for Vanda to sell Hetlioz to patients with Non-24, which one former rep described as the classic "needle in the haystack" exercise. After launch in 2014, Vanda's strategy was centered on building awareness by sending sales reps to blind community centers and running tv and radio spots to target friends and family members, an effort that initially appears to have been somewhat fruitful.

But our research also indicates that Hetlioz has unfavorable levels of front-end patient churn, meaning patients who begin treatment often drop off in the first six months.  One explanation is that the drug simply doesn't work very well for some patients.  Although commentary from people we spoke to about the drug's efficacy was mixed, a former manager stated:

*"[Patients] might have stayed on the drug [Hetlioz] for three or four months, and there's probably some that are still on it from initial launch.  The others, there was big turnover….because of efficacy, I would think"*

We also examined data from the FDA Adverse Event Reporting System ("FAERS"), which contains information on medication error reports submitted to the FDA.  **The single most frequently reported adverse event is the complaint of "drug ineffective"** which, when combined with similar complaints about efficacy, totals 888 complaints since 2014, an amount which exceeds the number of patients currently on Hetlioz.  In fact, questions about Hetlioz's efficacy date back to 2013, when Health Care columnist Adam Feuerstein identified "a disturbingly large number of irregularities and red flags" related to Vanda's clinical trials of Hetlioz.



Source: FAERS Public Dashboard

Validation in the Land of The Blind, The One-Eyed Man is King

One former employee suggested that elevated reports of the drug being ineffective reflect the increased off-label usage: "*That's what happens when you write it for a diagnosis that's imaginary, it's not going to work*".

Churn and efficacy issues would be problematic for any drug, but especially an orphan drug that most patients are supposed to use on a chronic basis.  In fact, Vanda's CEO, Dr. Mihael Polymeropoulos, initially touted the patient persistence of Hetlioz, stating in October 2014 that:

*"the guidance we're giving is that from new scripts in, the long-term expectation is, at least more than half the patients will become chronic patients."*

Yet in February 2015 Vanda announced it "will no longer report the number of HETLIOZ prescriptions written, dispensed or patients on therapy". We question if the decision to eliminate this transparency was made because Hetlioz patient persistence was beginning to deteriorate.

Vanda quickly moved to begin extracting more money from predominantly government payors through aggressive Hetlioz price increases. Since its commercial launch in 2014, we calculate that Vanda has raised Hetlioz pricing from $84k/year to roughly $188k/year at present (below).  With Hetlioz costing more than many life-saving cancer drugs, one former sales manager observed that Polymeropoulos "**_was so proud he was gouging people for this product_**".

| Date | Hetlioz WAC Pricing | Y/Y% |
|---|---|---|
| 3/11/14 | $84,231 | - |
| 1/19/15 | $97,287 | 15.5% |
| 5/7/15 | $112,366 | 15.5% |
| 8/25/15 | $134,727 | 19.9% |
| 1/1/16 | $148,200 | 10.0% |
| 1/1/17 | $160,056 | 8.0% |
| 1/1//18 | $174,461 | 9.0% |
| 1/1/19 | $188,418 | 8.0% |
| **Price increase since launch** | | **123.7%** |

We believe that Vanda eventually began running out of enough blind patients to replace the ones churning off Hetlioz.  Vanda pivoted to begin targeting sighted patients through the "HETLIOZ to Psychiatrists initiative" ("HPI") formally announced by Vanda in 2017, whereby the Fanapt sales force would begin selling Hetlioz.

Vanda stated last year that at least *2 out of every 3* prescriptions now come from Psychiatrists for sighted patients.

We find this particularly curious because instances of non-24 in sighted patients are widely believed to be even more rare than in blind patients. Vanda's 10-K filed in 2017 recognized that "*non-24 occurs almost entirely in blind individuals*", before this language was abruptly changed in the 2018 filing. An experienced sleep doctor who has prescribed Hetlioz stated on a private call that he was "flabbergasted" to learn about Vanda's initiative to target Psychiatrists and explained that Non-24 in

sighted patients is *"as rare as angels on the head of a pin"*.  An article in a medical journal states **"there have been fewer than 100 cases of sighted people with Non-24 sleep-wake disorder reported in the scientific literature"**.

### *So how is it possible that so many sighted patients could suddenly develop non-24?*

Our discussion with former employees and a sleep doctor support the whistleblower's assertion that Vanda is engaging in off-label marketing of Hetlioz as a sleep aid. A former sales rep we spoke to explained that *"We were [internally] saying 'give it to everyone who doesn't sleep well'"*.  The sleep doctor opined that *"they are prescribing this off label and calling it's something it's not. I'll tell you that, Absolutely."*

A former sales manager explained *"basically the training was creating the story or creating the plausible idea that this could be happening really commonly in our psychiatry office"*. The whistleblower lawsuit alleges that Vanda's off-label marketing pitch was premised, in part, on Hetlioz not being classified as a schedule drug by the FDA.

158.  Polymeropoulos also told the RBLs that psychiatrists would connect the dots and easily determine that if Hetlioz treats circadian rhythm disruption in Non-24 that it would also be able to treat their non-blind patients with other sleep disorders caused by circadian rhythm disruption, such as shift work sleep disorder, jet lag, and insomnia. According to Relator, the RBLs and sales representatives were to focus on Hetlioz's ability to treat circadian rhythm compensation plans.  Further, the RBLs stated that many of the providers that sales representatives call on do not have any blind patients.  Ramirez responded that the sales representatives' job security was compensation for promoting Hetlioz and insisted that it was mandatory that they promote this drug on every sales call. Ramirez continued that in promoting Hetlioz to providers, sales representatives should focus on the fact that Hetlioz, unlike most other sleep aides, was not classified as a schedule drug by the FDA. In this way, Vanda was able to differentiate Hetlioz from other sleep aides.

We note that Vanda's off-label activities directly contradict Polymeropoulos own testimony to the FDA in November 2013, when he told the agency *"for patients that don't have non-24, we don't recommend it, and it's actually easy to keep the drug only in the hands of blind people"*.

Now, for patients that don't have non-24, we don't recommend it, and it's actually easy to keep the drug only in the hands of blind people, given first of all the recognized condition of blindness and, two, the closed distribution system we have.

Source: Hetlioz FDA Advisory Committee Meeting Transcript, November 2013

Since there were only around 700 patients on Hetlioz at the end of 2017, each incremental patient is extremely valuable for Vanda. Former sales reps told us that Vanda began offering them $1k for each Hetlioz prescription they were able to get a Psychiatrist to write (regardless if it was eventually filled). One former rep informed us that some Vanda employees were able get friendly doctors in certain regions to fax a highly abnormal number of prescriptions.  We also reviewed a sell side research report that suggests a select number of psychiatrists are responsible for an outsized number of prescriptions. The same former rep asked us:

"*Look across the country, how come one guy can have 50, 60, 70, 80 [Hetlioz prescriptions] and a whole state can only have three?…Do they have 70 more blind people, all in one little-pocketed area, coming from one or two doctors, three blocks from each other*"?

The whistleblower suit also states that employees were threatened with termination unless they engaged in the illegal activity.  Vanda's Director of Marketing and the Chief Compliance Officer resigned after "CEO Polymeropoulos refused to alter the marketing strategy", according to the complaint:

side effect was the main focus of the marketing strategy. However, despite Holland's protests, CEO Polymeropoulos refused to alter the marketing strategy, and as a result Holland resigned in January 2016 along with Thomas Gibbs, Vanda Senior Vice President and Chief Compliance Officer. Vanda subsequently removed the sales piece in March 2016, leaving the sales force without any marketing materials for several months. However, even though the marketing piece was removed, sales representatives were still instructed to continue marketing Fanapt in the same manner.

Vanda appears to have experienced a mass employee exodus since Polymeropoulos' announcement of the so-called HPI initiative. Our review of Linkedin found that 87 people have left Vanda since the beginning of 2017 (below), which amounts to 31% of the 273 total employees Vanda had as of

December 2017. One employee stated he/she left because "*Offloading the drug to patients that don't have the disorder…I couldn't do it, ethically*". Departures include high level staffers from compliance, sales, and operations such as Richard Gulino Vanda's General Counsel and Paolo Baroldi, Vanda's Chief Medical Officer.  We also confirmed an undisclosed mass purge of at least 29 sales representatives occurred in the summer of 2018.

### Vanda's Mass Employee Exodus

| Position | Start | Finish | Position | Start | Finish |
|---|---|---|---|---|---|
| Account Manager | 2014 | 2017 | Neuroscience specialty Rep | 2016 | 2018 |
| Account Manager | 2014 | 2017 | Neuroscience specialty Rep | 2017 | 2018 |
| Account Manager | 2014 | 2017 | Neuroscience specialty Rep | 2017 | 2018 |
| Account Manager | 2015 | 2018 | Neuroscience specialty Rep | 2017 | 2018 |
| Account Manager | 2016 | 2018 | Neuroscience specialty Rep | 2017 | 2018 |
| Admin Assistant | 2017 | 2018 | Neuroscience specialty Rep | 2017 | 2018 |
| Analyst | 2017 | 2017 | Neuroscience specialty Rep | 2017 | 2017 |
| Associate Clinical Manager | 2016 | 2017 | Neuroscience specialty Rep | 2017 | 2018 |
| Associate Director | 2012 | 2018 | Neuroscience specialty Rep | 2017 | 2018 |
| Associate Director | 2015 | 2017 | Neuroscience specialty Rep | 2017 | 2017 |
| Associate Director, Clinical Development | 2011 | 2017 | Neuroscience specialty Rep | 2017 | 2018 |
| Associate Director, Clinical Development | 2015 | 2018 | Neuroscience specialty Rep | 2017 | 2018 |
| Associate Manager | 2015 | 2017 | Neuroscience specialty Rep | 2017 | 2017 |
| audit | 2018 | 2018 | Neuroscience specialty Rep | 2017 | 2018 |
| Clinical | 2017 | 2018 | Neuroscience specialty Rep | 2017 | 2018 |
| Clinical Data manager | 2017 | 2018 | Neuroscience specialty Rep | 2017 | 2018 |
| Clinical Development Director | 2016 | 2017 | Neuroscience specialty Rep | 2017 | 2017 |
| Clinical Informatics | 2012 | 2018 | Neuroscience specialty Rep | 2017 | 2017 |
| Clinical Pharmacist (reimbursement/market access) | 2016 | 2018 | Neuroscience specialty Rep | 2017 | 2018 |
| Clinical trial Associate | 2014 | 2017 | Neuroscience specialty Rep | 2017 | 2018 |
| Director of clinical development | 2010 | 2017 | Neuroscience specialty Rep | 2017 | 2017 |
| Director of Commercial Finance | 2015 | 2017 | Neuroscience specialty Rep | 2017 | 2018 |
| Director of HR | 2016 | 2018 | Product Manager, marketing | 2010 | 2017 |
| Health Education & Outreach Manager | 2015 | 2017 | QA/GMP Manager | 2017 | 2018 |
| Health Education & Outreach Manager | 2015 | 2017 | R&D Scientists | 2016 | 2018 |
| HR | 2016 | 2017 | Regional Business Leader | 2015 | 2018 |
| HR Generalist | 2015 | 2018 | Regional Business Leader | 2017 | 2018 |
| Key Account Manager Rare Disease | 2016 | 2017 | Regional Business Leader | 2017 | 2018 |
| Marketing Operations Manager | 2015 | 2017 | Regional Nurse Educator | 2016 | 2017 |
| Medical Affaires | 2018 | 2018 | Regional Nurse Educator | 2017 | 2017 |
| Medical Director (germany) | 2016 | 2017 | Regional Sales Director | 2014 | 2017 |
| Medical Science Liaison | 2015 | 2017 | Regulatory & medical affaires director | 2015 | 2017 |
| Medical Science Liaison | 2015 | 2017 | Sales Director | 2014 | 2017 |
| Medical Science Liaison | 2016 | 2017 | Sales Director | 2017 | 2018 |
| National Sales Rep | 2017 | 2018 | Sales Rep | 2017 | 2018 |
| Neuroscience specialty Rep | 2015 | 2017 | Senior Director (Fanapt) | 2016 | 2017 |
| Neuroscience specialty Rep | 2015 | 2018 | Senior Director Marketing | 2016 | 2017 |
| Neuroscience specialty Rep | 2015 | 2018 | Senior Director, Medical Affairs | 2013 | 2017 |
| Neuroscience specialty Rep | 2015 | 2018 | Senior VP/General Counsel | 2015 | 2018 |
| Neuroscience specialty Rep | 2015 | 2018 | Specialty Sales Rep | 2017 | 2018 |
| Neuroscience specialty Rep | 2015 | 2018 | Sr. Clinical Research Associate | 2010 | 2017 |
| Neuroscience specialty Rep | 2016 | 2018 | Territory Manager | 2017 | 2017 |

Source: Internal Review of Linkedin

Former employees also explain that Polymeropoulos has turned Vanda into an increasingly nepotistic organization by transferring authority of key departments to his children.  Former employees we spoke to described how seasoned professionals were jettisoned in favor of newly hired reps lacking

experience. A different former employee observed, "*it's going to save him [Polymeropoulos] money, but also is it because they don't know anything and he can mold them into doing what he wants them to do*?".   One former employee explained "*once you start challenging Mihael*", "*your days are numbered*".   Similar sentiments pointing to internal turmoil and corruption at Vanda have repeatedly appeared on Glassdoor, a website where employees anonymously review companies.



## Are Taxpayers on the Hook For Vanda's Alleged Fraud?

Insurance payors appear to be denying HETLIOZ prescriptions for sighted patients in great numbers, something that Vanda has even conceded in recent conference calls.  Multiple former employees have told us that virtually all prescriptions would automatically be rejected for reimbursement for sighted people by commercial insurers. This is consistent with numerous insurance forms we reviewed (example from BCBS Arizona below), that state that all patients must be completely blind. We also note that Vanda does very little business in Europe, where total blindness is a requirement for reimbursement.

**Criteria:**

➤ **Criteria for initial therapy:** Hetlioz (tasmelteon)  is considered *medically necessary* and will be approved when **ALL** of the following criteria are met :

1.  Request is from a Specialist in Sleep Disorders

2.  Individual is 18 years of age and older

3.  A confirmed diagnosis of Non-24-hour sleep wake disorder in an individual who is totally blind with no light perception
    - Diagnosis is supported by **ONE** of the following:
      - Measurement of urinary melatonin levels
      - Actigraphy performed for ≥ 1 week plus evaluation of sleep logs recorded for ≥ 1 month

4.  Individual has failure, contraindication or intolerance to **ALL** the following preferred step therapy agents:
    - Preferred step therapy agents include: (used nightly at same time, not on an as needed basis)
      - Timed melatonin
      - Timed Rozerem (ramelteon)

A former employee explained the difficult and labor-intensive process of getting prescriptions approved:

*You'd have to prove– through the appeals process, you would have to document that other formulary agents have been tried, and failed, and that there's no other formulary alternative. I wouldn't think it would be the– it wouldn't be the first drug that they would try. It would have to be a most likely last resort. Also, through the mechanism of action, was there another agent that had the same mechanism of action that, actually, they tried and failed? You really would have to document that the patient has Non-24 …. I, personally, don't understand how you get Non-24 if you're sighted.*

<u>*So, who is providing reimbursement for sighted patients?*</u>

We note that the core allegation of the Qui Tam suit is that Vanda is "<u>has submitted and/or caused to be submitted false or fraudulent claims to Medicare</u>":

> 165.    As described above, Defendant has submitted and/or caused to be submitted false or fraudulent claims to Medicare, Medicaid, and TRICARE by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government).

While many unanswered questions remain, we have three primary observations on this topic:

1. We believe it's likely easier for Vanda to obtain reimbursement for sighted Hetlioz patients from Medicare than for commercial payors. Vanda's SEC filings recognize that a "significant portion" of its business comes from government payors (10-k page 21). Medicare reimbursement standards for Hetlioz appear to be more lax than those applied by commercial payors.  For instance, in contrast to commercial payors, one Medicare prior authorization form we reviewed does not have a stated mandate for blindness.

2. Vanda has made the unusual move of internalizing its hub. Expensive specialty drugs like Hetlioz necessitate the use of what is commonly known as a reimbursement hub, corporate speak for the function that assists patients with getting their prescriptions filled and reimbursed (see here). Most manufacturers utilize the services of an externally run hub, which we are informed Vanda did until on or about 2017 when it <u>brought this function in-house.</u> Vanda's move to internalize the hub is rare because it brings into play significant regulatory risks and opens the door for potential abuse in the prescription fulfillment and reimbursement process.  For example, an expert quoted in an industry article explains:

> "*internal hubs need to be set up with a complete separation from sales/marketing*" , "*and I'm talking about secured offices with keypad access and the like. Some pharma companies don't want to go this route just because of the risks it creates*".
>
> That's why we are troubled by persistent (but unverified) allegations on Cafepharma related to misconduct involving Vanda's hub:





3. Documents indicate that Vanda has donated money to a non-profit named Patient Services Incorporated ("PSI"), which provides financial assistance to patients with "Circadian Rhythm Disorder". A former sales rep stated that most Vanda patients do not pay any money because the co-pays are covered by a foundation, although no former employee we spoke to was able to recall the name of the foundation used by Vanda. We believe this relationship introduces another risk for investors. We note that in 2017, PSI was referenced by the Department of Justice in criminal and civil charges brought against Aegerion Pharmaceuticals that resulted in a guilty plea. The DOJ stated that Aegerion was engaging in off-label promotion and **"funneling funds through Patient Services, Inc., an entity that claimed to be a non-profit patient assistance organization**" in violation of Anti-Kickback Statute.

In a deferred prosecution agreement to resolve a felony charge that Aegerion conspired to violate HIPAA, 42 U.S.C. §§ 1320d-6(a) and 1320-6(b)(3), Aegerion admitted that it conspired to obtain patients' personally identifiable health information, without patient authorization, for commercial gain. Under the terms of the deferred prosecution agreement, Aegerion will implement enhanced compliance provisions, including periodic certifications to the government concerning its implementation of those provisions.

Under the civil false claims settlement, Aegerion will pay $28.8 million over three years to resolve federal and state civil liability for causing false claims for Juxtapid to be submitted to government health care programs (Medicare, Medicaid, and TRICARE) arising from its promotion of Juxtapid for patients without a diagnosis of, or consistent with, HoFH; false and misleading statements to doctors that the use of Juxtapid was appropriate in patients with symptoms including high cholesterol, irrespective of whether such patients had a diagnosis of HoFH and despite counter-indications to a diagnosis of HoFH; and alteration or falsification of statements of medical necessity and prior authorizations that were submitted to federal health care programs. The government further alleged that Aegerion defrayed patients' copayment obligations for Juxtapid, in violation of the Anti-Kickback Statute (AKS), by funneling funds through Patient Services Inc. (PSI), an entity that claimed to be a non-profit patient assistance organization. The federal share of the $28.8 million civil false claims settlement is $26.1 million and the state portion is $2.7 million.



**We See Significant Downside Potential in Vanda Shares**

Last week, Vanda shares plummeted after the company made a bizarre announcement that it was suing the FDA to lift a partial clinical hold on its flagship pipeline drug, Tradipitant. Now, fraud allegations relating to Vanda's sales activities have exploded to the surface in a recently unsealed lawsuit.

At a current valuation of around 5x trailing sales, Vanda investors are paying a significant "blue sky" premium for projected future growth.  We believe investors fundamentally misunderstand the true nature of Vanda's activities and therefore see significant downside potential in the shares.

*All investors are encouraged to conduct their own due diligence into these factors.*