UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————— x

KENNETH GORDON, Individually and on
Behalf of All Others Similarly Situated,

                   Plaintiff,

    vs.

VANDA PHARMACEUTICALS, INC. and
MIHAEL H. POLYMEROPOULOS,

                 Defendants.

———————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:19-cv-01108-FB-LB

<u>CLASS ACTION</u>

Hon. Frederic Block

REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF LEAD
PLAINTIFF'S MOTION FOR CLASS
CERTIFICATION

# REDACTED PURSUANT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT .........................................................................................................3

      A.    Defendants Have Failed to Prove A Complete Lack of Price Impact ....................3

            1.    The Legal Standards Governing Defendants' Deficient Price
                  Impact Argument ......................................................................................3

            2.    Defendants Ignore *Halliburton II*'s Market Efficiency Definition..............5

            3.    Defendants Do Not Submit Any Admissible Evidence for Their
                  Deficient Price Impact Argument ...............................................................7

            4.    Defendants Mischaracterize the Aurelius Report ......................................11

            5.    Defendants' "Generic" Argument Fails......................................................13

            6.    Defendants Submit No Proof for Their Argument that Only Non-
                  Fraud Related Information Caused Vanda's Stock Price Decline on
                  February 11, 2019 ......................................................................................15

      B.    Defendants' Class Definition Arguments Regarding Teamsters'
            Tradipitant Allegations Are Improper ..................................................................16

            1.    The Complaint Clearly Delineates the Time Period for Teamsters'
                  Tradipitant Allegations ..............................................................................18

            2.    Defendants' Materiality and Falsity Arguments Fail.................................18

            3.    The Time Period for the Tradipitant Allegations Is A Common
                  Question that Predominates .......................................................................20

      C.    Defendants' *Comcast* Arguments Are Premature..................................................21

            1.    Class-Wide Proof of Damages Is Not Required to Show
                  Predominance..............................................................................................21

            2.    Defendants' Criticisms of the Damages Model Are Unavailing and
                  Inappropriate for Resolution at Class Certification ..................................22

                  a.    Confounding Information ...............................................................22

                  b.    Inflation Over Time .......................................................................23

**Page**

c.      Materialization of Risks ...................................................................24

III.     CONCLUSION ..........................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..................................................................................................7

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................ *passim*

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ...............................................................................9, 10

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ..................................................................... *passim*

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011).....................................................................20

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...................................................................................2, 21, 23, 24

*Cooper v. Thoratec Corp.*,
2018 WL 2117337
(N.D. Cal. May 8, 2018) .............................................................................................9

*Erica P. John Fund, Inc. v. Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) .........................................................................10

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021)..............................................................................2, 4, 14, 15

*Gordon v. Vanda Pharms. Inc.*,
2021 WL 911755 (E.D.N.Y. Mar. 10, 2021)....................................................14, 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)........................................................................................ *passim*

*In re Allergan PLC Sec. Litig.*,
2021 WL 4077942
(S.D.N.Y. Sept. 8, 2021)................................................................................ *passim*

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ....................................................................................3

*In re Bank of Am. Corp. Sec. Deriv. and Emp. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012)..............................................................................17

**Page**

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
   2021 WL 5826285
   (S.D.N.Y. Dec. 8, 2021)......................................................................................................15

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008)...................................................................................22

*In re Petrobras Sec. Litig.*,
   862 F.3d 250 (2d Cir. 2017)...................................................................................................5

*In re SAIC, Inc. Sec. Litig.*,
   2014 WL 407050
   (S.D.N.Y. Jan. 30, 2014).....................................................................................................16

*In re SandRidge Energy, Inc. Sec. Litig.*,
   2019 WL 4752268
   (W.D. Okla. Sept. 30, 2019) ...............................................................................................21

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015)...................................................................................19

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084
   (S.D.N.Y. July 10, 2019) ...............................................................................4, 20, 22, 24

*In re SunEdison, Inc. Sec. Litig.*,
   329 F.R.D. 124 (S.D.N.Y. 2019) .......................................................................................16

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) .......................................................................................17

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)..................................................................................................20

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) .........................................................................................24, 25

*Meyer v. Jinksolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014)................................................................................................19

*Oklahoma Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)...................................................................................19

**Page**

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453
    (S.D.N.Y. Jan. 26, 2021)...............................................................................................24

*Pelletier v. Endo Int'l PLC*,
    338 F.R.D. 446 (E.D. Pa. May 20, 2021) ...................................................................20

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018)...........................................................................4, 22, 24

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)........................................................................................21

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)..........................................................................................21

*U.S. ex rel. Simpson v. Bayer Corp.*,
    2013 WL 4710587
    (D.N.J. Aug. 30, 2013).................................................................................................12

*Vanda Pharms., Inc. v. FDA*,
    436 F. Supp. 3d 256 (D.D.C. 2020) ............................................................................18

*Villela v. Chem. & Mining Co. of Chile Inc.*,
    2019 WL 4631530
    (S.D.N.Y. Sept. 24, 2019)............................................................................................21

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)................................................................................ *passim*

*Willis v. Big Lots, Inc.*,
    242 F. Supp. 3d 634 (S.D. Ohio 2017) .......................................................................21

**STATUTES, RULES AND REGULATIONS**

31 U.S.C.
    §3730..........................................................................................................................9, 11

**Page**

Federal Rules of Civil Procedure
    Rule 12(b)(6)............................................................................................16, 17
    Rule 23 ......................................................................................... *passim*
    Rule 23(a)...............................................................................................16, 25
    Rule 23 (b) ........................................................................................................7
    Rule 23(b)(3)...............................................................................16, 18, 25
    Rule 23(g) ...........................................................................................................25

Federal Rule of Evidence
    Rule 702 ...............................................................................................................3

Local Civil Rule
    Rule 6.3 ...............................................................................................................16

Private Securities Litigation Reform Act of 1995 ("PSLRA")
    Pub. L. No. 104-67, 109 Stat. 737 (1995)..............................................16

## I.    INTRODUCTION

Defendants[1] do not oppose the appointment of Teamsters as the Class Representative or Robbins Geller as Class Counsel.  Nor do Defendants contest that: (i) each of the *Cammer* and *Krogman* factors show that Vanda's common stock traded in an efficient market; (ii) the *Basic* presumption of reliance applies to Teamsters' Tradipitant allegations; or (iii) superiority is met.

Instead, Defendants raise three disparate arguments in opposition, each of which lacks merit.  ***First***, Defendants try – and fail – to prove a complete lack of price impact for the February 11, 2019 corrective disclosure associated with the Fanapt and Hetlioz allegations (the Aurelius Report), which would render the *Basic* presumption inapplicable for that theory.  Among the many infirmities with this argument is Defendants' use of the wrong market efficiency definition, which contravenes the Supreme Court's holding that stock prices reflect "most publicly announced material statements about companies[.]"  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) ("*Halliburton II*").  In violation of this standard, Defendants inaccurately argue that all information that is theoretically publicly accessible – regardless of whether it was "publicly announced" to investors – is immediately impacted into a company's stock price.  That is wrong.

Moreover, Defendants rely on mischaracterizations of the Aurelius Report and the reports submitted by Teamsters' expert, Steinholt, to inaccurately portray the type of information that was announced to investors before February 11, 2019.  Critically, Defendants' expert – Dr. Stulz – and

---

[1] Capitalized terms not otherwise defined have the same meanings ascribed to them in Teamsters' Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification ("Pltf. Mem."), dated October 29, 2021, and in Defendants' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification ("Def. Opp."), dated December 1, 2021.  References to "Pltf. Ex." are to the exhibits in the Declaration of Michael G. Capeci, dated October 29, 2021, and the accompanying Reply Declaration of Michael G. Capeci, dated January 7, 2022.  References to "Def. Ex." are to the exhibits in the Declaration of Audra J. Soloway, dated December 1, 2021. All citations and internal quotations are omitted and all emphasis is added unless otherwise noted.

Steinholt agree that there was no public announcement of Vanda's alleged off-label marketing scheme as described in the Qui Tam Complaint before February 11. And Defendants ignore, among other things, that the Aurelius Report described the Qui Tam Complaint as new information of which investors were previously unaware. Recognizing these obvious deficiencies, Defendants rely on the recent *Goldman* decision from the Supreme Court to make an illogical front-end price impact argument that Dr. Stulz admits he is not asserting. At bottom, Defendants do not completely disprove price impact for the February 11 corrective disclosure, as they must.

*Second*, in a thinly-veiled effort to re-litigate the denial of their motion to dismiss, Defendants argue that the time period associated with Teamsters' Tradipitant allegations is unclear and requires re-assessing which statements in the Complaint are actionable. This ignores that the Complaint clearly defines this time period – August 1, 2018 to February 6, 2019 – which Defendants have acknowledged numerous times during this litigation. Defendants then rely upon a distortion of the admissions made by Vanda in the FDA Litigation regarding Study 2301 – the study that is the subject of all the challenged misstatements and omissions – to improperly re-argue liability for all pre-December 3, 2018 statements and omissions. Among other deficiencies, Defendants fail to address their pre-December 3 violations of Items 303 and 503, and admit that at least some statements – those from December 3 – should be included in the class definition.

*Finally*, Defendants raise loss causation and damages arguments under *Comcast* that: (i) are inappropriate for resolution on a Rule 23 motion; (ii) rely upon a fundamental misunderstanding of the proposed damages model offered by Steinholt; and (iii) ignore the uniform rejection by courts in this Circuit of these types of challenges.

II.    ARGUMENT

A.    **Defendants Have Failed to Prove A Complete Lack of Price Impact**

Relying only on their expert's inadmissible suspicions and no event study of their own[2] – "the sine qua non for proving or disproving price impact" (*In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020)) – Defendants argue that they have completely disproven price impact for the February 11, 2019 corrective disclosure alleged by Teamsters.  Def. Opp. at 17-33.

Importantly, Defendants and Dr. Stulz do not attempt to disprove price impact for the corrective disclosure on February 6, 2019 that pertains to the Tradipitant allegations.  Def. Ex. 3 at 53:9-56:19; Def. Opp. at 17-33.  Their concession is unsurprising because Steinholt's event study shows that this corrective disclosure caused a statistically significant decline in Vanda's stock price on February 6, meaning the *Basic* presumption of reliance indisputably applies to this portion of Teamsters' claims.  Pltf. Ex. A at ¶¶44-45.  Steinholt's event study also shows a statistically significant decline in Vanda's common stock on February 11, when the Aurelius Report first announced the alleged off-label marketing scheme for Fanapt and Hetlioz.  *Id.* at ¶¶46-47.  Defendants do not dispute Steinholt's event study findings.  *See* Def. Opp. at 19-20.

1.    **The Legal Standards Governing Defendants' Deficient Price Impact Argument**

Teamsters and Steinholt have demonstrated that the market for Vanda common stock was efficient during the Class Period.  Pltf. Mem. at 15-22; Ptlf. Ex. A at ¶¶12-55.  Defendants and Dr. Stulz do not contest that each of the *Cammer* and *Krogman* factors demonstrate that Vanda's common stock traded in an efficient market during the Class Period.  *See, e.g.*, Def. Opp. at 17-

---

[2]    As explained in Plaintiff's accompanying motion to exclude, all of Dr. Stulz's report and opinions are inadmissible under Federal Rule of Evidence 702.  Should the Court agree, Defendants will have submitted no other purported evidence of lack of price impact.

33; Def. Ex. 3 at 45:17-46:20. Because Plaintiff has "establish[ed] the applicability of *Basic*'s presumption of reliance, the burden then shifts to the defendants, who bear the burden of persuasion [under *Halliburton II*] to rebut the *Basic* presumption by a preponderance of the evidence." *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *11 (S.D.N.Y. July 10, 2019); *see also Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021) ("[W]e agree with the Second Circuit that our precedents require defendants to bear the burden of persuasion to prove a lack of price impact by a preponderance of the evidence."). Defendants must "do more than merely produce evidence that *might* result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the stock's price by a preponderance of the evidence." *Waggoner v. Barclays PLC*, 875 F.3d 79, 101 (2d Cir. 2017) (emphasis in original).

Price impact is shown through "event studies." *Halliburton II*, 573 U.S. at 280; *see also Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018) ("Notably, however, Defendant did not conduct, or submit, their own event study to show the absence of price impact; instead, they rely on, and criticize, the event study conducted by Plaintiffs' expert, Dr. Zachary Nye. That alone would arguably support rejection of Defendants' arguments[.]"); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 94-95 (S.D.N.Y. 2015) (same).

Although the complete absence of price impact can be shown by proving either no "front-end" or "back-end" impact (*In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *11 (S.D.N.Y. Sept. 8, 2021)), Dr. Stulz concedes that he does not contest front-end impact. Def. Ex. 3 at 57:1-8. Thus, Dr. Stulz's price impact challenge focuses solely on the February 11, 2019 corrective disclosure for Teamsters' Fanapt and Hetlioz claims, *i.e.*, the issuance of the Aurelius Report.

- 4 -

## 2.    Defendants Ignore *Halliburton II*'s Market Efficiency Definition

The Supreme Court in *Halliburton II* explained that market efficiency has a unique meaning in the *Basic* context – it is based on "the fairly modest premise that '***market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.***'"  573 U.S. at 272 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 247 n.24 (1988)).[3]  "'That the . . . price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,' which is 'all that *Basic* requires.'"  *Id.*

*Halliburton II*'s pronouncement that "most publicly announced material statements about companies" are what is reflected in a company's stock price for purposes of the *Basic* presumption is precisely the definition used by Steinholt.  *See* Pltf. Ex. A at ¶16.  The *Halliburton II* definition is fully consistent with: (i) the academic definitions of market efficiency used in Steinholt's Reply Report of "information that is obviously publicly available (e.g., announcements of annual earnings, stock splits, etc.)" and "that prices reflect all published information" (Def. Ex. 2 at ¶¶4, 10-16); and (ii) Steinholt's discussion of market efficiency during his deposition.  Def. Ex. 4 at 50:13-57:7 ("from a practical point of view, it has to be information that the market is aware of, because if the market is not aware of it, it will not be reflected in the stock price.").  Thus, Steinholt

---

[3]    Courts in this Circuit routinely cite *Halliburton II* as articulating the correct market efficiency definition.  *See, e.g., Waggoner*, 875 F.3d at 93-94; *In re Petrobras Sec. Litig.*, 862 F.3d 250, 278 (2d Cir. 2017); *Carpenters*, 310 F.R.D. at 78, 84 n.98, 94 n.162.

is not offering a "novel theory" of market efficiency, as Defendants wrongly charge (Def. Opp. at 7, 22-27),[4] but instead has consistently used the definition that *Halliburton II* endorses.[5]

It is Defendants and Dr. Stulz – not Steinholt – who engage in a misguided effort to have this Court adopt a market efficiency definition that has never been used by the Supreme Court in (wrongly) arguing that stock prices must reflect all information that is theoretically publicly accessible, regardless of whether it is announced or published.  *See* Def. Opp. at 18, 22-27.[6]  This ignores the Supreme Court's rejection of this very tactic in *Halliburton II*:

> Halliburton focuses on the debate among economists about the degree to which the market price of a company's stock reflects public information about the company— and thus the degree to which an investor can earn an abnormal, above-market return by trading on such information.  *See* Brief for Financial Economists as *Amici Curiae* 4-10 (describing the debate). That debate is not new. Indeed, the *Basic* Court acknowledged it and declined to enter the fray, declaring that "[w]e need not determine by adjudication what economists and social scientists have debated through the use of sophisticated statistical analysis and the application of economic theory." To recognize  the presumption of reliance, the Court explained, was not "conclusively to adopt any particular theory of how quickly and completely

---

4    Unable to plausibly argue that Steinholt is using the wrong definition of market efficiency, Defendants resort to attacking Steinholt's credentials and ask this Court to ignore *Halliburton II* because "Steinholt is an accountant[.]"  Def. Opp. at 25-26.  Beyond citing no case law for this proposition, Defendants wrongly describe Steinholt, who does not have any accounting degrees or certifications, but is instead a securities analyst who has earned the professional designation Chartered Financial Analyst and is routinely permitted by courts to provide expert testimony on market efficiency.  Pltf. Ex. A at ¶¶2, 5.  Moreover, Defendants chose not to move to exclude Steinholt's testimony on reliability grounds.  If Defendants had legitimate concerns about Steinholt's qualifications, they would have made such a motion.  They did not.  Instead, Defendants rely on Steinholt's event study for their arguments.  Def. Opp. at 21.

5    Defendants cite a report by Steinholt in a case from 2010 – years before *Halliburton II* was decided – as supposed proof that Steinholt uses the same market efficiency definition as Dr. Stulz.  Def. Opp. at 26.  Beyond the temporal disconnect of this argument, it fails because Steinholt relied there on the *Basic* market efficiency definition later endorsed in *Halliburton II*.  Def. Ex. 15 at ¶8.

6    Defendants make much of their belief that an alternative dictionary definition of "available" is "accessible."  Def. Opp. at 24 & n.17.  This is not supported with any admissible evidence, however, and contradicts the requirement in *Halliburton II* that information must be "publicly announced" (573 U.S. at 272) to count for price impact under *Basic*.  Indeed, even Dr. Stulz does not resort to citing the dictionary for his speculative arguments.  *See generally* Def. Ex. 1.

publicly available information is reflected in market price." The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*'s presumption of reliance thus does not rest on a "binary" view of market efficiency. Indeed, in making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof.

573 U.S. at 271-72.  So too here.[7]

### 3.    Defendants Do Not Submit Any Admissible Evidence for Their Deficient Price Impact Argument

Applying *Halliburton II*'s market efficiency definition causes Defendants' price impact argument to quickly unravel because it is premised on Defendants' inaccurate belief that the unannounced placement of the Qui Tam Complaint on a court docket on February 4, 2019 meant that the contents of that pleading were theoretically "accessible" and, therefore, had impacted Vanda's common stock price by no later than February 5.  *See* Def. Opp. at 4-8, 21-22, 24, 28.

Defendants' argument – which relies on an unproven assumption that Vanda's investors definitively had knowledge of the Qui Tam Complaint before February 11, 2019 (*id.* at 26-27)[8] –

---

[7]    Although *Halliburton II* is the Supreme Court's seminal decision on the contours of market efficiency under *Basic* (573 U.S. at 263-64), Defendants' brief avoids citing the portion of *Halliburton II* that articulates the market efficiency definition and instead cites an earlier Supreme Court decision assessing materiality under Fed. R. Civ. P. 23(b) as providing the operative market efficiency definition.  Def. Opp. at 22 (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).  *Amgen* makes no such pronouncement, which is why courts (and Steinholt) look to *Halliburton II* to understand market efficiency.  *See, e.g.*, *Waggoner* , 875 F.3d at 93-94 ("In other words, an efficient market is one in which market professionals generally consider most publicly announced material statements about companies, thereby affecting stock prices.").  Thus, it is Defendants and Dr. Stulz, not Steinholt, who use a market efficiency definition that "is inconsistent with Supreme Court precedent[.]"  Def. Opp. at 26; *cf.* Pltf. Mem. at 15-16.

[8]    Contrary to Defendants' inaccurate suggestion (Def. Opp. at 5 n.2), Teamsters' counsel made no concession at Dr. Stulz's deposition regarding when investors first learned of the Qui Tam Complaint.  Read in context, the snippet of testimony cited by Defendants refers to Dr. Stulz's belief that the nonpublic sealed filing of the Qui Tam Complaint in March 2017 should have impacted Vanda's stock price at that time (Def. Ex. 1 at ¶70; Def. Ex 3 at 247:13-251:24), an entirely unfounded proposition that Defendants abandoned in their brief.  *See* Def. Opp. at 39-40.

contravenes *Halliburton II* and common sense. Steinholt confirmed that there is no publicly announced information about the Qui Tam Complaint before the Aurelius Report was issued on February 11, or proof that Aurelius obtained it before then. Pltf. Ex. A at ¶¶46-47; Def. Ex. 2 at ¶¶5, 19; Def. Ex. 4 at 130:23-132:9, 164:11-165:22. ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ Pltf. Ex. E at 39:7-15, 168:25-169:7. Thus, investors had no reason to know of the Qui Tam Complaint or react to it before February 11, meaning it was not incorporated into Vanda's stock price until then.

Moreover, Defendants did not subpoena Aurelius or depose it (or any other analyst who covered Vanda during the Class Period).[9] Unsurprisingly, Defendants' choice to forgo this discovery forced Dr. Stulz to admit that he had no basis other than his own speculation for concluding when or how Aurelius learned of the Qui Tam Complaint, or that any investor

---

[9] In deposing Kehoe, the only evidence Defendants offered of the Qui Tam Complaint being publicly announced was a *Bloomberg* alert dated February 11, 2019. Pltf. Ex. E at 88:19-92:5; Def. Ex. 16. While this alert does not specifically mention the Qui Tam Complaint (Def. Opp. at 25 n.18), contemporaneous news sources and analyst reports make clear that the focus of the Aurelius Report was the Qui Tam Complaint. Pltf. Ex. F ("Aurelius Value . . . stat[es] in a newly published report that a recently unsealed whistleblower complaint includes 'detailed allegations that Vanda has engaged in a series of fraudulent schemes . . . .'"); *see also* ¶230. In fact, Vanda provided a statement to the media on February 11 refuting the allegations in the Qui Tam Complaint, which was the Company's first public statement on this matter. Pltf. Ex. G ("a spokesperson for the company said that, 'On February 4, 2019, a qui tam lawsuit against the company was unsealed. Vanda denies the allegations[.]'"). This evidence all strongly supports a finding that investors first learned of the Qui Tam Complaint on February 11, 2019.

(including Aurelius) knew about it before February 11. Def. Ex. 3 at 152:24-161:15, 200:13-202:10.[10] Thus, Defendants have provided no evidence to support their unfounded assertions.[11]

Defendants' argument also overlooks that courts in this Circuit recognize that information on public websites, whose existence is unknown to investors, is not reflected in a company's stock price until it is publicly announced. *See, e.g.*, *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ("The results of the CASPER trial were not 'publicly available' simply because they were posted in an obscure location on the internet. The CASPER trial results became publicly available when an analyst, E. Russell McAllister, at Merriman Curhan Ford issued a research report on the disappointing clinical results."); *Allergan*, 2021 WL 4077942, at *12 (rejecting argument that previous public discussions of the subject of the alleged fraud made before the challenged corrective disclosure demonstrated a lack of price impact); *cf. Cooper v. Thoratec Corp.*, 2018 WL 2117337, at *5 (N.D. Cal. May 8, 2018) (rejecting price impact challenge based on a pre-corrective disclosure web posting that "lack[ed] authority," meaning even if it had "some viewership, it would not result in a meaningful impact on the stock price").

*Billhofer* is instructive. Similar to here, the defendants argued that there was no price impact because clinical trial results for a company's key drug were publicly posted on the Internet on August 13, 2007 with no announcement by the company, but the company's stock price did not

---

[10] As explained in Plaintiff's accompanying motion to exclude Dr. Stulz's report and opinions, Dr. Stulz's reliance on conjecture as his only basis for concluding that Vanda investors knew about the Qui Tam Complaint before the Aurelius Report renders his report and testimony inadmissible.

[11] Defendants again engage in pure speculation by arguing that DocketBird would have sent the Qui Tam Complaint to investors on February 4, 2019. Def. Opp. at 22 n.15. Defendants have no evidence to support this assertion because they did not subpoena or depose DocketBird, or any investor to ascertain their use of the service. Defendants' failure to do so is unsurprising – qui tam lawsuits are sealed, unknown to the public, and are not reflected on a court's docket until the government decides whether to intervene (*see* 31 U.S.C. §3730), meaning Vanda investors had no reason to monitor legal dockets until the Aurelius Report was issued on February 11.

decline until August 23, 2007, when an analyst issued a report about the clinical trial results. 281 F.R.D. at 154, 160. Unlike here, the defendants in *Billhofer* actually developed admissible evidence by deposing all of the analysts who covered the company to determine when they learned about the clinical trial results, and found that one analyst had found it before August 23, but never publicly announced it. *Id.* at 154-55. Notwithstanding that the *Billhofer* defendants had some proof that at least one analyst possessed the clinical trial results before the corrective disclosure, Judge Sweet held that "*Basic* does not require a perfectly efficient market or require a court to draw purely academic and unfounded conclusions regarding the spread of information" and reached the commonsense conclusion that information that is publicly accessible, but not publicly announced to investors, cannot impact a company's stock price. *Id.* at 160.

Defendants do not attempt to address cases like *Billhofer*, or cite any case law for their argument that placing a complaint on a previously sealed docket without any public announcement completely disproves price impact. Def. Opp. at 17-21. Instead, Defendants cite cases finding no price impact where, unlike here, the alleged corrective information was obviously publicly announced before the challenged corrective disclosure. *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 273-74 (N.D. Tex. 2015) (finding lack of price impact for an October 30 corrective disclosure because on October 29 the same exact information "had already been disclosed in a statewide newspaper, some AP wires, and 3M had disclosed the verdict in a press release" and did not cause a decline in Halliburton securities). No similar facts exist here.

Finally, recognizing that their main price impact argument fails, Defendants argue in the alternative that "the market was not efficient" because Vanda's stock price did not decline between the unsealing of the Qui Tam Complaint and the issuance of the Aurelius Report. Def. Opp. at 19-20, 22. This ignores the Supreme Court's refusal in *Halliburton II* "to adopt any particular theory

- 10 -

of how quickly and completely publicly available information is reflected in the market price." 573 U.S. at 272; *see also Carpenters*, 310 F.R.D. at 78 (same). Instead, courts use the *Cammer* and *Krogman* factors (which Defendants do not contest are met) and the results of event studies (which Defendants do not offer) as the proper tests for whether markets are efficient. *Id.* at 78-82. As explained above, these metrics uniformly support market efficiency for the entire Class Period.

### 4. Defendants Mischaracterize the Aurelius Report

Defendants misstate the contents of the Aurelius Report and the market's response to it. *See* Def. Opp. at 26-30. The Aurelius Report describes the Qui Tam Complaint as an "undisclosed and previously unreported lawsuit" that contained "new allegations" of off-label marketing by Vanda. Def. Ex. 17 at 2. The Aurelius Report further states that "[w]e believe most investors are not aware of this lawsuit because the filing date is 2017, which disguises that it was recently unsealed." *Id.* at 3.[12] Unsurprisingly, the initial eight pages of the fourteen page Aurelius Report are dedicated to discussing the Qui Tam Complaint's allegations in detail. *Id.* at 1-8. Analysts tied Vanda's February 11, 2019 stock decline to the "unsealed whistleblower lawsuit" (¶230), and inquired about the Qui Tam Complaint during Vanda's February 13, 2019 earnings conference call. Def. Ex. 2 at ¶23. And Vanda has consistently provided investors with updates on it. *Id.*

Defendants ignore that the Qui Tam Complaint's allegations were viewed by analysts and investors as new and material information as of February 11, 2019. Def. Opp. at 27-28. Instead, Defendants speculate that several anonymous posts (sprinkled among many thousands about Vanda) from a gossip website called Cafepharma must have previously disclosed the off-label marketing scheme described in the Qui Tam Complaint to Vanda's investors. *Id.*

---

[12] To be clear, qui tam complaints are not assigned a publicly available docket number for investors to track in the hopes that pleadings may ultimately be unsealed. *See* 31 U.S.C. §3730. In other words, there is no public indication that a qui tam case is pending until it is unsealed.

- 11 -

Beyond offering no admissible evidence as proof,[13] Defendants inaccurately describe the Aurelius Report in claiming that it "quoted information" from Cafepharma regarding off-label marketing. *Id.* at 27. The only quotations to Cafepharma in the Aurelius Report, however, involve Vanda's prescription reimbursement hub (Def. Ex. 17 at 12), which is not alleged as being part of Vanda's off-label marketing scheme. The Cafepharma posts cited by Dr. Stulz (Def. Ex. 1 at ¶¶25-26) are not quoted or mentioned anywhere in the Aurelius Report. *See generally* Def. Ex. 17.

Moreover, Defendants fail to establish that any investor knew about the handful of anonymous Cafepharma posts cited by Dr. Stulz. Def. Ex. 3 at 113:23-117:13.[14] Likewise, even if Cafepharma, and not the Aurelius Report, had first publicly disclosed off-label marketing at Vanda, investors had no reason to believe that these anonymous posts were reliable when made. *See U.S. ex rel. Simpson v. Bayer Corp.*, 2013 WL 4710587, at *6-*7 (D.N.J. Aug. 30, 2013) (holding that Cafepharma posts comprise "nothing more than vague allegations in an informal forum discussion without any indicia of reliability or substantiation."). Defendants cannot seriously equate anonymous Cafepharma posts that describe vague marketing problems at Vanda with the sworn allegations of former Vanda managers that Vanda's CEO trained Vanda's sales force to illegally off-label market Fanapt and Hetlioz. *See, e.g.*, *Allergan*, 2021 WL 4077942, at *12-*13 (rejecting argument that earlier public disclosures negated price impact).[15]

---

[13] As explained in Plaintiff's accompanying motion to exclude Dr. Stulz's report and opinions, Dr. Stulz never assessed whether the Cafepharma (or Glassdoor) posts were publicly announced or material to investors before the Aurelius Report was issued.

[14] Dr. Stulz cites a 2007 article in *The New York Times* as proof that Vanda's investors definitely reviewed Cafepharma posts during the Class Period. Def. Ex. 1 at ¶25 & n.49. That article is not included with the exhibits submitted by Defendants, however, because it agrees with Teamsters and Steinholt that "the signal-to-noise ratio [on Cafepharma] is ridiculous" and it is not "a source of reliable information[.]" Pltf. Ex. H at 1, 3. It also says nothing about Vanda's investors. *Id.*

[15] These arguments apply equally to Defendants' reliance on anonymous posts from Glassdoor.

Defendants also argue that drug effectiveness complaints for Hetlioz from **2013** previously disclosed the Hetlioz off-label marketing scheme (which is not alleged to begin until November **2015**) to investors. Def. Opp. at 18. But Hetlioz's ***efficacy*** is unrelated to whether it was ***illegally marketed off-label***, and Defendants ignore this obvious disconnect. *Id.* Likewise, Defendants point to several analyst reports as proof that Vanda's off-label marketing scheme was known to investors before February 11, 2019 (Def. Opp. at 29 n.22; Def. Exs. 7-10), but these reports merely discuss on-label marketing of Hetlioz to treat Non-24, not the alleged off-label marketing scheme.

Finally, Defendants argue that "the lack of any reaction from securities analysts covering Vanda either before or after the Aurelius Report" is "powerful evidence" of no price impact. Def. Opp. at 29-30. But Defendants ignore the many instances where analysts ascribed importance to the Qui Tam Complaint and Vanda informed investors about it. *See supra* 11. Even worse, Defendants' argument is unsupported by case law and is contradicted by Dr. Stulz, who testified that "I am not saying that a condition for price impact is that analysts change their view." Def. Ex. 3 at 187:2-3. This is because price impact assesses whether the corrective disclosure "played some role in the price decline" (*Allergan*, 2021 WL 4077942, at *10), meaning the response by investors – not analysts – is dispositive. As Steinholt's event study found, "investors clearly did view the information in the Aurelius Report as new and material information, and immediately started to trade on the information causing the decline in Vanda's stock price." Def. Ex. 2 at ¶22.

### 5.    Defendants' "Generic" Argument Fails

Even though Dr. Stulz admits that Defendants are not making any "front-end" price impact challenge to the statements in the Complaint alleged to be false and misleading (*see supra* 4), Defendants nonetheless argue that the Complaint only challenges statements that "are exceedingly general in nature," meaning there is no front-end price impact. Def. Opp. at 30-32 (citing

- 13 -

*Goldman*, 141 S. Ct. at 1960-61). Dr. Stulz's concession means Defendants have submitted no admissible evidence in support of this argument and, for that reason alone, it should be rejected.

Defendants' argument also mischaracterizes the Complaint, which challenges many highly specific statements about Vanda's marketing of Fanapt[16] and Hetlioz[17] – precisely the reason why Dr. Stulz makes no front-end price impact challenge. Defendants fail to identify anything generic about these detailed statements of Vanda's marketing of Fanapt and Hetlioz. *See* Def. Opp. at 30-32. Instead, Defendants mainly focus their "generic" argument on statements about: (i) Vanda's need to successfully market Fanapt and Hetlioz; and (ii) the importance of complying with off-label marketing laws in selling Fanapt and Hetlioz. *Id.* Because Defendants must completely disprove price impact (*see supra* 3-4), their failure to argue that *all* of the statements challenged in the Complaint are generic is another reason why this argument fails.

In addition, Defendants overlook that this Court has already found the statements challenged in the Complaint to be sufficiently specific in denying Defendants' motion to dismiss. *Gordon*, 2021 WL 911755, at *3 ("The complaint alleges Polymeropoulos made affirmative statements regarding the company's marketing practices which failed to convey the company's suspect drug promotion activities."). Effectively, Defendants seek to re-litigate the falsity and

---

[16] *E.g.*, ¶253 ("we are recommending Fanapt as a second-line treatment"); ¶265 ("Fanapt, in patients with schizophrenia, will be a drug that will be used once patients switch from another medication"); ¶278 ("Fanapt is considered in the US a second line treatment for schizophrenia."); ¶302 ("Our sales team continues making progress in introducing Fanapt as an additional option in treating adult patients with schizophrenia."). Several of these statements were addressed by the Court. *Gordon v. Vanda Pharms. Inc.*, 2021 WL 911755, at *3 (E.D.N.Y. Mar. 10, 2021).

[17] *E.g.*, ¶336 ("Our HETLIOZ team is focused on driving growth by creating awareness about non-24 and assisting patients to learn more about treatment options."); ¶354 ("So we did have experience before with sighted patients with Non-24 that have spontaneously come into the program."); ¶366 ("The positive response from the psychiatric community is a confirmation of the significant unmet medical need for patients with Non-24.").

materiality arguments that they already made (ECF No. 48-1 at 25-31) and lost (*Gordon*, 2021 WL 911755, at *3).  That is not permitted on this motion.  *See* Pltf. Mem. at 9.

Moreover, after Defendants opposed this motion, the district court in *Goldman* clarified on remand from the Supreme Court that whether a statement is "generic" is only relevant at class certification insofar as the "misstatement and corrective disclosure diverge in genericness." *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2021 WL 5826285, at *14 (S.D.N.Y. Dec. 8, 2021) (finding that even though the corrective disclosures were "more detailed and narrow in scope than the corresponding alleged misstatements," defendants still could not disprove price impact).[18]  Here, Defendants do not argue that the two sets of statements they attack as "generic" diverge from the disclosures in the Aurelius Report, and for good reason – statements about the importance of complying with off-label marketing laws and the need to successfully market Fanapt and Hetlioz fully align with a corrective disclosure that Vanda was engaged in rampant off-label marketing.

6.      **Defendants Submit No Proof for Their Argument that Only Non-Fraud Related Information Caused Vanda's Stock Price Decline on February 11, 2019**

Although Dr. Stulz did not perform an event study (*see supra* 3-4), Defendants nonetheless argue (again, citing no case law) that the only causes of Vanda's stock price decline on February 11, 2019 were: (i) other negative information in the Aurelius Report unrelated to the Qui Tam Complaint; and (ii) Aurelius' short position in Vanda.  Def. Opp. at 32.[19]  Defendants provide no

---

[18]    *Goldman* also recognized that repeatedly making statements that would otherwise be generic supports a finding of price impact.  2021 WL 5826285, at *11.  Defendants concede that both sets of statements were made many times during the Class Period.  Def. Opp. at 30-31.

[19]    This argument mirrors Defendants' loss causation argument (ECF No. 48-1 at 40-41) that this Court found must be resolved by a jury.  *Gordon*, 2021 WL 911755, at *3-*4.  As explained in Plaintiff's accompanying motion to exclude Dr. Stulz's report and opinions, Dr. Stulz never reviewed *Gordon* and willfully ignored this Court's loss causation ruling in the Stulz Report.

evidence to support either contention.  The Stulz Report does not provide any event study or other financial analysis showing that these factors alone caused Vanda's stock price to decline on February 11.  Def. Ex. 1 at ¶¶38-39.  As if to emphasize that Defendants have provided no such evidence, Defendants only argue that these factors "could plausibly have moved the market" (Def. Opp. at 32), hardly sufficient to meet Defendants' burden to completely disprove price impact.

As Steinholt testified, a damages event study can be conducted to discern the specific information in the Aurelius Report that caused the February 11 decline.  Def. Ex. 4 at 251:5-258:1.  It is Defendants' burden to conduct that study at this stage to prove no price impact.  *See supra* 4.  Dr. Stulz could have done that, but he chose not to.  Def. Ex. 3 at 81:22-82:23.

**B.      Defendants' Class Definition Arguments Regarding Teamsters' Tradipitant Allegations Are Improper**

Unable to plausibly contest Teamsters' satisfaction of each Fed. R. Civ. P. 23(a) and (b)(3) factor, Defendants' opposition begins with a brazen attempt to re-litigate the denial of Defendants' motion to dismiss by manufacturing a dispute about the contours of the time period applicable to Teamsters' Tradipitant allegations.  Def. Opp. at 9-17.  The Complaint, however, clearly articulates this time period – August 1, 2018 to February 6, 2019.  That ends the inquiry.

In addition, rehashing unsuccessful Rule 12(b)(6) arguments on this motion is improper.  Pltf. Mem. at 9.[20]  Defendants' own cases acknowledge that merits issues like materiality and falsity cannot be resolved in ascertaining the scope of a class period on a Rule 23 motion.  *See, e.g.*, *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 134-35, 147 (S.D.N.Y. 2019) ("when a disclosure is less than clear, or would require the Court to adjudicate questions of materiality, the

---

[20]   If Defendants truly had concerns about how the Court adjudicated their motion to dismiss regarding the Tradipitant allegations, they could have moved for reconsideration under Local Civil Rule 6.3.  *See In re SAIC, Inc. Sec. Litig.*, 2014 WL 407050 (S.D.N.Y. Jan. 30, 2014) (granting reconsideration in PSLRA case and reversing denial of the motion to dismiss).  They did not.

adequacy of disclosure cannot be decided on a Rule 23 motion" and rejecting attempt to raise merits arguments in limiting a class period as premature) (collecting cases).[21]

Unsurprisingly, Defendants cite no authority sanctioning their tactic of re-litigating their Rule 12(b)(6) motion under the guise of altering the class definition. *See, e.g.*, *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 224, 241 (S.D.N.Y. 2006) (adjudicating Rule 12(b)(6) and 23 motions simultaneously and shortening the class period because the first challenged statement was found on to be inactionable); *Carpenters*, 310 F.R.D. at 96-97 (benignly noting that "a class period ends when the truth has been disseminated to the market," and stating nothing about shortening a proposed class period or allowing Rule 12(b)(6) arguments on Rule 23 motions). Because the Court upheld the entirety of the time period alleged in the Complaint that pertains to the Tradipitant allegations (ECF No. 55 at 3 n.2), Defendants' falsity and materiality arguments are improper at this juncture.

Beyond being procedurally inappropriate, Defendants' arguments are centered on a factually incorrect contention that the challenged statements were about two different Tradipitant studies (Def. Opp. at 13-17) – arguments Defendants ***never raised*** in moving to dismiss. *See* ECF No. 48-1 at 31-35. Further, Defendants do not address Teamsters' Items 303 and 503 claims pertaining to Tradipitant, both of which imposed an affirmative duty to disclose the refusal to conduct the safety study by August 2, 2018. ¶¶412, 418. Likewise, Defendants entirely ignore (and therefore concede) their scienter, and agree that at least some portion of the Tradipitant time period is appropriate. Def. Opp. at 13-17 (arguing that it should start on December 3, 2018).

---

[21] Other courts are in accord. *See, e.g.*, *In re Bank of Am. Corp. Sec. Deriv. and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 140 (S.D.N.Y. 2012) ("[C]lass certification is emphatically not an opportunity for a second round of review, at a higher standard no less, of the substantive merits of plaintiffs' underlying claims.").

Finally, Defendants overlook that the appropriate time period for the Tradipitant allegations is a common issue that predominates under Fed. R. Civ. P. 23(b)(3).

### 1.    The Complaint Clearly Delineates the Time Period for Teamsters' Tradipitant Allegations

The Complaint outlines the time period applicable to Teamsters' Tradipitant allegations: (i) Defendants' duty to disclose arose on May 15, 2018 (¶¶206-12); (ii) their first misstatements and omissions were made on August 1, 2018 (¶¶386, 412, 418); and (iii) their fraud was revealed after the market closed on February 5, 2019. ¶¶431-32. Defendants fully understood these parameters in moving to dismiss. *See* ECF No. 48-1 at 9-11. Likewise, Dr. Stulz acknowledged them in his Report. Def. Ex. 1 at ¶64. And in July 2021, Defendants recognized that the Tradipitant allegations implicate nearly all of the Class Period, and agreed to produce documents for these allegations from at least September 1, 2016 to February 19, 2019. *See* Pltf. Ex. I at 2.

### 2.    Defendants' Materiality and Falsity Arguments Fail

According to Defendants, their statements regarding Tradipitant that predate December 3, 2018 were not false and misleading because they related to a "short term" study of Tradipitant, which they claim was unrelated to the "long term" study that needed the safety study as a condition precedent and was not discussed until December 3, 2018. *Id.* at 14. This fails for several reasons.

First, there is no "short term" or "long term" study – the study at issue is Study 2301, which was a four-week Phase II trial initiated in November 2016 that was ongoing when Vanda requested to extend it to 52 weeks on April 10, 2018. ¶¶200-05. As Defendants admit in the FDA Litigation, on May 15, 2018 "the FDA informed Vanda that the Company could not extend Study 2301 to be a full year clinical trial unless Vanda completed a 9-month non-rodent toxicity study on tradipitant." ¶¶206-12; *Vanda Pharms., Inc. v. FDA*, 436 F. Supp. 3d 256, 262 (D.D.C. 2020) (granting summary judgment to the FDA and finding that the "FDA informed Vanda [in May

2018] that the 12-month extension was not permissible because, without a 9-month nonrodent toxicity study, FDA did not have sufficient data as to the safety or effects of long-term tradipitant use in humans.").[22]  Defendants' attempt to manufacture a nonexistent distinction between a "short term" and "long term" study contravenes Vanda's admissions and Judge Bates' factual findings, and mischaracterizes the challenged statements, all of which concern Study 2301.  ¶¶386-407.

Second, Defendants' failure to disclose that Vanda *knew* the FDA would impose a clinical trial hold on future studies of Tradipitant (even if the original four week portion of Study 2301 was successful) is actionable.  *See, e.g.*, ¶387; *Oklahoma Firefighters Pension and Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) (statements even if "literally true" can be misleading in light of additional facts).  Defendants weakly argue that they had no duty to disclose (Def. Opp. at 16 n.10), but by specifically discussing Study 2301 and the path to obtaining FDA approval for Tradipitant, Defendants were obligated to inform investors that Vanda's refusal to conduct the required safety test meant that the FDA would impose a clinical trial hold on Tradipitant.  *See, e.g.*, *Meyer v. Jinksolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth").[23]

---

[22]  Further, Vanda has admitted that "[t]hroughout 2018… FDA made clear that, one way or another, Vanda would be obligated to conduct the nine-month safety study[.]" ¶223.  Defendants' attempt to take back these admissions by changing it to be a "suggestion" made by the FDA in May 2018 (Def. Opp. at 37 n.29) should be rejected.  In fact, after Dr. Stulz tried the same tactic (Def. Ex. 1 at ¶64(c)), he testified that he inaccurately cited Vanda's admissions in the FDA Litigation and that using "suggests" to describe what the FDA conveyed in May 2018 is wrong.  Def. Ex. 3 at 234:10-24.

[23]  Defendants' citation to *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015) (Def. Opp. at 16 n.10), fully supports Teamsters.  *Sanofi* found that a drug company's statements were not materially false and misleading because the guidance that the company received from the FDA was "not tantamount to a statement that [the drug] could not or would not obtain timely FDA approval." *Id.* at 541.  Here, by contrast, Teamsters – relying on Vanda's own admissions – has

- 19 -

Finally, Defendants ignore their pre-December 3, 2018 liability for violating Items 303 and 503 on August 2, 2018, and November 7, 2018.  Defendants violated Item 303 by failing to disclose that they knew by May 15, 2018, of a risk or uncertainty that Vanda's unwillingness to conduct the required safety study would halt the approval process for Tradipitant and jeopardize future profits.  ¶¶206-12, 412.  These events and uncertainties are actionable under Item 303.  *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-96 (2d Cir. 2016) (holding that Item 303 requires the disclosure of the uncertainty created by an undisclosed risk).  Likewise, Defendants' failure to disclose this information violated Item 503, which requires a candid discussion of risks to a company in its SEC filings.  ¶418; *see also City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 427 (S.D.N.Y. 2011) (finding a violation of Item 503 where significant risks were not sufficiently described in the company's risk factors).

### 3.    The Time Period for the Tradipitant Allegations Is A Common Question that Predominates

The scope of the relevant time period for Teamsters' Tradipitant allegations is an issue common to the Class that predominates over individual issues.  *See Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 477 (E.D. Pa. May 20, 2021) (finding that arguments regarding class period length are improper on a Rule 23 motion and can be resolved on a class-wide basis later in the litigation).  Furthermore, that there are two distinct sets of factual allegations alleged in the Complaint does not mean separate time periods need to be certified for each theory.  *See Signet Jewelers*, 2019 WL 3001084 at *1 (noting that the complaint addressed "entirely separate sets of non-disclosures" but was "far from extraordinary" and certifying both sets of claims using the broader class period).

---

alleged just that: the FDA informed Vanda in May 2018 that the safety study "is a requirement, ***not a recommendation***, prior to proceeding to long-term studies in humans."  ¶211.

### C.    Defendants' *Comcast* Arguments Are Premature

Although Steinholt's damages model is routinely upheld at class certification (Pltf. Ex. A at ¶¶3-4; Pltf. Mem. at 22-23),[24] and Defendants make no effort to show how the model Steinholt proposes in this case differs from the one courts repeatedly find to be sufficient, Defendants nonetheless argue that Steinholt's model is precluded by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  Def. Opp. at 33-40.  As explained below, Defendants are wrong.

#### 1.    Class-Wide Proof of Damages Is Not Required to Show Predominance

The Second Circuit has held that *Comcast* requires only that a plaintiff's damages methodology match its theory of injury.  *See Waggoner*, 875 F.3d at 106 (the methodology should "measure damages that result from the class's asserted theory of injury"); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) (same); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (same).  Steinholt's event study methodology matches Teamsters' theory of damages because it assesses the artificial inflation in Vanda's common stock price caused by the alleged false and misleading statements and omissions.  Def. Ex. 2 at ¶¶24-29; Def. Ex. 4 at 208:15-20, 253:17-254:8, 268:16-269:18.  Nothing more is required on this motion.

---

[24]   *See, e.g.*, *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 652 n.5 (S.D. Ohio 2017) ("[C]ourts have held that event studies such as the one proposed by Mr. Steinholt are acceptable for calculating damages on a classwide basis in securities litigation."); *see also, e.g.*, *Villela v. Chem. & Mining Co. of Chile Inc.*, 2019 WL 4631530 (S.D.N.Y. Sept. 24, 2019); *In re SandRidge Energy, Inc. Sec. Litig.*, 2019 WL 4752268 (W.D. Okla. Sept. 30, 2019) (each affirming Steinholt's proposed damages model on a Rule 23 motion).

### 2.    Defendants' Criticisms of the Damages Model Are Unavailing and Inappropriate for Resolution at Class Certification

#### a.    Confounding Information

Defendants argue, with respect to both sets of allegations, that Plaintiff "does not explain how it will disentangle any fraud-related price impact . . . from other, confounding information[.]" Def. Opp. at 34-36, 39-40.  This argument fails for both theories because: (i) it presents a common question of loss causation that cannot be resolved now; and (ii) Steinholt's model can disentangle confounding information.  Def. Ex. 2 at ¶¶24-29.

First, whether the loss is attributable to the alleged fraud is a loss causation question common to the Class.  *See, e.g., Pirnik*, 327 F.R.D. at 47 (finding that a failure to "control for confounding information" goes to "the question of loss causation" which "is a common question that need not be adjudicated before a class is certified." (internal alterations omitted)); *Carpenters*, 310 F.R.D. at 99-100 ("[W]hether plaintiffs will be able to prove loss causation or measure price impact…are questions that go to the merits and not whether common issues predominate."). Tellingly, the only case Defendants cite in support is a summary judgment decision.  *See* Opp. at 35 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008)).

Second, Steinholt's proposed model does account for confounding variables.  *See Signet Jewelers*, 2019 WL 3001084, at *20 ("[T]he Court rejects the suggestion that an event study is incapable of disaggregating the effects of confounding information. Were it otherwise, nearly every securities fraud class action would fail.").  As Steinholt has explained, the proposed model can be refined using fundamental valuation tools to account for any confounding information.  Def. Ex. 2 at ¶28.  Courts routinely recognize that is more than sufficient at this juncture.  *See, e.g.*, *Allergan*, 2021 WL 4077942, at *15 (rejecting confounding information argument and finding a damages model virtually identical to Steinholt's to suffice on a Rule 23 motion).

Finally, Defendants' confounding information argument wrongly asserts that the February 6, 2019 decline associated with the Tradipitant allegations was solely due to investor concern about the FDA lawsuit because of its possible impact on Hetlioz, and not the clinical hold on Tradipitant. Def. Opp. at 35-36. In so doing, Defendants inaccurately describe a March 2019 report to Teamsters (Def. Ex. 12) and mischaracterize Kehoe, who testified that Vanda's refusal to perform the safety study was "unprecedented" and meant that defendant Polymeropoulos violated his fiduciary duties to Vanda's shareholders. Pltf. Ex. E at 144:1-145:8, 159:6–162:4.[25] Kehoe further testified that the March 2019 report discussed Hetlioz because Vanda's "stock was already reflecting the issues with Tradipitant with gastroparesis" and "[m]y opinion is that the stock sold off because of [Defendants'] reluctance to do an animal safety study." *Id.* at 104:8-105:13. In other words, by March 2019, there was no need to discuss Vanda's failure to disclose the refusal to conduct the safety study because it was already impacted into Vanda's stock price – precisely the reason why Defendants do not make a price impact challenge for the Tradipitant allegations.

### b.    Inflation Over Time

Defendants argue that Steinholt's proposed model cannot account for changes in the rate of inflation over time for the Tradipitant allegations. Def. Opp. at 36-38. Again, this argument fails because it is a loss causation argument and mischaracterizes Steinholt's proposed model.

Indeed, the Second Circuit has rejected this precise argument. *See Waggoner*, 875 F.3d at 106 ("*Comcast* does not suggest that damage calculations must be so precise at this juncture.…Thus, even accepting the Defendants' premises that inflation would have varied during the class period in this case and that such variation could not be accounted for, the Defendants'

---

[25]    Defendants conveniently omit theses portions of Kehoe's testimony from Def. Ex. 5, requiring Teamsters to submit the full transcript of Kehoe's deposition as Pltf. Ex. E.

argument fails."). Whether Steinholt's proposed model correctly assumes that "[Vanda] could have disclosed the 'truth' of its alleged misstatements at the beginning of the class period in a manner equivalent to supposed 'corrective disclosures'" is a "question of loss causation" which raises "a common question that need not be adjudicated before a class is certified." *Pirnik*, 327 F.R.D. at 47. Defendants cannot escape that *Comcast* does not require a plaintiff to "isolate the amount of price impact attributable to each specific misstatement" at class certification. *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *22-*23 (S.D.N.Y. Jan. 26, 2021). Regardless, Steinholt's proposed model can account for changes in inflation over time using multiple inflation ribbons. Pltf. Ex. A at ¶59 ("[i]f there are multiple disclosures of the alleged truth, then multiple inflation ribbons are used" in any case where new information "introduces additional inflation[.]").

### c.    Materialization of Risks

Finally, Defendants argue for both theories that some aspect of the associated price declines is attributable to the realization of a disclosed risk, rather than an allegedly concealed risk. Def. Opp. at 38-40. Again, this is an improper loss causation argument. *See, e.g.*, *Signet*, 2019 WL 3001084, at *20 ("[Defendants'] contention that Plaintiff's methodology did not adequately isolate the impact of the materialization of known risks from the impact of allegedly concealed risks is simply a loss causation argument in disguise, because it tests the causal relationship between the alleged misstatements and the price decline.").

*Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), which Defendants principally rely upon, is an outlier case that contravenes Second Circuit precedent and is inapplicable to the facts of this case. *Id.* at 690 (denying certification of a subclass because liability "hinge[d] on a determination that each plaintiff would not have bought BP stock *at all* were it not for the alleged misrepresentations") (emphasis in original). In other words, *Ludlow* found that class certification was not appropriate in that case because each investor's risk tolerance varied. *Id.* By contrast,

- 24 -

Teamsters is proceeding under the out-of-pocket damages methodology (Pltf. Mem. at 22-23) – which the Second Circuit endorsed in *Waggoner* where the plaintiffs were also pursuing a materialization of the risk theory – that looks at the true price of Vanda stock during the Class Period versus the inflation caused by Defendants' fraud, and presents a question common to all class members.  875 F.3d at 106.

Moreover, *Ludlow* separately affirmed a subclass of plaintiffs that, like Teamsters, alleged that misstatements and omissions inflated the stock price, and whose "damages model, in turn, relied on a theory that the 'inflation' in the stock price caused by the misstatements would be exposed by at [*sic*] the fall in the price when certain 'corrective events' brought the 'true' information to the market's attention."  800 F.3d at 680.  In other words, the rejected *Ludlow* subclass is unlike the Class in this case, and the certified *Ludlow* subclass used the same damages model as Steinholt proposes.  Courts in this Circuit have rejected defendants' reliance on *Ludlow* on precisely these grounds.  *See, e.g., Allergan*, 2021 WL 4077942, at *16 ("[N]ot only is *Ludlow* an out-of-circuit case that is contrary to precedent in this Circuit, but its facts are inapplicable to the facts in the case at bar.").

III.    CONCLUSION

As demonstrated herein and in Teamsters' opening motion, Teamsters has affirmatively demonstrated compliance with all of the requirements for class certification.  Accordingly, Teamsters respectfully requests that the Court enter an Order: (i) certifying this action as a class action pursuant to Rule 23(a) and Rule 23(b)(3); (ii) certifying Teamsters as Class Representative; and (iii) appointing Robbins Geller as Class Counsel pursuant to Rule 23(g).

DATED:  January 7, 2022

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID A. ROSENFELD
MICHAEL G. CAPECI
AVITAL O. MALINA


                    /s/ Michael G. Capeci
              MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
drosenfeld@rgrdlaw.com
mcapeci@rgrdlaw.com
amalina@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

CERTIFICATE OF SERVICE

I, Michael G. Capeci, hereby certify that on January 7, 2022, I authorized a true and correct copy of the foregoing document to be served on counsel for Defendants via electronic mail.

*/s/ Michael G. Capeci*

MICHAEL G. CAPECI