# EXHIBIT E

**REDACTED PURSUANT TO PROTECTIVE ORDER**

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK


C.A. NO:  1:19-CV-01108-FB-LB

----------------------------)

                            )

KENNETH GORDON, INDIVIDUALLY)

AND ON BEHALF OF ALL OTHERS )

SIMILARILY SITUATED         )

                            )

          Plaintiff(s),     )

                            )

VS.                         )

                            )

                            )

VANDA PHARMACEUTICALS, INC. )

AND MIHAEL H. POLYMEROPOULOS)

                            )

          Defendant(s).     )

                            )

----------------------------)

CONFIDENTIAL

ATTORNEYS EYES ONLY


VIDEO DEPOSITION OF: MICHAEL KEHOE


DATE:     November 11, 2021

TIME:     9:30 a.m.


HELD REMOTELY BY WEB CONFERENCE

                    - - -


Reporter:  JENNY C. EBNER, RPR/CLR/LSR 00030

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 2

APPEARANCES:

REPRESENTING THE PLAINTIFF(S):

ROBBINS GELLER RDMAN & DOWD, LLP.
58 South Service Road
Melville, NY 11747
631.367.7100
amalina@rgrdlaw.com
bmitchell@rgrdlaw.com
mcapeci@rgrdlaw.com
By:  AVITAL MALINA, ESQ.
By:  BRENT MITCHELL, ESQ.
      MICHAEL CAPECI, ESQ.

REPRESENTING THE DEFENDANT(S):

PAUL WEISS RIFKIND WHARTON & GARRISON, LLP.
1285 Avenue of the Americas
New York, NY 10019
212.373.3289
asoloway@paulweiss.com
By:  AUDRA SOLOWAY, ESQ.
      JUSTIN WARD, ESQ.
      THOMAS BOUNDS, ESQ.

REPRESENTING THE WITNESS:

COHEN & GRESSLER, LLP.
800 Third Avenue
New York, NY 10022
212.957.7806
dtabak@cohengressler.com
By:  DANIEL TABAK, ESQ.

ALSO PRESENT:
   ROCCO MERCURIO, Videographer
   CLINT THOMAS, Technician

Page 4

READ IN

READ IN                          Page

By Court Reporter                7

**Exhibits presented on screen by technician and retained by technician**

Page 3

INDEX
November 11, 2021

EXAMINATION

WITNESS NAME            Direct Cross

MICHAEL KEHOE
   By Ms. Soloway ................      8
   By Ms. Malina ................     164

EXHIBITS
Exhibit      Description    Marked
Exhibit 1    Tab 20 .......... 30
Exhibit 2    A document ...... 44
Exhibit 3    Teamsters' letter 46
Exhibit 4    Tab 7 ........... 47
Exhibit 5    Tab 9 ........... 52
Exhibit 6    Tab 8 .......... 70
Exhibit 7    Tab 19 ......... 80
Exhibit 8    Tab 11 ......... 82
Exhibit 9    2/11/2019 E-mail  88
Exhibit 10   2/12/2019 E-mail  92
Exhibit 11   4/25/19 E-mail   97
Exhibit 12   Tab 28 ......... 106
Exhibit 13   Tab 27 ......... 109
Exhibit 14   Tab 25 ......... 112
Exhibit 15   Tab 24 ......... 116
Exhibit 16   Tab 22 ......... 123
Exhibit 17   Tab 15 ......... 124
Exhibit 18   Tab 18 ......... 126
Exhibit 19   Tab 21 ......... 128
Exhibit 20   10/23/19 E-mail . 136
Exhibit 21   Tab 29 ......... 142
Exhibit 22   2/2/20 E-mail ... 152
Exhibit 23   Rothschild 1 .... 167

Recess
Recess                          Page
Recess 10:50 a.m. - 10:59 a.m.        70
Recess 11:28 a.m. - 11:36 a.m.        93
Recess 12:27 p.m. - 12:29 p.m.        135
Lunch 12:59 p.m. - 1:38 p.m.          163
Recess 1:53 p.m. - 1:58 p.m.          174

Page 5

COURT REPORTER:  Ms. Malina, do you know what you want for a transcript?

MS. MALINA:  I was actually going to request that we get an official transcript as soon as possible.  Friday if possible.

COURT REPORTER:  Ms. Soloway, can you tell me what you want for a transcript?

A VOICE:  I can get you the standing order after the deposition is concluded.

It's my understanding it's just going to be an electronic transcript is fine with a mini.

A VOICE:  Recording in progress.

VIDEOGRAPHER:  We are now going on the record.  Today is Thursday, November 11, 2021, the time is approximately 9:38.

This is the remote video deposition of Michael Kehoe, in the matter of Gordon versus Vanda Pharmaceuticals, Inc. filed in the Eastern District Court of New York, Case number 1:19-cv-01108-FB 6.

My name is Rocco Mercurio.  The court reporter is Jenny Ebner.

Will counsel please introduce yourselves and who you represent for the

2 (Pages 2 - 5)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 6

record?

MS. MALINA: This is Avital Malina representing the plaintiff, Teamsters Local Union No. 727 Pension Funds.

MS. SOLOWAY: Good morning. Audra Soloway, from Paul Weiss Rifkin Wharton & Garrison representing the defendants.

MR. TABAK: Good morning. Daniel Tabak, Cohen and Gresser representing the witness.

MS. SOLOWAY: I will just note for the record that there are some other attorneys from I think each Robbins Geller and Paul Weiss on the, on the, on the Zoom, as well.

I know this is considered representation, but I'm Dina (inaudible) Clements. I'm in-house counsel at (inaudible).

COURT REPORTER: I'm sorry. All these names are going to run together because I don't know who anybody is talking. "Zima Clements," did you say?"

MS CLEMENTS: Dina Clements, in-house counsel for (inaudible).

Page 7

MS. SOLOWAY: Good morning, Dina.

MS. CLEMENTS: Good morning.

VIDEOGRAPHER: That will do it? The court reporter will now swear in the witness and proceed.

COURT REPORTER: (Reading) Pursuant to Executive Order 7Q issued on March 30, 2020, by Governor Ned Lamont, this deposition is being reported remotely.

All counsel participating in this deposition proceeding acknowledge that I am not present in the deposition room and further acknowledge that in lieu of an in-person administration of the oath, it will be administered remotely.

The parties and all counsel consent to this arrangement and waive any objections to this method of reporting.

Counsel, kindly voice your agreement, stating your name and agreement on the record.

MS. SOLOWAY: On behalf of the defendants, we agree.

MS. MALINA: On behalf of plaintiff, we agree.

Page 8

MR. TABAK: I agree, as well.

(Deposition commenced at 9:35 a.m.)

MICHAEL KEHOE, called as a witness, being duly sworn or affirmed by Jenny C. Ebner, RPR, CSR, CLR, a Notary Public in and for the State of Connecticut, testified as follows:

DIRECT EXAMINATION
BY MS. SOLOWAY:

Q  Good morning, Mr. Kehoe. How are you?

A  Fine, thanks. Good morning.

Q  Thank you so much for your patience this morning as we were getting going.

Could I ask you to please state your full name for the record?

A  Michael Noel Kehoe.

Q  What is your address?

A  18 Kensett Lane, Darien, Connecticut 06820.

Q  You understand you are under oath today just as if we are sitting in a court room with a judge and a jury?

Page 9

A  Yes.

Q  You understand that your testimony here today could be played in front of a jury in a trial in this case?

A  I do.

Q  You understand that you have an obligation to testify truthfully?

A  I do.

Q  Is there any reason why you would not be able to testify truthfully here today?

A  No.

Q  You are feeling okay?

A  Fine.

Q  Okay. Good. If you don't understand one of my questions, please let me know. I am happy to rephrase it. So just let me know if there is any issue.

A  Okay.

Q  Okay. I will try very hard not to talk over you. It makes it very difficult for the court reporter. Sometimes it can be hard with the Zoom format to tell when people are done and know when to start. We will try to make her life easy that way.

You and I have never met before. Correct?

3 (Pages 6 - 9)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 10

A   Correct.

Q   In advance of this deposition, in preparation for this deposition, you have not spoken with anyone at Vanda.  Correct?

A   Correct.

Q   Or with any other, any of the defendants in the case.  Correct?

A   Correct.

Q   I am just going to start with some background information if you wouldn't mind.  Would you mind giving me an overview of your educational background?

A   Sure.  I went to the University of Pennsylvania for undergraduate studies and then Yale University for an MBA.

Q   What year did you graduate Penn?

A   2000.

Q   You are younger than me.  We did not overlap.

Did you attend -- I am sorry.

Where did you attend graduate school?  I think you said.

A   Yale.

Q   Yale.  Was that for an MBA or --

A   It was.

Page 11

Q   Are you currently employed?

A   I am.

Q   By Rothschild & Co.?

A   That is right.

Q   Since you graduated from -- or since you finished your formal education, have you worked anywhere other than Rothschild & Co.

A   Yes.

Q   Give me at a high level, an overview of your career since completing school.

A   Outside -- after undergraduate I worked in the equity options industry for, I guess mainly for Knight Securities which was ultimately acquired by CitiGroup.

And then after business school, I worked for CIBC and Cowen and Co. before going to Roth.

Q   Just at a high level, what types of jobs -- I mean we can start with your first job, but what responsibilities have you had?  Have you always been an investment professional?

A   Since business school, yes.  Prior to that I was a trader, options trader activities.

Q   Got it.  Then since you finished your MBA, you have been an investment professional?

A   Correct.  In an oriented analytical

Page 12

capability or capacity I should say.

Q   How long have you been at Rothschild?

A   Just over 13 years.

Q   Are you the managing director there?

A   I am.

Q   Since you have been at Rothschild, I assume you've had a number of positions; is that fair?

A   Yes.

Q   Can you walk me through since the time you have been at Rothschild what positions you have held there?

A   So, my title has changed from vice president to director to managing director, so it's three different titles.

My job responsibilities have changed once. So my first job responsibility was an analyst.  And then subsequently became a portfolio manager.

Q   When did you become a portfolio manager?

A   I have to answer that two ways.  I was a, what we call a backup portfolio manager for the last five years, but I have been the sole lead portfolio manager for the small and mid cap portfolio for about two and a half years.

Q   You have been working on the small and mid

Page 13

cap portfolios in some capacity now for how many years?

A   Thirteen.

Q   Got it.  You have been with these two strategies the entire time you have been at Rothschild?

A   That is correct.

Q   During the time period or -- let's just start in 2017.  Which of these jobs did you have? Is that a time when you were an analyst?

A   Yes.  I would characterize it as an analyst.

Q   In 2018?

A   Still an analyst.  Yes.

Q   Then 2019?

A   That is when I became the portfolio manager.  I believe it was in mid -- early '19 or mid '19.  Mid '19.

Q   Mid '19?

A   Yes.

Q   Okay.  Fair enough.  Turning to -- we can get back into the strategies in a minute.  Just turning to the plaintiff in this case.  The plaintiff in this case has a full name:  Teamsters Local 727 Pension Fund.  Is it okay with you if

4 (Pages 10 - 13)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 14

today I just refer to them as Teamsters to keep it short?

A   Yes.

Q   You will understand who I am talking about if I say Teamsters?

A   Yes.

Q   Okay.  Did you have any -- in connection with your role as an analyst or a leader in your role with some portfolio management responsibilities, did you interact with Teamsters in any way?

A   No.

Q   Is it one of your responsibilities to interact -- again, as an analyst working on these strategies, was it your responsibility to interact with clients of Rothschild who might invest in those strategies?

A   Not with any regularity.  Maybe if it was a new client and they came in to meet us before investing with us, there would be an introduction, but not after that, no.

Q   Okay.

A   Generally.

Q   Are you aware, sitting here today, that Teamsters is one of Rothschild's customer accounts?

Page 15

A   I believe it was.  Correct?

Q   Yes.

A   Yes.

Q   Are you familiar at all with Teamsters?

A   No.

Q   So, you are not familiar with what types of strategies they invest in, for example?

A   No, I wouldn't have that.

Q   You have never spoken with any representative of Teamsters?

A   No.

Q   Have you ever spoken to Teamsters in connection with any investment by Rothschild for Teamsters in Vanda Securities?

A   No.

Q   To your knowledge did Teamsters ever call anyone at Rothschild to ask about Rothschild's investment thesis in Vanda?

MS. MALINA:  Objection.

THE WITNESS:  Not to my knowledge.

BY MS. SOLOWAY:

Q   Did you do anything to prepare for today's deposition?

A   Nothing out of the ordinary, no.

Q   Let me just ask, other than speaking with

Page 16

your counsel, Mr. Tabak, who is here with us today, did you do anything to prepare for this deposition?

A   No.

Q   Did you go back, outside of with Mr. Tabak, and review any documents?

A   No.  Whatever he showed me, which was I think some --

Q   You don't have to tell me what he showed you.  I am just going --

(Talking on top of each other.)

A   I don't actually recall.  He just showed me what you shared with him.

Q   Putting aside what Mr. Tabak showed you, because I don't want to hear about anything that happened between you and your counsel, did you go and look at any documents?

A   No.

Q   Did you go talk to any of your colleagues, for example, to try to remember the events that surrounded the Rothschild investment in Vanda?

A   No.

Q   Have you talked to anyone other than Mr. Tabak about the testimony you would give today?

A   No.

Q   How many times did you meet with

Page 17

Mr. Tabak?

A   Once.

Q   For how long?

A   Couple hours.

Q   Have you spoken with anyone from the plaintiffs about this deposition?

A   No.

Q   Have you spoken to plaintiffs' counsel?

A   No.

Q   Are you aware that Rothschild has produced documents to the parties in this case in connection with this litigation?

A   Yes.

Q   Did you have anything to do with collecting those documents?

A   No.

Q   Are you aware of what was produced?

A   (Shaking head.)

Q   No.  Do you have any hard copy documents that relate to investments that Rothschild made in Vanda?

A   I believe those were filed away, and that is what they went through to produce for you.  But I wasn't part of that process.

Q   Understood.  I am just trying to

5 (Pages 14 - 17)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 18

understand what you might have in your personal possession.

A  Nothing.

Q  Okay.  Anything that you might have had that related to Rothschild's investment in Vanda would have been put in files?

A  That's right.

Q  Okay.  Then other than, other than those types of hard copy documents, it would have been retained electronically?

A  That is correct.

Q  Other than e-mail is there any other electronic location where those documents may have been located?

A  No, not that I am aware of.

Q  Do you create -- for example, if you look at analysts' reports in connection with an investment, do you create a file that memorialized what analyst reports you looked at?

A  That is possible.

Q  Do you know whether you did that in connection with your investment in Vanda?

A  (Silence.)

Q  I am sorry.  I didn't hear that.  I think you cut out.

Page 19

A  I don't recall.

Q  Okay.  Thanks.  I want to just cover -- actually, let me take a step back.  Is your expertise as an analyst focused on the Pharmaceutical industry?

MS. MALINA:  Objection.

(Reporter clarification.)

BY MS. SOLOWAY:

Q  Excuse me, healthcare.  Thank you.

The sound is not perfect today, we will keep going, but -- Mr. Kehoe, if you have any trouble hearing me, let me know, because it's not always perfect up here.

A  Audio is okay.

Q  It's okay.  Good.  Do you have educational background in health care at all?

A  No, not in sciences if that is what you are asking like a Master's or anything like that, no.

Q  When you came out of school and decided to focus on health care, is that the first time you got exposure to the health care industry?

MS. MALINA:  Objection.

THE WITNESS:  When I traded equity options it was in health care as well.

Page 20

BY MS. SOLOWAY:

Q  Got it.  Have you focused in health care for your career?

A  Yes.

Q  You continue to do that today?

A  Yes.

Q  I am just going to ask you some very general questions about investing in health care and particularly in investing in pharmaceutical companies.

Would you agree that investors in the pharmaceutical industry take on risks?

A  Yes.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q  Did you always --

(Talking on top of each other.)

Q  Can you identify the types of risks that investors in the pharmaceutical industry take on?

A  Basic investment risk, capital risk.  They are investing in companies that may or may not succeed.

Q  Specific to pharmaceutical companies in particular, what types of risks tend to, you know, tend to present in that particular industry?

Page 21

A  There is clinical risk, self-study risk.  There is regulatory risk from the FDA.  There is commercial risks from launching a product and building a commercial team and promoting it properly, educating physicians.  That can also be a risk.  And competitive risk.

Q  So, I think you just named five categories of risk.  I am going to ask you to take me through them just so every, just so -- a jury may not understand what all of those things mean.  You'll forgive me if I ask you to give me a little bit more granularity.

When you say clinical risk, I think you said clinical study risks, what do you mean?

A  A company in order to gain approval from the FDA needs to conduct a clinical study, which means in humans to satisfy the FDA's requirements with some statistical level of proof that the drug, in fact, does what they say it does.

Q  There are multiple phases of studies that have to be conducted, correct?

A  There's three.

Q  And there is studies that test safety as well as -- let's start with that.  There are safety studies.  Correct?

6 (Pages 18 - 21)

CONFIDENTIAL

ATTORNEYS EYES ONLY

Page 22

A  Correct.

Q  Then there are efficacy studies.  Correct?

A  Correct.

Q  What is -- when I say "efficacy studies," what does that mean to you?

A  It means what I just said prior to that, the drug works.  Generally versus a placebo or a control group.

Q  How long is the pipeline, to your understanding, for FDA approval from beginning to end?

MS. MALINA:  Objection.

THE WITNESS:  How long is the process from starting phase one and getting all the way through phase three?

BY MS. SOLOWAY:

Q  Yes.

A  That's the question?  It depends on -- it depends on the clinical study, kind of the disease they are targeting.  So, you could have, you know, the duration or end point time in which they are trying to prove can be very short or long.  It depends.

Q  Do you have any understanding of whether there is an average?

Page 23

MS. MALINA:  Objection.

THE WITNESS:  You know, maybe three to four years.

BY MS. SOLOWAY:

Q  From phase one through phase three?

A  Yes.  Maybe three years.  Depends.  I don't know.

Q  For some drugs it can take much longer.  Correct?

A  Like I said, it depends.  If you are asking just perform or conduct a study or if you are saying from phase one to approval, I am thinking about approval.

Q  I'm sorry.  I was actually -- let's rephrase the question just to make sure we are on the same page.

From the time that a company starts phase one trials through approval can take many years.  Correct?

A  Correct.

Q  Do you have a ballpark sense of what the average is?

A  I would say four years.

Q  For some drugs it can take longer.  Correct?

Page 24

A  Correct.  Or shorter.

Q  So, when you said that clinical studies risk is inherent in investing in pharmaceutical companies, what you meant, I believe, is that investors who invest in pharmaceutical companies run the risk that the clinical study will not prove the efficacy or the safety of the drug.  Correct?

MS. MALINA:  Objection.

THE WITNESS:  Correct.

BY MS. SOLOWAY:

Q  You then said there was regulatory risk; is that right?

A  Right.

Q  What did you mean by that?

A  The FDA, a lot of times in some instances, if it's a new mechanism, a new type of science, they are trying to figure it out as they go.

So while the company can tell investors what their intentions are, what design study they want to, you know, sort of implement, it has to be agreed to by the FDA.  And sometimes you don't know how that is going to play out.

Q  So --

A  And the FDA can also just at the end of the day, you can do all your clinical studies and

Page 25

then you can follow your thesis MBA, and the FDA can say they just don't think, well, it's not a case that statistically proves and that efficacy just wasn't strong enough to warrant its approval.  Or maybe --

(Court reporter interrupts.  Transmission lag time.)

THE WITNESS:  That efficacy wasn't strong enough or that there was a safety signal that raised a risk that didn't justify the efficacy.

BY MS. SOLOWAY:

Q  During the time that a drug is in the clinical trial pipeline, there is dialogue between the FDA and the company.  Correct?

A  Correct.

Q  Not all of that dialogue is public information.  Correct?

A  Correct.

Q  You understand that companies have competitive reasons to preserve the confidentiality of certain clinical trial data?

MS. MALINA:  Objection.

THE WITNESS:  That is correct.

BY MS. SOLOWAY:

Q  Have you ever heard of a clinical hold?

7 (Pages 22 - 25)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 26

A   I have.

Q   What is it?

A   It's when the FDA halts a clinical study, or you know, stops a company from starting a clinical study because of safety concerns.

Q   Is it always safety concerns?

A   It could be utility or I suppose the drug is not working so there is no point in pursuing it.

Q   Are there any other situations where a clinical hold might be imposed?

A   It's possible.

Q   Is it understood by you as an investor in the pharmaceutical industry that clinical holds are a risk in connection with pharmaceutical investments?

A   Yes.

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Q   Did you understand my question?

A   I said yes.

Q   Do you -- have you ever heard of off-label marketing?

A   I have.

Q   That is a term you are familiar with?

Page 27

A   I am.

Q   What does it mean to you?

A   It means you promote a drug for a disease that is not indicated on its label.

Q   Do you have any sense of the extent to which off-label marketing happens in the pharmaceutical industry?

MS. MALINA:  Objection.

THE WITNESS:  I don't.

BY MS. SOLOWAY:

Q   Have you ever sold a stock in a pharmaceutical company upon learning that an allegation of off-label marketing had been made in a private litigation?

A   I don't recall.

Q   You don't recall ever doing that?

A   I don't recall that happening or -- so, therefore, I don't think I did.

Q   I didn't catch the last few words.  "I don't think I did;" is that what you said?

A   I don't know if I did or didn't.

Q   Do you have an understanding of how pharmaceutical sales representatives are compensated?

A   I believe they have a base salary, and

Page 28

they are incentivized with sales goals.

Q   Tell me what that means by incentivized by sales goals?

A   Bonuses.

Q   What are those bonuses, to your understanding, based on?

A   I couldn't even --

MS. MALINA:  Objection.

THE WITNESS:  I could not speculate on how a management team incentivizes their sales people.  That's not something they go around disclosing.

BY MS. SOLOWAY:

Q   Understood.  I am just trying to understand at a high level when you say they are incentivized with sales goals, at a high level, you mean, correct me if I am not getting this right, that the amount of drug that that sales representative is responsible for selling. Correct?

MS. MALINA:  Objection.

THE WITNESS:  Again, that could be the case.  I don't know how they are incentivized.

BY MS. SOLOWAY:

Page 29

Q   Okay.  Fair enough.  So, I am going to have you look at a document -- you know, I should mention we sent you a binder of hard copy documents.

A   Yes.

Q   Your counsel and I agreed that you would cut the envelope open, but not open the binder until the deposition; is that right?

A   That is correct.

Q   Okay.  So you have the binder in front of you?

A   I do.

MS. SOLOWAY:  Avital, do you have the binder as well?

MS. MALINA:  Yes, I do.

I want to note that our secretary opens this but nobody looked at what was inside and I'm reopening it now.

MS. SOLOWAY:  That is fine.  I trust you.

BY MS. SOLOWAY:

Q   Mr. Kehoe, with a couple of the documents we made a mistake and we did not include the full document, inadvertently, in the binder, so for a couple of the documents I am going to show you on

8 (Pages 26 - 29)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 30

the screen and the others I will send you to the binder.

MS. SOLOWAY: Avital, I will let you know when that is happening if that is okay with you.

MS. MALINA: Sure.

MS. SOLOWAY: There is a document at tab 20 in your binder but it is not the complete document. So I am going to ask my team if they could also just put the full document up on the Exhibit Share.

We will mark Exhibit, tab 20 as Exhibit 1 for this deposition.

(Exhibit 1: Marked for identification.)

THE WITNESS: I am sorry. Do you want me to go to the binder or are you going to disclose it visually?

MS. SOLOWAY: Both.

BY MS. SOLOWAY:

Q If you would like to look at the cover page of the document, it is in tab 20 of your binder, and the rest of the document is on Exhibit Share.

A Got it.

Page 31

Q I am very sorry for that.

A It's okay.

Q Just, Mr. Kehoe, just in case you want to look at the version that is online, which is the complete document, if you go into the Veritext platform now, do you see where it says Deposition of Mike Kehoe, and then it says Marked Exhibits?

A Yes. It says Marked Exhibits, yes. It says the folder is empty. Do I have to refresh this?

Q If you close it and reopen that folder, it should show up as Exhibit 1 now.

A Okay. Let me refresh it.

MS. MALINA: I just would like to ask the exhibits be marked confidential.

This is Avital Malina. I am just asking that the transcript be marked confidential.

TECHNICIAN: This is Clint, the tech. I will confirm for everyone that the exhibit is indeed showing up in the Marked Exhibit folder.

THE WITNESS: I see it.

BY MS. SOLOWAY:

Q Okay. So Mr. Kehoe, the first page is in

Page 32

your binder, and the rest of the exhibit is only available online.

A I see it.

Q Good. First of all, do you recognize this document?

A No.

Q The cover page is an e-mail dated November 19, 2018? Do you see that?

A I do.

Q I couldn't tell from looking at this whether this is a document that you would have received. Your name is not listed, but there are a bunch of Rothschild groups.

You see, like there is some group lists it was sent to, and I wouldn't know who was in that group. So Sales and Client Services Associates Group.

Do you know -- if you don't know, it's totally fine. Do you know whether this is an e-mail you would have received through one of the groups that is listed here?

A I see two groups. Correct me if you see more. I see NYC and US Sales and Client Service Associates.

(Talking on top of each other.)

Page 33

I see AMUS. It's an acronym, stands for -- well, AMUS. It's a Sales and Client Services Associates. That is one group.

The other group I see is NYC AMUS, underscore, OPS. Those are the two groups I see, and I would not be in either of those.

Q Got it. I am going to ask you a couple questions about the document. If you look below you will see it says, "Teamsters 727 Pension Fund will invest approximately 22 million into Rothschild USA Small Cap Core." Do you see that?

A I do.

Q Rothschild's Small Cap Core is one of the strategies you referenced earlier?

A I did not reference Small Cap Core.

Q I apologize. Is Small Cap Core one of the funds that you performed work for as an analyst?

A It is.

Q Describe for me just generally what is U.S. Small Cap Core within Rothschild's business?

A Right. So we manage portfolios for clients that are tailored to an index that is managed by the Russell. In this index which is a Russell 2000, the Russell compiles 2,000 small cap stocks and creates an index.

9 (Pages 30 - 33)

CONFIDENTIAL
ATTORNEYS EYES ONLY



Page 34

And our service to our clients is we say we will match something very similar to this Russell 2000 group of stocks and try to out perform.

Page 35

Page 36

Page 37

10 (Pages 34 - 37)

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

CONFIDENTIAL

ATTORNEYS EYES ONLY

Page 38



Q  I am just making a note of everything you listed.  We will come back to that.

In this cover e-mail that we are looking at, if you look below, it says that the Teamsters will invest 22 mill into the U.S. Small Cap Core around December 1, 2018.  See that?

A  I do.

Page 40

Q  Is it your understanding then that based on what you told me earlier that Teamsters created an account for Rothschild to manage?

A  It looks like that, yes.

Q  The management was directed to be consistent with the U.S. Small Cap Core?

A  Mandate.  Correct.

Q  So, if a client like Teamsters comes to you after you already obviously have a strategy up and running, and they give you, as in this case, $22 million, how does Rothschild, what does Rothschild do with that $22 million?

MS. MALINA:  Objection.  Outside the scope.

THE WITNESS:  It's invested in the current holdings, current portfolio.

BY MS. SOLOWAY:

Q  So, you replicate what the current portfolio looks like at the time of the investment for the client?

A  Right.

Q  So if you had already made an investment here in Vanda Pharmaceuticals, and then Teamsters fund, you know, comes to you and say, We want you to use this existing strategy for us, you replicate

Page 41

the existing strategy for that client.  Correct?

A  Correct.

Q  So if Vanda Pharmaceuticals -- you know, I am going to make up a number -- is, you know, .50 percent of the portfolio for the overall strategy, you would make that true for this client, as well.  Correct?

A  Sorry.  Repeat the question, please.

Q  Sure.  When we say "replicate the strategy," I am trying to understand what that means.

It means that for the, you know, for any given client, you are going to make their, the amount of money they have given you model what you have got going in your strategy.  Correct?

A  That is correct.

Q  That tells you how many stocks in any given company to buy for that client.  Correct?

A  That is correct.

Q  You are not making new investment decisions specific to that client at the time they invest.  Correct?

MS. MALINA:  Objection.

THE WITNESS:  Not unless there's a prerequisite or something we find.  You

11 (Pages 38 - 41)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 42

know, not unless they asked us to exclude some type of stock.

BY MS. SOLOWAY:

Q   With respect to Teamsters, sitting here today, are you aware of any such exclusion?

A   I am not.

Q   I am going to put another document in front of you.  This one I think should be in your binder.  Tab 23.

MR. TABAK:  As long as we are moving to another document -- this is Mr. Tabak -- my understanding is the confidentiality order in the case provides that the entire transcript is confidential for a certain time period.

So we will live with that and I think when we go back, we may, in particular look at the testimony Mr. Kehoe just gave for confidentiality purposes.

MS. SOLOWAY:  That's not a problem.  We can talk about designations of confidential information at a later time.

But we all agree to keep the transcript confidential until we have worked through that, Dan.

Page 43

BY MS. SOLOWAY:

Q   I am on tab 23 of your binder, Mr. Kehoe.

A   Okay.

Q   This is a January 28, 2019 e-mail to you and many others.  Your name, by the way, appears somewhere in the middle of the page, in case you are looking for it.

A   Yes.  I see it, yes.

Q   If you turn to the second page of this e-mail, do you see that?

A   I do, yes.

Q   Is this -- taking a look at this e-mail, to me this appears to be a description of Teamsters investing in the -- excuse me -- in the Rothschild Fund under strategy SCC; do you see that?

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Q   Is that the small cap funds we were just talking about?

A   It is.

Q   Okay.  When it says funded date, do you see that, it says 1/22/2019?

A   I do.

Q   What does that mean?

Page 44

A   That is when their funds are invested.  I shouldn't say their funds.  That is when it was invested.  Generally when they are invested, that's when their capital is funded to us.

Q   Is that when the stocks would be purchased to replicate the small cap fund portfolio?

A   It is.

Q   I am just going to have you look at one more document quickly, tab 33 of your binder.  And I will just mention this one is missing the cover e-mail.  It might be easier to look at it on the screen.

I apologize.  I think I did not mark the last document as an exhibit.

MS. SOLOWAY:  For the record that is Exhibit 2.

(Exhibit 2:
Marked for identification.)

THE WITNESS:  Do you want me to look in the binder?

BY MS. SOLOWAY:

Q   Why don't we go to the screen just to make it easier for you, Mr. Kehoe?

A   I am going to refresh it.

Q   Sure.  This is an e-mail dated February

Page 45

12, 2020 from someone named Kunal Desai; do you see that?

A   I don't.  My screen is still --

Q   I will give you a minute.  Let me know.

A   Okay.  It just populated.  I see three exhibits.  Which one am I supposed to --

Q   Exhibit 3, please.

A   Okay.

Q   So, do you see it says, "Please liquidate assets as per attached client request"?

A   I do.

Q   Do you see in the subject line, it references Teamsters 727?

A   It does.

Q   If you go to the next page, do you see there is a February 7, 2020 letter?

A   I do.

Q   The letter, in the second paragraph says, "We are asking that Rothschild liquidate all securities in the most efficient manner possible."  Do you see that?

A   I do.

Q   Do you have an understanding that Teamsters closed its account with Rothschild on or about February 7, 2020?

12 (Pages 42 - 45)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 46

A   I don't recall.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q   You would not have been aware of this at the time?

A   I would have been aware of this at the time, but I don't recall when I sold those assets.

Q   Fair enough.  Sitting here today, you don't remember this?

A   Yes.

Q   Okay.  Do you have any recollection of ever being told the reason why Teamsters closed their account?

MS. MALINA:  Objection.

THE WITNESS:  I don't recall.

BY MS. SOLOWAY:

Q   Do you know anything else about why Teamsters sent the letter that's attached as Exhibit 3?

(Exhibit 3:
Marked for identification.)

MS. MALINA:  Objection.

THE WITNESS:  Just straightforward e-mail, they want to redeem their assets.

BY MS. SOLOWAY:

Page 47

Q   You don't have any further information about why?

A   I don't.

Q   Okay.

MS. MALINA:  Asked and answered.

MS. SOLOWAY:  That is fine.  All right.

BY MS. SOLOWAY:

Q   I want to turn to the work that you did in, you know, as an analyst at Rothschild to consider the Vanda investment now.

A   Okay.

Q   Okay.  Just to orient you in time, why don't you take a look -- you can look in the binder at tab 7 which I will mark as Exhibit 4.

(Exhibit 4:
Marked for identification.)

BY MS. SOLOWAY:

Q   Let me know when you have had a chance to take a quick look at it.

A   I have the binder open.  I am waiting for the exhibit on the video to upload.

Q   This should be the same as in your binder.

A   I can work off the binder if that is okay with you.

Page 48

Q   Totally.

A   Okay.

Q   So, this is an e-mail from Daniel Oshinskie.  Do you see that?

A   Oshinskie, correct.

Q   I am sorry.  I apologize.  Don't tell him I screwed up his name.  Is he a colleague of yours?

A   He was.  He is no longer employed at Rothschild.

Q   Did he work in your group?

A   He did.

Q   Was he another analyst?

A   He was a portfolio manager.

Q   Got it.  Then there is a group of other Rothschild employees.  Correct?

A   Yes.

Q   You are copied on this?

A   Yes.

Q   So this says, "We began" -- the first sentence says, "We began to purchase a new stock today in our Small Cap Core and our Small Cap Growth strategies."  Do you see that?

A   I do.

Q   This e-mail is dated September 13, 2017?

A   It is.

Page 49

Q   Do you have a recollection that the Small Cap Core. strategy first invested in Vanda in September of 2017?

MS. MALINA:  Objection.

THE WITNESS:  I don't know the exact date.  I know it was back in that time period, yes.

BY MS. SOLOWAY:

Q   Okay.  Does this e-mail refresh your recollection about the timing of all that?

A   Yes.

Q   You have no reason to doubt what is in this e-mail.  Correct?

A   I don't, no.

Q   Okay.  Does that mean that as of the time that this investment was made that is referenced in the September 17th e-mail that you had done the process that we talked about earlier of first having the quantitative analysis?

A   Sorry to interrupt.  You said September 17th?

Q   I am sorry.  I think I said September of 2017.

A   Okay.  Yes.  Okay.  Sorry.

Q   I just want to make sure we're on the same

13 (Pages 46 - 49)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 50

page. I am just trying --

A   The e-mail says September 13 --

Q   Of course.

A   -- of 2017.

Q   Of course. I am trying to help sort of situate us back in time. Right?

A   Right.

Q   The month of September 2017, is it consistent with your recollection that in or about that month Rothschild made its investment in Vanda?

A   Yes.

Q   Okay. I just want to understand, this investment would have been made after conducting that two-step process that you testified about earlier?

A   It would, yes.

Q   Tell me who on the team at Rothschild would have been responsible for analyzing Vanda?

A   I would.

Q   Were you the only person?

A   Yes.

Q   How did that -- how did that responsibility come to you?

A   I am the health care analyst, analyst for health care.

Page 51

Q   There is no one else on your team who looks, at the time, at health care? No other analyst that looked at health care at the time?

A   No.

Q   Do you know whether, after making this initial investment in Vanda in September of 2017, the Small Cap Core strategy purchased additional shares of Vanda in 2017 or 2018?

A   I don't recall.

Q   So, you, sitting here today, don't remember whether the strategy made additional purchases of Vanda Securities over time?

A   They would have built a position and sometimes that can take time. I can't stand here today and tell you how long that took or when they did those purchases.

Q   Fair enough. Okay. Do you remember personally being involved in any strategic decision making?

I understand when you are building a position, you might not buy everything in one day. Right? You may spread it out over some period of time; is that fair?

A   Yes.

Q   But do you remember being --

Page 52

MS. MALINA:  Object.

BY MS. SOLOWAY:

Q   -- involved in any, in any substantive analysis either later in 2017 or in 2018, about deciding to increase the size of the Vanda position?

A   I would have been consulted with -- or it would have been brought to my attention, yes.

Q   Do you recall any such discussions?

A   I don't.

Q   I want to turn your attention -- I think this one will be easier to look at in the binder -- to tab 9.

A   Okay.

Q   It might make sense for you to take a minute to look at this one. It's long and you should take the time you need to review it. And then I will ask you questions about it.

MS. SOLOWAY:  For the record we will mark this, by the way, as Exhibit 5.

(Exhibit 5:
Marked for identification.)

BY MS. SOLOWAY:

Q   This is a September 20, 2017 e-mail from you. Correct?

Page 53

A   It is.

Q   Was this e-mail written around the time that you conducted the analysis that's described in it?

A   It is.

Q   Is it fair to say that as the preparer of this e-mail, you had knowledge of the subject matter of the e-mail?

A   That is fair.

Q   And is this exhibit, was it prepared by you in the course of your usual business activity at Rothschild?

A   It was.

Q   Would you like me to give you a minute to take a look at the document? I don't want to rush you.

A   I will take some time, sure.

(Pause.)

THE WITNESS:  Okay.

BY MS. SOLOWAY:

Q   At a high level does this document reflect your investment thesis in Vanda at the time you decided to invest in the company in September of 2017?

A   Yes.

14 (Pages 50 - 53)

CONFIDENTIAL
ATTORNEYS EYES ONLY



Page 54

Q   Is it common that when you make an investment decision for the strategy, and I mean the small cap strategy, that you would memorialize that in a writing?

A   It is.

Q   Is that what this is?

A   It is.

Q   I want to ask you a few questions about the investment thesis, as you described it here. If I take you to investment positives?

A   It is.

Page 55

Page 56

Page 57

Veritext Legal Solutions

212-279-9424                www.veritext.com                212-490-3430

CONFIDENTIAL
ATTORNEYS EYES ONLY



16 (Pages 58 - 61)

CONFIDENTIAL
ATTORNEYS EYES ONLY



Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

CONFIDENTIAL
ATTORNEYS EYES ONLY



Page 66

Page 68

Page 67

Page 69

BY MS. SOLOWAY:

Q  If I can ask you to turn to -- first of all, are you doing okay?  Because we have been going about an hour.  I am happy to give you a break.  Otherwise we can keep going.  It's totally up to you and your lawyer.

MR. TABAK:  Why don't we take a break?  We have gone for an hour.  We can come back.

MS. SOLOWAY:  We usually just mute it and turn -- so that there's no technical difficulty getting back on, so we usually just mute it and turn our cameras.

VIDEOGRAPHER:  Going off the record.  The time is 10:50.

MS. SOLOWAY:  We will come back at 10:55.

A VOICE:  Recording stopped.

18 (Pages 66 - 69)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 70

(Whereupon, a brief recess was taken from 10:50 o'clock a.m. until 10:59 o'clock a.m.)

A VOICE:  Recording in progress.

VIDEOGRAPHER:  We are going back on and the time is 10:59.

BY MS. SOLOWAY:

Q  Hi, Mr. Kehoe.  Going back to Exhibit 5 which we were looking at right before the break, do you know whether you ever revised the investment thesis contained in this document?

A  Yes.  All theses are an ongoing dynamic conversation and analysis.

Q  I should have asked a more clear question.  I mean in writing.  Do you know whether you ever wrote up another investment thesis?

A  Not like this.  Not that I am aware of.  No.

Q  Okay.  I am going to have you turn to tab 8 of your binder.

MS. SOLOWAY:  We will mark that as Exhibit 6.

(Exhibit 6:
Marked for identification.)

THE WITNESS:  Okay.

BY MS. SOLOWAY:

Page 71

Q  Okay.  So, why don't we start.  You should, obviously, take the time you need to read the document, but we will start by setting the scene.

This is an -- at the top line this is a September 14, 2017 e-mail from you to Sarah Weber.  Do you see that?

A  I do.

Q  Who is Ms. Weber?

A  Looks like she works at Piper Jaffray and she is -- well, Charles Duncan is the analyst.  I'm guessing Sarah might have been an associate of his.

Q  Got it.  Sometimes you speak to analysts in the course of doing your investment analysis?

A  Yes.

Q  Is Sarah a person you spoke to in connection with Vanda?

A  I don't recall if I spoke to her.

Q  I apologize.  You e-mailed her.  Fair enough?

A  Yes.

Q  This e-mail from you is written on September 14, 2017.  That is around the time that you made your initial investment in this small cap fund in Vanda.  Correct?

Page 72

A  Correct.

Q  Fair to say as the author of at least some of this e-mail, you had knowledge of the subject matter?

A  Yes.

Q  And is this document something that was prepared by you in the course of your regularly conducted business at Rothschild?

A  Yes.

Q  So, I just want to bring your attention to the page -- you said you don't remember if you had a call with her?  She says in her September 14, 2017 10:05 message, "Following up on our call yesterday."  Do you see that?

A  Yes.

Q  Sitting here today do you remember speaking with her?

A  I don't.

Q  She then says, "See some thoughts to your questions below."  Do you see that?

A  I do.

Q  Okay.  If you look below you'll see where it says, "Questions on Vanda."

And then there is a bunch of topics with bullets with little bubbles underneath.

Page 73

A  I do.

Q  Tell me if I am reading this correctly.  Are the bullets with the line questions and then the bubbles responses?

A  That is what it looks like to me.

Q  Okay.  Do you understand this e-mail to be communicating her thoughts on some questions she believes you asked during the call?

A  That, that seems logical, yes.  Reasonable.

Q  Okay.  Fair enough.

I want to ask you about a couple of the issues in this e-mail.  At the bottom of the page, it says, "Non 24 script drivers."  Do you see that?

A  I do.

Q  Do you understand this section to be about Hetlioz?

A  Yes.  That would be the assumption, yes.

Q  Okay.  If you turn to the next page, the top of the page, there is a third bullet down that says, "Awareness of the disorder itself, and that a treatment exists are the biggest hurdles at this point."

And then it goes on to say, "A lot of steps to help patients give a name to their

19 (Pages 70 - 73)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 74

problem, then try drug." Do you see that?

A   I do.

Q   Do you have an understanding what that bullet refers to?

A   What she is saying is sort of what I mentioned earlier. This is a commercial risk. So it sounds like the company and its sales force has got to educate clinicians on how to look out for this particular disorder.

So, therefore, a physician has to know how to look out for it and then prescribe Hetlioz.

Q   To your understanding is it common that companies, pharmaceutical companies who are selling, I think you described it earlier as a orphan drug, would need to educate the physician community about both the disorder and the drug itself?

MS. MALINA:  Objection.

THE WITNESS:  That is normal -- or that's not -- yes, that happens.

BY MS. SOLOWAY:

Q   When she writes -- I get that these are her -- I think these are her words, not yours. If I understand the way this e-mail is written, "a lot of steps to help patients give a name to their

Page 75

problem" -- do you see that?

A   I do.

Q   What does that mean?

A   Steps is what I just referenced. You need your commercial team to educate the physicians, and the physicians need to be able to diagnose the particular issue which the patient presents as their issue so they can properly diagnose and prescribe the drug.

Q   Do you have an understanding of how difficult, if at all, it was to diagnose the non 24?

A   I don't.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q   Underneath you see where it says Fanapt royalties?

A   Yes.

Q   It says, "I see your math on the nine percent."

A   Yes.

Q   Do you happen to remember what the math on the nine percent was?

A   Well, if it's royalties, I don't know. I don't know, but I would guess it's on sales, a

Page 76

royalty on sales. That just says royalty.

Q   You think you may have been looking at the Fanapt sales at that point?

MS. MALINA:  Objection.

THE WITNESS:  I don't recall.

BY MS. SOLOWAY:

Q   Fair enough. The second bullet says, "To be commercially successful we'll need to market focusing on lack of akathisia." Do you remember what akathisia is?

A   I don't.

Q   Do you understand that certain types of antipsychotics have side effects?

A   Oh, yes. All drugs do.

Q   Yes, they do. Do you -- do you have an understanding of whether Fanapt had a pointed differentiation as compared to other drugs based on the lack of certain side effects?

MS. MALINA:  Objection.

THE WITNESS:  I don't recall.

BY MS. SOLOWAY:

Q   Sitting here today you don't remember what akathisia is?

A   I don't.

Q   Okay. It goes on to say, "2H17 will be a

Page 77

proving ground on how receptive the market is to this message." Do you see that?

A   Yes.

Q   Do you have an understanding sitting here today what that means?

A   What she is saying --

MS. MALINA:  Objection.

THE WITNESS:  I think what she is saying is the commercial effort has been implemented, and so we will know if that commercial effort or that education effort works or not in the second half of '17.

BY MS. SOLOWAY:

Q   When she says, "this message," do I understand her to be referring back to the first sentence?

A   That -- that --

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Q   Sitting here today you don't remember what market focusing on lack of akathisia is?

MS. MALINA:  Objection; asked and answered.

THE WITNESS:  I don't.

20 (Pages 74 - 77)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 78

BY MS. SOLOWAY:

Q   At the bottom, second to the last bullet, it says, "I am just more compelled by the growth opportunity and return on investment from a new orphan market E, period, U, period, Hetlioz and SMS and/or maybe even Autism related sleep."  Do you see that?

A   Yes.

Q   Reading this e-mail today, do you understand that to be Ms. Weber's view?

A   I do.

Q   Do you agree with that view?

A   I did at the time.

Q   Underneath that it says, "One interesting synergy is a psychiatrist sales force could market Hetlioz for non 24 and SMS as well as Fanapt."  Do you see that?

A   I do.

Q   Do you have an understanding of why Hetlioz would be marketed by psychiatrists?

MS. MALINA:  Objection.

THE WITNESS:  If -- I am sorry.

Please repeat the question.

BY MS. SOLOWAY:

Q   Sure.  Do you have an understanding of why

Page 79

Hetlioz would be marketed to psychiatrists?

A   Because these people who are off cycle would potentially go to a psychiatrist to tell them about their symptoms and see if they could prescribe a drug to help.

Q   So a psychiatrist may treat sleep disorders.  Correct?

MS. MALINA:  Objection.

THE WITNESS:  If you have a sleep disorder, you could have some sort of psychosis.

You could have -- I, you know, the severity of the symptoms with someone who's afflicted with these diseases could get to the point, I would imagine, where you are seeing things and you're paranoid, or you're, you know, you have some sort of like sleep deprivation.

So you start seeing -- you don't feel right mentally.

BY MS. SOLOWAY:

Q   Got it.  Fair to say that in 2017 you understood that psychiatrists were part of the target audience for Hetlioz?

MS. MALINA:  Objection.

Page 80

THE WITNESS:  I was aware.  Yes.

BY MS. SOLOWAY:

Q   I just want to -- I am going to show you another e-mail.  It's in your binder at tab 19.

MS. SOLOWAY:  We can mark this as Exhibit -- let's see what are we up to -- Exhibit 7.

(Exhibit 7:
Marked for identification.)

MS. SOLOWAY:  Thomas, you are going to tell me if I fail to mark an exhibit.  Right?

MR. BOUNDS:  That is correct.

MS. SOLOWAY:  Okay.  We are marking tab 19 as Exhibit 7.

TECHNICIAN:  It's marked.

BY MS. SOLOWAY:

Q   Have you had a chance to look at that, Mr. Kehoe?

A   I see the binder.  I am waiting for the upload.

Q   It's the same one.  It's fine to look at the binder.  This is an e-mail from you to your colleague Mr. Oshinskie dated November 9, 2018.  Do

Page 81

you see that?

A   I do.

Q   You write in here, "I just realized that when discussing FOLD you mentioned jet lag disorder I just wanted to remind you that jet lag is treated with Hetlioz, which is Vanda's drug."  Do you see that?

A   I do.

Q   Did you have an understanding in 2018 that some patients with jet lag were being treated with Hetlioz?

MS. MALINA:  Objection.

THE WITNESS:  Yes, I don't recall that.

BY MS. SOLOWAY:

Q   What do you understand this e-mail to mean?

A   It sounds like there was some confusion what Dan and I were -- we are having a discussion.  Some of it is confusion between his jet lag disorder, what it's relevant to.

I'm explaining that it is relevant to Vanda, not another holding that we have.

Q   Sitting here today you can't remember whether you understood at the time that jet lag was

21 (Pages 78 - 81)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 82

treated with Hetlioz?

A  I don't.

Q  Okay.  All right.  Let's jump to the document that is in your binder at tab 11.

MS. SOLOWAY:  We will mark that as Exhibit 8.

(Exhibit 8:

Marked for identification.)

BY MS. SOLOWAY:

Q  Let me just start by asking you a couple background questions.

Mr. Kehoe, you said earlier that among things you looked at when you were researching stocks were analysts' reports.  Correct?

A  Right.

Q  Do you recall whether you looked at any Oppenheimer reports in connection with your research on Vanda?

A  I don't.  I don't recall.

Q  Does this report that we just marked as Exhibit 8 look familiar to you?

A  Exhibit 8 you say?

Q  Yes.  It's also, in case it's helpful, tab 11 of your binder?

A  Oh, thank you.

Page 83

Q  No problem.

A  Yes.  I see it here.  And this looks like something I would read, yes.

Q  But sitting here today do you know whether you read this report?

A  I don't.

Q  Okay.

A  I read thousands of things every day.

Q  Got it.  I would be shocked if you could tell me with precision exactly what research reports you were reading in October of 2017.  That would be impressive.

I just want to ask you a couple questions about what your understanding is of some of the information in this research report.

If you look under Key Points on the first page, do you see that there's a heading that says "Sighted non 24 opportunity could be large."  Do you see that?

A  I do.

Q  It says then, "Prevalence data for sighted non 24 is scant.  Based on our due diligence we conservatively estimate 145,000 sighted non 24 Hetlioz candidate patients in the six psychiatric conditions we analyze in this report."  You see

Page 84

that?

A  I do.

Q  It goes on to say, "Physicians feel certain sleep disorders remain underdiagnosed in psychiatric patients.  And we believe only modest penetration in this population could really accelerate sales growth."  Do you see that?

A  I do.

Q  Do you recall at the time, this is October of 2017, I think that we covered before you made your investment in September of 2017.  Correct?

A  Correct.

Q  So, do you recall at the time having done or having had an understanding of the potential market for sighted non 24?

A  I believe he referenced -- he or she, you know, Derek, I believe he's referencing SMS, but I don't know that to be certain.

Q  Sitting here today, this goes back to the question we talked about earlier, you don't recall whether there is a difference between SMS patients and sighted non 24 patients?

A  That is correct.

Q  I want to -- just let me see if I can refresh your recollection at all.

Page 85

If you flip to page -- so, you see the report has Bates numbers at the bottom, says Steinholt.  And there are some numbers.

A  Yes.

Q  Flip to the page that says 1159.

A  Okay.

Q  There is some -- if you look at the paragraph that says, "According to the specialist" --

A  Uh-huh.

Q  There's a discussion in here about -- you should take your time to review the document if you need to -- that talks about "currently the specialist treats approximately 150 patients with sighted non 24 of whom he suggests about 30 are being treated with Hetlioz."  Do you see that?

A  I do.

Q  Does that refresh your understanding at all about what your understanding was about how Hetlioz was being used at the time?

MS. MALINA:  Objection.

THE WITNESS:  It didn't, no.

BY MS. SOLOWAY:

Q  If you look down at the paragraph that starts, "It is clear to us that educating

22 (Pages 82 - 85)

Page 86

psychiatrists on sighted non 24 will play a major role on whether Vanda will be able to materially penetrate this market.

"Based on our discussion with Vanda management, few sighted non 24 patients are on Hetlioz therapy, meaning there is significant room for growth." Do you see that?

A I see it. Yes.

Q Do you recall earlier we talked about the education efforts that you said sometimes companies need to undertake in order to sell an orphan drug? Do you recall that?

A I do, yes.

Q Is it consistent with your understanding that at the time Vanda was engaged in such education efforts?

MS. MALINA: Objection.

THE WITNESS: My assumption is they are always engaging in those efforts.

BY MS. SOLOWAY:

Q No specific details coming to mind for you?

MS. MALINA: Objection.

THE WITNESS: No.

BY MS. SOLOWAY:

Page 87

Q Was that a no?

A That is a no.

Q All right. Then we can skip the rest of this document.

(Pause.)

I am not going to ask you about documents that you don't have recollections about. So we are skipping forward a little bit.

Let me ask you -- so, I want you -- in answering these questions, I want to exclude, I want you to exclude anything -- so I don't want you to tell me about privileged conversations with your counsel. I want to know what you knew before you prep'd for this deposition. Okay?

Don't tell me about your discussions with your counsel or anything you may have learned.

Excluding any preparation for this deposition with your counsel, have you heard of Aurelius Value?

A No.

Q You don't know who they are?

A I don't. I don't recall.

Q I am going to -- You don't recall?

A It's possible they came across my desk. You ask me today? I don't remember.

Page 88

Q That is fine. Let's take a look at -- let's take a look at -- this is one, I think.

MS. SOLOWAY: Actually, Thomas, I am not sure if this is in the binder, but can we put up the February 11, 2019 e-mail from Richard Vasquez to Mr. Kehoe? Can you see that, Mr. Kehoe?

TECHNICIAN: I will get on it right now.

MS. SOLOWAY: Thank you very much. Mine hasn't refreshed yet. Let's just give it a minute. I think this is Exhibit 9, right?

TECHNICIAN: That is correct.

(Exhibit 9: Marked for identification.)

BY MS. SOLOWAY:

Q All right. Mine just came up. So, I am going to start. Mr. Kehoe, if it's okay, I am going to start in the middle of the page where it says, "News Alert, Subject, Vanda Pharma six to eight month low after Aurelius' short report." Do you see that?

A I do.

Q To take you through the e-mail at the top,

Page 89

it looks like this is Exhibit 9 that we are looking at. Mr. Vasquez forwards it to you and a couple of others -- or one other. Excuse me.

A Yes. Yes.

Q Who is Mr. Vasquez?

A Our trader.

Q Okay. This is on February 11, 2019. Correct?

A Correct.

Q Sitting here today do you recall receiving this e-mail?

A I don't.

Q Do you know what report this is that is forwarded in the e-mail below or -- let me withdraw.

Do you know what the report is, the Aurelius report that's referenced in the e-mail below?

A I don't.

Q Do you remember ever reading that report?

A No.

Q Is it fair to say you don't know what information that report contained?

A That is fair.

Q If you look at the e-mail below, do you

23 (Pages 86 - 89)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 90

see that it says -- and now I'm looking at the e-mail from Bloomberg below. It says, "Shares of Vanda Pharmaceuticals drop as much as 9.8 percent to the lowest intraday since May 29, 2018, as research firm Aurelius Value says it is short on the company." Do you see that?

A  Yes.

Q  What is a short seller?

A  It's someone who has a negative opinion of a stock but they take that short position. To do that they borrow stock from someone else and sell it into the market. So they are effectively betting that the stock will go down.

Q  If someone takes a short position before releasing a report taking a negative position on the company, what economic interest do they have?

A  Please be more specific.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q  Sure. If an investor takes a short position and then releases a negative report on a company, what economic interest does that investor have?

MS. MALINA:  Objection.

THE WITNESS:  Their interest is for

Page 91

the stock to go down so they can profit.

BY MS. SOLOWAY:

Q  Right. So they are betting that the stock is going to go down. Correct?

A  Correct.

Q  In your experience can news that an investor is short on a company cause a stock to decline?

MS. MALINA:  Objection.

THE WITNESS:  Yes. That can happen.

BY MS. SOLOWAY:

Q  If you look here at the Bloomberg e-mail, do you see that?

A  I do.

Q  It says, quote, "We believe investors fundamentally misunderstand the true nature of Vanda activities, and therefore, see significant downside activities of the shares." Do you see that?

A  I do.

Q  Do you know what activities are being referred to?

A  I don't.

Q  You can't tell that from this e-mail. Correct?

Page 92

A  (Shaking head.)

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q  I didn't hear your answer.

A  No.

Q  Mr. Kehoe, I am going to ask you to flip now in your binder to tab -- sorry -- not tab. Hang on. A new document.

Thomas is going to put it up. This is a February 12, 2019 e-mail. Let's give it a minute to refresh but we'll mark this as Exhibit 10.

(Exhibit 10:
Marked for identification.)

BY MS. SOLOWAY:

Q  Let me know when it's up for you, sir?

A VOICE:  I am having a technical issue. Give me a second.

MS. SOLOWAY:  Sure.

BY MS. SOLOWAY:

Q  Mr. Kehoe, this was easier when I could just hand documents to witnesses.

A  I know, but I think virtual, net of all things, might be still better. But that is me as a witness.

Q  Hopefully for you, not wanting to sit in

Page 93

the room with a bunch of litigators?

(Pause.)

A  I still don't see it.

Q  Me either.

MS. SOLOWAY:  Thomas, it is not uploading.

MR. BOUNDS:  Give me one second.

MS. SOLOWAY:  Yes.

(Pause.)

VIDEOGRAPHER:  Go off the record briefly?

VIDEOGRAPHER:  Going off the record. Time is 11:28.

(Whereupon a recess was held from 11:28 o'clock a.m. until 11:36 o'clock a.m.)

A VOICE:  Recording stopped.

(Pause.)

TECHNICIAN:  We are good.

A VOICE:  Recording in progress.

VIDEOGRAPHER:  Going back on the record. Time is 11:36.

BY MS. SOLOWAY:

Q  Before we took that brief break, Mr. Kehoe, we were, we were trying to get Exhibit

24 (Pages 90 - 93)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 94

10 loaded.

You should be able to see Exhibit 10 now. This is a February 12, 2019 from MarketIntel@factset.com to you. Do you see that?

A Yes.

Q What is marketintel@factset.com?

A Fact Set is a data provider. They also -- they were -- they were (inaudible) Bloomberg. They provide a lot of financial data and information.

Q Do they send you periodic e-mails gathering a whole bunch of information?

A Yes. They just send any news and reports.

Q Okay. If you take a look at the page that's Bates stamped -- let me first ask you, you don't remember receiving this February 12, 2019 e-mail. Correct?

MS. MALINA: Objection.

COURT REPORTER: I didn't hear an answer.

THE WITNESS: Correct.

BY MS. SOLOWAY:

Q Let me ask it as a nonleading question, Mr. Kehoe. Do you remember receiving this February 12, 2019 e-mail?

A No.

Page 95

Q Take a look at the page that has Bates number 7778 in the bottom right corner.

A Okay.

Q 7778?

A Yes.

Q Do you see near the top of the page, it mentions Vanda on the left side, V-n-d-a?

A I see it.

Q It says, "Vanda Pharmaceuticals trading lower"?

A Yes, I see that.

Q Then it says, "Circulation of negative Aurelius Value report cited." Do you see that?

A I do.

Q Do you remember whether you read this when you received it on February 12, 2019?

A I don't.

Q Do you remember --

MS. MALINA: Objection.

BY MS. SOLOWAY:

Q Do you remember, sitting here today, whether you ever read this document before?

A I don't recall ever reading the document.

Q Okay. You'll recall earlier I asked if you are familiar with the term off-label marketing.

Page 96

A Yes.

Q Do you know what a Qui Tam Action is?

A No.

Q Do you know what the False Claims Act is?

A No.

Q Again I am going to ask you to exclude everything you have discussed with your lawyer in preparation for this deposition.

So putting aside this lawsuit and your preparation for this deposition, do you recall ever learning whether Vanda was subject to False Claims Act claims in a lawsuit?

A I don't recall.

Q Do you recall ever hearing that Vanda had be been sued in a Qui Tam Action?

A No.

Q Sitting here today, again excluding any discussions with your lawyer, have you ever learned of any claim that Vanda was engaged in off-label marketing of its drugs?

A Don't recall.

Q You don't recall?

A No.

Q Okay. All right. Mr. Kehoe, did there come a time when you learned that Vanda had sued

Page 97

the FDA?

A Yes.

Q Do you recall --

MS. MALINA: Objection.

BY MS. SOLOWAY:

Q Do you recall approximately when you learned that information?

A Approximately -- I don't know -- I don't recall.

Q Let's see if we can help orient you in time. Let's take a look at Rothschild -- excuse me -- withdrawn.

I am going to show you a document. We are going to now work as Exhibit 11 where, unfortunately, one piece of the document is missing from your binder, so we will put it up on the screen, but if you need to look at the longer piece of it, it's available in the hard copy of your binder.

Let's start with online. Let's get this document marked -- this is Tab 27 marked as Exhibit 11.

(Exhibit 11:
Marked for identification.)

BY MS. SOLOWAY:

25 (Pages 94 - 97)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 98

Q   Let me know when it comes up for you on the Exhibit Share.

A   Okay.  I see it.

Q   It came up for me.  All right.  Looking at Exhibit Share, why don't we start with that.  This is an e-mail from Vivianne Bai, B-a-i, dated April 25, 2019.  Do you see that?

A   I do.

Q   It goes to Local -- it goes to several addresses that are at Local 727 HW Fund.  Do you see that?

Withdrawn.  I misstated that.

Do you see that the second e-mail address is to Bobby L at 727benefitfunds.com, do you see that?

A   Yes.

Q   Okay.  Then I just want to point out in the subject line it says, Rothschild and Co, March 2019 quarterly report Teamsters Local 727.

A   Yes.

Q   Teamsters is the plaintiff in this action.  Correct?

A   Yes.

Q   Rothschild would have provided them with periodic reporting on their portfolio.  Correct?

Page 99

A   Yes.

Q   Okay.  So this cover e-mail attaches a file which is also in your binder, which you are free to look at either in hard copy or in, you know, on the electronic platform.

I want to confirm is this document, says, at the top front page, Bates stamp 137434, Teamsters Local 727 Pension Fund, and underneath it says, Rothschild and Co U.S. Small Cap Core.  Do you see that?

A   I do.

Q   That says quarterly, March 25, 2019?

A   Yes.

Q   Do you understand this to be the first quarter report sent to Teamsters concerning their investment in the Small Cap Core portfolio?

A   I don't know that to be true.

Q   Are you familiar with this type of document that Teamsters -- excuse me -- the portfolio summary for the small cap fund?

A   Yes.  This looks like a presentation that we disseminate, yes.

Q   Okay.  These presentations go to investors who had asked you to invest them in one of your strategies.  Correct?

Page 100

A   Yes.

Q   Those are created in the ordinary course of Rothschild's regularly conducted business?

A   Yes.

Q   And do you provide content sometimes to go into those quarterly reports to investors?

A   Yes.

Q   You would do that if you were the analyst, for example, who was responsible for a particular stock?

A   Yes.

Q   All right.  So I want to ask you about something on page two of that report, which is Bates stamped 137437.

A   Yes.

Q   I said I would help -- this is a report from March of 2019, and you will see that it says, "On a stock specific basis our largest relative detractor has included Vanda Pharmaceuticals down 29.6 percent, a biotechnology company."  Do you see that?

A   I do.

Q   Then it goes on to say, "The company disclosed their intention to sue the FDA after the agency placed a partial hold on Vanda's phase three

Page 101

trial for its gastroparesis treatment after Vanda questioned the necessity to conduct animal safety studies."  Do you see that?

A   I do.

Q   Does this refresh your recollection that Vanda sued the FDA in the first quarter of 2019?

A   It does.

Q   Okay.  It goes on to say, "This provocation raised concerns that the FDA could potentially take a hostile stance towards the company's filing for label expansion for its flagship Hetlioz commercial drug.

"Vanda expects to hear a court decision over the next few months."  Do you see that?

A   I do.

Q   I just want to ask you a few questions about this summary.

When you say, "This provocation," what do you mean?

MS. MALINA:  Objection.

THE WITNESS:  With the FDA.

BY MS. SOLOWAY:

Q   Let me withdraw that.

Would you have provided that content for this report?

26 (Pages 98 - 101)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 102

A  Yes.

Q  Okay.  So you are the author of those words.  Correct?

A  Yes.  The context, yes.  The marketing team can tweak things, but yes, the context is mine.

Q  Okay.  So the words "this provocation"?

A  Yes.

Q  What does that mean?

MS. MALINA:  Objection.

THE WITNESS:  Suing the FDA.

(Pause.)

BY MS. SOLOWAY:

Q  So, why is suing the FDA provocative?

MS. MALINA:  Objection.

THE WITNESS:  Well, you are suing the same agency that you are asking for previously to approve your drug.

BY MS. SOLOWAY:

Q  You go on to say that "This provocation raised concerns that the FDA could potentially take a hostile stance towards the company's filing for label expansion for its flagship Hetlioz commercial drug."

What do you mean when you use the words

Page 103

flagship --

MS. MALINA:  Objection.

THE WITNESS:  It's the main revenue, main source of revenue for the company.

BY MS. SOLOWAY:

Q  What was your concern for Hetlioz as explained in this sentence?

A  That their lawsuit could impact the FDA's decision on label expansion indications for Hetlioz.

Q  Why would it impact the FDA's ultimate decision for label expansion for Hetlioz?

MS. MALINA:  Objection.

THE WITNESS:  Possibly the FDA doesn't like being sued.

BY MS. SOLOWAY:

Q  So you are worried that the FDA would essentially be -- I don't want to put words in your mouth -- but unhappy with Vanda for bringing a lawsuit?

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Q  And that would potentially implicate other drugs?

Page 104

A  It would implicate Vanda in the case that they have a filing for, on file with the FDA for Hetlioz.

Q  Why is it that you are focused on Hetlioz as opposed to any other product that Vanda sells or might sell?

MS. MALINA:  Objection.

THE WITNESS:  This stock was already reflecting the issues with Tradipitant with gastroparesis.  For the stock to work in this case, you want to get approval for another indication to be done before the stock and the stock would appreciate.

That's why it was relevant.

BY MS. SOLOWAY:

Q  You mean the stock -- when you said the stock was already reflecting the issue with Tradipitant, you mean the risk that Tradipitant might not get approved by the FDA?

A  Correct.

Q  The concern here, from your point of view, is that this new stock price decline that you are describing in this investor presentation reflects the market's concern that as to the flagship Hetlioz drug, the FDA might take retributive action

Page 105

against the company?

MS. MALINA:  Objection.

THE WITNESS:  To answer the question, I don't know what the market was really thinking or why the stock was doing what it was doing.

BY MS. SOLOWAY:

Q  I can only ask you about your opinion.

A  My opinion is that the stock sold off because of their reluctance to do an animal safety study.  From that point forward we own the stock and that price of the stock, based on its performance, which went down.

Going forward what could have helped the stock is if they were to get Hetlioz second indication approval.

Q  So the stock would have been positively impacted if the company was able to get an expansion for Hetlioz?

A  Right.

Q  Which is what you believed the market was worried about based on this FDA lawsuit?

MS. MALINA:  Objection.

THE WITNESS:  It could have been, yes.

27 (Pages 102 - 105)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 106

I would say it was my opinion. Yes.

BY MS. SOLOWAY:

Q   That was your concern?

A   Yes.

Q   I am going to show you another document. This is in your binder at tab 28.

A   I am there.

MS. SOLOWAY:  So we will mark this as Exhibit -- I guess we are up to 12 now.

TECHNICIAN:  That is correct.

(Exhibit 12:

Marked for identification.)

BY MS. SOLOWAY:

Q   This is an e-mail from you to someone named Lakenda Tesar.  Do you see that?

A   Yes.

Q   This is dated March 4, 2019?

A   Yes.

Q   Was this written around the time that you -- withdrawn.

Is it fair to say that as the author of this e-mail, you had knowledge of the subject matter of it?

A   Yes.

Q   Also fair to say that this e-mail was

Page 107

prepared by you in the course of your regularly conducted business activity?

A   Yes.

Q   You said earlier that you would often provide content for the reports that went out to investors?

A   Yes.

Q   Do you believe this e-mail reflects the content that you were providing for the investor report we just looked at?

A   Yes.

Q   When you -- again, just turning to this, to this description in the third paragraph where it says "Vanda," "this provocation raised unnecessary concerns the FDA would take retribution"?

A   Yes.

Q   "And hostile stance."  Do you see that?

A   I do.

Q   Again, what did you mean by retribution and hostile stance?

A   It was referencing their review of their filing for Hetlioz.

Q   You were concerned that the FDA would basically take revenge on Vanda because it had been filed?  Excuse me.

Page 108

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q   They had been sued.  Correct?

A   Yes.

Q   Did you understand the question?

A   Revenge, I don't know that I would use that strong a language.  Yes.

Q   I guess retribution and revenge to me seem like similar words.  But feel free to put it in your own words.

When you say "retribution," you mean they would react negatively to Vanda?

A   We could split hairs.  Revenge seems emotional.  I don't think it's an emotional thing. The FDA has a lot of things they can do.  They don't have to spend time on this.

Q   The concern was they would therefore take a negative act toward Vanda because Vanda had sued them?

THE WITNESS:  Yes.

MS. MALINA:  Objection.  Asked and answered.

BY MS. SOLOWAY:

Q   All right.  I just want to ask one other question -- I am sorry.  I am done with this

Page 109

document.

Why don't we flip to tab 27 of your binder which we can mark as Exhibit 13?

(Exhibit 13:

Marked for identification.)

MR. BOUNDS:  We are going to look at the complete version online, Audra.

MS. SOLOWAY:  Thank you.  Thanks for the reminder, Thomas.

BY MS. SOLOWAY:

Q   So, I believe we will have you pull up both docs so there is full context, but actually I am going to only show you a page of this.

I will tell you when it's up, Mr. Kehoe.

A   Just remind me which Exhibit Number is this?

Q   Up to Exhibit 13 now?

TECHNICIAN:  Should be up.

MS. SOLOWAY:  Great.

BY MS. SOLOWAY:

Q   Tell me once you've had a chance to flip through it, Mr. Kehoe.

A   I have it up.  It's the presentation we just looked at.  Is this a different date?  No. That's March 19.  This is the same one.  Correct?

28 (Pages 106 - 109)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 110

It's in the binder.

Q   That is right.  I apologize.  This is --

MS. SOLOWAY:  Thomas, is this --

TECHNICIAN:  Exhibit 11.

MS. SOLOWAY:  I am sorry.  I apologize we just marked an exhibit twice.  That is my fault.

Why don't we go back to Exhibit 11 then, because I don't want to unnecessarily have extra exhibits.  I apologize.

MR. BOUNDS:  Okay.

BY MS. SOLOWAY:

Q   If I could just ask you to turn to page, internal page 22, which is marked Rothschild 137457.  Let me know when you are there.

A   Sorry.  It's taking a long time to load.  It's slow.

Q   That is okay.  Actually if you want to look in your binder, this page should be in your binder.

It's really a super quick question.  I want to make sure I understand what is on page 22.

A   Yep.  Okay.  I am there.

Q   Okay.  So on page 22, if I understand this

Page 111

correctly, this is a list of purchases by Teamsters in various securities?

A   Okay.

Q   Do you see where it says, "Purchases continued" at the top bar?

A   I do, yes.

Q   There is a list of symbols on the left side?

A   Yes.

Q   About halfway down the page, do you see that it says VNDA?

A   I do.

Q   That is Vanda.  Correct?

A   It is.

Q   This reflects that on January 22, 2019, shares of Vanda were purchased for Teamsters?

A   It does.

Q   And this would have been -- you'll recall earlier we talked about Teamsters having invested right around this time in the small cap strategy.  Correct?

A   Yes.

Q   This would reflect the, you know, the replication of the small cap strategy for the Teamsters account.  Correct?

Page 112

A   That is correct.

Q   I am going to ask you about -- turn to tab 25 which is in your binder, and we can also mark that as Exhibit 12 -- sorry.  Exhibit 13.

THE WITNESS:  This was tab --

BY MS. SOLOWAY:

Q   Tab 25 of your binder.

A   Thank you.

MR. WARD:  Fourteen just because, you know, we erroneously used up 13.

MS. SOLOWAY:  But -- sorry.  Did 13 ever get introduced on Exhibit Share?

MR. WARD:  It did.

MS. SOLOWAY:  It did.  Okay.  So, we will do this as 14.  Sorry.

(Exhibit 14:
Marked for identification.)

MS. SOLOWAY:  Thanks, Justin.  Sorry for the confusion, Mr. Kehoe.  Still tab 25.

THE WITNESS:  I have the tab open.

BY MS. SOLOWAY:

Q   Great.  I am waiting for -- great.  This is an e-mail from Mr. Vasquez to you dated February 6, 2019.  Correct?

Page 113

A   Yes.

Q   The subject is "Vanda Pharma cut at cantor on, quote, challenged, unquote, FDA interactions"?

A   Yes.

Q   Take your time to review the document if it's helpful.  I am curious about whether you recall what you meant in the middle of the page where you said, "Nothing suspicious about all of that selling at all"?

A   I see that.  Sorry.  Was there a question?  Repeat.

Q   Yes, of course.  Take your time to read the document.  I want to ask whether you recall what you meant on February 6, 2019 at 9:27 a.m. when you wrote, "Nothing suspicious about all of that selling at all," unquote?

A   I would be referring if I answered that question.  I don't remember what was going on with the stock.  I am responding to the price action of the stock probably leading up to this report.

Q   Do you know, sitting here today, what you meant by suspicious?

MS. MALINA:  Objection.

THE WITNESS:  Market things get leaked all the time that people get

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 114

knowledge of that other people don't have knowledge of.

If the stock was already reflecting negative news prior to negative news coming out, that is suspicious.

BY MS. SOLOWAY:

Q   Sitting here today you think you may have observed that there was some leak before the public disclosure of the FDA litigation?

MS. MALINA:  Objection.

THE WITNESS:  It's possible.

BY MS. SOLOWAY:

Q   Sitting here today you have no other possible explanation?

MS. MALINA:  Objection.

THE WITNESS:  I don't recall, really recall that, every nuance or context of my e-mail with Rich Vasquez.

BY MS. SOLOWAY:

Q   So, going back to the FDA litigation, I think you testified earlier that you understood that Vanda had sued the FDA in connection with the FDA seeking to require Vanda to conduct a dog study on Tradipitant; is that right?

A   That's right.

Page 115

Q   Did you have an understanding at the time that Vanda had other options that it could pursue if it did not conduct the dog study requested by the FDA on Tradipitant?

MS. MALINA:  Objection.

THE WITNESS:  Management team tried to -- not tried.

The management team said they thought they had a work around, but it was never confirmed by the FDA.

The FDA didn't come out and confirm that to be the case because we didn't have knowledge of their conversations.

BY MS. SOLOWAY:

Q   Sitting here today what do you recall about what the potential work arounds might have been for the dog study issue?

MS. MALINA:  Objection.

THE WITNESS:  If I recall, they had the drug in humans for longer than the three-month study that the FDA was requesting them to do.

I thought that was something they thought was obvious.  I think they also said they could do studies outside the

Page 116

U.S.  So they could do it, you know, in Europe or Asia or wherever they would do it to prove the efficacy in humans without, you know, having to do the canine studies in the U.S. to satisfy the FDA.

BY MS. SOLOWAY:

Q   Understood.  That is the best of your recollection?

A   Yes.

Q   Okay.  Let's take a look at tab 24 in your binder.

MS. SOLOWAY:  Thomas, I think this is one that is missing another piece.

MR. BOUNDS:  That is correct.  We are going to upload it right now.

BY MS. SOLOWAY:

Q   Mr. Kehoe, I am going to only ask you a question about the cover page.  We have uploaded the entire document.  You can look at either tab 24 in your binder or Exhibit 15.

(Exhibit 15:
Marked for identification.)

THE WITNESS:  I have the binder open.

BY MS. SOLOWAY:

Q   Great.  So let me know when you are ready.

Page 117

This is -- just to set the ground, this is a February 6, 2019, e-mail.  Correct?

A   Yes.

Q   It's from you.  Correct?

A   Yes.

Q   To some of your colleagues at Rothschild?

A   Yes.

Q   And it looks like you are forwarding a research report on Vanda; is that correct?

A   Yes.

Q   I just, directing your attention to the top of the e-mail, you write, "This is just a weird development where Vanda believes the FDA requests to conduct a 12 MIN Tradipitant safety test in Beagle dogs is unethical because they would have to be destroyed.

"The company just reported positive Phase two data in gastroparesis, a potential one billion dollar market that doesn't require more than three month of drug."  Do you see that?

A   Yes.

Q   When you say the company just reported positive phase two data in gastroparesis, are you referring back to the company's report of its phase two clinical trial in December of 2018?

30 (Pages 114 - 117)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 118

A   Yes.

Q   And when you say that it doesn't require more than three month of drug -- do you see that?

A   Yes.

Q   What does that mean?

A   That if someone were to take this therapy, they wouldn't take it for longer than three months.

Q   Which would mean, as I understand it, that the dog study wouldn't be required for that length of taking the drug.  Correct?

A   No.  No.  The dog study, what the FDA was asking for a 12-month safety study in canines.  The company's argument was the drug won't be in humans for 12 months.

Q   I see.  I see.  So your understanding is that what Vanda was saying to the FDA is that since humans won't be taking the drug for 12 months, we shouldn't have to test it in dogs for 12 months.  Am I getting that right?

A   Yes.

Q   That is your recollection of what the, what the various positions between Vanda and the FDA were at the time?

A   Yes.

Q   Are you still doing okay?  Do you want to

Page 119

take a break?

A   Well, I don't know.  Do we go to lunch at some point?  If this is going to go several hours, then I think -- I don't know when everyone wants to take lunch.  I am open to do it when everyone wants to do it.  But if we could end up at 1:00, I will say let's keep going.

Q   I am definitely not going to have you here all day.  That I can promise you.  I am not sure we will be done at noon.  If you'd like to do lunch, we could take a half hour and try to move you through your day.

And Ms. Malina may have questions, as well.  If you are hungry -- I say we take a short lunch.

A   I am actually not hungry.  But at 1:00 o'clock I can't guarantee I won't be.

MS. SOLOWAY:  Dan, how do you want to proceed?

MR. TABAK:  Probably go a little bit longer.  Mike's not hungry, I'm not hungry, to the extent that anybody cares.  So why don't we go a little bit longer and then we will do lunch?

MS. SOLOWAY:  I care if you are

Page 120

hungry, Dan.

BY MS. SOLOWAY:

Q   Okay.  I want to take a step back, Mr. Kehoe, to the decision by Rothschild to invest in Vanda and the work that you did.

You said that you generally would review SEC filings.  Do you know, sitting here today, what, if any, SEC filings of Vanda's you reviewed?

A   I don't.

Q   Sitting here today you don't recall exactly what you did or didn't look at?

A   That's right.

Q   Okay.  So, let's take a look at -- let's take a look at what is in your binder as Exhibit 22.

A   Okay.

Q   This is an EK from Vanda.  Correct?

A   Yes.

Q   Dated December 3, 2018.  Correct?

A   Yes.

Q   Okay.  And take the time that you need to review it, sir, but at the top it says, "Vanda announces positive phase two study results for Tradipitant in patients with gastroparesis."  Do you see that?

Page 121

A   Yes.

Q   Obviously, interrupt me if you need more time to look at the document.

Do you recall that the phase two study that came out December 3rd announced they had met their primary end point for gastroparesis?

A   Yes, I remember the data.  It was positive, yes.

Q   And do you recall as well that the patients that were tested in this study were tested over a period of four weeks?

A   I don't recall that, but it says that here.

Q   Okay.  It's consistent -- is it consistent with your recollection that the study was to test the drug over a short period of time?

MS. MALINA:  Objection.

THE WITNESS:  I don't recall.

BY MS. SOLOWAY:

Q   Okay.  You have no reason to dispute that the study, as being reported here, did test the drug over a period of four weeks?

A   No.  I don't know.

Q   Okay.  Do you have an understanding of why Vanda was able to perform this study without

31 (Pages 118 - 121)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 122

completing the FDA's request for a dog study?

MS. MALINA: Objection.

THE WITNESS: Yes. Because I believe before -- you only have to show long term -- I believe with regards to the FDA, you have to provide long-term safety data at the time you file your NDA.

So you could perform phase one and phase two studies, which in the case of phase two it was a short term.

Phase three would be a longer study, and that's why they would require with the filing long term.

Safety study in this case was the canine studies that they requested.

BY MS. SOLOWAY:

Q Got it. If you look at the last sentence of this -- well, not -- I'll just direct your attention, it's the top of the page right after the one we were just looking at that starts with, "In addition Vanda expects."

A Sorry. You are on -- the same --

Q Yes, the first -- So, there is the press release that says "Vanda announces positive phase two study results," and then carries over onto the

Page 123

next page. See that?

A Yes.

MR. TABAK: I don't know that we gave it an Exhibit Number to this.

MS. SOLOWAY: Sure. Justin, what Exhibit Number should this be?

TECHNICIAN: Currently up as Exhibit 16 in the --

MS. SOLOWAY: Okay. Tab 22 is up as Exhibit 16. Everyone following along?

(Exhibit 16:

Marked for identification.)

BY MS. SOLOWAY:

Q Okay. Good. Mr. Kehoe, did you find where I am directing you to, where it says. "In addition Vanda expects"?

A I did.

Q Okay. I will just read the complete sentence. "In addition Vanda expects to meet with regulatory authorities in the near future to further define and confirm the path forwards toward registration of Tradipitant in the treatment of patients with gastroparesis." Do you see that?

A I do.

Q Do you have any reason, sitting here

Page 124

today, to believe that this statement is inaccurate?

A No.

Q I am going to direct your attention to tab 15 in your binder which we will mark as Exhibit -- what are we up to?

MR. BOUNDS: Seventeen.

MS. SOLOWAY: Seventeen. Thank you.

(Exhibit 17:

Marked for identification.)

A VOICE: Could I have the tab again, please?

MS. SOLOWAY: Of course. Tab 15.

A VOICE: Thank you. It's going up.

BY MS. SOLOWAY:

Q By the way, Mr. Kehoe, with respect to the exhibit we were just looking at, the EK, sitting here today, do you know whether you read that EK at the time it came out?

A I don't recall.

Q Okay. Now, I am looking at tab 15, which we've marked as Exhibit 17.

This is a August 1st Vanda earnings call transcript. Do you see that?

A I do.

Page 125

Q Okay. And sitting here today do you recall whether you listened to this call at that time?

A I don't recall.

Q Do you know whether you ever read this transcript before?

A I don't recall.

Q I want you to flip to -- so now, just to orient you in time, sir, this is August 2018. We were just looking at the announcement of the phase two study in the December, and this is now going back in time to August. Right?

A Okay.

Q We are at page five of the transcript, roughly one-third of the way down. Do you see the paragraph that starts with, "I will now turn to Tradipitant?

A I see that.

Q Okay. Obviously take your time, but I am going to direct your attention to the middle of that paragraph. It says, "The recruitment efforts in Tradipitant gastroparesis clinical study are now working.

"We can now report that as of today 110 patients have been randomized in the study with a

32 (Pages 122 - 125)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 126

number of patients in screening.

"We are now on target to randomize approximately 150 patients and expect to report results by year end." See that?

A  I do.

Q  In fact, Vanda did report results by year end. Correct?

A  Yes.

Q  Do you have any reason, sitting here today, to believe that that statement that I just read aloud is inaccurate?

A  No.

Q  All right. Let's flip to tab 18. All right. So this is a Vanda 10Q. Correct?

A  It is.

Q  Dated November 7, 2018?

MR. BOUNDS:  For the record, this is Exhibit 18.

MS. SOLOWAY:  Thank you, Thomas.

(Exhibit 18:
Marked for identification.)

THE WITNESS:  Okay.

BY MS. SOLOWAY:

Q  Mr. Kehoe, this is the third quarter of 2018 Q. Correct?

Page 127

A  Yes.

Q  Sitting here today, do you know whether you read this at the time?

A  Don't recall.

Q  I am going to direct your attention to page 24. Let me know when you are there.

A  I am there.

Q  All right. So now to orient you in time, we are now in November, right, of 2018. Correct?

A  Yes.

Q  Page 24 under Operational Highlights, do you see where it says Tradipitant?

A  Yes.

Q  I am going to read a sentence to you. It says, "Enrollment in the clinical study of Tradipitant and gastroparesis is complete, results are expected by the end of 2018." Do you see that?

A  I do.

Q  Sitting here today do you have any reason to believe that statement is inaccurate?

A  No.

Q  All right. Here I am going to have you look at tab 21 in your binder, which we will mark as Exhibit --

MR. BOUNDS:  Nineteen.

Page 128

MS. SOLOWAY:  Thank you.

(Exhibit 19:
Marked for identification.)

MR. BOUNDS:  Tab 21. Correct?

MS. SOLOWAY:  Yes.

BY MS. SOLOWAY:

Q  Mr. Kehoe, if you are looking at tab 21, Exhibit 19, this is a Vanda Pharmaceutical's call. I should say the cover says Vanda Pharmaceutical's call. Correct?

A  Special call?

Q  Yes.

A  Yes.

Q  Okay. This is dated December 3, 2018?

A  Yes.

Q  That's the date that the phase three gastroparesis results were released. Correct?

A  Yes.

Q  We just looked at that EK a few moments ago. Correct?

A  Correct.

Q  Did you -- sitting here today, do you recall whether you participated in a special call on December 3rd?

Page 129

A  Did I listen to it or did I participate in it?

Q  I assume you didn't post it. Fair enough. Do you know whether you listened to it?

A  I don't recall.

Q  Okay. Do you recall whether you've ever read this transcript?

A  I don't recall.

Q  Do you know whether you have ever seen this document before?

A  I don't recall.

Q  I am going to just direct your attention to a couple of things in here.

Let's take a look at page six of the transcript. So there's a description here of the improvement seen in most of the core gastroparesis symptoms. Do you see that? It's about in the middle of that.

A  Three days, is that what you are --

Q  I am going to make sure we are on the same page. Do you see where that is?

A  Yes.

Q  Is that consistent with your understanding that the trial had demonstrated an improvement in symptoms for patients with gastroparesis?

33 (Pages 126 - 129)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 130

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Q  Okay.  See at the bottom it says, "Finally we believe that if these robust efficacy results with a well tolerated chronic treatment safety profile are further confirmed in future studies, Tradipitant has the potential to become a first line pharmacological option in the treatment of patients with gastroparesis and the first such agent in 40 years."  Do you see that?

A  I do.

Q  Any reason to question the accuracy of that statement?

A  No.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q  It goes on to say, "Detailed results of the study are expected to be presented in our cabin meetings and peer review publications."  Do you see that?

A  I do.

Q  Do you have any basis to question the accuracy of that statement?

A  No.

Page 131

MS. MALINA:  Objection.

MS. SOLOWAY:  What is the basis for your objection?

Actually, you know, forget I asked.  I don't want to invite a speaking objection.  We will just muddle through.

BY MS. SOLOWAY:

Q  Next it says, "We will also be meeting with regulatory authorities in the near future to further define and confirm the path toward registration of Tradipitant in the treatment of patients with gastroparesis."  Do you see that?

A  I do.

Q  Any reason to question the accuracy of that statement?

A  No.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q  In the question and answer on the next page -- let me just ask the question.  It was your understanding, Mr. Kehoe, at this point before Tradipitant could be marketed and sold to patients, it would need to undergo additional testing.  Correct?

A  Correct.

Page 132

Q  Okay.  If you look in the middle of the page, do you see that there is a response by Mihael H. Polymeropoulos?  Do you see that?

A  Yes.

Q  Do you know who Mr. Polymeropoulos is?

A  The CEO.

Q  I am going to read the paragraph, but please take your time, if you need to review the context around it.

It says, "Pete, certainly, we want to continue to evaluate the effectiveness of the drug in the broad population of gastroparetic patients; however, I would say while we have some very good ideas of potential designs and population of patients, we need to spend a little more time understanding these study results but also sit down with key opinion leaders, investigators, and certainly the Food and Drug Administration to find out the fastest to market."

Do you see that?

A  Actually I don't know which paragraph that is.

Q  I am sorry.  I lost you.  I am sorry.  I am on page 11.  I apologize.

A  Okay.  "Pete, certainly," yes I see this

Page 133

now.

Q  Why don't you just take a minute to read where it says, "Pete, certainly," that paragraph, and then I will ask you about it.

A  Okay.

(Pause.)

Q  Have you had a chance to read that paragraph?

A  I did.

Q  In your view is Mr. Polymeropoulos acknowledging that there are still steps that need to be taken before Tradipitant could go to the market?

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Q  What steps is Mr. Polymeropoulos acknowledging would need to happen?

A  He would have to speak to key leaders which are clinicians who generally, I don't, are institutions, investigators, people who conduct the study, clinicians and the FDA to understand the next steps into the design phase three to satisfy the FDA.

Q  You do not interpret Mr. -- well, let me

34 (Pages 130 - 133)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 134

ask you this: Do you interpret Mr. Polymeropoulos' statement to be a representation that the FDA is going to approve Tradipitant?

MS. MALINA: Objection.

THE WITNESS: No.

BY MS. SOLOWAY:

Q   Is there anything in this paragraph that we just read together that sitting here today you believe is inaccurate?

MS. MALINA: Objection.

THE WITNESS: No.

BY MS. SOLOWAY:

Q   Turn to page 12, please. There is a question here from Esther Rajavelu, R-a-j-a-v-e-l-u. Do you see that? From Oppenheimer?

A   (Inaudible) Can you hear me?

Q   You are breaking up a little bit. Speak again.

A   Yes.

TECHNICIAN: I think we need to go off the record.

VIDEOGRAPHER: Off the record. It's 12:27.

A VOICE: Recording has stopped.

Page 135

(Whereupon, a brief recess was taken from 12:27 o'clock p.m. until 12:29 o'clock p.m.)

VIDEOGRAPHER: Going back on. Time is 12:29.

BY MS. SOLOWAY:

Q   We just briefly went off the record to address a technical issue.

Mr. Kehoe, I am going to direct your attention to page 12 of the document that we have been looking at, which is Exhibit -- where are we up to -- 19. Are you on page 12?

A   I am.

Q   Okay. There is a second question from Esther Rajavelu of Oppenheimer. Do you see where it says, "Okay. Got it"?

A   Yes.

Q   It states, "Then my last question: Are you, do you anticipate having to do a long-term safety study on the gastroparesis population given the chronic nature of the condition and the treatment?" Do you see that?

A   I do.

Q   Then Mr. Polymeropoulos says, "Absolutely,

Page 136

it would be very appropriate to do so. And in fact we have a 12-month protocol which we will be implementing shortly." Do you see that?

A   I do.

Q   Do you have any reason to believe that this is inaccurate?

MS. MALINA: Objection.

THE WITNESS: No.

BY MS. SOLOWAY:

A   I am going to have you turn to tab 30, but this is another one of the documents that doesn't have all the pieces, so we will put it up on Exhibit Share. We're up to Exhibit 20.

(Exhibit 20:

Marked for identification.)

BY MS. SOLOWAY:

Q   It just came up for me, Mr. Kehoe.

Okay. Tab 30 which is Exhibit 20, just taking a look at this, this is an e-mail dated October 23, 2019, do you see that?

A   It's not in the right, I don't see that in the binder under tab 30.

Q   No? Okay. You know what, let's use the version -- I apologize. Let's use the version on the screen then.

Page 137

A   Okay. I am opening the exhibit now.

Q   Sure.

A   I see it.

Q   I think the problem is that the binder only has the attachment, but not the cover e-mail, sir. I apologize for that.

If you look in the cover e-mail, do you see that this is an e-mail from Ms. Bai?

A   I do.

Q   October 23, 2019. Correct?

A   Yes.

Q   Okay. This is another quarterly report for Teamsters. Correct?

A   Yes.

Q   And the subject line is Rothschild & Co., September 2019, Quarterly Report, Teamsters Local 727. Correct?

A   Yes.

Q   The attachment to this is the portfolio report for the fourth quarter ending September 30, 2019. Correct?

A   Yes.

Q   Again, is this a document that you are familiar with from your, performing your responsibilities as an analyst for the small cap

35 (Pages 134 - 137)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 138

funds?

A   I don't -- I don't put these reports together.  This is a marketing task.

Q   Understood.  But you have seen these investor reports?

A   Yes.  This is familiar with what they sent our clients.  Yes.

Q   I think you told me earlier you provide content for these reports sometimes.  Correct?

A   Yes.

Q   Sitting here today you have no reason to believe that this is not an accurate copy of the report that was provided to the Teamsters Fund for their quarter in September of 2019?

A   No.

Q   Okay.  That is a document that's prepared by Rothschild in the ordinary course of its business.  Correct?

A   Yes.

Q   With respect to any content about -- actually, withdrawn.

I am just going to have you turn to page 21 of the document, which is Rothschild Bates number 137662.

Let me know when you are there, Mr. Kehoe.

Page 139

A   I am there.  Can you hear me?

Q   I can, yes.  So I just, I want to make sure I understand this page.  This is a list of purchases that were made in the Teamsters' account.  Correct?

A   Yes.

Q   And with respect to the (sound disappeared) mentioned in the middle of the page, do you see that there's a trade date listed of 9/6/2019?

A   Yes.

Q   Does this reflect that additional Vanda securities were purchased for Teamsters on September 6, 2019?

A   Yes.

Q   So this reflects that there was an additional investment by the strategy in Vanda during that time.  Correct?

A   Yes.

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q   Then that -- that modification to the strategy was translated into a purchase in the Teamsters account.  Correct?

A   Yes.

Page 140

MS. MALINA:  Objection.

BY MS. SOLOWAY:

Q   So, again, you're replicating your small cap strategy, as you designed it, into the Teamsters' own account.  Correct?

MS. MALINA:  Objection.

THE WITNESS:  Yes.

(Court reporter clarification.)

BY MS. SOLOWAY:

Q   To your knowledge did Teamsters ever ask Rothschild why it had purchased additional shares of Vanda in September of 2019 for its account?

MS. MALINA:  Objection.

THE WITNESS:  I don't know that.

BY MS. SOLOWAY:

Q   To your knowledge did Teamsters ever object to the purchase of Vanda in its account in September of 2019?

A   Not to my knowledge.

Q   If a client had objected to a purchase in its portfolio, would you have been made aware of that?

MS. MALINA:  Objection.

THE WITNESS:  Yes.

BY MS. SOLOWAY:

Page 141

Q   You don't recall ever learning of such an objection by Teamsters?

MS. MALINA:  Objection.

THE WITNESS:  No.

BY MS. SOLOWAY:

Q   To your knowledge did Teamsters ever communicate with Rothschild at all concerning any concerns about the investment in Vanda in its account?

MS. MALINA:  Objection.

THE WITNESS:  Not to my knowledge.

BY MS. SOLOWAY:

Q   Not to your knowledge?

A   Not to my knowledge.

Q   And you believe that had such concerns been communicated, it would have made its way to you?

A   Yes.

Q   All right.

MS. SOLOWAY:  You know, we are actually getting -- we are doing well.  We might actually wrap up before lunch if you can keep going a bit, Mr. Kehoe.

THE WITNESS:  Yes.

MS. SOLOWAY:  Obviously, I don't

36 (Pages 138 - 141)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 142

control Ms. Malina's questioning, but we are making good progress here.  Okay.

BY MS. SOLOWAY:

Q   Let's turn to what is behind tab 29 in your binder, sir.

A   Okay.

Q   This is -- I am going to look at the bottom e-mail in the chain first.  This is an e-mail from you to Mr. Chandra.  Correct?

A   Yes.

Q   Who is Mr. Chandra?

A   I don't recall.

Q   Do you know what Lionpoint is?

TECHNICIAN:  Exhibit 21.

(Exhibit 21:

Marked for identification.)

THE WITNESS:  I have the binder open.  That is okay.

BY MS. SOLOWAY:

Q   I am sorry.  We are going to mark this Exhibit 21.  You can continue to look at tab 29.

A   I don't know what Lionpoint is.

Q   Sitting here today do you have any recollection of any back and forth between you and Mr. Chandra?

Page 143

MS. MALINA:  Objection.

THE WITNESS:  Looking at this I am trying to put a face to the name and I can't.

BY MS. SOLOWAY:

Q   Okay.  Do you recall having had a discussion with Mr. Chandra that morning?

A   I don't recall.

Q   Okay.  In this e-mail you write, "The stock I referred to is VNDA.  The CEO is taking unprecedented posture by suing FDA.  He thinks he's running a nonprofit."  Do you see that?

A   I do.

Q   Does this relate back to the February 2019 announcement that Vanda had sued the FDA to try to reverse the FDA's dog study position?

A   Yes.

Q   When you say the CEO thinks he is running a nonprofit, are you referring to the position that Vanda is taking about killing dogs?

MS. MALINA:  Objection.

THE WITNESS:  No.

BY MS. SOLOWAY:

Q   What do you mean by running a nonprofit, sir?

Page 144

A   He is not running the business for profitability.  He is not running the business for profitability because he sued the FDA.  Because he's not conducting an animal study.

Q   In your view the refusal to conduct an animal study means he is running a nonprofit?

A   Yes.

Q   You think those two things are equivalent?

MS. MALINA:  Objection.

THE WITNESS:  If he ran the animal study, this drug would have a better chance of coming to market and that would generate profits.

BY MS. SOLOWAY:

Q   Are you suggesting, sir, that any time a course of conduct will make money for the company, the CEO is required to do it?

MS. MALINA:  Objection.  Misstates testimony.

THE WITNESS:  Not my requirement; it's the FDA's requirement.

BY MS. SOLOWAY:

Q   That's not what I am asking.  I am going back to your analogy to a nonprofit.  I am focusing

Page 145

on that.  Is it your view that any time a CEO rejects a course of conduct that will make money for the company, he is running a nonprofit?

MS. MALINA:  Objection.

THE WITNESS:  I can't generalize.  I can just speak to this case.  It was within his power to do the study, and he chose not to do the study.

BY MS. SOLOWAY:

Q   Do you have an understanding of why Mr. Polymeropoulos had concluded that doing the dog study was unethical?

MS. MALINA:  Objection.

THE WITNESS:  I don't know why.

BY MS. SOLOWAY:

Q   You don't know how he reached that conclusion.  Correct?

MS. MALINA:  Objection.  Asked and answered.

THE WITNESS:  I don't.

BY MS. SOLOWAY:

Q   Are you personally familiar with scientific evidence about whether the dog study would have provided valuable information about the safety of Tradipitant?

37 (Pages 142 - 145)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 146

MS. MALINA: Objection. Improper opinion.

THE WITNESS: I defer to the FDA.

BY MS. SOLOWAY:

Q So, you, yourself, have not undertaken an investigation of whether the dog study would have provided valuable scientific information?

A I did not.

Q Do you know whether Tradipitant had already been tested in an earlier dog study?

A I believe it --

MS. MALINA: Objection.

THE WITNESS: I believe it was, yes.

BY MS. SOLOWAY:

Q Do you know what the outcome was of that study?

A I believe it was safe.

Q Do you know what safety information, if any, additional testing would have yielded?

MS. MALINA: Objection.

THE WITNESS: I don't know.

MS. MALINA: Speculation.

THE WITNESS: It wasn't run.

BY MS. SOLOWAY:

Q The answer is you don't know what

Page 147

additional information it would have yielded. Correct?

A Correct.

MS. MALINA: Objection. Asked and answered.

BY MS. SOLOWAY:

Q Do you have an understanding of what additional value, beyond the previously existing dog study this second requested study would have provided?

(Court reporter clarification.)

MS. MALINA: Objection. Argumentative.

THE WITNESS: The answer would be just it's longer safety data.

BY MS. SOLOWAY:

Q Do you know whether that safety data would have had like, made a meaningful difference in the FDA's understanding of whether the drug was safe or not?

MS. MALINA: Objection. Improper opinion.

THE WITNESS: That is what the FDA asked for. That is all I know.

BY MS. SOLOWAY:

Page 148

Q You obviously don't know whether it would have provided valuable information. Correct?

MS. MALINA: Objection.

THE WITNESS: Are you asking me -- I mean, I don't particularly spend a lot of time looking at canine studies, but I am just saying the FDA asked for it, and that is what I was basing my decision on.

BY MS. SOLOWAY:

Q Do you know whether Vanda offered the FDA to conduct the dog testing on a smaller number of dogs?

A I don't know that.

MS. MALINA: Object to the form.

BY MS. SOLOWAY:

Q Do you know -- you don't know whether that is true or not?

A I don't.

MS. MALINA: Objection. Asked and answered.

BY MS. SOLOWAY:

Q Do you know what positions the FDA took about the necessity for dog study that they requested?

MS. MALINA: Objection.

Page 149

THE WITNESS: They requested a 12-month canine study.

BY MS. SOLOWAY:

Q Do you know anything else about what the FDA requested?

A I don't.

Q Do you know whether in other countries regulators similar to the FDA require dog studies?

MS. MALINA: Objection. Speculation.

THE WITNESS: I don't know what other agencies' standards are.

BY MS. SOLOWAY:

Q Is it just your view that if a company, a pharmaceutical company has an ethical concern about a requirement that the FDA is asking it to fulfill, it shouldn't raise that ethical concern with the FDA?

MS. MALINA: Objection. Improper opinion.

THE WITNESS: Sorry. Can you repeat the question?

BY MS. SOLOWAY:

Q Sure. Is it your view that if a company has an ethical concern about a requirement that the FDA is asking it to fulfill, it shouldn't raise

38 (Pages 146 - 149)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 150

that ethical concern with the FDA?

MS. MALINA: Same objection.

THE WITNESS: I think it should raise it. I think there should be a conversation. That makes sense.

BY MS. SOLOWAY:

Q Okay. If the company has an ethical concern and it wants to submit additional data to the FDA trying to persuade the FDA that the FDA should consider its ethical concern, you are comfortable with that as well?

MS. MALINA: Objection. Misstates testimony.

THE WITNESS: Yes, I would -- that makes sense. If they had a concern they want to discuss it, yes.

BY MS. SOLOWAY:

Q Okay. Here you are not taking issue with the fact that Vanda raised its concern with the FDA about the killing of dogs in this dog study. Correct?

MS. MALINA: Objection.

THE WITNESS: No.

BY MS. SOLOWAY:

Q If Vanda had determined the day before it

Page 151

filed its lawsuit to accede to the FDA's dog study request, would that have addressed the concern that you were raising in this e-mail that we have been looking at?

A Could you repeat the question?

Q Certainly. Let me just present some context here. We are looking at Exhibit -- tab 29, which I think is Exhibit --

MR. BOUNDS: Twenty-one.

MS. SOLOWAY: Thank you, 21.

BY MS. SOLOWAY:

Q This is the e-mail in which you say that you believe the CEO thinks he is running a nonprofit. Right?

A Yes.

Q With respect to this e-mail, I am asking you whether if Vanda had determined the day before filing its lawsuit to capitulate to the FDA's request for a dog study, would that have addressed the concern that you are raising in this e-mail?

MS. MALINA: Objection.

THE WITNESS: Yes.

BY MS. SOLOWAY:

Q So, your view is that it's okay to raise the concern with the FDA; it's okay to ask the FDA

Page 152

to change its mind, but where you would draw the line is bringing a lawsuit against the FDA?

MS. MALINA: Objection. Misstates testimony.

THE WITNESS: As an investor, yes.

BY MS. SOLOWAY:

Q I would like to direct your attention now to tab 32. Let me know when you are there.

MS. SOLOWAY: We will mark this as an exhibit as well.

THE WITNESS: I am there.

MS. SOLOWAY: We are marking this -- Are we up to 22 now?

MR. BOUNDS: That is correct.

MS. SOLOWAY: So this is Exhibit 22, tab 32.

THE WITNESS: Yes, I am.

(Exhibit 22: Marked for identification.)

BY MS. SOLOWAY:

Q Okay. Mr. Kehoe, this is an e-mail from you. Correct?

A Yes.

Q It's February 2, 2020. Correct?

A Yes.

Page 153

Q So we are now in -- just to situate you in time, we are now in 2020, a year following the FDA lawsuit being filed in 2019 or approximately a year following. Correct?

A Yes.

Q Okay. This is to some of your colleagues at Rothschild & Co.?

A Yes.

Q I am just going to read the e-mail to you. It says, "This is positive in that we have resolution regarding VNDA's challenge to FDA's request for a longer term big animal safety study.

"Court ruled in favor of the FDA, as many expected, and now the VNDA management is running out of options.

"The CEO will feel pressure, possibly, to fulfill its fiduciary duty to shareholders.

"Management stated they are reviewing options. We should learn more soon." See that?

A Yes.

Q When you state, "The CEO will feel pressure to fulfill his fiduciary duty to shareholders," do you mean that he will feel pressure to find a way to commercialize Tradipitant?

39 (Pages 150 - 153)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 154

MS. MALINA: Objection.

THE WITNESS: No. He will perform and conduct the study.

BY MS. SOLOWAY:

Q   So you are saying you think he should do the animal study?

A   Yes.

MS. MALINA: Objection.

BY MS. SOLOWAY:

Q   In your view were there other options apart from doing the dog study that the CEO could explore that would have, in your view, fulfilled his fiduciary duties?

MS. MALINA: Objection.

THE WITNESS: You mean, is it in any of this court ruling?

BY MS. SOLOWAY:

Q   Well, as of February 2, 2020?

A   Right. This e-mail. No, to me he, you know, should do the study at this point. I don't know, you know.

Q   Are you suggesting that not doing the study would, in your view, be a violation of his fiduciary duties?

MS. MALINA: Objection.

Page 155

THE WITNESS: To shareholders. I don't know what other options he would have to exhaust at this point.

He challenged the FDA and he lost.

I don't know what else he would try to do at that point. So yes. That's my opinion.

BY MS. SOLOWAY:

Q   Up until this time is it your view that he has violated some fiduciary duty to shareholders?

MS. MALINA: Objection. Improper opinion.

THE WITNESS: Yes.

BY MS. SOLOWAY:

Q   And what is your view about how he violated his fiduciary duty to shareholders before this?

MS. MALINA: Objection.

THE WITNESS: What he did was unprecedented.

BY MS. SOLOWAY:

Q   Any other reason?

A   He is not the first or the last company that had to perform a safety study in dogs or other animals.

Page 156

Q   Well, we spoke earlier -- we agreed that you don't really know the scientific basis for Vanda's objection to the dog study in this case. Correct?

MS. MALINA: Objection.

THE WITNESS: That's right.

BY MS. SOLOWAY:

Q   Are you suggesting that, sir, any time a course of conduct will make money for the company, the CEO is required to do it even if it's unethical?

MS. MALINA: Objection. Misstates testimony.

THE WITNESS: His opinion of what is ethical is his opinion.

BY MS. SOLOWAY:

Q   We all have to have views about what is and isn't ethical. Right?

A   We have a government agency called the FDA that is determining what is and what is not ethical, and they took it into consideration. A court did, too.

Q   So, your view is he is not allowed to hold a different view of what is or isn't ethical than the FDA?

Page 157

MS. MALINA: Objection. Misstates testimony.

THE WITNESS: He can. I just don't have to be a shareholder.

BY MS. SOLOWAY:

Q   Fair enough. What I'm trying to get at is why you think that is a breach of fiduciary duty.

MS. MALINA: Objection. Improper opinion.

THE WITNESS: As a shareholder, to me his duty to me is to make money.

BY MS. SOLOWAY:

Q   And he should do that even if he believes that it's unethical to do the dog study?

MS. MALINA: Objection.

THE WITNESS: That is his opinion. The FDA and the Court both sided against him.

At that point I don't have faith or confidence in him.

BY MS. SOLOWAY:

Q   Okay. So, I am trying to get at whether before the FDA and the court ruled against him, you think there is a violation of some fiduciary duty?

A   This was a long shot. This outcome of

40 (Pages 154 - 157)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 158

this is very unlikely and reflected by the shareholders, which is why they were down.

Q   Again, I am not asking about that.  I am asking you whether -- you just said, you know, he went to the court.  He went to the FDA and he went to the court, and you know, he, he made an effort to propose his point of view on this to see how that would turn out.  Correct?

A   Correct.

Q   But ultimately the court ruled against him.  Correct?

A   Right.

Q   Up until the court rules, Mr. Polymeropoulos does not know the outcome of this dog study issue with respect to a legal resolution.  Correct?

A   (Nodding head.)

Q   Prior to that was it a breach of his fiduciary duties, in your view, to persuade, try to persuade the FDA and the court that it would be unethical to kill dogs in connection with this study?

MS. MALINA:  Objection.  Asked and answered.

(Talking on top of each other.)

Page 159

MS. MALINA:  Improper opinion.

THE WITNESS:  I am sorry.  The line of questioning somehow I can't understand the question.

BY MS. SOLOWAY:

Q   Let's back up for a second.  Okay?  I think what you said earlier is that Mr. Polymeropoulos had an opportunity to try to persuade the FDA that it was unethical to kill these dogs.  Correct?

A   In his opinion, yes.

Q   Okay.  He had an opportunity to try to persuade the FDA that the benefit of killing the dogs did not outweigh the ethical concerns about killing the dogs.  Correct?

A   Correct.

Q   Then he had an opportunity to present that issue to a court.  Correct?

A   Yes.

Q   Okay.  What I am saying is:  Up until the moment that the court rules, has Mr. Polymeropoulos, in your view, breached some fiduciary duty to shareholders by pressing that argument?

MS. MALINA:  Object to the form.

Page 160

THE WITNESS:  Yes.  His losses were already suffered, his stock price.

BY MS. SOLOWAY:

Q   In your view, because the stock price went down and losses were suffered, that somehow means he breached his fiduciary duty?

THE WITNESS:  Yes.

MS. MALINA:  Objection. Argumentative.  Objection to the entire line of questioning.  The witness made his view.  The witness made his opinions on these points clear.

BY MS. SOLOWAY:

Q   You are not suggesting that at any time the CEO makes a decision that is unpopular with shareholders that breaches a fiduciary duty?

MR. TABAK:  Objection.

MS. MALINA:  Objection.

THE WITNESS:  No.

BY MS. SOLOWAY:

Q   Can we agree that it's sometimes okay for a CEO to take ethical positions even if it means the company is going to make less money?

MS. MALINA:  Objection.  Asked and answered.  Improper opinion.

Page 161

Argumentative.

MR. TABAK:  I object, as well.

(Court reporter clarification.)

THE WITNESS:  The answer is yes.

BY MS. SOLOWAY:

Q   What kinds of situations are those?  Can you think of some examples?

A   Please repeat the context.

Q   It's sometimes okay for a CEO to take ethical positions, even if it means the company is going to make less money?

MS. MALINA:  Same objection.

THE WITNESS:  I would say the scenario was, it was fine for him to object, but he'd really exhausted all avenues.

So at some point I think you have to concede that your view is not shared with the FDA, and you need to move forward.

That didn't happen.  It still hasn't happened.

BY MS. SOLOWAY:

Q   That moment came at some point after the lawsuit was filed?

A   It was solidified on this February 2nd

41 (Pages 158 - 161)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 162

headline report.  It was ruled against.  It was a foregone conclusion as reflected in the stock this was a likely outcome.  He wasn't going to win this, the ethical argument.

(Talking on top of each other.)

Q  Mr. Kehoe, do you personally invest in the Small Cap Core strategy?

A  No.

Q  During 2017, '18 and '19, did you personally invest in the Small Cap Core strategy?

A  No.

Q  Is your -- during that time period, was your compensation affected by the performance of that strategy?

A  It was in consideration of many other things, yes.

Q  At least some portion of your compensation is contingent on how the strategy performs?

A  Yes.

Q  That is an incentive, obviously, for you to be a high performer.  Correct?

A  It is.

MS. SOLOWAY:  Can we take a five-minute break so I can figure out what else I have and come back at 1:05?

Page 163

MR. TABAK:  That works for me.

VIDEOGRAPHER:  Off the record.  Time is 12:59.

A VOICE:  Recording stopped.

(Whereupon a recess was taken from 12:59 o'clock p.m. until 1:38 o'clock p.m.)

(Whereupon, the witness was excused and a recess for lunch was taken at 1:00 o'clock p.m.)

Page 164

AFTERNOON SESSION

1:38 O'CLOCK P.M.

VIDEOGRAPHER:  Back on record.  The time is 1:38.

A VOICE:  Recording in progress.

CROSS EXAMINATION

BY MS. MALINA:

Q  Good afternoon, Mr. Kehoe.  My name is Avital Malina with the law firm of Robbins Geller Rudman & Dowd, and we are representing the Teamsters local Union Number 727 Pension Fund.

I just have a few follow-up questions for you today.

Mr. Kehoe, what is your objective as an investment manager?

A  To out perform the benchmark.

Q  And when an investment that -- when an investment doesn't perform the way that you hope, and an investment doesn't out perform the benchmark, is it your job to go ahead and find another stock that will meet that performance goal?

MS. SOLOWAY:  Objection to the form.

THE WITNESS:  Yes.

Page 165

BY MS. MALINA:

Q  In that situation is it your job as an investment manager to go back and investigate whether a fraud has been committed?

MS. SOLOWAY:  Objection.

THE WITNESS:  To prove a fraud, no.

BY MS. MALINA:

Q  Are you an expert in securities fraud?

A  No.

Q  Do you know the elements of a securities fraud?

MS. SOLOWAY:  Objection to the form.

THE WITNESS:  No.

BY MS. MALINA:

Q  In this case we have been discussing here today, did you ever go back and try and determine whether Vanda made any misrepresentations?

A  No.

MS. SOLOWAY:  Objection to the form.

BY MS. MALINA:

Q  In this case did you ever go back and try to determine whether Vanda made any omissions?

MS. SOLOWAY:  Objection to the form.

THE WITNESS:  No.

42 (Pages 162 - 165)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 166

BY MS. MALINA:

Q  If you had known that Vanda was engaged in off-label marketing, would that have altered your investment thesis?

MS. SOLOWAY:  Objection.

THE WITNESS:  Possibly.

BY MS. MALINA:

Q  I would like to turn back to a document that Defendants marked -- actually, I am sorry. Let's first introduce a new exhibit.

MS. MALINA:  Brent, can you please introduce Rothschild 1, and what exhibit are we up to now?

MR. MITCHELL: I believe it's going to be 22.

MR. BOUNDS:  I think we actually have a 22 already.

A VOICE:  It will be 23.

MR. BOUNDS:  Right.  You are right. My apologies.

BY MS. MALINA:

Q  That document should be up.  It doesn't have a Bates stamp number on the bottom, but I will represent to you that this is Rothschild 1.

Page 167

(Exhibit 23:

Marked for identification.)

MR. MITCHELL:  Really quick, Exhibit Share is giving me a message it's unable to stamp the file.  I am not sure what to do about that.

TECHNICIAN:  I will take a look at it real quick.  Which exhibit is it?

MS. MALINA:  Exhibit 23.

TECHNICIAN:  Okay.  Yes.  You can't put a sticker on spreadsheets like that, but in production Veritext will be able to apply one.  So, don't worry about it for right now.

MR. MITCHELL:  Okay.  Okay.  Should I just move it to the Marked Exhibits folder, or how do I --

TECHNICIAN:  It's already -- I see it in the Marked Exhibits folder.

MS. MALINA:  It's there, Brent.

MR. MITCHELL:  Great.  Sorry everybody.

BY MS. MALINA:

Q  Do you see the first line of this spreadsheet, the transaction dated January 22,

Page 168

2019?

A  Yes.

Q  Is it accurate to say that this line item reflects your purchase of Vanda common stock on behalf of Teamsters on this date?

MS. SOLOWAY:  Objection.  Lacks foundation.

THE WITNESS:  If this is the spreadsheet that was supplied by Rothschild, I have no reason to think that wasn't a purchase made by Rothschild on behalf of Teamsters.

BY MS. MALINA:

Q  Was this purchase made based on any non public information?

A  No.

MS. SOLOWAY:  Objection.

THE WITNESS:  No.

MS. SOLOWAY:  Objection to the form.

(Court reporter clarification.)

BY MS. MALINA:

Q  What information was that purchase based on?

MS. SOLOWAY:  Objection to the form.

THE WITNESS:  The information was

Page 169

sort of what we discussed earlier, which was the, their own statements made in press releases, quarterly calls, transcripts, speaking to -- reading Celsa research, speaking Celsa research, and SEC filings that can be an industry conference.

BY MS. MALINA:

Q  All of those facts were public information; is that right?

A  That's right.

Q  Is it also fair to say that in deciding to invest in Vanda, you relied on the market price of the stock as reflected in publicly available information?

MS. SOLOWAY:  Objection.

THE WITNESS:  Yes.

BY MS. MALINA:

Q  Would you purchase Vanda if you knew that the price that you had paid was artificially inflated by securities fraud?

MS. SOLOWAY:  Objection.  Calls for speculation.

THE WITNESS:  No.

BY MS. MALINA:

43 (Pages 166 - 169)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 170

Q   We are going to go back to a document that is marked -- it's Rothschild 0124287, and I am just trying to find the right exhibit.

I am sorry.  Just bear with me one moment.

(Pause.)

Q   Okay.  Actually, I believe this is Exhibit 6.

Let me know when you have it.

A   I am there.

Q   Okay.  Do you see on the last page the bullet point where it says, "Awareness of the disorder itself and that a treatment exists are the biggest hurdles at this point"?

A   Yes.

Q   Do you have an understanding of what this sentence means?

A   Yes, it says Exhibit 4.  It's -- it's suggesting or alluding to the fact that there are educational efforts required to make physicians aware of the disease and what symptoms to look for and prescribe.  Okay.

Q   When you received this e-mail, did you understand this statement made by Ms. Weber mean that Vanda was off-label marketing any of its drugs?

Page 171

MS. SOLOWAY:  Objection.

THE WITNESS:  No.

BY MS. MALINA:

Q   Okay.  Can you please turn to the bullet point that starts with, "To be commercially successful."  It's under Fanapt Royalties.

A   Yes.  I see it.

Q   It says, "To be commercially successful we will need to market, focusing on lack of akathisia.

"Second half of 2017 will be a proving ground regarding how receptive the market is to this message."

What do you understand that statement to mean?

MS. SOLOWAY:  Objection.

THE WITNESS:  That if, you know, they want to know if it had a side effect physicians are aware of this.

BY MS. MALINA:

Q   When you received -- I am sorry.  Finish your answer.

A   It would make it more commercially successful if physicians were better educated on the fact it didn't have a side effect.

Q   When you received this e-mail from

Page 172

Ms. Weber, you understand her response to mean that Vanda was off-label marketing Fanapt?

MS. SOLOWAY:  Objection.

THE WITNESS:  No, I didn't.

BY MS. MALINA:

Q   If you just go to the bullet point that starts with, "In addition" --

A   Yes.

Q   You want to take a second to read that bullet point?

(Pause.)

A   Okay.

Q   Do you have an understanding of what Ms. Weber meant when she wrote this?

A   She is saying -- to me it reads that at that time they do have a label advantage.  They did a better job of communicating that.  In order to do that, to make those claims, they probably have to do a phase three study.

Q   When you read -- when you received this e-mail and read that portion, did you understand Ms. Weber's response to mean that Vanda was off-label marketing?

A   No.

MS. SOLOWAY:  Objection to the form.

Page 173

THE WITNESS:  No, I didn't.

(Talking on top of each other.)

BY MS. MALINA:

Q   Finally, on this document, the last bullet point that starts with "One interesting synergy," can you just read that for one moment?

(Pause.)

A   Yes, I read it.

Q   Do you know what Ms. Weber meant by that?

A   She is speaking in terms of commercial economic synergies that use the same sales force to sell all three drugs or all three -- all two drugs and three indications.

Q   Now when you read this e-mail, did you understand Ms. Weber's response to mean that Vanda was off-label marketing Fanapt?

MS. SOLOWAY:  Objection.  Form.

THE WITNESS:  No.

BY MS. MALINA:

Q   Turn back to another one of Defendant's exhibits, Exhibit 5, if you could, please, turn back.  Rothschild 0124320.

A   I am there.

Q   Earlier -- strike that.

Does the writeup in this e-mail accurately

44 (Pages 170 - 173)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 174

reflect your investment thesis as of September 2017?

A   Yes.

Q   Is it fair to say that your investment thesis could have changed between that time and 2019?

A   Yes.

MS. MALINA:  Could we have two minutes off the record?  I want to see if I have anything else.

MS. SOLOWAY:  Give you two minutes.

MS. MALINA:  That is fine.

VIDEOGRAPHER:  Going off the record. The time is 1:53.

A VOICE:  Recording stopped.

(Whereupon, a recess was taken from 1:53 o'clock p.m. until 1:58 o'clock p.m.)

VIDEOGRAPHER:  Back on.  Time is 1:58.

BY MS. MALINA:

Q   Good afternoon, Mr. Kehoe.  Earlier you testified that off-label marketing of a company may have changed your investment thesis; is that right?

Page 175

MS. SOLOWAY:  Objection to form.

THE WITNESS:  Right.

BY MS. MALINA:

Q   Why is that?

A   If I knew it was rampant and it was, say, their main drug, it could impact their financials and their promotion.  Basically it would mean that their sales were overstated because they were generating sales off label, which would be curtailed under an investigation.

However, if it was in a drug that wasn't core to a thesis or core to its financial standing, it would be less relevant from a financial perspective.

And a lot of times these things could be one case so you don't know if it's rampant.  You know, it could be one sales rep or one physician stating that something that went awry.

So you have to understand the details of it.

Q   Is it your understanding that Fanapt and Hetlioz were core drugs of Vanda Pharmaceuticals?

MS. SOLOWAY:  Objection.

THE WITNESS:  They are two commercial drugs.

Page 176

My thesis Fanapt was not a, not a catalyst; was not a -- it was not a reason to own it.  It was about Hetlioz.

MS. MALINA:  I have nothing further.

MS. SOLOWAY:  I have nothing further, either.  Mr. Kehoe, thank you for your time today.  We really appreciate it.

MS. MALINA:  Thank you, Mr. Kehoe.  I wanted to request, and I know we discussed transcripts earlier, we are going to get an expedited transcript.

VIDEOGRAPHER:  Going off the record. This concludes today's deposition.  The time is 2:00 o'clock.

(Whereupon, the deposition was concluded at 2:00 o'clock p.m.)

Page 177

GORDON vs. VANDA PHARMACEUTICALS, et al.

11/11/2021 - MICHAEL KEHOE

ACKNOWLEDGEMENT OF DEPONENT

I, MICHAEL KEHOE, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____   _____

MICHAEL KEHOE                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

45 (Pages 174 - 177)

CONFIDENTIAL
ATTORNEYS EYES ONLY

Page 178

GORDON vs. VANDA PHARMACEUTICALS, et al.

11/11/2021 - MICHAEL KEHOE

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

MICHAEL KEHOE                    Date

Page 179

STATE OF CONNECTICUT

I, JENNY C. EBNER, a Registered Professional Reporter/Commissioner within and for the State of Connecticut, do hereby certify that pursuant to Notice I took the deposition of MICHAEL KEHOE, on November 11, 2021, via Remote Conference.

I further certify that the above named deponent was by me first duly sworn to testify to the truth and nothing but the truth concerning his knowledge in the matter of the case of KENNETH GORDON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARILY SITUATED V. VANDA PHARMACEUTICALS, INC. AND MIHAEL H. POLYMEROPOULOS now pending in the Unites States District Court Eastern District of New York.

I further certify that the within testimony was taken by me stenographically and reduced to typewritten form under my direction by means of COMPUTER ASSISTED TRANSCRIPTION; and I further certify that said deposition is a true record of the testimony given by said witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and seal this 14th day of November, 2021.

_____

Jenny C. Ebner, RPR, CSR, CLR,

Certified Connecticut Reporter Number: 00030

46 (Pages 178 - 179)

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[& - 21]**                                                                                           Page 1

| & |
|---|
| **&**   2:3,10,16 6:6 11:3,7 137:15 153:7 164:11 |

| 0 |
|---|
| **00030**   1:24 179:24 |
| **01108**   1:4 5:21 |
| **0124287**   170:2 |
| **0124320**   173:22 |
| **06820**   8:22 |

| 1 |
|---|
| **1**   3:9,20 30:13,14 31:12 39:24 166:12,24 |
| **1/22/2019**   43:23 |
| **10**   3:13 92:11,12 94:1,2 |
| **10/23/19**   3:18 |
| **10019**   2:11 |
| **10022**   2:17 |
| **106**   3:14 |
| **109**   3:15 |
| **10:05**   72:13 |
| **10:50**   3:23 69:22 70:2 |
| **10:55**   69:24 |
| **10:59**   3:23 70:2,5 |
| **10q**   126:14 |
| **11**   1:17 3:1,12,14 5:16 82:4,24 88:5 89:7 97:14,22,23 110:4,8 132:24 179:4 |
| **11/11/2021**   177:2 178:2 |
| **110**   125:24 |
| **112**   3:15 |
| **1159**   85:5 |
| **116**   3:16 |

**11747**   2:4
**11:28**   3:23 93:13 93:15
**11:36**   3:23 93:15 93:22
**12**   3:14 45:1 92:10 94:3,15,24 95:16 106:9,11 112:4 117:14 118:12,14 118:17,18 134:13 135:11,13 136:2 149:2
**120**   38:6
**123**   3:16
**124**   3:17
**126**   3:17
**128**   3:18
**1285**   2:10
**12:27**   3:24 134:24 135:3
**12:29**   3:24 135:3,6
**12:59**   3:24 163:3,7
**13**   3:15 12:3 48:24 50:2 109:3,4,17 112:4,10,11
**135**   3:24
**136**   3:18
**137434**   99:7
**137437**   100:14
**137457**   110:16
**137662**   138:24
**14**   3:15 35:7,9 71:6,23 72:12 112:15,16
**142**   3:19
**145,000**   83:23
**14th**   179:17
**15**   3:16,17 116:20 116:21 124:5,13 124:21

**150**   85:14 126:3
**152**   3:19
**16**   3:16 123:8,10 123:11
**163**   3:24
**164**   3:6
**167**   3:20
**17**   3:17 77:12 124:9,22
**174**   3:25
**17th**   49:17,21
**18**   3:17,17 8:21 126:13,18,20 162:9
**18978**   179:22
**19**   3:12,18 13:17 13:18,18,19 32:8 80:5,16 109:25 128:3,9 135:13 162:9
**1:05**   162:25
**1:19**   1:4 5:21
**1:38**   3:24 163:7 164:2,4
**1:53**   3:25 174:14 174:18
**1:58**   3:25 174:18 174:21
**1st**   124:23

| 2 |
|---|
| **2**   3:9 44:16,17 62:23 152:24 154:18 |
| **2,000**   33:24 |
| **2/11/2019**   3:13 |
| **2/12/2019**   3:13 |
| **2/2/20**   3:19 |
| **20**   3:9,18 30:8,12 30:22 52:24 136:13,14,18 177:15 |

**200,000**   38:9
**2000**   10:17 33:24 34:3 37:6 38:5
**2017**   13:9 48:24 49:3,23 50:4,8 51:6,8 52:4,24 53:24 64:22 65:14 65:18 71:6,23 72:13 79:22 83:11 84:10,11 162:9 171:10 174:2
**2017-2018**   38:18
**2018**   13:13 32:8 39:24 51:8 52:4 62:7,12 80:25 81:9 90:4 117:25 120:19 125:9 126:16,25 127:9 127:17 128:15
**2019**   13:15 43:4 88:5 89:7 92:10 94:3,15,24 95:16 98:7,19 99:12 100:17 101:6 106:17 111:15 112:25 113:14 117:2 136:20 137:10,16,21 138:14 139:14 140:12,18 143:14 153:3 168:1 174:6
**2020**   7:8 45:1,16 45:25 152:24 153:2 154:18
**2021**   1:17 3:1 5:16 179:4,18
**21**   3:18,19 127:23 128:5,8 138:23 142:14,15,21 151:10

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[212.373.3289 - agency]**

**212.373.3289** 2:11
**212.957.7806** 2:17
**22** 3:16,19 33:10
  39:23 40:11,12
  110:15,23,25
  111:15 120:15
  123:9 152:13,15
  152:18 166:15,17
  167:25
**23** 3:20 42:9 43:2
  136:20 137:10
  166:18 167:1,9
**24** 3:16 54:20
  55:22 56:5,8,12
  58:13 73:14 75:12
  78:16 83:18,22,23
  84:15,22 85:15
  86:1,5 116:10,19
  127:6,11
**25** 3:15 98:7 99:12
  112:3,7,20
**27** 3:15 97:21
  109:2
**28** 3:14 43:4 106:6
**29** 3:19 90:4 142:4
  142:21 151:7
**29.6** 100:20
**2:00** 176:14,17
**2h17** 76:25
**2nd** 161:25

**3**

**3** 3:10 45:7 46:19
  46:20 62:16,19
  120:19 128:15
**30** 3:9 7:7 85:15
  136:10,18,22
  137:20
**32** 152:8,16
**33** 44:9
**3rd** 121:5 128:25

**4**

**4** 3:10 47:15,16
  106:17 170:17
**4/25/19** 3:14
**40** 130:11
**44** 3:9
**46** 3:10
**47** 3:10

**5**

**5** 3:11 52:20,21
  70:7 173:21
**50** 38:8,9 41:4
**52** 3:11
**58** 2:3

**6**

**6** 3:11 5:21 70:21
  70:22 112:25
  113:14 117:2
  139:14 170:7
**631.367.7100** 2:4

**7**

**7** 3:10,12 4:3
  45:16,25 47:15
  80:8,9,16 126:16
**70** 3:11,23
**727** 6:4 13:25 33:9
  45:13 98:10,19
  99:8 137:17
  164:12
**727benefitfunds...**
  98:14
**7778** 95:2,4
**7q** 7:7

**8**

**8** 3:5,11,12 70:19
  82:6,7,21,22
**80** 3:12
**800** 2:16

**82** 3:12
**88** 3:13

**9**

**9** 3:11,13 52:13
  80:25 88:13,15
  89:1
**9.8** 90:3
**9/6/2019** 139:10
**92** 3:13
**93** 3:23
**97** 3:14
**9:27** 113:14
**9:30** 1:18
**9:35** 8:3
**9:38** 5:16

**a**

**a.m.** 1:18 3:23,23
  3:23,23 8:3 70:2,2
  93:15,16 113:14
**ability** 56:3
**able** 9:10 55:11
  75:6 86:2 94:2
  105:18 121:25
  167:12
**absolutely** 135:25
**accede** 151:1
**accelerate** 84:7
**account** 40:3
  45:24 46:13
  111:25 139:4,24
  140:5,12,17 141:9
**accounts** 14:25
**accuracy** 130:13
  130:24 131:14
**accurate** 138:12
  168:3
**accurately** 173:25
**acknowledge** 7:11
  7:13

**acknowledgement**
  177:3
**acknowledging**
  133:11,18
**acquired** 11:13
**acronym** 33:1
**act** 96:4,12 108:18
**action** 96:2,15
  98:21 104:25
  113:19 179:14,16
**activities** 11:22
  91:17,18,21
**activity** 53:11
  107:2
**added** 38:8 54:24
**addition** 122:21
  123:16,19 172:7
**additional** 51:7,11
  54:24 131:23
  139:12,17 140:11
  146:19 147:1,8
  150:8
**additions** 177:6
**address** 8:20
  98:13 135:9
**addressed** 151:2
  151:19
**addresses** 98:10
**administered** 7:15
**administration**
  7:14 132:18
**advance** 10:2
**advantage** 172:16
**affirmed** 8:7
**afflicted** 79:14
**afternoon** 164:1,9
  174:23
**agencies** 149:11
**agency** 100:25
  102:17 156:19

**[agent - author]**                                                         Page 3

**agent** 130:11
**aggregate** 35:2
  37:20
**ago** 128:21
**agree** 7:23,25 8:1
  20:11 42:23 78:12
  160:21
**agreed** 24:21 29:6
  156:1
**agreement** 7:19,20
**ahead** 164:21
**akathisia** 76:9,10
  76:23 77:22 171:9
**al** 177:1 178:1
**alert** 88:21
**algorithm** 34:13
**allegation** 27:13
**allow** 57:9
**allowed** 156:23
**alluding** 170:18
**aloud** 126:11
**altered** 166:3
**amalina** 2:5
**americas** 2:10
**amount** 28:18
  41:14
**amus** 33:1,2,4
**analogy** 144:25
**analysis** 34:9
  36:16,18,22,23
  37:1,13,24 38:4,12
  38:12,15,22 49:19
  52:4 53:3 67:8,11
  68:20 70:12 71:14
**analyst** 12:17
  13:10,12,14 14:8
  14:14 18:19 19:4
  33:17 38:14,20
  47:10 48:12 50:24
  50:24 51:3 61:18
  71:11 100:8

137:25
**analysts** 18:17
  39:11 71:13 82:14
**analytical** 11:25
  37:17
**analyze** 83:25
**analyzing** 50:18
**animal** 101:2
  105:10 144:4,7,11
  153:12 154:6
**animals** 155:25
**announced** 121:5
**announcement**
  125:10 143:15
**announces** 120:23
  122:24
**answer** 12:20 92:4
  94:19 105:3
  131:19 146:25
  147:14 161:4
  171:21
**answered** 47:5
  77:24 108:22
  113:17 145:19
  147:5 148:20
  158:24 160:25
**answering** 87:10
**anticipate** 135:20
**antipsychotics**
  76:13
**anybody** 6:22
  119:22
**apart** 154:11
**apologies** 166:20
**apologize** 33:16
  44:13 48:6 71:19
  110:2,6,11 132:24
  136:24 137:6
**appearances** 2:1
**appears** 43:5,13
  67:22

**appended** 177:7
**applied** 35:6
**apply** 36:7 167:13
**appreciate** 104:13
  176:7
**appropriate** 136:1
**approval** 21:15
  22:10 23:12,13,18
  25:4 104:11
  105:16
**approvals** 66:7
**approve** 102:18
  134:3
**approved** 54:17
  54:20 64:16,19
  65:16 104:19
**approximately**
  5:16 33:10 38:6
  85:14 97:6,8
  126:3 153:3
**april** 98:6
**argument** 118:13
  159:24 162:4
**argumentative**
  147:13 160:9
  161:1
**arounds** 115:16
**arrangement** 7:17
**artificially** 169:20
**asia** 57:4 116:2
**aside** 16:13 96:9
**asked** 42:1 47:5
  70:13 73:8 77:23
  95:24 99:24
  108:21 131:4
  145:18 147:4,24
  148:7,19 158:23
  160:24
**asking** 19:18
  23:11 31:17 45:19
  82:10 102:17

118:12 144:24
  148:4 149:15,25
  151:16 158:3,4
**asleep** 56:2
**asoloway** 2:12
**assets** 45:10 46:7
  46:24
**assisted** 179:11
**associate** 71:12
**associates** 32:16
  32:24 33:3
**assume** 12:7 129:3
**assumption** 73:18
  86:18
**attached** 45:10
  46:18
**attaches** 99:2
**attachment** 137:5
  137:19
**attend** 10:20,21
  39:12
**attention** 52:8,11
  72:10 117:11
  122:19 124:4
  125:20 127:5
  129:12 135:11
  152:7
**attorney** 179:15
**attorneys** 1:15
  6:13
**audience** 79:24
**audio** 19:14
**audra** 2:12 6:5
  109:7
**august** 124:23
  125:9,12
**aurelius** 87:19
  88:22 89:17 90:5
  95:13
**author** 72:2 102:2
  106:21

**[authorities - brought]**                                                          Page 4

**authorities** 123:20
  131:9
**autism** 58:5 78:6
**available** 32:2
  97:18 169:14
**avenue** 2:10,16
**avenues** 161:16
**average** 22:25
  23:22
**avital** 2:6 6:2
  29:13 30:3 31:16
  164:10
**awake** 56:1 57:7
**aware** 14:24 17:10
  17:17 18:15 42:5
  46:4,6 70:16 80:1
  140:21 170:20
  171:18
**awareness** 73:21
  170:11
**awry** 175:18

**b**

**b** 98:6
**back** 13:22 16:4
  19:3 39:20 42:17
  49:6 50:6 63:22
  67:6 68:25 69:16
  69:19,23 70:4,7
  77:15 84:19 93:21
  110:8 114:20
  117:24 120:3
  125:12 135:5
  142:24 143:14
  144:25 159:6
  162:25 164:3
  165:3,16,21 166:8
  170:1 173:20,22
  174:20
**background** 10:10
  10:12 19:16 82:11

**backs** 35:24
**backup** 12:21
**bai** 98:6 137:8
**balance** 35:19
**ballpark** 23:21
**bar** 111:5
**base** 27:25 66:13
**based** 28:6 36:18
  37:20 38:3 39:4
  40:1 59:19 76:17
  83:22 86:4 105:12
  105:22 168:14,22
**basic** 20:20
**basically** 57:9
  107:24 175:7
**basing** 148:8
**basis** 100:18
  130:23 131:2
  156:2
**bates** 85:2 94:14
  95:1 99:7 100:14
  138:23 166:23
**beagle** 117:15
**bear** 170:4
**beat** 62:18
**began** 48:19,20
**beginning** 22:10
**behalf** 1:6 7:22,24
  168:5,12 179:7
**believe** 13:17 15:1
  17:22 24:4 27:25
  84:5,16,17 91:15
  107:8 109:11
  122:3,5 124:1
  126:10 127:20
  130:5 134:9 136:5
  138:12 141:15
  146:11,13,17
  151:13 166:14
  170:6

**believed** 67:9
  105:21
**believes** 73:8
  117:13 157:13
**benchmark**
  164:17,21
**benefit** 159:13
**best** 37:16,18
  116:7
**better** 57:10 58:23
  92:23 144:12
  171:23 172:17
**betting** 90:13 91:3
**beyond** 60:16
  147:8
**big** 153:12
**biggest** 73:22
  170:13
**billion** 117:18
**binder** 29:3,7,10
  29:14,24 30:2,8,17
  30:23 32:1 42:9
  43:2 44:9,20
  47:14,21,23,24
  52:12 70:19 80:5
  80:21,24 82:4,24
  88:4 92:7 97:16
  97:19 99:3 106:6
  109:2 110:1,20,21
  112:3,7 116:11,20
  116:23 120:14
  124:5 127:23
  136:22 137:4
  142:5,17
**biotech** 65:25
**biotechnology**
  100:20
**biotechs** 67:17
  68:16
**bit** 21:11 87:8
  119:20,23 134:18

  141:23
**blind** 55:24
**bloomberg** 90:2
  91:12 94:8
**bmitchell** 2:5
**bobby** 98:14
**bonuses** 28:4,5
**borrow** 90:11
**bottom** 59:23
  61:14 67:13 73:13
  78:2 85:2 95:2
  130:4 142:8
  166:23
**bounds** 2:13 80:14
  93:7 109:6 110:12
  116:14 124:7
  126:17 127:25
  128:5 151:9
  152:14 166:16,19
**breach** 157:7
  158:18
**breached** 159:22
  160:6
**breaches** 160:16
**break** 69:12,15
  70:8 93:24 119:1
  162:24
**breaking** 134:18
**breakout** 39:16
**brent** 2:7 166:11
  167:20
**brief** 70:1 93:24
  135:2
**briefly** 93:11
  135:8
**bring** 72:10
**bringing** 103:19
  152:2
**broad** 132:12
**brought** 52:8

**[bubbles - colleagues]**                                                                    Page 5

**bubbles** 72:25
73:4
**build** 35:1 39:11
**building** 21:4
51:20
**built** 51:13
**bullet** 73:20 74:4
76:7 78:2 170:11
171:4 172:6,10
173:4
**bullets** 72:25 73:3
**bunch** 32:13 72:24
93:1 94:11
**business** 11:15,21
33:20 34:25 53:11
66:5,10 72:8
100:3 107:2
138:18 144:1,2
**buy** 35:24 41:18
51:21

**c**

**c** 1:24 8:7 179:2,23
**c.a.** 1:4
**cabin** 130:19
**call** 12:21 15:16
34:22 56:22,24
66:22 72:12,13
73:8 124:23 125:2
128:9,11,12,24
**called** 8:6 34:19
156:19
**calls** 39:10 169:3
169:22
**cameras** 69:20
**candidate** 83:24
**canine** 116:4
122:15 148:6
149:2
**canines** 118:12
**cantor** 113:2

**cap** 12:23 13:1
33:11,13,15,16,20
33:24 39:23 40:6
43:19 44:6 48:21
48:21 49:2 51:7
54:3 65:24 71:24
99:9,16,20 111:20
111:24 137:25
140:4 162:7,10
**capability** 12:1
**capacity** 12:1 13:1
**capeci** 2:7
**capital** 20:20
35:21,23 36:1
44:4 66:14
**capitulate** 151:18
**care** 19:16,21,22
19:25 20:2,8
50:24,25 51:2,3
119:25
**career** 11:10 20:3
**cares** 119:22
**carries** 122:25
**case** 5:21 9:4 10:7
13:23,24 17:11
25:3 28:23 31:3
36:25 40:10 42:13
43:6 82:23 104:1
104:11 115:12
122:9,14 145:6
156:3 165:15,21
175:16 179:6
**cash** 64:23 66:18
67:10
**catalyst** 63:13
176:2
**catalysts** 61:15,18
65:8
**catch** 27:19
**categories** 21:7

**cause** 62:12,20
63:18 65:11 91:7
**celsa** 169:4,5
**ceo** 132:6 143:10
143:18 144:18
145:1 151:13
153:16,21 154:11
156:10 160:15,22
161:9
**certain** 25:21
42:15 76:12,18
84:4,18
**certainly** 132:10
132:18,25 133:3
151:6
**certified** 179:24
**certify** 179:3,5,10
179:12,13
**chain** 142:8
**challenge** 153:11
**challenged** 113:3
155:4
**chance** 47:19
80:19 109:21
133:7 144:13
**chandra** 142:9,11
142:25 143:7
**change** 61:21
152:1 178:4,7,10
178:13,16,19
**changed** 12:13,16
174:5,25
**changes** 177:6
**characterize** 13:11
35:10
**charles** 71:11
**chose** 145:8
**chronic** 130:6
135:22
**cibc** 11:16

**circulation** 95:12
**cited** 95:13
**citigroup** 11:14
**claim** 96:19
**claims** 96:4,11,12
172:18
**clarification** 19:7
140:8 147:11
161:3 168:20
**clear** 70:13 85:25
160:12
**clements** 6:18,23
6:24,24 7:2
**client** 14:19 32:16
32:23 33:2 40:8
40:20 41:1,6,13,18
41:21 45:10
140:20
**clients** 14:16 33:22
34:1 138:7
**cliff** 60:23
**clinical** 21:1,13,14
21:16 22:19 24:2
24:6,25 25:13,21
25:25 26:3,5,10,13
58:24 63:6 66:11
117:25 125:22
127:15
**clinicians** 74:8
133:20,22
**clint** 2:21 31:19
**close** 31:11
**closed** 45:24 46:12
**clr** 1:24 8:7 179:23
**cohen** 2:16 6:9
**cohengressler.co...**
2:18
**colleague** 48:7
80:25
**colleagues** 16:18
117:6 153:6

**[collecting - continue]**                                                Page 6

| | | | |
|---|---|---|---|
| **collecting** 17:15 | **company** 21:15 | **concern** 103:6 | **confirm** 31:20 |
| **come** 39:20 50:23 | 23:17 24:18 25:14 | 104:21,24 106:3 | 99:6 115:11 |
| 69:16,23 96:25 | 26:4 27:12 34:21 | 108:17 149:14,16 | 123:21 131:10 |
| 115:11 162:25 | 34:23 39:5 41:18 | 149:24 150:1,8,10 | **confirmed** 115:10 |
| **comes** 40:8,24 | 53:23 63:23 66:1 | 150:15,19 151:2 | 130:7 |
| 98:1 | 74:7 90:6,16,22 | 151:20,25 | **confusion** 81:18 |
| **comfortable** 60:23 | 91:7 100:20,23 | **concerned** 107:23 | 81:20 112:19 |
| 150:11 | 103:4 105:1,18 | **concerning** 99:15 | **connecticut** 8:9,21 |
| **coming** 86:21 | 117:17,22 144:17 | 141:7 179:6 | 179:1,3,24 |
| 114:5 144:13 | 145:3 149:13,14 | **concerns** 26:5,6 | **connection** 14:7 |
| **commenced** 8:3 | 149:23 150:7 | 101:9 102:21 | 15:13 17:11 18:17 |
| **commercial** 21:3,4 | 155:23 156:9 | 107:15 141:8,15 | 18:22 26:14 71:17 |
| 59:1 66:4 67:16 | 160:23 161:10 | 159:14 | 82:17 114:22 |
| 68:5 74:6 75:5 | 174:24 | **concluded** 5:9 | 158:21 |
| 77:9,11 101:12 | **company's** 36:5 | 145:11 176:17 | **consent** 7:16 |
| 102:23 173:10 | 101:11 102:22 | **concludes** 176:13 | **conservatively** |
| 175:24 | 117:24 118:13 | **conclusion** 67:14 | 83:23 |
| **commercialize** | **compared** 63:22 | 145:17 162:2 | **consider** 47:11 |
| 153:24 | 68:15 76:17 | **condition** 135:22 | 150:10 |
| **commercially** 76:8 | **compelled** 78:3 | **conditions** 83:25 | **consideration** |
| 171:5,8,22 | **compensated** | **conduct** 21:16 | 156:21 162:15 |
| **commissioner** | 27:24 | 23:11 58:24 101:2 | **considered** 6:16 |
| 179:2 | **compensation** | 114:23 115:3 | 37:14 |
| **committed** 165:4 | 162:13,17 | 117:14 133:21 | **considering** 58:9 |
| **common** 54:1 | **competing** 35:4 | 144:6,17 145:2 | 64:12 |
| 74:12 168:4 | **competitive** 21:6 | 148:11 154:3 | **consistent** 40:6 |
| **communicate** | 25:20 | 156:9 | 50:9 60:19 86:14 |
| 141:7 | **compiles** 33:24 | **conducted** 21:21 | 121:14,14 129:23 |
| **communicated** | **complete** 30:9 | 53:3 72:8 100:3 | **consulted** 52:7 |
| 141:16 | 31:5 109:7 123:18 | 107:2 | **contained** 70:10 |
| **communicating** | 127:16 177:8 | **conducting** 50:13 | 89:23 |
| 58:23 73:7 172:17 | **completing** 11:10 | 55:8 64:6 144:4 | **content** 100:5 |
| **community** 39:15 | 122:1 | **conference** 1:20 | 101:24 107:5,9 |
| 65:3 74:16 | **component** 34:8 | 39:10 169:7 179:4 | 138:9,20 |
| **companies** 20:10 | 35:11 | **conferences** 39:13 | **context** 102:4,5 |
| 20:21,23 24:4,5 | **component's** | **confidence** 157:20 | 109:12 114:17 |
| 25:19 38:3 39:13 | 34:16 | **confidential** 1:14 | 132:9 151:7 161:8 |
| 58:20,23 59:2 | **computer** 34:13 | 31:15,18 42:14,22 | **contingent** 162:18 |
| 66:1 74:13,13 | 179:11 | 42:24 | **continue** 20:5 |
| 86:10 | **concede** 161:18 | **confidentiality** | 132:11 142:21 |
| | | 25:20 42:13,19 | |

**[continued - decision]**                                                Page 7

**continued**  111:5
**control**  22:8 142:1
**conversation**
  70:12 150:5
**conversations**
  87:12 115:13
**copied**  48:17
**copy**  17:19 18:9
  29:3 97:18 99:4
  138:12
**core**  33:11,13,15
  33:16,20 39:23
  40:6 48:21 49:2
  51:7 99:9,16
  129:16 162:7,10
  175:12,12,22
**corner**  95:2
**correct**  9:25 10:1
  10:4,5,7,8 11:25
  13:7 15:1 18:11
  21:21,25 22:1,2,3
  23:9,19,20,25 24:1
  24:7,9 25:14,15,17
  25:18,23 28:17,20
  29:9 32:22 36:20
  37:2 38:16 40:7
  41:1,2,7,15,16,18
  41:19,22 48:5,15
  49:13 52:25 54:20
  54:21 55:1,13,14
  57:23 58:2,3
  59:18,21,22 63:19
  63:20 64:1,4,5,10
  64:13,14,17,18,20
  65:16,17,20,21
  67:24 68:2,8,9,12
  68:13,17,18 71:25
  72:1 79:7 80:14
  82:14 84:11,12,23
  88:14 89:8,9 91:4
  91:5,25 94:16,20

98:22,25 99:25
  102:3 104:20
  106:10 108:3
  109:25 111:13,21
  111:25 112:1,25
  116:14 117:2,4,9
  118:10 120:17,19
  126:7,14,25 127:9
  128:5,11,18,21,22
  131:24,25 137:10
  137:13,17,21
  138:9,18 139:5,18
  139:24 140:5
  142:9 145:17
  147:2,3 148:2
  150:21 152:14,22
  152:24 153:4
  156:4 158:8,9,11
  158:16 159:10,15
  159:16,18 162:21
  177:8
**corrections**  177:6
**correctly**  73:2
  111:1
**counsel**  5:24 6:18
  6:25 7:10,16,19
  16:1,15 17:8 29:6
  87:13,16,18
  179:14,15
**countries**  149:7
**couple**  17:4 29:22
  29:25 33:7 73:12
  82:10 83:13 89:2
  129:13
**course**  50:3,5
  53:11 71:14 72:7
  100:2 107:1
  113:12 124:13
  138:17 144:17
  145:2 156:9

**court**  1:1 4:3 5:1,6
  5:20,22 6:20 7:4,6
  8:24 9:20 25:6
  94:18 101:13
  140:8 147:11
  153:13 154:16
  156:22 157:17,23
  158:5,6,10,13,20
  159:18,21 161:3
  168:20 179:8
**cover**  19:2 30:21
  32:7 39:21 44:10
  99:2 116:18
  128:10 137:5,7
**covered**  84:10
**cowen**  11:16
**create**  18:16,18
**created**  40:2 100:2
**creates**  33:25
**cross**  3:3 164:7
**csr**  8:7 179:23
**curious**  113:6
**current**  40:16,16
  40:18 64:10 67:16
  68:5
**currently**  11:1
  68:8 85:13 123:7
**curtailed**  175:10
**customer**  14:25
**cut**  18:25 29:7
  113:2
**cv**  1:4 5:21
**cycle**  55:17 56:1,4
  57:6,10,11 59:24
  79:2

**d**

**d**  95:7
**dan**  42:25 81:19
  119:18 120:1
**daniel**  2:18 6:8
  48:3

**darien**  8:21
**dark**  55:19 56:1
**darkness**  55:25
**data**  25:21 36:11
  36:15 62:16,19,23
  83:21 94:7,9
  117:18,23 121:7
  122:6 147:15,17
  150:8
**date**  1:17 43:22
  49:6 109:24
  128:17 139:9
  168:5 177:12
  178:24
**dated**  32:7 44:25
  48:24 80:25 98:6
  106:17 112:24
  120:19 126:16
  128:15 136:19
  167:25
**day**  24:25 51:21
  60:13,13 83:8
  119:9,12 150:25
  151:17 177:15
  179:17
**daylight**  55:25
**days**  129:19
**dead**  62:18
**dealing**  65:25 66:6
**debt**  36:2
**december**  39:24
  117:25 120:19
  121:5 125:11
  128:15,25
**decided**  19:20
  53:23
**deciding**  52:5
  65:18 169:12
**decision**  51:18
  54:2 63:24 65:23
  101:13 103:9,12

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[decision - doing]**                                                                        Page 8

120:4 148:8
160:15
**decisions** 41:21
**declare** 177:4
**decline** 91:8
104:22
**decrease** 61:7,24
**deemed** 177:6
**deeper** 39:5
**defendant** 1:12
2:9
**defendant's**
173:20
**defendants** 6:7
7:23 10:6 166:9
**defensive** 60:8
**defer** 146:3
**define** 123:21
131:10
**definitely** 119:8
**demonstrated**
129:24
**depends** 22:18,19
22:23 23:6,10
**deploying** 35:21
**deponent** 177:3
179:5
**deposition** 1:16
5:9,17 7:9,11,12
8:3 10:2,3 15:23
16:2 17:6 29:8
30:13 31:6 87:14
87:18 96:8,10
176:13,16 179:3
179:12,14
**deprivation** 79:18
**derek** 84:17
**desai** 45:1
**describe** 33:19
**described** 53:3
54:9 74:14

**describing** 104:23
**description** 3:8
43:13 59:20
107:13 129:15
**design** 24:19
133:23
**designations** 42:21
**designed** 140:4
**designs** 132:14
**desk** 87:24
**destroyed** 117:16
**detailed** 130:18
**details** 86:21
175:19
**determine** 165:16
165:22
**determined**
150:25 151:17
**determining**
156:20
**detractor** 100:19
**development** 63:6
67:17 68:15
117:13
**diagnose** 75:6,8,11
**dialogue** 25:13,16
**difference** 84:21
147:18
**different** 12:15
56:25 69:4 109:24
156:24
**differentiation**
76:17
**difficult** 9:20
75:11
**difficulty** 69:19
**dig** 39:5
**diligence** 83:22
**dina** 6:17,24 7:1
**direct** 3:3 8:11
122:18 124:4

125:20 127:5
129:12 135:10
152:7
**directed** 40:5
**directing** 117:11
123:15
**direction** 179:11
**director** 12:4,14
12:14
**disappeared** 139:8
**disclose** 30:18
**disclosed** 100:24
**disclosing** 28:12
**disclosure** 114:9
**discuss** 150:16
**discussed** 96:7
169:1 176:9
**discussing** 81:4
165:15
**discussion** 81:19
85:11 86:4 143:7
**discussions** 52:9
87:15 96:18
**disease** 22:19 27:3
55:19 58:17
170:20
**diseases** 54:18
79:14
**disorder** 55:17
56:18,24 58:1,5
62:16 73:21 74:9
74:16 79:10 81:4
81:21 170:12
**disorders** 58:5
79:7 84:4
**dispute** 121:20
**disseminate** 99:22
**district** 1:1,2 5:20
179:8,8
**dive** 60:23

**divided** 34:20
**dividends** 35:24
**docs** 109:12
**document** 3:9 29:2
29:24 30:7,9,11,22
30:23 31:5 32:5
32:11 33:8 42:7
42:11 44:9,14
53:15,21 70:10
71:3 72:6 82:4
85:12 87:4 92:8
95:22,23 97:13,15
97:21 99:6,19
106:5 109:1 113:5
113:13 116:19
121:3 129:10
135:11 137:23
138:16,23 166:8
166:22 170:1
173:4
**documents** 16:5
16:16 17:11,15,19
18:9,13 29:4,22,25
87:6 92:21 136:11
**dog** 114:23 115:3
115:17 118:9,11
122:1 143:16
145:11,23 146:6
146:10 147:9
148:11,23 149:8
150:20 151:1,19
154:11 156:3
157:14 158:15
**dogs** 117:15
118:18 143:20
148:12 150:20
155:24 158:21
159:10,14,15
**doing** 27:16 69:10
71:14 105:5,6
118:25 141:21

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[doing - events]**                                                                 Page 9

145:11 154:11,22
**dollar** 117:19
**doubt** 49:12
**dowd** 2:3 164:11
**downside** 91:18
**draw** 152:1
**drivers** 73:14
**driving** 65:23
**drop** 90:3
**drug** 21:18 22:7
  24:7 25:12 26:7
  27:3 28:18 54:13
  54:17 57:9 60:3
  63:1,5 64:1,5,15
  66:6 74:1,15,16
  75:9 79:5 81:6
  86:11 101:12
  102:18,24 104:25
  115:20 117:20
  118:3,10,13,17
  121:16,22 132:11
  132:18 144:12
  147:19 175:6,11
**drugs** 23:8,24 59:3
  67:16 68:5 76:14
  76:17 96:20
  103:25 170:25
  173:12,12 175:22
  175:25
**dtabak** 2:18
**due** 83:22
**duly** 8:6 179:5
**duncan** 71:11
**duration** 22:21
**duties** 154:13,24
  158:19
**duty** 153:17,22
  155:10,16 157:7
  157:11,24 159:23
  160:6,16

**dynamic** 70:11

**e**

**e** 3:13,13,14,18,19
  18:12 32:7,20
  39:21 43:4,10,12
  44:11,25 46:24
  48:3,24 49:9,13,17
  50:2 52:24 53:2,7
  53:8 71:6,19,22
  72:3 73:6,13
  74:24 78:5,9 80:5
  80:24 81:16 88:5
  88:25 89:11,14,17
  89:25 90:2 91:12
  91:24 92:10 94:10
  94:16,24 98:6,13
  99:2 106:14,22,25
  107:8 112:24
  114:18 117:2,12
  134:15 136:19
  137:5,7,8 142:8,9
  143:9 151:3,12,16
  151:20 152:21
  153:9 154:19
  170:22 171:25
  172:21 173:14,25
  178:3,3,3
**earlier** 33:14 40:2
  49:18 50:15 74:6
  74:14 82:12 84:20
  86:9 95:24 107:4
  111:19 114:21
  138:8 146:10
  156:1 159:7 169:1
  173:24 174:23
  176:10
**early** 13:17
**earning** 35:21
**earnings** 34:20
  124:23

**easier** 44:11,23
  52:12 92:20
**eastern** 1:2 5:20
  179:8
**easy** 9:23
**ebner** 1:24 5:23
  8:7 179:2,23
**economic** 59:7
  90:16,22 173:11
**economics** 59:4
**educate** 74:8,15
  75:5
**educated** 171:23
**educating** 21:5
  85:25
**education** 11:6
  77:11 86:10,16
**educational** 10:11
  19:15 170:19
**effect** 171:17,24
**effectively** 90:12
**effectiveness**
  132:11
**effects** 76:13,18
**efficacy** 22:2,4
  24:7 25:3,7,10
  116:3 130:5
**efficient** 45:20
**effort** 77:9,11,11
  158:6
**efforts** 86:10,16,19
  125:21 170:19
**eight** 57:5 88:22
**either** 33:6 52:4
  93:4 99:4 116:19
  176:6
**ek** 120:17 124:17
  124:18 128:20
**electronic** 5:11
  18:13 99:5

**electronically**
  18:10
**elements** 165:10
**emotional** 108:14
  108:14
**employed** 11:1
  48:8 179:14,15
**employee** 179:15
**employees** 48:15
**empty** 31:9
**engaged** 86:15
  96:19 166:2
**engaging** 86:19
**enrollment** 127:15
**entire** 13:5 42:14
  116:19 160:9
**envelope** 29:7
**equity** 11:12 19:24
  36:2
**equivalent** 144:9
**errata** 177:7
**erroneously**
  112:10
**esq** 2:6,7,7,12,13
  2:13,18
**essentially** 103:18
**esther** 134:14
  135:16
**estimate** 83:23
**et** 177:1 178:1
**ethical** 149:14,16
  149:24 150:1,7,10
  156:15,18,21,24
  159:14 160:22
  161:10 162:4
**europe** 116:2
**evaluate** 132:11
**evaluation** 34:17
  34:18 35:11 66:25
**events** 16:19 61:23

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[everybody - fda's]** Page 10

**everybody** 167:22
**evidence** 145:23
**exact** 49:5
**exactly** 83:10
  120:11
**examination** 3:2
  8:11 164:7
**example** 15:7
  16:19 18:16 37:1
  64:8 67:10 100:9
**examples** 161:7
**excel** 67:7
**excited** 69:5
**exclude** 38:3 42:1
  87:10,11 96:6
**excluded** 38:7
**excluding** 87:17
  96:17
**exclusion** 42:5
**excuse** 19:9 43:14
  89:3 97:11 99:19
  107:25
**excused** 163:10
**executive** 7:7
**exhaust** 155:3
**exhausted** 161:15
**exhibit** 3:8,9,9,10
  3:10,11,11,12,12
  3:13,13,14,14,15
  3:15,16,16,17,17
  3:18,18,19,19,20
  30:11,12,13,14,23
  31:12,21,22 32:1
  44:14,16,17 45:7
  46:19,20 47:15,16
  47:22 52:20,21
  53:10 70:7,21,22
  80:7,8,9,12,16
  82:6,7,21,22 88:12
  88:15 89:1 92:11
  92:12 93:25 94:2

97:14,21,23 98:2,5
106:9,11 109:3,4
109:15,17 110:4,6
110:8 112:4,4,12
112:16 116:20,21
120:14 123:4,6,7
123:10,11 124:5,9
124:17,22 126:18
126:20 127:24
128:3,9 135:12
136:13,13,14,18
137:1 142:14,15
142:21 151:7,8
152:10,15,18
166:10,12 167:1,3
167:8,9 170:3,6,17
173:21
**exhibits** 3:7 4:4
  31:7,8,15 45:6
  110:10 167:16,19
  173:21
**existing** 40:25
  41:1 147:8
**exists** 73:22
  170:12
**expanded** 59:24
**expansion** 54:13
  54:16 55:4 57:13
  57:18 58:2,8
  68:11 69:2 101:11
  102:23 103:9,12
  105:19
**expect** 66:19 126:3
**expectations**
  60:15 64:23
**expected** 62:4
  127:17 130:19
  153:14
**expecting** 65:4
**expects** 101:13
  122:21 123:16,19

**expedited** 176:11
**expediting** 58:22
**expensive** 67:22
**experience** 91:6
**expert** 165:8
**expertise** 19:4
**explain** 34:6 54:15
**explained** 103:7
**explaining** 81:22
**explanation**
  114:14
**explore** 154:12
**exposure** 19:22
**extent** 27:5 119:22
**extra** 110:10
**eyes** 1:15

**f**

**face** 143:3
**fact** 21:19 94:7
  126:6 136:1
  150:19 170:18
  171:24
**factors** 35:7,9,11
  35:16,19
**facts** 169:9
**factset.com** 94:4,6
**fail** 80:12
**fair** 12:8 13:21
  29:1 36:3 38:7
  46:8 51:17,23
  53:6,9 68:19 69:3
  71:19 72:2 73:11
  76:7 79:22 89:22
  89:24 106:21,25
  129:3 157:6
  169:12 174:4
**faith** 157:19
**false** 96:4,11
**familiar** 15:4,6
  26:25 82:21 95:25
  99:18 137:24

138:6 145:22
**fanapt** 59:24 60:2
  60:5,18,22,24 61:6
  61:6,7 62:7 63:17
  64:9 68:7 75:16
  76:3,16 78:16
  171:6 172:2
  173:16 175:21
  176:1
**fastest** 132:19
**fault** 110:7
**favor** 153:13
**fb** 1:4 5:21
**fda** 21:2,16 22:10
  24:15,21,24 25:1
  25:14 26:3 58:19
  58:20 97:1 100:24
  101:6,9,21 102:11
  102:14,21 103:14
  103:17 104:2,19
  104:25 105:22
  107:15,23 108:15
  113:3 114:9,20,22
  114:23 115:4,10
  115:11,21 116:5
  117:13 118:11,16
  118:23 122:5
  133:22,24 134:2
  143:11,15 144:3
  146:3 147:23
  148:7,10,22 149:5
  149:8,15,17,25
  150:1,9,9,9,19
  151:25,25 152:2
  153:2,13 155:4
  156:19,25 157:17
  157:23 158:5,20
  159:9,13 161:19
**fda's** 21:17 103:8
  103:11 122:1
  143:16 144:22

CONFIDENTIAL
ATTORNEYS EYES ONLY

[fda's - gastroparesis]                                                                                     Page 11

147:19 151:1,18
153:11
**february** 44:25
  45:16,25 88:5
  89:7 92:10 94:3
  94:15,23 95:16
  112:24 113:14
  117:2 143:14
  152:24 154:18
  161:25
**feel** 79:19 84:3
  108:9 153:16,21
  153:23
**feeling** 9:12
**fiduciary** 153:17
  153:22 154:13,24
  155:10,16 157:7
  157:24 158:19
  159:23 160:6,16
**figure** 24:17 63:24
  162:24
**file** 18:18 99:3
  104:2 122:7 167:5
**filed** 5:19 17:22
  107:25 151:1
  153:3 161:24
**files** 18:6
**filing** 101:11
  102:22 104:2
  107:22 122:13
  151:18
**filings** 36:6 120:7
  120:8 169:6
**finally** 130:4 173:4
**financial** 34:18
  39:8,12 94:9
  175:12,13
**financially** 179:16
**financials** 175:6
**find** 41:25 123:14
  132:18 153:24

164:21 170:3
**fine** 5:11 8:14 9:13
  29:19 32:19 47:6
  80:23 88:1 161:14
  174:12
**finish** 171:20
**finished** 11:6,23
**fire** 66:24 67:1
**firm** 90:5 164:10
**first** 11:18 12:17
  19:21 31:25 32:4
  35:6 37:2 48:19
  49:2,18 54:12
  62:1 68:25 69:9
  77:15 83:16 94:14
  99:14 101:6
  122:23 130:8,10
  142:8 155:23
  166:10 167:24
  179:5
**fiscally** 35:22
**fit** 60:5,24
**five** 12:22 21:7
  35:11 125:14
  162:24
**flagship** 101:12
  102:23 103:1
  104:24
**flip** 85:1,5 92:6
  109:2,21 125:8
  126:13
**flow** 67:10
**flows** 64:23 66:18
**focus** 19:21 65:13
**focused** 19:4 20:2
  55:6 59:14 64:11
  104:4
**focusing** 76:9
  77:22 144:25
  171:9

**fold** 81:4
**folder** 31:9,11,22
  167:17,19
**follow** 25:1 164:13
**following** 72:13
  123:10 153:2,4
**follows** 8:9
**food** 132:18
**force** 59:24 74:7
  78:15 173:11
**foregoing** 177:5
**foregone** 162:2
**forget** 131:4
**forgive** 21:11
**form** 148:14
  159:25 164:23
  165:12,19,23
  168:19,24 172:25
  173:17 175:1
  179:11
**formal** 11:6
**format** 9:22
**forming** 55:5
**formula** 35:6 36:6
**forth** 142:24
**forward** 87:8
  105:11,14 161:19
**forwarded** 89:14
**forwarding** 117:8
**forwards** 89:2
  123:21
**foundation** 168:7
**four** 23:3,23 35:11
  62:22 121:11,22
**fourteen** 112:9
**fourth** 137:20
**fraud** 165:4,6,8,11
  169:21
**free** 99:4 108:9
**friday** 5:5

**friendly** 35:22
**front** 9:3 29:10
  34:10,12 36:21
  37:13 38:25 42:8
  99:7
**fulfill** 149:15,25
  153:17,22
**fulfilled** 154:12
**full** 8:17 13:24
  29:23 30:11 56:7
  109:12
**fund** 13:25 33:9
  40:24 43:15 44:6
  71:25 98:10 99:8
  99:20 138:13
  164:12
**fundamentally**
  91:16
**funded** 43:22 44:4
**funds** 6:4 33:17
  43:19 44:1,2
  138:1
**further** 7:13 47:1
  123:21 130:7
  131:10 176:4,5
  179:5,10,12,13,15
**future** 55:11,12
  63:19 64:11,12,23
  66:19 68:11
  123:20 130:7
  131:9

---

**g**

**gain** 21:15
**garrison** 2:10 6:7
**gastroparesis**
  62:23 63:7 101:1
  104:10 117:18,23
  120:24 121:6
  123:23 125:22
  127:16 128:18
  129:16,25 130:10

**[gastroparesis - helpful]**                                                      Page 12

131:12 135:21
**gastroparetic**
  132:12
**gathering**  94:11
**geller**  2:3 6:13
  164:10
**general**  20:8
**generalize**  145:5
**generally**  14:23
  22:7 33:19 37:15
  38:20,23 44:3
  55:18 59:6 120:6
  133:20
**generate**  144:14
**generating**  175:9
**genetic**  55:17,19
**getting**  8:16 22:14
  28:17 69:19
  118:19 141:21
**give**  11:9 16:23
  21:11 40:10 45:4
  53:14 69:11 73:25
  74:25 88:12 92:10
  92:17 93:7 174:11
**given**  41:13,14,18
  58:12 135:21
  177:9 179:12
**gives**  66:13
**giving**  10:11 167:4
**go**  16:4,15,18
  24:17 28:12 30:17
  31:5 35:12 37:21
  39:17 42:17 44:22
  45:15 55:15 58:4
  58:11 59:9,23
  66:8 79:3 90:13
  91:1,4 93:10
  99:23 100:5
  102:20 110:8
  119:2,3,20,23
  133:12 134:21

164:21 165:3,16
165:21 170:1
172:6
**goal**  66:23 164:22
**goals**  28:1,3,16
**goes**  56:17 65:2
  66:17 73:24 76:25
  84:3,19 98:9,9
  100:23 101:8
  130:18
**going**  5:3,10,14
  6:21 8:16 10:9
  11:16 16:9 19:11
  20:7 21:8 24:22
  29:1,25 30:9,18
  33:7 34:5 41:4,13
  41:15 42:7 44:8
  44:24 55:11 68:25
  69:4,11,12,21 70:4
  70:7,18 80:4,11
  87:6,23 88:19,20
  91:4 92:6,9 93:12
  93:21 96:6 97:13
  97:14 105:14
  106:5 109:6,13
  112:2 113:18
  114:20 116:15,17
  119:3,7,8 124:4,14
  125:11,20 127:5
  127:14,22 129:12
  129:20 132:7
  134:3 135:5,10
  136:10 138:22
  141:23 142:7,20
  144:24 153:9
  160:23 161:11
  162:3 166:14
  170:1 174:13
  176:10,12
**good**  6:5,8 7:1,2
  8:13,14 9:14

19:15 32:4 59:6,7
  93:19 123:14
  132:13 142:2
  164:9 174:23
**gordon**  1:6 5:18
  177:1 178:1 179:7
**gotten**  37:23
**government**
  156:19
**governor**  7:8
**graduate**  10:16,21
**graduated**  11:5
**granularity**  21:12
**great**  59:19,20
  109:19 112:23,23
  116:25 167:21
**greatest**  58:12
**gresser**  6:9
**gressler**  2:16
**ground**  77:1 117:1
  171:11
**group**  22:8 32:14
  32:16,17 33:3,4
  34:3 48:10,14
**groups**  32:13,21
  32:22 33:5
**growth**  34:23
  48:22 78:3 84:7
  86:7
**guarantee**  119:17
**guess**  11:12 37:10
  39:18 75:25 106:9
  108:8
**guessing**  71:12

---

                  **h**

**h**  1:11 132:3 178:3
  179:8
**h217**  62:23
**hairs**  108:13
**half**  12:24 77:12
  119:11 171:10

**halfway**  111:10
**halts**  26:3
**hand**  92:21 179:17
**hang**  92:8
**happen**  75:22
  91:10 133:18
  161:20
**happened**  16:15
  161:21
**happening**  27:17
  30:4
**happens**  27:6
  74:20
**happy**  9:15 69:11
**hard**  9:19,21
  17:19 18:9 29:3
  97:18 99:4
**head**  17:18 35:8
  92:1 158:17
**heading**  83:17
**headline**  162:1
**heads**  35:13
**health**  19:16,21,22
  19:25 20:2,8
  50:24,25 51:2,3
**healthcare**  19:9
**hear**  16:14 18:24
  92:4 94:18 101:13
  134:17 139:1
**heard**  25:25 26:22
  87:18
**hearing**  19:12
  96:14
**held**  1:20 12:12
  93:14
**help**  50:5 58:23
  60:9 73:25 74:25
  79:5 97:10 100:16
**helped**  105:14
**helpful**  82:23
  113:6

CONFIDENTIAL
ATTORNEYS EYES ONLY

helping 38:15
helps 56:4
hereto 177:7
 179:16
hetlioz 54:13,20
 55:10 57:13,19
 58:9 59:10,14
 62:2,15 64:9
 67:16 68:7,10,10
 69:2,5 73:17
 74:11 78:5,16,20
 79:1,24 81:6,11
 82:1 83:24 85:16
 85:20 86:6 101:12
 102:23 103:6,10
 103:12 104:3,4,25
 105:15,19 107:22
 175:22 176:3
hi 70:7
high 11:9,17 28:15
 28:16 34:6 37:23
 38:11 53:21 59:13
 162:21
higher 39:3 57:3
highest 37:21
highlights 127:11
hold 25:25 26:10
 100:25 156:23
holding 81:23
holdings 40:16
holds 26:13
honest 57:21
hope 164:19
hopefully 92:25
horse 62:18
hostile 101:10
 102:22 107:17,20
hour 69:11,15
 119:11
hours 17:4 56:2
 119:3

house 6:18,24
huh 58:14 62:9
 68:6 85:10
humans 21:17
 115:20 116:3
 118:13,17
hundred 65:5,5
hungry 119:14,16
 119:21,22 120:1
hurdles 73:22
 170:13
hurt 60:8,10
hw 98:10

              i

ideas 132:14
identification
 30:15 44:18 46:21
 47:17 52:22 70:23
 80:10 82:8 88:16
 92:13 97:24
 106:12 109:5
 112:17 116:22
 123:12 124:10
 126:21 128:4
 136:15 142:16
 152:19 167:2
identify 20:18
imagine 79:15
impact 103:8,11
 175:6
impacted 105:18
impairs 56:2
implement 24:20
implemented
 77:10
implementing
 136:3
implicate 103:24
 104:1
imposed 26:10

impressive 83:12
improper 146:1
 147:21 149:18
 155:11 157:8
 159:1 160:25
improvement
 129:16,24
inaccurate 124:2
 126:11 127:20
 134:9 136:6
inadvertently
 29:24
inaudible 6:17,19
 6:25 94:8 134:17
incentive 162:20
incentivize 58:20
incentivized 28:1
 28:2,16,24
incentivizes 28:10
include 29:23 68:7
included 57:22,24
 58:1 100:19
includes 37:5,6
including 67:23
 68:16
increase 52:5
 55:12
index 3:1 33:22,23
 33:25 35:3 38:5
indicated 27:4
 54:18
indication 55:7
 104:12 105:16
indications 54:24
 103:9 173:13
indiscernable
 35:14
individually 1:6
 179:7
industry 11:12
 19:5,22 20:12,19

 20:25 26:13 27:7
 34:18 39:12 169:6
inflated 169:21
influenced 61:8
information 10:10
 25:17 34:14 36:4
 42:22 47:1 83:15
 89:23 94:9,11
 97:7 145:24 146:7
 146:18 147:1
 148:2 168:15,22
 168:25 169:10,15
inherent 24:3
initial 51:6 71:24
input 35:5
inside 29:18
insomnia 55:20
instance 34:16
instances 24:15
 39:16
institutions 133:21
insurance 59:2
intention 100:24
intentions 24:19
interact 14:10,14
 14:15
interactions 113:3
interest 66:2 90:16
 90:22,25
interested 179:16
interesting 39:4,6
 78:14 173:5
internal 110:15
interpret 133:25
 134:1
interrupt 49:20
 121:2
interrupts 25:6
intraday 90:4
introduce 5:24
 166:10,12

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[introduced - know]**                                                    Page 14

**introduced**  112:12
**introduction**
  14:20
**invest**  14:16 15:7
  24:5 33:10 39:23
  41:22 53:23 99:24
  120:4 162:6,10
  169:13
**invested**  40:15
  44:1,3,3 49:2
  111:19
**investigate**  165:3
**investigation**
  146:6 175:10
**investigators**
  132:17 133:21
**investing**  14:20
  20:8,9,21 24:3
  43:14
**investment**  11:20
  11:24 15:13,18
  16:20 18:5,18,22
  20:20 39:14 40:19
  40:22 41:20 47:11
  49:16 50:10,13
  51:6 53:22 54:2,9
  54:10 57:17,22
  60:6,24,25 61:8,19
  63:9,24 64:8 65:1
  65:3 69:1 70:9,15
  71:14,24 78:4
  84:11 99:16
  139:17 141:8
  164:16,18,19,20
  165:3 166:4 174:1
  174:4,25
**investments**  17:20
  26:15
**investor**  26:12
  90:20,22 91:7
  104:23 107:9

138:5 152:5
**investors**  20:11,19
  24:5,18 91:15
  99:23 100:6 107:6
**invite**  131:5
**involved**  51:18
  52:3
**ip**  59:24
**iron**  67:1
**irons**  66:24
**issue**  9:17 75:7,8
  92:17 104:17
  115:17 135:9
  150:18 158:15
  159:18
**issued**  7:7
**issues**  73:13 104:9
**issuing**  35:25
**item**  168:3

**j**

**j**  134:15
**jaffray**  71:10
**january**  43:4
  111:15 167:25
**jenny**  1:24 5:23
  8:7 179:2,23
**jet**  56:18,21,22,23
  56:24 57:25 62:15
  62:15,19 63:17
  81:4,5,10,20,25
**job**  11:18 12:16,17
  164:21 165:2
  172:17
**jobs**  11:18 13:9
**judge**  8:25
**jump**  61:12,24
  62:12 82:3
**jury**  8:25 9:3 21:9
  60:13
**justify**  25:10 59:4

**justin**  2:13 112:18
  123:5

**k**

**keep**  14:1 19:11
  42:23 69:12 119:7
  141:23
**kehoe**  1:16 3:5
  5:18 8:5,13,19
  19:11 29:22 31:3
  31:7,25 42:18
  43:2 44:23 70:7
  80:20 82:12 88:6
  88:7,19 92:6,20
  93:25 94:23 96:24
  109:14,22 112:19
  116:17 120:4
  123:14 124:16
  126:24 128:8
  131:21 135:10
  136:17 138:25
  141:23 152:21
  162:6 164:9,15
  174:23 176:6,8
  177:2,4,12 178:2
  178:24 179:4
**kenneth**  1:6 179:6
**kensett**  8:21
**key**  83:16 132:17
  133:19
**kill**  158:21 159:9
**killing**  143:20
  150:20 159:13,15
**kind**  22:19 34:13
**kindly**  7:19
**kinds**  161:6
**knew**  87:13
  169:19 175:5
**knight**  11:13
**know**  5:2 6:16,22
  9:15,16,22 18:21
  19:12 20:24 22:20

23:2,7 24:20,21
26:4 27:21 28:23
29:2 30:4 32:15
32:18,18,19 34:17
35:8,20,23,25 36:1
37:17 40:24 41:3
41:4,12 42:1 45:4
46:17 47:10,19
49:5,6 51:5 56:10
56:15,17,25 57:1
60:20 61:4,19
64:7,16,19 65:15
65:19 66:21 69:1
70:9,14 74:10
75:24,25 77:10
79:12,17 83:4
84:17,18 87:13,21
89:13,16,22 91:21
92:15,22 96:2,4
97:8 98:1 99:5,17
105:4 108:6
110:16 111:23
112:10 113:21
116:1,4,25 119:2,4
120:7 121:23
123:3 124:18
125:5 127:2,6
129:4,9 131:4
132:5,21 136:23
138:25 140:14
141:20 142:13,22
145:14,16 146:9
146:15,18,21,25
147:17,24 148:1
148:10,13,16,16
148:22 149:4,7,10
152:8 154:20,21
154:21 155:2,5
156:2 158:4,6,14
165:10 170:8
171:16,17 173:9

**[know - lot]**                                                                Page 15

175:16,17 176:9
**knowledge** 15:16
  15:20 53:7 72:3
  106:22 114:1,2
  115:13 140:10,16
  140:19 141:6,11
  141:13,14 179:6
**known** 166:2
**kunal** 45:1

**l**

**l** 98:14 134:15
**label** 26:22 27:4,6
  27:13 54:13,16,25
  55:4 57:13 58:1,9
  69:2 95:25 96:19
  101:11 102:23
  103:9,12 166:3
  170:24 172:2,16
  172:23 173:16
  174:24 175:9
**labeling** 68:11
**lack** 76:9,18 77:22
  171:9
**lacks** 168:6
**lag** 25:6 56:18,21
  56:23,23,24 58:1
  62:15,19 63:17
  81:4,5,10,20,25
**lakenda** 106:15
**lamont** 7:8
**lane** 8:21
**language** 108:7
**large** 83:18
**largest** 100:18
**late** 68:15
**launching** 21:3
**law** 164:10
**lawsuit** 96:9,12
  103:8,20 105:22
  151:1,18 152:2
  153:3 161:24

**lawyer** 69:13 96:7
  96:18
**lay** 66:7
**lb** 1:4
**lead** 12:22 67:17
**leader** 14:8
**leaders** 132:17
  133:19
**leading** 113:20
**leak** 114:8
**leaked** 113:25
**learn** 38:21 153:19
**learned** 87:16
  96:18,25 97:7
**learning** 27:12
  96:11 141:1
**left** 95:7 111:7
**legacy** 60:3
**legal** 158:15
**length** 118:9
**letter** 3:10 45:16
  45:18 46:18
**level** 11:9,17 21:18
  28:15,16 34:6
  38:11 39:18 53:21
  57:3 59:13
**lieu** 7:13
**life** 9:23 56:3
  59:24
**light** 39:1
**line** 45:12 71:5
  73:3 98:18 130:9
  137:15 152:2
  159:2 160:10
  167:24 168:3
  178:4,7,10,13,16
  178:19
**lionpoint** 142:13
  142:22
**liquidate** 45:9,19

**list** 37:22 38:9
  55:15 62:2,22
  111:1,7 139:3
**listed** 32:12,21
  39:20 139:9
**listen** 129:1
**listened** 125:2
  129:4
**listeners** 35:13
**lists** 32:14
**litigation** 17:12
  27:14 114:9,20
**litigators** 93:1
**little** 21:11 72:25
  87:8 119:20,23
  132:15 134:18
**live** 42:16 56:3
**llp** 2:3,10,16
**load** 110:17
**loaded** 94:1
**local** 6:4 13:25
  98:9,10,19 99:8
  137:16 164:12
**located** 18:14
**location** 18:13
**logical** 73:9
**long** 12:2 17:3
  22:9,13,22 42:10
  51:15 52:16
  110:17 122:4,6,13
  135:20 157:25
**longer** 23:8,24
  48:8 97:17 115:20
  118:7 119:21,23
  122:11 147:15
  153:12
**look** 16:16 18:16
  29:2 30:21 31:4
  33:8 34:18 35:19
  39:7,8,9,22 42:18
  43:12 44:8,11,19

47:14,14,20 52:12
  52:16 53:15 66:2
  66:14 72:22 74:8
  74:11 80:19,23
  82:21 83:16 85:7
  85:24 88:1,2
  89:25 91:12 94:13
  95:1 97:11,17
  99:4 109:6 110:20
  116:10,19 120:11
  120:13,14 121:3
  122:17 127:23
  129:14 132:1
  136:19 137:7
  142:7,21 167:7
  170:20
**looked** 18:19
  29:17 39:4,6 51:3
  63:21 82:13,16
  107:10 109:24
  128:20
**looking** 32:10
  35:17 37:15 39:21
  43:7 59:16 64:7,9
  64:9 66:22 70:8
  76:2 89:1 90:1
  98:4 122:20
  124:17,21 125:10
  128:8 135:12
  143:2 148:6 151:4
  151:7
**looks** 34:10,16
  40:4,19 51:2
  71:10 73:5 83:2
  89:1 99:21 117:8
**losses** 160:1,5
**lost** 132:23 155:4
**lot** 24:15 34:22,25
  35:25 36:1 65:2
  66:7 69:2 73:24
  74:24 94:9 108:15

**[lot - materially]**                                                                                    Page 16

148:5 175:15
**lots** 66:23
**low** 88:22
**lower** 95:10
**lowest** 90:4
**lsr** 1:24
**lunch** 3:24 119:2,5
   119:10,15,24
   141:22 163:11

**m**

**magenis** 55:16
**mail** 3:13,13,14,18
   3:19 18:12 32:7
   32:20 39:21 43:4
   43:10,12 44:11,25
   46:24 48:3,24
   49:9,13,17 50:2
   52:24 53:2,7,8
   71:6,22 72:3 73:6
   73:13 74:24 78:9
   80:5,24 81:16
   88:5,25 89:11,14
   89:17,25 90:2
   91:12,24 92:10
   94:16,24 98:6,13
   99:2 106:14,22,25
   107:8 112:24
   114:18 117:2,12
   136:19 137:5,7,8
   142:8,9 143:9
   151:3,12,16,20
   152:21 153:9
   154:19 170:22
   171:25 172:21
   173:14,25
**mailed** 71:19
**mails** 94:10
**main** 103:3,4
   175:6
**major** 86:1

**making** 39:19
   41:20 51:5,19
   63:23 142:2
**malina** 2:6 3:6 5:1
   5:3 6:2,2 7:24
   15:19 19:6,23
   20:14 22:12 23:1
   24:8 25:22 26:17
   27:8 28:8,21
   29:15 30:6 31:14
   31:16 36:8 37:3
   40:13 41:23 43:16
   46:2,14,22 47:5
   49:4 52:1 55:2
   56:14 61:1 63:11
   64:2,25 67:2
   68:22 69:6 74:18
   75:14 76:4,19
   77:7,18,23 78:21
   79:8,25 81:12
   85:21 86:17,23
   90:18,24 91:9
   92:2 94:17 95:19
   97:4 101:20
   102:10,15 103:2
   103:13,21 104:7
   105:2,23 108:1,21
   113:23 114:10,15
   115:5,18 119:13
   121:17 122:2
   130:1,16 131:1,17
   133:14 134:4,10
   136:7 139:20
   140:1,6,13,23
   141:3,10 143:1,21
   144:10,19 145:4
   145:13,18 146:1
   146:12,20,22
   147:4,12,21 148:3
   148:14,19,25
   149:9,18 150:2,12

150:22 151:21
   152:3 154:1,8,14
   154:25 155:11,18
   156:5,12 157:1,8
   157:15 158:23
   159:1,25 160:8,18
   160:24 161:12
   164:8,10 165:1,7
   165:14,20 166:1,7
   166:11,21 167:9
   167:20,23 168:13
   168:21 169:8,18
   169:25 171:3,19
   172:5 173:3,19
   174:8,12,22 175:3
   176:4,8
**malina's** 142:1
**manage** 33:21
   40:3
**managed** 33:23
**management** 14:9
   28:10 40:5 59:25
   86:5 115:6,8
   153:14,18
**manager** 12:18,19
   12:21,23 13:17
   48:13 164:16
   165:3
**managing** 12:4,14
**mandate** 40:7
**manner** 45:20
**march** 7:7 98:18
   99:12 100:17
   106:17 109:25
**mark** 30:12 44:13
   47:15 52:20 70:20
   80:6,12 82:5
   92:11 106:8 109:3
   112:3 124:5
   127:23 142:20
   152:9

**marked** 3:8 30:15
   31:7,8,15,17,21
   44:18 46:21 47:17
   52:22 70:23 80:10
   80:17 82:8,20
   88:16 92:13 97:21
   97:21,24 106:12
   109:5 110:6,15
   112:17 116:22
   123:12 124:10,22
   126:21 128:4
   136:15 142:16
   152:19 166:9
   167:2,16,19 170:2
**market** 58:16 59:7
   59:8,17 63:25
   64:5 76:8 77:1,22
   78:5,15 84:15
   86:3 90:12 105:4
   105:21 113:24
   117:19 132:19
   133:13 144:13
   169:13 171:9,11
**market's** 104:24
**marketed** 78:20
   79:1 131:22
**marketing** 26:23
   27:6,13 95:25
   96:20 102:4 138:3
   166:3 170:24
   172:2,23 173:16
   174:24
**marketintel** 94:4,6
**markets** 58:13
**marking** 80:15
   152:12
**master's** 19:18
**match** 34:2
**materially** 61:7
   86:2

**math** 75:19,22
**matter** 5:18 53:8
  65:4 72:4 106:23
  179:6
**mba** 10:15,24
  11:23 25:1
**mcapeci** 2:6
**mean** 11:18 21:10
  21:14 22:5 24:14
  27:2 28:17 34:13
  37:13 43:25 49:15
  54:2,15,23 56:22
  56:23 58:15 60:14
  61:5,20 63:14
  67:20,21 70:14
  75:3 81:17 101:19
  102:9,25 104:16
  104:18 107:19
  108:11 118:5,8
  143:24 148:5
  153:23 154:15
  170:23 171:14
  172:1,22 173:15
  175:7
**meaning** 60:8
  63:16,18 86:6
**meaningful**
  147:18
**means** 21:17 22:6
  27:3 28:2 39:7
  41:11,12 59:2
  67:21 77:5 144:7
  160:5,22 161:10
  170:16 179:11
**meant** 24:4 113:7
  113:14,22 172:14
  173:9
**mechanism** 24:16
**medication** 55:7
**meet** 14:19 16:25
  39:13 123:19

164:22
**meeting** 57:8
  131:8
**meetings** 130:20
**melville** 2:4
**memorialize** 54:3
**memorialized**
  18:18
**mentally** 79:20
**mention** 29:3
  44:10
**mentioned** 57:20
  58:10 74:6 81:4
  139:8
**mentions** 95:7
**mercurio** 2:20
  5:22
**message** 72:13
  77:2,14 167:4
  171:12
**met** 9:25 121:5
**method** 7:18
**metric** 34:18
  67:22
**metrics** 36:10,19
**michael** 1:16 2:7
  3:5 5:18 8:5,19
  177:2,4,12 178:2
  178:24 179:3
**mid** 12:23,25
  13:17,18,18,19
**middle** 43:6 88:20
  113:7 125:20
  129:18 132:1
  139:8
**mihael** 1:11 132:2
  179:8
**mike** 31:7
**mike's** 119:21
**mill** 39:23

**million** 33:10
  40:11,12 65:5
**min** 117:14
**mind** 10:10,11
  86:21 152:1
**mine** 88:11,18
  102:6
**mini** 5:12
**minute** 13:22 45:4
  52:16 53:14 88:12
  92:10 133:2
  162:24
**minutes** 174:9,11
**misrepresentatio...**
  165:17
**missing** 44:10
  97:15 116:13
**misstated** 98:12
**misstates** 144:19
  150:12 152:3
  156:12 157:1
**mistake** 29:23
**misunderstand**
  91:16
**mitchell** 2:7
  166:14 167:3,15
  167:21
**model** 34:15 41:14
  63:9
**modeled** 60:9
  66:18
**modeling** 60:12,15
**models** 39:11,12
**modest** 84:5
**modification**
  139:22
**moment** 159:21
  161:23 170:4
  173:6
**moments** 128:20

**momentum** 35:16
**money** 35:21
  41:14 144:17
  145:2 156:9
  157:11 160:23
  161:11
**month** 50:8,10
  88:22 115:21
  117:20 118:3,12
  136:2 149:2
**months** 35:18
  101:14 118:7,14
  118:17,18
**morning** 6:5,8 7:1
  7:2 8:13,14,16
  143:7
**mouth** 103:19
**move** 36:22 37:24
  62:13,20 63:19
  65:6,11 119:11
  161:19 167:16
**moving** 42:10
**muddle** 131:6
**multiple** 21:20
  34:21 54:13,15,18
  54:22 55:4 66:23
  69:2
**mute** 69:17,20

**n**

**n** 95:7
**name** 3:3 5:22
  7:20 8:18 13:24
  32:12 43:5 48:7
  73:25 74:25 143:3
  164:9
**named** 21:7 45:1
  106:15 179:5
**names** 6:21
**nature** 91:16
  135:22

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[nda - okay]**                                                                 Page 18

**nda**  122:7
**near**  61:14 95:6
  123:20 131:9
**necessary**  177:6
**necessity**  101:2
  148:23
**ned**  7:8
**need**  52:17 57:7
  61:13 71:2 74:15
  75:4,6 76:8 85:13
  86:11 97:17
  120:21 121:2
  131:23 132:8,15
  133:11,18 134:21
  161:19 171:9
**needed**  39:11
**needs**  21:16
**negative**  90:9,15
  90:21 95:12
  108:18 114:4,4
**negatively**  108:12
**negatives**  57:24
**neither**  179:13
**net**  92:22
**never**  9:25 15:9
  115:9
**new**  1:2 2:11,17
  5:20 14:19 24:16
  24:16 41:20 48:20
  78:4 92:8 104:22
  166:10 179:9
**news**  88:21 91:6
  94:12 114:4,4
**nice**  66:4
**nine**  75:19,23
**nineteen**  127:25
**nodding**  158:17
**noel**  8:19
**non**  54:20 55:22
  56:5,8,12 58:13
  73:14 75:11 78:16

83:18,22,23 84:15
84:22 85:15 86:1
86:5 168:14
**nonleading**  94:22
**nonprofit**  143:12
  143:19,24 144:7
  144:25 145:3
  151:14
**noon**  119:10
**nope**  64:21
**normal**  56:3 74:19
**notary**  8:8 177:13
  177:19
**note**  6:11 29:16
  39:19
**noted**  177:7
**notice**  179:3
**november**  1:17
  3:1 5:15 32:7
  80:25 126:16
  127:9 179:4,18
**nuance**  114:17
**number**  5:21 12:7
  41:4 58:17 95:2
  109:15 123:4,6
  126:1 138:24
  148:11 164:12
  166:23 179:24
**numbers**  85:2,3
**numerator**  34:20
**ny**  2:4,11,17
**nyc**  32:23 33:4

**o**

**o'clock**  70:2,2
  93:15,15 119:17
  135:3,3 163:7,7,12
  164:2 174:18,18
  176:14,17
**oath**  7:14 8:23
**object**  52:1 61:1
  140:17 148:14

159:25 161:2,15
**objected**  140:20
**objection**  15:19
  19:6,23 20:14
  22:12 23:1 24:8
  25:22 26:17 27:8
  28:8,21 36:8 37:3
  40:13 41:23 43:16
  46:2,14,22 49:4
  55:2 56:14 63:11
  64:2,25 67:2
  68:22 69:6 74:18
  75:14 76:4,19
  77:7,18,23 78:21
  79:8,25 81:12
  85:21 86:17,23
  90:18,24 91:9
  92:2 94:17 95:19
  97:4 101:20
  102:10,15 103:2
  103:13,21 104:7
  105:2,23 108:1,21
  113:23 114:10,15
  115:5,18 121:17
  122:2 130:1,16
  131:1,3,6,17
  133:14 134:4,10
  136:7 139:20
  140:1,6,13,23
  141:2,3,10 143:1
  143:21 144:10,19
  145:4,13,18 146:1
  146:12,20 147:4
  147:12,21 148:3
  148:19,25 149:9
  149:18 150:2,12
  150:22 151:21
  152:3 154:1,8,14
  154:25 155:11,18
  156:3,5,12 157:1,8
  157:15 158:23

160:8,9,17,18,24
  161:12 164:23
  165:5,12,19,23
  166:5 168:6,17,19
  168:24 169:16,22
  171:1,15 172:3,25
  173:17 175:1,23
**objections**  7:18
**objective**  164:15
**objectively**  36:5
**obligation**  9:6
**observed**  114:8
**obvious**  115:24
**obviously**  40:9
  61:12 71:2 121:2
  125:19 141:25
  148:1 162:20
**october**  83:11 84:9
  136:20 137:10
**odd**  56:2
**offered**  55:11
  148:10
**official**  5:4
**oh**  76:14 82:25
**okay**  9:12,14,18
  9:19 13:21,25
  14:7,22 18:4,8
  19:2,14,15 29:1,10
  30:5 31:2,13,25
  43:3,22 45:5,8
  46:11 47:4,12,13
  47:24 48:2 49:9
  49:15,24,24 50:12
  51:17 52:14 53:19
  56:17 58:4,11
  69:10 70:18,24
  71:1 72:22 73:6
  73:11,19 76:25
  80:15 82:3 83:7
  85:6 87:14 88:20
  89:7 94:13 95:3

95:24 96:24 98:3
98:17 99:2,23
101:8 102:2,7
110:12,19,24,25
111:3 112:14
116:10 118:25
120:3,13,16,21
121:14,20,24
123:9,14,18
124:21 125:1,13
125:19 126:22
128:15 129:6
130:4 132:1,25
133:5 135:15,17
136:18,23 137:1
137:12 138:16
142:2,6,18 143:6,9
150:7,18 151:24
151:25 152:21
153:6 157:22
159:6,12,20
160:21 161:9
167:10,15,15
170:6,10,21 171:4
172:12
**omissions** 165:22
**once** 12:16 17:2
  109:21
**ongoing** 70:11
**online** 31:4 32:2
  97:20 109:7
**open** 29:7,7 47:21
  112:21 116:23
  119:5 142:17
**opening** 137:1
**opens** 29:17
**operational**
  127:11
**opinion** 90:9 105:8
  105:9 106:1
  132:17 146:2

147:22 149:19
155:7,12 156:14
156:15 157:9,16
159:1,11 160:25
**opinions** 160:11
**oppenheimer**
  82:17 134:16
  135:16
**opportunities**
  54:14,16,23 55:5
  66:16,16 69:3
**opportunity** 57:18
  58:2,12 78:4
  83:18 159:8,12,17
**opposed** 104:5
**ops** 33:5
**option** 130:9
**options** 11:12,22
  19:25 115:2
  153:15,19 154:10
  155:2
**order** 5:9 7:7
  21:15 37:8 42:13
  59:3 86:11 172:17
**ordinary** 15:24
  100:2 138:17
**orient** 47:13 97:10
  125:9 127:8
**oriented** 11:25
**orphan** 58:12,16
  58:18 63:17 74:15
  78:5 86:11
**oshinskie** 48:4,5
  80:25
**outcome** 66:11
  146:15 157:25
  158:14 162:3
  179:16
**outside** 11:11 16:4
  39:11 40:13 66:10
  67:25 115:25

**outweigh** 159:14
**overall** 41:5
**overlap** 10:19
**overstated** 175:8
**overview** 10:11
  11:9

**p**

**p.m.** 3:24,24,24,24
  3:25,25 135:3,3
  163:7,8,12 164:2
  174:18,18 176:17
**page** 3:22 4:2
  23:16 30:22 31:25
  32:7 43:6,9 45:15
  50:1 61:14 67:14
  68:25 72:11 73:13
  73:19,20 83:17
  85:1,5 88:21
  94:13 95:1,6 99:7
  100:13 109:13
  110:14,15,20,23
  110:25 111:10
  113:7 116:18
  122:19 123:1
  125:14 127:6,11
  129:14,21 131:20
  132:2,24 134:13
  135:11,13 138:22
  139:3,8 170:10
  178:4,7,10,13,16
  178:19
**paid** 169:20
**paragraph** 45:18
  59:11,12 85:8,24
  107:13 125:16,21
  132:7,21 133:3,8
  134:7
**paranoid** 79:16
**part** 17:24 57:17
  79:23

**partial** 100:25
**participate** 129:1
**participated**
  128:24
**participating** 7:10
**particular** 20:24
  20:25 39:2 42:17
  74:9 75:7 100:9
**particularly** 20:9
  148:5
**parties** 7:16 17:11
  179:14,16
**path** 123:21
  131:10
**patience** 8:15
**patient** 58:21 75:7
**patients** 73:25
  74:25 81:10 83:24
  84:5,21,22 85:14
  86:5 120:24
  121:10 123:23
  125:25 126:1,3
  129:25 130:10
  131:12,22 132:12
  132:15
**paul** 2:10 6:6,14
**paulweiss.com**
  2:12
**pause** 53:18 87:5
  93:2,9,18 102:12
  133:6 170:5
  172:11 173:7
**pay** 59:3
**pe** 34:19 35:2,5,15
**peak** 67:15
**peer** 130:20
**pending** 179:8
**penetrate** 86:3
**penetration** 84:6
**penn** 10:16

[pennsylvania - posture]                                                          Page 20

**pennsylvania** 10:14

**pension** 6:4 13:25 33:9 99:8 164:12

**people** 9:22 28:11 55:11,19,23 56:5,8 56:11,12,25 58:18 79:2 113:25 114:1 133:21

**percent** 38:8 41:5 75:20,23 90:3 100:20

**perfect** 19:10,13

**perform** 23:11 34:4 38:15 57:3 121:25 122:8 154:2 155:24 164:17,19,20

**performance** 60:19 61:7 105:13 162:13 164:22

**performed** 33:17 60:19

**performer** 162:21

**performing** 38:22 137:24

**performs** 162:18

**period** 13:8 38:18 42:15 49:7 51:22 78:5,5 121:11,16 121:22 162:12

**periodic** 94:10 98:25

**person** 7:14 50:20 71:16

**personal** 18:1

**personally** 51:18 145:22 162:6,10

**perspective** 59:1,7 65:2 175:14

**persuade** 150:9 158:19,20 159:9 159:13

**pete** 132:10,25 133:3

**pharma** 88:22 113:2

**pharmaceutical** 19:5 20:9,12,19,23 24:3,5 26:13,14 27:7,12,23 65:25 74:13 149:14

**pharmaceutical's** 128:9,10

**pharmaceuticals** 1:10 5:19 40:23 41:3 90:3 95:9 100:19 175:22 177:1 178:1 179:7

**pharmacological** 130:9

**phase** 22:14,15 23:5,5,12,17 37:24 38:4 55:8 62:5,16 62:19,22 100:25 117:17,23,24 120:23 121:4 122:8,9,10,11,24 125:10 128:17 133:23 172:19

**phases** 21:20

**physician** 74:10 74:15 175:17

**physicians** 21:5 75:5,6 84:3 170:19 171:18,23

**piece** 97:15,17 116:13

**pieces** 136:12

**pipeline** 22:9 25:13 54:12 61:15

63:1,6 64:15 68:20

**piper** 71:10

**placebo** 22:7

**placed** 66:25 100:25

**plaintiff** 1:8 2:2 6:3 7:24 13:23,24 98:21

**plaintiffs** 17:6,8

**platform** 31:6 99:5

**play** 24:22 86:1

**played** 9:3

**please** 5:24 8:17 9:15 41:8 45:7,9 78:23 90:17 124:12 132:8 134:13 161:8 166:11 171:4 173:21

**plus** 67:16 68:10

**point** 22:21 26:8 39:3 73:23 76:3 79:15 98:17 104:21 105:11 119:3 121:6 131:21 154:20 155:3,6 157:19 158:7 161:17,23 170:11,13 171:5 172:6,10 173:5

**pointed** 76:16

**points** 83:16 160:12

**polymeropoulos** 1:11 132:3,5 133:10,17 134:1 135:25 145:11 158:14 159:8,22 179:8

**populated** 45:5

**population** 84:6 132:12,14 135:21

**populations** 58:21

**portfolio** 12:18,19 12:21,23,24 13:16 14:9 35:2,3 38:1,6 40:16,19 41:5 44:6 48:13 98:25 99:16,20 137:19 140:21

**portfolios** 13:1 33:21

**portion** 162:17 172:21

**position** 51:13,21 52:6 90:10,14,15 90:21 143:16,19

**positions** 12:7,11 118:22 148:22 160:22 161:10

**positive** 65:6 117:17,23 120:23 121:8 122:24 153:10

**positively** 105:17

**positives** 54:10 57:23 64:8

**possession** 18:2

**possibility** 37:2 54:24

**possible** 5:5,5 18:20 26:11 45:20 58:8 87:24 114:11 114:14

**possibly** 58:4 62:21 103:14 153:16 166:6

**post** 129:3

**posture** 143:11

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[potential - putting]**                                                   Page 21

| | | | |
|---|---|---|---|
| **potential** 55:12 57:12 58:1 59:17 63:12 64:5 67:1 68:11 84:14 115:16 117:18 130:8 132:14 | **pressing** 159:23 | **profit** 91:1 | **psychiatrist** 78:15 79:3,6 |
| **potentially** 79:3 101:10 102:21 103:24 | **pressure** 153:16 153:22,24 | **profitability** 34:24 144:2,3 | **psychiatrists** 78:20 79:1,23 86:1 |
| **power** 145:7 | **prevalence** 83:21 | **profits** 144:14 | **psychosis** 60:4 79:11 |
| **practice** 61:22 | **previously** 102:18 147:8 | **progress** 5:13 70:3 93:20 142:2 164:5 | **public** 8:8 25:16 114:8 168:15 169:9 177:19 |
| **precision** 83:10 | **price** 34:19 35:14 62:13,20 63:18 67:21 104:22 105:12 113:19 160:2,4 169:13,20 | **progression** 34:15 36:16 | **publications** 130:20 |
| **preference** 37:8 | **priced** 66:15 | **promise** 119:9 | **publicly** 169:14 |
| **prep'd** 87:14 | **primary** 121:6 | **promote** 27:3 | **pull** 36:5 109:11 |
| **preparation** 10:3 87:17 96:8,10 | **prior** 11:21 22:6 61:6 66:7 114:4 158:18 | **promoting** 21:4 | **purchase** 48:20 65:18,23 139:23 140:17,20 168:4 168:11,14,22 169:19 |
| **prepare** 15:22 16:2 | **private** 27:14 | **promotion** 175:7 | |
| **prepared** 53:10 72:7 107:1 138:16 | **privileged** 87:12 | **proof** 21:18 | **purchased** 44:5 51:7 111:16 139:13 140:11 |
| **preparer** 53:6 | **probably** 35:12 113:20 119:20 172:18 | **properly** 21:5 75:8 | |
| **prerequisite** 41:25 | **problem** 42:20 74:1 75:1 83:1 137:4 | **propose** 158:7 | **purchases** 51:12 51:16 111:1,4 139:4 |
| **prescribe** 74:11 75:9 79:5 170:21 | **proceed** 7:5 119:19 | **protocol** 136:2 | |
| **present** 2:20 7:12 20:25 37:16 39:13 57:8 151:6 159:17 | **proceeding** 7:11 | **prove** 22:22 24:6 55:9 116:3 165:6 | **purposes** 42:19 |
| **presentation** 57:5 99:21 104:23 109:23 | **process** 17:24 22:13 37:18 49:18 50:14 | **proves** 25:3 | **pursuant** 7:6 179:3 |
| **presentations** 99:23 | **produce** 17:23 36:16 | **provide** 36:13 94:9 100:5 107:5 122:6 138:8 | **pursue** 115:2 |
| **presented** 4:4 130:19 | **produced** 17:10 17:17 | **provided** 60:22 98:24 101:24 138:13 145:24 146:7 147:10 148:2 | **pursuing** 26:8 |
| **presenting** 39:2 | **product** 21:3 104:5 | **provider** 94:7 | **put** 18:6 30:10 37:25 42:7 61:4 88:5 92:9 97:16 103:18 108:9 136:12 138:2 143:3 167:11 |
| **presents** 37:7 75:7 | **production** 167:12 | **providers** 36:12 | |
| **preserve** 25:20 | **professional** 11:20 11:24 179:2 | **provides** 42:13 | |
| **president** 12:14 | | **providing** 107:9 | |
| **press** 39:8 122:23 169:3 | **profile** 130:7 | **proving** 77:1 171:10 | **putting** 16:13 37:25 96:9 |
| | | **provocation** 101:9 101:18 102:7,20 107:14 | |
| | | **provocative** 102:14 | |
| | | **psychiatric** 83:24 84:5 | |

| q | r | | |
|---|---|---|---|
| **qualitative** 36:22 38:12,15,22 39:1 | **r** 134:15 178:3,3 | 161:15 167:3 176:7 | 163:11 174:17 |
| **quantify** 67:9 | **raise** 149:16,25 150:3 151:24 | **reason** 9:9 46:12 49:12 66:1 121:20 123:25 126:9 127:19 130:13 131:14 136:5 138:11 155:22 168:10 176:2 178:6,9,12,15,18 178:21 | **recognize** 32:4 |
| **quantitative** 34:8 36:18,22 37:1,17 49:19 | **raised** 25:9 101:9 102:21 107:14 150:19 | | **recollection** 46:11 49:1,10 50:9 84:25 101:5 116:8 118:21 121:15 142:24 |
| **quarter** 99:15 101:6 126:24 137:20 138:14 | **raising** 151:3,20 | | |
| | **rajavelu** 134:14 135:16 | | **recollections** 87:7 |
| **quarterly** 39:10 98:19 99:12 100:6 137:12,16 169:3 | **rampant** 175:5,16 | | **record** 5:15 6:1,12 7:21 8:18 44:15 52:19 69:21 93:10 93:12,22 126:17 134:22,23 135:8 163:2 164:3 174:9 174:13 176:12 179:12 |
| | **ran** 144:11 | **reasonable** 73:10 | |
| **question** 22:18 23:15 26:20 41:8 56:9 70:13 78:23 84:20 94:22 105:3 108:5,25 110:22 113:10,18 116:18 130:13,23 131:14 131:19,20 134:14 135:15,19 149:21 151:5 159:4 | **randomize** 126:2 | **reasons** 25:20 | |
| | **randomized** 125:25 | **recall** 16:11 19:1 27:15,16,17 46:1,7 46:15 51:9 52:9 63:4 67:3,4,12 71:18 76:5,20 81:13 82:16,19 84:9,13,20 86:9,12 87:22,23 89:10 95:23,24 96:10,13 96:14,21,22 97:3,6 97:9 111:18 113:7 113:13 114:16,17 115:15,19 120:10 121:4,9,12,18 124:20 125:2,4,7 127:4 128:24 129:5,6,8,11 141:1 142:12 143:6,8 | |
| | **rank** 39:3 | | |
| | **ratio** 34:19 35:2,5 | | **recording** 5:13 69:25 70:3 93:17 93:20 134:25 163:4 164:5 174:15 |
| | **rdman** 2:3 | | |
| | **reached** 145:16 | | |
| | **react** 108:12 | | |
| | **read** 4:1,2 61:13 61:13 71:2 83:3,5 83:8 95:15,22 113:12 123:18 124:18 125:5 126:11 127:3,14 129:7 132:7 133:2 133:7 134:8 153:9 172:9,20,21 173:6 173:8,14 177:5 | | **recover** 57:10 |
| **questioned** 101:2 | | | **recruitment** 125:21 |
| **questioning** 142:1 159:3 160:10 | | | **redeem** 46:24 |
| **questions** 9:15 20:8 33:8 39:17 52:18 54:8 72:20 72:23 73:3,7 82:11 83:13 87:10 101:16 119:13 164:13 | | | **reduced** 179:11 |
| | | | **refer** 14:1 |
| | | | **reference** 33:15 62:25 |
| | **reading** 7:6 73:2 78:9 83:11 89:20 95:23 169:4 | **received** 32:12,20 95:16 170:22 171:20,25 172:20 | **referenced** 33:14 49:16 75:4 84:16 89:17 |
| **qui** 96:2,15 | **reads** 172:15 | **receiving** 89:10 94:15,23 | **references** 45:13 |
| **quick** 39:4 47:20 110:22 167:3,8 | **readup** 39:5 | | **referencing** 36:11 84:17 107:21 |
| | **ready** 116:25 | **receptive** 77:1 171:11 | |
| **quickly** 44:9 | **real** 167:8 | | **referred** 91:22 143:10 |
| **quote** 91:15 113:3 | **realized** 81:3 | **recess** 3:21,22,23 3:23,24,25 70:1 93:14 135:2 163:6 | **referring** 62:4 77:15 113:17 117:24 143:19 |
| | **really** 57:20 84:6 105:4 110:22 114:16 156:2 | | |

**[refers - retribution]**                                                    Page 23

**refers** 68:11 74:4
**reflect** 53:21 66:20
  111:23 139:12
  174:1
**reflected** 158:1
  162:2 169:14
**reflecting** 104:9
  104:17 114:3
**reflects** 34:22,23
  34:24,24,25
  104:23 107:8
  111:15 139:16
  168:4
**refresh** 31:9,13
  44:24 49:9 84:25
  85:18 92:11 101:5
**refreshed** 88:11
**refusal** 144:6
**regarding** 153:11
  171:11
**regards** 122:5
**registered** 179:2
**registration**
  123:22 131:11
**regularity** 14:18
**regularly** 36:14
  72:7 100:3 107:1
**regulators** 149:8
**regulatory** 21:2
  24:11 123:20
  131:9
**rejects** 145:2
**relate** 17:20
  143:14
**related** 18:5 78:6
  179:14
**relative** 100:18
  179:15
**release** 122:24
**released** 128:18

**releases** 39:9
  90:21 169:3
**releasing** 90:15
**relevant** 81:21,22
  104:14 175:13
**relied** 169:13
**reluctance** 105:10
**remain** 84:4
**remember** 16:19
  46:9 51:11,17,25
  72:11,16 75:22
  76:9,22 77:21
  81:24 87:25 89:20
  94:15,23 95:15,18
  95:21 113:18
  121:7
**remind** 81:5
  109:15
**reminder** 109:9
**remote** 5:17 179:4
**remotely** 1:20 7:9
  7:15
**reopen** 31:11
**reopening** 29:18
**rep** 175:17
**repeat** 41:8 78:23
  113:11 149:20
  151:5 161:8
**rephrase** 9:16
  23:15
**replicate** 40:18,25
  41:9 44:6
**replicating** 140:3
**replication** 111:24
**report** 82:20 83:5
  83:15,25 85:2
  88:23 89:13,16,17
  89:20,23 90:15,21
  95:13 98:19 99:15
  100:13,16 101:25
  107:10 113:20

117:9,24 125:24
  126:3,6 137:12,16
  137:20 138:13
  162:1
**reported** 7:9
  117:17,22 121:21
**reporter** 1:24 4:3
  5:1,6,23 6:20 7:4
  7:6 9:21 19:7 25:6
  94:18 140:8
  147:11 161:3
  168:20 179:2,24
**reporting** 7:18
  98:25
**reports** 18:17,19
  82:14,17 83:11
  94:12 100:6 107:5
  138:2,5,9
**represent** 5:25
  166:24
**representation**
  6:17 134:2
**representative**
  15:10 28:19
**representatives**
  27:23
**representing** 2:2,9
  2:15 6:3,7,9
  164:11
**request** 5:4 45:10
  122:1 151:2,19
  153:12 176:9
**requested** 115:3
  122:15 147:9
  148:24 149:1,5
**requesting** 115:22
**requests** 117:13
**require** 114:23
  117:19 118:2
  122:12 149:8

**required** 118:9
  144:18 156:10
  170:19 177:13
**requirement**
  144:21,22 149:15
  149:24
**requirements**
  21:17
**rerate** 66:17
**research** 59:4
  61:19 82:18 83:10
  83:15 90:5 117:9
  169:5,5
**researching** 82:13
**resolution** 153:11
  158:16
**respect** 42:4
  124:16 138:20
  139:7 151:16
  158:15
**responding** 113:19
**response** 132:2
  172:1,22 173:15
**responses** 73:4
**responsibilities**
  11:19 12:16 14:10
  14:13 137:25
**responsibility**
  12:17 14:15 50:23
**responsible** 28:19
  50:18 100:9
**rest** 30:23 32:1
  87:3
**results** 62:4
  120:23 122:25
  126:4,6 127:16
  128:18 130:5,18
  132:16
**retained** 4:5 18:10
**retribution** 107:15
  107:19 108:8,11

**[retributive - scant]**                                                    Page 24

**retributive** 104:25
**return** 78:4
**returning** 35:22
**revenge** 107:24
  108:6,8,13
**revenue** 64:10,11
  64:12,20 65:20
  103:3,4
**revenues** 66:14,19
**reverse** 143:16
**review** 16:5 52:17
  85:12 107:21
  113:5 120:6,22
  130:20 132:8
**reviewed** 120:8
**reviewing** 153:18
**reviews** 58:22
**revised** 70:9
**rgrdlaw.com** 2:5,5
  2:6
**rich** 114:18
**richard** 88:6
**rifkin** 6:6
**rifkind** 2:10
**right** 11:4 18:7
  24:12,13 28:18
  29:8 33:21 40:21
  47:7 50:6,7 51:22
  61:10,11,25 65:9
  65:12 66:12,17
  68:5 70:8 79:20
  80:13 82:3,15
  87:3 88:8,13,18
  91:3 95:2 96:24
  98:4 100:12
  105:20 108:24
  110:2 111:20
  114:24,25 116:15
  118:19 120:12
  122:19 125:12
  126:13,14 127:8,9

127:22 136:21
141:19 151:14
154:19 156:6,18
158:12 166:19,19
167:14 169:10,11
170:3 174:25
175:2
**risk** 20:20,20 21:1
  21:1,2,6,6,8,13
  24:3,6,11 25:9
  26:14 74:6 104:18
**risks** 20:12,18,24
  21:3,14 34:24
  66:7
**road** 2:3
**robbins** 2:3 6:13
  164:10
**robust** 130:5
**rocco** 2:20 5:22
**role** 14:8,9 86:2
**room** 7:12 8:24
  86:6 93:1
**rooms** 39:17
**roth** 11:16
**rothschild** 3:20
  11:3,7 12:2,6,11
  13:6 14:16 15:13
  15:17 16:20 17:10
  17:20 32:13 33:11
  40:3,11,12 43:14
  45:19,24 47:10
  48:9,15 50:10,17
  53:12 72:8 97:11
  98:18,24 99:9
  110:15 117:6
  120:4 137:15
  138:17,23 140:11
  141:7 153:7
  166:12,24 168:10
  168:11 170:2
  173:22

**rothschild's** 14:25
  15:17 18:5 33:13
  33:20 100:3
**roughly** 125:15
**royalties** 75:17,24
  171:6
**royalty** 76:1,1
**rpr** 1:24 8:7
  179:23
**rudman** 164:11
**ruled** 153:13
  157:23 158:10
  162:1
**rules** 158:13
  159:21
**ruling** 154:16
**run** 6:21 24:6
  36:15 146:23
**running** 40:10
  143:12,18,24
  144:1,2,7 145:3
  151:13 153:14
**runs** 34:13
**rush** 53:15
**russell** 33:23,24,24
  34:3

|  |
|---|
| **s** |

**s** 1:8,12 2:2,9
  178:3
**safe** 146:17 147:19
**safety** 21:23,24
  24:7 25:8 26:5,6
  101:2 105:10
  117:14 118:12
  122:6,14 130:6
  135:21 145:25
  146:18 147:15,17
  153:12 155:24
**salary** 27:25
**sale** 35:17

**sales** 27:23 28:1,3
  28:11,16,18 32:16
  32:23 33:2 35:14
  55:13 59:15,24
  60:15 62:8,12
  66:4 67:15,22
  74:7 75:25 76:1,3
  78:15 84:7 173:11
  175:8,9,17
**sarah** 71:6,12,16
**satisfy** 21:17 116:5
  133:23
**saying** 23:12 62:11
  62:19 74:5 77:6,9
  118:16 148:7
  154:5 159:20
  172:15
**says** 31:6,7,8,9
  33:9 39:22 43:22
  43:23 45:9,18
  48:19,20 50:2
  54:12 61:14 63:5
  67:15 72:12,19,23
  73:14,21 75:16,19
  76:1,7 77:14 78:3
  78:14 83:17,21
  85:2,5,8 88:21
  90:1,2,5 91:15
  95:9,12 98:18
  99:6,9,12 100:17
  107:14 111:4,11
  120:22 121:12
  122:24 123:15
  125:21 127:12,15
  128:10 130:4
  131:8 132:10
  133:3 135:17,25
  153:10 170:11,17
  171:8
**scant** 83:22

**scc** 43:15
**scenario** 161:14
**scene** 71:4
**school** 10:21 11:10
    11:15,21 19:20
**science** 24:16 63:4
**sciences** 19:17
**scientific** 145:23
    146:7 156:2
**scope** 40:14
**score** 37:18,19,24
**scored** 39:3
**scores** 37:20,21,21
**scoring** 37:8
**screen** 4:4 30:1
    34:10,12 38:25
    44:12,22 45:3
    97:17 136:25
**screening** 126:1
**screwed** 48:7
**script** 73:14
**seal** 179:17
**sec** 120:7,8 169:5
**second** 37:24 38:4
    38:11 43:9 45:18
    76:7 77:12 78:2
    92:17 93:7 98:13
    105:15 135:15
    147:9 159:6
    171:10 172:9
**secretary** 29:16
**section** 73:16
**securities** 11:13
    15:14 45:20 51:12
    111:2 139:13
    165:8,10 169:21
**see** 31:6,23 32:3,8
    32:14,22,22,23
    33:1,4,5,9,11
    37:10 39:24 43:8
    43:10,15,23 45:1,5

45:9,12,15,21 48:4
48:22 55:24 56:18
58:7,7,13 59:10,19
59:20,25 61:16
62:2,16,23 66:23
67:18 71:7 72:14
72:19,20,22 73:14
74:1 75:1,16,19
77:2 78:7,17 79:4
80:7,21 81:1,6
83:2,17,19,25 84:7
84:24 85:1,16
86:7,8 88:7,23
90:1,6 91:13,17,18
93:3 94:2,4 95:6,8
95:11,13 97:10
98:3,7,11,13,14
99:10 100:17,20
101:3,14 106:15
107:17 111:4,10
113:10 117:20
118:3,15,15
120:25 123:1,23
124:24 125:15,18
126:4 127:12,17
129:17,21 130:4
130:11,20 131:12
132:2,3,20,25
134:15 135:16,23
136:3,20,21 137:3
137:8 139:9
143:12 153:19
158:7 167:18,24
170:10 171:7
174:9
**seeing** 79:16,19
**seeking** 114:23
**seen** 129:9,16
    138:4
**self** 21:1

**sell** 36:14 86:11
    90:11 104:6
    173:12
**seller** 90:8
**selling** 28:19 36:1
    36:2 74:14 113:9
    113:16
**sells** 104:5
**send** 30:1 94:10,12
**sense** 23:21 27:5
    52:15 150:5,15
**sent** 29:3 32:15
    46:18 99:15 138:6
**sentence** 48:20
    54:12 67:14 77:16
    103:7 122:17
    123:19 127:14
    170:16
**september** 48:24
    49:3,17,20,22 50:2
    50:8 51:6 52:24
    53:23 71:6,23
    72:12 84:11
    137:16,20 138:14
    139:14 140:12,18
    174:1
**served** 58:21
**service** 2:3 32:23
    34:1 36:12
**services** 32:16
    33:3
**session** 164:1
**set** 94:7 117:1
**setting** 71:3
**seventeen** 124:7,8
**severity** 79:13
**shaking** 17:18
    92:1
**share** 30:11,24
    98:2,5 112:12
    136:13 167:4

**shared** 16:12
    161:18
**shareholder** 157:4
    157:10
**shareholders**
    35:23 153:17,23
    155:1,10,16 158:2
    159:23 160:16
**shares** 51:8 90:2
    91:18 111:16
    140:11
**sheet** 35:19
**shocked** 83:9
**short** 14:2 22:22
    88:22 90:5,8,10,14
    90:20 91:7 119:14
    121:16 122:10
**shorter** 24:1
**shortly** 136:3
**shot** 157:25
**shots** 66:23
**show** 29:25 31:12
    80:4 97:13 106:5
    109:13 122:4
**showed** 16:6,8,11
    16:13
**showing** 31:21
**shows** 37:7
**side** 76:13,18 95:7
    111:8 171:17,24
**sided** 157:17
**sighted** 56:5,8,13
    83:18,21,23 84:15
    84:22 85:15 86:1
    86:5
**signal** 25:9
**signature** 179:22
**significant** 86:6
    91:17
**silence** 18:23

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[similar - special]**                                                Page 26

| | | | |
|---|---|---|---|
| **similar** 34:2 58:12 108:9 149:8 | 33:24 39:23 40:6 43:19 44:6 48:21 | 81:15 82:5,9 85:23 86:20,25 | 157:21 159:5 160:3,13,20 161:5 |
| **similarily** 1:7 179:7 | 48:21 49:1 51:7 54:3 58:16,17 | 88:3,10,17 90:19 91:2,11 92:3,14,18 | 161:22 162:23 164:23 165:5,12 |
| **sir** 92:15 120:22 125:9 137:6 142:5 143:25 144:16 156:8 | 65:24 71:24 99:9 99:16,20 111:20 111:24 137:25 140:3 162:7,10 | 92:19 93:5,8,23 94:21 95:20 97:5 97:25 101:22 102:13,19 103:5 | 165:19,23 166:5 168:6,17,19,24 169:16,22 171:1 171:15 172:3,25 |
| **sit** 92:25 132:16 | **smaller** 148:11 | 103:16,23 104:15 | 173:17 174:11 |
| **sitting** 8:24 14:24 42:4 46:8 51:10 72:16 76:22 77:4 77:21 81:24 83:4 84:19 89:10 95:21 96:17 113:21 114:7,13 115:15 120:7,10 123:25 124:17 125:1 126:9 127:2,19 128:23 134:8 138:11 142:23 | **smith** 55:16 **sms** 55:7,12 56:6,7 56:12 58:11 62:2 62:5 63:17 67:16 68:10,10 78:5,16 84:17,21 **sold** 27:11 46:7 68:8 105:9 131:22 **sole** 12:22 **solidified** 161:25 **soloway** 2:12 3:5 5:6 6:5,6,11 7:1 | 105:7 106:2,8,13 108:2,23 109:8,10 109:19,20 110:3,5 110:13 112:6,11 112:14,18,22 114:6,12,19 115:14 116:6,12 116:16,24 119:18 119:25 120:2 121:19 122:16 123:5,9,13 124:8 124:13,15 126:19 | 175:1,23 176:5 **soon** 5:5 153:19 **sorry** 6:20 10:20 18:24 23:14 30:16 31:1 41:8 48:6 49:20,22,24 58:6 78:22 92:7 108:25 110:5,17 112:4,11 112:15,18 113:10 122:22 132:23,23 142:20 149:20 |
| **situate** 50:6 153:1 **situated** 1:7 179:7 **situation** 165:2 **situations** 26:9 161:6 | 7:22 8:12 15:21 19:8 20:1,15 22:16 23:4 24:10 25:11,24 26:19 | 126:23 128:1,6,7 130:3,17 131:2,7 131:18 133:16 134:6,12 135:7 136:9,16 139:21 | 159:2 166:9 167:21 170:4 171:20 **sort** 24:20 36:5 37:8,17,21 38:10 39:2 50:5 55:20 |
| **six** 83:24 88:22 129:14 | 27:10 28:13,25 29:13,19,21 30:3,7 30:19,20 31:24 | 140:2,9,15,25 141:5,12,20,25 142:3,19 143:5,23 | 60:18,22 66:5 67:8 74:5 79:10 79:17 169:1 |
| **size** 52:5 58:12 59:16 | 36:17 37:9 40:17 42:3,20 43:1,18 | 144:15,23 145:9 145:15,21 146:4 | **sound** 19:10 139:7 **sounds** 74:7 81:18 |
| **skip** 87:3 **skipping** 87:8 **slash** 61:15 | 44:15,21 46:3,16 46:25 47:6,8,18 49:8 52:2,19,23 | 146:14,24 147:6 147:16,25 148:9 148:15,21 149:3 | **source** 103:4 **south** 2:3 **speak** 39:10 71:13 |
| **sleep** 55:17,25 57:6,10,11 58:5 78:6 79:6,9,18 84:4 | 53:20 55:3 56:16 61:3 63:15 64:3 65:7 67:5 68:24 69:8,17,23 70:6,20 | 149:12,22 150:6 150:17,24 151:10 151:11,23 152:6,9 152:12,15,20 | 133:19 134:18 145:6 **speaking** 15:25 38:23 72:17 131:5 |
| **sleepy** 55:18 57:7 **slow** 110:18 **small** 12:23,25 33:11,13,15,16,20 | 70:25 74:21 75:15 76:6,21 77:13,20 78:1,24 79:21 80:3,6,11,15,18 | 154:4,9,17 155:8 155:14,21 156:7 156:16 157:5,12 | 169:4,5 173:10 **special** 128:12,24 |

**[specialist - suffered]** Page 27

specialist 85:9,14
specific 20:23
  41:21 86:21 90:17
  100:18
spectrum 58:5
speculate 28:9
speculation
  146:22 149:9
  169:23
spend 108:16
  132:15 148:5
spit 37:2
spits 34:14
split 108:13
spoke 71:16,18
  156:1
spoken 10:4 15:9
  15:12 17:5,8
spread 51:22
spreadsheet 67:7
  167:25 168:9
spreadsheets
  167:11
stage 38:11 67:17
  68:15
stamp 99:7 166:23
  167:5
stamped 94:14
  100:14
stance 101:10
  102:22 107:17,20
stand 51:14
standards 149:11
standing 5:8
  175:12
stands 33:1
start 9:23 10:9
  11:18 13:9 21:24
  37:22 71:1,3
  79:19 82:10 88:19
  88:20 97:20 98:5

starting 22:14
  26:4
starts 23:17 85:25
  122:20 125:16
  171:5 172:7 173:5
state 8:8,17 153:21
  179:1,3
stated 153:18
statement 124:1
  126:10 127:20
  130:14,24 131:15
  134:2 170:23
  171:13
statements 39:8
  169:2
states 1:1 55:7
  135:19 179:8
stating 7:20
  175:18
statistical 21:18
statistically 25:3
status 58:18
steinholt 85:3
stenographically
  179:10
step 19:3 35:6
  50:14 63:22 67:6
  120:3
steps 73:25 74:25
  75:4 133:11,17,23
sticker 167:11
stock 27:11 34:11
  34:19 35:17,24
  36:25 37:12,23
  38:1,21 39:2,3
  42:2 48:20 60:10
  60:11 61:22 62:12
  62:20 63:18,21
  65:6,11 66:15,15
  66:17,19 67:15
  68:14 90:10,11,13

91:1,3,7 100:10,18
  104:8,10,13,13,16
  104:17,22 105:5,9
  105:11,12,15,17
  113:19,20 114:3
  143:10 160:2,4
  162:2 164:22
  168:4 169:14
stocks 33:25 34:3
  37:6,16 38:5,6,7,9
  41:17 44:5 82:14
stopped 69:25
  93:17 134:25
  163:4 174:15
stops 26:4
story 39:14
straightforward
  46:23
strategic 51:18
strategies 13:5,22
  14:15,17 15:7
  33:14 48:22 99:25
strategy 40:9,25
  41:1,5,10,15 43:15
  49:2 51:7,11 54:2
  54:3 65:24 111:20
  111:24 139:17,23
  140:4 162:7,10,14
  162:18
street 66:18
strength 35:17
strike 173:24
strong 25:4,8
  108:7
studies 10:14
  21:20,23,25 22:2,4
  24:2,25 58:25
  101:3 115:25
  116:5 122:9,15
  130:7 148:6 149:8

study 21:1,14,16
  22:19 23:11 24:6
  24:19 26:3,5
  62:20 105:11
  114:23 115:3,17
  115:21 118:9,11
  118:12 120:23
  121:4,10,15,21,25
  122:1,11,14,25
  125:11,22,25
  127:15 130:19
  132:16 133:22
  135:21 143:16
  144:5,7,12 145:7,8
  145:12,23 146:6
  146:10,16 147:9,9
  148:23 149:2
  150:20 151:1,19
  153:12 154:3,6,11
  154:20,23 155:24
  156:3 157:14
  158:15,22 172:19
subject 45:12 53:7
  72:3 88:21 96:11
  98:18 106:22
  113:2 137:15
submit 150:8
subscribed 177:14
subsequently
  12:18 54:25
substantive 52:3
succeed 20:22
successful 76:8
  171:6,8,23
sue 100:24
sued 96:15,25
  101:6 103:15
  108:3,18 114:22
  143:15 144:3
suffered 160:2,5

CONFIDENTIAL

ATTORNEYS EYES ONLY

**[suggested - testing]**

Page 28

| | | | |
|---|---|---|---|
| **suggested** 37:12 | **t** | 132:8 133:2 | **tech** 31:19 |
| **suggesting** 144:16 | | 160:22 161:9 | **technical** 69:18 |
| 154:22 156:8 | **t** 178:3,3 | 162:23 167:7 | 92:16 135:9 |
| 160:14 170:18 | **tab** 3:9,10,11,11 | 172:9 | **technician** 2:21 |
| **suggests** 85:15 | 3:12,12,14,15,15 | **taken** 70:1 133:12 | 4:4,5 31:19 80:17 |
| **suing** 102:11,14,16 | 3:16,16,17,17,18 | 135:2 163:6,12 | 88:8,14 93:19 |
| 143:11 | 3:19 30:8,12,22 | 174:17 179:10,15 | 106:10 109:18 |
| **summary** 99:20 | 42:9 43:2 44:9 | **takes** 90:14,20 | 110:4 123:7 |
| 101:17 | 47:15 52:13 70:18 | **talk** 9:19 16:18 | 134:21 142:14 |
| **super** 110:22 | 80:5,16 82:4,23 | 42:21 59:9 69:1 | 167:7,10,18 |
| **supplied** 168:9 | 92:7,7 97:21 | **talked** 16:22 49:18 | **tell** 5:7 9:22 16:8 |
| **suppose** 26:7 | 106:6 109:2 112:2 | 84:20 86:9 111:19 | 24:18 28:2 32:10 |
| **supposed** 45:6 | 112:5,7,19,21 | **talking** 6:23 14:4 | 38:12,20 48:6 |
| **sure** 10:13 23:15 | 116:10,19 123:9 | 16:10 20:17 32:25 | 50:17 51:15 73:2 |
| 30:6 37:11 41:9 | 124:4,11,13,21 | 36:9 43:20 61:6 | 79:3 80:12 83:10 |
| 44:25 49:25 53:17 | 126:13 127:23 | 65:8 158:25 162:5 | 87:12,15 91:24 |
| 54:19 60:21 61:11 | 128:5,8 136:10,18 | 173:2 | 109:14,21 |
| 62:10 66:9 68:3 | 136:22 142:4,21 | **talks** 85:13 | **tells** 41:17 |
| 78:25 88:4 90:20 | 151:7 152:8,16 | **tam** 96:2,15 | **tend** 20:24,25 |
| 92:18 110:23 | **tabak** 2:18 6:8,9 | **target** 58:21 79:24 | **term** 26:25 95:25 |
| 119:9 123:5 | 8:1 16:1,5,13,23 | 126:2 | 122:5,6,10,13 |
| 129:20 137:2 | 17:1 42:10,12 | **targeting** 22:20 | 135:20 153:12 |
| 139:3 149:23 | 69:14 119:20 | **task** 138:3 | **terms** 173:10 |
| 167:5 | 123:3 160:17 | **tax** 66:13 | **tesar** 106:15 |
| **surrounded** 16:20 | 161:2 163:1 | **team** 21:4 28:10 | **test** 21:23 117:14 |
| **suspicious** 113:8 | **tailored** 33:22 | 30:10 50:17 51:1 | 118:18 121:15,21 |
| 113:15,22 114:5 | **take** 19:3 20:12,19 | 75:5 102:5 115:6 | **tested** 121:10,10 |
| **swear** 7:4 | 21:8 23:8,18,24 | 115:8 | 146:10 |
| **sworn** 8:6 177:14 | 37:11 47:14,20 | **teamsters** 3:10 6:3 | **testified** 8:9 50:14 |
| 179:5 | 51:14 52:15,17 | 13:24 14:1,5,10,25 | 114:21 174:24 |
| **symbols** 111:7 | 53:15,17 54:10 | 15:4,10,12,14,16 | **testify** 9:7,10 |
| **symptoms** 79:4,13 | 60:22 61:12 63:22 | 33:9 39:22 40:2,8 | 179:5 |
| 129:17,25 170:20 | 69:14 71:2 85:12 | 40:23 42:4 43:13 | **testimony** 9:2 |
| **syndrome** 55:16 | 88:1,2,25 90:10 | 45:13,24 46:12,18 | 16:23 42:18 |
| **synergies** 173:11 | 94:13 95:1 97:11 | 98:19,21 99:8,15 | 144:20 150:13 |
| **synergy** 78:15 | 101:10 102:21 | 99:19 111:1,16,19 | 152:4 156:13 |
| 173:5 | 104:25 107:15,24 | 111:25 137:13,16 | 157:2 177:9 |
| **systematic** 36:13 | 108:17 113:5,12 | 138:13 139:4,13 | 179:10,12 |
| | 116:10 118:6,7 | 139:24 140:5,10 | **testing** 131:23 |
| | 119:1,5,11,14 | 140:16 141:2,6 | 146:19 148:11 |
| | 120:3,13,14,21 | 164:12 168:5,12 | |
| | 125:19 129:14 | | |

Veritext Legal Solutions

212-279-9424              www.veritext.com              212-490-3430

**[thank - tradipitant]**                                                    Page 29

**thank** 8:15 19:9
82:25 88:10 109:8
112:8 124:8,14
126:19 128:1
151:10 176:6,8
**thanks** 8:14 19:2
109:8 112:18
**therapies** 59:5
**therapy** 86:6
118:6
**theses** 70:11
**thesis** 15:18 25:1
37:17 53:22 54:9
55:6 57:17 60:6
60:24,25 61:9
69:1 70:10,15
166:4 174:1,5,25
175:12 176:1
**thing** 55:23 69:4
108:14
**things** 21:10 34:11
34:22,25 62:2
63:13 66:3,3,8
69:4 79:16 82:13
83:8 92:23 102:5
108:15 113:24
129:13 144:9
162:16 175:15
**think** 6:13 10:22
16:7 18:24 21:7
21:13 25:2 27:18
27:20 35:7,18
39:4 42:8,16
44:13 49:22 52:11
57:20 74:14,23
76:2 77:8 84:10
88:2,12 92:22
108:14 114:7,21
115:24 116:12
119:4 134:21
137:4 138:8 144:9

150:3,4 151:8
154:5 157:7,24
159:7 161:7,17
166:16 168:10
**thinking** 23:13
57:14,15 105:5
**thinks** 143:11,18
151:13
**third** 2:16 73:20
107:13 125:15
126:24
**thirteen** 13:3
**thomas** 2:13,21
80:11 88:3 92:9
93:5 109:9 110:3
116:12 126:19
**thought** 115:8,23
115:24
**thoughts** 72:19
73:7
**thousands** 83:8
**three** 12:15 21:22
22:15 23:2,5,6
35:18 45:5 55:8
62:5 67:18 100:25
115:21 117:19
118:3,7 122:11
128:17 129:19
133:23 172:19
173:12,12,13
**throw** 57:6
**thursday** 5:15
**time** 1:18 5:16
12:10 13:5,8,10
19:21 22:21 23:17
25:6,12 38:18
40:19 41:21 42:15
42:22 46:5,7
47:13 49:6,15
50:6 51:2,3,12,14
51:23 52:17 53:2

53:17,22 54:20
57:1,6,14 60:20
61:12 63:5 65:15
65:23 67:15 69:22
70:5 71:2,23
78:13 81:25 84:9
84:13 85:12,20
86:15 93:13,22
96:25 97:11
106:19 108:16
110:17 111:20
113:5,12,25 115:1
118:23 120:21
121:3,16 122:7
124:19 125:3,9,12
125:19 127:3,8
132:8,15 135:5
139:18 144:16
145:1 148:6 153:2
155:9 156:8
160:14 162:12
163:2 164:4
172:16 174:5,14
174:20 176:7,14
**timeline** 61:15
**times** 16:25 24:15
67:18 175:15
**timing** 49:10
**title** 12:13
**titles** 12:15
**today** 5:15 8:23
9:3,10 14:1,24
16:1,23 19:10
20:5 42:5 46:8
48:21 51:10,15
72:16 76:22 77:5
77:21 78:9 81:24
83:4 84:19 87:25
89:10 95:21 96:17
113:21 114:7,13
115:15 120:7,10

124:1,18 125:1,24
126:10 127:2,19
128:23 134:8
138:11 142:23
164:14 165:16
176:7
**today's** 15:22
176:13
**told** 40:2 46:12
138:8
**tolerated** 130:6
**tool** 39:1
**top** 16:10 20:17
32:25 35:8 36:9
37:22 39:18 71:5
73:20 88:25 95:6
99:7 111:5 117:12
120:22 122:19
158:25 162:5
173:2
**topics** 72:24
**totally** 32:19 48:1
69:12
**trade** 67:17 139:9
**traded** 19:24
**trader** 11:22,22
89:6
**trades** 67:15 68:15
**trading** 95:9
**tradipitant** 62:22
63:3,8 64:22
65:16,19 67:1,23
68:17,19 104:9,18
104:18 114:24
115:4 117:14
120:24 123:22
125:17,22 127:12
127:16 130:8
131:11,22 133:12
134:3 145:25
146:9 153:25

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[transaction - update]**                                    Page 30

**transaction**
  167:25
**transcript**  5:2,4,7
  5:11 31:17 42:14
  42:24 124:24
  125:6,14 129:7,15
  176:11 177:5,8
**transcription**
  179:11
**transcripts**  39:9
  169:4 176:10
**translated**  139:23
**transmission**  25:6
**travel**  57:5
**traveling**  56:25
  57:4
**treat**  63:7 79:6
**treated**  81:5,10
  82:1 85:16
**treatment**  73:22
  101:1 123:22
  130:6,9 131:11
  135:23 170:12
**treats**  60:4 85:14
**trial**  9:3 25:13,21
  55:8 101:1 117:25
  129:24
**trials**  23:18 62:5
**tried**  115:6,7
**tries**  67:9
**trigger**  61:24
**trouble**  19:12
**true**  41:6 68:21
  91:16 99:17
  148:17 177:8
  179:12
**trust**  29:19
**truth**  179:6,6
**truthfully**  9:7,10
**try**  9:19,23 16:19
  34:3 35:1,1 74:1

119:11 143:15
155:5 158:19
159:8,12 165:16
165:21
**trying**  17:25 22:22
  24:17 28:14 41:10
  50:1,5 56:10
  63:24 65:22 93:25
  143:3 150:9 157:6
  157:22 170:3
**turn**  38:10,11 43:9
  47:9 52:11 69:9
  69:18,20 70:18
  73:19 110:14
  112:2 125:16
  134:13 136:10
  138:22 142:4
  158:8 166:8 171:4
  173:20,21
**turning**  13:21,23
  107:12
**turnover**  38:8
**tweak**  102:5
**twenty**  151:9
**twice**  110:6
**two**  12:20,24 13:4
  32:22 33:5 50:14
  65:5 66:3 67:18
  100:13 117:18,23
  117:25 120:23
  121:4 122:9,10,25
  125:11 144:9
  173:12 174:8,11
  175:24
**type**  24:16 38:13
  42:2 59:8 99:18
**types**  11:17 15:6
  18:9 20:18,24
  76:12
**typewritten**
  179:11

**typically**  38:25

**u**

**u**  78:5 134:15
**u.s.**  33:20 39:23
  40:6 99:9 116:1,5
**uh**  58:14 62:9 68:6
  85:10
**ultimate**  103:11
**ultimately**  11:13
  158:10
**unable**  167:4
**underdiagnosed**
  84:4
**undergo**  131:23
**undergraduate**
  10:14 11:11
**underneath**  72:25
  75:16 78:14 99:8
**underscore**  33:5
**understand**  8:23
  9:2,6,14 14:4 18:1
  21:10 25:19 26:20
  28:15 37:11 39:1
  41:10 50:12 51:20
  54:19 56:9,10
  60:21 61:23 62:11
  65:13,22 67:13
  68:3 73:6,16
  74:24 76:12 77:15
  78:10 81:16 99:14
  108:5 110:23,25
  118:8 133:22
  139:3 159:3
  170:23 171:13
  172:1,21 173:15
  175:19
**understanding**
  5:10 22:10,24
  27:22 28:6 40:1
  42:12 45:23 55:22
  56:7,11 60:2 63:2

74:3,12 75:10
76:16 77:4 78:19
78:25 81:9 83:14
84:14 85:18,19
86:14 115:1
118:15 121:24
129:23 131:21
132:16 145:10
147:7,19 170:15
172:13 175:21
**understood**  17:25
  26:12 28:14 34:5
  57:12 79:23 81:25
  114:21 116:7
  138:4
**undertake**  86:11
**undertaken**  146:5
**unethical**  117:15
  145:12 156:11
  157:14 158:21
  159:9
**unfortunately**
  97:15
**unhappy**  103:19
**union**  6:4 164:12
**united**  1:1
**unites**  179:8
**universe**  37:6 56:8
**university**  10:13
  10:15
**unknown**  66:10
**unnecessarily**
  110:10
**unnecessary**
  107:14
**unpopular**  160:15
**unprecedented**
  143:11 155:20
**unquote**  113:3,16
**update**  36:14

**[upheld - weber]**                                                    Page 31

**upheld**  59:24
**upload**  47:22
  80:22 116:15
**uploaded**  116:18
**uploading**  93:6
**upside**  59:10,14,15
  59:20 60:9,12
  62:7
**usa**  33:11
**use**  36:15 40:25
  102:25 108:6
  136:23,24 173:11
**usual**  53:11
**usually**  69:17,19
**utility**  26:7

**v**

**v**  95:7 134:15
  179:7
**valuable**  145:24
  146:7 148:2
**valuation**  63:9
  65:14 66:13 67:8
  67:21
**value**  35:14 63:21
  66:10 67:9 68:16
  87:19 90:5 95:13
  147:8
**valued**  63:25 64:1
**valuing**  63:8,23
  68:14
**vanda**  1:10 5:19
  10:4 15:14,18
  16:20 17:21 18:5
  18:22 36:25 37:2
  40:23 41:3 47:11
  49:2 50:10,18
  51:6,8,12 52:5
  53:22 63:9 65:14
  65:18,24 66:1
  67:10 69:4 71:17
  71:25 72:23 81:23

82:18 86:2,4,15
88:21 90:3 91:17
95:7,9 96:11,14,19
96:25 100:19
101:1,6,13 103:19
104:1,5 107:14,24
108:12,18,18
111:13,16 113:2
114:22,23 115:2
117:9,13 118:16
118:22 120:5,17
120:22 121:25
122:21,24 123:16
123:19 124:23
126:6,14 128:9,10
139:12,17 140:12
140:17 141:8
143:15,20 148:10
150:19,25 151:17
165:17,22 166:2
168:4 169:13,19
170:24 172:2,22
173:15 175:22
177:1 178:1 179:7
**vanda's**  81:6
  100:25 120:8
  156:3
**various**  111:2
  118:22
**vasquez**  88:6 89:2
  89:5 112:24
  114:18
**veritext**  31:5
  167:12
**version**  31:4 109:7
  136:24,24
**versus**  5:19 22:7
  35:25
**vice**  12:13
**video**  1:16 5:17
  47:22

**videographer**  2:20
  5:14 7:3 69:21
  70:4 93:10,12,21
  134:23 135:5
  163:2 164:3
  174:13,20 176:12
**view**  78:10,12
  104:21 133:10
  144:6 145:1
  149:13,23 151:24
  154:10,12,23
  155:9,15 156:23
  156:24 158:7,19
  159:22 160:4,11
  161:18
**views**  156:17
**violated**  155:10,16
**violation**  154:23
  157:24
**virtual**  92:22
**visually**  30:18
**vivianne**  98:6
**vnda**  111:11
  143:10 153:14
**vnda's**  153:11
**voice**  5:8,13 7:19
  69:25 70:3 92:16
  93:17,20 124:11
  124:14 134:25
  163:4 164:5
  166:18 174:15
**vs**  1:9 177:1 178:1

**w**

**waiting**  47:21
  80:21 112:23
**waive**  7:17
**walk**  12:10
**want**  5:2,7 16:14
  19:2 24:20 29:16
  30:17 31:3 34:5
  35:20 37:11 40:24

44:19 46:24 47:9
49:25 50:12 52:11
53:15 54:8 60:10
60:20 61:11,12
62:10 65:13 66:4
66:9 67:13 68:3
72:10 73:12 80:4
83:13 84:24 87:9
87:10,11,11,13
98:17 99:6 100:12
101:16 103:18
104:11 108:24
110:9,19,23
113:13 118:25
119:18 120:3
125:8 131:5
132:10 139:2
150:16 171:17
172:9 174:9
**wanted**  81:5 176:9
**wanting**  92:25
**wants**  58:20 119:4
  119:5 150:8
**ward**  2:13 112:9
  112:13
**warrant**  25:4
**way**  9:24 14:11
  22:15 36:1,13
  37:20 43:5 52:20
  55:15 56:3 57:2
  58:24 59:6 60:14
  65:6 74:24 124:16
  125:15 141:16
  153:24 164:19
**ways**  12:20
**we've**  124:22
**web**  1:20
**weber**  71:6,9
  170:23 172:1,14
  173:9

CONFIDENTIAL
ATTORNEYS EYES ONLY

**[weber's - zoom]**                                                                    Page 32

| | | |
|---|---|---|
| **weber's** 78:10 | 121:18 122:3 | **worried** 103:17 |
| 172:22 173:15 | 126:22 130:2 | 105:22 |
| **weeks** 121:11,22 | 133:15 134:5,11 | **worry** 167:13 |
| **weird** 117:12 | 136:8 140:7,14,24 | **wrap** 141:22 |
| **weiss** 2:10 6:6,14 | 141:4,11,24 | **write** 81:3 117:12 |
| **went** 10:13 17:23 | 142:17 143:2,22 | 143:9 |
| 105:13 107:5 | 144:11,21 145:5 | **writes** 74:22 |
| 135:8 158:5,5,5 | 145:14,20 146:3 | **writeup** 173:25 |
| 160:4 175:18 | 146:13,21,23 | **writing** 54:4 70:14 |
| **wharton** 2:10 6:6 | 147:14,23 148:4 | **written** 53:2 71:22 |
| **willing** 59:3 | 149:1,10,20 150:3 | 74:24 106:19 |
| **win** 162:3 | 150:14,23 151:22 | **wrong** 66:8 |
| **withdraw** 60:20 | 152:5,11,17 154:2 | **wrote** 68:1,4,4 |
| 89:15 101:23 | 154:15 155:1,13 | 70:15 113:15 |
| **withdrawn** 97:12 | 155:19 156:6,14 | 172:14 |
| 98:12 106:20 | 157:3,10,16 159:2 | **y** |
| 138:21 | 160:1,7,10,11,19 | **yale** 10:15,23,24 |
| **witness** 2:15 3:3 | 161:4,13 163:10 | **year** 10:16 38:9 |
| 6:10 7:5 8:6 15:20 | 164:24 165:6,13 | 126:4,6 153:2,3 |
| 19:24 22:13 23:2 | 165:24 166:6 | **years** 12:3,22,24 |
| 24:9 25:7,23 | 168:8,18,25 | 13:2 23:3,6,18,23 |
| 26:18 27:9 28:9 | 169:17,24 171:2 | 130:11 |
| 28:22 30:16 31:23 | 171:16 172:4 | **yep** 110:24 |
| 36:10 37:4 40:15 | 173:1,18 175:2,24 | **yesterday** 72:14 |
| 41:24 43:17 44:19 | 179:12,17 | **yielded** 146:19 |
| 46:15,23 49:5 | **witnesses** 92:21 | 147:1 |
| 53:19 56:15 61:2 | **words** 27:19 55:10 | **york** 1:2 2:11,17 |
| 63:12 65:1 67:3 | 61:5 74:23 102:3 | 5:20 179:9 |
| 68:23 69:7 70:24 | 102:7,25 103:18 | **younger** 10:18 |
| 74:19 76:5,20 | 108:9,10 | **z** |
| 77:8,19,25 78:22 | **work** 33:17 38:13 | **zero** 65:4 |
| 79:9 80:1 81:13 | 47:9,24 48:10 | **zima** 6:23 |
| 85:22 86:18,24 | 57:2 97:14 104:10 | **zones** 57:1,6 |
| 90:25 91:10 92:24 | 115:9,16 120:5 | **zoom** 6:15 9:21 |
| 94:20 101:21 | **worked** 11:6,11,15 | |
| 102:11,16 103:3 | 42:25 | |
| 103:14,22 104:8 | **working** 12:25 | |
| 105:3,24 108:20 | 14:14 26:8 125:23 | |
| 112:5,21 113:24 | **works** 22:7 34:7 | |
| 114:11,16 115:6 | 71:10 77:12 163:1 | |
| 115:19 116:23 | | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.