# Exhibit A

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

_____

)

KENNETH GORDON, Individually and )CIVIL ACTION

on Behalf of All Others          )NO.:

Similarly Situated,              )

                                 )1:19-cv-01108-FB

              Plaintiff,         )-LB

                                 )

       v.                        )

                                 )

VANDA PHARMACEUTICALS INC. And   )

MIHAEL H. POLYMEROPOULOS,        )

                                 )

              Defendants.         )

_____)

DEPOSITION OF BJORN STEINHOLT

REMOTELY IN SAN DIEGO, CALIFORNIA

FRIDAY, NOVEMBER 5, 2021

REPORTED BY:   NATALIE PARVIZI-AZAD, CSR, RPR, RSR

               CSR NO. 14125

Page 2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

_____
                              )
KENNETH GORDON, INDIVIDUALLY AND )CIVIL ACTION
ON BEHALF OF ALL OTHERS         )NO.:
SIMILARLY SITUATED,             )
                                )1:19-cv-01108-FB
         Plaintiff,    )-LB
                                )
         v.            )
                                )
VANDA PHARMACEUTICALS INC. And   )
MIHAEL H. POLYMEROPOULOS,       )
                                )
         Defendants.   )
_____)



DEPOSITION OF BJORN STEINHOLT,
TAKEN ON BEHALF OF THE DEFENDANTS
REMOTELY VIA ZOOM VIDEO CONFERENCING, IN
SAN DIEGO, CALIFORNIA, BEGINNING AT
8:32 A.M. AND ENDING AT 3:52 P.M., ON
FRIDAY, NOVEMBER 5, 2021, BEFORE
NATALIE PARVIZI-AZAD, CERTIFIED SHORTHAND
REPORTER NUMBER 14125.

Page 3

A P P E A R A N C E S


FOR THE PLAINTIFF, KENNETH GORDON, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED:
    ROBBINS GELLER RUDMAN & DOWD LLP
    BY:  MICHAEL CAPECI, ESQ.
    BY:  BRENT MITCHELL, ESQ.
    BY:  AVITAL O. MALINA, ESQ.
    58 SOUTH SERVICE ROAD
    MELVILLE, NEW YORK  11747
    (631) 367-7100
    MCAPECI@RGRDLAW.COM
    BMITCHELL@RGRDLAW.COM
    AMALINA@RGRDLAW.COM

FOR THE DEFENDANTS, VANDA PHARMACEUTICALS INC. AND
MIHAEL H. POLYMEROPOULOS:
    PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
    BY:  AUDRA SOLOWAY, ESQ.
    BY:  EMILY MILLER, ESQ.
    BY:  ALLISON PEARL, ESQ.
    1285 AVENUE OF THE AMERICAS
    NEW YORK, NEW YORK  10019
    (212) 373-3289
    ASOLOWAY@PAULWEISS.COM
    EMILLER@PAULWEISS.COM
    APEARL@PAULWEISS.COM


ALSO PRESENT:
    DUSTIN BROWN, VIDEOGRAPHER;
    MATT RIESDORPH, DEPOSITION TECHNICIAN

Page 4

I N D E X

WITNESS                      PAGE
BJORN STEINHOLT
    EXAMINATION              6
BY MS. SOLOWAY


      E X H I B I T S

EXHIBIT NO.    DESCRIPTION          PAGE

EXHIBIT 1    JULY 30, 2021 REPORT       10

EXHIBIT 2    OCTOBER 29, 2021 REPORT     10

EXHIBIT 3    EXHIBITS TO MR. STEINHOLT'S  28
             EXPERT REPORT
EXHIBIT 4    MERRIAM WEBSTER COLLEGIATE   57
             DICTIONARY DEFINITION OF
             "AVAILABLE"
EXHIBIT 5    DR. FAMA ARTICLE FROM 1970   78
EXHIBIT 6    DR. FAMA'S 1991 ARTICLE      111
             CALLED "EFFICIENT CAPITAL
             MARKETS:  II"
EXHIBIT 7    REPORT DATED              147
             JANUARY OF 2009

EXHIBIT 8    EXPERT REPORT IN THE       152
             NOVATEL LITIGATION
EXHIBIT 9    AURELIUS VALUE REPORT      166
EXHIBIT 10   PAPER BY THORSEN, KAPLAN,   218
             AND HAKALA CALLED
             REDISCOVERING THE ECONOMICS
             OF LOSS CAUSATION

Page 5

REMOTELY IN SAN DIEGO, CALIFORNIA

FRIDAY, NOVEMBER 5, 2021, 8:32 A.M.

        THE VIDEOGRAPHER:  Good morning.  We are on record at 8:32 a.m. on November 5th, 2021.  This is the video-recorded deposition of Bjorn Steinholt.

        My name is Dustin Brown here with our court reporter, Natalie Parvizi.  This deposition is being recorded using Zoom technology.  All participants are attending remotely.  The caption of this case is "Gordon versus Vanda Pharmaceuticals, Incorporated."

        Please note audio and video recording will take please unless all parties agree to go off the record.  If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

        MS. SOLOWAY:  Good morning.  No objection. I'm Audra Soloway from Paul Weiss Rifkind Wharton & Garrison, LLP.  We represent the defendants in this case.  And I have with me my two colleagues, Emily Miller and Allison Taylor Pearl.

2 (Pages 2 - 5)

Page 6

MR. CAPECI: Good morning. Michael Capeci from Robbins Geller Rudman & Dowd on behalf of the plaintiff. And with me are Avital Malina and Brent Mitchell from our firm.

THE VIDEOGRAPHER: Thank you. Go ahead, Natalie.

THE CERTIFIED STENOGRAPHER: Please raise your right hand to be sworn.

BJORN STEINHOLT,

having declared under penalty of perjury to tell the truth, was examined and testified as follows:

EXAMINATION

BY MS. SOLOWAY:

Q. Good morning, Mr. Steinholt.

A. Good morning.

Q. You're hearing me okay?

A. Yes.

Q. Yes. Nice meet you. You and I have never met before, I don't think?

A. I don't think.

Q. So I take it you've been deposed a number of times before?

Page 7

A. Yes. So the times I have been deposed is listed on my CV.

Q. Okay. So fair to say that you are an old hand at this; right?

A. Yes. I do a couple of depositions every year.

Q. So if you don't understand a question that I ask, please let me know. But otherwise, I'll just move forward. Okay?

A. That's fine.

Q. Okay. You understand that you're under oath today?

A. Yes.

Q. That means that giving this deposition testimony today is the same as giving testimony as if there were a judge or a jury sitting right there?

A. Yes.

Q. Okay. And you understand that that's going to be true all day, even if we take a number of breaks; right?

A. Yes.

Q. You're under oath all day; correct?

A. That's correct.

Q. Okay. Is there any reason why you

Page 8

can't testify truthfully here today?

A. No.

Q. You're not taking any medications that might interfere with your ability to testify?

A. No.

Q. You feel good today?

A. I feel fine.

Q. Okay. Good. I'll take fine. So we have an -- an agreement in this case in order to try to make things a little bit easier, sent you hardcopies of exhibits we were able to gather as of a few days ago, and you and Mr. -- and your lawyer, Mr. Capeci, should have a hardcopy set of those documents, which we agreed to open on the record.

Do you want to just do that right now?

A. Yeah, sure.

Q. Okay.

MS. SOLOWAY: And you had a scissor handy?

MR. CAPECI: I come prepared.

MS. SOLOWAY: Seriously.

BY MS. SOLOWAY:

Q. So I'm going make a suggestion.

MS SOLOWAY: Yes. Thank you.

Page 9

BY MS. SOLOWAY:

Q. I'm going to make a suggestion. Your two reports are in the binder under tabs 2 and tab 46. So my suggestion is that you may want to take out tab 2 and tab 46 and have it handy. And then, obviously, the other stuff, we'll get to it when we get to it, but...

A. Okay. I can hear you again now.

Q. Oh, I'm sorry. I didn't realize you couldn't. I -- I was making a suggestion. Could you put -- take tab 2 and tab 46, which are your two reports. I think it will be helpful if you take them out of the binder so that you have them handy all day.

A. Okay.

Q. Let me know when you're ready and we'll get -- we'll get going.

A. Just a second. I just have some paper clips, hold on. (Indiscernible).

Q. Sure.

A. Okay.

Q. Okay. Good. So, Mr. Steinholt, you submitted two reports in this matter; correct?

A. That is correct, yes.

Q. The first is your July 30th, 2021,

3 (Pages 6 - 9)

Page 10

report?

A. That is correct, yes.

Q. Okay. We're going mark that as Exhibit 1 for the record today.

(Exhibit 1 marked.)

BY MS. SOLOWAY:

Q. The second report is your October 29th, 2021, report; correct?

A. That is correct.

Q. Okay. Let's mark that as Exhibit 2 for the record today.

(Exhibit 2 marked.)

BY MS. SOLOWAY:

Q. If I refer to your July 30th report, Exhibit 1, as your "opening report," will you understand what I mean?

A. Yes.

Q. And if I refer to the October 29th report marked as Exhibit 2 as your "reply report," will you understand what I mean?

A. Yes.

Q. Okay. Good.

MR. CAPECI: I just want to -- I'm sorry. I just -- I just want to say for the record that Exhibit 1 is his -- is his report,

Page 11

but the exhibits to that report aren't attached to the document. I just want to make that clear for the record.

MS. SOLOWAY: That's correct. I'm going to mark those as Exhibit 3 shortly.

MR. CAPECI: Okay. That's fine.

MS. SOLOWAY: Thank you.

BY MS. SOLOWAY:

Q. Okay. The -- let me just back up. Mr. Steinholt, you've also reviewed the report that was submitted by Professor Stulz from September 17th, 2021?

A. Yes, I have.

Q. Okay. Today I'm going to refer to that as the "Stulz report"; okay?

A. Okay.

Q. Okay. Your reply report contains all of the opinions that you're offering in response to Professor Stulz's report in this case; correct?

A. That is correct, yes.

Q. Did you review both of your reports in reparation for this deposition?

A. Yes, I read through them.

Q. Okay. And do those reports contain

Page 12

all of the opinions that you're offering -- offering in this lawsuit concerning class certification?

A. Yes.

Q. Is there anything in either of your two reports that you would like to correct?

A. No.

Q. Is there anything in either of your two reports that you would like to amend?

A. No.

Q. You stand by those two reports today?

A. Yes.

Q. How did you determine which documents were pertinent to review as part of your expert witness assignment here?

A. Are you talking about the opening report?

Q. Either. How did you determine what materials you wanted to review?

A. I have analyzed the issue of market efficiency at class certification numerous times. I think my open report has a list of the times where the judge has actually rendered the judgment then certified the class. So I used the same process in this case as in these

Page 13

other cases.

I obtained the data necessary to form the Cammer and Krogman analyses that I conduct in my opening report. And -- and I think that all of that information actually was sent over to you guys so you have a set of the information that I relied on.

(Reporter clarification.)

THE WITNESS: Cammer, C-A-M-M-E-R.

THE CERTIFIED STENOGRAPHER: Thank you.

THE WITNESS: And it's -- yeah. It's -- it's a legal opinion or a legal case. And the other one is Krogman, K-R-O-G-M-A-N, which is also something you probably will hear a little bit more of during this deposition.

THE CERTIFIED STENOGRAPHER: Thank you.

BY MS. SOLOWAY:

Q. Mr. Steinholt, did your production of materials that you provided in connection with your expert reports encompass all of the materials you relied upon?

A. Yes. For the opening report, yes.

Q. And what about for the reply report?

4 (Pages 10 - 13)

Page 14

A. I'm -- I'm trying to think if there was any additional materials, but I don't think we produced anything. I don't really -- I don't conduct any analysis. I respond to Dr. Stulz.

Q. Are you aware that you did, in fact, produce some additional materials with your reply report?

A. Maybe I did, maybe I didn't. I'm not sure.

Q. So sitting here today, you're not sure what was produced?

A. I didn't -- I'm not sure about whether or not anything additional was produced or not.

Q. Is it your typical practice to provide, as part of your expert reports, a list of documents that you considered or replied on in forming your opinions?

A. I typically summarize a list like I did in the opening report, I believe. And then, I produced the actual documents or data directly.

Q. So, in other words, you don't generally provide a list?

A. Sometimes I do. If it's -- if it is

Page 15

in the later stages in litigations, like an expert report for trial, for instance, then it becomes a little bit more important. But here, I mean, the -- the data I reviewed is fairly basic, and it's also produced to -- to you guys so you can see what I -- I looked at and relied on.

Q. But you agree with me, in this case, you did not make a list of all the materials you considered in forming your opinions; correct?

A. We'll, the list I -- I included on -- let's see.

Q. You may be looking for paragraph 8 of your opening report.

A. Yes. So that is a -- a list of the categories with respect to the actual data that is something that was sent to you guys directly.

Q. But there is no way for me to read paragraph 8 and for me to know exactly what you looked at; correct?

A. No. I mean, for -- for the detail, you would have to look at the data that was produced.

Page 16

Q. Uh-huh. You'll see in paragraph 8, you mention that you looked at "contemporaneous media reports regarding Vanda and its industry."

Do you see that?

A. Yes.

Q. Can you tell me, sitting here today, what was included in that?

A. There were earnings releases because I was looking at the earnings releases, and there were also some media from the two corrective disclosures on February 5th and February 11th.

Q. Anything else?

A. Not in terms of what I relied on, no.

Q. How did you -- did you conduct your own search, or did you rely on someone else to do that for you?

A. No. I did it myself.

Q. Before you submitted your expert report on July 30th, so your opening report, had you reviewed your complaint in the whistleblower litigation? And when I -- when I say "whistleblower litigation" today, I'm referring to the qui tam action that's captioned "Burger versus Vanda."

Page 17

Can we agree on that definition?

A. Yes, that's fine.

Q. Had you reviewed the complaint in that action before you submitted your opening report?

A. I had looked at it. I don't think there was anything -- I --  in terms of what I relied on was the -- the media on Bloomberg. But yes, I -- I did have that, and I had looked at it.

Q. I -- I -- yeah, I want to understand. You had it available to you before you filed your opening report; correct?

A. That's correct, yes.

Q. Had you read it?

A. I probably read the first few pages. I didn't read it in detail, no. It's not necessary for the purposes of conducting my market efficiency analysis to go into detail. The market, during this time period, was sufficient irrespective of every little detail that was in that particular report.

Q. Well, we'll get there. For present purposes, I'm just -- just asking: Had you read the whole thing before submitting your

5 (Pages 14 - 17)

Page 18

opening report? I take it the answer is no.

A. Not in detail, no --

Q. And had you read the --

A. The first few pages kind of summarized what it was about, yes, but not in detail. Of course, I did review what the media said about the report. I also had read the complaint in terms of what was in that complaint, the whistleblower complaint. But no, I didn't review it in detail, no.

Q. Okay. And before you put in your reply report, did you read the entirety of the complaint in the whistleblower action?

A. No. It wasn't -- I probably looked at it a little more closely. But no, I -- it's not something that I studied in -- in great detail. I think that the allegations there are fairly straightforward in terms of the --

Q. I -- I -- I'm just asking if you just -- the simple -- really, we'll get there. I promise. We'll have lots of time today to get into the details.

Just a simple question: Had you read it? The answer is no; correct?

A. It wasn't no or yes. It was that

Page 19

parts of it, I looked at. But I hadn't read it in detail.

Q. Okay. I want to --

A. So sometimes the yes or no answers (indiscernible) --

MR. CAPECI: Just going -- going forward, please let the witness finish his answers.

MS. SOLOWAY: Uh-huh.

BY MS. SOLOWAY:

Q. The Cafepharma website that you cite in your reply report, when I -- when I mention a "Cafepharma," do you understand what I'm talking about from your reply -- from your report?

A. Yes.

Q. Before you submitted your opening report in this case, had you reviewed the posts concerning Vanda on the Cafepharma website?

A. No. I knew there was a reference to it, but no, I had not reviewed the -- the post until I saw Dr. Stulz's report.

Q. And since you've seen Dr. Stulz's report, you've read the relevant -- or you've read the references on Cafepharma that he

Page 20

relied on in his report?

A. Yes.

Q. And in -- in connection with your reply report, there were also references to the Glassdoor website; isn't that right?

A. Yes. I think there was a post on Glassdoor too, yes.

Q. And in connection -- again, this is just -- I'm just asking abut your opening report.

Before you submitted your opening report in this matter, had you read the Glassdoor posts concerning Vanda?

A. No. I was not testing for whether or not that information came reflected in the stock price or not.

Q. Okay. Have you conducted just sort of internet searches to try to figure out, again, before you put in your opening report, what the, you know, sort of full array of publicly available information was about Vanda before you put in your opening report?

A. I reviewed the analyst reports, so I relied on the analyst report to kind of inform me with respect to the important information

Page 21

that was on there. But, again, I was -- the reason I did so was to analyze market efficiency in the reliance context. And, of course, I focussed on the earnings releases because that is specifically what Cammer Factor 5 asked -- asks you to do.

Q. Okay. So you mentioned analyst reports, but I'm asking, just more generally: Did you do sort of widespread searches on the internet to see what the full array of information on Vanda during the class period was?

A. No. I mean, I have -- I mean, I have literally a Bloomberg in front of me that has basically all of the important information that they -- or all of the information that they think are important. But -- so I have that.

But, again, I was focussing on the -- the Cammer analysis, which was Cammer Factor 5. So I was focusing in on the earnings releases. And in addition to that, I was looking at the analyst reports and what was important to the analysts.

Q. So you had Bloomberg available, but my question is -- is not the same.

6 (Pages 18 - 21)

Page 22

My question is: Did you conduct searches on the internet before you submitted your opening report in this matter to assess what the full array of public information was about Vanda during the class period? I take it that's a no; correct?

A. What I did is what I did. Does that include everything that ever was said about Vanda on the internet? Of course not.

Q. Okay. Who engaged you in this case?

A. Robbins Geller.

Q. When were you retained?

A. Shortly before the -- probably two months or so before the expert report, maybe longer. A -- a few months prior to the first -- the opening expert report.

Q. And your hourly rate is $525 an hour?

A. That's correct, yes.

Q. Is Robbins Geller paying that fee?

A. Yes.

Q. Other than your hourly fee, are you being compensated in any way in this matter?

A. No.

MS. SOLOWAY: Does anyone hear that echo?

Page 23

THE CERTIFIED STENOGRAPHER: Yes. Can we go off the record?

THE VIDEOGRAPHER: Going off the record at 8:54 a.m.

(Discussion held off the record.)

THE VIDEOGRAPHER: Back on record at 8:55 a.m.

BY MS. SOLOWAY:

Q. Do you know how much in total compensation you've received so far in this matter?

A. I don't know specifically, but it probably would be maybe 40,000.

Q. Do you have any outstanding invoices?

A. Well, I -- I have unbilled time, which is including this deposition here, you know. But no, I have no outstanding invoices.

Q. So you're still -- there is still more fees to be -- to be paid; correct --

A. Well --

Q. -- that are out sounding?

A. Yes. And, you know, as we go through this process.

Q. Yeah. Are you offering any legal opinions here today?

Page 24

A. No.

Q. You cite a number of -- of court decisions in your reports. Why do you that if you're not offering a legal opinion?

A. It is to provide context to my analysis. It's very important for experts to understand how their analysis will be used. And it is important for me to provide an opinion that is consistent with what courts -- courts ask for. And I make a note of that, for instance, with respect to just relying on some academic definition of an efficient market because that is not really what courts are looking for. They are looking more for reliance, and I want to be transparent in terms of what I'm -- the opinions I'm providing.

So in -- in the sense that I'm -- if I'm wrong in terms of the opinions that I'm providing, the court -- it's transparent to the court what I'm doing. It's not a black box where some experts say, "well, you know, it was not efficient" or "it was inefficient," which, you know, can mean many, many different things depending on how you define an efficient market.

Page 25

Q. So just -- just to summarize what you just said. In your view, for context, it's appropriate for an expert to provide their understanding of the relevant principles; correct?

MR. CAPECI: Objection.

THE WITNESS: Correct. So that it is fully understood that I'm doing an analysis of the Cammer factor and -- and the Krogman factors for the purposes of determining whether or not it was reasonable for most investors to rely on the stock price.

And, of course, the courts use this to determine reliance with respect to statements made by defendants, in this case Vanda and the corporate executives at the firm.

BY MS. SOLOWAY:

Q. Did you prepare your reports alone, Mr. Steinholt?

A. Well, yes. But, I mean, I -- I did send drafts to -- to counsel to make sure that, you know, I -- I -- the scope of the assignment was consistent with what I was opining on.

Q. Does anyone else work with you, apart from counsel, on your reports?

7 (Pages 22 - 25)

Page 26

A. No. In this particular case, I wrote the entire report myself.

Q. In preparation for this deposition, did you meet with counsel at Robbins Geller?

A. Yes. I assume you mean "meet," yes, we had a -- a telephone conversation.

Q. Meet as we do these days; right?

A. Yes. We spoke on the phone yesterday.

Q. For how long?

A. I think it was probably close to two hours. Maybe an hour and a half.

Q. So in preparation for this deposition, you had one telephone call with Robbins Geller lasting two hours; am I correctly getting that?

A. Two hours, at most. I don't think it was a full two hours, but...

Q. Okay. And was anyone else present other than the lawyers of Robbins Geller?

A. No.

Q. Did you review, at that meeting, any document that you had not previously looked at?

A. No.

MR. CAPECI: I'm just going to object and instruct the witness to answer these questions to the extent he can without

Page 27

revealing the contents of any attorney-client privilege.

MS. SOLOWAY: It's a -- well, I -- I intend it to be a yes or no question, so I think we should be okay.

BY MR. SOLOWAY:

Q. Can you answer it with a yes or a no, Mr. Steinholt?

A. I did. I said no.

Q. Okay. Great. Have you discussed this case with anyone else other than the lawyers at Robbins Geller at any time?

A. I don't believe so.

Q. Friends?

A. No.

Q. Family?

A. They're not particularly interested in this kind of stuff, no.

Q. It's funny, my family is not interested in what I do for a living either, Mr. Steinholt.

What about analysts?

A. No.

Q. No? Former Vanda employees?

A. No.

Page 28

Q. No? Anyone from the Aurelius Value report?

A. No.

Q. So I think if you -- if you take look at tab 1 of your binder, it's the exhibits to your report. Let's mark that as Exhibit 3, please.

(Exhibit 3 marked.)

BY MS. SOLOWAY:

Q. Mr. Steinholt, can you just confirm that exhibit -- these are the exhibits to your report?

A. So Exhibit 3 is the first few exhibits in my report. I think there was -- there may be -- yeah. It's -- it's the exhibits to my report.

Q. The full set; correct?

A. The -- yes, the opening report.

Q. Okay. The exhibits to your opening report. Got it. And just -- just to make sure I understand, Exhibit A is your CV; correct?

A. That's correct, yes.

Q. Are there any inaccuracies in that CV of which you're aware?

A. No.

Page 29

Q. I just want to briefly -- I have the benefit of your CV, but I just want to briefly go through a couple of questions about your educational background and -- and career.

Your -- your undergraduate degree (transmission error); correct?

A. It's very difficult to hear you because there is some feedback. Could you please ask it again?

Q. Sure. Your undergraduate degree is in computer science; correct?

A. Yes. I do have a undergraduate degree in computer science.

Q. And then, was there any economic subject matter covered as part of your undergraduate degree?

A. Not economics. Statistics, of course, but not economics.

Q. Okay. And then, you have a graduate degree in engineering; correct?

A. Yes.

Q. And then, you have a masters of international business from 1989; correct?

A. Yes. That's a -- effectively an MBA with emphasis on international business.

8 (Pages 26 - 29)

Page 30

Q. Understood. And as part of that degree, did you study economics?

A. Oh, yes, economics is part of the course work of any M -- MBA program.

Q. And when you get an -- at least, I know from my -- my sister who has an -- who has an advanced degree in business, people sometimes concentrate within their course work. Yours was on international business; is that right?

A. No. Actually, it was finance. All of my electives were in finance.

Q. Okay.

A. But the program was international, which effectively meant you had additional requirements, you had -- you had to take additional courses, internships, disciplinary courses. Your marketing classes would be international marketing. Your finance classes would include international finance, and so on. We also had a language require -- requirement that was easy for me.

And -- but the -- the courses were taught together with MBA students. But my -- my emphasis was finance, and that's also why I

Page 31

worked as a research assistant for the finance professor who was teaching investment analysis at the University of San Diego.

Q. Do you consider yourself a financial economist?

A. I have considered myself a securities analyst.

Q. But not a financial economist?

A. Listen, different people have a different definition of these terms. I certainly have worked in the area of financial economics for -- for decades. But my experience has been mostly with, you know, the single firm event studies. And I have not the same experience in multi-firm event studies, which is kind of driving a lot of the work that financial economists do.

Q. Would you hold yourself out to the court and say to the judge "I am an expert in financial economics"?

A. In financial economics? I'm saying I'm a -- I'm a securities analyst. And there are areas in financial economics that I've been use -- using for work, that I've been trained in, and I have been using for 30 years.

Page 32

There are other area in this economics that, you know, I do not consider myself an expert on. The areas that I testify on are areas that -- where I consider myself to be an expert.

Q. You -- you do not have a Ph.D.; correct?

A. That's correct, yes.

Q. I do not either. In my family, that's considered a great disappointment, Mr. Steinholt.

A. That's too bad.

Q. It is. You do not hold any academic appoints; correct?

A. That's correct. I'm not an academic.

Q. Do you hold any editorial positions on any journals?

A. No. That's not my area.

Q. Have you published any work in academic journals?

A. No.

Q. Have you published any books?

A. No. I'm not in the publish or perish world.

(Reporter clarification.)

Page 33

MS. SOLOWAY: Publish or perish, he said.

BY MS. SOLOWAY:

Q. Are there any other academic credentials relevant to your current work that we have not already covered?

A. Well, I'm a chartered financial analyst and the course work there relates directly to securities analysis and the type of work that I did in this case.

Q. Are you familiar with professor Stulz's credentials?

A. Yes.

Q. How would you characterize them?

A. He's a financial economist.

Q. Would you agree with me that his credentials are impressive?

A. I --

MR. CAPECI: Objection. Relevance.

THE WITNESS: I hadn't even thought about what makes credentials impressive. I think, you know, he has a Ph.D. He has published a lot of things in a lot of different areas. I think perhaps the area involved in securities litigation is not exactly an area

9 (Pages 30 - 33)

Page 34

where he has published a lot. But, you know -- but I'm not going to characterize his -- his credentials one way or another.

BY MS. SOLOWAY:

Q. When you say he hasn't published a lot in securities litigation, what do you mean?

A. It means that he is a financial economist. An economist that has covered a lot of different areas. And when you read his report, particularly his view of market efficiency in a reliance context for instance, he seemed to be in an academic world as opposed to in the real world. And that is one of the criticisms I have of his work, which is not uncommon.

And this is one of the things that -- one of the reasons why I regularly go up against academics and -- by strictly focusing in on what the courts are seeking, which is an analysis of the Cammer and Krogman Factors, courts typically -- at least in all of the cases I've been involved with, you know, they cited me and not the academic on the other side who has more of a theoretical academic view in terms of analyzing market efficiency.

Page 35

Q. So you feel that you have more experience analyzing market efficiency from a securities litigation perspective?

A. This is --

MR. CAPECI: Objection. Misstates the prior testimony.

THE WITNESS: This is, you know, more of my area of expertise than it appears to be his area of expertise. Although, you know, again, it's not really my job to characterize his -- his expertise. I think that his work and his reports speaks for itself.

BY MS. SOLOWAY:

Q. Have you ever been fired from a job?

A. No.

Q. Just to go through a couple of your job experiences, it looks like you may have spent some time, when you were at Princeton Venture Research, doing -- well, let me ask you: Did you do stock picking in that job?

A. Not stock picking. We were looking at private companies for -- that were seeking venture capital investments.

Q. Got it. So have you before --

A. So these would not be public

Page 36

companies. There were a couple of public companies. But traditionally, that is not the type of investments that we would do.

Q. So have you ever had a job where, as part of the process of deciding whether to invest in a public company, you would go out and do fundamental analysis to try to, you know, make a call about whether the stock was going to go up or down?

MR. CAPECI: Objection.

THE WITNESS: Well, I -- I haven't had the responsibility of doing, you know, what you call "stock picking." But, of course, I have 30 years experience in this particular field reviewing analyst reports, and yes, getting analyses that analysts have done, performing my own type of analysis. I've done that in securities litigation context too, where I have modelled stock prices, so.

But in terms of working for a mutual fund or -- and picking stocks, other than doing it for my own purposes, which I do, you know, I haven't worked for a -- for a mutual fund, and I have not been a securities analyst in that respect.

Page 37

BY MS. SOLOWAY:

Q. In your current job at Caliber Advisors, do you do work other than expert witness work?

A. I do primarily expert -- witness report. I do do securities analysis for the purposes of investing, but it's not for, like, a mutual fund. But it's predominantly -- my work is predominantly litigation-related.

Q. Over the past five years, roughly what percent of your income comes from working as an expert witness in litigation?

A. When you say "expert witness," maybe it will help you to kind of broaden it, like expert consulting and litigation --

Q. That's fine.

A. Yeah.

Q. Do want to use "litigation consulting"? Is that a better term?

A. Yeah, litigation consulting. Because, obviously, you know, a lot of my income comes from consulting in the litigation con- -- context. It doesn't necessarily mean that I'm an expert -- I'm a testifying expert in the case. So I -- I would say it could be perhaps

10 (Pages 34 - 37)

Page 38

as much as 80 percent.

Q. Does all of your consulting litigation work happen on the plaintiff's side?

A. No.

Q. What percentage of your work would you say comes from the plaintiff's side versus the defendant's side?

A. I would have the vast majority been on the plaintiff's side. And then, you have, you know, a job here and there that would be on the defense side.

Q. And in the context of securities class actions, have you ever been an expert or consulting -- a consultant on the defense side?

A. Yes.

Q. How many times?

A. A handful of times, at most.

Q. Any time within the past five years?

A. I have to think -- I think so, yes.

Q. How many times within the last five years?

A. I probably had one case in the past five years. Although, I'm -- I'm not entirely sure whether it would be three years ago or six years ago. You know, time flies.

Page 39

Q. Got it. Have you personally been a litigant in a litigation?

A. No.

THE TECHNICIAN: Ms. Soloway?

MS. SOLOWAY: Yes?

THE TECHNICIAN: I'm so sorry to interrupt. I -- I think I know what the audio issue is. I'm not sure if anyone else is hearing the echo. I think I just heard a little bit there. I think we could probably resolve this off the record, if that would be okay?

MS. SOLOWAY: Sure.

THE VIDEOGRAPHER: Okay. Going off record at 9:16 a.m.

(Discussion held off the record.)

THE VIDEOGRAPHER: Back on record 9:19 a.m.

BY MS. SOLOWAY:

Q. Just a couple of follow ups on that.

In those cases in which you submitted expert reports in litigation, where those all on the plaintiff's side?

A. I think there was one declaration for Wilson Sonsini ten years ago, but other than

Page 40

that, it has been all on the plaintiff's side.

Q. How many times have you been retained by Robbins Geller in the past five years, approximately?

A. I don't know a precise number, but typically, there may be -- one -- maybe a couple of -- one or two new cases a month, something like that. So we can -- so maybe 100 cases over the past five years. But it's not a number that I have precisely in my head.

Q. Thank you. That -- that's your best estimate. That's fine.

A. Yeah.

Q. I just want to turn quickly to Exhibit C of your -- this is now still Exhibit 3, the exhibits to your opening report.

A. Yes.

Q. Can you just quickly explain what Exhibit C is?

A. This is a list of reports reporting constitutions. In other words, people -- institutions that that are reporting their holding. So you have a firm that is consolidating that information and report at -- you know, reporting on the institutional

Page 41

ownership of the stock.

Q. So these are -- just -- so to summarize, these are institutional investors who, during the class period, invested in Vanda securities; right?

A. They are reported as owning shares of Vanda securities at the end of one of the quarters during the class period.

Q. Okay. And I think you -- you -- there is 423 institutions on this list; correct?

A. That is correct, yes.

Q. And I think you may have said in your report, but you'll correct me if I've got this wrong, but this likely undercounts how many institutional investors were invested in Vanda because the reporting may not have captured everyone; is that right?

A. Well, it's the minimum number; right? So it's the number we know about. So it could -- I mean, there's -- there is always the likelihood or some likelihood that some institutions -- institution owned it, but not at the end of a quarter. And consequently, they would not show up in this report.

Q. So intra quarter institutional

11 (Pages 38 - 41)

Page 42

investing would not show up in this report; right?

A. No. This is end of quarter reporting.

Q. Okay. Why, in your view -- or what, in your view, is the significance of the institutional trading in Vanda securities for the class certification motion?

A. It has to do with how information becomes reflected in the stock price. The information has to be disclosed, obviously. It has to be analyzed by sophisticated -- or investors that have sufficient sophistication to determine whether or not information is positive or negative. And it had to be traded on because, ultimately, what sets the price of any stock is the trading that occurs.

So the information will inform the trading and the trading will become reflected in the stock price. It's this competition that causes new material information to be reflected in the stock price.

Q. Tell me more about that competition between institutional investors.

A. There is always competition in -- in terms of analyzing information, getting

Page 43

information quickly, analyzing the information, and trading on it quickly. There is a cost associated with that. And that is part of what I was talking about in my rebuttal report and with respect to the Grossman-Stiglitz paradox, and that is that all of this costs money, having analyst costs money, accessing monetary information costs money. So to the extent -- so there has to be some economic incentive to do that, but that is also what makes the market efficient, this type of competition.

Q. So institutional investors are incentivized to go out and collect information in an effort to know that information before other investors; correct?

A. Well, different institutions have a different way of trying to gain an advantage, and it all depends on their strategy. Maybe they think that they are superior in terms of analyzing the information. Maybe they think they can be quicker, you know. So there is a lot of things that an institution can do.

And maybe an institution is more of a passive investor, in which case, you know, maybe it's -- it's the -- they're more focused

Page 44

in on the overall portfolio and how Vanda fits into the overall portfolio.

So they're not all trying to be, you know, the first one to -- to get information. There is a lot of institutions that have given up that fight because they are -- if you're not winning, you're losing and you're spending money without gaining the benefit of being first. Only the first one is first. And so, there is a lot of different strategies.

Q. There would have to be enough -- there would have to be enough institutional investors out there who try to acquire information first to make the market efficient; correct? Otherwise, the market wouldn't be efficient.

A. It doesn't have to be institutions.

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: You -- you don't have to have institutional investors, per se. But you have to have investors that actually, you know, analyze the -- the information that's being disclosed and trade on it and so that it comes reflected in the stock price.

(Reporter clarification.)

Page 45

MR. CAPECI: Yeah.

THE CERTIFIED STENOGRAPHER: Thank you.

BY MS. SOLOWAY:

Q. And at least some institutions on the list you provided would be doing that; correct?

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: The -- well, I mean, these are institutions, they typically hire people with my background who are financial analysts and -- or other individuals who have that kind of training. And the reason they do so is that these individuals can, then, analyze new information to determine whether or not it is material or value relevant, whether or not it has an impact on future cash flow of the company and what it means. It doesn't mean that everybody agrees with respect to what the implication of future cash flows is, but that's where the trading comes in.

So they -- based on their own conviction, they buy or sell and -- and, ultimately, price ends up being whatever it is, reflecting investors view -- collective view of

12 (Pages 42 - 45)

Page 46

the new information that has been disclosed to them.

BY MS. SOLOWAY:

Q. I want you to turn, if you can, to your opening report, which is Exhibit 1, paragraph 9. I just want to read the last sentence of paragraph 9. It says:

"Consequently, it is my opinion that it was reasonable for investors to rely on the integrity of market prices of Vanda's common stock during the Class Period as reflecting all publicly available information about the company."

Do you see that?

A. Yes, I do.

Q. So you used the phrase "all publicly available information about the company;" correct?

A. Yes.

Q. And then, I just want to take you to paragraph 15 of your report. Do you see that you're quoting the supreme court's decision in Amgen there? A-M-G-E-N.

A. Yes.

Q. And the quote from Amgen states that

Page 47

the fraud-on-the-market presumption rests on the premise that the "'market prices of shares' will 'reflect all publicly available information'."

Correct?

A. I'm sorry. Where did you say?

Q. Yeah. I'm looking at the first sentence of your quote of Amgen on paragraph 15.

MR. CAPECI: Objection.

THE WITNESS: You mean the second sentence of that quote? In the --

BY MS. SOLOWAY:

Q. I apologize. Yes. It is the second sentence. You see the quote "all publicly available information" from the Amgen cite in paragraph 15?

A. Yes.

Q. Is there anywhere -- just to -- this is your understanding of what the Supreme Court -- or how the Supreme Court has described the fraud-on-the-market theory; correct?

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. This -- this quote -- let me rephrase

Page 48

this.

This quote from Amgen, you provided it because you -- I think you told us earlier it informs your understanding of how the Supreme Court has explained the fraud-on-the-market presumption; correct?

MR. CAPECI: Objection.

THE WITNESS: No. I actually -- I think that the first part there is just the general concept of market efficiency. And then, the second paragraph there, it talks about kind of how the court looks (indiscernible) -- looks at it.

And I think that the way that we typically talk about market efficiency, it's actually reflected at the very end of the first quote. It is actually from one of the finance books that are taught in business school, and, you know, they -- we had it back in my day as well. And it talks about "in an efficient market, there is no way for most investors to achieve consistently superior rates of return." I think that is what -- what we typically mean when we talk about market efficiency from a practical point of view, that it reflects --

Page 49

for all practical purposes, it -- the stock price reflects all the publicly available information so that at least regular investors, setting aside the most sophisticated investors, there is no use for them to have to personally read newspapers and seek out -- or earnings calls and so on. Because by the time they get around to trading on -- on the information, it will already be reflected in the stock.

BY MS. SOLOWAY:

Q. You just used the phrase "all publicly" --

MR. CAPECI: I -- I'm so sorry to interject. We're -- we're actually -- there's a fire alarm going off, so the parade of interruptions continues.

All right. We've been going about an hour anyway. I mean, I -- I'm hoping there is not an actual fire in the building, but I think I'm obligated to exit.

MS. SOLOWAY: That's fine. Since there's -- since there's a question half-asked, I'll ask that you not discuss the testimony with the witness while you deal with your fire drill.

13 (Pages 46 - 49)

Page 50

MR. CAPECI: I will -- I will not be speaking with the witness during the fire drill.

MS. SOLOWAY: Thank you. All right. Go deal with your fire drill. Should we take a five minute break?

THE VIDEOGRAPHER: Yeah. Going off the record at 9:34 a.m.

(Recess.)

THE VIDEOGRAPHER: Back on record 9:47 a.m.

BY MS. SOLOWAY:

Q. So, Mr. Steinholt, I want to just redirect your attention to the quote in paragraph 15 of your report from the Amgen decision where the court uses the words "all publicly available information." It's the third line of the block quote.

Do you see that?

A. Yeah. Yeah. I mean, they are -- they are quoting -- it looks to me that they are quoting Brealey and Myers and Allen. And so, they are talking about market efficiency --

Q. I want to --

A. -- the -- the concept of market

Page 51

efficiency. And then, in the second paragraph, they are, then, linking it to the fraud-on-the-market theory.

Q. So I want to focus just on those four words being used by the Supreme Court in that third line -- or quoted by the Supreme Court in the third line.

A. Yes.

Q. "All publicly available information." What does "all publicly available information" include?

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: It means that the information that's disclosed to the market is reflected in the stock price. And that, as the last sentence from Brealey and Myers explains, in an efficient market, for most investors, it is not possible to achieve consistently superior rates of return because inform -- information that's disclosed to the market is quickly incorporated into the stock price.

BY MS. SOLOWAY:

Q. Tell me your understanding of what types of information is included in "all

Page 52

publicly available information."

A. Well, it's information that has been disclosed to the market, that the market is aware of.

Q. Well, what does it -- what does it mean -- let's go to basic principles here; right? The words "publicly available," what does it mean for a piece of information to be publicly available? Does it mean that it is accessible to the market?

A. Well, you can -- you can go to my rebuttal report. And Eugene Fama had some examples of that, and --

Q. We'll get -- we'll get there in a minute.

A. I -- I -- well, listen, either I can answer your questions, or you want to ask me it later, but Eugene Fama provided examples of what the type of information that he was talking about in terms of a semi-strong market.

Brealey and Myers, I had the quote in here. They talked about published information. But it has to be -- just from a practical point of view, it has to be information that the market is aware of, because if the market is

Page 53

not aware of it, it will not be reflected in the stock price. It's not a particularly, you know, difficult concept.

Q. I'm trying to get at the issue of what does it mean for information to be publicly available. That -- that simple concept. So if I know something about Vanda, and I put it on a piece of paper, and I put it in a shoe box, and I put it in my closet, we could agree that's not publicly available; correct?

MR. CAPECI: Objection.

THE WITNESS: I mean, you're -- that particular piece of paper is certainly not something that the market would be aware of.

BY MS. SOLOWAY:

Q. So how do you draw the line --

A. Unless --

Q. -- of what the market is aware of?

A. Well, if you want to know what the market is aware of, my standard procedure is to go to Bloomberg and -- and also the analyst reports. By reading analyst reports and going on Bloomberg, you're going to find pretty much -- find pretty good -- you kind of have a pretty good understanding of what the market is

14 (Pages 50 - 53)

Page 54

aware of.

Now, there has been situations where -- I've had cases where you have had big price movements, and it's not yet discussed on Bloomberg. But, then, you can kind of dig further and -- and find out that the market became aware of it, you know, not from Bloomberg or from an analyst report, but from another source. So that can happen, but the market has to be aware of it. And the market is aware of what's in analyst reports and they are aware of what's published on Bloomberg and those type of sources.

Q. So, in your mind, publicly available is synonymous with "what the market is aware of"?

A. I mean, if a market -- for the information to be reflected in stock price, the market has to be aware of it, yes.

Q. Okay.

A. And that is typically what we talk about when we talk about publicly available information.

Q. Okay. I want to just focus on the word "available." And, again, I'm looking at

Page 55

the word "available" in the third line of that block quote. Okay? And this is really just going back to basic principles of the English language. "Available," in your mind, means accessible; is that right?

A. Available, as defined by the example used by Eugene Fama, would be -- I think you mentioned earnings releases. That's also what the Cammer factors talk about. And Brealey Myers talked about published information. And, again, what I typically look at is what's on Bloomberg and what's on -- what's written about in analyst reports.

Q. Can you cite an academic source that says that Bloomberg and analyst reports are the right defining line for what's publicly available?

A. In terms of earnings releases, that will be on Bloomberg. And that is specifically what the academic paper that I cited by Eugene Fama references stock splits would also be an Bloomberg and that's exactly the example given by Eugene Fama, you know.

So I think that the academic paper by Eugene Fama is consistent with looking at this

Page 56

type of information that is available on Bloomberg because it's -- I think his term was obviously publicly available information. And I think that if it's on Bloomberg, given that there are thousands of these terminals on desks of securities analysts, that would obviously mean that it's publicly available because this is the type of information that investors that are focusing in on Vanda would be aware of.

Q. Okay. So if it's on Bloomberg, it's publicly available; right?

A. If it's on Bloomberg, it's publicly available, yes.

Q. And if it's not on Bloomberg, it might be publicly available?

A. Yes. I mean, Bloomberg is not necessarily the first one to publish every story. But, typically, Bloomberg will -- just because of the fact that when the stock starts moving, then they'll typically provide some sort of a commentary if there is a big move in the stock price.

Q. Okay. So I want to get back to what the word "available" means. Can we agree that the word available means accessible or

Page 57

obtainable?

MR. CAPECI: Objection.

THE WITNESS: I -- accessible. No. I mean, there is a lot of information that's accessible that may not be -- the market might not be aware of because they don't know where to find it.

BY MS. SOLOWAY:

Q. I'm just talking about the word "available," English language principles.

A. Yeah. Listen --

Q. Are -- okay. Let's -- let's take out the dictionary then. Let's just go directly to the term.

MS. SOLOWAY: Emily, would you mind putting up the Merriam Webster Collegiate Dictionary definition of "available"?

MS. MILLER: That's been introduced.

MS. SOLOWAY: Thank you.

(Exhibit 4 marked.)

BY MS. SOLOWAY:

Q. I think it should come up on your screen. Mr. Steinholt, this one is not in your binder. I'll give you a minute to find it.

A. Oh, it's -- I'm supposed to find it in

15 (Pages 54 - 57)

Page 58

this binder somewhere?

Q. No. No. It's --

MS. SOLOWAY: Emily -- it's -- it's now marked as Exhibit 4; correct?

BY MS. SOLOWAY:

Q. So you need to look at Exhibit 4 on the -- the plat- -- the electronic platform.

THE TECHNICIAN: And, Mr. Steinholt, you just need to refresh the marked exhibit folder, and it should show up there at the bottom.

THE WITNESS: Okay. I have Exhibit 4.

BY MS. SOLOWAY:

Q. Yeah. Turn to the third page of the exhibit. You can see it's the Merriam Webster's Collegiate Dictionary, Tenth Edition. And if you go to the third page of the PDF, at the top of the right column, you'll see the second word is "available."

Do you see that?

A. Available. Yeah.

Q. Okay. Take a minute to read that to yourself. If you need to -- if you need to expand it, I'm sure there is a way to make the screen bigger.

Page 59

A. Please. Okay. Available.

Is there a question pending or?

Q. Let me -- have you had a chance to read it?

A. Yeah. Available. I have.

Q. Okay. So I want to direct your attention the fourth definition in capital letters. It says, "accessible, obtainable."

Do you see that?

A. Yeah.

Q. Can we agree that that's what the word available means?

A. We can agree that that is one definition, yes.

Q. Okay. So if you look at what the Supreme Court says in the 15th paragraph of your report, when it refers to all publicly available information, can we agree that that refers to all publicly obtainable or accessible information?

MR. CAPECI: Objection.

THE WITNESS: No. I would not agree to that, no.

BY MS. SOLOWAY:

Q. Okay. And the reason you would not

Page 60

agree to that is because of the article from 1970 by Dr. Fama?

A. No.

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. What -- you have another reason for not agreeing?

A. Yeah. Of course.

Q. What's your reason?

A. I mean, there's a lot of information that's accessible about a company. That is why sophisticated investors are trying to obtain that information. That's why they do research. Sometimes, that can take a long time. Sometimes, it takes a short time.

In terms of the way that we use it in terms of defining market efficiency, we are talking about information that's disclosed to the market. In other words, information that the market is aware of.

So in terms of what is accessible, I can call up a Vanda employee and ask that individual questions, just like Aurelius did. So that information was accessible to them, but that is private information in the context of a

Page 61

market -- an efficient market. So it's --

Q. Your --

A. I mean, it's -- it's -- I think the US Supreme Court has a much more practical view of it. That's my understanding. That's why it looks at earnings -- that's why the Cammer factors look at earnings releases and, you know, corporate events and -- and that is what Cammer factors 5 calls for. That's what Eugene Fam- -- Eugene Fama talks about. The Brealey and Myers talks about a semi-strong efficient market as being published information. That's why I look at Bloomberg because that's where published information.

And so, in terms of what's accessible, you get answers -- you conflate a lot of different issues here and -- which leads you astray, because there may be a lot of -- there may be information that's accessible, but that doesn't mean -- mean that the market is aware of it and that it is therefore reflected in the stock price.

Q. I don't -- I understand you are -- you now focused on the word "publicly"; right? What does it mean to be publicly available as

16 (Pages 58 - 61)

Page 62

opposed to privately available? I'm just asking --

A. No. I'm -- I'm focusing in on common sense.

Q. Uh-huh.

A. You know, in order for -- in order for the market to reflect information, it has to be aware of it. Not everything that is accessible to everyone in the market is necessarily something that the market is aware of.

Aurelius didn't know about the whistleblower complaint until they, you know, obtained it. You know, prior to that point in time, you know, they -- you know, and -- and that's the same thing with any other -- other investor.

Q. Can you show me where -- yeah. Where in your opening report do you explain the distinction that you're now making between everything that the market has available to it versus everything that the market is aware of? Is there a paragraph of your report where you make that distinction in your opening report?

A. Oh, I'm very clear in my report what I'm doing. I'm -- I'm analyzing the Cammer

Page 63

factors. And the Cammer factors are talking about specific information, such as earnings releases. Earnings releases is information that investors would be aware of. Why? Because they are on Bloomberg, that I -- the company provides it on their own website. And that is what I'm analyzing.

I'm also very, very specific in terms of why I'm analyzing that information. It is -- whether or not it is reasonable for most investors to rely on the market reflecting all available information. It doesn't necessarily mean that it does reflect all available information. It means that because there will always be somebody who is able to take advantage of market efficiencies.

But for -- from a practical point of view, which is what the Supreme Court addressed, it is reasonable for investors to rely on the stock price. I think I couldn't have been more clear. And to bring up some -- one definition -- definition number 4 of Merriam-Webster to suggest that the market should have reflected information even if it was not aware of it, to me, seems to lack

Page 64

common sense.

Market efficiency is not magic. I explain the process by which information became -- becomes reflected in the stock price and that's -- has to happen. The market has to be aware of the information for the information to be reflected in the stock price.

Q. I'm going to ask this question one more time. Is there any paragraph of your opening report -- and I just -- I want the record to reflect that I did not get an answer to this question.

I want you to show me the paragraph of your report, your opening report, that draws a distinction between information that is available to the market versus information of which the market is aware?

MR. CAPECI: Objection. Asked and answered.

BY MS. SOLOWAY:

Q. Show me a paragraph.

A. I have a whole section explaining what market efficiency in a reliance context is. If you have a problem understanding, based on that section, that the market has to be aware of the

Page 65

information in order for it to be reflected, you know, that may be true. Maybe I should have written a book on it. But that is what that explains.

That is why I had a whole section explaining it. That's why I went through and explained the process. And the common sense means that if -- if the market is not aware of information, it cannot be reflected in the stock price.

MS. SOLOWAY: I'll just note, for the record, that I didn't get a paragraph identified for me.

THE WITNESS: I -- I give you a section with multiple paragraphs.

BY MS. SOLOWAY:

Q. No. No. I understand. There's a section about it.

MR. CAPECI: This is -- I think this is -- I think we're veer -- veering into it being argumentative, and I don't see a question pending.

MS. SOLOWAY: No. No. I didn't ask a question. I'm about to.

///

17 (Pages 62 - 65)

Page 66

BY MS. SOLOWAY:

Q. Mr. Steinholt, in your reply report, you use the words "obviously publicly available"; is that right?

A. No. Actually, that is taken from the definition used by Stulz. It is actually the definition used by Eugene Fama in the paper that he cites as the definition of a strong -- semi-strong.

Q. Show me where in your opening report, if any where, you use the words "obviously publicly available"?

A. Well, I didn't, because I didn't respond to Dr. Stulz's confusion with respect to what publicly available information is.

Q. So in your opening report, you did not distinguish between all available public information and quote "obviously available public information"; correct?

A. I explained what I meant in an entire section talking about market efficiency in a reliance context. That's what I did, and I did --

Q. But you did not --

A. I -- I -- I didn't have a crystal ball

Page 67

in terms of how Stulz would -- would define an efficient market, but that is not the way that -- and I didn't know that he would cite to Eugene Fama. Because from my point of view, the academic definition of an efficient market is not what's relevant here. It is what's required in terms of Cammer and Krogman in establishing whether or not a market is efficiently efficient for investors to rely on it. So that's why I did Cammer and Krogman analysis.

So there was no need for me to get into the academic definition of an efficient market because I didn't know that, you know, you would hire an expert who, then, would go and use that definition.

Q. Uh-huh. You gave your own understanding of what an efficient market is in your opening report, however; right?

A. Well, I -- yes. I explained what an efficient market was and that it had different meanings in different contexts.

Q. And in that presentation, nowhere in your opening report did you talk about "obviously publicly available information";

Page 68

correct?

A. Of --

MR. CAPECI: Objection. Asked and answered.

THE WITNESS: Of course not, because that is the definition that was used by Dr. Stulz.

BY MS. SOLOWAY:

Q. And then, when you submitted your rely report, that's the first time the words "obviously publicly available information" come up in your discussion of market efficiency; correct?

MR. CAPECI: Objection.

THE WITNESS: Yes. Because that is what Dr. Stulz points to. He points to Eugene Fama's definition of a semi-strong efficient market. So I went back. I quoted Fama. To me, it's -- it's irrelevant in the sense that what I'm doing is analyzing market efficiency in the reliance context in the fraud on the -- on the market context as prescribed by the court, using the Cammer and Krogman Factors.

I'm not into -- you know, this -- this whole academic, you know, argument over what an

Page 69

efficient market is is irrelevant, and the Supreme Court specifically states that that is not what we're looking at.

BY MS. SOLOWAY:

Q. I want to turn to your reply report which is Exhibit 2, paragraph 4.

Who is Dr. Fama, by the way?

A. He is a noble laureate. He -- he's the individual who coined the term an "efficient market."

Q. Fair to say that you've cited him multiple times in your experience as a testifying expert?

A. Yeah. I -- I cite him for different reason in the opening statement. I cite him and his work relating to -- demonstrating that money managers generally cannot beat market.

Q. Yeah. How many times do you think you've cited professor Fama over the course of all the work you've done as an expert witness? More than 20 times?

A. I -- well, that particular article came out in, I think, 2010. I had -- you can double check my opening report. So -- but that is the cite that I -- that I use for that

18 (Pages 66 - 69)

Page 70

particular purpose.

Q. I -- I'm not following you. Are we talking about the 1970 article right now?

A. No. I don't know how many times I've cited that particular article, but I certainly cited it before when experts have unsuccessfully tried to convince courts that it is the academic definition that applies.

Q. Fair to say that when you put it in your opening report, you were aware of the existence of a 1970 article by Dr. Fama?

A. Yes.

Q. Take a look at -- actually, you know what, before we -- before we look at the report, I -- I just want to be clear: When I'm using the words "obviously publicly available," I'm using them the way you used them in your reply report. Okay?

MR. CAPECI: Objection.

THE WITNESS: Yeah. You mean the way that Eugene Fama used it.

BY MS. SOLOWAY:

Q. Your quote from Dr. Fama.

A. Okay.

Q. Okay. How do you define "obviously

Page 71

public information"?

A. Well, the way Eugene Fama defined it was by providing examples. And he provided examples of stock splits and earnings announcements.

Q. Beyond those examples, what does it include?

A. Well, typically, you have an interpretation done that is in Brealey and Myers, and that would be published information.

Q. What's -- what's included in published information?

A. Well, typically, what you would include is things that are available to -- available on Bloomberg, for instance, analyst reports, and so on.

Q. What about information that's available on the internet? Is that published?

A. Well --

MR. CAPECI: Objection.

THE WITNESS: It -- that would make all published authors, wouldn't it? Because anyone who writes a tee -- a tweet -- that would include -- that -- it becomes more and more gray area when you get into everything

Page 72

that's written on -- on the internet.

BY MS. SOLOWAY:

Q. So how do you determine --

A. I -- I -- I think that the problem with the internet is that it's unverified and it is not -- and it's anonymous. I think that that is where it -- it loses its -- it's attraction. But I don't think that you automatically assume that every tweet or every -- every -- every anonymous tweet and every anonymous thing written on the internet would be known by the market.

Q. So how do you -- as a -- as an economist who has to study stock price movements, how do you determine whether information available on the internet is published or not published?

A. Well, in my case, I don't have to because I'm -- I'm conducting the Cammer factors. And the Cammer is very specific. We're talking about earnings releases. So that is sufficient in terms of analyzing market efficiency in the context of -- fraud-on-the-market theory. And that's what I did.

Page 73

These other issues that you seem to be very interested in are -- can be interesting topics to -- to analyze. And if it -- you know, you could have hired an expert to do so, if you thought it was informative. But for my purposes, I was analyzing the Cammer and Krogman Factors. And it's very specific, so I analyzed to the -- the earnings releases.

Q. Mr. Steinholt, you review public information all the time in order to conclude whether stock prices have moved in reaction to that information; correct?

A. That's correct, yes.

Q. Your position that you're taking is that information can only move stock prices if it is published; correct?

A. No. The -- the market has to know about it.

Q. And you said the market knows about it if it's published; correct?

A. The market, it is reasonable to assume that if it's in an analyst report or if it's on Bloomberg, the market will know about it, yes.

Q. I'm asking you to tell me how, as an -- as an expert, you can determine whether

19 (Pages 70 - 73)

Page 74

information is published or not published? How does an economist approach that?

A. It is not something that I had to deal with. It's a semantic -- you're getting in -- involved in all of these semantic definition. What I'm doing is I'm trying to find out whether or not the market is aware of the information. And if it is on Bloomberg or if it's in an analyst report, then the market is aware of it. You know, there may be other information that the market is also aware of, and then I will analyze that.

Q. So I'm asking you: How do you figure out what that other information is? Put aside Bloomberg, put aside the analyst report, how do you conclude what other information the market is also aware of?

MR. CAPECI: Objection. Asked and answered.

THE WITNESS: Well, you have -- you have to look at the information and there may be information that -- where you don't know whether the market is aware or not. But if it's information that did not cause -- that was not in an analyst report, that's not in -- on

Page 75

Bloomberg, did not cause the stock price reaction, then there is no -- then, there would be no reasonable basis to conclude that that was -- that the market was aware of that information.

BY MS. SOLOWAY:

Q. Well, surely you're not --

A. You don't have a basis for it.

Q. Surely, you're not --

A. It doesn't mean that -- it doesn't mean that analysts and so on may not read anything other than analyst reports, and so on. But the assumption that Dr. Stulz makes is that anything written anywhere or is accessible is something that the market is aware of and, consequently, should be reflected in the stock price. My point is that is simply not true.

Q. I'm going to get to the 1970 Dr. Fama article in a minute. But I would like to know if you can point me to any other academic literature that makes a distinction between what is publicly accessible and what the market is aware of or that's obviously publicly available. Can you point to any academic literature that makes a distinction?

Page 76

MR. CAPECI: Objection.

THE WITNESS: I -- I -- I think I pointed to a couple of -- couple of sources. I think that's sufficient.

BY MS. SOLOWAY:

Q. And those sources are Dr. Fama's 1970s article and the Brealey article? Am I remembering that right?

A. Brealey and Myers and Allen article, and it was the two sources that Dr. Stulz cited.

Q. I'm sorry. You're going to have to spell this out for me. Tell me exactly which sources you think make the distinction between what is accessible to the public and what the public is aware of.

MR. CAPECI: Objection. Asked and answered.

THE WITNESS: Listen, I can tell you the process that I go through in terms of determining whether or not, you know, information is obviously available to the market. And I -- I told you that process.

In terms of your specific question, you know, I -- I think that the -- the articles

Page 77

I -- I cite discusses that sufficiently. I --

BY MS. SOLOWAY:

Q. Exactly which articles? Tell me exactly which articles.

A. The ones that I quote.

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. List them right now.

A. Well, it's the Fama article from 1970.

MR. CAPECI: Objection.

THE WITNESS: And it is the Chapter 13 in the Brealey, Myers, and Allen textbook.

BY MS. SOLOWAY:

Q. Okay. Thank you.

A. Both (indiscernible) --

Q. Thank you. So those two sources. Thank you.

I want to turn to that 1970 article by Dr. Fama. That's actually tab 51 in your binder.

MS. SOLOWAY: Actually, Emily, am I getting that right? Did I give him the right tab number?

MS. MILLER: That -- that's right.

MS. SOLOWAY: Okay. Thanks.

20 (Pages 74 - 77)

Page 78

BY MS. SOLOWAY:

Q. Okay. So just to go through -- I'm sorry. And I should mention this is being marked as Exhibit 5. So Exhibit 5 is this Dr. Fama article from 1970; correct?

A. Yes.

(Exhibit 5 marked.)

BY MS. SOLOWAY:

Q. And this is what you cite in your reply report; correct?

A. This is where I found the definition that Stulz cited to in his deposition, yes.

Q. Are you saying that Dr. Stulz used the words "obviously publicly available"?

A. No. I think what Stulz stated in the quote that I cited was that he defined semi-strong market based on this paper. And so, I went to the paper to find out exactly what the definition was, and that is what the definition was.

Q. But you're not suggesting that Dr. Stulz, in his testimony or in his report, used the words "obviously publicly available"; correct?

A. No. What I'm -- I'm specifically

Page 79

saying is that when asked about it at his deposition, he answered that question by referring to this particular article and the definition of semi-strong efficiency in this particular article. All I did was go to the article and see what that definition was.

Q. Okay. Got it. Have you -- in -- in any of the places before you put in your reply report in this case, can you identify any other situation in which you've quoted the 1970 Dr. Fama article for the language obvious -- "obviously publicly available"?

MR. CAPECI: Objection.

THE WITNESS: I -- no. I don't think there has been any case where the opposing expert has suggested that information that may not have been -- that the market may not have been aware of would magically be reflected in the stock price.

BY MS. SOLOWAY:

Q. But you've talked about -- you've talked about the semi-strong definition of the efficient market before; correct?

A. Yes.

Q. And have you ever used the words

Page 80

"obviously publicly available" when you've talked about the semi-strong efficient market theory before?

MR. CAPECI: Objection. Asked and answered.

THE WITNESS: No. Typically, I would not have used that. This is what Stulz used.

BY MS. SOLOWAY:

Q. Well, we just agreed that professor Stulz never used those words; right?

MR. CAPECI: Objection.

THE WITNESS: Well, he did. He cited -- this is what he cited to.

BY MS. SOLOWAY:

Q. You said that he --

A. -- he cited to this specific article and -- and the definition of semi-strong efficiency. I opened up the article. I searched on semi-strong and this is what came up.

Q. Again, I -- I understand what the article says. I'm asking you whether in any private discussion that you've ever -- let me -- withdrawn.

I'm asking you whether, sitting here

Page 81

today, you can point me to any expert report or testimony that you have ever given in the past where you have addressed the semi-strong form of the market -- of the market efficiency theory where you have used the words "obviously publicly available"?

MR. CAPECI: Objection. Asked and answered.

THE WITNESS: No. It has never been necessary because I've never encountered an expert who has opined that -- that information that may not have been available to the market should magically be reflected in the stock price.

BY MS. SOLOWAY:

Q. Well, now, it's information that's not available to the market. Before, it was that the market wasn't aware of it. But now, you're saying the information wasn't available to the market?

A. That's what I mean.

MR. CAPECI: Objection.

THE WITNESS: They may not have been aware of it.

MR. CAPECI: Objection.

21 (Pages 78 - 81)

Page 82

Argumentative. Proceed.

(Reporter clarification.)

THE WITNESS: Is there a question? I'm sorry.

MS. SOLOWAY: I'll -- I'll rephrase the question.

BY MS. SOLOWAY:

Q. You just said that Dr. Stulz's testimony in this case is that the market -- is that the information wasn't available to the market. Did you misspeak, or do you mean to say that the -- that the information that's the focus of the expert reports here, namely the whistleblower complaint and the Cafepharma Glassdoor websites were not available to the market?

A. The term --

MR. CAPECI: Objection. Misstates prior testimony.

THE WITNESS: You know, we're getting into the whole semantic issue again, what the term available means. I can just explain to you how an efficient market works.

BY MS. SOLOWAY:

Q. No. That's okay. You've -- you've

Page 83

done that. Let's keep going.

A. Okay.

Q. Let's turn to the Dr. Fama paper. Take a look at paragraph 12 of your reply report. I just want to show you in the footnote, when you cite Dr. Fama's article, you're citing page 388 and page 415; correct?

A. Let me see here.

Q. This is page -- excuse me -- paragraph 15 of your reply, you cite page 388 and 415; is that right?

A. Paragraph 15 of my report. And I cite -- I cite, what is it, 388. Did you want me to go to page 388?

Q. I -- just first confirm. Dr. Steinholt, just try to -- let's just try to answer the questions as they're asked. Okay? I -- I just want you to confirm that the two pages you've cited in your reply report are page 388 and page 415; is that right?

MR. CAPECI: Objection. Objection. Objection. Misstates the report.

THE WITNESS: Yes. That's what it says here, yes.

///

Page 84

BY MS. SOLOWAY:

Q. Excuse me. Page 415 and page 388; correct?

A. That's what it says on my report, yes.

Q. Okay. Thank you.

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. So let's start with page 388 of Dr. Fama's 1970 article.

Are you there?

A. Yes.

Q. Are you citing the first paragraph under the heading "The Evidence"?

A. Yes. Again, I did a search on semi-strong -- on semi-strong in that particular paragraph. And it says that the "semi-strong form tests in which the concern is the speed of price adjustment to other obviously publicly available information (e.g., announcements of stock splits, annual reports, new security issues)."

Q. Okay. So I want to work our way through this paragraph. In this -- would you agree with me that in this paragraph, Dr. Fama is talking about the empirical research that

Page 85

has been done on the theory of efficient markets?

MR. CAPECI: Objection. Calls for speculation. And -- and -- and I just want to --

MS. SOLOWAY: Well, I'm just asking about his understanding of the paragraph. Just his understanding.

THE WITNESS: In terms of the --

MR. CAPECI: Well, hold on. This is -- this is a 35 page document. I just -- you know, the witness should feel comfortable to review the full document if we're going to be asking about specific understandings and portions of it.

MS. SOLOWAY: I assume, since he has cited it dozens of times, he's familiar with the article.

BY MS SOLOWAY:

Q. Do you feel that you need to take the time to review the article, Mr. Steinholt?

A. My testimony was actually this is the first time I've had -- cited this language, so...

Q. Oh, oh, this is the first time you've

22 (Pages 82 - 85)

Page 86

cited the -- the language "obviously publicly available"; right? But you've cited this article before?

A. I've -- I've cited this article. And Fama explains that this is not an efficient market hypothesis and is not something that anyone believes is literally true. And then, I explained why that is, but that is a different -- that is a different issue than what was brought forth by Dr. Stulz. And, again, I think that the relevant sentence here is the sentence that I quoted.

Q. Okay. I -- I --

A. And that is what is semi-strong market is and that's what --

Q. We'll get there. I want to -- you'll agree with me that it's fair that when you look at one sentence in the article, it's okay to look at the context around that sentence, right, to understand what's going on? That's --

A. I think that that is --

Q. -- that's -- that's what we're going to do?

A. No...

Page 87

Q. That's what we're going to do. Let's look at the first sentence. Okay? The first sentence says --

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. -- "all the empirical research on the theory of efficient markets has been concerned with whether prices 'fully reflect' particular subsets of available information."

Do you see that?

A. Yes.

Q. Okay. Fair to say that he is talking about empirical research that has been done in the past on the theory of efficient markets in that sentence?

A. Yeah.

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: Yeah. It's from prior to 1970, yes.

BY MS. SOLOWAY:

Q. Okay. He, then, goes to say:
"Historically, the empirical work involved more or less as follows. The initial studies were concerned with what we

Page 88

call weak form tests in which the information subset of interest is just past price (or return) histories."

Do you see that?

A. Yes.

Q. So in that sentence, he's talking about studies that have been concerned with the weak form test; correct?

A. That's correct.

Q. Okay. And then he says, "most of the" -- reports -- "results here come from the random walk literature."

Do you see that?

A. Yes.

Q. Okay. So he's talking about what studies have been conducted and what the results are; correct?

A. Correct.

Q. Okay.

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. Next sentence:
"When extensive tests seem to support the efficiency hypothesis at this level, attention was turned to semi-strong form

Page 89

tests."

Do you see that?

A. Yes.

Q. Okay. That refers to studies that have been done of the semi-strong form of the efficient market theory; correct?

A. That's correct, yeah.

Q. And then goes on to say, "in which the concern is the speed of price adjustment to other" publicly -- excuse me -- "to other obviously publicly available information."

Do you see that?

A. Yes.

Q. So he's talking about tests that have been done on the semi-strong form of the efficient market theory in the past; correct?

MR. CAPECI: Objection.

THE WITNESS: That's correct.

BY MS. SOLOWAY:

Q. And then, he goes on to say "(e.g., announcements of stock splits, annual reports, new security issue, et cetera."

Correct?

A. Yes.

Q. Okay. So let's go through each of

23 (Pages 86 - 89)

Page 90

those. When he says announcements of stock splits, he's referring to studies that had been conducted in the past of the semi-strong form of the efficient market theory on that issue; right? Announcements of stock splits?

A. Yes. That is a -- an obviously publicly event, yes.

Q. Okay. So one form of testing that has been done is on announcements of stock splits; correct?

A. Yes.

Q. And that is Dr. -- as Dr. Fama an obviously publicly available piece of information; correct?

A. That's correct.

Q. Okay. Another form of testing that has been done is annual reports.

Do you see that?

A. Yes.

Q. Okay. Another form that has been done is on new security issues; correct?

A. Yes.

Q. Okay. Do you see where it says "et cetera"?

A. Yes.

Page 91

Q. Dr. Fama acknowledges that there are other pieces of information that have been tested for the semi-strong form of the efficient market theory; correct?

MR. CAPECI: Objection.

THE WITNESS: That's correct.

BY MS. SOLOWAY:

Q. Do you know what the "et cetera" means?

MR. CAPECI: Objection.

THE WITNESS: I don't know what he's referring to because it's not in the paper --

BY MS. SOLOWAY:

Q. Okay.

A. -- or on this line.

Q. But you agree that there are other forms of semi -- excuse me -- of obviously publicly available information that could have been subject to tests prior to this time; correct?

A. Absolutely, yes.

Q. And, sitting here today, you can't identify what those are; correct?

MR. CAPECI: Objection.

THE WITNESS: No. But I can tell you

Page 92

what I did. I looked at earnings releases.

BY MS. SOLOWAY:

Q. Okay. That's -- that's fine --

A. That's another example -- that's another example of an obviously publicly available information.

Q. Do you read this sentence, the one we just read together that starts with "when extensive tests seem to support," do you read that sentence to say that the semi-strong form of the efficient market hypothesis only concerns "obviously publicly available information"?

A. Well --

MR. CAPECI: Objection.

THE WITNESS: -- it's the only definition of semi-strong form that I found in this paper and that's what Stulz cited. If he wanted to cite something else, he should cite something else.

BY MS. SOLOWAY:

Q. Well, you would agree with me that Dr. Fama is not saying in this paragraph that that semi-strong form of the efficient market hypothesis is limited to obviously publicly

Page 93

available information; correct?

MR. CAPECI: Objection.

THE WITNESS: Well, I -- this is the definition that was provided by Eugene Fama, this is a paper Dr. Stulz referred to, so that's why I quoted it in my report. If he means something different, he can -- he also quoted Brealey and Myers that talks about published information, fine, you can change it to public information. It's still irrelevant. This whole exercise is irrelevant because we are talking about market efficiency in fraud-on-the-market context, but I'll be happy to engage.

BY MS. SOLOWAY:

Q. Okay. Well, I -- I just want to go back to this sentence. I want to just be very clear. I read -- let me tell you, I read this sentence as saying that there have been tests performed on semi-strong form of the efficient market theory and that those tests were conducted on obviously publicly available information.

Would you agree with that?

THE WITNESS: I have no opinion one

24 (Pages 90 - 93)

Page 94

way or the other.

MR. CAPECI: Objection.

THE WITNESS: It's -- I put it in there because that's what Dr. Stulz referred to.

BY MS. SOLOWAY:

Q. I'm -- I'm -- you are the one, Mr. Steinholt, who cited this page of this report. So you must have an opinion about what it means. Are you telling me now that you actually have no opinion about what page 388 means?

A. No. I think that I cited --

MR. CAPECI: Objection.

THE WITNESS: I cited the definition that Eugene Fama used. That's the only definition I found in there. If there is another one, tell me what it is.

BY MS. SOLOWAY:

Q. Okay. Let's go back to the sentence. Okay? I read this sentence as saying that tests have been conducted on the semi-strong form of the efficient market theory that were done on obviously publicly available information.

Page 95

Would you agree with that reading of what this sentence means?

MR. CAPECI: Objection.

THE WITNESS: Listen, to me, it doesn't matter any of my opinions whether or not that is true or not. The only thing is that Dr. Stulz cited this paper as the definition of semi-strong efficiency. I've entered the paper. I searched on the term semi-strong. This is the only thing I found. If he was meaning to say something else, that's fine. We can use the Brealey and Myers definition.

BY MS. SOLOWAY:

Q. Okay. I -- I want to -- I want to go back to this sentence, though. You believe that Dr. Fama is defining the semi-strong form of the efficient market theory in this sentence, that is your testimony?

MR. CAPECI: Objection.

THE WITNESS: My testimony is that that is the only definition I found in the paper.

BY MS. SOLOWAY:

Q. I want to direct your attention to the

Page 96

first sentence under the paragraph we were just looking at. You just said that you couldn't find a definition other than that for semi-strong form efficient market; correct?

A. Yes.

MR. CAPECI: Objection. Misstates the prior testimony.

BY MS. SOLOWAY:

Q. In that first sentence, Dr. Fama says:

"We should note that what we have called the efficient markets model in the discussions of earlier sections is the hypothesis that security prices at any point in time 'fully reflect' all available information."

Do you see that?

A. Yes, which is strong form.

Q. So your position is that the strong form reflects all available information and the semi-strong form only reflects obviously publicly available information?

A. There's a difference between whether or not the information is public or whether or not it is private. This doesn't say all public -- all publicly available information.

Page 97

So there is -- so if it was the semi-strong form, it would be limited to the publicly available information.

Q. I'm sorry. Say that again. If it was semi-strong form, it would be limited to the publicly available information. That's right, isn't it?

A. Correct. Correct. Which is not --

Q. And not -- and not obviously publicly available information; correct?

MR. CAPECI: Objection.

THE WITNESS: Well, that is what -- it would be publicly available information. The question is what is publicly available, which is what we were discussing earlier. Well, typically, like Brealey and Myers talks about published information and -- and in this case, it talks about obviously publicly available information.

BY MS. SOLOWAY:

Q. I want to read your testimony back to you a moment ago and see if you're withdrawing it. Hang on one second. I'm just experiencing some technical difficulties scrolling here.

Okay. You -- in response to my

25 (Pages 94 - 97)

Page 98

question a moment ago, you said:

"There was difference between whether or not the information is public or whether or not it is private. This doesn't say all public -- all publicly available information. So if it was the semi-strong form, it would be limited to the publicly available information?"

Do you stand by that testimony?

A. Yes.

MR. CAPECI: Objection.

THE WITNESS: But I obviously do not define publicly available information differently than someone who believes that anything, you know, that -- that -- that the whistleblower report was publicly disclosed just because it was concealed. That is not what that typically refers to.

And that -- and the support for that is the Brealey and Myer [sic] article also cited by Dr. Stulz. And in this case, it's even more specific. Because in this case, we are dealing with whether misrepresentations by -- by the company.

And so, the statements by the company, they can be in financial releases. It can be

Page 99

in press releases by the company. It can be on conference calls, and so on. That is typically the type of information that we are concerned about in a reliance context.

MS. SOLOWAY: I'm going move to strike that as nonresponsive.

BY MS. SOLOWAY:

Q. I -- I am not talking about the whistleblower complaint --

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. -- I am asking you about the semi-strong form of the efficient market hypothesis. That is -- that is what I'm asking you about. And I would like to know whether you are withdrawing your testimony that the semi-strong form of the efficient market hypothesis requires "obviously publicly information," or whether it pertains to publicly available information. That is my question.

MR. CAPECI: Objection. Objection. We've now misstated prior testimony numerous times. This is well -- well long ago veered into the territory of being unduly

Page 100

argumentative. We're going to object to this entire line of questioning.

MS. SOLOWAY: That's fine.

BY MS. SOLOWAY:

Q. Answer the question, please.

A. I reject this whole semantic exercise that you are engaged in.

Q. Okay.

A. The -- I have explained very clearly how the market incorporates new and material information and that is consistent with the way we test for market efficiency. To get into the semantic exercise by saying that anything that is -- anyone can type anything on -- on the internet and, all of the sudden, it should be reflected in the stock price, that's really not what we're -- what we are dealing with here when we are talking about all publicly available information.

Q. Okay. Let's turn to page --

A. We're talking -- we are talking about information that's actually disclosed to the market that the market is aware of.

Q. Let's turn to page 415. That's the other page you cite in your reply report;

Page 101

correct?

MR. CAPECI: Objection. Misstates the report.

MS. SOLOWAY: Michael, are you suggesting that the reply report does not cite page 415?

MR. CAPECI: I'm suggesting that the reply report cites other articles other than page 388 and 415, if you read the entire reply report.

MS. SOLOWAY: Okay.

BY MS. SOLOWAY:

Q. I am referring to footnote 30 of the rely report where 388 and 415 are cited. Okay? To clarify the record.

Are you on page 415?

A. Yes.

Q. Okay. I want to read that first sentence that starts with "semi-strong form tests."

Are you with me?

A. Yes.

Q. Okay.

"Semi-strong form tests, in which prices are assumed to fully reflect all obviously

26 (Pages 98 - 101)

Page 102

publicly available information, have also supported the efficient markets hypothesis."

Q. Do you see that?

A. Yes.

Q. Okay. Would you agree with me that what Dr. Fama is talking about here are tests that have been conducted in which the test has been of obviously publicly available information?

MR. CAPECI: Objection.

THE WITNESS: The -- the semi-strong form tests that he's talking about relates to -- are obviously tests that have been performed. And these are tests -- are things that are obviously publicly traded -- publicly available information.

Sometimes, it can be difficult to ascertain whether or not information is publicly available in the sense that the market is aware of it. So it makes sense that you would focus in on things that are obviously publicly available and you don't make, like Dr. Stulz does, you know, assumptions based on information that the market may not have been aware of.

Page 103

BY MS. SOLOWAY:

Q. I think we may have found something that you and I agree on, Mr. Steinholt. You just said it makes sense in the context of doing testing to focus on things that the market is obviously publicly aware of; right?

A. That's correct, yes.

Q. But that -- that does mean, of course, that the semi-strong form of the efficient market theory is entirely premised on the concept of "obviously publicly available information"; correct?

MR. CAPECI: Objection.

THE WITNESS: Just to repeat myself. And I'm -- this is the definition in this particular paper. This is the paper Dr. Stulz quoted. That's why I refer to it.

BY MS. SOLOWAY:

Q. Okay. I want to just spend a little bit of time on the 1970s, if you will. Do you know how, in 1970, companies made files with the SCC?

MR. CAPECI: Objection.

THE WITNESS: It was a little bit -- it was a little bit before my time, but I do

Page 104

know that filings with the SCC were not available on the internet back then. I remember from earlier in my career, which started 20 years after that, you know, we had to actually call for service and -- to get those filings. There was not a SCC as -- as it is today.

BY MS. SOLOWAY:

Q. So what would you have to do to get an SCC filing when -- for example, early in your career?

MR. CAPECI: Objection. Are we talking about the 1970s now or the 1990s?

MS. SOLOWAY: Well, I think he said his career started 20 years ago.

BY MS. SOLOWAY:

Q. So how -- let's start -- let's start with 20 -- you -- I think you said I remember from earlier in my career, which started 20 years after that -- oh, I'm sorry. You mean the '90s; correct?

A. Yes.

Q. Okay. In the '90s, what did you have to do to get an SCC filing?

A. It's a long time ago. I'm trying to

Page 105

think, but it -- but there was no internet when I started. So you couldn't -- I -- I think that database started in probably 1994 or thereabouts.

So prior to that time, what the companies would do if you were a shareholder is that they would send you -- send you the annual reports and the quarterly reporters saying -- they actually had fancy quarterly reports back then -- that they would send to the shareholders.

Obviously, if you were a mutual fund or institution, that is something that you would, you know, you would get sent to you as well. But for a regular investor, it was quite difficult to get that information. Or it wasn't difficult in the sense that if you were a registered shareholder and you get sent it, you get it in the mail. But, then, again, how long does the mail take? By the time you read it, all of the institutions will know what's in there.

Q. So if you wanted to get a -- a SCC filing and you weren't an investor who got it in the mail, did you go have to go to the

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Page 106

microfiche or something to try to find it?

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: No. You -- I mean, you simply register with the company and say, listen, I'm a shareholder. Send me the -- you know, send me the 10K or annual report or the quarterly report and that's what the company would do. But you would --

BY MS. SOLOWAY:

Q. I'm asking --

A. But -- but as an individual investor, obviously, you wouldn't get it as quickly as the institutions.

Q. So I'm asking: If you're not an investor in the company and you're not on their mailing list, do you know how you would get copies of SCC filings?

A. Well, if you do it, like -- like we did it back then, there would be service, and they would scan in -- I don't remember the name of the service, but they would scan it in. But, obviously, that is quite different than today when you can just go on the internet.

Q. Right. And in the 1970s, it was

Page 107

probably far more rudimentary even then in the '90s; right?

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: I mean, I -- I mean -- I just don't know. I -- but I don't know if it really changed that much. I presume that in that 1970s, they also mailed their annual and quarterly reports to the shareholders. I'm pretty sure that the institutions would get them as quickly as possible as well.

BY MS. SOLOWAY:

Q. Do you know how, in the 1970s, you could information about stock splits if you wanted that information?

MR. CAPECI: Objection.

THE WITNESS: Well, typically, a company will announce that in a press release. So, you know, you would just keep the price of stock splits based on company announcements.

BY MS. SOLOWAY:

Q. And how would you get that information before the internet?

A. Well, that's one of the reasons why --

MR. CAPECI: Objection --

Page 108

THE WITNESS: -- people used to read the Wall Street Journal for that very reason. I mean, the Wall Street Journal used to have a whole section with that type of information, with stock prices, and -- and so on.

But, of course, it's -- sophisticated investors, they would have better access and low quick access than the regular investor. And, of course, you have analysts that also would monitor these things to keep their clients apprised of what was going on with a particular company.

BY MS. SOLOWAY:

Q. Are you able to -- well, let me ask, first: Have you looked to see whether the words "obviously publicly available information" have appeared in any other academic literature?

A. No. I mean --

MR. CAPECI: Objection.

THE WITNESS: -- this was the -- this is what Dr. Stulz cited. That's the only reason why it is in -- in my report. I think that the Brealey and Myers quote regarding published information probably is better.

Page 109

But from a practical point of view, the way that I looked at it, is that the market has to be aware of the information because that's the only way that the information can be analyzed and investors can trade on the information so that it comes reflected in the stock price.

BY MS. SOLOWAY:

Q. Did you look to see whether Dr. Fama's view of the -- the market efficiency hypothesis ever included the words "obviously publicly available" again in the future?

MR. CAPECI: Objection.

THE WITNESS: No. Because it was not relevant to me. Again, it's relevant to -- apparently this is really relevant and really -- this is really important to Dr. Stulz. That's why I looked at it. But, you know, to me, it's -- it's not particularly relevant. It's a semantic exercise.

The premises of Dr. Stulz's argument that an efficient market is -- and market that's -- that is efficient, as I defined it by using the Cammer and Krogman Factors, means that even information that the market may not

28 (Pages 106 - 109)

Page 110

be aware of would magically be reflected in the stock price, is not true.

BY MS. SOLOWAY:

Q. Okay. Well, let's -- let's look at -- you've cited Dr. Fama's 1991 paper before; right?

MR. CAPECI: Objection.

THE WITNESS: You would have to refresh my --

MS. SOLOWAY: All right. Let's mark that as -- let's mark that as Exhibit 6.

THE WITNESS: I don't remember --

BY MS. SOLOWAY:

Q. And we can --

A. I don't recall citing that paper in any of my reports, but -- or any -- either the opening report or the rebuttal report. Can you point to where I cited that paper in my opening or -- please --

Q. I -- I -- I did -- I did not say -- I did not say you did. Why don't we start with an open question. Are you familiar with Dr. Fama's 1991 article called "Efficient Capital Markets: II"?

MR. CAPECI: Hold on. Hold on.

Page 111

Where -- where can we find this new Exhibit 6?

MS. MILLER: It's just been introduced on the exhibit platform.

(Exhibit 6 marked.)

MR. CAPECI: Oh, I'm sorry. It's not on the binder. It's only on the exhibit share?

MS. MILLER: Correct.

MS. SOLOWAY: Correct.

MR. CAPECI: Okay.

THE WITNESS: Okay.

MR. CAPECI: I'm just going to state for the record that this appears to be a 43-page document. So, Mr. Steinholt, if you feel like you need to review the entire document to answer any of the question that are asked of you, I encourage you to take the time to do so.

THE WITNESS: I mean, this is a long paper. I mean, you're not suggesting that --

BY MS. SOLOWAY:

Q. Are you -- are you telling me, Mr. Steinholt, that you're not familiar with this paper? I've read so many of your expert reports, and I've seen you cite it so many times; is that your testimony?

Page 112

A. No. But it's --

MR. CAPECI: Objection.

THE WITNESS: You have to realize that when you are dealing with large -- you know, it's not like I have committed this particular paper to memory just because I have cited it in -- in some prior reports.

BY MS. SOLOWAY:

Q. Would you agree with me that this is a seminal work in the area of the efficient market theory?

MR. CAPECI: Objection.

THE WITNESS: Yeah. I think it is. It's a very important paper, yes.

BY MS. SOLOWAY:

Q. Okay. So you're familiar with it; correct?

A. I'm familiar with it, but if you are going to ask me questions about it, it is not something that's fresh in my mind.

Q. Okay. Let's -- let's look at it. Why don't we start with the first sentence. I'll give you a minute. I just -- I -- if you could start by reading the first sentence that starts with "sequels are rarely as good as the

Page 113

originals."

Do you see that?

A. Let me see here. Can you give me some -- you're looking at the first page of this paper, and there is "sequel" in here?

Q. I am -- I am looking at the first page -- are we -- are we looking at a document that says "Efficient Capital Markets: II" at the top?

A. Yes.

Q. Eugene F. Fama.

A. Okay. Here we go.

Q. I want to make sure we're looking at the right -- the right document together; yes?

A. Right.

Q. Okay. First paragraph, "sequels are rarely as good as the originals."

Do you see that?

A. Yes.

Q. Fair to say that this is a review by Dr. Fama of the work that has been done on the efficient market theory over the 20 years since his 1971 paper -- excuse me -- 1970 paper came out?

MR. CAPECI: Objection.

29 (Pages 110 - 113)

Page 114

THE WITNESS: Yes, I think so.

BY MS. SOLOWAY:

Q. Okay. So he starts with "sequels are rarely as good as the originals" because this paper is a sequel to the 1970 article; right?

A. That's correct, yes.

Q. Okay. Let's look at the first sentence under "The Theme."

Do you see that?

A. Yes.

Q. Okay. "I take the market efficiency hypothesis to be the simple statement that security prices" -- reflect -- "fully reflect all available information."

Do you see that?

A. Yes.

Q. Do you disagree with that statement?

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: All information. I -- that's a strong form of the efficient market hypothesis, yes.

BY MS. SOLOWAY:

Q. He doesn't say that it's the strong form, does he?

Page 115

A. No. I'm just telling you because there is a difference between public information and private information.

Q. Okay. I --

A. So then, the question -- then the whole issue relates to -- what information are you talking about. Are you talking about something that's -- that the market is aware of or are you talking about information that the market is not aware of? And that's where you get the distinction.

Q. Can you show me --

A. The -- the -- the -- the issue --

Q. Yeah. Can you show me anywhere in this article where he makes the distinction that you just made?

MR. CAPECI: Objection.

THE WITNESS: Listen, you just gave me a 40-whatever-page article and -- and are asking me to point out different things in this article. I'm just explaining to you that the -- the efficient market hypothesis is one thing, which is the first sentence here. The definition of what semi-strong versus strong and versus weak, that is what relates to what

Page 116

information you are testing.

BY MS. SOLOWAY:

Q. Okay.

A. And whether or not that information is sufficiently reflected in -- in the stock price.

Q. Okay. So we'll -- we'll get to semi-strong in a minute. I want to focus just on the market efficiency hypothesis. Do you agree with the first sentence of this paper, which says "I take the market efficiency hypothesis to be the simple statement that security prices fully reflect all available information."

Do you disagree with that statement?

A. Of course not.

Q. Okay. Let's turn to section 2, which starts on the next page, "The Main Areas of Research."

Do you see that?

A. Yes.

Q. Okay. I'm going give you a minute to read that paragraph that starts with "The 1970 review."

Have you had a chance to read the

Page 117

paragraph?

A. Yes.

Q. You'll see that Dr. Fama makes a reference there to the semi-strong form tests.

Do you see that?

A. Yes.

Q. And he says, then, in parentheticals, "how quickly to security prices reflect public information announcements?"

Do you see that?

A. Yes.

Q. So he is referring to his 1970 paper and he's referring to the semi-strong form tests, and he's asking the question, how quickly do security prices reflect public information announcements.

Do you see that?

A. Yes.

Q. He is not using the words "obviously publicly available"; correct?

MR. CAPECI: Objection.

THE WITNESS: That's correct. It's more in line with Brealey and Myers and Allen, which is published information.

///

30 (Pages 114 - 117)

Page 118

BY MS. SOLOWAY:

Q. So would you consider this an update then to the 1970 paper?

A. I'm not sure I would consider -- I mean, I don't care -- neither of -- I don't have a dispute with either of these definitions of -- of publicly available information. I mean, if -- if, you know, Dr. Stulz wants to use the one in Brealey and Myers that he cited to, fine. If he wants to use the one in the 1970 -- 1970 Eugene Fama paper, that's fine. If you want to update it to -- to this particular paper, which talks about announcements, then that's -- that's fine. I mean, I -- I don't understand where the dispute is, quite frankly.

Q. Do you --

A. I'm just -- it's up to him to define it however he wants to define it.

Q. I'm not asking how Dr. Stulz defines it. I'm asking about your understanding of the semi-strong form of the efficient market hypothesis. And I'm asking you: You've now confirmed that this paragraph does not contained the words "obviously publicly

Page 119

available." Will you agree that the semi-strong form test looks at how quickly securities prices reflect public information announcements? Are you okay with that?

A. Absolutely.

Q. Okay. Good.

A. Absolutely.

Q. Okay. Let's turn to the next page.

A. But I just want to say that that is not the paper that Stulz referenced.

Q. That's fine. Let's turn to the next page.

A. Okay. Is there a particular paragraph you want me to read or?

Q. Just give me -- give me one second. Hang on. Okay. Yeah. There's one sentence I want you to read. It says, "for the second and third" -- the paragraph starts -- "for the second and third categories."

Do you see that?

A. Yeah.

Q. I want to just point out, he says:
"Instead of semi-strong-form tests of the adjustment of prices to public announcements, I use the now common title,

Page 120

event studies."

Do you see that?

A. Yes.

Q. So what he's talking about, if I understand this correctly, is that event studies can be used to examine the adjustment of prices to public announcements; is that right?

A. Absolutely, yes.

Q. And that's consistent with your understanding as well?

A. Absolutely, yes.

Q. Okay. What -- what are public announcements?

A. Typically, public announcements by the company would be, you know, earnings releases. It could be other types of press releases. And, you know, typically, you would find the announcements made by the company on Bloomberg. That's why -- one of the reasons why I go on Bloomberg.

Q. The semi-strong form is not limited simply to company announcements; correct?

A. Absolutely. There -- you can have -- in this case, we have information disclosed by

Page 121

Aurelius and -- which I analyze. So yes, it's not limited to -- to companies.

Q. Tell me everything that you can think of that includes a public announcement, if it's not by the company itself.

A. Listen, I'm not going to --

MR. CAPECI: Objection. Asked and answered.

THE WITNESS: I'm not going to exhaust my -- I mean, the simple answer is, you know, look at analyst reports and look at the Bloomberg and you can get a good idea of what's announced about a -- a company at least with respect to material information.

BY MS. SOLOWAY:

Q. Sitting here today, can you give me anything other than what's on Bloomberg and what's on analyst reports?

A. Well, you can go to a company's website.

Q. I don't want to talk about what the company puts out. I'm asking you: Put aside what the -- what the company's own announcements are. I'm talking about when information comes from a source other than the

31 (Pages 118 - 121)

Page 122

company, what falls in to the bucket of "public announcements"? Tell me everything you can think of.

MR. CAPECI: Objection. Argumentative. Asked and answered.

THE WITNESS: It can be news articles that's not done on Bloomberg. We can -- you -- you sometimes have information disclosed on television, like CBC, that can move to start. So there are other places. But generally, it will be discussed on Bloomberg.

BY MS. SOLOWAY:

Q. Can it include court papers that are available on the -- on the court filing system?

A. Information from court papers can also be disclosed to -- to the market.

Q. No. No. That's not what I'm asking.

I'm asking whether the words "public announcements" can include court papers on the court system?

A. Well, I wouldn't -- I mean, the -- the issue of whether or not that information becomes part of the public mix of information relates to whether or not the market becomes aware of it.

Page 123

Q. Okay. So the court papers --

A. So it's not the announcement same --

Q. There is a special test for court papers. They only become "a public announcement" if the market becomes aware of them, that's your test?

A. No --

MR. CAPECI: Objection. Misstates the prior testimony.

THE WITNESS: I'm not quite sure what -- I mean -- if you're dealing with something being unsealed, I don't know if that is -- qualifies as an announcement. But, obviously, if the market becomes aware of it, that's going to be reflected in the stock price.

BY MS. SOLOWAY:

Q. Okay. So --

A. I mean, this is not particularly complicated, I don't -- I don't think.

Q. Let's -- let's keep going. I want you to exhaust your understanding of what constitutes a "public announcement" that is not information issued by the company itself. Tell me everything else you can think of.

Page 124

A. If you're going to be --

MR. CAPECI: Objection.

THE WITNESS: -- inclusive of everything, it's going to be anything that the market becomes aware of.

BY MS. SOLOWAY:

Q. How do you determine, as a -- as a, you know, matter of financial economics, what the market is or is not aware of?

MR. CAPECI: Objection. Asked and answered.

THE WITNESS: It's information that the market would clearly be aware of, which is analysts reports, press releases by the companies, and those types of things that I -- that I discuss. And -- but the market can become aware of other things as well and -- and you can end up with kind of like a gray area.

But -- but for the purposes of doing the Cammer and Krogman analysis, you would follow the guidance set by the courts and the courts look at earnings releases.

BY MS. SOLOWAY:

Q. Okay. I -- I'm going to try this one more time because that's not an answer to my

Page 125

question. And I just want the record to reflect that.

Do you have a methodology that you can identify, siting here today, to tell me how is it, as an expert, you would determine whether the market is "aware" of a piece of information that is available?

MR. CAPECI: Objection.

THE WITNESS: Yeah. I take offense to that type of attitude where you're -- where you're saying that you're not getting a question answered when, in fact, I have explained to you, numerous times, what my methodology is, which is looking at analyst reports and looking at what's available on sources such as Bloomberg.

Now, in terms of can there be other information that the market also becomes aware of, of course there is. I'm not saying it is perfect, that it includes everything. But as a general matter, with respect to doing the Cammer and Krogman Factors where the focus is on company press releases, this is sufficient.

MR. CAPECI: I just -- we've -- we've been going about an hour and a half. I just

32 (Pages 122 - 125)

Page 126

want to mention that in case there is a --

MS. SOLOWAY: You know what, why don't we take a break and -- and maybe during the break, Michael, you can talk to Mr. Steinholt about trying to answer the questions that have been asked.

I -- you know, this is really -- it's -- it's fascinating to hear about Cammer and Krogman, but those are really not -- which he keeps repeating the discussion of, but that's not really what I'm asking him about.

THE WITNESS: But that's my --

(Cross-talk.)

MS. SOLOWAY: Mr. Steinholt, I'm speaking to -- I'm speaking to your counsel. It would be great, Michael, if you could try to cut through this little bit because I would really hate to have to ask the court to reconvene this deposition so I can get to my depositions. So why dont you talk to your witness about that.

MR. CAPECI: Audra, you can -- you can reserve your rights all you want. Mr. Steinholt is answering the questions cooperatively. Certainly more so than

Page 127

Dr. Stulz was being in his deposition. Why don't we take a break. We've been going for a while.

MS. SOLOWAY: Sure.

THE VIDEOGRAPHER: All right. Going off record at 11:15 a.m.

(Recess.)

THE VIDEOGRAPHER: Back on record. 11:37 a.m.

BY MS. SOLOWAY:

Q. Mr. Steinholt, could you look at paragraph 15 of your reply report again? That's Exhibit 2 in case you...

A. Yes. I'm here.

Q. So we -- we spent a bunch of time this morning -- or this afternoon talking about what "obviously publicly available" means; is that right?

A. Yes.

Q. Is there anything in paragraph 15 of your report that you'd like to change based on any of the discussion we've had this morning?

A. No.

Q. If you look at the sentence that's -- let's see. Six lines down, there is a sentence

Page 128

that starts "the semi-strong form of the hypothesis states that prices reflect all published information."

Do you see that?

A. Correct, yes.

Q. Do you have a methodology that you could use to ascertain what information is published versus not published?

A. Usually -- as I testified to earlier, usually, you would look at sources such Bloomberg and analyst reports.

Q. Is information on the court system PACER published information?

A. I'm not that familiar with PACER. In terms of -- in terms of information that's available on various databases, you cannot automatically assume that that ends up being publish available.

Obviously, when it was disclosed in the Aurelius report, it certainly became publicly available. But it's not something that one would necessarily just assume.

Q. I'm asking a very narrow question. I'm asking you whether information available on PACER is "published."

Page 129

A. I wouldn't view it as published information. The more important thing is whether or not the market became aware of it.

Q. And then, how do you test whether or not the market became aware of it?

A. Well, you look at the evidence. And in this particular case, you can do what -- what Stulz talked about in his report and see whether or not there was any evidence that it impacted the stock price at the time that the filing was unsealed. And his conclusion was that, you know, it did not impact Vanda's stock price at the time.

Then, you can look at things such as the -- the time when it did become publicly available, and you can look at well, is there a price reaction to the information at that point in time. And I have a price graph that demonstrates that, yes, there is a significant price movement just as this information became available to the market.

We can also look at other types of information. You can read the Aurelius itself, and the whole point of the report is that they do not believe that this is information that

33 (Pages 126 - 129)

Page 130

investors are aware of. That's why they are shorting the stock because they believe that investors do become aware of if the stock price will -- will decline. And they base that on, I think it was five times trailing sales. In other words, the valuation in part. And also, because of their understanding of PACER. And apparently, it's -- it's not something that necessarily investors would -- would find given the -- the -- the filing date of the original suit which was 2017.

Now, I'm not an expert on PACER, so I do not know whether or not that is correct or not. You can look at analyst commentary attributing the price decline to -- to the whistleblower complaint such as the Stifel analyst report on February 14th. So you can look at all of the evidence. And you can make an assessment of when this information became available to the overall market. And in my opinion, that occurred on February 11th of 2019.

Q. So, Mr. Steinholt, it sounds to me like what you're saying is that the reason we know the information became published in the

Page 131

Aurelius report is because, according to you, the stock price moved at the time the Aurelius report was published. Is that what you're saying?

A. What I'm saying is that you can see whether or not there was an impact from the report when -- so if the market became aware of the report on February -- February 4th or February 5th, then you would expect the market to react on February 4th or February -- February 5th.

If the market became aware of the whistleblower complaint on February 11th through the Aurelius report, then you would expect there to be a price decline at that point in time. So that is one piece of evidence you can look at.

Q. Of course, it's entirely possible, Mr. Steinholt, that the information in the qui tam action was not viewed by the market as material. And therefore, when the qui tam complaint became available, the market price didn't move; correct? That's also possible?

MR. CAPECI: Objection.

THE WITNESS: Well, the -- the

Page 132

information -- well, I mean, the -- the information contained in the whistleblower complaint is the report that was disclosed later in the Aurelius report. So it's a hard -- hard argument to make that on February 4th and 5th, the market didn't think this was important. But, then, on February 11th, all of a sudden, they did think it was important.

BY MS. SOLOWAY:

Q. Have you done any analysis of whether the Aurelius report contained information that was different and separate from what was in the qui tam complaint?

A. Well, there are obviously -- they obviously had performed some investigations themselves that corroborated the allegations in the whistleblower report, so --

Q. That's not -- yeah. That's not my question. I'm asking whether you have an understanding of whether the Aurelius report included information separate and apart from the allegations of off-label marketing in the qui tam complaint?

MR. CAPECI: Objection.

Page 133

THE WITNESS: I -- I was looking in the Stulz report to look for conforming factors and one conforming factors that he identified was the first statement, and that was that Aurelius had a short position in -- in the stock. That is -- that was, of course, not in the whistleblower complaint. So in that sense, it was new information.

Of course, it's not exactly unrelated to the information in the whistleblower complaint because the reason they had the short position was -- was because of their negative view of -- of their stock-based on the whistleblower complaint and (transmission error) investigation corroborating those allegations.

BY MS. SOLOWAY:

Q. What else? What else in the Aurelius report was new?

MR. CAPECI: Objection.

THE WITNESS: Other than, you know, corroboration and the -- and the -- and the fact that they had a short position, those were the key pieces of -- of information. I didn't see anything material, information that could

34 (Pages 130 - 133)

Page 134

explain the price climb as significant as the (indiscernible) significant price decline that occurred other than the information that related to the whistleblower complaint.

BY MS. SOLOWAY:

Q. How did you determine -- well, withdrawn.

Put aside the concept of materiality for a second. Did you see new information in the Aurelius report that had not been contained in the whistleblower complaint?

MR. CAPECI: Objection.

THE WITNESS: As I said before, there were information with respect to investigations that they had performed that corroborated the -- the allegations in the whistleblower complaint. And, of course, what --

BY MS. SOLOWAY:

Q. (Indiscernible).

A. -- and, of course, what Stulz points to it, which is the short position.

Q. Anything else?

A. Those are the two things that comes to mind.

Q. All right. Well, we'll come back to

Page 135

that later. I want to go back to this concept of published information. Is there -- other than what you've already described for me, can you identify any methodology that would help an expert ascertain what is "published" versus what is "publicly available"?

A. The methodology that I explained is the methodology I used for the purposes of analyzing --

MR. CAPECI: Objection.

THE WITNESS: -- Cammer Factor 5, and I think that that is -- for the purposes of my market efficiency opinion, that is sufficient.

BY MS. SOLOWAY:

Q. I'm not asking about Cammer Factor 5. I'm asking, generally speaking, as an expert sitting here today, other than what you've already described for me, can you identify any methodology that you could apply to identify "published" information versus "publicly available" information"?

MR. CAPECI: Objection.

THE WITNESS: For the reasons I explained, I -- I prefer my methodology in order to -- to differentiate between those type

Page 136

of -- of information. That doesn't mean that there may not be exceptions to the rule. But in general, in terms of the general methodology for conducting the analysis, I think that is the proper way.

BY MS. SOLOWAY:

Q. So the methodology you've already given me, you're sticking with. That's what you're saying?

A. Yes. I think that that is the proper way for the purposes of the type of analysis that I have performed, yes.

Q. Okay. In any of your prior expert witness assignments, have you ever used the criterion of "published" to evaluate whether information impacted market prices?

A. Typically, I would run an event study to determine whether or not the information impacted the stock price. If, for instance, there had been a significant price reaction to the unsealing of the whistleblower complaint, then that is evidence that that information became available to the market. And I would make that connection. But I wouldn't automatically assume that something impacted

Page 137

the stock price just by the mere definition of whether or not it was published or -- or just because it was defined as unpublished.

Q. So now you're saying that information that is published, you wouldn't assume is incorporated into the stock price?

MR. CAPECI: Objection.

THE WITNESS: No. Information that's unpublished.

BY MS. SOLOWAY:

Q. Okay. So you -- so we can agree that unpublished information does not impact the stock price. Is that what you're saying?

A. No. I don't make that distinction. And -- and if you are going to make the assumption in terms of the form of the market assumption, then you would assume that the information that's publicly available would be incorporated -- published information would be incorporated in the stock price if the information is in corporate press releases or earnings reports or if it is in analyst reports or if it's on Bloomberg, then you would assume that that type of information would be incorporated into the stock price.

35 (Pages 134 - 137)

Page 138

But when you go outside of that, then you can perform an event study to see whether or not -- if it was material, it should impact the stock price and then you can test whether or not it impacted the stock price.

Q. Sitting here today, can you identify any expert report that you've issued before -- before the reply report in this case where you explain the semi-strong form of the efficient market hypothesis by using the word "published"?

MR. CAPECI: Objection. Asked and answered.

THE WITNESS: If I talk about the semi-strong form, I would probably likely have cited the Brealey and Myers and Allen textbook and they use the term "published." But, as I sit here right now, I don't -- I don't even know if I -- I ever really used the term semi-strong efficient in my reports.

Although, when I'm asked about it, that is obviously what we're talking about in terms of the Cammer and Krogman Factors, it is information that is, you know -- it's -- it is not the strong form, which would include all

Page 139

information. And it is not the weak form that just focuses on historical prices and so on. And so, obviously, it's semi-strong form.

BY MS. SOLOWAY:

Q. So, sitting here today, you can't identify a case in which you've used the word "published" as the criteria for applying the semi-strong version of the market efficiency hypothesis; correct?

MR. CAPECI: Objection. Misstates prior testimony.

THE WITNESS: If I have used the term "semi-strong," I have assumed that everybody knew what it was. It is what Brealey and Myers and Allen describes here. I don't know if I, you know, ever been asked to provide a reference for it. But that is typically what we are talking about. And in my particular case, the important thing is whether or not the market became aware of it.

BY MS. SOLOWAY:

Q. Okay. So let me -- let me ask -- I really want to try to, like, pin down exactly what your working definition is of the semi-strong form of the efficient capital

Page 140

market hypothesis. I'm going to read a sentence to you, and I want you to tell me whether you agree or disagree that this is an appropriate definition of the efficient capital market hypothesis semi-strong form.

Okay? Ready for the sentence?

A. By the -- I -- I just have one qualifying thing you have to understand before you go through all this line of questioning, because, you know, I never opined relating to semi-strong form efficient in my opening report. I did the Cammer and Krogman Factors with respect to misrepresentations made by the company and following guidance from the court.

You seem to be insistent on talking about this academic definition, which is, you know, a little bit different than what is needed in order to meet the -- the -- to meet the Cammer and Krogman tests.

Q. Well --

A. So it's a little bit beside the point, and I don't want you to conflate those two things later on.

Q. Well, I'm not -- I'm not going to conflate them. I'm not talking about the

Page 141

Cammer and the Krogman Factors. I'm simply trying to get a working definition of the efficient capital market hypothesis semi-strong form. Okay?

I'm going to read you a sentence, and I want you to tell me whether you agree or disagree with the definition I'm about to provide. Okay?

A. Okay.

Q. The most commonly held form of the most efficient capital hypothesis is known as the semi-strong form and holds that securities markets incorporate all available public information into the respective securities prices.

Agree or disagree?

MR. CAPECI: Objection. Objection. To the extent you're reading from something, the witness should be allowed to see the full context of where this appears. So we object to the question.

MS. SOLOWAY: That's fine.

BY MS. SOLOWAY:

Q. You know, it might be helpful, Mr. Steinholt, you have Real Note going; right?

36 (Pages 138 - 141)

Page 142

A. No.

Q. No. Would you like me to read it one more time so you can hear it a second time?

A. No. I mean, I -- I heard the statement.

Q. Agree or disagree, then?

A. Well, under --

MR. CAPECI: Objection.

THE WITNESS: Under normal circumstances, I would agree. But given the fact that you, earlier, were insisting on some Webster dictionary definition that, then, defined it as "anything accessible," you know, I don't know -- because I don't know what definitions you have of these words in your mind. But under normal circumstances, I would say yes -- say yes.

BY MS. SOLOWAY:

Q. Okay. So let's just go through this one more time. I want to make sure I have this clean. The dictionary will speak for itself; right? The judge can choose to understand the English language as the judge wants to.

I just want to know whether you agree that this is the correct definition of the

Page 143

semi-strong form of the efficient capital market hypothesis. I'm going to read this one more time and let's see if we can just get this done. Okay?

This is the sentence:

"The most commonly held form of the efficient capital market hypothesis is known as the semi-strong form and holds that securities markets incorporate all available public information into the respective securities prices."

A. Again, under normal circumstances, I would agree to that. But given -- given the way that you twist and place semantic games with definitions, you know, I can't agree to it.

Q. Okay.

A. But under normal circumstances, I would agree to it.

Q. Okay. What definition of "available" would make you comfortable with that sentence?

A. Well, that the market was aware of it.

Q. Okay. So your definition of "available" is that the market was aware of?

A. Yeah. And we're dealing with

Page 144

published information that the market became aware of.

(Cross-talk.)

BY MS. SOLOWAY:

Q. And you believe that awareness and availability are the --

MR. CAPECI: Hold on. Hold on. Hold on. Hold on. Hold on. Please let the witness finish his answer.

THE WITNESS: For an -- and I explained to you earlier why that is an important. The reason is that the market cannot incorporate information that it's not aware of. So that is why, from a practical point of view, you know, the market has to be aware of the information. Otherwise, there is no way for that information to become reflected in the stock price.

BY MS. SOLOWAY:

Q. Okay. So you're -- you're totally comfortable with that definition that I read, but you would like the judge to understand that you believe the word "available," as used in that sentence, means of "which the market is aware"?

Page 145

A. Yes.

MR. CAPECI: Objection.

THE WITNESS: Yes. The market has to be aware of the information.

BY MS. SOLOWAY:

Q. Okay.

A. That is typically the way that you -- when you talk about publicly available information, you're talking about information that the market is aware of. And in that context -- in -- in -- and in that context, that sentence makes sense.

But if you're going to start talking about other types of information that the evidence showed that the market was not aware of, of course that is -- you know, when you say that the market is efficient, you don't mean that that type of info -- information that the market is not aware of should magically be reflected in the stock.

Q. Okay. So we -- we looked at sources this morning on the quote -- the words "obviously publicly available." We've looked at sources this morning on "published." Can you, sitting here today, identify any sources

37 (Pages 142 - 145)

Page 146

on the semi-strong form of the efficient capital markets hypothesis that uses the words of which the market is aware in sum or substance?

MR. CAPECI:  Objection.

THE WITNESS:  Listen, the -- as a matter of common sense, nobody who says that the market is efficient means that the market will incorporate information that it's not aware of.  I mean, it's just a matter of -- of -- of logic.

BY MS. SOLOWAY:

Q.  Okay.  Let's turn to tab 48 of your binder.  This is an exhibit from the Dendreon Corporation litigation; correct?

A.  Yes, it appears to be.

Q.  And it's your expert report; correct?

A.  Yes.

Q.  I'd like you to turn to paragraph 7.

MR. CAPECI:  Are we marking this as an exhibit?

MS. SOLOWAY:  Oh, I'm -- thank you, Michael.  Yes, we are.

Are we up to seven, Emily?

MS. MILLER:  Yes.  It's just been

Page 147

marked as Exhibit 7.

MS. SOLOWAY:  Thank you so much.

(Exhibit 7 marked.)

MR. CAPECI:  I just want to note that the report has been dated January of 2009, so to the extent the witness hasn't seen this since then, I encourage him to -- to review it as he needs.  It appears to comprise at least 100 pages.

BY MS. SOLOWAY:

Q.  Professor Steinholt -- excuse me -- Mr. Steinholt, paragraph 7.

Are you with me?

A.  Yes.

Q.  I'm going to read to you.

"For the past 40 years, the efficient capital market hypothesis ('ECMH') has held an important place in financial and economic history."

Do you see that?

A.  Yes.

Q.  Any quibble with that sentence, sitting here today?

A.  Of course not.

Q.  Next sentence:

Page 148

"The most commonly held form is known as the 'semi-strong' form and holds that securities market incorporate all available public information into the respective securities prices."

Do you see that?

A.  Yes.

Q.  Any quibble with that sentence today?

A.  Well, today, I would just -- I would just note that this doesn't mean that information that the market is not aware of would magically be incorporated into the stock price.

Q.  So you're using your -- your definition that you gave me before for what it means for information to be available?

A.  Yes.  I mean, it's -- I mean --

Q.  Okay.

A.  -- it's -- I -- I know in -- in -- I said this in the Flowserve case and the judge repeated it, you know, obviously the market cannot react to what it does not know.  I mean, you know, I -- I -- I thought -- I think it's a fairly obvious observation, but...

Q.  Sure.

Page 149

A.  You know.

Q.  Let's look at the next sentence:

"Consequently, in an efficient market, investors rely on the market price of a security to reflect all the available public information regarding that security."

Any problem with this sentence, sitting here today?

A.  No.

Q.  And then, you go on to say, "the semi-strong form of the ECMH has been empirically validated in numerous studies."

Any problem with that statement?

A.  No.

Q.  Who did you cite for the information in this paragraph?

A.  I cited Eugene Fama.

Q.  You cited Eugene Fama from both 1970 and 1988; correct?

A.  Correct, yes.

Q.  And the Fama article that you cite is the one we looked at earlier; correct?

A.  Exactly, yes.

Q.  Yes.  And that article, the 1970 article, is the article that has the words

38 (Pages 146 - 149)

Page 150

"obviously publicly available" in it; correct?

A. That's correct, yes.

Q. But you did not use the words "obviously public available" when you described the semi-strong form of the ECMH in this paragraph, did you?

A. That's correct.

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. Fair to say that when you put your report in the Dendreon case, this accurately reflected your understanding of Mr. Fama's 1970 and 1998 articles?

MR. CAPECI: Objection.

THE WITNESS: Yes. I don't think there is a distinction. I think that things that -- you know, publicly available information -- published information, obviously publicly available relates to the same thing.

BY MS. SOLOWAY:

Q. Okay. Now, the same -- I'm sorry. Please finish.

A. But -- but the difference is -- and that's, by the way, when I criticized Dr. Stulz, I include the Brealey and Myers

Page 151

definition, which is all published information. The -- the only point is that that is different than information that the -- that the market is not aware of.

Q. Uh-huh. So now, I just want to make sure I'm catching up with you today. You agree that all three of those definitions, obviously publicly available, published, and all public available information, those are now the same thing, those three concepts?

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. That's what you just said; right?

A. You can use different term -- terminology in order to explain the same thing. In my rebuttal report, I use two different -- two different cites with two different wordings. There is no inconsistency here.

Q. Why don't we turn to tab 47. Is this your expert report in the Novatel litigation, sir?

THE CERTIFIED STENOGRAPHER: And is this being marked?

MS. SOLOWAY: I'm sorry. Yes. Thank you so much. It's Exhibit 8.

Page 152

(Exhibit 8 marked.)

MR. CAPECI: I want to note, for the record, this appears to be a report from 2010 that comprises almost 500 pages. And I just ask that the witness be given an opportunity to fully review the document, if necessary, in answering any questions that may be asked about this exhibit.

BY MS. SOLOWAY:

Q. I'm directing your attention to paragraph 7 of this report. In this case, Mr. Steinholt, you offered the court the same definition of the efficient capital market hypothesis in the semi-strong form as you did in the Dendreon case that we just looked at; correct?

A. Yes. This is the --

MR. CAPECI: Objection.

THE WITNESS: This is the introductory paragraph on market efficiency followed by where I explain more of the -- the legal -- what the US Supreme Court has said in how they use the concept of market efficiency in a reliance context.

///

Page 153

BY MS. SOLOWAY:

Q. You stand by this report today?

A. Of course.

Q. You still think it's accurate?

A. Of course.

Q. How many times do you believe you've used, in sum or substance, the definition of the semi-strong form of the efficient capital market hypothesis that you used in paragraph 7 of this report?

MR. CAPECI: Objection.

THE WITNESS: I don't know.

BY MS. SOLOWAY:

Q. More than five?

A. Maybe. Five, ten.

Q. More than ten?

A. I don't know. I mean, it's -- it became more and more clear that I needed to provide greater explanation in terms of what market efficiency and the form market context was. So I changed the format a little bit but -- because the -- the way that I had it, you know, didn't go into that level of detail. But, yeah, of course. I mean, that is -- I mean, I have no argument with respect

39 (Pages 150 - 153)

Page 154

to the academic definition of an efficient market. I'm just saying that the market is not going to react to information that it doesn't know about. And no -- you know, and -- and the -- you know, the definition of an efficient market is not going to change that.

And, you know, the Cammer and Krogman Factors that I analyzed does not imply that information that the market did not know about magically would be reflected in the stock price. That's my only point.

Q. Okay. So, sir, in your next expert report, when you identified the definition of an efficient market using the semi-strong form, are you willing to qualify that it has to be information of which the market is aware?

A. No.

MR. CAPECI: Objection. No. No. That calls for speculation. The witness can't testify to a report that doesn't exist. Please direct your questions to things that actually exist.

BY MS. SOLOWAY:

Q. Please answer.

A. No. I mean, I -- I -- I've never had

Page 155

an expert misinterpret my market efficiency opinion to the degree that Dr. Stulz has where he opines that the implication of my market efficiency opinion is that the market would have reacted to information that there is no evidence that it was aware of. I mean, that -- that's nonsensical.

Q. So going forward, you have no plan to modify your definition of the efficient market theory to clarify this issue about what does available mean in the context of the efficient market?

A. Everybody knows --

MR. CAPECI: Objection.

THE WITNESS: Everybody knows what -- what it means. There is no need for clarification. Everybody knows what we're talking about. We're talking about the Cammer and Krogman Factors for the purposes of reliance, for the purposes of analyzing market efficiency in fraud-on-the-market context. I already spent, you know, several pages explaining it.

Just because I have an attorney who seems to be insistent on this academic

Page 156

definition and looking up definitions on the Webster dictionary to try to make these things mean something they don't, doesn't change that reality.

BY MS. SOLOWAY:

Q. Okay. I -- I just -- I want to -- I just want to be clear. You -- and I could put it up again. Are you comfortable with the Merriam-Webster definition of the word "available"?

MR. CAPECI: Objection. Asked and answered. We've -- we've -- I think we've covered this as much as we could possibly cover it.

THE WITNESS: I have no opinion about, you know, the four definitions or five or six -- I guess there were six different definitions of -- of "available." If your argument is that because Webster provided one definition that I think said accessible, that means that, all of the sudden, the information in the whistleblower complaint should have caused a price reaction on February 4th or 5th, even if the market was not aware of it, then, I mean, you're in theoretical hyper space.

Page 157

You know, I mean, that is not the market -- the way that the market works and -- because the market cannot react to what it does not know. And that's -- it's -- that's as simple as I can put it.

BY MS. SOLOWAY:

Q. Do you agree that anyone can access the PACER system?

MR. CAPECI: Objection.

THE WITNESS: I don't use PACER, so I do not know how it functions.

BY MS. SOLOWAY:

Q. And in order to provide your opinion, you did not educate yourself, in any way, on how to access filings on the PACER system?

A. No.

MR. CAPECI: Objection.

THE WITNESS: Neither did Stulz, according to his testimony in his deposition.

MS. SOLOWAY: Move to strike. Nonresponsive.

BY MS. SOLOWAY:

Q. Are you aware of how searches can be conducted on PACER?

MR. CAPECI: Objection. He just

40 (Pages 154 - 157)

Page 158

testified that he's never used it. I mean, he can't testify to something that lacks a foundation. So we'll object to this line of testimony to the extent it's about PACER.

THE WITNESS: I --

BY MS. SOLOWAY:

Q. So the answer is no; correct?

A. I have not used the system. I -- the only thing I know about the system is what the Aurelius report stated and that is that they did not believe that -- that investors were aware of this report, which is obviously why they shorted the stock prior to publishing the Aurelius report. And they made some mention about the date when it was filed, which was 2007. I don't know whether or not, you know, that is the reason why the market did not become aware of this information beforehand, but...

MS. SOLOWAY: Okay. That -- that was also nonresponsive. And it's pretty clear to me that the strategy here is to run out the clock. So I'll just move to strike that as nonresponsive.

///

Page 159

BY MS. SOLOWAY:

Q. My next question, Mr. Steinholt, is whether you believe that information is publicly available if there is a fee to get it. Does the fee matter?

MR. CAPECI: Objection.

THE WITNESS: Does the fee matter? It is -- not generally because if you have analyst reports, they may not be necessarily available for free. They may only be available to clients. So, you know, that's shelf dollars, you know.

So I'm not, you know, I'm not -- the fee could be a barrier for some investors because it increases the cost of acquiring the information. And if you're going to do that continuously, and, you know, you are going to spend a lot of money and not getting any return on it, it may heighten the bar, the cost of -- of obtaining the information.

So it may have some impact, but I don't really think that the fee would be that big of a -- big of an issue. But, then, again, I don't know what the fee for the PACER is, and I don't -- I haven't examined that issue.

Page 160

BY MS. SOLOWAY:

Q. Do you know who the author of the Aurelius value report that was issued on February 11th is?

A. You mean the individual?

Q. Yes.

A. Or the -- the firm?

Q. The individual.

A. No. I do not know. I -- I know of the firm. They -- they -- they issue these types of report periodically, but I do not know the individual, no.

Q. Who are the people behind Aurelius Value who issue those reports?

MR. CAPECI: Objection.

THE WITNESS: Who are the people?

BY MS. SOLOWAY:

Q. Yeah.

A. They -- they --

Q. Who are the people behind the Aurelius Value Enterprise?

A. They are -- well, obviously, they are -- are individuals who are looking to get an edge in the market by trying to uncover information that is -- that the market is not

Page 161

aware of and then trying to take advantage of that by, you know, trading on it.

Q. You don't know who they are though; correct?

A. I don't know what -- the individuals? No. I don't know the individuals, if that's what you're asking me.

Q. The identity of the individuals who published the Aurelius Value report is anonymous; correct?

MR. CAPECI: Objection.

THE WITNESS: Well, I know the -- the firm because the firm has issued these type of reports before. And it is a report that becomes -- became publicly available on -- on Bloomberg. And so -- but I -- I know about the firm. I know that they have caused stock price declines in the past because of the opinions that they provide or the information that they provide, but...

BY MS. SOLOWAY:

Q. Do you know if Aurelius Value is a firm, like, is it is a company? Is it an LLC? What do you know about it?

MR. CAPECI: Objection.

41 (Pages 158 - 161)

Page 162

THE WITNESS: Whether or not it's an LLC? I don't know whether or not it's -- it's an LLC. I know that they said something to the effect that individuals at the company and -- and -- and at the firm itself, I believe, had a short position in the stock --

BY MS. SOLOWAY:

Q. You don't -- you don't know if they're incorporated, for example?

MR. CAPECI: He's trying to -- hold on. No, no, no, no.

MS. SOLOWAY: I'm asking a really, really simple question.

MR. CAPECI: No, no, no, no, no, no. The witness gets to finish his answers. Dr. Stulz got to finish his answers, three paragraphs worth of answers. My witness gets to finish his answers. Do not interpose a question over him. Thank you.

BY MS. SOLOWAY:

Q. The question is a very simple one. It is a yes or no question. Do you know whether the Aurelius Value Enterprise is an incorporated company; yes or no?

A. I don't know whether or not it's an

Page 163

LLC, whether or not it's a corporation, whether or not it's a -- I -- other than what's in the report, and I think there is some mention about individuals in the report.

Q. So it could be one person. It could be two people. It could be 100. You have no idea; correct?

MR. CAPECI: Objection.

THE WITNESS: No. I -- I -- it's not something that I have investigated, but I am aware of them. They are not an unknown entity.

BY MS. SOLOWAY:

Q. Sitting here today, can you tell me how many investors actually reviewed the Aurelius Report on February 11th?

MR. CAPECI: Objection.

THE WITNESS: I think that would be impossible to know.

BY MS. SOLOWAY:

Q. Sitting here today, can you tell me how many investors actually reviewed the qui tam complaint between February 4th and February 11th?

MR. CAPECI: Objection. Speculation. Calls -- assumes facts not in evidence.

Page 164

THE WITNESS: Unlike the prior questions, I'm -- I'm -- I'm not aware of anyone who actually reviewed the whistleblower complaint prior to February 11th.

BY MS. SOLOWAY:

Q. Well, the Aurelius Value people did, didn't they?

A. I don't know that.

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. So you're suggesting that, at the time the February Aurelius Value report was issued, the Aurelius Value people had not reviewed the whistleblower complaint?

MR. CAPECI: Objection.

THE WITNESS: The Aurelius report was, I think, at 10:00 o'clock in the morning on February 11th. I do not know when they first obtained the whistleblower complaint, whether or not that was prior to February 11th. Maybe they used the weekend to write it. The prior trading day is that Friday. That is just something -- it's impossible for me to know.

BY MS. SOLOWAY:

Q. We can agree that before they issued

Page 165

the report, they had the whistleblower complaint; correct?

A. Prior to 10:00 o'clock on February 11th, yes, they would have had the whistleblower complaint, yes.

Q. And Aurelius Value, they traded on the basis of the whistleblower complaint; correct?

MR. CAPECI: Objection. Calls -- assumes facts not in evidence.

BY MS. SOLOWAY:

Q. I'm just asking for your understanding, Mr. Steinholt.

A. Yeah. I wouldn't call it that they traded. I think that they took a short position on the belief that this was information that investors -- the market was not aware of that. And they expected that the market would become aware of that information and cause the stock price to decline. I don't know if they actually -- when -- or when they traded, but they certainly disclosed that they had a short position.

Q. Do you recall that in the Aurelius Value report, the author copies and pastes excerpts from Cafepharma?

42 (Pages 162 - 165)

Page 166

MR. CAPECI: Objection.

THE WITNESS: I certainly recall mentions of Cafepharma in the -- in the report. And I think they point out that this was unverified anonymous information.

BY MS. SOLOWAY:

Q. Why don't we put the Aurelius Value report in front of you so we can refresh your recollection your recollection on what it says. I think it's in your binder. It is tab 3 in your binder. So let's mark this as exhibit --

MS. SOLOWAY: What are we up to, 9, Emily?

MS. MILLER: Yup.

(Exhibit 9 marked.)

BY MS. SOLOWAY:

Q. Take a look at the bottom of the page that's -- that's labeled 11 of 14 in the bottom right corner. It says:

"That's why we are troubled by persistent (but unverified) allegations on Cafepharma related to misconduct involving Vanda's hub."

And if you look at the next page, which is 12 out of 14, you'll see that there

Page 167

are a couple of pastes.

Do you see that?

A. I'm -- I'm trying to find -- where did you say that they were troubled?

Q. They're -- that was at the bottom of -- bottom of page 11 and then look at page 12.

Just to be very clear about what the question is. Just first question, a simple one. You agree with me that the Aurelius Value authors include excerpts from Cafepharma in their report; correct?

A. Yeah. Can you point me to the excerpts, please?

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. Page 12. Page 12.

A. 12. Okay.

Q. Are we in agreement?

A. Yes. On --

Q. Mr. Steinholt, are you able to see the excerpts from Cafepharma?

A. On page 12, you said, on to 14.

Q. Yes.

A. Yes. I see the excerpt.

Page 168

Q. Okay. Can we agree that they -- the Aurelius Value report includes excerpts from the Cafepharma website, that's correct; right?

A. Yes. Yes.

Q. So someone at Aurelius Value clearly found these website postings; correct? Because they put them in their report; right?

A. Oh, yes. Aurelius was aware of the postings, yes.

Q. Okay. And they -- however they did it, they found them on the Cafepharma website; correct?

MR. CAPECI: Objection.

THE WITNESS: I mean, I don't know how they obtained them, but that is certainly a likely possibility.

BY MS. SOLOWAY:

Q. So we can agree that the Cafepharma website was available to the Aurelius Value investors; correct?

A. They had that information, yes.

Q. Okay. Do you have any reason, sitting here today, to believe that other investors could not access the same information on Cafepharma that Aurelius Value accessed?

Page 169

MR. CAPECI: Objection.

THE WITNESS: No. I think that investors could have gone to Cafepharma and read all of the -- I don't recall how many thousand plus posts on Vanda that was on that particular website.

BY MS. SOLOWAY:

Q. And, in fact, Aurelius did; right?

MR. CAPECI: Objection.

THE WITNESS: I do not know what Aurelius did or did not. But it's -- but it's clear that they had had these excerpts at the time of them publishing the Aurelius report.

BY MS. SOLOWAY:

Q. Can we agree that the Cafepharma website was available to all the investors who looked for the information?

MR. CAPECI: Objection.

THE WITNESS: I think that any investor who wanted to access that website could have done so and could have read those posts after they were posted.

BY MS. SOLOWAY:

Q. Do -- do you know anything about the Cafepharma website -- like let me -- let me do

43 (Pages 166 - 169)

Page 170

one question at a time.

Have you personally accessed it?

A. No, I have not.

Q. Did --

A. I -- I -- I -- I looked at it a little bit in the context of this litigation. But prior to this litigation, no, I have not.

Q. Sitting here today, do you have any understanding or knowledge about how many investors accessed that website?

MR. CAPECI: Objection.

THE WITNESS: I think it would be impossible for me to know if any or a lot of investors accessed that information.

BY MS. SOLOWAY:

Q. Did you attempt to find out?

MR. CAPECI: Objection.

THE WITNESS: For what purpose? I mean, I -- I don't quite understand. No. I -- I mean -- in my opening report, I did an analysis of the Cammer -- Cammer and Krogman Factors, and I did not consider any of this with respect to Stulz' report as I stated in my rebuttal.

The point I was making is that this is

Page 171

unverified information by anonymous sources. So, you know, I don't really see what -- how much value sophisticated investors would put on it. Unless they viewed it as a trigger to conduct additional investigations and look more into it. But the posts, by themselves, to me, you know, I would not expect them to have any impact on the stock price.

BY MS. SOLOWAY:

Q. Sitting here today, you --

MS. SOLOWAY: Move to strike.

BY MS. SOLOWAY:

Q. Sitting here today, you don't know whether any other investors looked at those Cafepharma posts about Vanda and conducted their own investigations; correct?

A. No. I -- it -- it would be -- I have not -- I don't have any evidence of anyone doing that except for, you know, what's in the Aurelius report.

Q. In your opening report, feel free to look at it, in paragraph 12, you said that:

"The driving force that causes markets to be efficient is the competition amongst investors to quickly analyze and trade on

Page 172

new information as it becomes publicly available."

A. Right.

Q. You're not withdrawing that opinion; right?

A. No, of course not.

Q. So Vanda investors were also competing to quickly analyze and trade on new information as it became publicly available; correct?

MR. CAPECI: Objection.

THE WITNESS: Correct. I mean, the -- the -- the point I'm making, we're talking about publicly available information, you're talking about the information that companies are -- are aware of.

Now, there is a cost benefit that investors can make with respect to looking into these type of unverified anonymous claims on this particular website. And the question is, you know, how can you look at that particular information and how can you make money off of it?

You know, I don't -- if I was an investor and I went and I came across this information, the question you have to ask

Page 173

yourself is what is it about this information that, number one, would make you believe that this information is credible at all. And, number two, if you believe it to be true, what -- what investment decision would you make in order to take advantage of it.

MS. SOLOWAY: Move to strike as nonresponsive.

BY MS. SOLOWAY:

Q. Mr. Steinholt, your theory depends on the concept that Vanda investors were competing to quickly analyze and trade on new information as it became publicly available; correct?

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. That's -- that's why you believe Vanda traded in an efficient market; right?

A. That is the basis --

MR. CAPECI: Objection.

THE WITNESS: That is why it is reasonable for investors to rely on the stock price as reflecting all publicly available information. The implication of that is that you can reread newspapers -- for most investors can read newspapers, you can, you know, do your

44 (Pages 170 - 173)

Page 174

own analysis, and so on. But you're not going to make excess profits. And that's why I was asking in the prior answer, you know.

So what excess profit do you believe or Dr. Stulz believed was available and that you could benefit from by reading these posts.

MS. SOLOWAY: Move to strike as nonresponsive.

BY MS. SOLOWAY:

Q. Let's try a really simple question, Mr. Steinholt.

Sitting here today, you can not tell me that other investors, in addition to Aurelius Value, did not locate the same information on Cafepharma that Aurelius did; correct?

MR. CAPECI: Objection. This assumes facts not in evidence. He can't speculate as to what -- what other people may or may not have done without a foundation for it. So you can move to strike his answers all you want, but you're not asking questions that have any relation to a foundational basis.

THE WITNESS: I --

///

Page 175

BY MS. SOLOWAY:

Q. You can answer.

A. I -- I don't know if any or -- or -- or some investors read that information, but it had -- it would have no impact on my opinion relating to whether or not Vanda -- or Vanda's -- whether or not investors could -- could reasonably rely on Vanda's stock price to reflect all available information.

Q. And it doesn't affect your opinion because you've decided the information on the Cafepharma website is unreliable?

A. Well, I think that is a big part of it. I just don't see how you could make money on it. In other words, the risk you're taking by believing everything you read on the internet is not rewarded by any profits that you may make.

BY MS. SOLOWAY:

Q. Let's -- let's turn to this question of reliability.

MR. CAPECI: I'll just note, Audra, we've been going for about an hour. I don't know if --

MS. SOLOWAY: You want to take a five

Page 176

minute break and then we'll start a new -- new topic?

MR. CAPECI: Well, sure. I'll just also note though that it's almost -- or maybe it already is lunchtime where the witness is. You know, I know one of the unique features of the post-COVID world is that we're all in different time zones, but I just want to --

MS. SOLOWAY: Can we go off the record for this conversation?

MR. CAPECI: Sure.

THE VIDEOGRAPHER: Okay. Going off record at 12:40 p.m.

(Lunch recess.)

THE VIDEOGRAPHER: Back on record. 1:12 p.m.

BY MS. SOLOWAY:

Q. Hi, Mr. Steinholt. You understand you're still under oath; right?

A. Yes.

Q. During the break, did you speak with your counsel?

A. No.

Q. So I want to -- I want to turn to a new concept related to the efficient market

Page 177

theory. The efficient market theory assumes that investors will give varying levels of weight to the same information; correct?

A. I'm not sure what you mean by that. Can you explain?

Q. All right. Let's just look at your report rather than summarizing it. Let's look at your opening report, footnote 9. So in that paragraph, or in that footnote, you say:

"This does not mean that all market participates agree on what the true value of the common stock is, as evidenced by the fact that some investors sell as others buy."

Do you see that?

A. Correct, yes.

Q. Okay. So my understanding of what you're saying here is that when information comes out, investors may have different views of the importance of that information; is that fair?

A. Yes. They will have -- they may have different conclusions regarding what the value impact of that information is, yes.

Q. Okay. So part of the efficient market

45 (Pages 174 - 177)

Page 178

hypothesis is that information will be valued differently -- that the same information will be valued differently by different investors?

A. The same information can be different -- valued by different investors. That's correct. Some may view it as -- some may conclude that the stock is overvalued and sell. Some may conclude it's undervalued and buy. And you also see that reflected in analyst reports. You may have an analyst report that has a buy recommendation and another one that has a sell recommendation, yes.

Q. I want to return to your reply report, paragraph 5. You describe -- in this paragraph, in the middle of the paragraph, you describe the anonymous Cafepharma and Glassdoor posts.

Do you see that?

A. I -- I think you're referring to certain postings on online forums of unverified information by anonymous sources.

Q. That's right.

A. Got you.

Q. I just want to -- let's just make sure

Page 179

we're on the same page. I want to -- I want to have a conversation about the Cafepharma and the Glassdoor postings. Can we just agree to call those -- and when I say that, I mean the Glassdoor and Cafepharma postings that are -- that are referenced in professor Stulz' report. Can we -- can we agree to call those the internet postings; is that -- would that be okay?

A. Yeah, that's fine.

Q. Okay. So I want to understand your position on whether investors buy and sell stocks only if they have vetted the information as true. So do investors ever buy and sell stocks on rumors?

MR. CAPECI: Objection.

THE WITNESS: You have lots of reasons why investors buy and sell stocks. And there is a lot of research relating to the rational investors. You know, the grandma may see their grand -- grandkids use a particular brand and say, okay, I'm going to buy that stock. So you can have all sorts of different reasons for buying the stock.

What drives the -- the efficiency of

Page 180

the market, as the research has found out, is this -- it's the informed investors that actually determines the stock price because if the rational investors continuously buy regardless of price, then, you know, the informed investors would sell and vice versa. So there is the host of different -- there is a host of different reasons.

BY MS. SOLOWAY:

Q. Do informed -- sorry. Please.

A. No. Go ahead. I'm sorry.

Q. Do informed investors buy and sell stocks based on rumors?

A. Informed investors can look at rumors and then try and verify those rumors. And that is one of the reasons why it would -- you know, why an informed investors may look at internet postings. It's just to kind of like get an idea. Maybe there is something here and then they go and check it out and they may call up people at the company, and so on.

But as an overall strategy, if you let yourself be swayed by anonymous internet postings, you know, I -- I haven't -- that is not particularly good strategy because if you

Page 181

ever been -- been looking at the postings on various internet sites about stocks, a lot of them are trying to pump the stock or a lot of them are just trying to make the stock go down.

So it's very difficult to assess. Or it's -- it would be very, very difficult just to assume that something is true and trade on it. Most likely it would not be.

Q. Are you able to point to any academic literature that would support the proposition that investors will not trade based on unverified information?

MR. CAPECI: Objection.

THE WITNESS: This is an interesting question because, actually, Dr. Stulz referenced his student doing some research on exactly that. And his claim was that there was information on, I think it was Glassdoor that was predicted, but not reflected in the market, which presents an opportunity to trade on that information. So, you know, you always take these claims with a little grain of salt.

In my opening report, I have a statement by Richard Roll where he has tried to invest based on these type of claims and been

46 (Pages 178 - 181)

Page 182

unsuccessful. But in general, it's just -- it -- it -- in general, I don't think that it is something that, you know, investors would trade on for the reasons that I stated. But that's the only thing that I -- that comes to mind on top of my head.

BY MS. SOLOWAY:

Q. Okay. So remember before when we looked at Dr. Fama's 19 -- Dr. Fama's 1970 article, he mentioned that there were all these semi-strong tests that had been done, and he identified a few.

Do you remember that?

MR. CAPECI: Objection.

THE WITNESS: Yes, he did.

BY MS. SOLOWAY:

Q. Yeah. He identified, for example, that tests had been done about company annual reports and about stock splits.

Remember that?

A. Yes, I do.

Q. Okay. I'm asking you whether you're aware of any studies that have been done like that that have been on unverified information?

A. The only study that comes to mind is

Page 183

the one that Stulz referenced in his deposition.

Q. Okay. Have you previously opined that speculation can move market prices?

MR. CAPECI: Objection.

THE WITNESS: That speculation -- speculation absolutely can move -- I mean, prior to mergers and so on, there may be speculations and that can absolutely move stock prices. I don't recall a -- specifically testing to that. But I can testify to that now, yes. Speculation can cause a stock price -- stock prices to change, yes.

BY MS. SOLOWAY:

Q. Okay. Are you distinguishing somehow between rumors and speculation, or could we agree that rumors and speculation are similar concepts?

MR. CAPECI: Objection.

THE WITNESS: No. I -- I think that rumors -- it all depends on how it's -- the credibility that rumors or speculations have and rumors and speculations can move markets, yes.

///

Page 184

BY MS. SOLOWAY:

Q. How, as a matter of the efficient market hypothesis, would you test the proposition that certain unverified information isn't sufficiently reliable to move the market?

MR. CAPECI: Objection.

THE WITNESS: Isn't sufficiently reliable to move the market...

BY MS. SOLOWAY:

Q. Right. Like, let me explain. You're -- you're saying in this report, as I understand it, that the Cafepharma and Glassdoor internet posts were not sufficiently reliable, therefore investors wouldn't have relied on them and they couldn't have moved the market; right?

A. It's -- I'm saying that they -- they are unverified -- unverified. And I'm saying that they are -- they are anonymous. And my point is that there are thousands of unverified anonymous rumors. So there has to be -- there has to be something that distinguishes these rumors from what is out there in a market. And I don't see anything that is -- that is specific in this particular case.

Page 185

And the other thing is, as I mentioned before, and that has to do with when you look at the information, which some of it is total information, and the question is what -- what conclusions do you draw on it, and how do you make money on it, what trading strategy would you employ in order to make money on it?

And, for instance, in -- you know, had you sold it short at the time of these Cafepharma articles, how would you make money on that, what strategy would it be, when would you cover, and so on. And it's very, very difficult to see a way to make money on it.

And that's why I -- you know, in my opinion, this is not something that would have impacted the stock price. That is not to say that maybe somebody read it and bought 100 shares or 1,000 shares as a result of it, but I don't see any evidence that there were any significant trading based on this type of information, nor would I expect them to be.

Q. The Aurelius Value investors figured out how to make money based on the internet postings; right?

MR. CAPECI: Objection.

47 (Pages 182 - 185)

Page 186

THE WITNESS: No. I don't believe -- I don't believe they did. I don't -- if Aurelius said, listen, we have a short position because of these internet postings, I do not believe the stock would have moved. It's like what are you going; right? I don't think these particular internet postings would have resulted in this type of a price reaction at all.

BY MS. SOLOWAY:

Q. So --

A. I don't see why it would.

Q. So if -- if the Aurelius Value report had been issued only citing the internet postings but not citing the qui tam complaint, your view is that it would not have moved the market?

MR. CAPECI: Objection.

THE WITNESS: Yes. And let me just double check here. You said that one is a -- one is a quote from August 12th, 2019, and another one -- well, actually, both of them are I guess -- yeah. I mean, if you say that, then February of, you know, here are two unverified anonymous quotes and then you just put them in

Page 187

your report and oh, yeah, you know, something is going on here, right, we are sure. I don't think any -- I mean, people would have looked at them and said, "what are you doing?"

BY MS. SOLOWAY:

Q. Well, if -- if people had wanted to, they could have gone to see all the other things on Glassdoor and the Cafepharma; right? Not just the couple that are in the Aurelius report; right?

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: That's correct.

BY MS. SOLOWAY:

Q. How do you know -- how do you know, sitting here today -- I mean, have you done an analysis to find out whether if the Aurelius report had not included the qui tam complaint, it would have been a different outcome?

MR. CAPECI: Objection.

THE WITNESS: In my -- in my view, because this is unverified information that is disclosed by anonymous sources, by itself, I do not believe that it would cause a statistically different price decline in the stock price.

Page 188

Now, the price decline that we're talking about is about, you know, $50 million, is 5 percent. That is, you know, anyone -- if -- if that's the way that the market worked, anyone could write these anonymous posts and all of a sudden shave $50 million off the market cap. But that's not the way the market works.

BY MS. SOLOWAY:

Q. I'm asking a really narrow question. You have not performed any kind of a study on that question; right? You're just sort of giving me your gut reaction here?

A. It's based -- based on the value.

MR. CAPECI: Objection.

THE WITNESS: My view, my interpretation of what's value relevant in that particular piece of information.

BY MS. SOLOWAY:

Q. Can you cite an article that supports that proposition?

A. You can look at how value is determined in the valuation portion of my report where it has to have future cash flow impact on the company. And in my opinion, this

Page 189

does not have future cash flow implications for the company. I'm talking about the posts themselves.

Q. So the posts do not have future cash flow impact for the company, but the whistleblower complaint does, in your view, have future cash flow impact for the company?

A. Well, what -- what you do in terms of this type of an analysis is that part of your cash flow analysis would be -- in a situation like this, would be based on assigning some sort of a credibility to the posts.

And in this particular case, you know, if you have anecdotal claims, the question is, well, does that translate to the entire company, is this a company wide policy, is that -- is this something where the top management are enrolled, did they -- how -- how does it relate to (indiscernible), how does it relate to a lot of different things.

So just seeing the tip of the iceberg, you know, you would -- you know, it doesn't have much credibility. And that's why, in my opinion, you would effectively not trade on this type of information -- or -- or these

48 (Pages 186 - 189)

Page 190

posts.

Q. You are aware that the allegations in the qui tam complaint are unproven allegations; right?

A. Oh, absolutely they are.

MR. CAPECI: Objection.

THE WITNESS: They are also contested by the company; right? So -- and so, the 150-page complaint is a lot stronger than unverified anonymous cones, obviously. But it is not as if investors are automatically going to say, "well, you know, this is 100 percent sure because they are unproven," as you say.

BY MS. SOLOWAY:

Q. Again, are you aware of a test that you can use that is based on principles of financial economics to measure the difference that you're pointing out between the reliability of the unproven allegations in the whistleblower complaint and the unproven allegations in the internet posts?

A. Well --

MR. CAPECI: Objection.

THE WITNESS: I mean, you're the one who hired a financial economist. So I mean,

Page 191

you could have had Dr. Stulz do that analysis.

You know, for my purposes, my -- the scope of my assignment is a little bit different, you know. I opine on market efficiency in a reliance context and also class wide damages. And no -- and I provide my -- you know, my rebuttal to Dr. Stulz.

But, you know, I haven't -- I didn't do any affirmative analysis, you know, and I would have to think about how to construct that if I was asked to do so.

BY MS. SOLOWAY:

Q. You've previously opined, and I think you agreed with me before, that speculation can move market prices; right?

MR. CAPECI: Objection.

THE WITNESS: Yes. Absolutely. Sometimes, speculation can make -- move market prices if the market, all of the sudden, starts believing that a company -- that company A is supposed to acquire company B, that will start impacting the stock price prior to the actual announcement, yes.

BY MS. SOlOWAY:

Q. What other types of speculation can

Page 192

move market prices?

A. Any type of speculation that will have future cash flow implications. In other words, there is an impact on the future cash flow of -- of the company or more directly the investment.

Q. So you, in your report, refer to the Aurelius Value investigation as a "credible investigation"; correct?

A. Can you point to exactly where I say that?

Q. Sure. It's your reply report paragraph 18.

Is that right, that you called it a credible investigation?

MR. CAPECI: Objection.

THE WITNESS: Actually, that was not what I intended to -- to opine. If -- if there is -- I used them as an example of something that could be incredible. I haven't independently verified whether or not Aurelius's investigation actually ended up being credible.

It was viewed by -- well, but if you have some credible investigation into the

Page 193

issues, that was the point that I was making, then, of course, there could be an impact on the stock price.

BY MS. SOLOWAY:

Q. Right. But you're not opining here today that the Aurelius Value information was, itself, a credible information?

A. No. It --

MR. CAPECI: Objection.

THE WITNESS: I mean, it's -- you know, I haven't independently verified the credibility of their investigation. What I intended -- I used it as an example of an investor that is going beyond just reading a post and doing their own independent investigation in order to determine the credibility. It's worded a little bit strange, but that was what I intended to say.

BY MS. SOLOWAY:

Q. Okay. And, of course, any investor who reads a post on the internet sites can do to follow up; right? They can make phone calls, they can call former Vanda employees, they could call the company and ask questions. Anyone -- any investor who is interested in

49 (Pages 190 - 193)

Page 194

getting more information could have read those internet postings and done that -- done that investigation; right?

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: In general, any investor who -- who saw that post could have undertaken additional investigation in to how credible the posts were. When you say "that," you know, I don't know if they would have been able to do exactly the same that Aurelius did because there are special skills involved to actually do these type of investigations and do this type of research. But certainly, they could do whatever they were capable of doing.

BY MS. SOLOWAY:

Q. Do you know whether the Aurelius report itself states that it could guarantee the accuracy of the information in it?

MR. CAPECI: Objection.

THE WITNESS: That it states that they would guarantee the accuracy of the information --

BY MS. SOLOWAY:

Q. Let me -- let me -- I think I confused

Page 195

you. Let me rephrase the question. Do you know whether the Aurelius report itself contains information about whether the Aurelius report authors guarantee the accuracy of the information in the report?

A. Well, I would -- I mean, these are allegations; right? So I would be very, very surprised if that was in the report. If I missed it, you can point it out to me. But I would be very surprised if that said that the allegations were accurate.

Q. Right. And you -- actually, if you look at your binder, the -- the tab for the Aurelius report is tab 3. It's already been introduced as an exhibit.

A. Yeah.

Q. If you look on the cover, you can see that the Aurelius report, itself, says that it cannot guarantee the accuracy of the contents; is that right?

A. I'm --

MR. CAPECI: Objection.

THE WITNESS: I'm pretty sure -- I -- I'll take your word for it. I mean, I would be surprised if it said anything else.

Page 196

BY MS. SOLOWAY:

Q. Do you want to look at the document and confirm that?

A. Not really. I mean, I -- I -- I think that what you're saying is fairly obvious and instead of searching for -- I mean, it is what it is.

Q. Okay. Just give me one second. I, of course, have misplaced my copy.

MS. SOLOWAY: Actually, Emily, could I bother you to put the Aurelius report back up on the screen? I'm sorry.

THE WITNESS: Could I -- just to speed this along, I think I found what you're referring to. Can I --

BY MS. SOLOWAY:

Q. Yes.

A. -- just read it into the record. And then we can --

Q. Sure. Sure. And tell us what exhibit you're looking at.

A. Yeah. So I'm looking at this, whatever the number is for the exhibit for the Aurelius report.

MR. CAPECI: Exhibit 9.

Page 197

THE WITNESS: Exhibit 9.

MS. SOLOWAY: Thank you.

THE WITNESS: And it states that:
"The author makes no representation as to the accuracy or completeness of the information set forth in this report and undertakes no duty to update its content."

BY MS. SOLOWAY:

Q. Okay.

A. "The author encourages all readers to do their own due diligence."

Q. Okay. Thank you. I appreciate that. Keep the Aurelius report in front of you just in case we need it.

A. Okay.

Q. And also if you could pull up your reply report. In footnote 34, you state -- I'm just going to direct you to the third line of 34 that the Aurelius report contained "new allegations [that] amplify the findings from our own months-long investigation."

Do you see that?

A. Yes. I do see that.

Q. Do you know what those new allegations are?

50 (Pages 194 - 197)

Page 198

A. New allegations --

MR. CAPECI: You mean --

BY MS. SOLOWAY:

Q. When you cited this report --

MR. CAPECI: Could we -- did -- could we direct him to where it -- it -- it appears in the document?

MS. SOLOWAY: I'm directing him to his expert report. I'm directing him to his expert report. I want to know if he understands what "new allegations" are being referred to here.

THE WITNESS: Well, I -- I assume that they were talking about their own investigation.

BY MS. SOLOWAY:

Q. Do -- do you --

A. Well, I'm sorry. Let -- I -- the new allegations from the whistleblower -- was the allegations from the whistleblower complaint. And then, that amplifies their own information. I'm sorry. I misspoke.

Q. Okay. But, sit -- sitting here today, you don't know what the new allegations themselves are; correct?

A. Yeah. I mean -- the -- the

Page 199

whistleblower complaint -- the allegations in the whistleblower complaint about the off-level marketing scheme and the billing and all of that, that is --

Q. Okay.

A. -- the new allegations.

Q. Okay. All right. I just -- I want to understand -- do you understand that the Aurelius report also contained information about alleged "mass employee exodus"?

A. It discusses that, yes.

Q. There is a chart actually with a bunch of titles of employees who have allegedly left the company; correct?

A. That's correct, yes.

Q. A fairly high -- high amount of detail; correct? This is on -- if it's helpful, it's on page 9 out of 14 of the Aurelius report.

A. Yes.

Q. Yes. And there is also information in the Aurelius report about fraud involving "'fake prescriptions'" and co-pay cards/bribes to doctors; is that right?

A. What are you talking -- which page are

Page 200

you talking about?

Q. Sure. If you look at page 2. I'll direct you, if it's helpful. It's the second full paragraph that starts with "now, 150 page Qui Tam lawsuit."

Do you see that?

A. Yes.

Q. It says:

"Vanda's participation in a fraud involving doctors writing hundreds of 'fake prescriptions' and pocketing cash."

Do you see that?

A. Yes.

Q. Do you know, sitting here today, Mr. Steinholt, whether that information had ever been publicly revealed before?

MR. CAPECI: Objection.

THE WITNESS: Depends on what you mean by "publicly revealed." It's -- I -- I haven't made -- as I sit here right now, I'm -- I'm not sure. And, again, publicly revealed or not, anyone had mentioned it, these internet postings or -- or so on. I -- I don't -- I don't know, as I sit here.

///

Page 201

BY MS. SOLOWAY:

Q. Okay. You don't know. Next one. Page 6. Price gouging with respect to Hetlioz?

A. Yeah. I see that. There is one former a manager observed price or --

(Cross-talk.)

Q. Yeah. Do you know whether that had been --

A. If there --

Q. Sorry. It's sometimes hard with the platform to know when you're going to stop talking. The -- the reference to price gouging, do you know whether that had been publicly disclosed before?

MR. CAPECI: Objection.

THE WITNESS: Well, I mean, the -- the prices, obviously, of the product, obviously, would have been known to -- publicly known. But in terms of this particular former sales manager's observation, it -- the -- this individual was called -- he was gouging people for this product, you know. I -- I don't know if anyone had disclosed that before.

BY MS. SOLOWAY:

Q. What about nepotism? Had nepotism

51 (Pages 198 - 201)

Page 202

been disclosed before?

MR. CAPECI: Objection.

THE WITNESS: I don't know if it -- if it had. Of course, all of that -- there is also discussion why there were -- employees were leaving and why the nepotism was necessary, you know, so --

BY MS. SOLOWAY:

Q. Do you know whether any of that -- I'm sorry. Do you know whether any of that had previously been disclosed?

MR. CAPECI: Objection.

THE WITNESS: It's not something I have specifically investigated.

BY MS. SOLOWAY:

Q. I want to take you back to your opening report, which is Exhibit 1. And I'll take you to paragraph 27, if you will. Oh, you know what. I'm going to -- I gave you the wrong paragraph. Give me a minute to find the right one. There was a typo. 47, not 27.

So I'll read you the first couple sentences of paragraph 47 of your opening report:

"This negative Aurelius Value research

Page 203

report, in an efficient market, would be expected to cause Vanda's stock price to decline."

You then go on to say:

"Following this disclosure, Vanda's stock price declined."

Do you see that?

A. Right, yes.

Q. And -- and you go on to identify a decrease of $0.95 per share; correct?

A. That's correct, yes.

Q. Okay. Is that the amount -- just so I understand it, is the $0.95 per share the amount that you believe the stock had previously been artificially inflated based on information that was connected then in the Aurelius Value report?

MR. CAPECI: No. Objection. This -- this is veering well off the path of what this deposition is about and what Mr. Steinholt has been retained for. You're asking a question about loss causation and this -- asking him -- asking him for what his opinion is on -- on why -- on why the stock declined and what the causation relation of it is to the -- to the

Page 204

stock price. I mean, that's -- that's totally improper.

MS. SOLOWAY: Well, we obviously completely disagree. This goes directly to the price impact and the rebuttal of the price impact under the fraud-on-the-market presumption. And you can make whatever relevance objections you want, but the witness is going to have to answer the question.

BY MS. SOLOWAY:

Q. Do you need the question read back, Mr. Steinholt?

MR. CAPECI: Thank you -- thank you for confirming that your price impact argument is just a loss of (indiscernible) argument.

MS. SOLOWAY: That is -- that is -- yeah. We'll fight about that in the briefs. Let's move on.

BY MS. SOLOWAY:

Q. Mr. Steinholt, do you need the question read back?

A. No. I don't think so. The -- the qualification of how much of that price decline was caused by alleged fraud is something that I am not -- is not an analysis that I have

Page 205

performed.

Q. Okay. So it is -- I just want to make sure I understand this. You're not saying that the $0.95 drop represents fraud-related inflation; correct?

A. No. I mean, 95 is a very specific number. And -- and, you know, I haven't performed any such quantification. I have only, you know, I have opined that you do the analysis using an event study framework, but I haven't actually performed that analysis.

Q. And you haven't attempted to disaggregate fraud-related conduct from nonfraud-related conduct; correct?

A. If there are -- are any material conforming factors that needs to be disaggregated, then that is something that would be incorporated into a damage analysis. But I have not performed such damage analysis at this time.

Q. And you also can't tell me that -- that, for example, it is theoretically possible that the entirety of the $0.95 decline that happened that day is attributable to nonfraud-related conduct; correct?

52 (Pages 202 - 205)

Page 206

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: To nonfraud-related conduct...

Well, it is -- it's entirely possible that there are no fraud in this case. In which case, the entire thing would be caused by -- as it would be in any case, to nonfraud-related conduct. So I don't make -- I don't provide any opinions whether or not there even exists a fraud in this case.

BY MS. SOLOWAY:

Q. I understand that. And I'm not -- I'm not asking you to assume away the fraud.

If you assume the truth of plaintiff's allegations, that there was, at Vanda, off-label marketing, we can just assume that for the purposes of the question, you had not attempted to eliminate the possibility that the $0.95 decline is attributable to nonfraud related revelations; correct?

MR. CAPECI: Objection.

THE WITNESS: Well, I -- I attribute that to the Aurelius report. I mean, clearly. But to the extent the information contained in

Page 207

that report constituted fraud or revealed a fraud, that is not something that I have and that's not an analysis that I have performed.

BY MS. SOLOWAY:

Q. So if I wanted to look for that analysis of how you might separate out fraud-related versus nonfraud-related damages, that's not something I'm going find in either of your reports; right?

MR. CAPECI: Objection. Asked and answered. Outside the scope.

THE WITNESS: Well, the methodology is what I'm talk -- you know, I -- I talk about the methodology. But if you're talking about the actual qualification, no, that is not something that I have included.

BY MS. SOLOWAY:

Q. And when you say you've talked about the methodology -- and we can get to this later -- you're talking about the fact that you explained that there are a couple of different techniques that can be used to calculate damages in a securities case?

A. Yes. I explained the event study framework and the way that the event study

Page 208

framework would be to first use the event study to quantify the company specific portion of -- of the price decline, which would be different than the $0.95 (indiscernible), most likely. And, plus, you control it for market in industry factors.

And then, the question becomes are there any material conforming factors? And, as of right now, I'm not aware of any. Dr. Stulz had not identified any. And so, that is something to be formed at a later juncture. But you had effectively identified the information that -- and do an analysis to make sure that this is actually unrelated to the alleged fraud. You would, then, do an analysis to see whether or not the information had future cash flow implications. And if so, which would make it material -- and if so, you could present value that and exclude that from the company-specific price decline.

Q. I'm going to go back to that question, the issue you just raised. Just give me one second. I just -- you -- you said something that made me realize I skipped something in my outline. So let's just go back to that.

Page 209

Excuse me.

If you look at paragraph 23 of your reply report, you reference an analyst report by Stifel.

Do you see that? Or Stifel [phonetic], I'm not sure how it's pronounced.

A. Yes. I'm on that paragraph, yes.

Q. Yeah. Did you actually look at that Stifel report, or are you just relying on the quotation of it in the complaint?

A. I read it in the complaint. I asked for -- I checked with plaintiff's counsel for the report if they had it. And I was provided just with some LexisNexis article that -- or that had this particular quote in it. So I do not actually have the report.

Q. So you've never read the entirety of this Stifel report; correct?

A. No, I have not.

Q. Okay. Do -- do you have any idea whether the Stifel report elaborated on any details about the "unsealed whistleblower lawsuit" that's referenced here?

MR. CAPECI: Objection. Asked and answered.

53 (Pages 206 - 209)

Page 210

THE WITNESS: The information I had available to me was just what was in the complaint. And I think there may have been a sentence or two -- additional sentence or two in the LexisNexis search. But I do not have the report, so I cannot provide any -- anything else with respect to the report.

BY MS. SOLOWAY:

Q. Well, you -- you quote the report where the analyst cites a stock price movement since February 5th; right?

A. Correct, yes.

Q. Is it your understanding that the analyst is just looking at the stock and saying, based on publicly available stock prices, that it moved between February 5th and the date of the report?

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: Well, the --

BY MS. SOLOWAY:

Q. Let me ask a clarifying question. I just want to understand: Is it your understanding that this analyst has done any kind of a regression analysis on the stock, or

Page 211

is it your understanding that the analyst is simply making an observation based on publicly available stock prices?

MR. CAPECI: Objection.

THE WITNESS: Well, in terms of the 26 percent -- reference to the 26 percent, that is based on an observation relating to the stock prices, which is the price decline from February 5th through a day prior to the date of this report, February 13th. I'm pretty sure that -- that's correct. And then he just opines on the fact that -- or he -- he just observed that the stock is up.

And then, he says that it has the -- that provides the opinion that -- that a 26 percent decline has been -- and I just am quoting it here, large -- "largely driven by the news of the partial clinical hold (PCH) on tradipitant and the unsealed whistleblower lawsuit."

BY MS. SOLOWAY:

Q. You have no idea what the basis is for that opinion that the Stifel analyst is offering there, do you?

MR. CAPECI: Objection.

Page 212

THE WITNESS: I mean, I -- I think what he's saying is fairly clear. I don't --

BY MS. SOLOWAY:

Q. I'm just asking whether you have any understanding, sitting here today, of what -- what, if any, analysis the analyst did to draw that opinion?

MR. CAPECI: Objection.

THE WITNESS: I only have the conclusion, and -- and, as I said before in my prior answers, I mean, I don't have the analyst report.

BY MS. SOLOWAY:

Q. Okay. You also talk about a city report. You say, "an analyst" -- this is in paragraph 23 of your reply report. You say:

"An analyst from Citigroup also asked Vanda for more information about the Whistleblower Complaint during the February 13, 2019 earnings call."

Do you see that?

A. Yes.

Q. Why is that relevant?

A. It's relevant in this case in particular because Stulz were looking at

Page 213

analyst commentary and was arguing that nobody paid any attention to the whistleblower complaint. So I added to the record a couple of instances that he did not include.

Q. Are you aware of any analyst changing their recommendation on Vanda stock on the basis of information in the whistleblower complaint?

MR. CAPECI: Objection.

THE WITNESS: Their -- their buy recommendation?

BY MS. SOLOWAY:

Q. Any -- analysts generally give buy, hold, sell recommendations; right?

A. Right. Right.

Q. Are you aware of any analyst changing their recommendation on the basis of the --

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. -- information in the whistleblower complaint?

A. No. I would be surprised if they did. I mean, the stock dropped quite quickly, so there was, you know -- so no, I do think they did.

54 (Pages 210 - 213)

Page 214

Q. Are you aware -- I'm sorry.

A. And I think the earnings were coming up right there, and then also -- so you would wait until after the earnings call to update your -- your -- typically, to update your recommendations.

Q. Analysts also prepare valuations that take into account their expectations of future cash flows and other financial information by the company; correct?

A. That's correct, yes.

MR. CAPECI: Objection.

BY MS. SOLOWAY:

Q. And -- and do you have, sitting here today, any knowledge of any analyst who modified their valuation of Vanda on the basis of the information in the whistleblower complaint?

MR. CAPECI: Objection.

THE WITNESS: I do not have their valuation models, so I don't know what they did, if anything, to their valuation models.

BY MS. SOLOWAY:

Q. You didn't look to see if any analyst had mollified their valuation of Vanda on the

Page 215

basis of the information in the whistleblower complaint?

MR. CAPECI: Objection.

THE WITNESS: The actual models are not available to me.

BY MS. SOLOWAY:

Q. I'm talking about --

A. They -- what -- they -- they -- what analyst will do is that they would have quite complex models, and they are not typically -- I mean, they -- complete models would not be typically available. And so, I don't have those models.

I, you know -- you can look at commentary and things of that nature, which I -- I guess that's probably what you're focusing in on. And no, I don't think that any analysts used this as the explanation for any changes that they may have made to their models.

Q. Okay. If you take a look at your opening report footnote 51, you explain, in that footnote, what an "event study" is; correct?

A. Footnote 50?

Page 216

Q. One.

A. One. Yes.

Q. Yes. You explain in that footnote what an "event study" is?

A. Yes.

Q. Is it your understanding that an event study is limited to the regression analysis that an expert performs?

A. No. It's the analysis of the event.

Q. So tell me what, beyond the regression, is involved in analyzing an event.

A. You have to -- you have to identify the event, first of all. In this case, what I did was I identified the earnings releases. So that was my event. And for the first part of my analysis relating to that, I also performed two additional event studies relating to the -- the company's announcement on February 5th of 2019, and of the Aurelius report on February 11th, 2019, to see whether or not the following -- these events, there was an impact on the stock price.

Q. Is it fair to say that you have to exercise some judgment, as an expert, in determining which events to analyze as part of

Page 217

your event study?

MR. CAPECI: Objection.

THE WITNESS: Well, in this particular case, when I was focusing in on the financial releases, I was just following Cammer, so I did not exercise any judgment with respect to that at all. It was -- it was just following Cammer. I think that's reasonable to look at the financial releases. I don't have a problem with that, but it wasn't as if I selected these events myself, subjectively. It's what I've done in this report and prior reports, and I analyzed the Cammer Factor 5.

With respect to the two other events, those other two corrective disclosures, again, they were not, you know, selected by me. They were selected by plaintiff's counsel because those are the two dates that they alleged that there were a corrective disclosure is.

BY MS. SOLOWAY:

Q. Would -- would it be fair to say that the first step in an event study is the review of all available public information on a qualitative basis to identify what investors would find material?

55 (Pages 214 - 217)

Page 218

MR. CAPECI: Objection.

THE WITNESS: I -- I suppose that some people can have different steps, but that's typically not the first step. The first step is typically to select the events.

BY MS. SOLOWAY:

Q. Let's look at the -- a paper that I think you cite somewhere by Thorsen, Kaplan, and Hakala called Rediscovering the Economics of Loss Causation. Let's mark this as 10.

MS. SOLOWAY: Em -- Emily, are we up to 10?

MS. MILLER: Yes, that's right.

MS. SOLOWAY: Okay.

(Exhibit 10 marked.)

MR. CAPECI: Where -- where can we find this in the binder?

MS. SOLOWAY: It is 50 in the binder.

BY MS. SOLOWAY:

Q. And I know it's a lengthy article. You can look at anything you like, but just so you know, I'm going to direct your attention to page -- give me one second -- page 110, if you will.

If you could read the first three

Page 219

paragraphs on page 110, that would be very helpful.

Let me know when you're done reading those paragraphs, please.

A. Yes.

Q. Do you have any -- do you quibble in any way -- maybe "quibble" is the wrong word. But do you have any disagreements with the authors of this article in their description of the three stages of an event study that's found on page 110?

MR. CAPECI: Objection.

THE WITNESS: This -- this relates to -- this relates to an event study for -- for the purposes of quantifying damages, so coming up with true value and backcasting. And so, this is, you know, for the event studies incorporated in that context. I have not performed a damage analysis. It's a different -- well, it would be very, very similar in terms of -- for a particular day, there may be no difference in terms of the results. We probably would end up with exactly the same results, but the process is different because of the fact that this is a damage

Page 220

analysis.

BY MS. SOLOWAY:

Q. So I understand that this is a description of an event study that you might use for a damages calculation, but is there anything in here that you believe is inaccurate? As in, you look at it and you say, "I would not do that if I were preparing an event study for the basis of a damages study, that's just wrong"?

A. I have not reviewed it in great enough detail to -- I mean, nothing jumps out at me, but...

Q. Okay. You -- you had a chance to read those three paragraphs though; right?

A. Yes.

Q. Okay. And nothing jumped out at you as wrong; correct?

MR. CAPECI: Objection.

THE WITNESS: I don't -- this is the way that they want to do it in the context of performing a -- a damage analysis and coming up with the true value. I don't have an opinion in terms of recent backcasting and, you know, using percentage ribbon, and so on.

Page 221

I mean, there are a lot of issues in here that are -- may be contested at various points in the litigations. But, you know, I don't really have any comments beyond that.

BY MS. SOLOWAY:

Q. I want to talk a little bit about Cammer Factor 3. What is Cammer Factor 3?

A. Cammer Factor 3 relates to -- actually, let me just -- it's sophisticated investors, but let me just, again, confirm.

It looks at individuals who

"Would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."

Q. I'm sorry. I apologize. I think I realized I didn't understand something about one of your prior answers, so I'm just going to ask you to go back to the Hakala article for a second. So Exhibit 10. Apologies. I think -- it's already been a long day for me.

I -- just, generally speaking, when you do an event study for purposes of class certification, do you still go through the three stages that are outlined by the Hakala

56 (Pages 218 - 221)

Page 222

article?

MR. CAPECI: Objection.

THE WITNESS: Well --

MS. SOLOWAY: I'm still on page 110, Michael.

THE WITNESS: In my previous -- or prior answer, I explained to you the -- the analysis that I went through, the steps that I went through and have been doing for quite some time in analyzing, you know, the nature of market deficiency, what I -- the only thing I found out was that this was not market deficiency, this was for the quantification of damages.

So when you get to the damages stage, you presume that the market is efficient. And then -- so it's not for the purposes of determining market efficiency. It's different for my analysis. So that was the distinction that I -- that I made.

BY MS. SOLOWAY:

Q. I just want to understand. I'm sorry. I'm genuinely just not following, and it may just be because it's a long day. But what exactly -- just looking at step one, for

Page 223

example, what in step one do you do for a damages analysis event study that you do not do for a class cert event study?

A. Well, for a class cert event study, what I -- what I did and I told you was that I focused in on the financial releases because that is what Cammer factor states. So the analysis I did was to try to, number one, determine whether or not there is statistical evidence to demonstrate that the stock price was impacted on days where there were financial releases. So that was the one -- one thing I did. And I know I'm repeating myself, but you're kind of asking the same question.

And the second thing I did was to look at the corrective disclosures and analyze those things. That is not here, you know, that is not the first step here. So it's a different context. And so, you know, I have -- you know, I -- different textbooks -- if you have different textbooks, you will have different steps. So I can show you another textbook where you don't have these three steps.

So if you're -- if the point of this is to say that you have to go through step one,

Page 224

two, three, I can say no, it's not. It's in the -- it is in this context. I don't think -- I don't think I have a problem with it. I think you're going to end up in the same place. But, you know, it's not -- if you took an econometrics textbook, I don't think you're going to get these three steps.

Q. No. I understand. I just was trying to understand -- and I think what you're saying is in step one, you make -- you make different choices based on whether -- of what public information to review based on what stage of the case you're doing the event study at? I -- I think I understand what you're saying. You still have to look at public information, but you make different choices about what to focus on; correct?

A. Yes. I -- I am -- I am focusing in on what Cammer is focusing in on.

Q. Got it. Okay. Sorry. Now we can move onto Cammer Factor 3 that you were just describing to me. You -- you -- sorry.

Actually, let me just scroll up because I don't want to make you repeat your answer again. And I know I -- I distracted

Page 225

you.

THE CERTIFIED STENOGRAPHER: And, counsel, whenever we get to a convenient, logical point in the testimony, if we could take a short break.

MS. SOLOWAY: Sure. You know what, now -- now -- now is totally fine. I'll -- I'll jump right in when we get back.

THE VIDEOGRAPHER: Okay. We're going off record at 2:19 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on record at 2:30 p.m.

MS. SOLOWAY: Okay. Just for the record, plaintiff's counsel is present. He just has the camera off for the moment. I don't -- I don't want anyone to think we're going forward without him.

Thank you.

BY MS. SOLOWAY:

Q. Mr. Steinholt, turning to Cammer Factor 3, just to summarize, the concept here is that invest -- investors, institutional investors have great economic incentives to go out and search for new information; correct?

57 (Pages 222 - 225)

Page 226

That's part of the premise?

MR. CAPECI: Objection.

THE WITNESS: Well, different firms function -- function differently. In terms of going out and searching for information, there are certain firms that that's kind of like their specialty. Other firms are -- or other things where they try to differentiate themselves. But, certainly, there are firms that are researching -- searching for information, yes.

BY MS. SOLOWAY:

Q. How many of those firms are out there, do you think? Hundreds, thousands?

MR. CAPECI: Objection.

THE WITNESS: You know, there is quite a large number of firms and what they try to -- and often, they have kind of like a -- a speciality. They may believe that they have particular insight to the technology or the -- the product, or they have other avenues to kind of obtain information that the rest of the market is not aware of. And if they can obtain information that the rest of the market is not aware of, then they can make money on that

Page 227

information, which is, of course, what happened in the case of the Aurelius where they were able to track down this -- this whistleblower suit. And presumably, they made money when they disclosed that whistleblower suit to the rest of the market and -- and the stock declined.

BY MS. SOLOWAY:

Q. Do you know, sitting here today, whether institutional investors, of the type you just mentioned, right, the kind that like to go out and get information, right, do they monitor glassdoor.com?

MR. CAPECI: Objection.

THE WITNESS: The only thing I can say on that is whether or not they monitor something depends on whether or not they believe they can make money off it. Because whenever they do something, there is a cost associated with it. So if you're going to monitor something, then you take resources and you shift it towards that particular source.

You have to obtain the information. You have to have the ability to analyze the information. And then, thirdly, you also have

Page 228

to have an ability to make money off that information. Now, that's why I, in general, would not think that that would be a place for sophisticated investors to go.

Now, that said, you know, Dr. Stulz says that his student has actually identified an arbitration (phonetic) to -- to that. And, you know, often, those claims should be taken with a grain of salt. But, you know, who knows. I mean, maybe there is. And maybe if he publishes a paper on it, then, all of a sudden, institutions will focus in on it.

Of course, that is how the anomalies disappear also because when it becomes known that you can make money off monitoring Glassdoor, assuming that Dr. Stulz' student is correct, as soon as you publish that, other people will do the same. And then, that opportunity is -- disappears.

BY MS. SOLOWAY:

Q. Do you have any idea what the average number of visitors on the average weekday is for Cafepharma?

MR. CAPECI: Objection.

THE WITNESS: I -- I have not -- I

Page 229

know there are a lot of posts on there, so -- so I would imagine there are also a lot of individuals reading information from there.

BY MS. SOLOWAY:

Q. Are you aware that the New York Times wrote an article in 2007 where it stated that readers of Cafepharma include investors?

MR. CAPECI: Objection.

THE WITNESS: I have no -- you know, I -- it's not in an article I've read, but -- that some investors may look at Cafepharma may be true. Do they trade on that information? That would be a different question. And it most likely would depend on the type of information that you have there.

Personally, when I go to internet sites like that, it is to find things that I may not be aware of in the public domain that is not on Bloomberg. But it is not to trade on the posts themselves. It is to find other sources that is publicly available and is verifiable sources. But that's me, you know. So there may be a lot of different reasons why an investor would visit sites like that.

I don't think I've ever -- ever traded

58 (Pages 226 - 229)

Page 230

on anything, any unverifiable information that I've read on an internet site. I have, however, found investment opportunities on those sites when I could, then, go over and verify that information.

BY MS. SOLOWAY:

Q. So that's a three paragraph answer to the question: Are you aware of a New York Times article? I -- I think the answer about the New York Times article from 2007 that said that readers of Cafepharma include investors was no. Am I getting that right?

A. I'm --

MR. CAPECI: Objection.

THE WITNESS: I don't recall that article, no.

BY MS. SOLOWAY:

Q. Okay. Okay. I'm going to ask you about a Financial Times article from January of 2017 where the Financial Times said that hedge fund and private equity managers have begun mining data from glassdoor.com.

Are you aware of that article?

MR. CAPECI: Objection.

THE WITNESS: No, I'm not.

Page 231

BY MS. SOLOWAY:

Q. Have you, personally, in any of your expert engagements, run up against Glassdoor before?

MR. CAPECI: Objection.

THE WITNESS: No, I have not.

BY MS. SOLOWAY:

Q. What about Cafepharma?

A. No, I have not.

Q. Okay. Have you ever heard of PacerPro?

MR. CAPECI: Objection.

THE WITNESS: I'm not that familiar with any types of PACER products, no.

BY MS. SOLOWAY:

Q. Do you know what PacerPro is?

MR. CAPECI: Objection.

THE WITNESS: No. I'm not familiar with it.

BY MS. SOLOWAY:

Q. Do you know what DocketBird is?

A. No.

Q. Are you aware that there are services that provide users with automatic notifications of legal developments at companies?

Page 232

MR. CAPECI: Objection.

THE WITNESS: I would assume there are, but I -- I don't know.

BY MS. SOLOWAY:

Q. Do you know how institutional invest -- withdrawn.

Do you know whether institutional investors use those services that provide automatic notifications of legal developments at companies?

MR. CAPECI: Objection.

THE WITNESS: I would imagine if the services are available, then they're making money on it, so they have clients.

BY MS. SOLOWAY:

Q. Is that a yes?

A. It's an assumption.

MR. CAPECI: Objection.

THE WITNESS: I mean, you -- you're -- I think your answer is in -- in the question if -- if those services are available, I mean, they must have some clients.

BY MS. SOLOWAY:

Q. And, sitting here today, do you believe that institutional investors would be

Page 233

interested in information provided by services that will provide notifications of legal developments in litigations involving public companies?

MR. CAPECI: Objection.

THE WITNESS: Yes.

BY MS. SOLOWAY:

Q. On the Cammer factors, Factors 1 to 4 are indirect evidence of market efficiency; correct?

A. Typically, we define them as such. I think that one academic article is -- includes analyst report that is direct evidence, but I typically review them as indirect evidence, yes. And I count Cammer Factor 5 -- 1 to 4 as indirect evidence and only Cammer Factor 5 is direct evidence.

Q. Do you believe Cammer Factor 5 is most important of the 5 Cammer factors for the purposes of evaluating market efficiency?

MR. CAPECI: Objection.

THE WITNESS: Not necessarily. It depends on the case.

BY MS. SOLOWAY:

Q. How would you make that decision then?

59 (Pages 230 - 233)

Page 234

A. It depends on what -- how reliable the information is that you have to work with.

Q. Does it depend on the outcome?

A. No.

MR. CAPECI: I -- I --

THE WITNESS: It doesn't depend on the outcome.

MR. CAPECI: Please. Please. Please. We have to let the witness finish his answers before interjecting another question.

THE WITNESS: The -- the issue that we have is that sometimes you get an inconclusive. So here is the way the hierarchy is, and I've testified to this many times. If we have -- if -- if Cammer Factor 5 demonstrates that the market is inefficient, obviously it is inefficient. Okay? If the Cammer Factor 5 is inconclusive, that is when you have to go back -- go to the indirect factors to make that determination.

BY MS. SOLOWAY:

Q. So I want to -- I'm going to go back to -- if you look at paragraph 2 of your opening report. I want to understand, in -- in the final sentence of paragraph 2, after giving

Page 235

that list of cases, you say:

"In each of the matters listed above, my economic analysis demonstrated that the market was efficient and the respective courts granted class certification."

Do you see that?

A. Yes.

Q. Are the cases listed above all class certifications cases then?

A. That's correct, yes.

Q. Okay. Why did you provide this information to the court in this case?

A. It was to show that -- the way that I analyze Cammer factors and the Krogman Factors have been accepted by other courts. I think it's important for experts to look at court opinions. And if the courts reject the way that you do your analysis, I think that you should modify the way that you do your analysis in order to provide analysis that are beneficial to the court as opposed to some theoretical economic analysis that the court may not -- that may not be relevant to the issue that the court is examining.

Q. Are there cases where a court has

Page 236

rejected the way that you did your class certification analysis?

A. My class certification -- oh, these -- the -- my market efficiency analysis? No.

Q. I -- I want to make sure we're talking about the same thing. I'm asking whether there have -- there have been any cases where you were retained as a class certification expert where the court did not grant class certification?

A. I think you're talking about Best Buy, but that is -- that wasn't -- that didn't have anything to do with my market efficiency opinion or the -- it -- it had to do with the price maintenance theory. It was a legal issue. Whether or not that was applicable given the facts in that particular case.

Q. So in -- in Best Buy -- the court -- this is in the -- this is an 8th Circuit decision from 2016; correct?

A. That's correct, yes.

Q. And in that case, the court -- excuse me. You submitted an -- withdrawn.

In that case, you submitted a report to demonstrate that Best Buy's stock traded in

Page 237

an efficient market; correct?

A. That's correct, yes.

Q. And the court, ultimately, concluded that the defendants had rebutted the presumption; correct?

MR. CAPECI: Objection.

THE WITNESS: I don't know how the court phrased it, but it -- it relied on my analysis. And it -- it related to an issue where the company had earnings in those months that caused the stock price to go up. And my recollection is that they also provided guidance, increased guidance and everything, and stock price goes up. Now, that is -- based on my analysis, that is what caused the stock price to go up.

Now, that particular disclosure was determined to be a forward looking statement. Subsequent to that, the -- so it was not actionable. Subsequent to that, there was a conference call with investors. And on the conference call, the company made certain statements that were deemed to be false and misleading and actionable.

So plaintiffs proceeded on the

60 (Pages 234 - 237)

Page 238

basis -- but there -- there was no prior increase in the stock price. And my analysis showed -- was no -- it didn't increase further.

In other words, the argument was that -- that it maintained the stock price. So the question was, well, you know, can you proceed as a class, have you rebutted -- have you demonstrated no price impact in that particular case? The district court favored plaintiffs, the appellate court was 2 to 1 in favor of -- of defendants. But it was effectively the legal issue and nothing to do with my -- my analysis.

BY MS. SOLOWAY:

Q. In fact, the majority decision relied in your legal analysis in finding -- against plaintiffs; correct?

A. My economic analysis, not the legal analysis.

Q. Yup. You also didn't list, in your paragraph 2, the Flowserve case; isn't that right?

A. The Flowserve case. You're talking about Flowserve that was -- it was -- I think it was certified at the time of settlement, so

Page 239

that was a little bit different issue. So I -- I don't -- there wasn't -- the issue -- there was not the market efficiency issue. The issue there was the loss causation standard.

The district court rejected the loss causation standard that I used. It was appealed. And then, there was a three panel -- a panel of three judges including Sandra Day O'Connor, actually. And they overturned the district court's opinion, rejecting the standard -- the loss causation standard that I had used, which is why I now use -- I always quote Flowserve when I state my loss causation standard because it's -- it's better than having it mischaracterized the way that it was in -- in Flowserve.

Q. I'm sorry. You cite other cases in the list from 2007, right, in paragraph 2?

A. In paragraph 2, I think it would -- it would have been misleading, I think, to say that that class was certified when it was certified at the time of the set -- settlement. It wasn't -- there was no decision with respect to certification in that particular case.

Q. No. No. I --

Page 240

A. So it wasn't adjudicated, so that's why it's not listed.

Q. No. No. I - I -- I understand. I'm just saying the legal standard for class verification have changed over time. Can we agree on that?

A. That's correct, yes.

MR. CAPECI: Objection. Calls for a legal conclusion.

BY MS. SOLOWAY:

Q. That's fine. But you -- you include cases going all the way back to 2007, all the way up to 2019; correct?

MR. CAPECI: Objection. Mischaracterizes the report.

THE WITNESS: The -- the reason I go back further is because the market efficiency issue has been a constant. What changed was that -- my understanding is that you, according to Amgen, you didn't have to get into issues relating to materiality. And according to Halliburton, you -- you didn't have to get into issues relating to loss possessions. News weather changes.

New Orleans had to do an analysis

Page 241

related to market efficiency. And this particular paragraph only relates to market efficiency, as the last sentence explains.

BY MS. SOLOWAY:

Q. But you've excluded from the list any decisions where the court also considered market efficiency and the class wasn't certified; correct?

MR. CAPECI: Objection.

THE WITNESS: I'm not aware of any decisions where any court has rejected my market efficiency opinion. So I'm -- I'm not exactly sure what -- what case you're referring to.

BY MS. SOLOWAY:

Q. So in the Flowserve case, is it fair to say that the court excluded your expert analysis?

A. Well, in the -- the fair reading of that particular opinion was that she believed I used an incorrect loss causation standard. And she subsidized -- substituted my loss causation standard with hers. And on appeal, the appellate court rejected her loss causation standard. And then, it went back to the

61 (Pages 238 - 241)

Page 242

district court again. And then, it was settled for, whatever, $55 million, or something like that.

Q. So the -- you're -- where you're distinguishing here is you -- you have not told the court about decisions on class certification where you were criticized, if the criticism was based on legal theories that are not before the court today; correct?

MR. CAPECI: Objection. It misstates his testimony. He's repeatedly testified that Flowserve was in a loss causation, not class cert context on direct counsel to footnote 1, on page 2 of his report, which makes it clear that these are limited to class certification decisions.

BY MS. SOLOWAY:

Q. Flowserve is a class certification decision; isn't it, Mr. Steinholt?

A. The decision -- back in those days, it was a -- a lost causation, particularly in the 5th Circuit, was very much a part of the class certification aspect of -- well, there was also a -- it was in (indiscernible), you know -- I'm not going to -- an expert on the legal loss

Page 243

causation standard. I picked up from what my legal loss causation standard was, and it was up to the court to reject or accept that standard. So I was very transparent about it. She rejected it.

The -- and then, the appellate court rejected her. It was overturned. But that has nothing to do with the issues that we are focusing on here today, which is, you know, market efficiency.

Q. Do you recall giving a -- an expert report in the Barrie v. Intervoice-Brite case also in the Northern District of Texas?

A. Yeah. That was the -- about at the same time. So the Flowserve opinion -- and it was Brite opinion -- was effectively the same opinion, and that went on appeal. But only the -- and settled before the -- the appeal, but only the -- Intervoice -- only the Flowserve opinion was -- was overturned. But, again, they were effectively the same opinion, and both related to loss causation.

Q. So you did not include the Barrie v. Intervoice-Brite case in paragraph 2; correct?

A. Well, why would I -- it has -- I mean,

Page 244

I don't even understand why I would include it, you know. I mean, it had nothing to do with market efficiency. It had to do with the loss causation standard. And it had to do -- and where they applied a different loss causation standard, that was overturned by the 5th Circuit.

So, I mean, it's a different issue than what we are -- what I'm opining on here today. And by the way, it's not as if I was providing a legal opinion on a loss causation standard. Again, that was me being transparent saying that this is the last loss causation standard I'm using. Thereby, they can provide it, transparently, and basically say, "okay, that's fine." And this goes back to my reasons for including these things and that is that, you know, I always want to make sure that I'm -- I'm providing courts with what they're asking -- asking for.

If, in fact, you know, the standard on market efficiency, if this court, unlike the other 20 that I have here, says, "well, listen, you know, I -- I think that you should do it differently," well, then, I -- I will take that

Page 245

into consideration.

Q. There are other cases listed in paragraph 2 where the court, in granting class certification, did not cite your opinion at all; correct?

A. If it was not -- if my testimony was not mentioned -- well, actually, let's -- let me see here.

Q. Do you want to look at an example? If you look at tab 32 in your binder.

A. Yeah. I mean, it's -- it's like, for instance in -- in (indiscernible), for instance, my -- my -- it was not -- I was not cited, but the class was certified. My opposing expert in that case was Dr. Stulz. He was cited, and his subpoena was rejected. So sometimes, they just cite opinions when they reject them. They do not necessarily cite the opinions when they just certify the class consistent with -- with your opinion.

Now, there are other cases where I am mentioned and that is typically when there is a battle of the experts. And then, they will discuss the battle of the experts. And that is also the type of opinions where I would be

62 (Pages 242 - 245)

Page 246

mentioned.

Q. Yeah. I'm just asking a simple question. Are there cases in the list -- have you included cases in the list at paragraph 2 where the court did not mention your expert analysis, so it didn't give an opinion, one way or the other, about your expert analysis in granting a class certification?

A. Well, they -- they granted class certification consistent with my opinion that the market was sufficient. Obviously, if they (indiscernible). If they disagreed with me, they wouldn't have certified the class.

Q. Well, are there cases in the list at paragraph 2 where the defendants did not even contest the predominance prong of rule 23?

A. I don't know. I haven't gone through it for that particular purpose. I think that usually they have some sort of a -- an argument. Even if they do not put up an expert, they throw something in there.

Q. Yeah. I mean, if the plaintiffs only -- excuse me. If the defendants in a case only quibbled with the adequacy, for example, of the lead plaintiff

Page 247

and that was the only issue addressed by court, would you include that decision in this list?

A. If I provide the market efficiency opinion and the court provided -- then provided any opinion either for or against class certification, I would include it.

Q. In paragraph 4, you talk about -- I'll -- I'll read it back to you, "I have also prepared class-wide damages analyses, based on the event-study framework, for trial." And then, you talk about the Novatel case.

Do you see that?

A. Yes.

Q. And you tell the court that in Novatel -- excuse me. Withdrawn.

In your expert report, you say that the court in Novatel found your event study to be "reasonable and reliable"; is that right?

A. That's correct, yes.

Q. Wasn't there also a decision in that case to exclude your original expert report?

A. The -- that's very misleading. The original expert report in that particular case was objected to on Daubert grounds. There was an opinion by the court that said, effectively,

Page 248

the same thing that we said at the very end, that my analysis was reliable.

Q. Your amended analysis; right?

A. No. My initial analysis. What happened was that after I submitted my report, one of the allegations, the channel surfing allegations was the court decided against those allegations. So what the court did was said, "well, you know -- you know that one allegation no longer is part of the -- part of plaintiff's actionable allegations." We had to have me resubmit the report.

Now, in this particular case, the -- this was just one of many means by which the defendants allegedly concealed certain alleged truth, so it didn't have an impact on my analysis. But the court didn't know that, based on my initial report, because my initial report had that allegation included as an assumption.

So I resubmitted my report, and I excluded that assumption, and I also explained to the court why it did not have an impact on my analysis. And then, the quote that you see is from the court's opinion relating to my

Page 249

amended report, even though I had a similar, you know, opinion issued on my initial report.

Q. Do you feel comfortable telling the judge about the decision in that case to accept your report but leaving out the decision in that case to exclude your report? You think that's accurate?

MR. CAPECI: Objection. Misstates the testimony.

THE WITNESS: I -- the -- the judge never criticized my analysis. So yeah, why wouldn't it be accurate. I mean, what you are doing is extraordinarily misleading, so what I'm doing is accurate. My first analysis, based on the assumption that was provided, I was found by the court to be reliable.

My second analysis, which was the same -- exact same analysis based on a slightly different set of assumption was also found by the court to be reliable. So to characterize it as anything else is -- is very, very misleading.

BY MS. SOLOWAY:

Q. I'm just asking questions. I'm not offering facts into evidence.

63 (Pages 246 - 249)

Page 250

I want to turn your opinion about whether class wide damages can be calculated using a common damages methodology that is consistent with plaintiff's allegations.

Let's -- let's start with footnote 52 of your report. I think --

A. Opening report?

Q. Opening report. Yeah. We covered this a little bit before. And I think you said that you would need to modify your event study for the purpose of quantifying damages. I think you -- you testified to that about an hour ago.

MR. CAPECI: Objection. Misstates the testimony.

THE WITNESS: I - if there are material conforming factors, that's when you have to modify the analysis because now you to decipher it, the -- the portion attributable to confirming factors.

BY MS. SOLOWAY:

Q. Right. I just want to --

A. So -- so that is where I was looking.

Q. Yeah. No. I just want to ask a question about the control period that you

Page 251

reference in footnote 52. How would changing the control period help you to properly isolate the fraud-related component of the price movement?

A. I have that in there because one of the things that you want to do is to have a control period that is -- that does not have tainted -- tainted returns. In other words, returns tainted by the fraud. And because of my market efficiency -- because my market efficiency analysis is not based on any assumptions relating to there being fraud of not, I don't consider that aspect of the case. I'm just analyzing market efficiency for a particular period regardless of whether or not there is fraud.

But in terms of the damages analysis, I may determine or the expert may determine that certain dates should be excluded in order to -- to prevent the control period from being tainted by fraud. I think that the impact would be immaterial. But I put the footnote in there just so that if I do make a change, it is something that I have noted in my opening report.

Page 252

Q. Got it. Paragraph 58 of your opening report -- and I think this was what you were alluding to before. You sometimes refine your event study -- or I should say -- the event -- withdrawn.

Event studies can be "refined using fundamental valuation tools."

Do you see that in paragraph 58?

A. Yes.

Q. Have you, sitting here today, ascertained whether that would be necessary in this case?

MR. CAPECI: Objection.

THE WITNESS: I'm not aware of any conforming factors, as I sit here today. It was one of the things that I looked at in terms of Stulz' report, whether or not he had actually demonstrated that there were any material factors that I would need to control for.

But that said, I haven't -- you know, just because he didn't identify anyone, any such material conforming factors. Although, he mentioned, I think in one -- that there were, like, a couple of things that he mentioned that

Page 253

potentially could be confirming factors. So I haven't conclusively excluded the possibility of doing so. But, you know, it -- it seems, to me, that having such information, I would -- I would just use the entire price decline.

BY MS. SOLOWAY:

Q. Do you remember before when we looked at the Aurelius report, I asked you a series of questions about whether certain conduct was disclosed for the first time in the Aurelius report that was about subjects other than off-label marketing.

Do you remember that?

A. Yes.

Q. When you talk about confounding [sic] factors, what do you mean?

A. Well, I was talking about material conforming factors. The material conforming factors are factors that are unrelated to the alleged fraud and that are value relevant in a sense that they have an impact on the future cash flows. So if you do that analysis and you determine that it does have an impact on the -- on the future cash flows, then what you can do is (indiscernible) value that.

64 (Pages 250 - 253)

Page 254

And then -- then, you have kind of the value of that piece of information and you can subtract that from total price decline. And so, that is kind of the -- the basic concept. It's not the only way to use, you know, different fundamental valuation totals to do that. But that's kind of like the basic way of doing it.

Q. Is there anything in either of your reports that I can look at right now to understand how, for example, on February 11, you would approach a fundamental valuation analysis if the Aurelius report contains material information that is not fraud-related?

A. I am -- well, I cited, you know, a couple of pages in the valuation book if you want to go through that. But in order to value anything, you have to -- it has to be identified first. So the first step is to identify the conforming factor, define it to make sure that this is truly unrelated to the alleged fraud. Some of that exercise may involve some -- some legal analysis outside of the scope of the expert.

In other words, it goes back to the

Page 255

appropriate legal standard. What is -- what is -- it -- it goes back to the lost -- the lost -- the issue of lost causation again.

So -- but if you have identified something and then you find it to be value relevant, then what you can do is to use fundamental valuation tools in order to quantify that impact.

Q. And that's not in your -- that -- that analysis that you just described, that's not in either of your reports; correct?

A. No. I just talk about the methodology. You know, I'm not doing any analysis because I do not have any particular conforming factors to perform the analysis on.

Q. Right. You have not received any instructions about confounding [sic] factors from which you could, then, perform or attempt to perform that valuation analysis; correct?

MR. CAPECI: Objection.

THE WITNESS: Well, I mean, it's -- when I looked at Stulz' report, for instance, the only conforming factor I think he has in that particular section is that -- the first sentence of the Aurelius report -- is that he

Page 256

had a short position.

So -- okay. The first step of the analysis is this -- is this statement related to the alleged fraud. Well, the reason they have a position is, of course -- of course, relates to the allegations of the misconduct. But separate and apart from that, just the statement itself that they have a short position, would that be -- would that be value relevant if nobody knew the context.

And so, then, you have to make a determination. Well, does that have any impact on the future cash flows of -- of Vanda? And just that the -- and so, we have an investor. They have a short position. Well, I have a spreadsheet here with a -- a ton of institutions that had long positions. So you have to have a rational why that would be value relevant, just the component of it that they had a short position.

And, you know, so then you have to make a determination. Is it really true that all Aurelius had to do was to say that they have a short position in the stock and then the stock declined? If so, that would be easy for

Page 257

them to make money. All they have to do is disclose their short position. And when the stock declines, then cover.

So you have to go through those types of steps and those -- and that type of an analysis to determine is this a material conforming factor. So -- and that is the step that is missing from Stulz's report. So just because Stulz says that sentence is a conforming factor, doesn't make it so. It doesn't make it so that a -- an expert would have to modify their damage analysis because of it.

BY MS. SOLOWAY:

Q. Professor Stulz also listed information that was in the Aurelius report that is not contained in the whistleblower complaint; correct?

A. I don't think in the damage analysis he did. I think the only conforming factor that he listed there was his one statement that -- that the report contained a sentence saying that they had a short position.

Q. On the --

A. I think -- I think the other part was

65 (Pages 254 - 257)

Page 258

the price impact analysis.

Q. On the -- we've spent a lot of time on the off-label marketing today. I want to turn to the tradipitant allegations.

Can you explain to me what your understanding of the plaintiff's theory with respect to tradipitant?

A. My understanding is that there was some knowledge on the behalf of the company or the defendants that the FDA would require (indiscernible) testing, that the company was not prepared to perform. And -- but was -- and when that was disclosed on February 5th through their lawsuit against the FDA, the stock price declined and that was effectively the corrected disclosure.

Q. What -- what alleged misrepresentations, to your understanding, did the defendants make about the tradipitant allegations, as you understand them?

A. Well --

MR. CAPECI: Objection. Calls for a legal conclusion.

THE WITNESS: From my point of view, the important part in terms of doing the damage

Page 259

analysis is when they legally should have been required to disclose the alleged truth. And I understand that that was in May '18 -- around May of 2018 -- at least by May of '18 -- of 2018, according to my understanding of plaintiff's allegations.

BY MS. SOLOWAY:

Q. What happened in May of 2018?

A. My understanding is that, at that point in time, that is when plaintiff's allege the company knew that the FDA would require this type of testing. And, obviously, the company was not prepared to perform such tests, according to my understanding.

Q. And I understand that you have not yet undertaken a damages analysis. So I'm -- I'm -- I'm not asking you to -- you know, to -- to -- I'm not suggesting that this is somehow already in your report, but you said the -- your understanding is that the -- the duty -- well, withdrawn.

Your understanding is that the starting point for the tradipitant allegations begins when the plaintiffs allege that the company knew that the FDA would require that

Page 260

testing; is that right?

A. Well --

MR. CAPECI: Objection.

THE WITNESS: The inflation would start when the legal obligation would start. That's my only point. So typically, you have a starting point. At this point in time, we haven't completed -- or you guys haven't completed discovery. So I'm just kind of going off the current complaint, which, of course, was written prior to discovery. So there may be changes to that.

But -- so what I'm -- I'm just generally explaining my understanding of it, that there was a duty to disclose. And then, you have a corrected disclosure that the FDA announcement or the suit against the FDA was the corrected disclosure with respect to that allegation.

BY MS. SOLOWAY:

Q. Specifically, though, I want to -- I -- I understand all that. I just want -- want to understand: What is your understanding of what, if anything, the company said in May of 2018 that triggers that start date for you?

Page 261

MR. CAPECI: Objection.

THE WITNESS: You have to -- I mean, that -- that's a legal issue, so I basically take -- in terms of liability -- real liability starts is a legal issue and I don't have, you know, a -- it's -- it's one of my assumption. I assume liability when I performed the damage analysis. And I do not, independently, try to determine, you know, when the company had a legal duty or -- or when they legally made an actionable misrepresentation. That's for the courts to decide. And obviously, whatever the court decide with that -- that respect, that's what would be incorporated into the damage analysis.

BY MS. SOLOWAY:

Q. So with -- without prying in to conversations between you and counsel, I'm just trying to understand is this May of 2018 date something that you got from the complaint, or is this an instruction that you were asked to assume for purposes of you report? I'm just not following where it came from.

A. It came from the --

MR. CAPECI: Objection.

66 (Pages 258 - 261)

Page 262

THE WITNESS: -- complaint, exclusively. I mean, I'm not opining on -- on liability. You asked me what my understanding was based on reading the complaint and that was my understanding on reading the complaint.

But -- you know, I'm not here as a -- you know, I'm not an expert on plaintiff's allegations. They are fully capable of articulating those things themselves and -- but it's -- you know, obviously, I have some sense of some of the allegations and -- in order to think about the methodology that one would use in order to capture those damages, but that's my general understanding of the case.

BY MS. SOlOWAY:

Q. Can you tell me, sitting here today, what statements the company allegedly made about tradipitant, if any, that the plaintiffs contend are false?

MR. CAPECI: Objection. Objection. Asked and answered. And I'll just say that we're getting kind of far afield here from what Mr. Steinholt is retained to do in this case. He's testified, repeatedly, that he's not here to talk about plaintiff's allegations. And I

Page 263

can't see what his views on the -- the factual allegations we made in the case have anything to do with anything with respect to price impact, damages, and so on, and so forth, as it related -- relates for class certification.

We've been on the record for a long time. It's late. I mean, I would ask that we move on from this line of questioning.

BY MS. SOLOWAY:

Q. I'm going to repeat the question unless you remember it, Mr. Steinholt.

A. Well, what happens is that you go through a process -- go through summary judgment and discovery and that's when you actually get the meat and the bones with respect to the allegations. And -- and what I have explained to you, in terms of the allegation, is -- is my understanding of it, and I'm -- I'm not going to go beyond that.

Q. So let's go to basic principles here. Companies make public statements; correct?

A. They sure do, yes.

MR. CAPCI: Objection.

BY MS. SOLOWAY:

Q. Okay. In this case, there is a theory

Page 264

of the case that Vanda made misleading statements about the tradipitant clinical trial study; correct?

A. That's my understanding.

MR. CAPECI: Objection. Misstates -- misstates the complaint.

THE WITNESS: They -- they have -- there is two aspects -- well, they -- they have both a misrepresentation case and they also have an intermission case. And from my point of view, you know, whether or not liability is triggered by misrepresentation or whether or not it is triggered by an omission, it's really not something that I -- I go in to.

BY MS. SOLOWAY:

Q. Okay. That's fine. You said there is a -- a misrepresentation component to the case. I just want to know, sitting here today, you can't tell me a single statement that Vanda made that is contained in the complaint, that plaintiffs filed in this case, that relates to their tradipitant theory?

MR. CAPECI: Objection.

THE WITNESS: I can't go beyond what I just stated. I mean, I haven't conducted a

Page 265

damage analysis. I'm -- I -- my focus is on -- on, you know, the way of conducting or the methodology of performing a damage analysis. These things, obviously, are things that one would consider because it is important to -- to know what triggers liability.

But, ultimately, you know, the -- what drives damages is the alleged truth. It is not the misrepresentations and no -- (indiscernible) is a good example of that because defendants were arguing that if you eliminate certain misrepresentations, that means that the damage methodology has to be changed.

It doesn't -- it's -- the driving force of the damage analysis is the alleged truth that is concealed. So the -- so the misrepresentations, themselves, are like a component of the analysis, but it's not something that I have analyzed at this point in time.

BY MS. SOLOWAY:

Q. Okay. I'm just going to -- I'm going give this one more go and see if can I get an answer to my question.

67 (Pages 262 - 265)

Page 266

Can you tell me, sitting here today, what statements the company allegedly made about tradipitant, if any, that the plaintiffs contend in this case are false?

MR. CAPECI: Objection. Asked and answered.

THE WITNESS: As -- as I said before, I'm not going to go beyond what I already have answered.

BY MS. SOLOWAY:

Q. You cannot tell me what the statements are that plaintiffs in this case contend are false under the tradipitant theory, can you?

MR. CAPECI: Objection. Counsel --

THE WITNESS: I --

MR. CAPECI: -- if you're so concerned with the statements, show him the complaint. (Indiscernible).

MS. SOLOWAY: That would -- that would help. Maybe he should have read the complaint.

MR. CAPECI: Okay.

MS. SOLOWAY: Okay. Let's move on.

MR. CAPECI: He's testified that he has. So I -- I don't -- I don't know what the point of this line of questioning is. It's got

Page 267

nothing to do with class certification.

MS. SOLOWAY: You don't think becoming familiar with the allegations in the complaint, Michael, is relevant to being an expert in a case? That's -- that's fascinating.

MR. CAPECI: I'm not going to -- I'm not going to engage with you on this deposition. This deposition is about Mr. Steinholt's reports. I urge you to keep your questioning within the confines of that. If you choose not to do so, that's your choice. I'll object to that entire line of questioning as being completely irrelevant.

MS. SOLOWAY: Sure.

BY MS. SOLOWAY:

Q. In paragraph 62 of -- of -- 62 of your report, you use the term "multiple inflation ribbons."

Do you see that?

MR. CAPECI: Objection. I -- I don't see that term in paragraph 62 of his report.

THE WITNESS: Paragraph 62?

BY MS. SOLOWAY:

Q. Sorry. I -- I gave you the wrong paragraph number. Give me one second. 59 has

Page 268

"inflation ribbon." I apologize. And then, you see in the second sentence, it uses the term "multiple disclosures" and "multiple inflation ribbons."

Do you see that?

A. Yes.

Q. Okay. So there are two theories in this case. I just want to understand, right, there is the tradipitant theory and then there is the off-label marketing theory. When you talk about multiple inflation ribbons in your report, are you talking about one inflation ribbon for the tradipitant theory and one inflation ribbon for the off-label marketing theory?

A. So, right now, we know that there is going to be -- there are two different parts of plaintiff's allegations. And one will relate to the February 5th price decline. And one will relate to the February 11th price decline. And they will generate their own independent inflation ribbon. And then, this is, you know, relevant because, you know, the damage methodology is tailored to the allegations in the complaint.

Page 269

And in this particular case, the price decline at the time of the corrected disclosure will be used and analyzed in order to determine the inflation from each of those corrected disclosures.

Q. Have you determined whether there would be a need in this case for more than two inflation ribbons?

A. No, I haven't. We have -- typically, in this particular case, you know, that is not something that one would do until after discovery because anything prior -- right now, we know the price declines, but we do not know what the internal documents will show in terms of what defendants would be -- could and should have legally disclosed at various times. But it could be different inflation ribbons, but I don't know.

Q. If there -- if you assume the truth of all of the allegations in the complaint, would you be able to determine, right now, whether there need to be multiple inflation ribbons?

MR. CAPECI: Objection. Calls for speculation.

THE WITNESS: If -- I would have to

68 (Pages 266 - 269)

Page 270

think about it. But I -- you still would want to know what the -- prior to actually doing an analysis, you still would want to have as much information as possible.

The -- there have been a couple of times that I would have -- there is been couple of cases where I have only used the portion of the company's specific price decline, which is what Stulz talks about where I would have to adjust it. On both of those occasions, I would have not been able to do so at the time of class certification because it required additional information that was not available at the time of class certification.

So -- so you don't -- you don't really know. You want to have the -- all of the information available before you actually conduct the analysis, even if all of plaintiffs allegations turns out to be true.

BY MS. SOLOWAY:

Q. So I guess what you're saying is, in your view, it's just premature to do an analysis now of whether multiple inflation ribbons would be needed for either of the two theories in this case?

Page 271

A. It's premature. It's not -- I mean, you can always put together a damage analysis. But, you know, they -- reflected in that damage analysis will be the fact that you do not have all of the information available. And consequently, will be less reliable then at a later stage where you do have that information available.

Q. Okay. Mr. Steinholt, have you ever submitted an expert report that included a compilation of publicly available information?

(Reporter clarification.)

MR. CAPECI: Objection.

THE WITNESS: When -- when you say "compilation," are you talking about, like, a chronology of events?

BY MS. SOLOWAY:

Q. Sure. That would be a compilation, wouldn't it?

A. Well, I'm just asking. I just want to answer accurately. Yeah. I have -- I have done that. I think that one of the reports that you showed me earlier had such a chronology of events.

Q. Yeah. Have you ever had one of your

Page 272

expert reports stricken on the basis that it included a compilation of information to present that information to the court?

MR. CAPECI: Objection.

THE WITNESS: Present? I don't think I ever attempted to present that information to any court.

(Cross-talk).

THE WITNESS: You will have to refresh my memory.

BY MS. SOLOWAY:

Q. Yeah. Yeah. Okay. So you say that there are compilations of information in your reports; correct?

MR. CAPECI: Objection. Misstates the testimony.

BY MS. SOLOWAY:

Q. Let's look at the -- let's look at the Dendreon example. We looked at it before; right? It's tab 48.

A. Yes. Fine.

Q. It's not -- it's not a trick question. So this is a report that you issued in the Dendreon case; correct?

A. This is -- one moment here because

Page 273

this is really heavy. I don't know there's another tab. But yeah, I -- I know -- I don't know where I put that.

Q. It's tab 48. Did you take it out of your binder? It's tab 48.

A. I don't know where I -- maybe I put it back in.

MS. MILLER: It's also marked as Exhibit 7, if you want to look at the exhibit platform.

THE WITNESS: Yeah. Sure. I'll look it up.

Okay. What do you want to -- want me to look at?

BY MS. SOLOWAY:

Q. Take a look at Exhibit B of your Dendreon report.

A. Okay. Any particular page you want me to --

Q. No. Just the first page of Exhibit B.

A. Okay.

Q. Fair to say that is a chart that compiles a whole bunch of public information about the company?

A. So this is chronology. It has the

69 (Pages 270 - 273)

Page 274

stock price, volume, closing price, percentage change, and a (indiscernible). And then, I put some events next to it.

So you can kind of go through and look at what happened on a particular day based on my search on Bloomberg, and I don't know if I put the analyst reports in here, but it looks like I did.

Q. When you submitted this compilation of public information in your expert report, did you believe it would be useful in sort of taking what is otherwise like a large amount of information and concentrating it in one place?

A. Well, it's -- I mean, no, I just -- I -- I don't include all of that information because it's only basically a lot of pages that nobody reads. But it's kind of -- it -- it shows what I looked at in my analysis in that particular case.

Q. Has anyone ever suggested to you that it's not proper for an expert to compile, (indiscernible), for example, a chart formation like this, the information that they've looked at in forming their opinions?

MR. CAPECI: Objection.

Page 275

THE WITNESS: You mean, like Stulz's Exhibit 1?

BY MS. SOLOWAY:

Q. For example, like that.

A. No.

Q. You've never heard that that's not a proper rule for an expert?

A. To disclose what he looked at?

Q. Correct.

A. No. I typically -- one would think that an expert would disclose what he looked at.

Q. And the -- the fact of sort of compiling, you don't find that to be something offensive from the perspective of your experience as an expert, to trust an expert to compile the information?

MR. CAPECI: Objection.

THE WITNESS: If the expert represents that that is the only information that's out there, then I think it's improper. But if the expert says this is the information that I looked at, then I think that that would be valuable. I think it's the -- it depends on how it's represented.

Page 276

BY MS. SOLOWAY:

Q. So as long as it's accurately represented, you're okay with it?

A. Well, I -- you know, I don't know what -- you know, it's -- it's, you know -- it's up to the judges to decide what they believe is appropriate. And I certainly would follow whatever guidance that -- that I would be provided if -- you know, if exhibits like (indiscernible) Exhibit 1 or the exhibit that I did more than a decade ago in Dendreon was not appropriate, that's certainly something I would not do.

Q. But you, personally, have never been a subject to a Daubert motion on the grounds that you included such a chart in your report?

A. Not that I know of.

Q. Why don't we take a break. I want to go back through and make sure I don't have anything else.

THE VIDEOGRAPHER: All right. Going off the record at 3:37 p.m.

(Recess.)

THE VIDEOGRAPHER: Back on record. 3:49 p.m.

Page 277

BY MS. SOLOWAY:

Q. Mr. Steinholt, right before the break, I asked you a question, as you may recall, about -- for the tradipitant theory of the case, what the significance was of May of 2018.

Do you remember that?

A. Yes.

Q. Can you clarify for me what event you're pointing to in May of 2018 that you said starts the inflation ribbon for that -- for that theory of the case?

MR. CAPECI: Objection.

THE WITNESS: Well, I -- my point was that you would go and you would have to look at the internal documents to determine when defendants had knowledge and a legal duty to disclose. And I think that may have been something that was mentioned in the complaint as when the company, internally, became aware of it.

Now, I would still have to know at what point in time, you know, the legal duty was there. In other words, when does liability start, which is outside of the scope of my analysis.

70 (Pages 274 - 277)

Page 278

BY MS. SOLOWAY:

Q. And if you're operating on a misrepresentation theory, you'd also need to know when the alleged false statements started; correct?

A. Yes. You'd have to -- if it is a misrepresentation that triggers liability, then you have to look at when that misrepresentation was made. And typically, in cases like this, which is -- you know, typically, we call it omission cases because it's kind of, you know, it's -- there may be misrepresentations where the company should have stated something that was false and misleading because there was something that they internally knew that they didn't disclose at the same time. But you would need to know that in order to do the analysis.

But, you know, that is outside of, you know, what I'm doing, you know. I take guidance from the court in terms of -- or the jury, if it goes to the jury, when they say liability starts.

Q. And you -- you don't know, sitting here today, what the first alleged

Page 279

misrepresentation about tradipitant in this case was; correct?

MR. CAPECI: Objection.

THE WITNESS: No. Well, I mean, it's -- it's -- I don't have -- you know, I'm not going to sit here and speculate. I mean, there is a lot of stuff that I'm not looking at, and I'm not going to start to engage in some sort of a memory test of everything that was in the complaint.

BY MS. SOLOWAY:

Q. Did you review any materials during the break we just took?

A. No, I did not.

Q. Did you speak to your counsel during the break?

A. No, I did not.

Q. I have nothing further.

MS. SOLOWAY: Michael, do you have questions?

MR. CAPECI: No. We don't. Thank you very much, Mr. Steinholt, for your time.

MS. SOLOWAY: Mr. Steinholt, thank you so much. I appreciate it.

THE WITNESS: Thank you.

Page 280

MS. SOLOWAY: Bye, everyone.

THE CERTIFIED STENOGRAPHER: Just a moment.

THE VIDEOGRAPHER: Okay. We're going off the record at 3:52 p.m. This concludes today's testimony provided by Bjorn Steinholt. Media will be retained by Veritext Legal Solutions. Thanks, everyone.

(Deposition concluded at 3:52 P.M.)

-oOo-

Page 281

GORDON vs. VANDA PHARMACEUTICALS, et al.

11/5/2021 - BJORN STEINHOLT

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

BJORN STEINHOLT            Date

71 (Pages 278 - 281)

Page 282

GORDON vs. VANDA PHARMACEUTICALS, et al.

11/5/2021 - BJORN STEINHOLT

ACKNOWLEDGEMENT OF DEPONENT

I, BJORN STEINHOLT, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

BJORN STEINHOLT                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

Page 283

CERTIFIED STENOGRAPHER'S CERTIFICATE

STATE OF CALIFORNIA   )
                      ) SS.
COUNTY OF LOS ANGELES )

I, NATALIE PARVIZI-AZAD, HERBY CERTIFY:

I AM A DULY QUALIFIED CERTIFIED SHORTHAND REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF CERTIFICATE NUMBER CSR 14125 ISSUED BY THE COURT REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL FORCE AND EFFECT.  (BUS. & PROF. § 8016)

I AM NOT FINANCIALLY INTERESTED IN THIS ACTION AND NOT A RELATIVE OR EMPLOYEE OF ANY ATTORNEY OF THE PARTIES, OR OF ANY OF THE PARTIES. (CIV. PROC. § 2025.320(A))

I AM AUTHORIZED TO ADMINISTER OATHS OR AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE, SECTION 2093 (B) AND PRIOR TO BEING EXAMINED, THE DEPONENT WAS FIRST PLACED UNDER OATH OR AFFIRMATION BY ME.  (CIV. PROC. §§ 2025.320, 2025.540(A))

I AM THE CERTIFIED OFFICER THAT STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE FOREGOING PROCEEDING AND THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE TESTIMONY GIVEN. (CIV. PROC. § 2025.540(A))

Page 284

I HAVE NOT, AND SHALL NOT, OFFER OR PROVIDE ANY SERVICES OR PRODUCTS TO ANY PARTY'S ATTORNEY OR THIRD PARTY WHO IS FINANCING ALL OR PART OF THE ACTION WITHOUT FIRST OFFERING SAME TO ALL PARTIES OR THEIR ATTORNEYS ATTENDING THE PROCEEDING AND MAKING SAME AVAILABLE AT THE SAME TIME TO ALL PARTIES OR THEIR ATTORNEYS.  (CIV. PROC § 2025.320(B))

I SHALL NOT PROVIDE ANY SERVICE OR PRODUCT CONSISTING OF THE CERTIFIED STENOGRAPHER'S NOTATIONS OR COMMENTS REGARDING THE DEMEANOR OF ANY WITNESS, ATTORNEY, OR PARTY PRESENT AT THE PROCEEDING TO ANY PARTY OR ANY PARTY'S ATTORNEY OR THIRD PARTY WHO IS FINANCING ALL OR PART OF THE ACTION, NOR SHALL I COLLECT ANY PERSONAL IDENTIFYING INFORMATION ABOUT THE WITNESS AS A SERVICE OR PRODUCT TO BE PROVIDED TO ANY PARTY OR THIRD PARTY WHO IS FINANCING ALL OR PART OF THE ACTION.  (CIV. PROC. § 2025.320(C))

DATED:  November 10, 2021.

_____

NATALIE PARVIZI-AZAD, CSR NO.14125

72 (Pages 282 - 284)

**[& - 40,000]**

Page 1

| & | | | |
|---|---|---|---|

**&**

**&**   3:4,12 5:22 6:2 283:10

**0**

**0.95**   203:10,13 205:4,23 206:20 208:4
**01108**   1:5 2:5

**1**

**1**   4:9 10:4,5,15,25 28:5 46:5 202:17 233:8,15 238:10 242:13 275:2 276:10
**1,000**   185:18
**10**   4:9,10,22 218:10,12,15 221:20 284:21
**100**   40:9 147:9 163:6 185:17 190:12
**10019**   3:14
**10:00**   164:17 165:3
**10k**   106:7
**11**   166:18 167:6 254:11
**11/5/2021**   281:2 282:2
**110**   218:23 219:1 219:11 222:4
**111**   4:16
**11747**   3:7
**11:15**   127:6
**11:37**   127:9
**11th**   16:12 130:21 131:13 132:8 160:4 163:15,23 164:4,18,20 165:4 216:20 268:20

**12**   83:4 166:25 167:7,17,17,18,23 171:22
**1285**   3:14
**12:40**   176:13
**12th**   186:21
**13**   77:11 212:20
**13th**   211:10
**14**   166:18,25 167:23 199:18
**14125**   1:24 2:22 283:8
**147**   4:18
**14th**   130:17
**15**   46:21 47:9,17 50:15 83:10,12 127:12,20
**150**   190:9 200:4
**152**   4:19
**15th**   59:16
**166**   4:21
**17th**   11:12
**18**   192:13 259:3,4
**19**   182:9
**1970**   4:15 60:2 70:3,11 75:18 77:9,18 78:5 79:10 84:9 87:20 103:21 113:23 114:5 116:23 117:12 118:3,11 118:11 149:18,24 150:12 182:9
**1970s**   76:6 103:20 104:13 106:25 107:8,13
**1971**   113:23
**1988**   149:19
**1989**   29:23
**1990s**   104:13

**1991**   4:16 110:5,23
**1994**   105:3
**1998**   150:13
**1:12**   176:16
**1:19**   1:5 2:5

**2**

**2**   4:10 9:3,5,11 10:10,12,19 69:6 116:17 127:13 200:2 234:23,25 238:10,21 239:18 239:19 242:14 243:24 245:3 246:4,15
**20**   69:21 104:4,15 104:18,20 113:22 244:23 282:15
**2007**   158:16 229:6 230:10 239:18 240:12
**2009**   4:18 147:5
**2010**   69:23 152:3
**2016**   236:20
**2017**   130:11 230:20
**2018**   259:4,5,8 260:25 261:19 277:5,9
**2019**   130:22 186:21 212:20 216:19,20 240:13
**2021**   1:18 2:20 4:9 4:10 5:2,6 9:25 10:8 11:12 284:21
**2025.320**   283:14 283:19 284:8,19
**2025.540**   283:20 283:25
**2093**   283:17
**21159**   284:23

**212**   3:15
**218**   4:22
**23**   209:2 212:16 246:16
**26**   211:6,6,16
**27**   202:18,21
**28**   4:11
**29**   4:10
**29th**   10:8,18
**2:19**   225:10
**2:30**   225:13

**3**

**3**   4:11 11:5 28:6,8 28:13 40:16 166:10 195:14 221:7,7,8 224:21 225:22
**30**   4:9 31:25 36:14 101:13
**30th**   9:25 10:14 16:20
**32**   245:10
**34**   197:17,19
**35**   85:11
**367-7100**   3:7
**373-3289**   3:15
**388**   83:7,10,13,14 83:20 84:2,8 94:11 101:9,14
**3:37**   276:22
**3:49**   276:25
**3:52**   2:19 280:5,9

**4**

**4**   4:13 57:20 58:4 58:6,12 63:22 69:6 233:8,15 247:7
**40**   115:19 147:16
**40,000**   23:13

**[415 - affirmation]**                                                                 Page 2

**415**  83:7,11,20
  84:2 100:24 101:6
  101:9,14,16
**423**  41:10
**43**  111:13
**46**  9:4,5,11
**47**  151:19 202:21
  202:23
**48**  146:13 272:20
  273:4,5
**4th**  131:8,10 132:6
  156:23 163:22

**5**

**5**  1:18 2:20 4:15
  5:2 21:6,19 61:9
  78:4,4,7 135:11,15
  178:15 188:3
  217:13 233:15,16
  233:18,19 234:15
  234:17
**50**  188:2,6 215:25
  218:18
**500**  152:4
**51**  77:19 215:22
**52**  250:5 251:1
**525**  22:17
**55**  242:2
**57**  4:13
**58**  3:6 252:1,8
**59**  267:25
**5th**  5:5 16:12
  131:9,11 132:6
  156:23 210:11,16
  211:9 216:18
  242:22 244:6
  258:13 268:19

**6**

**6**  4:5,16 110:11
  111:1,4 201:3

**62**  267:16,16,21,22
**631**  3:7

**7**

**7**  4:18 146:19
  147:1,3,12 152:11
  153:9 273:9
**78**  4:15

**8**

**8**  4:19 15:14,21
  16:1 151:25 152:1
**80**  38:1
**8016**  283:10
**8:32**  2:19 5:2,5
**8:54**  23:4
**8:55**  23:7
**8th**  236:19

**9**

**9**  4:21 46:6,7
  166:12,15 177:8
  196:25 197:1
  199:18
**90s**  104:21,23
  107:2
**95**  205:6
**9:16**  39:15
**9:19**  39:18
**9:34**  50:8
**9:47**  50:11

**a**

**a.m.**  2:19 5:2,5
  23:4,7 39:15,18
  50:8,11 127:6,9
**ability**  8:4 227:24
  228:1
**able**  8:11 63:15
  108:14 167:21
  181:9 194:10
  227:3 269:21
  270:11

**absolutely**  91:21
  119:5,7 120:9,12
  120:24 183:7,9
  190:5 191:17
**abut**  20:9
**academic**  24:12
  32:13,15,20 33:4
  34:12,23,24 55:14
  55:20,24 67:5,13
  68:25 70:8 75:20
  75:24 108:18
  140:16 154:1
  155:25 181:9
  233:12
**academics**  34:18
**accept**  243:3 249:4
**accepted**  235:15
**access**  108:7,8
  157:7,15 168:24
  169:20
**accessed**  168:25
  170:2,10,14
**accessible**  52:10
  55:5 56:25 57:3,5
  59:8,19 60:11,21
  60:24 61:15,19
  62:8 75:14,22
  76:15 142:13
  156:20
**accessing**  43:7
**account**  214:8
**accuracy**  194:19
  194:22 195:4,19
  197:5
**accurate**  153:4
  195:11 249:7,12
  249:14
**accurately**  150:11
  271:21 276:2
**achieve**  48:22
  51:19

**acknowledgement**
  282:3
**acknowledges**
  91:1
**acquire**  44:13
  191:21
**acquiring**  159:15
**action**  1:4 2:4
  16:24 17:4 18:13
  131:20 283:12
  284:4,15,19
**actionable**  237:20
  237:24 248:11
  261:11
**actions**  38:13
**actual**  14:21 15:17
  49:19 191:22
  207:15 215:4
**added**  213:3
**addition**  21:21
  174:13
**additional**  14:2,7
  14:14 30:15,17
  171:5 194:8 210:4
  216:17 270:13
**additions**  282:6
**addressed**  63:19
  81:3 247:1
**adequacy**  246:25
**adjudicated**  240:1
**adjust**  270:10
**adjustment**  84:18
  89:9 119:24 120:6
**administer**  283:15
**advanced**  30:7
**advantage**  43:17
  63:16 161:1 173:6
**advisors**  37:3
**affect**  175:10
**affirmation**
  283:19

**affirmations** 283:16
**affirmative** 191:9
**afield** 262:22
**afternoon** 127:16
**ago** 8:12 38:24,25 39:25 97:22 98:1 99:24 104:15,25 250:13 276:11
**agree** 5:15 15:8 17:1 33:16 53:9 56:24 59:11,13,18 59:22 60:1 84:24 86:17 91:16 92:22 93:24 95:1 102:5 103:3 112:9 116:10 119:1 137:11 140:3 141:6,16 142:6,10 142:24 143:13,15 143:19 151:6 157:7 164:25 167:10 168:1,18 169:15 177:11 179:3,7 183:17 240:6
**agreed** 8:15 80:9 191:14
**agreeing** 60:7
**agreement** 8:9 167:19
**agrees** 45:19
**ahead** 6:6 180:11
**al** 281:1 282:1
**alarm** 49:15
**allegation** 248:9 248:19 260:19 263:18
**allegations** 18:17 132:17,23 133:16 134:16 166:21

190:2,3,19,21 195:7,11 197:20 197:24 198:1,11 198:18,19,23 199:1,6 206:16 248:6,7,8,11 250:4 256:6 258:4,20 259:6,23 262:8,11 262:25 263:2,16 267:3 268:18,24 269:20 270:19
**allege** 259:10,24
**alleged** 199:10 204:24 208:15 217:18 248:15 253:20 254:22 256:4 258:17 259:2 265:8,16 278:4,25
**allegedly** 199:13 248:15 262:17 266:2
**allen** 50:22 76:9 77:12 117:23 138:16 139:15
**allison** 3:13 5:24
**allowed** 141:19
**alluding** 252:3
**amalina** 3:9
**amend** 12:9
**amended** 248:3 249:1
**americas** 3:14
**amgen** 46:23,25 47:8,16 48:2 50:15 240:20
**amount** 199:16 203:12,14 274:12
**amplifies** 198:20
**amplify** 197:20

**analyses** 13:3 36:16 247:9
**analysis** 14:4 17:19 21:19 24:6 24:7 25:8 31:2 33:9 34:20 36:7 36:17 37:6 67:11 124:20 132:11 136:4,11 170:21 174:1 187:17 189:9,10 191:1,9 204:25 205:10,11 205:18,19 207:3,6 208:13,15 210:25 212:6 216:7,9,16 219:19 220:1,22 222:8,19 223:2,8 235:3,18,19,20,22 236:2,4 237:9,15 238:2,13,16,18,19 240:25 241:18 246:6,7 248:2,3,4 248:17,24 249:11 249:14,17,18 250:18 251:11,17 253:22 254:13,23 255:10,14,15,19 256:3 257:6,12,19 258:1 259:1,16 261:8,15 265:1,3 265:16,19 270:3 270:18,23 271:2,4 274:18 277:25 278:18
**analyst** 20:23,24 21:7,22 31:7,22 33:8 36:15,24 43:7 53:21,22 54:8,11 55:13,15 71:15 73:22 74:9 74:15,25 75:12

121:11,18 125:14 128:11 130:14,17 137:22 159:8 178:10,10 209:3 210:10,14,24 211:1,23 212:6,11 212:15,17 213:1,5 213:16 214:15,24 215:9 233:13 274:7
**analysts** 21:23 27:22 36:16 45:12 56:6 75:11 108:9 124:14 213:13 214:7 215:18
**analyze** 21:2 44:22 45:14 73:3 74:12 121:1 171:25 172:8 173:12 216:25 223:16 227:24 235:14
**analyzed** 12:20 42:11 73:8 109:5 154:8 217:13 265:20 269:3
**analyzing** 34:25 35:2 42:25 43:1 43:20 62:25 63:7 63:9 68:20 72:22 73:6 135:9 155:20 216:11 222:10 251:14
**anecdotal** 189:14
**angeles** 283:3
**announce** 107:18
**announced** 121:13
**announcement** 121:4 123:2,5,13 123:23 191:23 216:18 260:17

**announcements** 71:5 84:20 89:21 90:1,5,9 107:20 117:9,16 118:14 119:4,25 120:7,14 120:15,19,23 121:24 122:2,19

**annual** 84:20 89:21 90:17 105:7 106:7 107:8 182:18

**anomalies** 228:13

**anonymous** 72:6 72:10,11 161:10 166:5 171:1 172:18 178:17,22 180:23 184:19,21 186:25 187:23 188:5 190:10

**answer** 18:1,24 26:24 27:7 52:17 64:11 83:17 100:5 111:15 121:10 124:25 126:5 144:9 154:24 158:7 174:3 175:2 204:9 222:7 224:25 230:7,9 232:20 265:25 271:21

**answered** 64:19 68:4 74:19 76:18 79:2 80:5 81:8 121:8 122:5 124:11 125:12 138:13 156:12 207:11 209:25 262:21 266:6,9

**answering** 126:24 152:7

**answers** 19:4,8 61:16 162:15,16 162:17,18 174:21 212:11 221:18 234:9

**anyway** 49:18

**apart** 25:24 132:22 256:7

**apearl** 3:16

**apologies** 221:20

**apologize** 47:14 221:16 268:1

**apparently** 109:16 130:8

**appeal** 241:23 243:17,18

**appealed** 239:7

**appearance** 5:18

**appeared** 108:17

**appears** 35:8 111:12 141:20 146:16 147:8 152:3 198:6

**appellate** 238:10 241:24 243:6

**appended** 282:7

**applicable** 236:16

**applied** 244:5

**applies** 70:8

**apply** 135:19

**applying** 139:7

**appoints** 32:14

**appreciate** 197:12 279:24

**apprised** 108:11

**approach** 74:2 254:12

**appropriate** 25:3 140:4 255:1 276:7 276:12

**approximately** 40:4

**arbitration** 228:7

**area** 31:11 32:1,18 33:24,25 35:8,9 71:25 112:10 124:18

**areas** 31:23 32:3,4 33:24 34:9 116:18

**arguing** 213:1 265:11

**argument** 68:25 109:21 132:5 153:25 156:19 204:14,15 238:4 246:20

**argumentative** 65:21 82:1 100:1 122:5

**array** 20:20 21:10 22:4

**article** 4:15,16 60:1 69:22 70:3,5 70:11 75:19 76:7 76:7,9 77:9,18 78:5 79:3,5,6,11 80:16,18,22 83:6 84:9 85:18,21 86:3,4,18 98:19 110:23 114:5 115:15,19,21 149:21,24,25,25 182:10 188:20 209:14 218:20 219:9 221:19 222:1 229:6,10 230:9,10,16,19,23 233:12

**articles** 76:25 77:3 77:4 101:8 122:6 150:13 185:10

**articulating** 262:9

**artificially** 203:15

**ascertain** 102:18 128:7 135:5

**ascertained** 252:11

**aside** 49:4 74:14 74:15 121:22 134:8

**asked** 21:6 49:22 64:18 68:3 74:18 76:17 79:1 80:4 81:7 83:17 111:16 121:7 122:5 124:10 126:6 138:12,21 139:16 152:7 156:11 191:11 207:10 209:11,24 212:17 253:8 261:21 262:3,21 266:5 277:3

**asking** 17:24 18:19 20:9 21:8 62:2 73:24 74:13 80:22,25 85:6,14 99:12,14 106:11 106:15 115:20 117:14 118:20,21 118:23 121:22 122:17,18 126:11 128:23,24 132:20 135:15,16 161:7 162:12 165:11 174:3,22 182:22 188:10 203:21,22 203:23 206:14 212:4 223:14 236:6 244:20,20 246:2 249:24 259:17 271:20

**asks**  21:6
**asoloway**  3:15
**aspect**  242:23
  251:13
**aspects**  264:8
**assess**  22:3 181:5
**assessment**  130:19
**assigning**  189:11
**assignment**  12:15
  25:22 191:3
**assignments**
  136:14
**assistant**  31:1
**associated**  43:3
  227:20
**assume**  26:5 72:9
  73:21 85:16
  128:17,22 136:25
  137:5,17,23 181:7
  198:12 206:14,15
  206:17 232:2
  261:7,22 269:19
**assumed**  101:25
  139:13
**assumes**  163:25
  165:9 174:17
  177:1
**assuming**  228:16
**assumption**  75:13
  137:16,17 232:17
  248:20,22 249:15
  249:19 261:6
**assumptions**
  102:23 251:12
**astray**  61:18
**attached**  11:1
**attempt**  170:16
  255:18
**attempted**  205:12
  206:19 272:6

**attending**  5:11
  284:5
**attention**  50:14
  59:7 88:25 95:25
  152:10 213:2
  218:22
**attitude**  125:10
**attorney**  5:19 27:1
  155:24 283:13
  284:2,12,13
**attorneys**  284:5,7
**attraction**  72:8
**attributable**
  205:24 206:20
  250:19
**attribute**  206:23
**attributing**  130:15
**audio**  5:14 39:7
**audra**  3:12 5:21
  126:22 175:22
**august**  186:21
**aurelius**  4:21 28:1
  60:23 62:11 121:1
  128:20 129:23
  131:1,2,14 132:4
  132:12,21 133:5
  133:18 134:10
  158:10,14 160:3
  160:13,20 161:9
  161:22 162:23
  163:15 164:6,12
  164:13,16 165:6
  165:23 166:7
  167:10 168:2,5,8
  168:19,25 169:8
  169:11,13 171:20
  174:14,15 185:22
  186:3,13 187:9,17
  192:8 193:6
  194:11,17 195:2,3
  195:14,18 196:11

  196:24 197:13,19
  199:9,19,22
  202:25 203:17
  206:24 216:19
  227:2 253:8,10
  254:13 255:25
  256:23 257:16
**aurelius's**  192:22
**author**  160:2
  165:24 197:4,10
**authorized**  283:15
**authors**  71:22
  167:11 195:4
  219:9
**automatic**  231:24
  232:9
**automatically**
  72:9 128:17
  136:25 190:11
**availability**  144:6
**available**  4:14
  17:12 20:21 21:24
  46:12,17 47:3,16
  49:2 50:17 51:9
  51:10 52:1,7,9
  53:6,10 54:14,22
  54:25 55:1,4,6,17
  56:1,3,7,11,13,15
  56:24,25 57:10,17
  58:19,21 59:1,5,12
  59:18 61:25 62:1
  62:20 63:12,13
  64:16 66:4,12,15
  66:17,18 67:25
  68:11 70:16 71:14
  71:15,18 72:16
  75:24 76:22 78:14
  78:23 79:12 80:1
  81:6,12,17,19
  82:10,15,22 84:19
  86:2 87:9 89:11

  90:13 91:18 92:6
  92:12 93:1,22
  94:24 96:14,19,21
  96:25 97:3,6,10,13
  97:14,18 98:5,7,12
  99:20 100:19
  102:1,8,16,19,22
  103:11 104:2
  108:16 109:12
  114:14 116:13
  117:20 118:7
  119:1 122:14
  125:7,15 127:17
  128:16,18,21,24
  129:16,21 130:20
  131:22 135:6,21
  136:23 137:18
  141:13 143:9,20
  143:24 144:23
  145:8,23 148:3,16
  149:5 150:1,4,17
  150:19 151:8,9
  155:11 156:10,18
  159:4,9,10 161:15
  168:19 169:16
  172:2,9,13 173:13
  173:22 174:5
  175:9 210:2,15
  211:3 215:5,12
  217:23 229:21
  232:13,21 270:13
  270:17 271:5,8,11
  284:6
**avenue**  3:14
**avenues**  226:21
**average**  228:21,22
**avital**  3:6 6:4
**aware**  14:6 28:24
  52:4,25 53:1,14,18
  53:20 54:1,7,10,11
  54:12,15,19 56:9

57:6 60:20 61:20
62:8,10,21 63:4,25
64:6,17,25 65:8
70:10 74:7,10,11
74:17,23 75:4,15
75:23 76:16 79:18
81:18,24 100:23
102:20,25 103:6
109:3 110:1 115:8
115:10 122:25
123:5,14 124:5,9
124:13,17 125:6
125:18 129:3,5
130:1,3 131:7,12
139:20 143:22,24
144:2,14,16,25
145:4,10,15,19
146:3,10 148:11
151:4 154:16
155:6 156:24
157:23 158:12,18
161:1 163:11
164:2 165:17,18
168:8 172:15
182:23 190:2,15
208:9 213:5,16
214:1 226:23,25
229:5,18 230:8,23
231:23 241:10
252:14 277:19
**awareness** 144:5
**azad** 1:24 2:21
283:5 284:24

**b**

**b** 4:7 191:21
273:16,20 283:17
284:8
**back** 11:9 23:6
39:17 48:19 50:10
55:3 56:23 68:18
93:17 94:20 95:16

97:21 104:2 105:9
106:20 127:8
134:25 135:1
176:15 196:11
202:16 204:11,21
208:21,25 221:19
225:8,12 234:19
234:22 240:12,17
241:25 242:20
244:16 247:8
254:25 255:2
273:7 276:19,24
**backcasting**
219:16 220:24
**background** 29:4
45:11
**bad** 32:12
**ball** 66:25
**bar** 159:19
**barrie** 243:12,23
**barrier** 159:14
**base** 130:4
**based** 45:22 64:24
78:17 102:23
107:20 127:21
133:13 180:13
181:11,25 185:20
185:23 188:14,14
189:11 190:16
203:15 210:15
211:2,7 224:11,12
237:14 242:8
247:9 248:18
249:15,18 251:11
262:4 274:5
**basic** 15:5 52:6
55:3 254:4,7
263:20
**basically** 21:15
244:15 261:3
274:16

**basis** 75:3,8 165:7
173:18 174:23
211:22 213:7,17
214:16 215:1
217:24 220:9
238:1 272:1
**battle** 245:23,24
**beat** 69:17
**becoming** 267:2
**beginning** 2:18
5:18
**begins** 259:24
**begun** 230:21
**behalf** 1:4 2:4,16
3:4 6:3 258:9
**belief** 165:15
**believe** 14:20
27:13 95:16
129:25 130:2
144:5,23 153:6
158:11 159:3
162:5 168:23
173:2,4,16 174:4
186:1,2,5 187:24
203:14 220:6
226:19 227:18
232:25 233:18
274:11 276:7
**believed** 174:5
241:20
**believes** 86:7
98:13
**believing** 175:16
191:20
**beneficial** 235:21
**benefit** 29:2 44:8
172:16 174:6
**best** 40:11 236:11
236:18,25
**better** 37:19 108:7
108:25 239:14

**beyond** 71:6
193:14 216:10
221:4 263:19
264:24 266:8
**big** 54:3 56:21
159:23,23 175:13
**bigger** 58:25
**billing** 199:3
**binder** 9:3,13 28:5
57:24 58:1 77:20
111:6 146:14
166:10,11 195:13
218:17,18 245:10
273:5
**bit** 8:10 13:16 15:3
39:10 103:20,24
103:25 126:17
140:17,21 153:21
170:6 191:3
193:17 221:6
239:1 250:9
**bjorn** 1:16 2:15
4:4 5:7 6:10 280:6
281:2,24 282:2,4
282:12
**black** 24:20
**block** 50:18 55:2
**bloomberg** 17:8
21:14,24 53:21,23
54:5,8,12 55:12,15
55:19,22 56:2,4,10
56:12,14,16,18
61:13 63:5 71:15
73:23 74:8,15
75:1 120:19,21
121:12,17 122:7
122:11 125:16
128:11 137:23
161:16 229:19
274:6

**bmitchell** 3:8
**board** 283:9
**bones** 263:15
**book** 65:3 254:16
**books** 32:22 48:18
**bother** 196:11
**bottom** 58:11
  166:17,18 167:5,6
**bought** 185:17
**box** 24:20 53:8
**brand** 179:21
**break** 50:6 126:3,4
  127:2 176:1,21
  225:5 276:18
  277:2 279:13,16
**breaks** 7:21
**brealey** 50:22
  51:17 52:21 55:9
  61:10 71:9 76:7,9
  77:12 93:8 95:12
  97:16 98:19
  108:24 117:23
  118:9 138:16
  139:14 150:25
**brent** 3:5 6:4
**bribes** 199:23
**briefly** 29:1,2
**briefs** 204:17
**bring** 63:21
**brite** 243:12,16,24
**broaden** 37:14
**brought** 86:10
**brown** 3:20 5:8
**bucket** 122:1
**building** 49:19
**bunch** 127:15
  199:12 273:23
**burger** 16:25
**bus** 283:10
**business** 29:23,25
  30:7,9 48:18

**buy** 45:23 177:14
  178:9,11 179:12
  179:14,18,22
  180:4,12 213:10
  213:13 236:11,18
**buy's** 236:25
**buying** 179:24
  221:13
**bye** 280:1

**c**

**c** 3:1 13:9 40:15,19
  284:19
**cafepharma** 19:11
  19:13,19,25 82:14
  165:25 166:3,22
  167:11,22 168:3
  168:11,18,25
  169:3,15,25
  171:15 174:15
  175:12 178:17
  179:2,5 184:12
  185:10 187:8
  228:23 229:7,11
  230:11 231:8
**calculate** 207:22
**calculated** 250:2
**calculation** 220:5
**caliber** 37:2
**california** 1:17
  2:18 5:1 283:2,7,9
  283:16
**call** 26:13 36:8,13
  60:22 88:1 104:5
  165:13 179:4,7
  180:20 193:23,24
  212:20 214:4
  237:21,22 278:10
**called** 4:16,22
  96:10 110:23
  192:14 201:21
  218:9

**calls** 44:17 45:7
  49:7 51:12 61:9
  85:3 87:17 99:2
  106:2 107:3
  114:18 154:19
  163:25 165:8
  187:11 193:23
  194:4 206:1
  210:18 240:8
  258:22 269:23
**camera** 225:16
**cammer** 13:3,9
  21:5,19,19 25:9
  34:20 55:9 61:6,9
  62:25 63:1 67:7
  67:10 68:23 72:19
  72:20 73:6 109:24
  124:20 125:22
  126:8 135:11,15
  138:23 140:12,19
  141:1 154:7
  155:18 170:21,21
  217:5,8,13 221:7,7
  221:8 223:7
  224:19,21 225:21
  233:8,15,16,18,19
  234:15,17 235:14
**cap** 188:7
**capable** 194:15
  262:8
**capci** 263:23
**capeci** 3:5 6:1,2
  8:13,21 10:23
  11:6 19:6 25:6
  26:23 33:19 35:5
  36:10 44:17 45:1
  45:7 47:10,23
  48:7 49:13 50:1
  51:12 53:11 57:2
  59:21 60:4 64:18
  65:19 68:3,14

70:19 71:20 74:18
  76:1,17 77:6,10
  79:13 80:4,11
  81:7,22,25 82:18
  83:21 84:6 85:3
  85:10 87:4,17
  88:20 89:17 91:5
  91:10,24 92:15
  93:2 94:2,14 95:3
  95:20 96:6 97:11
  98:10 99:10,22
  101:2,7 102:10
  103:13,23 104:12
  106:2 107:3,16,25
  108:20 109:13
  110:7,25 111:5,9
  111:11 112:2,12
  113:25 114:18
  115:17 117:21
  121:7 122:4 123:8
  124:2,10 125:8,24
  126:22 131:24
  132:25 133:20
  134:12 135:10,22
  137:7 138:12
  139:10 141:17
  142:8 144:7 145:2
  146:5,20 147:4
  150:8,14 151:11
  152:2,18 153:11
  154:18 155:14
  156:11 157:9,17
  157:25 159:6
  160:15 161:11,25
  162:10,14 163:8
  163:16,24 164:9
  164:15 165:8
  166:1 167:15
  168:13 169:1,9,18
  170:11,17 172:10
  173:14,19 174:17

**[capeci - changed]**

175:22 176:3,11
179:16 181:13
182:14 183:5,19
184:6 185:25
186:18 187:11,20
188:15 190:6,23
191:16 192:16
193:9 194:4,20
195:22 196:25
198:2,5 200:17
201:15 202:2,12
203:18 204:13
206:1,22 207:10
209:24 210:18
211:4,25 212:8
213:9,18 214:12
214:19 215:3
217:2 218:1,16
219:12 220:19
222:2 226:2,15
227:14 228:24
229:8 230:14,24
231:5,12,17 232:1
232:11,18 233:5
233:21 234:5,8
237:6 240:8,14
241:9 242:10
249:8 250:14
252:13 255:20
258:22 260:3
261:1,25 262:20
264:5,23 266:5,14
266:16,21,23
267:6,20 269:23
271:13 272:4,15
274:25 275:18
277:12 279:3,21
**capital** 4:16 35:23
59:7 110:24 113:8
139:25 140:4
141:3,11 143:1,7

146:2 147:17
152:13 153:8
**caption** 5:12
**captioned** 16:25
**capture** 262:13
**captured** 41:16
**cards** 199:23
**care** 118:5
**career** 29:4 104:3
104:11,15,19
**case** 5:12,23 8:9
11:20 12:25 13:13
15:8 19:18 22:10
25:15 26:1 27:11
33:10 37:25 38:22
43:24 72:18 79:9
79:15 82:9 97:17
98:20,21 120:25
126:1 127:13
129:7 138:8 139:6
139:19 148:20
150:11 152:11,15
184:25 189:13
197:14 206:6,7,8
206:11 207:23
212:24 216:13
217:4 224:13
227:2 233:23
235:12 236:17,22
236:24 238:9,21
238:23 239:24
241:13,16 243:12
243:24 245:15
246:24 247:11,21
247:23 248:13
249:4,6 251:13
252:12 262:14,23
263:2,25 264:1,9
264:10,17,21
266:4,12 267:5
268:8 269:1,7,10

270:25 272:24
274:19 277:5,11
279:2
**cases** 13:1 34:22
39:21 40:7,9 54:3
235:1,8,9,25 236:7
239:17 240:12
245:2,21 246:3,4
246:14 270:7
278:9,11
**cash** 45:17,20
188:24 189:1,4,7
189:10 192:3,4
200:11 208:17
214:9 253:22,24
256:13
**catching** 151:6
**categories** 15:17
119:19
**causation** 4:23
203:22,25 218:10
239:4,6,11,13
241:21,22,24
242:12,21 243:1,2
243:22 244:4,5,11
244:13 255:3
**cause** 74:24 75:1
165:19 183:12
187:24 203:2
**caused** 156:23
161:17 204:24
206:7 237:11,15
**causes** 42:20
171:23
**cbc** 122:9
**cert** 223:3,4
242:13
**certain** 178:21
184:4 226:6
237:22 248:15
251:19 253:9

265:12
**certainly** 31:11
53:13 70:5 126:25
128:20 165:21
166:2 168:15
194:14 226:9
276:7,12
**certificate** 283:1,8
**certification** 12:3
12:21 42:7 221:24
235:5 236:2,3,8,10
239:24 242:7,15
242:18,23 245:4
246:8,10 247:6
263:5 267:1
270:12,14
**certifications**
235:9
**certified** 2:21 6:7
12:24 13:10,17
23:1 45:2 151:22
225:2 238:25
239:21,22 241:8
245:14 246:13
280:2 283:1,6,21
284:10
**certify** 245:19
283:5
**cetera** 89:22 90:24
91:8
**chance** 59:3
116:25 220:14
**change** 93:9
127:21 154:6
156:3 183:13
251:23 274:2
281:4,7,10,13,16
281:19
**changed** 107:7
153:21 221:14
240:5,18 265:14

**changes** 215:19 240:24 260:12 282:6
**changing** 213:5,16 251:1
**channel** 248:6
**chapter** 77:11
**characterize** 33:14 34:2 35:10 249:20
**chart** 199:12 273:22 274:22 276:16
**chartered** 33:7
**check** 69:24 180:20 186:20
**checked** 209:12
**choice** 267:11
**choices** 224:11,16
**choose** 142:22 267:11
**chronology** 271:16,24 273:25
**circuit** 236:19 242:22 244:7
**circumstances** 142:10,16 143:12 143:18
**cite** 19:11 24:2 47:16 55:14 67:3 69:14,15,25 77:1 78:9 83:6,10,13,13 92:19,19 100:25 101:5 111:24 149:15,21 188:20 218:8 239:17 245:4,17,18
**cited** 34:23 55:20 69:11,19 70:5,6 76:11 78:12,16 80:13,13,16 83:19 85:17,23 86:1,2,4

92:18 94:8,13,15 95:7 98:20 101:14 108:22 110:5,18 112:6 118:9 138:16 149:17,18 198:4 245:14,16 254:15
**cites** 66:8 101:8 151:17 210:10
**citigroup** 212:17
**citing** 83:7 84:12 110:15 186:14,15
**city** 212:14
**civ** 283:14,19,24 284:7,19
**civil** 1:4 2:4 283:16
**claim** 181:17
**claims** 172:18 181:22,25 189:14 228:8
**clarification** 13:8 32:25 44:25 82:2 155:17 271:12
**clarify** 101:15 155:10 277:8
**clarifying** 210:22
**class** 12:2,21,24 21:11 22:5 38:12 41:4,8 42:7 46:11 191:5 221:23 223:3,4 235:5,8 236:1,3,8,9 238:7 239:21 240:4 241:7 242:6,12,15 242:18,22 245:3 245:14,19 246:8,9 246:13 247:5,9 250:2 263:5 267:1 270:12,14

**classes** 30:18,19
**clean** 142:21
**clear** 11:3 62:24 63:21 70:15 93:18 153:18 156:7 158:21 167:8 169:12 212:2 242:14
**clearly** 100:9 124:13 168:5 206:24
**client** 27:1
**clients** 108:11 159:11 232:14,22
**climb** 134:1
**clinical** 211:18 264:2
**clips** 9:19
**clock** 158:23
**close** 26:10
**closely** 18:15
**closet** 53:9
**closing** 274:1
**code** 283:16
**coined** 69:9
**colleagues** 5:24
**collect** 43:13 284:15
**collective** 45:25
**collegiate** 4:13 57:16 58:16
**column** 58:18
**come** 8:21 57:22 68:11 88:11 134:25
**comes** 37:11,21 38:6 44:23 45:21 109:6 121:25 134:23 177:19 182:5,25

**comfortable** 85:12 143:21 144:21 156:8 249:3
**coming** 214:2 219:15 220:22
**commentary** 56:21 130:14 213:1 215:15
**comments** 221:4 284:11
**committed** 112:5
**common** 46:10 62:3 64:1 65:7 119:25 146:7 177:12 250:3
**commonly** 141:10 143:6 148:1
**companies** 35:22 36:1,2 103:21 105:6 121:2 124:15 172:14 231:25 232:10 233:4 263:21
**company** 36:6 45:18 46:13,17 60:11 63:6 98:23 98:24 99:1 106:5 106:8,16 107:18 107:20 108:12 120:16,19,23 121:5,13,22 122:1 123:24 125:23 140:14 161:23 162:4,24 180:21 182:18 188:25 189:2,5,7,16,16 190:8 191:20,20 191:21 192:5 193:24 199:14 208:2,20 214:10 221:12 237:10,22

258:9,11 259:11 259:13,25 260:24 261:9 262:17 266:2 273:24 277:19 278:13
**company's** 121:19 121:23 216:18 270:8
**compensated** 22:22
**compensation** 23:10
**competing** 172:7 173:11
**competition** 42:19 42:22,24 43:11 171:24
**compilation** 271:11,15,18 272:2 274:9
**compilations** 272:13
**compile** 274:21 275:17
**compiles** 273:23
**compiling** 275:14
**complaint** 16:21 17:3 18:7,8,9,13 62:12 82:14 99:9 130:16 131:13,22 132:3,14,24 133:7 133:11,14 134:4 134:11,17 136:21 156:22 163:22 164:4,14,19 165:2 165:5,7 186:15 187:18 189:6 190:3,9,20 198:19 199:1,2 209:10,11 210:3 212:19 213:3,8,21 214:18

215:2 257:18 260:10 261:20 262:1,4,5 264:6,20 266:17,20 267:3 268:25 269:20 277:18 279:10
**complete** 215:11 282:8
**completed** 260:8,9
**completely** 204:4 267:13
**completeness** 197:5
**complex** 215:10
**complicated** 123:20
**component** 251:3 256:19 264:17 265:19
**comprise** 147:8
**comprises** 152:4
**computer** 29:11 29:13
**con** 37:22
**concealed** 98:16 248:15 265:17
**concentrate** 30:8
**concentrating** 274:13
**concept** 48:10 50:25 53:3,6 103:11 134:8 135:1 152:23 173:11 176:25 225:22 254:4
**concepts** 151:10 183:18
**concern** 84:17 89:9
**concerned** 87:7,25 88:7 99:3 266:16

**concerning** 12:2 19:19 20:13
**concerns** 92:12
**conclude** 73:10 74:16 75:3 178:7 178:8
**concluded** 237:3 280:9
**concludes** 280:5
**conclusion** 129:11 212:10 240:9 258:23
**conclusions** 177:23 185:5
**conclusively** 253:2
**conduct** 13:3 14:4 16:15 22:1 171:5 205:13,14,25 206:4,9 253:9 270:18
**conducted** 20:17 88:16 90:3 93:22 94:22 102:7 157:24 171:15 264:25
**conducting** 17:18 72:19 136:4 265:2
**cones** 190:10
**conference** 99:2 237:21,22
**conferencing** 2:17
**confines** 267:10
**confirm** 28:10 83:15,18 196:3 221:10
**confirmed** 118:24
**confirming** 204:14 250:20 253:1
**conflate** 61:16 140:22,25

**conforming** 133:2 133:3 205:16 208:8 250:17 252:15,23 253:18 253:18 254:20 255:15,23 257:7 257:10,20
**confounding** 253:15 255:17
**confused** 194:25
**confusion** 66:14
**connected** 203:16
**connection** 13:21 20:3,8 136:24
**consequently** 41:23 46:8 75:16 149:3 271:6
**consider** 31:4 32:2 32:4 118:2,4 170:22 251:13 265:5
**consideration** 245:1
**considered** 14:17 15:10 31:6 32:10 241:6
**consistent** 24:9 25:23 55:25 100:11 120:10 245:20 246:10 250:4
**consistently** 48:22 51:19
**consisting** 284:10
**consolidating** 40:24
**constant** 240:18
**constituted** 207:1
**constitutes** 123:23
**constitutions** 40:21

**construct** 191:10
**consultant** 38:14
**consulting** 37:15
  37:19,20,22 38:2
  38:14
**contain** 11:25
**contained** 118:25
  132:2,12 134:10
  197:19 199:9
  206:25 257:17,22
  264:20
**contains** 11:17
  195:3 254:13
**contemporaneous**
  16:2
**contend** 262:19
  266:4,12
**content** 197:7
**contents** 27:1
  195:19
**contest** 246:16
**contested** 190:7
  221:2
**context** 21:3 24:5
  25:2 34:11 36:18
  37:23 38:12 60:25
  64:23 66:22 68:21
  68:22 72:23 86:19
  93:13 99:4 103:4
  141:20 145:11,11
  152:24 153:20
  155:11,21 170:6
  191:5 219:18
  220:21 223:19
  224:2 242:13
  256:10
**contexts** 67:22
**continues** 49:16
**continuously**
  159:17 180:4

**control** 208:5
  250:25 251:2,7,20
  252:19
**convenient** 225:3
**conversation** 26:6
  176:10 179:2
**conversations**
  261:18
**conviction** 45:23
**convince** 70:7
**cooperatively**
  126:25
**copies** 106:18
  165:24
**copy** 196:9
**corner** 166:19
**corporate** 25:16
  61:8 137:21
**corporation**
  146:15 163:1
**correct** 7:23,24
  9:23,24 10:2,8,9
  11:4,20,21 12:6
  15:11,22 17:13,14
  18:24 22:6,18
  23:19 25:5,7
  28:17,21,22 29:6
  29:11,20,23 32:7,8
  32:14,15 41:10,11
  41:13 43:15 44:14
  45:6 46:18 47:5
  47:22 48:6 53:10
  58:4 66:19 68:1
  68:13 73:12,13,16
  73:20 78:5,10,24
  79:23 83:7 84:3
  88:8,9,17,18 89:6
  89:7,16,18,23
  90:10,14,15,21
  91:4,6,20,23 93:1
  96:4 97:8,8,10

101:1 103:7,12
  104:21 111:7,8
  112:17 114:6
  117:20,22 120:23
  128:5 130:13
  131:23 139:9
  142:25 146:15,17
  149:19,20,22
  150:1,2,7 152:16
  158:7 161:4,10
  163:7 165:2,7
  167:12 168:3,6,12
  168:20 171:16
  172:9,11 173:13
  174:16 177:3,16
  178:6 187:13
  192:9 198:24
  199:14,15,17
  203:10,11 205:5
  205:14,25 206:21
  209:18 210:12
  211:11 214:10,11
  215:24 220:18
  224:17 225:25
  228:17 233:10
  235:10 236:20,21
  237:1,2,5 238:17
  240:7,13 241:8
  242:9 243:24
  245:5 247:19
  255:11,19 257:18
  263:21 264:3
  272:14,24 275:9
  278:5 279:2 282:8
**corrected** 258:15
  260:16,18 269:2,4
**corrections** 282:6
**corrective** 16:11
  217:15,19 223:16
**correctly** 26:14
  120:5

**corroborated**
  132:17 134:15
**corroborating**
  133:15
**corroboration**
  133:22
**cost** 43:2 159:15
  159:19 172:16
  227:19
**costs** 43:6,7,8
**counsel** 25:21,25
  26:4 126:15
  176:22 209:12
  217:17 225:3,15
  242:13 261:18
  266:14 279:15
**count** 233:15
**county** 283:3
**couple** 7:5 29:3
  35:16 36:1 39:20
  40:7 76:3,3 167:1
  187:9 202:22
  207:21 213:3
  252:25 254:16
  270:5,6
**course** 18:6 21:4
  22:9 25:13 29:17
  30:4,8 33:8 36:13
  60:8 68:5 69:19
  103:8 108:6,9
  116:16 125:19
  131:18 133:6,9
  134:17,20 145:16
  147:24 153:3,5,24
  172:6 193:2,20
  196:9 202:4 227:1
  228:13 256:5,5
  260:10
**courses** 30:17,18
  30:23

**court**  1:1 2:1 5:9 24:2,19,20 31:19 47:21,21 48:5,12 50:16 51:5,6 59:16 61:4 63:18 68:23 69:2 122:13 122:14,15,19,20 123:1,3 126:18 128:12 140:14 152:12,22 235:12 235:16,21,22,24 235:25 236:9,18 236:22 237:3,8 238:9,10 239:5 241:6,11,17,24 242:1,6,9 243:3,6 244:22 245:3 246:5 247:1,4,14 247:17,25 248:7,8 248:17,23 249:16 249:20 261:13 272:3,7 278:21 283:8

**court's**  46:22 239:10 248:25

**courts**  24:9,10,13 25:13 34:19,21 70:7 124:21,22 235:5,15,17 244:19 261:12

**cover**  156:13 185:12 195:17 257:3

**covered**  29:15 33:6 34:8 156:13 250:8

**covid**  176:7

**credentials**  33:5 33:12,17,21 34:3

**credibility**  183:22 189:12,23 193:12

193:17

**credible**  173:3 192:8,15,23,25 193:7 194:8

**criteria**  139:7

**criterion**  136:15

**criticism**  242:8

**criticisms**  34:14

**criticized**  150:24 242:7 249:11

**cross**  126:13 144:3 201:6 272:8

**crystal**  66:25

**csr**  1:24,24 283:8 284:24

**current**  33:5 37:2 260:10

**cut**  126:17

**cv**  1:5 2:5 7:2 28:21,23 29:2

**d**

**d**  4:1

**damage**  205:18,19 219:19,25 220:22 257:12,19 258:25 261:7,14 265:1,3 265:13,16 268:23 271:2,3

**damages**  191:6 207:7,23 219:15 220:5,9 222:14,15 223:2 247:9 250:2 250:3,11 251:17 259:16 262:13 263:4 265:8

**data**  13:2 14:21 15:4,17,24 230:22

**database**  105:3

**databases**  128:16

**date**  130:10 158:15 210:17

211:9 260:25 261:19 281:24 282:12

**dated**  4:18 147:5 284:21

**dates**  217:18 251:19

**daubert**  247:24 276:15

**day**  7:20,23 9:14 48:19 164:22 205:24 211:9 219:21 221:21 222:24 239:8 274:5 282:15

**days**  8:12 26:7 223:11 242:20

**deal**  49:24 50:5 74:3

**dealing**  98:22 100:17 112:4 123:11 143:25

**decade**  276:11

**decades**  31:12

**decide**  261:12,13 276:6

**decided**  175:11 248:7

**deciding**  36:5

**decipher**  250:19

**decision**  46:22 50:16 173:5 233:25 236:20 238:15 239:23 242:19,20 247:2 247:20 249:4,5

**decisions**  24:3 241:6,11 242:6,16

**declaration**  39:24

**declare**  282:4

**declared**  6:11

**decline**  130:4,15 131:15 134:2 165:19 187:25 188:1 203:3 204:23 205:23 206:20 208:3,20 211:8,16 253:5 254:3 268:19,20 269:2 270:8

**declined**  203:6,24 227:7 256:25 258:15

**declines**  161:18 257:3 269:13

**decrease**  203:10

**deemed**  237:23 282:6

**defendant's**  38:7

**defendants**  1:9 2:9 2:16 3:11 5:23 25:15 237:4 238:11 246:15,24 248:15 258:10,19 265:11 269:15 277:16

**defense**  38:11,14

**deficiency**  222:11 222:13

**define**  24:24 67:1 70:25 98:12 118:18,19 233:11 254:20

**defined**  55:6 71:2 78:16 109:23 137:3 142:13

**defines**  118:20

**defining**  55:16 60:17 95:17

**definition**  4:13 17:1 24:12 31:10

57:17 59:7,14
63:22,22 66:6,7,8
67:5,13,16 68:6,17
70:8 74:5 78:11
78:19,20 79:4,6,22
80:17 92:17 93:4
94:15,17 95:8,13
95:22 96:3 103:15
115:24 137:1
139:24 140:4,16
141:2,7 142:12,25
143:20,23 144:21
148:15 151:1
152:13 153:7
154:1,5,13 155:9
156:1,9,20
**definitions** 118:6
142:15 143:15
151:7 156:1,16,18
**degree** 29:5,10,12
29:16,20 30:2,7
155:2
**demeanor** 284:11
**demonstrate**
223:10 236:25
**demonstrated**
235:3 238:8
252:18
**demonstrates**
129:19 234:15
**demonstrating**
69:16
**dendreon** 146:14
150:11 152:15
272:19,24 273:17
276:11
**depend** 229:14
234:3,6
**depending** 24:24
**depends** 43:18
173:10 183:21

200:18 227:17
233:23 234:1
275:24
**deponent** 282:3
283:18
**deposed** 6:24 7:1
**deposition** 1:16
2:15 3:21 5:6,10
7:14 11:23 13:16
23:16 26:3,12
78:12 79:2 126:19
127:1 157:19
183:2 203:20
267:8,8 280:9
**depositions** 7:5
126:20
**describe** 178:15
178:17
**described** 47:21
135:3,18 150:4
255:10
**describes** 139:15
**describing** 224:22
**description** 4:8
219:9 220:4
**desks** 56:5
**detail** 15:23 17:17
17:19,21 18:2,5,10
18:17 19:2 153:23
199:17 220:12
**details** 18:22
209:22
**determination**
234:20 256:12,22
**determine** 12:13
12:18 25:14 42:13
45:15 72:3,15
73:25 124:7 125:5
134:6 136:18
193:16 223:9
251:18,18 253:23

257:6 261:9 269:3
269:21 277:15
**determined**
188:23 237:18
269:6
**determines** 180:3
**determining** 25:10
76:21 216:25
222:18
**developments**
231:25 232:9
233:3
**dictionary** 4:13
57:13,17 58:16
142:12,21 156:2
**diego** 1:17 2:18
5:1 31:3
**difference** 96:22
98:2 115:2 150:23
190:17 219:22
**different** 24:23
31:9,10 33:23
34:9 43:16,17
44:10 61:17 67:21
67:22 69:14 86:9
86:9 93:7 106:23
115:20 132:13
140:17 151:2,14
151:16,17,17
156:17 176:8
177:19,23 178:3,5
178:5 179:23
180:7,8 187:19,25
189:20 191:4
207:21 208:3
218:3 219:20,24
222:18 223:18,20
223:21,21 224:10
224:16 226:3
229:13,23 239:1
244:5,8 249:19

254:6 268:17
269:17
**differentiate**
135:25 226:8
**differently** 98:13
178:2,3 226:4
244:25
**difficult** 29:7 53:3
102:17 105:16,17
181:5,6 185:13
**difficulties** 97:24
**dig** 54:5
**diligence** 197:11
**direct** 59:6 95:25
154:21 197:18
198:6 200:3
218:22 233:13,17
242:13
**directing** 152:10
198:8,9
**directly** 14:22
15:19 33:9 57:13
192:5 204:4
**disaggregate**
205:13
**disaggregated**
205:17
**disagree** 114:17
116:15 140:3
141:7,16 142:6
204:4
**disagreed** 246:12
**disagreements**
219:8
**disappear** 228:14
**disappears** 228:19
**disappointment**
32:10
**disciplinary** 30:17
**disclose** 257:2
259:2 260:15

275:8,11 277:17 278:16

**disclosed** 42:10 44:23 46:1 51:15 51:21 52:3 60:18 98:15 100:22 120:25 122:8,16 128:19 132:3 165:21 187:23 201:14,23 202:1 202:11 227:5 253:10 258:13 269:16

**disclosure** 203:5 217:19 237:17 258:16 260:16,18 269:2

**disclosures** 16:12 217:15 223:16 268:3 269:5

**discovery** 260:9 260:11 263:14 269:12

**discuss** 49:23 124:16 245:24

**discussed** 27:10 54:4 122:11

**discusses** 77:1 199:11

**discussing** 97:15

**discussion** 23:5 39:16 68:12 80:23 126:10 127:22 202:5

**discussions** 96:12

**dispute** 118:6,15

**distinction** 62:19 62:23 64:15 75:21 75:25 76:14 115:11,15 137:14 150:16 222:19

**distinguish** 66:17

**distinguishes** 184:22

**distinguishing** 183:15 242:5

**distracted** 224:25

**district** 1:1,2 2:1,2 238:9 239:5,10 242:1 243:13

**docketbird** 231:21

**doctors** 199:24 200:10

**document** 11:2 26:21 85:11,13 111:13,15 113:7 113:14 152:6 196:2 198:7

**documents** 8:14 12:13 14:17,21 269:14 277:15

**doing** 24:20 25:8 35:19 36:12,21 45:6 62:25 68:20 74:6 103:5 124:19 125:21 171:19 181:16 187:4 193:15 194:15 222:9 224:13 249:13,14 253:3 254:8 255:13 258:25 270:2 278:20

**dollars** 159:11

**domain** 229:18

**double** 69:24 186:20

**dowd** 3:4 6:2

**dozens** 85:17

**dr** 4:15,16 14:5 19:22,23 60:2 66:14 68:7,16

69:7 70:11,23 75:13,18 76:6,10 77:19 78:5,13,22 79:11 82:8 83:3,6 83:16 84:9,24 86:10 90:12,12 91:1 92:23 93:5 94:4 95:7,17 96:9 98:20 102:6,23 103:16 108:22 109:9,18,21 110:5 110:23 113:21 117:3 118:8,20 127:1 150:25 155:2 162:16 174:5 181:15 182:9,9 191:1,7 208:9 228:5,16 245:15

**drafts** 25:21

**draw** 53:16 185:5 212:6

**draws** 64:14

**drill** 49:25 50:3,5

**driven** 211:17

**drives** 179:25 265:8

**driving** 31:16 171:23 221:14 265:15

**drop** 205:4

**dropped** 213:23

**due** 197:11

**duly** 283:6

**dustin** 3:20 5:8

**duty** 197:7 259:20 260:15 261:10 277:16,22

**e**

**e** 3:1,1 4:1,7 13:9 46:23 281:3,3,3

**e.g.** 84:19 89:20

**earlier** 48:3 96:12 97:15 104:3,19 128:9 142:11 144:11 149:22 271:23

**early** 104:10

**earnings** 16:9,10 21:4,20 49:6 55:8 55:18 61:6,7 63:2 63:3 71:4 72:21 73:8 92:1 120:16 124:22 137:22 212:20 214:2,4 216:14 237:10

**easier** 8:10

**eastern** 1:2 2:2

**easy** 30:22 256:25

**echo** 22:25 39:9

**ecmh** 147:17 149:11 150:5

**econometrics** 224:6

**economic** 29:14 43:9 147:18 225:24 235:3,22 238:18

**economics** 4:23 29:17,18 30:2,3 31:12,20,21,23 32:1 124:8 190:17 218:9

**economist** 31:5,8 33:15 34:8,8 72:14 74:2 190:25

**economists** 31:17

**edge** 160:24

edition  58:16
editorial  32:16
educate  157:14
educational  29:4
effect  162:4
  283:10
effectively  29:24
  30:15 189:24
  208:12 238:12
  243:16,21 247:25
  258:15
efficiencies  63:16
efficiency  12:21
  17:19 21:3 34:11
  34:25 35:2 48:10
  48:15,24 50:23
  51:1 60:17 64:2
  64:23 66:21 68:12
  68:20 72:23 79:4
  80:18 81:4 88:24
  93:12 95:8 100:12
  109:10 114:11
  116:9,11 135:13
  139:8 152:20,23
  153:20 155:1,4,21
  179:25 191:5
  222:18 233:9,20
  236:4,13 239:3
  240:17 241:1,3,7
  241:12 243:10
  244:3,22 247:3
  251:10,11,14
efficient  4:16
  24:12,22,24 43:11
  44:14,15 48:20
  51:18 61:1,11
  67:2,5,9,13,18,21
  68:17 69:1,10
  79:23 80:2 82:23
  85:1 86:5 87:7,14
  89:6,16 90:4 91:4

92:11,24 93:20
94:23 95:18 96:4
96:11 99:13,17
102:2 103:9
109:22,23 110:23
112:10 113:8,22
114:21 115:22
118:22 138:9,20
139:25 140:4,11
141:3,11 143:1,7
145:17 146:1,8
147:16 149:3
152:13 153:8
154:1,5,14 155:9
155:11 171:24
173:17 176:25
177:1,25 184:2
203:1 222:16
235:4 237:1
efficiently  67:9
effort  43:14
either  12:5,8,18
  27:20 32:9 52:16
  110:16 118:6
  207:8 247:5 254:9
  255:11 270:24
elaborated  209:21
electives  30:12
electronic  58:7
eliminate  206:19
  265:12
em  218:11
emiller  3:16
emily  3:13 5:24
  57:15 58:3 77:21
  146:24 166:13
  196:10 218:11
emphasis  29:25
  30:25
empirical  84:25
  87:6,13,23

empirically
  149:12
employ  185:7
employee  60:22
  199:10 283:12
employees  27:24
  193:23 199:13
  202:5
encompass  13:22
encountered  81:10
encourage  111:16
  147:7
encourages  197:10
ended  192:22
ends  45:24 128:17
engage  93:14
  267:7 279:8
engaged  22:10
  100:7
engagements
  231:3
engineering  29:20
english  55:3 57:10
  142:23
enrolled  189:18
entered  95:9
enterprise  160:21
  162:23
entire  26:2 66:20
  100:2 101:9
  111:14 189:15
  206:7 253:5
  267:12
entirely  38:23
  103:10 131:18
  206:5
entirety  18:12
  205:23 209:17
entity  163:11
equity  230:21

errata  282:7
error  29:6 133:15
esq  3:5,5,6,12,13
  3:13
establishing  67:8
estimate  40:12
et  89:22 90:23
  91:8 281:1 282:1
eugene  52:12,18
  55:7,20,23,25 61:9
  61:10 66:7 67:4
  68:16 70:21 71:2
  93:4 94:16 113:11
  118:11 149:17,18
evaluate  136:15
evaluating  233:20
event  31:14,15
  90:7 120:1,5
  136:17 138:2
  205:10 207:24,25
  208:1 215:23
  216:4,6,9,11,13,15
  216:17 217:1,22
  219:10,14,17
  220:4,9 221:23
  223:2,3,4 224:13
  247:10,17 250:10
  252:4,4,6 277:8
events  61:8 216:21
  216:25 217:11,14
  218:5 271:16,24
  274:3
everybody  45:19
  139:13 155:13,15
  155:17
evidence  84:13
  129:6,9 130:18
  131:17 136:22
  145:15 155:6
  163:25 165:9
  171:18 174:18

185:19 223:10
233:9,13,14,16,17
249:25
**evidenced** 177:12
**exact** 249:18
**exactly** 15:21
33:25 55:22 76:13
77:3,4 78:18
133:9 139:23
149:23 181:17
192:10 194:11
219:23 222:25
241:13
**examination** 4:5
6:15
**examine** 120:6
**examined** 6:12
159:25 283:18
**examining** 235:24
**example** 55:6,22
92:4,5 104:10
162:9 182:17
192:19 193:13
205:22 223:1
245:9 246:25
254:11 265:10
272:19 274:22
275:4
**examples** 52:13,18
71:3,4,6
**exceptions** 136:2
**excerpt** 167:25
**excerpts** 165:25
167:11,14,22
168:2 169:12
**excess** 174:2,4
**exclude** 208:19
247:21 249:6
**excluded** 241:5,17
248:22 251:19
253:2

**exclusively** 262:2
**excuse** 83:9 84:2
89:10 91:17
113:23 147:11
209:1 236:22
246:23 247:15
**executives** 25:16
**exercise** 93:11
100:6,13 109:20
216:24 217:6
254:22
**exhaust** 121:9
123:22
**exhibit** 4:8,9,10,11
4:13,15,16,18,19
4:21,22 10:4,5,10
10:12,15,19,25
11:5 28:6,8,11,13
28:21 40:15,16,19
46:5 57:20 58:4,6
58:9,12,15 69:6
78:4,4,7 110:11
111:1,3,4,6 127:13
146:14,21 147:1,3
151:25 152:1,8
166:11,15 195:15
196:20,23,25
197:1 202:17
218:15 221:20
273:9,9,16,20
275:2 276:10,10
**exhibits** 4:11 8:11
11:1 28:5,11,13,15
28:19 40:16 276:9
**exist** 154:20,22
**existence** 70:11
**exists** 206:10
**exit** 49:20
**exodus** 199:10
**expand** 58:24

**expect** 131:9,15
171:7 185:21
**expectations**
214:8
**expected** 165:17
203:2
**experience** 31:13
31:15 35:2 36:14
69:12 275:16
**experiences** 35:17
**experiencing**
97:23
**expert** 4:12,19
12:14 13:22 14:16
15:2 16:19 22:14
22:16 25:3 31:19
32:3,5 37:3,5,12
37:13,15,24,24
38:13 39:22 67:15
69:13,20 73:4,25
79:16 81:1,11
82:13 111:23
125:5 130:12
135:5,16 136:13
138:7 146:17
151:20 154:12
155:1 198:9,9
216:8,24 231:3
236:8 241:17
242:25 243:11
245:15 246:5,7,21
247:16,21,23
251:18 254:24
257:11 262:7
267:4 271:10
272:1 274:10,21
275:7,11,16,16,19
275:22
**expertise** 35:8,9
35:11

**experts** 24:6,21
70:6 235:16
245:23,24
**explain** 40:18
62:18 64:3 82:22
134:1 138:9
151:15 152:21
177:5 184:10
215:22 216:3
258:5
**explained** 48:5
65:7 66:20 67:20
86:8 100:9 125:13
135:7,24 144:11
207:21,24 222:7
248:22 263:17
**explaining** 64:22
65:6 115:21
155:23 260:14
**explains** 51:17
65:4 86:5 241:3
**explanation**
153:19 215:18
**extensive** 88:23
92:9
**extent** 26:25 43:8
141:18 147:6
158:4 206:25
**extraordinarily**
249:13

|  f  |
| --- |

**f** 113:11
**fact** 14:6 56:19
125:12 133:23
142:11 169:8
177:13 207:20
211:12 219:25
238:15 244:21
271:4 275:13
**factor** 21:5,19
25:9 135:11,15

**[factor - first]**                                                                 Page 17

217:13 221:7,7,8
223:7 224:21
225:22 233:15,16
233:18 234:15,17
254:20 255:23
257:7,10,20
**factors** 25:10
34:20 55:9 61:7,9
63:1,1 68:23
72:20 73:7 109:24
125:22 133:2,3
138:23 140:12
141:1 154:8
155:19 170:22
205:16 208:6,8
233:8,8,19 234:19
235:14,14 250:17
250:20 252:15,19
252:23 253:1,16
253:18,19,19
255:15,17
**facts** 163:25 165:9
174:18 236:17
249:25
**factual** 263:1
**fair** 7:3 69:11 70:9
86:17 87:12
113:20 150:10
177:21 216:23
217:21 241:16,19
273:22
**fairly** 15:4 18:18
148:24 196:5
199:16 212:2
**fake** 199:23
200:10
**falls** 122:1
**false** 237:23
262:19 266:4,13
278:4,14

**fam** 61:10
**fama** 4:15 52:12
52:18 55:7,21,23
55:25 60:2 61:10
66:7 67:4 68:18
69:7,19 70:11,21
70:23 71:2 75:18
77:9,19 78:5
79:11 83:3 84:24
86:5 90:12 91:1
92:23 93:4 94:16
95:17 96:9 102:6
113:11,21 117:3
118:11 149:17,18
149:21
**fama's** 4:16 68:17
76:6 83:6 84:9
109:9 110:5,23
150:12 182:9,9
**familiar** 33:11
85:17 110:22
111:22 112:16,18
128:14 231:13,18
267:3
**family** 27:16,19
32:9
**fancy** 105:9
**far** 23:10 107:1
262:22
**fascinating** 126:8
267:5
**favor** 238:11
**favored** 238:9
**fb** 1:5 2:5
**fda** 258:10,14
259:11,25 260:16
260:17
**features** 176:6
**february** 16:12,12
130:17,21 131:8,8
131:9,10,10,11,13

132:6,7 156:23
160:4 163:15,22
163:22 164:4,12
164:18,20 165:3
186:24 210:11,16
211:9,10 212:20
216:18,20 254:11
258:13 268:19,20
**fee** 22:19,21 159:4
159:5,7,14,22,24
**feedback** 29:8
**feel** 8:6,7 35:1
85:12,20 111:14
171:21 249:3
**fees** 23:19
**field** 36:14
**fight** 44:6 204:17
**figure** 20:18 74:13
**figured** 185:22
**filed** 17:12 158:15
264:21
**files** 103:21
**filing** 104:10,24
105:24 122:14
129:11 130:10
**filings** 104:1,6
106:18 157:15
**final** 234:25
**finance** 30:11,12
30:19,20,25 31:1
48:17
**financial** 31:4,8,11
31:17,20,21,23
33:7,15 34:7
45:11 98:25 124:8
147:18 190:17,25
214:9 217:4,9
221:13 223:6,11
230:19,20
**financially** 283:11

**financing** 284:3,14
284:18
**find** 53:23,24 54:6
57:7,24,25 74:6
78:18 96:3 106:1
111:1 120:18
130:9 167:3
170:16 187:17
202:20 207:8
217:25 218:17
229:17,20 255:5
275:14
**finding** 238:16
**findings** 197:20
**fine** 7:10 8:7,8
11:6 17:2 37:16
40:12 49:21 92:3
93:9 95:12 100:3
118:10,11,14
119:11 141:22
179:10 225:7
240:11 244:16
264:16 272:21
**finish** 19:7 144:9
150:22 162:15,16
162:18 234:9
**fire** 49:15,19,24
50:2,5
**fired** 35:14
**firm** 6:4 25:16
31:14,15 40:23
160:7,10 161:13
161:13,17,23
162:5
**firms** 226:3,6,7,9
226:13,17
**first** 9:25 17:16
18:4 22:16 28:13
44:4,9,9,9,13 47:7
48:9,16 56:17
68:10 83:15 84:12

85:23,25 87:2,2 96:1,9 101:18 108:15 112:22,24 113:4,6,16 114:7 115:23 116:10 133:4 164:18 167:9 202:22 208:1 216:13,15 217:22 218:4,4,25 223:18 249:14 253:10 254:19,19 255:24 256:2 273:20 278:25 283:18 284:4

**fits** 44:1

**five** 37:10 38:18 38:20,23 40:3,9 50:6 130:5 153:14 153:15 156:16 175:25

**flies** 38:25

**flow** 45:17 188:24 189:1,5,7,10 192:3 192:4 208:17

**flows** 45:20 214:9 253:22,24 256:13

**flowserve** 148:20 238:21,23,24 239:13,16 241:16 242:12,18 243:15 243:20

**focus** 51:4 54:24 82:13 102:21 103:5 116:8 125:22 224:16 228:12 265:1

**focused** 43:25 61:24 223:6

**focuses** 139:2

**focusing** 21:20 34:18 56:9 62:3

215:17 217:4 224:18,19 243:9

**focussed** 21:4

**focussing** 21:18

**folder** 58:10

**follow** 39:20 124:21 193:22 276:8

**followed** 152:20

**following** 70:2 140:14 203:5 216:21 217:5,7 222:23 261:23

**follows** 6:13 87:24

**footnote** 83:6 101:13 177:8,9 197:17 215:22,23 215:25 216:3 242:13 250:5 251:1,22

**force** 171:23 265:16 283:10

**foregoing** 282:5 283:23,23

**form** 13:2 81:3 84:17 88:1,8,25 89:5,15 90:3,8,16 90:20 91:3 92:10 92:17,24 93:20 94:23 95:17 96:4 96:17,19,20 97:2,5 98:6 99:13,17 101:19,24 102:12 103:9 114:21,25 117:4,13 118:22 119:2,23 120:22 128:1 137:16 138:9,15,25 139:1 139:3,25 140:5,11 141:4,10,12 143:1 143:6,8 146:1

148:1,2 149:11 150:5 152:14 153:8,20 154:14

**format** 153:21

**formation** 274:22

**formed** 208:11

**former** 27:24 193:23 201:5,19

**forming** 14:18 15:10 274:24

**forms** 91:17

**forth** 86:10 197:6 263:4

**forums** 178:21

**forward** 7:9 19:7 155:8 225:18 237:18

**found** 78:11 92:17 94:17 95:10,22 103:2 168:6,11 180:1 196:14 219:10 222:12 230:3 247:17 249:16,19

**foundation** 158:3 174:20

**foundational** 174:23

**four** 51:4 156:16

**fourth** 59:7

**framework** 205:10 207:25 208:1 247:10

**frankly** 118:16

**fraud** 47:1,22 48:5 51:3 68:21 72:24 93:13 155:21 199:22 200:9 204:6,24 205:4,13 206:6,11,14 207:1 207:2,7 208:15

251:3,9,12,16,21 253:20 254:14,22 256:4

**free** 159:10 171:21

**fresh** 112:20

**friday** 1:18 2:20 5:2 164:22

**friends** 27:14

**front** 21:14 166:8 197:13

**full** 20:20 21:10 22:4 26:16 28:17 85:13 141:19 200:4 283:9

**fully** 25:8 87:8 96:14 101:25 114:13 116:13 152:6 262:8

**function** 226:4,4

**functions** 157:11

**fund** 36:21,23 37:8 105:12 230:21

**fundamental** 36:7 252:7 254:6,12 255:7

**funny** 27:19

**further** 54:6 238:3 240:17 279:18

**future** 45:17,20 109:12 188:24 189:1,4,7 192:3,4 208:17 214:8 253:21,24 256:13

| g |

**g** 13:14 46:23

**gain** 43:17

**gaining** 44:8

**games** 143:14

**garrison** 3:12 5:22

**gather** 8:12

**[geller - hakala]**                                                                 Page 19

| | | | |
|---|---|---|---|
| **geller** 3:4 6:2 22:11,19 26:4,13 26:18 27:12 40:3 | 181:18 184:13 187:8 228:16 231:3 | 11:14 19:6,6 23:3 26:23 34:2 36:9 39:14 49:15,17 | **gordon** 1:4 2:4 3:3 5:12 281:1 282:1 |
| **general** 48:10 125:21 136:3,3 182:1,2 194:6 228:2 262:14 | **glassdoor.com** 227:13 **glassdoor.com.** 230:22 | 50:7 53:22,23 55:3 64:8 75:18 76:12 83:1 85:13 86:20,23 87:1 | **gouging** 201:3,13 201:21 **graduate** 29:19 **grain** 181:22 228:9 |
| **generally** 14:24 21:8 69:17 122:10 135:16 159:8 213:13 221:22 260:14 | **go** 5:15 6:5 17:19 23:2,22 29:3 34:17 35:16 36:6 36:9 43:13 50:5 52:6,11 53:21 | 99:5 100:1 108:11 111:11 112:19 116:22 121:6,9 123:15,21 124:1,4 124:24 125:25 | **grand** 179:21 **grandkids** 179:21 **grandma** 179:20 **grant** 236:9 **granted** 235:5 246:9 |
| **generate** 268:21 **genuinely** 222:23 **getting** 26:14 36:15 42:25 74:4 77:22 82:20 125:11 159:18 194:1 230:12 262:22 | 57:13 58:17 67:15 76:20 78:2 79:5 83:14 89:25 93:16 94:20 95:15 105:25,25 106:24 113:12 120:20 121:19 135:1 138:1 140:9 142:19 149:10 | 127:2,5 137:15 140:1,24 141:5,25 143:2 145:13 147:15 154:3,6 155:8 159:16,17 174:1 175:23 176:12 179:22 186:6 187:2 190:11 193:14 | **granting** 245:3 246:8 **graph** 129:18 **gray** 71:25 124:18 **great** 18:16 27:10 32:10 126:16 220:11 225:24 **greater** 153:19 **grossman** 43:5 |
| **give** 57:24 65:14 77:22 112:23 113:3 116:22 119:15,15 121:16 177:2 196:8 202:20 208:22 213:13 218:23 246:6 265:24 267:25 | 153:23 176:9 180:11,20 181:4 203:4,9 208:21,25 221:19,24 223:25 225:24 227:12 228:4 229:16 230:4 234:18,19 234:22 237:11,16 240:16 254:17 | 197:18 201:11 202:19 204:9 207:8 208:21 218:22 221:18 224:4,7 225:9,18 226:5 227:20 230:18 234:22 240:12 242:25 260:9 263:10,19 | **grounds** 247:24 276:15 **guarantee** 194:18 194:22 195:4,19 **guess** 156:17 186:23 215:16 270:21 **guidance** 124:21 |
| **given** 44:5 55:22 56:4 81:2 130:9 136:8 142:10 143:13,13 152:5 236:17 282:9 283:24 | 257:4 263:12,13 263:19,20 264:14 264:24 265:24 266:8 274:4 276:19 277:14 | 265:23,23 266:8 267:6,7 268:17 276:21 279:6,8 280:4 **good** 5:4,20 6:1,17 | 140:14 237:13,13 276:8 278:21 **gut** 188:13 **guys** 13:6 15:5,18 260:8 |
| **giving** 7:14,15 188:13 234:25 243:11 | **goes** 87:22 89:8,20 204:4 237:14 244:16 254:25 255:2 278:22 | 6:18 8:6,8 9:22 10:22 53:24,25 112:25 113:17 114:4 119:6 | **h** |
| **glassdoor** 20:5,7 20:13 82:15 178:17 179:3,5 | **going** 7:20 8:24 9:2,17 10:3 11:5 | 121:12 180:25 265:10 | **h** 1:8 2:8 3:11 4:7 281:3 **hakala** 4:22 218:9 221:19,25 |

**half** 26:11 49:22 125:25

**halliburton** 240:22

**hand** 6:8 7:4

**handful** 38:17

**handy** 8:20 9:5,14

**hang** 97:23 119:16

**happen** 38:3 54:9 64:5

**happened** 205:24 227:1 248:5 259:8 274:5

**happens** 263:12

**happy** 93:13

**hard** 132:5,5 201:10

**hardcopies** 8:11

**hardcopy** 8:14

**hate** 126:18

**head** 40:10 182:6

**heading** 84:13

**hear** 9:8 13:15 22:24 29:7 126:8 142:3

**heard** 39:9 142:4 231:10 275:6

**hearing** 6:19 39:9

**heavy** 273:1

**hedge** 230:20

**heighten** 159:19

**held** 23:5 39:16 141:10 143:6 147:17 148:1

**help** 37:14 135:4 251:2 266:20

**helpful** 9:13 141:24 199:18 200:3 219:2

**herby** 283:5

**hereto** 282:7

**hetlioz** 201:3

**hi** 176:18

**hierarchy** 234:13

**high** 199:16,16

**hire** 45:10 67:15

**hired** 73:4 190:25

**historical** 139:2

**historically** 87:23

**histories** 88:3

**history** 147:19

**hold** 9:19 31:18 32:13,16 85:10 110:25,25 144:7,7 144:7,8,8 162:10 211:18 213:14

**holder** 283:7

**holding** 40:23

**holds** 141:12 143:8 148:2

**hoping** 49:18

**host** 180:7,8

**hour** 22:17 26:11 49:18 125:25 175:23 250:13

**hourly** 22:17,21

**hours** 26:11,14,15 26:16

**hub** 166:23

**huh** 16:1 19:9 62:5 67:17 151:5

**hundreds** 200:10 226:14

**hyper** 156:25

**hypothesis** 86:6 88:24 92:11,25 96:13 99:14,18 102:2 109:10 114:12,22 115:22 116:9,12 118:23 128:2 138:10

139:9 140:1,5 141:3,11 143:2,7 146:2 147:17 152:14 153:9 178:1 184:3

**i**

**iceberg** 189:21

**idea** 121:12 163:7 180:19 209:20 211:22 228:21

**identified** 65:13 133:3 154:13 182:12,17 208:10 208:12 216:14 228:6 254:19 255:4

**identify** 79:9 91:23 125:4 135:4 135:18,19 138:6 139:6 145:25 203:9 216:12 217:24 252:22 254:20

**identifying** 284:16

**identity** 161:8

**ii** 4:17 110:24 113:8

**imagine** 229:2 232:12

**immaterial** 251:22

**impact** 45:17 129:12 131:6 137:12 138:3 159:21 171:8 175:5 177:24 188:25 189:5,7 192:4 193:2 204:5 204:6,14 216:21 238:8 248:16,23 251:21 253:21,23 255:8 256:12

258:1 263:4

**impacted** 129:10 136:16,19,25 138:5 185:16 223:11

**impacting** 191:22

**implication** 45:20 155:3 173:23

**implications** 189:1 192:3 208:17

**imply** 154:8

**importance** 177:20

**important** 15:3 20:25 21:15,17,22 24:6,8 109:17 112:14 129:2 132:7,9 139:19 144:12 147:18 233:19 235:16 258:25 265:5

**impossible** 163:18 164:23 170:13

**impressive** 33:17 33:21

**improper** 204:2 275:21

**inaccuracies** 28:23

**inaccurate** 220:7

**incentive** 43:9

**incentives** 225:24

**incentivized** 43:13

**include** 22:8 30:20 51:11 71:7,14,24 122:13,19 138:25 150:25 167:11 213:4 229:7 230:11 240:11 243:23 244:1 247:2,6 274:15

**[included - information]**                                                    Page 21

| | | | |
|---|---|---|---|
| **included** 15:12 | **indiscernible** 9:19 | 49:3,8 50:17 51:9 | 129:2,17,20,23,25 |
| 16:8 51:25 71:11 | 19:5 48:13 77:15 | 51:10,15,21,25 | 130:19,25 131:19 |
| 109:11 132:22 | 134:2,19 189:19 | 52:1,2,8,19,22,24 | 132:1,2,12,22 |
| 187:18 207:16 | 204:15 208:4 | 53:5 54:18,23 | 133:8,10,24,25 |
| 246:4 248:19 | 242:24 245:12 | 55:10 56:1,3,8 | 134:3,9,14 135:2 |
| 271:10 272:2 | 246:12 253:25 | 57:4 59:18,20 | 135:20,21 136:1 |
| 276:16 | 258:11 265:10 | 60:10,13,18,19,24 | 136:16,18,22 |
| **includes** 121:4 | 266:18 274:2,22 | 60:25 61:12,14,19 | 137:4,8,12,18,19 |
| 125:20 168:2 | 276:10 | 62:7 63:2,3,9,12 | 137:21,24 138:24 |
| 233:12 | **individual** 60:23 | 63:14,24 64:3,6,6 | 139:1 141:14 |
| **including** 23:16 | 69:9 106:12 160:5 | 64:15,16 65:1,9 | 143:10 144:1,13 |
| 239:8 244:17 | 160:8,12 201:21 | 66:15,18,19 67:25 | 144:16,17 145:4,9 |
| **inclusive** 124:3 | **individually** 1:4 | 68:11 71:1,10,12 | 145:9,14,18 146:9 |
| **income** 37:11,21 | 2:4 3:3 | 71:17 72:16 73:10 | 148:4,11,16 149:6 |
| **inconclusive** | **individuals** 45:12 | 73:12,15 74:1,8,11 | 149:15 150:18,18 |
| 234:12,18 | 45:14 160:23 | 74:14,16,21,22,24 | 151:1,3,9 154:3,9 |
| **inconsistency** | 161:5,6,8 162:4 | 75:5 76:22 79:16 | 154:16 155:5 |
| 151:18 | 163:4 221:11 | 81:11,16,19 82:10 | 156:21 158:18 |
| **incorporate** | 229:3 | 82:12 84:19 87:9 | 159:3,16,20 |
| 141:13 143:9 | **industry** 16:4 | 88:2 89:11 90:14 | 160:25 161:19 |
| 144:13 146:9 | 208:6 | 91:2,18 92:6,13 | 165:16,18 166:5 |
| 148:3 | **inefficient** 24:22 | 93:1,9,10,23 94:25 | 168:21,24 169:17 |
| **incorporated** 5:13 | 234:16,17 | 96:15,19,21,23,25 | 170:14 171:1 |
| 51:22 137:6,19,20 | **inflated** 203:15 | 97:3,6,10,13,17,19 | 172:1,8,13,14,21 |
| 137:25 148:12 | **inflation** 205:5 | 98:3,5,7,12 99:3 | 172:25 173:1,3,12 |
| 162:9,24 205:18 | 260:4 267:17 | 99:19,20 100:11 | 173:23 174:15 |
| 219:18 261:14 | 268:1,4,11,12,14 | 100:19,22 102:1,9 | 175:4,9,11 177:3 |
| **incorporates** | 268:22 269:4,8,17 | 102:16,18,24 | 177:18,20,24 |
| 100:10 | 269:22 270:23 | 103:12 105:16 | 178:1,2,4,22 |
| **incorrect** 241:21 | 277:10 | 107:14,15,22 | 179:13 181:12,18 |
| **increase** 238:2,3 | **info** 145:18 | 108:4,17,25 109:3 | 181:21 182:24 |
| **increased** 237:13 | **inform** 20:24 | 109:4,6,25 114:14 | 184:4 185:3,4,21 |
| **increases** 159:15 | 42:17 51:20 | 114:20 115:3,3,6,9 | 187:22 188:18 |
| **incredible** 192:20 | **information** 13:5 | 116:1,4,14 117:9 | 189:25 193:6,7 |
| **independent** | 13:7 20:15,21,25 | 117:16,24 118:7 | 194:1,19,23 195:3 |
| 193:15 268:21 | 21:11,15,16 22:4 | 119:3 120:25 | 195:5 197:6 |
| **independently** | 40:24 42:8,10,13 | 121:14,25 122:8 | 198:20 199:9,21 |
| 192:21 193:11 | 42:17,20,25 43:1,1 | 122:15,22,23 | 200:15 203:16 |
| 261:8 | 43:8,13,14,20 44:4 | 123:24 124:12 | 206:25 208:13,16 |
| **indirect** 233:9,14 | 44:13,22 45:15 | 125:6,18 128:3,7 | 210:1 212:18 |
| 233:16 234:19 | 46:1,12,17 47:4,16 | 128:12,13,15,24 | 213:7,20 214:9,17 |

215:1 217:23 224:12,15 225:25 226:5,11,22,24 227:1,12,23,25 228:2 229:3,12,15 230:1,5 233:1 234:2 235:12 253:4 254:2,14 257:16 270:4,13 270:17 271:5,7,11 272:2,3,6,13 273:23 274:10,13 274:15,23 275:17 275:20,22 284:16

**informative** 73:5

**informed** 180:2,6 180:10,12,14,17

**informs** 48:4

**initial** 87:25 248:4 248:18,18 249:2

**insight** 226:20

**insistent** 140:15 155:25

**insisting** 142:11

**instance** 15:2 24:11 34:11 71:15 136:19 185:8 245:12,13 255:22

**instances** 213:4

**institution** 41:22 43:22,23 105:13

**institutional** 40:25 41:3,15,25 42:6,23 43:12 44:12,20 225:23 227:10 232:5,7,25

**institutions** 40:22 41:10,22 43:16 44:5,16 45:5,10 105:21 106:14 107:10 228:12

256:17

**instruct** 26:24

**instruction** 261:21

**instructions** 255:17

**integrity** 46:10

**intend** 27:4

**intended** 192:18 193:13,18

**interest** 88:2

**interested** 27:17 27:20 73:2 193:25 233:1 283:11

**interesting** 73:2 181:14

**interfere** 8:4

**interject** 49:14

**interjecting** 234:10

**intermission** 264:10

**internal** 269:14 277:15

**internally** 277:19 278:15

**international** 29:23,25 30:9,14 30:19,20

**internet** 20:18 21:10 22:2,9 71:18 72:1,5,11,16 100:15 104:2 105:1 106:24 107:23 175:17 179:8 180:17,23 181:2 184:13 185:23 186:4,7,14 190:21 193:21 194:2 200:22 229:16 230:2

**internships** 30:17

**interpose** 162:18

**interpretation** 71:9 188:17

**interrupt** 39:7

**interruptions** 49:16

**intervoice** 243:12 243:19,24

**intra** 41:25

**introduced** 57:18 111:2 195:15

**introductory** 152:19

**invest** 36:6 181:25 225:23 232:6

**invested** 41:4,15

**investigated** 163:10 202:14

**investigation** 133:15 192:8,9,15 192:22,25 193:12 193:16 194:3,8 197:21 198:14

**investigations** 132:16 134:14 171:5,16 194:13

**investing** 37:7 42:1

**investment** 31:2 173:5 192:6 230:3

**investments** 35:23 36:3

**investor** 43:24 62:16 105:15,24 106:12,16 108:8 169:20 172:24 193:14,20,25 194:6 229:24 256:14

**investors** 25:11 41:3,15 42:12,23 43:12,15 44:12,20 44:21 45:25 46:9 48:21 49:3,4 51:18 56:8 60:12 63:4,11,19 67:9 108:7 109:5 130:1 130:3,9 149:4 158:11 159:14 163:14,21 165:16 168:20,23 169:3 169:16 170:10,14 171:3,14,25 172:7 172:17 173:11,21 173:24 174:13 175:4,7 177:2,13 177:19 178:3,5 179:12,14,18,20 180:2,4,6,12,14,17 181:11 182:3 184:14 185:22 190:11 217:24 221:10 225:23,24 227:10 228:4 229:7,11 230:11 232:8,25 237:21

**invoices** 23:14,17

**involve** 254:23

**involved** 33:24 34:22 74:5 87:24 194:12 216:11

**involving** 166:22 199:22 200:10 233:3

**irrelevant** 68:19 69:1 93:10,11 267:13

**irrespective** 17:21

**isolate** 251:2

**issue** 12:20 39:8
53:4 82:21 86:9
89:22 90:4 115:6
115:13 122:22
155:10 159:23,25
160:10,14 208:22
234:11 235:24
236:16 237:9
238:12 239:1,2,3,3
240:18 244:8
247:1 255:3 261:3
261:5
**issued** 123:24
138:7 160:3
161:13 164:12,25
186:14 249:2
272:23 283:8
**issues** 61:17 73:1
84:21 90:21 193:1
221:1 240:20,23
243:8

**j**

**january** 4:18
147:5 230:19
**job** 35:10,14,17,20
36:4 37:2 38:10
**journal** 108:2,3
**journals** 32:17,20
**judge** 7:16 12:23
31:19 142:22,23
144:22 148:20
249:4,10
**judges** 239:8
276:6
**judgment** 12:24
216:24 217:6
263:14
**july** 4:9 9:25 10:14
16:20
**jump** 225:8

**jumped** 220:17
**jumps** 220:12
**juncture** 208:11
**jury** 7:16 278:22
278:22

**k**

**k** 13:14
**kaplan** 4:22 218:8
**keep** 83:1 107:19
108:10 123:21
197:13 267:9
**keeps** 126:10
**kenneth** 1:4 2:4
3:3
**key** 133:24
**kind** 18:4 20:24
27:18 31:16 37:14
45:13 48:12 53:24
54:5 124:18
180:18 188:11
210:25 223:14
226:6,18,21
227:11 254:1,4,7
260:9 262:22
274:4,17 278:11
**knew** 19:20
139:14 256:10
259:11,25 278:15
**know** 7:8 9:16
15:21 20:20 23:9
23:12,16,22 24:21
24:23 25:22 30:6
31:13 32:2 33:22
34:1,22 35:7,9
36:8,12,22 37:21
38:10,25 39:7
40:5,25 41:19
43:14,21,24 44:4
44:21 48:19 53:3
53:7,19 54:7
55:23 57:6 61:8

62:6,11,12,13,14
62:14 65:2 67:3
67:14,14 68:24,25
70:4,13 73:4,17,23
74:10,22 75:19
76:21,25 82:20
85:12 91:8,11
98:14 99:15
102:23 103:21
104:1,4 105:14,21
106:7,17 107:6,6
107:13,19 109:19
112:4 118:8
120:16,18 121:10
123:12 124:8
126:2,7 129:12
130:13,25 133:21
138:19,24 139:15
139:16 140:10,17
141:24 142:13,14
142:14,24 143:15
144:15 145:16
148:19,21,22,23
149:1 150:17
153:12,17,23
154:4,4,5,7,9
155:22 156:16
157:1,4,11 158:9
158:16,16 159:11
159:12,13,17,24
160:2,9,9,11 161:2
161:3,5,6,12,16,17
161:22,24 162:2,3
162:8,22,25
163:18 164:8,18
164:23 165:20
168:14 169:10,24
170:13 171:2,7,13
171:19 172:20,23
173:25 174:3
175:3,24 176:6,6

179:20 180:5,16
180:24 181:21
182:3 185:8,14
186:24 187:1,15
187:15 188:2,3
189:13,22,22
190:12 191:2,4,7,8
191:9 193:11
194:9,10,17 195:2
197:24 198:10,23
200:14,24 201:2,7
201:11,13,22,22
202:3,7,9,10,19
205:7,9 207:13
213:24 214:21
215:14 217:16
218:20,22 219:3
219:17 220:24
221:3 222:10
223:13,17,19,19
224:5,25 225:6
226:16 227:9
228:5,8,9 229:1,9
229:22 231:16,21
232:3,5,7 237:7
238:6 242:24
243:9 244:2,18,21
244:24 246:17
248:9,9,17 249:2
252:21 253:3
254:5,15 255:13
256:21 259:17
261:6,9 262:6,7,10
264:11,18 265:2,6
265:7 266:24
268:16,22,23
269:10,13,13,18
270:2,16 271:3
273:1,2,3,6 274:6
276:4,4,5,5,9,17
277:21,22 278:4

**[know - look]**                                                                                 Page 24

278:10,11,17,19
278:20,20,24
279:5
**knowledge** 170:9
214:15 258:9
277:16
**known** 72:12
141:11 143:7
148:1 201:18,18
228:14
**knows** 73:19
155:13,15,17
228:10
**krogman** 13:3,14
25:9 34:20 67:7
67:10 68:23 73:7
109:24 124:20
125:22 126:9
138:23 140:12,19
141:1 154:7
155:19 170:21
235:14

**l**

**label** 132:23
206:17 253:12
258:3 268:10,14
**labeled** 166:18
**lack** 63:25
**lacks** 158:2
**language** 30:21
55:4 57:10 79:11
85:23 86:1 142:23
**large** 112:4 211:17
226:17 274:12
**largely** 211:17
**lasting** 26:14
**late** 263:7
**laureate** 69:8
**lawsuit** 12:2 200:5
209:23 211:20
258:14

**lawyer** 8:13
**lawyers** 26:18
27:11
**lb** 1:6 2:6
**lead** 246:25
**leads** 61:17
**leaving** 202:6
249:5
**left** 199:13
**legal** 13:13,13
23:24 24:4 152:21
231:25 232:9
233:2 236:15
238:12,16,18
240:4,9 242:8,25
243:2 244:11
254:23 255:1
258:23 260:5
261:3,5,10 277:16
277:22 280:7
**legally** 259:1
261:10 269:16
**lengthy** 218:20
**letters** 59:8
**level** 88:24 153:23
199:2 221:15
**levels** 177:2
**lexisnexis** 209:14
210:5
**liability** 261:4,4,7
262:3 264:11
265:6 277:23
278:7,23
**likelihood** 41:21
41:21
**limited** 92:25 97:2
97:5 98:7 120:22
121:2 216:7
242:15
**line** 50:18 51:6,7
53:16 55:1,16

91:15 100:2
117:23 140:9
158:3 197:18
263:8 266:25
267:12 281:4,7,10
281:13,16,19
**lines** 127:25
**linking** 51:2
**list** 12:22 14:16,19
14:24 15:9,12,16
40:20 41:10 45:6
77:8 106:17 235:1
238:20 239:18
241:5 246:3,4,14
247:2
**listed** 7:2 235:2,8
240:2 245:2
257:15,21
**listen** 31:9 52:16
57:11 76:19 95:4
106:6 115:18
121:6 146:6 186:3
244:23
**literally** 21:14
86:7
**literature** 75:21
75:25 88:12
108:18 181:10
**litigant** 39:2
**litigation** 4:20
16:22,23 33:25
34:6 35:3 36:18
37:9,12,15,18,20
37:22 38:2 39:2
39:22 146:15
151:21 170:6,7
**litigations** 15:1
221:3 233:3
**little** 8:10 13:16
15:3 17:21 18:15
39:10 103:19,24

103:25 126:17
140:17,21 153:21
170:5 181:22
191:3 193:17
221:6 239:1 250:9
**living** 27:20
**llc** 161:23 162:2,3
163:1
**llp** 3:4,12 5:22
**locate** 174:14
**logic** 146:11
**logical** 225:4
**long** 26:9 60:14
99:24 104:25
105:20 111:18
197:21 221:21
222:24 256:17
263:6 276:2
**longer** 22:15
248:10
**look** 15:24 28:4
55:11 58:6 59:15
61:7,13 70:13,14
74:21 83:4 86:17
86:19 87:2 109:9
110:4 112:21
114:7 121:11,11
124:22 127:11,24
128:10 129:6,14
129:16,22 130:14
130:18 131:17
133:2 149:2
166:17,24 167:6
171:5,22 172:20
177:6,7 180:14,17
185:2 188:22
195:13,17 196:2
200:2 207:5 209:2
209:8 214:24
215:14,21 217:8
218:7,21 220:7

**[look - market]** Page 25

223:15 224:15 229:11 234:23 235:16 245:9,10 254:10 272:18,18 273:9,11,14,16 274:4 277:14 278:8

**looked** 15:6,22 16:2 17:6,9 18:14 19:1 26:21 92:1 108:15 109:2,18 145:21,23 149:22 152:15 169:17 170:5 171:14 182:9 187:3 252:16 253:7 255:22 272:19 274:18,23 275:8 275:11,23

**looking** 15:14 16:10 21:21 24:14 24:14 35:21 47:7 54:25 55:25 69:3 96:2 113:4,6,7,13 125:14,15 133:1 156:1 160:23 172:17 181:1 196:21,22 210:14 212:25 222:25 237:18 250:23 279:7

**looks** 35:17 48:12 48:13 50:21 61:6 119:2 221:11 274:7

**los** 283:3

**loses** 72:7

**losing** 44:7

**loss** 4:23 203:22 204:15 218:10 239:4,5,11,13

240:23 241:21,22 241:24 242:12,25 243:2,22 244:3,5 244:11,13

**lost** 242:21 255:2,3 255:3

**lot** 31:16 33:23,23 34:1,5,8 37:21 43:22 44:5,10 57:4 60:10 61:16 61:18 159:18 170:13 179:19 181:2,3 189:20 190:9 221:1 229:1 229:2,23 258:2 274:16 279:7

**lots** 18:21 179:17

**low** 108:8

**lunch** 176:14

**lunchtime** 176:5

## m

**m** 13:9,9,14 30:4 46:23

**magic** 64:2

**magically** 79:18 81:13 110:1 145:19 148:12 154:10

**mail** 105:19,20,25

**mailed** 107:8

**mailing** 106:17

**main** 116:18

**maintained** 238:5

**maintenance** 236:15

**majority** 38:8 238:15

**making** 9:10 62:19 170:25 172:12 193:1 211:2 232:13 284:6

**malina** 3:6 6:4

**management** 189:18

**manager** 201:5

**manager's** 201:20

**managers** 69:17 230:21

**mark** 10:3,10 11:5 28:6 110:10,11 166:11 218:10

**marked** 10:5,12 10:19 28:8 57:20 58:4,9 78:4,7 111:4 147:1,3 151:23 152:1 166:15 218:15 273:8

**market** 12:20 17:19,20 21:2 24:12,25 34:10,25 35:2 43:10 44:14 44:15 46:10 47:1 47:2,22 48:5,10,15 48:21,24 50:23,25 51:3,15,18,21 52:3 52:3,10,20,25,25 53:14,18,20,25 54:6,10,10,15,17 54:19 57:5 60:17 60:19,20 61:1,1,12 61:20 62:7,9,10,20 62:21 63:11,16,23 64:2,5,16,17,23,25 65:8 66:21 67:2,5 67:8,14,18,21 68:12,18,20,22 69:1,10,17 72:12 72:22,24 73:17,19 73:21,23 74:7,9,11 74:16,23 75:4,15 75:22 76:23 78:17

79:17,23 80:2 81:4,4,12,17,18,20 82:9,11,16,23 86:6 86:14 89:6,16 90:4 91:4 92:11 92:24 93:12,13,21 94:23 95:18 96:4 99:13,17 100:10 100:12,23,23 102:19,24 103:6 103:10 109:2,10 109:22,22,25 112:11 113:22 114:11,21 115:8 115:10,22 116:9 116:11 118:22 122:16,24 123:5 123:14 124:5,9,13 124:16 125:6,18 129:3,5,21 130:20 131:7,9,12,20,22 132:6 135:13 136:16,23 137:16 138:10 139:8,20 140:1,5 141:3 143:2,7,22,24 144:1,12,15,24 145:3,10,15,17,19 146:3,8,8 147:17 148:3,11,21 149:3 149:4 151:3 152:13,20,23 153:9,20,20 154:2 154:2,6,9,14,16 155:1,3,4,9,12,20 155:21 156:24 157:2,2,3 158:17 160:24,25 165:16 165:18 173:17 176:25 177:1,10 177:25 180:1

181:19 183:4
184:3,5,8,16,23
186:17 188:4,7,7
191:4,15,18,19
192:1 203:1 204:6
208:5 222:11,12
222:16,18 226:23
226:24 227:6
233:9,20 234:16
235:4 236:4,13
237:1 239:3
240:17 241:1,2,7
241:12 243:10
244:3,22 246:11
247:3 251:10,10
251:14
**marketing** 30:18
30:19 132:23
199:3 206:17
253:12 258:3
268:10,14
**markets** 4:17 85:2
87:7,14 96:11
102:2 110:24
113:8 141:13
143:9 146:2
171:23 183:23
**marking** 146:20
**mass** 199:10
**masters** 29:22
**material** 42:20
45:16 100:10
121:14 131:21
133:25 138:3
205:15 208:8,18
217:25 250:17
252:19,23 253:17
253:18 254:14
257:6
**materiality** 134:8
240:21

**materials** 12:19
13:21,23 14:2,7
15:9 279:12
**matt** 3:21
**matter** 9:23 20:12
22:3,22 23:11
29:15 95:5 124:8
125:21 146:7,10
159:5,7 184:2
**matters** 235:2
**mba** 29:24 30:4,24
**mcapeci** 3:8
**mean** 10:16,20
15:4,23 21:13,13
24:23 25:20 26:5
34:6 37:23 41:20
45:9,18 47:11
48:23 49:18 50:20
52:6,8,9 53:5,12
54:17 56:7,16
57:4 60:10 61:3
61:20,20,25 63:13
70:20 75:10,11
81:21 82:11 103:8
104:20 106:4
107:5,5 108:3,19
111:18,19 118:5,8
118:15 121:10
122:21 123:11,19
132:1 136:1 142:4
145:17 146:10
148:10,17,17,22
153:17,24,25
154:25 155:6,11
156:3,25 157:1
158:1 160:5
168:14 170:19,20
172:11 177:4,10
179:4 183:7
186:23 187:3,16
190:24,25 193:10

195:6,24 196:4,6
198:2,25 200:18
201:16 204:1
205:6 206:24
212:1,11 213:23
215:11 220:12
221:1 228:10
232:19,21 243:25
244:2,8 245:11
246:22 249:12
253:16 255:21
261:2 262:2 263:7
264:25 271:1
274:14 275:1
279:4,6
**meaning** 95:11
**meanings** 67:22
**means** 7:14 34:7
45:18 51:14 55:4
56:24,25 59:12
63:14 65:8 82:22
91:9 93:7 94:10
94:12 95:2 109:24
127:17 144:24
146:8 148:16
155:16 156:21
248:14 265:13
**meant** 30:15 66:20
**measure** 190:17
**meat** 263:15
**media** 16:3,11
17:8 18:6 280:7
**medications** 8:3
**meet** 6:21 26:4,5,7
140:18,18
**meeting** 26:20
**melville** 3:7
**memory** 112:6
272:10 279:9
**mention** 16:2
19:12 78:3 126:1

158:14 163:3
246:5
**mentioned** 21:7
55:8 182:10 185:1
200:22 227:11
245:7,22 246:1
252:24,25 277:18
**mentions** 166:3
**mere** 137:1
**mergers** 183:8
**merriam** 4:13
57:16 58:15 63:23
156:9
**met** 6:22
**methodology**
125:3,14 128:6
135:4,7,8,19,24
136:3,7 207:12,14
207:19 250:3
255:13 262:12
265:3,13 268:24
**michael** 3:5 6:1
101:4 126:4,16
146:23 222:5
267:4 279:19
**microfiche** 106:1
**middle** 178:16
**mihael** 1:8 2:8
3:11
**miller** 3:13 5:24
57:18 77:24 111:2
111:7 146:25
166:14 218:13
273:8
**million** 188:2,6
242:2
**mind** 54:14 55:4
57:15 112:20
134:24 142:16
182:6,25

**[minimum - newspapers]**

**minimum** 41:18
**mining** 230:22
**minute** 50:6 52:15
  57:24 58:22 75:19
  112:23 116:8,22
  176:1 202:20
**mischaracterized**
  239:15
**mischaracterizes**
  240:15
**misconduct**
  166:22 256:6
**misinterpret**
  155:1
**misleading** 237:24
  239:20 247:22
  249:13,22 264:1
  278:14
**misplaced** 196:9
**misrepresentation**
  261:11 264:9,12
  264:17 278:3,7,8
  279:1
**misrepresentatio...**
  98:22 140:13
  258:18 265:9,12
  265:18 278:12
**missed** 195:9
**missing** 257:8
**misspeak** 82:11
**misspoke** 198:21
**misstated** 99:23
**misstates** 35:5
  82:18 83:22 96:6
  101:2 123:8
  139:10 242:10
  249:8 250:14
  264:5,6 272:15
**mitchell** 3:5 6:4
**mix** 122:23

**model** 96:11
**modelled** 36:19
**models** 214:21,22
  215:4,10,11,13,20
**modified** 214:16
**modify** 155:9
  235:19 250:10,18
  257:12
**mollified** 214:25
**moment** 97:22
  98:1 225:16
  272:25 280:3
**monetary** 43:7
**money** 43:6,7,8
  44:8 69:17 159:18
  172:21 175:14
  185:6,7,10,13,23
  226:25 227:4,18
  228:1,15 232:14
  257:1
**monitor** 108:10
  227:13,16,21
**monitoring** 228:15
**month** 40:7
**months** 22:14,15
  197:21 237:10
**morning** 5:4,20
  6:1,17,18 127:16
  127:22 145:22,24
  164:17
**motion** 42:7
  276:15
**move** 7:9 56:21
  73:15 99:5 122:9
  131:23 157:20
  158:23 171:11
  173:7 174:7,21
  183:4,7,9,23 184:5
  184:8 191:15,18
  192:1 204:18
  224:21 263:8

  266:22
**moved** 73:11
  131:2 184:15
  186:5,16 210:16
**movement** 129:20
  210:10 251:4
**movements** 54:4
  72:15
**moving** 56:20
**multi** 31:15
**multiple** 65:15
  69:12 267:17
  268:3,3,11 269:22
  270:23
**mutual** 36:20,23
  37:8 105:12
**myer** 98:19
**myers** 50:22 51:17
  52:21 55:10 61:11
  71:10 76:9 77:12
  93:8 95:12 97:16
  108:24 117:23
  118:9 138:16
  139:14 150:25

## n

**n** 3:1 4:1 13:14
  46:23
**name** 5:8 106:21
**narrow** 128:23
  188:10
**natalie** 1:24 2:21
  5:9 6:6 283:5
  284:24
**nature** 215:15
  222:10
**necessarily** 37:23
  56:17 62:9 63:12
  128:22 130:9
  159:9 233:22
  245:18

**necessary** 13:2
  17:18 81:10 152:6
  202:7 252:11
  282:6
**need** 58:6,9,23,23
  67:12 85:20
  111:14 155:16
  197:14 204:11,20
  250:10 252:19
  269:7,22 278:3,17
**needed** 140:18
  153:18 270:24
**needs** 147:8
  205:16
**negative** 42:14
  133:12 202:25
**neither** 118:5
  157:18
**nepotism** 201:25
  201:25 202:6
**never** 6:22 80:10
  81:9,10 140:10
  154:25 158:1
  209:17 249:11
  275:6 276:14
**new** 1:2 2:2 3:7,14
  3:14 40:7 42:20
  45:15 46:1 84:21
  89:22 90:21
  100:10 111:1
  133:8,19 134:9
  172:1,8 173:12
  176:1,1,25 197:19
  197:24 198:1,11
  198:17,23 199:6
  225:25 229:5
  230:8,10 240:25
**news** 122:6 211:18
  221:12 240:23
**newspapers** 49:6
  173:24,25

**nice** 6:21
**no.14125** 284:24
**noble** 69:8
**nonfraud** 205:14
205:25 206:3,8,20
207:7
**nonresponsive**
99:6 157:21
158:21,24 173:8
174:8
**nonsensical** 155:7
**normal** 142:9,16
143:12,18
**northern** 243:13
**notary** 282:13,19
**notations** 284:11
**note** 5:14 24:10
65:11 96:10
141:25 147:4
148:10 152:2
175:22 176:4
**noted** 251:24
282:7
**noticing** 5:18
**notifications**
231:24 232:9
233:2
**novatel** 4:20
151:21 247:11,15
247:17
**november** 1:18
2:20 5:2,5 284:21
**number** 2:22 6:25
7:21 24:2 40:5,10
41:18,19 63:22
77:23 173:2,4
196:23 205:7
223:8 226:17
228:22 267:25
283:8

**numerous** 12:21
99:23 125:13
149:12

**o**

**o** 3:6 13:14
**o'clock** 164:17
165:3
**o'connor** 239:9
**oath** 7:12,23
176:19 283:18
**oaths** 283:15
**object** 26:23 100:1
141:20 158:3
267:12
**objected** 247:24
**objection** 5:21
25:6 33:19 35:5
36:10 44:17 45:7
47:10,23 48:7
51:12 53:11 57:2
59:21 60:4 64:18
68:3,14 70:19
71:20 74:18 76:1
76:17 77:6,10
79:13 80:4,11
81:7,22,25 82:18
83:21,21,22 84:6
85:3 87:4,17
88:20 89:17 91:5
91:10,24 92:15
93:2 94:2,14 95:3
95:20 96:6 97:11
98:10 99:10,22,22
101:2 102:10
103:13,23 104:12
106:2 107:3,16,25
108:20 109:13
110:7 112:2,12
113:25 114:18
115:17 117:21
121:7 122:4 123:8

124:2,10 125:8
131:24 132:25
133:20 134:12
135:10,22 137:7
138:12 139:10
141:17,17 142:8
145:2 146:5 150:8
150:14 151:11
152:18 153:11
154:18 155:14
156:11 157:9,17
157:25 159:6
160:15 161:11,25
163:8,16,24 164:9
164:15 165:8
166:1 167:15
168:13 169:1,9,18
170:11,17 172:10
173:14,19 174:17
179:16 181:13
182:14 183:5,19
184:6 185:25
186:18 187:11,20
188:15 190:6,23
191:16 192:16
193:9 194:4,20
195:22 200:17
201:15 202:2,12
203:18 206:1,22
207:10 209:24
210:18 211:4,25
212:8 213:9,18
214:12,19 215:3
217:2 218:1
219:12 220:19
222:2 226:2,15
227:14 228:24
229:8 230:14,24
231:5,12,17 232:1
232:11,18 233:5
233:21 237:6

240:8,14 241:9
242:10 249:8
250:14 252:13
255:20 258:22
260:3 261:1,25
262:20,20 263:23
264:5,23 266:5,14
267:20 269:23
271:13 272:4,15
274:25 275:18
277:12 279:3
**objections** 5:16
204:8
**obligated** 49:20
**obligation** 260:5
**observation**
148:24 201:20
211:2,7
**observed** 201:5
211:13
**obtain** 60:12
226:22,23 227:23
**obtainable** 57:1
59:8,19
**obtained** 13:2
62:13 164:19
168:15
**obtaining** 159:20
**obvious** 79:11
148:24 196:5
**obviously** 9:6
37:21 42:10 56:3
56:6 66:3,11,18
67:25 68:11 70:16
70:25 75:23 76:22
78:14,23 79:12
80:1 81:5 84:19
86:1 89:11 90:6
90:13 91:17 92:5
92:12,25 93:22
94:24 96:20 97:9

97:18 98:11 99:18
101:25 102:8,13
102:15,21 103:6
103:11 105:12
106:13,23 108:16
109:11 117:19
118:25 123:14
127:17 128:19
132:15,16 138:22
139:3 145:23
148:21 150:1,4,18
151:7 158:12
160:22 190:10
201:17,17 204:3
234:16 246:11
259:12 261:12
262:10 265:4
**occasions**   270:10
**occurred**   130:21
   134:3
**occurs**   42:16
**october**   4:10 10:8
   10:18
**offense**   125:9
**offensive**   275:15
**offer**   284:1
**offered**   152:12
**offering**   11:18
   12:1,2 23:24 24:4
   211:24 249:25
   284:4
**officer**   283:21
**oh**   9:9 30:3 57:25
   62:24 85:25,25
   104:20 111:5
   146:22 168:8
   187:1 190:5
   202:18 236:3
**okay**   6:19 7:3,9,11
   7:19,25 8:8,18 9:8
   9:15,21,22 10:3,10

10:22 11:6,9,14,15
11:16,17,25 18:11
19:3 20:17 21:7
22:10 26:17 27:5
27:10 28:19 29:19
30:13 39:12,14
41:9 42:4 54:20
54:24 55:2 56:10
56:23 57:12 58:12
58:22 59:1,6,15,25
70:18,24,25 77:14
77:25 78:2 79:7
82:25 83:2,17
84:5,22 86:13,18
87:2,12,22 88:10
88:15,19 89:4,25
90:8,16,20,23
91:14 92:3 93:16
94:20,21 95:15
97:25 100:8,20
101:11,14,18,23
102:5 103:19
104:23 110:4
111:9,10 112:16
112:21 113:12,16
114:3,7,11 115:4
116:3,7,17,22
119:4,6,8,13,16
120:13 123:1,18
124:24 136:13
137:11 139:22
140:6 141:4,8,9
142:19 143:4,17
143:20,23 144:20
145:6,21 146:13
148:18 150:21
154:12 156:6
158:20 167:18
168:1,10,22
176:12 177:17,25
179:9,11,22 182:8

182:22 183:3,15
193:20 196:8
197:9,12,15
198:22 199:5,7
201:2 203:12
205:2 209:20
212:14 215:21
218:14 220:14,17
224:20 225:9,14
230:18,18 231:10
234:17 235:11
244:15 256:2
263:25 264:16
265:23 266:21,22
268:7 271:9
272:12 273:13,18
273:21 276:3
280:4
**old**   7:4
**omission**   264:13
   278:11
**ones**   77:5
**online**   178:21
**ooo**   280:10
**open**   8:15 12:22
   110:22
**opened**   80:18
**opening**   10:15
   12:16 13:4,24
   14:20 15:15 16:20
   17:4,13 18:1
   19:17 20:9,11,19
   20:22 22:3,16
   28:18,19 40:16
   46:5 62:18,23
   64:10,14 66:10,16
   67:19,24 69:15,24
   70:10 110:17,18
   140:11 170:20
   171:21 177:8
   181:23 202:17,23

215:22 234:24
250:7,8 251:24
252:1
**operating**   278:2
**opine**   191:4
   192:18
**opined**   81:11
   140:10 183:3
   191:13 205:9
**opines**   155:3
   211:12
**opining**   25:23
   193:5 244:9 262:2
**opinion**   13:13 24:4
   24:9 46:8 93:25
   94:9,11 130:21
   135:13 155:2,4
   156:15 157:13
   172:4 175:5,10
   185:15 188:25
   189:24 203:23
   211:15,23 212:7
   220:23 236:14
   239:10 241:12,20
   243:15,16,17,20
   243:21 244:11
   245:4,20 246:6,10
   247:4,5,25 248:25
   249:2 250:1
**opinions**   11:18
   12:1 14:18 15:10
   23:25 24:16,18
   95:5 161:18
   206:10 235:17
   245:17,19,25
   274:24
**opportunities**
   230:3
**opportunity**   152:5
   181:20 228:19

**opposed** 34:12 62:1 235:21

**opposing** 79:15 245:15

**order** 8:9 62:6,6 65:1 73:10 135:25 140:18 151:15 157:13 173:6 185:7 193:16 235:20 251:19 254:17 255:7 262:11,13 269:3 278:17

**original** 130:10 247:21,23

**originals** 113:1,17 114:4

**orleans** 240:25

**outcome** 187:19 234:3,7

**outline** 208:25

**outlined** 221:25

**outside** 138:1 207:11 254:23 277:24 278:19

**outstanding** 23:14 23:17

**overall** 44:1,2 130:20 180:22

**overturned** 239:9 243:7,20 244:6

**overvalued** 178:7

**owned** 41:22

**ownership** 41:1

**owning** 41:6

**p**

**p** 3:1,1

**p.m.** 2:19 176:13 176:16 225:10,13 276:22,25 280:5,9

**pacer** 128:13,14 128:25 130:7,12 157:8,10,15,24 158:4 159:24 231:14

**pacerpro** 231:11 231:16

**page** 4:3,8 58:14 58:17 83:7,7,9,10 83:14,20,20 84:2,2 84:8 85:11 94:8 94:11 100:20,24 100:25 101:6,9,16 111:13 113:4,7 115:19 116:18 119:8,12 166:17 166:24 167:6,7,17 167:17,23 179:1 190:9 199:18,25 200:2,4 201:3 218:23,23 219:1 219:11 222:4 242:14 273:18,20 281:4,7,10,13,16 281:19

**pages** 17:16 18:4 83:19 147:9 152:4 155:22 254:16 274:16

**paid** 23:19 213:2

**panel** 239:7,8

**paper** 4:22 9:18 53:8,13 55:20,24 66:7 78:17,18 83:3 91:12 92:18 93:5 95:7,9,23 103:16,16 110:5 110:15,18 111:19 111:23 112:6,14 113:5,23,23 114:5 116:10 117:12

118:3,11,13 119:10 218:7 228:11

**papers** 122:13,15 122:19 123:1,4

**parade** 49:15

**paradox** 43:5

**paragraph** 15:14 15:21 16:1 46:6,7 46:21 47:9,17 48:11 50:15 51:1 59:16 62:22 64:9 64:13,21 65:12 69:6 83:4,10,12 84:12,16,23,24 85:7 92:23 96:1 113:16 116:23 117:1 118:24 119:13,18 127:12 127:20 146:19 147:12 149:16 150:6 152:11,20 153:9 171:22 177:9 178:15,16 178:16 192:13 200:4 202:18,20 202:23 209:2,7 212:16 230:7 234:23,25 238:21 239:18,19 241:2 243:24 245:3 246:4,15 247:7 252:1,8 267:16,21 267:22,25

**paragraphs** 65:15 162:17 219:1,4 220:15

**parentheticals** 117:7

**part** 12:14 14:16 29:15 30:1,3 36:5

43:3 48:9 122:23 130:6 175:13 177:25 189:9 216:15,25 226:1 242:22 248:10,10 257:25 258:25 284:3,14,18

**partial** 211:18

**participants** 5:11

**participates** 177:11

**participation** 200:9

**particular** 17:22 26:1 36:14 53:13 69:22 70:1,5 79:3 79:5 84:16 87:8 103:16 108:12 112:5 118:13 119:13 129:7 139:18 169:6 172:19,20 179:21 184:25 186:7 188:18 189:13 201:19 209:15 212:25 217:3 219:21 226:20 227:22 236:17 237:17 238:9 239:24 241:2,20 246:18 247:23 248:13 251:15 255:14,24 269:1 269:10 273:18 274:5,19

**particularly** 27:17 34:10 53:2 109:19 123:19 180:25 242:21

**parties** 5:15 283:13,13 284:4,7

**parts** 19:1 268:17
**party** 284:3,12,13
  284:14,17,18
**party's** 284:2,13
**parvizi** 1:24 2:21
  5:9 283:5 284:24
**passive** 43:24
**pastes** 165:24
  167:1
**path** 203:19
**paul** 3:12 5:21
**paulweiss.com**
  3:15,16,16
**pay** 199:23
**paying** 22:19
**pch** 211:18
**pdf** 58:17
**pearl** 3:13 5:25
**penalty** 6:11
**pending** 59:2
  65:22
**people** 30:7 31:9
  40:21 45:11 108:1
  160:13,16,20
  163:6 164:6,13
  174:19 180:21
  187:3,6 201:21
  218:3 228:18
**percent** 37:11 38:1
  188:3 190:12
  211:6,6,16
**percentage** 38:5
  220:25 274:1
**perfect** 125:20
**perform** 138:2
  255:15,18,19
  258:12 259:13
**performed** 93:20
  102:14 132:16
  134:15 136:12
  188:11 205:1,8,11

205:19 207:3
  216:16 219:19
  261:7
**performing** 36:16
  220:22 265:3
**performs** 216:8
**period** 17:20
  21:11 22:5 41:4,8
  46:11 250:25
  251:2,7,15,20
**periodically**
  160:11
**perish** 32:23 33:1
**perjury** 6:11
**persistent** 166:21
**person** 163:5
**personal** 284:15
**personally** 39:1
  49:5 170:2 229:16
  231:2 276:14
**perspective** 35:3
  275:15
**pertains** 99:19
**pertinent** 12:14
**ph.d.** 32:6 33:22
**pharmaceuticals**
  1:8 2:8 3:11 5:13
  281:1 282:1
**phone** 26:8 193:22
**phonetic** 209:6
  228:7
**phrase** 46:16
  49:11
**phrased** 237:8
**picked** 243:1
**picking** 35:20,21
  36:13,21
**piece** 52:8 53:8,13
  90:13 125:6
  131:16 188:18
  254:2

**pieces** 91:2 133:24
**pin** 139:23
**place** 143:14
  147:18 224:4
  228:3 274:13
**placed** 283:18
**places** 79:8 122:10
**plaintiff** 1:6 2:6
  3:3 6:3 246:25
**plaintiff's** 38:3,6,9
  39:23 40:1 206:15
  209:12 217:17
  225:15 248:10
  250:4 258:6 259:6
  259:10 262:7,25
  268:18
**plaintiffs** 237:25
  238:10,17 246:23
  259:24 262:18
  264:21 266:3,12
  270:18
**plan** 155:8
**plat** 58:7
**platform** 58:7
  111:3 201:11
  273:10
**please** 5:14,15,17
  6:7 7:8 19:7 28:7
  29:9 59:1 100:5
  110:19 144:8
  150:22 154:20,24
  167:14 180:10
  219:4 234:8,8,8
**plus** 169:5 208:5
**pocketing** 200:11
**point** 48:25 52:23
  62:13 63:17 67:4
  75:17,20,24 81:1
  96:13 109:1
  110:18 115:20
  119:22 129:17,24

131:16 140:21
  144:15 151:2
  154:11 166:4
  167:13 170:25
  172:12 181:9
  184:20 192:10
  193:1 195:9
  223:24 225:4
  258:24 259:10,23
  260:6,7,7 264:10
  265:20 266:25
  277:13,22
**pointed** 76:3
**pointing** 190:18
  277:9
**points** 68:16,16
  134:20 221:3
**policy** 189:16
**polymeropoulos**
  1:8 2:8 3:11
**portfolio** 44:1,2
**portion** 188:23
  208:2 250:19
  270:7
**portions** 85:15
**position** 73:14
  96:18 133:5,12,23
  134:21 162:6
  165:15,22 179:12
  186:3 256:1,5,9,15
  256:20,24 257:2
  257:23
**positions** 32:16
  256:17
**positive** 42:14
**possessions** 240:23
**possibility** 168:16
  206:19 253:2
**possible** 51:19
  107:11 131:18,23
  205:22 206:5

Page 32

270:4
possibly 156:13
post 19:21 20:6
  176:7 193:15,21
  194:7
posted 169:22
postings 168:6,9
  178:21 179:3,5,8
  180:18,24 181:1
  185:24 186:4,7,15
  194:2 200:23
posts 19:18 20:13
  169:5,22 171:6,15
  174:6 178:18
  184:13 188:5
  189:2,4,12 190:1
  190:21 194:9
  229:1,20
potentially 253:1
practical 48:25
  49:1 52:23 61:4
  63:17 109:1
  144:14
practice 14:15
precise 40:5
precisely 40:10
predicted 181:19
predominance
  246:16
predominantly
  37:8,9
prefer 135:24
premature 270:22
  271:1
premise 47:2
  226:1
premised 103:10
premises 109:21
preparation 26:3
  26:12

prepare 25:18
  214:7
prepared 8:21
  247:9 258:12
  259:13
preparing 220:8
prescribed 68:22
prescriptions
  199:23 200:11
present 3:19 17:23
  26:17 208:19
  225:15 272:3,5,6
  284:12
presentation
  67:23
presents 181:20
press 99:1 107:18
  120:17 124:14
  125:23 137:21
presumably 227:4
presume 107:7
  222:16
presumption 47:1
  48:6 204:7 237:5
pretty 53:23,24,25
  107:10 158:21
  195:23 211:10
prevent 251:20
previous 222:6
previously 26:21
  183:3 191:13
  202:11 203:15
price 20:16 25:12
  42:9,15,19,21
  44:24 45:24 49:2
  51:16,22 53:2
  54:4,18 56:22
  61:22 63:20 64:4
  64:7 65:10 72:14
  75:1,17 79:19
  81:14 84:18 88:3

89:9 100:16
  107:19 109:7
  110:2 116:6
  123:16 129:10,13
  129:17,18,20
  130:3,15 131:2,15
  131:22 134:1,2
  136:19,20 137:1,6
  137:13,20,25
  138:4,5 144:18
  148:13 149:4
  154:11 156:23
  161:17 165:19
  171:8 173:22
  175:8 180:3,5
  183:13 185:16
  186:8 187:25,25
  188:1 191:22
  193:3 201:3,5,12
  203:2,6 204:1,5,5
  204:14,23 208:3
  208:20 210:10
  211:8 216:22
  221:15 223:10
  236:15 237:11,14
  237:16 238:2,5,8
  251:3 253:5 254:3
  258:1,14 263:3
  268:19,20 269:1
  269:13 270:8
  274:1,1
prices 36:19 46:10
  47:2 73:11,15
  87:8 96:13 101:24
  108:5 114:13
  116:13 117:8,15
  119:3,24 120:7
  128:2 136:16
  139:2 141:15
  143:11 148:5
  183:4,10,13

191:15,19 192:1
  201:17 210:16
  211:3,8
primarily 37:5
princeton 35:18
principles 25:4
  52:6 55:3 57:10
  190:16 263:20
prior 22:15 35:6
  62:13 82:19 87:19
  91:19 96:7 99:23
  105:5 112:7 123:9
  136:13 139:11
  158:13 164:1,4,20
  164:21 165:3
  170:7 174:3 183:8
  191:22 211:9
  212:11 217:12
  221:18 222:7
  238:1 260:11
  269:12 270:2
  283:17
private 35:22
  60:25 80:23 96:24
  98:4 115:3 230:21
privately 62:1
privilege 27:2
probably 13:15
  17:16 18:14 22:13
  23:13 26:10 38:22
  39:10 105:3 107:1
  108:25 138:15
  215:16 219:23
problem 64:24
  72:4 149:7,13
  217:9 224:3
proc 283:14,19,25
  284:7,19
procedure 53:20
  283:17

**proceed** 82:1 238:7
**proceeded** 237:25
**proceeding** 5:17 283:23 284:5,13
**process** 12:25 23:23 36:5 64:3 65:7 76:20,23 219:24 263:13
**produce** 14:7
**produced** 14:3,12 14:14,21 15:5,25
**product** 201:17,22 226:21 284:9,17
**production** 13:20
**products** 231:14 284:2
**prof** 283:10
**professor** 11:11,19 31:2 33:11 69:19 80:9 147:11 179:6 257:15
**profit** 174:4
**profits** 174:2 175:17
**program** 30:4,14
**promise** 18:21
**prong** 246:16
**pronounced** 209:6
**proper** 136:5,10 274:21 275:7
**properly** 251:2
**proposition** 181:10 184:4 188:21
**provide** 14:16,24 24:5,8 25:3 56:20 139:16 141:8 153:19 157:13 161:19,20 191:6 206:9 210:6

231:24 232:8 233:2 235:11,20 244:14 247:3 284:1,9
**provided** 13:21 45:6 48:2 52:18 71:3 93:4 156:19 209:13 233:1 237:12 247:4,4 249:15 276:9 280:6 284:17
**provides** 63:6 211:15
**providing** 24:16 24:19 71:3 244:11 244:19
**prying** 261:17
**public** 22:4 35:25 36:1,6 66:17,19 71:1 73:9 76:15 76:16 93:10 96:23 96:25 98:3,5 115:2 117:8,15 119:3,24 120:7,13 120:15 121:4 122:1,18,23 123:4 123:23 141:13 143:10 148:4 149:5 150:4 151:8 217:23 224:11,15 229:18 233:3 263:21 273:23 274:10 282:19
**publicly** 20:20 46:12,16 47:3,15 49:2,12 50:17 51:9,10 52:1,7,9 53:5,10 54:14,22 55:16 56:3,7,11,12 56:15 59:17,19 61:24,25 66:3,12

66:15 67:25 68:11 70:16 75:22,23 78:14,23 79:12 80:1 81:6 84:19 86:1 89:10,11 90:7,13 91:18 92:5,12,25 93:22 94:24 96:21,25 97:2,6,9,13,14,18 98:5,7,12,15 99:18 99:20 100:18 102:1,8,15,15,19 102:22 103:6,11 108:16 109:11 117:20 118:7,25 127:17 128:21 129:15 135:6,20 137:18 145:8,23 150:1,17,19 151:8 159:4 161:15 172:1,9,13 173:13 173:22 200:16,19 200:21 201:14,18 210:15 211:2 229:21 271:11
**publish** 32:23 33:1 56:17 128:18 228:17
**published** 32:19 32:22 33:23 34:1 34:5 52:22 54:12 55:10 61:12,14 71:10,11,18,22 72:17,17 73:16,20 74:1,1 93:9 97:17 108:25 117:24 128:3,8,8,13,25 129:1 130:25 131:3 135:2,5,20 136:15 137:2,5,19 138:11,17 139:7

144:1 145:24 150:18 151:1,8 161:9
**publishes** 228:11
**publishing** 158:13 169:13
**pull** 197:16
**pump** 181:3
**purpose** 70:1 170:18 246:18 250:11
**purposes** 17:18,24 25:10 36:22 37:7 49:1 73:6 124:19 135:8,12 136:11 155:19,20 191:2 206:18 219:15 221:23 222:17 233:20 261:22
**pursuant** 283:16
**put** 9:11 18:11 20:19,22 53:7,8,9 70:9 74:14,15 79:8 94:3 121:22 134:8 150:10 156:7 157:5 166:7 168:7 171:3 186:25 196:11 246:20 251:22 271:2 273:3,6 274:2,7
**puts** 121:22
**putting** 57:16

**q**

**qualification** 204:23 207:15
**qualified** 283:6
**qualifies** 123:13
**qualify** 154:15
**qualifying** 140:8

**qualitative** 217:24
**quantification** 205:8 222:13
**quantify** 208:2 255:8
**quantifying** 219:15 250:11
**quarter** 41:23,25 42:3
**quarterly** 105:8,9 106:8 107:9
**quarters** 41:8
**question** 7:7 18:23 21:25 22:1 27:4 49:22 59:2 64:8 64:12 65:21,24 76:24 79:2 82:3,6 97:14 98:1 99:21 100:5 110:22 111:15 115:5 117:14 125:1,12 128:23 132:20 141:21 159:2 162:13,19,21,22 167:9,9 170:1 172:19,25 174:10 175:20 181:15 185:4 188:10,12 189:14 195:1 203:21 204:9,11 204:21 206:18 208:7,21 210:22 223:14 229:13 230:8 232:20 234:10 238:6 246:3 250:25 263:10 265:25 272:22 277:3
**questioning** 100:2 140:9 263:8 266:25 267:10,12

**questions** 26:25 29:3 52:17 60:23 83:17 112:19 126:5,24 152:7 154:21 164:2 174:22 193:24 249:24 253:9 279:20
**qui** 16:24 131:19 131:21 132:14,24 163:21 186:15 187:18 190:3 200:5
**quibble** 147:22 148:8 219:6,7
**quibbled** 246:24
**quick** 108:8
**quicker** 43:21
**quickly** 40:14,18 43:1,2 51:22 106:13 107:11 117:8,15 119:2 171:25 172:8 173:12 213:23
**quite** 105:15 106:23 118:16 123:10 170:19 213:23 215:9 222:9 226:16
**quotation** 209:10
**quote** 46:25 47:8 47:12,15,25 48:2 48:17 50:14,18 52:21 55:2 66:18 70:23 77:5 78:16 108:24 145:22 186:21 209:15 210:9 239:13 248:24
**quoted** 51:6 68:18 79:10 86:12 93:6

93:8 103:17
**quotes** 186:25
**quoting** 46:22 50:21,22 211:17

**r**

**r** 3:1 13:9,14 281:3 281:3
**raise** 6:8
**raised** 208:22
**random** 88:12
**rarely** 112:25 113:17 114:4
**rate** 22:17
**rates** 48:22 51:20
**rational** 179:19 180:4 256:18
**react** 131:10 148:22 154:3 157:3 221:12
**reacted** 155:5
**reaction** 73:11 75:2 129:17 136:20 156:23 186:8 188:13
**read** 11:24 15:20 17:15,16,17,25 18:3,7,12,23 19:1 19:24,25 20:12 34:9 46:6 49:6 58:22 59:4 75:11 92:7,8,9 93:18,18 94:21 97:21 101:9 101:18 105:20 108:1 111:23 116:23,25 119:14 119:17 129:23 140:1 141:5 142:2 143:2 144:21 147:15 169:4,21 173:25 175:4,16 185:17 194:1

196:18 202:22 204:11,21 209:11 209:17 218:25 220:14 229:10 230:2 247:8 266:20 282:5
**readers** 197:10 229:7 230:11
**reading** 53:22 95:1 112:24 141:18 174:6 193:14 219:3 229:3 241:19 262:4,5
**reads** 193:21 274:17
**ready** 9:16 140:6
**real** 34:13 141:25 261:4
**reality** 156:4
**realize** 9:9 112:3 208:24
**realized** 221:17
**really** 14:3 18:20 24:13 35:10 55:2 100:16 107:7 109:16,17,17 126:7,9,11,18 138:19 139:23 159:22 162:12,13 171:2 174:10 188:10 196:4 221:4 256:22 264:13 270:15 273:1
**reason** 7:25 21:2 45:13 59:25 60:6 60:9 69:15 108:2 108:23 130:24 133:11 144:12 158:17 168:22

240:16 256:4
281:6,9,12,15,18
281:21
**reasonable** 25:11
46:9 63:10,19
73:21 75:3 173:21
217:8 247:18
**reasonably** 175:8
**reasons** 34:17
107:24 120:20
135:23 179:17,23
180:8,16 182:4
229:23 244:16
**rebuttal** 43:4
52:12 110:17
151:16 170:24
191:7 204:5
**rebutted** 237:4
238:7
**recall** 110:15
165:23 166:2
169:4 183:10
230:15 243:11
277:3
**received** 23:10
255:16
**recess** 50:9 127:7
176:14 225:11
276:23
**recollection** 166:9
166:9 237:12
**recommendation**
178:11,12 213:6
213:11,17
**recommendations**
213:14 214:6
**reconvene** 126:19
**record** 5:5,16 8:15
10:4,11,25 11:3
23:2,4,5,6 39:11
39:15,16,17 50:8

50:10 64:11 65:12
101:15 111:12
125:1 127:6,8
152:3 176:9,13,15
196:18 213:3
225:10,13,15
263:6 276:22,24
280:5 283:24
**recorded** 5:6,10
283:22
**recording** 5:14
**redirect** 50:14
**rediscovering** 4:23
218:9
**refer** 10:14,18
11:14 103:17
192:7
**reference** 19:20
117:4 139:17
201:12 209:3
211:6 251:1
**referenced** 119:10
179:6 181:16
183:1 209:23
**references** 19:25
20:4 55:21
**referred** 93:5 94:4
198:11
**referring** 16:24
79:3 90:2 91:12
101:13 117:12,13
178:20 196:15
241:13
**refers** 59:17,19
89:4 98:17
**refine** 252:3
**refined** 252:6
**reflect** 47:3 62:7
63:13 64:11 87:8
96:14 101:25
114:13,13 116:13

117:8,15 119:3
125:2 128:2 149:5
175:9
**reflected** 20:15
42:9,18,20 44:24
48:16 49:9 51:16
53:1 54:18 61:21
63:24 64:4,7 65:1
65:9 75:16 79:18
81:13 100:16
109:6 110:1 116:5
123:15 144:17
145:20 150:12
154:10 178:9
181:19 271:3
**reflecting** 45:25
46:11 63:11
173:22
**reflects** 48:25 49:2
96:19,20
**refresh** 58:9 110:9
166:8 272:9
**regarding** 16:3
108:24 149:6
177:23 284:11
**regardless** 180:5
251:15
**register** 106:5
**registered** 105:18
**regression** 210:25
216:7,11
**regular** 49:3
105:15 108:8
**regularly** 34:17
**reject** 100:6
235:17 243:3
245:18
**rejected** 236:1
239:5 241:11,24
243:5,7 245:16

**rejecting** 239:10
**relate** 189:19,20
268:18,20
**related** 37:9 134:4
166:22 176:25
205:4,13,14,25
206:3,8,21 207:7,7
237:9 241:1
243:22 251:3
254:14 256:3
263:5
**relates** 33:8
102:12 115:6,25
122:24 150:19
219:13,14 221:8
241:2 256:6 263:5
264:21
**relating** 69:16
140:10 175:6
179:19 211:7
216:16,17 240:21
240:23 248:25
251:12
**relation** 174:23
203:25
**relative** 283:12
**release** 107:18
**releases** 16:9,10
21:4,20 55:8,18
61:7 63:3,3 72:21
73:8 92:1 98:25
99:1 120:16,17
124:14,22 125:23
137:21 216:14
217:5,9 223:6,12
**relevance** 33:19
204:8
**relevant** 19:24
25:4 33:5 45:16
67:6 86:11 109:15
109:15,16,20

188:17 212:23,24
235:23 253:20
255:6 256:10,19
267:4 268:23
**reliability**  175:21
190:19
**reliable**  184:5,8,14
234:1 247:18
248:2 249:16,20
271:6
**reliance**  21:3
24:15 25:14 34:11
64:23 66:22 68:21
99:4 152:24
155:20 191:5
**relied**  13:7,23 15:6
16:14 17:8 20:1
20:24 184:15
237:8 238:15
**rely**  16:16 25:12
46:9 63:11,20
67:9 68:9 101:14
149:4 173:21
175:8
**relying**  24:11
209:9
**remember**  104:3
104:18 106:21
110:12 182:8,13
182:20 253:7,13
263:11 277:6
**remembering**  76:8
**remotely**  1:17
2:17 5:1,12
**rendered**  12:23
**reparation**  11:23
**repeat**  103:14
224:24 263:10
**repeated**  148:21
**repeatedly**  242:11
262:24

**repeating**  126:10
223:13
**rephrase**  47:25
82:5 195:1
**replied**  14:17
**reply**  10:19 11:17
13:25 14:8 18:12
19:12,14 20:4
66:2 69:5 70:18
78:10 79:8 83:4
83:10,19 100:25
101:5,8,9 127:12
138:8 178:14
192:12 197:17
209:3 212:16
**report**  4:9,10,12
4:18,19,21 10:1,7
10:8,14,15,19,20
10:25 11:1,10,15
11:17,19 12:17,22
13:4,24,25 14:8,20
15:2,15 16:20,20
17:5,13,22 18:1,7
18:12 19:12,15,18
19:22,24 20:1,4,10
20:12,19,22,24
22:3,14,16 26:2
28:2,6,12,14,16,18
28:20 34:10 37:6
40:16,24 41:13,24
42:1 43:4 46:5,21
50:15 52:12 54:8
59:17 62:18,22,23
62:24 64:10,14,14
66:2,10,16 67:19
67:24 68:10 69:5
69:24 70:10,15,18
73:22 74:9,15,25
78:10,22 79:9
81:1 83:5,12,19,22
84:4 93:6 94:9

98:15 100:25
101:3,5,8,10,14
106:7,8 108:23
110:17,17 127:12
127:21 128:20
129:8,24 130:17
131:1,3,7,8,14
132:3,4,12,18,21
133:2,19 134:10
138:7,8 140:12
146:17 147:5
150:11 151:16,20
152:3,11 153:2,10
154:13,20 158:10
158:12,14 160:3
160:11 161:9,14
163:3,4,15 164:12
164:16 165:1,24
166:3,8 167:12
168:2,7 169:13
170:20,23 171:20
171:21 177:7,8
178:11,14 179:6
181:23 184:11
186:13 187:1,10
187:18 188:24
192:7,12 194:18
195:2,4,5,8,14,18
196:11,24 197:6
197:13,17,19
198:4,9,10 199:9
199:19,22 202:17
202:24 203:1,17
206:24 207:1
209:3,3,9,13,16,18
209:21 210:6,7,9
210:17 211:10
212:12,15,16
215:22 216:19
217:12 233:13
234:24 236:24

240:15 242:14
243:12 247:16,21
247:23 248:5,12
248:18,19,21
249:1,2,5,6 250:6
250:7,8 251:25
252:2,17 253:8,11
254:13 255:22,25
257:8,16,22
259:19 261:22
267:17,21 268:12
271:10 272:23
273:17 274:10
276:16
**reported**  1:24 41:6
221:13
**reporter**  2:22 5:9
13:8 32:25 44:25
82:2 271:12 283:7
**reporters**  105:8
283:9
**reporting**  40:20
40:22,25 41:16
42:3
**reports**  9:3,12,23
11:22,25 12:6,9,11
13:22 14:16 16:3
20:23 21:8,22
24:3 25:18,25
35:12 36:15 39:22
40:20 53:22,22
54:11 55:13,15
71:16 75:12 82:13
84:20 88:11 89:21
90:17 105:8,9
107:9 110:16
111:24 112:7
121:11,18 124:14
125:15 128:11
137:22,22 138:20
159:9 160:14

161:14 178:10 182:19 207:9 217:12 254:10 255:11 267:9 271:22 272:1,14 274:7

**represent** 5:22

**representation** 197:4

**represented** 275:25 276:3

**represents** 205:4 275:19

**require** 30:21 258:10 259:11,25

**required** 67:7 259:2 270:12 282:13

**requirement** 30:21

**requirements** 30:16

**requires** 99:18

**reread** 173:24

**research** 31:1 35:19 60:13 84:25 87:6,13 116:19 179:19 180:1 181:16 194:14 202:25

**researching** 226:10

**reserve** 126:23

**resolve** 39:11

**resources** 227:21

**respect** 15:17 20:25 24:11 25:14 36:25 43:5 45:19 66:14 121:14 125:21 134:14 140:13 153:25

170:23 172:17 201:3 210:7 217:6 217:14 239:23 258:7 260:18 261:13 263:3,16

**respective** 141:14 143:10 148:4 235:4

**respond** 14:4 66:14

**response** 11:19 97:25

**responsibility** 36:12

**rest** 226:22,24 227:6

**rests** 47:1

**resubmit** 248:12

**resubmitted** 248:21

**result** 185:18

**resulted** 186:8

**results** 88:11,17 219:23,24 221:13

**retained** 22:12 40:2 203:21 236:8 262:23 280:7

**return** 48:22 51:20 88:3 159:18 178:14

**returns** 251:8,9

**revealed** 200:16 200:19,21 207:1

**revealing** 27:1

**revelations** 206:21

**review** 11:22 12:14,19 18:6,10 26:20 73:9 85:13 85:21 111:14 113:20 116:24 147:7 152:6

217:22 224:12 233:14 279:12

**reviewed** 11:10 15:4 16:21 17:3 19:18,21 20:23 163:14,21 164:3 164:13 220:11

**reviewing** 36:15

**rewarded** 175:17

**rgrdlaw.com** 3:8,8 3:9

**ribbon** 220:25 268:1,13,14,22 277:10

**ribbons** 267:18 268:4,11 269:8,17 269:22 270:24

**richard** 181:24

**riesdorph** 3:21

**rifkind** 3:12 5:22

**right** 6:8 7:4,17,21 8:16 20:5 26:7 30:10 41:5,17,18 42:2 49:17 50:4 52:7 55:5,16 56:11 58:18 61:24 66:4 67:19 70:3 76:8 77:8,22,22,24 80:10 83:11,20 86:2,20 90:5 97:6 103:6 106:25 107:2 110:6,10 113:14,14,15 114:5 120:8 127:5 127:18 134:25 138:18 141:25 142:22 151:13 166:19 168:3,7 169:8 172:3,5 173:17 176:19 177:6 178:23

184:10,16 185:24 186:6 187:2,8,10 188:12 190:4,8 191:15 192:14 193:5,22 194:3 195:7,12,20 199:7 199:24 200:20 202:21 203:8 207:9 208:9 210:11 213:14,15 213:15 214:3 218:13 220:15 225:8 227:11,12 230:12 238:22 239:18 247:18 248:3 250:22 254:10 255:16 260:1 268:8,16 269:12,21 272:20 276:21 277:2

**rights** 126:23

**risk** 175:15

**road** 3:6

**robbins** 3:4 6:2 22:11,19 26:4,13 26:18 27:12 40:3

**roll** 181:24

**roughly** 37:10

**rpr** 1:24

**rsr** 1:24

**rudimentary** 107:1

**rudman** 3:4 6:2

**rule** 136:2 246:16 275:7

**rumors** 179:15 180:13,14,15 183:16,17,21,22 183:23 184:21,23

**run** 136:17 158:22 231:3

**s**

**s** 3:1 4:7 281:3
**sales** 130:5 201:19
**salt** 181:22 228:9
**san** 1:17 2:18 5:1
  31:3
**sandra** 239:8
**saw** 19:22 194:7
**saying** 31:21 78:13
  79:1 81:19 92:23
  93:19 94:21
  100:13 105:8
  125:11,19 130:24
  131:4,5 136:9
  137:4,13 154:2
  177:18 184:11,17
  184:18 196:5
  205:3 210:15
  212:2 224:9,14
  240:4 244:13
  257:23 270:21
**says** 46:7 55:15
  59:8,16 80:22
  83:24 84:4,16
  87:3 88:10 90:1
  90:23 96:9 113:8
  116:11 117:7
  119:17,22 146:7
  166:9,19 195:18
  200:8 211:14
  228:6 244:23
  257:9 275:22
**scan** 106:21,22
**scc** 103:22 104:1,6
  104:10,24 105:23
  106:18
**scheme** 199:3
**school** 48:18
**science** 29:11,13
**scissor** 8:19

**scope** 25:22 191:3
  207:11 254:24
  277:24
**screen** 57:23 58:25
  196:12
**scroll** 224:23
**scrolling** 97:24
**se** 44:20
**search** 16:16
  84:14 210:5
  225:25 274:6
**searched** 80:19
  95:9
**searches** 20:18
  21:9 22:2 157:23
**searching** 196:6
  226:5,10
**second** 9:18 10:7
  47:11,14 48:11
  51:1 58:19 97:23
  119:15,17,19
  134:9 142:3 196:8
  200:3 208:23
  218:23 221:20
  223:15 249:17
  267:25 268:2
**section** 64:22,25
  65:5,15,18 66:21
  108:4 116:17
  255:24 283:17
**sections** 96:12
**securities** 31:6,22
  33:9,25 34:6 35:3
  36:18,24 37:6
  38:12 41:5,7 42:6
  56:6 119:3 141:12
  141:14 143:9,11
  148:3,5 207:23
**security** 84:21
  89:22 90:21 96:13
  114:13 116:13

  117:8,15 149:5,6
**see** 15:6,13 16:1,5
  21:10 46:14,21
  47:15 50:19 58:15
  58:18,20 59:9
  65:21 79:6 83:8
  87:10 88:4,13
  89:2,12 90:18,23
  96:16 97:22 102:3
  108:15 109:9
  113:2,3,18 114:9
  114:15 116:20
  117:3,5,10,17
  119:20 120:2
  127:25 128:4
  129:8 131:5
  133:25 134:9
  138:2 141:19
  143:3 147:20
  148:6 166:25
  167:2,21,25 171:2
  175:14 177:15
  178:9,19 179:20
  184:24 185:13,19
  186:12 187:7
  195:17 197:22,23
  200:6,12 201:4
  203:7 208:16
  209:5 212:21
  214:24 216:20
  235:6 245:8
  247:12 248:24
  252:8 263:1
  265:24 267:19,21
  268:2,5
**seeing** 189:21
**seek** 49:6
**seeking** 34:19
  35:22
**seen** 19:23 111:24
  147:6

**select** 218:5
**selected** 217:10,16
  217:17
**sell** 45:23 177:13
  178:8,12 179:12
  179:14,18 180:6
  180:12 213:14
**selling** 221:14
**semantic** 74:4,5
  82:21 100:6,13
  109:20 143:14
**semi** 52:20 61:11
  66:9 68:17 78:17
  79:4,22 80:2,17,19
  81:3 84:15,15,17
  86:14 88:25 89:5
  89:15 90:3 91:3
  91:17 92:10,17,24
  93:20 94:22 95:8
  95:10,17 96:4,20
  97:1,5 98:6 99:13
  99:17 101:19,24
  102:11 103:9
  115:24 116:8
  117:4,13 118:22
  119:2,23 120:22
  128:1 138:9,15,20
  139:3,8,13,25
  140:5,11 141:3,12
  143:1,8 146:1
  148:2 149:11
  150:5 152:14
  153:8 154:14
  182:11
**seminal** 112:10
**send** 25:21 105:7,7
  105:10 106:6,7
**sense** 24:17 62:4
  64:1 65:7 68:19
  102:19,20 103:4
  105:17 133:7

145:12 146:7 253:21 262:10

**sent** 8:10 13:5 15:18 105:14,18

**sentence** 46:7 47:8 47:12,15 51:17 86:11,12,18,19 87:2,3,15 88:6,22 92:7,10 93:17,19 94:20,21 95:2,16 95:19 96:1,9 101:19 112:22,24 114:8 115:23 116:10 119:16 127:24,25 140:2,6 141:5 143:5,21 144:24 145:12 147:22,25 148:8 149:2,7 210:4,4 234:25 241:3 255:25 257:9,22 268:2

**sentences** 202:23

**separate** 132:13 132:22 207:6 256:7

**september** 11:12

**sequel** 113:5 114:5

**sequels** 112:25 113:16 114:3

**series** 253:8

**seriously** 8:22

**service** 3:6 104:5 106:20,22 284:9 284:17

**services** 231:23 232:8,13,21 233:1 284:2

**set** 8:14 13:6 28:17 124:21 197:6 239:22 249:19

**sets** 42:15

**setting** 49:4

**settled** 242:1 243:18

**settlement** 238:25 239:22

**seven** 146:24

**share** 111:6 203:10,13

**shareholder** 105:6 105:18 106:6

**shareholders** 105:11 107:9

**shares** 41:6 47:2 185:18,18

**shave** 188:6

**shelf** 159:11

**shift** 227:22

**shoe** 53:8

**short** 60:15 133:5 133:11,23 134:21 162:6 165:14,22 185:9 186:3 225:5 256:1,8,15,20,24 257:2,23

**shorted** 158:13

**shorthand** 2:21 283:6

**shorting** 130:2

**shortly** 11:5 22:13

**show** 41:24 42:1 58:10 62:17 64:13 64:21 66:10 83:5 115:12,14 223:22 235:13 266:17 269:14

**showed** 145:15 238:3 271:23

**shows** 274:18

**sic** 98:19 253:15 255:17

**side** 34:23 38:3,6,7 38:9,11,14 39:23 40:1

**signature** 284:23

**significance** 42:5 277:5

**significant** 129:19 134:1,2 136:20 185:20

**similar** 183:17 219:21 249:1

**similarly** 1:5 2:5 3:4

**simple** 18:20,23 53:6 114:12 116:12 121:10 157:5 162:13,21 167:9 174:10 246:2

**simply** 75:17 106:5 120:23 141:1 211:2

**single** 31:14 264:19

**sir** 151:21 154:12

**sister** 30:6

**sit** 138:18 198:22 200:20,24 252:15 279:6

**site** 230:2

**sites** 181:2 193:21 229:17,24 230:4

**siting** 125:4

**sitting** 7:16 14:11 16:7 80:25 91:22 121:16 135:17 138:6 139:5 145:25 147:23 149:8 163:13,20 168:22 170:8 171:10,13 174:12

187:16 198:22 200:14 212:5 214:14 227:9 232:24 252:10 262:16 264:18 266:1 278:24

**situated** 1:5 2:5 3:4

**situation** 79:10 189:10

**situations** 54:2

**six** 38:24 127:25 156:17,17

**skills** 194:12

**skipped** 208:24

**slightly** 249:18

**sold** 185:9

**soloway** 3:12 4:5 5:20,21 6:16 8:19 8:22,23,25 9:1 10:6,13 11:4,7,8 13:19 19:9,10 22:24 23:8 25:17 27:3,6 28:9 33:1,3 34:4 35:13 37:1 39:4,5,13,19 45:4 46:3 47:13,24 49:10,21 50:4,12 51:23 53:15 57:8 57:15,19,21 58:3,5 58:13 59:24 60:5 64:20 65:11,16,23 66:1 68:8 69:4 70:22 72:2 75:6 76:5 77:2,7,13,21 77:25 78:1,8 79:20 80:8,14 81:15 82:5,7,24 84:1,7 85:6,16,19 87:5,21 88:21 89:19 91:7,13

**[soloway - splits]**                                                       Page 40

92:2,21 93:15
94:6,19 95:14,24
96:8 97:20 99:5,7
99:11 100:3,4
101:4,11,12 103:1
103:18 104:8,14
104:16 106:10
107:12,21 108:13
109:8 110:3,10,13
111:8,20 112:8,15
114:2,23 116:2
118:1 121:15
122:12 123:17
124:6,23 126:2,14
127:4,10 132:10
133:17 134:5,18
135:14 136:6
137:10 139:4,21
141:22,23 142:18
144:4,19 145:5
146:12,22 147:2
147:10 150:9,20
151:12,24 152:9
153:1,13 154:23
156:5 157:6,12,20
157:22 158:6,20
159:1 160:1,17
161:21 162:7,12
162:20 163:12,19
164:5,10,24
165:10 166:6,12
166:16 167:16
168:17 169:7,14
169:23 170:15
171:9,11,12 173:7
173:9,15 174:7,9
175:1,19,25 176:9
176:17 180:9
182:7,16 183:14
184:1,9 186:10
187:5,14 188:9,19

190:14 191:12,24
193:4,19 194:16
194:24 196:1,10
196:16 197:2,8
198:3,8,15 201:1
201:24 202:8,15
204:3,10,16,19
206:12 207:4,17
210:8,21 211:21
212:3,13 213:12
213:19 214:13,23
215:6 217:20
218:6,11,14,18,19
220:2 221:5 222:4
222:21 225:6,14
225:20 226:12
227:8 228:20
229:4 230:6,17
231:1,7,15,20
232:4,15,23 233:7
233:24 234:21
238:14 240:10
241:4,15 242:17
249:23 250:21
253:6 257:14
259:7 260:20
261:16 262:15
263:9,24 264:15
265:22 266:10,19
266:22 267:2,14
267:15,23 270:20
271:17 272:11,17
273:15 275:3
276:1 277:1 278:1
279:11,19,23
280:1
**solutions** 280:8
**somebody** 63:15
185:17
**sonsini** 39:25

**soon** 228:17
**sophisticated**
42:11 49:4 60:12
108:6 171:3 221:9
228:4
**sophistication**
42:12
**sorry** 9:9 10:24
39:6 47:6 49:13
76:12 78:3 82:4
97:4 104:20 111:5
150:21 151:24
180:10,11 196:12
198:17,21 201:10
202:10 214:1
221:16 222:22
224:20,22 239:17
267:24
**sort** 20:17,20 21:9
56:21 188:12
189:12 246:19
274:11 275:13
279:9
**sorts** 179:23
**sounding** 23:21
**sounds** 130:23
**source** 54:9 55:14
121:25 227:22
**sources** 54:13 76:3
76:6,10,14 77:16
125:16 128:10
145:21,24,25
171:1 178:22
187:23 229:21,22
**south** 3:6
**space** 156:25
**speak** 142:21
176:21 279:15
**speaking** 50:2
126:15,15 135:16
221:22

**speaks** 35:12
**special** 123:3
194:12
**speciality** 226:19
**specialty** 226:7
**specific** 63:2,8
72:20 73:7 76:24
80:16 85:14 98:21
184:25 205:6
208:2,20 270:8
**specifically** 21:5
23:12 55:19 69:2
78:25 183:10
202:14 260:21
**speculate** 174:18
279:6
**speculation** 44:18
45:8 51:13 85:4
87:18 106:3 107:4
114:19 154:19
163:24 183:4,6,7
183:12,16,17
187:12 191:14,18
191:25 192:2
194:5 206:2
210:19 269:24
**speculations** 183:9
183:22,23
**speed** 84:18 89:9
196:13
**spell** 76:13
**spend** 103:19
159:18
**spending** 44:7
**spent** 35:18
127:15 155:22
258:2
**splits** 55:21 71:4
84:20 89:21 90:2
90:5,9 107:14,20
182:19

**[spoke - street]**   Page 41

| | | | |
|---|---|---|---|
| **spoke** 26:8 | 264:25 278:13 | 279:22,23 280:6 | 123:15 129:10,12 |
| **spreadsheet** 256:16 | **statement** 69:15 114:12,17 116:12 | 281:2,24 282:2,4 282:12 | 130:2,3 131:2 133:6,13 136:19 |
| **ss** 283:2 | 116:15 133:4 | **steinholt's** 4:11 | 137:1,6,13,20,25 |
| **stage** 222:15 224:12 271:7 | 142:5 149:13 181:24 237:18 | 267:9 | 138:4,5 144:18 145:20 148:12 |
| **stages** 15:1 219:10 221:25 | 256:3,8 257:21 264:19 | **stenographer** 6:7 13:10,17 23:1 45:2 151:22 225:2 | 154:10 158:13 161:17 162:6 |
| **stand** 12:11 98:8 153:2 | **statements** 25:14 98:24 237:23 | 280:2 | 165:19 171:8 173:21 175:8 |
| **standard** 53:20 239:4,6,11,11,14 | 262:17 263:21 264:2 266:2,11,17 | **stenographer's** 283:1 284:10 | 177:12 178:7 179:22,24 180:3 |
| 240:4 241:21,23 241:25 243:1,2,4 | 278:4 | **stenographically** 283:22 | 181:3,4 182:19 183:9,12,13 |
| 244:4,6,12,14,21 255:1 | **states** 1:1 2:1 46:25 69:2 128:2 | **step** 217:22 218:4 218:4 222:25 | 185:16 186:5 187:25 191:22 |
| **start** 84:8 104:17 104:17 110:21 | 194:18,21 197:3 223:7 | 223:1,18,25 224:10 254:19 | 193:3 203:2,6,14 203:24 204:1 |
| 112:22,24 122:9 145:13 176:1 | **statistical** 223:9 **statistically** | 256:2 257:7 | 210:10,14,15,25 211:3,8,13 213:6 |
| 191:21 250:5 260:5,5,25 277:24 | 187:24 **statistics** 29:17 | **steps** 218:3 222:8 223:22,23 224:7 257:5 | 213:23 216:22 221:14 223:10 |
| 279:8 | **steinholt** 1:16 2:15 | **sticking** 136:8 | 227:6 236:25 |
| **started** 104:4,15 104:19 105:2,3 | 4:4 5:7 6:10,17 9:22 11:10 13:20 | **stifel** 130:16 209:4 209:5,9,18,21 | 237:11,14,15 238:2,5 256:24,25 |
| 278:4 | 25:19 27:8,21 28:10 32:11 50:13 | 211:23 | 257:3 258:14 274:1 |
| **starting** 259:23 260:7 | 57:23 58:8 66:2 73:9 83:16 85:21 | **stiglitz** 43:5 **stock** 20:16 25:12 | **stocks** 36:21 179:13,15,18 |
| **starts** 56:19 92:8 101:19 112:24 | 94:8 103:3 111:13 111:22 126:4,14 | 35:20,21 36:8,13 36:19 41:1 42:9 | 180:13 181:2 |
| 114:3 116:18,23 119:18 128:1 | 126:24 127:11 130:23 131:19 | 42:16,19,21 44:24 46:11 49:1,9 | **stop** 201:11 **story** 56:18 |
| 191:19 200:4 261:5 277:10 | 141:25 147:11,12 152:12 159:2 | 51:16,22 53:2 54:18 55:21 56:19 | **straightforward** 18:18 |
| 278:23 | 165:12 167:21 173:10 174:11 | 56:22 61:22 63:20 64:4,7 65:10 71:4 | **strange** 193:17 **strategies** 44:10 |
| **state** 5:17 111:11 197:17 239:13 | 176:18 200:15 203:20 204:12,20 | 72:14 73:11,15 75:1,16 79:19 | **strategy** 43:18 158:22 180:22,25 |
| 283:2,7 | 225:21 242:19 262:23 263:11 | 81:13 84:20 89:21 90:1,5,9 100:16 | 185:6,11 |
| **stated** 78:15 158:10 170:23 | 271:9 277:2 | 107:14,20 108:5 109:7 110:2 116:5 | **street** 108:2,3 |
| 182:4 229:6 | | | |

[stricken - sure]                                                             Page 42

stricken  272:1
strictly  34:18
strike  99:5 157:20
  158:23 171:11
  173:7 174:7,21
strong  52:20 61:11
  66:8,9 68:17
  78:17 79:4,22
  80:2,17,19 81:3
  84:15,15,17 86:14
  88:25 89:5,15
  90:3 91:3 92:10
  92:17,24 93:20
  94:22 95:8,10,17
  96:4,17,18,20 97:1
  97:5 98:6 99:13
  99:17 101:19,24
  102:11 103:9
  114:21,24 115:24
  115:24 116:8
  117:4,13 118:22
  119:2,23 120:22
  128:1 138:9,15,20
  138:25 139:3,8,13
  139:25 140:5,11
  141:3,12 143:1,8
  146:1 148:2
  149:11 150:5
  152:14 153:8
  154:14 182:11
stronger  190:9
student  181:16
  228:6,16
students  30:24
studied  18:16
studies  31:14,15
  87:25 88:7,16
  89:4 90:2 120:1,6
  149:12 182:23
  216:17 219:17
  252:6

study  30:2 72:14
  136:17 138:2
  182:25 188:11
  205:10 207:24,25
  208:1 215:23
  216:4,7 217:1,22
  219:10,14 220:4,9
  220:9 221:23
  223:2,3,4 224:13
  247:10,17 250:10
  252:4 264:3
stuff  9:6 27:18
  279:7
stulz  11:11,15 14:5
  66:6 67:1 68:7,16
  75:13 76:10 78:12
  78:13,15,22 80:7
  80:10 86:10 92:18
  93:5 94:4 95:7
  98:20 102:23
  103:16 108:22
  109:18 118:8,20
  119:10 127:1
  129:8 133:2
  134:20 150:25
  155:2 157:18
  162:16 170:23
  174:5 179:6
  181:15 183:1
  191:1,7 208:9
  212:25 228:5,16
  245:15 252:17
  255:22 257:9,15
  270:9
stulz's  11:19 19:22
  19:23 33:12 66:14
  82:8 109:21 257:8
  275:1
subject  29:15
  91:19 276:15

subjectively
  217:11
subjects  253:11
submitted  9:23
  11:11 16:19 17:4
  19:17 20:11 22:2
  39:21 68:9 236:23
  236:24 248:5
  271:10 274:9
submitting  17:25
subpoena  245:16
subscribed  282:14
subsequent  237:19
  237:20
subset  88:2
subsets  87:9
subsidized  241:22
substance  146:4
  153:7
substituted  241:22
subtract  254:3
sudden  100:15
  132:8 156:21
  188:6 191:19
  228:12
sufficient  17:21
  42:12 72:22 76:4
  125:23 135:13
  246:11
sufficiently  77:1
  116:5 184:5,7,13
suggest  63:23
suggested  79:16
  274:20
suggesting  78:21
  101:5,7 111:19
  164:11 259:18
suggestion  8:24
  9:2,4,10
suit  130:11 227:4
  227:5 260:17

sum  146:3 153:7
summarize  14:19
  25:1 41:3 225:22
summarized  18:4
summarizing
  177:7
summary  263:13
superior  43:19
  48:22 51:20
support  88:23
  92:9 98:18 181:10
supported  102:2
supports  188:20
suppose  218:2
supposed  57:25
  191:21
supreme  46:22
  47:20,21 48:4
  51:5,6 59:16 61:4
  63:18 69:2 152:22
sure  8:17 9:20
  14:10,11,13 25:21
  28:20 29:10 38:24
  39:8,13 58:24
  107:10 113:13
  118:4 123:10
  127:4 142:20
  148:25 151:6
  176:3,11 177:4
  178:25 187:2
  190:13 192:12
  195:23 196:20,20
  200:2,21 205:3
  208:14 209:6
  211:10 225:6
  236:5 241:13
  244:18 254:21
  263:22 267:14
  271:18 273:11
  276:19

**surely** 75:7,9
**surfing** 248:6
**surprised** 195:8
  195:10,25 213:22
**swayed** 180:23
**swiftly** 221:12
**sworn** 6:8 282:14
**synonymous**
  54:15
**system** 122:14,20
  128:12 157:8,15
  158:8,9

**t**

**t** 4:7 281:3,3
**tab** 9:4,5,5,11,11
  28:5 77:19,23
  146:13 151:19
  166:10 195:13,14
  245:10 272:20
  273:2,4,5
**tabs** 9:3
**tailored** 268:24
**tainted** 251:8,8,9
  251:21
**take** 5:15 6:24
  7:20 8:8 9:5,11,13
  18:1 22:5 28:4
  30:16 46:20 50:5
  57:12 58:22 60:14
  63:15 70:13 83:4
  85:20 105:20
  111:16 114:11
  116:11 125:9
  126:3 127:2 161:1
  166:17 173:6
  175:25 181:21
  195:24 202:16,18
  214:8 215:21
  225:5 227:21
  244:25 261:4
  273:4,16 276:18

278:20
**taken** 2:16 66:5
  228:8
**takes** 60:15
**talk** 48:15,24
  54:21,22 55:9
  67:24 121:21
  126:4,13,20
  138:14 144:3
  145:8 201:6
  207:13,13 212:14
  221:6 247:7,11
  253:15 255:12
  262:25 268:11
  272:8
**talked** 52:22 55:10
  79:21,22 80:2
  129:8 207:18
**talking** 12:16
  19:14 43:4 50:23
  52:20 57:9 60:18
  63:1 66:21 70:3
  72:21 84:25 87:12
  88:6,15 89:14
  93:12 99:8 100:18
  100:21,21 102:6
  102:12 104:13
  115:7,7,9 120:4
  121:24 127:16
  138:22 139:18
  140:15,25 145:9
  145:13 155:18,18
  172:12,14 188:2
  189:2 198:13
  199:25 200:1
  201:12 207:14,20
  215:7 236:5,11
  238:23 253:17
  268:12 271:15
**talks** 48:11,20
  61:10,11 93:8

97:16,18 118:13
  270:9
**tam** 16:24 131:20
  131:21 132:14,24
  163:22 186:15
  187:18 190:3
  200:5
**taught** 30:24
  48:18
**taylor** 5:25
**teaching** 31:2
**technical** 97:24
**technician** 3:21
  39:4,6 58:8
**techniques** 207:22
**technology** 5:11
  226:20
**tee** 71:23
**telephone** 26:6,13
**television** 122:9
**tell** 6:12 16:7
  42:22 51:24 73:24
  76:13,19 77:3
  91:25 93:18 94:18
  121:3 122:2
  123:24 125:4
  140:2 141:6
  163:13,20 174:12
  196:20 205:21
  216:10 247:14
  262:16 264:19
  266:1,11
**telling** 94:10
  111:21 115:1
  249:3
**ten** 39:25 153:15
  153:16
**tenth** 58:16
**term** 37:19 56:2
  57:14 69:9 82:17
  82:22 95:9 138:17

138:19 139:12
  151:14 267:17,21
  268:3
**terminals** 56:5
**terminology**
  151:15
**terms** 16:14 17:7
  18:8,18 24:15,18
  31:10 34:25 36:20
  42:25 43:19 52:20
  55:18 60:16,17,21
  61:15 63:8 67:1,7
  72:22 76:20,24
  85:9 125:17
  128:15,15 136:3
  137:16 138:23
  153:19 189:8
  201:19 211:5
  219:21,22 220:24
  226:4 251:17
  252:16 258:25
  261:4 263:17
  269:14 278:21
**territory** 99:25
**test** 88:8 100:12
  102:7 119:2 123:3
  123:6 129:4 138:4
  184:3 190:15
  279:9
**tested** 91:3
**testified** 6:12
  128:9 158:1
  234:14 242:11
  250:12 262:24
  266:23
**testify** 8:1,4 32:3
  154:20 158:2
  183:11
**testifying** 37:24
  69:13

**testimony** 7:15,15 35:6 49:23 78:22 81:2 82:9,19 85:22 95:19,21 96:7 97:21 98:8 99:16,23 111:25 123:9 139:11 157:19 158:4 225:4 242:11 245:6 249:9 250:15 272:16 280:6 282:9 283:22,24

**testing** 20:14 90:8 90:16 103:5 116:1 183:11 258:11 259:12 260:1

**tests** 84:17 88:1,23 89:1,14 91:19 92:9 93:19,21 94:22 101:20,24 102:6,12,13,14 117:4,14 119:23 140:19 182:11,18 259:13

**texas** 243:13

**textbook** 77:12 138:16 223:22 224:6

**textbooks** 223:20 223:21

**thank** 6:5 8:25 11:7 13:10,17 40:11 45:2 50:4 57:19 77:14,16,17 84:5 146:22 147:2 151:24 162:19 197:2,12 204:13 204:13 225:19 279:21,23,25

**thanks** 77:25 280:8

**theme** 114:8

**theoretical** 34:24 156:25 235:22

**theoretically** 205:22

**theories** 242:8 268:7 270:25

**theory** 47:22 51:3 72:24 80:3 81:5 85:1 87:7,14 89:6 89:16 90:4 91:4 93:21 94:23 95:18 103:10 112:11 113:22 155:10 173:10 177:1,1 236:15 258:6 263:25 264:22 266:13 268:9,10 268:13,15 277:4 277:11 278:3

**thereabouts** 105:4

**thing** 17:25 62:15 72:11 95:6,10 115:23 129:2 139:19 140:8 150:19 151:10,15 158:9 182:5 185:1 206:7 222:11 223:12,15 227:15 236:6 248:1

**things** 8:10 24:23 33:23 34:16 43:22 71:14 102:14,21 103:5 108:10 115:20 124:15,17 129:14 134:23 140:23 150:16 154:21 156:2 187:8 189:20

215:15 223:17 226:8 229:17 244:17 251:6 252:16,25 262:9 265:4,4

**think** 6:22,23 9:12 12:22 13:4 14:1,2 17:6 18:17 20:6 21:17 26:10,15 27:5 28:4,14 33:22,24 35:11 38:19,19 39:7,9,10 39:24 41:9,12 43:19,20 48:3,9,14 48:23 49:19 55:7 55:24 56:2,4 57:22 61:3 63:20 65:19,20 69:18,23 72:4,6,8 76:2,4,14 76:25 78:15 79:14 86:11,22 94:13 103:2 104:14,18 105:1,2 108:23 112:13 114:1 121:3 122:3 123:20,25 130:5 132:6,8 135:12 136:4,10 148:23 150:15,16 153:4 156:12,20 159:22 163:3,17 164:17 165:14 166:4,10 169:2,19 170:12 175:13 178:20 181:18 182:2 183:20 186:6 187:3 191:10,13 194:25 196:4,14 204:22 210:3 212:1 213:24 214:2 215:17

217:8 218:8 221:16,20 224:2,3 224:4,6,9,14 225:17 226:14 228:3 229:25 230:9 232:20 233:12 235:15,18 236:11 238:24 239:19,20 244:24 246:18 249:6 250:6,9,12 251:21 252:2,24 255:23 257:19,20,25,25 262:12 267:2 270:1 271:22 272:5 275:10,21 275:23,24 277:17

**third** 50:18 51:6,7 55:1 58:14,17 119:18,19 197:18 284:3,14,18

**thirdly** 227:25

**thorsen** 4:22 218:8

**thought** 33:20 73:5 148:23

**thousand** 169:5

**thousands** 56:5 184:20 226:14

**three** 38:24 151:7 151:10 162:16 218:25 219:10 220:15 221:25 223:23 224:1,7 230:7 239:7,8

**throw** 246:21

**time** 5:17 17:20 18:21 23:15 27:12 35:18 38:18,25 49:7 60:14,15 62:14 64:9 68:10 73:10 85:21,23,25

91:19 96:14
103:20,25 104:25
105:5,20 111:16
124:25 127:15
129:10,13,15,18
131:2,16 142:3,3
142:20 143:3
164:11 169:13
170:1 176:8 185:9
205:20 222:10
238:25 239:22
240:5 243:15
253:10 258:2
259:10 260:7
263:7 265:21
269:2 270:11,14
277:22 278:16
279:22 284:6
**times** 6:25 7:1
12:22,23 38:16,17
38:20 40:2 69:12
69:18,21 70:4
85:17 99:24
111:25 125:13
130:5 153:6 229:5
230:9,10,19,20
234:14 269:16
270:6
**tip** 189:21
**title** 119:25
**titles** 199:13
**today** 7:12,15 8:1
8:6 10:4,11 11:14
12:11 14:11 16:7
16:23 18:21 23:25
81:1 91:22 104:7
106:24 121:16
125:4 135:17
138:6 139:5
145:25 147:23
148:8,9 149:8

151:6 153:2
163:13,20 168:23
170:8 171:10,13
174:12 187:16
193:6 198:22
200:14 212:5
214:15 227:9
232:24 242:9
243:9 244:10
252:10,15 258:3
262:16 264:18
266:1 278:25
**today's** 280:6
**told** 48:3 76:23
223:5 242:5
**ton** 256:16
**tools** 252:7 255:7
**top** 58:18 113:9
182:6 189:17
**topic** 176:2
**topics** 73:3
**total** 23:9 185:3
254:3
**totally** 144:20
204:1 225:7
**totals** 254:6
**track** 227:3
**trade** 44:23 109:5
171:25 172:8
173:12 181:7,11
181:20 182:4
189:24 229:12,19
**traded** 42:14
102:15 165:6,14
165:21 173:17
229:25 236:25
**trading** 42:6,16,18
42:18 43:2 45:21
49:8 161:2 164:22
185:6,20

**tradipitant** 211:19
258:4,7,19 259:23
262:18 264:2,22
266:3,13 268:9,13
277:4 279:1
**traditionally** 36:2
**trailing** 130:5
**trained** 31:24
**training** 45:13
**transcript** 282:5,8
283:23
**translate** 189:15
**transmission** 29:6
133:14
**transparent** 24:15
24:19 243:4
244:12
**transparently**
244:15
**trial** 15:2 247:10
264:2
**trick** 272:22
**tried** 70:7 181:24
**trigger** 171:4
**triggered** 264:12
264:13
**triggers** 260:25
265:6 278:7
**troubled** 166:20
167:4
**true** 7:20 65:2
75:17 86:7 95:6
110:2 173:4
177:11 179:14
181:7 219:16
220:23 229:12
256:22 270:19
282:8 283:24
**truly** 254:21
**trust** 275:16

**truth** 6:12 206:15
248:16 259:2
265:8,17 269:19
**truthfully** 8:1
**try** 8:10 20:18
36:7 44:13 83:16
83:16 106:1
124:24 126:16
139:23 156:2
174:10 180:15
223:8 226:8,17
261:8
**trying** 14:1 43:17
44:3 53:4 60:12
74:6 104:25 126:5
141:2 160:24
161:1 162:10
167:3 181:3,4
224:8 261:19
**turn** 40:14 46:4
58:14 69:5 77:18
83:3 100:20,24
116:17 119:8,11
146:13,19 151:19
175:20 176:24
250:1 258:3
**turned** 88:25
**turning** 225:21
**turns** 270:19
**tweet** 71:23 72:9
72:10
**twist** 143:14
**two** 5:24 9:3,12,23
12:6,9,11 16:11
22:13 26:10,14,15
26:16 40:7 76:10
77:16 83:18
134:23 140:22
151:16,17,17
163:6 173:4
186:24 210:4,4

216:17 217:14,15 217:18 224:1 264:8 268:7,17 269:7 270:24
**type** 33:9 36:3,17 43:11 52:19 54:13 56:1,8 99:3 100:14 108:4 125:10 135:25 136:11 137:24 145:18 161:13 172:18 181:25 185:20 186:8 189:9,25 192:2 194:13,14 227:10 229:14 245:25 257:5 259:12
**types** 51:25 120:17 124:15 129:22 145:14 160:11 191:25 231:14 257:4
**typical** 14:15
**typically** 14:19 34:21 40:6 45:10 48:15,23 54:21 55:11 56:18,20 71:8,13 80:6 97:16 98:17 99:2 107:17 120:15,18 136:17 139:17 145:7 214:5 215:10,12 218:4,5 233:11,14 245:22 260:6 269:9 275:10 278:9,10
**typo** 202:21

**u**

**uh** 16:1 19:9 62:5 67:17 151:5

**ultimately** 42:15 45:24 237:3 265:7
**unbilled** 23:15
**uncommon** 34:15
**uncover** 160:24
**undercounts** 41:14
**undergraduate** 29:5,10,12,16
**understand** 7:7,11 7:19 10:16,20 17:11 19:13 24:7 28:21 61:23 65:17 80:21 86:20 118:15 120:5 140:8 142:22 144:22 170:19 176:18 179:11 184:12 199:8,8 203:13 205:3 206:13 210:23 220:3 221:17 222:22 224:8,9,14 234:24 240:3 244:1 254:11 258:20 259:3,15 260:22,23 261:19 268:8
**understanding** 25:4 47:20 48:4 51:24 53:25 61:5 64:24 67:18 85:7 85:8 118:21 120:11 123:22 130:7 132:21 150:12 165:12 170:9 177:17 210:13,24 211:1 212:5 216:6 240:19 258:6,8,18 259:5,9,14,20,22

260:14,23 262:3,5 262:14 263:18 264:4
**understandings** 85:14
**understands** 198:10
**understood** 25:8 30:1
**undertaken** 194:7 259:16
**undertakes** 197:7
**undervalued** 178:8
**unduly** 99:25
**unique** 176:6
**united** 1:1 2:1
**university** 31:3
**unknown** 163:11
**unproven** 190:3 190:13,19,20
**unpublished** 137:3 137:9,12
**unrelated** 133:9 208:14 253:19 254:21
**unreliable** 175:12
**unsealed** 123:12 129:11 209:22 211:19
**unsealing** 136:21
**unsuccessful** 182:1
**unsuccessfully** 70:7
**unverifiable** 230:1
**unverified** 72:5 166:5,21 171:1 172:18 178:21 181:12 182:24 184:4,18,18,20

186:24 187:22 190:10
**update** 118:2,12 197:7 214:4,5
**ups** 39:20
**urge** 267:9
**use** 25:13 31:24 37:18 49:5 60:16 66:3,11 67:16 69:25 95:12 118:9 118:10 119:25 128:7 138:17 150:3 151:14,16 152:23 157:10 179:21 190:16 208:1 220:5 232:8 239:12 253:5 254:5 255:6 262:12 267:17
**useful** 274:11
**users** 231:24
**uses** 50:16 146:2 268:2
**usually** 128:9,10 246:19

**v**

**v** 1:7 2:7 243:12 243:23
**validated** 149:12
**valuable** 275:24
**valuation** 130:6 188:23 214:16,21 214:22,25 252:7 254:6,12,16 255:7 255:19
**valuations** 214:7
**value** 4:21 28:1 45:16 160:3,14,21 161:9,22 162:23 164:6,12,13 165:6 165:24 166:7

167:10 168:2,5,19
168:25 171:3
174:14 177:11,23
185:22 186:13
188:14,17,22
192:8 193:6
202:25 203:17
208:19 219:16
220:23 253:20,25
254:2,17 255:5
256:9,18
**valued** 178:1,3,5
**vanda** 1:8 2:8 3:11
5:13 16:3,25
19:19 20:13,21
21:11 22:5,9
25:15 27:24 41:4
41:7,15 42:6 44:1
53:7 56:9 60:22
169:5 171:15
172:7 173:11,16
175:6 193:23
206:16 212:18
213:6 214:16,25
256:13 264:1,19
281:1 282:1
**vanda's** 46:10
129:12 166:23
175:7,8 200:9
203:2,5
**various** 128:16
181:2 221:2
269:16
**varying** 177:2
**vast** 38:8
**veer** 65:20
**veered** 99:24
**veering** 65:20
203:19
**venture** 35:19,23

**verifiable** 229:22
**verification** 240:5
**verified** 192:21
193:11
**verify** 180:15
230:5
**veritext** 280:7
**versa** 180:6
**version** 139:8
**versus** 5:13 16:25
38:6 62:21 64:16
115:24,25 128:8
135:5,20 207:7
**vetted** 179:13
**vice** 180:6
**video** 2:17 5:6,14
**videographer** 3:20
5:4 6:5 23:3,6
39:14,17 50:7,10
127:5,8 176:12,15
225:9,12 276:21
276:24 280:4
**view** 25:2 34:10,24
42:4,5 45:25,25
48:25 52:24 61:4
63:18 67:4 109:1
109:10 129:1
133:13 144:15
178:6 186:16
187:21 188:16
189:6 258:24
264:11 270:22
**viewed** 131:20
171:4 192:24
**views** 177:19
263:1
**visit** 229:24
**visitors** 228:22
**volume** 274:1
**vs** 281:1 282:1

**w**

**wait** 214:4
**walk** 88:12
**wall** 108:2,3
**want** 8:16 9:4
10:23,24 11:2
17:11 19:3 24:15
29:1,2 37:18
40:14 46:4,6,20
50:13,24 51:4
52:17 53:19 54:24
56:23 59:6 64:10
64:13 69:5 70:15
77:18 83:5,13,18
84:22 85:4 86:16
93:16,17 95:15,15
95:25 97:21
101:18 103:19
113:13 116:8
118:12 119:9,14
119:17,22 121:21
123:21 125:1
126:1,23 135:1
139:23 140:2,22
141:6 142:20,24
147:4 151:5 152:2
156:6,7 174:21
175:25 176:8,24
176:24 178:14,25
179:1,1,11 196:2
198:10 199:7
202:16 204:8
205:2 210:23
220:21 221:6
222:22 224:24
225:17 234:22,24
236:5 244:18
245:9 250:1,22,24
251:6 254:17
258:3 260:21,22
260:23 264:18

268:8 270:1,3,16
271:20 273:9,13
273:13,18 276:18
**wanted** 12:19
92:19 105:23
107:15 169:20
187:6 207:5
**wants** 118:8,10,19
142:23
**way** 15:20 22:22
34:3 43:17 48:14
48:21 58:24 60:16
67:2 69:7 70:17
70:20 71:2 84:22
94:1 100:11 109:2
109:4 136:5,11
143:14 144:17
145:7 150:24
153:22 157:2,14
185:13 188:4,7
207:25 219:7
220:21 234:13
235:13,17,19
236:1 239:15
240:12,13 244:10
246:6 254:5,7
265:2
**we've** 49:17 99:23
125:24,24 127:2
127:22 145:23
156:12,12,12
175:23 258:2
263:6
**weak** 88:1,8
115:25 139:1
**weather** 240:24
**website** 19:11,19
20:5 63:6 121:20
168:3,6,11,19
169:6,16,20,25
170:10 172:19

**[website - worth]**                                    Page 48

175:12
**websites**  82:15
**webster**  4:13
  57:16 63:23
  142:12 156:2,9,19
**webster's**  58:16
**weekday**  228:22
**weekend**  164:21
**weight**  177:3
**weiss**  3:12 5:21
**went**  65:6 68:18
  78:18 172:24
  222:8,9 241:25
  243:17
**wharton**  3:12 5:22
**whistleblower**
  16:22,23 18:9,13
  62:12 82:14 98:15
  99:9 130:16
  131:13 132:2,18
  133:7,10,14 134:4
  134:11,16 136:21
  156:22 164:3,14
  164:19 165:1,5,7
  189:6 190:20
  198:18,19 199:1,2
  209:22 211:19
  212:19 213:2,7,20
  214:17 215:1
  227:3,5 257:17
**wide**  189:16 191:6
  247:9 250:2
**widespread**  21:9
**willing**  154:15
**wilson**  39:25
**winning**  44:7
**withdrawing**
  97:22 99:16 172:4
**withdrawn**  80:24
  134:7 232:6
  236:23 247:15

252:5 259:21
**witness**  4:3 12:15
  13:9,12 19:7 25:7
  26:24 33:20 35:7
  36:11 37:4,5,12,13
  44:19 45:9 47:11
  48:8 49:24 50:2
  51:14 53:12 57:3
  58:12 59:22 65:14
  68:5,15 69:20
  70:20 71:21 74:20
  76:2,19 77:11
  79:14 80:6,12
  81:9,23 82:3,20
  83:23 85:9,12
  87:19 89:18 91:6
  91:11,25 92:16
  93:3,25 94:3,15
  95:4,21 97:12
  98:11 102:11
  103:14,24 106:4
  107:5,17 108:1,21
  109:14 110:8,12
  111:10,18 112:3
  112:13 114:1,20
  115:18 117:22
  121:9 122:6
  123:10 124:3,12
  125:9 126:12,21
  131:25 133:1,21
  134:13 135:11,23
  136:14 137:8
  138:14 139:12
  141:19 142:9
  144:8,10 145:3
  146:6 147:6
  150:15 152:5,19
  153:12 154:19
  155:15 156:15
  157:10,18 158:5
  159:7 160:16

161:12 162:1,15
  162:17 163:9,17
  164:1,16 166:2
  168:14 169:2,10
  169:19 170:12,18
  172:11 173:20
  174:24 176:5
  179:17 181:14
  182:15 183:6,20
  184:7 186:1,19
  187:13,21 188:16
  190:7,24 191:17
  192:17 193:10
  194:6,21 195:23
  196:13 197:1,3
  198:12 200:18
  201:16 202:3,13
  204:8 206:3,23
  207:12 210:1,20
  211:5 212:1,9
  213:10 214:20
  215:4 217:3 218:2
  219:13 220:20
  222:3,6 226:3,16
  227:15 228:25
  229:9 230:15,25
  231:6,13,18 232:2
  232:12,19 233:6
  233:22 234:6,9,11
  237:7 240:16
  241:10 249:10
  250:16 252:14
  255:21 258:24
  260:4 261:2 262:1
  264:7,24 266:7,15
  267:22 269:25
  271:14 272:5,9
  273:11 275:1,19
  277:13 279:4,25
  284:12,16

**word**  54:25 55:1
  56:24,25 57:9
  58:19 59:11 61:24
  138:10 139:6
  144:23 156:9
  195:24 219:7
**worded**  193:17
**wordings**  151:18
**words**  14:23 40:21
  50:16 51:5 52:7
  60:19 66:3,11
  68:10 70:16 78:14
  78:23 79:25 80:10
  81:5 108:16
  109:11 117:19
  118:25 122:18
  130:6 142:15
  145:22 146:2
  149:25 150:3
  175:15 192:3
  238:4 251:8
  254:25 277:23
**work**  25:24 30:4,8
  31:16,24 32:19
  33:5,8,10 34:14
  35:11 37:3,4,9
  38:3,5 69:16,20
  84:22 87:23
  112:10 113:21
  234:2
**worked**  31:1,11
  36:23 188:4
**working**  36:20
  37:11 139:24
  141:2
**works**  82:23 157:2
  188:8
**world**  32:24 34:12
  34:13 176:7
**worth**  162:17

**write**   164:21 188:5
**writes**   71:23
**writing**   200:10
**written**   55:12 65:3
   72:1,11 75:14
   260:11
**wrong**   24:18 41:14
   202:20 219:7
   220:10,18 267:24
**wrote**   26:1 229:6

**x**

**x**   4:1,7

**y**

**yeah**   8:17 13:12
   17:11 23:24 28:15
   37:17,20 40:13
   45:1 47:7 50:7,20
   50:20 57:11 58:14
   58:21 59:5,10
   60:8 62:17 69:14
   69:18 70:20 87:16
   87:19 89:7 112:13
   115:14 119:16,21
   125:9 132:19
   143:25 153:24
   160:18 165:13
   167:13 179:10
   182:17 186:23
   187:1 195:16
   196:22 198:25
   201:4,7 204:17
   209:8 243:14
   245:11 246:2,22
   249:11 250:8,24
   271:21,25 272:12
   272:12 273:2,11
**year**   7:6
**years**   31:25 36:14
   37:10 38:18,21,23
   38:24,25 39:25

40:3,9 104:4,15,20
   113:22 147:16
**yesterday**   26:8
**york**   1:2 2:2 3:7
   3:14,14 229:5
   230:8,10
**yup**   166:14 238:20

**z**

**zones**   176:8
**zoom**   2:17 5:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.