# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— X

KENNETH GORDON, Individually and on Behalf of All Others Similarly Situated,

                Plaintiff,

    vs.

VANDA PHARMACEUTICALS INC. and MIHAEL H. POLYMEROPOULOS,

                Defendants.

———————————————————— x

:   Civil Action No. 1:19-cv-01108-FB-LB
:
:
:
:
:
:
:
:
:
:
:
:
:

# EXPERT REPORT OF BJORN I. STEINHOLT, CFA

July 30, 2021

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND QUALIFICATIONS ...............................................................1

II.     OVERVIEW OF ASSIGNMENT ..................................................................................4

III.    MARKET EFFICIENCY IN A FRAUD-ON-THE-MARKET CONTEXT.......................6

IV.     ANALYSIS OF MARKET EFFICIENCY.......................................................................10

        A.      Trading on the on the Nasdaq Stock Market Supports My Conclusion that
                Vanda Traded in an Efficient Market .................................................................11

        B.      *Cammer* Factor 1: Large Trading Volume Supports My Conclusion that
                Vanda Traded in an Efficient Market .................................................................13

        C.      *Cammer* Factor 2: Substantial Analyst Coverage Supports My Conclusion
                that Vanda Traded in an Efficient Market ...........................................................14

        D.      *Cammer* Factor 3: Significant Number of Liquidity Providers and
                Institutional Investors in Vanda's Common Stock Supports My
                Conclusion that Vanda Traded in an Efficient Market .......................................17

        E.      *Cammer* Factor 4: Vanda was Eligible to File on Form S-3.................................19

        F.      *Cammer* Factor 5: Material Market, Industry and Company-Specific
                Information Was Quickly Incorporated into Vanda's Stock Price,
                Supporting My Conclusion that Vanda Traded in an Efficient Market................19

        G.      *Krogman* Factor 1: Large Market Capitalization Satisfied..................................26

        H.      *Krogman* Factor 2: Small Bid-Ask Spread Satisfied ...........................................26

        I.      *Krogman* Factor 3: Large Float Satisfied............................................................27

        J.      Conclusion: The *Cammer* and *Krogman* Factors Support My Opinion that
                Vanda Traded in an Efficient Market During the Class Period.............................28

V.      USING THE EVENT-STUDY FRAMEWORK TO CALCULATE CLASS-
        WIDE DAMAGES .......................................................................................................28

VI.     CONCLUSION.............................................................................................................30

## I.    INTRODUCTION AND QUALIFICATIONS

1.      I am a Managing Director at Caliber Advisors, Inc., a full-service financial valuation and economic consulting firm with offices in San Diego, California and Chicago, Illinois.  I have more than 30 years of experience providing capital markets consulting, including analyzing and valuing investments.  A summary of my background and qualifications is attached as Exhibit A to this report.

2.      Over the past 20 years, I have been retained on numerous occasions to provide expert opinions relating to market efficiency, materiality, loss causation and damages in securities class actions similar to this litigation.  I am frequently asked to analyze market efficiency in a reliance context and have submitted many reports to various federal courts outlining my findings, including in the following cases:

- *Chin, et al. v. Sonus Networks, Inc., et al.*, No. 04-cv-10294 (D. Mass. Sept. 25, 2007);

- *Kelleher, et al. v. ADVO, Inc., et al.*, No. 06-cv-01422 (D. Conn. Mar. 30, 2009);

- *In re Healthsouth Corp. Sec. Litig.*, No. 03-cv-01501 (N.D. Ala. Mar. 31, 2009);

- *In re Novatel Wireless Sec. Litig.*, No. 08-cv-01689 (S.D. Cal. May 12, 2010);

- *McGuire v. Dendreon Corp., et al.*, No. 07-cv-00800 (W.D. Wash. May 27, 2010);

- *Luman, et al. v. Anderson, et al.*, No. 08-cv-00514 (W.D. Mo. Feb. 10, 2012);

- *Siracusano, et al. v. Matrixx Initiatives, et al.*, No. 04-cv-00886 (D. Ariz. Feb. 27, 2012);

- *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., et al.*, No. 11-cv-05026 (S.D.N.Y. Feb. 14, 2012);

- *T Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp., et al.*, No. 10-cv-02847 (N.D. Ala. June 14, 2012);

- *Smilovits, et al. v. First Solar Inc., et al.*, No. 12-cv-00555 (D. Ariz. Oct. 8, 2013);

- *In re Celera Corp. Sec. Litig.*, No. 10-cv-02604 (N.D. Cal. Feb. 25, 2014);

- *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc., et al.*, No. 12-cv-05162 (W.D. Ark. Sept. 20, 2016);

- *Marcus, et al. v. J.C. Penney Co. Inc., et al.*, No. 13-cv-00736 (E.D. Tex. Mar. 8, 2017);

- *Willis, et al. v. Big Lots, Inc., et al.*, No. 12-cv-00604 (S.D. Ohio Mar. 17, 2017);

- *In re LendingClub Corporation Sec. Litig.*, No. 16-cv-02627 (N.D. Cal. Oct. 20, 2017);

- *Villella, et al. v. Chemical & Mining Co. of Chile, Inc., et al.*, No. 15-cv-02106 (S.D.N.Y. Sept. 24, 2019);

- *In re Sandridge Energy Inc., Sec. Litig.*, No. 12-cv-01341 (W.D. Okla. Sept. 30, 2019);

- *Scheufele, et al v. Tableau Software, Inc., et al.*, No. 17-cv-05753 (S.D.N.Y. Jan. 16, 2020);

- *Chabot, et al. v. Walgreens Boots Alliance, Inc., et al.*, No. 18-cv-02118 (M.D. Penn. Jan. 21, 2020); and

- *Plymouth County Ret. Sys., et al. v. Patterson Companies, Inc., et al.*, No. 18-cv-00871 (D. Minn. Sept. 28, 2020).[1]

In each of the matters listed above, my economic analyses demonstrated that the market was efficient and the respective courts granted class certification.

3.      Furthermore, I have provided expert testimony explaining how to calculate class-wide damages using the event-study framework for purposes of class certification.  For example, in *J.C. Penney*, the court rejected defendants' criticism of my proposed class-wide damages methodology, agreed it was consistent with plaintiffs' theory of liability, and certified the class.[2] In *Big Lots*, the court found that my damages methodology was "both relevant and reliable," determined that I had "explained how it is both workable and consistent with Plaintiffs' theory of liability in this particular case," and certified the class.[3]  In *Gruber*, the court also accepted my class-wide damages methodology based on a fundamental valuation approach, and certified the

---

[1]   The date that class certification was granted is reflected in the parentheses.

[2]   *See Marcus v. J.C. Penney Co., Inc.*, 2016 WL 8604331, at *10 (E.D. Tex. Aug. 29, 2016).

[3]   *See Willis v. Big Lots*, 2017 WL 1074048, at *7 (S.D. Ohio Mar. 17, 2017).

class.[4]  In *Patterson*, the court also found my damages model based on the event-study framework sufficiently reliable and certified the class.[5]

4.       I have also prepared class-wide damages analyses, based on the event-study framework, for trial.  In *Novatel*, the court undertook a rigorous *Daubert* analysis of every element of my comprehensive loss causation and damages methodology, and found that "Steinholt's testimony on loss causation and damages, based on his event study analysis, is reasonable and reliable."[6]  Other courts have similarly permitted my damages testimony for trial, including in *Employer-Teamsters Joint Council Pension Trust Fund v. America West Holding, et al.* No. 99-cv-399 (D. Ariz.); *Nursing Home Pension Fund, et al. v. Oracle Corp., et al.*, No. 01-cv-00988 (N.D. Cal.); *In re Neopharm Inc. Sec. Litig.*, No. 02-cv-02976 (N.D. Ill.) and *Gruber*.

5.       I received a Master of International Business degree from the University of San Diego and a Bachelor of Science degree in Computer Science and Engineering from California State University, Long Beach.  In addition to my graduate business degree and my engineering degree, I have earned the professional designation Chartered Financial Analyst ("CFA") awarded by the CFA Institute, and I participate in its continuing education program.  The CFA designation is a qualification for finance and investment professionals focusing on investment management and securities analyses of common stock, fixed income and other investments.

6.       My billable rate is currently $525 per hour.  My compensation is not contingent on the outcome of this case.

---

[4]    *See Gruber v. Gilbertson*, 2019 WL 4439415, at *8 (S.D.N.Y. Sept. 17, 2019).

[5]    *See* Memorandum of Law & Order, *Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*, No. 18-cv-00871 (D. Minn. Sept. 28, 2020).

[6]    *See In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *13 (S.D. Cal. Oct. 25 2013).

## II.    OVERVIEW OF ASSIGNMENT

7.    Counsel for plaintiff Teamsters Local Union No. 727 Pension Fund ("Plaintiff") has requested that I examine and discuss the economic issues relating to whether the market in which Vanda Pharmaceuticals Inc. ("Vanda" or the "Company") common stock traded between November 4, 2015 and February 11, 2019, inclusive (the "Class Period"), was open, developed, and efficient, in that the market prices during this time period quickly changed to reflect new and material information concerning Vanda as such information became publicly available.[7]    In addition, I have also been asked to briefly explain how class-wide damages can be calculated in this case using a common damages methodology that is consistent with Plaintiff's allegations.

8.    My opinions in this matter are based on my professional experience, as well as my review of a substantial amount of information, including: (a) the Amended Complaint for Violation of the Federal Securities Laws, dated July 23, 2019, (the "Complaint");  (b) Memorandum and Order, dated March 10, 2021; (c) public filings by Vanda with the Securities and Exchange Commission ("SEC") from 2015 through 2019, including filings on Form 10-K, Form 10-Q, Form 8-K, Proxy Statement and Prospectus; (d) Vanda press releases and conference call transcripts from November 2015 through February 2019; (e) securities analyst reports relating to Vanda and its industry from November 2015 through February 2019; (f) contemporaneous media reports

---

[7]    Throughout this report, I use the term "material information" in the manner investors and securities analysts generally use the term.  For investors and securities analysts, material information is information that impacts the value of an investment.  From an economic point of view, the value of an investment is based on the expected future cash flows of that investment, including the timing and associated risk of those cash flows.  Material information, therefore, is information that impacts the future cash flows, or the timing or riskiness of the future cash flows. *See* Jerald E. Pinto, Elaine Henry, Thomas R. Robinson & John D. Stove, *Equity Asset Valuation*, John Wiley & Sons, 2, 18 (2nd ed. 2010).  ("The most important type of equity valuation models are present value models.  In finance theory, present value models are considered the fundamental approach to equity valuation. . . .  A present value model or discounted cash flow model applied to equity valuation derives the value of the common stock as the present or discounted value of its expected future cash flows.").

regarding Vanda and its industry from November 2015 through February 2019; (g) price, volume and other trading information for Vanda common stock, market and industry indices, including intra-day trading information for Vanda on February 5, 6, and 11, 2019; and (h) articles, court decisions and other relevant information cited in the text, or in footnotes to the text, of this report.

9.      Based on my review and analysis of the above information, as well as a careful consideration of the market efficiency factors discussed in greater detail below, it is my opinion that the market in which Vanda common stock traded throughout the Class Period was impersonal, open, well developed, and efficient in that the market prices quickly responded to incorporate and reflect new, material information as it became publicly available.  Consequently, it is my opinion that it was reasonable for investors to rely on the integrity of the market prices of Vanda's common stock during the Class Period as reflecting all publicly available information about the Company.

10.      Furthermore, based on my experience as a damages expert and consultant in many other securities cases similar to this one, it is my opinion that class-wide damages can be calculated in this case using the event-study damages framework explained in Section V below.

11.      This report is based on the information I have reviewed to date.  I understand that discovery is still ongoing and that additional information may become available.  As a result, I reserve the right to amend, refine, or modify my opinion and report, including in the event any additional information or analysis becomes available.

## III.    MARKET EFFICIENCY IN A FRAUD-ON-THE-MARKET CONTEXT

12.    An efficient market is one that efficiently processes new and material information. In an efficient market, new and material information is quickly incorporated into the stock price as different investors buy and sell based on their respective evaluations of the new information disclosed.[8]  This also means that the resulting stock price will reflect the investors' consensus regarding the stock's value given the available public mix of information.[9]  The driving force that causes markets to be efficient is the competition amongst investors to quickly analyze and trade on new information as it becomes publicly available.  As a result of this competition, riskless profit opportunities are short lived and do not persist in efficient markets.  This concept has broad empirical support.[10]

13.    Perhaps the most compelling evidence demonstrating that open and developed securities markets are efficient is the academic research that, time and time again, has shown that professional fund managers are unable to consistently beat the market.  For example, a study by Nobel Laureate Eugene Fama (who is generally credited with coining the term "market efficiency") and Kenneth French found that actively traded U.S. mutual funds in the aggregate

---

[8]  How quickly it takes for new information to be incorporated into the stock price depends, in part, on how unexpected and complex the information is.  Generally, it is reasonable to assume that new and material information is incorporated into a stock price within one day.

[9]  This does not mean that all market participants agree on what the true value of the common stock is, as evidenced by the fact that some investors sell as others buy.  Rather, it means that the respective investors' views of the stock's true value drives their purchases and sales (*i.e.*, the demand and supply for the stock), which, in turn, becomes the basis for the consensus price set by the overall market.

[10]  *See, e.g.*, Burton G. Malkiel, *Rethinking the Financial Crisis* 75, Russell Sage Found. (2012) ("At its core, EMH [the Efficient Market Hypothesis] implies that arbitrage opportunities for riskless gains do not exist in an efficiently functioning market and that, if they do appear from time to time, they do not persist.  The evidence is clear that this version of EMH is strongly supported by the data.").

underperformed the market portfolio after costs.[11]  The difficulty of outperforming the market is also illustrated by the following frequently cited statement by economist Richard Roll:[12]

> Over the past decade, I have attempted to exploit many of the seemingly most promising "inefficiencies" by actually trading significant amounts of money according to a trading rule suggested by the "inefficiencies.". . .
>
>     . . . I have never yet found one that worked in practice, in the sense that it returned more after cost than a buy-and-hold strategy.[13]

14.     While financial economists may hold different views regarding various aspects of market efficiency, they generally agree that securities traded in open and developed markets quickly incorporate and reflect new information as it becomes available.  As noted in one academic article:

> Financial economists have shown repeatedly that stock prices react quickly to the release of important new information; though they may differ in their interpretations of this evidence, they do agree it exists.  Even prominent financial economists with divergent interpretations of the evidence on market efficiency share similar views on how stock prices react to new information.[14]

15.     For securities class actions, there are two important implications of an efficient market.  First, in an efficient market it is reasonable for investors to rely on the integrity of the

---

[11]  *See* Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. of Fin. 1915 (2010) ("The aggregate portfolio of actively managed U.S. equity mutual funds is close to the market portfolio, but the high costs of active management show up intact as lower returns to investors.  Bootstrap simulations suggest that few funds produce benchmark-adjusted expected returns sufficient to cover their costs.").

[12]  According to one common finance text-book, Richard Roll is characterized as someone who "probably knows as much as anyone about market anomalies."  Brealey, Myers & Allen, *Principles of Corporate Finance* 329.

[13]  Richard Roll, *What Every CFO Should Know About Scientific Progress in Financial Economics: What Is Known and What Remains to be Resolved*, 23 Fin. Mgmt. 69, 71 (1994).

[14]  Jonathan Macey, Geoffrey Miller, Mark Mitchell & Jeffry Netter, *Lessons From Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson*, 77 Va. L. Rev. 1017, 1026 (1991).

market price.  As explained in a commonly used finance textbook, "[i]n an efficient market you

can trust prices," because they quickly impound new and material information, meaning that "in

an efficient market, there is no way for most investors to achieve consistently superior rates of

return."[15]  This implication is important for the fraud-on-the-market presumption.  In *Amgen Inc.,*

*et al. v. Conn. Ret. Plans and Trust Funds*, the U.S. Supreme Court explained:

> The fraud-on-the-market theory rests on the premise that certain well
> developed markets are efficient processors of public information.  In such markets,
> the "market price of shares" will "reflec[t] all publicly available information."  Few
> investors in such markets, if any, can consistently achieve above-market returns by
> trading based on publicly available information alone, for if such above-market
> returns were readily attainable, it would mean that market prices were not
> efficiently incorporating the full supply of public information. *See* R. Brealey, S.
> Myers, & F. Allen, Principles of Corporate Finance 330 (10th ed. 2011) ("[I]n an
> efficient market, there is no way for most investors to achieve consistently superior
> rates of return.").

> In *Basic*, we held that if a market is shown to be efficient, courts may
> presume that investors who traded securities in that market relied on public,
> material misrepresentations regarding those securities.  This presumption springs
> from the very concept of market efficiency. If a market is generally efficient in
> incorporating publicly available information into a security's market price, it is
> reasonable to presume that a particular public, material misrepresentation will be
> reflected in the security's price.  Furthermore, it is reasonable to presume that most
> investors – knowing that they have little hope of outperforming the market in the
> long run based solely on their analysis of publicly available information – will rely
> on the security's market price as an unbiased assessment of the security's value in
> light of all public information.[16]

16.     In its 2014 opinion in *Halliburton Co. v. Erica P. John Fund* ("*Halliburton II*") the

U.S. Supreme Court reaffirmed the fraud-on-the-market presumption, and further clarified:

> [T]he *Basic* Court acknowledged [debate amongst academics] and declined to enter
> the fray, declaring that "[w]e need not determine by adjudication what economists
> and social scientists have debated through the use of sophisticated statistical
> analysis and the application of economic theory." To recognize the presumption of
> reliance, the Court explained, was not "conclusively to adopt any particular theory
> of how quickly and completely publicly available information is reflected in market

---

[15]   Brealey, Myers & Allen, *Principles of Corporate Finance* 337.

[16]   *Amgen*, 568 U.S. 455, 461-62 (2013) (citations omitted) (alteration in original).

price." The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." . . .

The academic debates discussed by Halliburton have not refuted the modest premise underlying the presumption of reliance. Even the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices.[17]

17. Second, in an efficient market, the impact of the alleged misrepresentations or omissions can be estimated, and class-wide damages quantified, based on an analysis of the market prices using an event study.[18] This is so because the "alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class," and that, therefore, the Class "will prevail or fail in unison."[19] I will explain in greater detail how damages can be quantified on a class-wide basis in this case in Section V below.

18. In *Cammer v. Bloom*, the court analyzed the criteria that should be evaluated in determining whether a market is efficient.[20] The *Cammer* court asked for evidence that the stock traded in an open and developed market, and provided five factors to assess market efficiency, including evidence showing that the market participants had the sophistication to understand the economic implications of new and material information (market makers/institutions), that market participants analyzed the information (analyst coverage), and that market participants traded on the information (trading volume). In my experience, and from an economic point of view, I find that these factors are very useful in determining whether a market was open and developed, and

---

[17] *Halliburton II*, 573 U.S. 258, 271-72 (2014) (citations omitted) (some alteration in original).

[18] *See, e.g.*, Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 Bus. Law 545 (1994).

[19] *Amgen*, 568 U.S. at 459-60.

[20] *Cammer*, 711 F. Supp. 1264 (D.N.J. 1989).

would be expected to efficiently process new, material information. As discussed above, academic research has shown that equity securities that trade in such markets react to new and material information so that it is extremely difficult, if not impossible, to consistently outperform the overall market.[21]  Consequently, in such markets, it would be reasonable to rely on the integrity of the market prices. *Cammer* also explained that it would be "helpful" to demonstrate that the stock price in question quickly reacted to new and material company-specific information, as this represents direct evidence of market efficiency. Below, I will review the *Cammer* factors used to assess market efficiency and explain how all of them support a finding of market efficiency for Vanda's common stock during the Class Period.

## IV. ANALYSIS OF MARKET EFFICIENCY

19. In *Cammer*, the court provided some general guidelines as to how to analyze market efficiency in a fraud-on-the-market context, and provided five specific factors to analyze. The first four factors are so-called indirect factors, as they provide evidence that the competitive environment which facilitates market efficiency was in place. From an economic point of view, the indirect factors are, by themselves, commonly viewed to be sufficient to establish market efficiency in a reliance context.[22]  Courts have also recognized this economic reality.[23]

---

[21]  *See* Malkiel (2012), *supra* fn. 10; Fama & French (2010), *supra* fn. 11; and Macey, Miller, Mitchell & Netter (1991), *supra* fn. 14.

[22]  *See* Bradford Cornell & James C. Rutten, *Market Efficiency, Crashes and Securities Litigation*, 81 Tulane L. Rev. 443, 457 (2006) ("There is almost no dispute, however, that for securities traded in 'open and developed' markets as measured by the *Cammer* and *Krogman* criteria, it is reasonable for all but the most sophisticated investors to rely on the market prices. There is thus little dispute that with respect to such securities, reliance on the integrity of the market prices (and thus on the defendants' statements) is appropriately presumed.").

[23]  For example, the Second Circuit has stated that "district courts in this and other Circuits regularly consider five factors first set forth in *Cammer v. Bloom*," with the "first four *Cammer* factors [being] 'particularly valuable in situations where direct evidence does ***not*** entirely resolve the question' of market efficiency," and explaining that "a plaintiff seeking to demonstrate market

20.     *Cammer* also explained that a fifth factor demonstrating "cause and effect" would be "helpful" because it provides direct evidence of market efficiency.[24]  Below, I will discuss the *Cammer* factors in the context of Vanda's common stock price.  In addition, I will discuss three additional factors included in *Krogman v. Sterritt* that some courts also consider as being relevant to assessing market efficiency.[25]

**A.     Trading on the on the Nasdaq Stock Market Supports My Conclusion that Vanda Traded in an Efficient Market**

21.     During the entire Class Period, Vanda's common stock was listed and traded on The NASDAQ Stock Market ("NASDAQ"), under the ticker symbol "VNDA."[26]  NASDAQ is one of the largest and most sophisticated securities markets in the world.  As of December 31, 2015, NASDAQ included 2,859 listed companies with a combined market capitalization of

---

efficiency need not always present direct evidence of price impact through event studies [*i.e.*, the fifth *Cammer* factor]."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 94, 97 (2d Cir. 2017) (citation omitted and emphasis in original).

[24]   *Cammer* does not appear to require that *Cammer* factor five necessarily be satisfied (at least not if the other factors are satisfied), stating: "As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.  However, as mentioned, such a showing . . . would be difficult because it would require exploration of materiality and causation issues. . . .  [P]laintiffs will not be required to delve into such issues at this early stage."  *Cammer*, 711 F. Supp. at 1291-92.

[25]   *Krogman*, 202 F.R.D. 467 (N.D. Tex. 2001).  These additional factors are: (a) market capitalization, which for Vanda ranged from $312 million to $1.65 billion during the Class Period; (b) bid-ask spread, which for Vanda's common stock averaged approximately $0.03 per share during the Class Period; and (c) the public float, or the Company's common stock in public hands (*i.e.*, excluding shares owned by insiders), which for Vanda ranged from 35.9 million to 50.6 million shares with a market value ranging from $261 million to $1.6 billion during the Class Period.  As explained below, all of these additional factors are also consistent with Vanda trading in an efficient market during the Class Period.

[26]   During the Class Period, The NASDAQ had three listing tiers.  Vanda was part of the middle tier, The Nasdaq Global Market.

- 11 -

approximately $8.3 trillion.[27]  By December 31, 2018, there were 3,058 total NASDAQ listings with a combined market capitalization of $11.1 trillion.[28]  NASDAQ listed companies "must meet minimum listing requirements," and "maintain rigorous listing and corporate governance standards (both initial and ongoing)."[29]  Market efficiency is commonly presumed for securities that trade on NASDAQ.[30]

22.    Although it is not explicitly a *Cammer* factor, the *Cammer* opinion discusses the importance of a security being listed and traded on a national exchange when analyzing market efficiency.[31]  In this case, the fact that Vanda's common stock traded on the NASDAQ supports my opinion that it traded in an efficient market.  This is consistent with empirical evidence that few, if any, professional fund managers investing in the U.S stock market (NYSE and NASDAQ) are able to outperform the market on a consistent basis.[32]

---

[27]  NASDAQ, Inc, 2015 Form 10-K filed with the SEC on February 6, 2016, page F-9.

[28]  NASDAQ, Inc, 2018 Form 10-K filed with the SEC on February 22, 2019, page F-9.

[29]  *Id.*, page 4.

[30]  *Cammer*, 711 F. Supp. at 1292 (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud* §8.6 (1988)) ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'").

[31]  *Id.*

[32]  *Supra* fn. 11.

- 12 -

**B.    *Cammer* Factor 1: Large Trading Volume Supports My Conclusion that Vanda Traded in an Efficient Market**

23.    The first *Cammer* factor relates to Vanda's trading volume. [33]  In its opinion, the *Cammer* court explained:

> The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.[34]

24.    During the Class Period, Vanda had a total reported trading volume of almost 530 million shares with a dollar trading volume of approximately $8.5 billion. *See* Exhibit B, attached hereto. During this same time period, the average reported daily trading volume for Vanda exceeded 640,000 shares with an average daily dollar volume of more than $10.3 million.  *See* Exhibit B.  This demonstrates that there was "significant investor interest" in Vanda stock, and that there were willing buyers and sellers who provided liquidity for the stock.  The substantial amount of daily trading supports my opinion that Vanda traded in an efficient market during the Class Period.

25.    One authority quoted in *Cammer* stated that "'[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.'"[35] During the Class Period, Vanda's average weekly trading volume was approximately 7%, thereby

---

[33]  Academic research has found that trading volume is one factor "that systematically differentiate[s] between efficiently and inefficiently priced stocks."  Brad M. Barber, Paul A. Griffin & Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. of Corp. L. 285 (1994).

[34]  *Cammer*, 711 F. Supp. at 1286.

[35]  *Id.* at 1293 (quoting Bromberg & Lowenfels §8.6, fn. 30).

substantially exceeding the benchmark used by some courts to justify a "strong presumption" of

market efficiency.[36]  *See* Exhibit B. The Company's high share turnover also supports my opinion

that Vanda common stock traded in an efficient market during the Class Period.

### C.  *Cammer* Factor 2: Substantial Analyst Coverage Supports My Conclusion that Vanda Traded in an Efficient Market

26.    The second *Cammer* factor relates to the number of securities analysts that followed

and reported on Vanda during the Class Period.[37]  In its opinion, the *Cammer* court explained:

> The existence of such analysts would imply, for example, the [Company] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.  In this way the market price of the stock would be bid up or down to reflect the financial information contained in the [Company] reports, as interpreted by the securities analysts.[38]

27.    Analyst coverage refers to securities analysts who follow, analyze and report on a

company to their clients.[39]  Many firms do not have any analyst coverage and are therefore more

likely to trade in less efficient markets than firms with analyst coverage.[40]  Vanda, on the other

---

[36]   Source: *Bloomberg* (VNDA US Equity).

[37]   Academic research has found that analyst coverage is another factor "that systematically differentiate[s] between efficiently and inefficiently priced stocks."  Barber, Griffin & Lev, *supra* fn. 33.

[38]   *Cammer*, 711 F. Supp. at 1286.

[39]   Analysts providing analysis and recommendations to their clients are commonly referred to as sell-side analysts.  In addition, public companies are also followed by a presumably much larger number of so-called buy-side analysts, or analysts who work for investment firms and whose research is generally used internally by these firms to make investment decisions.  Information on the number of buy-side analysts of a particular company is not publicly available.

[40]   *See* fn. 37, *supra*.  One study found that approximately 35% of a large sample of publicly traded firms in the United States did not have any analyst coverage.  Fang (Frank) Yu, *Analyst Coverage and Earnings Management*, 88 J. of Fin. Econ. 245 (2008).  Another study found that the median and mean number of analysts covering a company was one and five, respectively. Pandej Chintrakarn, Pornsit Jiraporn, Young S. Kim & Jang Chul Kim, *Does Corporate Governance Quality Affect Analyst Coverage? Evidence from the Institutional Shareholder Services (ISS)*, SSRN Working Paper, http://ssrn.com/abstract=2458841.

hand, had at least 12 analyst firms that followed the Company during the Class Period, including: Aegis Capital Corp., Brean Capital, Canaccord Genuity, Cantor Fitzgerald, Empire Asset Management, HC Wainwright & Co, Jefferies, JMP Securities, Morningstar, Oppenheimer, Piper Jaffray and Stifel.[41]  So far, I have obtained and reviewed approximately 190 analyst reports covering Vanda from the relevant time period of November 2015 through February 2019.

28.    Furthermore, Vanda participated in numerous investor conferences during the Class Period, including: the Citi 2015 Global Healthcare 1x1 Conference on Thursday November 5, 2015; the Brean Capital 2015 Life Sciences Summit on Monday, November 16, 2015; the Jefferies Autumn Global Healthcare Conference on Thursday, November 19, 2015; the 27th Annual Piper Jaffray Healthcare Conference on Wednesday, December 2, 2015; the Canaccord Genuity Rare Disease, Biopharma One-on-One Day on Tuesday, February 2, 2016; the Jefferies Healthcare Conference in New York City on Thursday, June 9, 2016; the JMP Securities Life Sciences Conference on Tuesday, June 21, 2016; the Stifel 2016 Healthcare Conference on Tuesday, November 15, 2016; the Jefferies 2016 London Healthcare Conference on Wednesday, November 16, 2016; the 28th Annual Piper Jaffray Healthcare Conference on Tuesday, November 29, 2016; the Cowen and Company 37th Annual Healthcare Conference on Tuesday, March 7, 2017; the Oppenheimer 27th Annual Healthcare Conference on Tuesday, March 21, 2017; the Deutsche Bank 42nd Annual Health Care Conference on Thursday, May 4, 2017; the Jefferies 2017 Global Healthcare Conference Wednesday, June 7, 2017; the JMP Securities Life Sciences Conference on Tuesday, June 20, 2017; the Citi 12th Annual Biotech Conference on Thursday, September 7, 2017; the Rodman and Renshaw 19th Annual Global Investment Conference on Tuesday, September 12, 2017; the Morgan Stanley 15th Annual Global Healthcare Conference on

---

[41]  *Bloomberg*: VNDA US ANR.

Wednesday, September 13, 2017; the Oppenheimer Specialty Pharma Summit Conference on Wednesday, October 11, 2017; the Stifel 2017 Healthcare Conference on Tuesday, November 14, 2017; the Jefferies 2017 London Healthcare Conference on Wednesday, November 15, 2017; the 29th Annual Piper Jaffray Healthcare Conference on Wednesday, November 29, 2017; the Cowen and Company 38th Annual Healthcare Conference on Monday, March 12, 2018; the Oppenheimer 28th Annual Healthcare Conference on Tuesday, March 20, 2018; the Deutsche Bank 43rd Annual Health Care Conference on Wednesday, May 9, 2018; the Jefferies 2018 Global Healthcare Conference on Tuesday, June 5, 2018; the JMP Securities Life Sciences Conference on Wednesday, June 20, 2018; the Citigroup 13th Annual Biotech Conference on Wednesday, September 5, 2018; the Morgan Stanley 16th Annual Global Healthcare Conference on Wednesday, September 12, 2018; the Oppenheimer Fall Summit Focused on Specialty Pharma & Rare Disease on Thursday, September 27, 2018; the Cantor Fitzgerald Global Healthcare Conference on Tuesday, October 2, 2018; the Stifel 2018 Healthcare Conference on Tuesday, November 13, 2018; and the Jefferies 2018 London Healthcare Conference on Thursday, November 15, 2018.[42]  Vanda's presentations at many of these investor conferences were also available at the Company's investor relations web site (usually for 30 days after the presentations), which also included the Company press releases, earnings announcements and conference calls.[43] Company press releases, earnings announcements, conference calls, as well as other media commentaries, were also available on *Bloomberg* (VNDA US Equity, CN), a major news source to the investment industry, during the relevant time period from November 2015 through February 2019.  This demonstrates that the Company's press releases, conference calls and other Company

---

[42]  https://www.vandapharma.com/investors.

[43]  *Id*.

events were widely available and discussed in the media.  The availability of such relevant Company-specific information facilitates market efficiency.

29.     The information above about the analyst and news coverage of the Company during the Class Period supports my opinion that Vanda's common stock traded in an efficient market during the Class Period.

**D.     *Cammer* Factor 3: Significant Number of Liquidity Providers and Institutional Investors in Vanda's Common Stock Supports My Conclusion that Vanda Traded in an Efficient Market**

30.     The third *Cammer* factor relates to the number of arbitrageurs, market makers and/or other sophisticated investors, such as institutional investors, who traded Vanda common stock during the Class Period.  In its opinion, the *Cammer* court explained:

> Third, it could be alleged the stock had numerous market makers.  The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.[44]

31.     For shares traded on NASDAQ, the matching of buy and sell orders are made by market makers.  When an order imbalance occurs, market makers increase the demand for a stock by lowering the ask price, or increase the supply of a stock by increasing the bid price.  As investors react to new information, this mechanism ensures that the price of the security changes to reflect investors' collective interpretation of the new information.  Consequently, market makers provide a key function in facilitating market efficiency.

32.     According to *Bloomberg*, out of more than 140 market makers or supplemental liquidity providers for Vanda stock, there were 20 with volume of at least one million shares during

---

[44]   *Cammer*, 711 F. Supp. at 1286-87.

- 17 -

the relevant time period.[45]  The presence of numerous market makers supports my opinion that Vanda common stock traded in an efficient market during the Class Period.

33.    The sophisticated investors discussed in *Cammer* are investors who are able to quickly evaluate new information and understand its potential impact on the value of a security, and who then take appropriate investment actions causing the new information to become reflected in the price of the security.  The presence of sophisticated investors is an important factor ensuring that a security is traded in an efficient market.[46]  Institutional investors are such sophisticated investors.

34.    Consequently, I examined the available information on institutional ownership of Vanda common stock for each quarter during the Class Period (from December 31, 2015, through December 31, 2018).  This information is generally only available on a quarterly basis and is therefore not a complete list of all sophisticated investors who may have owned Vanda common stock during the Class Period.  According to the available information, there were more than 420 institutional investors that reportedly owned at least 37.5 million Vanda shares during the Class Period, making up more than 80% of the Company's shares outstanding plus short interest.  *See* Exhibit C, attached hereto.  Again, institutional investors are generally considered to be sophisticated investors who quickly evaluate new information and understand its potential impact on the value of a security, and who then take appropriate investment actions causing the new information to become reflected in the price of the security.[47]  The substantial presence of

---

[45]   Source: Bloomberg (VNDA US BAS) from November 2015 through February 2019.

[46]   Academic research has shown that efficiently traded firms tend to have higher institutional ownership than inefficiently traded firms.  Barber, Griffin & Lev, *supra* fn. 33.

[47]   Barber, Griffin & Lev, *supra* fn. 33, at 292. ("Institutional investors (e.g., mutual funds, money managers, banks) are presumed to be better informed about the securities they hold and better able to interpret new information than individual investors.  Accordingly, the larger the number of

- 18 -

sophisticated institutional investors supports my opinion that Vanda's common stock traded in an efficient market during the Class Priod.

### E.    *Cammer* Factor 4: Vanda was Eligible to File on Form S-3

35.    The fourth *Cammer* factor relates to Vanda's eligibility to file on Form S-3. According to the *Cammer* court:

> Fourth, as discussed, it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met.  Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[48]

36.    To be eligible to file on Form S-3, a company has to be an SEC reporting company for at least 12 months and have $75 million in voting stock held by non-affiliates (average during 60-day period prior to filing).[49]  Vanda met both of these requirements and was eligible to file on Form S-3 during the entire Class Period.  Consequently, Vanda meets the *Cammer* factor four benchmark.

### F.    *Cammer* Factor 5: Material Market, Industry and Company-Specific Information Was Quickly Incorporated into Vanda's Stock Price, Supporting My Conclusion that Vanda Traded in an Efficient Market

37.    The direct test of market efficiency relates to whether a stock price quickly reacts to unexpected new material information.  While *Cammer* factors one through four, discussed above, provide evidence that the competitive environment that facilitates market efficiency was in place during the Class Period, the last *Cammer* factor calls for some empirical evidence that

---

institutional investors in a stock or the larger the percentage of stock held by institutions, or both, the more efficient it is expected to be.").

[48]    *Cammer*, 711 F. Supp. at 1287.

[49]    General Instruction I.B.1 to Form S-3, https://www.sec.gov/files/forms-3.pdf.

Vanda's common stock price quickly incorporated new and material information. More specifically, in its opinion, the *Cammer* court explained:

> Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory.[50]

38.    The analysis of the impact of new information (the event, such as a financial release) on securities prices is generally performed using an event study.[51] The event study *first* determines the statistical relationship between the stock price returns of the company and the returns on market and/or industry indices during a control period using a regression analysis.[52] In this case, I used the NASDAQ Composite index to control for market factors and the NASDAQ Biotechnology index to control for industry factors. These indices were used by Vanda as its respective market and industry indices to measure its stock price performance during the relevant time period.[53]

---

[50]    *Cammer*, 711 F. Supp. at 1287.

[51]    An event study is a statistical tool that first determines the normal statistical relationship between the stock price and that of market and industry indices; and then, second, uses this statistical relationship to quantify the residual return (price reaction net of market and industry factors). If the magnitude of the price reaction is statistically significant, or unlikely to have occurred simply by chance, the residual return is commonly attributed to the new information disclosed and is viewed as proof of cause and effect. For an explanation of the event-study methodology as used in securities fraud cases, *see* Mitchell & Netter (1994), *supra* fn. 18.

[52]    For the purpose of analyzing market efficiency, I used the one-year period (252 trading days) prior to each event/day analyzed as the control period, excluding the events analyzed. For the purpose of quantifying damages, or the impact of the alleged fraud, it may be necessary to modify the event study and control period further in order to properly isolate the fraud-related component of the price movement.

[53]    *See* Vanda 2018 Form 10-K, filed with the SEC on February 19, 2019, at 52.

39.    *Second*, the actual stock price return on the event day analyzed is compared to the return predicted by the regression to determine the excess (or abnormal) return, *i.e.*, the stock's return on the event day net of market and/or industry factors. The excess return can also be used to determine the so-called p-value, the probability of an equal or greater absolute return occurring randomly. A price movement with a p-value of 5% or less is defined as being statistically significant at the 5% level, while a price movement with a p-value of 1% or less is defined as being statistically significant at the 1% level.[54] Attached as Exhibit D are the statistical results of my event analyses.[55]

40.    *Cammer* factor five calls for empirical evidence that shows that new and material information was quickly incorporated into Vanda's stock price during the Class Period. To analyze whether new and material _market_ information was incorporated into Vanda's stock price, I ran a regression of Vanda's returns against the market index (NASDAQ Composite) during the Class Period. Based on this regression, I found that there was a statistically significant relationship between the market index (NASDAQ Composite) and Vanda, indicating that new and material _market_ information was quickly incorporated into the Company's stock price. Specifically, the t-statistic associated with the NASDAQ Composite in my regression analysis was 11.8, far exceeding the 1.96 benchmark for statistical significance at the 5% level (two-tailed).

---

[54]  Similarly, a price movement with a p-value of 10% or less is defined as being statistically significant at the 10% level.

[55]  The daily statistical analysis determines the so-called t-statistic, or the abnormal return on a particular day divided by the standard deviation (or standard error) during the control period. The t-statistic can then be translated into a p-value, or probability of an equal or greater absolute return occurring randomly. A t-statistic with an absolute value greater than 1.96 is defined as being statistically significant at the 5% level, using a two-tailed test (testing for large negative _and_ large positive returns). A t-statistic with a value greater than 1.645 (or less than -1.645) is defined as being a statistically significant price increase (or decrease) at the 5% level, using a one-tailed test (testing either for large positive _or_ for large negative returns, but not both).

41.    Similarly, I found that there was a statistically significant relationship between the NASDAQ Biotechnology index's residual returns (returns net of market, *i.e.*, net of the NASDAQ Composite returns) and Vanda as well, indicating that new and material *industry* information was also quickly incorporated into the Company's stock price.  Specifically, the t-statistic associated with the NASDAQ Biotechnology index's residuals in my regression was 10.2.  Again, the t-statistic far exceeded the 1.96 benchmark for statistical significance at the 5% level (two-tailed).

42.    To assess "cause and effect" relating to *Company-specific* information, I analyzed whether the information disclosed in Vanda's "financial releases" impacted the Company's stock price, as suggested by *Cammer*.  Financial releases generally provide new information to investors and therefore they have a greater likelihood of materially altering the public mix of information, as noted in *Cammer* above.[56]  For my purposes, I examined the price reaction (or absence thereof) following each of the financial releases from 3Q2015 through 3Q2018, a total of thirteen quarters and sixteen financial releases.[57]  In a random sample, there is one chance out of twenty of ending up with a statistically significant price reaction at the 5% level simply by chance ($1 / 20 = 5\%$).  In this case, ten out of the sixteen financial releases I examined were statistically significant at the 5% level.  *See* Exhibit E, attached hereto.  The cumulative probability of 10 or more days out of 16 being statistically significant at the 5% level simply by chance is one in more than 1 billion (far

---

[56]  That said, just because the Company announced earnings does not mean that one would necessarily expect there to be a statistically significant price movement because the totality of the information disclosed could still be interpreted by the market as being neutral.

[57]  Each fourth quarter release was pre-announced, so I included both the preannouncement of these quarters, as well as the subsequent official announcement, resulting in sixteen financial releases for thirteen quarters.

exceeding the 1 out of 20, or the 5% benchmark).[58]  Consequently, the statistical evidence is very strong that new and material *Company-specific* information was quickly incorporated into Vanda's stock price.[59]

43.    Finally, to assess "cause and effect" relating to *Company-specific* information, I also examined Vanda's price reactions following the two alleged corrective disclosures on February 5, 2019 (after market close) and February 11, 2019 (during trading).[60]  This evidence, on its own, is sometimes viewed as the only evidence needed to prove market efficiency in a reliance context.  For example, Fisher (2005) explains: "If an event study shows that a … corrective disclosure had a statistically significant effect on the price of a stock, then the market may be said to have 'relied' on the misrepresentation."[61]  Similarly, Macey, Miller, Mitchell & Netter (1991) explains: "A plaintiff need show only that the misstatement affected the security return – by testing for an abnormal return … when the fact that it was a misstatement became known to the public – and that the abnormal return was statistically significant.  If the abnormal return is found statistically significant, we suggest that a court should consider the misstatement material and presume reliance by a plaintiff on the integrity of the market price."[62]

---

[58]  The cumulative probability was calculated using the binomial distribution. Richard A. DeFusco, Dennis W. McLeavey, Jerald E. Pinto & David E. Runkle, *Quantitative Investment Analysis*, John Wiley & Sons, Inc., (2nd ed. 2007), at 178-179.

[59]  I also reviewed the media and analyst reports to confirm that, on days with statistically significant price declines, there was negative information disclosed that could explain the price declines, and on days with statistically significant price increases, there was positive information disclosed that could explain the price increases.

[60]  Complaint, ¶¶9, 184-185, 226-228, 431, 433.

[61]  Fisher, "Does the Efficient Market Theory Help Us Do Justice in a Time of Madness?" *Emory Law Journal*, Vol. 54, No. 843, 874 (2005).

[62]  Macey, Miller, Mitchell & Netter (1991), *supra* fn. 14.

44.     First, on February 5, 2019, after the market had closed, Vanda issued a press release stating that it had "filed a complaint against the U.S. Food and Drug Administration (FDA) requesting that the court lift a partial clinical hold the agency illegally imposed prohibiting Vanda from studying a promising new drug in humans for more than 12 weeks without conducting unnecessary and unethical animal studies."[63]  According to the Complaint, this revealed the alleged truth to investors, *i.e.*, Vanda's refusal to conduct a safety trial for tradipitant that was needed for this drug to receive FDA approval.[64]

45.     This was negative information that, in an efficient market, would be expected to cause Vanda's stock price to decline.[65]  Following this disclosure, Vanda's stock price declined from a closing price of $25.06 per share on February 5, 2019, to a closing price of $20.06 per share on February 6, 2019, a decrease of $5.00 per share, or approximately 20%, on volume of more than 3 million shares, or six times the median trading volume during the Class Period.  The February 6, 2019, residual decline in Vanda's stock price was statistically significant at the 1% level.  *See* Exhibit D, at 21.  The evidence above shows that investors quickly analyzed and traded on the new and material information disclosed regarding Vanda, and that the negative economic implication of the information was quickly incorporated into Vanda's stock price.

---

[63]  Vanda Pharmaceuticals Takes A Stand Against Unnecessary Animal Research, VANDA PHARMACEUTICALS INC. (Feb. 5, 2019). https://vandapharmaceuticalsinc.gcs-web.com/node/8281/pdf.

[64]  Complaint, ¶9.

[65]  See *e.g.*, February 6, 2019 analyst reports: Stifel: "[T]his will certainly raise questions amongst investors about the clinical timeliness for this program and whether or not management is really focused on creating value for its shareholders." Jefferies: "[W]e lower POS to 65% and our PT to $35 based on adjusted regulatory/clinical risks." Cantor Fitzgerald: "We are downgrading Vanda to Neutral from Overweight and lowering our 12-mo. PT to $30 from $38. Our new view is the result of yesterday's disclosure of FDA interactions that appear 'challenged.'"

46.     Second, on February 11, 2019, at approximately 10am in the morning, Aurelius Value published a negative research report on Vanda titled: "In the Land of The Blind, The One-Eyed Man is King."[66]  According to the Complaint, this report  revealed the alleged truth, *i.e.*, Vanda's off-label promotion scheme for Fanapt and Hetlioz.[67]

47.     This negative Aurelius Value research report, in an efficient market, would be expected to cause Vanda's stock price to decline.  Following this disclosure, Vanda's stock price declined from a closing price of $18.95 per share on Friday February 8, 2019, to a closing price of $18.00 per share on Monday February 11, 2019, a decrease of $0.95 per share, or approximately 5% on volume of more than 4.5 million shares, or almost nine times the median trading volume during the Class Period.  The February 11, 2019, residual decline in Vanda's stock price was statistically significant at the 5% level.  *See* Exhibit D, at 21.     The evidence above shows that investors quickly analyzed and traded on the new and material information disclosed regarding Vanda, and that the negative economic implication of the information was quickly incorporated into Vanda's stock price.

48.     Based on the above, it is my opinion that new and material (1) *market*, (2) *industry* and (3) *Company-specific* information was quickly analyzed by market participants, who then traded on the information, resulting in the information efficiently becoming reflected in Vanda's stock price during the Class Period.

---

[66]  Complaint, ¶185.

[67]  Complaint, ¶9.

**G.    *Krogman* Factor 1: Large Market Capitalization Satisfied**

49.    The first *Krogman* factor[68] relates to the total market capitalization of Vanda's equity.  In its opinion, the *Krogman* court stated:

> Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations.[69]

50.    During the Class Period, the Company's market capitalization ranged from $312 million to $1.65 billion.[70]  This market capitalization is significantly greater than the $75 million benchmark in *Cammer* factor four, and would provide a sufficient economic incentive for the Company's common stock purchasers to invest in and monitor Vanda.  Based on the above, it is my opinion that *Krogman* factor one has been satisfied.

**H.    *Krogman* Factor 2: Small Bid-Ask Spread Satisfied**

51.    The second *Krogman* factor relates to Vanda's bid-ask spread.  In its opinion, the *Krogman* court stated:

> The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares.  A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.[71]

52.    During the Class Period, the average bid-ask spread for Vanda's common stock was approximately $0.03 per share, or roughly 0.2% of the closing price.[72]  By comparison, in 1991,

---

[68]    *See* fn. 25, *supra* (list of *Krogman* factors).

[69]    *Krogman*, 202 F.R.D. at 478.

[70]    *Bloomberg* VNDA US Equity.

[71]    *Krogman*, 202 F.R.D. at 478.

[72]    *Bloomberg* VNDA US Equity.

two years following the *Cammer* decision (1989), the vast majority of dollar spreads on the NASDAQ exceeded one-quarter ($0.25), or significantly larger than the average $0.03 per share dollar spread for Vanda.[73]   In other words, the bid-ask spread for Vanda's common stock was so low that it would not make its common stock "too expensive" for investors to trade.  Based on the above, it is my opinion that *Krogman* factor two has been satisfied.

### I.    *Krogman* Factor 3: Large Float Satisfied

53.    The third *Krogman* factor relates to Vanda's float, *i.e.*, shares in public hands.  In its opinion, the *Krogman* court stated:

> In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders.  "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security."[74]

54.    Based on *Bloomberg*, Vanda's float ranged from 35.9 million to 50.6 million shares with a market value ranging from $261 million to $1.6 billion during the Class Period.[75]   According to *Bloomberg*, Vanda's float accounted for the vast majority, or at least 84%, of the Company's shares outstanding during the Class Period.[76]   The market value of Vanda's float (ranging from $261 million to $1.6 billion during the Class Period) exceeds the $75 million benchmark in *Cammer* factor four, thereby providing sufficient economic incentive for Vanda common stock holders to invest in the Company.  Based on the above, it is my opinion that *Krogman* factor three has been satisfied.

---

[73]   William G. Christie & Paul H. Schultz, *Why do NASDAQ Market Makers Avoid Odd-Eighth Quotes?*, 49 J. of Fin. 1819 (1994).

[74]   *Krogman*, 202 F.R.D. at 478 (quoting defendants' expert).

[75]   *Bloomberg* VNDA US Equity.

[76]   *Id*.

**J.        Conclusion: The *Cammer* and *Krogman* Factors Support My Opinion that Vanda Traded in an Efficient Market During the Class Period**

55.     The various analyses discussed above demonstrate that new and material (1) *market*, (2) *industry* and (3) *Company-specific* information was incorporated into Vanda's stock price during the Class Period, as one would expect in an efficient market.  Specifically, the evidence I have reviewed shows that new and material information about Vanda was widely disseminated to the market, analyzed by market participants and traded on, causing the information to quickly become reflected in the Company's stock price

## V.     USING THE EVENT-STUDY FRAMEWORK TO CALCULATE CLASS-WIDE DAMAGES

56.     I have also been asked to briefly explain how class-wide damages can be calculated in this case using a common damages methodology that is consistent with Plaintiff's allegations. Ultimately, the quantification of damages will depend on what Plaintiff proves at trial based on the evidence presented, including evidence obtained from fact discovery that has yet to be completed.

57.     Securities fraud cases generally involve allegations that defendants misled investors, either by (a) making affirmatively false or misleading statements that concealed some material information, and/or (b) omitting material information.  The material information concealed or omitted is commonly referred to as the alleged truth, or relevant truth.  In an efficient market, concealing an alleged truth that is materially different than the public mix of information will distort the stock price and cause it to trade at artificially inflated prices.  Investors who overpaid for their shares as a result of the artificially inflated prices are then damaged when the alleged truth is disclosed (or partially disclosed) and the stock price declines as a result. Consequently, quantifying the fraud-related portion of the price decline caused by the disclosure of the alleged truth is key to quantifying class-wide damages.

58.    The event-study framework is a well-accepted framework for calculating class-wide damages in class action securities cases.[77]  First, the impact of the disclosure of the alleged truth (the event) on the stock price is quantified using an event study, sometimes also refined using fundamental valuation tools.  The event-study methodology is discussed in greater detail above.[78]  The fundamental valuation tools are based on the premise that the present value of an investment is a reflection of its future cash flows, including the riskiness of these cash flows, generally using the income approach (discounted cash flow approach) and the market approach (market multiples on various financial metrics).[79]  These are the same types of valuation tools commonly used by investors when making buy or sell decisions, or securities analysts when making investment recommendations.

59.    Second, this fraud-related impact is then used as the inflation from the misrepresentations concealing the alleged truth until its disclosure, known as an inflation ribbon. If there are multiple disclosures of the alleged truth, then multiple inflation ribbons are used. Multiple misrepresentations may, or may not, result in multiple inflation ribbons, depending on whether a new misrepresentation introduces additional inflation, or just maintains the level of inflation that already existed in the stock.  Similarly, multiple omissions may also result in multiple

---

[77]  *See* Marge Thorsen, Richard Kaplan & Scott Hakala, *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 109 (2006) ("Forensic experts agree generally on the techniques to be used to show inflation and dissipation in stock prices.  The gold standard, which is accepted by both courts and economists, is the event study.  Other tools such as valuation analyses often aid the event study.").

[78]  *See supra*, ¶¶38-39; *see* also Mitchell & Netter (1994), *supra* fn. 18.

[79]  For more detailed information regarding the commonly used financial valuation tools, *see, e.g.,* Shannon Pratt & Alina Niculita, *Valuing a Business: Part III – Business Valuation Approaches and Methods* 171-380 (McGraw-Hill, 5th ed. 2008).

inflation ribbons with different starting points depending on when it is determined that defendants had a legal obligation to disclose the omitted information.

60.     Third, because each class member purchased and/or sold their shares at market prices, each class member's individual damages can now be calculated based on the inflation (quantified the same for all the class members) at the time of their respective purchases and sales. In other words, the above event-study framework provides a methodology that can be used to quantify class-wide damages.

61.     Finally, recoverable damages are limited by the Federal 90-Day Bounce Back Rule that became effective on January 1, 1996.[80]   According to this Rule, recoverable damages are limited to either: (a) the purchase price per share less the average closing price from the day after the class period through the day of the sale, if the shares were sold during the 90-day period following the end of the class period, or (b) the purchase price less the 90-day average closing price after the class period, if the shares were still retained at the end of the 90-day period.

62.     While the actual damages analysis may have to be modified as a result of additional information, such as information obtained through discovery or future legal rulings, and may even be modified by a jury to fit its interpretation of the evidence presented at trial, the proposed damages framework is flexible.  Based on my review of Plaintiff's allegations in this case, it is my opinion that the above methodology can be used to calculate class-wide damages in this matter, as it has been found to be appropriate for use in hundreds of other similar securities class actions.

## VI.     CONCLUSION

63.     Based on my review and analysis of the evidence in this case, including a careful consideration of the market efficiency factors discussed above, it is my opinion that the market in

---

[80]  Private Securities Litigation Reform Act of 1995, Sec. 21D(e).  *See also* 15 U.S.C. § 78u–4(e)(1), (2).

which Vanda's common stock traded throughout the Class Period was impersonal, open, well developed, and efficient in that the prices reflected new, material information as it became publicly available. Consequently, it is my opinion that it was reasonable for investors to rely on the integrity of the market price of Vanda common stock during the Class Period as reflecting publicly available information.

64.     Furthermore, based on my experience as a damages expert and consultant in numerous other securities cases similar to this one, it is my opinion that class-wide damages can be calculated in this case using the event-study damages framework explained above.

Executed this 30th day of July, 2021, in San Diego, California.

Respectfully submitted,

Bjorn I. Steinholt, CFA

- 31 -