# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| KENNETH GORDON, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:19-cv-01108-FB-LB |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| VANDA PHARMACEUTICALS INC. and MIHAEL H. POLYMEROPOULOS, | : |  |
|  | : |  |
| Defendants. | : |  |

## EXPERT REPORT OF BJORN I. STEINHOLT, CFA

## October 29, 2021

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     SUMMARY OF THE STULZ REPORT ..............................................................1

III.    IMPLICATIONS OF AN EFFICIENT MARKET................................................4

    A.    Market efficiency in a fraud-on-the-market context.................................6

    B.    The posts on Cafepharma and Glassdoor online forums involved
        unverified information from anonymous sources ...................................10

    C.    The Whistleblower Complaint was first publicly disclosed on  February
        11, 2019 (when discussed in Aurelius Report) ......................................11

    D.    The February 11, 2019 Aurelius Report contained new and material
        information, and investors viewed it as such ..........................................11

IV.     THE EVENT STUDY DAMAGES FRAMEWORK CAN BE USED TO
    CALCULATE CLASS-WIDE DAMAGES.........................................................13

## I.      INTRODUCTION

1.      On July 30, 2021, I submitted an expert report in this case ("Steinholt Report"), in which I analyzed the market for Vanda Pharmaceuticals Inc. ("Vanda" or the "Company") common stock from November 4, 2015 through February 11, 2019 (the "Class Period"), using the *Cammer* and *Krogman* factors, and, based on this analysis, opined that it was reasonable for investors to rely on the integrity of the market price of Vanda common stock during the Class Period as reflecting the publicly available information.[1]  Furthermore, I opined that class-wide damages can be calculated in this case using the event study damages framework commonly used to quantify damages in Section 10(b) securities cases.[2]

2.      I have now been asked to review and discuss an expert report by Dr. René M. Stulz, dated September 17, 2021 ("Stulz Report").  As part of my work, I have also reviewed a transcript of Dr. Stulz's October 22, 2021, deposition in this matter ("Stulz Deposition").

## II.     SUMMARY OF THE STULZ REPORT

3.      In his Report, Dr. Stulz does not challenge the results of my event studies, or provide his own alternative event study or any other relevant economic analyses.  Instead, he relies on my results when assessing statistical significance.[3]  Nor does he challenge my analysis of the *Cammer* and *Krogman* factors, or my opinion regarding market efficiency in a reliance context.[4]

---

[1]    Steinholt Report, ¶63.

[2]    Steinholt Report, ¶64.

[3]    Stulz Report, ¶¶23, 27, 53, 57; fns 50, 51, 52, 53, 54, 56, 57, 59, 73, 117.  Stulz Deposition, Tr. 82:2-6.  ("I can use the significance of abnormal returns from the Steinholt report to discuss those issues, and so there was no need for me to do my own event study to raise the issues that I do.").

[4]    The Stulz Report includes one reference to the *Cammer* factors in ¶41.  However, he does not dispute the evidence I provide, or my analysis of the evidence.  There are no other mention of the *Cammer* or *Krogman* factors in his Report.

Rather, he purports to assess "the implications of Mr. Steinholt's market efficiency conclusions." However, there are two main problems with his analysis. First, nowhere in his discussion does Dr. Stulz ever acknowledge that my analysis relates to reliance and market efficiency in a fraud-on-the-market context.[5] Absent an understanding of what my market efficiency conclusions actually are,[6] Dr. Stulz is in no position to testify as to "the implications of Mr. Steinholt's market efficiency conclusions."[7]

4.    Second, even using the academic definition advocated by Dr. Stulz[8] of a semi-strong efficient market, as defined by Nobel laureate Eugene Fama ("Fama"), this definition does not relate to all publicly accessible information, just "information that is obviously publicly available (e.g., announcements of annual earnings, stock splits, etc,) is considered."[9] A commonly used textbook, also cited by Dr. Stulz, explains: "The semistrong form of the hypothesis states that

---

[5]    Steinholt Report, ¶¶12-18. For example, as the U.S. Supreme Court explained in its 2014 opinion in *Halliburton Co. v. Erica P. John Fund*, ("*Halliburton II*"), quoting its earlier opinion in *Basic v. Levinson*, market efficiency at class certification does not require "'what economists and social scientists have debated through the use of sophisticated statistical analysis and the application of economic theory, [the issue of] conclusively [adopting] any particular theory of how quickly and completely publicly available information is reflected in market price. … [*Basic*] instead based the presumption on the fairly modest premise that 'market professionals generally consider most **publicly announced material statements** about companies, thereby affecting stock market prices.'" *Id.*, ¶16 (emphasis added).

[6]    Stulz Report, ¶7. For the record, my actual market efficiency conclusion is that the market for Vanda's common stock meets the *Cammer* and *Krogman* factors, and the implication of this conclusion is that "it was reasonable for investors to rely on the integrity of the market price of Vanda common stock during the Class Period as reflecting the publicly available information." Steinholt Report, ¶63.

[7]    Stulz Report, ¶7.

[8]    Stulz Deposition, Tr. 44:15-17, 22-24. ("My understanding of market efficiency is one that one can find in the study by Professor Fama. … My understanding is that, in litigations, a relevant concept of efficiency is a semi-strong form of efficiency.").

[9]    Eugene Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 383 (1970). Also cited in the Stulz Report, fn 149.

prices reflect all published information."[10]  Yet, the key information analyzed by Dr. Stulz, a Qui Tam whistleblower complaint ("Whistleblower Complaint"), was not "obviously publicly available," nor "published," although it may have been publicly accessible.  Therefore, his main argument that, in a market that is semi-strong efficient, the Whistleblower Complaint would be reflected in the stock price simply by being unsealed, is not true.[11]

5.    Regardless, Dr. Stulz also opines that the February 11, 2019, Aurelius Value Report ("Aurelius Report") "merely summarized and repeated claims . . . that were made in various public fora and media months before February 11, 2019," principally referring to (a) certain postings on online forums of unverified information by anonymous sources, and (b) the allegations in  the Whistleblower Complaint unsealed one week earlier.[12]  Importantly, Dr. Stulz provides no relevant economic analysis to show that the information in the Whistleblower Complaint (or the anonymous Cafepharma and Glassdoor posts) was reflected in Vanda's stock price prior to February 11, 2019. He simply argues that my market efficiency conclusion, or semi-strong market efficiency, implies that the information in the Whistleblower Complaint would be reflected in Vanda's stock price shortly after it was unsealed, which reflects both a misunderstanding of my market efficiency opinion and Fama's definition of semi-strong efficiency.

6.    Finally, Dr. Stulz opines that I do not "offer a reliable methodology for calculating damages on a class-wide basis."[13]  To be clear, the event study framework I propose here is the

---

[10]  R. Brealey, S. Myers, & F. Allen, Principles of Corporate Finance 330 (10th ed. 2011).  Also cited in the Stulz Report, fn 149.

[11]  Anonymous posts of unverified information on online forums, such as Cafepharma and Glassdoor, do not represent "obviously publicly available information," or "published" information, either.

[12]  Stulz Report, ¶18.a.

[13]  Stulz Report, ¶18.c.

same methodology used by experts for either defendants or plaintiffs in virtually every 10(b) securities class action litigation. Calls for more specifics regarding how to fully account for what "could and should" have been disclosed are premature as discovery has not been completed yet and I do not know what Plaintiff will be able to prove at trial. That said, over the past 20 years as a testifying damages expert, no court has ever found my damages analysis using the event study framework to be unreliable, unscientific or not sufficiently tailored to plaintiff's specific theory of liability.[14]

7.      Nothing in the Stulz Report changes my opinions set forth in the Steinholt Report. Below, I will discuss Dr. Stulz's opinions in greater detail.

### III.    IMPLICATIONS OF AN EFFICIENT MARKET

8.      According to Dr. Stulz, he was asked to "assess the implications of Mr. Steinholt's market efficiency conclusions for determining whether certain alleged misrepresentations and corrective disclosures impacted the stock price of Vanda during the Putative Class Period."[15] His Report, however, does not provide any "implications" regarding the alleged misrepresentations.[16]

---

[14]  I do not respond to Dr. Stulz's arguments concerning the need for individual inquiries (Stulz Report, ¶¶40-42) because it is my understanding this is a legal issue. Nonetheless, I note that the fraud-on-the-market theory does not assume that every Class member has the same knowledge. Instead, it is based on a proper understanding of how efficient markets work, and recognizes that each Class member bought and sold their respective securities at market prices, and that their economic harm, therefore, is reflected in any distortion of these market prices caused by the alleged fraud that can be proven. As *Basic* explains: "An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price" and  "Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements[.]"  485 U.S. at 241-42, 247.

[15]  Stulz Report, ¶7.

[16]  Stulz Deposition, Tr. 57:6-8.  ("Q. I'm simply trying to confirm. Your report doesn't make a front-end price impact argument for any of the misrepresentations alleged in the complaint; isn't that right? A. If by front-end argument you mean me assessing abnormal returns on dates of alleged misrepresentations, I do not do so in my report.").

- 4 -

Nor does his report provide any "implications" regarding the February 5, 2019, corrective disclosure.[17]  Instead, Dr. Stulz's opinions relating to market efficiency focuses solely on the alleged corrective disclosure on February 11, 2019.  Dr. Stulz states:

> Plaintiff's claim that the alleged corrective information on February 11, 2019, caused Vanda's stock price to decline is inconsistent with Mr. Steinholt's finding of market efficiency.[18]

9.       It is noteworthy that Dr. Stulz does not support his opinion with any economic analyses demonstrating either that: (a) the alleged truth was reflected in the stock price prior to the alleged corrective disclosure; or that (b) the corrective disclosure did not impact the stock price. Instead, Dr. Stulz makes the argument that "Steinholt's market efficiency conclusions," or "Steinholt's findings of market efficiency," or semi-strong market efficiency, implies that the information in the Whistleblower Complaint would have been reflected shortly after being unsealed on February 4, 2019, and, therefore, could not have caused Vanda's stock price decline on February 11, 2019.  The problem with Dr. Stulz's argument is that he misunderstands both my market efficiency opinion and Fama's definition of semi-strong efficiency.  My analysis does not address how long it would take for investors to uncover the information in the Whistleblower Complaint unsealed on February 4, 2019, because this type of inquiry is not part of the *Cammer* or *Krogman* analyses.[19]  Similarly, semi-strong efficiency does not address this issue either.  Semi-strong efficiency relates to information that is "obviously publicly available," not the time it takes

---

[17]  Stulz Deposition, Tr. 5-8.  ("Q. So there's no explicit opinion of no price impact for the February 5th announcement, correct? A. That's correct.").

[18]  Stulz Report, ¶18.a.

[19]  Specifically, *Cammer* factor five focuses on "corporate events or financial releases."  Steinholt Report, ¶37.

for unknown information that may be publicly accessible to be uncovered and disclosed to the market, and then reflected in the stock price.

### A.    Market efficiency in a fraud-on-the-market context

10.    In the Steinholt Report, I explained the general concept of market efficiency, and then quoted U.S. Supreme Court legal opinions that explained the relevance of market efficiency in a fraud-on-the-market or reliance context.  More specifically, I first quoted the U.S. Supreme Court opinion in *Amgen*.[20]  It stated:

> The fraud-on-the-market theory rests on the premise that certain well developed markets are efficient processors of public information.  In such markets, the "market price of shares" will "reflec[t] all publicly available information."  Few investors in such markets, if any, can consistently achieve above-market returns by trading based on publicly available information alone, for if such above-market returns were readily attainable, it would mean that market prices were not efficiently incorporating the full supply of public information. *See* R. Brealey, S. Myers, & F. Allen, Principles of Corporate Finance 330 (10th ed. 2011) ("[I]n an efficient market, there is no way for **most investors** to achieve consistently superior rates of return.").

> In *Basic*, we held that if a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities.  This presumption springs from the very concept of market efficiency. If a market is **generally efficient** in incorporating publicly available information into a security's market price, it is reasonable to presume that a particular public, material misrepresentation will be reflected in the security's price.  Furthermore, it is reasonable to presume that **most investors** – knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information – will rely on the security's market price as an unbiased assessment of the security's value in light of all public information.[21]

---

[20]    Steinholt Report, ¶15.

[21]    *Amgen Inc., et al. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 461-62 (2013) (citations omitted) (alteration in original)(emphasis added).

11.    Furthermore, to make sure that it was understood that market efficiency in a fraud-on-the-market context is different than the strict academic definition provided by Fama (that Dr. Stulz relies on), I cited the U.S. Supreme Court opinion in *Halliburton II*.[22] It stated:

> [T]he *Basic* Court acknowledged [debate amongst academics] and declined to enter the fray, declaring that "**[w]e need not determine** by adjudication what economists and social scientists have debated through the use of sophisticated statistical analysis and the application of economic theory." To recognize the presumption of reliance, the Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." The Court instead based the presumption on the **fairly modest premise** that "**market professionals generally** consider **most publicly announced material statements** about companies, thereby affecting stock market prices." . . .
>
> The academic debates discussed by Halliburton have not refuted the modest premise underlying the presumption of reliance. Even the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices.[23]

12.    Also, in the Steinholt Report I explained my understanding that, from a legal point of view, market efficiency in a fraud-on-the-market context should be evaluated using the *Cammer* and *Krogman* factors.[24] These factors are sufficient to determine whether it is reasonable for investors to rely on the integrity of the stock price and do not address the time it takes for unknown information that may be publicly accessible to be uncovered and disclosed to the market, and then reflected in the stock price. As noted above, Dr. Stulz ignores the *Cammer* and *Krogman* factors and their implications.

13.    At his deposition, Dr. Stulz provided the following definition of market efficiency, which he apparently believes is the relevant definition for class certification.

---

[22]    Steinholt Report, ¶16.

[23]    *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 271-72 (2014) (citations omitted) (some alteration in original)(emphasis added).

[24]    Steinholt Report, ¶18.

My understanding of market efficiency is one that one can find in the study by Professor Fama. It is the proposition that prices of securities reflects the information that is available about those securities so quickly. There usually is a distinction between various types of efficiency. My understanding is that, in litigations, a relevant concept of efficiency is a semi-strong form of efficiency. With that semi-strong form, public information is incorporated in stock prices and the securities of stock within very rapidly and fully if the market is semi-strong form efficient. I believe that Mr. Steinholt also has this definition of efficiency. In this case, he says that the information is incorporated within one day, typically..[25]

14.     First, the academic definition of an efficient market proposed by Fama in 1970 was "an extreme null hypothesis.  And, like any other extreme null hypothesis, we do not expect it to be literary true."[26]  One reason Fama's academic definition is not literally true is that sophisticated investors need to have an economic incentive to analyze information, *i.e.*, there have to be inefficiencies in the market for sophisticated investors to exploit to make them analyze the information and trade on it, thereby eliminating the inefficiencies.  This is called the Grossman-Stiglitz paradox.[27]  The point of market efficiency in a fraud-on-the-market context is that, while

---

[25]   Stulz Deposition, Tr. 44:15-25; 45:1-7.  It should be noted that Dr. Stulz's statement that, "[i]n this case, [Steinholt] says that the information is incorporated within one day, typically," is misleading because I was referring to information that clearly was publicly available, like the Aurelius Report, consistent with Fama's definition of semi-strong efficiency. Dr. Stulz, on the other hand, seems to believe I was referring to any information that is publicly accessible, regardless of whether investors actually knew of its existence.  To state the obvious, if investors do not know about the information, it will not be reflected in the stock price, let alone reflected in the stock price within one day.

[26]   Fama (1970), 383-417, at 388.  This paper is also cited in the Stulz Report, fn 149.

[27]   Sanford J. Grossman & Nobel laureate Joseph E. Stiglitz, "On the Impossibility of Informationally Efficient Markets," *American Economic Review* 70 (June 1980), pp. 393-408. ("If competitive equilibrium is defined as a situation in which prices are such that all arbitrage profits are eliminated, is it possible that a competitive economy always be in equilibrium?  Clearly not, for then those who arbitrage make no (private) return from their (privately) costly activity.").

no market is perfectly efficient, a market can still be efficient in the sense that it is reasonable for investors to rely on the market price incorporating new and material information.[28]

15.     Second, I agree with Dr. Stulz that, out of the three forms provided for in the Efficient Market Hypothesis, it is the information defined by the semi-strong form that is relevant for the purposes of analyzing market efficiency in a fraud-on-the-market context.[29]  According to Fama, "[s]emi-strong form tests … are assumed to fully reflect all obviously publicly available information," such as "announcements of stock splits, annual reports, new security issues, etc."[30] Similarly, a commonly used textbook cited by Stulz explains: "The semistrong form of the hypothesis states that prices reflect all published information. That means it is impossible to make consistently superior returns just by reading the newspaper, looking at the company's annual accounts, and so on."[31]    Publicly accessible information, such as recently unsealed court

---

[28]     Bradford Cornell & James Rutten, "Market Efficiency, Crashes and Securities Litigation," Vol. 81 *Tulane L. Rev.* (2006) at 456. ("As [Nobel laureate] Robert Merton stresses, the widely documented evidence that professional money managers on average underperform market indexes is strong evidence that readily exploitable profit opportunities do not exist.  Virtually all investors reasonably rely on market prices in such circumstances.  Investors accept the market prices not because they believe they reflect all public information, but because investors recognize that they cannot exploit possible mispricing in light of the risks, information constraints, cognitive limitations, and trading costs they face.").

[29]   R. Brealey, S. Myers, & F. Allen, Principles of Corporate Finance 330 (10th ed. 2011).  ("The efficient-market hypothesis comes in three different flavors. The weak form of the hypothesis states that prices efficiently reflect all the information in the past series of stock prices. In this case it is impossible to earn superior returns simply by looking for patterns in stock prices; in other words, price changes are random. The semistrong form of the hypothesis states that prices reflect all published information. That means it is impossible to make consistently superior returns just by reading the newspaper, looking at the company's annual accounts, and so on. The strong form of the hypothesis states that stock prices effectively impound all available information. It tells us that superior information is hard to find because in pursuing it you are in competition with thousands, perhaps millions, of active, intelligent, and greedy investors." (emphasis added).

[30]   Fama (1970), 388, 415 (emphasis added).

[31]   Brealey, Myers & Allen (2011), 342 (emphasis added).

documents, could also be reflected in securities prices if investors were broadly informed about the existence of the documents, but it is not simply assumed to be reflected in the stock price as a result of the market being semi-strong efficient.

16.     More specifically, a market that is semi-strong efficient is assumed to quickly reflect information such as the Aurelius Report that on February 11, 2019, became part of the Bloomberg news feed for Vanda, but not the Whistleblower Complaint that was unsealed on February 4, 2019, because Dr. Stulz has provided no evidence showing that the market found out about the Whistleblower Complaint before February 11, 2019.

### B.    The posts on Cafepharma and Glassdoor online forums involved unverified information from anonymous sources

17.     The information posted anonymously on Cafepharma and Glassdoor in 2017 and 2018 does not meet the definition of "obviously publicly available" or "published" information either. Additionally, even if investors actually read the posts, there is no reason why they would accept the unverified information contained in the posts as true. Confronted with this reality at his Deposition, Dr. Stulz stated: "… what I'm saying is that a piece of information where investors are not 100 percent sure that it is correct can still have a very big impact on the value of the firm."[32] But in this case, Dr. Stulz used my event studies and concluded that there was no impact from the Cafepharma and Glassdoor posts.[33] This is consistent with the posts not being viewed by potential investors (if they even read them) as a reliable source of information.

18.     In my opinion, posts of unverified information by anonymous sources would generally be viewed by investors as unreliable. Consequently, unless independently verified by a

---

[32]    Stulz Deposition, Tr. 91: 15-18.

[33]    Stulz Report, fns 49, 50, 51, 52, 53, 54 and 56.

credible investigation such as in the Aurelius Report,[34] it is my opinion that these posts would have no impact on the stock price.  This is also consistent with an absence of statistically significant price movements at the time of the postings, as also noted by Dr. Stulz.[35]

### C.    The Whistleblower Complaint was first publicly disclosed on February 11, 2019 (when discussed in Aurelius Report)

19.    Based on my review of the analyst reports and media available to me, the first time the Whistleblower Complaint, and the allegations contained in it, was disclosed to the market was when the Aurelius Report was made available at 10:00am EST on Monday, February 11, 2019.  Nor does Dr. Stulz identify any earlier disclosure of the Whistleblower Complaint.  Also, as Dr. Stulz points out, there were no statistically significant price declines when the Whistleblower Complaint was unsealed on February 4, 2019, or the next day February 5, 2019.  Consequently, based on the above, it is my opinion that the first time the Whistleblower Complaint was disclosed to the market was at 10:00 am EST on February 11, 2019, when the Aurelius Report was made available to the market.

### D.    The February 11, 2019 Aurelius Report contained new and material information, and investors viewed it as such

20.    Dr. Stulz's opinion that the Aurelius Report "merely summarized and repeated" claims that had already been made public is not true.  In addition to disclosing for the first time the allegations in the Whistleblower Complaint, Aurelius also disclosed their own independent investigation corroborating these allegations.

---

[34]  The Aurelius Report describes the Cafepharma posts as "unverified" and focuses almost exclusively on the "recently unsealed" Whistleblower Complaint that was "undisclosed and previously unreported" and contained "new allegations [that] amplify the findings from our own months-long investigation[.]"   http://www.mavalue.org/research/vanda-in-the-land-of-the-blind-the-one-eyed-man-is-king/

[35]  Stulz Report, ¶¶25-26.

- 11 -

21.     Furthermore, whether the Aurelius Report contained new and material information that caused Vanda's stock price to decline is a testable proposition, and the graph below clearly shows price impact at the time of the Aurelius Report was made available.



**Vanda Monday February 11, 2019, Intra-Day Trading Prices**

22.     As can be seen in the graph above, investors clearly did view the information in the Aurelius Report as new and material information, and immediately started to trade on the information causing the decline in Vanda's stock price.  This is consistent with my event study showing that the decline in Vanda's stock price on February 11 was statistically significant.[36]

23.     Finally, Dr. Stulz argues that in an efficient market "it would be expected that there would be some discussion of the lawsuit, … if such information was considered 'new and

---

[36]   Steinholt Report, ¶¶46-47.

material'" but that there was a "lack of analyst attention" to the Whistleblower Complaint.[37] Contrary to Dr. Stulz's representation, the Complaint itself cites an analyst report from Stifel Nicolaus dated February 14, 2019 that stated: "Vanda's 'shares [were] down -26% since 2/5 vs. S&P 500 which is up +1%,' a result that 'has largely been driven by the news of the partial clinical hold (PCH) on tradipitant and the unsealed whistleblower lawsuit[.]"[38]  Furthermore, an analyst from Citigroup also asked Vanda for more information about the Whistleblower Complaint during the February 13, 2019 earnings conference call.[39]  According to Dr. Stulz's rationale above, this is evidence that the allegations in the Whistleblower Complaint were new and material. Also, Vanda began discussing the Whistleblower Complaint in its SEC filings beginning on February 19, 2019,[40] a practice it continues to this day.[41]

## IV.    THE EVENT STUDY DAMAGES FRAMEWORK CAN BE USED TO CALCULATE CLASS-WIDE DAMAGES

24.    As discussed in the Steinholt Report, in this case, I propose to calculate damages based on the artificial inflation in Vanda's stock price that relates to Plaintiff's allegations.[42] Furthermore, to quantify the artificial inflation, I propose using "an event study, sometimes also refined using fundamental valuation tools."[43]  Again, the event study framework I propose here is the same methodology used by experts for either defendants or plaintiffs in virtually every 10(b)

---

[37]  Stulz Report, ¶33.

[38]  Complaint, ¶230.

[39]  Vanda Pharmaceuticals Inc. Earnings Call, Q4 2018, dated February 13, 2019.

[40]  Vanda 2018 Form 10-K, filed with the SEC on February 19, 2019, at page 51.

[41]  Vanda 2Q2021 Form 10-Q, filed with the SEC on July 29, 2021, at page 19.

[42]  Steinholt Report, ¶57.

[43]  Steinholt Report, ¶58.

securities class action litigation.  Prior to the U.S. Supreme Court decision in *Comcast*, an antitrust case, using this event-study framework was generally not controversial.  This is reflected in a pre-*Comcast* article discussing how to quantify Section 10(b) damages.  It states:

> Forensic experts agree generally on the techniques to be used to show inflation and dissipation in stock prices. The gold standard, which is accepted by both courts and economists, is the event study. Other tools such as valuation analyses often aid the event study.[44]

25.    It should be noted that antitrust cases, such as *Comcast*, are generally very different than securities cases.  First, the product at issue in antitrust cases are generally not bought and sold in an actively traded market, so the event study methodology is not available to quantify damages.  Second, the product at issue in antitrust cases generally do not have a stand-alone fundamental value, so the valuation tools used by securities analysts and investors to assess value are also unavailable.  In other words, antitrust cases do not have a set methodology or framework to quantify damages.  However, the methodology or framework, regarding how to quantify damages in securities cases is virtually the same in every case, the very event study framework that I propose to use in this case.

26.    Dr. Stulz, on the other hand, opines that I do not "offer a reliable methodology for calculating damages on a class-wide basis."[45]  However, he does not opine that the event study methodology that I propose to use cannot quantify the impact of new and material Company-specific news on a particular day.  In fact, as I note above, Dr. Stulz himself relied on my event studies to quantify the impact (or lack thereof) of the Cafepharma and Glassdoor posts.[46]

---

[44]   *See* Marge Thorsen, Richard Kaplan & Scott Hakala, *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 109 (2006)

[45]   Stulz Report, ¶18.c.

[46]   Stulz Report, fns 50, 51, 52, 53, 54, 56.

27.     Nor does Dr. Stulz opine that fundamental value tools "based on the premise that the present value of an investment is a reflection of its future cash flows, including the riskiness of these cash flows," cannot be used to determine the value of a specific piece of information.  In fact, at his Deposition, Dr. Stulz stated:

Q. What makes information value relevant?

A. Information that changes expectations about future cash flows or changes.  … The discount rate applied to future cash flows future expected cash flows is value relevant. I think I agree with Mr. Steinholt on that.[47]

28.     In other words, Dr. Stulz's criticism does not relate to my proposed methodology, which in the case of: (a) the event study, can be applied to any fraud-related price movement during the Class Period consistent with Plaintiff's theory of liability; and, if needed, in the case of (b) the fundamental value approach, it can be applied to determine the value of other specific information, including confounding information, to further refine the estimate of the artificial inflation caused by the alleged fraud.  Dr. Stulz's issue, then, appears to be that I have not performed the analysis yet, so there is no guarantee that it will be a reliable estimate of damages at trial.  But that is a different issue than what I was asked to address.

29.     The availability of a valid methodology to quantify damages does not mean that the ultimate damages analysis will be reliable.  In fact, it is fairly certain that there will be an opposing expert arguing that the damages analysis is not reliable, as there is in virtually all cases.  The reliability of the ultimate damages analysis will depend on the ability of the damages expert to properly conduct the analysis.  Over the past 20 years as a testifying damages expert, no court has ever found my damages analysis using the event study framework to be unreliable, unscientific or not sufficiently tailored to plaintiff's specific theory of liability.

---

[47]   Stulz Deposition, Tr. 88:23-89:7.

Executed this 29th day of October, 2021, in San Diego, California.

Respectfully submitted,

Bjorn I. Steinholt, CFA