UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
GORDON,                        : 19-cv-01108(FB)(LB)
                               :
             Plaintiff,        :
                               :
    - versus -                 : U.S. Courthouse
                               : Brooklyn, New York
VANDA PHARMACEUTICALS,         :
INC., ET AL.,                  :
                               : January 13, 2022
             Defendants        : 2:30 p.m.
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
BEFORE THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**
**(VIA VIDEO/AUDIO)**

**For the Plaintiff**:          **Michael G. Capeci, Esq.**
                                **David A. Rosenfeld, Esq.**
                                Robbins Geller Rudman & Dowd
                                58 South Service Rd., Ste 200
                                Melville, NY 11747


**For the Defendant**:          **Audra J. Soloway, Esq.**
                                Paul, Weiss, Rifkind, Wharton
                                 & Garrison, LLP
                                1285 Avenue of the Americas
                                New York, NY 10019


**Transcription Service**:      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

THE CLERK:  Criminal Cause for Telephone Status Conference, Docket Number 19-cv-1108, *Gordon v. Vanda Pharmaceuticals, Inc., et al.*

Will the parties please state their names for the record?

THE COURT:  For plaintiff?

MR. CAPECI:  On behalf of plaintiff Teamsters Local 727 Pension Fund, Michael Capeci and David Rosenfeld; Robbins Geller Rudman & Dowd, LLP.

MS. SOLOWAY:  And good afternoon, your Honor. For defendant, this is Audra Soloway from Paul Weiss.

THE CLERK:  The Honorable Lois Bloom presiding.

THE COURT:  Good afternoon, Mr. Capeci, Mr. Rosenfeld, Ms. Soloway.  As I said before we got on the line, Happy New Year.  I hope everybody is well.

This is a telephone conference in plaintiff's putative class action alleging violations of the Securities Exchange Act of 1934.  As alleged in the amended complaint, plaintiff claims defendants made misleading statements about the pharmaceuticals Fanapt, Hetlioz, and Tradipitant.

I last spoke with the parties on July 13, 2021 and at that time I ordered the parties to substantially complete fact discovery by January 28, 2022, and to complete all fact discovery by May 20, 2022.

Transcriptions Plus II, Inc.

3

Proceedings

I further ordered the parties to file a status letter addressing any remaining deadlines, and the parties filed the status letter on July 27 and I adopted their proposed remaining deadlines.

On August 24, 2021, Judge Block adopted the parties' agreed-upon briefing schedule for class certification and ordered that the fully briefed motions be filed by December 29, 2021. That deadline was extended until January 7, 2022. I didn't see that motion, Mr. Capeci and Mr. Rosenfeld. Am I missing it?

MR. CAPECI: No you're not, your Honor. We, meaning the plaintiff, made a motion to exclude the defendant's class certification expert. And so we appeared before Judge Block. I forget the exact date. It was just before Thanksgiving though. And what we agreed there was that because that briefing schedule ended on January 28, 2022, that we would file on the docket simultaneously the class cert brief and the Daubert brief. So the class cert --

THE COURT: Okay. So --

MR. CAPECI: We are fully briefed. We're just not filing it until the Daubert brief is fully briefed.

THE COURT: I follow. I do see the minute order that was entered on November 29th by Judge Block that the fully briefed class cert and Daubert motion to

4

Proceedings

exclude the report and opinion of the defendant's rebuttal expert. So I do see it, just it never revised the schedule that I had ticklers on. So thank you for clarifying.

On December 20th, defendants requested a protective order regarding several topics listed in plaintiff's 30(b)(6) deposition notice. That's at ECF number 78. I ordered plaintiffs to respond to that motion by January 4, 2022 and I scheduled today's conference. Plaintiff's filed their response on January 4th, and so here we are.

So I need a little more information. I have read both sides' letters and the cases that were cited, but I really don't know besides what you told me in the letters, which is somewhat selective, what has been done and what hasn't been done.

In Ms. Soloway's letter, she says that there have been 72 individual document requests, searches of various employees, that there's been 170,000 documents exchanged, or at least defendants were reviewing those. And I just have no idea how many depositions have been taken, how many are noticed. I do understand the importance of getting information to plaintiffs regarding these off label claims, but I also know that the requests that are being made on paper seem extraordinarily broad

Proceedings

5

as written.

And as you know from litigating these kinds of cases, you cannot expect a 30(b)(6) witness to have committed to memory the identities, positions, titles of all of these employees. And so the defendant's request is that there be a protective order. And of course I would rather there be some agreement reached between the parties so that we could move forward here. Vanda supposedly agreed to provide responsive information in document and interrogatory format. I don't know why that wouldn't be a good substitute under these circumstances. So I'm interested in hearing what has been done, Mr. Capeci, Mr. Rosenfeld, and Ms. Soloway.

I'm also interested in talking about the precise allegedly over broad topics which are 3 to 6 in Schedule A of the deposition notice topics. 4 and 6 request a description of all regularly scheduled meetings regarding the marketing and promotion of Fanapt and Hetlioz since January 2015.

Topics 3 and 5 request the identity of all persons involved in the marketing and promotion of Fanapt and Hetlioz. And defendants say not only are these requests over broad, burdensome, duplicative, somewhat impossible to provide, they also say that they have provided the list of custodians of the records.

6

Proceedings

And plaintiff, from my reading, and again I have called today's conference so you could put some more flesh on the bone here, plaintiff's position is that topics 4 and 6 are appropriate because if meetings were "regularly scheduled", it should not be difficult to find records about them.  Plaintiff also states that topics 3 and 5 are appropriate because it need not take counsel's word about the identity of the individuals involved in marketing of the drugs which again leads me back to I don't know what has already happened and what you have because it seems to me that there were many people identified by plaintiff in the initial disclosures which is 80-1 at Pages 5 to 10.

There have been 298 organizational charts produced.  Plaintiff provisionally agreed to 32 custodians for the off label claim.  And topics 4 and 6, according to plaintiffs, are to better ascertain how Fanapt and Hetlioz were marketed by Vanda.  But it seems like there's been a lot of documents produced and if there have already been depositions, I would like to hear why this is the best way to get the information that plaintiff is requesting.

So I'll start with you.  If you could address in whatever order you think is the best order, Mr. Capeci, the Court's concern.

Transcriptions Plus II, Inc.

7

Proceedings

MR. CAPECI:  Sure.  And thank you, your Honor.

In our view, there have not been very many documents produced so far in this case.  Right now we have 437 documents from the defendant that have been produced by the two defendants.  299 actually are org charts.  There was an error in our letter.  So when you --

THE COURT:  I'm sorry, walk me back.  437 documents have been produced.

MR. CAPECI:  Yes.  299 of those are organization charts.  So ten of them are insurance policies.  So that gets us down to 128 documents.  Five documents from the FDA administrative record that pertains to the Tradipitant part of the case.  32 documents were produced to us in response to our provisional agreement on topics 7 to 9 in the 30(b)(6) notice.  90 documents were produced to us in response to topic 10.

And you know, a review of those documents has revealed some problematic things with what has been represented to us already.  And I'll start with the 90 documents for topic 10 because that more directly pertains to Fanapt and Hetlioz.  But I would like to talk about topic 7 to 9 as well.

No depositions have been taken in the case,

Transcriptions Plus II, Inc.

8

Proceedings

your Honor, because of the fact that we have still not received very many of the documents from the defendant. The depositions that have taken place have all pertained to class certification. So we deposed their class certification expert, they deposed a representative of our client, of our client's investment manager, and our class certification expert. So those are the depositions that have taken place so far. But none of those depositions have pertained to fact discovery.

One of the documents that they provided us of the 90 is a Hetlioz launch training that was held at the Fairmont Hotel on October 4th and 5th 2017. And if you look, your Honor, at what we proposed to the defendants in 78-2, ECF 78-2, we had included Mallery Mayo and we had included James Pomponio. Number 44 is Ms. Mayo, and number 61 is Mr. Pomponio.

And then if you look at ECF 78-4, you'll see that the defendants best and final offer on custodians didn't include those individuals purportedly because they were either uninvolved or quote had duplicative information which is a very hard concept for us to wrap our heads around.

But notwithstanding that, at this launch training there were about ten people who provided presentations, Ms. Mayo being one of them. She kicked

9

Proceedings

off the presentation in a one and a half hour presentation to all the regional business leaders and sales representatives on marketing Hetlioz.  And Mr. Pomponio closed the day with a one-hour presentation on the Hetlioz business model, intake to dispense process.

So you know, already just in the limited documents we have we're finding people who undoubtedly are relevant, undoubtedly should be custodians.

And in fact, there was a third individual, Mr. Rodger Sykes.  Mr. Rodger Sykes does not appear on ECF 78-2 in our proposal because he's an account manager.  We went to great pains, your Honor, to try to include people above the sales representative level or the account manager level, and those are the 80 people that appear in ECF 2.  But we did reserve rights in ECF 2 for sales representatives in number 81 on ECF 78-2 in case there were particular representatives that had involvement. And this gentleman, Mr. Rodger Sykes, who we've never heard of before, defendants have never said anything to us about him --

THE COURT:  Mr. Capeci, I'm sorry, you're going really fast.  I'm trying to keep up with you.  Rodger Sykes, S-I, or S-Y?  How do you spell this man's last name?

MR. CAPECI:  Sure.  For the record, it's

Transcriptions Plus II, Inc.

10

Proceedings

S-Y-K-E-S.

THE COURT:  Thank you.

MR. CAPECI:  And he's an account manager from Chicago, according to the organization charts.  But he was involved in three sessions at this very important Hetlioz training, Hetlioz key selling points, Hetlioz roleplay and roleplay workshop.  He was leading the sales representatives for more than half the day.

THE COURT:  So before we go further into the weeds here for a moment, I am not opposed to you getting the people that you think you need to depose.  That is not my purpose as a magistrate judge overseeing discovery.  I am here to make sure that you have access.  I know that it is important under Rule 30(b)(6) for the Court to ensure that both sides adhere to the objective affair access to corporate information, and at the same time to guard against overreaching.

So I get it.  But you're telling me about Mayo, Pomponio, and Sykes, but really what we're here fighting about is a 30(b)(6).  And I do understand that it would be better for you to get one witness who could tell you everything that you need to know about how everything was done.  But when you haven't even taken one other deposition except for the class cert depositions, how is it that we're now in this funny position where you do

11

Proceedings

know some people's names but I imagine you'd want to depose Ms. Mayo and Mr. Pomponio, maybe even Mr. Sykes. And I understand that generally you only get ten depositions but with Court approval you can get more than that.  Why are we doing this at this end of the case before we've even really gotten started on the collection of the information that you need?

MS. SOLOWAY:  Your Honor, this is --

MR. CAPECI:  Well, your Honor --

MS. SOLOWAY:  -- Audra Soloway.  If I --

MR. CAPECI:  Your Honor --

THE COURT:  Well, I'll let you, Ms. Soloway, but the question was to Mr. Capeci, so I'll let --

MS. SOLOWAY:  I apologize, your Honor.

THE COURT:  -- him answer the question.  Go ahead.

MS. SOLOWAY:  I'll hold my fire, your Honor.

THE COURT:  Thank you.  Thank you.

MR. CAPECI:  Thank you, your Honor.  We somewhat addressed that in Footnote 3 to our letter.  We have informed the defendants many, many months ago that we believe that 50 depositions are appropriate for this case.  They have not responded to that other than to say that's too much.  We have a deadline in the scheduling order of January 28th which is just 15 days.  We've never

12

Proceedings

heard from them again.  We've raised the issue repeatedly.  So our view was if we're going to be limited on the number of depositions here, that's why we're doing this now.  We're doing this now --

THE COURT:  Wait, wait, wait, wait.  There's a huge delta between agree to 50 depositions or give me somebody for a 30(b)(6) that will be able to recite from their head all of this information, seven years of meetings.  That's a very strange position to take since they wouldn't agree to 50 depositions, we're now in this position.

Look, I'm a reasonable human being.  I understand we're also working within COVID protocols.  I want you to present to me what is necessary and not be looking at this that it's an all or nothing proposition. I do understand we have a looming deadline.  But I'm quite surprised that there haven't been any depositions and there have only been class certification depositions. That's a big surprise to me.

MS. SOLOWAY:  Your Honor, if I may address that?  As Mr. Capeci describes, there have been some small but rolling productions of information that the plaintiff asked us to prioritize and produce earlier. The reason there haven't been significant productions so far is because the deadline is coming up on us, your

13

Proceedings

Honor, the January 28th deadline which is for substantial completion of document production by that date is the date by which we intend to produce the responsive material for the very significant number of emails that we've collected through which we've run search terms and have been very busy reviewing.

So you'll note in our letter, your Honor, we mention that we've already begun the process of reviewing something like hundred 70,000 documents. Those are documents that after at least coming to some preliminary agreement with plaintiff on these 40 plus custodians, 32 of which are relevant to the off label marketing claim, we then got to work going through their emails and identifying responsive materials which will be in that production that's coming by the end of January.

THE COURT: But quite frankly, Ms. Soloway, 170,000 documents is not so big for a case like this. I've overseen other big pharma cases, and 170,000 emails and documents when -- I mean have you already eliminated duplication, et cetera? And I am concerned. We're 15 days before that deadline and I do understand that there was a lot of back and forth and negotiation about terms and about who the relevant custodians would be. But that doesn't mean that you get the hold them hostage on all the other discovery that they need to plan for.

14

Proceedings

MS. SOLOWAY:  And your Honor, we don't intend to.  I mean we've actually -- since we sent the letter, we've added a number of documents into the review queue to keep things moving and to move forward.  And we've also provided the plaintiff -- and again, I don't want to front issues, your Honor, that we haven't completed the meet and confer process on because that wouldn't be appropriate.  But we have provided the plaintiffs with additional hit reports and we're meeting and conferring tomorrow so that they had more information about which of search terms they proposed have turned out to be over broad and they could tailor their requests accordingly.

So that process is very much still ongoing and I hope we'll be able to resolve it without your Honor's intervention.  But in any event, a very significant production will be coming out by January 28th and we're still working with plaintiffs to determine what else needs to be reviewed.  So I guess --

THE COURT:  Okay.  So let's move over for a moment then.  Thank you, Ms. Soloway.  I appreciate that you will continue to meet and confer and try to eliminate issues that need to be brought to the Court.

I'm interested in hearing your position on the depositions that need to be scheduled because if they say that they tried to get you to agree to 50 and you

15

Proceedings

wouldn't agree to 50 and they haven't heard from you again, I do understand. I don't know if it's frustration or just their reluctance to take your word for it, but Mr. Capeci's letter was not completely off the mark. He's trying to do his best to figure out how Fanapt and Hetlioz were marketed during the class period.

And I do understand what defendant's problem is with the term regularly scheduled meetings. I get that. But I also know that they are concerned to get the pertinent individuals for the off label claim and that they're now sort of stabbing in the dark because they haven't gotten the documents. You're still reviewing them. You haven't agreed to more than ten depositions even if you don't want to agree to 50, which is why we're in this situation with the 30(b)(6) notice.

MS. SOLOWAY: Right. So your Honor, I actually, I understood the parties' agreement not to say we're taking a position today on the number of witnesses but rather that it made more sense to have a conversation about what witnesses should be deposed and sort of incidentally how many of them there were after the relevant documents had been produced and plaintiffs had actually had an opportunity to review them and think more thoughtfully about who they, based on the documents, wanted to take depositions of.

16

Proceedings

So I think the reason we have not had that conversation is only because the plaintiffs are I think appropriately waiting for the email production that's forthcoming at which point we are totally prepared to have that conversation about who they would like to depose.

I think all we said at the time we negotiated the case management order, your Honor, was that we didn't want to agree to 50 in a vacuum for the position that it had to be ten, for example, your Honor, and that we should talk about it when we were all more informed by the documents that have been produced.

So we again stand ready to meet and confer to talk about deponents. But on the current record where we're hustling to get these emails out the door, I could understand why plaintiffs wouldn't want to commit, and defendants are in the same position. We're just not there yet to have an informed conversation.

THE COURT: Mr. Capeci?

MR. CAPECI: I mean our understanding of the protective -- I'm sorry, of the operative scheduling order was that that was a deadline by which we would have come to an agreement. As your Honor noted, it's nearly impossible. Essentially they're asking us to negotiate against ourselves. And that was our concerned with the

17

Proceedings

custodian list is that we're being told that people weren't involved and no, don't worry about that person, and that's why I started my presentation off with three people, two of whom were on our radar, one was not, that clearly was involved and --

THE COURT: But what if we were to wait, Mr. Capeci, for the two more weeks because that's what we're talking about, two weeks from tomorrow that they have to produce.

I understand you can't look at everything they give you in one fell swoop and know everything. But hearing the tenor of this conversation, and you understand I'm not trying to cut you off at the knees, but I also understand that if they're focusing on their obligation to produce and go through the documents, that maybe it's just better to wait until you've gotten the documents for us to decide whether or not these 30(b)(6) topics are over broad or whether or not you've made the case that they somehow, I won't say denied, but not given you the information you needed when you asked for the documents from custodians for somebody like Rodger Sykes because he was listed as an account manager and it wasn't until later that you saw that he held three sessions at the Hetlioz launch training.

MR. CAPECI: Our view, your Honor, was that we

Transcriptions Plus II, Inc.

18

Proceedings

were trying to prioritize efficiency.  I think that part of the problem here too, and I was going to get to this in my initial presentation, is even topics 7 through 9 where we made a provisional agreement with the defendants to give us documents sufficient to show the individuals involved with the Tradipitant side of the case, they produced 32 documents to us.  It only listed four people.

One of those people was an executive assistant of the CEO who we proposed, and her name is Adrienne Belken, and that is B-E-L-K-E-N for the record.  And you'll see Ms. Belken's name appear in ECF 78-1 and 78-2. And she was one of the people who again we were told wasn't going to have any responsive communication.

There was only four people total.  We note from the administrative record, however, that there were 12 individuals at Vanda who directly communicated with the FDA.  So that 32 document production should have at least had 12 individuals in it and it didn't.

And one of the individuals and there was the general counsel of the company and the defendant --

MS. SOLOWAY:  Your Honor, none of this has been raised with us at all before today.

MR. CAPECI:  Counsel, the reason for that --

MS. SOLOWAY:  So you know, it --

MR. CAPECI:  The reason for that, counsel, the

19

Proceedings

reason for that, counsel --

MS. SOLOWAY: -- quite frankly, you know, I --

MR. CAPECI: -- is because the documents were introduced until after the letters were filed. That's why you're hearing about this. But I'm sure you understand what was in your own production.

And Mr. Williams, who's the general counsel is included on these communications. And we are being told that people in the legal department shouldn't be custodians even though we all know that not every document that a lawyer comes across necessarily has a privilege associated with it.

So just in, your Honor, just in the 122 documents of substance that we received from the defendant so far in the case, a whole host of very troubling issues have arisen vis-à-vis the representations that have been made to us.

And so again, our view is simply that there is an efficiency to be had to do this deposition now. I hear, your Honor, however that if two more weeks time is something that would give the Court some comfort, we're happy to do that. But I mean for us to review 170,000 emails, we're not to be prepared to have that answer.

THE COURT: No, but Mr. Capeci, quite frankly, Ms. Soloway does point out that these new issues about

20

Proceedings

Adrienne Belken and about the 32 documents which should have included other names but didn't, were not raised to her. And I'm not telling you that you have to tip your whole hand here.

This is document review and this is discovery. But if I was to rule today, I don't know that it would turn out the way that you would hope. And I do hear you about efficiency. But I don't know that having regularly scheduled meetings as your term, and what can they possibly do, produce somebody who's going to read from a list? I don't know how that helps.

And again, you're saying oh, it should be easy because if it's regularly scheduled, they'll just basically push a button and they'll have all -- you know, it was every Wednesday at 1 o'clock. Well, I don't know that's what regularly scheduled means and I'm not sure that that's going to be a productive way to proceed here. I hear what you're saying and I would like to come up with an efficient way because I do think that you are going to be hit like a tsunami with documents. I would like to figure something out but I also do hear that certain of these topics were things that were discovered and not discussed with defense counsel before you came on the line today.

I also know that I have good counsel on both

21

Proceedings

sides, so I trust that you're hearing the tenor of this conversation that I'm not jumping onto either bandwagon here.  I think that both of you have a lot of work to do.  And you know, again, bandwagon was just picked at random.  I understand that you have this bandying in your letters, but I wasn't going for that.

So I'm interested in being pragmatic in coming up with solutions in what is a complex matter.  I don't want it to be that I'm just ruling as these other southern and eastern district cases do about a deposition is not a quiz, nor is it the most practical way to obtain information.  I don't want that to be the way this goes.

I understand that there really is something going on here.  Mr. Capeci, I hear you.  I also understand that they're doing a document production that they're focused on.  They may be focused on it more after today's conversation.  But I don't want to decide this and set you off on another course that is not going to be productive and efficient because I'm not sure that you would get the results that you want from me, Mr. Capeci.  You've already heard that I don't think regularly scheduled meetings is very helpful here.  And when in topics 3 and 5 you request the identity of all persons involved in the marketing and promotion of Fanapt and Hetlioz, I don't know why that would be in a 30(b)(6) and

Proceedings

not in an interrogatory.

MR. CAPECI:  Well your Honor, we did pose it in an interrogatory, your Honor, and the response was wait for the documents.  And the problem with waiting for the documents --

MS. SOLOWAY:  Your Honor --

MR. CAPECI:  -- is they never came before we had an opportunity to negotiate custodians.  So again, we've been put in a bit of a bind here.

We hear your Honor.  And so I think we would be comfortable waiting until we have some more information to revisit this.

THE COURT:  And Ms. Soloway, I heard you were chomping at the bit, so go ahead, what do you have?

MS. SOLOWAY:  Your Honor, I'll say this.  One of the reasons why I think a lot of this is premature is because at least in my experience document productions are iterative and plaintiffs often look through the documents, as Mr. Capeci did today, and say you know what, this person looks like they were important, they were at a meeting we're interested in, give us that person's documents.  And it takes some time for that process to play out.  And we have not attempted to put the plaintiffs in a box here or limit their ability to do that.

23

Proceedings

So in my view, I think putting off the 30(b)(6) issue for now is a good one. And I also think that once we've met and conferred on the issues that are going to be raised both by the production that's coming in the next couple of weeks and any issues plaintiffs have identified to date, we can have a much more productive conversation about this because the defendants have not said no to any of this yet. We simply haven't had a chance to discuss it with the plaintiff.

THE COURT: But you also hear how they're frustrated because they were put in a position where they had to take your word for it that the custodians that you were going to search for emails and other documents were your choice and that they were basically asked to trust that you were giving them the people that they would need, so --

MS. SOLOWAY: Well your Honor, I mean what we did hear, and again, I think this was actually a really good process, was that the organizational charts that Vanda prepared which Mr. Capeci has referenced several times are incredibly comprehensive. So the plaintiffs had access for quite some time to the names and positions of hundreds of people over the years who have worked in various jobs. From that, you know, the plaintiffs had come up with a list of over 100 people that they were

24

Proceedings

interested in and we went back to the client repeatedly to ask well what was this person's job and what was this person's job, et cetera.

I am not representing, and I didn't represent to plaintiff that none of the people that aren't on the current list of 40 plus custodians could possibly have relevant information. But we had to make judgments and we made recommendations to the plaintiff about well this person would be duplicative or that person is an executive assistant, so if you get their boss, you're good. Or this person heads the department, so let's start with the head of the department and not do all eight people that sit under him, for example. I mean there has to be judgments because collecting the data of 100 plus people is not a starting point.

And so we've obviously made an offer. The plaintiffs will see what the documents look like and they can come back and they can request additional items. We are not in any way attempting to foreclose that, your Honor.

THE COURT: Okay. Thank you.

MR. CAPECI: Your Honor, if I may respond to that very briefly?

THE COURT: Sure, Mr. Capeci. Go ahead.

MR. CAPECI: So we wouldn't describe this as a

Transcriptions Plus II, Inc.

25

Proceedings

good process.  We describe this as a process where our motion to dismiss was resolved ten months ago.  We've continually tried to get this information.  The organizational charts don't have any substantive information in them and that constantly has been used against us.

Mr. Pomponio is the head of his department.  He appears on the org charts as the head on a single page.  He's the head of a unit of Vanda.  And finally, I would just like to note that, you know, we obviously have a lot of issues going on here.  We just want to let the Court know that we've been working very hard and we may be before the Court again soon.  And so I just appreciate the Court's understanding and articulation of our views today.  We do appreciate it.

THE COURT:  So what I would suggest is you both are working hard at this, you both know a whole lot more about your case than I know.  I'm only getting snippets of it, but even the snippets I'm getting are not complete because as you've made clear, Mr. Capeci, you have not yet gotten most of the documents.  And as Ms. Soloway has made clear, you haven't even gotten to discuss things like whether or not Mr. Sykes should have been on the list and what about Ms. Belken or whatever the issues, Ms. Mayo, Mr. Pomponio, whatever.

Proceedings

So what I would suggest is that we have another conference. I'm not going to rule on the motion because that way it's still out there.

But on the other hand, I'm giving Ms. Soloway -- I think I'm not jumping to the issue of a protective order here because I do want there to be cooperation and I do want to know that you're getting what you're entitled to, Mr. Capeci. And I do also know that without having taken a single deposition that you're trying to front load this on 30(b)(6) which I get. But there should be conversations between now and the next conference about who's going to be deposed, when they're going to be deposed because as you've seen in some of the southern and eastern district cases that you've recited to me, sometimes the motion for a protective order is granted or denied without prejudice, and then the judge lets you continue along your way and will take up a renewed motion if it's not resolved through the other discovery that's been scheduled.

And so I hear you, Mr. Capeci, that right now you have 437 documents produced of which 298 pages are organizational charts and that you've only gotten 122 documents of substance and that you're predicting that there are going to be other problems with who the custodians were that were searched. I hear you.

27

Proceedings

On the flip side, Ms. Soloway is saying give us the time to produce the documents, document production is iterative, and we'll be able to have a much more meaningful discussion regarding what needs to happen once they get the documents.  I know that's not everybody's complete position but that's in my mind the boiled down position.

So how would -- and again, I'm not trying to cut you off, but I'm also looking at what my calendar is, so I don't want to put you on the spot and put it on too soon so you haven't even had a chance to eyeball the documents they produce or to talk to them.  How about if I put it on February 7th which is a Monday?  They're producing the 28th.  So that gives you a little bit more than a week.  But at least you'll have read the tea leaves by then.

Maybe you will not have looked at 170,000 pages, but you will have gotten more information.  And I am requiring you to speak about these issues because I do think scheduling depositions, and it's not going to be ten in a case like this, I would not hold you to ten, but I also, Mr. Capeci, wouldn't say you're allowed to take 50.  I don't know any judge that would.  Because then you're not even thinking who's the best person, what do I need to do here?  At least if your limit is ten, which is

28

Proceedings

what the rules say and you have to come to me for permission beyond ten, but I'm already telling you in a case like this I would give you permission beyond ten, but that doesn't mean that I'd let you, you know, stay at somebody else's house and use the car and everything else you want to as if, you know, your ask is going to be fulfilled in every way.  You just need to zero in on what the next stage of the case is going to be.

I will resolve the motion for the protective order by the next conference or soon after.  I've gotten what your arguments are.  Again, I think it's unfortunate that regularly scheduled is the wording of that request in topics 3 to 6, but I've already told you that and you've already told me in your ECF 80 that you think it's appropriate because if meetings were regularly scheduled, then it wouldn't be hard to find records about them.

Somehow, this will all work out and I am hoping that I am telling defense counsel that if I hear that everything that's being produced is sort of of the same ilk as the 122 documents so far that have been produced and we're not getting any of these other launch training documents or what these sessions were about, that's going to raise a red flag for me.

And you both know that magistrate judges cover both criminal and civil duty, so I've had more than one

29

Proceedings

off label case that's turned out to be a criminal prosecution in my time here. I'm not casting any aspersions here. That's not the point. I'm just saying that, you know, there's a universe of documents that exist, there's a universe of people that have information that plaintiff should be given access to.

You're not going to get everything you ever wanted, Mr. Capeci. That's clear. I do think that you're going to need to discuss whether there were minutes at meetings, is that part of the documents that have been exchanged? The identity or description of the people that are involved in marketing and promoting the drugs. Again, I imagine that you're going to get a lot of that information in what Ms. Soloway is going to produce to you. And if I'm wrong, you'll raise that with her and you'll raise it back with me.

Everybody's being very quiet. Did everybody look at their calendars for February 7th?

MR. CAPECI: Yes, your Honor. February 7th is fine for the plaintiff.

MS. SOLOWAY: Same for me, your Honor.

THE COURT: And would 2 o'clock be okay on that date?

MS. SOLOWAY: Yes, your Honor.

MR. CAPECI: Yes.

30

Proceedings

THE COURT:  Then let's write it in our calendars and I'll adjourn today's conference to February 7th.  And again, my intent was to give you enough time to at least get a broader brush stroke understanding of what they're producing and also to get enough time that you could have a couple of conversations about depositions and who's going to be deposed and what you need to do. And hopefully, that will inform my judgment about what needs to happen here.

How onerous were the letters that you had to write to me?  Because I would rather get a letter by noon on the 4th to know what I'm preparing for on the 7th. Would that work for both sides?  I won't require you to give me a joint letter because I think that might be too tough to get your heads together on.  But a short letter as to what's happened since today's conference by noon on the 4th.

MR. CAPECI:  That's fine for plaintiff, your Honor.

MS. SOLOWAY:  Yes, your Honor.

THE COURT:  Okay.  So again, I am kicking the can down the road a bit but with purpose and I'm hoping that with the production that's forthcoming and with the parties having very able counsel to try to address these concerns that there may be less for the Court to have to

31

Proceedings

decide.  Again, I do understand that there's a lot going on and I do understand what my duty is in moving you along.  You need decisions to be made.  But I think today it is in the interest of justice to say that I'm going to give you a little more time.

So was there anything else that needed to be addressed on behalf of plaintiff today?

MR. CAPECI:  No, your Honor.  Thank you very much.

THE COURT:  Anything further on behalf of defendant today?

MS. SOLOWAY:  No.  Thank you, your Honor.

THE COURT:  Thank you very much.  And I will look forward to hearing that a lot of progress has been made by the next conference.  This matter is adjourned to February 7th at 2 p.m. by telephone.  And I'll expect a letter by ECF to be filed by both sides on Friday, February 4th by noon.  Thank you very much.  This matter is adjourned.

(Matter concluded)

-oOo-

Transcriptions Plus II, Inc.

32

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **2nd** day of **February**, 2022.

_Mary Greco_
Transcriptions Plus II, Inc.