UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNETH GORDON, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 1:19-cv-01108-FB-LB |
| Plaintiff, | CLASS ACTION |
| vs. | DECLARATION OF MICHAEL G. CAPECI IN SUPPORT OF: (1) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION; AND (2) LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AN AWARD TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4) |
| VANDA PHARMACEUTICALS, INC., and MIHAEL H. POLYMEROPOULOS, | |
| Defendants. | |

4864-2348-1663.v1

I, MICHAEL G. CAPECI, declare as follows:

1.      I am a partner of Robbins Geller Rudman & Dowd LLP ("Robbins Geller or "Lead Counsel"), counsel for Lead Plaintiff Teamsters Local Union No. 727 Pension Fund ("Teamsters," "Lead Plaintiff," or "Plaintiff") and the proposed Class in the above-captioned action (the "Action").[1]  I have been actively involved in all material aspects of the prosecution and resolution of this Action, and have personal knowledge of the matters set forth herein.

2.      I respectfully submit this declaration in support of Lead Plaintiff's motion for final approval of the all-cash settlement of $11,500,000 (the "Settlement Amount") and the proposed Plan of Allocation and Lead Counsel's application for an award of attorneys' fees and expenses and an award to Lead Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4) in connection with Teamsters' representation of the Class.

## I.      PRELIMINARY STATEMENT

3.      This Settlement is the product of an efficient litigation strategy executed from the commencement of this Action in February 2019 until March 16, 2022, when the Settlement was reached.  The Settlement was achieved shortly following an all-day mediation session, but only after Lead Counsel, *inter alia*, (i) conducted a thorough investigation regarding the alleged claims and drafted a detailed amended complaint; (ii) successfully opposed, in part, Defendants' motion to dismiss the amended complaint; (iii) completed class certification discovery, including depositions of a representative of Teamsters, a representative of Teamsters' money manager, and the parties' respective class certification experts; (iv) fully briefed the motion for class certification; (v) engaged in extensive document discovery that involved the production of over 52,000 documents (comprising

---

[1]      Capitalized terms not defined herein have the meaning ascribed to them in the Stipulation and Agreement of Settlement, dated May 5, 2022 (ECF 96) (the "Stipulation").

approximately 500,000 pages) by Defendants and third parties; (vi) responded to discovery propounded by Defendants; and (vii) retained and consulted with experts.

4.      The Settlement takes into consideration the significant risks specific to this Action, including, for example, the risk that Judge Block would render adverse decisions on Plaintiff's motion for class certification and Defendants' likely motion for summary judgment.  Furthermore, the Settlement is the result of arm's-length negotiations between the parties facilitated by mediator Jed D. Melnick, Esq., a nationally-recognized mediator of complex cases and class actions.  These negotiations were conducted by experienced counsel with an understanding of the strengths and weaknesses of the claims and defenses, and the Settlement was reached after each side had an opportunity to reflect on the negotiations at the mediation and deliberate further.

5.      The Settlement provides a significant recovery to the Class, given the nature of the allegations and the size of investors' estimated losses.  Despite the fact that many of these allegations were independently supported, numerous uncertainties remained in the Action, especially given that at the time the parties reached a settlement in principle, the Court had not yet ruled on Lead Plaintiff's motion for class certification and fact discovery had not yet been substantially completed.

6.      The operative complaint is the Amended Complaint for Violations of the Federal Securities Laws (ECF 29) ("Amended Complaint").  The gravamen of the Amended Complaint is that, in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, Defendants allegedly perpetrated two distinct fraudulent schemes.  One alleged scheme concerns Vanda's two flagship drugs Fanapt and Hetlioz, and the other concerns Vanda's primary clinical pipeline drug, Tradipitant.

7.      With respect to Fanapt and Hetlioz, the Amended Complaint alleges Defendants failed to disclose that Vanda was marketing these two FDA-approved drugs for off-label uses not

4864-2348-1663.v1

approved by the FDA (the "Off-Label Claim"). ¶¶74-186. The Amended Complaint alleges that investors learned of this scheme on February 11, 2019, when Aurelius Value, a short-seller, issued a report (the "Aurelius Report") detailing Defendants' alleged off-label marketing scheme, which extensively cited whistleblower allegations made by Richard Gardner ("Gardner"), a former Vanda sales manager. ¶185. The trading price of Vanda's common stock declined in concert with the publication of the Aurelius Report. ¶¶433-435.

8.      With respect to Tradipitant, the Amended Complaint alleges that Defendants failed to disclose that the drug's clinical development was at a standstill due to Vanda's refusal to conduct an FDA-required safety study (the "Tradipitant Claim"). ¶¶187-231. The Amended Complaint alleges that, after market close on February 5, 2019, Vanda announced it had sued the FDA for placing a clinical trial hold on Tradipitant because Vanda refused to conduct the required safety study. The Amended Complaint further alleges that the trading price of Vanda's common stock declined on February 6, 2019, in concert with the press release announcing Vanda's lawsuit against the FDA. ¶¶431-432.

9.      In opting to settle the Action, Plaintiff and Lead Counsel extensively considered the risks of proving the securities-fraud claims alleged in the Amended Complaint. For example, it was Defendants' position that no off-label marketing ever actually occurred, and that the news associated with the Off-Label Claim had no impact on Vanda's stock price. Additionally, Defendants argue that the alleged statements related to the Tradipitant Claim were not false when made, and that Defendants possessed no intent to defraud investors regarding Tradipitant's clinical trial progress. Although Plaintiff disputed (and continues to dispute) those assertions, it was clear that Defendants would attempt to marshal evidence in support of these arguments as the Action progressed, including possibly at summary judgment and at trial.

- 3 -

4864-2348-1663.v1

10.     In addition, Plaintiff and Lead Counsel weighed the documents and information they believed supported the allegations against the other documents and information that could be used to undercut those allegations.  Indeed, the parties disagreed on the importance of much of the evidence in this Action – including the evidence the parties utilized at the mediation – and there is no way to predict which interpretations or inferences a jury would accept.  On balance, considering all of the circumstances and risks both sides faced if this Action progressed further, both Plaintiff (for itself and the Class) and Defendants concluded that settlement on the terms agreed upon was in their respective best interests.

11.     To date, Lead Counsel has prosecuted this Action on a wholly contingent basis and has advanced and incurred substantial, albeit reasonable, litigation expenses.  In doing so, Lead Counsel shouldered the substantial risk of an unfavorable result in a challenging case and has not received any compensation for its efforts thus far.

12.     The fee application of one-third of the Settlement Amount is fair, reasonable, and within the range of fee percentages frequently awarded in this type of action.  Indeed, the fee request here was approved by Teamsters.  Under the facts and circumstances of this Action, the requested fee percentage is justified in light of the substantial benefits conferred on the Class, the risks undertaken on a contingency basis, the quality of representation, and the extent of legal services performed.

13.     Lead Counsel also seeks an award of expenses totaling $179,885.92 that were reasonably and necessarily committed to prosecuting the Action.  These costs include: (i) the costs associated with conducting and/or defending the depositions of Teamsters and the parties' experts in connection with class certification, which included court reporter and videographer fees as well as travel expenses; (ii) fees and expenses of consultants and experts whose services Lead Counsel

- 4 -

4864-2348-1663.v1

required in the prosecution and resolution of this Action; (iii) fees, expenses and other costs associated with Lead Counsel's investigative efforts; (iv) charges for photocopying, imaging, shipping, and managing over 52,000 documents (comprising approximately 500,000 pages) stored in an online repository; and (v) factual and legal research. These charges and expenses were reasonable and necessary to obtain the successful result reflected in the Settlement.

14.     In addition, as permitted under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Lead Plaintiff seeks an award of $10,000 in connection with Teamsters' representation of the Class. As explained below, Teamsters reviewed drafts of filings, provided input on litigation and settlement strategy, assisted in gathering and producing over 7,500 pages of documents in discovery, prepared and produced a representative for deposition, and attended the all-day mediation through its representative. Lead Plaintiff's investment of time and effort greatly contributed to the Settlement.

15.     The following is a summary of the principal events that occurred during the course of the Action and the legal services provided by Lead Counsel.

## II.     THE ACTION

### A.     The Commencement of the Action and Appointment of Lead Plaintiff

16.     The Action began on February 25, 2019, when The Rosen Law Firm, P.A., on behalf of Kenneth Gordon, filed a putative class action against Defendants and James P. Kelly ("Kelly"). ECF 1. The initial complaint alleged violations of the Exchange Act arising only with respect to the Off-Label Claim. *Id.* The initial complaint did not contain allegations related to the Tradipitant Claim. *Id.*

17.     On April 26, 2019, the following investors each filed competing motions for appointment as lead plaintiff and for their counsel to be approved as lead counsel: (a) Teamsters

(ECF 7-9); (b) Thomas Rigsbee (ECF 5-6); (c) Kenny Dean (ECF 12, 15-16); and (d) Rushit Kothari (ECF 10-11, 14).

18.    Following these submissions, Thomas Rigsbee, Kenny Dean and Rushit Kothari each filed notices of non-opposition or withdrawal of their respective motions seeking appointment as lead plaintiff.  ECF 17 (Notice of Non-Opposition by Kenny Dean); ECF 18 (Notice of Withdrawal by Thomas Rigsbee); ECF 23 (Notice of Withdrawal by Rushit Kothari).

19.    On May 10, 2019, Teamsters filed a notice of non-opposition to its motion for appointment as lead plaintiff.  ECF 24.

20.    Accordingly, on May 24, 2019, the Court granted Teamsters' motion for appointment as lead plaintiff, and approved Teamsters' selection of Robbins Geller as lead counsel.  ECF 26.

**B.    Lead Counsel's Investigation and Filing of the Amended Complaint**

21.    Before and after moving for appointment as lead plaintiff in this matter, Lead Counsel directed an extensive investigation of the alleged securities law violations at issue.  Specifically, this investigation included, but was not limited to, a review and analysis of the allegations in *United States of America, ex rel. Richard Gardner v. Vanda Pharmaceuticals*, Case No. 1:17-cv-00464-APM (D.D.C.) (the "Qui Tam Litigation" or "Qui Tam"), in which former Vanda employees Gardner and Jeffery Bourgeois ("Bourgeois") asserted alleged False Claims Act violations against Vanda arising out of the alleged off-label marketing of Fanapt and Hetlioz.  Lead Counsel interviewed Gardner and Bourgeois in preparing the Amended Complaint, and their accounts are described therein.

22.    These investigative efforts also included a review and analysis of: (i) Vanda's public filings with the SEC; (ii) press releases, public statements, public letters, and other publications disseminated by, or concerning, Defendants; (iii) information posted on Vanda's corporate website;

- 6 -

(iv) securities analyst reports concerning Vanda; (v) relevant news articles and media coverage of Vanda; (vi) drug labels and approval information for Fanapt and Hetlioz; and (vii) transcripts of investor conference calls hosted by Vanda.

23.     Based on this investigation, Lead Counsel prepared the Amended Complaint on behalf of Vanda investors, including Lead Plaintiff, who purchased or otherwise acquired Vanda's common stock during the period November 4, 2015 to February 11, 2019, inclusive, and who were damaged thereby.  The Amended Complaint built upon and expanded the Off-Label Claim from the initial complaint, which did not reflect the participation of Gardner or Bourgeois.

24.     Fanapt is FDA-approved to treat adults with schizophrenia in a twice-daily formulation only after another antipsychotic has failed.  The Amended Complaint detailed the various ways that Vanda had allegedly promoted Fanapt off-label, including by marketing the drug: (i) as a first-line treatment; (ii) for once-daily dosing; (iii) for pediatric uses; and (iv) as an alternative to antipsychotics that treat diseases other than schizophrenia.

25.     Hetlioz is FDA-approved to treat Non-24, a rare sleep disorder that almost fully occurs in blind individuals.  The Amended Complaint also detailed how Vanda allegedly promoted Hetlioz off-label by marketing Hetlioz for any sleep disorder, not just Non-24.

26.     Additionally, Lead Counsel's investigative efforts included a review and analysis of filings and decisions in *Vanda Pharms., Inc., et al. v. Food and Drug Admin., et al.*, No. 1:19-cv-00301-JDB (D.D.C.) (the "FDA Litigation"), in which Vanda sued the FDA for placing a clinical trial hold on Tradipitant because Vanda refused to conduct a required safety study.  Furthermore, Lead Counsel moved to intervene in the FDA Litigation for the purpose of unsealing the administrative record cited in the summary judgment decision granted in favor of the FDA.  Lead

- 7 -

Counsel also sent FOIA requests and subpoenas to the FDA for documents relevant to the Tradipitant Claim.

27.     Based on this investigation, Lead Counsel added the Tradipitant Claim to the Amended Complaint, which was not contained in the initial complaint.  Because the Tradipitant Claim involves an additional loss-causing Vanda common stock decline separate from the one associated with the Off-Label Claim, Plaintiff's addition of the Tradipitant Claim greatly expanded the potential recovery in the Action as compared to the initial complaint.

28.     Additionally, on May 17, 2019 and July 23, 2019, Lead Counsel submitted FOIA requests to the FDA seeking documents relevant to the claims alleged in the Amended Complaint. Lead Counsel and the FDA exchanged numerous emails regarding the requests, and the FDA provided partial responses to Lead Counsel.

29.     The Amended Complaint was filed on July 23, 2019.  Reflecting the significant amount of research conducted, the Amended Complaint spanned 94 pages, consisted of 454 numbered paragraphs, included the accounts, testimony, and/or findings from Gardner, Bourgeois, and the FDA Litigation, added the Tradipitant Claim, added significant detail from Gardner and Bourgeois on the Off-Label Claim, and added two additional defendants, former Vanda executives Gian Piero Reverberi and Thomas E. Gibbs.

**C.      Defendants' Motion to Dismiss, the Court's Decision to Partially Sustain Claims against Vanda and Defendant Polymeropoulos, and Subsequent Events**

30.     Pursuant to Judge Block's Rules and this Court's Order (ECF 27, 38), Defendants submitted a letter request for a pre-motion conference on September 23, 2019, in anticipation of their motion to dismiss the Amended Complaint.  ECF 39.

4864-2348-1663.v1

31.    Lead Plaintiff responded on September 30, 2019, outlining the allegations in the Amended Complaint, stating Plaintiff's position with respect to the requested motion to dismiss, and expounding on the adequacy of the Amended Complaint.  ECF 40.

32.    Judge Block held a pre-motion conference on January 14, 2020.  Thereafter, a briefing schedule for Defendants' anticipated motion to dismiss was set by Judge Block.

33.    Defendants served the opening brief of their motion to dismiss on Lead Plaintiff on March 23, 2020.  ECF 46, 48.  In accordance with the PSLRA, discovery in the Action was stayed until the Court ruled on Defendants' motion to dismiss.

34.    In support of their motion to dismiss, Defendants argued that: (i) the Amended Complaint failed to plead the required inference of scienter; (ii) the Amended Complaint failed to plead fraud with particularity with respect to each defendant; (iii) the Amended Complaint failed to allege any actionably false or misleading statements; and (iv) the Amended Complaint failed to adequately plead loss causation.

35.    On May 7, 2020, Lead Plaintiff served its opposition to the motion to dismiss.  ECF 47-48.  Lead Plaintiff's opposition set forth in careful detail the facts and circumstances surrounding Defendants' alleged fraudulent schemes.  In particular, based on the information provided by Gardner and Bourgeois, Plaintiff detailed the numerous specific ways that Vanda allegedly promoted Fanapt and Hetlioz off label.  Furthermore, Plaintiff outlined the specific timeline of Tradipitant's clinical development, isolating specific admissions from the FDA Litigation demonstrating precisely when Vanda was alleged to have known that the FDA would issue a clinical trial hold in the absence of the required safety study.  In addition, Plaintiff argued that Defendants' knowledge of the circumstances underlying the Off-Label Claim and the Tradipitant Claim gave rise to a strong inference of scienter.  Finally, Plaintiff explained why the two corrective disclosures alleged in the

4864-2348-1663.v1

Amended Complaint – February 5-6, 2019, and February 11, 2019 – sufficed to adequately allege loss causation. In short, Lead Counsel spent significant time and resources performing the legal and factual research necessary to show that the Amended Complaint satisfied the heightened pleading standards imposed by the PSLRA.

36.    On May 19, 2020, while the motion to dismiss in this Action was still being briefed, Judge Amit Mehta issued a decision on the motion to dismiss in the Qui Tam Litigation, dismissing the Qui Tam case without prejudice.

37.    On June 9, 2020, Defendants served a reply brief in further support of their motion to dismiss, supplementing their arguments regarding the failure to plead: a strong inference of scienter; fraud with particularity; actionable material misstatements or omissions; and loss causation. *See* ECF 43. Additionally, Defendants cited the motion to dismiss opinion from the Qui Tam Litigation, as well as a new Second Circuit decision issued after Lead Plaintiff had served the opposition brief.

38.    Also on June 9, 2020, Gardner filed an amended complaint in the Qui Tam Litigation (the "Qui Tam Amended Complaint").

39.    On June 23, 2020, Lead Plaintiff filed a letter motion with the consent of Defendants requesting a supplemental briefing schedule to address the Qui Tam Litigation dismissal and the new Second Circuit decision. ECF 49.

40.    Judge Block granted Lead Plaintiff's letter motion, and the parties each submitted supplemental memoranda of law on June 24, 2020, stating their positions on the implications of the newly announced decisions. ECF 50-51.

41.    On August 4, 2020, Lead Plaintiff submitted a letter to Judge Block regarding a Second Circuit decision announced on August 3, 2020, which Lead Plaintiff argued supported

- 10 -

denying Defendants' motion to dismiss.  ECF 52.  Defendants responded in kind on August 10, 2020.  ECF 53.

42.    On March 10, 2021, Judge Block issued a Memorandum and Order granting in part and denying in part Defendants' motion to dismiss.  ECF 55.  Judge Block found that "even with the heightened pleading standard, plaintiffs have adequately pled corporate scienter as to individual defendant Polymeropoulos, and that such intent can be imputed to Vanda Pharmaceuticals." *Id.* at 5. Judge Block also found that the Amended Complaint "alleged omissions which are material." *Id.* at 7.  In addition, Judge Block found that the Amended Complaint adequately alleged loss causation. *Id.* at 8-9.    Judge Block sustained the Amended Complaint against Vanda and defendant Polymeropoulos, but dismissed the claims against defendants Kelly, Gian Piero Reverberi, and Thomas E. Gibbs.  *Id.* at 10.

43.    On March 25, 2021, the Court in the Qui Tam Litigation denied Vanda's motion to dismiss the Qui Tam Amended Complaint.

44.    Defendants filed their answer to the Amended Complaint on April 23, 2021, denying Lead Plaintiff's substantive allegations and asserting 24 separate affirmative defenses.  ECF 60.

**D.    Lead Counsel Successfully Unseals Critical Documents from the FDA Litigation**

45.    Separate from Plaintiff's fact discovery efforts in this Action, Lead Counsel filed a motion to intervene in the FDA Litigation on December 4, 2020, for the purpose of requesting the unsealing of certain documents cited in the summary judgment decision there. *See* FDA Litigation ECF 51.  Lead Counsel filed this motion to obtain additional information supporting the Tradipitant Claim.

46.    The FDA filed its opposition to Lead Counsel's motion on January 7, 2021.  FDA Litigation ECF 57.  Vanda filed its opposition to Lead Counsel's motion on January 29, 2021.  FDA Litigation ECF 58.

47.    Lead Counsel vigorously supported this motion by filing a reply memorandum in further support of the motion for leave to intervene and unseal judicial records on February 25, 2021 (FDA Litigation ECF 60), as well as a notice of supplemental authority on April 6, 2021.  FDA Litigation ECF 62.  Vanda provided its response to the supplemental authority on April 9, 2021.  ECF 63.

48.    The Court in the FDA Litigation granted Lead Counsel's motion to intervene on May 6, 2021.  FDA Litigation ECF 64.  The Court in the FDA Litigation also granted, in part, Lead Counsel's motion to unseal certain documents.  *Id.*

49.    On June 18, 2021, Vanda publicly placed on the docket portions of the administrative record that had been previously sealed in the FDA Litigation.  ECF 66.  This provided Lead Counsel with critical documents concerning the Tradipitant Claim at the outset of fact discovery, effectively providing Plaintiff with the type of discovery roadmap that is often lacking in many securities fraud class actions.

50.    Moreover, the documents Lead Counsel obtained from the FDA Litigation provided substantial support for the falsity, scienter and loss causation elements of the Tradipitant Claim.  In addition, these documents assisted Lead Counsel with identifying individuals at Vanda who had relevant knowledge, information and documents regarding the Tradipitant Claim.

**E.    Fact Discovery**

51.    Lead Counsel immediately began fact discovery efforts following the March 10, 2021 Memorandum and Order.  Until the parties reached an agreement in principle to settle this Action,

- 12 -

4864-2348-1663.v1

Lead Plaintiff engaged in rigorous fact discovery. As detailed below, Lead Counsel received approximately 500,000 pages of documents from Defendants and several non-parties.

### 1. Joint Rule 26(f) Report

52. Following the March 10, 2021 Memorandum and Order, the parties commenced an extensive meet-and-confer process designed to outline the factual boundaries of discovery, establish scheduling milestones, and establish the parameters of electronic discovery. On May 12, 2021, the parties filed with the Court a Joint Report pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, which set forth their respective views on various discovery matters. ECF 65. Following a telephonic conference, on May 19, 2021, the Court issued an Order approving the non-disputed portions of the Joint Rule 26(f) Report and directing the parties to meet and confer about the remaining disputed portions.

53. On July 7, 2021, the parties submitted a joint letter submission spanning 20 pages and numerous exhibits regarding the remaining disputed portions of the Joint Rule 26(f) Report. ECF 70.

54. Following a telephonic conference, on July 13, 2021, the Court issued an Order resolving the majority of the remaining disputes and set a deadline for the parties to file another joint status letter by July 27, 2021.

55. On July 27, 2021, the parties submitted a joint letter submission that contained an agreement on the remaining disputed portions of the Joint Rule 26(f) Report. ECF 71. On July 28, 2021, the Court issued an Order adopting the joint position of the parties.

### 2. Protective Order

56. To protect against the public disclosure of potentially sensitive personal or proprietary information, the parties negotiated and prepared a protective order to govern the treatment, handling

4864-2348-1663.v1

and continued protection of confidential information produced in this Action.  The parties also negotiated the extent to which, and the conditions under which, such confidential information could be shown to deponents, non-parties, and others not previously privy to such information.  The parties ultimately reached an agreement on all of their respective areas of concern, and on May 5, 2021, submitted a Stipulation and [Proposed] Order of Confidentiality to the Court ("Protective Order"). The next day, on May 6, 2021, the Court entered the Protective Order, with a modification to paragraph 13 therein.  ECF 63.

### 3.    Written Discovery Directed to Defendants

#### a.    Document Requests

57.    As contemplated by the Joint Rule 26(f) Report, the parties exchanged initial requests for document production on May 14, 2021.  Lead Plaintiff's First Set of Requests for the Production of Documents consisted of 72 discrete requests germane to the parties' claims and defenses and calling for the production of documents from January 1, 2015 to the present.

58.    In their responses, on June 14, 2021, Defendants objected to nearly every request for production on the grounds of relevance, over-breadth, ambiguity and/or privilege; asserted positions reflecting material disagreements as to the relevant subject matter involved in this Action, including the relevance of the FDA Litigation; argued that discovery should be coordinated with discovery in the Qui Tam Litigation; and disputed the relevant time period for the purposes of discovery and the claims alleged in this Action.

59.    In an effort to resolve these material, global disputes without judicial intervention, Lead Counsel engaged in numerous discussions, spanning many months, with Defendants' counsel. Though the parties reached a settlement in principle before many of the disputes were fully resolved, Lead Plaintiff worked diligently and in good faith to resolve the disputes with minimal judicial

- 14 -

intervention to conserve the resources of the parties and the Court, and to ensure that production occurred in the most efficient manner possible under the circumstances.

### b.    Initial Disclosure Statement

60.    On May 12, 2021, Lead Plaintiff served its Initial Disclosure Statement pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure.  In it, Lead Plaintiff identified numerous individuals and entities likely to have discoverable information supporting the claims alleged in the Amended Complaint.  To compile this information, Lead Plaintiff reviewed its own internal investigation files, public information regarding Vanda's corporate organization and employee hierarchy as well as employee departures at Vanda, materials obtained from the FDA, information provided by Gardner and Bourgeois, and Vanda's SEC filings.  Lead Plaintiff also reviewed and compiled information from analyst reports covering Vanda to identify individuals at analyst firms likely to possess knowledge and information regarding Vanda's operations.

61.    On May 20, 2021, Lead Plaintiff, on its own volition, served its Corrected Initial Disclosure Statement pursuant to Rules 26(a)(1) and 26(e)(1)(A) of the Federal Rules of Civil Procedure, which provided additional information concerning Teamsters' investment manager that was uncovered as Plaintiff was undergoing its document collection efforts.

### c.    Negotiations Concerning the Production of Defendants' Electronically Stored Information ("ESI")

62.    Multiple meet and confer discussions were also necessary to address the identification and production of relevant ESI.  Virtually all of the relevant materials were maintained electronically by Vanda, making these discussions particularly important to the prosecution of this Action.  Given the importance of ESI, the parties negotiated, and Lead Plaintiff submitted to the Court, a Stipulation and [Proposed] Order of Electronic Discovery to provide a framework for all ESI and hard copy

4864-2348-1663.v1

productions by the parties to the Action. The Court approved the Stipulation and [Proposed] Order of Electronic Discovery on May 6, 2021. ECF 64.

63. In addition, Lead Counsel, based on consultation with in-house ESI and information technology ("IT") personnel, posed detailed questions to Defendants concerning Vanda's IT systems, focused on the general electronic systems maintained by and for Vanda and the location of potentially responsive ESI. The ensuing discussions involved, *inter alia*: custodial and non-custodial sources of ESI; search terms and date ranges for identifying relevant ESI; ESI retention and destruction policies and practices; file server and document management systems and policies; and the volume of data by custodian, date, and file type.

64. Lead Counsel also initiated and participated in written and telephonic exchanges with Defendants' Counsel regarding the use of metadata, de-duplication, file type filtering, date filtering, and other potential methods to efficiently search, review, and produce documents from ESI custodians. The parties additionally discussed and resolved Defendants' concerns regarding the purported burden of reviewing potentially vast amounts of ESI for privilege.

65. Additionally, the parties worked cooperatively to reach agreement on search terms over a series of months, beginning in August 2021 and ending on January 31, 2022. This process involved running and testing various alternatives to Lead Plaintiff's and Defendants' proposed searches in an effort to reach a mutually agreeable set of search terms. At each step, Lead Counsel utilized the services of in-house e-discovery personnel.

66. To ensure that discovery progressed while the parties negotiated a resolution of these matters, Plaintiff secured from Defendants a commitment to produce documents on a rolling basis. By the time the parties had reached the Settlement, Defendants had made several productions.

- 16 -

4864-2348-1663.v1

67.     All told, the parties and non-parties collectively produced over 510,000 pages of documents, which Robbins Geller electronically hosted and managed for the prosecution of this Action on an advanced platform in-house, as discussed below.

### d.      Interrogatories

68.     On May 14, 2021, Lead Plaintiff served its First Set of Interrogatories to All Defendants, consisting of seven interrogatories designed to identify various current and former Vanda personnel, including those responsible for: communicating with the FDA regarding Tradipitant; reaching Vanda's decision to sue the FDA; the marketing and promotion of Fanapt and Hetlioz; and designing the incentive compensation system which the Amended Complaint alleges encouraged off-label promotion of Fanapt and Hetlioz.  The interrogatories were designed to narrow the universe of relevant Vanda personnel so as to streamline the discovery process.

69.     Defendants served their objections and responses on June 14, 2021.  The parties met and conferred regarding Defendants' responses and objections, and Defendants served supplemental responses and objections to one interrogatory on August 24, 2021.

70.     Lead Plaintiff served its Second Set of Interrogatories to All Defendants on December 17, 2021, consisting of four interrogatories concerning Vanda's document retention and preservation policies and a claim made by defendant Polymeropoulos on an investor phone-call in November 2021 regarding the number of doctors who had prescribed Hetlioz in the past several years.

71.     Defendants served their responses and objections to the second set of interrogatories on January 18, 2022.  The parties met and conferred regarding Defendants' responses and objections. Lead Counsel relied on Defendants' responses to both sets of interrogatories in guiding its strategy for discovery.

### 4.    Discovery Disputes with Defendants

72.    Lead Counsel devoted much time to reviewing and analyzing documents produced in discovery, preparing for and participating in conferences with counsel for Defendants, and drafting email and letter correspondence memorializing these conversations and detailing Plaintiff's positions on discovery disputes.  Through these efforts, which covered several months, the parties were able to resolve their differences with respect to many of the discovery disputes.  When the parties reached the Settlement, many discovery disputes remained, as evidenced by the lengthy discovery conference held by the Court on March 15, 2022, one day after the mediation took place.

### a.    Defendants' Attempt to Coordinate Discovery with the Qui Tam Litigation

73.    To avoid potentially serious delays in the disposition of this Action, and the likely prejudice to the Tradipitant Claim that was unrelated to the Off-Label Claim, Lead Plaintiff vigorously and effectively opposed Defendants' efforts to coordinate discovery in this case with discovery in the Qui Tam Litigation.

74.    During the parties' negotiations on the Joint Rule 26(f) Report, it became clear that Defendants intended, either formally or informally, to coordinate discovery in this Action with the discovery schedule in the Qui Tam Litigation.  Lead Plaintiff vigorously resisted these efforts.

75.    On May 12, 2021, the parties submitted a Proposed Joint Rule 26(f) Report and Discovery Plan, which set out the parties' positions and outlined the parties' disagreements regarding deadlines for substantial completion of document production, close of fact discovery, and the timing of class certification.  The key dispute between the parties was Defendants' insistence that discovery be coordinated with the Qui Tam Litigation.

76.    On May 19, 2021, the Court held a telephone conference, which resolved many of the outstanding disagreements over deadlines in the Joint Rule 26(f) Report.  The Court instructed the

- 18 -

4864-2348-1663.v1

parties to meet and confer regarding the remaining issues concerning the discovery schedule, particularly whether discovery should be coordinated with the Qui Tam Litigation.

77.     Following the May 19, 2021 conference, and despite numerous meet and confers, the parties remained at an impasse regarding whether discovery should be coordinated with the Qui Tam Litigation.  On July 7, 2021, the parties submitted a joint letter to the Court regarding the remaining discovery schedule disputes and outlining the parties' positions, much of which detailed Lead Plaintiff's opposition to Defendants' request to consolidate discovery with the Qui Tam Litigation.

78.     The Court held a telephone conference on the remaining discovery schedule issues on July 13, 2021, wherein Lead Plaintiff vigorously defended its positions outlined in the July 7, 2021 joint letter.  That same day, the Court resolved the disputes and set the deadlines for substantial completion of fact discovery and close of fact discovery.  In so doing, the Court rejected Defendants' request to formally consolidate this case with the Qui Tam Litigation, but encouraged the parties to work cooperatively regarding any overlapping discovery requests in this Action and the Qui Tam Litigation.  Following this conference, Lead Plaintiff abided by this directive as fact discovery proceeded in this Action.

**b.      Search Terms and Custodians of Relevant Documents, and Plaintiff's Effort to Obtain Rule 30(b)(6) Testimony**

79.     Defendants provided their initial proposal for search terms and custodians in response to Plaintiff's first set of document requests on September 17, 2021.  Appreciating the full scope of the Tradipitant Claim and the Off-Label Claim, the latter of which concerned an alleged pervasive company-wide scheme of off-label promotion, Lead Plaintiff worked diligently to craft a tailored counter-proposal congruent with the scope of the claims.  After reviewing 298 organizational charts produced by Defendants, Lead Plaintiff proposed what it believed to be a reasonable, narrowly-tailored list of document custodians on October 1, 2021.

4864-2348-1663.v1

80.    The parties met and conferred numerous times regarding the parties' respective proposals.  Given the importance of obtaining documents from different employees at different levels of Vanda's organizational hierarchy in light of the nature of the Off-Label Claim, Lead Plaintiff maintained the position that this Action required numerous document custodians, and negotiated with Defendants in good faith to that effect.  Lead Plaintiff also sought to ensure the search terms used to locate responsive documents were precise and tailored to the needs of the case.

81.    The parties had numerous email exchanges and meet and confers from September 2021 to January 2022 to reach an agreement on search terms and custodians.  On October 19, 2021, Lead Plaintiff provided a detailed counterproposal that encompassed search terms and custodians for the Off-Label Claim and the Tradipitant Claim.  Defendants responded with their counter-proposal on October 29, 2021.  Despite the fact that Defendants' counter-proposal regarding custodians contained less individuals than Lead Plaintiff's best and final offer, in the interest of resolving the dispute, Lead Plaintiff provisionally agreed to the proposal subject to Defendants allowing the taking of a Fed. R. Civ. P. 30(b)(6) deposition of Vanda (the "Proposed 30(b)(6)"), discussed in more detail below, in order to corroborate Defendants' representations regarding which employees at Vanda did or did not have information relevant to the claims in the Action.

82.    Lead Plaintiff served its notice for the Proposed 30(b)(6) deposition on November 1, 2021, outlining 10 deposition topics concerning the structure and function of the marketing department at Vanda.  In addition, the notice contained topics regarding the individuals involved in and the meetings relevant to Tradipitant's clinical development and the decision to refuse to conduct the FDA's required safety study.  The deposition notice also requested testimony on Vanda's document retention and collection policies and efforts.

4864-2348-1663.v1

83.     The parties met and conferred twice to discuss the propriety of the Proposed 30(b)(6) and the scope of the topics outlined in the notice.  Defendants objected both to the 30(b)(6) itself, as well as to aspects of each of the topics proposed.

84.     On December 9, 2021, Defendants memorialized in a letter their positions on the Proposed 30(b)(6) deposition topics, and proposing alternatives to deposition testimony for certain of the disputed topics.

85.     On December 13, 2021, Lead Plaintiff sent a letter to Defendants' Counsel accepting many of Defendants' proposed alternatives in lieu of the Proposed 30(b)(6), which provided Plaintiff with helpful information regarding Vanda's document custodians that would not otherwise have been obtained in fact discovery.  Plaintiff also vigorously defended four of the proposed topics and the propriety of the deposition itself.

86.     On December 20, 2021, Defendants filed a letter motion for a protective order to prohibit the Proposed 30(b)(6) at this juncture.  Lead Plaintiff filed an opposition to this motion on January 4, 2022.

87.     On January 13, 2022, the Court held a telephone conference regarding Defendants' request for a protective order.  In light of the impending January 28, 2022 substantial completion deadline, the parties and the Court agreed it was best to delay ruling on the motion for a protective order until Lead Plaintiff had an opportunity to review the documents and determine whether the Proposed 30(b)(6) was still necessary.  The Court set a hearing for February 7, 2022 so the parties could update the Court on their positions with regard to the Proposed 30(b)(6) and apprise the Court of any remaining discovery disputes.

88.     After a diligent effort by Lead Counsel to review as many of the over 37,000 documents produced on January 28, 2022 in advance of the February 7 conference, Lead Plaintiff

- 21 -

4864-2348-1663.v1

met and conferred with Defendants so the parties could mutually apprise each other of the issues they intended to raise in their respective February 4 letters that the Court requested in advance of the February 7 conference.

89.    On February 4, 2022, Lead Plaintiff filed its letter, outlining the timeline of the parties' negotiations and Defendants' delay culminating in Defendants' failure to substantially complete document discovery by January 28, 2022. ECF 87. Unable to adequately assess the necessity of the Proposed 30(b)(6) without receiving a substantial portion relevant discovery, Lead Plaintiff requested an additional four weeks to ascertain whether a ruling on the Proposed 30(b)(6) was necessary.

90.    On February 7, 2022, the Court granted Lead Plaintiff's request for additional time before rendering a final determination on the Proposed 30(b)(6), as well as a request to extend the deadline for substantial completion of fact discovery to March 31, 2022, to provide Defendants with additional time to complete their productions and for Lead Counsel to review and analyze such materials before commencing depositions. *See* ECF 88.

91.    To ensure that discovery progressed while the parties continued to negotiate outstanding disputes, Lead Plaintiff secured from Defendants a commitment to produce documents on a rolling basis, with the next production to be made on February 28, 2022; and the final, substantially complete production to be made on March 31, 2022.

92.    In light of Plaintiff's review of Defendants' document productions, on March 10, 2022, Plaintiff informed the Court that it was withdrawing the Proposed 30(b)(6) without prejudice. On March 15, 2022, the Court denied Defendants' request for a protective order as moot.

93.    Though the parties had provisionally agreed on a list of custodians while the Proposed 30(b)(6) issue was being litigated, negotiations on search terms continued during this time. In

- 22 -

4864-2348-1663.v1

November 2021, Defendants provided Lead Plaintiff with hit counts for both parties' proposed search terms, and the parties had numerous meet and confers to discuss the appropriate scope of document production in this Action. Lead Counsel worked diligently to analyze the hit count charts and devise ways to refine search term proposals to narrow in on relevant documents. As mentioned above, the parties ultimately reached a final agreement on search terms on January 31, 2022, with Plaintiff securing Defendants' agreement to use dozens of search strings for both the Off-Label Claim and the Tradipitant Claim.

**c.    Deficiencies with Defendants' Rolling Document Productions**

94.    The Court's July 13, 2021 Order set the deadline for substantial completion of document productions for January 28, 2022. ECF 71. As explained below, Plaintiff complied with this deadline.

95.    Plaintiff believes that Defendants, however, did not. As discussed above, because the parties had not reached final agreements on search terms and custodians by January 28, 2022, Plaintiff contends that Defendants' production on January 28, 2022 did not, by definition, contain the substantial majority of responsive documents that Defendants were obligated to produce. Plaintiff provided a detailed accounting of the various alleged deficiencies with Defendants' January 28 production in the same February 4, 2022 status letter regarding the Proposed 30(b)(6).

96.    During the February 7, 2022 status conference, the Court granted Defendants' request to extend their deadline for substantial completion of documents to March 31, 2022 to provide Defendants with additional time to complete their productions and for Lead Counsel to review and analyze such materials before commencing depositions. The Court also ordered the parties to file a joint status letter on March 10, 2022, apprising the Court of all outstanding discovery issues. The Court set a conference for March 15, 2022 to resolve any outstanding discovery disagreements.

- 23 -

97.     In reviewing Defendants' documents thereafter, Lead Plaintiff raised numerous issues with Defendants, including: alleged discrepancies in the custodial metadata; Defendants' alleged failure to produce the requested text messages, instant messages, Slack, WhatsApp, or similar electronic communications; Defendants' alleged failure to produce documents associated with Gardner; Defendants' alleged failure to provide the identities of individuals who were members of Vanda group email addresses; Defendants' alleged improper unilateral second-level of relevance review; and Defendants' refusal to agree to additional document custodians, whose relevance did not become apparent to Lead Counsel until Defendants' documents were received and reviewed.

98.     The parties exchanged numerous emails and met and conferred multiple times on the issues in February and March 2022.  Lead Plaintiff raised the issues that could not be resolved in the March 10, 2022 joint letter to the Court.  *See* ECF 90.

99.     During the March 15, 2022 conference with the Court, the parties presented their positions on the outstanding discovery disputes.  The Court ordered Defendants to produce all electronic communications, including text messages and similar forms of communication.

100.    Shortly following the March 15, 2022 conference, the parties reached an agreement in principle to settle the Action.

**d.      Defendants' Privilege Claims**

101.    During discovery, Defendants produced one privilege log with plans to produce another final privilege log on a rolling basis.  After careful review of the log, which included cross-checking communications produced by Defendants and third parties, Lead Plaintiff identified several categories of documents appropriate for further discussion.  Lead Plaintiff served its responses to Defendants' privilege log on February 28, 2022, and the parties began negotiating their disputes over

- 24 -

the privilege log thereafter.  The parties reached a settlement in principle before the disputes over the privilege log were resolved.

### 5.    Discovery Efforts Directed Toward Third Parties

102.    Much of the relevant information in this Action was in the possession, custody, or control of third parties, including numerous former Vanda employees who were central figures to the alleged Off-Label Claim and Tradipitant Claim.  As with Vanda's production, Lead Counsel expended significant time and resources negotiating the scope of the document requests with third parties and addressing their objections to the requests.  Lead Counsel subpoenaed documents and/or testimony from the following third parties:

| Subpoenaed Person/Entity | Date | Relationship to Action |
| --- | --- | --- |
| Gian Piero Reverberi | May 14, 2021 | Vanda's Senior Vice President and Chief Commercial Officer from December, 2015 through shortly after the Class Period; one of six members of Vanda's management team; executive officer of Vanda during tenure as COO. |
| Paul Ramirez | May 14, 2021 | An attorney hired by Vanda as an outside consultant who reported directly to Defendant Polymeropoulos. |
| Bristol-Myers Squibb Company | May 17, 2021 | Pharmaceutical company that licensed the right to develop and commercialize Hetlioz to Vanda. |
| David James | May 17, 2021; May 24, 2021 | Vanda's National Sales Director from January 2014 to July 2016 to whom Vanda's Regional Business Leaders (including Gardner and Bourgeois) directly |

| Subpoenaed Person/Entity | Date | Relationship to Action |
|---|---|---|
| | | reported, and who directly reported to Vanda's CCO. |
| Eli Lilly and Company | May 17, 2021 | Pharmaceutical company that licensed the right to develop and commercialize Tradipitant to Vanda. |
| Global Pharma Strategies, Inc. | May 17, 2021 | Global Pharma Strategies is a life sciences advisory firm focused on pharmaceutical company business development whose services Vanda utilized during the Class Period. |
| James Kelly | May 17, 2021 | Vanda's Executive Vice President, Chief Financial Officer and Treasurer until shortly after the Class Period; one of six members of Vanda's management team; executive officer of Vanda during tenure as CFO. |
| Kate Holland | May 17, 2021 | Vanda's Vice President of Sales and Marketing from May 2012 to January 2016; resigned from the Company January 2016 allegedly due to disagreements over marketing strategy. |
| Novartis Pharmaceuticals Corporation | May 17, 2021 | Pharmaceutical company that arbitrated and settled a dispute against Vanda regarding Fanapt in 2014, which led to Vanda acquiring the rights to market and sell Fanapt in the United States in early 2015. |

- 26 -

4864-2348-1663.v1

| Subpoenaed Person/Entity | Date | Relationship to Action |
|---|---|---|
| Paolo Baroldi | May 17, 2021 | Chief Medical Officer at Vanda during the Class Period until his departure in 2017. |
| Thomas Gibbs | May 17, 2021 | Vanda's Senior Vice President and CCO from April 2015 until December 2015; executive officer at Vanda during tenure as CCO. |
| Titan Pharmaceuticals, Inc. | May 17, 2021 | Pharmaceutical company that licensed the right to develop and commercialize Fanapt to Vanda. |
| Richard Gulino | May 18, 2021 | Senior Vice President and General Counsel at Vanda from September 2015 to May 2018. |
| Andrew Heitman | July 23, 2021 | Former Clinical Project Manager at Vanda who was a signatory of Vanda's proposal to waive the FDA required safety study. |
| Christina Perry | July 23, 2021 | Former senior clinical research assistant at Vanda, author and signatory of Tradipitant clinical study protocols. |
| Sarah Welsh | July 23, 2021 | Former Member of clinical department at Vanda; attended a critical meeting with the FDA regarding the required safety study. |
| Circadian Sleep Disorders Network | October 6, 2021 | Non-profit organization devoted to studying Non-24, the disease for which Hetlioz is approved to treat. |

- 27 -

| Subpoenaed Person/Entity | Date | Relationship to Action |
|---|---|---|
| Envigo RMS Inc. | October 6, 2021 | Contract research organization utilized by Vanda in the clinical development and study of Tradipitant. |
| Merkley + Partners Inc. | October 6, 2021 | Advertising agency utilized by Vanda in the marketing and promotion of Fanapt and Hetlioz. |
| FDA | October 14, 2021 | Vanda's primary regulator; sent warning letters regarding the proper labeling of Fanapt and Hetlioz; placed a clinical hold on Tradipitant which caused Vanda to sue the agency. |
| Laboratory Corporation of American Holdings | November 29, 2021 | A Network of clinical laboratories utilized by Vanda in the clinical development and study of Tradipitant. |
| Amplity, Inc. (f/k/a Publicis Touchpoint Solutions, Inc.) | February 16, 2022 | Life sciences company which provides management consulting services and customized healthcare sales strategies which Vanda utilized in the marketing and promotion of Fanapt and Hetlioz. |
| Jeffrey Bourgeois | March 15, 2022 | Former Regional Business Leader of Vanda who oversaw sales representatives who promoted and sold Fanapt and Hetlioz during the Class Period, and who provided allegations in the Qui Tam Litigation. |
| Richard Gardner | March 15, 2022 | Former Regional Business Leader of Vanda who oversaw sales representatives |

- 28 -

| Subpoenaed Person/Entity | Date | Relationship to Action |
|---|---|---|
| | | who promoted and sold Fanapt and Hetlioz during the Class Period, and who was the relator in the Qui Tam Litigation. |

103.    Counsel for Defendants agreed to accept service of third party subpoenas for most of the former employees of Vanda subpoenaed by Lead Plaintiff, including Paolo Baroldi, Thomas Gibbs, James Kelly, Gian Piero Reverberi, Kate Holland, David James, Christina Perry, Andrew Heitman, and Sarah Welsh.  Defendants' Counsel served the first production in response to third party subpoenas on July 2, 2021, including documents from Paolo Baroldi, Thomas Gibbs, James Kelly, and Gian Piero Reverberi.

104.    On May 20, 2021, counsel for Eli Lilly and Company ("Eli Lilly") responded to Lead Counsel regarding the third-party subpoena served on it.  Eli Lilly represented that, after licensing a pharmaceutical compound to Vanda in 2012, Eli Lilly had no involvement with Vanda's development or promotion of the compound.

105.    On Wednesday, July 7, 2021, following a meet and confer at which Lead Plaintiff agreed to accept Bristol-Myers Squibb Company's ("BMS") response to the third party subpoena on that date, BMS served its responses and objections to the subpoena.  BMS raised numerous objections to the subpoena, including that it was overbroad, unduly burdensome, and unlikely to lead to discovery of relevant documents.  BMS also represented that, for many of the requests, no such documents existed or were in the custody or control of Vanda.

106.    On July 20, 2021, Defendants' Counsel served its second production in response to third party subpoenas sent to former Vanda employees, producing documents from Kate Holland and David James.

4864-2348-1663.v1

107.    On July 30, 2021, counsel for Paul Ramirez served responses and objections and a first production of documents in response to the third party subpoena served on him.

108.    On August 17, 2021, Defendants' Counsel served a third production of responsive documents on behalf of former Vanda employees, including documents from Andrew Heitman, Christina Perry, and Sarah Welsh.  In total, Defendants' Counsel produced 142 documents from former Vanda employees.

109.    On October 18, 2021, a member of the Circadian Sleep Disorders Network ("CSDN") reached out to Lead Plaintiff expressing concern with the costs of complying with the third party subpoena served on CSDN.  Understanding that CSDN is a small non-profit organization, Lead Plaintiff worked in good faith with CSDN to identify the relevant information and documents with as minimal burden to the organization as possible in lieu of full compliance with the demands of the subpoena.

110.    On October 27, 2021, Envigo RMS Inc. ("Envigo") served on Lead Plaintiff a letter responding to the third party subpoena served on it.  The letter represented that Envigo could not identify any documents responsive to Lead Plaintiff's request.

111.    On October 27, 2021, Steven Trave, the Director of the Office of Strategic Planning and Operational Policy at the FDA, sent a letter response to the third party subpoena served on the FDA.  The letter raised numerous objections, principle among them focused on confidentiality concerns for documents relevant to Vanda's trade secrets and confidential commercial information.  Defendants' Counsel also objected to the FDA's production of documents to the extent they contained confidential trade secrets.  Lead Counsel, Defendants' Counsel, and the FDA met and conferred and exchanged numerous emails to reach a satisfactory agreement with regards to documents to be produced in light of the confidentiality order governing discovery in this Action.

Though an agreement was reached with regards to the FDA's obligations to produce, the parties reached a settlement in principle before Lead Plaintiff received any of the FDA's documents.

112.    On November 8, 2021, Merkley + Partners Inc. ("Merkley") served its objections and responses to the subpoena served on it.  Merkley raised numerous objections, including that the request was overly broad and unduly burdensome and sought documents protected as confidential trade secrets or under the work product privilege.

113.    On December 28, 2021, Laboratory Corporation of American Holdings ("LabCorp") served its objections and responses to the subpoena served on it.  LabCorp raised numerous objections, including that the subpoena was overly broad and unduly burdensome, sought documents outside of the possession or control of LabCorp, and sought documents which were protected by attorney-client privilege.

114.    In each instances, Lead Plaintiff worked cooperatively and in good faith with counsel for each of the third parties through email and various meet and confers in order to lessen the burden of compliance with each subpoena for each third party and/or to ascertain whether the subpoena would lead to the production of documents that would support Plaintiff's claims in the Action.

115.    Lead Plaintiff also served document subpoenas on Gardner, the relator in the Qui Tam Litigation; and Bourgeois, a former Vanda employee whose allegations provided a foundation both for the Qui Tam Litigation and the Amended Complaint in this Action, for production of all relevant documents produced or set to be produced in the Qui Tam Litigation.  The parties in this case reached a settlement before the time to respond to those subpoenas came due.  Nonetheless, Bourgeois made a production of documents to Lead Counsel on April 15, 2022.

4864-2348-1663.v1

### 6.    Plaintiff's Review and Analysis of Discovery Materials

116.    As a result of Lead Plaintiff's document requests to Defendants, subpoena requests to third parties, and Lead Counsel's extensive meet and confer discussions with both Defendants and the third parties, Lead Plaintiff obtained over 500,000 pages of documents comprising over 52,000 documents.    These documents required careful examination and analysis.    This required a considerable effort by Lead Counsel and its staff.

117.    First, Lead Counsel uploaded these documents to a database to manage the volume of documents produced.  Lead Counsel established and maintains the database in-house.  Then, Lead Counsel utilized its e-discovery system and staff for, *inter alia*, identifying and tracking documents for use in depositions and further proceedings (by Lead Plaintiff or Defendants), identifying relevant witnesses for deposition or additional discovery requests, and establishing procedures to identify documents and information that had not been produced.

118.    Attorneys and staff reviewed documents by accessing the database and used search terms, date filters, custodian fields, and other metadata to analyze thousands of documents related to key issues in the case, which issues were also included in coding sheets used to identify documents for responsive information.  Throughout the document review process, counsel for Lead Plaintiff analyzed the information contained in the documents, determined the documents' relevance to the allegations, and located the evidence necessary to support certain of the claims and rebut certain of Defendants' defenses.  In connection with this effort, Lead Counsel supervised and actively managed a team of attorneys in their Melville, New York office, and elsewhere.

### 7.    Depositions

119.    Before the Settlement was reached and in connection with class certification, Lead Counsel deposed Defendants' market efficiency expert, Dr. René M. Stulz, and prepared for and

- 32 -

defended depositions of: Lead Plaintiff's market efficiency expert, Mr. Bjorn I. Steinholt; Mr.

Michael Kehoe, a representative of Rothschild & Co. Asset Management ("Rothschild"), Teamsters'

investment advisor; and Mr. Robert Laino, a representative of Teamsters.  These depositions took

place remotely, as follows:

| Deponent | Position | Date |
| --- | --- | --- |
| Dr. René M. Stulz | Defendants' Market Efficiency Expert | October 22, 2021 |
| Bjorn I. Steinholt | Lead Plaintiff's Economics and Market Efficiency Expert | November 5, 2021 |
| Michael Kehoe | Member of small/mid-cap investment management team at Rothschild | November 11, 2021 |
| Robert Laino | Fund manager at Teamsters | November 17, 2021 |

120.    At the time the Settlement was reached, Lead Counsel had also spent significant time

determining key witnesses to be deposed, and was in the process of negotiating with Defendants

regarding the proper number of depositions given the scope of the case.  Lead Plaintiff and

Defendants had exchanged numerous emails and met and conferred numerous times regarding the

proper number of depositions.  After the Court ruled on March 15, 2022 that Lead Counsel would

not be entitled to take forty-four depositions, Plaintiff worked diligently to ascertain a revised

number of depositions that would be appropriate to effectively prosecute Plaintiff's claims.

121.    Additionally, Lead Counsel and its team engaged in regular communications with

Gardner's counsel before they withdrew as his counsel in January 2022, and planned to depose

Gardner and Bourgeois as key witnesses to Vanda's alleged off-label promotion activities.

Arrangements for these depositions were not yet finalized at the time the Settlement was reached.

4864-2348-1663.v1

### 8.    Plaintiff's Response to Defendants' Discovery

122.    On June 14, 2021, Lead Plaintiff served written responses and objections to discovery requests directed to Teamsters by Defendants on May 14, 2021.  Thereafter, the parties met and conferred regarding the scope of production and the objections asserted by Teamsters, resolving all potential disputes by October 2021.

123.    Lead Counsel worked with Teamsters, as well as their financial and other advisors, to identify, review and produce responsive, non-privileged documents.  Lead Plaintiff made its first production to Defendants on October 4, 2021, substantially completing the production on behalf of Teamsters, which consisted of over 300 documents comprising over 7,500 pages.  On October 25, 2021, Lead Counsel furnished to Defendants a privilege log and a redaction log associated with this production.  On November 16, 2021, recognizing that a document regarding Teamsters' financial advisor had been inadvertently omitted from the initial production, Lead Plaintiff promptly furnished an additional document to Defendants, completing Lead Plaintiff's production in this Action.

### F.    Class Certification Proceedings and Motion to Exclude Expert Evidence

124.    As outlined above, Lead Counsel spent substantial time and effort collecting and producing documents on behalf of Teamsters in connection with class certification proceedings. This process entailed regular meetings by telephone with Teamsters' representatives concerning the nature, substance, and scope of documents responsive to Defendants' document requests.

125.    Moreover, as noted above, a representative from Teamsters was deposed on behalf of Plaintiff: Robert Laino, fund manager at Teamsters.  Mr. Laino spent a day and a half with Lead Counsel in person in Chicago, Illinois, in November 2021 reviewing documents from the Action and preparing for the deposition.  Mr. Laino sat for a deposition on November 17, 2021 and testified generally on, *inter alia*: Teamsters' involvement in and supervision of the Action; preparation for the

- 34 -

deposition; the allegations in the Amended Complaint, including the bases of the claims alleged; the risks of investing and the financial and other effects of the alleged fraud and its implications for members of Teamsters; Teamsters' responsibility as Lead Plaintiff; and Teamsters' suitability as the Class Representative.

126. Shortly before Mr. Laino was deposed, on October 29, 2021, Lead Plaintiff served its motion for class certification and supporting memorandum of law, a supporting declaration, and exhibits via electronic mail on Defendants, seeking to certify the Class, appoint itself as Class Representative, and appoint Robbins Geller as Class Counsel. ECF 82-1 to 82-7. The memorandum of law addressed all of the requirements of Fed. R. Civ. P. 23, as well as the factors necessary to qualify as an efficient market for the purposes of the presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and upheld in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014).

127. In support of its motion, Lead Plaintiff retained Bjorn I. Steinholt to conduct an event study of publicly available information on Vanda and to opine on the efficiency of the trading market for Vanda's common stock during the Class Period. Based on his findings, Mr. Steinholt concluded, in his professional opinion, that Vanda's stock traded in an efficient market during the Class Period. Lead Counsel spent a substantial amount of time preparing Mr. Steinholt for his deposition, which, as mentioned above, occurred on November 5, 2021.

128. Lead Counsel received Dr. Stulz's report on September 17, 2021, and deposed Dr. Stulz on October 22, 2021. Thereafter, in accordance with the Court's pre-motion requirements, Lead Plaintiff filed a letter motion on October 29, 2021 for a pre-motion conference outlining Lead Plaintiff's position with regards to the reasons why Plaintiff believed it should be permitted to move to exclude the report and opinions of Dr. Stulz under the *Daubert* standard. *See* ECF 73. Though

- 35 -

Defendants opposed the letter motion (ECF 74), the Court ordered an in-person pre-motion conference to discuss the *Daubert* motion, which took place on November 22, 2021.

129.    At the November 22, 2021 conference, Lead Plaintiff defended the merits of its motion and convinced Judge Block of the propriety of evaluating the *Daubert* motion concurrently with the motion for class certification.  At the conclusion of the conference, Judge Block granted Plaintiff's application and, following the submission by the parties of a briefing schedule on the *Daubert* motion (ECF 77), ordered on November 29, 2021 that Plaintiff's motion for class certification and the *Daubert* motion would be filed concurrently on January 28, 2022.

130.    Defendants served their opposition to Lead Plaintiff's motion for class certification on December 1, 2021, which relied upon the findings of Defendants' market efficiency expert, Dr. Stulz.  Defendants raised numerous arguments in opposition to class certification, including, *inter alia*: (1) that the class period for the Tradipitant Claim should be shortened; (2) that *Basic*'s presumption of reliance had been rebutted for the Off-Label Claim; and (3) that Lead Plaintiff had failed to propose an adequate model for calculating class-wide damages for both claims.  As a testament to Teamsters' and Mr. Laino's preparation and involvement in the Action, Defendants did not contest the adequacy of Teamsters as Lead Plaintiff under Fed. R. Civ. P. 23 in their opposition to class certification.

131.    That same day, Lead Plaintiff served on Defendants the motion to exclude the report and opinions of Dr. Stulz under Federal Rule of Evidence 702 and *Daubert*.

132.    In its opening memorandum of law in support of the *Daubert* motion, Lead Plaintiff challenged Dr. Stulz's expert opinions on numerous grounds, including that: (i) Dr. Stulz's opinions with regard to the price impact of the alleged Off-Label Claim were unreliable, unsupported and inadmissible speculation; (ii) Dr. Stulz offered inadmissible legal opinions by opining on the

- 36 -

necessity of individual inquiries and the predominance requirement of Fed. R. Civ. P. 23(b)(3); and (iii) Dr. Stulz offered an inadmissible legal opinion by opining on the supposed absence of a class-wide damages methodology.

133.   On January 7, 2022, Lead Plaintiff served its reply in further support of the motion for class certification and Defendants served their opposition to the *Daubert* motion.  Lead Plaintiff then served its reply in further support of its *Daubert* motion on Defendants on January 28, 2022.

134.   In both the reply in support of the motion for class certification and the reply in support of the *Daubert* motion, Lead Counsel spent a substantial amount of time conducting research and refining its position to prosecute both motions and refute Defendants' oppositions.

135.   In accordance with Judge Block's Rules and November 29, 2021 Order, Lead Plaintiff filed the fully briefed motion for class certification (ECF 82) and the fully briefed *Daubert* motion (ECF 83) on January 28, 2022.

136.   Before the motions were resolved, the parties agreed in principle to settle the Action and later entered into the Stipulation, which was signed on May 5, 2022, and filed with the Court on May 19, 2022.  ECF 96.  On September 15, 2022, as part of its preliminary approval of the Settlement, the Court certified, for settlement purposes only, the following Class pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure:

> [A]ll persons and entities who purchased or otherwise acquired Vanda common stock between November 4, 2015 and February 11, 2019, inclusive, and who were allegedly damaged thereby.  Excluded from the Class are: Defendants, the officers and directors of Vanda at all relevant times, members of their immediate families, any entity in which any Defendant has or had a controlling interest, and the legal representatives, heirs, successors-in-interest or assigns of any such excluded party. Also excluded from the Class are those Persons who timely and validly request exclusion from the Class pursuant to the requirements described below and in the Notice of Pendency and Proposed Settlement of Class Action ("Notice") to be sent to Class Members pursuant to this Order.

ECF 100-1.

### G.    Expert Witnesses and Consultants

137.    To assist in investigating and proving Plaintiff's claims and navigating the multitude of issues in this Action – including substantive issues, such as those relating to FDA regulations and improper pharmaceutical marketing tactics – the services of several experts and consultants were required.  The work performed by these experts and consultants provided valuable insights to Lead Counsel in evaluating the merits of the claims and defenses and the prospects for settlement during the course of the Action.

### 1.    Mr. Bjorn I. Steinholt, CFA

138.    Mr. Steinholt, managing director at Caliber Advisors, Inc., a full-service financial valuation and economic consulting firm, has over 30 years of experience being a consultant analyzing capital markets and valuing investments.  Mr. Steinholt provides a broad range of consulting services on financial and economic topics, including mergers and acquisitions, initial public offerings, fairness opinions, structured finance, portfolio risk management, market structure, and securities analysis and financial valuations.  Mr. Steinholt has provided expert analysis and testimony in numerous complex securities class-action lawsuits.  Lead Plaintiff utilized the services of Mr. Steinholt to examine and explain how Vanda's stock traded in an efficient market during the Class Period; to conduct a thorough event study examining all industry, market, and company specific news during the Class Period; and to review and analyze documents related to events surrounding the declines in Vanda's stock on February 6 and 11, 2019.  Mr. Steinholt prepared two expert reports on behalf of Lead Plaintiff at class certification and assisted Lead Counsel in preparing for Dr. Stulz's deposition and addressing his market efficiency arguments.  Mr. Steinholt also prepared and analyzed damages models used in preparing for the mediation and the proposed Plan of Allocation.

4864-2348-1663.v1

### 2.    Dr. Philip Lavin, Ph.D.

139.    Dr. Philip Lavin ("Lavin") holds a Ph.D. in applied mathematics from Brown University.  He has spent over 40 years serving as an expert consultant with expertise in biostatistics and clinical study design.  Lead Plaintiff consulted Dr. Lavin on the clinical study of Tradipitant; the FDA's required safety study for Tradipitant; and potential reasons a pharmaceutical company might resist performing a routine toxicology study.  At the time of the Settlement, Lead Counsel intended to utilize Lavin to assist with fact discovery and, if serving as a testifying expert, to prepare reports on required safety studies and the clinical trial process for use in the Action.

### 3.    Mr. John S. Russell

140.    Mr. John S. Russell ("Russell") is a managing partner at the ASDO Consulting Group, a life sciences consulting firm that specializes in commercialization strategy and planning, market assessment, and risk analysis.  Mr. Russell also has extensive experience as a consulting and testifying expert regarding patent infringement, false advertising, and antitrust issues.  Lead Plaintiff consulted with Mr. Russell regarding off-label marketing, and utilized his services to help formulate a strategy for fact discovery pertaining to the Off-Label Claim.  At the time of the Settlement, Lead Counsel intended to utilize Russell to assist with fact discovery and, if serving as a testifying expert, to prepare reports on off-label marketing for use in the Action.

## III.    THE RISKS OF LITIGATION

141.    The Settlement was reached only after Lead Counsel had a thorough understanding of the strengths and potential weaknesses of the surviving claims in the Action.  Indeed, at the time of the Settlement, Lead Plaintiff had completed class certification discovery, and also substantial document discovery.  Accordingly, Teamsters and Lead Counsel fully understood the strengths of their claims and Defendants' defenses, and the potential damages suffered by the Class.

4864-2348-1663.v1

142.   Numerous hurdles remained before trial.  For example, certain key individuals employed at Vanda during the Class Period were no longer employed by Vanda when fact discovery commenced.  By the time of the Settlement, these individuals had not agreed to cooperate with Lead Counsel and there was no guarantee they would or that Lead Plaintiff could otherwise compel them to do so, by resort to legal process or otherwise.

143.   In addition, at the time of the Settlement, Lead Plaintiff's motion for class certification was pending.  While Lead Plaintiff strongly believed that the proposed Class was appropriate for class certification, there was no guarantee that the Court would certify it.  If Lead Plaintiff was unable to obtain class certification, the Action could not be sustained on a class-wide basis and members of the putative Class would have been forced to commence individual actions (if timely).  There was also the risk that if a Class was certified, the Court might not maintain the Action, or particular claims, on a class-wide basis through trial.

144.   Likewise, motions important to Lead Plaintiff's ability to obtain a verdict in the Class' favor at trial likely would have been filed, including summary judgment and other motions that would have determined the extent of the evidence (if any) that could be presented at trial and the issues (if any) upon which liability could be premised.  Depending on their outcome, such motions could seriously undermine or altogether preclude Lead Plaintiff from proving its case.

145.   Moreover, in January 2022, Gardner's counsel withdrew from representing him in the Qui Tam Litigation and there was uncertainty surrounding whether Gardner could obtain new counsel to continue the Qui Tam Litigation.  Ultimately, Gardner was unable to secure new counsel and the Qui Tam Litigation was dismissed without prejudice on March 29, 2022 because qui tam actions cannot be maintained *pro se*.  The dismissal of the Qui Tam Litigation posed a significant risk to Lead Plaintiff's ability to prove the Off-Label Claim at summary judgment and trial because

- 40 -

the allegations made by Gardner and Bourgeois in the Qui Tam Litigation formed the primary basis of both Plaintiff's alleged Off-Label Claim and the information contained in the Aurelius Report.

146.    While Plaintiff firmly believed that the documentary and other evidence it had compiled and intended to develop would support its claims, Teamsters also understood that there is no way of predicting which interpretations, inferences, or testimony the Court and/or jury would have accepted.  Defendants have adamantly denied any culpability throughout this Action and were prepared to mount defenses that could have barred a class-wide recovery.  If the Court or jury sided with Defendants on even one of these defenses, the Class could have recovered nothing.

A.    **Falsity and Materiality for the Off-Label Claim**

147.    With regard to the Off-Label Claim, Lead Plaintiff alleged that certain statements by Defendants regarding the marketing and promotion of Fanapt and Hetlioz were materially false and misleading when made for failing to disclose that Vanda had employed a company-wide off-label marketing scheme that used incentive compensation to encourage sales reps to improperly market Fanapt and Hetlioz for uses other than those approved by the FDA.  Defendants, on the other hand, maintained that all of the marketing at Vanda was properly on-label and that they accurately disclosed the risk of non-compliance by certain Vanda employees, and therefore that their statements were neither false nor misleading.

148.    Additionally, Defendants argued that any off-label marketing that may have occurred would have been marginal to Vanda's operations and therefore immaterial to investors.  Likewise, Defendants argued that Gardner and Bourgeois were disgruntled former employees who were not being truthful in recounting the alleged off-label marketing of Fanapt and Hetlioz by Vanda during the Class Period.

- 41 -

4864-2348-1663.v1

149.    Defendants also asserted a "truth-on-the-market" defense, arguing that the allegations concerning off-label marketing were already publicly available through posts on internet forums Cafepharma and Glassdoor, in which anonymous posters described unlawful marketing practices.  In addition, Defendants argued that because the initial complaint filed in the Qui Tam Litigation was unsealed on the docket a few days before its contents were publicly reported in the Aurelius Report, this meant that investors and the market were apprised of the fraud.

150.    While the parties disagreed about the merits of these arguments, Lead Plaintiff recognized that if the Court or a jury found any of Defendants' arguments compelling, Lead Plaintiff would have difficulty demonstrating that Vanda's statements pertaining to the Off-Label Claim were materially false or misleading or otherwise actionable.

**B.    Falsity and Materiality for the Tradipitant Claim**

151.    With regard to the Tradipitant Claim, Lead Plaintiff alleged that certain statements by Defendants regarding the progress of Tradipitant's clinical trials were materially false and misleading when made for failing to disclose that Vanda's refusal to conduct the required safety study meant that Tradipitant's clinical trial progress would be halted.  Defendants, on the other hand, maintained that the challenged statements referenced only short-term clinical trials, which were completed in December 2018, and not any later clinical trials for Tradipitant.

152.    In addition, Defendants argued that they had no duty to disclose the FDA's statements to Vanda in May 2018 that Tradipitant would receive a clinical trial hold if the required safety study was not performed, and that even if Vanda had such a duty, this information would not be material to investors.  Likewise, Defendants argued that Vanda disclosed to investors the risk that Tradipitant's clinical trial progress may be halted by the FDA.  Accordingly, Defendants argued that the statements pertaining to the Tradipitant Claim were not false and misleading.

4864-2348-1663.v1

153.    While the parties disagreed about the merits of these arguments, Lead Plaintiff recognized that if a Court or a jury found any of Defendants' arguments compelling, Lead Plaintiff would have difficulty demonstrating that Vanda's statements pertaining to the Tradipitant Claim were materially false or misleading or otherwise actionable.

### C.    Scienter for the Off-Label Claim

154.    In addition to the risks Lead Plaintiff faced in establishing falsity and materiality, Defendants were also prepared to argue that Lead Plaintiff could not establish that Defendants made any false or misleading statements on the Off-Label Marketing Claim with the requisite fraudulent intent.  Specifically, Defendants would argue that any off-label marketing that did occur was the work of low-level employees departing from Vanda's compliance policies and procedures, and that Lead Plaintiff would not be able to prove at trial that the individuals making the challenged statements on Vanda's behalf, including defendant Polymeropoulos, had any knowledge of, or reckless disregard for, the incidents off-label marketing.

155.    Defendants were also prepared to argue at trial that Lead Plaintiff could not demonstrate scienter because there was insufficient evidence of fraudulent motive, given the lack of insider-trading allegations or the articulation of some other reason for Vanda's executives to conceal adverse information about off-label promotion activities at Vanda from the investing public.  While these arguments were not dispositive on the issue of motive and Lead Plaintiff had responses to them, it was plausible that the Court or a jury would find motive lacking and/or that the absence of motive undermined fraudulent intent generally.

### D.    Scienter for the Tradipitant Claim

156.    Defendants were also prepared to challenge the requisite intent to defraud with regards to the Tradipitant Claim.  Specifically, Defendants would argue that the FDA never made its

- 43 -

position on the clinical hold clear until after the challenged statements were made, and that constant communication between Vanda and the FDA meant that the executives at Vanda responsible for issuing the challenged statements – including defendant Polymeropoulos – were neither aware nor in reckless disregard that their statements were materially false or misleading.  Likewise, Defendants would argue that Vanda had a vested interest in the clinical trial success of Tradipitant, and would not have intentionally jeopardized Tradipitant's progress.

157.    Additionally, Defendants were prepared to argue at trial that Lead Plaintiff could not demonstrate scienter because there was insufficient evidence of fraudulent motive, given the lack of insider-trading allegations or the articulation of some other reason for Vanda's executives to conceal adverse information about Vanda's refusal to conduct the required safety study.  While these arguments were not dispositive on the issue of motive and Lead Plaintiff had responses to them, it was plausible that the Court or a jury would find motive lacking and/or that the absence of motive undermined fraudulent intent generally.

E.    **Loss Causation and Damages for the Off-Label Claim**

158.    Even if Lead Plaintiff succeeded in proving falsity, materiality, and scienter, there was a risk it would be unable to prove loss causation or damages for the Off-Label Claim. Defendants argued that loss causation could not be established for the Off-Label Claim because: information about Vanda's alleged off-label promotion scheme was already known to the market; Vanda's common stock declined on February 11, 2019 due to other information in the Aurelius Report unrelated to alleged off-label marketing; and Lead Plaintiff could not disaggregate the non-fraud related factors from the fraudulent conduct that allegedly caused Vanda's price decline.

159.    Defendants would have also argued that the damages methodology developed by Lead Plaintiff's expert – the same methodology used at class certification – was unreliable and

- 44 -

otherwise unable to calculate damages on a class-wide basis. This was a hotly contested issue at the class certification stage, and likely would continue to be throughout the duration of the Action.

**F.    Loss Causation and Damages for the Tradipitant Claim**

160.    Even if Lead Plaintiff succeeded in proving falsity, materiality, and scienter, there was a risk it would be unable to prove loss causation or damages for the Tradipitant Claim. Defendants argued that loss causation could not be established because Vanda's common stock declined on February 11, 2019 due to Vanda suing the FDA, Vanda's primary regulator, not because of the clinical hold placed on Tradipitant. Thus, Defendants would argue that Vanda's common stock declined because of the lawsuit, rather than undisclosed information regarding Vanda's refusal to conduct the required safety study, and that Lead Plaintiff could not disaggregate the non-fraud related factors from the fraudulent conduct that allegedly caused Vanda's price declines.

161.    Just as with the Off-Label Marketing Claim, Defendants would have also argued that the damages methodology Lead Plaintiff proposed was unreliable and that Lead Plaintiff would be unable to calculate damages on a class-wide basis. Though Lead Plaintiff was prepared to refute these arguments, it was plausible that the Court or a jury could find in favor of Defendants on these issues, minimizing or potentially even barring recovery for the Class.

162.    Defendants' arguments, like Plaintiff's, would be buttressed by expert witnesses, and issues relating to loss causation and damages would have likely come down to an inherently unpredictable "battle of the experts."

163.    While Plaintiff would have had the burden of identifying and isolating the fraud-related damages suffered by Class Members pertaining to the Off-Label Claim, Defendants only had to identify a flaw with the methodology utilized by Plaintiff's experts and prevail on a *Daubert* motion or win the inevitable battle of the experts before the jury. Defendants would have argued

- 45 -

that the case either should not reach a jury or that the jury had no choice but to determine that there were little or no cognizable damages.

164.    Although Plaintiff was confident that it could support its claims with qualified and persuasive expert testimony, jury reactions to competing experts are difficult to predict, and Defendants would have presented highly experienced experts to support their various defenses to liability.  Accordingly, in the absence of the Settlement, there was a very real risk that the Class would have recovered an amount significantly less than the total Settlement Amount – or even nothing at all.

165.    In short, the parties disagreed about the merits of this case, including whether or not damages were suffered and recoverable.  Defendants strongly defended this lawsuit with experienced attorneys from Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") and consistently denied that they were liable in any respect.  Recovery of any amount at trial was far from certain, as was, perhaps, the prospect of even reaching trial.

166.    Assuming Plaintiff reached and prevailed at trial, it is likely that Defendants would file post-trial motions and appeals to limit or overturn any verdict in Plaintiff's favor.  The post-trial motion and appeals process would likely span several years, during which time the Class would receive no payment.  In addition, an appeal of any verdict would carry with it the risk of reversal, in which case the Class would receive no payment despite having prevailed on the claims at trial.

167.    While Lead Counsel had developed strong evidence before achieving the Settlement, Plaintiff faced both factual and legal challenges in proceeding to trial and presenting this matter to a jury and potentially on appeal.  Based on these factors, as well as Lead Counsel's extensive securities class action experience, Lead Counsel submits that the Settlement, which provides a

4864-2348-1663.v1

substantial recovery to Class Members, is far more beneficial than any realistic alternative offered by continued litigation.

## IV.    SETTLEMENT NEGOTIATIONS AND TERMS

168.    While Plaintiff's class certification motion was pending, and as fact discovery continued to progress, the parties began settlement discussions with Jed D. Melnick, Esq., a nationally-recognized mediator with experience resolving complex litigation and class actions. Before the mediation, the parties submitted detailed mediation statements that outlined their respective critical facts and legal principles, as well as select pieces of evidence.

169.    On March 14, 2022, the parties participated in a mediation session in New York City with Mr. Melnick.  In connection with the mediation process, Plaintiff conducted arm's-length negotiations with respect to a potential compromise and settlement of the Action with a view to achieving the best relief possible consistent with the interests of the Class.  No agreement could be reached at the mediation.

170.    Following the mediation, the parties continued to negotiate with the assistance of Mr. Melnick.  On March 16, 2022, Mr. Melnick issued a mediator's proposal for $11.5 million, which the parties accepted.

171.    The parties then negotiated, drafted, finalized, and signed the formal settlement agreement detailing the terms of the proposed Settlement, which was submitted to the Court with the Motion for Preliminary Approval of Settlement filed on May 19, 2022.  *See* ECF 96.  On September 15, 2022, the Court granted preliminary approval, as well as the form and manner of notice of the Settlement to the Class.  ECF 100.

172.    The Settlement set forth in the Stipulation resolves the claims of the Class against all Defendants.  The Stipulation provides that Defendants will pay or cause to be paid $11,500,000 in

4864-2348-1663.v1

cash, inclusive of attorneys' fees and expenses and any award to Lead Plaintiff.  The recovery to individual Class Members will depend on variables, including the amount of Vanda common stock the Class Member purchased or acquired, and when and at what price such purchases or acquisitions were made.  If 100% of the eligible Vanda common stock purchased or acquired by Class Members participate in the Settlement, the estimated average distribution per share of Vanda common stock is $0.39, before deduction of any Court-approved fees and expenses.  Historically, actual claim rates are lower than 100%, resulting in higher distributions per share of common stock.

### A.    The Settlement Is in the Best Interest of the Class and Warrants Approval

173.    Plaintiff believes it would have prevailed on the merits at trial.  Defendants were just as adamant that Plaintiff would not have.  There was a very real risk that Plaintiff would not have convinced a jury that Defendants acted with scienter, or that the alleged misrepresentations and omissions were materially false and misleading when made, or had any impact on the price of Vanda's common stock.

174.    Having considered the foregoing, and evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and its extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement of this matter before the Court is fair, reasonable, and adequate, and in the best interest of the Class.

175.    The Settlement represents an extremely favorable result.  The Settlement Amount reflects a recovery of approximately 10.2% of estimated recoverable damages of $112.3 million.  Given both the risks at trial and the recognition that not all damaged Class Members will seek recovery, the size of the recovery strongly supports approval.

**B.      The Plan of Allocation**

176.    The Net Settlement Fund will be distributed to Class Members who, in accordance with the terms of the Stipulation, are entitled to a distribution and who submit a valid and timely Proof of Claim and Release form.  The Plan of Allocation provides that a Class Member will be eligible to participate in the distribution of the Net Settlement Fund only if the Class Member has an overall net loss on all of his, her, or its transactions in Vanda's common stock during the Class Period.

177.    For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Counsel conferred with its damages expert, Mr. Steinholt, and the proposed Plan of Allocation reflects an assessment of the damages that could have been recovered by Class Members had Plaintiff prevailed at trial.  The plan is premised on the out-of-pocket measure of damages and is designed to measure the difference between what Class Members paid for Vanda's common stock during the November 4, 2015 to February 11, 2019 Class Period, and what they would have paid had the allegedly omitted information been disclosed and/or the allegedly false and misleading statements and omissions had not been made.

178.    To date, there have been no objections to the Plan of Allocation and Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable, and should be approved.

**V.      LEAD COUNSEL'S ATTORNEYS' FEES AND EXPENSES**

179.    Lead Counsel respectfully requests that the Court award attorneys' fees of one-third of the Settlement Amount.  Lead Counsel believes such a fee is reasonable and appropriate in light of the efficiency with which Robbins Geller litigated this matter, the resources Robbins Geller expended in prosecuting the case, the inherent risk of nonpayment from representing the Class on a contingent basis, and the aggregate monetary benefit conferred on the Class in a challenging case.

- 49 -

Lead Counsel further requests an award of $179,885.92 in litigation expenses.  The legal authorities supporting the requested fees and expenses are set forth in the accompanying memorandum of law.

### A.    Time, Labor, and Fee Percentage Requested

180.    Lead Counsel has devoted a significant amount of time and resources in the research, investigation, and prosecution of this Action.

181.    Robbins Geller has substantial experience representing investors in securities fraud cases, including in this District.  The identification and background of Robbins Geller and its partners is attached as Exhibit F to the Declaration of Michael G. Capeci Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award for Attorneys' Fees and Expenses ("Robbins Geller Declaration"), submitted herewith.

182.    Robbins Geller's representation of the Class in this Action required considerable pre-filing investigation, as well as substantial work during the Action, including: analyzing a massive amount of information, including Vanda SEC filings, conference calls, and the administrative record from the FDA Litigation; securing the cooperation of Gardner and Bourgeois in preparing the Amended Complaint; thoroughly researching the law pertinent to the claims and defenses asserted; drafting the Amended Complaint; opposing the motion to dismiss; moving for class certification and to exclude the expert testimony of Dr. Stulz; completing substantial document discovery that involved the production of over 52,000 documents (comprising approximately 500,000 pages) from Defendants and third parties; consulting with internal and external experts; drafting a mediation statement and amassing significant evidentiary support for use at the mediation; and preparing for and participating in a full-day mediation session, as well as subsequent negotiations.

183.    Indeed, given that there are two distinct fraudulent schemes outlined in the Amended Complaint in the form of the Off-Label Claim and the Tradipitant Claim, Lead Counsel diligently, efficiently, and effectively marshalled both theories to a settlement.

184.    Robbins Geller's experience and advocacy were required in presenting the strengths of the case from its inception to the mediation and thereafter, in an effort to achieve the best possible settlement and convince Defendants, their insurers, defense counsel, and the mediator of the risks Defendants faced from not settling.

185.    The fee requested is based upon a percentage of the recovery after discussion with and approval by Teamsters. *See* Declaration of Robert J. Laino on behalf of Teamsters Local Union No. 727 Pension Fund ("Laino Declaration"), ¶9, submitted herewith.  The fee request is similar to other requests approved by judges in this District, as set forth in the accompanying memorandum.

186.    The fee request is also reasonable when cross-checked against the lodestar Robbins Geller incurred in prosecuting the Action.

187.    The number of hours spent on the Action by Robbins Geller is 4,844.  A breakdown of the lodestar from Robbins Geller is provided in Exhibit A to the Robbins Geller Declaration.  The lodestar amount for attorney/paraprofessional time based on Robbins Geller's current rates is $3,023,451.00.

**B.    Risk, Magnitude, and Complexity of the Litigation**

188.    As detailed above, the Action involved challenging issues of law and fact that presented considerable risk to Lead Plaintiff's case.  This case involved litigating violations of §§10(b) and 20(a) of the Exchange Act.  Thus, when Lead Counsel undertook this representation, there was no assurance that the Action would survive a motion to dismiss or other proceedings, and therefore no assurance Lead Counsel would recover any payment for its services.

- 51 -

189.    Lead Counsel accepted the representation of the Class on a contingent fee basis in this securities class action wherein, even if a recovery was obtained, any payment for Lead Counsel's services was likely to be delayed for several years.  These cases present formidable challenges as there are numerous decisions ruling in favor of defendants at each stage of the litigation.  The motion to dismiss raised complex and challenging arguments, requiring experience and considerable effort to prepare a thorough and persuasive opposition.  And although a recovery is never guaranteed, Lead Counsel in this case had developed sufficient evidence before Settlement to convince Defendants and their insurers to pay $11,500,000 to settle these claims.  Had this case not settled, Lead Counsel was prepared to litigate this case through the remaining stages of fact discovery, expert discovery, class certification, summary judgment, trial, and appeal.  Each of those litigation stages would have posed considerable challenges and expenses.

## C.    Quality of Representation

190.    Lead Counsel worked efficiently and diligently to obtain an exceptional result for the Class.  From the outset, Lead Counsel employed considerable resources and spent considerable time researching and investigating facts to support a pleading that could survive a motion to dismiss and position the Action for class certification.  Theories of damages were complex and Lead Counsel devoted much time analyzing potential defenses to liability and damages.

191.    The recovery obtained for the Class is the direct result of the significant efforts of highly-skilled attorneys who possess substantial experience in prosecuting complex securities class actions.  Lead Counsel is among the most experienced securities practitioners in the country.  The Settlement represents a substantial recovery for the Class – one that is attributable to the diligence, determination, hard work, and reputation of Lead Counsel.

- 52 -

192.    The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work.  Defendants were represented by experienced lawyers from Paul Weiss, which is among the largest and most well-respected defense firms.  Defense counsel has a reputation for vigorous advocacy in defending complex securities cases such as this.  The ability of Lead Counsel to obtain a favorable settlement for the Class in the face of such opposition confirms the excellence of Lead Counsel's representation.

193.    When Lead Counsel undertook to represent Lead Plaintiff and the Class, it was with the expectation that it would have to devote a significant amount of time and effort in its prosecution and advance large sums of expenses on experts, mediation, and discovery.  The time spent by Lead Counsel on this case was at the expense of time that it could have devoted to other matters.  Lead Counsel undertook this case solely on a contingent fee basis, assuming a substantial risk that the case would yield no recovery and leave Lead Counsel uncompensated.  Unlike counsel for Defendants, who are paid an hourly rate and paid for their expenses on a regular basis, Lead Counsel has not been compensated for any time or expenses since this case began in 2019.  When Lead Counsel undertook to represent Lead Plaintiff and the Class in this matter, it was with the knowledge that Lead Counsel would spend many hours of hard work against capable defense lawyers with no assurance of ever obtaining any compensation for its efforts.  The only way Lead Counsel would be compensated was to achieve a successful result.

194.    As discussed above, the Settlement is a very good result for the Class in light of the risks and obstacles to recovery presented in this Action, including the difficulty in establishing liability and damages at trial, if Lead Plaintiff would have ultimately been successful in certifying a class and had prevailed at the summary judgment stage.  Instead of facing additional years of

- 53 -

4864-2348-1663.v1

uncertain, costly and time-consuming litigation, the Settlement will provide Class Members a benefit now without the risk of no recovery if the Action were to continue.

## VI. THE REQUESTED EXPENSES ARE FAIR AND REASONABLE

195.    Robbins Geller seeks an award of $179,885.92 in expenses in connection with the prosecution of the Action. Those expenses and charges are summarized by category in Exhibit B to the Robbins Geller Declaration. These expenses are: (i) reflected in the books and records maintained by Robbins Geller; and (ii) accurately recorded in the Robbins Geller Declaration.

196.    Robbins Geller submits that the expenses are reasonable and were necessary for the successful prosecution of this Action. Lead Counsel was aware that it may not recover any of these expenses unless and until this Action was successfully resolved. Accordingly, Robbins Geller took steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of Lead Plaintiff's claims.

197.    Robbins Geller's expenses reflect routine and typical expenditures incurred in the course of litigation, such as the costs of travel, investigation, document duplication, transcript fees, expert and consultant fees, mediation fees, and expedited mail delivery. Lead Counsel believes these expenses are reasonable and were necessary for the successful prosecution of the Action.

## VII. THE REQUESTED LEAD PLAINTIFF AWARD IS FAIR AND REASONABLE

198.    Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), Teamsters seeks an award of $10,000 in connection with its representation of the Class. The amount of time and effort devoted to the Action by Teamsters is detailed in the accompanying Laino Declaration, ¶¶4-7, submitted herewith.

199.    As discussed above, and in the Laino Declaration, Teamsters has been fully committed to pursuing the Class's claims since it became involved in the Action. Specifically,

- 54 -

4864-2348-1663.v1

Teamsters engaged in time-consuming discovery efforts and searches to obtain and produce documents responsive to discovery requests, including information concerning their proprietary investment strategies and investments.  Teamsters also expended substantial time and effort preparing for, and testifying during, a deposition conducted by Defendants' Counsel, Paul Weiss. Teamsters also spent time and effort participating in the mediation, where Mr. Laino participated remotely for the substantial majority of the full day of mediation.  These efforts required members of Teamsters to dedicate considerable time and resources to this Action that would have been otherwise devoted to their regular employment duties.

200.    As more fully set forth in the accompanying memorandum, the efforts expended by Teamsters during the course of this Action are precisely the types of activities courts have found adequate to support an award, and fully support the instant request by Teamsters.

## VIII.  CONCLUSION

201.    In light of the significant recovery to the Class and the substantial risks presented by this Action, as described above and in the accompanying memorandum, Lead Counsel respectfully submits that the Settlement and Plan of Allocation should be approved as fair and reasonable.  In addition, as a result of the recovery obtained in the face of substantial risks, including the contingent nature of the fees and the complexity of the case, Lead Counsel respectfully submits that the Court should award attorneys' fees in the amount of one-third of the Settlement Amount, plus $179,885.92 in expenses, plus the interest earned thereon at the same rate and for the same period as that earned on the Settlement Fund until paid, plus an award to Teamsters of $10,000.

4864-2348-1663.v1

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of December, 2022, at Melville, New York.

_s/ Michael G. Capeci_
MICHAEL G. CAPECI

4864-2348-1663.v1

CERTIFICATE OF SERVICE

I, Michael G. Capeci, hereby certify that on December 1, 2022, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

_s/ Michael G. Capeci_
MICHAEL G. CAPECI